1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA :
                         :
                         :
                         :
     vs                  :    3:12-CR-224
                         :
                         :
                         :
RICHARD J. HARLEY        :
                         :
                         :


     BEFORE:      THE HONORABLE A. RICHARD CAPUTO

     PLACE:       COURTROOM NO. 1
                  WILKES-BARRE, PENNSYLVANIA

     PROCEEDINGS: JURY TRIAL

     DATE:        FRIDAY, DECEMBER 5, 2014


APPEARANCES:

For the United States:

BRUCE D. BRANDLER, ESQ.
U.S. ATTORNEY'S OFFICE
ROOM 217, FEDERAL BUILDING
228 WALNUT STREET
HARRISBURG, PA 17108


For the Defendant:

JOSEPH A. O'BRIEN, ESQ.
OLIVER PRICE & RHODES
1212 SOUTH ABINGTON ROAD
CLARKS SUMMIT, PA 18411

INDEX TO WITNESSES

FOR GOVERNMENT:    DIRECT   CROSS  REDIRECT  RECROSS

EDWARD SIEGEL          3      37

MARY ANN ALEXANDER   42      64

PETER BLAU            67      94

KATHLEEN KELLY       99     121

KEVIN FOGERTY       121

MARSHALL SILVERSTEIN  143

3

1        THE COURT:  Good morning.  Good morning, everyone.

2        MR. BRANDLER:  Ned Sigel.

3        EDWARD SIEGEL, called as a witness, being duly sworn,

4    testified as follows:

5    DIRECT EXAMINATION

6    BY MR. BRANDLER:

7    Q.    Mr. Siegel, are you currently employed?

8    A.    Yes.

9    Q.    And where are you employed?

10   A.    State Street Corporation.

11   Q.    And where is that located?

12   A.    Global headquarters is Boston.

13   Q.    And what is your position with State Street Corporation?

14   A.    I head a business development team that focuses on

15   alternative asset management and --

16   Q.    Can you move that microphone closer?

17   A.    I head up a business development activity for State Street

18   for alternative asset managers for North America.

19   Q.    And what is your title at State Street?

20   A.    Managing director of business development.

21   Q.    What type of business is State Street -- what is State

22   Street involved in?  What is the nature of the business?

23   A.    Principal activity involves providing custodial and

24   administrative services to asset managers, institutional

25   investors.

1  Q.    And what is your particular duties and responsibilities in

2  that company?

3  A.    Principally reviewing new business opportunity, soliciting

4  new business opportunity working with a team to develop new

5  business opportunities again with asset managers and the

6  private equity hedge fund and --

7  Q.    All right.  For those of us not involved in the financial

8  arena as you are, can you explain in laymen's terms what that

9  means in terms of who these asset managers and what type of

10 things your company performs?

11 A.    Asset managers run the gamut from large institutional

12 names, which are you are probably familiar --

13 Q.    Slow down.

14 A.    -- names such as Morgan Stanley, Goldman Sachs, UBS.

15 Those are some of the larger names that I deal with today.

16 They can also be smaller boutique asset managers that are

17 independent but have assets that they would like an

18 administration shop like State Street to support.  So what we

19 do is we provide accounting and custody services.  Those are

20 the two principle functions that we support for managers that

21 are looking to create a fund into which investors can place

22 money, and then they will make the investments according to the

23 particular investment thesis of that fund.  So a real estate

24 fund, for example, we will direct assets, it could be shopping

25 malls, it can be single family homes, things like that.  The

1    manager will place these into a legal structure entity and then

2    offer shares or allocations to investors.  The investors can be

3    high net worth individuals.  They can be endowments,

4    foundations, large institutions such as the names I mentioned

5    before.  We provide all of the back office support services for

6    these asset managers.  So they focus on making the investments

7    and managing the portfolio.  We do the accounting.  We hold the

8    cash, move the cash on their behalf, hold a record of the

9    assets.  We do the accounting reporting.  We do all the

10   required quarterly, annual financial reporting, anything else

11   that's required such as performance and analytics.  So it's a

12   full service solution for asset managers that are looking to

13   create and develop funds and then provide investment

14   opportunities for investors.

15   Q.    Thank you.  And how long have you been with State Street

16   Corporation?

17   A.    Twenty-three years.

18   Q.    Have you been a vice president of business development

19   that entire time?

20   A.    I started as a financial analyst and worked my way up

21   through the ranks through the investment banking training

22   program over a number of years.  I've been in this role for the

23   past ten years.

24   Q.    You said you work out of the Boston office?

25   A.    Principally, New York as well.  I'm headquartered in

1  Boston.

2  Q.    Is State Street Corporation what is known as a custodial

3  bank?

4  A.    Correct.

5  Q.    And directing your attention to March and April of 2012,

6  did you have contact with Mr. Harley in your official capacity

7  with State Street Corporation?

8  A.    Yes, I did.

9  Q.    And can you tell us how that began, what the circumstances

10  were?

11  A.    Mr. Harley reached out to a colleague of mine who is no

12  longer with State Street.  Her name is Kelly Earley.  She was a

13  client relationship officer in our Fair Lawn, New Jersey,

14  private equity office.  He reached out to her after doing what

15  I understand internet research about State Street.  The Fair

16  Lawn office I was told is close to where Mr. Harley's principal

17  place of business was located.  Kelly Early was in operations.

18  She was not in business development.  She referred the

19  opportunity to me.  It was at that point I commenced contact

20  with Mr. Harley.

21  Q.    And when you commenced contact with him, was that via

22  telephone?

23  A.    Yes.

24  Q.    Tell us the nature of -- this is March 2012?

25  A.    Yes, correct.

1  Q.    Tell us what happened.

2  A.    Mr. Harley called me to inquire about an opportunity that

3  he had, which is effectively to place an amount of Federal

4  Reserve securities bonds with State Street in safekeeping for

5  our custodial services.

6  Q.    How much money of these Federal Reserve instruments did he

7  claim to have that he wanted to put in your custody?

8  A.    Upwards in total of 200 billion.  The initial amount that

9  he sought to place with State Street was a billion dollars.

10 Q.    Tell us -- can you elaborate more on what he told you

11 about how he had come into possession of those funds what he

12 wanted to do with those funds and what he wanted State Street

13 to do with those funds once they were in your custody?

14 A.    Certainly.  So Mr. Harley indicated that he was acting as

15 a power of attorney on behalf of an individual named Joseph

16 Kiat, who I guess was based in Singapore and as his power of

17 attorney and acting on his behalf wanted to place an initial

18 amount of a billion dollars, two 500 million dollar treasury

19 checks as collateral security with State Street and again on

20 behalf of Mr. Kiat.

21       And the initial conversation with Mr. Harley stipulated

22 that he wanted to start with a billion dollars but potentially

23 give him $200 billion, spread this amongst various institutions

24 but certainly the amount he would place with State Street over

25 time would far exceed a billion dollars.  The purpose for

1  placing the money with State Street was twofold.  One, he was

2  looking for asset management services, investment management.

3  Second, he also sought to receive a loan from State Street

4  collateralized by the notes that we would hold in safekeeping.

5  So two things were noted by Mr. Harley.  One, he wanted to

6  co-mingle the money that he was placing with State Street in an

7  account with other investors -- institutional investors was

8  what he stipulated, and, second, that the loan that he sought

9  -- he was looking to take proceeds directly in cash from State

10 Street, the remainder of the loans with us and potentially

11 looked to leverage the loan amount to purchase further assets

12 as it occurred.  So that's a very typical thing for us.  When

13 we lend money in a loan capacity to an investor, they will

14 leverage the proceeds of the loan to purchase additional

15 assets.  That was one of the things he indicated he was looking

16 to do.

17 Q.   Did he discuss how much of a loan he was looking for from

18 State Street?

19 A.   Not at the time.

20 Q.   And you mentioned co-mingling.  What did you mean by that?

21 A.   Co-mingling is when an investor places his or her money

22 with another investor.  So a good example is a mutual fund.  If

23 you invest into a mutual fund through your 401 K., your money

24 is co-mingled with other investors.  It means do you not have a

25 separate account with your assets.  So your assets are with

1    other investors.

2         Co-mingling typically means that there's a look of less

3    transparency unless you're doing record keeping for the

4    investors around the cash moving and the money flow.  So that

5    was of the one things that jumped out given the dollar amounts

6    that he was indicating he wished to invest with us.

7    Q.    Why did it jump out?

8    A.    Typically when you are investing, you know, upwards of a

9    billion and potentially far greater amounts, most investment

10   managers are individuals seeking to have that kind of money

11   placed into our asset management team want what is called a

12   separate account or a managed account.  They do not want the

13   share of the returns of the investment with any other

14   investors.  They want recording keeping that is strictly

15   weighed to their investment portfolio, and they will have

16   greater control over the investment thesis or the investment

17   activity.  So typically there's an agreement drawn up or

18   negotiated between the investor and the asset manager which is

19   in this instance would be State Street.  That stipulates the

20   type of investments that are made, the risk profile of the

21   managed account and the returns and the calculations -- how the

22   calculations are done in terms of deriving the returns back to

23   the investor and to the asset manager.  What that means is a

24   managed account is in this dollar amount typically a far more

25   common structure or occurrence than a co-mingled account.  When

1  you are co-mingling money in that amount, it sends up a red

2  flag.

3  Q.    And he wanted to co-mingle?

4  A.    That's correct.

5  Q.    And did he also -- besides the federal instruments --the

6  Federal Reserve instruments that he was seeking to deposit into

7  State Street, did he also mention any other assets that his

8  company had?

9  A.    Yes, he sent me a profile -- corporate profile of RJH,

10 LLC, whatever the legal entity name -- he talked about in the

11 confines of the letter that he sent me in the profile that

12 there was oil reserves in excess of a billion dollars in, I

13 think, Brown County, Texas.  And there was also another one

14 billion dollars in investment grade debt instruments, now,

15 neither of which came up in future discussions.  He did mention

16 the oil reserves a number of times.  The investment grade

17 instruments were never mentioned in any further conversations

18 other than it included in the corporate profile.

19 Q.    The oil reserves you said did come up in future

20 conversation?

21 A.    That's correct.

22 Q.    In what context?

23 A.    Potentially as collateral?

24 Q.    When you say collateral, you mean collateral for loans

25 from State Street?

1  A.    Collateral for loans from State Street, correct.

2  Q.    And how -- just starting in March 2012, how frequently did

3  you talk to him and -- well, let's talk -- how long did this

4  relationship last?

5  A.    It was a couple months.

6  Q.    And during that time period how frequently did you

7  communicate with Mr. Harley?

8  A.    It was typically a couple times a week, three, four times

9  a week.

10  Q.    And how did you communicate?

11  A.    It was both by e-mail and telephone.

12  Q.    And when he first presented this opportunity to you for

13  State Street, what did you do?  What did you do in terms of

14  seeing it to fruition?

15  A.    Initially we have a process we go through in terms of new

16  business opportunities largely because we are a federally

17  regulated bank.  So we are audited on an ongoing basis which

18  means as an officer of a bank with the effective power or

19  authority for new business opportunities, I have to follow a

20  very disciplined process and evaluation.

21        So whenever we start talking to a new client or

22  prospective client, we ask for things such as corporate

23  profiles, biographies, information related to the investment

24  opportunities, any other documentation such as limited

25  partnership agreements or any other things you'd typically look

1 -- you know, if somebody is going to make an investment, right,

2 you're going to ask to have information.  It's the same kind of

3 process we go through.  This information is then reviewed by

4 myself, and I have a business analyst who works for my team

5 look at the information as well.  We will typically do our own

6 independent research on the internet and through other sources

7 that State Street has given our capabilities to do analytics.

8 So I have a business analyst do some background research in

9 terms of Mr. Harley's corporate profiles, and then this

10 information again --

11 Q.    Before we get to that, did you enter into any type of

12 confidentiality agreements?

13 A.    We did.  That's typically a common course of action as

14 well when we look at new business opportunities.  So we -- I

15 sent him our form of non-disclosure or confidentiality

16 agreement.  There was some back and forth in terms of some of

17 the language there.  He executed, and I executed.

18 Q.    And when he was executing that, he executed on behalf of

19 his company, RJH?

20 A.    He signed Richard Harley, CEO.  He did not stipulate

21 whether it was Richard -- RJ Harley or Madison Park Realty,

22 which was the other entity he referenced.

23 Q.    So he mentioned another entity besides RJH that he was

24 affiliated with?

25 A.    Correct.

1   Q.   What was the name of that?

2   A.   Madison Park Realty.

3   Q.   How did he describe that?

4   A.   As a multi-asset manager.

5   Q.   Did he say what assets he had under his control?

6   A.   No, not at the time.  I requested a corporate profile from

7   him for Madison Park Realty.  I did not receive that.  I only

8   got the RJ Harley profile.

9   Q.   So the confidentiality agreement was executed amongst the

10  parties?

11  A.   Yes.

12  Q.   And then did you receive documents from Mr. Harley as you

13  requested?

14  A.   Yes, and these were documents we were looking for that

15  describe -- we typically circulate amongst our risk compliance

16  and custody or operations teams.  The initial documents I

17  received were redacted which means there was some of the names

18  and information was blacked out.  We can't circulate

19  information like that.  We have to have fully unredacted

20  documents so there's total disclosure.  So I followed up with

21  an e-mail to him and requested that he send to me unredacted

22  documentation, which he did within a few days.

23  Q.   He sent you the unredacted documents?

24  A.   Yes.

25  Q.   Can you generally describe what documents he sent you?

1  A.    A corporate profile.  There was safekeeping receipts which

2  showed the checks that he had being held in the Federal

3  Reserve.   There was a power of attorney document from Mr. Kiat,

4  Joseph Kiat of Singapore, to Mr. Harley.  There was an

5  additional continuation or extension of power of attorney, and

6  then there was some -- there was a grey screen which

7  purportedly showed that these assets were being held in the

8  Federal Reserve system, and then there was further -- a letter

9  from Mr. Bernanke on the Federal Reserve letterhead indicating

10  that Mr. Harley was effectively holding these assets on behalf

11  of Mr. Kiat.

12  Q.    And how did he transmit those documents to you?

13  A.    e-mail.

14  Q.    After you received the documents what -- you said you

15  turned them over to your compliance department?

16  A.    Right.  We did a review first.  Before I do anything, we

17  do -- I do an analysis with my team, and then we turn them over

18  to our risk and compliance teams as well as the operations team

19  for their review.  So there's got to be a signoff and approval

20  by a number of different authorities within State Street before

21  we can proceed with any business opportunities, so I need

22  everybody's agreement in order to do so.

23  Q.    Who were the people that you sent it to for further

24  review?

25  A.    Gene Morris, head of risk, one of our custody operations

1  heads.  I also sent this to my sales manager, who is our global

2  head of sales, Scott Fitzgerald.  Because there was some red

3  flags, I sent the documentation as well to Jim Eckenrode -- I'm

4  sorry -- Jack Eckenrode, who is our global head of security.

5  Q.    You said there was some red flags.  What red flags are you

6  referring to?

7  A.    First the dollar amount, $200 billion is an extraordinary

8  amount.  That kind of money that we place with us from

9  sovereign wealth entities such as Saudi Arabia, Abu Dhabi, you

10  know, governmental organizations, typically individuals do not

11  have control over an amount of that size.  That was one of the

12  first tip-offs.

13      The second was that we did a little research and -- I

14  forget the gentleman's name -- Riyadi -- there was somebody

15  there whose name was in the documentation and there was

16  fraudulent activity we found related to activity around Fed

17  Reserve moneys, and that came up as a red flag from the

18  research we did.

19      There were a number of things that, you know, that came up

20  for me as well the fact that we did not get full -- when I say

21  corporate profile -- we did not get that information other than

22  that two-page letter he sent to me.  We were not able to find

23  anything on the internet about his corporate entities or

24  activity related thereto.  We had no information about these

25  so-called oil reserves in Texas.  So there were a number of

1  things that, you know, came out as well as what I mentioned

2  previously, the request to comingle assets.  So --

3  Q.  This research that you did with Mr. Riyadi, did that take

4  a lot of labor, extensive research to find?

5  A.  No, one of the guys that works for me spent a couple hours

6  and was able to come back with the information that came back

7  as fraudulent.

8  Q.  And after it went to your superiors and the other people

9  you mentioned for review, did you communicate with them about

10  whether or not State Street would enter into this relationship

11  as proposed by Mr. Harley?

12  A.  I'm sorry.  Did I communicate with -- internally?

13  Q.  Internally, yes.

14  A.  What we do once we have the opportunity to review the

15  material, we have what we call a deal team call or a meeting.

16  So all the relevant folks that need to be included and opine on

17  a particular opportunity, I made certain I had them on this

18  particular day.  So the conclusive argument that came back and

19  discussion that came back to me was this is not something we

20  want to proceed in terms of pursuing anything further.

21  Q.  And why wasn't it something you wanted to pursue?

22  A.  Risk effectively.  State Street is one of the largest

23  global custodian institutions.  We have a tremendous reputation

24  in the industry.  This is one of the reasons why I stayed there

25  for as long as I have.  I truly believe in the corporation.

1  Putting State Street at risk with a transaction of this type is

2  nothing I would endeavor to do.  It's the same with the guys I

3  work with.  This was not something that we sought -- we thought

4  was, you know, a real opportunity.  It was something we found

5  to be potentially high risk and there was a lot of uncertainty

6  around the information we received.  So we stepped away from

7  it.

8  Q.    What was the nature of the risk?

9  A.    Again, it was that we did not have real access to any of

10 the data that purportedly showed this money was held in actual

11 Fed Reserve accounts, and, you know, that Mr. Bernanke -- Ben

12 Bernanke, chairman of the Fed was alleging were held out in

13 this letter were held with the Fed.  You know, we don't have

14 access to grey screen.  There was no way for us to show or

15 prove internally to our colleagues, you know, these treasury

16 checks actually exist.

17       The fact he was to looking put this money into a

18 co-mingled account, these were things that jumped out and

19 effectively told us that was not risk we want to undertake.

20 Q.    And certainly not give loans based on these assets that

21 you couldn't verify?

22 A.    Yeah, and I worked for quite a while heading up our loans

23 communications desk, so I am very familiar with how the loan

24 process works.  So typically when we are making a loan to an

25 institutional client, it has to be collateralized, and we

1 extend the loan in amounts that are determined by the type and

2 amount of collateral that we have, and there's a certain

3 duration for which the loans are made.  But then they have to

4 be paid or refinanced within a certain period of time.  When we

5 looked at what we'd be actually be holding within State

6 Street's custodial accounts, it was really just these

7 safekeeping receipts.  There was no actual cash that would be

8 held within State Street.  That's within the Fed Reserve

9 accounts.  So effectively you are lending against paper.  That

10 was not something we were going to do.

11      When I inquired of Mr. Harley about other potential

12 collateral, he said there was a billion dollars in investment

13 grade security.  I was told that was not available for

14 collateral purposes.  He mentioned the $1 billion in

15 approximate value of the oil reserves.  That's stuff that's in

16 the ground.

17      It would cost us a lot of time and money if we had to go

18 after it.  And we're not in what I call the asset based lending

19 business.  So from a lending profile, this was not something

20 that would fit within our risk parameters.

21 Q.    Did you communicate to Mr. Harley that State Street was

22 not interested?

23 A.    I did by e-mail.

24 Q.    And approximately when did that communication take place?

25 A.    It was the latter part of April, I think the 26th or 27th

1  if I remember correctly.

2  Q.    Of 2012?

3  A.    I'm sorry, 2012, yes.

4  Q.    And after you communicated that to Mr. Harley, what was

5  his reaction?

6  A.    He sent me a cease and desist letter and asked me to

7  destroy all the information he sent to me, safekeeping

8  receipts, the profile, all the other information that he sent

9  along.  Prior to that, however, we had gone through a period of

10  time we were doing the internal review, there was some vacation

11  schedules there were there as well.  So the total time that we

12  were looking at this and making a determination internally as

13  to whether we wanted to proceed was at least two -- two weeks.

14       It was during that intervening period Mr. Harley became

15  belligerent is perhaps the right word -- certainly very

16  determined to get a response from me from State Street, so he

17  was calling my cell phone on a regular basis, sending me

18  e-mails on a regular basis looking for us to make a decision

19  informing me if we didn't make a decision quickly he was going

20  to move on to a different institution.

21  Q.    During any point in any of these conversations with you

22  did Mr. Harley ever mention that he had repeated contact with

23  government officials at the Federal Reserve Bank of Atlanta,

24  Federal Preserve Bank of New York and the Federal Reserve Board

25  in Washington where they told him these instruments were bogus?

1  A.    No, not once was that mentioned to me.

2  Q.    And to the contrary, was he was saying these were

3  legitimate instruments?

4  A.    Correct.

5  Q.    Now, you said you got the cease and desist letter from Mr.

6  Harley.  And then what did you do, if anything?

7  A.    At that point I reached back out to Jack Eckenrode, who is

8  our global head of security, and informed Jack that we were no

9  longer going to continue to pursue the opportunity on our side.

10  Mr. Eckenrode informed me he was going to reach out to Mr.

11  Harley and require any further correspondence between State

12  Street and Mr. Harley to occur between himself, Mr. Eckenrode

13  and Mr. Harley.  He wanted to pull me out of the loop.

14  Q.    I want to show some exhibits now, exhibit 13.2.  Do you

15  have that on your screen?

16  A.    Yes.

17  Q.    Can you identify this document?

18  A.    This is the non-disclosure agreement.  I don't see the

19  full document itself.  I just see the --

20  Q.    This is the front page.  I just want you to identify the

21  document first.

22  A.    Yes.

23  Q.    Can you scroll down, please?  So go to the next page.  Is

24  there an e-mail from you to Mr. Harley?

25  A.    Yes, sir.

1  Q.    What is the date of the e-mail?

2  A.    March 22, 2012.

3  Q.    And can you just read the body of the e-mail?

4  A.    I think this was just an e-mail I sent to him saying this

5  was the signed non-disclosure agreement --

6  Q.    Just read what it says.

7  A.    It says, Richard, as requested, best, Ned.

8  Q.    And then it has an attachment that can be downloaded in a

9  PDF at the bottom?

10  A.    Yes.

11  Q.    Going back to the front page, the first page of this

12  document -- that was from Mr. Harley to you the day before on

13  March 21, 2012?

14  A.    Yes, sir.

15  Q.    Read what that e-mail says.

16  A.    Ned, please see the attached signed NDA, best regards, R.

17  Harley, CEO, Madison Park Realty.

18  Q.    The NDA stands for what?

19  A.    Non-disclosure agreement, which is the same as a

20  confidentiality agreement.

21  Q.    He's indicating here he's affiliated with this entity

22  Madison Park Realty, correct?

23  A.    Correct.

24  Q.    Which is another company he said he managed or he was the

25  CEO of?

1  A.    This is what he referred to as a multi-asset management

2  company.

3  Q.    Going to the second page again, that was your response?

4  A.    Correct.

5  Q.    And we will go through the document itself on the next

6  page.  Can you identify this document?

7  A.    This was the executed non-disclosure agreement.

8  Q.    And it's on State Street's letterhead.  So is this

9  something that your company prepared?

10  A.    This was a form that I sent to him.  It's our form of

11  non-disclosure agreement.

12  Q.    I don't want to you to read the entire document.  Just

13  summarize what the substance of the document is.

14  A.    Correct.  Effectively what it does is it stipulates any

15  information received by or from State Street -- by State Street

16  from another third party or information State Street provides

17  to a third party is going to be held in confidence.

18        So for example, things such as fee schedules or other

19  confidential documents are not to be disclosed by either party.

20  There's liability that each party is subject to in the event

21  that information is shared in violation of the non-disclosure

22  agreement.

23        This talks about access to systems and things like that.

24  Effectively this puts both parties on notice any information

25  shared that is confidential.

1  Q.   Go to the signature page, the next page.  On the bottom

2  there's a signature by -- is that your signature for State

3  Street Bank and Trust?

4  A.   Yes, sir.

5  Q.   And below that it says, acknowledged and agreed, Madison

6  Park Realty.  Is there a signature below that?

7  A.   Correct, Richard Harley.

8  Q.   As CEO?

9  A.   Yes.

10  Q.   So that would have been the initial step in this process

11  to get this confidentiality agreement signed?

12  A.   Correct.

13  Q.   Can we have exhibit 13.1?  Go to that portion.  It appears

14  to be an e-mail from Mr. Harley to you dated Tuesday, April

15  3rd, 2012, 9:54 a.m., subject, Federal Reserve instruments.

16  Did you receive this e-mail from Mr. Harley on that day?

17  A.   Yes, sir.

18  Q.   And can you read the body of the e-mail?

19  A.   Ned, it was good speaking with you.  As promised, please

20  see the unredacted documents, corporate profile, limited power

21  of attorney, authorization and bond power, modified agreement

22  to extend, custodial trustee letter, SKR -- which stands for

23  safekeeping receipts -- reserve funds letter and one grey

24  screen printout, look forward doing business with you, kindest

25  regards, R. Harley, CEO, Madison Park Realty.

1  Q.    Going to the attachment -- it says unredacted documents.

2  You discussed earlier that the initial set was redacted had

3  things X.'d out or blacked out?

4  A.    Correct.

5  Q.    So this was the second in the series of communications?

6  A.    That's correct.

7  Q.    Let's go to the documents.  Go to the next page, please.

8         MR. O'BRIEN:  What are these pages?

9         MR. BRANDLER:  This is exhibit 13.1.

10        MR. O'BRIEN:  What pages?

11        MR. BRANDLER:  There's no page numbers on it, but

12  it's attached to the same document.

13        MR. O'BRIEN:  Attached with the --

14        MR. BRANDLER:  Attached to 13.1, the next page.

15  BY MR. BRANDLER:

16  Q.    So is this the corporate profile that was attached to that

17  e-mail?

18  A.    That is correct.

19  Q.    Now, can you just read what it says?

20  A.    Corporate profile, name and address of --

21  Q.    Before we get to that on the top, it says it's for a

22  particular company?

23  A.    Yes, it should be RJH Harley --

24  Q.    Just read it exactly --

25  A.    RJH and Company, Incorporated.

1  Q.   The date?

2  A.   April 2nd, 2012.

3  Q.   If you can start reading.

4  A.   This communication is confidential and privileged

5  information and may only be used for discussion and evaluation

6  purposes by the recipient.  Corporate profile.  Name and

7  address of registered agent, RJH and Company, Incorporated, 25

8  Cedar Grove Lane, Summerset, New Jersey, 08873.  State and date

9  of incorporation, incorporated in the State of New Jersey in

10  1989.  Principal officers, Richard Harley, chairman and CEO,

11  Harry Dawson, CFO, Tonya Harley, secretary.  The purpose of

12  company, RJH and Company Incorporated is a vertically

13  integrated privately held holding company owning and

14  controlling and leasing, developing and administering assets in

15  commercial and residential real estate, petroleum products and

16  commodities.

17       Assets and liabilities, the principal asset of RJH and

18  Company Incorporated -- in quotations -- RJH, a privately held

19  New Jersey corporation is provable in the ground petroleum

20  reserves, approximately 10 million barrels of oil located in

21  Brown County, Texas.  These reserves are wholly owned by RJH

22  with value in excess of US $1 billion.  RJH has been sole owner

23  of these reserves since September 24, 1997.  This opinion and

24  its accompanying documentation and data were prepared by Donald

25  Kesterson, a petroleum geologist licensed by and in the State

1  of West Virginia.  The company also owns investment grade debt

2  instruments valued in excess of USD $1 billion.  The foregoing

3  assets or material information pertaining thereto --

4  Q.    Slow down, please.

5  A.    -- can be produced and examined subsequent to the

6  negotiation and acceptance of appropriate terms to safeguard

7  their use and confidentiality.  In April 2009, RJH and Company,

8  Inc., was granted unrestricted bond power over Federal Reserve

9  Bank instruments totaling more $700 billion USD.  RJH and

10  Company is seeking an institution to place our firm's

11  instruments in a custodial account for utilization to obtain

12  credit, credit enhancements or private placement.  These bank

13  instruments consist of custodial letter, reserve funds letters,

14  safekeeping receipts and confidential memos with screening

15  procedures consisting of CUSIP, ISIN and DTC codes.  RJH has no

16  current liabilities in excess of normal and ordinary operating

17  expenses.  Thank you for your consideration in this matter.

18  Should you have any questions, please do not hesitate to

19  contact our office, very truly yours, Richard Harley, CEO.

20  Q.    Go to the next attachment.  Just read the top portion.

21  A.    To Richard J. Harley, CEO --

22  Q.    Title of the document?

23  A.    Excuse me.  Limited power of attorney authorization and

24  bond power.  To Mr. Richard J. Harley, CEO from Joseph Teo Hui

25  Kiat, reference power of attorney, authorization and bond

1  power.

2  Q.    Read the first paragraph.

3  A.    I, Joseph Teo Hui Kiat, the undersigned, do hereby give,

4  grant and appoint Mr. Richard J. Harley, CEO, and/or any

5  person, persons, entity, and/or assigns dually appointed by he,

6  them at his, their, sole discretion as my attorneys in fact to

7  act in my capacity on my behalf as if I were present in my

8  place instead to make and do any and all of the following.

9  Q.    That's enough.  Scroll to the bottom of the page.  Does

10 this document appear to be notarized?

11 A.    That is correct.

12 Q.    And who is the notary -- that seal on the bottom

13 right-hand corner?

14 A.    A gentleman by the name of Henry Cohen.

15 Q.    From the Commonwealth of Pennsylvania?

16 A.    Correct.

17 Q.    Is he certifying any signature, or is he certifying --

18 what does he say next to his signature?

19 A.    It says, I certify that this is a true copy of the

20 original dated April 16th, 2009.  So my understanding was he

21 was in his capacity as a notary public stipulating this copy is

22 a -- this is a copy of the original power of attorney, which is

23 signed on -- or notarized on the following page by a notary

24 public in Singapore.

25 Q.    Go to the following page.  Is that what you were referring

1  to, the signature -- purported signature of Mr. Kiat on April

2  13th of 2009?

3  A.    Yes, sir.

4  Q.    Which is -- appears to be notarized if you scroll down a

5  little bit -- by some notary in Singapore named Noor Mohammed?

6  A.    Correct.

7  Q.    Go to the next document attached.  Just read the title of

8  this document.

9  A.    Modified agreement to extend limited power of attorney,

10  authorization and bond power, power of attorney number

11  RJH/AT/1BE/13-04-09-1.

12  Q.    Just read that first paragraph.

13  A.    This agreement to extend the limited power of attorney,

14  authorization and bond power -- in quotations -- the agreement

15  is made this 26th day of March, 2010 by and between Richard

16  Harley -- in quotations -- Harley CEO and its assignee and

17  Joseph Teo Hui Kiat -- in quotations -- Kiat -- a Singapore

18  citizen having his address at No. 2 Jalan Rajaj Unite #07-14,

19  Singapore 329134.

20  Q.    Now, going to number four at the bottom of the page, it

21  says something.  Scroll down, please.  Can you read the item

22  number -- what item four says?

23  A.    Collection of payment.  The percentage of ownership

24  interest in the net earnings generated under the agreement

25  dated April 13th, 2009 shall be 50 percent in quotations the

1  numbers 50 percent -- in quotations -- the numbers 50 percent

2  to RJH and Company, Inc. and 50 percent -- in quotations-- the

3  number 50 percent to Joseph Teo Hui Kiat.

4  Q.    Go the next page.  There's signatures?

5  A.    Wherefore, the parties to this agreement have subscribed

6  their signatures to this agreement on the day and year first

7  set forth above.  We also declare that any copy of this

8  instrument will be valid and legal as the original.  The

9  signatures are Joseph Teo Hui Kiat and Richard Harley, CEO.

10 Q.    Go to the next document.  Was this also attached to the

11 e-mail he sent you?

12 A.    That's correct.

13 Q.    On the logo at the top left, what does it say?

14 A.    The Federal Reserve Board.

15 Q.    Below that?

16 A.    Federal Reserve Bank, the address in New York City.

17 Q.    And the date of this document?

18 A.    February 16th, 2009.

19 Q.    And the title of the document?

20 A.    Safe keeping receipt.

21 Q.    Just read the first paragraph.

22 A.    We, the Federal Reserve Bank of New York, located at 33

23 Liberty Street, New York, New York, 10045, U.S.A., with

24 telephone number (212) 720-5000, fax number (212) 720-6331,

25 SWIFT code, FRNY US 33, hereby confirm with full authority and

1  responsibility that our valued client has deposited with us in

2  custodial account number 021088506 funds, slash, assets of

3  which details are outlined as follows.

4  Q.    Under that the type of funds, assets are listed as what?

5  A.    U.S. treasury checks.

6  Q.    On the check numbers, it has a series of numbers?

7  A.    These are the sequential numbers for the treasury checks

8  he referenced by Mr. Harley in the safe keeping receipt.

9  Q.    And the date of issue?

10 A.    The date of issue was February 6th, 2009, renewable

11 annually, after a five-year period from the time of the initial

12 note.

13 Q.    The check denomination?

14 A.    Each of $500 million.

15 Q.    And the total amount that he's saying is being kept safe

16 at the Federal Reserve Bank in New York?

17 A.    200 billion U.S. dollars.

18 Q.    And below that it describes these custody arrangements.

19 Read the first two paragraphs.

20 A.    These funds, slash, assets have been placed in our

21 custodial safe keeping under custodial account number

22 021088506, comma, custodial account name, Yohannes Riyadi, safe

23 keeping period from May 1, 2006 to May 1, 2016 .  This safe

24 keeping receipt is issued and effective from the date of

25 issuance for the benefit of the custodial trustee and signatory

1  of the aforesaid funds, slash, assets, namely Mr. Joseph Teo

2  Hui Kiat, holder of Singapore passport number 0059881Z of his

3  assignees.

4  Q.    Read the next paragraph, please.

5  A.    We further confirm that these funds, slash, assets are

6  good, clean, cleared and of non-criminal origin, free and clear

7  of all liens and encumbrances and shall remain so for the

8  above-stated safe keeping period.

9  Q.    And on the next page there's purported signatures of some

10 Federal Reserve officials?

11 A.    That is Ben Bernanke, who is the former chairman of the

12 Fed and Donald Kohn, former vice chairman.

13 Q.    Going back to the page before, was there anything about

14 the custodial arrangements that raised a red flag to you?

15 A.    Well, one is that the dollar amount again, 200 billion, as

16 I referenced previously, is a number that we typically do not

17 see for individuals.  It would be more akin to large sovereign

18 wealth entity or a large global corporation.

19     Second, there was -- it was unclear to us because there

20 was no other information provided the relationship between Mr.

21 Kiat and Mr. Yohannes Riyadi.  So there was no background

22 information provided by Mr. Harley regarding Mr. Riyadi and how

23 that power of attorney or safe keeping authority was granted to

24 Mr. Kiat by Mr. Riyadi.

25     Also the fact that, you know, again, typically we don't --

1  I've never come across a letter signed by Ben Bernanke in this

2  manner.  I seen other Federal Reserve correspondence but never

3  anything like this titled safe keeping receipt.

4  Q.    Did you mention any of these red flags to Mr. Harley

5  during the course of your discussions?

6  A.    No, we typically do not.  This is something we do

7  internally first.  I don't typically -- again, this is part of

8  our training.  We go through various stringent K. Y. C., which

9  is know your client and anti money laundering.  So K.Y.C.,

10  A.M.L. training, every year we have to certify.  If you don't

11  certify and pass the required corporate examination, you got to

12  basically take it again.  If you don't pass it, then you don't

13  work at State Street.  So to make a long story short, these are

14  things that we have to go through from a protocol perspective.

15  We do not disclose red flags to clients.

16      We keep this internally, and we pass our concerns to the

17  appropriate authorities internally and externally.

18  Q.    So if we go to the next document in this series of

19  attachments -- and does it appear to have the same logo as the

20  document before with the Federal Reserve Board and then the

21  Federal Reserve Bank of New York underneath it?

22  A.    That's correct, sir.

23  Q.    And the date of this document?

24  A.    February 16th, 2009.

25  Q.    And to?

33

1   A.   To Mr. Joseph Teo Hui Kiat, who is stipulated here named

2   as custodial trustee for the custodial account number I

3   referenced previously.

4   Q.   And the title of this document?

5   A.   Reserved funds letters.

6   Q.   And read the paragraph below that.

7   A.   With reference to your request, we hereby confirm with

8   full authority and bank responsibility that the Federal Reserve

9   Bank, New York, has blocked and reserved your U.S. Treasury

10  check numbers 2122 10024065 up to 2122 10024464 inclusively

11  with a total amount of 200 billion United States dollars in

12  parenthesis, USD 200,000,000,000.00, for the benefit of Mr.

13  Joseph Teo Hui Kiat, holder of Singapore passport number

14  0059881Z.

15  Q.   That has the signatures of Mr. Bernanke and Mr. Kohn

16  purportedly?

17  A.   That's correct.

18  Q.   Just comparing that document to the corporate profile if

19  you go back to the second page of this document -- the

20  corporate profile.  Next page -- RJH corporate profile, in the

21  second paragraph can you just -- talks about $700 billion of

22  Federal Reserve Bank instruments, correct?

23  A.   That's correct.

24  Q.   Did you notice the discrepancy between the documentation

25  and the corporate profile?

1  A.    Just a half trillion dollars, but yes.

2  Q.    Just a half trillion.  Did you mention that to Mr. Harley,

3  and did he give you an explanation for that?

4  A.    No, I did not.  This was something I would not mention

5  directly to him, but this was one of the red flags that was

6  raised.

7  Q.    And going back to the reserve funds that you previously

8  had on the screen -- the next document in this series that was

9  attached was what we call the Federal Reserve grey screen?

10  A.    Yes.

11  Q.    Now, on that document we go down to the total issued

12  amount, what was the amount there?

13  A.    500 million U.S. dollars.

14  Q.    All right.

15  A.    So this purportedly showed the existence of one U.S.

16  treasury check that would likely have been in that sequential

17  order that was referenced in the prior exhibit.  So this was

18  for one check of $500 million.  So each check as noted in some

19  prior documentation was issued in the denomination of $500

20  million.

21  Q.    Had you ever heard of anything called a grey screen

22  before?

23  A.    No.

24  Q.    You don't even know if such a thing exists?

25  A.    I don't, no.  We certainly do not have --  and I do not

1  have the access in my capacity as an officer of State Street

2  into any of the Fed Reserve -- something called grey screen.

3  We have in State Street access to the Federal Reserve system

4  because we act on behalf of the Fed in moving treasury moneys

5  through our custodial system, but I don't know of anything

6  called a grey screen.

7  Q.   Can we go to Exhibit 13.3?  Can you identify this e-mail?

8  A.   This was an e-mail that I sent to Mr. Harley dated April

9  27th -- redundant grammar inclusive -- but basically I told Mr.

10 Harley we were not interested in pursuing the opportunity

11 further with him based upon our internal review.

12 Q.   April 27th of what year?

13 A.   2012.

14 Q.   Just read the body.

15 A.   Richard, thank you for your interest in State Street's

16 services.  Upon conclusion of our internal review, we have

17 concluded we will not continue discussions around the proposed

18 custody opportunity, Regards, Ned Sigel.

19 Q.   And go to 13.4.  Can you identify this document?

20 A.   This was a cease and desist notice that I received from

21 Mr. Harley the following -- the following day, dated April

22 27th, 2012.

23 Q.   Go back to the prior document, 13.3.  What was -- the date

24 on this one appears to be April 27th, 2012 at 1:37 p.m.,

25 correct?

36

1  A.    Yes.

2  Q.    Let's go to 13.4.  This is dated April 27th, 2012 at 2:27,

3  about an hour later?

4  A.    Right, it wasn't prior -- it was the same date.

5  Q.    So what does this e-mail say?

6  A.    Ned, please see the attached cease and desist notice,

7  regards, R. Harley, CEO Madison Park Realty, LLC.

8  Q.    Attachment and a PDF?

9  A.    That's correct.

10  Q.    Go to the next page.  Is this the cease and desist that

11  was attached in the PDF?

12  A.    That's correct.

13  Q.    Now, what company's letterhead is this on?

14  A.    Madison Park Realty, LLC.

15  Q.    And the title of the document is?

16  A.    Cease and desist notice.

17  Q.    What is the data that appears on the document?

18  A.    It's an incorrect date.  It's April 27th, 2011, but it was

19  actually 2012.

20  Q.    The subject?

21  A.    Federal Reserve Bank instruments.

22  Q.    And to whose attention?

23  A.    Edward Ned Sigel, vice president of State Street Bank and

24  Trust Company.  That's me.

25  Q.    Just read the first paragraph.

A.    Due to your non-performance of our request for a custodial

account, you and your associates are hereby ordered to

immediately cease and desist any further activities,

representations or involvement regarding Madison Park Realty,

LLC, and RJH and Company, Incorporated.

Q.    And going to the third paragraph.  Scroll down.  Read the

third paragraph.

A.    You are hereby directed to destroy the following documents

sent to you on April 3rd, 2012 immediately.  One, corporate

profile, two, limited power of attorney, authorization and bond

power, three, modified agreement to extend, four, custodial

letter, five, S. K. R -- which stands for safe keeping receipt

-- six, reserved funds letter and, seven, one Federal Reserve

grey screen printouts.

Q.    The other sections that's in bold below that?

A.    This notice is not a waiver of our firm's rights to seek

relief and cost for any damages that may have resulted in this

matter.

Q.    And it's signed?

A.    Correct, by Richard Harley, CEO.

        MR. BRANDLER:  Your Honor, I move the admission of

13.1, 2, 3 and 4.  And I have no further questions.

        THE COURT:  Any objection?

        MR. O'BRIEN:  No objection.

        THE COURT:  They'll be admitted.  Cross-examine.

1  CROSS EXAMINATION

2  BY MR. O'BRIEN:

3  Q.   Mr. Sigel, tell us what a custodial account is.

4  A.   Custodial account is an account we hold within or system,

5  which is linked to the Fed Reserve's system through which

6  moneys flow.  We hold securities such as equities, fixed income

7  securities, cash, other types of instruments.  And we hold

8  those in accounts that are effectively denominated in the name

9  of the holder.  So Goldman Sachs, Morgan Stanley is an example

10 of the name of the accounts we hold in our -- some of the names

11 we hold in our custodial accounts.

12 Q.   You have a custodial account, that money in there belongs

13 to the customer?

14 A.   That's correct.

15 Q.   It's like a trust account where you -- someone puts money

16 there?  You're holding his money?

17 A.   Correct, there's bit of a difference between a trust

18 account and a custodial account.  In either case was act as a

19 directed entity.  So there are certain stipulations from a

20 legal perspective that permits State Street in a custodial

21 account to move money or to cover shortfalls or take collateral

22 in the event -- for example, if assets move out of a custodial

23 account before settlement of other securities occurs and we are

24 short money or what is called an overdraft for that account, we

25 have the right to take collateral to make ourselves whole.  So

1  there are differences between a trust account and a custodial

2  account.

3  Q.    Now, depository account, that's when a customer puts his

4  money in your bank and it becomes the bank's money and the bank

5  owes him, right?

6  A.    No, if a client puts money into an account at State

7  Street, that is their asset.  That's their money.  That's not

8  our money.

9  Q.    No.  In a custodial account, it's their money?

10  A.    A deposit account is the same thing.

11  Q.    Deposit account -- let me suggest to you a deposit account

12  when you put money in a depository account, that money belongs

13  to the bank but then the bank owes it back to the customer?

14  A.    I don't agree with that.

15  Q.    Okay.

16  A.    State Street holds -- we have what is called demand and

17  deposit account.  That's technically a custodial account.  Call

18  it whatever you want.  But if the money is coming into State

19  Street, it's held in the client's name.  We are the custodian.

20  The registrant on the account is the client.  It's not our

21  money.

22  Q.    It's his money, okay.  I'll leave it at that.  Now, in

23  this case, he requested -- he sent you some documents, and you

24  just went through them .  I will not go through them again.  He

25  said to you, would you accept these documents and accept this

1  what they represent in a deposit -- in a custodial account,

2  correct?

3  A.    Correct.

4  Q.    You -- you examined it and said you had some concerns.

5  One of the concerns you said here is the actual money here is

6  being held at the Fed, there's really no money here, it's just

7  paper, and you had some concerns because there was some red

8  flags about Riyadi, and a couple other concerns and you said,

9  we don't want the business?

10 A.    At the end of the day, yes.

11 Q.    How about the issue of the loan?  In all the documents I

12 saw, I didn't see any indication that he requested a loan.

13 A.    He did.  If you go back and review the documents, he was

14 looking for -- there was reference what he was looking to do

15 when the money was put into the custodial account.  That was

16 effectively -- I believe he called it a credit.  That's another

17 name for a loan.  When we make a credit -- we lend credit to a

18 client, we lend money.  So he did, in fact, request a loan.

19 Q.    If you accept this and take it in the custodial account, I

20 will then come to you and ask for money and we will use this as

21 collateral?

22 A.    Correct.

23 Q.    And it never got anywhere near that because you didn't

24 accept it in the custodial account?

25 A.    That's correct.

1  Q.    He never filed any formal application for a loan?

2  A.    No, he did not.

3  Q.    He didn't tell you how much he was going to borrow or --

4  A.    What he inquired about typically the pricing of the loan

5  and how we would structure a loan.  So he did inquire about our

6  loan services and our loan capabilities.

7  Q.    But he didn't tell you what he wanted to borrow, what was

8  it was going to be and never applied for one?

9  A.    Well, he said it was putting in a billion dollars and he

10  wanted to borrow some amount against that.  So there was --

11  typically for State Street, we're not going to lend more than

12  40 to 50 percent against the amount in the account.

13        So maybe he did not stipulate that, but by virtue of the

14  fact that we have risk limits and risk parameters, which I

15  articulated to him, there's a dollar amount of which we will

16  not lend.  And I stipulated that in the conversation with him.

17  Q.    But he never told you he wanted ten thousand or ten

18  million, did he?

19  A.    No, he was just looking for a loan against those assets.

20  Q.    He wanted -- what he said to you was, listen, if you

21  accept this custodial deposit, then I want to use that as

22  collateral and I'll apply for a loan?

23  A.    Correct.

24  Q.    Okay .

25            MR. O'BRIEN:  That's all I have.

42

1    MR. BRANDLER:  No further questions.

2    THE COURT:  You may step down.  Any reason not to

3 excuse Mr. Sigel?

4    MR. O'BRIEN:  No.  Thank you, sir.

5    THE COURT:  You're excused.

6    MR. BRANDLER:  Maryann Alexander.

7    MARY ANN ALEXANDER, called as a witness, being duly

8 sworn, testified as follows:

9 DIRECT EXAMINATION

10 BY MR. BRANDLER:

11 Q.   Good morning, Ms. Alexander.

12 A.   Good morning.

13 Q.   Ms. Alexander, how old are you?

14 A.   Fifty-three.

15 Q.   And where do you currently live?

16 A.   Cape Coral, Florida.

17 Q.   And are you currently employed?

18 A.   I am.

19 Q.   And what is your job?

20 A.   I work for my fiance who owns and runs a vending route in

21 the Charlotte and Lee County areas.  I am an administrative

22 assistant.

23 Q.   I will approach to make the microphone a little closer.

24 Just repeat that.

25 A.   Yes, I work for my fiance who is -- owns and runs a

1  vending route in Lee and Charlotte Counties.  I am his

2  administrative assistant.  I also actually run one of the

3  facilities, one of 22 that he runs.

4  Q.    And, Ms. Alexander, you're visually impaired?

5  A.    I am blind.  I have just light perception and mostly

6  outdoor light perception.

7  Q.    And are you totally blind?

8  A.    I am.

9  Q.    And how long have you been blind?

10 A.    All my life.  I was born blind.

11 Q.    And are you able to read documents despite being blind?

12 A.    No, sir -- well, not read per se.  I can access them

13 through my technology through my computer.  I have -- use

14 office off-the-shelf software like Microsoft Word and Outlook.

15 Then I have what is called a screen reader.  It's called JAWS,

16 and it reads whatever is on the screen.  So I have access to

17 documents in that way.

18 Q.    So you work for this vending machine business I think you

19 said it was?

20 A.    Yes.

21 Q.    Owned by your fiance?

22 A.    Yes.

23 Q.    You do -- what type of work do you do for the company?

24 A.    I fill out his reimbursement forms.  I send refunds to

25 customers who lost money in machines.  I do the ordering --

1  inventory and ordering, and then I actually do the filling of

2  machines at one of his locations.

3  Q.    So if there's paperwork associated with your job

4  responsibilities, how are you able to handle that?

5  A.    With the computer.  Our reimbursement forms are in a

6  template, and I just go and fill out the specific information

7  about the vendor that we are getting reimbursement from, so on

8  and so forth.

9  Q.    If you get a written type document -- let's say an invoice

10  of some type, how are you able to discern what's on the

11  document?

12  A.    If it's typed and it's written and it's handed to me as a

13  hard copy, I use an off-the-shelf scanner, and I have specific

14  software that will then -- I scan the document, and the

15  software then translates the document into a form that I can

16  read.  If it's e-mailed to me as a PDF document, then I can use

17  software within my computer to access that PDF document.

18  Q.    Now, prior to coming here today, you were interviewed by

19  the FBI related to your interaction with Mr. Harley, correct?

20  A.    Yes.

21  Q.    And there were interview reports generated, and there were

22  various documents that were given to you in preparation to for

23  your testimony today, correct?

24  A.    Yes, sir.

25  Q.    And were you able to review those documents prior to

1  coming here today?

2  A.   I reviewed the report that Mr. Browning wrote.  It was

3  sent to me as a PDF document.  It was typed.  So I was able to

4  able to access that entire report.  I reviewed an e-mail that I

5  had written to Mr. Harley.  I have reviewed the original note

6  that was sent to me by Mr. Harley.  My personal assistant, who

7  my fiance -- he is also blind -- and we employ a personal

8  assistant once a week.  And she went over the checks and

9  deposit slips with me and read them to me.

10  Q.   Very good.  You said you currently live in Florida.  Did

11  you previously live in Pennsylvania?

12  A.   Yes, sir.

13  Q.   When did you live in Pennsylvania?

14  A.   From 1992 until 2011.

15  Q.   And what portion of Pennsylvania did you live in?

16  A.   In Monroe County most of the time.

17  Q.   And is that the East Stroudsburg area?

18  A.   Yes, it is.

19  Q.   And is that also known as the Poconos?

20  A.   Yes, it is.

21  Q.   Okay.  And when you were living in Pennsylvania, were you

22  employed?

23  A.   Yes, I was.

24  Q.   Where were you employed?

25  A.   I worked for ten years for Attorney Christie Bower as her

1  legal assistant.

2  Q.   What ten-year period of time are you referring to?

3  A.   From March 6th, 2000 until sometime in June -- second week

4  of June into 2010.

5  Q.   How did it come to be you became employed by Attorney

6  Bower?

7  A.   She was actually my attorney as I was fighting a custody

8  case.  When I called, it was difficult to get in touch with

9  her.  And she had lost her secretary.  And when I finally did

10 get to meet with her, I asked her if she might benefit from

11 having someone answer her phones and take appointments.  And

12 she called me two weeks later and asked me if I was still

13 interested in doing that.  Then the position grew into much,

14 much more.

15 Q.   Where was Ms. Bower's office located?

16 A.   It started out in Jay Park Plaza, which was a small

17 division called Marshalls Creek, and then she moved into East

18 Stroudsburg, a little north of where she had been in a larger

19 -- a bit nicer office.

20 Q.   Was Ms. Bower a solo practitioner or affiliated with a

21 firm?

22 A.   She was -- she is a solo practitioner.

23 Q.   You worked there for about ten years.  What was the nature

24 of her practice?

25 A.   Generally it was family law, Social Security cases, wills,

1  that kind of thing.

2  Q.   When you say family law, you mean divorce, custody?

3  A.   Divorce, custody, that's correct.

4  Q.   Did she do any criminal work?

5  A.   No.

6  Q.   Any corporate finance?

7  A.   No, not that I know of.  Again, what she did before 2000

8  -- she was an attorney before me.  So --

9  Q.   Besides working for Ms. Bower, did you develop a personal

10  friendship with her?

11  A.   We were friends.

12  Q.   And what were your duties and responsibilities generally

13  when you worked for Ms. Bower?

14  A.   Everything.  She dictated pleadings.  I typed them.

15  Sometimes she just dictated just the basics and I wrote for

16  her.  Sometimes she dictated specifically, and I typed them.  I

17  wrote letters.  I filed.  I opened mail.  I made appointments.

18  I helped Social Security clients fill out documents.  Later on

19  they became accessible online.  I helped them fill out

20  documents, talked to judges, talked to other attorneys.

21  Q.   Everything.  You were the --

22  A.   I was it.  I was the front lady.  I was the first person

23  that people saw and often times the person that they talked to

24  more often than even they spoke with her.

25  Q.   Did you while working for Ms. Bower as her legal

1  secretary, did you come in contact with Mr. Harley?

2  A.    Yes.

3  Q.    And what was the circumstances of that?

4  A.    Well, he came into the office for various issues I guess.

5  I was -- the one thing I didn't do was sit in with Christie

6  with clients in most cases.  There were very few cases where

7  maybe in a custody case I might have sat in if she thought I

8  could be -- if she thought I might have valuable input.  I

9  never sat on meetings with Mr. Harley and Attorney Bower.  So

10 he would come in for various things.

11 Q.    Was he a client of Ms. Bower's?

12 A.    Yes, he was.

13 Q.    And how frequently -- first of all, approximately what

14 year did you first meet Mr. Harley?

15 A.    I guess it was later in 2005, 2006, somewhere around

16 there.

17 Q.    How frequently would he come to Ms. Bower's office?

18 A.    I would have to say -- again, this is years ago.  But I

19 would have to say one or two times a week, sometimes.

20 Q.    Would he also call on the phone?

21 A.    Yes.

22 Q.    You would take those phone calls and direct them to Ms.

23 Bower?

24 A.    Yes, yes.

25 Q.    Through him coming into the office did you ever have

1  conversations with Mr. Harley regarding potential investment

2  opportunities?

3  A.    That came later on in around 2007.

4  Q.    Tell us what happened.

5  A.    He just approached me and said that he was offering an

6  opportunity to people he thought could benefit, just a few

7  people who he thought needed it most and if we would invest

8  whatever we would invest, he would multiply that by five times

9  and within a month's period of time and that -- so I did.  I

10  took money from a home equity line.  I gave it to him.

11  Q.    Before we get to the actual money that you gave to him,

12  did he tell you what he was going to invest your money in and

13  why he needed the money?

14  A.    Yes, it was oil that he had -- he was -- supposed to fund,

15  and I don't know exactly to define that.  But it was -- he was

16  going to fund this oil that he had that would be worth billions

17  of dollars and that the money I gave him again he would

18  quadruple that initial investment.

19  Q.    Did he say he owned this oil that was worth billions?

20  A.    He said he owned a note for oil that was in the ground in

21  Texas I think it was.

22  Q.    And how much money did he ask you for?

23  A.    Whatever I could manage, not a specific amount.

24  Q.    What was your financial circumstances at the time that he

25  asked you to invest with him?

1  A.    I earned about $1,600 a month before taxes from Christie,

2  and I received Social Security benefits.  Around 2006 I lost --

3  my daughter turned 18.  So her benefit dropped off.  And that

4  diminished my income by 800 -- 7 or 800 hundred dollars then.

5  And my -- I was receiving -- I was a single parent raising two

6  teenage daughters.  So my child support ended also for her.  So

7  I was down somewhere between 900 and a thousand dollars a

8  month.  So my financial circumstances were at best difficult.

9  Q.    And he said he would take whatever you could give him?

10 A.    Yes.

11 Q.    How much -- I think you said that you borrowed money from

12 your home equity line of credit?

13 A.    Yes.

14 Q.    You didn't have any extra money?  You had to borrow the

15 money?

16 A.    That's correct.  It was a home equity line that I had a

17 couple thousand dollars still left on.  I did that.

18 Q.    Why did you borrow money to invest?

19 A.    Because I believed him.  Because -- instead of my

20 daughter's college, you know -- her little tiny savings account

21 getting her what she could afford of college, a tiny bit of

22 money here or there, I thought $10,000 would almost get her

23 through college.  She was going to a state university, and I

24 just -- you know, it's always been for me about how I can make

25 my kids' lives better.  So I believed him.  It's as simple as

51

1    that.  I have no better excuse.

2    Q.    He told you -- how much did you decide to invest

3    initially?

4    A.    Initially $2,000.

5    Q.    How much did he say you were going to get back?

6    A.    Ten thousand.

7    Q.    How long was it going to take for you to get that back?

8    A.    Thirty days.

9    Q.    In 30 days you get five times your amount of money?

10   A.    Yes.

11   Q.    And he was going to use this money to fund his oil --

12   A.    I am not sure what he was going to use the money for.

13   What he told me was that he had loans outstanding that when the

14   fund -- when the funding came in, it would help him in terms of

15   taxes, that he wouldn't have to pay as many taxes because he

16   would have loans outstanding.

17   Q.    So there was -- he was going to benefit in some tax way by

18   you giving him this money?

19   A.    That's what I understood.

20   Q.    He told you that?

21   A.    That's what he told me.

22   Q.    And during his visits to the office with Ms. Bower,

23   besides this investment opportunity -- he said it was only for

24   a select few people?

25   A.    That's correct.

1  Q.    What did he tell you about that?

2  A.    He told me not to tell Christie because he hadn't offered

3  the same thing to her.  And he told me not -- he told me not to

4  tell her, and he told me it was just for a few people that

5  needed it the most, he thought the people that could use the

6  help.

7  Q.    Just one moment.  So you pulled out 2,000 of your home

8  equity line of credit?

9  A.    Yes.

10  Q.    What did you get in return?

11  A.    I got nothing.

12  Q.    Did you -- did he give you any documentation?

13  A.    Oh, yes, I got a note, a promissory note.

14  Q.    From --

15  A.    RJH and Company, that's correct.

16  Q.    What did that note say?

17  A.    In essence that I would have a return in 30 days of

18  $10,000 and that he -- that I could call in the note and have

19  the money returned to me if that weren't -- if that weren't

20  forthcoming.  I don't remember the legal -- the legality of it,

21  the legal jargon on the note.

22  Q.    Prior to the note becoming due in -- I think -- do you

23  remember the dates of these transactions?  You said 2007.  Do

24  you remember approximately --

25  A.    September -- I believe the first money was given to him on

1  September 6th of 2007, and then the note was due on October 7th

2  or 10th of 2007.

3  Q.   Prior to the note becoming due, did you -- did Mr. Harley

4  solicit more money from you?

5  A.   He said that -- right before it was due, he said that

6  something -- it's seven years ago, so I don't remember the

7  details or the exact words he said -- but something magnificent

8  was going to happen, if I give him more money it would increase

9  -- obviously increase my then overall benefit, financial

10  benefit.  So I gave him another $500, and that -- I wrote a

11  check for $500.  It may have been additional cash that I gave

12  him --

13  Q.   Where did you get the additional $500 from?

14  A.   My daughter's savings account.

15  Q.   And how old was your daughter?

16  A.   She was 16.

17  Q.   And was she saving -- was she using that bank account to

18  save up for something?

19  A.   For a car.

20  Q.   So you pulled it out of that account based upon what Mr.

21  Harley -- this magnificent thing that was going to happen?

22  A.   And I believed him.

23  Q.   Right.  And was he going to -- did he promise you a return

24  on that 500 similar to the 2,000?

25  A.   Yes.

1  Q.   And that was going to come in just a couple of days?

2  A.   Yes.

3  Q.   Because the note was due?

4  A.   That's right.

5  Q.   In that following week?

6  A.   Yes.

7  Q.   So the following week when the note became due, what

8  happened?

9  A.   Nothing.

10  Q.   Well, did you request --

11  A.   I asked periodically over the next 26 months to have the

12  money returned.  There were times though honestly that through

13  the course of the 26 months when I finally gave up that, you

14  know, there were -- this was going to happen, and it was going

15  to happen, and it was going to happen and, you know, the crime

16  certainly has been the -- the legal crime being charged here is

17  the fraud.  The crime for me was that I was a struggling parent

18  and I had taken money from my daughter, and the hope that was

19  held out on a regular basis was the crime for me, you know.

20  Believing in him was the crime for me, and then having to tell

21  my daughter that she didn't have that $500.

22  Q.   In terms of believing him, did you ever have other

23  conversations with him where he appeared to be a very religious

24  person?

25  A.   Richard could put -- Mr. Harley could quote scripture

1   quite eloquently, yes.  Because he used to say things you and

2   Christie won't have to worry about anything, you'll have --

3   when this funds your life will be entirely changed.  And what

4   is your response -- if you're a humble person, your response --

5   you say, oh, my God, thank you so much.  And the response then

6   used to be then God is going to bless me, so I'm going to bless

7   others.

8   Q.   Did he quote scripture to you during these conversations?

9   A.   Yes, there were times when he quoted scripture.

10  Q.   So after the note became due in October 2007, you said

11  there was a period of 26 months where you tried to get your

12  money back?

13  A.   Yes, there were times when I tried to get it back.  I

14  guess in the beginning for the first, you know, few months

15  probably, there were other things that he said that kept me

16  thinking it would happen, it would happen.  So unfortunately,

17  the requests were made by e-mail and by telephone.  I had a

18  crash of a computer.  So I can't tell you when I began to ask

19  for the money back, but I did at some point begin to realize

20  that nothing good was going to come of it and I needed the

21  money desperately.  Until December of 2009 I asked for it

22  regularly.

23  Q.   These requests, were they made to him personally when he

24  came in the office, via telephone, via e-mail?

25  A.   All those different ways.

1   Q.    Did you ever threaten legal action?

2   A.    The last e-mail I wrote was in 2009 -- December of 2009.

3   In that e-mail I had -- I know it was -- there were -- there

4   was no way to get through to him anymore.  So I did --  I said

5   that I have no recourse but to seek legal action.  And I knew

6   couldn't use Attorney Bower because there would be a conflict

7   of interest ethically.  I couldn't use her.  So I looked at the

8   cost of legal action and never pursued it because things were

9   very difficult at that time.

10  Q.    You said he only presented this investment to select

11  people -- what he claimed.  Do you know if he solicited

12  Attorney Bower for any of this --

13  A.    No, he did not.  In fact, he told me not to tell her.

14  When I finally did tell her what I had done, she told me that

15  she had not been asked.

16  Q.    Did you ever get any money back from Mr. Harley?

17  A.    I did.  I got about $1,500 back.

18  Q.    And you had invested --

19  A.    I invested 2,500 in checks and as far as I recall another

20  500 in cash.  So my last e-mail asked for the balance of

21  $1,500.

22  Q.    I see.  I am going to present the jury and the Court with

23  some documents now that I believe you said you previously

24  looked at, and I know you can't read them here without your

25  scanner.  But I will read them to you with the Court's

 1    permission and with counsel's permission and see if you can

 2    identify these documents as the ones that you talked about here

 3    earlier that were involved in this transaction.  Do you

 4    understand?

 5    A.    Yes.

 6              MR. BRANDLER:  That permissible?

 7              THE COURT:  Mr. O'Brien, are you familiar with these

 8    documents?

 9              MR. O'BRIEN:  Yes.

10              THE COURT:  Do you have any objection?

11              MR. O'BRIEN:  No objection.

12              THE COURT:  You may proceed.

13              MR. BRANDLER:  Can we have 46.3?

14    BY MR. BRANDLER:

15    Q.    For your benefit, Ms. Alexander, there's a monitor in

16    front of you.  And the jurors all have these computer

17    documents.  So they have the documents in front of them.

18    A.    Okay.

19    Q.    I will read it to see if this is the same document that

20    you referred to earlier.  You referred to something called a

21    note that he gave you in connection with this transaction,

22    correct?

23    A.    Yes.

24    Q.    All right.  I will read this document now.  It says,

25    secured corporate promissory demand note.  One, borrower's

1  promise to pay.  This promissory note, the note is made this

2  10th day of September, 2007.  In return for the loan of 2,000,

3  the satisfactory and full receipt of which is hereby

4  acknowledged by RJH and Company, Inc., whose corporate address

5  is P. O. Box 337, Shawnee on Delaware, Pennsylvania, 18356,

6  hereinafter referred to as the borrower promises to pay to Mary

7  Ann Alexander, an adult, residing at 805 Sioux Drive, East

8  Stroudsburg, Pennsylvania, 18302, or his or her assignee,

9  hereinafter collectively referred to as the lender, the

10  principal amount borrowed, the principal, in addition the fee

11  stipulated in Section 3 herein, the payment shall be payable

12  when due at the address set forth in section 2 of this note.

13  The borrower further warrants and represents that it will make

14  all payments due under this note on a timely basis and in the

15  form of electronic wire transfer of funds.  The borrow further

16  stipulates that said note will be paid regardless by any means

17  unlawfully obtained through a lending institution.  Two,

18  payments.  The borrower will pay the principal due herein at or

19  before the end of the term of this loan, which date shall be on

20  or before October 10th, 2007, hereinafter referred to as the

21  maturity date.  Payments shall be remitted via electronic wire

22  transfer to Mary Ann Alexander, 805 Sioux Drive, East

23  Stroudsburg, P.A. 18302 or at a different address if required

24  in a subsequent writing mailed to the borrower by the note

25  holder.  Fee and loan premium.  Repayment of principle and fee

1   total $10,000.  Four, borrower's right to prepay.  The borrower

2   has the right to pay some or all of the said loan and fee at

3   any time before the maturity date.  The borrower may make a

4   full payment or partial payment of all amounts due under this

5   note without incurring a prepayment charge.  The note holder

6   must use any prepayments made before the maturity date to

7   reduce the amount of principal and fee owed by the borrower

8   under this note.  Any initial prepayments made by the borrower

9   shall be applied first to fee and then to principal.  Five,

10  borrower's failure to pay as required.  A., default.  If the

11  borrower does not pay the full amount due under the terms of

12  this note, the borrower will be in default.  B., note waiver by

13  note holder.  Even if the borrower was to be in default with

14  respect to its obligation under this note, if the note holder

15  does not require the borrower to pay the payment immediately in

16  full as described above, the note holder maintains the right to

17  do so if the borrower is in default at a later time.  C.,

18  payment of note holder's costs and expenses.  If the note

19  holder requires the borrower to pay immediately in full as

20  described above, the note holder will have the right to be paid

21  back by the borrower for all of his costs and expenses in

22  enforcing this note to the extent not prohibited by

23  Pennsylvania law and the laws of the United States.

24       Those expenses include but are not limited to, reasonable

25  attorney's fees, court costs, the amount of any discount

1  negotiated by the note holder in selling this note to any

2  subsequent holder in due course, et cetera.  Six, giving of

3  notices.  Any notice that must be given under this note will be

4  given by delivering it to -- by delivering it or by mailing it

5  by first class mail, return receipt requested and correctly

6  addressed to the party or parties at the property addresses set

7  forth above or at a different address if the borrower or the

8  lender so designates to the other party in writing.  Seven,

9  waivers.  The borrower hereby waives all rights of presentment

10  and notice of dishonor.  Presentment means the right to require

11  the note holder to demand payment of amounts due.

12      Notice of dishonor means the right to require the note

13  holder to give notice to other persons that amounts due have

14  not been paid.  Eight, choice of law.  This promissory note

15  shall be construed according to the laws of the State of

16  Pennsylvania.  Please note that facsimile or e-mailed copy of

17  the document is to be construed as the original.  Witness the

18  hand and seal of the undersigned, RJH and Company, Inc.  There

19  appears a signature line for Richard J. Harley, CEO, with no

20  signature.  Now, was this document given to you after you gave

21  Mr. Harley money in connection with this transaction?

22  A.    Yes.

23  Q.    Was it a signed document when you received it?

24  A.    The hard copy was a signed document.  He provided this as

25  a courtesy to me so that I could read it through my technology.

1  Q.    And did you maintain this signed version from 2007?

2  A.    I do not have it any longer.  I moved probably four times

3  since then, and I have since lost track of it.

4  Q.    But this is the version that you received from Mr. Harley?

5  A.    Oh, yes, it is.

6  Q.    Now, Exhibit 46.2.  There appears to be a check -- 46.1,

7  I'm sorry.  There appears a check on the screen.  It's on the

8  account of Mary Ann Alexander at 805 Sioux Drive, East

9  Stroudsburg, P.A., check number 2541 dated 9/6/07.  It's paid

10 to the order of Jacqueline Kube.  Who is Jacqueline Kube?

11 A.    His wife.

12 Q.    Why did you make the check payable to his wife?

13 A.    That's what I was told to do.

14 Q.    By the --

15 A.    By Mr. Harley.

16 Q.    And the amount of the check is for $2,000, and it's signed

17 by you, Mary Ann Alexander.  Is that your investment?

18 A.    Yes.

19 Q.    With Mr. Harley?

20 A.    Yes, that is the initial investment.

21 Q.    46.2, there appears a check on your account again, Mary

22 Ann Alexander, 805 Sioux Drive, East Stroudsburg.  It's dated

23 -- this one says 01/6/07?

24 A.    I must have inverted the numbers, but that was given to

25 them in October.  And sometimes when you are writing a check as

1  a visually impaired person, it's -- you have to remember every

2  single thing that you are writing, where you're writing it.

3  And it's not all that easy.  So sometimes silly things like

4  that happen.

5  Q.    And this is paid to the order of cash $500, and it's

6  signed by you, Mary Ann Alexander.  Does this represent the

7  $500 that you gave him right at the end of the term of the

8  loan?

9  A.    Yes.

10  Q.    Can we have 46.4?  This appears to be an e-mail, and it's

11  dated December 9th of 2009, 12:16 p.m.  It says from, Christie

12  E. Bower to rjhco@verizon.net -- when you e-mail people, did

13  you use the computer and e-mail address of Ms. Bower?

14  A.    If I e-mailed from work, then I had to because I didn't

15  have my own e-mail address set up there.

16  Q.    I want to read the contents of this e-mail and ask if you

17  sent this e-mail to Mr. Harley.  Dear Richard, as I have not

18  heard anything from you at all with all sincerity, I regret

19  that I will have to proceed with legal action to recover the

20  $1,500 lent you 26 months ago.  As, of course, you are aware,

21  Christie cannot ethically represent me, so I will find other

22  counsel.  This is so heart breaking to me as most of all I

23  trusted your Christian values to guide you to doing what is

24  right.

25        I have found myself in situations which so often could

1   have been avoided should I have had access to these funds.  I

2   know it is a small amount of money to you, but to me so often

3   it was a life altering difference.  Should you wish to begin

4   making payments, you can do so by Friday of this week, and I

5   will joyfully forget the hurt that this has caused, most

6   sincerely, Mary Ann.  Is that an e-mail you sent to Mr. Harley?

7   A.    Yes.

8   Q.    Did you get any response?

9   A.    No.

10   Q.    Did you ever -- I think you said that you threatened legal

11   action.  Is that what you were referring to in this e-mail?

12   A.    Yes.

13   Q.    And you didn't do that?

14   A.    I did not.

15          MR. BRANDLER:  I have no further questions.  I move

16   for the admission of 46.1, 2 and 3 and 4.  There are two

17   additional documents.  I'm sorry.  These are not on the exhibit

18   list.

19   BY MR. BRANDLER:

20   Q.    The next check, which I have marked as exhibit 46.5 is

21   dated December 21, 2007.  It's on the account of RJH and

22   Company, Inc., P. O. Box 337, Shawnee on Delaware, P.A.

23   18356-0337.  It's on a W. C. M. A. working capital management

24   account at Merrill Lynch paid to the order of Mary Ann

25   Alexander in the amount of $900, and the signature is not -- I

1  am not able to discern the signature.  But it says in the memo

2  section repayment of $1,000 loan.  Is that the check that you

3  received from Mr. Harley as partial payment for the money you

4  invested with him?

5  A.   That was partial payment, but the amount that he said I

6  lent him was not correct.  It was $2,000 -- the first initial

7  amount was 2,000 and then 500.  As those checks that you have

8  indicate --

9  Q.   Plus you said it was about 500 in cash?

10 A.   In cash.  Even if you don't have the document to prove

11 that cash, then you have $2,500 in checks so --

12 Q.   Yes, I understand.  There's another check which I have

13 marked as exhibit 46.6.  It's on the same account, RJH and

14 Company, Inc. From the Merrill Lynch account, check number 630,

15 payable to Mary Ann Alexander in the amount of $500.  It has

16 nothing in the memo section, and the signature appears Richard

17 Harley, CEO.  Is this also a partial payment that you got back

18 from Mr. Harley?

19 A.   Yes.

20         MR. BRANDLER:  I would also move the admission of

21 46.5 and 46.6.

22         THE COURT:  Any objection to the exhibits that were

23 moved?

24         MR. O'BRIEN:  No objection.

25         THE COURT:  All exhibits moved at the conclusion of

1 this examination are admitted.  Cross-examine.

2 CROSS EXAMINATION

3 BY MR. O'BRIEN:

4 Q.   Ms. Alexander, I guess we're talking here about you made

5 -- on two have a separate occasions you loaned money to Mr.

6 Harley?

7 A.   More like three, two checks and some cash.

8 Q.   You don't know how much or when you did that?

9 A.   I don't know when I did it, but it was $500 in cash.

10 Q.   $500 in cash.  Okay.  And now the first loan of $2,000,

11 did you do that voluntarily?

12 A.   I was asked to -- yeah, I did it voluntarily.  I was told

13 --

14 Q.   You loaned him that --

15        MR. BRANDLER:  I'm sorry.  She was speaking when you

16 --

17        THE WITNESS:  That was the basis of my giving him

18 money.

19 BY MR. O'BRIEN:

20 Q.   And when you -- did you give him the money before you saw

21 the note?

22 A.   I gave him the money -- no.  I guess I did, yeah -- the

23 note came to my e-mail around the 10th because that's when it's

24 dated.  But I was -- the terms of the note were described to me

25 verbally before -- before I gave him the money.

1  Q.    You weren't forced to do this.  You made a voluntary

2  decision?

3  A.    Of course.

4  Q.    Okay.  And you knew that you were transferring money to

5  him because you put it in writing and gave him a check?

6  A.    Yes, sir.

7  Q.    And you knew from your own experience in life that when

8  you loan money, there's a risk involved?

9  A.    No, that's never happened to me before.  I trusted him.

10 Q.    So you completely trusted him.  You didn't think there was

11 any risk involved?

12 A.    Absolutely not.  I completed trusted him.

13 Q.    Now, the second loan was the $500.  That was your

14 daughter's money?

15 A.    Yes.

16 Q.    When you were on direct examination you said -- I just

17 want to make clear you said -- you talked about the crime for

18 me.  Do you remember using those terms?

19 A.    Yes.

20 Q.    And did you say the crime for me was believing Mr. Harley

21 and taking my daughter's money without permission.

22 A.    No, I didn't say that.  I said trusting him was the crime

23 for me, the hope that he held out over and over that life would

24 get better because of the terms of that note and the extra

25 additional hope of life will get better for you because I will

1  have billions of dollars and you and Christie will benefit, and

2  the hope that he held out that life would get better as a

3  single parent raising two teenage daughters.  That is a pretty

4  powerful thing, sir.

5  Q.    You trusted --

6  A.    I trusted him implicitly.

7  Q.    Just like your daughter trusted you?

8  A.    She trusted me.  It was a shameful thing I did.

9          MR. O'BRIEN:  That's all I have.

10          THE COURT:  Any further examination?

11          MR. BRANDLER:  No.  I think it will be a good time

12  for a break?

13          THE COURT:  It will be, yeah.  Members of the jury,

14  we will take a 15-minute recess.  Come back at 25 after.

15  Remember not to discuss this case among yourselves or with

16  anyone else.  Should anyone try to talk to you about, bring it

17  to my attention immediately.  We will see you 25 after -- I

18  will give you 15 minutes.  And we will see you then.

19          (A brief recess was taken.)

20          MR. BRANLDER:  Peter Blau.

21          PETER BLAU, called as a witness, being duly sworn,

22  testified as follows:

23  DIRECT EXAMINATION

24  BY MR. BRANDLER:

25  Q.    Mr. Blau, good morning.  How old are you, sir?

1  A.    Seventy-seven.

2  Q.    And where do you currently live?

3  A.    Los Angeles, California.

4  Q.    And are you currently employed?

5  A.    Self-employed.

6  Q.    And what type of business are you self-employed?

7  A.    I act as an agent for buyers and sellers of commodities.

8  Q.    Can you go into more detail about what that means?

9  A.    I work with buyers and sellers of precious metals and -- I

10 work with buyers and sellers of precious metals, and I

11 formulate with them precious metal transactions and act as

12 their agents.  And I am licensed by the State of California.

13 Q.    Licensed in what field?

14 A.    I am licensed as a lender and as a broker.  I also have a

15 small business where I have one client.  I provide them with

16 accounts receivable financing.

17 Q.    And these clients that you have, the buyers and sellers

18 you put together in transactions?

19 A.    Correct.

20 Q.    Do you -- how did you find these clients?

21 A.    Mainly referrals.  I've been doing it for many years, and

22 I have referral sources.

23 Q.    How long have you been doing this type of work?

24 A.    About 22 years.

25 Q.    Prior to doing that, were you involved in any other type

1  of businesses?

2  A.    Yes.

3  Q.    What kind of businesses?

4  A.    I was a principal in a commercial collection agency, and I

5  was a consultant for firms in regards to tax matters.

6  Q.    What's your educational background?

7  A.    I have a Bachelor of Science degree from the University of

8  Oregon and one and a half years of law school.

9  Q.    When did you get your degree from the University of

10 Oregon?

11 A.    1959.

12 Q.    Is there a name of the business you're currently in?

13 A.    Yes.

14 Q.    What is it?

15 A.    California Money.

16 Q.    And these commodities that you put the buyers and sellers

17 together on, what type of commodities are we talking?

18 A.    Diamonds, gold, fuel.

19 Q.    And do you get a commission if there's a deal that's put

20 together?

21 A.    Yes.

22 Q.    Have you ever closed a deal in the last 20 years?

23 A.    Closed one.

24 Q.    And when was that approximately?

25 A.    I would say about 13 years ago.

70

1   Q.    Do you remember what your commission was on that deal?

2   A.    Several thousand dollars.

3   Q.    So other than that one deal over the last 20 years, you

4   haven't gotten any income as a result of this business?

5   A.    No.

6   Q.    Did you ever have any dealings with Mr. Harley, the

7   defendant in this case around 2009?

8   A.    Yes.

9   Q.    And how did you come in contact with Mr. Harley?

10  A.    I was referred to him by an associate of mine.

11  Q.    What's your associate's name?

12  A.    Jerry Palma.

13  Q.    P-a-l-m-e-r?

14  A.    P-a-l-m-a.

15  Q.    How did you know Mr. Palma?

16  A.    I met him.  He lives in Los Angeles.  I met him before,

17  and I known him for several years previously.

18  Q.    Was he a business associate or a personal friend?

19  A.    Business associate.

20  Q.    And you didn't know Mr. Harley prior to Mr. Palma

21  introducing him to you?

22  A.    No.

23  Q.    Did you ever meet Mr. Harley prior to today?

24  A.    No.

25  Q.    So your dealings with Mr. Harley were -- how were they

1  conducted?

2  A.    Over the telephone and by e-mail.

3  Q.    And you live in California, correct?

4  A.    Yes.

5  Q.    You lived there the entire time that you had your dealings

6  with Mr. Harley?

7  A.    Yes.

8  Q.    What did Mr. -- why did Mr. Palma refer you to Mr. Harley?

9  A.    Because he said Mr. Harley was involved in financial

10 matters.

11 Q.    And you were interested in -- why were you interested in

12 getting in touch with Mr. Harley?

13 A.    Because he made me an opportunity.

14 Q.    Through your business of matching buyers and sellers?

15 A.    Correct.

16 Q.    Did you get in touch with Mr. Harley, or did he get in

17 touch with you, or do you remember?

18 A.    I don't remember.

19 Q.    At some point in 2009, you did get in touch with him?

20 A.    Yes.

21 Q.    And did Mr. Harley explain to you what type of businesses

22 he was involved in?

23 A.    No.

24 Q.    Did he say what companies he owned?

25 A.    Later he said he had certain -- initially, no.  Later he

72

1  told me about some of the other financial interests that he

2  had.

3  Q.    Tell us about what he told you.

4  A.    Initially or later?

5  Q.    Both.

6  A.    Initially he said he represented a group of Indonesian

7  wealthy people and they had Federal Reserve notes and that

8  these people could not come to the United States and didn't

9  speak English and engaged him, that he had power of attorney to

10 handle these Federal Reserve notes and came to me to assist him

11 in selling the notes.

12 Q.    So he said he represented these Indonesians, they didn't

13 speak English, they gave him power of attorney.  Did he say how

14 much the notes were worth?

15 A.    I think they were worth about a huge amount of money, like

16 $40 billion.

17 Q.    He wanted you to do what to him in relation to these --

18 this $40 billion?

19 A.    To see if I can bring him buyers who would purchase the

20 notes.

21 Q.    You would receive a commission if you could match up the

22 buyer and the seller?

23 A.    Correct.

24 Q.    So he would be the seller in this transaction, and you

25 would find the buyer?

73

1  A.    Correct.

2  Q.    Did Mr. Harley tell you why he couldn't just find buyers

3  by himself, why would he need you to do that for him?

4  A.    He didn't tell me.  But the experience I have, I deal with

5  people who may have an interest in purchasing those notes.

6  Q.    And I kind of cut you off.  You said initially he talked

7  about these Federal Reserve notes as far as some of his

8  business interests.  Did he tell you anything else?

9  A.    Later in our relationship he said that he owned oil and

10  gas reserves worth huge amounts of money and that he had other

11  substantial assets he wanted to dispose of using my services.

12  Q.    And dispose of in which way, the same way with the notes

13  you would find the buyer?

14  A.    Correct, or one time -- providing him with loans on these

15  assets.

16  Q.    Just elaborate a little bit more about what you mean by

17  monetizing the assets.

18  A.    If you have an asset that has a great value like a note --

19  the note is not yet due -- and don't want to sell the note

20  because you want to maintain for its interest, then there are

21  firms that will provide loans on that asset.

22  Q.    And what was going to be your role in terms of these

23  transactions?  Were you going to find people to give him loans

24  based on the oil and gas reserves?

25  A.    Yes.

1  Q.    Did he say where these oil and gas reserves were located?

2  A.    In the United States.

3  Q.    Did he say where in the United States?

4  A.    No.

5  Q.    And you said it was worth a huge amount of money according

6  to Mr. Harley?

7  A.    He never gave me any numbers for the oil and gas reserves,

8  but he said they were very valuable.

9  Q.    Did he tell you how he came to be so lucky to get

10 possession and control over these oil reserves?

11 A.    No.

12 Q.    Did you ever ask him?

13 A.    No.

14 Q.    Did you ever do any independent verification to talk to

15 anyone to verify that he really owned any oil or $40 billion of

16 Federal Reserve notes?

17 A.    I have no means of verifying.  I am in the business

18 wherein I have to trust people and hope that they are telling

19 me the truth.

20 Q.    So I guess the answer is, no, you didn't do any

21 independent verification?

22 A.    No.

23 Q.    You took him at his word?

24 A.    Yes.

25 Q.    Was there an individual involved in any of these

1  transactions by the name of Larry Card?

2  A.    Yes.

3  Q.    What was Larry Card's involvement?

4  A.    I brought Larry Card to the defendant, and I believe he

5  had interest in the Federal Reserve notes because he was

6  involved with firms that could either monetize those notes or

7  purchase them.

8  Q.    Who is Larry Card?

9  A.    Larry Card was an associate of mine that I dealt with.

10  Q.    A business associate?

11  A.    Yes.

12  Q.    Someone you met over the internet?

13  A.    No.

14  Q.    Does he live in Los Angeles?

15  A.    I have not dealt with Larry Card for many years.  I reread

16  my notes before I came to the city, and in my notes it didn't

17  say where he lived.

18  Q.    Have you ever met Larry Card?

19  A.    No.

20  Q.    Always been over the phone or the internet?

21  A.    Yeah, my business is mainly done on the telephone and

22  internet.  I meet very few people.

23  Q.    Similar to Mr. Harley, this situation?

24  A.    Correct.

25  Q.    So you thought -- you brought Larry Card into this

1  situation as a potential buyer for Mr. Harley's notes?

2  A.   He was not a buyer.  He was merely another broker who

3  would represent more buyers.

4  Q.   To find the potential buyer for the notes?

5  A.   Correct.

6  Q.   Did Mr. Card ever ask Mr. Harley for any proof of

7  ownership of the notes or the assets that he said he had

8  controlled?

9  A.   Yes.

10 Q.   And did Mr. Harley provide you and Mr. Card with any

11 documentation?

12 A.   In my notes that I read -- this is in 2009.

13          MR. O'BRIEN:  Objection reading from notes, Your

14 Honor.

15          MR. BRANDLER:  He's not reading from notes.  He's

16 talking prior to coming here he read notes.

17          THE COURT:  That's what he said.  Proceed.

18          THE WITNESS:  The notes -- in the notes I read before

19 I came here, it mentioned in 2009 Larry Card's name, and it

20 listed the questions he asked.  And my notes did not state that

21 Mr. Harley answered those questions.  But what my notes did

22 state after those questions were asked there was never anymore

23 contact between Mr. Card and the defendant.

24          MR. O'BRIEN:  I renew my objection.  Clearly he

25 wasn't testifying from his own recollection.  He was testifying

1  from a note he read.

2          THE COURT:  Were they your notes?

3          THE WITNESS:  Yes, they were my notes.

4          MR. O'BRIEN:  The witness has to testify from his own

5  recollection, can't testify from a note whether it's his or

6  someone else's.

7          THE COURT:  He testified it was from his recollection

8  of the notes.  I don't know if there's a better refreshing of

9  recollection than that.  So I will allow it.

10         MR. O'BRIEN:  Okay.

11         THE COURT:  He doesn't have the notes with him.

12  BY MR. BRANDLER:

13  Q.   Did Mr. Harley send you some documents via e-mail

14  regarding the notes that he claimed he owned?

15  A.   Yes.

16  Q.   And what type of documents did he send you?

17  A.   They were official looking documents with seals, had

18  people's signatures on it.  I believed that they were official

19  -- that came from a government agency like the Federal Reserve,

20  and I believe some of the correspondence had the name of Mr.

21  Bernanke.

22  Q.   You said there were official looking documents.  Were you

23  familiar with those documents?  Have you ever seen anything

24  like that before?

25  A.   No.

1  Q.   Did you believe they were valid?

2  A.   Yes.

3  Q.   Did Mr. Harley tell you they were valid?

4  A.   Yes.

5  Q.   That's why he sent them to you, correct?

6  A.   Yes.

7  Q.   Did Mr. Harley ever ask you for money?

8  A.   Yes.

9  Q.   Tell us about that.

10 A.   He said that he had a business proposal for me, that if I

11 give him $5,000 he would then provide me with documents

12 confirming that I would receive a million dollars from the

13 transactions that he was involved in with third parties.

14 Q.   And how -- for your $5,000, you were going to get a

15 million dollars in return?

16 A.   Correct.

17 Q.   And how long was it going to take for you to get the

18 million?  How long was the term of the note?

19 A.   I don't remember.

20 Q.   We will look at it later.  Did you give him the $5,000?

21 A.   Yes.

22 Q.   And how did you transfer the money to him?

23 A.   I went to my bank and sent a wire to his bank.

24 Q.   From California to Pennsylvania?

25 A.   Correct.

1  Q.    Did he tell you why he needed $5,000 if he had $40 billion

2  in the reserve -- Federal Reserve Bank and billions of oil in

3  the United States?  Why would he need 5,000 from you?

4  A.    Best of my memory he needed $5,000 to trigger this

5  transaction.

6  Q.    To trigger which transaction?

7  A.    The Federal Reserve notes.

8  Q.    Did he explain how your $5,000 would somehow trigger that

9  transaction?

10 A.    As I remember it, he said he needed $5,000 in order to pay

11 a certain expense in order to be able to have these notes free

12 and clear of any encumbrances.

13 Q.    And in exchange for your $5,000, did you get any documents

14 from Mr. Harley documenting this investment?

15 A.    Yes.

16 Q.    And what did you get from him?

17 A.    I believe I received a document stating that I would

18 receive a million dollars for the 5,000 dollars that I sent

19 you.

20 Q.    When he got -- when Mr. Harley got his money, what did he

21 say he was going to use his money for?  Did he ever promise you

22 to make investments with you?

23 A.    I have to think about that for a moment.  To the best of

24 my knowledge -- this is going back to 2009, 2010.  The only --

25 the only investment that he would make with me where I was

1  acting as an agent for third parties who would be able to help

2  him with assets that he owned or controlled.

3  Q.    Did he ever talk about his own financial position in terms

4  of -- besides the assets that he said he owned and controlled,

5  did he ever tell you anything about his financial situation?

6  A.    Later -- years later he came to me and wanted more money.

7  He told me that he risked losing his home, he was having

8  financial problems and he was going to fight.

9  Q.    How much money did he ask for?

10 A.    I don't know the exact amounts that he asked for, but I do

11 remember that I sent him several payments of smaller dollars

12 than he asked for.

13 Q.    Approximately how much did you send him?

14 A.    All together I sent him $8,000.

15 Q.    In addition to the 5,000?

16 A.    No, including the 5,000.

17 Q.    Including the five.  And would that have been not just in

18 one lump sum of $3,000 extra, just incrementally you would send

19 him more money?

20 A.    Correct.

21 Q.    Would that be as a result of repeated contacts by Mr.

22 Harley?

23 A.    Yes, he repeatedly called me and asked for money.

24 Q.    And it was because he was destitute and losing his home?

25 A.    I trusted him.  I knew him for many years.  I felt it was

1  an honorable man.  So I loaned him in smaller increments money

2  over a period of time.

3  Q.    Did he ever discuss with you during this period of time

4  access to the international monetary fund and trading

5  platforms?

6  A.    Yes.

7  Q.    What did he say?

8  A.    He simply said that he had -- he had a great number of

9  assets -- he wanted to monetize these assets and put them into

10  a trading program and that some of these assets he dealt with

11  the international monetary fund.

12  Q.    Now, when the note came due, the initial note when you

13  gave him the 5,000 and you were supposed to get a million, did

14  you ask him for your million dollars?

15  A.    Yes.

16  Q.    And what did he say?

17  A.    He didn't have the money.

18  Q.    And what did you do in response to that?

19  A.    As I recall, he said he would have the money at another

20  time due to certain setbacks in business, and as I recall I

21  trusted him and I was patient.

22  Q.    And did you send him more money after that?

23  A.    Yes.

24  Q.    When did you stop having contact with Mr. Harley?

25  A.    I stopped having contact with him when I realized he was

1  repeatedly asking for money in our conversations over the -- it

2  was turning into money, money, money.  And I just simply said,

3  I don't have any more money, I have obligations, I can't send

4  you any more money.

5  Q.    All right.  Do you know approximately what year that would

6  have been?

7  A.    I believe that was in 2012 or 2013.

8  Q.    I'm going to show you some documents that are going to be

9  on that screen in front of you, that computer monitor.  I ask

10 if you can identify them, 37.3.  Do you see that?

11 A.    Yes.

12 Q.    And do you recognize it?

13 A.    Yes.

14 Q.    What is it?

15 A.    It's a -- it was part of an e-mail dated November 18th,

16 2009, and it states that --

17 Q.    Don't tell us yet.  I will have you read it.  But this is

18 part of an e-mail that Mr. Harley sent you in connection with

19 these transactions?

20 A.    Yes.

21 Q.    And the date on the document is what?

22 A.    November 18th, 2009.

23 Q.    And the re says what?

24 A.    Federal Reserve instruments.

25 Q.    And it says, Dear Peter.  I would like you to read what it

1  says.

2  A.    It was a pleasure speaking with you today.  And in

3  furtherance of our telephone conversation, we are pleased to

4  confirm that RJH and Company, Inc., has full and unrestricted

5  limited power of attorney, authorization and bond power over

6  valuable bank instruments from $1 billion USD plus for the

7  utilization in credit enhancements, private placement programs,

8  high yield investment or trading programs.  These bank

9  instruments consist of safe keeping receipts, reserve funds

10  letter and confidential memos with screening procedures.

11       All of these debt/credit securities are issued and

12  confirmed by the Federal Reserve Bank in New York City, New

13  York, and authenticity must be confirmed by grey screen only to

14  any responsible inquiring bank.  Please call if you have any

15  further questions regarding the above.  Kindest regards,

16  Richard Harley.

17  Q.    And if we go to -- well, before we get there, this is what

18  he was asking to you to try and sell for him, these federal --

19  valuable bank instruments of a billion dollars, someone to buy

20  for him?

21  A.    Correct.

22  Q.    Did he ever send you the documents that are referenced in

23  the e-mail here , these safe keeping receipts, reserve funds,

24  letters, confidential memos, grey screens?

25  A.    He did send me certain documents that were relative to

1  this e-mail, yes.

2  Q.   And you said you didn't verify the legitimacy of any of

3  that, you believed they were true, correct?

4  A.   Correct.

5  Q.   I want to show you an exhibit, 37.4.  Enlarge the top

6  portion.  It's titled questions from Larry Card, and it's dated

7  Tuesday, November 24th of 2009, which is about six days after

8  the prior e-mail that we just read.  Could you -- do you

9  recognize this document?

10  A.   Yes.

11  Q.   What is it?

12  A.   Larry Card is an associate.  He is also a broker.  And he

13  had relationships with firms that could utilize the bank

14  instruments from the defendant, and I sent Larry Card the

15  e-mails I received from the defendant, and arranged, I believe,

16  a conference call between Larry Card and the defendant.  And

17  then Larry Card worked with the defendant in doing due

18  diligence and going forward.

19  Q.   All right.  If we scroll down and -- on this document --

20  and is this the e-mail that -- well, before we get to that, I

21  want to make sure your e-mail address -- scroll up.  It says

22  it's from califmo260@aol.com.  Is that your e-mail address?

23  A.   Yes.

24  Q.   It was from rjhco@verizon.net, which you were using to

25  contact Mr. Harley?

1  A.    Yes.

2  Q.    What does the message say?

3  A.    Dear Richard, I am enclosing a request from Larry Card.

4  Kindly advise if you have any questions.  Respectfully, my name

5  and my coordinates.

6  Q.    If we can scroll down.  Just read what the requests were

7  from Larry Card?

8  A.    Thanks for -- No. 1, proof of ownership --

9  Q.    No, you can say, thanks for all your e-mails.

10 A.    Thanks for all your e-mails.  The documents requested by

11 Larry Card are as follows:  No. 1, proof of ownership of the

12 FRNs.

13 Q.    What are FRNs?

14 A.    Federal Reserve notes.

15 Q.    Okay.  Continue.

16 A.    2, where are they held in safekeeping, brokerage firm,

17 what country.  No. 3, the face amount of the notes.  4,

18 passport copy of owner.  5, brief letter of intent on the

19 client's full letterhead.

20 Q.    Go to the next page.  Go to the next e-mail, 37.5.  This

21 appears to be an e-mail from California Money to rjhco3.com on

22 June 2nd, 2011 at 11:55 a.m.  Do you recognize this e-mail?

23 A.    Yes.

24 Q.    Did you send it to Mr. Harley?

25 A.    Yes.

1  Q.    And could you read it, please?

2  A.    Dear Richard, you have sent an excellent explanatory

3  letter to the Federal Reserve Board wherein you have requested

4  a response in 72 hours, which will be Friday, June 3, 2011.  If

5  you do not have a response, let's discuss this matter on

6  Monday, regards, my name and my coordinates.

7  Q.    What were you referring to about this explanatory letter

8  that Mr. Harley sent to the Federal Reserve Board?

9  A.    Mr. Harley stated that he had contacted the Federal

10  Reserve and wanted to speak to Mr. -- the head of the Federal

11  Reserve, Mr. Bernanke, and that they wouldn't let him speak

12  with him and that they were blocking his ability to sell the

13  Federal Reserve notes.

14  Q.    And did he ever tell you that the people at the Federal

15  Reserve told him that these notes he had were bogus?

16  A.    No.

17  Q.    And then below that, it says there's a message that

18  preceded your e-mail on June 1st, 2011.  And it's from Mr.

19  Harley to you.  Can you just read that?

20  A.    Peter, it was good speaking with you.  As promised,

21  attached is a copy of the demand letter sent to Mr. Bernanke,

22  kindest regards, R. Harley, CEO, RJH and Company and his

23  coordinates.

24  Q.    Can we have 37.6?  This appears to be an e-mail on Tuesday

25  October 25, 2011 at 1:54 from Mr. Harley to you with certain

1  attachments.  Was this an e-mail that was sent to you by Mr.

2  Harley?

3  A.    Yes.

4  Q.    Could you just read it?

5  A.    Peter, we thank you for your kind consideration in this

6  matter.  As promised please see the attached documents,

7  corporate note, wiring instruction, kindest regards, R. Harley

8  and his coordinates.

9  Q.    Okay.  And the corporate note that is being referred to

10  here is what?

11  A.    Is the corporate note that he had for the FRNs.

12  Q.    Is it the -- wiring instructions is that where you send

13  your money for your investment?

14  A.    I believe -- let's see.

15  Q.    I will make it easier on you.  Let's go to -- let's skip

16  this for a second.  Can we go to 37.1?  Do you recognize that

17  document?

18  A.    Yes.

19  Q.    What is it?

20  A.    It's a promissory note from the defendant to pay me a

21  return for the $5,000 loan.

22  Q.    So the title of this document is secured corporate

23  promissory note, correct?

24  A.    Yes.

25  Q.    And it relates to your investment with Mr. Harley where

1  you were going to get a million dollars?

2  A.    Yes.

3  Q.    All right.  Going back to the prior document, 37.6, this

4  e-mail is also dated October 25th of 2011, the same date on the

5  note.

6  A.    Correct.  Thank you for -- now I remember, yes, that's the

7  corporate note.  That's the wire instructions for sending him

8  the $5,000.  He sent me the corporate note before I sent the

9  funds.

10  Q.    So now let's go to 37.1 and the first paragraph of the

11  terms of this transaction.

12  A.    Yes.

13  Q.    And what was the date of the promissory note as reflected

14  in paragraph one?

15  A.    October 25th, 2011.

16  Q.    And the amount of the loan?

17  A.    $5,000.

18  Q.    And it was received which was acknowledged by RJH and

19  Company and gives the address, correct?

20  A.    Yes.

21  Q.    And it has your address in Marina Del Rey, California?

22  A.    Yes.

23  Q.    And going to paragraph two as far as payments, can you

24  just read that section out loud?

25  A.    The borrower will pay the principal due herein at or

1  before the end of the term of this loan, which date shall be on

2  or about 120 days from the date hereinafter referred to as the

3  maturity date.  Payments shall be remitted to Peter Blau, 310

4  Tahiti Way, Unit 207, Marina Del Rey, California, 90292 or at a

5  different address if required in a subsequent writing mailed to

6  the borrower by the note holder.

7  Q.    So I asked you earlier what the term of the note was.

8  Does this refresh your recollection that it was 120 days?

9  A.    Yes, it does.

10  Q.    Which was about four months roughly.  So the $5,000 was

11  going to turn -- well, paragraph three says what your return is

12  going to be.  How much does it say you are going to get after

13  four months?

14  A.    $1 million.

15  Q.    Going to the last page of this document, is there a

16  signature?

17  A.    Yes, there's a signature -- there's a seal and a signature

18  Richard Harley written out, and below it says Richard J.

19  Harley, president and CEO which has been typed.

20  Q.    So October 25th of 2011, you gave him the 5,000.  Four

21  months after that would be February of 2012 I guess the note

22  would be due.

23  A.    Yes.

24  Q.    You get your million dollars.  And did you get your

25  million dollars in February?

1  A.    No, because Mr. Harley said that he was having a problem

2  with the Federal Reserve that they would not deal with him and

3  would not honor the notes that he had and that he was going to

4  take legal action.

5  Q.    Did you ever do anything in terms of legal action to

6  collect on your debt?

7  A.    No.

8  Q.    Did you believe Mr. Harley was taking some type of legal

9  action against the Federal Reserve to get his money?

10  A.    To the best of my memory he sent me some documents that he

11  planned to take legal action.

12  Q.    Can we go to 37.9?  Do you recognize this document?

13  A.    Yes.

14  Q.    What is it?

15  A.    It's the wiring instructions that I received from Mr.

16  Harley, and then my notes are on the -- are on the -- this

17  sheet of paper.

18  Q.    That's your handwriting?

19  A.    Yes.

20  Q.    But the typed information was the wiring instructions

21  referred to in the e-mail?

22  A.    Correct.

23  Q.    And where does it indicate that the wired money should go?

24  A.    It should go to Jacqueline Harley, Post Office Box 306,

25  Shawnee on Delaware, 18356.

1  Q.    You don't need to read the rest.  It has got the bank

2  routing number and account number and a bank name of Penn

3  Security, correct?

4  A.    Yes.

5  Q.    The bank is in East Stroudsburg, Pennsylvania?

6  A.    Correct.

7  Q.    The handwritten portion below that, what do your

8  handwritten notations indicate?

9  A.    It gives me the home phone number of Mr. Harley, his cell

10  phone number, the $5,000, the amount that's taken out of my

11  account number and the date 10/25/11 that the -- I sent 5,000

12  by wire and the wire cost $30 from the bank.

13  Q.    37.8.  Do you recognize this document?

14  A.    Yes.

15  Q.    What is it?

16  A.    It's from Chase Bank, the information that I sent the wire

17  for $5,000.

18  Q.    Is that your bank?

19  A.    Yes.

20  Q.    And is this the confirmation of the wire transfer from

21  your bank?

22  A.    Yes.

23  Q.    So under requester name, it has your name and below that,

24  the account was Peter Blau doing business as California Money.

25  Was that the name of the account from your wired funds came

92

1  from?

2  A.    Yes.

3  Q.    The second box below that if we scroll down where it says

4  wire transfer information, the request date of the wire

5  transfer is what?

6  A.    10/25/2011.

7  Q.    And going all the way to the right where it says wire

8  amount.

9  A.    $5,000.

10  Q.    Then you mention the wire fee of $30 is right below that.

11  A.    Yes.

12  Q.    So there was 5,030 that was deducted out of your account?

13  A.    Yes.

14  Q.    And below that it has the beneficiary account where the

15  money ended up.  It shows Jacqueline Harley with an account

16  number, correct?

17  A.    Yes.

18  Q.    And the beneficiary bank is below that is Penn Security

19  Bank pursuant to the wiring instructions, correct?

20  A.    Yes.

21  Q.    And then on the second page of this document, the bottom

22  there is a confirmation that the wire went through?

23  A.    Yes.

24  Q.    The wire did go through, the money was deducted from your

25  account?

1  A.    Yes.

2  Q.    And can we have 37.2?  I will show you what's marked as

3  37.2, which is on the bank account of Jacqueline Harley at Penn

4  Security Bank.  I understand this is not your account, but we

5  have an agreement by counsel that I can show this to you for

6  the purpose of this presentation.  It indicates that on October

7  25th of 2011 the $5,000 did go into Jacqueline Harley's

8  account, which made the balance $5,001.36.  Do you see that?

9  A.    Yes.

10 Q.    And then I want to show you 37.7.  Is this another wire

11 transfer request from you to Mr. Harley for additional funds?

12 A.    Yes.

13 Q.    And the date on this one is March 15th of 2012 at 3:30,

14 correct?

15 A.    Yes.

16 Q.    Now, the original note, the million dollars, would have

17 been due February 25th of 2012.  So this is now about a month

18 -- almost a month later after that note was due.  You sent this

19 additional $800, correct?

20 A.    Yes.

21 Q.    What was the reason you sent him this $800?

22 A.    He said he was planning on suing Bernanke and the Federal

23 Reserve and he needed to have more money for his litigation and

24 his needs.

25 Q.    So you believed that, and you sent him the money?

94

1   A.   Yes.

2   Q.   And this wire transfer is signed by you at the bottom of

3   the page?

4   A.   Yes.

5   Q.   That's your signature?

6   A.   Yes.

7   Q.   And it's for $800 to the same account at Penn Security

8   that the -- the Jacqueline Harley account?

9   A.   Yes.

10  Q.   That was pursuant to Mr. Harley's instructions, correct?

11  A.   Yes.

12  Q.   If we go to the third page of this document, those are the

13  wiring instructions that you received where to send the $800?

14  A.   Yes.

15            MR. BRANDLER:  Your Honor, I have no further

16  questions.  I will move the admission of the previously

17  referenced exhibits.  I believe it was 37.3 -- 37.1, 2, 3, 4,

18  5, 6, 7, 8 and 9.

19            THE COURT:  Mr. O'Brien?

20            MR. O'BRIEN:  Do you want me to do cross before

21  lunch?

22            THE COURT:  Any objection?

23            MR. O'BRIEN:  No.

24            THE COURT:  They'll be admitted.  Cross-examine.

25  CROSS EXAMINATION

1  BY MR. O'BRIEN:

2  Q.   Now, Mr. Blau, just a couple of things.  No. 1, my

3  understanding is correct that your initial involvement with Mr.

4  Harley is you were working with him, you were attempting to get

5  other businessmen interested in what he had and put them -- the

6  two of them together?

7  A.   I was trying to bring some of my associates to Mr. Harley

8  who could provide him with the services that he needed.

9  Q.   Sounds good.  And how long did that -- how long -- when

10  did that begin?  When did your relationship with Mr. Harley

11  attempting to bring associates to him, when did that begin?

12  A.   I believe it was 2009 when I first met Mr. Harley, and

13  when I brought my associates it may have been 2009 or 2010.

14  Q.   So that relationship, 2009, 2010 -- and 2011 is when you

15  sent him the check?

16  A.   Yes.

17  Q.   Okay, now, the -- put 37.1 up, please.  My recollection

18  from your direct examination was that you said that Mr. Harley

19  said to you that -- there was some type of -- he was waiting

20  for something to happen with somebody else -- some arrangement

21  with a third party -- you used the word a third party -- that

22  had to occur before you get your million dollars?

23  A.   Mr. Harley said that the Federal Reserve would not

24  acknowledge his obligation and that he would have to file a

25  lawsuit against Ben Bernanke.

1  Q.   I am talking when you signed the note.  Did he tell you --

2  you used the term third party.  Who were you referring to when

3  you said to you that this million dollars -- you're going to

4  get this million dollars but it's dependant on the arrangement

5  I have with a third party.  You used the word arrangement and

6  third party.

7           MR. BRANDLER:  I object to the question.  I don't

8  believe that was the term Mr. Blau used.

9           THE COURT:  I don't know offhand.  So you can ask.

10          THE WITNESS:  What I did was on the Federal Reserve

11  notes, I referred him to Mr. Larry card.  And Larry Card was

12  working with him, and then that was unsuccessful.  And then the

13  defendant said he was going to deal directly with Bernanke.  So

14  I think the third party is Mr. Larry Card.

15  BY MR. O'BRIEN:

16  Q.   Well, Larry Card is someone you brought to him.  You said

17  that he was dealing with a third party and there was some

18  arrangement with a third party that was somehow contingency on

19  you getting paid back?

20  A.   No.  If I said that, that was a mistake.  There was no

21  contingency with a third party.  There was only the people --

22  only Larry Card who I brought with him and what he told me in

23  subsequent conversations.

24  Q.   Was Larry Card -- was this million dollars, was that

25  dependant on Larry Card and Mr. Harley reaching some

1  arrangement?

2  A.     No.

3  Q.     So you're telling us that you loaned him $5,000 and that

4  the idea was that in four months without any contingencies you

5  were going to get a million dollars?

6  A.     He told me that he could -- he could -- he had these

7  assets from the people in Indonesia and he had power of

8  attorney and with that power of attorney he could bring them to

9  fruition and that the $5,000 was -- he needed it in order to

10 fulfill that transaction and that he would pay me within four

11 months because he said that he would be able to receive the

12 funding right away.

13 Q.     So you knew that something had to happen between the loan

14 and the four months before you get the money back?

15 A.     I trusted his word.

16 Q.     But you knew something had to happen?

17 A.     As to what he told me.

18 Q.     You knew something had to happen?

19 A.     Of course.

20 Q.     That was the third party arrangement you talked about, you

21 loaned him $5,000, he will pay you a million in four months --

22 that's a pretty good deal -- but something had to happen, he

23 had to work something out with some other third parties?

24 A.     There was nothing specific said about a third party.  All

25 I took him was at his word.

1  Q.   But you knew something had to happen before that million

2  dollars --

3  A.   I knew something had to happen because he said he needed

4  the money for four months before he can pay me back.

5  Q.   You've been a businessman, a very sophisticated

6  businessman for a long time?

7  A.   Correct.

8  Q.   You know that people plan business arrangements and they

9  plan deals and sometimes they don't happen?

10 A.   There's a difference.  He's the one of the few people I

11 loaned money to because I trusted him.  He was very facile in

12 his conversations.  He was very trusting.  We started off in

13 the year 2009 and he didn't ask for money until much a later

14 time period.  So because I trusted him, I didn't use my best

15 judgment.

16 Q.   You know -- you know that a lot times -- you're involved

17 in the business of putting agents and brokers and people

18 together.  You know a lot of times when someone has a proposed

19 business arrangement it's dependant on something happening,

20 whatever that is, and a lot of times it doesn't happen and the

21 deals don't occur, do they?

22 A.   True.

23 Q.   Okay.  In fact, I think you said on direct -- you probably

24 have a lot of knowledge about this because you said you've

25 spent 22 years trying to put together and you've only done one

99

1   in 22 years?

2   A.   Correct.

3   Q.   Because a lot of them don't happen?

4   A.   Most of them.

5   Q.   That's what didn't happen here?

6   A.   That's why I misused my judgment.

7           MR. O'BRIEN:  No further questions, Your Honor.

8           MR. BRANDLER:  Nothing further.

9           THE COURT:  You may step down.  Do you want to start

10  another witness?  Why don't we go for 15 minutes?

11          MR. BRANDLER:  Fine.  Kathleen Kelly.

12          KATHLEEN KELLY, called as a witness, being duly

13  sworn, testified as follows:

14  DIRECT EXAMINATION

15  BY MR. BRANDLER:

16  Q.   Ms. Kelly, where do you currently reside?

17  A.   Currently I am in -- I'm sorry -- Port St. Luci, Florida.

18  Q.   Do you want a glass of water?  Are you all right?

19  A.   Yeah, I'm okay.

20  Q.   A little bit nervous?

21  A.   Yes.

22  Q.   Have you ever testified in court before?

23  A.   No.

24  Q.   Okay.  Take it very slowly here.  You live in Florida

25  currently?

1  A.    Yes.

2  Q.    How long have you lived in Florida?

3  A.    Since August.

4  Q.    August of this year?

5  A.    Yes.

6  Q.    Prior to living in Florida, where did you live?

7  A.    Mount Pocono, P.A.

8  Q.    Is that in the Pocono region?

9  A.    Yes.

10 Q.    Monroe County?

11 A.    Yes.

12 Q.    And how old are you?

13 A.    Fifty-five.

14 Q.    And are you currently employed?

15 A.    No, I am on Social Security disability.

16 Q.    And what is your disability?

17 A.    Major depression disorder.

18 Q.    Did you ever have any medical besides your psychological

19 issues?

20 A.    Oh, yes, I have a torn rotator cuff and osteoporosis in my

21 right knee.

22 Q.    Was there aneurisms that caused you to be on disability?

23 A.    Yes, sorry, brain aneurysms, I had them clipped and so on

24 and so forth.

25 Q.    Is that why you're on disability for those medical issues?

101

1   A.    Yes.

2   Q.    How long have you been on disability?

3   A.    Since '06.

4   Q.    2006?

5   A.    Yes.

6   Q.    So you have not worked since 2006?

7   A.    No.

8   Q.    Prior to 2006, what type of employment did you have?

9   A.    Thirty years advertising in New York, commercial

10  advertising.

11  Q.    What did you do in the advertising business?

12  A.    Actually I was a coordinator where I basically -- I headed

13  the department for talent payment, and I fell into the Screen

14  Actors Guild roles and even wrote programs with talent payment

15  departments and made sure everyone got paid by the Screen

16  Actors Guild contract.

17  Q.    As a result of your medical problems, you had to stop

18  working?

19  A.    Yes.

20  Q.    And when you were living in Pennsylvania, did you have

21  occasion to know a woman by the name of Jacqueline Kube?

22  A.    Yes.

23  Q.    And how did you know Jacqueline Kube?

24  A.    I met her through -- when I was going through

25  determination for Social Security.  The Social Security

1  determination board sent me to a doctor, Dr. Mathia (ph).  And

2  on April 4th I got sent to Dr. Mathia, and she was his

3  secretary  April 4th of '03.

4  Q.    What is Jacqueline Kube in relation to the defendant in

5  this case, Richard Harley?

6  A.    She was his wife.

7  Q.    And these doctor visits that -- Dr. Mathia?

8  A.    Yes.

9  Q.    When you met Jacqueline Kube through those visits, what

10  was her job at the doctor's office?

11  A.    Secretary.

12  Q.    Do you remember approximately -- was that around 2003,

13  2004?

14  A.    It was April 4th of '03.  I found the paperwork.

15  Q.    April 4th of when?

16  A.    '03.

17  Q.    When you started going to the doctor and met Jacqueline?

18  A.    Yes.

19  Q.    All right.  And did you develop a relationship friendly

20  relationship with Jacqueline?

21  A.    Yes, very close relationship.

22  Q.    And because you that you had repeated visits at that

23  doctor?

24  A.    Yes, we hit it off really well.

25  Q.    Did you also socialize outside of the doctor's office?

1  A.   Oh, yes, we went to dinner all the time together.  I went

2  to dinner at her house.  We went shopping together all the

3  time.

4  Q.   Would you consider her your best friend at that time?

5  A.   Yes, that's exactly what it was.

6  Q.   Now, through that relationship did you ever meet her

7  husband, Mr. Richard Harley?

8  A.   Yes, at first it was just me and her, and then Richard

9  came back into the picture.

10  Q.   And was that about 2005 you met him?

11  A.   I guess so, yes.

12  Q.   And when -- you said you went over to the house, have

13  dinner there with him?

14  A.   Constantly, almost every weekend.  We have dinner, watch a

15  movie.

16  Q.   And did you receive any money as a result of your medical

17  disability, any lump sum payments?

18  A.   Yes, in 2006, I got a lump sum payment -- I got granted

19  Social Security disability.  I got a lump sum payment.

20  Q.   Do you remember how much that was about?

21  A.   It came to total of almost $40,000.

22  Q.   And was that around 2006?

23  A.   Yes.

24  Q.   And did you discuss that with Mr. Harley and Jackie when

25  you received that money?  Was that a topic of discussion?

1  A.    Oh, yeah, major topic of discussion because they were with

2  me basically through all of it.

3  Q.    And was that a lot of money for you?

4  A.    That was everything.  I was living on $205 a month through

5  public assistance.

6  Q.    Did Mr. Harley make any solicitations to you about what

7  you should do with your money?

8  A.    Yes, that was basically, you know, if you give me that

9  money, we can triple it, so on and so forth.  That's where the

10 promissory came in.

11 Q.    We need to go into the so on and so forth part.

12 A.    I'm so sorry.

13 Q.    That's all right.  I understand.  I understand.  I want to

14 make you comfortable here.  Unfortunately, we have to get in

15 more detail beyond so on and so forth.  Tell us what he told

16 you as far as the promissory note, the triple your money and

17 what assets he had.

18 A.    Well, it was a conversation about that he had oil, a lot

19 of oil.  And at the time we were in a big oil crunch in this

20 country and he had a lot of oil and he could triple my money

21 and it wouldn't be very long, it would be 185 days.

22 Q.    So about half a year, six months?

23 A.    Six months.

24 Q.    He would triple your money?

25 A.    He would triple my money.  Since we were so good friends,

1  who else would you trust but your friends?  I was not one to --

2  ever had any money to make investments.  So it was a natural

3  thing that I would want to make money.

4  Q.    So you believed that he owned this oil?

5  A.    Yes.

6  Q.    Did he tell you where it was located?

7  A.    No, not really.

8  Q.    Go ahead.

9  A.    He had investors.

10 Q.    What did he say about his investors?

11 A.    He had investors that would, you know -- he was going to

12 sell it to and so on and so forth, not where he would spread it

13 out -- I didn't get into the big details with it.

14 Q.    And is there a reason you didn't get into the details

15 because you considered him a friend and you trusted him?

16 A.    Yeah, I trusted him.

17 Q.    Did he ever show you any documents to support his claim of

18 ownership of the oil, any notes or --

19 A.    No, not that I recall.

20 Q.    And so you got -- you got $40,000 from your disability

21 payment.  How much did you invest with Mr. Harley?

22 A.    The money issue of how much I was getting was dribbling in

23 from Social Security.  S. S. I. was paying ten, and Social

24 Security Disability was giving me 30.  So Jackie and Richard

25 was pushing the fact of how much I should give them, so I was

1  getting a little leery about it.  So I changed how much I was

2  going to give them.

3  Q.   So you said Jackie and Richard was pushing how much you

4  should invest.  How much did they want to you invest out of the

5  40,000?

6  A.   38,000.

7  Q.   Then you would triple it in six months?

8  A.   Yes.

9  Q.   You said you had other obligations that you need the money

10 for or it was coming in slow?

11 A.   Yes, it was coming in slow, and I gave them five and --

12 Q.   When you say you gave them five, you mean $5,000?

13 A.   $5,000.

14 Q.   And was that in one lump sum increment --

15 A.   No, it was in five different increments.  I took out my

16 notes in front of me.

17 Q.   No, I have the documents.  I want to get the story out

18 first.  So in separate increments would you give -- how would

19 you transfer the money to Mr. Harley?

20 A.   Two were wire transfer to his bank.

21 Q.   From your bank to his bank?

22 A.   Yes.

23 Q.   And then what about the other transactions?

24 A.   They were cash.

25 Q.   And that was all in 2006?

1  A.   Yes.

2  Q.   And what was the bank that you used?

3  A.   Tobyhanna Credit Union.

4  Q.   And do you remember what Harley's bank was where the money

5  went?

6  A.   I think -- right now I don't remember -- it was Mellon

7  Bank.

8  Q.   And did you have wiring instructions?

9  A.   Yes, I did.

10 Q.   Who did you get the wiring instructions from?

11 A.   From Jackie and Richard.

12 Q.   Did you ever get a document, promissory note in return

13 after you gave him the money?

14 A.   I never got a clean copy of a new 5,000 promissory note.

15 I had the original with the original amount of money on it,

16 36,000 -- the $38,000 one.

17 Q.   So after you gave him the money, you got this note and you

18 were supposed to triple the money in six months.  So that would

19 have been around January of 2007?

20 A.   Yes.

21 Q.   And you were expecting $15,000?

22 A.   Uh-huh.

23 Q.   Did you get $15,000?

24 A.   No.

25 Q.   And did you make any contact with Mr. Harley and Jackie to

1  find out what the story was?

2  A.   I stayed friends with them after that, and there was many

3  excuses.  And, you know, there was many reasons and a lot of

4  deals had fallen through for Richard, and we would discuss that

5  at dinner, so on and so forth.

6  Q.   I'm sorry, but again I will have to make you -- some of

7  the so on and so forth --

8  A.   A lot of deals that fell through for Richard, and he had a

9  prospect coming up and --

10  Q.   Something was right around the corner?

11  A.   Absolutely.

12  Q.   And he was promising to pay you the money?

13  A.   Yes.

14  Q.   And did he ever tell you what these deals were that fell

15  through?

16  A.   There was one that I remember that was a producer in

17  California that fell through that I remember quite clearly --

18  never told me the name of the producer.

19  Q.   Anything else that you remember?

20  A.   No, that was the one I remember.

21  Q.   That's fine.  Did there ever reach a point where you

22  stopped -- you got impatient and wanted your money more

23  persistently?

24  A.   Yes.

25  Q.   Tell us how long that took and, you know, while you were

1  making friends at some point it changed.

2  A.    It changed when I went over there, and there was a new car

3  parked in the garage in the neighbors.  I noticed this car was

4  brand new, and he was showing it to me and I realized this car

5  showed up way after my money was due.

6  Q.    What kind of car was it?

7  A.    I'm not really sure.  It was a brand new car that he kept

8  telling me was way out of my league.

9  Q.    He said it was way out of your league?

10  A.    Yeah.

11  Q.    Richard said that?

12  A.    Yes, it was way too much car for me.

13  Q.    Was it a Lexus?

14  A.    No, no, it wasn't a Lexus, but it had racing seats that

15  had K. 2 on it.  I was making jokes about how this K. 2 would

16  be perfect for me, Kathleen Kelly, K. 2.  He said, way too out

17  of your league, it's too much car for you.  I said, I thought

18  you got it for me, this was my surprise for my money.  I went

19  home that night.  I didn't say much more.  I called Jackie the

20  next day.  I said, he bought this car when he knows he owes me

21  money.

22  Q.    What did she say?

23  A.    Oh, no, he bought that before.  I said, no, he didn't.

24  And then I didn't really get invited back anymore.

25  Q.    Did you ever confront Richard -- you said he told you car

1  was out of your league.  Did you say, why are you buying a new

2  car when you owe me --

3  A.    No, I didn't say that to him.  I -- I really was

4  flabbergasted.

5  Q.    Now, approximately when did you stop having contact with

6  Jackie and Richard over this car incident?

7  A.    I guess it was before I started making phone calls.  I

8  guess that was around '08.

9  Q.    Okay.  You said there was some phone calls after that you

10 -- tell us about that.  What do you mean?

11 A.    Well, in October of '08 is my notes of when I started

12 making a lot of phone calls to them about my money and leaving

13 messages and --

14 Q.    Did you ever get your messages returned?

15 A.    Some of them they would answer, and so on and -- well --

16 Q.    So on and so forth?

17 A.    I don't have any notes in front of me.

18 Q.    That's all right.  If you need to refresh your

19 recollection with your notes, we can get them.  I think we're

20 all right so far.

21 A.    Okay.  I very detailed notes of days.

22 Q.    Why were you keeping such detailed notes?

23 A.    It's just force of habit of being in advertising that you

24 always wrote down everything, and I still do it to this day.

25 Q.    So on the occasions where you got a return phone call from

1  Richard about your money, what did he tell you?

2  A.   At one point I know in my notes there's something he said

3  it was just -- you know, right around the corner and he was

4  going to surprise me -- he was going to call me soon, he was

5  going to surprise me.

6  Q.   Did you ever contact law enforcement about money that you

7  lost from --

8  A.   I contacted a lawyer, and he just -- I didn't have the

9  money to pursue it.

10 Q.   There was a search of Mr. Harley's residence in August of

11 2012.  Were you still in the Poconos then?

12 A.   Yes.

13 Q.   Did you contact the FBI at that time?

14 A.   Yes, that's exactly what I did.

15 Q.   And you spoke to Mr. Browning?

16 A.   I spoke to Mr. Browning.  He visited me.

17 Q.   You gave him various documents you saved?

18 A.   Uh-huh.

19 Q.   From these transactions.  I will go through some of those

20 documents with you now.  Could we have --

21          THE COURT:  All right.  Is it a good time --

22          MR. BRANDLER:  Yes.

23          THE COURT:  We will do this after lunch.  Members of

24 the jury, we will take our lunch break now.  Come back at

25 quarter to two, an hour and ten minutes.  Do not discuss the

1  case among yourselves or with anyone else.  If anyone tries to

2  talk to you about it, bring to my attention immediately.  Enjoy

3  your lunch.  We will see you back here quarter to two.

4          (A lunch recess was taken.)

5          THE COURT:  Mr. Brandler?

6          MR. BRANDLER:  Thank you.

7  BY MR. BRANDLER:

8  Q.   Ms. Kelly, before we broke for lunch, I was showing some

9  documents.  I want to continue that process now.  Could we have

10 exhibit 39, please?  You had mentioned during your earlier

11 testimony that there was some revisions made to the note in

12 terms of the amount.  Do you recognize this document?

13 A.   Yes.

14 Q.   And what do you recognize it to be?

15 A.   It's the original promissory note.

16 Q.   And it says on the top secured corporate -- just enlarge

17 the top half, please.  It says secured corporate promissory

18 note, and it's dated July 19th of 2006.  Underneath that it

19 says it's in return for a loan of $12,000 between you and RJH

20 and Company, correct?  That's in that first paragraph?

21 A.   Yes.

22 Q.   Yes.  Then the bottom -- scroll down to number three --

23 that you were going to get three times the amount of said loan,

24 $36,000 on the maturity date which was in the paragraph above

25 it 185 days after July 19th, 2006.  Is that the original deal

113

1   or -- that was presented to you by Mr. Harley?

2   A.   Yes.

3   Q.   But you didn't invest $12,000?

4   A.   No.

5   Q.   Go to the third page of this document, just the bottom

6   portion.  There's signatures and handwriting.  Do you see your

7   signature line, Kathleen Kelly?

8   A.   Uh-huh.

9   Q.   Is that your signature?

10  A.   Yes.

11  Q.   Above that Mr. Harley.  Is that his signature?

12  A.   Yes.

13  Q.   There's some handwriting there.  Do you know whose

14  handwriting that is?

15  A.   K. K. is mine.

16  Q.   Keep your voice up.

17  A.   Kathleen Kelly is mine.

18  Q.   Is that where it says K. K. right next to your name there?

19  A.   Yes.

20  Q.   And the R. J. H. initials?

21  A.   Richard.

22  Q.   And on the right-hand side of that there's some

23  handwriting.  Do you know whose handwriting that is?  It says

24  R. J. H., K. K.?

25  A.   That's Richard and mine.

114

1  Q.   And what does it say?

2  A.   The balance was 8,000, paid 500 on 8/20/06, balance is --

3  Q.   Can you interpret what all this -- 9,000 is crossed out,

4  the 8,500 -- and then there's some handwriting.  What did you

5  understand this revision to mean?

6  A.   Well, I got paid 500 first.

7  Q.   So there was --

8  A.   That was after I made the -- I guess the wire transfers.

9  Q.   So you said you were making incremental payments?

10  A.   Yes.

11  Q.   It was revised as you were making the incremental

12  payments?

13  A.   Yes.

14  Q.   Can we go to exhibit 39.2?  Do you recognize this

15  document?

16  A.   Yes, that was the beginning of my notes.

17  Q.   These are your personal notes?

18  A.   Yes.

19  Q.   That you were referring to earlier?

20  A.   Yes.

21  Q.   And does it show the date of the agreement that you had

22  with Mr. Harley?

23  A.   July 19th, 2006.

24  Q.   And the due date?

25  A.   Due date was maturity date, January 24th, 2007.

1  Q.   Does it show the money and dates you paid?

2  A.   Yes.

3  Q.   What does it show?

4  A.   August 20th, '06, I paid 500 in cash, July 19th, 2006, I

5  wired 3,000 into their bank, September 1, 2006 I wired another

6  thousand dollars into their bank, and 8/8/06 I paid another 500

7  in cash.

8  Q.   What do the notations below that indicate?

9  A.   Oh, these are all my notes of the conversation October 6th

10 at 8:30 per convo, spoke to Richard, said within a few days he

11 was going to surprise me.  He has a company interested.  I said

12 I would call him back by Friday, October 10th.

13 Q.   Then what happened October 10th?

14 A.   Left message with Jack.  I always called his wife Jackie,

15 Jack, for him to call me back and he never did.

16 Q.   What happened on October 14th?

17 A.   From my cell, and I put the cell number 347 -- I had a New

18 York cell my son from New York gave me.  And 12:23 in the

19 afternoon I spoke to Richard.  He asked if he can call me back.

20 Q.   Did you call him again?

21 A.   Later on that afternoon I called again from home phone at

22 5:20 and left a message to call me, need some dollars back, I

23 am in deep trouble or I will have to take this further.

24 Q.   On the 18th?

25 A.   Called from the New York cell at 1:54 p.m., left voicemail

1  message, please call me, I have tried -- tried more than --

2  numerous times over a week.  I tried over a week to get in

3  touch with you and no response.

4  Q.    Next page.

5  A.    Transferred a thousand on September 1st, sent 11:16 to the

6  Mellon Bank, 500 -- these are the wire instructions.

7  Q.    So that's just more documentation of the money and where

8  it went?

9  A.    Yes.

10  Q.    Then the next page.  Are these more of your handwritten

11  notes?

12  A.    Yes.  Called and left a message on voicemail on October

13  11th, '08 with phone and address change.  I changed my address

14  at that point.  I just changed.

15  Q.    What does it say after that?

16  A.    I would accept your original dollars and gave them the

17  number to call me back.

18  Q.    So when you say the original dollars, what did you mean

19  that you would accept?

20  A.    The 5,000.

21  Q.    You weren't looking for the 15?

22  A.    No, anything would have helped.

23  Q.    And there's a note --

24  A.    Yeah, this was just a different scrap note I had on the

25  side saying April 8th, 2007 I just asked Jack again for a clean

1  copy of the original -- of the revised promissory note -- for a

2  clean copy of it, and she was going to look for it.  She said

3  she had it, she didn't -- but for one reason or another she

4  couldn't make me a copy.  What I meant by that was either her

5  computer wasn't working at the time or printer or she couldn't

6  get to a computer.  So that's what I wrote.

7  Q.    Below that is just another --

8  A.    Breakdown of the money.

9  Q.    The next page appears to be a revised promissory note?

10 A.    Yes, I crossed out twelve and made it five.

11 Q.    The date on this one is July 19th, 2006?

12 A.    Same date, yes.

13 Q.    Same note except --

14 A.    Yes.

15 Q.    So you crossed out the 12,000 to make it a five because

16 that's how much you invested?

17 A.    Yes.

18 Q.    The initials on the side there?

19 A.    Those are mine.  That's K. K.

20 Q.    On number three, the amount you are going to get paid

21 below that, did you cross out the 36,000 and -- can you --

22 A.    Yes, I must have crossed out 36 to make it five, yes.

23 That's my $5,000.

24 Q.    Well, 15 -- you will get three times the amount of the

25 loan, so that would be 15,000, correct?

118

1   A.   Yes, probably can't see because of the dark line.

2   Q.   Going to the last page of this document, signature page,

3   two pages following that page -- Bates number 874 at the

4   bottom.   This appears to be the same one we saw earlier with

5   the same marks?

6   A.   Yes.

7   Q.   You made revision to the original note based upon the

8   actual amount of money?

9   A.   Yes.

10  Q.   And you were asking Jackie for a clean copy to reflect

11  what your changes were?

12  A.   Yes.

13  Q.   Did you ever get that?

14  A.   No.

15  Q.   And can we go to the next page of this document?   Just

16  enlarge that.   Do you recognize this document?

17  A.   This is my bank account.

18  Q.   At what bank?

19  A.   Tobyhanna Credit Union.

20  Q.   And the statement date that appears on the right?

21  A.   September 1st, '06, the month of September '06.

22  Q.   Does it show a wire transfer Mellon Bank, RJH and Company?

23  A.   Yes.

24  Q.   The date it's showing there is showing September 5th.

25  Then you have -- you have next to it 01/06.   But that's next to

 1  withdrawal.  Do you know what that -- just interpret that for

 2  me -- that's your handwriting where it says slash '06?

 3  A.    Yes.

 4  Q.    What does that mean, you withdrew money?

 5  A.    I guess so.  I don't really understand this right now.

 6  The wire transfer --

 7  Q.    All right.

 8  A.    I guess the wire transfer is a withdrawal, and it's a

 9  withdrawal wire transfer.  And it costs $15 to wire to transfer

10  it.

11  Q.    Let's go 39.3.  This is a record of the wire transfer of

12  $3,000 on July 19th, 2006.

13  A.    Yes, that's $3,000 out of my Tobyhanna account.

14  BY MR. BRANDLER:

15  Q.    Okay.  It says Tobyhanna Army Depot on the right, correct?

16  A.    Yes.

17  Q.    It says where it's going under name and address, Merrill

18  Lynch Pierce Fenner and Smith, Jacksonville, Florida?

19  A.    Yes.

20  Q.    It says Merrill Lynch for the benefit of RJH and Company,

21  Inc., right?  So that's the wire transfer on that date, July

22  19th, 2006, correct?

23  A.    Yes.

24  Q.    If we go to 39.4, is there another similar document

25  indicating a wire transfer from your account at Tobyhanna to

1  the Merrill Lynch account of RJH for $1,000 on September 1st,

2  2006?

3  A.    Right, exactly.

4  Q.    That's what happened?

5  A.    Right.

6  Q.    And then 39.5, what is this document?  Can you make it

7  larger?

8  A.    This was the wire instructions I got from Jackie and

9  Richard the first time -- yes, where to wire the first $3,000.

10 Q.    The handwriting on that, do you know whose handwriting

11 that is?

12 A.    That's my handwriting.

13 Q.    In addition to the $4,000, you had a $3,000 wire transfer

14 and then a thousand dollar.  Was there cash you said?

15 A.    Yes.

16 Q.    How much in cash?

17 A.    A thousand dollars in total broken up into two payments of

18 500 each.

19 Q.    Who did you give that cash to?  Do you remember the

20 circumstances of how and -- who you gave it to?

21 A.    One was in the car -- in Richard's car.  Five hundred of

22 it was handed to Richard in his Lexus on our way out to dinner,

23 and one was in the kitchen of their house, and I you gave it to

24 Richard.

25             MR. BRANDLER:  No further questions.  I move

1  admission of 39.1, 2, 3, 4 and 5.

2          THE COURT:  Any objection to the admission?

3          MR. O'BRIEN:  No objection.

4          THE COURT:  Admitted.  Cross-examine.

5  CROSS EXAMINATION

6  BY MR. O'BRIEN:

7  Q.    Ms. Kelly, you said you were friendly with Mr. Harley and

8  with Jacqueline, his wife?

9  A.    Yes.

10 Q.    And I believe you also said if I copied this down

11 correctly, when he asked you for the loan, you didn't go into

12 any details with him because he was a friend?  Did you say that

13 on direct examination?

14 A.    Well, it wasn't a loan.  It was investment.

15 Q.    Investment?

16 A.    Yes.

17 Q.    And he didn't show you any documents?

18 A.    Not that I recall.

19 Q.    And you stand by your statement you didn't go to any

20 details with him because he was a friend?

21 A.    I said not that I recall.

22 Q.    So this was an investment you voluntarily made with him?

23 A.    Yes, it was voluntary.

24 Q.    You did it knowingly?

25 A.    Excuse me?

1  Q.    You did it knowingly?  Knowingly, you knew --

2  A.    Yes, it was knowingly.  I trusted them.

3  Q.    Can I see exhibit 39.2 -- I'm sorry -- 39.2.  How many

4  pages is this exhibit?  Bear with me -- okay.  First page.  If

5  you look at the -- right here can you read that, please, 10/6

6  notation?

7  A.    10/6, 8:30 p.m. per convo, spoke to Richard.  He said he

8  was going to -- within a few days he was going to surprise me.

9  He has a company interested in his venture, and I said I would

10 call him back by Friday, October 10th.

11 Q.    How did you understand that reference to a company

12 interested?

13 A.    His oil.  That was what was pertaining to our promissory

14 note.

15 Q.    Your understanding he would pay you back when the money

16 came in from the investment?

17 A.    Absolutely.

18        MR. O'BRIEN:  Thank you.

19        MR. BRANDLER:  No further questions, Your Honor.

20        THE COURT:  You may step down.

21        MR. BRANDLER:  Kevin Fogerty.

22        KEVIN FOGERTY, called as a witness, being duly sworn,

23 testified as follows:

24 DIRECT EXAMINATION

25 BY MR. BRANDLER:

123

1  Q.  Mr. Fogerty, what is your occupation?

2  A.  I'm a lawyer.

3  Q.  Where do you practice law?

4  A.  Allentown.

5  Q.  Are you licensed in Pennsylvania?

6  A.  Yes, sir.

7  Q.  And how long have you been a lawyer in Pennsylvania?

8  A.  Since November 1982.

9  Q.  And are you solo practitioner or part of a firm?

10  A.  I have my own firm, two other lawyers that work with me.

11  Q.  Where is your firm located?

12  A.  The exact address --

13  Q.  Just the town, city.

14  A.  It's in Allentown, Pennsylvania.

15  Q.  I want to direct -- what kind of work do you specialize

16  in, if any?

17  A.  Mostly what would be called civil litigation.  It's civil

18  disputes, lawsuits between individuals as opposed to criminal

19  cases.

20  Q.  I want to direct your attention to July of 2009.  Did you

21  have occasion to get a new client, a man by the name of

22  Marshall Silverstein?

23  A.  Yes, I met with Marshall that day -- to be clear I had

24  known Marshall before that.  He was not a new client.

25  Q.  I see.  And you knew him as a former client, another

1 litigation or as a friend or both?

2 A.    Marshall had been involved in some business matters, and I

3 represented him in connection with those for a number of years

4 before then.

5 Q.    In July 2009 did you meet Marshall in connection with a

6 new matter?

7 A.    I did.

8 Q.    And what was the nature of that new matter?

9 A.    The nature of the new matter was that he had provided a

10 substantial amount of money to an individual, Mr. Harley, and

11 had not gotten any of the money back as had been promised.

12 Q.    And after Mr. Silverstein explained to you the facts of

13 that case, did you take any action as a lawyer on his behalf?

14 A.    I did.  I prepared what would be called a civil complaint.

15 Q.    And what does that mean, a civil complaint?

16 A.    Civil complaint is a document that you file at the

17 courthouse where one person called the plaintiff sues the

18 defendant or defendants if there's more than one asking for

19 some relief from the Court.

20 Q.    When did you file that lawsuit?

21 A.    I filed that complaint on November 9 of 2009.

22 Q.    What court did you file it in?

23 A.    In what is called the Lehigh County Court of Common Pleas.

24 Q.    And who did you file against?  Who were the defendants in

25 that case?

1  A.    The defendants were Richard J. Harley, Jacqueline

2  Kube-Harley and a corporation known as RJH and Company, Inc.

3  Q.    And you said that your client Mr. Silverstein had given

4  money to Mr. Harley, and you alleged that in your complaint?

5  A.    Correct.

6  Q.    Do you know how much money it was?

7  A.    My recollection is about $235,000.

8  Q.    And how much were you suing for?

9  A.    Well, based on the documents that I was given, the claim

10  was for $1.1 million.

11  Q.    And when you say the documents you were given, what are

12  you referring to?

13  A.    There were agreements that had been signed between Mr.

14  Silverstein and in one instance Mr. Harley and another instance

15  Mr. and Mrs. Harley as well as this corporation, RJH and

16  Company, Inc., that made certain promises to Mr. Silverstein

17  regarding not just the return of his money but a profit on that

18  return.  That's where the $1.1 million came from.

19  Q.    And why was the case filed in Lehigh County?

20  A.    Because that's where Mr. Silverstein resides.

21  Q.    You said you filed it on November -- November of 2009.

22  How long did the case last?  Is it -- has it been finalized?

23  A.    It was eventually finalized August 11th of 2011 with the

24  entry of a judgment, which I believe was for $1,140,000 in

25  favor of Mr. Silverstein and against Mr. Harley and Mrs. Harley

1 and RJH and Company, Inc.

2 Q.    I'm showing you exhibit 20.4.

3 A.    Yes, sir.

4 Q.    And do you recognize this document?

5 A.    I do.

6 Q.    What do you recognize it to be?

7 A.    That is the order that was entered on August 8th of 2011

8 by Judge Johnson in Lehigh County, J. Brian Johnson, who is one

9 of the judges in the court of common pleas to whom this case

10 was assigned.  And that's the order pursuant to which the judge

11 ruled that Mr. Silverstein was entitled to a money judgment for

12 the event I referenced earlier, $1,140,000.

13 Q.    Is that in paragraph four on that first page?

14 A.    It is, sir.

15 Q.    Just read that out loud.

16 A.    Paragraph four says, judgment is entered in favor of the

17 plaintiff, Marshall Silverstein and against the defendants, RJH

18 and Company, Inc., Richard J. Harley and Jacqueline Kube-Harley

19 in the amount of $1,140,000 as of July 2, 2009 plus interest

20 thereon from and after that date at the rate of 6 percent per

21 year.

22 Q.    Below that is the Court's signature?

23 A.    Correct.

24 Q.    In Lehigh County what happens once an order of judgment

25 like this is entered in the record?

1 A.   In and of itself nothing.  If I want to do anything with

2 it, I then have to file papers to convert this order to what is

3 called a final judgment, which I did in this case.

4 Q.   All right.  Before we get to that, can we go to the second

5 page of this document?  There's something called a document

6 distribution list.  Are you familiar with that?

7 A.   Yes.  That is a page that's attached by the Lehigh County

8 Clerk of Courts which is where the order would have been filed,

9 and this is a confirmation of where the clerk of courts mailed

10 that order.  In other words, it's a list of everyone who

11 received a copy of it by mail from the clerk of courts office.

12 Q.   And one of the people is Mr. Harley with an address of P.

13 O. Box 337, Shawnee on Delaware?

14 A.   Correct.

15 Q.   Can we scroll down here?  And there's a notice provision.

16 What does the identification provision say?

17 A.   Pursuant to -- that's short for Pennsylvania Rule of Civil

18 Procedure 236, notice is hereby given that an order of decree

19 or judgment in the above-captioned matter has been entered.

20 Then Andrea Naugle is the clerk of judicial records whose staff

21 would have mailed this out.

22 Q.   You mentioned that you took some action regarding this

23 judgment.  Can we go to the next page?  Do you recognize that?

24 A.   Correct, that's the document I was referring to a few

25 minutes ago.  That's the paperwork I would have prepared to

1  cause that order to become what is called a final judgment.

2  And that would have been filed -- in this instance it was filed

3  on August 11, 2011, which was two days after the order.

4  Q.    Just highlight the bottom half.  These are legal terms.

5  Praecipe, that first word, for entry of judgment on order

6  entered August 9th, is that a direction to the clerk?

7  A.    The word praecipe means it's a request.  It's a laymen's

8  term for praecipe.  I'm requesting the clerk to enter the final

9  judgment on Judge Johnson's August 9th order.

10  Q.    The amount that you're going to assess damages is what?

11  A.    The total was $1,289,730.40.

12  Q.    That was made up of the 1.1 million plus some interest of

13  149,000?

14  A.    Right, remember when the order that was up there before --

15  the prior exhibit -- Judge Johnson had given us interest from

16  -- I think it was -- June or July -- according to this it was

17  June of 2009.  So we added that on.

18  Q.    Now, the second page of this document -- the next page.

19  There's some signatures that appear there?

20  A.    That's me.

21  Q.    So that's you filing this --

22  A.    Correct.  That's me -- I would have signed before it would

23  have gotten filed.  When the clerk's office would have accepted

24  it, they would have put the stamp for Andrea Naugle who is

25  clerk of courts in Lehigh County.  That's -- the initials after

1  that are the initials of one of her staff who stamps her name.

2  Then they fill in the date.

3  Q.    All right.  So the judgment was entered.  It was finalized

4  in the court?

5  A.    Correct.

6  Q.    And then what do you do next as the lawyer for Mr.

7  Silverstein?

8  A.    Well, the objective here is not to just file paper, it's

9  to collect money you have a judgment on.  So the next step is

10  because Mr. and Mrs. Harley resided in Monroe County, which is

11  different than Lehigh County, we filed papers literally the

12  same day I filed these judgment papers, August 11th of 2011, to

13  transfer the judgment from Lehigh to Monroe because if I want

14  to try to collect in Monroe County, I have to have the judgment

15  transferred up there first.  It's much easier to do it that

16  way.

17  Q.    Were you able to transfer the judgment up to Monroe

18  County?

19  A.    I was.

20  Q.    And were you able to eventually collect any portion of

21  this $1.2 million judgment?

22  A.    The only amount that was ever collected was through a levy

23  against, I believe, a 2008 Lexus automobile that was titled in

24  the name of RJH and Company, Inc.

25  Q.    And can we go to exhibit 27.32?  Enlarge the top half,

1  please.  Do you recognize this document?

2  A.    I do.

3  Q.    What is it?

4  A.    It's an order that was entered in Monroe County case to

5  which we had transferred this judgment that's dated September

6  20, 2012.

7  Q.    And what does it relate to?

8  A.    It relates to the fact that we had -- there was a hearing

9  held before one of the judges up there -- the name escapes me

10  right now but -- I'm sorry -- Judge -- there was a hearing

11  before Judge Zulick on a motion we filed.  It's referred to at

12  the top of the order.  It's plaintiff's motion for

13  supplementary relief in aid of execution.  This was an order

14  that was entered in response to that motion that we had filed

15  as well as RJH and Company had filed a petition trying to

16  prevent for us completing the execution against the Lexus.

17  Q.    Did the Court take action as far as awarding ownership of

18  the Lexus to Mr. Silverstein?

19  A.    It did.  Yes, that's in paragraph one.

20  Q.    All right.  And it transferred ownership to Mr.

21  Silverstein?

22  A.    Correct.

23  Q.    And was Mr. Silverstein able to take possession of the

24  vehicle?

25  A.    He did eventually, yes.

1  Q.    What happened?  What do you mean by eventually?

2  A.    I was not personally there when he got it, but he went up

3  there, I believe --

4  Q.    I don't want you to talk about things that happened when

5  you were not personally there.  But just tell us the process in

6  terms of once an order like this is entered what happens?

7  A.    The defendants, in this instance RJH and Company, was the

8  title holder of the Lexus were given, I believe, 24 hours to

9  turn over the car.  And so following the entry of this order,

10 Mr. Silverstein went up the next day accompanied by another

11 individual and picked up the car.

12 Q.    Was he able to successfully to get the car?

13 A.    Yes.

14 Q.    Was there a sheriff's sale of some type?

15 A.    What happened is -- prior to this hearing in September of

16 2012, we had filed -- once we transferred the judgment to

17 Monroe County, transferring the judgment there doesn't get you

18 much other than a lien against any real estate in that county.

19 If you want to put a lien against and foreclose against any

20 personal property, you have to get the sheriff to what they

21 call levy or go out and put a lien against personal property.

22       When we transferred the judgment up there in August of

23 2011, we also filed papers asking the sheriff to execute on

24 whatever assets existed, particularly this Lexus.  And so there

25 was actually -- prior to September of 2012, I think sometime in

1  the Spring of 2012 there was a sheriff's sale of the Lexus

2  pursuant to a levy that was accomplished.  And on behalf of Mr.

3  Silverstein I attended that sale.  We were the only bidder.  We

4  were the successful bidder.  At that sale we bought the

5  vehicle.  The problem became the vehicle was in Mr. Harley's

6  possession and he refused to turn it over after we bought it at

7  the sale, so I had to file this motion and eventually go in

8  front of Judge Zulick on September 20th and basically asked the

9  Court to order Mr. Harley to give us what we had bought in the

10 Spring.

11 Q.    I understand.  Going to the second page of this document

12 on paragraph four, did the Court assess the value of the Lexus?

13 A.    It did, at $40,000.

14 Q.    Other than that Lexus which was valued at $40,000, were

15 you able to collect any portion of the judgment that you had

16 gotten against Mr. Harley, his wife Jacqueline Kube and the

17 company RJH?

18 A.    No, sir.

19 Q.    Now, your civil litigation lasted about two years as I

20 calculated.  You filed it in November 2009?

21 A.    Close to that, 21 months, November 2009 to August 2011.

22 Q.    Was there any reason for the delay in the resolution of

23 the lawsuit?

24 A.    Yes.

25 Q.    What was the reason?

1  A.   Well, the primary reason was the bankruptcy filings that

2  occurred during the length of that case.  My recollection is

3  there were two.

4  Q.   Well, let's go through them and what you recall.  Just

5  elaborate what you mean.  Why would a bankruptcy filing have

6  any impact on your collection?

7  A.   All right.  When --

8  Q.   Not on your collection -- on the resolution of the case.

9  A.   Right.  When a bankruptcy is filed, it -- what happens is

10 any pending state court actually or federal court litigation in

11 which the person who files for bankruptcy is a party, the case

12 stops automatically.  You're not allowed to take any further

13 steps in the case.  So, for example, in this instance, there

14 was a bankruptcy filed in November of 2010.

15 Q.   Could we have exhibit 16.6?  What is that document?

16 A.   That document is what is called the docket or the docket

17 entries for the first bankruptcy case that was filed that

18 impacted the Lehigh County litigation.

19 Q.   And it was filed in the U.S. Bankruptcy Court for the

20 Middle District of Pennsylvania in Wilkes-Barre, this

21 courthouse?

22 A.   Correct.

23 Q.   And the docket number of the case, can you read that?

24 A.   Sure.  It's 10-BK-09451-RNO.  The RNO means it was

25 assigned to Judge Opel.

1 Q.    There's a date filing.  What was the date the petition was

2 filed?

3 A.    That petition was filed on November 22, 2010.

4 Q.    It says date terminated?

5 A.    December 28th, 2010.

6 Q.    And debtor dismissed?

7 A.    Same date, December 28th, 2010.

8 Q.    The debtor that's listed on the docket sheet is who?

9 A.    Well, it says RJH and Company, Inc.  But underneath the

10 address it says a/k/a Richard J. Harley.

11 Q.    Was Mr. -- did you participate in this bankruptcy action?

12 A.    I did.  Once I became aware of it in mid December, I filed

13 what is called an entry of appearance, which is where you file

14 a document with the Court, and the consequence of that is you

15 get all notifications electronically from the Court following

16 that point.

17 Q.    And can we go to the last page of this document, docket

18 entry 26, is that where you entered your appearance?

19 A.    Correct, that's the bottom half of the entry for that,

20 December 28th, 2010.

21 Q.    It appears on the same date there was an order entered

22 dismissing the case for failing to pay the filing fee, correct?

23 A.    Absolutely, correct.

24 Q.    Now, in the little over a month that this case was

25 pending, did that case -- the filing of that case have any

1   impact on your civil litigation in --

2   A.    Lehigh County.

3   Q.    Lehigh County.

4   A.    It did.

5   Q.    Tell us how it had an impact.

6   A.    Well, the impact was in the Lehigh County case what was

7   happening in the fall and winter was -- actually it started in

8   the Spring -- I was trying to take Mr. Harley and his wife's

9   deposition in response to issues they attempted to raise in

10  that case.

11        And basically because they kept refusing to appear, I had

12  to keep going to court and filing what are called motions for

13  sanctions.  Eventually, after I think three of those, there was

14  a pretrial conference scheduled on December 14th before Judge

15  Johnson at which I was going to present the third motion for

16  sanctions and asked actually for the entry of judgment against

17  Mr. Harley and Mrs. Harley and RJH and Company, Inc., on -- I

18  was going to ask for that to be entered on December 14th.

19  Q.    So that hearing, the pretrial conference was scheduled for

20  December 14th of 2010.  This petition was filed on November 22,

21  2010.  Would it have any impact on whether that hearing

22  occurred?

23  A.    It did .  What ended up happening was even though we did

24  not get -- neither I nor Judge Johnson received notice of the

25  initial filing of this on November 22, on December 13th, I was

1  -- I received either a fax or phone call telling me that Mr.

2  Harley had filed this bankruptcy, and Judge Johnson was also

3  notified.  And when a state court judge is notified there's a

4  bankruptcy against one of the parties, he immediately cancels

5  anything that's scheduled because as I explained earlier,

6  nothing is allowed to take place in a state court case when you

7  have a bankruptcy that's filed.

8       So the end result of the notification to Judge Johnson on

9  December 13th of this bankruptcy which had been filed three

10 weeks earlier was that the session was scheduled for the 14th

11 of December was automatically cancelled.  So that stopped

12 everything.

13 Q.   You said you didn't receive notice of this until the day

14 before or sometime --

15 A.   Correct.

16 Q.   -- before.  Was Mr. Silverstein listed as a creditor of

17 Mr. -- on that bankruptcy petition that was filed on November

18 22nd, 2010?

19 A.   He was.

20 Q.   And it was for the judgment amount you previously talked

21 about, testified about?

22 A.   I'm not sure how Mr. -- what amount he listed, but it was

23 something in the million to $2 million range, correct.

24 Q.   Now, that petition for bankruptcy was dismissed and

25 delayed that hearing.  Was there a second bankruptcy petition

1   filed by Mr. Harley during the course of your Lehigh County

2   litigation?

3   A.    There was.

4   Q.    Can we have exhibit 17.7?  What's the docket number for

5   this bankruptcy case?

6   A.    This was 11-BK-02060-JJT.  Those letters mean this was

7   assigned to Judge Thomas.

8   Q.    It is also in the bankruptcy court here in this building

9   in Wilkes-Barre?

10  A.    Correct.

11  Q.    What was the date that this petition was filed?

12  A.    March 24, 2011.

13  Q.    And the date it was terminated?

14  A.    May 12, 2011.

15  Q.    And the debtor dismissed?

16  A.    May 12, 2011.

17  Q.    Who was listed as the debtor on this bankruptcy petition?

18  A.    RJH and Company, Inc., a/k/a Richard Harley.

19  Q.    It says represented by RJH and Company, Inc., pro se.

20  What does pro se mean?

21  A.    Pro se means without a lawyer.

22  Q.    Is that the same as the earlier petition, there was no

23  lawyer?

24  A.    There were no lawyers involved in any of his bankruptcies.

25  Q.    Representing him?

1   A.    Representing him, correct.

2   Q.    All right.  You also entered your appearance in this case,

3   correct?

4   A.    Correct.

5   Q.    Can we go to docket number 18, which would be on the third

6   page?  Did you enter your appearance March 30th as reflected

7   there?

8   A.    I did.

9   Q.    You were representing Mr. Silverstein and his interests in

10  that bankruptcy case?

11  A.    Correct.

12  Q.    Now, did you take any legal action besides entering your

13  appearance?

14  A.    I did.  I filed a motion to dismiss the case and also to

15  ask the Court to impose what is called a 180-day bar on any

16  further bankruptcy filings by either RJH or Mr. Harley.

17  Q.    What was the reason for your motion to dismiss the case?

18  A.    Well, the reason was that it was my belief that it had

19  been filed -- this case had been filed in bad faith because

20  there -- we had a previous situation in December where the day

21  before a state court hearing Mr. Harley notified the Court of a

22  bankruptcy -- and that's the first bankruptcy -- and the

23  hearing stops.  In this situation, I think we covered this fact

24  this was filed on March 24 of 2011.

25        There was a hearing scheduled on March 25 of 2011 in the

1  Lehigh County case on the same issues that I was trying to

2  present back to the judge back in December when that hearing

3  got cancelled because of the first bankruptcy.

4  Q.    So this petition was filed the day before the hearing?

5  A.    Correct.  And a copy was provided -- notification was

6  provided to me and to Judge Johnson the day before the hearing

7  on March 24th, as a result of which has happened the first time

8  Judge Johnson stopped everything and said we can't have a

9  hearing on March 25th.

10 Q.    And as a result of that, you filed your motion in the

11 bankruptcy court to dismiss that case for bad faith?

12 A.    Correct, I filed that on April 4th, which was four days

13 after -- five days after I entered my appearance.

14 Q.    Now, as a result of that filing, was there a hearing that

15 took place in the bankruptcy court on your motion?

16 A.    There was.

17 Q.    Can we have exhibit 17.8?  Do you recognize this document?

18 A.    I do.

19 Q.    What do you recognize it to be?

20 A.    This is the transcript of the proceedings that took place

21 before Judge Thomas literally down the hall in the courtroom at

22 the end of the hall here on -- I will double confirm the date

23 here -- May 12, 2011.

24 Q.    And did you participate in this hearing on behalf of Mr.

25 Silverstein?

1  A.   I did.

2  Q.   And did you have an opportunity to question Mr. Harley

3  under oath regarding your motion?

4  A.   I did.

5  Q.   I want to go to Page 18 of this transcript.  On the top

6  was Mr. Harley sworn when you questioned him?

7  A.   He was, and it was so noted.

8  Q.   Where it says Richard J. Harley, sworn and examination?

9  A.   Exactly.

10 Q.   Going to Page 23, the Line 10 -- just highlight Lines 10

11 through 18, please.  Does that accurately reflect the

12 questioning of Mr. Harley by you during that hearing regarding

13 your motion?

14 A.   A portion of it, yes, sir.

15 Q.   And can you just read that?

16 A.   Sure.  The Q. is me questioning him.  The A. is the

17 answer.  Question, Mr. Harley, my question was a simple one.

18 Did you file for bankruptcy on March 24th to prevent the

19 hearing on March 25th from going forward.  Answer, that wasn't

20 the only reason, no.  Question, well, was that one of the

21 reasons.  Answer, that was one of the reasons, correct.

22 Q.   That's all I need you to read.  Thank you.  So at the end

23 of that hearing, was there a ruling from the Court on your

24 motion to dismiss?

25 A.   There was.

1  Q.    And what was the ruling?

2  A.    The ruling granted the motion which means the Court agreed

3  with what we had asked for and entered an order dismissing the

4  bankruptcy case and barring Mr. Harley or RJH from filing any

5  other bankruptcy cases for 180 days without first getting Court

6  approval.

7  Q.    You won your motion and barred from filing, but still that

8  hearing that had been scheduled for the next day didn't take

9  place, correct?

10 A.    The one back on March 25, yeah, we were passed that now.

11 Now, I have to go Lehigh County and ask for another hearing

12 date.  That's why we asked for the 180-day bar.  We wanted that

13 bar part of the order.  The debtor can do this forever.

14 Q.    In this second bankruptcy petition, did he also -- Mr.

15 Harley also list Mr. Silverstein as a creditor?

16 A.    My recollection is he did, yes, sir.

17 Q.    Now, there was 180-day bar, which was about six months,

18 correct?

19 A.    Correct.

20 Q.    Was there yet a third bankruptcy petition filed in 2012?

21 Can we have exhibit 20.7?  Do you recognize this document?

22 A.    Yes, sir.

23 Q.    What is it you recognize it to be?

24 A.    This is now the docket for the third bankruptcy, which is

25 12-BK-03201-RNO.

1  Q.    What's the date of filing of this bankruptcy petition?

2  A.    May 29, 2012.

3  Q.    And then it has date terminated.  What's the date of

4  termination?

5  A.    October 2nd, 2012.

6  Q.    What's that -- this is 20.7.  And it indicates this was

7  terminated what date did you say?

8  A.    October 2, 2012.

9  Q.    The debtor in this particular case is who?

10  A.    Richard Harley.

11  Q.    Personally as opposed to the company in the last two?

12  A.    Correct, the company was not named on this one.

13  Q.    In this particular bankruptcy, the personal bankruptcy

14  petition, did Mr. Harley list Mr. Silverstein as a creditor?

15  A.    I don't believe he did.

16  Q.    And as a result, did you get notice about this personal

17  bankruptcy petition?

18  A.    Not in the timeliness we would have had he been listed as

19  a creditor.  Eventually I found out about it.  I don't remember

20  how, but it came up.

21  Q.    At the time that this bankruptcy petition was filed, you

22  had already received the judgment in Lehigh County in --

23  A.    Correct, that was August 2001, yes, sir.  That was during

24  that 180-day day window that we had.

25  Q.    But you were engaged in collection efforts I believe you

1  said?

2  A.   Correct.

3  Q.   And did this personal filing, this personal bankruptcy

4  petition filing have an any impact on your collection efforts?

5  A.   It did.  It stopped everything.  I mean, other than the

6  Lexus -- because again the Lexus was titled in the name of the

7  corporation.  And if you look at this docket, you will see it's

8  just Mr. Harley.  But at the same time we were executing

9  against the Lexus, we were trying to get the sheriff to go into

10  Mr. Harley's home and levy against all assets owned by he

11  and/or Mrs. Harley and to have those sold also.  And the filing

12  of this bankruptcy prevents us from doing that because again he

13  got the bar, the order to stay, you can't proceed in any state

14  court action while somebody is in bankruptcy.

15  Q.   And was there -- you entered your appearance here if we

16  look at docket entry 25 on July 3rd -- can we go to --

17  A.   Yes, sir, that would be my entry of appearance.

18  Q.   Okay.  So it was filed on May 29th, but you didn't enter

19  your appearance until sometime thereafter?

20  A.   Correct.

21  Q.   And what -- you said everything was put on hold in terms

22  of your collection effort .  There was trying to get personal

23  property in the home of Mr. Harley levied upon?

24  A.   Yes, sir.

25  Q.   That was prevented by the course of this filing?

1  A.    Everything freezes.  When the bankruptcy is filed, you're

2  not allowed to do anything in state court without first getting

3  relief from the bankruptcy court.

4  Q.    And was there a hearing held on August 1st of 2012, what

5  is known as a 341 meeting -- actually on the first page of this

6  document -- if you go back to the first page, something called

7  a 341 meeting?

8  A.    There was.

9  Q.    What is a 341 meeting?

10 A.    341 41 meeting is standard procedure in a bankruptcy case.

11 It's an opportunity for the trustee that's appointed through

12 the bankruptcy system to question the debtor, meaning the

13 person whose in bankruptcy, about whatever the trustee -- they

14 wish concerning assets, income, things like that try to

15 determine what -- is this a legitimate bankruptcy or where are

16 we going with this.  It's an opportunity for the creditors to

17 appear.  It's called a meeting of creditors.  Creditors can

18 show up and ask questions, too.

19 Q.    If we go to docket entry 32 on August 3rd, 2012, there's

20 something called an answer filed by you on behalf of Mr.

21 Silverstein.  Were you able to enter your appearance and make

22 his -- Mr. Silverstein's claim despite not being included by

23 Mr. Harley in that personal bankruptcy?

24 A.    Correct, what you were just referring to as entry 31 was

25 my answer to item 26 on the docket.  Mr. Harley filed something

1  called objection to entry of appearance of Kevin T. Fogerty,

2  Esquire.

3  Q.    So he objected to you entering your appearance?

4  A.    Correct.

5  Q.    Was this a pro se representation as well where he was not

6  represented by counsel?

7  A.    Correct, he had no lawyer again.

8  Q.    What was the basis for him objecting to you entering your

9  appearance on behalf of Mr. Silverstein?

10  A.    You know, the document that was filed didn't make -- it

11  wasn't very clear on what his reasoning was.  I think he was

12  basically trying to say Mr. Silverstein wasn't owed any money,

13  and, therefore, I had no basis to enter an appearance for Mr.

14  Silverstein to represent him.

15  Q.    In any event, after that hearing occurred this -- there

16  was a resolution to this bankruptcy petition also if we go to

17  entry 41 on October 2nd of 2012.

18  A.    Yes, sir.  The case was dismissed because he didn't pay

19  the filing fee.

20  Q.    So on that date, October 2nd, 2012?

21  A.    That was the date of dismissal, yes, sir.

22  Q.    But despite that dismissal, you were still delayed in the

23  interim in terms of your collection efforts?

24  A.    Absolutely, if this was filed in May and that date you

25  referred to, we could do nothing.

1          MR. BRANDLER:  Your Honor, I have no further

2    questions.  I would move admission of the documents I

3    previously referred to, and I believe that would be exhibit

4    20.4, 27.32, 16.6, 17.7, 17.8, page -- only the page that he

5    read from -- I believe that -- 20.7 as well.

6          THE COURT:  Any objection, Mr. O'Brien?

7          MR. O'BRIEN:  No objection and no questions.

8          THE COURT:  They'll be admitted.  No questions?

9          MR. O'BRIEN:  No questions.

10          THE COURT:  You may step down.

11          THE WITNESS:  Thank you, Your Honor.  Have a nice

12   day.

13          MR. BRANDLER:  I call Marshall Silverstein.

14          MARSHALL SILVERSTEIN, called as a witness, being duly

15   sworn, testified as follows:

16   DIRECT EXAMINATION

17   BY MR. BRANDLER:

18   Q.   Good afternoon, Mr. Silverstein.  I will try to keep my

19   voice up.  I know unfortunately you have difficulty hearing.

20   At any time you can't hear me, let me know, all right?

21   A.   Yes.

22   Q.   All right.  How old are you, sir?

23   A.   Eighty-three years old.

24   Q.   And where do you currently live?

25   A.   Allentown, Pennsylvania.

1  Q.    And are you married, or do you live alone?

2  A.    I'm married.

3  Q.    And do you live with your wife?

4  A.    Yes.

5  Q.    How old is she?

6  A.    Eighty.

7  Q.    And are you currently employed or retired?

8  A.    I am retired.

9  Q.    And what are you retired from?  What was your occupation?

10 A.    Initially I had clearance for atomic energy.  I worked

11 with atomic energy, and after a while I switched to a private

12 handbag manufacturing operation.

13 Q.    And did you own your own businesses, or were you an

14 employee of somebody else or both?

15 A.    The handbags I was my own employee.

16 Q.    You owned that business?

17 A.    Yes.

18 Q.    And what's your educational background?

19 A.    I have two college degrees.  The second one is from

20 Columbia University, engineering.

21 Q.    How long have you lived in the Allentown area?

22 A.    Since 1958.

23 Q.    And I noticed you came up in a wheelchair.  Can you

24 describe -- do you have some physical disabilities?

25 A.    Yes, my legs can't carry me.

148

1  Q.   And do you have any other physical problems that you're

2  dealing with?

3  A.   Yes, CHF, congestive heart failure.

4  Q.   If at any time you feel stressed out during my

5  questioning, just let me know and we can take a break, all

6  right?

7  A.   Yes.

8  Q.   Have you ever testified in court before?

9  A.   Yes.

10 Q.   So you're familiar with this process?

11 A.   Yes.

12 Q.   All right.  How is your wife's health?

13 A.   She has dementia now for the past -- about 15 years.

14 Q.   I see.  Did you ever engage in any financial transactions

15 with Mr. Harley, the defendant in this case?

16 A.   Yes.

17 Q.   And can you tell us approximately when you started dealing

18 with Mr. Harley?

19 A.   I believe it was 2006.

20 Q.   And how did you meet Mr. Harley in the beginning?  How did

21 it come to be you met him and started dealing with him?

22 A.   A friend of mine Henry Cohen introduced me to him.

23 Q.   And who was Henry Cohen, a friend of yours?

24 A.   Yes.

25 Q.   And had he been a long time friend of yours prior to his

1  introduction of Mr. Harley to you?

2  A.   Would you repeat that, please?

3  Q.   How long have you known Mr. Cohen prior to him introducing

4  to you to Mr. Harley?

5  A.   I would say ten years.

6  Q.   Did you ever engage in any business dealings with Mr.

7  Cohen?

8  A.   No.

9  Q.   That was just a personal friendship?

10 A.   Yes.

11 Q.   I see.  Do you and Mr. Cohen belong to the same synagog?

12 A.   No, he doesn't live in Allentown.

13 Q.   I see.  And what was the reason Mr. Cohen introduced you

14 to Mr. Harley?

15 A.   A way to invest your money and get good returns.

16 Q.   And were you looking for a place to invest your money and

17 get good returns?

18 A.   Yes.

19 Q.   Did you have a substantial amount of money to invest?

20 A.   Yes.

21 Q.   And approximately -- did you end up investing money with

22 Mr. Harley?

23 A.   Yes.

24 Q.   About how much money did you end up investing with Mr.

25 Harley?

1  A.    Approximately $240,000.

2  Q.    And other than the Lexus -- the jury heard about this

3  $40,000 Lexus that you were able to recover from Mr. Harley,

4  have you gotten any of that money back?

5  A.    No.

6  Q.    Was that basically your life savings?

7  A.    No.

8  Q.    You have other money to live on?

9  A.    Yes.

10 Q.    Okay.  And tell me more about when you met Mr. Harley --

11 you said it was introduction by Mr. Cohen.  Did Mr. Harley talk

12 to you about this financial opportunity that he would present

13 to you?  What did he tell you?

14 A.    Yes.

15 Q.    What did he say?  What did he tell you that -- what was

16 the deal that he presented?  Did he say -- let me strike that.

17 Did he say that him and his company owned anything, any

18 valuable assets?

19 A.    Repeat that.

20 Q.    What did Mr. Harley tell you as far as what his company,

21 what he personally owned?

22 A.    Oh, oil reserves in Texas.

23 Q.    Did he tell you how valuable they were?

24 A.    Astronomical numbers.  I think it was billions of dollars.

25 Q.    Did he tell you about any other things his company owned,

1  any other assets?

2  A.   Yes, he had government treasury checks, two of them at

3  $500,000 each.

4  Q.   500 thousand or 500 million?

5  A.   Yes.

6  Q.   Which one, 500 thousand or 500 million?

7  A.   500 million.  Sorry about that.

8  Q.   No, that's all right.  I know this is difficult.  So he

9  said his company had this oil, had -- you said two $500 million

10  checks from the Fed, Federal Reserve?

11  A.   Right.

12  Q.   Anything else that he said he had that was valuable?

13  A.   He told me he has connections with Ben Bernanke, who was

14  the -- I believe the government treasurer at that time.

15  Q.   What about any art work?

16  A.   Art work -- he had two pieces of art work in the garage

17  boxed up.  I couldn't see them.  One was an artist by the name

18  of Settlemyre, and one was an artist of the School of da Vinci

19  -- it was either da Vinci or the School of da Vinci.

20  Q.   Did he tell you how much that -- those paintings were

21  worth?

22  A.   Once again, an extravagant amount of money, over a million

23  dollars.

24  Q.   Do you remember where the first meeting took place between

25  you and Mr. Harley?

1  A.    Yes, I believe it was in a restaurant, Olive Garden.

2  Q.    Where was the Olive Garden located?  What county?

3  A.    Lehigh.

4  Q.    And who was present at the meeting?

5  A.    Harley and Mr. Cohen.

6  Q.    And how long did that meeting last approximately?

7  A.    Give or take an hour and a half.

8  Q.    And you said that was around 2006 when you first met?

9  A.    Yes.

10 Q.    During that meeting, is that when Mr. Harley explained to

11 you what assets his company owned?

12 A.    Yes.

13 Q.    Now, besides telling you what his company owned, did he

14 tell you that you can make a lot of money?  What did he tell

15 you?

16 A.    Absolutely.

17 Q.    What did he tell you?

18 A.    He told me I could triple or quadruple my money.

19 Q.    How would you be able to do that?

20 A.    By his investments opening up the oil wells and some other

21 things he hoped to.

22 Q.    So did he ask you for money to invest?

23 A.    I believe he asked me for money the first time.

24 Q.    And what did he say he was going to do with the money?

25 Why did he need your money if he was so rich and all this oil

1  and Federal Reserve notes and art?  What was he going to do

2  with your money?

3  A.    He needed to carry it over until he was able to get the

4  oil.

5  Q.    Did he say he was going to use the money for any

6  particular reason related to the oil?

7  A.    No.

8  Q.    To get the oil out of the ground?

9  A.    Say again.

10  Q.    Did he tell you he needed your money so he can get the oil

11  out of the ground?

12  A.    For the process of getting the oil out of the ground.

13  Q.    If you invested with him, you said he promised you triple,

14  quadruple your money?

15  A.    Yes.

16  Q.    And you believed him?

17  A.    Unfortunately, yes.

18  Q.    Did you ever do any background check on him at that time?

19  A.    No, I -- this was quite unlike me.  I'm usually very

20  thorough with that.  I believed my friend Henry Cohen, and I

21  did it.

22  Q.    You didn't check out whether he owned oil or notes or

23  anything like that?

24  A.    He showed me the notes.

25  Q.    The Federal Reserve notes?

154

1  A.    No --

2  Q.    The oil note?

3  A.    No, the oil note.

4  Q.    I see.   The promissory note?

5  A.    Yeah.

6  Q.    That was for $200 million from Enpetro?

7  A.    Yes.

8  Q.    He showed that to you?

9  A.    Yes.

10 Q.    And you believed it was valid and legitimate?

11 A.    Yes.

12 Q.    That he was owed $200 million, correct?

13 A.    Approximately.

14 Q.    On these various loans or investments, whatever you want

15 to call it that you made to Mr. Harley, did he guarantee to pay

16 you back using some of his assets?

17 A.    Yes.

18         MR. O'BRIEN:   Objection.   That's a really leading

19 question, and it's a key question.   He should ask what he said

20 --

21         THE COURT:   It is.   Try to trim it down a little.

22 BY MR. BRANDLER:

23 Q.    What did Mr. Harley tell you as far as guarantees as far

24 as how -- why you get your money back?

25         MR. O'BRIEN:   Same objection.

1    THE COURT:  Just a minute.  Go ahead.  I will allow

2  that.

3  BY MR. BRANDLER:

4  Q.    Go ahead.

5  A.    He told me it was guaranteed and in writing to be returned

6  in 30 days, and another instance six months, another instance a

7  year.

8  Q.    When -- did you enter into a series of transactions?  Did

9  you give him the money in one lump sum?

10  A.    Quite a number of transactions.

11  Q.    And how did you generally give him the money?  What was

12  the method that you gave him the money?

13  A.    I sent him a wire to Merrill Lynch in favor of his account

14  at Mellon Bank.

15  Q.    The money would come out of your bank account?

16  A.    Yes.

17  Q.    Where was your bank?

18  A.    Lehigh Valley.

19  Q.    What was the name of your bank?

20  A.    M&T Bank of Lehigh Valley.

21  Q.    Would you go to the bank and ask to wire funds to this

22  Merrill Lynch account?

23  A.    Yes.

24  Q.    How did you know where to wire the funds?

25  A.    Well, he gave me wiring instructions.

1  Q.    When a note would come due -- you said it was 30 days or

2  60 days these notes would come due, did you ask for your money?

3  A.    Yes.

4  Q.    And what did he say?

5  A.    It will be coming soon, it will be coming soon.

6  Q.    And did he -- what happened?  Did you invest more money

7  after that -- after the note would come due and he didn't pay

8  you, did you continue to invest?

9  A.    Yes.

10 Q.    And all together I think you said it was about $240,000?

11 A.    That's correct.

12 Q.    Do the amounts -- do you remember generally how much the

13 amounts were?

14 A.    The first amount was $10,000, and there was another amount

15 for about $150,000, and there was a cash payment of $16,000 and

16 two checks of $10,000 each, and there might have been a couple

17 other wires.

18 Q.    Wires and checks basically?

19 A.    There was two -- one cash, two checks, and all the rest

20 were wires.

21 Q.    Do you know what the term collateral means?

22 A.    Yes.

23 Q.    Were the loans or the investments that you engaged with

24 Mr. Harley, were they collateralized by his assets?

25 A.    Yes, by the oil rights, the oil that he owned.

1 Q.   Did he ever -- did you ever have any discussion with Mr.

2 Harley about charitable contributions that he said he would

3 make to your synagog?

4 A.   Yes.

5 Q.   What did he tell you?

6 A.   We were in the middle of building a new synagog, and I was

7 the finance chairman.  And he promised $500,000 donation and a

8 loan up to $1,500,000.

9 Q.   Did you ever ask Mr. Harley how he came to be so lucky to

10 own all this valuable oil and valuable art work?

11 A.   If I remember correctly, somebody's death and he inherited

12 them.

13 Q.   Did you ever ask him why he didn't just sell the oil?

14 A.   Say again.

15 Q.   Did you ever ask him why he just didn't sell his oil, why

16 is he asking you for money?

17 A.   It puzzles me.  I kept asking him to show the -- to get

18 the oil out of the ground.  He said, no, it's not time, the

19 price of oil is going up.  And at one time I know I told him

20 this is the time to sell, the price of oil is going to go down.

21 Q.   How long did you continue to invest with Mr. Harley before

22 you realized you weren't going to get any of your money back?

23 A.   Oh, less than three years.

24 Q.   Would that be sometime in 2009?

25 A.   Yes.

1  Q.   What did you do after you realized you weren't going to

2  get any money back?

3  A.   Through my attorney.

4  Q.   Did you ever go to Mr. Harley's house and confront him?

5  A.   Once.

6  Q.   Tell us about that.

7  A.   To Mr. Cohen -- I said, Henry, I am not getting anywhere

8  with Mr. Harley for collecting money under the contracts.  And

9  he said to me, maybe it's time to visit him in his home, not in

10 a business place.  So Henry took me up there.

11 Q.   And where was that located?

12 A.   In the Poconos, Shawnee on the Village or something like

13 that.

14 Q.   Did you and Mr. Cohen go to Mr. Harley's house?

15 A.   Yes.

16 Q.   And did you meet with Mr. Harley?

17 A.   Yes.

18 Q.   And what happened?

19 A.   He was extremely perturbed with Mr. Cohen for bringing me

20 there unannounced.

21 Q.   And did you discuss with him why you hadn't gotten any of

22 your money for two, three years?

23 A.   Yes.

24 Q.   What did he say?

25 A.   His answer was always soon, soon, soon, and he had other

159

1  schemes lined up, too.

2  Q.    So you didn't get anywhere as a result of that meeting?

3  A.    No.

4  Q.    You said you went to visit your attorney.  Was that Mr.

5  Fogarty?

6  A.    Yes.

7  Q.    You told him your story?

8  A.    Yeah.

9  Q.    He filed the lawsuit?

10  A.    Yes.

11  Q.    You finally -- as a result of Mr. Fogarty, that lawsuit,

12  you got a judgment against Mr. Harley?

13  A.    Yes.

14  Q.    In court for over a million dollars, correct?

15  A.    Yes.

16  Q.    That is right?  All right.  After you got that judgment,

17  did there come a time when you and your attorney reported this

18  to law enforcement, to the FBI?

19  A.    Yes.

20  Q.    And that's how this case started?

21  A.    Yes.

22  Q.    You met with Mr. Browning and myself?

23  A.    Yes.

24  Q.    All right.  I want to show you some exhibits now, Mr.

25  Silverstein, and see if we can elaborate on some of the things

1  you said.  Can we have 27.1?  It will be on that computer

2  screen in front of you.  If you have difficulty seeing that, we

3  can enlarge them.  I have also the papers --

4  A.    There you go.

5  Q.    Is that better?

6  A.    Yes.  What's your question?

7  Q.    The question is, do you recognize that document?

8  A.    Yes.

9  Q.    What do you recognize it to be?

10 A.    If you go below there's a list of 20 odd things that have

11 to be confidential.  There it goes -- business records,

12 financial statements, customer lists, trade secrets, technical

13 information, products, inventions, product design information,

14 pricing structure, discounts, costs, computer programs --

15 Q.    All right.  I think that's enough.  There's some

16 handwriting on the side that says ask Cohen about.  Whose

17 handwriting is that?

18 A.    I don't recall why that's on there.

19 Q.    But do you know whose handwriting?  Is that your

20 handwriting?

21 A.    Not my handwriting.

22 Q.    Okay.  On the bottom left there's some initials.

23 A.    There's no initials there.

24 Q.    Just enlarge that.

25 A.    Harley's.

1  Q.    RJH?

2  A.    Yes.

3  Q.    This document, this confidentiality agreement, did you

4  enter into a confidentiality agreement with Mr. Harley?

5  A.    Yes.

6  Q.    Can we go to the last page?  Does it appear it was signed

7  by Mr. Harley?

8  A.    Mr. Cohen, and maybe my signature is at the bottom.

9  Q.    It appears Mr. Cohen's signature below that.  But above

10 that, does it appear Mr. Harley signed it?

11 A.    Yes.

12 Q.    All right.  And but you entered into this confidentiality

13 agreement with him.  Can we go to the first page in -- I just

14 want to get the timing of this.  Can we just enlarge the first

15 two sentences right there?  It shows the effective date?

16 A.    February something 2006.

17 Q.    It's between who?

18 A.    RJH and Company and Henry Cohen and Marshall Silverstein.

19 Q.    So was this one of the first items that you had to engage

20 in before you started investing the money with Mr. Harley, this

21 confidentiality agreement?  This would have been one of the

22 first documents --

23 A.    I don't think so.

24 Q.    Was there stuff before this as well?  You believe there

25 was or there was not?  I didn't catch your answer.

1  A.   I believe I gave him money before this confidentiality --

2  or it may be the same time.

3  Q.   We will go through the records, and we will see if we can

4  work it out.  Can we have exhibit 27.2?  Do you recognize this

5  document?

6  A.   Yes.

7  Q.   What do you recognize it to be?

8  A.   It's a fax cover from me to Henry Cohen.

9  Q.   And you say a fax cover.  It was the -- did you have a fax

10 machine at your house?

11 A.   Yes.

12 Q.   And you would use it to correspond to -- to various

13 people?

14 A.   Yes.

15 Q.   All right.  And could you just read what this fax says

16 because I think it gives the date, the date next to your name?

17 A.   9/20/06.

18 Q.   So the confidentiality agreement was in February of '06.

19 This is now in September of '06.  Just read what the note says.

20 A.   Could you tell me I have not given him money before --

21 Q.   Just read what that says on the fax.

22 A.   Okay.  Note dated 9/20/06 is original.  9/20/06 is a

23 corrected copy -- did I say 9/20?  9/21/06.  I have several

24 more changes that I want to make, please call me as early as

25 you can as he would like the money wired tomorrow, Thursday.

1  Thanks, Marshall.

2  Q.   When you say please call me as early as you can because he

3  would like the money wired, who are you referring to?

4  A.   Harley.

5  Q.   You were sending this to your friend Cohen to look over?

6  A.   Right.

7  Q.   Before you sent him the money?

8  A.   Right.

9  Q.   All right.  Can we go to the next page?  Is that the note

10  you were sending to Henry to look over before you sent in your

11  money?

12  A.   I believe so.

13  Q.   And the title says secured corporate promissory demand

14  note?

15  A.   Yeah, the second paragraph -- first sentence says in

16  return for the loan of $10,000, the satisfactory and full

17  receipt of -- and full receipt of which is hereby acknowledged.

18  Obviously, I am giving the money before I signed this note.

19  Q.   And does the note indicate -- go to Paragraph 3 of the

20  $10,000, how much money you're going to get in return?

21  A.   Borrower will pay the principal due on or before the end

22  of the term of this loan.

23  Q.   I think you're reading Paragraph 2.  I'm asking you to

24  read Paragraph 3.

25  A.   Oh, sorry.  The fee shall be the same rate as three times

1  the amount of said loan of $10,000 or $30,000.  The fee shall

2  be due to the note holder on or before the maturity date.

3  Q.   And now the maturity date is in Paragraph 2.  So can we go

4  up to Paragraph 2.  Now, what does that one say?

5  A.   At the end of this loan which date shall be on or before

6  30 days hereafter referred to as the maturity date.

7  Q.   So in 30 days you're going to triple your money?

8  A.   Yes.

9  Q.   10,000 will become 30,000, right?

10  A.   Right.

11  Q.   According to this note.  And if we go to the last page of

12  the document, there's signatures there?

13  A.   Yeah, Richard Harley.  He signed CEO of RJH, and he signed

14  it individually as Richard Harley.

15  Q.   As the guarantor?

16  A.   Yes.

17  Q.   Was this note eventually used to -- well, before we get to

18  that, let's go to 27.3.

19  A.   It's a wire from my bank.

20  Q.   Which was Embassy Bank, right?

21  A.   Which is Embassy Bank.

22  Q.   And the date?

23  A.   The date 9/21/2006.

24  Q.   Which is the same date that was on the note?

25  A.   Right.

1  Q.    And the wire amount if --

2  A.    $10,000.

3  Q.    Scroll down, please.  There was a fee of $15?

4  A.    Yeah.

5  Q.    And the receiving bank's name was where?

6  A.    Receiving bank was Mellon.

7  Q.    Then the beneficiary?

8  A.    Was Merrill Lynch.

9  Q.    Then it says special instructions.  What does it say?

10  A.    For RJH and Company.

11  Q.    It has an account number?

12  A.    88107051.

13  Q.    Is this the first money you wired to Mr. Harley in

14  connection with your financial transactions with him?

15  A.    Correct.

16  Q.    All right.  The note that we previously looked at, 27.2

17  was the note relating to this wire transfer?

18  A.    Right.

19  Q.    All right.  If we go to 27.3 -- before we get to that,

20  sorry -- that was 27.3.  If we go to 27.4.  You said you

21  received wiring instructions from Mr. Harley.  Are these wiring

22  instructions?

23  A.    Yes.

24  Q.    And would this be what you received -- you knew where to

25  wire the money?

166

1  A.    Right.

2  Q.    Can we go to 27.5?

3  A.    Wire transfer.

4  Q.    What was the date on this wire?

5  A.    10/20/06.

6  Q.    And the amount of this wire transfer?

7  A.    $10,000 plus the $15 fee.

8  Q.    It went to the same bank, to Mr. Harley's bank?

9  A.    Yes.

10 Q.    Now, can we go back to the top, please?  This wire took

11 place on October 20th of 2006?

12 A.    Correct.

13 Q.    The note that you had initially, which was exhibit 27.2,

14 was supposed to be coming due 30 days from September 21st,

15 which would have been October 20th.  This would have been the

16 date you were supposed to get $30,000?

17 A.    Correct.

18 Q.    But you didn't get 30,000, correct?

19 A.    Correct.

20 Q.    You invested another ten?

21 A.    Right.

22 Q.    Why did you invest another ten?

23 A.    That's my personal fallacy.

24 Q.    I am not trying to condemn you.  I'm sorry the way that

25 was phrased.  What did Mr. Harley tell you that caused you to

1 give him another $10,000?

2 A.   I can't remember exactly.

3 Q.   Was it similar to --

4 A.   I didn't send him any more -- any money unless he

5 requested it.

6 Q.   But was it under similar premises why you initially

7 invested with him, he owned all this oil, Federal Reserve notes

8 --

9          MR. O'BRIEN:  Objection, objection, leading question.

10          THE COURT:  It is leading.

11 BY MR. BRANDLER:

12 Q.   Was it based on the same circumstances as your initial

13 investment?

14 A.   Yes.

15 Q.   There was never -- was there ever a point in time when Mr.

16 Harley told you, by the way, I don't own any oil or I don't own

17 Federal Reserve notes or valuable art?

18 A.   Never.

19 Q.   All right.  So 27.5 I think we went through, that was a

20 10,000 request wire on 10/20/06.  Can we have 27.5 A.?

21 A.   This was a note from RJH signed by Harley that says,

22 strictly confidential, as promised enclosed is a sanitized copy

23 of the oil reserves assignment.

24 Q.   Instrument?

25 A.   Instrument.

168

1   Q.   The date on this fax?

2   A.   10/26.

3   Q.   '06.  So it's about six days after you invested the second

4   $10,000?

5   A.   Uh-huh.

6   Q.   You said you had a fax machine in your house.  Could you

7   scroll to the top?

8   A.   State that again.

9   Q.   I'm sorry.  I asked her to just scroll to the top.  Were

10  those documents faxed to your house, your home fax machine?

11  A.   Yes.

12  Q.   All right.  There's a fax header at the top from a 570

13  telephone number to you, correct?

14  A.   That's my number.

15  Q.   That's your number?

16  A.   Yeah, the fax number is my number.

17  Q.   Maybe we should take a break.  I think maybe -- needs --

18  apparently he needs some -- do you need some of your medicine?

19  A.   I got it.

20         MR. BRANDLER:  Can I approach the witness?

21         THE COURT:  Sure.  Do you want to take a break?  I am

22  happy to do that.

23         MR. BRANDLER:  His aide said he needed this.  If you

24  need a break, let us know.  You're okay?

25         THE WITNESS:  Yeah.

169

1          MR. BRANDLER:  All right.

2          THE COURT:  All right.

3   BY MR. BRANDLER:

4   Q.   This fax was from Mr. Harley to you with some sanitized

5   copy of a document.  Can we go to the next page?  Can you read

6   what it says at the top there?

7   A.   At the top?

8   Q.   Yes.

9   A.   Oil reserves assignment instrument?

10  Q.   Instrument.  Yeah, just read that.

11  A.   This agreement executed the 22nd day of 2006 by and

12  between RJH and Company, Post Office Box 337, Shawnee on the

13  Delaware, Pennsylvania, U.S.A., hereinafter referred to as

14  assignor and hereby sometimes referred to as assignee.

15  Q.   So he crossed out or he blacked out the name of the

16  assignee on this, that's what he --

17  A.   Yes.

18  Q.   The sanitized version, right?

19  A.   Right.

20  Q.   And then the first paragraph says what?  Whereas?

21  A.   The assignor is the owner of approximately ten million

22  barrels of a certain corporate note.

23  Q.   Of oil -- ten million barrels of --

24  A.   No, it doesn't say that.

25  Q.   It doesn't?

1  A.    Of a corporate note and then gives the number of it, M.

2  20092497 and following proven reserves of crude oil and whereas

3  the assignee wishes to establish a bank line of credit based

4  upon the assignment of ten million barrels of proven reserves

5  of crude oil.

6  Q.    It has to do with the assignment of ten million barrels of

7  oil?

8  A.    Yes.

9  Q.    And what did Harley tell you about his ownership of this

10  ten million barrels of oil?

11  A.    He didn't give me a bonus or didn't state a bonus on the

12  number of gallons.  He stated a specific number that he would

13  owe me.

14  Q.    All right.  Did you understand this document when he sent

15  it to you?  Did you understand what it was purported to

16  represent to mean?

17  A.    Yes.

18  Q.    What did you understand it to be?

19  A.    That he was eventually going to sell the oil and I would

20  get my money, and I believe there's language in there about

21  when I would get my money.

22  Q.    So you thought he was selling the oil, that's how you were

23  going to get your money?

24  A.    Right.

25  Q.    I got you.  All right.  And the last page of this document

1  has some signatures there on the top.  It has Richard Harley as

2  president and CEO as the assignor and someone named Carol

3  Wilson --

4  A.    I don't know who Carol Wilson is.

5  Q.    Right.  So you never contacted Carol Wilson to verify that

6  any of this was getting sold or anything of that nature,

7  correct?

8  A.    Yes.

9  Q.    But at this point when you received that, how did that

10  make you feel as far as the likelihood you were going to get

11  paid since there was this deal in the works?

12  A.    It made me feel good.  Along the way I started doubting

13  it.  I don't know approximately when I started doubting it.

14  Q.    All right.  Can we go to 27.6?  Is this another document

15  Mr. Harley faxed to you?

16  A.    Yes.

17  Q.    The date on this one is December 26 of 2006, correct?

18  A.    Yes.

19  Q.    And what does it say at the top, the letterhead?

20  A.    Donald C. Kesterson, petroleum geologist.

21  Q.    It has his address somewhere in West Virginia on the left?

22  A.    Yes.

23  Q.    All right.  And it appears to be a letter dated December

24  13th of 2005, which would be about a year earlier?

25  A.    No, 2006.

1  Q.    I am talking about the date here.

2  A.    Oh, December 13th, 2005.

3  Q.    It's a letter from -- this purports to be from Kesterson

4  to Mr. Harley?

5  A.    Yeah.

6  Q.    This is something he sent to you, correct, Mr. Harley?

7  A.    Yes.

8  Q.    And why did he send it to you?  Did you ask for it?

9  A.    I couldn't tell you.  Maybe I started doubting, and he

10  decided to send it to me.

11  Q.    On the last page of this document -- go to the last page,

12  please.  There's more wiring instructions?

13  A.    Yes.

14  Q.    Did you make more investments after you got this document?

15  A.    This was the same thing sending money to Merrill Lynch in

16  favor of RJH and Company.

17  Q.    All right.  I -- the date of this fax if we go to the top

18  from Kesterson is December 26th of '06, correct?  Do you see

19  that?

20  A.    Correct.

21  Q.    If we go to exhibit 27.7, did you wire money --

22  A.    Yes.

23  Q.    -- the same day you received that to Mr. Harley?

24  A.    Yes.

25  Q.    And is that what 27.7 is, another wire?

1  A.    Yes.

2  Q.    And the date is 12/26/06 from you.  What's the amount of

3  this wire transfer now?

4  A.    It was for $55,000 and a $15 fee.

5  Q.    And then if you scroll down, that's your signature

6  authorizing the transfer of the money, correct?

7  A.    Yes.

8  Q.    And to the same place, to RJH and Company's account?

9  A.    Yes.

10  Q.    Can we go to 27.8?  Can we first get the fax header at the

11  top?  Was this another fax from Mr. Harley to you, this one

12  January 30th, 2007?

13  A.    Uh-huh.

14  Q.    Is that a yes?  There's a court reporter so we can't --

15  A.    It says, copy, strictly confidential, copy of oil

16  production note.

17  Q.    Is this something he faxed to you to show he had oil,

18  right?

19  A.    Yes.

20  Q.    Can we go to the next page?  Can you flip it?

21  A.    That's okay.

22  Q.    Do you remember seeing this document, this oil production

23  note?

24  A.    Yes.

25  Q.    And on the top left there's some handwriting.  Can you

1  enlarge that, please?

2  A.    Capital -- oh, certified as a true and correct copy from

3  the original 12/1/97, Christa Bowen.

4  Q.    Christie Bower I believe it says.  Do you know who

5  Christie Bower is?  Have you ever met her or heard of her?

6  A.    No.

7  Q.    Did Mr. Harley ever tell you who she was?

8  A.    No.

9  Q.    This company, Enpetro, LPC, Inc., have you ever heard of

10  Enpetro, LPC, Inc., prior to meeting Mr. Harley?

11  A.    Yes -- repeat your question.

12  Q.    Have you ever heard of Enpetro, LPC, Inc., before you met

13  Mr. Harley?

14  A.    Oh, no.

15  Q.    Did you even know if it was a valid company?

16  A.    No.

17  Q.    All right.  The amount of this note, can you just enlarge

18  the amount?  How much is the amount?

19  A.    $200 million.

20  Q.    And supposedly this note represents a debt from Enpetro

21  for $200 million?

22  A.    Right.

23  Q.    Is that what you understood it to be?

24  A.    Uh-huh.

25  Q.    Did Harley explain that to you?

1  A.    I'm sure he did, but I can't say for sure.

2  Q.    All right.  Can you scroll up, please?  Did you ever

3  contact anyone from Enpetro, LPC, Inc.?

4  A.    No.

5  Q.    There's some signatures on the bottom.  Someone signed for

6  Enpetro as corporate secretary treasurer.  Do you know who that

7  person was?

8  A.    I have no idea.

9  Q.    And the date of issue is September 24th of 1997?

10  A.    Right.

11  Q.    You invested your money in 2007?

12  A.    Right.

13  Q.    That was about ten years before?

14  A.    Uh-huh.

15  Q.    Did you understand that?

16  A.    Yes.

17  Q.    Did you know whether or not this money was still owed to

18  Mr. Harley or not?

19  A.    I didn't question it.

20  Q.    Did you believe it was a valid document?

21  A.    Yes.

22  Q.    Is that why you continued to invest?

23  A.    Yes.

24  Q.    All right.  I will go to exhibit 27.9.  And this appears

25  to be another note issued from Mr. Harley's company to you, the

1  date February 9th of '07.  After you got the oil note in

2  January 30th of '07, there's another note there?  Do you see

3  that?

4  A.   Yes, I do.

5  Q.   And did you invest more money with Mr. Harley after you

6  had gotten the oil production note?

7  A.   Uh-huh.

8  Q.   How much now did you invest?

9  A.   About $150,000 -- I think 150,000 was the sum of

10  everything I gave him to that --

11  Q.   To that point?

12  A.   Yes.

13  Q.   Total.  So he hadn't paid you anything on the prior notes,

14  you just rolled it over to this new note?

15  A.   Right.

16  Q.   If you go to Paragraph 3, you were going to get how much

17  back from this new investment?

18  A.   Payment and principal and fees a total of $500,000.

19  Q.   If you go to Paragraph 2, you will get this $500,000 on or

20  before July 9th?

21  A.   Uh-huh.

22  Q.   That would be in four months from the date of the note,

23  correct?

24  A.   Yes.

25  Q.   And did Mr. Harley promise to do that, to give you this

1  $500,000 in four months?

2  A.    Yes.

3  Q.    And can we go to the last page?  Does it appear to be

4  signed?

5  A.    It's signed by Richard Harley for RJH and Company, CEO and

6  as a personal guarantor.

7  Q.    Can we have exhibit 27 -- the date of that note was

8  February 9th of 2007.  Can we have 27.10?  Do you recognize

9  this document?

10  A.    Yes.

11  Q.    What is it?

12  A.    It's a different kind of partnership.  Harley is the owner

13  of a certain oil painting attributed to J. Lee Settlemyre, the

14  description which is incorporated herein and attached hereto

15  and marked exhibit A. sometimes referred to as a subject work

16  of art.

17  Q.    Continue reading.

18  A.    Whereas the painting estimated fair value is approximately

19  $1.8 million and whereas in consideration of the immediate

20  payment to Harley in the amount of $75,000, Harley agrees to

21  transfer 50 percent ownership interest in and to the subject

22  work of art to Silverstein pursuant to the following terms and

23  conditions.

24  Q.    Keep reading.

25  A.    The agreement is entered into for the sole purpose of

1  ensuring repayment by Harley to Silverstein for certain moneys

2  advanced to Harley.  The parties agree that no sale of the

3  subject work of art shall commence until after nine months from

4  the date of this agreement.  In the event that Harley repays

5  the amount of $500,000 to Silverstein prior to the date set

6  forth in Paragraph 2 above, then this partnership agreement

7  shall be rendered null and void.

8      If Harley is unable to pay Silverstein the amount set

9  forth in Paragraph 3 within the prescribed timeframe, then the

10  parties shall take all steps necessary to sell the subject work

11  of art.

12  Q.    Next page.

13  A.    The parties agree that they shall accept any bona fide

14  offer that is at least within 90 percent of the subject work of

15  art's fair market value as determined at the time of sale.  The

16  parties shall equally divide -- the parties shall equally

17  divide the net proceeds of the sale and shall be responsible

18  for any consequence on his share of the proceeds.  Harley shall

19  pay Silverstein the sum of $500,000 from Harley's share of the

20  proceeds.

21      The parties agree to execute any and all documentation

22  necessary to carry out the terms of this agreement.

23  Q.    It's signed by Mr. Harley?

24  A.    Signed it.

25  Q.    February 9, '07?

1  A.    I don't know.  I didn't sign it.

2  Q.    Well, was this document faxed to you already signed by Mr.

3  Harley?

4  A.    Uh-huh.

5  Q.    Is that why you didn't sign it?

6  A.    I guess so.

7  Q.    And as opposed to the other agreements, notes that you

8  were entering into -- can we have Page 1 of the partnership

9  agreement?

10  A.    State again.

11  Q.    I am just talking to my assistant here.  This agreement

12  was between Mr. Harley personally and you, not between you and

13  the RJH company, correct?  Do you see the first sentence?

14  A.    Yes.

15  Q.    And the second paragraph that you read -- it says Harley

16  is the owner of the painting, correct, not RJH?

17  A.    Correct.

18  Q.    The next sentence says the painting is worth $1.8 million?

19  A.    Yes.

20  Q.    And that's what you believed to be true, correct?

21  A.    No.

22  Q.    You didn't believe it?

23  A.    No.

24  Q.    Why did you enter into the partnership agreement?

25  A.    I didn't feel different about it until after this and I

1  called up a library somewhere in the midwest where Settlemyre

2  was the head of the art department, and he had died.  And I

3  asked them what was the approximate values of the painting.

4           MR. O'BRIEN:  Objection.  Hearsay.

5           MR. BRANDLER:  It's not offered for the proof of what

6  the value is.  It's what he believed.

7           THE COURT:  No.

8  BY MR. BRANDLER:

9  Q.    What you are saying is it accurate you did some research

10  about the value of the painting?

11  A.    Yes.

12  Q.    After did you your research, you entered into this

13  agreement?  You had this partnership with him, and you --

14  A.    No.

15  Q.    You never entered into this partnership?

16  A.    I entered the partnership, but I didn't investigate it

17  until later.

18  Q.    I see.  So you entered into the partnership and researched

19  it later; is that right?

20  A.    Yes.

21  Q.    Now, on the second page there's some handwriting.  Whose

22  handwriting is all that?

23  A.    That's mine.

24  Q.    Could you read it to us?

25  A.    As this reads to me is that I receive one half of the

1  sale's price of the painting plus $500,000 debt, do you agree.

2  Q.    And half of the sales price is worth $1.8 million, so that

3  would be $900,000?

4  A.    Half the sale's price I think was $500,000.  Am I correct?

5  Q.    You said he owed you $500,000 from your notes.  When the

6  painting is sold for 1.8, you will get half of that, too?

7  A.    Yes.

8  Q.    And that's how Harley was going to pay you back your

9  $500,000 from the proceeds of the sale?

10 A.    Yes.

11 Q.    And the third page of this document, this -- another

12 document he faxed to you in connection with this partnership

13 agreement?

14 A.    Richard Harley --

15 Q.    Is this part of the package that he faxed you?  It has the

16 fax up at the top.

17 A.    That was sent to me by Richard Harley.

18 Q.    That was the painting that was going to get sold for $1.8

19 million?

20 A.    Yes.

21 Q.    This is talking -- it's called the Provenance.  Do you

22 know what Provenance means?

23 A.    (No audible response.)

24 Q.    That's all right.

25         THE COURT:  Just a minute.  Is that a no?

182

1          THE WITNESS:  I said no.

2          THE COURT:  You said no?  Okay.

3          MR. BRANDLER:  That's fine.

4   BY MR. BRANDLER:

5   Q.    Just read what it says below Provenance.

6   A.    Richard Harley, the present owner of the oil painting

7   attributed to J. Lee Settlemyre has been the owner since 1991

8   upon the untimely death of his dear friend Yolanda B. Blake

9   December on 24th, 1991.  The oil painting was purchased by

10  Christopher Blake, M.D., and Yolanda B. Blake, his wife, from

11  Julius Lee Settlemyer on August 2nd, 1974.

12  Q.    All right.  Can we go to 27.11?  The second page is a fax

13  header.  Was this additional documents that was faxed to you

14  from Mr. Harley?

15  A.    Uh-huh.

16  Q.    Is that yes -- you have to answer yes or no because when

17  you say uh-huh --

18  A.    That's a letter from the library to Mrs. Jackie Harley.

19  Q.    And it's dated September 23, 2005?

20  A.    Yes.

21  Q.    And then there's some handwriting on the side.  It says

22  provided by Harley.  Whose handwriting is that?  Whose

23  handwriting is over here?

24  A.    I don't think it's mine, but it could be.

25  Q.    All right.  And the rest of this document, there's a lot

1  of material relating to this artist Mr. Settlemyer.  Go to the

2  next page.

3  A.    Article from the newspaper about the artist.

4  Q.    That was all faxed to you by Mr. Harley?

5  A.    Uh-huh.

6  Q.    He sent it to you?

7  A.    I'm not sure where I got it from.

8  Q.    Can we go -- do you see the fax on the top?

9  A.    Harley sent it to me.

10  Q.    Do you see where it says -- right where I circled it from?

11  Do you see where it says from?

12  A.    RJH and Company.

13  Q.    Is that part of what he faxed to you regarding this

14  painting?

15  A.    You have that repeat that.

16  Q.    All right.  You said earlier you got this document via a

17  fax.  You got a fax machine in your house?

18  A.    Yeah.

19  Q.    Was this part of it?

20  A.    Yeah.

21  Q.    That's not a trick question.

22  A.    Yes.

23  Q.    Can we have 27.12?

24  A.    This is the picture we were referring to.

25  Q.    Can you enlarge what it says about it, the typed portion?

1  What does it say?

2  A.   Attached, Marshall, is a picture of the oil painting by

3  Julius Lee Settlemyer.

4  Q.   From Richard -- Richard?

5  A.   He signed it Richard.

6  Q.   He gave this to you to show you what the picture looks

7  like that you're going to sell?

8  A.   Right.

9  Q.   You will get this money so he can pay you back?

10  A.   Uh-huh.

11  Q.   Go to 27.13.

12  A.   Same picture.

13  Q.   No, this is a new one.  Was there another piece of art

14  besides the Settlemyer that he said he owned?  You said

15  something about the school of -- I don't remember  -- Rembrandt

16  or --

17  A.   This was not sent to me by Harley.

18  Q.   All right.  Where did you get it from?

19  A.   Henry Cohen.

20  Q.   What was the purpose of Henry Cohen giving you this

21  document?  Why did you get this?

22  A.   I asked Henry if he knew -- if he knew what the works of

23  art were worth.

24  Q.   Did you have any discussion with Mr. Harley about another

25  piece of art by an artist named Titian?

1  A.    That's this.

2  Q.    Did you have a discussion with harley about whether he

3  owned it or not?

4  A.    Yeah.

5  Q.    What did he say?

6  A.    A very valuable painting, it was either done by Titian or

7  the House of Titian.

8  Q.    So he was making personal guarantees on your loans?

9  A.    Yes.

10 Q.    He owned all this valuable art?

11 A.    Yes.

12 Q.    You believed that to be true?

13 A.    Yeah.

14 Q.    Can we have 27.14?

15 A.    It's a fax from RJH and Company.

16 Q.    To you?

17 A.    To me.

18 Q.    All right.  Let's see what it says.

19 A.    February 9, 2007.

20 Q.    February 9, 2007.  The title of the document says what?

21 A.    Temple Beth El capital campaign fund.

22 Q.    What does it say?

23 A.    RJH and Company, Inc., does hereby pledge the sum of

24 $500,000 to Temple Beth El campaign fund from the profits

25 gathered from its investments.  RJH and Company agrees to loan

1  the Temple Beth El the sum of one and a half million dollars

2  from the profits generated from its investments dated this 9th

3  day of February, 2007.

4  Q.    There is some handwriting.  Is that your handwriting?

5  A.    Yes.

6  Q.    What does it say?

7  A.    I know this is no time on investment specification, but we

8  have a verbal agreement.

9  Q.    There's a signature by Mr. Harley as CEO, right?

10  A.    Right.

11  Q.    All right.  You said you were the campaign finance

12  chairman or the --

13  A.    I was campaign funds chairman.

14  Q.    Campaign fund chairman of the synagog.  So you -- were you

15  happy to be getting this --

16  A.    Sure.

17  Q.    -- money?

18  A.    Sure.

19  Q.    Did the synagog ever get the money?

20  A.    No.

21  Q.    Can we go to 27.16?  What's the date on this fax?

22  A.    July 7, 2007.

23  Q.    So the other one we saw with the campaign fund was

24  February 9th of '07.  Now, we're about five months past.  Let's

25  go down -- is this another one you received from Mr. Harley?

187

1  Let's look at the top.

2  A.    This note --

3  Q.    Before you read it --

4  A.    What?

5  Q.    I just want to her to scroll to the fax.  You said you

6  didn't know if you received it.

7  A.    Yeah, RJH and Company.

8  Q.    All right.  Now, you can read it.

9  A.    Temple Beth El capital campaign.  RJH and Company does

10 hereby pledge the sum of $250,000 to Temple Beth El campaign

11 fund from the profits generated from its investments.  RJH and

12 Company company agrees to make a loan to Temple Beth El not to

13 exceed $1.5 million from the profits generated from its

14 investments dated the 9th of July 2007.

15 Q.    So the temple will get another $250,000?

16 A.    I don't believe so.  I think he was reducing it from 500

17 to the 250 signed by Richard Harley, CEO.

18 Q.    Why did he reduce it?  Why did he tell you he was reducing

19 it?

20 A.    I don't know.

21 Q.    All right.  If we go to -- that was dated July 7th of '07.

22 Can we go to 27.15?  Before we enlarge that, can you just get

23 the date on the top, please?  Is that the same date, July 7th

24 of 2007?

25 A.    Yes.

188

1  Q.    That was --

2  A.    From RJH and Company.

3  Q.    And did you enter into another investment with him on that

4  day?

5  A.    Secured corporate promissory demand note.  Borrower's

6  promise to pay the promissory note.  The note, is made this 9th

7  day of July 2007.  In return for the loan of $150,000, the

8  satisfactory, full -- satisfactory full receipt is hereby

9  acknowledged by RJH and Company whose corporate address is Post

10  Office Box --

11  Q.    You don't need to read all that.  Thank you.  I just want

12  to get when -- the amount you were going to get back according

13  to this document on Paragraph 3 says you will get $500,000 of a

14  150,000 loan, correct?

15  A.    Correct.

16  Q.    It's going to be due in Paragraph 2 on September 9th,

17  which is two months away?

18  A.    Yes.

19  Q.    Now, you haven't received any money up from him up to this

20  point on any of the prior notes, correct?

21  A.    Didn't get any money.

22  Q.    So this was rolling over the debt into a new note?

23  A.    Yes.

24  Q.    All right.  And it's on the same day that he's pledging to

25  make these contributions to your synagog -- it was same day,

1  July 7th of '07?

2  A.    Okay.

3  Q.    And the following day, can we go to 27.17?

4  A.    RJH and Company, dated July 8th, 2007.

5  Q.    And this is another fax to you from him?

6  A.    Right.

7  Q.    And what is he faxing now?

8  A.    Hi, Marshall, enclosed is a correct copy of our firm's

9  agreement for Temple Beth El capital fund.

10  Q.    And the next page.  It appears to be the same language

11  from prior, $250,000 pledge and a $1.5 million loan interest

12  free?

13  A.    No interest.

14  Q.    Right.

15         THE COURT:  Mr. Brandler, are you going to be much

16  longer?

17         MR. BRANDLER:  Yes.

18         THE COURT:  I think we should take a 15-minute

19  recess.  Members of the jury, we will take a 15-minute recess.

20  Do not discuss the case among yourselves or with anyone else.

21  If anyone attempts to talk to you about it, bring it to my

22  attention.  We will adjourn at 5:00.  See you back in 15

23  minutes.

24         (A brief recess was taken.)

25  BY MR. BRANDLER:

1  Q.  Mr. Silverstein, when we left off, we were looking at

2  documents from July 7 and 8th, 2007, related to the Temple Beth

3  El capital fund.  I want to show you a document now from July

4  9th, '07, 27.19.  Is this another wire transfer of money?

5  A.  Yes.

6  Q.  Is this a wire transfer of money?

7  A.  Yes.

8  Q.  And is it from your bank?

9  A.  Yes.

10  Q.  To who?

11  A.  To Merrill Lynch and further credit to RJH and Company and

12  --

13  Q.  Going to the top, the date of the wire is July 9th, 07?

14  A.  7/9/07.

15  Q.  And the amount is how much?

16  A.  $75,000.

17  Q.  So you gave him another 75,000 on July 9th of '07, right?

18  A.  Yes.

19  Q.  Go to 27.20.

20  A.  It's a wire from RJH and Company dated December -- October

21  25th, 2007.

22  Q.  It's a fax, right, not a wire -- it's a fax?

23  A.  It's a fax.

24  Q.  Yes.  And it was to you from Mr. Harley?

25  A.  Correct.

1  Q.    What does it say in the fax in the body?

2  A.    Hi, Marshall.  Enclosed is as promised a faxed copy of our

3  firm's secured promissory demand note.  Our prayers and

4  blessings are with both you and your wife, best regards,

5  Richard Harley.

6  Q.    Do you know what that was referred to about prayers and

7  blessings are with both you and your wife?

8  A.    My wife has dementia now for about 24 years.  And as far

9  as he was concerned, I can't tell you.

10  Q.    Okay.  Going to the next page, the note itself, can we

11  just have that highlighted?

12  A.    It says secured corporate promissory demand note.  This

13  promissory note is made this 25th day of October, 2007 in

14  return for the loan of $160,000 the satisfactory and full

15  receipt, which is hereby acknowledged by RJH and Company, whose

16  corporate address is --

17  Q.    You don't need to read the entire address.  This is the

18  same parties, between you and RJH?

19  A.    Correct.

20  Q.    For $160,000 now, so there's another $10,000 investment?

21  A.    I guess it's 10,000 was the last one, total was $150,000.

22  Q.    So in Paragraph 3, the return on this 160 now is going to

23  be how much?

24  A.    $550,000.

25  Q.    It's going to be due in Paragraph 2 when?

1  A.    November 15, 2007.

2  Q.    So that's only three weeks from October 25th.  In three

3  weeks he's going to turn that 160 into 550?

4  A.    Yeah.

5  Q.    Going to the last page, it's signed again?

6  A.    By Richard Harley as CEO of RJH and Company and signature

7  -- signed by Richard Harley as guarantor, personal guarantor.

8  Q.    And the extra $10,000 if we go to 27.21, can you identify

9  this document?

10 A.    Yes, it's a check wrote to Jacqueline Kube, which is his

11 wife, for $10,000 as per agreement with Richard Harley.  And

12 the note was from me.

13 Q.    The date --

14 A.    Check was -- the check was from me.

15 Q.    Right.  The date of the check, October 25th of '07, is the

16 same date as the note that we just looked at?

17 A.    Correct.

18 Q.    All right.  It looks like there is an envelope at the top.

19 Did you mail the check?  There's a return address and an

20 address of Jacqueline Kube.  Was that mailed?

21 A.    No, I mailed that.

22 Q.    Right.  It was mailed?

23 A.    Yes.

24 Q.    And why did you make the check payable to Jacqueline Kube?

25 A.    By request of Richard Harley.

1  Q.   Did you ask him why?

2  A.   No.

3  Q.   All right.  Moving forward now to July of 2008, can we go

4  to 27.22?  Did you make another transfer?

5  A.   Yes.

6  Q.   What's the amount of this transfer?

7  A.   $35,000.

8  Q.   And going back to the top, the date of the transfer?

9  A.   7/24/2008.

10 Q.   Was that wire transfer for the same reasons you gave the

11 prior money to Mr. Harley, the investments, the promise you

12 would get this return of money later on?

13 A.   Yes.

14 Q.   Can we have exhibit 1.1?  I know this is difficult to see.

15 We have an agreement with counsel on bank records.  But this is

16 the actual internal bank record of that $35,000 wire transfer.

17 Do you see the amount, 35,000?

18 A.   Yes.

19 Q.   That's highlighted there.  And the date --

20 A.   Yeah.

21 Q.   July 24th of 2008.  It indicates it went to Merrill Lynch

22 Pierce Fenner and Smith, ultimate beneficiary, RJH and Company.

23 Go to 27.23.

24 A.   A fax from RJH and Company dated July 28th, 2008.

25 Q.   So that's four days after you transferred the extra

194

1  35,000?

2  A.    Okay.

3  Q.    And what was -- what was communicated in this fax from Mr.

4  Harley to you?

5  A.    Sorry for the delay.  As promised enclosed are the

6  following, joint venture agreement, oil analysis report, copy

7  of our firm's oil production promissory note, signed by Richard

8  Harley.

9  Q.    And do you remember -- if you do -- why he sent you these

10  documents at this time?

11  A.    No.

12  Q.    Did you request them?

13  A.    I don't remember.

14  Q.    All right.  Can we go to the next page?  There's a

15  document that's called joint venture agreement.  And if we go

16  to the next page after this, it has your signature.

17  A.    Richard Harley signing for RJH and Company and as a

18  guarantor individually and my signature and Jacqueline Harley's

19  signature.  Jacqueline Harley is the Jacqueline Kube.

20  Q.    Do you know why Jacqueline Harley was party to this

21  agreement?

22  A.    No.  Perhaps I asked for his wife's signature.

23  Q.    Do you know if -- is that the reason?

24  A.    It could be.

25  Q.    All right.  Why did you want his wife signature's to be on

1  the agreement?

2  A.    Because most probably his assets are combined with her

3  assets, so I didn't want a differentiation between assets.

4  Q.    You thought it would protect you?

5  A.    Yes.

6  Q.    Let's go back to the page before, what the agreement is.

7  A.    This agreement executed the 24th day of July of 2008 by

8  and between RJH and Company, and his address, and Marshall

9  Silverstein, as an adult residing at 2234 West Highland Street,

10  Allentown, P.A., 18104.

11  Q.    Just keep reading.  Go ahead.

12  A.    You want the next paragraph?

13  Q.    Yes.

14  A.    Whereas party A. is the owner of certain corporate note,

15  M20092487, which has been valued by Donald C. Kesterson,

16  certified oil geologist to have a current value of one billion

17  three hundred one million seven hundred forty thousand dollars

18  three hundred dollars, and whereas party A. has agreed to

19  participate in a private placement program based upon the value

20  of its corporate note.

21  Q.    Keep reading.

22  A.    Whereas party A. has agreed to agree to participate in a

23  joint venture agreement for the mutual benefit.  Party B. shall

24  deposit the sum of $35,000 in party's A. Merrill Lynch account.

25  Party A. guarantees the return of party B.'s deposit together

1  with interest at a rate of three times the amount of any

2  default.  Party A. will set aside a hundred thousand dollars to

3  be utilized for the benefit of party B. for the purpose of the

4  private placement program.

5       Party B. shall receive the same percentage rate as party

6  A. during the term of the private placement program.  Said

7  payment will be on a weekly basis during this term.  At the end

8  of this term of the private placement program, this agreement

9  shall become null and void and all obligations shall be deemed

10 paid in full.

11      In addition to this agreement party -- in addition to this

12 agreement, party A. incorporates herein the following.  There

13 is due and owing to party B. the sum of $550,000 on a corporate

14 promissory note.  Party A. shall pay the party $200,000 from

15 the proceeds received from a collateral of assignment agreement

16 it has with a movie producer.  Payment will be made on or

17 before September -- no, I'm sorry -- August 7th, 2008.  The

18 remainder of the $550,000 will be paid from the first Trunch of

19 the Private Placement Program.

20 Q.   Next page.

21 A.   Payment is expected in one week from the start of the

22 program will commence on or before August 4th, 2008.  Party A.

23 acknowledges its commitment to Temple Beth El capital campaign

24 fund dated July 9, 2007.  Please note that facsimile or mailed

25 copy of the document is to be construed as the original.

1  Q.   All right.  So was -- we talked about this $35,000 that

2  you wired to him on July 24th of '08.  Was that in connection

3  with this agreement here?

4  A.   Say that again.

5  Q.   You wired $35,000 to Mr. Harley on July 24th of '08?

6  A.   Yes.

7  Q.   This document is dated July 24th '08.  It talks about in

8  paragraph -- item No. 1 that you're going to give $35,000 to

9  Mr. Harley.  So it was based upon the representations in this

10  agreement?

11  A.   Right.

12  Q.   That's why you gave him the money?

13  A.   Uh-huh.

14  Q.   Is that right?

15  A.   Yes.

16  Q.   We have 27.24.

17  A.   It's a wire sent by me to Embassy to Merrill Lynch for the

18  beneficiary, address, city and state for -- for distribution to

19  RJH and Company, sub-account --

20  Q.   You don't need to read all of this.  Mr. Silverstein, was

21  this another wire to Mr. Harley under the same circumstances we

22  previously discussed that you were investing this money with

23  promises of high rates of return in a short period of time made

24  by Mr. Harley?

25  A.   But a different project.

198

1  Q.    And what's -- before we get to the project, what's the

2  amount of this wire?

3  A.    $15,000.

4  Q.    And the date?

5  A.    8/24/2008.

6  Q.    Okay.  Now, you say it's for a different project.  What

7  project is this for?

8  A.    It was a partnership also to do with oil, but the third

9  party was involved.  And they were going to -- I believe it was

10 oil -- and they were going to get it out and make a profit

11 every week and distribute the profit every week.

12 Q.    And who told you that?

13 A.    Mr. Harley.

14 Q.    And based on that, you gave him another $15,000?

15 A.    Yes.

16 Q.    And exhibit 2.1, this is an internal bank document showing

17 the wire transfer of that $15,000 from your account to Mr.

18 Harley's account on September 4th of '08?

19 A.    Correct.

20 Q.    All right.  Exhibit 27.25.

21 A.    This is a wire from -- not a wire -- fax from RJH and

22 Company to me on February 15th, 2009.

23 Q.    What does the body of the fax say?

24 A.    Hi, Marshall.  Closed as promised is a fax copy of our

25 firm's secured promissory demand note.  Please note on October

1  24th, 2008, a joint venture agreement was signed regarding the

2  $100,000 that will be utilized for the benefit of you.  Our

3  continued prayers are with you and your wife.

4  Q.   The next page -- can we have exhibit 3.1?  This is a wire

5  transfer, internal bank record showing a $10,000 wire transfer

6  from your bank at Embassy to Mr. Harley's bank?

7  A.   Right.

8  Q.   And it's dated February 13th, '09 and the amount of

9  $10,000?

10  A.   Correct.

11  Q.   That was based upon the document that we just saw, 27.25,

12  the firm's secured -- updated promissory note, the fax that he

13  sent you?  Why did you send him this new $10,000?  Do you

14  remember, Mr. Silverstein, you sent him another $10,000 here?

15  A.   Correct.

16  Q.   What was the reason you sent him the money?

17  A.   I don't know.

18  Q.   Was it the same reasons you sent him all the rest of them?

19  A.   Yes, for profits.

20  Q.   Was it because you believed everything he told you was

21  true --

22          MR. O'BRIEN:  Objection, leading.

23          THE COURT:  It is.

24  BY MR. BRANDLER:

25  Q.   Any other reasons you did it besides to make money?

1  A.   Right.

2  Q.   Can we have 27.26?

3  A.   It's confirmation of a wire, and confirmation came from

4  RJH and Company.  And Merrill Lynch was the wiring bank to

5  Mellon.

6  Q.   It's a wiring instruction document; isn't that right?  Can

7  you just enlarge the whole -- go to the whole page about the

8  wiring instructions --

9  A.   Uh-huh.

10  Q.   -- that you -- where you should send money February 17th?

11  A.   Right.

12  Q.   Go to 27.27.  Did you wire another $10,000 for Mr. Harley

13  four days later on February 17th?

14  A.   Yes.

15  Q.   Does this document reflect that, the same as we showed

16  before, Embassy Bank and Merrill Lynch?

17  A.   Yes.

18  Q.   For the same reasons we previously stated?

19           MR. O'BRIEN:  What are they?

20           MR. BRANDLER:  Well, do you want to go through them?

21           MR. O'BRIEN:  I just object to the question.  It's

22  too vague.

23  BY MR. BRANDLER:

24  Q.   Mr. Silverstein, did you believe everything that Mr.

25  Harley was telling you, that he owned all this oil?

201

1  A.    Up until the end.

2  Q.    That he had these Federal Reserve notes, billions of

3  dollars?

4  A.    Up until the end.

5  Q.    Valuable art work?

6  A.    What?

7  Q.    Valuable art work?  The art work, Settlemyer, the Titian?

8  A.    I don't understand it.

9  Q.    Did you believe he owned valuable art work -- he said it

10 was $1.8 million.

11 A.    Yes.

12 Q.    You believed him?

13 A.    Yes.

14 Q.    And is that the reason you were giving him all this money

15 because you thought he was a man of substance?

16 A.    Right.

17 Q.    If we go to exhibit 4.1, this is another wire transfer --

18 internal bank record dated February 17th, 2009, the amount of

19 $10,000 from your account to the Merrill Lynch account of

20 Richard Harley by agreement of counsel.

21 A.    Yes.

22 Q.    27.28.  Did you wire another $3,500 to Mr. Harley March

23 24th, '09?

24 A.    What?

25 Q.    $3,500.

1  A.    Yes.

2  Q.    These amounts -- did you decide the amounts, or how did

3  you know how much to -- how was that decided?

4  A.    He dictated it.

5  Q.    When you say he, you mean Mr. Harley?

6  A.    Yes.

7  Q.    Can we have 5.1?  This is an internal bank document

8  showing the wire of $3,500 from Mr. Silverstein's account to

9  Mr. Harley's account at Merrill Lynch Pierce Fenner and Smith

10  made out to $3,500 on March 24th, 2009.  27.29.

11  A.    This is a secured corporate promissory -- secured

12  corporate promissory note.

13  Q.    This is a new one dated June 2nd, 2009?

14  A.    Yes.

15  Q.    What does this one say?  How much is the loan now?

16  A.    $185,000.

17  Q.    That's the cumulative amount that you had?

18  A.    Yes.

19  Q.    And going to Paragraph 3, of that 185, you're promised to

20  get how much?

21  A.    Repayment to a total of $1 million.

22  Q.    And on Paragraph 2, you're going to get that on or before

23  July 2nd, 2009?

24  A.    Correct.

25  Q.    So in a month, you're going to get this million dollars,

1  right, according to this?

2  A.   Yes.

3  Q.   Note.  Let's go to the last page.  It's signed again by

4  Mr. Harley in his corporate capacity and as a personal

5  guarantor?

6  A.   Yes.

7  Q.   And he gave that to you as he did all the others?

8  A.   Uh-huh.

9  Q.   Can we have 27.30?  Is there another joint venture

10  agreement entered into between you and RJH and Company?

11  A.   Right.

12  Q.   And going to the second page, it has the same signatures

13  that appear on the other joint venture agreement, correct?

14  A.   Including Mrs. Harley.

15  Q.   And is it accurate that this document dated June 2nd of

16  '09 is the same as the last one except the amounts have

17  changed?

18  A.   Yes.

19  Q.   Okay.  And in number one, it is hereby agreed -- it says

20  party B., that being you, you giving a deposit of $35,000 into

21  his Merrill Lynch account, right?

22  A.   Right.

23  Q.   All right.  27.33.  I'm sorry.  Can we have 27.30 again?

24  In the bottom of the page where it says letter A., there's an

25  acknowledgment that party A. --

1  A.    There is due and owing to party B. the sum of $1 million

2  on a corporate promissory note dated June 2, 2009.  The $1

3  million will be paid on or before July 2nd, 2009.  Party A.

4  acknowledges its commitment to Temple Beth El capital fund

5  dated July 9, 2007.

6  Q.    Go to 27.33.  Did you write another check?

7  A.    Check, yes.

8  Q.    And the date is June 2nd '09?

9  A.    Yes.

10  Q.    How much is the check for?

11  A.    $10,000.

12  Q.    That was the same date as your joint venture agreement

13  where you agreed to give him another $35,000, the one document

14  we just looked at?

15  A.    Uh-huh.

16  Q.    And it's made payable to Jacqueline Kube again.  Why did

17  you make it to Jacqueline Kube?

18  A.    As requested by Richard Harley.

19  Q.    And it says in the memo section four --

20  A.    Richard Harley.

21  Q.    And that's your handwriting?

22  A.    Yes.

23  Q.    And this is going to be the last document.  I know you're

24  going to find this hard to believe, Mr. Silverstein.  27.31.

25  Is this a fax from Mr. Harley to you on July 24th of 2009?

1  A.    Uh-huh.

2  Q.    You have to answer yes or no because the court reporter

3  can't --

4  A.    Yes.

5  Q.    What does it say?

6  A.    Hi, Marshall.  As promised is a -- is a faxed copy of our

7  firm's secured promissory demand note.  Our continued prayers

8  are with you and your wife.

9  Q.    This is going to the --

10  A.    Signed by Richard Harley.

11  Q.    The next page.  The date of the note?

12  A.    July 24th, 2009.

13  Q.    And it's between the same parties, you and RJH?

14  A.    Right.

15  Q.    And then on paragraph -- below that it says how much the

16  loan is for --

17  A.    $220,000.  The satisfactory and full receipt which is

18  hereby acknowledged by the RJH and Company --

19  Q.    You don't need to read any more.  Can we go to Paragraph

20  3?  And in return for that --

21  A.    Repayment of principal and fee total $2 million.

22  Q.    And the maturity date in Paragraph 2?

23  A.    August 17th, 2009.

24  Q.    Which is less than a month from the date of the note,

25  correct?

206

1  A.   Right.

2  Q.   And you thought you were going to get $2 million on August

3  17th, '09.

4  A.   Right.

5  Q.   But you didn't get the money?

6  A.   That's correct.

7  Q.   You realized you never going to get the money?

8         MR. O'BRIEN:  Objection, Your Honor.

9         THE COURT:  Just a minute.  Sustained.  Please don't

10 lead, Mr. Brandler.  I understand the problem.  It's not fair.

11 Restrain yourself.

12 BY MR. BRANDLER:

13 Q.   At that point, did you -- at that point is that when you

14 sought a lawyer?

15 A.   Yes.

16 Q.   Summer of 2009?

17 A.   Yes.

18 Q.   Now, in addition to those wired funds and checks, did you

19 ever give Mr. Harley cash?

20 A.   I gave him $16,000.

21 Q.   And did you give it all in one lump sum?

22 A.   Yes.

23 Q.   What were the circumstances -- why did you give him cash?

24 A.   Once again, he requested he has to have it in cash.

25 Q.   It was at his request?

1  A.    Yes.

2  Q.    And did you physically just hand it to him?  Did you take

3  it out of your bank or mail it?  How did you get --

4  A.    No, I physically handed it to him.

5  Q.    Do you remember approximately when you did that in terms

6  of this chronology here?

7  A.    No.

8  Q.    Beginning or the end you started --

9  A.    At the end.  I think it was the last payment I made to

10 him.

11          MR. BRANDLER:  No further questions.  I will move

12 admission of all previously identified documents without

13 reading them off.

14          THE COURT:  Any objection?

15          MR. O'BRIEN:  No objection.

16          THE COURT:  All right.  Mr. O'Brien, I take it you're

17 going to be a while?

18          MR. O'BRIEN:  I prefer to start Monday.

19          THE COURT:  I think we will just do it Monday.  I

20 think you'd rather do it on -- members of the jury, we are

21 going to adjourn for the day until Monday.  Remember not to

22 discuss the case with yourselves or among yourselves.  Do not

23 expose yourself to media.  You know the rules.  No research of

24 any kind -- I don't care what -- social media or computer,

25 electronic device.  I can't remember them all.  You get the

1  message.  You're to decide this case solely on what you see and

2  hear in this courtroom.  Enjoy your weekend.  We will see you

3  Monday morning at 9:30.

209

1                    REPORTER'S CERTIFICATE

2

3      I, LAURA BOYANOWSKI, Official Court Reporter for the

4  United States District Court for the Middle District of

5  Pennsylvania, appointed pursuant to the provisions of Title 28,

6  United States Code, Section 753, do hereby certify that the

7  foregoing is a true and correct transcript of the

8  within-mentioned proceedings had in the above-mentioned and

9  numbered cause on the date or dates hereinbefore set forth; and

10 I do further certify that the foregoing transcript has been

11 prepared by me or under my supervision.

12

13

14                        _____
                          Laura Boyanowski, RMR, CRR
15                        Official Court Reporter

16 REPORTED BY:

17      LAURA BOYANOWSKI, RMR, CRR
        Official Court Reporter
18      United States District Court
        Middle District of Pennsylvania
19      Scranton, PA  18503

20

21          (The foregoing certificate of this transcript does not
   apply to any reproduction of the same by any means unless under
   the direct control and/or supervision of the certifying
22 reporter.)

23

24

25

## #

**#07-14** [1] - 28:18

## $

**$1,000** [2] - 64:2, 120:1
**$1,140,000** [3] - 125:24, 126:12, 126:19
**$1,289,730.40** [1] - 128:11
**$1,500** [3] - 56:17, 56:21, 62:20
**$1,500,000** [1] - 157:8
**$1,600** [1] - 50:1
**$10,000** [22] - 50:22, 52:18, 59:1, 156:14, 156:16, 163:16, 163:20, 164:1, 165:2, 166:7, 167:1, 168:4, 191:20, 192:8, 192:11, 199:5, 199:9, 199:13, 199:14, 200:12, 201:19, 204:11
**$100,000** [1] - 199:2
**$12,000** [2] - 112:19, 113:3
**$15** [4] - 119:9, 165:3, 166:7, 173:4
**$15,000** [5] - 107:21, 107:23, 198:3, 198:14, 198:17
**$150,000** [4] - 156:15, 176:9, 188:7, 191:21
**$16,000** [2] - 156:15, 206:20
**$160,000** [2] - 191:14, 191:20
**$185,000** [1] - 202:16
**$2,000** [4] - 51:4, 61:16, 64:6, 65:10
**$2,500** [1] - 64:11
**$200** [6] - 7:23, 15:7, 154:6, 154:12, 174:19, 174:21
**$200,000** [1] - 196:14
**$205** [1] - 104:4
**$220,000** [1] - 205:17
**$235,000** [1] - 125:7
**$240,000** [2] - 150:1, 156:10
**$250,000** [3] - 187:10, 187:15, 189:11
**$3,000** [5] - 80:18, 119:12, 119:13, 120:9, 120:13

**$3,500** [4] - 201:22, 201:25, 202:8, 202:10
**$30** [2] - 91:12, 92:10
**$30,000** [2] - 164:1, 166:16
**$35,000** [8] - 193:7, 193:16, 195:24, 197:1, 197:5, 197:8, 203:20, 204:13
**$36,000** [1] - 112:24
**$38,000** [1] - 107:16
**$4,000** [1] - 120:13
**$40** [4] - 72:16, 72:18, 74:15, 79:1
**$40,000** [5] - 103:21, 105:20, 132:13, 132:14, 150:3
**$5,000** [22] - 78:11, 78:14, 78:20, 79:1, 79:4, 79:8, 79:10, 79:13, 87:21, 88:8, 88:17, 89:10, 91:10, 91:17, 92:9, 93:7, 97:3, 97:9, 97:21, 106:12, 106:13, 117:23
**$5,001.36** [1] - 93:8
**$500** [14] - 30:14, 34:18, 34:19, 53:10, 53:11, 53:13, 54:21, 62:5, 62:7, 64:15, 65:9, 65:10, 66:13, 151:9
**$500,000** [13] - 151:3, 157:7, 176:18, 176:19, 177:1, 176:19, 177:9, 181:1, 181:4, 181:5, 181:9, 185:24, 188:13
**$55,000** [1] - 173:4
**$550,000** [3] - 191:24, 196:13, 196:18
**$700** [2] - 26:9, 33:21
**$75,000** [2] - 177:20, 190:16
**$8,000** [1] - 80:14
**$800** [4] - 93:19, 93:21, 94:7, 94:13
**$900** [1] - 63:25
**$900,000** [1] - 181:3

## '

**'03** [3] - 102:3, 102:14, 102:16
**'06** [9] - 101:3, 115:4, 118:21, 119:2, 162:18, 162:19,

168:3, 172:18
**'07** [9] - 176:1, 176:2, 178:25, 186:24, 187:21, 189:1, 190:4, 190:17, 192:15
**'08** [7] - 110:8, 110:11, 116:13, 197:2, 197:5, 197:7, 198:18
**'09** [5] - 199:8, 201:23, 203:16, 204:8, 206:3

## 0

**0059881Z** [2] - 31:2, 33:14
**01/06** [1] - 118:25
**01/6/07** [1] - 61:23
**021088506** [2] - 30:2, 30:22
**07** [1] - 190:13
**08873** [1] - 25:8

## 1

**1** [17] - 1:11, 18:14, 25:22, 26:2, 30:23, 83:6, 85:8, 85:11, 89:14, 95:2, 115:5, 179:8, 197:8, 202:21, 204:1, 204:2
**1.1** [4] - 125:10, 125:18, 128:12, 193:14
**1.2** [1] - 129:21
**1.5** [2] - 187:13, 189:11
**1.8** [6] - 177:19, 179:18, 181:2, 181:6, 181:18, 201:10
**10** [3] - 25:20, 140:10
**10,000** [3] - 164:9, 167:20, 191:21
**10-BK-09451-RNO** [1] - 133:24
**10/20/06** [2] - 166:5, 167:20
**10/25/11** [1] - 91:11
**10/25/2011** [1] - 92:6
**10/26** [1] - 168:2
**10/6** [2] - 122:5, 122:7
**10024065** [1] - 33:10
**10024464** [1] - 33:10
**10045** [1] - 29:23
**10th** [7] - 53:2, 58:2, 58:20, 65:23, 115:12, 115:13, 122:10
**11** [1] - 128:3

**11-BK-02060-JJT** [1] - 137:6
**11:16** [1] - 116:5
**11:55** [1] - 85:22
**11th** [3] - 116:13, 125:23, 129:12
**12** [3] - 137:14, 137:16, 139:23
**12,000** [1] - 117:15
**12-BK-03201-RNO** [1] - 141:25
**12/1/97** [1] - 174:3
**12/26/06** [1] - 173:2
**120** [2] - 89:2, 89:8
**121** [2] - 2:7, 2:8
**1212** [1] - 1:23
**12:16** [1] - 62:11
**12:23** [1] - 115:18
**13** [1] - 69:25
**13.1** [4] - 23:13, 24:9, 24:14, 37:22
**13.2** [1] - 20:14
**13.3** [2] - 35:7, 35:23
**13.4** [2] - 35:19, 36:2
**13th** [7] - 28:2, 28:25, 135:25, 136:9, 171:24, 172:2, 199:8
**143** [1] - 2:9
**149,000** [1] - 128:13
**14th** [5] - 115:16, 135:14, 135:18, 135:20, 136:10
**15** [7] - 67:18, 99:10, 116:21, 117:24, 148:13, 189:22, 192:1
**15,000** [1] - 117:25
**15-minute** [3] - 67:14, 189:18, 189:19
**150,000** [2] - 176:9, 188:14
**15th** [2] - 93:13, 198:22
**16** [1] - 53:16
**16.6** [2] - 133:15, 146:4
**160** [2] - 191:22, 192:3
**16th** [3] - 27:20, 29:18, 32:24
**17.7** [2] - 137:4, 146:4
**17.8** [2] - 139:17, 146:4
**17108** [1] - 1:20
**17th** [5] - 200:10, 200:13, 201:18, 205:23, 206:3
**18** [4] - 50:3, 138:5, 140:5, 140:11
**180** [1] - 141:5
**180-day** [4] - 138:15,

141:12, 141:17, 142:24
**18104** [1] - 195:10
**18302** [2] - 58:8, 58:23
**18356** [2] - 58:5, 90:25
**18356-0337** [1] - 63:23
**18411** [1] - 1:24
**185** [3] - 104:21, 112:25, 202:19
**18503** [1] - 209:19
**18th** [3] - 82:15, 82:22, 115:24
**1958** [1] - 147:22
**1959** [1] - 69:11
**1974** [1] - 182:11
**1982** [1] - 123:8
**1989** [1] - 25:10
**1991** [2] - 182:7, 182:9
**1992** [1] - 45:14
**1997** [2] - 25:23, 175:9
**19th** [7] - 112:18, 112:25, 114:23, 115:4, 117:11, 119:12, 119:22
**1:37** [1] - 35:24
**1:54** [2] - 86:25, 115:25
**1st** [5] - 86:18, 116:5, 118:21, 120:1, 144:4

## 2

**2** [25] - 28:18, 37:22, 58:12, 63:16, 85:16, 94:17, 109:15, 109:16, 121:1, 126:19, 136:23, 142:8, 163:23, 164:3, 164:4, 176:19, 178:6, 188:16, 191:25, 202:22, 204:2, 205:21, 205:22, 206:2
**2,000** [4] - 52:7, 53:24, 58:2, 64:7
**2,500** [1] - 56:19
**2.1** [1] - 198:16
**20** [4] - 69:22, 70:3, 130:6, 160:10
**20.4** [2] - 126:2, 146:4
**20.7** [3] - 141:21, 142:6, 146:5
**200** [4] - 7:8, 30:17, 31:15, 33:11
**200,000,000,000.00** [1] - 33:12
**2000** [2] - 46:3, 47:7
**2001** [2] - 142:23
**2003** [1] - 102:12

**2004** [1] - 102:13
**2005** [5] - 48:15,
103:10, 171:24,
172:2, 182:19
**2006** [25] - 30:23,
48:15, 50:2, 101:4,
101:6, 101:8,
103:18, 103:22,
106:25, 112:18,
112:25, 114:23,
115:4, 115:5,
117:11, 119:12,
119:22, 120:2,
148:19, 152:8,
161:16, 166:11,
169:11, 171:17,
171:25
**2007** [29] - 49:3, 52:23,
53:1, 53:2, 55:10,
58:2, 58:20, 61:1,
63:21, 107:19,
114:25, 116:25,
173:12, 175:11,
177:8, 185:19,
185:20, 186:3,
186:22, 187:14,
187:24, 188:7,
189:4, 190:2,
190:21, 191:13,
192:1, 196:24, 204:5
**2008** [8] - 129:23,
193:3, 193:21,
193:24, 195:7,
196:17, 196:22,
199:1
**2009** [43] - 26:7, 27:20,
28:2, 28:25, 29:18,
30:10, 32:24, 55:21,
56:2, 62:11, 70:7,
71:19, 76:12, 76:19,
79:24, 82:16, 82:22,
84:7, 95:12, 95:13,
95:14, 98:13,
123:20, 124:5,
124:21, 125:21,
126:19, 128:17,
132:20, 132:21,
157:24, 198:22,
201:18, 202:10,
202:13, 202:23,
204:2, 204:3,
204:25, 205:12,
205:23, 206:16
**20092497** [1] - 170:2
**2010** [13] - 28:15, 46:4,
79:24, 95:13, 95:14,
133:14, 134:3,
134:5, 134:7,
134:20, 135:20,
135:21, 136:18

**2011** [23] - 36:18,
45:14, 85:22, 86:4,
86:18, 86:25, 88:4,
88:15, 89:20, 93:7,
95:14, 125:23,
126:7, 128:3,
129:12, 131:23,
132:21, 137:12,
137:14, 137:16,
138:24, 138:25,
139:23
**2012** [32] - 6:5, 6:24,
11:2, 19:2, 19:3,
21:2, 21:13, 23:15,
25:2, 35:13, 35:22,
35:24, 36:2, 36:19,
37:9, 82:7, 89:21,
93:13, 93:17,
111:11, 130:6,
131:16, 131:25,
132:1, 141:20,
142:2, 142:5, 142:8,
144:4, 144:19,
145:17, 145:20
**2013** [1] - 82:7
**2014** [1] - 1:14
**2016** [1] - 30:23
**207** [1] - 89:4
**20th** [4] - 115:4, 132:8,
166:11, 166:15
**21** [3] - 21:13, 63:21,
132:21
**212** [2] - 29:24
**2122** [2] - 33:10
**217** [1] - 1:19
**21st** [1] - 166:14
**22** [8] - 21:2, 43:3,
68:24, 98:25, 99:1,
134:3, 135:20,
135:25
**2234** [1] - 195:9
**228** [1] - 1:19
**22nd** [2] - 136:18,
169:11
**23** [2] - 140:10, 182:19
**236** [1] - 127:18
**24** [5] - 25:23, 131:8,
137:12, 138:24,
191:8
**24th** [16] - 84:7,
114:25, 139:7,
140:18, 175:9,
182:9, 193:21,
195:7, 197:2, 197:5,
197:7, 199:1,
201:23, 202:10,
204:25, 205:12
**25** [7] - 25:7, 67:14,
67:17, 86:25,
138:25, 141:10,

143:16
**250** [1] - 187:17
**2541** [1] - 61:9
**25th** [11] - 88:4, 88:15,
89:20, 93:7, 93:17,
139:9, 140:19,
190:21, 191:13,
192:2, 192:15
**26** [7] - 54:11, 54:13,
55:11, 62:20,
134:18, 144:25,
171:17
**26th** [3] - 18:25, 28:15,
172:18
**27** [1] - 177:7
**27.1** [1] - 160:1
**27.10** [1] - 177:8
**27.11** [1] - 182:12
**27.12** [1] - 183:23
**27.13** [1] - 184:11
**27.14** [1] - 185:14
**27.15** [1] - 187:22
**27.16** [1] - 186:21
**27.17** [1] - 189:3
**27.19** [1] - 190:4
**27.2** [3] - 162:4,
165:16, 166:13
**27.20** [1] - 190:19
**27.21** [1] - 192:8
**27.22** [1] - 193:4
**27.23** [1] - 193:23
**27.24** [1] - 197:16
**27.25** [2] - 198:20,
199:11
**27.26** [1] - 200:2
**27.27** [1] - 200:12
**27.28** [1] - 201:22
**27.29** [1] - 202:10
**27.3** [3] - 164:18,
165:19, 165:20
**27.30** [2] - 203:9,
203:23
**27.31** [1] - 204:24
**27.32** [2] - 129:25,
146:4
**27.33** [2] - 203:23,
204:6
**27.4** [1] - 165:20
**27.5** [3] - 166:2,
167:19, 167:20
**27.6** [1] - 171:14
**27.7** [2] - 172:21,
172:25
**27.8** [1] - 173:10
**27.9** [1] - 175:24
**27th** [7] - 18:25, 35:9,
35:12, 35:22, 35:24,
36:2, 36:18
**28** [1] - 209:5

**28th** [4] - 134:5, 134:7,
134:20, 193:24
**29** [1] - 142:2
**29th** [1] - 143:18
**2:27** [1] - 36:2
**2nd** [11] - 25:2, 85:22,
142:5, 145:17,
145:20, 182:11,
202:13, 202:23,
203:15, 204:3, 204:8

# 3

**3** [16] - 2:4, 37:22,
58:11, 63:16, 85:17,
86:4, 94:17, 121:1,
163:19, 163:24,
176:16, 178:9,
188:13, 191:22,
202:19, 205:20
**3,000** [1] - 115:5
**3.1** [1] - 199:4
**30** [8] - 51:9, 52:17,
105:24, 155:6,
156:1, 164:6, 164:7,
166:14
**30,000** [2] - 164:9,
166:18
**306** [1] - 90:24
**30th** [3] - 138:6,
173:12, 176:2
**31** [1] - 144:24
**310** [1] - 89:3
**32** [1] - 144:19
**329134** [1] - 28:19
**33** [2] - 29:22, 29:25
**337** [4] - 58:5, 63:22,
127:13, 169:12
**341** [4] - 144:5, 144:7,
144:9, 144:10
**347** [1] - 115:17
**35,000** [2] - 193:17,
194:1
**36** [1] - 117:22
**36,000** [2] - 107:16,
117:21
**37** [1] - 2:4
**37.1** [4] - 87:16, 88:10,
94:17, 95:17
**37.2** [2] - 93:2, 93:3
**37.3** [2] - 82:10, 94:17
**37.4** [1] - 84:5
**37.5** [1] - 85:20
**37.6** [2] - 86:24, 88:3
**37.7** [1] - 93:10
**37.8** [1] - 91:13
**37.9** [1] - 90:12
**38,000** [1] - 106:6
**39** [1] - 112:10
**39.1** [1] - 121:1

**39.2** [3] - 114:14,
122:3
**39.3** [1] - 119:11
**39.4** [1] - 119:24
**39.5** [1] - 120:6
**3:12-CR-224** [1] - 1:5
**3:30** [1] - 93:13
**3rd** [4] - 23:15, 37:9,
143:16, 144:19

# 4

**4** [5] - 37:22, 63:16,
85:17, 94:17, 121:1
**4.1** [1] - 201:17
**40** [1] - 41:12
**40,000** [1] - 106:5
**401** [1] - 8:23
**41** [2] - 144:10, 145:17
**42** [1] - 2:5
**46.1** [2] - 61:6, 63:16
**46.2** [2] - 61:6, 61:21
**46.3** [1] - 57:13
**46.4** [1] - 62:10
**46.5** [2] - 63:20, 64:21
**46.6** [2] - 64:13, 64:21
**4th** [7] - 102:2, 102:3,
102:14, 102:15,
139:12, 196:22,
198:18

# 5

**5** [4] - 1:14, 85:18,
94:18, 121:1
**5,000** [6] - 79:3, 79:18,
80:15, 80:16, 81:13,
89:20, 91:11,
107:14, 116:20
**5,030** [1] - 92:12
**5.1** [1] - 202:7
**50** [7] - 28:25, 29:1,
29:2, 29:3, 41:12,
177:21
**500** [18] - 7:18, 34:13,
53:24, 56:20, 64:7,
64:9, 114:2, 114:6,
115:4, 115:6, 116:6,
120:18, 151:4,
151:6, 151:7, 187:16
**550** [1] - 192:3
**570** [1] - 168:12
**5:00** [1] - 189:22
**5:20** [1] - 115:22
**5th** [1] - 118:24

# 6

**6** [2] - 94:18, 126:20
**60** [1] - 156:2

**630** [1] - 64:14
**64** [1] - 2:5
**67** [1] - 2:6
**6th** [4] - 30:10, 46:3, 53:1, 115:9

## 7

**7** [4] - 50:4, 94:18, 186:22, 190:2
**7/24/2008** [1] - 193:9
**7/9/07** [1] - 190:14
**72** [1] - 86:4
**720-5000** [1] - 29:24
**720-6331** [1] - 29:24
**75,000** [1] - 190:17
**753** [1] - 209:6
**7th** [5] - 53:1, 187:21, 187:23, 189:1, 196:17

## 8

**8** [1] - 94:18
**8,000** [1] - 114:2
**8,500** [1] - 114:4
**8/20/06** [1] - 114:2
**8/24/2008** [1] - 198:5
**8/8/06** [1] - 115:6
**800** [2] - 50:4
**805** [4] - 58:7, 58:22, 61:8, 61:22
**874** [1] - 118:3
**88107051** [1] - 165:12
**8:30** [2] - 115:10, 122:7
**8th** [4] - 116:25, 126:7, 189:4, 190:2

## 9

**9** [7] - 94:18, 124:21, 178:25, 185:19, 185:20, 196:24, 204:5
**9,000** [1] - 114:3
**9/20** [1] - 162:23
**9/20/06** [3] - 162:17, 162:22
**9/21/06** [1] - 162:23
**9/21/2006** [1] - 164:23
**9/6/07** [1] - 61:9
**90** [1] - 178:14
**900** [1] - 50:7
**90292** [1] - 89:4
**94** [1] - 2:6
**99** [1] - 2:7
**9:30** [1] - 208:3
**9:54** [1] - 23:15
**9th** [14] - 62:11, 128:6,

128:9, 176:1, 176:20, 177:8, 186:2, 186:24, 187:14, 188:6, 188:16, 190:4, 190:13, 190:17

## A

**a.m** [2] - 23:15, 85:22
**A.M.L** [1] - 32:10
**a/k/a** [2] - 134:10, 137:18
**ability** [1] - 86:12
**ABINGTON** [1] - 1:23
**able** [21] - 15:22, 16:6, 43:11, 44:4, 44:10, 44:25, 45:3, 45:4, 64:1, 79:11, 80:1, 97:11, 129:17, 129:20, 130:23, 131:12, 132:15, 144:21, 150:3, 152:19, 153:3
**above-captioned** [1] - 127:19
**above-mentioned** [1] - 209:8
**above-stated** [1] - 31:8
**absolutely** [6] - 66:12, 108:11, 122:17, 134:23, 145:24, 152:16
**Abu** [1] - 15:9
**accept** [8] - 39:25, 40:19, 40:24, 41:21, 116:16, 116:19, 178:13
**acceptance** [1] - 26:6
**accepted** [1] - 128:23
**access** [11] - 17:9, 17:14, 22:23, 35:1, 35:3, 43:12, 43:16, 44:17, 45:4, 63:1, 81:4
**accessible** [1] - 47:19
**accompanied** [1] - 131:10
**accompanying** [1] - 25:24
**accomplished** [1] - 132:2
**according** [7] - 4:22, 60:15, 74:5, 128:16, 164:11, 188:12, 203:1
**account** [82] - 8:7, 8:25, 9:12, 9:21, 9:24, 9:25, 17:18,

26:11, 30:2, 30:21, 30:22, 33:2, 37:2, 38:3, 38:4, 38:12, 38:15, 38:18, 38:21, 38:23, 38:24, 39:1, 39:2, 39:3, 39:6, 39:9, 39:10, 39:11, 39:12, 39:17, 39:20, 40:1, 40:15, 40:19, 40:24, 41:12, 50:20, 53:14, 53:17, 53:20, 61:8, 61:21, 63:21, 63:24, 64:13, 64:14, 91:2, 91:11, 91:24, 91:25, 92:12, 92:14, 92:15, 92:25, 93:3, 93:4, 93:8, 94:7, 94:8, 118:17, 119:13, 119:25, 120:1, 155:13, 155:15, 155:22, 165:11, 173:8, 195:24, 197:19, 198:17, 198:18, 201:19, 202:8, 202:9, 203:21
**accounting** [3] - 4:19, 5:7, 5:9
**accounts** [7] - 17:11, 18:6, 18:9, 38:8, 38:10, 38:11, 68:16
**accurate** [2] - 180:9, 203:15
**accurately** [1] - 140:11
**acknowledge** [1] - 95:24
**acknowledged** [7] - 23:5, 58:4, 88:18, 163:17, 188:9, 191:15, 205:18
**acknowledges** [2] - 196:23, 204:4
**acknowledgment** [1] - 203:25
**act** [5] - 27:7, 35:4, 38:18, 68:7, 68:11
**acting** [3] - 7:14, 7:17, 80:1
**action** [16] - 12:13, 56:1, 56:5, 56:8, 62:19, 63:11, 90:4, 90:5, 90:9, 90:11, 124:13, 127:22, 130:17, 134:11, 138:12, 143:14
**activities** [1] - 37:3
**activity** [6] - 3:17, 3:23, 9:17, 15:16, 15:24

**Actors** [2] - 101:14, 101:16
**actual** [6] - 17:10, 18:7, 40:5, 49:11, 118:8, 193:16
**added** [1] - 128:17
**addition** [6] - 58:10, 80:15, 120:13, 196:11, 206:18
**additional** [9] - 8:14, 14:5, 53:11, 53:13, 63:17, 66:25, 93:11, 93:19, 182:13
**address** [29] - 4:20, 25:7, 28:18, 29:16, 58:4, 58:12, 58:23, 60:7, 62:13, 62:15, 84:21, 84:22, 88:19, 88:21, 89:5, 116:13, 119:17, 123:12, 127:12, 134:10, 171:21, 188:9, 191:16, 191:17, 192:19, 192:20, 195:8, 197:18
**addressed** [1] - 60:6
**addresses** [1] - 60:6
**adjourn** [2] - 189:22, 207:21
**administering** [1] - 25:14
**administration** [1] - 4:18
**administrative** [3] - 3:24, 42:21, 43:2
**admission** [8] - 37:21, 63:16, 64:20, 94:16, 121:1, 121:2, 146:2, 207:12
**admitted** [5] - 37:25, 65:1, 94:24, 121:4, 146:8
**adult** [2] - 58:7, 195:9
**advanced** [1] - 178:2
**advertising** [4] - 101:9, 101:10, 101:11, 110:23
**advise** [1] - 85:4
**affiliated** [3] - 12:24, 21:21, 46:20
**afford** [1] - 50:21
**aforesaid** [1] - 31:1
**afternoon** [3] - 115:19, 115:21, 146:18
**agency** [2] - 69:4, 77:19
**agent** [3] - 25:7, 68:7, 80:1
**agents** [2] - 68:12,

98:17
**ago** [5] - 48:18, 53:6, 62:20, 69:25, 127:25
**agree** [6] - 39:14, 178:2, 178:13, 178:21, 181:1, 195:22
**agreed** [6] - 23:5, 141:2, 195:18, 195:22, 203:19, 204:13
**agreement** [59] - 9:17, 12:16, 13:9, 14:22, 20:18, 21:5, 21:19, 21:20, 22:7, 22:11, 22:22, 23:11, 23:21, 28:9, 28:13, 28:14, 28:24, 29:5, 29:6, 37:11, 93:5, 114:21, 161:3, 161:4, 161:13, 161:21, 162:18, 169:11, 177:25, 178:4, 178:6, 178:22, 179:9, 179:11, 179:24, 180:13, 181:13, 186:8, 189:9, 192:11, 193:15, 194:6, 194:15, 194:21, 195:1, 195:6, 195:7, 195:23, 196:8, 196:11, 196:12, 196:15, 197:3, 197:10, 199:1, 201:20, 203:10, 203:13, 204:12
**agreements** [4] - 11:25, 12:12, 125:13, 179:7
**agrees** [3] - 177:20, 185:25, 187:12
**ahead** [4] - 105:8, 155:1, 155:4, 195:11
**aid** [1] - 130:13
**aide** [1] - 168:23
**akin** [1] - 31:17
**ALEXANDER** [2] - 2:5, 42:7
**Alexander** [14] - 42:6, 42:11, 42:13, 43:4, 57:15, 58:7, 58:22, 61:8, 61:17, 61:22, 62:6, 63:25, 64:15, 65:4
**alleged** [1] - 125:4
**alleging** [1] - 17:12
**Allentown** [6] - 123:4, 123:14, 146:25, 147:21, 149:12,

195:10
**allocations** [1] - 5:2
**allow** [2] - 77:9, 155:1
**allowed** [3] - 133:12, 136:6, 144:2
**almost** [4] - 50:22, 93:18, 103:14, 103:21
**alone** [1] - 147:1
**altering** [1] - 63:3
**alternative** [2] - 3:15, 3:18
**AMERICA** [1] - 1:3
**America** [1] - 3:18
**amount** [72] - 7:3, 7:8, 7:18, 7:24, 8:11, 9:24, 10:1, 15:7, 15:8, 15:11, 18:22, 30:15, 31:15, 33:11, 34:12, 41:10, 41:12, 41:15, 49:23, 51:9, 58:10, 59:7, 59:11, 59:25, 61:16, 63:2, 63:25, 64:5, 64:7, 64:15, 72:15, 74:5, 85:17, 88:16, 91:10, 92:8, 107:15, 112:12, 112:23, 117:20, 117:24, 118:8, 124:10, 126:19, 128:10, 129:22, 136:20, 136:22, 149:19, 151:22, 156:14, 164:1, 165:1, 166:6, 173:2, 174:17, 174:18, 177:20, 178:5, 178:8, 188:12, 190:15, 193:6, 193:17, 196:1, 198:2, 199:8, 201:18, 202:17
**amounts** [13] - 9:5, 9:9, 18:1, 59:4, 60:11, 60:13, 73:10, 80:10, 156:12, 156:13, 202:2, 203:16
**analysis** [2] - 14:17, 194:6
**analyst** [3] - 5:20, 12:4, 12:8
**analytics** [2] - 5:11, 12:7
**Andrea** [2] - 127:20, 128:24
**aneurisms** [1] - 100:22
**aneurysms** [1] - 100:23

**Angeles** [3] - 68:3, 70:16, 75:14
**ANN** [2] - 2:5, 42:7
**Ann** [9] - 58:7, 58:22, 61:8, 61:17, 61:22, 62:6, 63:6, 63:24, 64:15
**annual** [1] - 5:10
**annually** [1] - 30:11
**answer** [12] - 46:11, 74:20, 110:15, 140:17, 140:19, 140:21, 144:20, 144:25, 158:25, 161:25, 182:16, 205:2
**answered** [1] - 76:21
**anti** [1] - 32:9
**appear** [9] - 27:10, 32:19, 128:19, 135:11, 144:17, 161:6, 161:10, 177:3, 203:13
**appearance** [14] - 134:13, 134:18, 138:2, 138:6, 138:13, 139:13, 143:15, 143:17, 143:19, 144:21, 145:1, 145:3, 145:9, 145:13
**APPEARANCES** [1] - 1:16
**appeared** [1] - 54:23
**application** [1] - 41:1
**applied** [2] - 41:8, 59:9
**apply** [2] - 41:22, 209:21
**appoint** [1] - 27:4
**appointed** [3] - 27:5, 144:11, 209:5
**appointments** [2] - 46:11, 47:17
**approach** [2] - 42:23, 168:20
**approached** [1] - 49:5
**appropriate** [2] - 26:6, 32:17
**approval** [2] - 14:19, 141:6
**approximate** [2] - 18:15, 180:3
**April** [21] - 6:5, 18:25, 23:14, 25:2, 26:7, 27:20, 28:1, 28:25, 35:8, 35:12, 35:21, 35:24, 36:2, 36:18, 37:9, 102:2, 102:3, 102:14, 102:15,

116:25, 139:12
**Arabia** [1] - 15:9
**area** [2] - 45:17, 147:21
**areas** [1] - 42:21
**arena** [1] - 4:8
**argument** [1] - 16:18
**Army** [1] - 119:15
**arranged** [1] - 84:15
**arrangement** [7] - 95:20, 96:4, 96:5, 96:18, 97:1, 97:20, 98:19
**arrangements** [3] - 30:18, 31:14, 98:8
**art** [19] - 151:15, 151:16, 153:1, 157:10, 167:17, 177:16, 177:22, 178:3, 178:11, 180:2, 184:13, 184:23, 184:25, 185:10, 201:5, 201:7, 201:9
**art's** [1] - 178:15
**article** [1] - 183:3
**articulated** [1] - 41:15
**artist** [5] - 151:17, 151:18, 183:1, 183:3, 184:25
**aside** [1] - 196:2
**assess** [2] - 128:10, 132:12
**asset** [20] - 3:15, 3:18, 3:24, 4:5, 4:9, 4:11, 4:16, 5:6, 5:12, 8:2, 9:11, 9:18, 9:23, 13:4, 18:18, 22:1, 25:17, 39:7, 73:18, 73:21
**assets** [45] - 4:17, 4:24, 5:9, 8:11, 8:15, 8:25, 10:7, 13:5, 14:7, 14:10, 16:2, 17:20, 25:14, 25:17, 26:3, 30:2, 30:4, 30:20, 31:1, 31:5, 38:22, 41:19, 73:11, 73:15, 73:17, 76:7, 80:2, 80:4, 81:9, 81:10, 97:7, 104:17, 131:24, 143:10, 144:14, 150:18, 151:1, 152:11, 154:16, 156:24, 195:2, 195:3
**assigned** [3] - 126:10, 133:25, 137:7
**assignee** [5] - 28:16, 58:8, 169:14,

169:16, 170:3
**assignees** [1] - 31:3
**assignment** [5] - 167:23, 169:9, 170:4, 170:6, 196:15
**assignor** [3] - 169:14, 169:21, 171:2
**assigns** [1] - 27:5
**assist** [1] - 72:10
**assistance** [1] - 104:5
**assistant** [6] - 42:22, 43:2, 45:6, 45:8, 46:1, 179:11
**associate** [6] - 70:10, 70:18, 70:19, 75:9, 75:10, 84:12
**associate's** [1] - 70:11
**associated** [1] - 44:3
**associates** [4] - 37:2, 95:7, 95:11, 95:13
**astronomical** [1] - 150:24
**Atlanta** [1] - 19:23
**atomic** [2] - 147:10, 147:11
**attached** [15] - 21:16, 24:12, 24:13, 24:14, 24:16, 28:7, 29:10, 34:9, 36:6, 36:11, 86:21, 87:6, 127:7, 177:14, 184:2
**attachment** [4] - 21:8, 24:1, 26:20, 36:8
**attachments** [2] - 32:19, 87:1
**attempted** [1] - 135:9
**attempting** [2] - 95:4, 95:11
**attempts** [1] - 189:21
**attended** [1] - 132:3
**attention** [6] - 6:5, 36:22, 67:17, 112:2, 123:20, 189:22
**attorney** [23] - 7:15, 7:17, 14:3, 14:5, 23:21, 26:23, 26:25, 27:22, 28:9, 28:10, 28:13, 31:23, 37:10, 46:7, 47:8, 72:9, 72:13, 83:5, 97:8, 158:3, 159:4, 159:17
**Attorney** [5] - 45:25, 46:5, 48:9, 56:6, 56:12
**attorney's** [1] - 59:25
**ATTORNEY'S** [1] - 1:18
**attorneys** [2] - 27:6, 47:20
**attributed** [2] -

177:13, 182:7
**audible** [1] - 181:23
**audited** [1] - 11:17
**August** [20] - 100:3, 100:4, 111:10, 115:4, 125:23, 126:7, 128:3, 128:6, 128:9, 129:12, 131:22, 132:21, 142:23, 144:4, 144:19, 182:11, 196:17, 196:22, 205:23, 206:2
**authenticity** [1] - 83:13
**authorities** [2] - 14:20, 32:17
**authority** [4] - 11:19, 29:25, 31:23, 33:8
**authorization** [7] - 23:21, 26:23, 26:25, 28:10, 28:14, 37:10, 83:5
**authorizing** [1] - 173:6
**automatically** [2] - 133:12, 136:11
**automobile** [1] - 129:23
**available** [1] - 18:13
**avoided** [1] - 63:1
**awarding** [1] - 130:17
**aware** [2] - 62:20, 134:12

## B

**B.'s** [1] - 195:25
**Bachelor** [1] - 69:7
**background** [5] - 12:8, 31:21, 69:6, 147:18, 153:18
**bad** [2] - 138:19, 139:11
**balance** [4] - 56:20, 93:8, 114:2
**bank** [54] - 6:3, 11:17, 11:18, 26:12, 33:8, 39:4, 39:13, 53:17, 78:23, 83:6, 83:8, 83:14, 83:19, 84:13, 91:1, 91:2, 91:5, 91:12, 91:18, 91:21, 92:18, 93:3, 106:20, 106:21, 107:2, 107:4, 115:5, 115:6, 118:17, 118:18, 155:15, 155:17, 155:19, 155:21, 164:19, 165:6, 166:8, 170:3, 190:8,

193:15, 193:16,
198:16, 199:5,
199:6, 200:4,
201:18, 202:7, 207:3
**Bank** [25] - 19:23,
19:24, 23:3, 26:9,
29:16, 29:22, 30:16,
32:21, 33:9, 33:22,
36:21, 36:23, 79:2,
83:12, 91:16, 92:19,
93:4, 107:7, 116:6,
118:22, 155:14,
155:20, 164:20,
164:21, 200:16
**bank's** [2] - 39:4,
165:5
**banking** [1] - 5:21
**bankruptcies** [1] -
137:24
**bankruptcy** [46] -
133:1, 133:5, 133:9,
133:11, 133:14,
133:17, 134:11,
136:2, 136:4, 136:7,
136:9, 136:17,
136:24, 136:25,
137:5, 137:8,
137:17, 138:10,
138:16, 138:22,
139:3, 139:11,
139:15, 140:18,
141:4, 141:5,
141:14, 141:20,
141:24, 142:1,
142:13, 142:17,
142:21, 143:3,
143:12, 143:14,
144:1, 144:3,
144:10, 144:12,
144:13, 144:15,
144:23, 145:16
**Bankruptcy** [1] -
133:19
**bar** [5] - 138:15,
141:12, 141:13,
141:17, 143:13
**BARRE** [1] - 1:12
**Barre** [2] - 133:20,
137:9
**barred** [1] - 141:7
**barrels** [6] - 25:20,
169:22, 169:23,
170:4, 170:6, 170:10
**barring** [1] - 141:4
**based** [14] - 7:16,
17:20, 18:18, 35:11,
53:20, 73:24, 118:7,
125:9, 167:12,
170:3, 195:19,
197:9, 198:14,

199:11
**basics** [1] - 47:15
**basis** [9] - 11:17,
19:17, 19:18, 54:19,
58:14, 65:17, 145:8,
145:13, 196:7
**Bates** [1] - 118:3
**bear** [1] - 122:4
**became** [7] - 19:14,
46:5, 47:19, 54:7,
55:10, 132:5, 134:12
**become** [3] - 128:1,
164:9, 196:9
**becomes** [1] - 39:4
**becoming** [2] - 52:22,
53:3
**BEFORE** [1] - 1:10
**began** [2] - 6:9, 55:18
**begin** [4] - 55:19,
63:3, 95:10, 95:11
**beginning** [4] - 55:14,
114:16, 148:20,
207:8
**behalf** [13] - 5:8, 7:15,
7:17, 7:20, 12:18,
14:10, 27:7, 35:4,
124:13, 132:2,
139:24, 144:20,
145:9
**belief** [1] - 138:18
**belligerent** [1] - 19:15
**belong** [1] - 149:11
**belongs** [2] - 38:12,
39:12
**below** [22] - 23:5,
23:6, 29:15, 30:18,
33:6, 37:15, 86:17,
89:18, 91:7, 91:23,
92:3, 92:10, 92:14,
92:18, 115:8, 117:7,
117:21, 126:22,
160:10, 161:9,
182:5, 205:15
**Ben** [5] - 17:11, 31:11,
32:1, 95:25, 151:13
**beneficiary** [5] -
92:14, 92:18, 165:7,
193:22, 197:18
**benefit** [14] - 30:25,
33:12, 46:10, 49:6,
50:3, 51:17, 53:9,
53:10, 57:15, 67:1,
119:20, 195:23,
196:3, 199:2
**benefits** [1] - 50:2
**bernanke** [1] - 86:21
**Bernanke** [12] - 14:9,
17:11, 17:12, 31:11,
32:1, 33:15, 77:21,
86:11, 93:22, 95:25,

96:13, 151:13
**best** [9] - 21:7, 21:16,
50:8, 79:4, 79:23,
90:10, 98:14, 103:4,
191:4
**Beth** [10] - 185:21,
185:24, 186:1,
187:9, 187:10,
187:12, 189:9,
190:2, 196:23, 204:4
**better** [7] - 50:25,
51:1, 66:24, 66:25,
67:2, 77:8, 160:5
**between** [9] - 9:18,
20:11, 20:12, 28:15,
31:20, 33:24, 38:17,
39:1, 50:7, 76:23,
84:16, 97:13,
112:19, 123:18,
125:13, 151:24,
161:17, 169:12,
179:12, 191:18,
195:3, 195:8,
203:10, 205:13
**beyond** [1] - 104:15
**bidder** [2] - 132:3,
132:4
**big** [2] - 104:19,
105:13
**billion** [27] - 7:8, 7:9,
7:18, 7:22, 7:23,
7:25, 9:9, 10:12,
10:14, 15:7, 18:12,
18:14, 25:22, 26:2,
26:9, 30:17, 31:15,
33:11, 33:21, 41:9,
72:16, 72:18, 74:15,
79:1, 83:6, 83:19,
195:16
**billions** [6] - 49:16,
49:19, 67:1, 79:2,
150:24, 201:2
**biographies** [1] -
11:23
**bit** [6] - 28:5, 38:17,
46:19, 50:21, 73:16,
99:20
**blacked** [3] - 13:18,
24:3, 169:15
**Blake** [3] - 182:8,
182:10
**BLAU** [2] - 2:6, 67:21
**Blau** [6] - 67:20,
67:25, 89:3, 91:24,
95:2, 96:8
**bless** [2] - 55:6
**blessings** [2] - 191:4,
191:7
**blind** [6] - 43:5, 43:7,
43:9, 43:10, 43:11,

45:7
**blocked** [1] - 33:9
**blocking** [1] - 86:12
**Board** [5] - 19:24,
29:14, 32:20, 86:3,
86:8
**board** [1] - 102:1
**body** [5] - 21:3, 23:18,
35:14, 191:1, 198:23
**bogus** [2] - 19:25,
86:15
**bold** [1] - 37:15
**bona** [1] - 178:13
**bond** [8] - 23:21, 26:8,
26:24, 26:25, 28:10,
28:14, 37:10, 83:5
**bonds** [1] - 7:4
**bonus** [2] - 170:11
**born** [1] - 43:10
**borrow** [6] - 41:3,
41:7, 41:10, 50:14,
50:18, 58:15
**borrowed** [2] - 50:11,
58:10
**borrower** [20] - 58:6,
58:13, 58:18, 58:24,
59:1, 59:3, 59:7,
59:8, 59:11, 59:12,
59:13, 59:15, 59:17,
59:19, 59:21, 60:7,
60:9, 88:25, 89:6,
163:21
**borrower's** [4] - 57:25,
59:1, 59:10, 188:5
**Boston** [3] - 3:12,
5:24, 6:1
**bottom** [16] - 21:9,
23:1, 27:9, 27:12,
28:20, 92:21, 94:2,
112:22, 113:5,
118:4, 128:4,
134:19, 160:22,
161:8, 175:5, 203:24
**bought** [5] - 109:20,
109:23, 132:4,
132:6, 132:9
**boutique** [1] - 4:16
**Bowen** [1] - 174:3
**Bower** [15] - 45:25,
46:6, 46:20, 47:9,
47:13, 47:25, 48:9,
48:23, 51:22, 56:6,
56:12, 62:12, 62:13,
174:4, 174:5
**Bower's** [4] - 46:15,
48:11, 48:17
**Box** [6] - 58:5, 63:22,
90:24, 127:13,
169:12, 188:10
**box** [1] - 92:3

**boxed** [1] - 151:17
**BOYANOWSKI** [2] -
209:3, 209:17
**Boyanowski** [1] -
209:14
**brain** [1] - 100:23
**brand** [2] - 109:4,
109:7
**BRANDLER** [56] -
1:18, 3:2, 3:6, 24:9,
24:11, 24:14, 24:15,
37:21, 42:1, 42:6,
42:10, 57:6, 57:13,
57:14, 63:15, 63:19,
64:20, 65:15, 67:11,
67:24, 76:15, 77:12,
94:15, 96:7, 99:8,
99:11, 99:15,
111:22, 112:6,
112:7, 119:14,
120:25, 122:19,
122:21, 122:25,
146:1, 146:13,
146:17, 154:22,
155:3, 167:11,
168:20, 168:23,
169:1, 169:3, 180:5,
180:8, 182:3, 182:4,
189:17, 189:25,
199:24, 200:20,
200:23, 206:12,
207:11
**Brandler** [3] - 112:5,
189:15, 206:10
**BRANDLER** [1] -
67:20
**break** [6] - 67:12,
111:24, 148:5,
168:17, 168:21,
168:24
**breakdown** [1] - 117:8
**breaking** [1] - 62:22
**Brian** [1] - 126:8
**brief** [3] - 67:19,
85:18, 189:24
**bring** [7] - 67:16,
72:19, 95:7, 95:11,
97:8, 112:2, 189:21
**bringing** [1] - 158:19
**broke** [1] - 112:8
**broken** [1] - 120:17
**broker** [3] - 68:14,
76:2, 84:12
**brokerage** [1] - 85:16
**brokers** [1] - 98:17
**brought** [5] - 75:4,
75:25, 95:13, 96:16,
96:22
**Brown** [2] - 10:13,
25:21

browning [4] - 45:2, 111:15, 111:16, 159:22
BRUCE [1] - 1:18
building [2] - 137:8, 157:6
BUILDING [1] - 1:19
business [44] - 3:14, 3:17, 3:20, 3:21, 3:22, 4:3, 4:4, 4:5, 5:18, 6:17, 6:18, 11:16, 11:19, 12:4, 12:8, 12:14, 14:21, 18:19, 23:24, 40:9, 43:18, 68:6, 68:15, 69:12, 70:4, 70:18, 70:19, 71:14, 73:8, 74:17, 75:10, 75:21, 78:10, 81:20, 91:24, 98:8, 98:17, 98:19, 101:11, 124:2, 147:16, 149:6, 158:10, 160:11
businesses [4] - 69:1, 69:3, 71:21, 147:13
businessman [2] - 98:5, 98:6
businessmen [1] - 95:5
buy [1] - 83:19
buyer [6] - 72:22, 72:25, 73:13, 76:1, 76:2, 76:4
buyers [9] - 68:7, 68:9, 68:10, 68:17, 69:16, 71:14, 72:19, 73:2, 76:3
buying [1] - 110:1
BY [29] - 3:6, 24:15, 38:2, 42:10, 57:14, 63:19, 65:3, 65:19, 67:24, 77:12, 95:1, 96:15, 99:15, 112:7, 119:14, 121:6, 122:25, 146:17, 154:22, 155:3, 167:11, 169:3, 180:8, 182:4, 189:25, 199:24, 200:23, 206:12, 209:16

## C

calculated [1] - 132:20
calculations [2] - 9:21, 9:22
califmo260@aol. com [1] - 84:22

California [10] - 68:3, 68:12, 69:15, 71:3, 78:24, 85:21, 88:21, 89:4, 91:24, 108:17
campaign [9] - 185:21, 185:24, 186:11, 186:13, 186:14, 186:23, 187:9, 187:10, 196:23
cancelled [2] - 136:11, 139:3
cancels [1] - 136:4
cannot [1] - 62:21
capabilities [2] - 12:7, 41:6
capacity [6] - 6:6, 8:13, 27:7, 27:21, 35:1, 203:4
cape [1] - 42:16
capital [8] - 63:23, 174:2, 185:21, 187:9, 189:9, 190:3, 196:23, 204:4
captioned [1] - 127:19
CAPUTO [1] - 1:10
car [17] - 53:19, 109:2, 109:3, 109:4, 109:6, 109:7, 109:12, 109:17, 109:20, 109:25, 110:2, 110:6, 120:21, 131:9, 131:11, 131:12
Card [21] - 75:1, 75:4, 75:8, 75:9, 75:15, 75:18, 75:25, 84:6, 84:12, 84:14, 84:16, 84:17, 85:3, 85:7, 85:11, 96:11, 96:14, 96:16, 96:22, 96:24, 96:25
card [4] - 76:6, 76:10, 76:23, 96:11
Card's [2] - 75:3, 76:19
care [1] - 207:24
Carol [3] - 171:2, 171:4, 171:5
carry [3] - 147:25, 153:3, 178:22
case [45] - 38:18, 39:23, 46:8, 48:7, 67:15, 70:7, 102:5, 112:1, 124:13, 124:25, 125:19, 125:22, 126:9, 127:3, 130:4, 133:2, 133:8, 133:11, 133:13, 133:17,

133:23, 134:22, 134:24, 134:25, 135:6, 135:10, 136:6, 137:5, 138:2, 138:10, 138:14, 138:17, 138:19, 139:1, 139:11, 141:4, 142:9, 144:10, 145:18, 148:15, 159:20, 189:20, 207:22, 208:1
cases [4] - 46:25, 48:6, 123:19, 141:5
cash [26] - 5:8, 8:9, 9:4, 18:7, 38:7, 53:11, 56:20, 62:5, 64:9, 64:10, 64:11, 65:7, 65:9, 65:10, 106:24, 115:4, 115:7, 120:14, 120:16, 120:19, 156:15, 156:19, 206:19, 206:23, 206:24
catch [1] - 161:25
caused [3] - 63:5, 100:22, 166:25
cease [7] - 19:6, 20:5, 35:20, 36:6, 36:10, 36:16, 37:3
Cedar [1] - 25:8
cell [6] - 19:17, 91:9, 115:17, 115:18, 115:25
CEO [24] - 12:20, 21:17, 21:25, 23:8, 23:25, 25:10, 26:19, 26:21, 26:24, 27:4, 28:16, 29:9, 36:7, 37:20, 60:19, 64:17, 86:22, 89:19, 164:13, 171:2, 177:5, 186:9, 187:17, 192:6
certain [14] - 16:17, 18:2, 18:4, 38:19, 71:25, 79:11, 81:20, 83:25, 86:25, 125:16, 169:22, 177:13, 178:1, 195:14
certainly [6] - 7:14, 7:24, 17:20, 19:15, 34:25, 54:16
CERTIFICATE [1] - 209:1
certificate [1] - 209:20
certified [2] - 174:2, 195:16

certify [5] - 27:19, 32:10, 32:11, 209:6, 209:10
certifying [3] - 27:17, 209:21
cetera [1] - 60:2
CFO [1] - 25:11
chairman [8] - 17:12, 25:10, 31:11, 31:12, 157:7, 186:12, 186:13, 186:14
change [1] - 116:13
changed [7] - 55:3, 106:1, 109:1, 109:2, 116:13, 116:14, 203:17
changes [2] - 118:11, 162:24
charge [1] - 59:5
charged [1] - 54:16
charitable [1] - 157:2
Charlotte [2] - 42:21, 43:1
Chase [1] - 91:16
check [31] - 30:6, 30:13, 33:10, 34:16, 34:18, 53:11, 61:6, 61:7, 61:9, 61:12, 61:16, 61:21, 61:25, 63:20, 64:2, 64:12, 64:14, 66:5, 95:15, 153:18, 153:22, 192:10, 192:14, 192:15, 192:19, 192:24, 204:6, 204:7, 204:10
checks [16] - 7:19, 14:2, 17:16, 30:5, 30:7, 45:8, 56:19, 64:7, 64:11, 65:7, 151:2, 151:10, 156:16, 156:18, 156:19, 206:18
CHF [1] - 148:3
child [1] - 50:6
choice [1] - 60:14
Christa [1] - 174:3
Christian [1] - 62:23
Christie [10] - 45:25, 48:5, 50:1, 52:2, 55:2, 62:11, 62:21, 67:1, 174:4, 174:5
Christopher [1] - 182:10
chronology [1] - 207:6
circled [1] - 183:10
circulate [2] - 13:15, 13:18
circumstances [8] -

6:9, 48:3, 49:24, 50:8, 120:20, 167:12, 197:21, 206:23
citizen [1] - 28:18
city [3] - 75:16, 123:13, 197:18
City [2] - 29:16, 83:12
civil [7] - 123:17, 124:14, 124:15, 124:16, 132:19, 135:1
Civil [1] - 127:17
claim [4] - 7:7, 105:17, 125:9, 144:22
claimed [2] - 56:11, 77:14
CLARKS [1] - 1:24
class [1] - 60:5
clean [5] - 31:6, 107:14, 116:25, 117:2, 118:10
clear [5] - 31:6, 66:17, 79:12, 123:23, 145:11
clearance [1] - 147:10
cleared [1] - 31:6
clearly [2] - 76:24, 108:17
Clerk [1] - 127:8
clerk [6] - 127:9, 127:11, 127:20, 128:6, 128:8, 128:25
clerk's [1] - 128:23
client [15] - 6:13, 11:21, 11:22, 17:25, 30:1, 32:9, 39:6, 39:20, 40:18, 48:11, 68:15, 123:21, 123:24, 123:25, 125:3
client's [2] - 39:19, 85:19
clients [5] - 32:15, 47:18, 48:6, 68:17, 68:20
clipped [1] - 100:23
close [3] - 6:16, 102:21, 132:21
closed [3] - 69:22, 69:23, 198:24
closer [2] - 3:16, 42:23
co [9] - 8:6, 8:20, 8:21, 8:24, 9:2, 9:25, 10:1, 10:3, 17:18
co-mingle [2] - 8:6, 10:3
co-mingled [3] - 8:24, 9:25, 17:18

**co-mingling** [4] - 8:20, 8:21, 9:2, 10:1
**Code** [1] - 209:6
**code** [1] - 29:25
**codes** [1] - 26:15
**cohen** [1] - 149:3
**Cohen** [19] - 27:14, 148:22, 148:23, 149:7, 149:11, 149:13, 150:11, 152:5, 153:20, 158:7, 158:14, 158:19, 160:16, 161:8, 161:18, 162:8, 163:5, 184:19, 184:20
**Cohen's** [1] - 161:9
**collateral** [14] - 7:19, 10:23, 10:24, 11:1, 18:2, 18:12, 18:14, 38:21, 38:25, 40:21, 41:22, 156:21, 196:15
**collateralized** [3] - 8:4, 17:25, 156:24
**colleague** [1] - 6:11
**colleagues** [1] - 17:15
**collect** [5] - 90:6, 129:9, 129:14, 129:20, 132:15
**collected** [1] - 129:22
**collecting** [1] - 158:8
**collection** [8] - 28:23, 69:4, 133:6, 133:8, 142:25, 143:4, 143:22, 145:23
**collectively** [1] - 58:9
**college** [4] - 50:20, 50:21, 50:23, 147:19
**Columbia** [1] - 147:20
**combined** [1] - 195:2
**comfortable** [1] - 104:14
**coming** [11] - 39:18, 44:18, 45:1, 48:25, 76:16, 106:10, 106:11, 108:9, 156:5, 166:14
**comingle** [1] - 16:2
**comma** [1] - 30:22
**commence** [2] - 178:3, 196:22
**commenced** [2] - 6:19, 6:21
**commercial** [3] - 25:15, 69:4, 101:9
**commission** [3] - 69:19, 70:1, 72:21
**commitment** [2] - 196:23, 204:4

**commodities** [4] - 25:16, 68:7, 69:16, 69:17
**common** [3] - 9:25, 12:13, 126:9
**Common** [1] - 124:23
**Commonwealth** [1] - 27:15
**communicate** [5] - 11:7, 11:10, 16:9, 16:12, 18:21
**communicated** [2] - 19:4, 194:3
**communication** [2] - 18:24, 25:4
**communications** [2] - 17:23, 24:5
**companies** [1] - 71:24
**company** [29] - 4:2, 4:10, 10:8, 12:19, 22:24, 22:9, 22:22, 22:9, 24:22, 25:12, 25:13, 26:1, 43:23, 115:11, 122:9, 122:11, 132:17, 142:11, 142:12, 150:17, 150:20, 150:25, 151:9, 152:11, 152:13, 174:9, 174:15, 175:25, 179:13, 187:12
**Company** [59] - 24:25, 25:7, 25:12, 25:18, 26:7, 26:10, 29:2, 36:24, 37:5, 52:15, 58:4, 60:18, 63:22, 64:14, 83:4, 86:22, 88:19, 112:20, 118:22, 119:20, 125:2, 125:16, 126:1, 126:18, 129:24, 130:15, 131:7, 134:9, 135:17, 137:18, 137:19, 161:18, 165:10, 169:12, 172:16, 177:5, 183:12, 185:15, 185:23, 185:25, 187:7, 187:9, 187:12, 188:2, 188:9, 189:4, 190:11, 190:20, 191:15, 192:6, 193:22, 193:24, 194:17, 195:8, 197:19, 198:22, 200:4, 203:10, 205:18
**company's** [1] - 36:13

**Company's** [1] - 173:8
**comparing** [1] - 33:18
**complaint** [5] - 124:14, 124:15, 124:16, 124:21, 125:4
**completed** [1] - 66:12
**completely** [1] - 66:10
**completing** [1] - 130:16
**compliance** [3] - 13:15, 14:15, 14:18
**computer** [4] - 43:13, 44:5, 44:17, 55:18, 57:16, 62:13, 82:9, 117:5, 117:6, 160:1, 160:14, 207:24
**concerned** [1] - 191:9
**concerning** [1] - 144:14
**concerns** [5] - 32:16, 40:4, 40:5, 40:7, 40:8
**concluded** [1] - 35:17
**conclusion** [2] - 35:16, 64:25
**conclusive** [1] - 16:18
**condemn** [1] - 166:24
**conditions** [1] - 177:23
**conducted** [1] - 71:1
**conference** [3] - 84:16, 135:14, 135:19
**confidence** [1] - 22:17
**confidential** [9] - 22:19, 22:25, 25:4, 26:14, 83:10, 83:24, 160:11, 167:22, 173:15
**confidentiality** [12] - 12:12, 12:15, 13:9, 21:20, 23:11, 26:7, 161:3, 161:4, 161:12, 161:21, 162:1, 162:18
**confines** [1] - 10:11
**confirm** [5] - 29:25, 31:5, 33:7, 83:4, 139:22
**confirmation** [5] - 91:20, 92:22, 127:9, 200:3
**confirmed** [2] - 83:12, 83:13
**confirming** [1] - 78:12
**conflict** [1] - 56:6
**confront** [2] - 109:25, 158:4
**congestive** [1] - 148:3

**connection** [8] - 57:21, 60:21, 82:18, 124:3, 124:5, 165:14, 181:12, 197:2
**connections** [1] - 151:13
**consequence** [2] - 134:14, 178:18
**consider** [1] - 103:4
**consideration** [3] - 26:17, 87:5, 177:19
**considered** [1] - 105:15
**consist** [2] - 26:13, 83:9
**consisting** [1] - 26:15
**constantly** [1] - 103:14
**construed** [3] - 60:15, 60:17, 196:25
**consultant** [1] - 69:5
**contact** [16] - 6:6, 6:19, 6:21, 19:22, 26:19, 48:1, 70:9, 76:23, 81:24, 81:25, 84:25, 107:25, 110:5, 111:6, 111:13, 175:3
**contacted** [3] - 86:9, 111:8, 171:5
**contacts** [1] - 80:21
**contents** [1] - 62:16
**context** [1] - 10:22
**contingencies** [1] - 97:4
**contingency** [2] - 96:18, 96:21
**continuation** [1] - 14:5
**continue** [7] - 20:9, 35:17, 85:15, 112:9, 156:8, 157:21, 177:17
**continued** [3] - 175:22, 199:3, 205:7
**contract** [1] - 101:16
**contracts** [1] - 158:8
**contrary** [1] - 20:2
**contributions** [2] - 157:2, 188:25
**control** [5] - 9:16, 13:5, 15:11, 74:10, 209:21
**controlled** [3] - 76:8, 80:2, 80:4
**controlling** [1] - 25:14
**conversation** [6] - 7:21, 10:20, 41:16, 83:3, 104:18, 115:9

**conversations** [8] - 10:17, 19:21, 49:1, 54:23, 55:8, 82:1, 96:23, 98:12
**convert** [1] - 127:2
**convo** [2] - 115:10, 122:7
**coordinates** [4] - 85:5, 86:6, 86:23, 87:8
**coordinator** [1] - 101:12
**copied** [1] - 121:10
**copy** [28] - 27:19, 27:21, 27:22, 29:7, 44:13, 60:16, 60:24, 85:18, 86:21, 107:14, 117:1, 117:2, 117:4, 118:10, 127:11, 139:5, 162:23, 167:22, 169:5, 173:15, 174:2, 189:8, 191:2, 194:6, 196:25, 198:24, 205:6
**Coral** [1] - 42:16
**corner** [3] - 27:13, 108:10, 111:3
**corporate** [44] - 10:9, 10:18, 11:22, 12:9, 13:6, 14:1, 15:21, 15:23, 23:20, 24:16, 24:20, 25:6, 32:11, 33:18, 33:20, 33:25, 37:9, 47:6, 57:25, 58:4, 87:7, 87:9, 87:11, 87:22, 88:7, 88:8, 112:16, 112:17, 163:13, 169:22, 170:1, 175:6, 188:5, 188:9, 191:12, 191:16, 195:14, 195:20, 196:13, 202:11, 202:12, 203:4, 204:2
**corporation** [6] - 16:25, 25:19, 31:18, 125:2, 125:15, 143:7
**Corporation** [5] - 3:10, 3:13, 5:16, 6:2, 6:7
**correct** [144] - 6:4, 6:25, 10:4, 10:21, 11:1, 12:25, 20:4, 21:22, 21:23, 22:4, 22:14, 23:7, 23:12, 24:4, 24:6, 24:18, 27:11, 27:16, 28:6, 29:12, 32:22, 33:17, 33:22, 33:23, 35:25,

36:9, 36:12, 37:20, 38:14, 38:17, 40:2, 40:3, 40:22, 40:25, 41:23, 44:19, 44:23, 47:3, 50:16, 51:25, 52:15, 57:22, 64:6, 68:19, 71:3, 71:15, 72:23, 73:1, 73:14, 75:24, 76:5, 78:5, 78:16, 78:25, 80:20, 83:21, 84:3, 84:4, 87:23, 88:6, 88:19, 90:22, 91:3, 91:6, 92:16, 92:19, 93:14, 93:19, 94:10, 95:3, 98:7, 99:2, 112:20, 117:25, 119:15, 119:22, 125:5, 126:23, 127:14, 127:24, 128:22, 129:5, 130:22, 133:22, 134:19, 134:22, 134:23, 136:15, 136:23, 137:10, 138:1, 138:3, 138:4, 138:11, 139:5, 139:12, 140:21, 141:9, 141:18, 141:19, 142:12, 142:23, 143:2, 143:20, 144:24, 145:4, 145:7, 154:12, 156:11, 159:14, 165:15, 166:12, 166:17, 166:18, 166:19, 168:13, 171:7, 171:17, 172:6, 172:18, 172:20, 173:6, 174:2, 176:23, 179:13, 179:16, 179:17, 179:20, 181:4, 188:14, 188:15, 188:20, 189:8, 190:25, 191:19, 192:17, 198:19, 199:10, 199:15, 202:24, 203:13, 205:25, 206:6, 209:7
**corrected** [1] - 162:23
**correctly** [4] - 19:1, 60:5, 121:11, 157:11
**correspond** [1] - 162:12
**correspondence** [3] - 20:11, 32:2, 77:20
**cost** [4] - 18:17, 37:17, 56:8, 91:12

**costs** [5] - 59:18, 59:21, 59:25, 119:9, 160:14
**counsel** [5] - 62:22, 93:5, 145:6, 193:15, 201:20
**counsel's** [1] - 57:1
**Counties** [1] - 43:1
**country** [2] - 85:17, 104:20
**county** [2] - 131:18, 152:2
**County** [25] - 10:13, 25:21, 42:21, 45:16, 100:10, 124:23, 125:19, 126:8, 126:24, 127:7, 128:25, 129:10, 129:11, 129:14, 129:18, 130:4, 131:17, 133:18, 135:2, 135:3, 135:6, 137:1, 139:1, 141:11, 142:22
**couple** [8] - 11:5, 11:8, 16:5, 40:8, 50:17, 54:1, 95:2, 156:16
**course** [9] - 12:13, 32:5, 54:13, 60:2, 62:20, 66:3, 97:19, 137:1, 143:25
**court** [21] - 59:25, 99:22, 124:22, 126:9, 129:4, 133:10, 135:12, 136:3, 136:6, 137:8, 138:21, 139:11, 139:15, 143:14, 144:2, 144:3, 148:8, 159:14, 173:14, 205:2
**Court** [19] - 56:22, 124:19, 124:23, 130:17, 132:9, 132:12, 133:19, 134:14, 134:15, 138:15, 138:21, 140:23, 141:2, 141:5, 209:3, 209:4, 209:15, 209:17, 209:18
**COURT** [46] - 1:1, 3:1, 37:23, 37:25, 42:2, 42:5, 57:7, 57:10, 57:12, 64:22, 64:25, 67:10, 67:13, 76:17, 77:2, 77:7, 77:11, 94:19, 94:22, 94:24, 96:9, 99:9, 111:21,

111:23, 112:5, 121:2, 121:4, 122:20, 146:6, 146:8, 146:10, 154:21, 155:1, 167:10, 168:21, 169:2, 180:7, 181:25, 182:2, 189:15, 189:18, 199:23, 206:9, 207:14, 207:16, 207:19
**Court's** [2] - 56:25, 126:22
**courtesy** [1] - 60:25
**courthouse** [2] - 124:17, 133:21
**courtroom** [2] - 139:21, 208:2
**COURTROOM** [1] - 1:11
**Courts** [1] - 127:8
**courts** [3] - 127:9, 127:11, 128:25
**cover** [3] - 38:21, 162:8, 162:9
**covered** [1] - 138:23
**crash** [1] - 55:18
**create** [2] - 4:21, 5:13
**Credit** [2] - 107:3, 118:19
**credit** [10] - 26:12, 40:16, 40:17, 50:12, 52:8, 83:7, 170:3, 190:11
**creditor** [4] - 136:16, 141:15, 142:14, 142:19
**creditors** [3] - 144:16, 144:17
**Creek** [1] - 46:17
**crime** [8] - 54:15, 54:16, 54:17, 54:19, 54:20, 66:17, 66:20, 66:22
**criminal** [3] - 31:6, 47:4, 123:18
**CROSS** [5] - 2:3, 38:1, 65:2, 94:25, 121:5
**cross** [6] - 37:25, 65:1, 94:20, 94:24, 117:21, 121:4
**cross-examine** [4] - 37:25, 65:1, 94:24, 121:4
**crossed** [5] - 114:3, 117:10, 117:15, 117:22, 169:15
**CRR** [2] - 209:14, 209:17

**crude** [2] - 170:2, 170:5
**crunch** [1] - 104:19
**cuff** [1] - 100:20
**cumulative** [1] - 202:17
**current** [2] - 26:16, 195:16
**CUSIP** [1] - 26:15
**custodial** [33] - 3:23, 6:2, 7:5, 18:6, 23:22, 26:11, 26:13, 30:2, 30:21, 30:22, 30:25, 31:14, 33:2, 35:5, 37:1, 37:11, 38:3, 38:4, 38:11, 38:12, 38:18, 38:20, 38:22, 39:1, 39:9, 39:17, 40:1, 40:15, 40:19, 40:24, 41:21
**custodian** [2] - 16:23, 39:19
**custody** [11] - 4:19, 7:7, 7:13, 13:16, 14:25, 30:18, 35:18, 46:7, 47:2, 47:3, 48:7
**customer** [4] - 38:13, 39:3, 39:13, 160:12
**customers** [1] - 43:25
**cut** [1] - 73:6

## D

**damages** [2] - 37:17, 128:10
**dark** [1] - 118:1
**data** [3] - 17:10, 25:24, 36:17
**DATE** [1] - 1:14
**date** [91] - 21:1, 25:1, 25:8, 29:17, 30:9, 30:10, 30:24, 32:23, 35:23, 36:4, 36:18, 58:19, 58:21, 59:3, 59:6, 82:21, 88:4, 88:13, 89:1, 89:2, 89:3, 91:11, 92:4, 93:13, 112:24, 114:21, 114:24, 114:25, 117:11, 117:12, 118:20, 118:24, 119:21, 126:20, 129:2, 134:1, 134:4, 134:7, 134:21, 137:11, 137:13, 139:22, 141:12, 142:1, 142:3, 142:7, 145:20, 145:21,

145:24, 161:15, 162:16, 164:2, 164:3, 164:5, 164:6, 164:22, 164:23, 164:24, 166:4, 166:16, 168:1, 171:17, 172:1, 172:17, 173:2, 175:9, 176:1, 176:22, 177:7, 178:4, 178:5, 186:21, 187:23, 190:13, 192:13, 192:15, 192:16, 193:8, 193:19, 198:4, 204:8, 204:12, 205:11, 205:22, 205:24, 209:9
**dated** [33] - 23:14, 27:20, 28:25, 35:8, 35:21, 36:2, 61:9, 61:22, 62:11, 63:21, 65:24, 82:15, 84:6, 88:4, 112:18, 130:5, 162:22, 171:23, 182:19, 186:2, 187:14, 187:21, 189:4, 190:20, 193:24, 196:24, 197:7, 199:8, 201:18, 202:13, 203:15, 204:2, 204:5
**dates** [3] - 52:23, 115:1, 209:9
**daughter** [5] - 50:3, 53:15, 54:18, 54:21, 67:7
**daughter's** [4] - 50:20, 53:14, 66:14, 66:21
**daughters** [2] - 50:6, 67:3
**Dawson** [1] - 25:11
**days** [26] - 13:22, 51:8, 51:9, 52:17, 54:1, 84:7, 89:2, 89:8, 104:21, 110:21, 112:25, 115:10, 122:8, 128:3, 139:12, 139:13, 141:5, 155:6, 156:1, 156:2, 164:6, 164:7, 166:14, 168:3, 193:25, 200:13
**deal** [13] - 4:15, 16:15, 69:19, 69:22, 70:1, 70:3, 73:4, 90:2, 96:13, 97:22, 112:25, 150:16,

171:11
dealing [4] - 96:17, 148:2, 148:17, 148:21
dealings [4] - 70:6, 70:25, 71:5, 149:6
deals [5] - 98:9, 98:21, 108:4, 108:8, 108:14
dealt [3] - 75:9, 75:15, 81:10
Dear [1] - 82:25
dear [4] - 62:17, 85:3, 86:2, 182:8
death [1] - 157:11, 182:8
debt [6] - 10:14, 26:1, 90:6, 174:20, 181:1, 188:22
debt/credit [1] - 83:11
debtor [7] - 134:6, 134:8, 137:15, 137:17, 141:13, 142:9, 144:12
December [22] - 55:21, 56:2, 62:11, 63:21, 134:5, 134:7, 134:12, 134:20, 135:14, 135:18, 135:20, 135:25, 136:9, 136:11, 138:20, 139:2, 171:17, 171:23, 172:2, 172:18, 182:9, 190:20
DECEMBER [1] - 1:14
decide [3] - 51:2, 202:2, 208:1
decided [2] - 172:10, 202:3
decision [3] - 19:18, 19:19, 66:2
declare [1] - 29:7
decree [1] - 127:18
deducted [2] - 92:12, 92:24
deemed [1] - 196:9
deep [1] - 115:23
default [5] - 59:10, 59:12, 59:13, 59:17, 196:2
Defendant [1] - 1:21
defendant [12] - 70:7, 75:4, 76:23, 84:14, 84:15, 84:16, 84:17, 87:20, 96:13, 102:4, 124:18, 148:15
defendants [5] - 124:18, 124:24, 125:1, 126:17, 131:7
define [1] - 49:15

degree [2] - 69:7, 69:9
degrees [1] - 147:19
Del [2] - 88:21, 89:4
Delaware [5] - 58:5, 63:22, 90:25, 127:13, 169:13
delay [2] - 132:22, 194:5
delayed [2] - 136:25, 145:22
delivering [2] - 60:4
demand [10] - 39:16, 57:25, 60:11, 86:21, 163:13, 188:5, 191:3, 191:12, 198:25, 205:7
dementia [2] - 148:13, 191:8
denominated [1] - 38:8
denomination [2] - 30:13, 34:19
department [3] - 14:15, 101:13, 180:2
departments [1] - 101:15
dependant [2] - 96:4, 96:25, 98:19
deposit [11] - 10:6, 39:10, 39:11, 39:17, 40:1, 41:21, 45:9, 195:24, 195:25, 203:20
deposited [1] - 30:1
deposition [1] - 135:9
depository [2] - 39:3, 39:12
Depot [1] - 119:15
depression [1] - 100:17
deriving [1] - 9:22
describe [4] - 13:3, 13:15, 13:25, 147:24
described [3] - 59:16, 59:20, 65:24
describes [1] - 30:18
description [1] - 177:14
design [1] - 160:13
designates [1] - 60:8
desist [7] - 19:6, 20:5, 35:20, 36:6, 36:10, 36:16, 37:3
desk [1] - 17:23
desperately [1] - 55:21
despite [3] - 43:11, 144:22, 145:22
destitute [1] - 80:24
destroy [2] - 19:7,

37:8
detail [2] - 68:8, 104:15
detailed [2] - 110:21, 110:22
details [6] - 30:3, 53:7, 105:13, 105:14, 121:12, 121:20
determination [3] - 19:12, 101:25, 102:1
determine [1] - 14:4
determined [3] - 18:1, 19:16, 178:15
develop [4] - 4:4, 5:13, 47:9, 102:19
developing [1] - 25:14
development [5] - 3:14, 3:17, 3:20, 5:18, 6:18
device [1] - 207:25
Dhabi [1] - 15:9
diamonds [1] - 69:18
dictated [4] - 47:14, 47:15, 47:16, 202:4
died [1] - 180:2
difference [3] - 38:17, 63:3, 98:10
differences [1] - 39:1
different [13] - 14:20, 19:20, 55:25, 58:23, 60:7, 89:5, 106:15, 116:24, 129:11, 177:12, 179:25, 197:25, 198:6
differentiation [1] - 195:3
difficult [5] - 46:8, 50:8, 56:9, 151:8, 193:14
difficulty [2] - 146:19, 160:2
diligence [1] - 84:18
diminished [1] - 50:4
dinner [6] - 103:1, 103:2, 103:13, 103:14, 108:5, 120:22
direct [4] - 4:24, 48:22, 66:16, 95:18, 98:23, 121:13, 123:15, 123:20, 209:21
DIRECT [7] - 2:3, 3:5, 42:9, 67:23, 99:14, 122:24, 146:16
directed [2] - 37:8, 38:19
directing [1] - 6:5
direction [1] - 128:6
directly [3] - 8:9, 34:5,

96:13
director [1] - 3:20
disabilities [1] - 147:24
Disability [1] - 105:24
disability [8] - 100:15, 100:16, 100:22, 100:25, 101:2, 103:17, 103:19, 105:20
discern [2] - 44:10, 64:1
disciplined [1] - 11:20
disclose [1] - 32:15
disclosed [1] - 22:19
disclosure [8] - 12:15, 13:20, 20:18, 21:5, 21:19, 22:7, 22:11, 22:21
discount [1] - 59:25
discounts [1] - 160:14
discrepancy [1] - 33:24
discretion [1] - 27:6
discuss [10] - 8:17, 67:15, 81:3, 86:5, 103:24, 108:4, 111:25, 158:21, 189:20, 207:22
discussed [2] - 24:2, 197:22
discussion [7] - 16:19, 25:5, 103:25, 104:1, 157:1, 184:24, 185:2
discussions [3] - 10:15, 32:5, 35:17
dishonor [2] - 60:10, 60:12
dismiss [4] - 138:14, 138:17, 139:11, 140:24
dismissal [2] - 145:21, 145:22
dismissed [4] - 134:6, 136:24, 137:15, 145:18
dismissing [2] - 134:22, 141:3
disorder [1] - 100:17
dispose [2] - 73:11, 73:12
disputes [1] - 123:18
distribute [1] - 198:11
distribution [2] - 127:6, 197:18
District [2] - 133:20, 209:4, 209:18, 209:18
DISTRICT [2] - 1:1, 1:1

divide [2] - 178:16, 178:17
division [1] - 46:17
divorce [2] - 47:2, 47:3
docket [12] - 133:16, 133:23, 134:8, 134:17, 137:4, 138:5, 141:24, 143:7, 143:16, 144:19, 144:25
doctor [4] - 102:1, 102:7, 102:17, 102:23
doctor's [2] - 102:10, 102:25
document [114] - 14:3, 20:17, 20:19, 20:21, 21:12, 22:5, 22:6, 22:12, 22:13, 24:12, 26:22, 27:10, 28:7, 28:8, 29:10, 29:17, 29:19, 32:18, 32:20, 32:23, 33:4, 33:18, 33:19, 34:8, 34:11, 35:19, 35:23, 36:15, 36:17, 44:9, 44:11, 44:14, 44:15, 44:16, 44:17, 45:3, 57:19, 57:24, 60:17, 60:20, 60:23, 60:24, 64:10, 79:17, 82:21, 84:9, 84:19, 87:17, 87:22, 88:3, 89:15, 90:12, 91:13, 92:21, 94:12, 107:12, 112:12, 113:5, 114:15, 118:2, 118:15, 118:16, 119:24, 120:6, 124:16, 126:4, 127:5, 127:24, 128:18, 130:1, 132:11, 133:15, 133:16, 134:14, 134:17, 139:17, 141:21, 144:6, 145:10, 160:7, 161:3, 162:5, 164:12, 169:5, 170:14, 170:25, 171:14, 172:11, 172:14, 173:22, 175:20, 177:9, 179:2, 181:11, 181:12, 182:25, 183:16, 184:21, 185:20, 188:13, 190:3, 192:9, 194:15, 196:25, 197:7, 198:16,

199:11, 200:6,
200:15, 202:7,
203:15, 204:13,
204:23
**documentation** [11] -
11:24, 13:22, 15:3,
15:15, 25:24, 33:24,
34:19, 52:12, 76:11,
116:7, 178:21
**documenting** [1] -
79:14
**documents** [57] -
13:12, 13:14, 13:16,
13:20, 13:23, 13:25,
14:12, 14:14, 22:19,
23:20, 24:1, 24:7,
37:8, 39:23, 39:25,
40:11, 40:13, 43:11,
43:17, 44:22, 44:25,
47:18, 47:20, 56:23,
57:2, 57:8, 57:17,
63:17, 77:13, 77:16,
77:17, 77:22, 77:23,
78:11, 79:13, 82:8,
83:22, 83:25, 85:10,
87:6, 90:10, 105:17,
106:17, 111:17,
111:20, 112:9,
121:17, 125:9,
125:11, 146:2,
161:22, 168:10,
182:13, 190:2,
194:10, 207:12
**dollar** [7] - 7:18, 9:5,
9:24, 15:7, 31:15,
41:15, 120:14
**dollars** [49] - 7:9, 7:18,
7:22, 7:25, 10:12,
10:14, 18:12, 30:17,
33:11, 34:1, 34:13,
41:9, 49:17, 50:4,
50:7, 50:17, 67:1,
70:2, 78:12, 78:15,
79:18, 80:11, 81:14,
83:19, 88:1, 89:24,
89:25, 93:16, 95:22,
96:3, 96:4, 96:24,
97:5, 98:2, 115:6,
115:22, 116:16,
116:18, 120:17,
150:24, 151:23,
159:14, 186:1,
195:17, 195:18,
196:2, 201:3, 202:25
**Donald** [4] - 25:24,
31:12, 171:20,
195:15
**donation** [1] - 157:7
**done** [5] - 9:22, 56:14,
75:21, 98:25, 185:6

**double** [1] - 139:22
**doubting** [3] - 171:12,
171:13, 172:9
**down** [25] - 4:13,
20:23, 26:4, 28:4,
28:21, 34:11, 37:6,
42:2, 50:7, 84:19,
85:6, 92:3, 99:9,
110:24, 112:22,
121:10, 122:20,
127:15, 139:21,
146:10, 154:21,
157:20, 165:3,
173:5, 186:25
**downloaded** [1] - 21:8
**Dr** [3] - 102:1, 102:2,
102:7
**drawn** [1] - 9:17
**dribbling** [1] - 105:22
**Drive** [4] - 58:7, 58:22,
61:8, 61:22
**dropped** [1] - 50:3
**DTC** [1] - 26:15
**dually** [1] - 27:5
**due** [37] - 37:1, 52:22,
53:1, 53:3, 53:5,
54:3, 54:7, 55:10,
58:12, 58:14, 58:18,
59:4, 59:11, 60:2,
60:11, 60:13, 73:19,
81:12, 81:20, 84:17,
88:25, 89:22, 93:17,
93:18, 109:5,
114:24, 114:25,
156:1, 156:2, 156:7,
163:21, 164:2,
166:14, 188:16,
191:25, 196:13,
204:1
**duly** [6] - 3:3, 42:7,
67:21, 99:12,
122:22, 146:14
**duration** [1] - 18:3
**during** [16] - 11:6,
19:14, 19:21, 32:5,
51:22, 55:8, 81:3,
112:10, 133:2,
137:1, 140:12,
142:23, 148:4,
152:10, 196:6, 196:7
**duties** [2] - 4:1, 47:12

## E

**e-mail** [50] - 11:11,
13:21, 14:13, 18:23,
20:24, 21:1, 21:3,
21:4, 21:15, 23:14,
23:16, 23:18, 24:17,
29:11, 35:7, 35:8,

36:5, 45:4, 55:17,
55:24, 56:2, 56:3,
56:20, 62:10, 62:12,
62:13, 62:15, 62:16,
62:17, 63:6, 63:11,
65:23, 71:2, 77:13,
82:15, 82:18, 83:23,
84:1, 84:8, 84:20,
84:21, 84:22, 85:20,
85:21, 85:22, 86:18,
86:24, 87:1, 88:4,
90:21
**e-mailed** [3] - 44:16,
60:16, 62:14
**e-mails** [4] - 19:18,
84:15, 85:9, 85:10
**Earley** [1] - 6:12
**early** [2] - 162:24,
163:2
**Early** [1] - 6:17
**earned** [1] - 50:1
**earnings** [1] - 28:24
**easier** [2] - 87:15,
129:15
**East** [7] - 45:17,
46:17, 58:7, 58:22,
61:8, 61:22, 91:5
**easy** [1] - 62:3
**Eckenrode** [5] - 15:3,
15:4, 20:7, 20:10,
20:12
**educational** [2] - 69:6,
147:18
**Edward** [1] - 36:23
**EDWARD** [2] - 2:4, 3:3
**effective** [3] - 11:18,
30:24, 161:15
**effectively** [9] - 7:3,
14:10, 16:22, 17:19,
18:9, 22:14, 22:24,
38:8, 40:16
**effort** [1] - 143:22
**efforts** [3] - 142:25,
143:4, 145:23
**eight** [1] - 60:14
**Eighty** [2] - 146:23,
147:6
**Eighty-three** [1] -
146:23
**either** [8] - 22:19,
38:18, 75:6, 117:4,
136:1, 138:16,
151:19, 185:6
**El** [10] - 185:21,
185:24, 186:1,
187:9, 187:10,
187:12, 189:9,
190:3, 196:23, 204:4
**elaborate** [4] - 7:10,
73:16, 133:5, 159:25

**electronic** [3] - 58:15,
58:21, 207:25
**electronically** [1] -
134:15
**eloquently** [1] - 55:1
**Embassy** [5] - 164:20,
164:21, 197:17,
199:6, 200:16
**employ** [1] - 45:7
**employed** [11] - 3:7,
3:9, 42:17, 45:22,
45:24, 46:5, 68:4,
68:5, 68:6, 100:14,
147:7
**employee** [2] - 147:14,
147:15
**employment** [1] -
101:8
**enclosed** [4] - 167:22,
189:8, 191:2, 194:5
**enclosing** [1] - 85:3
**encumbrances** [2] -
31:7, 79:12
**end** [16] - 40:10,
58:19, 62:7, 89:1,
136:8, 139:22,
140:22, 149:21,
149:24, 163:21,
164:5, 196:7, 201:1,
201:4, 207:8, 207:9
**endeavor** [1] - 17:2
**ended** [3] - 50:6,
92:15, 135:23
**endowments** [1] - 5:3
**energy** [2] - 147:10,
147:11
**enforcement** [2] -
111:6, 159:18
**enforcing** [1] - 59:22
**engage** [3] - 148:14,
149:6, 161:19
**engaged** [2] - 72:9,
142:25, 156:23
**engineering** [1] -
147:20
**English** [2] - 72:9,
72:13
**enhancements** [2] -
26:12, 83:7
**enjoy** [2] - 112:2,
208:2
**enlarge** [12] - 84:5,
112:16, 118:16,
129:25, 160:3,
160:24, 161:14,
174:1, 174:17,
183:25, 187:22,
200:7
**Enpetro** [7] - 154:6,
174:9, 174:10,

174:12, 174:20,
175:3, 175:6
**ensuring** [1] - 178:1
**enter** [11] - 12:11,
16:10, 128:8, 138:6,
143:18, 144:21,
145:13, 155:8,
161:4, 179:24, 188:3
**entered** [23] - 126:7,
126:16, 126:25,
127:19, 128:6,
129:3, 130:4,
130:14, 131:6,
134:18, 134:21,
135:18, 138:2,
139:13, 141:3,
143:15, 161:12,
177:25, 180:12,
180:15, 180:16,
180:18, 203:10
**entering** [4] - 138:12,
145:3, 145:8, 179:8
**entire** [5] - 5:19,
22:12, 45:4, 71:5,
191:17
**entirely** [1] - 55:3
**entities** [2] - 15:9,
15:23
**entitled** [1] - 126:11
**entity** [8] - 5:1, 10:10,
12:22, 12:23, 21:21,
27:5, 31:18, 38:19
**entries** [1] - 133:17
**entry** [13] - 125:24,
128:5, 131:9,
134:13, 134:18,
134:19, 135:16,
143:16, 143:17,
144:19, 144:24,
145:1, 145:17
**envelope** [1] - 192:18
**equally** [2] - 178:16
**equities** [1] - 38:6
**equity** [6] - 4:6, 6:14,
49:10, 50:12, 50:16,
52:8
**escapes** [1] - 130:9
**ESQ** [2] - 1:18, 1:22
**Esquire** [1] - 145:2
**essence** [1] - 52:17
**establish** [1] - 170:3
**estate** [3] - 4:23,
25:15, 131:18
**estimated** [1] - 177:18
**et** [1] - 60:2
**ethically** [2] - 56:7,
62:21
**evaluation** [2] - 11:20,
25:5
**event** [5] - 22:20,

38:22, 126:12, 145:15, 178:4
**eventually** [9] - 125:23, 129:20, 130:25, 131:1, 132:7, 135:13, 142:19, 164:17, 170:19
**exact** [3] - 53:7, 80:10, 123:12
**exactly** [7] - 24:24, 49:15, 103:5, 111:14, 120:3, 140:9, 167:2
**examination** [7] - 32:11, 65:1, 66:16, 67:10, 95:18, 121:13, 140:8
**EXAMINATION** [10] - 3:5, 38:1, 42:9, 65:2, 67:23, 94:25, 99:14, 121:5, 122:24, 146:16
**examine** [4] - 37:25, 65:1, 94:24, 121:4
**examined** [2] - 26:5, 40:4
**example** [6] - 4:24, 8:22, 22:18, 38:9, 38:22, 133:13
**exceed** [2] - 7:25, 187:13
**excellent** [1] - 86:2
**except** [2] - 117:13, 203:16
**excess** [4] - 10:12, 25:22, 26:2, 26:16
**exchange** [1] - 79:13
**excuse** [4] - 26:23, 42:3, 51:1, 121:25
**excused** [1] - 42:5
**excuses** [1] - 108:3
**execute** [2] - 131:23, 178:21
**executed** [7] - 12:17, 12:18, 13:9, 22:7, 169:11, 195:7
**executing** [2] - 12:18, 143:8
**execution** [2] - 130:13, 130:16
**exhibit** [31] - 20:14, 23:13, 24:9, 34:17, 63:17, 63:20, 64:13, 84:5, 112:10, 114:14, 122:3, 122:4, 126:2, 128:15, 129:25, 133:15, 137:4, 139:17, 141:21,

146:3, 162:4, 166:13, 172:21, 175:24, 177:7, 177:15, 193:14, 198:16, 198:20, 199:4, 201:17
**Exhibit** [2] - 35:7, 61:6
**exhibits** [5] - 20:14, 64:22, 64:25, 94:17, 159:24
**exist** [1] - 17:16
**existed** [1] - 131:24
**existence** [1] - 34:15
**exists** [1] - 34:24
**expected** [1] - 196:21
**expecting** [1] - 107:21
**expense** [1] - 79:11
**expenses** [4] - 26:17, 59:18, 59:21, 59:24
**experience** [2] - 66:7, 73:4
**explain** [4] - 4:8, 71:21, 79:8, 174:25
**explained** [3] - 124:12, 136:5, 152:10
**explanation** [1] - 34:3
**explanatory** [2] - 86:2, 86:7
**expose** [1] - 207:23
**extend** [5] - 18:1, 23:22, 28:9, 28:13, 37:11
**extension** [1] - 14:5
**extensive** [1] - 16:4
**extent** [1] - 59:22
**externally** [1] - 32:17
**extra** [5] - 50:14, 66:24, 80:18, 192:8, 193:25
**extraordinary** [1] - 15:7
**extravagant** [1] - 151:22
**extremely** [1] - 158:19

---

# F

**face** [1] - 85:17
**facile** [1] - 98:11
**facilities** [1] - 43:3
**facsimile** [2] - 60:16, 196:24
**fact** [11] - 15:20, 17:17, 27:6, 31:25, 40:18, 41:14, 56:13, 98:23, 105:25, 130:8, 138:23
**facts** [1] - 124:12
**failing** [1] - 134:22

**failure** [2] - 59:10, 148:3
**Fair** [2] - 6:13, 6:15
**fair** [3] - 177:18, 178:15, 206:10
**faith** [2] - 138:19, 139:11
**fall** [1] - 135:7
**fallacy** [1] - 166:23
**fallen** [1] - 108:4
**familiar** [6] - 4:12, 17:23, 57:7, 77:23, 127:6, 148:10
**family** [3] - 4:25, 46:25, 47:2
**far** [14] - 7:25, 9:9, 9:24, 56:19, 73:7, 88:23, 104:16, 110:20, 130:17, 150:20, 154:23, 171:10, 191:8
**favor** [4] - 125:25, 126:16, 155:13, 172:16
**fax** [36] - 29:24, 136:1, 162:8, 162:9, 162:15, 162:21, 168:1, 168:6, 168:10, 168:12, 168:16, 169:4, 172:17, 173:10, 173:11, 181:16, 182:12, 183:8, 183:17, 185:15, 186:21, 187:5, 189:5, 190:22, 190:23, 191:1, 193:24, 194:3, 198:21, 198:23, 198:24, 199:12, 204:25
**faxed** [11] - 168:10, 171:15, 173:17, 179:2, 181:12, 181:15, 182:13, 183:4, 183:13, 191:2, 205:6
**faxing** [1] - 189:7
**FBI** [3] - 44:19, 111:13, 159:18
**February** [20] - 29:18, 30:10, 32:24, 89:21, 89:25, 93:17, 161:16, 162:18, 176:1, 177:8, 178:25, 185:19, 185:20, 186:3, 186:24, 198:22, 199:8, 200:10, 200:13, 201:18

**Fed** [11] - 15:16, 17:11, 17:12, 17:13, 18:8, 31:12, 35:2, 35:4, 38:5, 40:6, 151:10
**FEDERAL** [1] - 1:19
**federal** [4] - 10:5, 29:16, 83:18, 133:10
**Federal** [52] - 7:3, 7:6, 10:6, 14:2, 14:8, 14:9, 19:23, 19:24, 23:15, 26:8, 29:14, 29:22, 30:16, 31:10, 32:2, 32:20, 32:21, 33:8, 33:22, 34:9, 35:3, 36:21, 37:13, 72:7, 72:10, 73:7, 74:16, 75:5, 77:19, 79:2, 79:7, 82:24, 83:12, 85:14, 86:3, 86:8, 86:9, 86:10, 86:13, 86:14, 90:2, 90:9, 93:22, 95:23, 96:10, 151:10, 153:1, 153:25, 167:7, 167:17, 201:2
**federally** [1] - 11:16
**fee** [16] - 22:18, 58:10, 58:25, 59:2, 59:7, 59:9, 92:10, 134:22, 145:19, 163:25, 164:1, 165:3, 166:7, 173:4, 205:21
**fees** [2] - 59:25, 176:18
**fell** [4] - 101:13, 108:8, 108:14, 108:17
**felt** [1] - 80:25
**Fenner** [3] - 119:18, 193:22, 202:9
**few** [11] - 13:22, 48:6, 49:6, 51:24, 52:4, 55:14, 75:22, 98:10, 115:10, 122:8, 127:24
**fiance** [4] - 42:20, 42:25, 43:21, 45:7
**fide** [1] - 178:13
**field** [1] - 68:13
**fifty** [1] - 100:13
**Fifty** [1] - 42:14
**fifty-five** [1] - 100:13
**Fifty-three** [1] - 42:14
**fight** [1] - 80:8
**fighting** [1] - 46:7
**file** [1] - 95:24, 124:16, 124:20, 124:22, 124:24, 127:2, 129:8, 132:7, 134:13, 140:18

**filed** [47] - 41:1, 47:17, 124:21, 125:19, 125:21, 127:8, 128:2, 128:23, 129:11, 129:12, 130:11, 130:14, 130:15, 131:16, 131:23, 132:20, 133:9, 133:14, 133:17, 133:19, 134:2, 134:3, 134:12, 135:20, 136:2, 136:7, 136:9, 136:17, 137:1, 137:11, 138:14, 138:19, 138:24, 139:4, 139:10, 139:12, 141:20, 142:21, 143:18, 144:1, 144:20, 144:25, 145:10, 145:24, 159:9
**files** [1] - 133:11
**filing** [16] - 128:21, 133:5, 134:1, 134:22, 134:25, 135:12, 135:25, 139:14, 141:4, 141:7, 142:1, 143:3, 143:4, 143:11, 143:25, 145:19
**filings** [2] - 133:1, 138:16
**fill** [5] - 43:24, 44:6, 47:18, 47:19, 129:2
**filling** [1] - 44:1
**final** [3] - 127:3, 128:1, 128:8
**finalized** [3] - 125:22, 125:23, 129:3
**finally** [4] - 46:9, 54:13, 56:14, 159:11
**finance** [3] - 47:6, 157:7, 186:11
**financial** [15] - 4:7, 5:10, 5:20, 49:24, 50:8, 53:9, 71:9, 72:1, 80:3, 80:5, 80:8, 148:14, 150:12, 160:12, 165:14
**financing** [1] - 68:16
**fine** [3] - 99:11, 108:21, 182:3
**firm** [5] - 46:21, 85:16, 123:9, 123:10, 123:11
**firm's** [8] - 26:10, 37:16, 189:8, 191:3, 194:7, 198:25,

199:12, 205:7
**firms** [4] - 69:5, 73:21, 75:6, 84:13
**first** [56] - 11:12, 14:16, 15:7, 15:12, 20:21, 21:11, 27:2, 28:12, 29:6, 29:21, 30:19, 32:7, 36:25, 47:22, 48:13, 48:14, 52:25, 55:14, 59:9, 60:5, 64:6, 65:10, 88:10, 95:12, 103:8, 106:18, 112:20, 114:6, 120:9, 122:4, 126:13, 128:5, 129:15, 133:17, 138:22, 139:3, 139:7, 141:5, 144:2, 144:5, 144:6, 151:24, 152:8, 152:23, 156:14, 161:13, 161:14, 161:19, 161:22, 163:15, 165:13, 169:20, 173:10, 179:13, 196:18
**fit** [1] - 18:20
**Fitzgerald** [1] - 15:2
**five** [16] - 30:11, 37:12, 49:8, 51:9, 59:9, 80:17, 100:13, 106:11, 106:12, 106:15, 117:10, 117:15, 117:22, 120:21, 139:13, 186:24
**five-year** [1] - 30:11
**fixed** [1] - 38:6
**flabbergasted** [1] - 110:4
**flag** [3] - 10:2, 15:17, 31:14
**flags** [7] - 15:3, 15:5, 32:4, 32:15, 34:5, 40:8
**flip** [1] - 173:20
**Florida** [7] - 42:16, 45:10, 99:17, 99:24, 100:2, 100:6, 119:18
**flow** [2] - 9:4, 38:6
**focus** [1] - 5:6
**focuses** [1] - 3:14
**Fogarty** [1] - 159:5
**Fogerty** [4] - 122:21, 123:1, 145:1, 159:11
**FOGERTY** [2] - 2:8, 122:22
**folks** [1] - 16:16
**follow** [1] - 11:19
**followed** [1] - 13:20

**following** [16] - 27:8, 27:23, 27:25, 35:21, 37:8, 54:5, 54:7, 118:3, 131:9, 134:15, 131:9, 170:2, 177:22, 189:3, 194:6, 196:12
**follows** [8] - 3:4, 30:3, 42:8, 67:22, 85:11, 99:13, 122:23, 146:15
**FOR** [2] - 1:1, 2:3
**force** [1] - 110:23
**forced** [1] - 66:1
**foreclose** [1] - 131:19
**foregoing** [4] - 26:2, 209:7, 209:10, 209:20
**forever** [1] - 141:13
**forget** [2] - 15:14, 63:5
**form** [5] - 12:15, 22:10, 44:15, 58:15
**formal** [1] - 41:1
**former** [3] - 31:11, 31:12, 123:25
**forms** [2] - 43:24, 44:5
**formulate** [1] - 68:11
**forth** [12] - 12:16, 29:7, 44:8, 58:12, 60:7, 100:24, 104:9, 104:11, 104:15, 105:12, 108:5, 108:7, 110:16, 178:6, 178:9, 209:9
**forthcoming** [1] - 52:20
**forty** [1] - 195:17
**forward** [4] - 23:24, 84:18, 140:19, 193:3
**foundations** [1] - 5:4
**four** [23] - 11:8, 28:20, 28:22, 37:11, 59:1, 61:2, 89:10, 89:13, 89:20, 97:4, 97:10, 97:14, 97:21, 98:4, 126:13, 126:16, 132:12, 139:12, 176:22, 177:1, 193:25, 200:13, 204:19
**fraud** [1] - 54:17
**fraudulent** [2] - 15:16, 16:7
**free** [3] - 31:6, 79:11, 189:12
**freezes** [1] - 144:1
**frequently** [4] - 11:2, 11:6, 48:13, 48:17
**Friday** [4] - 63:4, 86:4, 115:12, 122:10

**FRIDAY** [1] - 1:14
**friend** [12] - 70:18, 103:4, 105:15, 121:12, 121:20, 124:1, 148:22, 148:23, 148:25, 153:20, 163:5, 182:8
**friendly** [1] - 102:19, 121:7
**friends** [5] - 47:11, 104:25, 105:1, 108:2, 109:1
**friendship** [2] - 47:10, 149:9
**FRNs** [3] - 85:12, 85:13, 87:11
**FRNY** [1] - 29:25
**front** [10] - 20:20, 21:11, 47:22, 57:16, 57:17, 82:9, 106:16, 110:17, 132:8, 160:2
**fruition** [2] - 11:14, 97:9
**fuel** [1] - 69:18
**fulfill** [1] - 97:10
**full** [19] - 5:12, 15:20, 20:19, 29:25, 33:8, 58:3, 59:4, 59:11, 59:16, 59:19, 83:4, 85:19, 163:16, 163:17, 188:8, 191:14, 196:10, 205:17
**fully** [1] - 13:19
**functions** [1] - 4:20
**fund** [21] - 4:6, 4:21, 4:23, 4:24, 8:22, 8:23, 49:14, 49:16, 51:11, 51:14, 81:4, 81:11, 185:21, 185:24, 186:14, 186:23, 187:11, 189:9, 190:3, 196:24, 204:4
**funding** [2] - 51:14, 97:12
**funds** [26] - 5:13, 7:11, 7:12, 7:13, 23:23, 26:13, 30:2, 30:4, 30:20, 31:1, 31:5, 33:5, 34:7, 37:13, 55:3, 58:15, 63:1, 83:9, 83:23, 88:9, 91:25, 93:11, 155:21, 155:24, 186:13, 206:18
**furtherance** [1] - 83:3
**future** [2] - 10:15, 10:19

# G

**gallons** [1] - 170:12
**gamut** [1] - 4:11
**garage** [2] - 109:3, 151:16
**Garden** [2] - 152:1, 152:2
**gas** [4] - 73:10, 73:24, 74:1, 74:7
**gathered** [1] - 185:25
**Gene** [1] - 14:25
**generally** [5] - 13:25, 46:25, 47:12, 155:11, 156:12
**generated** [5] - 28:24, 44:21, 186:2, 187:11, 187:13
**gentleman** [1] - 27:14
**gentleman's** [1] - 15:14
**geologist** [3] - 25:25, 171:20, 195:16
**given** [15] - 9:5, 12:7, 44:22, 52:25, 60:3, 60:4, 60:20, 61:24, 125:3, 125:9, 125:11, 127:18, 128:15, 131:8, 162:20
**glass** [1] - 99:18
**global** [6] - 3:12, 15:1, 15:4, 16:23, 20:8, 31:18
**God** [2] - 55:5, 55:6
**gold** [1] - 69:18
**Goldman** [2] - 4:14, 38:9
**government** [4] - 19:23, 77:19, 151:2, 151:14
**GOVERNMENT** [1] - 2:3
**governmental** [1] - 15:10
**grade** [4] - 10:14, 10:16, 18:13, 26:1
**grammar** [1] - 35:9
**grant** [1] - 27:4
**granted** [4] - 26:8, 31:23, 103:18, 141:2
**great** [2] - 73:18, 81:8
**greater** [2] - 9:9, 9:16
**grew** [1] - 46:13
**grey** [10] - 14:6, 17:14, 23:23, 34:9, 34:21, 35:2, 35:6, 37:14, 83:13, 83:24
**ground** [7] - 18:16, 25:19, 49:20, 153:8,

153:11, 153:12, 157:18
**group** [1] - 72:6
**Grove** [1] - 25:8
**guarantee** [1] - 154:15
**guaranteed** [1] - 155:5
**guarantees** [3] - 154:23, 185:8, 195:25
**guarantor** [6] - 164:15, 177:6, 192:7, 194:18, 203:5
**guess** [16] - 7:16, 48:4, 48:15, 55:14, 65:4, 65:22, 74:20, 89:21, 103:11, 110:7, 110:8, 114:8, 119:5, 119:8, 179:6, 191:21
**guide** [1] - 62:23
**Guild** [2] - 101:14, 101:16
**guys** [2] - 16:5, 17:2

# H

**habit** [1] - 110:23
**half** [14] - 34:1, 34:2, 69:8, 104:22, 112:17, 128:4, 129:25, 134:19, 152:7, 180:25, 181:2, 181:4, 181:6, 186:1
**hall** [2] - 139:21, 139:22
**hand** [4] - 27:13, 60:18, 113:22, 207:2
**handbag** [1] - 147:12
**handbags** [1] - 147:15
**handed** [3] - 44:12, 120:22, 207:4
**handle** [2] - 44:4, 72:10
**handwriting** [25] - 90:18, 113:6, 113:13, 113:14, 113:23, 114:4, 119:2, 120:10, 120:12, 160:16, 160:17, 160:19, 160:20, 160:21, 173:25, 180:21, 180:22, 182:21, 182:22, 182:23, 186:4, 204:21
**handwritten** [3] - 91:7, 91:8, 116:10, 116:10
**happy** [2] - 168:22, 186:15

**hard** [3] - 44:13, 60:24, 204:24
**HARLEY** [1] - 1:7
**harley** [3] - 56:16, 66:20, 185:2
**Harley** [280] - 6:6, 6:11, 6:20, 7:2, 7:14, 7:21, 8:5, 11:7, 12:20, 12:21, 13:8, 13:12, 14:4, 14:10, 16:11, 18:11, 18:21, 19:4, 19:14, 19:22, 20:6, 20:11, 20:12, 20:13, 20:24, 21:12, 21:17, 23:7, 23:14, 23:16, 23:25, 24:23, 25:10, 25:11, 26:19, 26:21, 26:24, 27:4, 28:16, 29:9, 30:8, 31:22, 32:4, 34:2, 35:8, 35:10, 35:21, 36:7, 37:20, 44:19, 45:5, 45:6, 48:1, 48:9, 48:14, 49:1, 53:3, 53:21, 54:25, 60:19, 60:21, 61:4, 61:15, 61:19, 62:17, 63:6, 64:3, 64:17, 64:18, 65:6, 70:6, 70:9, 70:20, 70:23, 70:25, 71:6, 71:8, 71:9, 71:12, 71:16, 71:21, 73:2, 74:6, 75:23, 76:6, 76:10, 76:21, 77:13, 78:3, 78:7, 79:14, 79:20, 80:22, 81:24, 82:18, 83:16, 84:25, 85:24, 86:8, 86:9, 86:19, 86:22, 86:25, 87:2, 87:7, 87:25, 89:18, 89:19, 90:1, 90:8, 90:16, 90:24, 91:9, 92:15, 93:3, 93:11, 94:8, 95:4, 95:7, 95:10, 95:12, 95:18, 95:23, 96:25, 102:5, 103:7, 103:24, 104:6, 105:21, 106:19, 107:25, 113:1, 113:11, 114:22, 121:7, 124:10, 125:1, 125:2, 125:4, 125:14, 125:15, 125:25, 126:18, 127:12, 129:10, 132:9, 132:16, 134:10, 135:8, 135:17, 136:2, 137:1, 137:18,
138:16, 138:21, 140:2, 140:6, 140:8, 140:12, 140:17, 141:4, 141:15, 142:10, 142:14, 143:8, 143:11, 143:23, 144:23, 144:25, 148:15, 148:18, 148:20, 149:1, 149:4, 149:14, 149:22, 149:25, 150:3, 150:10, 150:11, 150:20, 151:25, 152:5, 152:10, 154:15, 154:23, 156:24, 157:2, 157:9, 157:21, 158:8, 158:16, 159:12, 161:4, 161:7, 161:10, 161:20, 163:4, 164:13, 164:14, 165:13, 165:21, 166:25, 167:16, 167:21, 169:4, 170:9, 171:1, 171:15, 172:4, 172:6, 172:23, 173:11, 174:7, 174:10, 174:13, 174:25, 175:18, 176:5, 176:25, 177:5, 177:12, 177:20, 178:1, 178:2, 178:4, 178:8, 178:18, 178:23, 179:3, 179:12, 179:15, 181:8, 181:14, 181:17, 182:6, 182:14, 182:18, 182:22, 183:4, 183:9, 184:17, 184:24, 186:9, 186:25, 187:17, 190:24, 191:5, 192:6, 192:7, 192:11, 192:25, 193:11, 194:4, 194:8, 194:17, 194:19, 194:20, 197:5, 197:9, 197:21, 197:24, 198:13, 200:12, 200:25, 201:20, 201:22, 202:5, 203:4, 203:14, 204:18, 204:20, 204:25, 205:10, 206:19
**Harley's** [19] - 6:16,
12:9, 76:1, 93:7, 94:10, 107:4, 111:10, 132:5, 143:10, 158:4, 158:14, 160:25, 166:8, 175:25, 178:19, 194:18, 198:18, 199:6, 202:9
**HARRISBURG** [1] - 1:20
**Harry** [1] - 25:11
**head** [8] - 3:14, 3:17, 14:25, 15:2, 15:4, 20:8, 86:10, 180:2
**headed** [1] - 101:12
**header** [3] - 168:12, 173:10, 182:13
**heading** [1] - 17:22
**headquartered** [1] - 5:25
**headquarters** [1] - 3:12
**heads** [1] - 15:1
**health** [1] - 148:12
**hear** [2] - 146:20, 208:2
**heard** [6] - 34:21, 62:18, 150:2, 174:5, 174:9, 174:12
**hearing** [23] - 130:8, 130:10, 131:15, 135:19, 135:21, 136:25, 138:21, 138:23, 139:2, 139:4, 139:6, 139:9, 139:14, 139:24, 140:12, 140:19, 140:23, 141:8, 141:11, 144:4, 145:15, 146:19
**hearsay** [1] - 180:4
**heart** [2] - 62:22, 148:3
**hedge** [1] - 4:6
**held** [17] - 14:2, 14:7, 17:10, 17:12, 17:13, 18:8, 22:17, 25:13, 25:18, 39:19, 40:6, 54:19, 66:23, 67:2, 85:16, 130:9, 144:4
**help** [3] - 51:14, 52:6, 80:1
**helped** [3] - 47:18, 47:19, 116:22
**Henry** [12] - 27:14, 148:22, 148:23, 153:20, 158:7, 158:10, 161:18, 162:8, 163:10,
184:19, 184:20, 184:22
**hereafter** [1] - 164:6
**hereby** [17] - 27:3, 29:25, 33:7, 37:2, 37:8, 58:3, 60:9, 127:18, 163:17, 169:14, 185:23, 187:10, 188:8, 191:15, 203:19, 205:18, 209:6
**herein** [5] - 58:11, 58:18, 88:25, 177:14, 196:12
**hereinafter** [5] - 58:6, 58:9, 58:20, 89:2, 169:13
**hereinbefore** [1] - 209:9
**hereto** [1] - 177:14
**hesitate** [1] - 26:18
**hi** [4] - 189:8, 191:2, 198:24, 205:6
**high** [4] - 5:3, 17:5, 83:8, 197:23
**Highland** [1] - 195:9
**highlight** [2] - 128:4, 140:10
**highlighted** [2] - 191:11, 193:19
**himself** [2] - 20:12, 73:3
**hit** [1] - 102:24
**hold** [9] - 5:7, 5:8, 8:4, 38:4, 38:6, 38:7, 38:10, 38:11, 143:21
**holder** [17] - 31:2, 33:13, 38:9, 58:25, 59:5, 59:13, 59:14, 59:16, 59:19, 59:20, 60:1, 60:2, 60:11, 60:13, 89:6, 131:8, 164:2
**holder's** [1] - 59:18
**holding** [4] - 14:10, 18:5, 25:13, 38:16
**holds** [1] - 39:16
**home** [13] - 49:10, 50:12, 50:16, 52:7, 80:7, 80:24, 91:9, 109:19, 115:21, 143:10, 143:23, 158:9, 168:10
**homes** [1] - 4:25
**honestly** [1] - 54:12
**Honor** [8] - 37:21, 76:14, 94:15, 99:7, 122:19, 146:1, 146:11, 206:8
**honor** [1] - 90:3
**honorable** [1] - 81:1
**HONORABLE** [1] - 1:10
**hope** [5] - 54:18, 66:23, 66:25, 67:2, 74:18
**hoped** [1] - 152:21
**hour** [3] - 36:3, 111:25, 152:7
**hours** [3] - 16:5, 86:4, 131:8
**House** [1] - 185:7
**house** [9] - 103:2, 103:12, 120:23, 158:4, 158:14, 162:10, 168:6, 168:10, 183:17
**huge** [3] - 72:15, 73:10, 74:5
**Hui** [8] - 26:24, 27:3, 28:17, 29:3, 29:9, 31:2, 33:1, 33:13
**humble** [1] - 55:4
**hundred** [6] - 50:4, 120:21, 195:17, 195:18, 196:2
**hurt** [1] - 63:5
**husband** [1] - 103:7

**I**

**idea** [2] - 97:4, 175:8
**identification** [1] - 127:16
**identified** [1] - 207:12
**identify** [8] - 20:17, 20:20, 22:6, 35:7, 35:19, 57:2, 82:10, 192:8
**immediate** [1] - 177:19
**immediately** [7] - 37:3, 37:9, 59:15, 59:19, 67:17, 112:2, 136:4
**impact** [6] - 133:6, 135:1, 135:5, 135:6, 135:21, 143:4
**impacted** [1] - 133:18
**impaired** [2] - 43:4, 62:1
**impatient** [1] - 108:22
**implicitly** [1] - 67:6
**impose** [1] - 138:15
**IN** [1] - 1:1
**Inc** [22] - 26:8, 29:2, 58:4, 60:18, 63:22, 64:14, 83:4, 119:21, 125:2, 125:16, 126:1, 126:18,

129:24, 134:9,
135:17, 137:18,
137:19, 174:9,
174:10, 174:12,
175:3, 185:23
**incident** [1] - 110:6
**include** [1] - 59:24
**included** [3] - 10:18,
16:16, 144:22
**including** [3] - 80:16,
80:17, 203:14
**inclusive** [1] - 35:9
**inclusively** [1] - 33:10
**income** [4] - 38:6,
50:4, 70:4, 144:14
**Incorporated** [5] -
24:25, 25:7, 25:12,
25:18, 37:5
**incorporated** [2] -
25:9, 177:14
**incorporates** [1] -
196:12
**incorporation** [1] -
25:9
**incorrect** [1] - 36:18
**increase** [2] - 53:8,
53:9
**increment** [1] - 106:14
**incremental** [2] -
114:9, 114:11
**incrementally** [1] -
80:18
**increments** [3] - 81:1,
106:15, 106:18
**incurring** [1] - 59:5
**independent** [4] -
4:17, 12:6, 74:14,
74:21
**INDEX** [1] - 2:1
**indicate** [5] - 64:8,
90:23, 91:8, 115:8,
163:19
**indicated** [2] - 7:14,
8:15
**indicates** [3] - 93:6,
142:6, 193:21
**indicating** [4] - 9:6,
14:9, 21:21, 119:25
**indication** [1] - 40:12
**individual** [4] - 7:15,
74:25, 124:10,
131:11
**individually** [2] -
164:14, 194:18
**individuals** [5] - 5:3,
9:10, 15:10, 31:17,
123:18
**Indonesia** [1] - 97:7
**Indonesian** [1] - 72:6
**Indonesians** [1] -

72:12
**industry** [1] - 16:24
**information** [27] -
11:23, 12:2, 12:3,
12:5, 12:10, 13:18,
13:19, 15:21, 15:24,
16:6, 17:6, 19:7,
19:8, 22:15, 22:16,
22:21, 22:24, 25:5,
26:3, 31:20, 31:22,
44:6, 90:20, 91:16,
92:4, 160:13
**informed** [2] - 20:8,
20:10
**informing** [1] - 19:19
**inherited** [1] - 157:11
**initial** [15] - 7:8, 7:17,
7:21, 13:16, 23:10,
24:2, 30:11, 49:18,
59:8, 61:20, 64:6,
81:12, 95:3, 135:25,
167:12
**initials** [6] - 113:20,
117:18, 128:25,
129:1, 160:22,
160:23
**input** [1] - 48:8
**inquire** [2] - 7:2, 41:5
**inquired** [2] - 18:11,
41:4
**inquiring** [1] - 83:14
**instance** [8] - 9:19,
125:14, 128:2,
131:7, 133:13, 155:6
**instead** [2] - 27:8,
50:19
**institution** [3] - 19:20,
26:10, 58:17
**institutional** [4] - 3:24,
4:11, 8:7, 17:25
**institutions** [3] - 5:4,
7:23, 16:23
**instruction** [2] - 87:7,
200:6
**instructions** [17] -
87:12, 88:7, 90:15,
90:20, 92:19, 94:10,
94:13, 107:8,
107:10, 116:6,
118:25, 155:25,
165:9, 165:21,
165:22, 172:12,
200:8
**instrument** [5] - 29:8,
167:24, 167:25,
169:9, 169:10
**instruments** [20] - 7:6,
10:5, 10:6, 10:14,
10:17, 19:25, 20:3,
23:15, 26:2, 26:9,

26:11, 26:13, 33:22,
36:21, 38:7, 82:24,
83:6, 83:9, 83:19,
84:14
**integrated** [1] - 25:13
**intent** [1] - 85:18
**interaction** [1] - 44:19
**interest** [13] - 28:24,
35:15, 56:7, 73:5,
73:20, 75:5, 126:19,
128:12, 128:15,
177:21, 189:11,
189:13, 196:1
**interested** [9] - 18:22,
35:10, 46:13, 71:11,
95:5, 115:11, 122:9,
122:12
**interests** [3] - 72:1,
73:8, 138:9
**interim** [1] - 145:23
**internal** [8] - 19:10,
35:11, 35:16,
193:16, 198:16,
199:5, 201:18, 202:7
**internally** [7] - 16:12,
16:13, 17:15, 19:12,
32:7, 32:16, 32:17
**international** [2] -
81:4, 81:11
**internet** [6] - 6:15,
12:6, 15:23, 75:12,
75:20, 75:22
**interpret** [2] - 114:3,
119:1
**intervening** [1] - 19:14
**interview** [1] - 44:21
**interviewed** [1] -
44:18
**introduced** [2] -
148:22, 149:13
**introducing** [2] -
70:21, 149:3
**introduction** [2] -
149:1, 150:11
**inventions** [1] -
160:13
**inventory** [1] - 44:1
**inverted** [1] - 61:24
**invest** [23] - 8:23, 9:6,
49:7, 49:8, 49:12,
49:25, 50:18, 51:2,
105:21, 106:4,
113:3, 149:15,
149:16, 149:19,
152:22, 156:6,
156:8, 157:21,
166:22, 175:22,
176:5, 176:8
**invested** [10] - 56:18,
56:19, 64:4, 117:16,

153:13, 166:20,
167:7, 168:3, 175:11
**investigate** [1] -
180:16
**investing** [5] - 9:8,
149:21, 149:24,
161:20, 197:22
**investment** [35] - 4:23,
5:13, 5:21, 8:2, 9:9,
9:13, 9:15, 9:16,
10:14, 10:16, 11:23,
12:1, 18:12, 26:1,
49:1, 49:18, 51:23,
56:10, 61:17, 61:20,
79:14, 79:25, 83:8,
87:13, 87:25,
121:14, 121:15,
121:22, 122:16,
167:13, 176:17,
186:7, 188:3, 191:20
**investments** [14] -
4:22, 5:6, 9:20,
79:22, 105:2,
152:20, 154:14,
156:23, 172:14,
185:25, 186:2,
187:11, 187:14,
193:11
**investor** [5] - 8:13,
8:21, 8:22, 9:18,
9:23
**investors** [14] - 3:25,
4:21, 5:2, 5:14, 8:7,
8:24, 9:1, 9:4, 9:14,
105:9, 105:10,
105:11
**invited** [1] - 109:24
**invoice** [1] - 44:9
**involved** [15] - 3:22,
4:7, 57:3, 66:8,
66:11, 68:25, 71:9,
71:22, 74:25, 75:6,
78:13, 98:16, 124:2,
137:24, 198:9
**involvement** [3] -
37:4, 75:3, 95:3
**involves** [1] - 3:23
**ISIN** [1] - 26:15
**issuance** [1] - 30:25
**issue** [5] - 30:9, 30:10,
40:11, 105:22, 175:9
**issued** [5] - 30:24,
34:11, 34:19, 83:11,
175:25
**issues** [5] - 48:4,
100:19, 100:25,
135:9, 139:1
**item** [4] - 28:21, 28:22,
144:25, 197:8
**items** [1] - 161:19

**itself** [4] - 20:19, 22:5,
127:1, 191:10

**J**

**Jack** [6] - 15:4, 20:7,
20:8, 115:14,
115:15, 116:25
**Jackie** [11] - 103:24,
105:24, 106:3,
107:11, 107:25,
109:19, 110:6,
115:14, 118:10,
120:8, 182:18
**Jacksonville** [1] -
119:18
**Jacqueline** [26] -
61:10, 90:24, 92:15,
93:3, 93:7, 94:8,
101:21, 101:23,
102:4, 102:9,
102:17, 102:20,
121:8, 125:1,
126:18, 132:16,
192:10, 192:20,
192:24, 194:18,
194:19, 194:20,
204:16, 204:17
**Jalan** [1] - 28:18
**January** [4] - 107:19,
114:25, 173:12,
176:2
**jargon** [1] - 52:21
**JAWS** [1] - 43:15
**Jay** [1] - 46:16
**Jerry** [1] - 70:12
**Jersey** [4] - 6:13, 25:8,
25:9, 25:19
**Jim** [1] - 15:3
**job** [3] - 42:19, 44:3,
102:10
**Johnson** [9] - 126:8,
128:15, 135:15,
135:24, 136:2,
136:8, 139:6, 139:8
**Johnson's** [1] - 128:9
**joint** [7] - 194:6,
194:15, 195:23,
199:1, 203:9,
203:13, 204:12
**jokes** [1] - 109:15
**JOSEPH** [1] - 1:22
**Joseph** [10] - 7:15,
14:4, 26:24, 27:3,
28:17, 29:3, 29:9,
31:1, 33:1, 33:13
**joyfully** [1] - 63:5
**Judge** [15] - 126:8,
128:9, 128:15,
130:10, 130:11,

132:8, 133:25, 135:14, 135:24, 136:2, 136:8, 137:7, 139:6, 139:8, 139:21
**judge** [3] - 126:10, 136:3, 139:2
**judges** [3] - 47:20, 126:9, 130:9
**judgment** [29] - 98:15, 99:6, 125:24, 126:11, 126:16, 126:24, 127:3, 127:19, 127:23, 128:1, 128:5, 128:9, 129:3, 129:9, 129:12, 129:13, 129:14, 129:17, 129:21, 130:5, 131:16, 131:17, 131:22, 132:15, 135:16, 136:20, 142:22, 159:12, 159:16
**judicial** [1] - 127:20
**Julius** [2] - 182:11, 184:3
**July** [37] - 112:18, 112:25, 114:23, 115:4, 117:11, 119:12, 119:21, 123:20, 124:5, 126:19, 128:16, 143:16, 176:20, 186:22, 187:14, 187:21, 187:23, 188:7, 189:1, 189:4, 190:2, 190:3, 190:13, 190:17, 193:3, 193:21, 193:24, 195:7, 196:24, 197:2, 197:5, 197:7, 202:23, 204:3, 204:5, 204:25, 205:12
**jump** [1] - 9:7
**jumped** [2] - 9:5, 17:18
**June** [11] - 46:3, 46:4, 85:22, 86:4, 86:18, 128:16, 128:17, 202:13, 203:15, 204:2, 204:8
**jurors** [1] - 57:16
**JURY** [1] - 1:13
**jury** [6] - 56:22, 67:13, 111:24, 150:2, 189:19, 207:20

# K

**K.Y.C** [1] - 32:9
**Kathleen** [4] - 99:11, 109:16, 113:7, 113:17
**KATHLEEN** [2] - 2:7, 99:12
**keep** [7] - 32:16, 113:16, 135:12, 146:18, 177:24, 195:11, 195:21
**keeping** [14] - 9:3, 9:14, 29:20, 30:8, 30:21, 30:23, 30:24, 31:8, 31:23, 32:3, 37:12, 83:9, 83:23, 110:22
**Kelly** [9] - 6:12, 6:17, 99:11, 99:16, 109:16, 112:8, 113:7, 113:17, 121:7
**KELLY** [2] - 2:7, 99:12
**kept** [5] - 30:15, 55:15, 109:7, 135:11, 157:17
**Kesterson** [5] - 25:25, 171:20, 172:3, 172:18, 195:15
**KEVIN** [2] - 2:8, 122:22
**Kevin** [2] - 122:21, 145:1
**key** [1] - 154:19
**Kiat** [17] - 7:16, 7:20, 14:3, 14:4, 14:11, 26:25, 27:3, 28:1, 28:17, 29:3, 29:9, 31:2, 31:21, 31:24, 33:1, 33:13
**kids'** [1] - 50:25
**kind** [11] - 9:10, 12:2, 15:8, 47:1, 69:3, 73:6, 87:5, 109:6, 123:15, 177:12, 207:24
**kindest** [4] - 23:24, 83:15, 86:22, 87:7
**kindly** [1] - 85:4
**kitchen** [1] - 120:23
**knee** [1] - 100:21
**knowingly** [4] - 121:24, 122:1, 122:2
**knowledge** [2] - 79:24, 98:24
**known** [7] - 6:2, 45:19, 70:17, 123:24, 125:2, 144:5, 149:3
**knows** [1] - 109:20
**Kohn** [2] - 31:12,

33:15
**Kube** [15] - 61:10, 101:21, 101:23, 102:4, 102:9, 125:2, 126:18, 132:16, 192:10, 192:20, 192:24, 194:19, 204:16, 204:17
**Kube-Harley** [2] - 125:2, 126:18

# L

**labor** [1] - 16:4
**lady** [1] - 47:22
**Lane** [1] - 25:8
**language** [3] - 12:17, 170:20, 189:10
**large** [4] - 4:11, 5:4, 31:17, 31:18
**largely** [1] - 11:16
**larger** [3] - 4:15, 46:18, 120:7
**largest** [1] - 16:22
**Larry** [24] - 75:1, 75:3, 75:4, 75:8, 75:9, 75:15, 75:18, 75:25, 76:19, 84:6, 84:12, 84:14, 84:16, 84:17, 85:3, 85:7, 85:11, 96:11, 96:14, 96:16, 96:22, 96:24, 96:25
**last** [23] - 11:4, 56:2, 56:20, 69:22, 70:3, 89:15, 118:2, 125:22, 134:17, 142:11, 152:6, 161:6, 164:11, 170:25, 172:11, 177:3, 191:21, 192:5, 203:3, 203:16, 204:23, 207:9
**lasted** [1] - 132:19
**latter** [1] - 18:25
**laundering** [1] - 32:9
**LAURA** [2] - 209:3, 209:17
**Laura** [1] - 209:14
**law** [8] - 46:25, 47:2, 59:23, 60:14, 69:8, 111:6, 123:3, 159:18
**Lawn** [2] - 6:13, 6:16
**laws** [2] - 59:23, 60:15
**lawsuit** [5] - 95:25, 124:20, 132:23, 159:9, 159:11
**lawsuits** [1] - 123:18
**lawyer** [9] - 111:8, 123:2, 123:7,

124:13, 129:6, 137:21, 137:23, 145:7, 206:14
**lawyers** [2] - 123:10, 137:24
**laymen's** [2] - 4:8, 128:7
**lead** [1] - 206:10
**leading** [4] - 154:18, 167:9, 167:10, 199:22
**league** [4] - 109:8, 109:9, 109:17, 110:1
**leasing** [1] - 25:14
**least** [2] - 19:13, 178:14
**leave** [1] - 39:22
**leaving** [1] - 110:12
**Lee** [6] - 42:21, 43:1, 177:13, 182:7, 182:11, 184:3
**leery** [1] - 106:1
**left** [10] - 29:13, 50:17, 115:14, 115:22, 115:25, 116:12, 160:22, 171:21, 173:25, 190:1
**legal** [20] - 5:1, 10:10, 29:8, 38:20, 46:1, 47:25, 52:20, 52:21, 54:16, 56:1, 56:5, 56:8, 62:19, 63:10, 90:4, 90:5, 90:8, 90:11, 128:4, 138:12
**legality** [1] - 52:20
**legitimacy** [1] - 84:2
**legitimate** [3] - 20:3, 144:15, 154:10
**legs** [1] - 147:25
**Lehigh** [19] - 124:23, 125:19, 126:8, 126:24, 127:7, 128:25, 129:11, 129:13, 133:18, 135:2, 135:3, 135:6, 137:1, 139:1, 141:11, 142:22, 152:3, 155:18, 155:20
**lend** [5] - 8:13, 40:17, 40:18, 41:11, 41:16
**lender** [3] - 58:9, 60:8, 68:14
**lending** [4] - 18:9, 18:18, 18:19, 58:17
**length** [1] - 133:2
**lent** [2] - 62:20, 64:6
**less** [3] - 9:2, 157:23, 205:24
**letter** [21] - 10:11,

14:8, 15:22, 17:13, 19:6, 20:5, 23:22, 23:23, 26:13, 32:1, 37:12, 37:13, 83:10, 85:18, 86:3, 86:7, 86:21, 171:23, 172:3, 182:18, 203:24
**letterhead** [5] - 14:9, 22:8, 36:13, 85:19, 171:19
**letters** [5] - 26:13, 33:5, 47:17, 83:24, 137:6
**leverage** [2] - 8:11, 8:14
**levied** [1] - 143:23
**levy** [4] - 129:22, 131:21, 132:2, 143:10
**Lexus** [16] - 109:13, 109:14, 120:22, 129:23, 130:16, 130:18, 131:8, 131:24, 132:1, 132:12, 132:14, 143:6, 143:9, 150:2, 150:3
**liabilities** [2] - 25:17, 26:16
**liability** [1] - 22:20
**Liberty** [1] - 29:23
**library** [2] - 180:1, 182:18
**licensed** [5] - 25:25, 68:12, 68:13, 68:14, 123:5
**lien** [3] - 131:18, 131:19, 131:21
**liens** [1] - 31:7
**life** [8] - 43:10, 55:3, 63:3, 66:7, 66:23, 66:25, 67:2, 150:6
**light** [2] - 43:5, 43:6
**likelihood** [1] - 171:10
**likely** [1] - 34:16
**limited** [8] - 11:24, 23:20, 26:3, 28:9, 28:13, 37:10, 59:24, 83:5
**limits** [1] - 41:14
**Line** [1] - 140:10
**line** [8] - 49:10, 50:12, 50:16, 52:8, 60:19, 113:7, 118:1, 170:3
**lined** [1] - 159:1
**Lines** [1] - 140:10
**linked** [1] - 38:5
**list** [6] - 63:18, 127:6, 127:10, 141:15,

142:14, 160:10
**listed** [7] - 30:4, 76:20, 134:8, 136:16, 136:22, 137:17, 142:18
**listen** [1] - 41:20
**lists** [1] - 160:12
**literally** [2] - 129:11, 139:21
**litigation** [8] - 93:23, 123:17, 124:1, 132:19, 133:10, 133:18, 135:1, 137:2
**live** [15] - 42:15, 45:10, 45:11, 45:13, 45:15, 68:2, 71:3, 75:14, 99:24, 100:6, 146:24, 147:1, 147:3, 149:12, 150:8
**lived** [4] - 71:5, 75:17, 100:2, 147:21
**lives** [2] - 50:25, 70:16
**living** [4] - 45:21, 100:6, 101:20, 104:4
**LLC** [4] - 10:10, 36:7, 36:14, 37:5
**loan** [51] - 8:3, 8:8, 8:11, 8:13, 8:14, 8:17, 17:23, 17:24, 18:1, 40:11, 40:12, 40:17, 40:18, 41:1, 41:4, 41:5, 41:6, 41:19, 41:22, 58:2, 58:19, 58:25, 59:2, 62:8, 64:2, 65:10, 66:8, 66:13, 87:21, 88:16, 89:1, 97:13, 112:19, 112:23, 117:25, 121:11, 121:14, 157:8, 163:16, 163:22, 164:1, 164:5, 185:25, 187:12, 188:7, 188:14, 189:11, 191:14, 202:15, 205:16
**loaned** [6] - 65:5, 65:14, 81:1, 97:3, 97:21, 98:11
**loans** [14] - 8:10, 10:24, 11:1, 17:20, 17:22, 18:3, 51:13, 51:16, 73:14, 73:21, 73:23, 154:14, 156:23, 185:8
**located** [10] - 3:11, 6:17, 25:20, 29:22, 46:15, 74:1, 105:6, 123:11, 152:2, 158:11

locations [1] - 44:2
**logo** [2] - 29:13, 32:19
**look** [13] - 9:2, 11:25, 12:5, 12:14, 23:24, 78:20, 117:2, 122:5, 143:7, 143:16, 163:5, 163:10, 187:1
**looked** [7] - 8:11, 18:5, 56:7, 56:24, 165:16, 192:16, 204:14
**looking** [18] - 4:21, 5:12, 8:2, 8:9, 8:15, 8:17, 13:14, 17:17, 19:12, 19:18, 40:14, 41:19, 77:17, 77:22, 116:21, 149:16, 190:1
**looks** [2] - 184:6, 192:18
**loop** [1] - 20:13
**Los** [3] - 68:3, 70:16, 75:14
**losing** [2] - 80:7, 80:24
**lost** [5] - 43:25, 46:9, 50:2, 61:3, 111:7
**loud** [2] - 88:24, 126:15
**LPC** [4] - 174:9, 174:10, 174:12, 175:3
**Luci** [1] - 99:17
**lucky** [2] - 74:9, 157:9
**lump** [7] - 80:18, 103:17, 103:18, 103:19, 106:14, 155:9, 206:21
**lunch** [6] - 94:21, 111:23, 111:24, 112:3, 112:4, 112:8
**Lynch** [18] - 63:24, 64:14, 119:18, 119:20, 120:1, 155:13, 155:22, 165:8, 172:15, 190:11, 193:21, 195:24, 197:17, 200:4, 200:16, 201:19, 202:9, 203:21

### M

**M&T** [1] - 155:20
**M.D** [1] - 182:10
**M20092487** [1] - 195:15
**machine** [5] - 43:18, 162:10, 168:6,

168:10, 183:17
**machines** [2] - 43:25, 44:2
**Madison** [10] - 12:21, 13:2, 13:7, 21:17, 21:22, 23:5, 23:25, 36:7, 36:14, 37:4
**magnificent** [2] - 53:7, 53:21
**mail** [55] - 11:11, 13:21, 14:13, 18:23, 20:24, 21:1, 21:3, 21:4, 21:15, 23:14, 23:16, 23:18, 24:17, 29:11, 35:7, 35:8, 36:5, 45:4, 47:17, 55:17, 55:24, 56:2, 56:3, 56:20, 60:5, 62:10, 62:12, 62:13, 62:15, 62:16, 62:17, 63:6, 63:11, 65:23, 71:2, 77:13, 82:15, 82:18, 83:23, 84:1, 84:8, 84:20, 84:21, 84:22, 85:20, 85:21, 85:22, 86:18, 86:24, 87:1, 88:4, 90:21, 127:11, 192:19, 207:3
**mailed** [11] - 44:16, 58:24, 60:16, 62:14, 89:5, 127:9, 127:21, 192:20, 192:21, 192:22, 196:24
**mailing** [1] - 60:4
**mails** [4] - 19:18, 84:15, 85:9, 85:10
**maintain** [2] - 61:1, 73:20
**maintains** [1] - 59:16
**major** [2] - 100:17, 104:1
**malls** [1] - 4:25
**man** [3] - 81:1, 123:21, 201:15
**manage** [1] - 49:23
**managed** [4] - 9:12, 9:21, 9:24, 21:24
**management** [6] - 3:15, 8:2, 9:11, 22:1, 63:23
**manager** [5] - 5:1, 9:18, 9:23, 13:4, 15:1
**managers** [10] - 3:18, 3:24, 4:5, 4:9, 4:11, 4:16, 4:20, 5:6, 5:12, 9:10
**managing** [2] - 3:20, 5:7

**manner** [1] - 32:2
**manufacturing** [1] - 147:12
**March** [19] - 6:5, 6:24, 11:2, 21:2, 21:13, 28:15, 46:3, 93:13, 137:12, 138:6, 138:24, 138:25, 139:7, 139:9, 140:18, 140:19, 141:10, 201:22, 202:10
**Marina** [2] - 88:21, 89:4
**marked** [4] - 63:20, 64:13, 93:2, 177:15
**market** [1] - 178:15
**marks** [1] - 118:5
**married** [2] - 147:1, 147:2
**MARSHALL** [2] - 2:9, 146:14
**Marshall** [15] - 123:22, 123:23, 123:24, 124:2, 124:5, 126:17, 146:13, 161:18, 163:1, 184:2, 189:8, 191:2, 195:8, 198:24, 205:6
**Marshalls** [1] - 46:17
**Mary** [9] - 58:6, 58:22, 61:8, 61:17, 61:21, 62:6, 63:6, 63:24, 64:15
**MARY** [2] - 2:5, 42:7
**Maryann** [1] - 42:6
**match** [1] - 72:21
**matching** [1] - 71:14
**material** [3] - 16:15, 26:3, 183:1
**Mathia** [3] - 102:1, 102:2, 102:7
**matter** [8] - 26:17, 37:18, 86:5, 87:6, 124:6, 124:8, 124:9, 127:19
**matters** [3] - 69:5, 71:10, 124:2
**maturity** [10] - 58:21, 59:3, 59:6, 89:3, 112:24, 114:25, 162:2, 164:3, 164:6, 205:22
**mean** [17] - 8:20, 10:24, 47:2, 73:16, 106:12, 110:10, 114:5, 116:18, 119:4, 124:15, 131:1, 133:5, 137:6, 137:20, 143:5,

170:16, 202:5
**meaning** [1] - 144:12
**means** [18] - 4:9, 8:24, 9:2, 9:23, 11:18, 13:17, 58:16, 60:10, 60:12, 68:8, 74:17, 128:7, 133:24, 137:21, 141:2, 156:21, 181:22, 209:21
**meant** [1] - 117:4
**media** [2] - 207:23, 207:24
**medical** [4] - 100:18, 100:25, 101:17, 103:16
**medicine** [1] - 168:18
**meet** [4] - 46:10, 48:14, 70:23, 75:22, 103:6, 124:5, 148:20, 158:16
**meeting** [12] - 16:15, 144:5, 144:7, 144:9, 144:10, 144:17, 151:24, 152:4, 152:6, 152:10, 159:2, 174:10
**meetings** [1] - 48:9
**Mellon** [6] - 107:6, 116:6, 118:22, 155:14, 165:6, 200:5
**members** [4] - 67:13, 111:23, 189:19, 207:20
**memo** [3] - 64:1, 64:16, 204:19
**memory** [2] - 79:4, 90:10
**memos** [3] - 26:14, 83:10, 83:24
**mention** [7] - 10:7, 10:15, 19:22, 32:4, 34:2, 34:4, 92:10
**mentioned** [13] - 5:4, 8:20, 10:17, 12:23, 16:1, 16:9, 18:14, 20:1, 76:19, 112:10, 127:22, 209:8
**merely** [1] - 76:2
**Merrill** [18] - 63:24, 64:14, 119:17, 119:20, 120:1, 155:13, 155:22, 165:8, 172:15, 190:11, 193:21, 195:24, 197:17, 200:4, 200:16, 201:19, 202:9, 203:21
**message** [7] - 85:2,

86:17, 115:14, 115:22, 116:1, 116:12, 208:1
**messages** [2] - 110:13, 110:14
**met** [16] - 70:16, 75:12, 75:18, 95:12, 101:24, 102:9, 102:17, 103:10, 123:23, 148:21, 150:10, 152:8, 159:22, 174:5, 174:12
**metal** [1] - 68:11
**metals** [2] - 68:9, 68:10
**method** [1] - 155:12
**microphone** [2] - 3:16, 42:23
**Microsoft** [1] - 43:14
**mid** [1] - 134:12
**MIDDLE** [1] - 1:1
**Middle** [3] - 133:20, 209:4, 209:18
**middle** [1] - 157:6
**midwest** [1] - 180:1
**might** [4] - 46:10, 48:7, 48:8, 156:16
**million** [61] - 7:18, 25:20, 30:14, 34:13, 34:18, 34:20, 41:18, 78:12, 78:15, 78:18, 79:18, 81:13, 81:14, 88:1, 89:14, 89:24, 89:25, 93:16, 95:22, 96:3, 96:4, 96:24, 97:5, 97:21, 98:1, 125:10, 125:18, 128:12, 129:21, 136:23, 151:4, 151:6, 151:7, 151:9, 151:22, 154:6, 154:12, 159:14, 169:21, 169:23, 170:4, 170:6, 170:10, 174:19, 174:21, 177:19, 179:18, 181:2, 181:19, 186:1, 187:13, 189:11, 195:17, 201:10, 202:21, 202:25, 204:1, 204:3, 205:21, 206:2
**mine** [10] - 6:11, 70:10, 75:9, 113:15, 113:17, 113:25, 117:19, 148:22, 180:23, 182:24
**mingle** [2] - 8:6, 10:3

**mingled** [3] - 8:24, 9:25, 17:18
**mingling** [4] - 8:20, 8:21, 9:2, 10:1
**minute** [3] - 155:1, 181:25, 206:9
**minutes** [5] - 67:18, 99:10, 111:25, 127:25, 189:23
**mistake** [1] - 96:20
**misused** [1] - 99:6
**modified** [3] - 23:21, 28:9, 37:11
**Mohammed** [1] - 28:5
**moment** [2] - 52:7, 79:23
**Monday** [5] - 86:6, 207:18, 207:19, 207:21, 208:3
**monetary** [2] - 81:4, 81:11
**monetize** [2] - 75:6, 81:9
**monetizing** [1] - 73:17
**money** [217] - 4:22, 7:6, 8:1, 8:6, 8:13, 8:21, 8:23, 9:4, 9:10, 10:1, 15:8, 17:10, 17:17, 18:17, 32:9, 38:12, 38:15, 38:16, 38:21, 38:24, 39:4, 39:6, 39:7, 39:8, 39:9, 39:12, 39:18, 39:21, 39:22, 40:5, 40:6, 40:15, 40:18, 40:20, 43:25, 49:10, 49:11, 49:12, 49:13, 49:17, 49:22, 50:11, 50:14, 50:15, 50:18, 50:22, 51:9, 51:11, 51:12, 51:18, 52:19, 52:25, 53:4, 53:8, 54:12, 54:18, 55:12, 55:19, 55:21, 56:16, 60:21, 63:2, 64:3, 65:5, 65:18, 65:20, 65:22, 65:25, 66:4, 66:8, 66:14, 66:21, 72:15, 73:10, 74:5, 78:7, 78:22, 79:20, 79:21, 80:6, 80:9, 80:19, 80:23, 81:1, 81:17, 81:19, 81:22, 82:1, 82:2, 82:3, 82:4, 87:13, 90:9, 90:23, 92:15, 92:24, 93:23, 93:25, 97:14, 98:4, 98:11, 98:13, 103:16, 103:25, 104:3, 104:7, 104:9,

104:16, 104:20, 104:24, 104:25, 105:2, 105:3, 105:22, 106:9, 106:19, 107:4, 107:13, 107:15, 107:17, 107:18, 108:12, 108:22, 109:5, 109:18, 109:21, 110:12, 111:1, 111:6, 111:9, 115:1, 116:7, 117:8, 118:8, 119:4, 122:15, 124:10, 124:11, 125:4, 125:6, 125:17, 126:11, 129:9, 145:12, 149:15, 149:16, 149:19, 149:21, 149:24, 150:4, 150:8, 151:22, 152:14, 152:18, 152:22, 152:23, 152:24, 152:25, 153:2, 153:5, 153:10, 153:14, 154:24, 155:9, 155:11, 155:12, 155:15, 156:2, 156:6, 157:16, 157:22, 158:2, 158:8, 158:22, 161:20, 162:1, 162:20, 162:25, 163:3, 163:7, 163:11, 163:18, 163:20, 164:7, 165:13, 165:25, 167:4, 170:20, 170:21, 170:23, 172:15, 172:21, 173:6, 175:11, 175:17, 176:5, 184:9, 186:17, 186:19, 188:19, 188:21, 190:4, 190:6, 193:11, 193:12, 197:12, 197:22, 199:16, 199:25, 200:10, 201:14, 206:5, 206:7
**Money** [3] - 69:15, 85:21, 91:24
**moneys** [4] - 15:17, 35:4, 38:6, 178:1
**monitor** [2] - 57:15, 82:9
**Monroe** [8] - 45:16, 100:10, 129:10, 129:13, 129:14,

129:17, 130:4, 131:17
**month** [9] - 50:1, 50:8, 93:17, 93:18, 104:4, 118:21, 134:24, 202:25, 205:24
**month's** [1] - 49:9
**months** [26] - 11:5, 54:11, 54:13, 55:11, 55:14, 62:20, 89:10, 89:13, 89:21, 97:4, 97:11, 97:14, 97:21, 98:4, 104:22, 104:23, 106:7, 107:18, 132:21, 141:17, 155:6, 176:22, 177:1, 178:3, 186:24, 188:17
**Morgan** [2] - 4:14, 38:9
**morning** [6] - 3:1, 42:11, 42:12, 67:25, 208:3
**Morris** [1] - 14:25
**most** [9] - 9:9, 45:16, 48:6, 49:7, 52:5, 62:22, 63:5, 99:4, 195:2
**mostly** [2] - 43:5, 123:17
**motion** [14] - 130:11, 130:12, 130:14, 132:7, 135:15, 138:14, 138:17, 139:10, 139:15, 140:3, 140:13, 140:24, 141:2, 141:7
**motions** [1] - 135:12
**Mount** [1] - 100:7
**move** [12] - 3:16, 5:8, 19:20, 37:21, 38:21, 38:22, 63:15, 64:20, 94:16, 120:25, 146:2, 207:11
**moved** [4] - 46:17, 61:2, 64:23, 64:25
**movie** [2] - 103:15, 196:16
**moving** [5] - 9:4, 35:4, 193:3
**MR** [93] - 3:2, 3:6, 24:8, 24:9, 24:10, 24:11, 24:13, 24:14, 24:15, 37:21, 37:24, 38:2, 41:25, 42:1, 42:4, 42:6, 42:10, 57:6, 57:9, 57:11, 57:13, 57:14, 63:15, 63:19, 64:20, 64:24,

65:3, 65:15, 65:19, 67:9, 67:11, 67:20, 67:24, 76:13, 76:15, 76:24, 77:4, 77:10, 77:12, 94:15, 94:20, 94:23, 95:1, 96:7, 96:15, 99:7, 99:8, 99:11, 99:15, 111:22, 112:6, 112:7, 119:14, 120:25, 121:3, 121:6, 122:18, 122:19, 122:21, 122:25, 146:1, 146:7, 146:9, 146:13, 146:17, 154:18, 154:22, 154:25, 155:3, 167:9, 167:11, 168:20, 168:23, 169:1, 169:3, 180:4, 180:5, 180:8, 182:3, 182:4, 189:17, 189:25, 199:22, 199:24, 200:19, 200:20, 200:21, 200:23, 206:8, 206:12, 207:11, 207:15, 207:18
**multi** [2] - 13:4, 22:1
**multi-asset** [2] - 13:4, 22:1
**multiply** [1] - 49:8
**must** [5] - 59:6, 60:3, 61:24, 83:13, 117:22
**mutual** [3] - 8:22, 8:23, 195:23

# N

**name** [38] - 6:12, 10:10, 13:1, 15:14, 15:15, 24:20, 25:6, 27:14, 30:22, 38:8, 38:10, 39:19, 40:17, 69:12, 70:11, 75:1, 76:19, 77:20, 85:4, 86:6, 91:2, 91:23, 91:25, 101:21, 108:18, 113:18, 119:17, 123:21, 129:1, 129:24, 130:9, 143:6, 151:17, 155:19, 162:16, 165:5, 169:15
**named** [6] - 7:15, 28:5, 33:1, 142:12, 171:2, 184:25
**namely** [1] - 31:1
**names** [6] - 4:12, 4:14,

4:15, 5:4, 13:17, 38:10
**natural** [1] - 105:2
**nature** [7] - 3:22, 6:24, 17:8, 46:23, 124:8, 124:9, 171:6
**Naugle** [2] - 127:20, 128:24
**NDA** [2] - 21:16, 21:18
**near** [1] - 40:23
**necessary** [2] - 178:10, 178:22
**Ned** [6] - 3:2, 21:7, 23:19, 35:18, 36:6, 36:23
**ned** [1] - 21:16
**need** [17] - 14:21, 16:16, 73:3, 79:3, 91:1, 104:11, 106:9, 110:18, 115:22, 140:22, 152:25, 168:18, 168:24, 188:11, 191:17, 197:20, 205:19
**needed** [14] - 49:7, 49:13, 52:5, 55:20, 79:1, 79:4, 79:10, 93:23, 95:8, 97:9, 98:3, 153:3, 153:10, 168:23
**needs** [3] - 93:24, 168:17, 168:18
**negotiated** [2] - 9:18, 60:1
**negotiation** [1] - 26:6
**neighbors** [1] - 109:3
**nervous** [1] - 99:20
**net** [3] - 5:3, 28:24, 178:17
**never** [20] - 10:17, 32:1, 32:2, 40:23, 41:1, 41:8, 41:17, 48:9, 56:8, 66:9, 74:7, 76:22, 107:14, 108:18, 115:15, 167:15, 167:18, 171:5, 180:15, 206:7
**New** [19] - 5:25, 6:13, 19:24, 25:8, 25:9, 25:19, 29:16, 29:22, 29:23, 30:16, 32:21, 33:9, 83:12, 101:9, 115:17, 115:18, 115:25
**new** [24] - 4:3, 4:4, 11:15, 11:19, 11:21, 12:14, 107:14, 109:2, 109:4, 109:7, 110:1, 123:21, 123:24, 124:6,

124:8, 124:9, 157:6, 176:14, 176:17, 184:13, 188:22, 199:13, 202:13
**newspaper** [1] - 183:3
**next** [49] - 20:23, 22:5, 23:1, 24:7, 24:14, 26:20, 27:18, 28:7, 29:4, 29:10, 31:4, 31:9, 32:18, 33:20, 34:8, 36:10, 54:11, 63:20, 85:20, 109:20, 113:18, 116:4, 116:10, 117:9, 118:15, 118:25, 127:23, 128:18, 129:6, 129:9, 131:10, 141:8, 162:16, 163:9, 169:5, 173:20, 178:12, 179:18, 183:2, 189:10, 191:10, 194:14, 194:16, 195:12, 196:20, 199:4, 205:11
**nice** [1] - 146:11
**nicer** [1] - 46:19
**night** [1] - 109:19
**nine** [1] - 178:3
**NO** [1] - 1:11
**non** [9] - 12:15, 20:18, 21:5, 21:19, 22:7, 22:11, 22:21, 31:6, 37:1
**non-criminal** [1] - 31:6
**non-disclosure** [7] - 12:15, 20:18, 21:5, 21:19, 22:7, 22:11, 22:21
**non-performance** [1] - 37:1
**Noor** [1] - 28:5
**normal** [1] - 26:16
**North** [1] - 3:18
**north** [1] - 46:18
**notarized** [3] - 27:10, 27:23, 28:4
**notary** [4] - 27:12, 27:21, 27:23, 28:5
**notation** [1] - 122:6
**notations** [2] - 91:8, 115:8
**note** [140] - 30:12, 45:5, 49:20, 52:13, 52:16, 52:18, 52:21, 52:22, 53:1, 53:3, 54:3, 54:7, 55:10, 57:21, 57:25, 58:1,

58:12, 58:14, 58:16, 58:24, 59:5, 59:8, 59:12, 59:13, 59:14, 59:16, 59:18, 59:20, 59:22, 60:1, 60:3, 60:11, 60:12, 60:14, 60:16, 65:21, 65:23, 65:24, 66:24, 73:18, 73:19, 77:1, 77:5, 78:18, 81:12, 87:7, 87:9, 87:11, 87:20, 87:23, 88:5, 88:7, 88:8, 88:13, 89:6, 89:7, 89:21, 93:16, 93:18, 96:1, 104:16, 107:12, 107:14, 107:17, 112:11, 112:15, 112:18, 116:23, 116:24, 117:1, 117:9, 117:13, 118:7, 122:14, 154:2, 154:3, 154:4, 156:1, 156:7, 162:19, 162:22, 163:9, 163:14, 163:18, 163:19, 164:2, 164:11, 164:17, 164:24, 165:16, 165:17, 166:13, 167:21, 169:22, 170:1, 173:16, 173:23, 174:17, 174:20, 175:25, 176:1, 176:2, 176:6, 176:14, 176:22, 177:7, 187:2, 188:5, 188:6, 188:22, 191:3, 191:10, 191:12, 191:13, 192:12, 192:16, 194:7, 195:14, 195:20, 196:14, 196:24, 198:25, 199:12, 202:12, 203:3, 204:2, 205:7, 205:11, 205:24
**noted** [3] - 8:5, 34:18, 140:7
**notes** [63] - 8:4, 72:7, 72:10, 72:11, 72:14, 72:20, 73:5, 73:7, 73:12, 74:16, 75:5, 75:6, 75:16, 76:1, 76:4, 76:7, 76:12, 76:13, 76:15, 76:16, 76:18, 76:20, 76:21, 77:2, 77:3, 77:8, 77:11, 77:14, 79:7, 79:11, 85:14, 85:17, 86:13, 86:15, 90:3,

90:16, 96:11, 105:18, 106:16, 110:11, 110:17, 110:19, 110:21, 110:22, 111:2, 114:16, 114:17, 115:9, 116:11, 153:1, 153:22, 153:24, 153:25, 156:2, 167:7, 167:17, 176:13, 179:7, 181:5, 188:20, 201:2
**nothing** [10] - 17:2, 52:11, 54:9, 55:20, 64:16, 97:24, 99:8, 127:1, 136:6, 145:25
**notice** [15] - 22:24, 33:24, 35:20, 36:6, 36:16, 37:16, 60:3, 60:10, 60:12, 60:13, 127:15, 127:18, 135:24, 136:13, 142:16
**noticed** [2] - 109:3, 147:23
**notices** [1] - 60:3
**notification** [2] - 136:8, 139:5
**notifications** [1] - 134:15
**notified** [3] - 136:3, 138:21
**November** [15] - 82:15, 82:22, 84:7, 123:8, 124:21, 125:21, 132:20, 132:21, 133:14, 134:3, 135:20, 135:25, 136:17, 192:1
**null** [2] - 178:7, 196:9
**number** [46] - 5:22, 10:16, 14:20, 15:19, 15:25, 28:10, 28:20, 28:22, 29:3, 29:24, 30:2, 30:21, 31:2, 31:16, 33:2, 33:13, 61:9, 64:14, 81:8, 91:2, 91:9, 91:10, 91:11, 92:16, 112:22, 115:17, 116:17, 117:20, 118:3, 124:3, 133:23, 137:4, 138:5, 155:10, 165:11, 168:13, 168:14, 168:15, 168:16, 170:1, 170:12, 203:19

**numbered** [1] - 209:9
**numbers** [10] - 24:11, 29:1, 30:6, 30:7, 33:10, 61:24, 74:7, 150:24
**numerous** [1] - 116:2

**O**

**O'Brien** [4] - 57:7, 94:19, 146:6, 207:16
**O'BRIEN** [38] - 1:22, 24:8, 24:10, 24:13, 37:24, 38:2, 41:25, 42:4, 57:9, 57:11, 64:24, 65:3, 65:19, 67:9, 76:13, 76:24, 77:4, 77:10, 94:20, 94:23, 95:1, 96:15, 99:7, 121:3, 121:6, 122:18, 146:7, 146:9, 154:18, 154:25, 167:9, 180:4, 199:22, 200:19, 200:21, 206:8, 207:15, 207:18
**oath** [1] - 140:3
**object** [2] - 96:7, 200:21
**objected** [1] - 145:3
**objecting** [1] - 145:8
**objection** [23] - 37:23, 37:24, 57:10, 57:11, 64:22, 64:24, 76:13, 76:24, 94:22, 121:2, 121:3, 145:1, 146:6, 146:7, 154:18, 154:25, 167:9, 180:4, 199:22, 206:8, 207:14, 207:15
**objective** [1] - 129:8
**obligation** [2] - 59:14, 95:24
**obligations** [3] - 82:3, 106:9, 196:9
**obtain** [1] - 26:11
**obtained** [1] - 58:17
**obviously** [2] - 53:9, 163:18
**occasion** [2] - 101:21, 123:21
**occasions** [2] - 65:5, 110:25
**occupation** [2] - 123:1, 147:9
**occur** [3] - 20:12, 95:22, 98:21
**occurred** [4] - 8:12,

133:2, 135:22,
145:15
**occurrence** [1] - 9:25
**occurs** [1] - 38:23
**October** [27] - 53:1,
55:10, 58:20, 61:25,
86:25, 88:4, 88:15,
89:20, 93:6, 110:11,
115:9, 115:12,
115:13, 115:16,
116:12, 122:10,
142:5, 142:8,
145:17, 145:20,
166:11, 166:15,
190:20, 191:13,
192:2, 192:15,
198:25
**odd** [1] - 160:10
**OF** [2] - 1:1, 1:3
**off-the-shelf** [2] -
43:14, 44:13
**offer** [2] - 5:2, 178:14
**offered** [2] - 52:2,
180:5
**offering** [1] - 49:5
**offhand** [1] - 96:9
**office** [17] - 5:5, 5:24,
6:14, 6:16, 26:19,
43:14, 46:15, 46:19,
48:4, 48:17, 48:25,
51:22, 55:24,
102:10, 102:25,
127:11, 128:23
**OFFICE** [1] - 1:18
**Office** [3] - 90:24,
169:12, 188:10
**officer** [3] - 6:13,
11:18, 35:1
**officers** [1] - 25:10
**official** [4] - 6:6,
77:17, 77:18, 77:22
**Official** [3] - 209:3,
209:15, 209:17
**officials** [2] - 19:23,
31:10
**offs** [1] - 15:12
**often** [4] - 47:23,
47:24, 62:25, 63:2
**oil** [71] - 10:12, 10:16,
10:19, 15:25, 18:15,
25:20, 49:14, 49:16,
49:19, 49:20, 51:11,
73:9, 73:24, 74:1,
74:7, 74:10, 74:15,
79:2, 104:18,
104:19, 104:20,
105:4, 105:18,
122:13, 150:22,
151:9, 152:20,
152:25, 153:4,

153:6, 153:8,
153:10, 153:12,
153:22, 154:2,
154:3, 156:25,
157:10, 157:13,
157:15, 157:18,
157:19, 157:20,
167:7, 167:16,
167:23, 169:9,
169:23, 170:2,
170:5, 170:7,
170:10, 170:19,
170:22, 173:15,
173:17, 173:22,
176:1, 176:6,
177:13, 182:6,
182:9, 184:2, 194:6,
194:7, 195:16,
198:8, 198:10,
200:25
**old** [7] - 42:13, 53:15,
67:25, 100:12,
146:22, 146:23,
147:5
**Olive** [2] - 152:1,
152:2
**OLIVER** [1] - 1:23
**once** [11] - 7:13,
16:14, 20:1, 45:8,
126:24, 131:6,
131:16, 134:12,
151:22, 158:5,
206:24
**one** [90] - 8:1, 8:5,
8:15, 9:5, 10:13,
14:25, 15:11, 16:5,
16:22, 16:24, 23:23,
31:15, 34:5, 34:15,
34:18, 35:24, 37:9,
37:13, 40:5, 41:8,
43:2, 43:3, 44:2,
48:5, 48:19, 52:7,
57:25, 61:23, 68:15,
69:8, 69:23, 70:3,
73:14, 80:18, 88:14,
93:13, 98:10, 98:25,
105:1, 106:14,
107:16, 108:16,
108:20, 111:2,
117:3, 117:11,
118:4, 120:21,
120:23, 124:17,
124:18, 125:14,
126:8, 127:12,
129:1, 130:9,
130:19, 136:4,
140:17, 140:20,
140:21, 141:10,
142:12, 147:19,
151:6, 151:17,

151:18, 155:9,
156:19, 157:19,
161:19, 161:21,
164:4, 171:17,
173:11, 180:25,
184:13, 186:1,
186:23, 186:25,
191:21, 195:16,
195:17, 196:21,
202:13, 202:15,
203:16, 203:19,
204:13, 206:21
**ones** [1] - 57:2
**ongoing** [1] - 11:17
**online** [1] - 47:19
**Opel** [1] - 133:25
**opened** [1] - 47:17
**opening** [1] - 152:20
**operating** [1] - 26:16
**operation** [1] - 147:12
**operations** [4] - 6:17,
13:16, 14:18, 14:25
**opine** [1] - 16:16
**opinion** [1] - 25:23
**opportunities** [8] -
4:5, 5:14, 11:16,
11:19, 11:24, 12:14,
14:21, 49:2
**opportunity** [18] - 4:3,
4:4, 6:19, 7:2, 11:12,
16:14, 16:17, 17:4,
20:9, 35:10, 35:18,
49:6, 51:23, 71:13,
140:2, 144:11,
144:16, 150:12
**opposed** [3] - 123:18,
142:11, 179:7
**order** [30] - 14:22,
34:17, 61:10, 62:5,
63:24, 79:10, 79:11,
97:9, 126:7, 126:10,
126:24, 127:2,
127:8, 127:10,
127:18, 128:1,
128:3, 128:5, 128:9,
128:14, 130:4,
130:12, 130:13,
131:6, 131:9, 132:9,
134:21, 141:3,
141:13, 143:13
**ordered** [1] - 37:2
**ordering** [2] - 43:25,
44:1
**ordinary** [1] - 26:16
**Oregon** [2] - 69:8,
69:10
**organizations** [1] -
15:10
**origin** [1] - 31:6
**original** [17] - 27:20,

27:22, 29:8, 45:5,
60:17, 93:16,
107:15, 112:15,
112:25, 116:16,
116:18, 117:1,
118:7, 162:22,
174:3, 196:25
**osteoporosis** [1] -
100:20
**ourselves** [1] - 38:25
**outdoor** [1] - 43:6
**outlined** [1] - 30:3
**Outlook** [1] - 47:19
**outside** [1] - 102:25
**outstanding** [2] -
51:13, 51:16
**overall** [1] - 53:9
**overdraft** [1] - 38:24
**owe** [2] - 110:2,
170:13
**owed** [5] - 59:7,
145:12, 154:12,
175:17, 181:5
**owes** [2] - 39:5, 39:13,
109:20
**owing** [2] - 196:13,
204:1
**own** [13] - 12:5, 62:15,
66:7, 76:25, 77:4,
80:3, 123:10,
147:13, 147:15,
157:10, 167:16
**owned** [26] - 25:21,
43:21, 49:19, 49:20,
71:24, 73:9, 74:15,
77:14, 80:2, 80:4,
105:4, 143:10,
147:16, 150:17,
150:21, 150:25,
152:11, 152:13,
153:22, 156:25,
167:7, 184:14,
185:3, 185:10,
200:25, 201:9
**owner** [8] - 25:22,
85:18, 169:21,
177:12, 179:16,
182:6, 182:7, 195:14
**ownership** [9] - 28:23,
76:7, 85:8, 85:11,
105:18, 130:17,
130:20, 170:9,
177:21
**owning** [1] - 25:13
**owns** [3] - 26:1, 42:20,
42:25

---

# P

---

**P-a-l-m-a** [1] - 70:14

**P.A** [5] - 58:23, 61:9,
63:22, 100:7, 195:10
**p.m** [4] - 35:24, 62:11,
115:25, 122:7
**PA** [3] - 1:20, 1:24,
209:19
**package** [1] - 181:15
**page** [77] - 15:22,
20:20, 20:23, 21:11,
22:3, 22:6, 23:1,
24:7, 24:11, 24:14,
27:9, 27:23, 27:25,
28:20, 29:4, 31:9,
31:13, 33:19, 33:20,
36:10, 85:20, 89:15,
92:21, 94:3, 94:12,
113:5, 116:4,
116:10, 117:9,
118:2, 118:3,
118:15, 122:4,
126:13, 127:5,
127:7, 127:23,
128:18, 132:11,
134:17, 138:6,
144:5, 144:6, 146:4,
161:6, 161:13,
163:9, 164:11,
169:5, 170:25,
172:11, 173:20,
177:3, 178:12,
180:21, 181:11,
182:12, 183:2,
189:10, 191:10,
192:5, 194:14,
194:16, 195:6,
196:20, 199:4,
200:7, 203:3,
203:12, 203:24,
205:11
**Page** [3] - 140:5,
140:10, 179:8
**pages** [4] - 24:8,
24:10, 118:3, 122:4
**paid** [20] - 18:4, 58:16,
59:20, 60:14, 61:9,
62:5, 63:24, 96:19,
101:15, 114:2,
114:6, 115:1, 115:4,
115:6, 117:20,
171:11, 176:13,
196:10, 196:18,
204:3
**painting** [14] - 177:13,
177:18, 179:16,
179:18, 180:3,
180:10, 181:1,
181:6, 181:18,
182:6, 182:9,
183:14, 184:2, 185:6
**paintings** [1] - 151:20

**Palma** [4] - 70:12, 70:15, 70:20, 71:8
**PALMER** [1] - 70:13
**paper** [4] - 18:9, 40:7, 90:17, 129:8
**papers** [5] - 127:2, 129:11, 129:12, 131:23, 160:3
**paperwork** [3] - 44:3, 102:14, 127:25
**Paragraph** [17] - 163:19, 163:23, 163:24, 164:3, 164:4, 176:16, 176:19, 178:6, 178:9, 188:13, 188:16, 191:22, 191:25, 202:19, 202:22, 205:19, 205:22
**paragraph** [25] - 27:2, 28:12, 29:21, 31:4, 33:6, 33:21, 36:25, 37:6, 37:7, 88:10, 88:14, 88:23, 89:11, 112:20, 112:24, 126:13, 126:16, 130:19, 132:12, 163:15, 169:20, 179:15, 195:12, 197:8, 205:15
**paragraphs** [1] - 30:19
**parameters** [2] - 18:20, 41:14
**parent** [2] - 50:5, 54:17, 67:3
**parenthesis** [1] - 33:12
**Park** [11] - 12:21, 13:2, 13:7, 21:17, 21:22, 23:6, 23:25, 36:7, 36:14, 37:4, 46:16
**parked** [1] - 109:3
**part** [10] - 18:25, 32:7, 82:15, 82:18, 104:11, 123:9, 141:13, 181:15, 183:13, 183:19
**partial** [4] - 59:4, 64:3, 64:5, 64:17
**participate** [4] - 134:11, 139:24, 195:19, 195:22
**particular** [8] - 4:1, 4:23, 16:17, 16:18, 24:22, 142:9, 142:13, 153:6
**particularly** [1] - 131:24
**parties** [16] - 13:10,

22:24, 29:5, 60:6, 78:13, 80:1, 97:23, 136:4, 178:2, 178:10, 178:13, 178:16, 178:21, 191:18, 205:13
**partnership** [11] - 11:25, 177:12, 178:6, 179:8, 179:24, 180:13, 180:15, 180:16, 180:18, 181:12, 198:8
**party** [40] - 22:16, 22:17, 22:19, 22:20, 60:6, 60:8, 95:21, 96:2, 96:5, 96:6, 96:14, 96:17, 96:18, 96:21, 97:20, 97:24, 133:11, 194:20, 195:14, 195:18, 195:22, 195:23, 195:25, 196:2, 196:3, 196:5, 196:11, 196:12, 196:13, 196:14, 196:22, 198:9, 203:20, 203:25, 204:1, 204:3
**party's** [1] - 195:24
**pass** [3] - 32:11, 32:12, 32:16
**passed** [1] - 141:10
**passport** [3] - 31:2, 33:13, 85:18
**past** [3] - 5:23, 148:13, 186:24
**patient** [1] - 81:21
**pay** [28] - 51:15, 58:1, 58:6, 58:18, 59:2, 59:10, 59:11, 59:15, 59:19, 79:10, 87:20, 88:25, 97:10, 97:21, 98:4, 108:12, 122:15, 134:22, 145:18, 154:15, 156:7, 163:21, 178:8, 178:19, 181:8, 184:9, 188:6, 196:14
**payable** [5] - 58:11, 61:12, 64:15, 192:24, 204:16
**paying** [1] - 105:23
**payment** [22] - 28:23, 58:11, 59:4, 59:15, 59:18, 60:11, 64:3, 64:5, 64:17, 101:13, 101:14, 103:18, 103:19, 105:21,

156:15, 176:18, 177:20, 196:7, 196:16, 196:21, 207:9
**payments** [11] - 58:14, 58:18, 58:21, 63:4, 80:11, 88:23, 89:3, 103:17, 114:9, 114:12, 120:17
**PDF** [6] - 21:9, 36:8, 36:11, 44:16, 44:17, 45:3
**pending** [2] - 133:10, 134:25
**Penn** [4] - 91:2, 92:18, 93:3, 94:7
**Pennsylvania** [21] - 27:15, 45:11, 45:13, 45:15, 45:21, 58:5, 58:8, 59:23, 60:16, 78:24, 91:5, 101:20, 123:5, 123:7, 123:14, 127:17, 133:20, 146:25, 169:13, 209:5, 209:18
**PENNSYLVANIA** [2] - 1:1, 1:12
**people** [24] - 14:23, 16:8, 47:23, 49:6, 49:7, 51:24, 52:4, 52:5, 56:11, 62:12, 72:7, 72:8, 73:5, 73:23, 74:18, 75:22, 86:14, 96:21, 97:7, 98:8, 98:10, 98:17, 127:12, 162:13
**people's** [1] - 77:18
**per** [5] - 43:12, 115:10, 122:7, 126:20, 192:11
**percent** [9] - 28:25, 29:1, 29:2, 29:3, 41:12, 126:20, 177:21, 178:14
**percentage** [2] - 28:23, 196:5
**perception** [2] - 43:5, 43:6
**perfect** [1] - 109:16
**performance** [2] - 5:11, 37:1
**performs** [1] - 4:10
**perhaps** [2] - 19:15, 194:22
**period** [14] - 11:6, 18:4, 19:9, 19:14, 30:11, 30:23, 31:8, 46:2, 49:9, 55:11, 81:2, 81:3, 98:14,

197:23
**periodically** [1] - 54:11
**permissible** [1] - 57:6
**permission** [3] - 57:1, 66:21
**permits** [1] - 38:20
**persistently** [1] - 108:23
**person** [10] - 27:5, 47:22, 47:23, 54:24, 55:4, 62:1, 124:17, 133:11, 144:13, 175:7
**personal** [19] - 45:6, 45:7, 47:9, 70:18, 114:17, 131:20, 131:21, 142:13, 142:16, 143:3, 143:22, 144:23, 149:9, 166:23, 177:6, 185:8, 192:7, 203:4
**personally** [6] - 55:23, 131:2, 131:5, 142:11, 150:21, 179:12
**persons** [2] - 27:5, 60:13
**perspective** [2] - 32:14, 38:20
**pertaining** [2] - 26:3, 122:13
**perturbed** [1] - 158:19
**Peter** [5] - 82:25, 86:20, 87:5, 89:3, 91:24
**PETER** [2] - 2:6, 67:21
**peter** [1] - 67:20
**petition** [19] - 130:15, 134:1, 134:3, 135:20, 136:17, 136:24, 136:25, 137:11, 137:17, 137:22, 139:4, 141:14, 141:20, 142:1, 142:14, 142:17, 142:21, 143:4, 145:16
**petroleum** [4] - 25:15, 25:19, 25:25, 171:20
**ph)** [1] - 102:1
**phone** [13] - 19:17, 48:20, 48:22, 75:20, 91:9, 91:10, 110:7, 110:9, 110:12, 110:25, 115:21, 116:13, 136:1
**phones** [1] - 46:11
**phrased** [1] - 166:25

**physical** [2] - 147:24, 148:1
**physically** [2] - 207:2, 207:4
**picked** [1] - 131:11
**picture** [5] - 103:9, 183:24, 184:2, 184:6, 184:12
**piece** [2] - 184:13, 184:25
**pieces** [1] - 151:16
**Pierce** [3] - 119:18, 193:22, 202:9
**place** [20] - 4:21, 5:1, 6:17, 7:3, 7:9, 7:17, 7:24, 15:8, 18:24, 26:10, 27:8, 136:6, 139:15, 139:20, 141:9, 149:16, 151:24, 158:10, 166:11, 173:8
**PLACE** [1] - 1:11
**placed** [2] - 9:11, 30:20
**Placement** [1] - 196:19
**placement** [6] - 26:12, 83:7, 195:19, 196:4, 196:6, 196:8
**places** [1] - 8:21
**placing** [2] - 8:1, 8:6
**plaintiff** [2] - 124:17, 126:17
**plaintiff's** [1] - 130:12
**plan** [2] - 98:8, 98:9
**planned** [1] - 90:11
**planning** [1] - 93:22
**platforms** [1] - 81:5
**Plaza** [1] - 46:16
**pleadings** [1] - 47:14
**pleas** [1] - 126:9
**Pleas** [1] - 124:23
**pleased** [1] - 83:3
**pleasure** [1] - 83:2
**pledge** [3] - 185:23, 187:10, 189:11
**pledging** [1] - 188:24
**plus** [6] - 64:9, 83:6, 126:19, 128:12, 166:7, 181:1
**Pocono** [2] - 100:7, 100:8
**Poconos** [3] - 45:19, 111:11, 158:12
**point** [16] - 6:19, 19:21, 20:7, 55:19, 71:19, 108:21, 109:1, 111:2, 116:14, 134:16, 167:15, 171:9,

176:11, 188:20, 206:13
**Port** [1] - 99:17
**portfolio** [2] - 5:7, 9:15
**portion** [10] - 23:13, 26:20, 45:15, 84:6, 91:7, 113:6, 129:20, 132:15, 140:14, 183:25
**position** [3] - 3:13, 46:13, 80:3
**possession** [4] - 7:11, 74:10, 130:23, 132:6
**Post** [3] - 90:24, 169:12, 188:9
**potential** [4] - 18:11, 49:1, 76:1, 76:4
**potentially** [5] - 7:22, 8:10, 9:9, 10:23, 17:5
**power** [27] - 7:15, 7:16, 11:18, 14:3, 14:5, 23:20, 23:21, 26:8, 26:23, 26:24, 26:25, 27:1, 27:22, 28:9, 28:10, 28:13, 28:14, 31:23, 37:10, 37:11, 72:9, 72:13, 83:5, 97:7, 97:8
**powerful** [1] - 67:4
**practice** [2] - 46:24, 123:3
**practitioner** [3] - 46:20, 46:22, 123:9
**praecipe** [3] - 128:5, 128:7, 128:8
**prayers** [4] - 191:3, 191:6, 199:3, 205:7
**preceded** [1] - 86:18
**precious** [3] - 68:9, 68:10, 68:11
**prefer** [1] - 207:18
**premises** [1] - 167:6
**premium** [1] - 58:25
**preparation** [1] - 44:22
**prepared** [5] - 22:9, 25:24, 124:14, 127:25, 209:11
**prepay** [1] - 59:1
**prepayment** [1] - 59:5
**prepayments** [2] - 59:6, 59:8
**prescribed** [1] - 178:9
**present** [7] - 27:7, 56:22, 135:15, 139:2, 150:12, 152:4, 182:6
**presentation** [1] -

93:6
**presented** [4] - 11:12, 56:10, 113:1, 150:16
**presentment** [2] - 60:9, 60:10
**Preserve** [1] - 19:24
**president** [4] - 5:18, 36:23, 89:19, 171:2
**pretrial** [2] - 135:14, 135:19
**pretty** [2] - 67:3, 97:22
**prevent** [2] - 130:16, 140:18
**prevented** [1] - 143:25
**prevents** [1] - 143:12
**previous** [1] - 138:20
**previously** [14] - 16:2, 31:16, 33:3, 34:7, 45:11, 56:23, 70:17, 94:16, 136:20, 146:3, 165:16, 197:22, 200:18, 207:12
**price** [5] - 157:19, 157:20, 181:1, 181:2, 181:4
**PRICE** [1] - 1:23
**pricing** [2] - 41:4, 160:14
**primary** [1] - 133:1
**principal** [14] - 3:23, 6:16, 25:10, 25:17, 58:10, 58:18, 59:7, 59:9, 69:4, 88:25, 163:21, 176:18, 205:21
**principally** [2] - 4:3, 5:25
**principle** [2] - 4:20, 58:25
**printer** [1] - 117:5
**printout** [1] - 23:24
**printouts** [1] - 37:14
**private** [9] - 4:6, 6:14, 26:12, 83:7, 147:11, 195:19, 196:4, 196:6, 196:8
**Private** [1] - 196:19
**privately** [2] - 25:13, 25:18
**privileged** [1] - 25:4
**pro** [4] - 137:19, 137:20, 137:21, 145:5
**problem** [3] - 90:1, 132:5, 206:10
**problems** [3] - 80:8, 101:17, 148:1
**Procedure** [1] - 127:18

**procedure** [1] - 144:10
**procedures** [2] - 26:15, 83:10
**proceed** [7] - 14:21, 16:20, 19:13, 57:12, 62:19, 76:17, 143:13
**PROCEEDINGS** [1] - 1:13
**proceedings** [2] - 139:20, 209:8
**proceeds** [7] - 8:9, 8:14, 178:17, 178:18, 178:20, 181:9, 196:15
**process** [9] - 11:15, 11:20, 12:3, 17:24, 23:10, 112:9, 131:5, 148:10, 153:12
**produced** [1] - 26:5
**producer** [3] - 108:16, 108:18, 196:16
**product** [1] - 160:13
**production** [4] - 173:16, 173:22, 176:6, 194:7
**products** [2] - 25:15, 160:13
**profile** [20] - 9:20, 10:9, 10:11, 10:18, 13:6, 13:8, 14:1, 15:21, 18:19, 19:8, 23:20, 24:16, 24:20, 25:6, 33:18, 33:20, 33:25, 37:10
**profiles** [2] - 11:23, 12:9
**profit** [3] - 125:17, 198:10, 198:11
**profits** [5] - 185:24, 186:2, 187:11, 187:13, 199:19
**program** [7] - 5:22, 81:10, 195:19, 196:4, 196:6, 196:8, 196:22
**Program** [1] - 196:19
**programs** [4] - 83:7, 83:8, 101:14, 160:14
**prohibited** [1] - 59:22
**project** [4] - 197:25, 198:1, 198:6, 198:7
**promise** [6] - 53:23, 58:1, 79:21, 176:25, 188:6, 193:11
**promised** [12] - 23:19, 86:20, 87:6, 124:11, 153:13, 157:7, 167:22, 191:2, 194:5, 198:24, 202:19, 205:6

**promises** [3] - 58:6, 125:16, 197:23
**promising** [1] - 108:12
**promissory** [31] - 52:13, 57:25, 58:1, 60:14, 87:20, 87:23, 88:13, 104:10, 104:16, 107:12, 107:14, 112:15, 112:17, 117:1, 117:9, 122:13, 154:4, 163:13, 188:5, 188:6, 191:3, 191:12, 191:13, 194:7, 196:14, 198:25, 199:12, 202:11, 202:12, 204:2, 205:7
**proof** [4] - 76:6, 85:8, 85:11, 180:5
**property** [4] - 60:6, 131:20, 131:21, 143:23
**proposal** [1] - 78:10
**proposed** [3] - 16:11, 35:17, 98:18
**prospect** [1] - 108:9
**prospective** [1] - 11:22
**protect** [1] - 195:4
**protocol** [1] - 32:14
**provable** [1] - 25:19
**prove** [2] - 17:15, 64:10
**proven** [2] - 170:2, 170:4
**Provenance** [3] - 181:21, 181:22, 182:5
**provide** [8] - 4:19, 5:5, 5:13, 68:15, 73:21, 76:10, 78:11, 95:8
**provided** [7] - 31:20, 31:22, 60:24, 124:9, 139:5, 139:6, 182:22
**provides** [1] - 22:16
**providing** [2] - 3:23, 73:14
**provision** [2] - 127:15, 127:16
**provisions** [1] - 209:5
**psychological** [1] - 100:18
**public** [3] - 27:21, 27:24, 104:5
**pull** [1] - 20:13
**pulled** [2] - 52:7, 53:20
**purchase** [4] - 8:11, 8:14, 72:19, 75:7

**purchased** [1] - 182:9
**purchasing** [1] - 73:5
**purported** [3] - 28:1, 31:9, 170:15
**purportedly** [4] - 14:7, 17:10, 33:16, 34:15
**purports** [1] - 172:3
**purpose** [6] - 7:25, 25:11, 93:6, 177:25, 184:20, 196:3
**purposes** [2] - 18:14, 25:6
**pursuant** [7] - 92:19, 94:10, 126:10, 127:17, 132:2, 177:22, 209:5
**pursue** [3] - 16:21, 20:9, 111:9
**pursued** [1] - 56:8
**pursuing** [2] - 16:20, 35:10
**pushing** [2] - 105:25, 106:3
**put** [18] - 7:7, 17:17, 39:12, 40:15, 54:25, 66:5, 68:18, 69:16, 69:19, 81:9, 95:5, 95:17, 98:25, 115:17, 128:24, 131:19, 131:21, 143:21
**puts** [4] - 22:24, 38:15, 39:3, 39:6
**putting** [3] - 17:1, 41:9, 98:17
**puzzles** [1] - 157:17

## Q

**quadruple** [3] - 49:18, 152:18, 153:14
**quarter** [2] - 111:25, 112:3
**quarterly** [1] - 5:10
**questioned** [1] - 140:6
**questioning** [3] - 140:12, 140:16, 148:5
**questions** [20] - 26:18, 37:22, 42:1, 63:15, 76:20, 76:21, 76:22, 83:15, 84:6, 85:4, 94:16, 99:7, 120:25, 122:19, 144:18, 146:2, 146:7, 146:8, 146:9, 207:11
**quickly** [1] - 19:19
**quite** [5] - 17:22, 55:1, 108:17, 153:19, 155:10

**quotations** [7] - 25:18, 28:14, 28:16, 28:17, 28:25, 29:1, 29:2
**quote** [2] - 54:25, 55:8
**quoted** [1] - 55:9

# R

**racing** [1] - 109:14
**raise** [1] - 135:9
**raised** [2] - 31:14, 34:6
**raising** [2] - 50:5, 67:3
**Rajaj** [1] - 28:18
**range** [1] - 136:23
**ranks** [1] - 5:21
**rate** [4] - 126:20, 163:25, 196:1, 196:5
**rates** [1] - 197:23
**rather** [1] - 207:20
**re** [1] - 82:23
**reach** [2] - 20:10, 108:21
**reached** [3] - 6:11, 6:14, 20:7
**reaching** [1] - 96:25
**reaction** [1] - 19:5
**read** [63] - 21:3, 21:6, 21:15, 22:12, 23:18, 24:19, 24:24, 26:20, 27:2, 28:7, 28:12, 28:21, 29:21, 30:19, 31:4, 33:6, 35:14, 36:25, 37:6, 43:11, 43:12, 44:16, 45:9, 56:24, 56:25, 57:19, 57:24, 60:25, 62:16, 76:12, 76:16, 76:18, 77:1, 82:17, 82:25, 84:8, 85:6, 86:1, 86:19, 87:4, 88:24, 91:1, 122:5, 126:15, 133:23, 140:15, 140:22, 146:5, 162:15, 162:19, 162:21, 163:24, 169:5, 169:10, 179:15, 180:24, 182:5, 187:3, 187:8, 188:11, 191:17, 197:20, 205:19
**reader** [1] - 43:15
**reading** [9] - 25:3, 76:13, 76:15, 163:23, 177:17, 177:24, 195:11, 195:21, 207:13
**reads** [2] - 43:16, 180:25
**real** [5] - 4:23, 17:4,

17:9, 25:15, 131:18
**realize** [1] - 55:19
**realized** [5] - 81:25, 109:4, 157:22, 158:1, 206:7
**really** [10] - 18:6, 40:6, 74:15, 102:24, 105:7, 109:7, 109:24, 110:3, 119:5, 154:18
**Realty** [10] - 12:21, 13:2, 13:7, 21:17, 21:22, 23:6, 23:25, 36:7, 36:14, 37:4
**reason** [15] - 42:2, 93:21, 105:14, 117:3, 132:22, 132:25, 133:1, 138:17, 138:18, 140:20, 149:13, 153:6, 194:23, 199:16, 201:14
**reasonable** [1] - 59:24
**reasoning** [1] - 145:11
**reasons** [8] - 16:24, 108:3, 140:21, 193:10, 199:18, 199:25, 200:18
**receipt** [12] - 29:20, 30:8, 30:24, 32:3, 37:12, 58:3, 60:5, 163:17, 188:8, 191:15, 205:17
**receipts** [7] - 14:1, 18:7, 19:8, 23:23, 26:14, 83:9, 83:23
**receivable** [1] - 68:16
**receive** [12] - 8:3, 13:7, 13:12, 23:16, 72:21, 78:12, 79:18, 97:11, 103:16, 136:13, 180:25, 196:5
**received** [27] - 13:17, 14:14, 17:6, 22:15, 35:20, 50:2, 60:23, 61:4, 64:3, 79:17, 84:15, 88:18, 90:15, 94:13, 103:25, 127:11, 135:24, 136:1, 142:22, 165:21, 165:24, 171:9, 172:23, 186:25, 187:6, 188:19, 196:15
**receiving** [3] - 50:5, 165:5, 165:6
**recess** [6] - 67:14, 67:19, 112:4, 189:19, 189:24

**recipient** [1] - 25:6
**recognize** [23] - 82:12, 84:9, 85:22, 87:16, 90:12, 91:13, 112:12, 112:14, 114:14, 118:16, 126:4, 126:6, 127:23, 130:1, 139:17, 139:19, 141:21, 141:23, 160:7, 160:9, 162:4, 162:7, 177:8
**recollection** [10] - 76:25, 77:5, 77:7, 77:9, 89:8, 95:17, 110:19, 125:7, 133:2, 141:16
**record** [7] - 5:8, 9:3, 119:11, 126:25, 193:16, 199:5, 201:18
**recording** [1] - 9:14
**records** [4] - 127:20, 160:11, 162:3, 193:15
**recourse** [1] - 56:5
**recover** [2] - 62:19, 150:3
**RECROSS** [1] - 2:3
**red** [10] - 10:1, 15:2, 15:5, 15:17, 31:14, 32:4, 32:15, 34:5, 40:7
**redacted** [2] - 13:17, 24:2
**REDIRECT** [1] - 2:3
**reduce** [2] - 59:7, 187:18
**reducing** [2] - 187:16, 187:18
**redundant** [1] - 35:9
**refer** [1] - 71:8
**reference** [4] - 26:25, 33:7, 40:14, 122:11
**referenced** [8] - 12:22, 30:8, 31:16, 33:3, 34:17, 83:22, 94:17, 126:12
**referral** [1] - 68:22
**referrals** [1] - 68:21
**referred** [20] - 6:18, 22:1, 57:20, 58:6, 58:9, 58:20, 70:10, 87:9, 89:2, 90:21, 96:11, 130:11, 145:25, 146:3, 164:6, 169:13, 169:14, 177:15, 191:6
**referring** [12] - 15:6,

27:25, 46:2, 63:11, 86:7, 96:2, 114:19, 125:12, 127:24, 144:24, 163:3, 183:24
**refinanced** [1] - 18:4
**reflect** [3] - 118:10, 140:11, 200:15
**reflected** [2] - 88:13, 138:6
**refresh** [2] - 89:8, 110:18
**refreshing** [1] - 77:8
**refunds** [1] - 43:24
**refused** [1] - 132:6
**refusing** [1] - 135:11
**regarding** [11] - 31:22, 37:4, 49:1, 77:14, 83:15, 125:17, 127:22, 140:3, 140:12, 183:13, 199:1
**regardless** [1] - 58:16
**regards** [9] - 21:16, 23:25, 36:7, 69:5, 83:15, 86:6, 86:22, 87:7, 191:4
**Regards** [1] - 35:18
**region** [1] - 100:8
**registered** [1] - 25:7
**registrant** [1] - 39:20
**regret** [1] - 62:18
**regular** [3] - 19:17, 19:18, 54:19
**regularly** [1] - 55:22
**regulated** [1] - 11:17
**reimbursement** [3] - 43:24, 44:5, 44:7
**relate** [1] - 130:7
**related** [6] - 11:23, 15:16, 15:24, 44:19, 153:6, 190:2
**relates** [2] - 87:25, 130:8
**relating** [2] - 165:17, 183:1
**relation** [2] - 72:17, 102:4
**relationship** [11] - 6:13, 11:4, 16:10, 31:20, 73:9, 95:10, 95:14, 102:19, 102:20, 102:21, 103:6
**relationships** [1] - 84:13
**relative** [1] - 83:25
**relevant** [1] - 16:16
**relief** [4] - 37:17, 124:19, 130:13,

144:3
**religious** [1] - 54:23
**remain** [1] - 31:7
**remainder** [2] - 8:10, 196:18
**Rembrandt** [1] - 184:15
**remember** [38] - 19:1, 52:20, 52:23, 52:24, 53:6, 62:1, 66:18, 67:15, 70:1, 71:17, 71:18, 78:19, 79:10, 80:11, 88:6, 102:12, 103:20, 107:4, 107:6, 108:16, 108:17, 108:19, 108:20, 120:19, 128:14, 142:19, 151:24, 156:12, 157:11, 167:2, 173:22, 184:15, 194:9, 194:13, 199:14, 207:5, 207:21, 207:25
**remitted** [2] - 58:21, 89:3
**rendered** [1] - 178:7
**renew** [1] - 76:24
**renewable** [1] - 30:10
**repayment** [5] - 58:25, 64:2, 178:1, 202:21, 205:21
**repays** [1] - 178:4
**repeat** [5] - 42:24, 149:2, 150:19, 174:11, 183:15
**repeated** [3] - 19:22, 80:21, 102:22
**repeatedly** [2] - 80:23, 82:1
**report** [3] - 45:2, 45:4, 194:6
**REPORTED** [1] - 209:16
**reported** [1] - 159:17
**reporter** [3] - 173:14, 205:2, 209:22
**Reporter** [3] - 209:3, 209:15, 209:17
**REPORTER'S** [1] - 209:1
**reporting** [2] - 5:9, 5:10
**reports** [1] - 44:21
**represent** [6] - 40:1, 62:6, 62:21, 76:3, 145:14, 170:16
**representation** [1] - 145:5
**representations** [2] -

<br>

37:4, 197:9
**represented** [5] - 72:6, 72:12, 124:3, 137:19, 145:6
**representing** [3] - 137:25, 138:1, 138:9
**represents** [2] - 58:13, 174:20
**reproduction** [1] - 209:21
**reputation** [1] - 16:23
**request** [13] - 16:2, 33:7, 37:1, 40:18, 54:10, 85:3, 92:4, 93:11, 128:7, 167:20, 192:25, 194:12, 206:25
**requested** [12] - 13:6, 13:13, 13:21, 21:7, 39:23, 40:12, 60:5, 85:10, 86:3, 167:5, 204:18, 206:24
**requester** [1] - 91:23
**requesting** [1] - 128:8
**requests** [3] - 55:17, 55:23, 85:6
**require** [4] - 20:11, 59:15, 60:10, 60:12
**required** [6] - 5:10, 5:11, 32:11, 58:23, 59:10, 89:5
**requires** [1] - 59:19
**reread** [1] - 75:15
**research** [10] - 6:15, 12:6, 12:8, 15:13, 15:18, 16:3, 16:4, 180:9, 180:12, 207:23
**researched** [1] - 180:18
**reserve** [6] - 23:23, 26:13, 34:7, 79:2, 83:9, 83:23
**Reserve** [56] - 7:4, 7:6, 10:6, 14:3, 14:8, 14:9, 15:17, 17:11, 18:8, 19:23, 19:24, 23:15, 26:8, 29:14, 29:16, 29:22, 30:16, 31:10, 32:2, 32:20, 32:21, 33:8, 33:22, 34:9, 35:2, 35:3, 36:21, 37:13, 72:7, 72:10, 73:7, 74:16, 75:5, 77:19, 79:2, 79:7, 82:24, 83:12, 85:14, 86:3, 86:8, 86:10, 86:11, 86:13, 86:15, 90:2, 90:9, 93:23, 95:23, 96:10,

151:10, 153:1, 153:25, 167:7, 167:17, 201:2
**Reserve's** [1] - 38:5
**reserved** [3] - 33:5, 33:9, 37:13
**reserves** [18] - 10:12, 10:16, 10:19, 15:25, 18:15, 25:20, 25:21, 25:23, 73:10, 73:24, 74:1, 74:7, 74:10, 150:22, 167:23, 169:9, 170:2, 170:4
**reside** [1] - 99:16
**resided** [1] - 129:10
**residence** [1] - 111:10
**residential** [1] - 25:15
**resides** [1] - 125:20
**residing** [2] - 58:7, 195:9
**resolution** [3] - 132:22, 133:8, 145:16
**respect** [1] - 59:14
**respectfully** [1] - 85:4
**response** [3] - 19:16, 22:3, 55:4, 55:5, 63:8, 81:18, 86:4, 86:5, 116:3, 130:14, 135:9, 181:23
**responsibilities** [3] - 4:1, 44:4, 47:12
**responsibility** [2] - 30:1, 33:8
**responsible** [2] - 83:14, 178:17
**rest** [4] - 91:1, 156:19, 182:25, 199:18
**restaurant** [1] - 152:1
**restrain** [1] - 206:11
**result** [11] - 70:4, 80:21, 101:17, 103:16, 136:8, 139:7, 139:10, 139:14, 142:16, 159:2, 159:11
**resulted** [1] - 37:17
**retired** [3] - 147:7, 147:8, 147:9
**return** [23] - 52:10, 52:17, 53:23, 58:2, 60:5, 78:15, 87:21, 89:11, 107:12, 110:25, 112:19, 125:17, 125:18, 163:16, 163:20, 188:7, 191:14, 191:22, 192:19, 193:12, 195:25, 197:23, 205:20

**returned** [4] - 52:19, 54:12, 110:14, 155:5
**returns** [5] - 9:13, 9:21, 9:22, 149:15, 149:17
**review** [10] - 14:16, 14:19, 14:24, 16:9, 16:14, 19:10, 35:11, 35:16, 40:13, 44:25
**reviewed** [4] - 12:3, 45:2, 45:4, 45:5
**reviewing** [1] - 4:3
**revised** [3] - 114:11, 117:1, 117:9
**revision** [2] - 114:5, 118:7
**revisions** [1] - 112:11
**Rey** [2] - 88:21, 89:4
**RHODES** [1] - 1:23
**rich** [1] - 152:25
**Richard** [70] - 12:20, 12:21, 21:7, 23:7, 25:10, 26:19, 26:21, 26:24, 27:4, 28:15, 29:9, 35:15, 37:20, 54:25, 60:19, 62:17, 64:16, 83:16, 85:3, 86:2, 89:18, 102:5, 103:7, 103:8, 105:24, 106:3, 107:11, 108:4, 108:8, 109:11, 109:25, 110:6, 111:1, 113:21, 113:25, 115:10, 115:19, 120:9, 120:22, 120:24, 122:7, 125:1, 126:18, 134:10, 137:18, 140:8, 142:10, 164:13, 164:14, 171:1, 177:5, 181:14, 181:17, 182:6, 184:4, 184:5, 187:17, 191:5, 192:6, 192:7, 192:11, 192:25, 194:7, 194:17, 201:20, 204:18, 204:20, 205:10
**RICHARD** [2] - 1:7, 1:10
**Richard's** [1] - 120:21
**right-hand** [2] - 27:13, 113:22
**rights** [3] - 37:16, 60:9, 156:25
**risk** [14] - 9:20, 13:15, 14:18, 14:25, 16:22,

17:1, 17:5, 17:8, 17:19, 18:20, 41:14, 66:8, 66:11
**risked** [1] - 80:7
**Riyadi** [7] - 15:14, 16:3, 30:22, 31:21, 31:22, 31:24, 40:8
**RJ** [2] - 12:21, 13:8
**RJH** [79] - 10:9, 12:19, 12:23, 24:23, 24:25, 25:7, 25:12, 25:17, 25:18, 25:21, 25:22, 26:7, 26:9, 26:15, 29:2, 33:20, 37:5, 52:15, 58:4, 60:18, 63:21, 64:13, 83:4, 86:22, 88:18, 112:19, 118:22, 119:20, 120:1, 125:2, 125:15, 126:1, 126:17, 129:24, 130:15, 131:7, 132:17, 134:9, 135:17, 137:18, 137:19, 138:16, 141:4, 161:1, 161:18, 164:13, 165:10, 167:21, 169:12, 172:16, 173:8, 177:5, 179:13, 179:16, 183:12, 185:15, 185:23, 185:25, 187:7, 187:9, 187:11, 188:2, 188:9, 189:4, 190:11, 190:20, 191:15, 191:18, 192:6, 193:22, 193:24, 194:17, 195:8, 197:19, 198:21, 200:4, 203:10, 205:13, 205:18
**RJH/AT/1BE/13-04-09-1** [1] - 28:11
**rjhco3.com** [1] - 85:21
**rjhco@verizon.net** [2] - 62:12, 84:24
**RMR** [2] - 209:14, 209:17
**RNO** [1] - 133:24
**ROAD** [1] - 1:23
**role** [2] - 5:22, 73:22
**roles** [1] - 101:14
**rolled** [1] - 176:14
**rolling** [1] - 188:22
**ROOM** [1] - 1:19
**rotator** [1] - 100:20
**roughly** [1] - 89:10

**route** [2] - 42:20, 43:1
**routing** [1] - 91:2
**Rule** [1] - 127:17
**ruled** [1] - 126:11
**rules** [1] - 207:23
**ruling** [3] - 140:23, 141:1, 141:2
**run** [2] - 4:11, 43:2
**runs** [3] - 42:20, 42:25, 43:3

# S

**Sachs** [2] - 4:14, 38:9
**safe** [12] - 29:20, 30:8, 30:15, 30:21, 30:22, 30:23, 31:8, 31:23, 32:3, 37:12, 83:9, 83:23
**safeguard** [1] - 26:6
**safekeeping** [8] - 7:4, 8:4, 14:1, 18:7, 19:7, 23:23, 26:14, 85:16
**sale** [9] - 131:14, 132:1, 132:3, 132:4, 132:7, 178:2, 178:15, 178:17, 181:9
**sale's** [2] - 181:1, 181:4
**sales** [3] - 15:1, 15:2, 181:2
**sanctions** [2] - 135:13, 135:16
**sanitized** [3] - 167:22, 169:4, 169:18
**sat** [2] - 48:7, 48:9
**satisfactory** [6] - 58:3, 163:16, 188:8, 191:14, 205:17
**Saudi** [1] - 15:9
**save** [1] - 53:18
**saved** [1] - 111:17
**saving** [1] - 53:17
**savings** [3] - 50:20, 53:14, 150:6
**saw** [6] - 40:12, 47:23, 65:20, 118:4, 186:23, 199:11
**scan** [1] - 44:14
**scanner** [2] - 44:13, 56:25
**scheduled** [6] - 135:14, 135:19, 136:5, 136:10, 138:25, 141:8
**schedules** [2] - 19:11, 22:18
**schemes** [1] - 159:1
**School** [2] - 151:18,

151:19
**school** [2] - 69:8,
184:15
**Science** [1] - 69:7
**Scott** [1] - 15:2
**Scranton** [1] - 209:19
**scrap** [1] - 116:24
**screen** [16] - 14:6,
17:14, 20:15, 23:24,
34:8, 34:9, 34:21,
35:2, 35:6, 37:14,
43:15, 43:16, 61:7,
82:9, 83:13, 160:2
**Screen** [2] - 101:13,
101:15
**screening** [2] - 26:14,
83:10
**screens** [1] - 83:24
**scripture** [3] - 54:25,
55:8, 55:9
**scroll** [17] - 20:23,
27:9, 28:4, 28:21,
37:6, 84:19, 84:21,
85:6, 92:3, 112:22,
127:15, 165:3,
168:7, 168:9, 173:5,
175:2, 187:5
**se** [5] - 43:12, 137:19,
137:20, 137:21,
145:5
**seal** [3] - 27:12, 60:18,
89:17
**seals** [1] - 77:17
**search** [1] - 111:10
**seats** [1] - 109:14
**second** [25] - 8:3, 8:8,
15:13, 22:3, 24:5,
31:19, 33:19, 33:21,
46:3, 66:13, 87:16,
92:3, 92:21, 127:4,
128:18, 132:11,
136:25, 141:14,
147:19, 163:15,
168:3, 179:15,
180:21, 182:12,
203:12
**secretary** [6] - 25:11,
46:9, 48:1, 102:3,
102:11, 175:6
**secrets** [1] - 160:12
**Section** [2] - 58:11,
209:6
**section** [5] - 58:12,
64:2, 64:16, 88:24,
204:19
**sections** [1] - 37:15
**secured** [13] - 57:25,
87:22, 112:16,
112:17, 163:13,
188:5, 191:3,

191:12, 198:25,
199:12, 202:11,
205:7
**securities** [5] - 7:4,
38:6, 38:7, 38:23,
83:11
**security** [4] - 7:19,
15:4, 18:13, 20:8
**Security** [13] - 46:25,
47:18, 50:2, 91:3,
92:18, 93:4, 94:7,
100:15, 101:25,
103:19, 105:23,
105:24
**see** [43] - 20:18, 20:19,
21:16, 23:20, 31:17,
36:6, 40:12, 56:22,
57:1, 57:19, 67:17,
67:18, 72:19, 82:10,
87:6, 87:14, 93:8,
112:3, 113:6, 118:1,
122:3, 123:25,
143:7, 148:14,
149:11, 149:13,
151:17, 154:4,
159:25, 162:3,
172:18, 176:2,
179:13, 180:18,
183:8, 183:10,
183:11, 185:18,
189:22, 193:14,
193:17, 208:1, 208:2
**seeing** [3] - 11:14,
160:2, 173:22
**seek** [2] - 37:16, 56:5
**seeking** [3] - 9:10,
10:6, 26:10
**select** [2] - 51:24,
56:10
**self** [2] - 68:5, 68:6
**self-employed** [2] -
68:5, 68:6
**sell** [10] - 73:19, 83:18,
86:12, 105:12,
157:13, 157:15,
157:20, 170:19,
178:10, 184:7
**seller** [2] - 72:22,
72:24
**sellers** [6] - 68:7, 68:9,
68:10, 68:17, 69:16,
71:14
**selling** [3] - 60:1,
72:11, 170:22
**send** [18] - 13:21,
43:24, 77:13, 77:16,
80:13, 80:18, 81:22,
82:3, 83:22, 83:25,
85:24, 87:12, 94:13,
167:4, 172:8,

172:10, 199:13,
200:10
**sending** [5] - 19:17,
88:7, 163:5, 163:10,
172:15
**sends** [1] - 10:1
**sent** [60] - 10:9, 10:11,
12:15, 13:23, 13:25,
14:23, 15:1, 15:3,
15:22, 19:6, 19:7,
19:8, 21:4, 22:10,
29:11, 35:8, 37:9,
39:23, 45:3, 45:6,
62:17, 63:6, 78:5,
78:23, 79:18, 80:11,
80:14, 82:18, 84:14,
86:2, 86:8, 86:21,
87:1, 88:8, 90:10,
91:11, 91:16, 93:18,
93:21, 93:25, 95:15,
102:1, 102:2, 116:5,
155:13, 163:7,
163:10, 170:14,
172:6, 181:17,
183:6, 183:9,
184:17, 194:9,
197:17, 199:13,
199:14, 199:16,
199:18
**sentence** [3] - 163:15,
179:13, 179:18
**sentences** [1] - 161:15
**separate** [4] - 8:25,
9:12, 65:5, 106:18
**September** [21] -
25:23, 52:25, 53:1,
58:2, 115:5, 116:5,
118:21, 118:24,
120:1, 130:5,
131:15, 131:25,
132:8, 162:19,
166:14, 175:9,
182:19, 188:16,
196:17, 198:18
**sequential** [2] - 30:7,
34:16
**series** [5] - 24:5, 30:6,
32:18, 34:8, 155:8
**service** [1] - 5:12
**services** [9] - 3:24,
4:19, 5:5, 7:5, 8:2,
35:16, 41:6, 73:11,
95:8
**session** [1] - 136:10
**set** [9] - 24:2, 29:7,
58:12, 60:6, 62:15,
178:5, 178:8, 196:2,
209:9
**setbacks** [1] - 81:20
**settlement** [1] - 38:23

**Settlemyer** [5] -
182:11, 183:1,
184:3, 184:14, 201:7
**Settlemyre** [4] -
151:18, 177:13,
180:1, 182:7
**seven** [5] - 37:13,
53:6, 60:8, 68:1,
195:17
**seventy** [1] - 68:1
**seventy-seven** [1] -
68:1
**several** [4] - 70:2,
70:17, 80:11, 162:23
**shall** [25] - 28:25,
31:7, 58:11, 58:19,
58:21, 59:9, 60:15,
89:1, 89:3, 163:25,
164:1, 164:5, 178:3,
178:7, 178:10,
178:13, 178:16,
178:17, 178:18,
195:23, 196:5,
196:9, 196:14
**shameful** [1] - 67:8
**share** [3] - 9:13,
178:18, 178:19
**shared** [2] - 22:21,
22:25
**shares** [1] - 5:2
**Shawnee** [6] - 58:5,
63:22, 90:25,
127:13, 158:12,
169:12
**sheet** [2] - 90:17,
134:8
**shelf** [2] - 43:14, 44:13
**sheriff** [3] - 131:20,
131:23, 143:9
**sheriff's** [2] - 131:14,
132:1
**shop** [1] - 4:18
**shopping** [2] - 4:24,
103:2
**short** [4] - 32:13,
38:24, 127:17,
197:23
**shortfalls** [1] - 38:21
**show** [19] - 17:14,
20:14, 82:8, 84:5,
93:2, 93:5, 93:10,
105:17, 114:21,
115:1, 115:3,
118:22, 121:17,
144:18, 157:17,
159:24, 173:17,
184:6, 190:3
**showed** [8] - 14:2,
14:7, 17:10, 34:15,
109:5, 153:24,

154:8, 200:15
**showing** [8] - 109:4,
112:8, 118:24,
126:2, 198:16,
199:5, 202:8
**shows** [2] - 92:15,
161:15
**side** [6] - 20:9, 113:22,
116:25, 117:18,
160:16, 182:21
**SIEGEL** [2] - 2:4, 3:3
**Siegel** [1] - 3:7
**Sigel** [5] - 3:2, 35:18,
36:23, 38:3, 42:3
**sign** [2] - 179:1, 179:5
**signatory** [1] - 30:25
**signature** [31] - 23:1,
23:2, 23:6, 27:17,
27:18, 28:1, 60:19,
60:20, 63:25, 64:1,
64:16, 89:16, 89:17,
94:5, 113:7, 113:9,
113:11, 118:2,
126:22, 161:8,
161:9, 173:5, 186:9,
192:6, 194:16,
194:18, 194:19,
194:22
**signature's** [1] -
194:25
**signatures** [12] - 29:4,
29:6, 29:9, 31:9,
33:15, 77:18, 113:6,
128:19, 164:12,
171:1, 175:5, 203:12
**signed** [36] - 12:20,
21:5, 21:16, 23:11,
27:23, 32:1, 37:19,
60:23, 60:24, 61:1,
61:16, 62:6, 94:2,
96:1, 125:13,
128:22, 161:6,
161:10, 163:18,
164:13, 167:21,
175:5, 177:4, 177:5,
178:23, 178:24,
179:2, 184:5,
187:17, 192:5,
192:7, 194:7, 199:1,
203:3, 205:10
**signing** [1] - 194:17
**signoff** [1] - 14:19
**silly** [1] - 62:3
**Silverstein** [38] -
123:22, 124:12,
125:3, 125:14,
125:16, 125:20,
125:25, 126:11,
126:17, 129:7,
130:18, 130:21,

130:23, 131:10, 132:3, 136:16, 139:25, 141:15, 142:14, 144:21, 145:9, 145:12, 145:14, 146:13, 146:18, 159:25, 161:18, 177:22, 178:1, 178:5, 178:8, 178:19, 190:1, 195:9, 197:20, 199:14, 200:24, 204:24

**silverstein** [1] - 138:9

**SILVERSTEIN** [2] - 2:9, 146:14

**Silverstein's** [2] - 144:22, 202:8

**similar** [5] - 53:24, 75:23, 119:24, 167:3, 167:6

**simple** [2] - 50:25, 140:17

**simply** [2] - 81:8, 82:2

**sincerely** [1] - 63:6

**sincerity** [1] - 62:18

**Singapore** [8] - 7:16, 14:4, 27:24, 28:5, 28:17, 28:19, 31:2, 33:13

**single** [4] - 4:25, 50:5, 62:2, 67:3

**Sioux** [4] - 58:7, 58:22, 61:8, 61:22

**sit** [1] - 48:5

**situation** [5] - 75:23, 76:1, 80:5, 138:20, 138:23

**situations** [1] - 62:25

**six** [10] - 37:13, 60:2, 84:7, 104:22, 104:23, 106:7, 107:18, 141:17, 155:6, 168:3

**size** [1] - 15:11

**skip** [1] - 87:15

**SKR** [1] - 23:22

**slash** [5] - 30:2, 30:20, 31:1, 31:5, 119:2

**slips** [1] - 45:9

**slow** [4] - 4:13, 26:4, 106:10, 106:11

**slowly** [1] - 99:24

**small** [3] - 46:16, 63:2, 68:15

**smaller** [3] - 4:16, 80:11, 81:1

**Smith** [3] - 119:18, 193:22, 202:9

**so-called** [1] - 15:25

**social** [1] - 207:24

**Social** [9] - 46:25, 47:18, 50:2, 100:15, 101:25, 103:19, 105:23

**socialize** [1] - 102:25

**software** [4] - 43:14, 44:14, 44:15, 44:17

**sold** [4] - 143:11, 171:6, 181:6, 181:18

**sole** [3] - 25:22, 27:6, 177:25

**solely** [1] - 208:1

**solicit** [1] - 53:4

**solicitations** [1] - 104:6

**solicited** [1] - 56:11

**soliciting** [1] - 4:3

**solo** [3] - 46:20, 46:22, 123:9

**solution** [1] - 5:12

**someone** [9] - 38:15, 46:11, 75:12, 77:6, 83:19, 96:16, 98:18, 171:2, 175:5

**sometime** [5] - 46:3, 131:25, 136:14, 143:19, 157:24

**sometimes** [8] - 47:15, 47:16, 48:19, 61:25, 62:3, 98:9, 169:14, 177:15

**somewhere** [4] - 48:15, 50:7, 171:21, 180:1

**son** [1] - 115:18

**soon** [6] - 111:4, 156:5, 158:25

**sophisticated** [1] - 98:5

**sorry** [20] - 15:4, 16:12, 19:3, 61:7, 63:17, 65:15, 99:17, 100:23, 104:12, 108:6, 122:3, 130:10, 151:7, 163:25, 165:20, 166:24, 168:9, 194:5, 196:17, 203:23

**sought** [5] - 7:9, 8:3, 8:8, 17:3, 206:14

**sounds** [1] - 95:9

**sources** [2] - 12:6, 68:22

**SOUTH** [1] - 1:23

**sovereign** [2] - 15:9, 31:17

**speaking** [4] - 23:19, 65:15, 83:2, 86:20

**special** [1] - 165:9

**specialize** [1] - 123:15

**specific** [5] - 44:6, 44:13, 49:23, 97:24, 170:12

**specifically** [1] - 47:16

**specification** [1] - 186:7

**spent** [2] - 16:5, 98:25

**spread** [2] - 7:23, 105:12

**Spring** [3] - 132:1, 132:10, 135:8

**St** [1] - 99:17

**staff** [2] - 127:20, 129:1

**stamp** [1] - 128:24

**stamps** [1] - 129:1

**stand** [1] - 121:19

**standard** [1] - 144:10

**stands** [3] - 21:18, 23:22, 37:12

**Stanley** [2] - 4:14, 38:9

**start** [6] - 7:22, 11:21, 25:3, 99:9, 196:21, 207:18

**started** [5] - 5:20, 46:16, 98:12, 102:17, 110:7, 110:11, 135:7, 148:17, 148:21, 159:20, 161:20, 171:12, 171:13, 172:9, 207:8

**starting** [1] - 11:2

**state** [15] - 3:10, 25:8, 50:23, 76:20, 76:22, 133:10, 136:3, 136:6, 138:21, 143:13, 144:2, 168:8, 170:11, 179:10, 197:18

**State** [55] - 3:13, 3:17, 3:19, 3:21, 4:18, 5:15, 6:2, 6:7, 6:12, 6:15, 7:4, 7:9, 7:12, 7:19, 7:24, 8:1, 8:3, 8:6, 8:9, 8:18, 9:19, 10:7, 10:25, 11:1, 11:13, 12:7, 14:20, 16:10, 16:22, 17:1, 18:5, 18:8, 18:21, 19:16, 20:11, 22:8, 22:15, 22:16, 23:2, 25:9, 25:25, 32:13, 35:1, 35:3, 35:15, 36:23, 38:20, 39:6, 39:16, 39:18, 41:11, 60:15, 68:12

**statement** [2] - 118:20, 121:19

**statements** [1] - 160:12

**STATES** [2] - 1:1, 1:3

**states** [1] - 82:16

**States** [10] - 1:17, 33:11, 59:23, 72:8, 74:2, 74:3, 79:3, 209:4, 209:6, 209:18

**stating** [1] - 79:17

**stay** [1] - 143:13

**stayed** [2] - 16:24, 108:2

**step** [6] - 23:10, 42:2, 99:9, 122:20, 129:9, 146:10

**stepped** [1] - 17:6

**steps** [2] - 133:13, 178:10

**still** [7] - 46:12, 50:17, 110:24, 111:11, 141:7, 145:22, 175:17

**stipulate** [2] - 12:20, 41:13

**stipulated** [5] - 7:21, 8:8, 33:1, 41:16, 58:11

**stipulates** [3] - 9:19, 22:14, 58:16

**stipulating** [1] - 27:21

**stipulations** [1] - 38:19

**stop** [3] - 81:24, 101:17, 110:5

**stopped** [5] - 81:25, 108:22, 136:11, 139:8, 143:5

**stops** [2] - 133:12, 138:23

**story** [4] - 32:13, 106:17, 108:1, 159:7

**STREET** [1] - 1:19

**Street** [51] - 3:10, 3:13, 3:17, 3:19, 3:21, 3:22, 4:18, 5:15, 6:2, 6:7, 6:12, 6:15, 7:4, 7:9, 7:12, 7:19, 7:24, 8:1, 8:3, 8:6, 8:10, 8:18, 9:19, 10:7, 10:25, 11:1, 11:13, 12:7, 14:20, 16:10, 16:22, 17:1, 18:8, 18:21, 19:16, 20:12, 22:15, 22:16, 23:3, 29:23, 32:13, 35:1, 35:3, 36:23, 38:20, 39:7, 39:16, 39:19, 41:11, 195:9

**Street's** [3] - 18:6, 22:8, 35:15

**stressed** [1] - 148:4

**strictly** [3] - 9:14, 167:22, 173:15

**strike** [1] - 150:16

**stringent** [1] - 32:8

**Stroudsburg** [7] - 45:17, 46:18, 58:8, 58:23, 61:9, 61:22, 91:5

**structure** [4] - 5:1, 9:25, 41:5, 160:14

**struggling** [1] - 54:17

**stuff** [2] - 18:15, 161:24

**sub** [1] - 197:19

**sub-account** [1] - 197:19

**subject** [8] - 22:20, 23:15, 36:20, 177:15, 177:21, 178:3, 178:10, 178:14

**subscribed** [1] - 29:5

**subsequent** [5] - 26:5, 58:24, 60:2, 89:5, 96:23

**substance** [2] - 22:13, 201:15

**substantial** [3] - 73:11, 124:10, 149:19

**successful** [1] - 132:4

**successfully** [1] - 131:12

**sues** [1] - 124:17

**suggest** [1] - 39:11

**suing** [2] - 93:22, 125:8

**sum** [15] - 80:18, 103:17, 103:18, 103:19, 106:14, 155:9, 176:9, 178:19, 185:23, 186:1, 187:10, 195:24, 196:13, 204:1, 206:21

**summarize** [1] - 22:13

**summer** [1] - 206:16

**Summerset** [1] - 25:8

**SUMMIT** [1] - 1:24

**superiors** [1] - 16:8

**supervision** [2] - 209:11, 209:21

**supplementary** [1] - 130:13

**support** [5] - 4:18, 4:20, 5:5, 50:6, 105:17

**supposed** [5] - 49:14, 81:13, 107:18, 166:14, 166:16
**supposedly** [1] - 174:20
**surprise** [5] - 109:18, 111:4, 111:5, 115:11, 122:8
**sustained** [1] - 206:9
**SWIFT** [1] - 29:25
**switched** [1] - 147:11
**sworn** [8] - 3:3, 42:8, 67:21, 99:13, 122:22, 140:6, 140:8, 146:15
**synagog** [6] - 149:11, 157:3, 157:6, 186:14, 186:19, 188:25
**system** [6] - 14:8, 35:3, 35:5, 38:4, 38:5, 144:12
**systems** [1] - 22:23

# T

**Tahiti** [1] - 89:4
**talent** [2] - 101:13, 101:14
**talks** [3] - 22:23, 33:21, 197:7
**tax** [2] - 51:17, 69:5
**taxes** [3] - 50:1, 51:15
**team** [7] - 3:14, 4:4, 9:11, 12:4, 14:17, 14:18, 16:15
**teams** [2] - 13:16, 14:18
**technical** [1] - 160:12
**technically** [1] - 39:17
**technology** [2] - 43:13, 60:25
**teenage** [2] - 50:6, 67:3
**telephone** [9] - 6:22, 11:11, 29:24, 55:17, 55:24, 71:2, 75:21, 83:3, 168:13
**template** [1] - 44:6
**temple** [2] - 185:21, 187:15
**Temple** [9] - 185:24, 186:1, 187:9, 187:10, 187:12, 189:9, 190:2, 196:23, 204:4
**ten** [18] - 5:23, 41:17, 45:25, 46:2, 46:23, 51:6, 105:23, 111:25, 149:5,

166:20, 166:22, 169:21, 169:23, 170:4, 170:6, 170:10, 175:13
**ten-year** [1] - 46:2
**Teo** [8] - 26:24, 27:3, 28:17, 29:3, 29:9, 31:1, 33:1, 33:13
**term** [13] - 58:19, 62:7, 78:18, 89:1, 89:7, 96:2, 96:8, 128:8, 156:21, 163:22, 196:6, 196:7, 196:8
**terminated** [4] - 134:4, 137:13, 142:3, 142:7
**termination** [1] - 142:4
**terms** [27] - 4:8, 4:9, 9:22, 11:13, 11:15, 12:9, 12:16, 16:20, 26:6, 51:14, 54:22, 59:11, 65:24, 66:18, 66:24, 73:22, 80:3, 88:11, 90:5, 112:12, 128:4, 131:6, 143:21, 145:23, 177:22, 178:22, 207:5
**testified** [10] - 3:4, 42:8, 67:22, 77:7, 99:13, 99:22, 122:23, 136:21, 146:15, 148:8
**testify** [2] - 77:4, 77:5
**testifying** [2] - 76:25
**testimony** [2] - 44:23, 112:11
**Texas** [5] - 10:13, 15:25, 25:21, 49:21, 150:22
**THE** [55] - 1:1, 1:1, 1:10, 3:1, 37:23, 37:25, 42:2, 42:5, 57:7, 57:10, 57:12, 64:22, 64:25, 65:17, 67:10, 67:13, 76:17, 76:18, 77:2, 77:3, 77:7, 77:11, 94:19, 94:22, 94:24, 96:9, 96:10, 99:9, 111:21, 111:23, 112:5, 121:2, 121:4, 122:20, 146:6, 146:8, 146:10, 146:11, 154:21, 155:1, 167:10, 168:21, 168:25, 169:2, 180:7, 181:25, 182:1, 182:2, 189:15,

189:18, 199:23, 206:9, 207:14, 207:16, 207:19
**thereafter** [1] - 143:19
**therefore** [1] - 145:13
**thereon** [1] - 126:20
**thereto** [2] - 15:24, 26:3
**thesis** [2] - 4:23, 9:16
**thinking** [1] - 55:16
**third** [26] - 22:16, 22:17, 37:6, 37:7, 78:13, 80:1, 94:12, 95:21, 96:2, 96:5, 96:6, 96:14, 96:17, 96:18, 96:21, 97:20, 97:23, 97:24, 113:5, 135:15, 138:5, 141:20, 141:24, 181:11, 198:8
**thirty** [2] - 51:8, 101:9
**Thomas** [2] - 137:7, 139:21
**thorough** [1] - 153:20
**thousand** [13] - 41:17, 50:7, 50:17, 51:6, 70:2, 115:6, 116:5, 120:14, 120:17, 151:4, 151:6, 195:17, 196:2
**threaten** [1] - 56:1
**threatened** [1] - 63:10
**three** [21] - 5:17, 11:8, 37:11, 42:14, 65:7, 89:11, 112:22, 112:23, 117:20, 117:24, 135:13, 136:9, 146:23, 157:23, 158:22, 163:25, 192:2, 195:17, 195:18, 196:1
**Thursday** [1] - 162:25
**timeframe** [1] - 178:9
**timeliness** [1] - 142:18
**timely** [1] - 58:14
**timing** [1] - 161:14
**tiny** [2] - 50:20, 50:21
**tip** [1] - 15:12
**tip-offs** [1] - 15:12
**Titian** [4] - 184:25, 185:6, 185:7, 201:7
**Title** [1] - 209:5
**title** [10] - 3:19, 26:22, 28:7, 29:19, 33:4, 36:15, 87:22, 131:8, 163:13, 185:20
**titled** [4] - 32:3, 84:6, 129:23, 143:6

**TO** [1] - 2:1
**Tobyhanna** [5] - 107:3, 118:19, 119:13, 119:15, 119:25
**today** [6] - 4:15, 44:18, 44:23, 45:1, 70:23, 83:2
**together** [11] - 68:18, 69:17, 69:20, 80:14, 95:6, 98:18, 98:25, 103:1, 103:2, 156:10, 195:25
**tomorrow** [1] - 162:25
**Tonya** [1] - 25:11
**took** [11] - 49:10, 74:23, 97:25, 106:15, 108:25, 127:22, 139:15, 139:20, 151:24, 165:10, 166:10
**top** [27] - 24:21, 26:20, 29:13, 84:5, 112:16, 112:17, 129:25, 130:12, 140:5, 166:10, 168:7, 168:9, 168:12, 169:6, 169:7, 171:1, 171:19, 172:17, 173:11, 173:25, 181:16, 183:8, 187:1, 187:23, 190:13, 192:18, 193:8
**topic** [2] - 103:25, 104:1
**torn** [1] - 100:20
**total** [15] - 7:8, 13:20, 19:11, 30:15, 33:11, 34:11, 59:1, 103:21, 120:17, 128:11, 176:13, 176:18, 191:21, 202:21, 205:21
**totaling** [1] - 26:9
**totally** [1] - 43:7
**touch** [6] - 46:8, 71:12, 71:16, 71:17, 71:19, 116:3
**town** [1] - 123:13
**track** [1] - 61:3
**trade** [1] - 160:12
**trading** [3] - 81:4, 81:10, 83:8
**training** [3] - 5:21, 32:8, 32:10
**transaction** [10] - 17:1, 57:3, 57:21, 60:21, 72:24, 79:5, 79:6, 79:9, 88:11,

97:10
**transactions** [13] - 52:23, 68:11, 68:18, 73:23, 75:1, 78:13, 82:19, 106:23, 111:19, 148:14, 155:8, 155:10, 165:14
**transcript** [5] - 139:20, 140:5, 209:7, 209:10, 209:20
**transfer** [38] - 58:15, 58:22, 78:22, 91:20, 92:4, 92:5, 93:11, 94:2, 106:19, 106:20, 118:22, 119:6, 119:8, 119:9, 119:11, 119:21, 119:25, 120:13, 129:13, 129:17, 165:17, 166:3, 166:6, 173:3, 173:6, 177:21, 190:4, 190:6, 193:4, 193:6, 193:8, 193:10, 193:16, 198:17, 199:5, 201:17
**transferred** [7] - 116:5, 129:15, 130:5, 130:20, 131:16, 131:22, 193:25
**transferring** [2] - 66:4, 131:17
**transfers** [1] - 114:8
**translates** [1] - 44:15
**transmit** [1] - 14:12
**transparency** [1] - 9:3
**treasurer** [2] - 151:14, 175:6
**Treasury** [1] - 33:9
**treasury** [7] - 7:18, 17:15, 30:5, 30:7, 34:16, 35:4, 151:2
**tremendous** [1] - 16:23
**TRIAL** [1] - 1:13
**trick** [1] - 183:21
**tried** [5] - 55:11, 55:13, 116:1, 116:2
**tries** [1] - 112:1
**trigger** [3] - 79:4, 79:6, 79:8
**trillion** [2] - 34:1, 34:2
**trim** [1] - 154:21
**triple** [10] - 104:9, 104:16, 104:20, 104:24, 104:25, 106:7, 107:18, 152:18, 153:13,

164:7
**trouble** [1] - 115:23
**true** [8] - 27:19, 84:3, 98:22, 174:2, 179:20, 185:12, 199:21, 209:7
**truly** [2] - 16:25, 26:19
**Trunch** [1] - 196:18
**trust** [5] - 38:15, 38:17, 39:1, 74:18, 105:1
**Trust** [2] - 23:3, 36:24
**trusted** [16] - 62:23, 66:9, 66:10, 66:12, 67:5, 67:6, 67:7, 67:8, 80:25, 81:21, 97:15, 98:11, 98:14, 105:15, 105:16, 122:2
**trustee** [5] - 23:22, 30:25, 33:2, 144:11, 144:13
**trusting** [2] - 66:22, 98:12
**truth** [1] - 74:19
**try** [6] - 67:16, 83:18, 129:14, 144:14, 146:18, 154:21
**trying** [9] - 95:7, 98:25, 130:15, 135:8, 139:1, 143:9, 143:22, 145:12, 166:24
**Tuesday** [3] - 23:14, 84:7, 86:24
**turn** [5] - 14:17, 89:11, 131:9, 132:6, 192:3
**turned** [2] - 14:15, 50:3
**turning** [1] - 82:2
**twelve** [1] - 117:10
**twenty** [1] - 5:17
**twenty-three** [1] - 5:17
**two** [38] - 4:20, 7:18, 8:5, 15:22, 19:13, 30:19, 37:10, 46:12, 48:19, 50:5, 58:17, 63:16, 65:5, 65:7, 67:3, 88:23, 95:6, 106:20, 111:25, 112:3, 118:3, 120:17, 123:10, 128:3, 132:19, 133:3, 142:11, 147:19, 151:2, 151:9, 151:16, 156:16, 156:19, 158:22, 161:15, 188:17
**two-page** [1] - 15:22

**twofold** [1] - 8:1
**type** [20] - 3:21, 4:9, 9:20, 12:11, 17:1, 18:1, 30:4, 43:23, 44:9, 44:10, 68:6, 68:23, 68:25, 69:17, 71:21, 77:16, 90:8, 95:19, 101:8, 131:14
**typed** [7] - 44:12, 45:3, 47:14, 47:16, 89:19, 90:20, 183:25
**types** [1] - 38:7
**typical** [1] - 8:12
**typically** [17] - 9:2, 9:8, 9:17, 9:24, 11:8, 11:25, 12:5, 12:13, 13:15, 15:10, 17:24, 31:16, 31:25, 32:6, 32:7, 41:4, 41:11

## U

**U.S** [7] - 1:18, 30:5, 30:17, 33:9, 34:13, 34:15, 133:19
**U.S.A** [2] - 29:23, 169:13
**UBS** [1] - 4:14
**ultimate** [1] - 193:22
**unable** [1] - 178:8
**unannounced** [1] - 158:20
**uncertainty** [1] - 17:5
**unclear** [1] - 31:19
**under** [18] - 13:5, 28:24, 30:4, 30:21, 58:14, 59:4, 59:8, 59:11, 59:14, 60:3, 91:23, 119:17, 140:3, 158:8, 167:6, 197:21, 209:11, 209:21
**underneath** [3] - 32:21, 112:18, 134:9
**undersigned** [2] - 27:3, 60:18
**understood** [2] - 51:19, 174:23
**undertake** [1] - 17:19
**unfortunately** [4] - 55:16, 104:14, 146:19, 153:17
**Union** [2] - 107:3, 118:19
**Unit** [1] - 89:4
**Unite** [1] - 28:18
**UNITED** [2] - 1:1, 1:3
**United** [10] - 1:17, 33:11, 59:23, 72:8, 74:2, 74:3, 79:3,

209:4, 209:6, 209:18
**University** [3] - 69:7, 69:9, 147:20
**university** [1] - 50:23
**unlawfully** [1] - 58:17
**unless** [3] - 9:3, 167:4, 209:21
**unlike** [1] - 153:19
**unredacted** [5] - 13:19, 13:21, 13:23, 23:20, 24:1
**unrestricted** [2] - 26:8, 83:4
**unsuccessful** [1] - 96:12
**untimely** [1] - 182:8
**up** [52] - 3:17, 5:20, 9:17, 10:1, 10:15, 10:19, 13:20, 15:17, 15:19, 17:22, 33:10, 53:18, 54:13, 62:15, 72:21, 84:21, 92:15, 95:17, 108:9, 109:5, 113:16, 120:17, 128:12, 128:14, 129:15, 129:17, 130:9, 131:2, 131:10, 131:11, 131:22, 135:23, 142:20, 144:18, 146:19, 147:23, 149:21, 149:24, 151:17, 152:20, 157:8, 157:19, 158:10, 159:1, 164:4, 175:2, 180:1, 181:16, 188:19, 201:1, 201:4
**updated** [1] - 199:12
**upwards** [2] - 7:8, 9:8
**US** [2] - 25:22, 29:25
**USD** [4] - 26:2, 26:9, 33:12, 83:6
**utilization** [2] - 26:11, 83:7
**utilize** [1] - 84:13
**utilized** [2] - 196:3, 199:2

## V

**vacation** [1] - 19:10
**vague** [1] - 200:22
**valid** [6] - 29:8, 78:1, 78:3, 154:10, 174:15, 175:20
**Valley** [2] - 155:18, 155:20
**valuable** [15] - 48:8, 74:8, 83:6, 83:19,

150:18, 150:23, 151:12, 157:10, 167:17, 185:6, 185:10, 201:5, 201:7, 201:9
**value** [10] - 18:15, 25:22, 73:18, 132:12, 177:18, 178:15, 180:6, 180:10, 195:16, 195:19
**valued** [4] - 26:2, 30:1, 132:14, 195:15
**values** [2] - 62:23, 180:3
**various** [8] - 7:23, 32:8, 44:22, 48:4, 48:10, 111:17, 154:14, 162:12
**vehicle** [3] - 130:24, 132:5
**vending** [3] - 42:20, 43:1, 43:18
**vendor** [1] - 44:7
**venture** [8] - 122:9, 194:6, 194:15, 195:23, 199:1, 203:9, 203:13, 204:12
**verbal** [1] - 186:8
**verbally** [1] - 65:25
**verification** [2] - 74:14, 74:21
**verify** [4] - 17:21, 74:15, 84:2, 171:5
**verifying** [1] - 74:17
**version** [3] - 61:1, 61:4, 169:18
**vertically** [1] - 25:12
**via** [6] - 6:21, 55:24, 58:21, 77:13, 183:16
**vice** [3] - 5:18, 31:12, 36:23
**Village** [1] - 158:12
**Vinci** [3] - 151:18, 151:19
**violation** [1] - 22:21
**Virginia** [2] - 26:1, 171:21
**virtue** [1] - 41:13
**visit** [2] - 158:9, 159:4
**visited** [1] - 111:16
**visits** [4] - 51:22, 102:7, 102:9, 102:22
**visually** [2] - 43:4, 62:1
**voice** [2] - 113:16, 146:19
**voicemail** [2] - 115:25, 116:12

**void** [2] - 178:7, 196:9
**voluntarily** [3] - 65:11, 65:12, 121:22
**voluntary** [2] - 66:1, 121:23
**vs** [1] - 1:5

## W

**waiting** [1] - 95:19
**waiver** [2] - 37:16, 59:12
**waivers** [1] - 60:9
**waives** [1] - 60:9
**WALNUT** [1] - 1:19
**warrants** [1] - 58:13
**Washington** [1] - 19:25
**watch** [1] - 103:14
**water** [1] - 99:18
**ways** [1] - 55:25
**wealth** [2] - 15:9, 31:18
**wealthy** [1] - 72:7
**week** [13] - 11:8, 11:9, 45:8, 46:3, 48:19, 54:5, 54:7, 63:4, 116:2, 196:21, 198:11
**weekend** [2] - 103:14, 208:2
**weekly** [1] - 196:7
**weeks** [5] - 19:13, 46:12, 136:10, 192:2, 192:3
**weighed** [1] - 9:15
**wells** [1] - 152:20
**West** [3] - 26:1, 171:21, 195:9
**wheelchair** [1] - 147:23
**whereas** [7] - 169:20, 170:2, 177:18, 177:19, 195:14, 195:18, 195:22
**wherefore** [1] - 29:5
**wherein** [2] - 74:18, 86:3
**whole** [3] - 38:25, 200:7
**wholly** [1] - 25:21
**wife** [15] - 61:11, 61:12, 102:6, 115:14, 121:8, 132:16, 147:3, 182:10, 191:4, 191:7, 191:8, 192:11, 194:25, 199:3, 205:8
**wife's** [3] - 135:8,

148:12, 194:22
**Wilkes** [2] - 133:20, 137:9
**WILKES** [1] - 1:12
**Wilkes-Barre** [2] - 133:20, 137:9
**WILKES-BARRE** [1] - 1:12
**wills** [1] - 46:25
**Wilson** [3] - 171:3, 171:4, 171:5
**window** [1] - 142:24
**winter** [1] - 135:7
**wire** [65] - 58:15, 58:21, 78:23, 88:7, 91:12, 91:16, 91:20, 92:4, 92:7, 92:10, 92:22, 92:24, 93:10, 94:2, 106:20, 114:8, 116:6, 118:22, 119:6, 119:8, 119:9, 119:11, 119:21, 119:25, 120:8, 120:9, 120:13, 155:13, 155:21, 155:24, 164:19, 165:1, 165:17, 165:25, 166:3, 166:4, 166:6, 166:10, 167:20, 172:21, 172:25, 173:3, 190:4, 190:6, 190:13, 190:20, 190:22, 193:10, 193:16, 197:17, 197:21, 198:2, 198:17, 198:21, 199:4, 199:5, 200:3, 200:12, 201:17, 201:22, 202:8
**wired** [10] - 90:23, 91:25, 115:5, 162:25, 163:3, 165:13, 197:2, 197:5, 206:18
**wires** [3] - 156:17, 156:18, 156:20
**wiring** [15] - 87:7, 87:12, 90:15, 90:20, 92:19, 94:13, 107:8, 107:10, 155:25, 165:21, 172:12, 200:4, 200:6, 200:8
**wish** [2] - 63:3, 144:14
**wished** [1] - 9:6
**wishes** [1] - 170:3
**withdrawal** [3] - 119:1, 119:8, 119:9
**withdrew** [1] - 119:4
**within-mentioned** [1]

- 209:8
**WITNESS** [7] - 65:17, 76:18, 77:3, 96:10, 146:11, 168:25, 182:1
**witness** [10] - 3:3, 42:7, 60:17, 67:21, 77:4, 99:10, 99:12, 122:22, 146:14, 168:20
**WITNESSES** [1] - 2:1
**woman** [1] - 101:21
**won** [1] - 141:7
**Word** [1] - 43:14
**word** [8] - 19:15, 74:23, 95:21, 96:5, 97:15, 97:25, 128:5, 128:7
**words** [2] - 53:7, 127:10
**works** [5] - 12:4, 16:5, 17:24, 171:11, 184:22
**worry** [1] - 55:2
**worth** [11] - 5:3, 49:16, 49:19, 72:14, 72:15, 73:10, 74:5, 151:21, 179:18, 181:2, 184:23
**write** [1] - 204:6
**writing** [8] - 58:24, 60:8, 61:25, 62:2, 66:5, 89:5, 155:5
**written** [4] - 44:9, 44:12, 45:5, 89:18
**wrote** [9] - 45:2, 47:15, 47:17, 53:10, 56:2, 101:14, 110:24, 117:6, 192:10

# X

**X.'d** [1] - 24:3

# Y

**year** [13] - 29:6, 30:11, 32:10, 35:12, 46:2, 48:14, 82:5, 98:13, 100:4, 104:22, 126:21, 155:7, 171:24
**years** [29] - 5:17, 5:22, 5:23, 45:25, 46:23, 48:18, 53:6, 68:21, 68:24, 69:8, 69:22, 69:25, 70:3, 70:17, 75:15, 80:6, 80:25, 98:25, 99:1, 101:9, 124:3, 132:19,

146:23, 148:13, 149:5, 157:23, 158:22, 175:13, 191:8
**yield** [1] - 83:8
**Yohannes** [2] - 30:22, 31:21
**Yolanda** [2] - 182:8, 182:10
**York** [15] - 5:25, 19:24, 29:16, 29:22, 29:23, 30:16, 32:21, 33:9, 83:12, 83:13, 101:9, 115:18, 115:25
**yourself** [2] - 206:11, 207:23
**yourselves** [5] - 67:15, 112:1, 189:20, 207:22

# Z

**Zulick** [2] - 130:11, 132:8