1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3   UNITED STATES OF AMERICA :
                             :
4                            :
                             :
5       vs                   :    3:12-CR-224
                             :
6                            :
                             :
7   RICHARD J. HARLEY        :
                             :
8                            :

9


10

        BEFORE:      THE HONORABLE A. RICHARD CAPUTO
11
        PLACE:       COURTROOM NO. 1
12                   WILKES-BARRE, PENNSYLVANIA

13      PROCEEDINGS:  JURY TRIAL

14      DATE:        WEDNESDAY, DECEMBER 10, 2014

15

16  APPEARANCES:

17  For the United States:

18  BRUCE D. BRANDLER, ESQ.
    U.S. ATTORNEY'S OFFICE
19  ROOM 217, FEDERAL BUILDING
    228 WALNUT STREET
20  HARRISBURG, PA 17108

21

    For the Defendant:
22
    JOSEPH A. O'BRIEN, ESQ.
23  OLIVER PRICE & RHODES
    1212 SOUTH ABINGTON ROAD
24  CLARKS SUMMIT, PA 18411

25

<u>INDEX TO WITNESSES</u>

FOR GOVERNMENT:   DIRECT   CROSS   REDIRECT   RECROSS

GREGORY SCHILLER              8

VICKI BARNES DAVIS  18      54

VINCENT BROWNING    66

1

2          THE COURT:  Gentlemen, two things before we begin.

3   One, at 12 we're going to handle the Bernanke motion to quash

4   via telephone with counsel from the Fed, a fellow named

5   Chadwick -- Joshua Chadwick, a lawyer from Washington.  And

6   then Larry Durkin from Scranton represents several of the other

7   folks who were subpoenaed, McCurdy, Ferguson -- I don't know

8   the rest of the names offhand.  And my question to you all is,

9   we can either ask him to come at 12:30, or I can ask him to

10  come later in the day.

11          I don't want to cramp your style in terms of the time

12  that you do have off by filling it with this.  So I thought

13  maybe it might be wiser to do --

14          MR. BRANDLER:  At the end of the day.

15          THE COURT:  -- the Chadwick thing and do him, say,

16  around 4:00 and let the jury go home early because I don't know

17  what the weather is going to be.  But some of the folks that

18  live in the northern environments may get more snow, although

19  it appears this thing fizzled out.  Is that acceptable?

20          MR. O'BRIEN:  Fine with me, Your Honor.

21          THE COURT:  Okay.

22          MR. O'BRIEN:  Your Honor, my client would like to

23  speak to you.

24          THE COURT:  Pardon?

25          MR. O'BRIEN:  My client has an issue he would like to

4

1 raise.

2          THE COURT:  Oh, okay.

3          MR. BRANDLER:  We can do it from here.

4          THE DEFENDANT:  Yes, during the testimony yesterday

5  with Mr. Schiller, Your Honor, certain documents went up on the

6  screen regarding the SCC, and I noticed that all of the

7  documents had my past criminal history on it basically.  And to

8  me that was highly prejudicial to the jury because right now

9  they don't know even about that.  In fact, Ms. Kelly was on the

10 stand when she was testifying -- she was getting ready to say

11 something about that.  I saw Mr. Brandler stop her from saying

12 anything about it.

13          But here she has it on the screen, large print,

14 criminal.  Then it had the C. R. number behind it.  So the jury

15 knows about that situation.  Now, if I testify, I know I am

16 open.  I haven't decided whether I am going to testify.  But

17 until that time, they should have known nothing.

18          THE COURT:  Well, all right.  You know, I don't

19 remember seeing that.

20          MR. O'BRIEN:  I think he's referring to exhibits 20.6

21 G. and H.

22          MR. BRANDLER:  Maybe we can put it up on here.

23          MR. O'BRIEN:  These may be exhibits that are not

24 listed.  20.5 and 20.6 -- I'm sorry, no -- 20.6, yeah.  I think

25 he's referring to -- referring to this exhibit.

5

1          THE COURT:  I don't see anything yet.

2          THE DEFENDANT:  There was one that said criminal on

3  it.

4          THE COURT:  No, I hear you.

5          MR. O'BRIEN:  There was another one -- are -- you

6  referring to the case where the United States obtained a civil

7  judgment against him arising out of a criminal prosecution for

8  which he was convicted.  There was civil proceedings filed

9  after that.  There were a number of exhibits introduced.

10          MR. BRANDLER:  Your Honor, so far I don't see

11  anything with the word criminal on it.

12          THE DEFENDANT:  You have that up here, Your Honor.

13  Mr. O'Brien saw it, and I saw it.

14          MR. O'BRIEN:  I don't recall it.

15          THE DEFENDANT:  I saw it up there.  It was there.

16          THE COURT:  Well, let's just assume that it was.

17  Would you like me to instruct the jury that they should --

18          THE DEFENDANT:  They already know.  The cow is out of

19  the barn.  They already know about it.

20          THE COURT:  That's not my question to you.  I can

21  cure the deficiency by instructing them that they should

22  disregard anything they saw.  I know you -- you give me that

23  reaction.  That unfortunately is the law.  I will do that if

24  you wish.  On the other hand, if you rather I did nothing, I

25  won't do anything.  I leave that to you.

6

1          THE DEFENDANT:  It will go on the screen again

2    because Mr. Schiller is still up there.

3          MR. BRANDLER:  Your Honor, I don't think there was

4    any document that said the word criminal despite Mr. Harley's

5    protestations to the contrary.  I think he needs to find this

6    document before we do anything.

7          THE COURT:  Let's find the document.

8          THE DEFENDANT:  I saw what I saw.

9          MR. O'BRIEN:  20.6 A.  I don't have that being

10   identified.

11         THE DEFENDANT:  It was right across it.

12         MR. O'BRIEN:  20.6 C. or 26.6 D. or 20.6 E. or G. or

13   H.

14         MR. BRANDLER:  Right.  So the ones I put up I don't

15   believe had the word criminal on it because I knew that issue,

16   and A. and B. had it.  That's why I didn't use A. and B.

17         THE DEFENDANT:  During that period I mentioned to my

18   attorney, Mr. O'Brien, that they have the word criminal on this

19   document.  And he said to me, you may testify anyway so it

20   doesn't make any difference.  I said I haven't decided yet.

21   And that should not have been up there.  That's what I would

22   have picked up if I was on the jury.  I am just saying it was

23   highly prejudicial to me because right at that point they had

24   not known anything about that particular case.

25         THE COURT:  I understand that, but we need to find

1   the document.

2   MR. O'BRIEN:  My understanding it had a C. R. docket

3   number.

4   THE DEFENDANT:  No, it had criminal on it.

5   MR. O'BRIEN:  Look for 20.6, C., D., E. or F.

6   MR. BRANDLER:  I don't think those exhibits were used

7   with Mr. Schiller.

8   THE DEFENDANT:  They were on the screen.  I saw it.

9   MR. BRANDLER:  When Mr. Schiller was up here it was

10  16, 17 and 18.

11  THE WITNESS:  I have copies of all my exhibits, and

12  those aren't one of them.

13  MR. O'BRIEN:  I think it was the paralegal.  It was

14  the paralegal.

15  MR. BRANDLER:  All right.  Well, I don't have her

16  exhibits here because she testified yesterday.  So we will have

17  to wait.  I don't have her exhibits --

18  MR. O'BRIEN:  These were exhibits that were not on

19  the thing.  What I am saying is 20.6 F., G. and H.

20  MR. BRANDLER:  All I'm telling you I don't have the

21  hard copies in court now because I didn't bring those because

22  she's not here.  I brought Mr. Schiller's because he said it

23  came out from Mr. Schiller.

24  THE DEFENDANT:  I brought it to my attorney's

25  attention immediately and asked him to do something about it.

8

1  He chose to wait.

2          MR. BRANDLER:  Our technician apparently is delayed.

3          THE COURT:  Before we can do anything, I would like

4  to see the document, and then we can make a record as to what

5  occurred and what can be done if anything.  That's what we will

6  do.  Okay.  Bring the jury out.

7          (The jury entered the courtroom at this time.)

8          THE COURT:  Good morning.  I guess we didn't get the

9  snow storm we thought.  We will keep our eye on today.  And I

10 know some of you do live somewhat north, and the forecast is a

11 little bit more snow today north although even at the outer

12 limits not supposed to be more than four inches.  We will go

13 almost a full day today.  Perhaps we will leave at four or so.

14 That said, ready to proceed?

15         GREGORY SCHILLER resumed the witness stand.

16 CROSS EXAMINATION

17 BY MR. O'BRIEN:

18 Q.   State your full name again.

19 A.   Gregory Schiller.

20 Q.   And you're employed by the United States bankruptcy

21 trustee?

22 A.   I'm employed by the Office of United States Trustee.

23 Q.   That is part of the Department of Justice?

24 A.   It is a component of the Department of Justice, yes.

25 Q.   And how long have you been in the position?

9

1  A.    A little over five years.

2  Q.    Okay.  And is part of your job to review bankruptcy

3  petitions that come in?

4  A.    It is.

5  Q.    How many petitions have you reviewed in the last five

6  years?

7  A.    I would say our case load on the average is about 10,000

8  cases a year.

9  Q.    Pardon?

10 A.    I would say on the average our case load is about 10,000

11 cases per year.

12 Q.    50,000 petitions --

13          THE COURT:  Move that microphone a little closer to

14 you.  You don't have to lean over it.  That's it.  That's fine.

15 BY MR. O'BRIEN:

16 Q.    Some of these petitions are Chapter 7s, which is just a

17 liquidation?

18 A.    That's correct.

19 Q.    And some are Chapter 13, which is a reorganization?

20 A.    Correct.

21 Q.    And some are Chapter 11, which is reorganization?

22 A.    Correct.

23 Q.    And you -- the petitions in this case you referred to them

24 as pro se.  Explain what that is.

25 A.    Yes, sir.  It means the debtor is represented without

counsel.
Q. Okay. And what percentage of the petitions you get are pro se?
A. Relatively few. I couldn't give you an exact percentage.
Q. And would you agree with me that the -- that when you get a pro se petition, very often there are mistakes on it?
A. Yes.
Q. Okay. It's because it's a lay person dealing with legal documents?
A. Yes.
Q. And your petitions are -- there's a lot of legal language in them?
A. Yes.
Q. You try as best to explain them, but it's still difficult for a lay person to understand them?
A. It depends on the person, but generally, yes.
Q. How many pages are -- these were, I think, two Chapter 11s and one Chapter 7. How many pages before it's filled out is a Chapter 11 petition?
A. It would vary depending upon the schedules that are filled out, sir. I can't give you an exact number.
Q. Say approximately 20 pages?
A. I would say approximately, yes.
Q. Chapter 7 petition may be the same?
A. Again, depending upon the complexity of the case.

1  Q.    Again, without sitting down and counting them, each of

2  those pages has a lot of items on them that you have to fill

3  out, right?

4  A.    Yes.

5  Q.    So I -- at least you have to make a decision about 20

6  things on each page?

7  A.    Yes, sir.

8  Q.    So maybe when an individual is filling out a Chapter 7, 11

9  petition, they at least -- there's 400 questions they have to

10 answer, 20 pages times 20?

11 A.    I think that 400 is an exaggeration, sir.

12 Q.    300?

13 A.    Not even that.

14 Q.    Not even questions -- but things you have to fill in.

15 Name is one, address, assets, secured credits, things like

16 that?

17 A.    Yes, many items of information that need to be complete.

18 Q.    In terms of items of information as opposed to questions,

19 I think that's a good correction you made there.  Four hundred

20 on each?

21 A.    Again, sir, I -- I think 400 is an extreme number

22 particularly in this case.

23 Q.    300?

24 A.    I think that's probably extreme.

25 Q.    250?

1  A.    Again, I can't give you an exact number, but this was not

2  a complicated Chapter 11 petition.

3  Q.    I am not saying this was.  I'm just saying that when you

4  hand somebody the Chapter 7 or Chapter 11 or Chapter 13 forms,

5  they have to put a lot of information on there?

6  A.    Yes.

7  Q.    In most cases it's done by lawyers?

8  A.    In most cases it is done by lawyers.

9  Q.    Most cases it's done by lawyers who specialize in

10  bankruptcy?

11  A.    Sir, that may be the case, but Mr. Harley made a decision

12  to fill these out on his own.

13  Q.    There are items of -- a lot of items of -- a lot of items

14  of information that have to be put on those forms?

15  A.    Yes.

16  Q.    Okay.  And it's not unusual for you to see there are

17  mistakes on them?

18  A.    It's not unusual for me to see mistakes on the pro se

19  petitions.

20  Q.    In a pro se case, it's really not unusual for you to see

21  mistakes is it?

22  A.    It is not unusual.

23  Q.    And in this case, they were riddled with mistakes all

24  through the forms?

25  A.    There were a significant number of mistakes.

1  Q.   Now, you used the term discharge.  Can you explain to the

2  jury what the term discharge means.

3  A.   Yes, discharge means that the debts the debtor lists are

4  --

5        MR. BRANDLER:  I can't hear.  Move that microphone --

6        THE COURT:  Judy, would you take care of that,

7  please?

8        MR. BRANDLER:  I don't think the sound is on.

9        THE COURT:  Sound is not working.

10        MR. O'BRIEN:  Shall I continue or we wait --

11        THE COURT:  Let's fix the sound.  This one is not

12  working.  Now it works.

13  BY MR. O'BRIEN:

14  Q.   One term you used on direct examination was discharge.

15  A.   Yes, sir.

16  Q.   Explain what that is.

17  A.   Discharge in bankruptcy means that with respect to the

18  debts that are listed by the person who files bankruptcy on

19  their schedules, those debts become legally unenforceable

20  against that person or against that entity.

21  Q.   And that discharge as you just indicated only applies to

22  debts that are listed on the schedule?

23  A.   Not necessarily.

24  Q.   Okay.  When does it apply to debts that are not listed?

25  A.   In a no asset case, which is what Mr. Harley's individual

14

1  case was, even if a particular debt is not listed, if the -- if

2  there are no assets to be distributed, that debt is still

3  subject to discharge even if it's not listed.

4  Q.    How does it get discharged if it's not listed on the

5  documents?

6  A.    It's under case law, sir, interpreting the rule that is

7  the rule.

8  Q.    Okay.  How about in a case where there's -- the assets on

9  his corporate filings were the assets exceed the debts, is

10 there discharge in those cases?

11 A.    In a Chapter 11 case for an individual it would be only

12 discharged if the claim was completed, and Mr. Harley's cases

13 no claim was ever filed.

14 Q.    But if you have a case where you have assets that exceed

15 liabilities --

16 A.    Yes.

17 Q.    -- you don't get a discharge in those case of debts, do

18 you?

19 A.    No, a discharge can be still be entered in cases like

20 that, yes.

21 Q.    So you -- the person will be able to keep assets and still

22 get his debts cancelled?

23 A.    Sure, that's the point of exemptions in bankruptcy.

24 Q.    Other than exemptions?

25 A.    Other than for exemptions, no.

1  Q.    Exemptions are the type of assets that you can withhold

2  from a bankruptcy proceeding?

3  A.    The exemptions means property the debtor is allowed to

4  keep.

5  Q.    And they involve things like maybe a small exemption,

6  homestead, small exemption for a car, things like that?

7  A.    Yes.

8  Q.    What exemptions are there in a corporate Chapter 11?

9  A.    In corporate Chapter 11 there are no exemptions unless

10 it's an individual case.

11 Q.    So in a Corporate Chapter 11 would you agree that if a

12 case had far more assets than liabilities, you won't have to

13 discharge the debts?

14 A.    Again, if there were no -- there'd be no discharge in a

15 corporate case.  In terms of what was actually paid out, it

16 would depend upon the plan that was filed and be confirmed.

17 Q.    But the debts aren't cancelled?

18 A.    The debts are not cancelled.

19 Q.    Explain to me again how -- if you have a no asset

20 individual bankruptcy that the -- how that involves a

21 cancellation of debts that aren't even listed.

22 A.    In a no asset case for an individual when there are no

23 assets to be distributed, the theory is that there's no

24 prejudice to creditors if a particular debt isn't listed

25 numbers, no assets have been brought into the estate to

1  distribute to creditors.  So if the debt isn't listed, it's

2  still subject to discharge because it would have made no

3  difference in distribution creditors.

4  Q.    Now, you say subject to discharge.  What does that mean,

5  subject to discharge?

6  A.    It means the same thing as discharge.

7            MR. O'BRIEN:  That's all I have.

8            MR. BRANDLER:  I have several questions.

9  REDIRECT EXAMINATION

10  BY MR. BRANDLER:

11  Q.    You were asked some questions about how many bankruptcy

12  petitions you review in a year.  You said in the thousands.

13  You said 10,000?

14  A.    Yes, 10,000.

15  Q.    How often have you filed a motion to dismiss a petition in

16  bankruptcy on the grounds of bad faith?

17  A.    Relatively infrequently.

18  Q.    And you did so in this case, correct, one of those

19  petitions?

20  A.    We alleged there were alleges on our motion to dismiss

21  concerning bad faith, yes.

22  Q.    In fact, the judge ruled on that?

23  A.    Yes, based on the allegations in our motion and the

24  allegations in Mr. Silverstein's motion and Mr. Harley's

25  testimony at the hearing.

1 Q.    And that was sustained?

2 A.    Yes.

3 Q.    And I think there was 180-day bar as a result of that

4 ruling?

5 A.    Correct.

6 Q.    And also Mr. O'Brien questioned you in a corporate

7 bankruptcy setting if there are assets of the corporation in

8 excess of the debts whether or not the debts get discharged.

9 A.    Again, it depends on the type of Chapter 11 case.  There

10 is no such thing as a discharge in a corporate Chapter 11 case.

11 What it comes down to is how the various debts are treated in

12 the confirmed plan of reorganization.

13 Q.    Let me just ask my question.

14 A.    Yes.

15 Q.    If the assets that are listed are phoney assets and unable

16 to be liquidated, what happens in that situation if there are

17 no assets to give to anybody?

18 A.    Then there's nothing to reorganize.  The plan would be

19 impossible.  The case is a futility.

20         MR. BRANDLER:  I have no further questions.

21 RECROSS EXAMINATION

22 MR. O'BRIEN:

23 Q.    Again, so I understand, in a corporate Chapter 11, which

24 we had two here, there was no discharge of debt?

25 A.    There was no discharge of debt, only a confirmed plan

1  which treats the debts.

2          MR. BRANDLER:  Well, I have a follow-up question.

3          THE COURT:  No follow-ups.  We have direct, cross,

4  redirect and recross.  I said that the first day of trial.

5          MR. BRANDLER:  Fair enough.

6          THE COURT:  Any reason he can't be excused?

7          MR. O'BRIEN:  No, Your Honor.  Thank you.

8          THE COURT:  You're excused.

9          THE WITNESS:  Thank you, Your Honor.

10         MR. BRANDLER:  Vicki Davis.

11         VICKI BARNES DAVIS, called as a witness, being duly

12 sworn, testified as follows:

13 DIRECT EXAMINATION

14 BY MR. BRANDLER:

15 Q.   Ms. Davis, by whom are you employed?

16 A.   The FBI.

17 Q.   And in what capacity?

18 A.   I am a special agent in the Birmingham, Alabama division.

19 Q.   How long have you been an FBI agent?

20 A.   Twenty-eight years in February.

21 Q.   I think the sound just went off.

22 A.   Twenty-eight years in February.  I can bellow.  I can

23 project.

24 Q.   How long have you been an FBI agent?

25 A.   Twenty-eight years in February of 2015.

1  Q.    You said you're in Alabama.  You work in Alabama?

2  A.    Birmingham, Alabama division.  I'm actually assigned to

3  Tuscaloosa.

4  Q.    I want to direct your attention to August of 1999.  Were

5  you an FBI agent at that time?

6  A.    I was.

7  Q.    And were you assigned in the Tuscaloosa RA?

8  A.    Yes, I was.

9  Q.    Did you have cause to open an investigation involving the

10 defendant in this case, Richard Harley?

11 A.    I did.

12 Q.    And can you tell us the circumstances of how that

13 investigation got open?

14 A.    I received a call from AUSA Jim Phillips in our U.S.

15 Attorney's Office in Birmingham.  He had been contacted by

16 South Trust Bank with regard to a transaction that Mr. Harley

17 was utilizing a local resident, Mr. Pate, and they were

18 concerns it was not a legitimate transaction, and they asked us

19 to open a case.

20 Q.    And as a result of that, you opened the case?

21 A.    I did.

22 Q.    And did you then speak to -- were you the lead agent on

23 that investigation?

24 A.    I was.

25 Q.    And did you speak to various bank officials at South Trust

20

1  Bank to determine what Mr. Harley and this other -- first of

2  all, what was the other individual's name, the local

3  individual?

4  A.   G. C. Pate, Cliffton Pate.

5  Q.   Did you interview the bank officials to see what the

6  suspicious transactions were they were reporting?

7  A.   Yes, I did.

8  Q.   And did you get an overview from them of what they were

9  alleging?

10  A.   I did.

11  Q.   Can you just briefly tell us what they told you?

12  A.   The initial conversation I had with --

13              THE COURT:  Just a minute.

14              MR. O'BRIEN:  I will object to that on the grounds of

15  hearsay.

16              THE COURT:  It is.

17              MR. BRANDLER:  Not offered for the truth, why she

18  conducted her investigation.

19              THE COURT:  But no one really can make that

20  distinction in such a situation as this.  The objection is

21  sustained.

22  BY MR. BRANDLER:

23  Q.   So you interviewed the bank officials?

24  A.   I did.

25  Q.   Did you obtain any documents from them that during the

1  course of your interviews?

2  A.    Copies of documents that Mr. Pate had left with him to

3  support the legitimacy of a $200 million promissory note.

4  Q.    And you received those documents from the bank officials?

5  A.    I did.

6  Q.    Can we have exhibit 25.10?  Could you identify this

7  document?

8  A.    This was a cover letter on a couple of documents that the

9  bank had given to me that Mr. Pate had brought in.

10  Q.    What's the date on the document?

11  A.    August 11, 1999.

12  Q.    Could you just read what the document says?

13  A.    It's addressed to Mr. Pate at Southern Timber at

14  Carrollton, Alabama regarding original documents of the

15  promissory oil production note, et al.  Dear, Cliff, enclosed

16  are the following original documents, original promissory oil

17  production note, original assignment of collateral, No. 2,

18  original and certified reports of the Texas Railroad

19  Commission, No. 3, original geologist report prepared by Donald

20  C. Kesterson.  Please deliver the above-mentioned documents to

21  the South Trust Bank in Tuscaloosa, Alabama with the following

22  instructions.  1, original safe keeping receipt must stay with

23  bank.  2, the bank is to photocopy two of the original safe

24  keeping receipt and have them -- quotation marks -- certify the

25  copies to be a true and exact copy of the original -- closed

1  quotations -- and have them notarized.  3, the original cover

2  letter to be sent along with a copy of the safe keeping receipt

3  via Federal Express to the following address, RJH and Company

4  Inc., 2 Columbia Drive, Marshalls Creek, Pennsylvania, 18335.

5  4, please send the other copy of the safe keeping receipt via

6  Federal Express mail to --

7  Q.    Go to the next page.

8  A.    Ms. Deborah Meredith Cave, 1022 Shawness Drive,

9  Elizabethtown, Kentucky, 42701.  Cliff, I thank you for your

10  kind consideration in this regard.  I remain very truly yours.

11  It's signed by Richard J. Harley, President and CEO.

12  Q.    Go to the next page.

13  A.    It's a draft bank letterhead in parenthesis at the top

14  regarding bank custodial safe keeping receipt number, colon,

15  and it's blank, amount 200 million U.S. dollars -- 200 million

16  is written out -- United States dollars, date of issue, there's

17  no date.  Beneficiary RJH and Company, Inc., P. O. Box 337,

18  Shawnee on the Delaware, P.A., 18356.  We, blank bank, N. A.,

19  located full address -- no address -- with the authorized

20  signatories appearing below based upon the certified documents

21  of the Texas Railroad Commission and Don Kesterson hereby

22  irrevocably acknowledge with full bank responsibility our

23  receipt of assets/securities which we certify and guarantee

24  based upon the aforementioned certified documents for current

25  value equal to 200 United States million -- United States

1 dollars million only, parenthesis, U.S. $200 million, closed

2 parenthesis, which shall be held by ourselves in safe custody

3 for one year and one month of issuance of this document on

4 behalf of RJH and Company, Inc.  We confirm that this safe

5 keeping receipt has been issued under full bank faith and trust

6 and that this instrument is freely available to the named

7 beneficiary hereof to obtain credit.  We further confirm that

8 this safe keeping receipt may be verified by a responsible bank

9 inquiry and will be confirmed by us by tested Telex and, slash,

10 or SWIFT wire transfer, parenthesis SWIFT, to such bank as

11 designated by the beneficiary, slash, assignee, and an original

12 copy of the safe keeping receipt will be delivered via courier

13 to the same bank.  We also declare that this safe keeping

14 receipt is an operating fully confirmed instrument and is

15 subject to the uniform customs and practice for documentary

16 credit, parenthesis, 1993-ultimate, closed parenthesis,

17 revision.  International Chamber of Commerce, parenthesis ICC,

18 closed parenthesis, publication number 500 and engages us in

19 accordance with the terms thereof.  There's a date -- place for

20 a date, a place for a transaction code, signed, regards, left

21 blank for the bank to sign.  And there's a couple of blanks for

22 bank officials to sign authenticating the letter.

23 Q.    Going to the next page.  From that blank document, does it

24 appear -- what is this document?

25 A.    It appears South Trust filled in the blanks, has their

1  address, Tuscaloosa, Alabama at the top, regarding bank

2  custodial safe keeping receipt, number 100, $200 million, date

3  of issue, August 12th, 1999, beneficiary, RJH and Company,

4  Inc., P. O. Box 337, Shawnee on Delaware, Pennsylvania, 18356.

5  We South Trust Bank, N. A., located at 1427 Greensboro Avenue,

6  Tuscaloosa, Alabama, 35401 with the authorized signatories

7  appearing below based upon the certified documents of the Texas

8  Railroad Commission and Don Kesterson hereby irrevocably

9  acknowledge with full bank responsibility our receipt of

10  assets, slash, securities which we certify and guarantee based

11  upon the aforementioned certified documents for a current value

12  equal to 200 United States dollars, million only parenthesis,

13  U.S. $200 million dollars, closed parenthesis, which shall be

14  held by ourselves in safe custody for one year and one month of

15  the issuance of this document on behalf of RJH and Company,

16  Inc.

17       We confirm that this safe keeping receipt has been issued

18  under full bank faith and trust and that this instrument is

19  fully available to the named beneficiary hereof to obtain

20  credit.  We further confirm that this safe keeping receipt may

21  be verified by a responsible bank inquiry and will be confirmed

22  by us by tested Telex and/or SWIFT wire transfer, parenthesis

23  SWIFT, to such bank as designated by the beneficiary, slash,

24  assignee, and an original copy of the same keeping receipt will

25  be delivered via the courier to the same bank.  We also declare

1  that this safe keeping receipt is an operating fully confirmed

2  instrument and is subject to the Uniform Customs and Practice

3  for documentary credit, parenthesis 1993 plus ultimate, closed

4  parenthesis, revision, International Chamber of Commerce, I. C.

5  C. in parenthesis, publication number 500 and engages us in

6  accordance with the terms thereof.  There's no date.  There's

7  no transaction code.  Regards, South Trust Bank, N. A.  The

8  names J. P. Lollar, vice president, and Wendy P. Lawrence,

9  senior vice president, appear at the bottom, but there are no

10  signatures.

11  Q.   Finally the last page of this document you received from

12  the bank, can you flip that through?

13  A.   It's a certificate that has the name Enpetro, LPC, Inc. at

14  the top, $200 million on the far left, $200 million on the far

15  right, promissory oil production note.

16  Q.   You don't need to read the entire document.  We have

17  already seen a lot of it.  So you received these documents from

18  the bank.  You opened your investigation regarding this

19  particular transaction?

20  A.   Yes, sir.

21  Q.   And without going into detail, what were you investigating

22  here?  What was the nature of your investigation?

23  A.   Well, it appeared to be a fraud, so we were trying to

24  prevent the bank from losing $200 million.

25  Q.   And as a result of that investigation, did you attempt to

1  tape record Mr. Harley and this individual Pate in conversation

2  with the bank to see what they were trying to do in connection

3  with these documents?

4  A.    Yes, sir.

5  Q.    And you made several recordings during the course of your

6  investigation?

7  A.    We did.

8  Q.    I want to direct your attention to the first recording and

9  exhibit 25.5.

10          MR. BRANDLER:  May I approach?  Just for the record,

11  there's a number of original tapes here.  We're going to be

12  playing digitized versions that have been put on to the sound

13  system for the computer, not the actual tapes.  But counsel has

14  had copies of both versions.

15          THE COURT:  All right.  Do you have any objection to

16  that process?

17          MR. O'BRIEN:  No, Your Honor.  I do not have any at

18  this time.

19          THE COURT:  All right.  Thank you.

20  BY MR. BRANDLER:

21  Q.    And can you identify that?

22  A.    Yes, sir.  It's an envelope where we store our electronic

23  surveillance tape recordings.  The agent that supervised this

24  particular recording is Gerald W. Kelly, who was in Birmingham.

25  And he did a tape recording of a bank official in Birmingham on

1  August 17th, 1999.  Our bank official was William Bill Thornton

2  and the conversation with Mr. Harley, and Mr. Harley's request

3  he asked to telephone in G. C. Pate.  So then Pate joined the

4  phone conversation.  So there's three individuals on the tape,

5  and then the envelope itself shows Mr. Kelly accepting custody

6  of the envelope and the tape and then turning it over to our

7  evidence storage in Birmingham.

8  Q.   Mr. Thornton was the bank official whose voice appears on

9  the tape?

10  A.   Correct.

11       MR. BRANDLER:  Your Honor, I move the admission of

12  25.5 and ask that the tape be played.

13       THE COURT:  Mr. O'Brien?

14       MR. O'BRIEN:  Yes, Your Honor.  Your Honor, I don't

15  have any objection.  I note there's 25.11 through 25.16 -- and

16  not dealing with those at this time?

17       MR. BRANDLER:  I am dealing with 25.5.

18       MR. O'BRIEN:  No objection.

19       THE COURT:  All right.  It will be admitted.

20       MR. BRANDLER:  Can we play 25.5?  We have headphones

21  actually for the jurors because it will be clearer.  So we have

22  -- could we distribute the headphones?

23       THE COURT:  Can we just hear it openly?

24       MR. BRANDLER:  It will be -- it will be more audible

25  with the headphones.  The quality is better with the

28

1  headphones.

2           THE COURT:  Okay.  No objection?  Go ahead.

3           MR. BRANDLER:  If you can't hear, let us know.  Don't

4  wait until the end.  Let's play it without the headphones and

5  see if it works.

6           (Exhibit 25.5 was played for the jury at this time.)

7  BY MR. BRANDLER:

8  Q.   Ms. Davis, that tape was on August 17th of 1999.  Did you

9  make a second recording involving Mr. Harley two days later on

10 August 19th of 1999?

11 A.   Yes, sir.

12 Q.   Can we have exhibit 25.15?  Can you identify what --

13          MR. O'BRIEN:  What was that?

14 BY MR. BRANDLER:

15 Q.   Can you identify the contents of that envelope and what

16 the envelope is?

17 A.   Again, this is the original recording that was done on

18 August 19th, 1999.  Mr. Harley is on the tape.  Mr. Pate,

19 myself, a colleague from my office, special agent Randy Farmer

20 and Wendy Lawrence.  This was recorded at the bank -- at South

21 Trust Bank in Tuscaloosa.

22 Q.   During that call were you posing as a bank employee?

23 A.   I was.

24          MR. BRANDLER:  Your Honor, I move the admission of

25 exhibit 25.15 and ask that be played for the jury.

1          MR. O'BRIEN:  No objection.

2          THE COURT:  It will be admitted.  Proceed.

3          (Exhibit 25.15 was played for the jury at this time.)

4          MR. BRANDLER:  For the record, there was a gap there.

5   Is there a long period where you discussing where Mr. Harley is

6   not involved in the conversation where you were in the room

7   with Mr. Pate?

8          THE WITNESS:  We're in a board room at the bank, and

9   it's Mr. Farmer, myself, Mr. Pate and talking about -- we were

10  getting ready to call Mr. Harley, and we have to get the phone,

11  dial the phone.  That's what you're going to hear on the tape

12  following.

13         MR. BRANDLER:  All right.

14         MR. O'BRIEN:  I have no problem with the phone

15  conversation.  But it seem this most recent thing is something

16  that -- I could be wrong -- that Mr. Harley is not a part of,

17  just a conversation between the agents.  I object to that on

18  the grounds of hearsay.  It's --

19         THE COURT:  Why is that germane?

20         MR. BRANDLER:  I don't know what part he's referring

21  to.  So far we have listened to Mr. Harley.

22         THE COURT:  No, just now Mr. Harley is not on the

23  line.

24         MR. BRANDLER:  I mean, I guess there's a four-way

25  conversation.  There's going to be places where Mr. Harley is

1 not talking.

2          THE COURT:  No, no.  He's not on the line.

3          MR. BRANDLER:  If he's not on the line --

4          THE COURT:  That's what I understand.  He was trying

5 to get Mr. Kesterson.

6          MR. BRANDLER:  We can skip ahead.  We are just

7 interested --

8          THE COURT:  How much more of this do we have?

9          MR. BRANDLER:  Quite a bit more.

10          THE COURT:  We will break now.  It's 10 to 12.  You

11 have been sitting over two hours.  Incidentally, the latest on

12 the weather even though it's snowing out there now, it's not

13 supposed to be a problem in the general area including Luzerne,

14 Lackawanna, Monroe.  No one lives in Susquehanna or Wayne, am I

15 right about that?  Apparently they will get more snow.  We will

16 keep an eye on it.  My plan at the moment is to go until 4:00

17 and let everybody go home.  If it looks like it will be worse,

18 we will consider an earlier out.  So in the meantime, we will

19 break for lunch now.

20          We will come back at 1:00.  Remember not to discuss

21 the case among yourselves or with anyone else.  If anyone

22 attempts to talk to you about it, bring it to my attention

23 immediately.  Enjoy your lunch.  See you back here at 1:00.

24          (The jury left for a lunch recess at this time.)

25          THE COURT:  We are going to have this -- we are going

1  to have this hearing on the motion to quash regarding Dr.

2  Bernanke at 12.  I am going to ask you, Mr. O'Brien, do you

3  have any evidence that he -- have you seen his motion?

4      MR. O'BRIEN:  Uh-huh.

5      THE COURT:  Do you have any evidence that is --

6  indicates he's not being truthful in his affidavit?  That is to

7  say -- he says, I didn't sign those documents, I'm unfamiliar

8  with them, I don't know about them, I never had any dealings

9  with these people.  Do you have any evidence to the contrary,

10  that's -- because it seems to me that's important -- I mean,

11  fine, he can come here, but all he's going to do is say the

12  same thing.  That makes no sense.

13      MR. O'BRIEN:  I understand that.  I will be prepared

14  to respond at the time of the motion.

15      THE COURT:  Fair enough.

16      MR. O'BRIEN:  Your Honor, ground rules, since some of

17  the questions asked -- question you asked -- and as I look at

18  the cases, the issue of is there another way to prove this, I

19  mean, I think infringing on lawyer/client issues.  I don't

20  think Mr. Brandler should be at this.

21      THE COURT:  Are you planning to be --

22      MR. BRANDLER:  Yeah, this is a public proceeding.  I

23  don't think it's a closed proceeding.  And --

24      THE COURT:  I didn't say it was.

25      MR. BRANDLER:  I do plan on being here.  I don't

1 think there's any -- doesn't apply to attorney/client

2 proceedings.  It's already been public record that these

3 subpoenas were issued, that these people have come.  It's on

4 public record.  The documents have been filed.  I have read

5 them.  I have seen their declarations.  They will argue a legal

6 point whether these people will be allowed to testify.  That's

7 not attorney/client.

8           MR. O'BRIEN:  The reason that they are important and

9 the reason -- the reason that they are important goes to

10 lawyer's work product and lawyer/client privilege.  I plan to

11 ask my client to respond to some of your questions.  I don't

12 think Mr. Brandler should be present.

13           THE COURT:  Well, is he going to respond to those

14 questions in the presence of counsel for the person who was

15 subpoenaed?

16           MR. O'BRIEN:  Yes, I assume because the --

17           THE COURT:  If you're telling me there's going to be

18 privileged matter disclosed, I don't think you should be party

19 to that.

20           MR. BRANDLER:  Well, it's privileged matter I agree.

21 If it's just Mr. Harley saying I believe Mr. Bernanke knows,

22 that's not privilege.

23           THE COURT:  I couldn't agree with you more.

24           MR. BRANDLER:  All right.  So it depends what he has

25 to say.

1    THE COURT:  I know.  We don't know what he's going to

2  say until he says it.

3    MR. BRANDLER:  Well, we can find out in advance --

4  shouldn't be excluded --

5    THE COURT:  Talk to Mr. Harley right now.  Mr.

6  Harley, so you -- you left.  What I said to Mr. O'Brien in

7  advance of this hearing is, do you or he have any evidence that

8  Mr. Bernanke has any evidence to offer that's contrary to what

9  he says in his affidavit that he never -- I am not asking -- I

10  am not asking you to answer me -- that is to say, I didn't sign

11  these documents, I am unfamiliar with them, I don't know any of

12  these people and I never had any dealings with them.  I'm going

13  to ask you to tell me if you have any evidence to the contrary

14  because if you don't, then it seems to me there's a problem

15  with making him appear.  I just want you to know that now.

16    THE DEFENDANT:  If I don't have any evidence of any

17  -- how did you put it again?

18    THE COURT:  Any evidence to the contrary to what he

19  says in his affidavit.

20    THE DEFENDANT:  Right, I understand, okay.

21    MR. BRANDLER:  Your Honor, could we just -- on the

22  Court's ruling excluding the portion that doesn't involve

23  Harley, could we -- to do that, we need to listen to it to cue

24  it up -- it's about 30 seconds in the next section that doesn't

25  include Harley.

1          THE COURT:  Okay.  Do that after we do this hearing.

2    We are going to have this thing on the line in no time.  If you

3    can do it four minutes --

4          MR. BRANDLER:  No, we will wait.

5          THE COURT:  Mr. Chadwick, can you hear me all right?

6          MR. CHADWICK:  Yes, Your Honor, I sure can.

7          THE COURT:  I am Judge Caputo.  We're waiting for one

8    more person, the -- to come into the courtroom.

9          MR. CHADWICK:  Okay.

10         THE COURT:  All right.  Mr. Chadwick, we're here in

11   the courtroom in Wilkes-Barre, Pennsylvania, in the midst of a

12   trial in the case of United States versus Richard Harley.

13   Present in the courtroom at the moment is Mr. Harley, the

14   defendant in this case, his counsel, Mr. Joseph O'Brien, and

15   the United States attorney on the case, Bruce Brandler.  We're

16   going to hear your motion to quash the subpoena of Dr.

17   Bernanke.  You can proceed.

18         I read your papers, and I know your position.  And

19   what I have done ahead of time is I said to Mr. O'Brien and Mr.

20   Harley that what I was going to ask them if they had any

21   evidence that would contradict the statements made by Dr.

22   Bernanke in his declaration.  I'm going to ask that question

23   right now.

24         THE DEFENDANT:  Yes, I do, Your Honor.

25         MR. O'BRIEN:  Let me speak first.  I discussed this

1  issue with Mr. Harley.  He informed me the evidence -- I will

2  put on some background.  He knows Mr. -- Mr. Harley knows Dr.

3  Bernanke's affidavit indicates that Dr. Bernanke according to

4  the affidavit doesn't know anything about this, doesn't know

5  anything about the documents, doesn't know anything about any

6  of the parties and nothing to offer.  I presented that to Mr.

7  Harley.  Mr. Harley informed me the evidence he would have to

8  offer to contradict him with that would be the fact there are

9  documents with Dr. Bernanke's signature on it.  Would you like

10  to speak to that?

11         THE DEFENDANT:  May 31, 2011 at 7:22 a.m., I

12  forwarded to Mr. Bernanke's office the demand for checks.  It

13  was a Monday that I did this, I believe.  And Rita C. Proctor,

14  assistant to the chairman, sent me a notice on -- background

15  e-mail acknowledging where she said all three messages to

16  Chairman Bernanke were received with his name and signatures on

17  it.

18         THE COURT:  What was received?

19         THE DEFENDANT:  I sent Mr. Bernanke -- at that time I

20  sent him the modified extension and safe keeping receipt for

21  200 B. with Mr. Bernanke's name on it, stamped name.

22         THE COURT:  She said what?

23         THE DEFENDANT:  She had -- she acknowledged all three

24  messages to Chairman Bernanke were received.

25         THE COURT:  She didn't say with his signature on it.

1          THE DEFENDANT:  I understand it, Your Honor.  What I

2    am trying to say he had a chance back in 2011 to come back and

3    say it wasn't his signature, he never did.

4          THE COURT:  Do you have any evidence that the

5    signatures on the papers that say Ben Bernanke are his

6    signature?

7          THE DEFENDANT:  The only evidence --

8          THE COURT:  You can't contradict him when he says I

9    didn't sign those papers?

10          THE DEFENDANT:  The only way I can contradict him --

11          THE COURT:  Does it make any sense to bring him in

12    here to say on the witness stand under oath I didn't sign those

13    papers?

14          THE DEFENDANT:  I would like him on the witness stand

15    to say that.

16          THE COURT:  I know you would.  That's not what I

17    asked you.  I asked you, does it make any sense to bring him

18    here simply to say what he said in his affidavit?

19          THE DEFENDANT:  How would I know if he's not here

20    presently, Your Honor, that, in fact, he's alleging that --

21    he's alleging that's not his signature.

22          THE COURT:  He's not alleging it.  He's saying it.

23          THE DEFENDANT:  He's saying it.  How would I know

24    that if he's not here on the stand to say it under oath?  I

25    know he's saying it in writing in an affidavit.

1        THE COURT:  Your answer to -- my question is, what

2   evidence do you have -- evidence you sent some papers that

3   contained his name and he didn't respond and say, oh, that

4   wasn't my name or I didn't sign --

5        THE DEFENDANT:  I sent it twice to her.

6        THE COURT:  That's your evidence?

7        THE DEFENDANT:  Part of my evidence.  I'm saying that

8   all of the documents that I have in my portfolio on all these

9   notes you have, safe keeping receipts, you have got the

10  confidential memos, you have the reserve funds letters.  You

11  have all those documents with Mr. Bernanke's name on it.  At

12  that time it would have been him to say -- come back to me to

13  say, look, that's not my name, I don't know what you're doing

14  with these documents even.  I sent him an e-mail.

15       THE COURT:  He's not obligated to tell you that.  I

16  understand your position.  That's your evidence?  You don't

17  have any evidence of anybody, another person who, for example,

18  saw him sign these papers?

19       THE DEFENDANT:  I can say this other people who have

20  confirmed to me that that was Mr. Bernanke's signature.  That's

21  all I can say.

22       THE COURT:  That's not what I asked you.  You don't

23  have any independent evidence, do you?

24       THE DEFENDANT:  Sir, a person doesn't have

25  independent evidence that's not my signature, sir.

1          THE COURT:  Mr. O'Brien, any comments?

2          MR. O'BRIEN:  No, Your Honor.  Thank you.

3          THE COURT:  Mr. -- counsel, I will hear you.

4          MR. CHADWICK:  Well, Your Honor, with respect to the

5     facts suggested, I can't speak to that.  People send things to

6     the chairman secretary all the time, and obviously that -- that

7     has no bearing on whether or not it ever reached him or

8     certainly has no bearing on whether or not he ever actually

9     signed it.  And Chairman Bernanke declared he never seen the

10    document.  So his secretary would send documents to any number

11    of a hundred people to manage things, which is the reason why

12    she received the e-mails at that time.

13         But in terms of the merits of this, Your Honor, I

14    think, you know -- three quick points, first, Dr. Bernanke

15    declared in his sworn declaration to the Court he knows nothing

16    about it, he didn't sign it, it's not his signature on these

17    documents.  He would so testify at trial.

18         So for him to travel from Washington, D. C. to take

19    the stand to repeat precisely what he said in his declaration

20    would not make any sense that I can see, and there's no -- no

21    reason why there's any reason to believe that he would testify

22    differently.  And I think -- we believe this is alone is the

23    trigger requirement -- that the subpoena would be unreasonable

24    or oppressive, in other words it would be a complete waste of

25    time at best and pose a significant burden on Dr. Bernanke

1  without good reason.

2          Second -- and this is important I think, you know,

3  Dr. Bernanke's testimony would be of no help whatsoever to

4  defend this case.  If he appeared at trial, it would be quite

5  the contrary.  It would only damage his case in the sense that

6  he will testify he never seen the documents, did not sign them.

7  And the defendant doesn't have any right to compel testimony

8  contrary to his interests.  Such testimony would not be, quote,

9  necessary for an adequate defense, end quote, which is Rule 17

10 standard for compelling testimony at government expense, nor is

11 it constitutionally required.  Quite the contrary, the Supreme

12 Court indicated any constitutional concerns under the Sixth

13 Amendment, under the due process clause are dependant upon the

14 satisfactory showing by the defendant the testimony would be,

15 quote, both material and favorable to his defense.  In that

16 case, Your Honor, U.S. V. Valenzuela-Bernal, 458 U.S. 58 -- and

17 there many cases citing that case.  Sixth Amendment allows the

18 defendant compulsory process for a witness, quote, in his

19 favor, and Dr. Bernanke is not such a witness here.  And

20 finally, I think the third point, Your Honor, even though we

21 believe it would be unreasonable under Rule 17 for any witness

22 no matter who they were to be compelled to repeat on the stand

23 that they know nothing about this, in this case, Dr. Bernanke

24 is a very senior former government official.  There is a body

25 of case law court officials are subject to compel testimony,

40

1  quote, in extraordinary circumstances.  We cited a few of these

2  cases in our papers, Your Honor, civil and criminal context.

3  And the defendant has articulated nothing that would amount to

4  extraordinary circumstances here in light of Dr. Bernanke's

5  sworn declaration.  And for that reason -- for all those

6  reasons, Your Honor, we ask the subpoena be quashed.

7           MR. O'BRIEN:  I have nothing further.  Do you have

8  anything further?

9           THE DEFENDANT:  I have a document here, Your Honor --

10  I forgot about it -- e-mail I received from a gentleman who

11  lives in Washington D. C., and he -- I sent him all of my

12  documents with Mr. Bernanke's signature on it -- on -- let's

13  see, May 5th, 2014.  If I can just read you the one line that

14  he said after the meeting he had with Mr. Greenspan by the way.

15           THE COURT:  Whom did you send it?

16           THE DEFENDANT:  A friend of mine in Washington D. C.,

17  and, in fact, Mr. Greenspan was his mentor at that time.  What

18  he says here, he said that we have confidential -- done our due

19  diligence on the submitted documents and were able to peel off

20  the veil of secrecy surrounding them through the highest levels

21  of the banking and financial authorities, this is good news

22  that we can confirm and assure you that the instruments are

23  valid, authentic obligation of the issuer.  Now, he received

24  the document with Mr. Bernanke's name on it, and he says here

25  they are authentic obligation of the issuer.  That's what --

1           THE COURT:  You're talking about the notes?

2           THE DEFENDANT:  Yes.

3           THE COURT:  Mr. Bernanke's name is not on the notes.

4           THE DEFENDANT:  They are on the notes -- the S. K.

5    R.s, safe keeping receipts.  Mr. Bernanke's name is all over

6    that as well as the confidential memos.

7           THE COURT:  Not on the notes.

8           THE DEFENDANT:  We don't have notes, Your Honor.

9           THE COURT:  Those $500 million notes.

10          THE DEFENDANT:  They're checks.  No, they were --

11   they come from the U.S. Treasury Department.  We're talking

12   about the instrument itself.  The instrument that states that

13   these checks have come from the U.S. Treasury Department.  The

14   instruments is what Mr. Bernanke signed off on, not the notes.

15   You're right, the checks -- I --

16          THE COURT:  Okay.  So you sent those to him in 2014?

17          THE DEFENDANT:  No, I sent these to Mr. Bernanke in

18   --

19          THE COURT:  No, no, not to Bernanke, to --

20          THE DEFENDANT:  I sent this to him May 5th, 2014 at

21   9:40 a.m.  And This is what he responded back to me after he

22   had his meeting.

23          THE COURT:  Uh-huh.  Well, again -- all right.  Mr.

24   Brandler, do you want to say anything?

25          MR. BRANDLER:  No.

1          THE COURT:  Anything else?

2          THE DEFENDANT:  That's all, Your Honor.

3          THE COURT:  My take on this is simple.  I don't think

4   you established to me that he has anything material or

5   favorable to offer in your behalf.  I think that you have a

6   general right under the Sixth Amendment to confrontation.

7   However, you need for -- for a subpoena to not be quashed you

8   need to be able to establish that this person would say

9   something that would be in this case contrary to what he says

10  in his subpoena -- in his declaration given that he says, I

11  know nothing about it, I didn't -- I did not sign these papers,

12  I don't know these people, I am -- I am going to quash the

13  subpoena and not require him to be here because I do think that

14  it is under these circumstances unreasonable and burdensome.

15         THE DEFENDANT:  Your Honor, I forgot one important

16  item -- one important item.  I'm sorry.  I really beg your --

17         THE COURT:  That's okay.

18         THE DEFENDANT:  The e-mails that were sent with these

19  instruments were sent by one of the senior vice presidents of

20  the Federal Reserve Bank.  The e-mails were all sent in J. peg.

21  J. peg means the actual picture of the instrument .  Mr.

22  McCurdy sent that e-mail out through the rightful owners.  I

23  have all those e-mails.  Now, the e-mails he sent out has Mr.

24  Bernanke's name on it.  So I think now after letting the Court

25  know that, I have established that it came from one of their

1  senior vice presidents on an e-mail sent in J. peg.  And like I

2  said, I have all those e-mails that the instruments were sent

3  out on with Mr. Bernanke's name on it.

4        THE COURT:  Well, that doesn't change my mind.  So my

5  decision is that the -- the subpoena will be quashed.  It's on

6  the record.  The record has been made of this hearing and my

7  decision, and we will move on from there.

8        MR. O'BRIEN:  Your Honor, before counsel gets off the

9  line, can I raise an issue?

10        THE COURT:  You can.

11        MR. O'BRIEN:  We subpoenaed two individuals from the

12  Federal Reserve Board, Ben Bernanke -- that's been resolved --

13  and also Roger Ferguson, I think was an assistant chief of --

14        THE DEFENDANT:  Vice chairman.

15        MR. O'BRIEN:  The e-mail -- the subpoena to Mr.

16  Ferguson -- I did some research -- I found out he works for

17  TIAA-CREF, which is an investment house mainly for private

18  colleges.  And so I sent the United States Marshals Service

19  subpoena on TIAA-CREF offices in New York.  The subpoena was

20  refused in New York and sent back, and they gave us an address

21  of TIAA-CREF in Charlotte where they said was the office that

22  accepted all subpoenas for TIAA-CREF officials.  I just learned

23  yesterday the United States Marshal went to Charlotte, and a

24  Mr. White who said he was the head of the legal department

25  refused to accept that subpoena.

1        The issue with Mr. Ferguson is still out there.

2   Someone is playing a little fast and loose with the Court in

3   refusing to accept subpoenas either the person at the

4   headquarters or the person at the designated legal office in

5   Charlotte.  I was wondering if you know anything about it at

6   this time.

7        MR. CHADWICK:  You mean me?

8        MR. O'BRIEN:  Yes.

9        MR. CHADWICK:  Your Honor, I have no knowledge of

10  this whatsoever.  Last night Mr. O'Brien mentioned there was a

11  subpoena issued to Mr. Ferguson.  I heard nothing about that.

12  As far as I know, no one from the Reserve has heard anything

13  about that.  If he had -- if he had -- I have no knowledge

14  certainly about what the marshals have or have not done.  If

15  the subpoena was -- you know, was properly served, then I think

16  we would -- and, you know, Mr. Ferguson referred it to us we

17  would represent him here.  He would have the option certainly

18  to obtain counsel.  I would imagine that he would -- barring

19  any factual circumstance I am not aware of that we would

20  undertake to represent anything he was alleged to have done in

21  his official capacity while the vice chairman of the Federal

22  Reserve.  But I know nothing about it, Your Honor.

23        THE COURT:  All right.  Anything else?

24        MR. O'BRIEN:  Well, I think, Your Honor, the issue is

25  whether or not the Court based on what I say is in the record

1   should send the marshal to pick up Mr. Ferguson if he wants to

2   ignore the dictates of the Court.  I think you have to respect

3   Mr. Bernanke.  He was served.  He turned it over to counsel.

4   Counsel filed objections.  A hearing was scheduled.  This other

5   gentleman just appears to be ignoring the Court or at least his

6   company because we sent it to the headquarters of the company.

7   They said we can't accept legal documents.  It's right in the

8   record.  They said contact this gentleman in Charlotte.

9   Another marshal went down there, and he said, I refuse to

10  accept this.

11              THE COURT:  A marshal confronted him, and he refused

12  to accept --

13              MR. O'BRIEN:  Confronted the person who was the head

14  of the legal department to whom they were referred.  It's all

15  in the returns.

16              THE COURT:  Where is Mr. Ferguson?

17              MR. O'BRIEN:  I don't know.  He is the chairman of

18  TIAA-CREF.  So we went to his corporate office.  His corporate

19  office said you have to serve in Charlotte.  And nobody seems

20  to want to do anything.

21              THE COURT:  All right.  Well, there's no need to have

22  counsel -- he's not involved.  He's not involved.

23              MR. O'BRIEN:  I maybe he was.  If he wants --

24              MR. CHADWICK:  I would just -- I don't want to speak

25  out of turn, Your Honor, if we end up ultimately representing

1  Mr. Ferguson, I can't accept service on his behalf.  I am not

2  authorized to do that.  But beyond that, you know, I would

3  think that he -- the obligation to serve him personally and it

4  may be understandable that if a corporate representative

5  wouldn't accept service on an individual not related to his

6  corporate responsibility --

7          THE COURT:  That may be.  If Mr. O'Brien was told to

8  send the marshal there by someone who he couldn't rely on, I --

9  I am not happy with that.  If there is some indication that Mr.

10  Ferguson may be involving you or involving counsel, I suggest

11  that that -- that be accelerated because I don't take kindly to

12  people not accepting subpoenas.

13          MR. CHADWICK:  I understand that, Your Honor.  Like I

14  said, we have heard not one word about that here.

15          THE COURT:  I understand that.  Thanks very much.  We

16  will sign off now.

17          MR. CHADWICK:  Thank you, Your Honor.  Thank you for

18  allowing me to participate by telephone.  I appreciate that

19  very much.

20          THE COURT:  You're welcome.  Now, one last thing

21  before we go away, we have this afternoon at 4:00 we will have

22  the motion to quash on McCurdy, Hennessy and Dages.  The same

23  questions will apply that I asked regarding Bernanke.  Do you

24  have any evidence to indicate what they are saying is not true

25  in their declarations.

47

1          THE DEFENDANT:  What I have, Your Honor --

2          THE COURT:  Well, I don't need it now.

3          THE DEFENDANT:  I'm sorry.

4          THE COURT:  I am giving you a heads up so you have

5    time to do your research.

6          THE DEFENDANT:  Thank you very much.

7          THE COURT:  You're welcome.  Okay.  See you at 1:00.

8          MR. BRANDLER:  Over the lunch break, we looked at the

9    records because Mr. Harley alleged that there was a document

10   that had criminal on it.  He was correct.  There is a document

11   that's 20.6 E., and I will hand it up to the Court.  There's

12   one -- you can see in the caption that says the word criminal.

13          It was admitted into evidence.  It probably was up on

14   the screen as Mr. Harley alleged.  I would recommend that

15   obviously before it goes back to the jury that that word be

16   redacted out of the document, that as the Court suggested

17   earlier, give Mr. Harley and his attorney the option of a

18   cautionary instruction or just leave it the way it is.  I

19   didn't even see it or notice it at the time.  I don't know any

20   jurors noticed it.  Obviously, Mr. Harley did, but that's the

21   document I believe he was referring to.

22          THE COURT:  We can do that.  Do you want me to give

23   an instruction to the jury about it?

24          MR. O'BRIEN:  It will be redacted when it goes to the

25   jury.  The word will be taken out.  Now, you have a choice now

48

1  to leave it at that or to ask the judge to bring the jury in

2  and instruct them to ignore it.

3           THE COURT:  It's not neither or.  I can do both.  You

4  may -- you may -- telling the jury only emphasizes it.

5           THE DEFENDANT:  I agree.  I agree.

6           THE COURT:  But you make the decision.  If you want

7  me to instruct them, I will.  If you don't, I won't.

8           MR. O'BRIEN:  Your Honor, I think -- I think the

9  failure to request an instruction constitutes a waiver of the

10 issue on appeal, I believe.

11          THE COURT:  Okay.  Fine.  That's up to him.

12          THE DEFENDANT:  Can I have time to think about it,

13 Your Honor?

14          THE COURT:  Oh, sure.  We don't have to do anything

15 with it now.

16          THE DEFENDANT:  Thank you very much.

17          THE COURT:  I can certainly do it before the case

18 goes to the jury.

19          THE DEFENDANT:  Right.  Thank you.

20          THE COURT:  Absolutely.

21          THE DEFENDANT:  Thank you so much.

22          (The jury entered the courtroom at this time.)

23          MR. BRANDLER:  May we have the tape cued up?

24          THE COURT:  Sure.  Members of the jury, we are

25 checking on the weather.  Things remain unchanged.  Unless

1   between now and whenever there's an indication that -- doesn't

2   seem to be sticking.   In any event, we will keep an eye on it.

3   Probably go until 4.   If there is an indication, we should quit

4   sooner, okay.

5           MR. BRANDLER:   Resume the tape, please.

6           MR. O'BRIEN:   Your Honor, are we getting into

7   something?   Seems to me this doesn't --

8           MR. BRANDLER:   It's Mr. Pate talking, but -- we can

9   -- it's just -- it will start right up.   Harley is the next

10  person on the -- I don't know.   Can you skip ahead?   It's Mr.

11  Pate talking who -- I don't think that's anything different

12  than what he said earlier.   I have the transcript here.

13          MR. O'BRIEN:   No objection.

14          THE COURT:   All right.

15          MR. BRANDLER:   We will skip ahead in the conversation

16  that doesn't pertain to Harley.   All right.

17  BY MR. BRANDLER:

18  Q.   Ms. Davis, that was the second recording on August 19th of

19  1999?

20  A.   Yes, sir.

21  Q.   After that recording occurred or maybe during that

22  recording was occurring, did you and other agents from your

23  office obtain a search warrant that was executed after that

24  call was made?

25  A.   Yes, Jerry Kelly was in Birmingham getting the search

1  warrant, and it was delivered in Tuscaloosa.  We served on Mr.

2  Pate for the documents that he had on his person after that

3  interview was over.  We let Mr. Pate know we were from the FBI

4  and the situation we were dealing with, asked him if he would

5  record phone calls for us with Mr. Harley, and he agreed to.

6  Q.    So after you executed the search warrant on Mr. Pate, he

7  agreed to cooperate?

8  A.    He did.

9  Q.    And did you make a third recording between Mr. Pate and

10  Mr. Harley?

11  A.    Yes, we did.

12  Q.    On the same date, August 19th now later in the evening,

13  6:30 p.m.?

14  A.    Yes.

15  Q.    Can I show you 25.7?

16  A.    Sure.  This is the custody envelope for the recording that

17  Mr. Pate made for us with Mr. Harley in our office on the

18  telephone on 8/19/99 in the evening.

19  Q.    Okay.

20        MR. BRANDLER:  I move introduction of 25.7 and ask it

21  be played.

22        (Exhibit 25.7 was played for the jury at this time.)

23  BY MR. BRANDLER:

24  Q.    That was the evening of August 19, 1999.  Was there a

25  fourth recording of a series of three telephone calls that you

1  made between Mr. Harley and Mr. Pate four days later on August

2  23rd of 1999 at the FBI office?

3  A.    Yes, sir.

4  Q.    And I want to show you exhibit 25.11.

5  A.    This is the evidence envelope for the recording that was

6  made August 23, 1999 at the Tuscaloosa resident agency office

7  with Mr. Harley and Mr. Pate.  I'm also on there with the

8  preamble.

9           MR. BRANDLER:  I move admission of 25.11 and ask it

10  be played.

11           MR. O'BRIEN:  No objection.

12           THE COURT:  Admitted.  I don't know -- did we cover

13  the preceding one?

14           MR. BRANDLER:  I think we did.  I offered it, and I

15  didn't hear any objection.  And it was played.

16           THE COURT:  I know it was played.  But I don't think

17  I ruled on it.  But I didn't hear any objection.

18           MR. O'BRIEN:  No, I have no objection.

19           THE COURT:  So that will be admitted, too.  All

20  right.  I want to make the record clear.

21           MR. O'BRIEN:  We were provided the tapes and

22  transcripts.

23           THE COURT:  No, I understand.

24           (Exhibit 25.11 was played for the jury at this time.)

25  BY MR. BRANDLER:

52

1  Q.   Was there a fifth recording August 25th, '99 made between

2  Mr. Harley and Mr. Pate?

3  A.   Yes.

4  Q.   And what was the circumstances of that?

5  A.   Well, it was one last conversation where they discussed

6  the fact that the FBI was working with Mr. Pate and --

7  Q.   You don't need to characterize.  We will listen to it.  I

8  will show you exhibit 25.13.

9  A.   Evidence envelope holding the original recording made on

10 August 25th, 1999.  Mr. Pate recorded Mr. Harley.  We actually

11 sent a recorder home with Mr. Pate so he can record if Mr.

12 Harley called him at home.  This was in Carrollton, Alabama.

13          MR. BRANDLER:  I will offer 25.13 into evidence and

14 ask it be played.

15          THE COURT:  No objection?

16          MR. O'BRIEN:  No objection.

17          THE COURT:  Admitted.  Proceed.

18          (Exhibit 25.13 was played for the jury at this time.)

19 BY MR. BRANDLER:

20 Q.   That was the last recording you obtained in this case of

21 Mr. Harley?

22 A.   Yes.

23 Q.   Now, did your investigation continue after those

24 recordings were made?

25 A.   It did.

1  Q.    And eventually did you present the case to the United

2  States Attorney's Office in Alabama for a decision on

3  prosecution?

4  A.    We did.

5  Q.    And no charges were filed?

6  A.    Correct.

7  Q.    That was not your decision?

8  A.    That was not my decision.

9          MR. BRANDLER:  I have no further questions.  And I

10  move the admission of exhibit 25.10, the initial document she

11  referred to earlier.  I believe all the documents were already

12  admitted -- tapes were the only other items.

13          THE COURT:  Any objection to 25.10?

14          MR. O'BRIEN:  May we have a second, Your Honor?

15          THE COURT:  Any objection to 25.10?

16          MR. O'BRIEN:  No objection.

17          THE COURT:  Admitted.  What do you need?

18          MR. O'BRIEN:  Can we take a couple minutes?

19          THE COURT:  Members of the jury, take ten minutes.  I

20  will let you go in about an hour.  Come back at 10 after -- I'm

21  sorry.  Come back at five after.  Remember not to discuss the

22  case among yourselves or with anyone else.  If anyone tries to

23  talk to you about it, bring it to my attention.  See you back

24  in ten minutes.

25  CROSS EXAMINATION

54

1  BY MR. O'BRIEN:

2  Q.    Ma'am, do you recall if the United States Attorney issued

3  a letter indicating there would be no criminal prosecution

4  arising out of your investigation?

5  A.    I'm sure they did.  Fifteen years ago, I mean the normal

6  course of action is they would give us something in writing

7  indicating there was a declaration.

8  Q.    You don't have it with you?

9  A.    No, sir.  I don't have it on me.

10            MR. O'BRIEN:  That's all I have.  Thanks.

11            MR. BRANDLER:  No questions.

12            THE COURT:  All right.  You may step down.

13            MR. BRANDLER:  Before I call the next witness, there

14  are certain documents I am going to be introducing.  Could we

15  have 30.1?  This is a certified record from the Texas Railroad

16  Commission dated August 14th of 2012.  I'd like to read it into

17  the record.  The Railroad Commission of Texas, the State of

18  Texas, County, Travis.  I, Cathy Way, secretary of the Railroad

19  Commission of Texas, the commission do hereby certify as the

20  legal custodian of the records, files and seal of the

21  commission that a thorough and diligent search of the

22  commission's computerized P. 5 database performed on August

23  14th, 2012 by Sheila Weigland, program specialist 3, office of

24  general counsel division, under my supervision and control

25  discloses that theirs is no record of any form P. 5

1  organization report on file at the commission for RJH and

2  Company, RJH and Company, Inc., Enpetro, Inc. or Enpetro, LPC,

3  Inc. and further there is no entry on the P. 5 officer listing

4  maintained by the commission for any Richard Harley.  Further

5  approved P. 5 is a prerequisite to engaging in any oil or gas

6  activity in Texas within the jurisdiction of the commission.

7  Given under my hand and seal of the Railroad Commission of

8  Texas this 14th day of August, 2012, signed by Kathy Way,

9  secretary.  I move for 30.1.

10          THE COURT:  Any objection?

11          MR. O'BRIEN:  No objection.

12          THE COURT:  Admitted.

13          MR. BRANDLER:  Could we have 29.1?  This is a

14  certified record from the Corporations Section of the State of

15  Texas Office of Secretary of State.  It states as follows:  The

16  undersigned as Secretary of the State of Texas, does hereby

17  certify that the attached is a true and correct copy of each

18  document on file in this office as described below.  Enpetro,

19  LPC, Inc., filing number 131463500, articles of corporation,

20  June 3rd of 1994, tax forfeiture, August 27th, 1996,

21  miscellaneous, June 4th, 1997, reinstatement including

22  correspondence, June 20th, 1997, tax forfeiture, February 12th

23  1999, reinstatement including correspondence, July 13, 1999,

24  tax forfeiture, March 22nd, 2002.  No further entries.  In

25  testimony whereof I have hereunto signed my name officially and

1  caused to be impressed hereon the seal of the state at my

2  office in Austin Texas on October 11th, 2013, signed by John

3  Steen, Secretary of State.

4         The next page is the first page of the articles of

5  incorporation of Enpetro, LPC, Inc., and it's filed in the

6  office of Secretary of State in Texas June 3rd of 1994.

7  Article 1 it says the name of the corporation is Enpetro, LPC,

8  Inc.  The third page in where it says article nine, the post

9  office address of the initial registered office of the

10 corporation in the State of Texas is 1341 West Mockingbird

11 Lane, No. 200 East Dallas, Texas and the name of the initial

12 registered agent of the corporation at such address is William

13 Trantham, scrolling down, article ten, the number of directors

14 constituting the initial board of directors of the corporation

15 is one and the name of the address of the person who is to

16 serve as a director until the first annual meeting of the

17 shareholders or until his successor is elected and qualified

18 are, Stan Dedmon, 12700 Park Central Drive, 1904, Dallas,

19 Texas, 75251.

20        Then the following page it appears that this document

21 -- article 11 the name and address of the incorporator is a

22 person by the name of Amy Hopson, 400 North Saint Paul, number

23 1025, Dallas, Texas, signed on June 3rd, 1994 by Amy Hopson,

24 incorporator.  Next page, the following the document is on the

25 letterhead of the State of Texas Secretary of State.  It says

1  determination of forfeiture pursuant to Section 171-309, Texas

2  Tax Code Annotated.  Came to be considered on the date shown

3  hereon, forfeiture of the charter or certificate of authority

4  of the following corporation; the Secretary of State finds and

5  determines the following, Enpetro LPC, Inc., charter number

6  type, R. T. D. B, right to do business, forfeited, certificate,

7  slash, charter forfeited -- I'm sorry, right to do business

8  forfeited on November 21, 1995, certificate charter forfeited

9  on August 27th, 1996.

10          Below that it says that the comptroller of public

11  accounts has notified this office that said corporation has

12  filed to fail a current year franchise tax report to establish

13  the existence of assets from which a judgment for the franchise

14  taxes, penalties and court costs may be satisfied, that the

15  comptroller of public accounts has further stated that the said

16  corporation has failed or refused to revive its right to do

17  business.  It is, therefore, ordered that the charter or

18  certificate of authority of the above named corporation be and

19  the name is hereby forfeited without judicial ascertainment and

20  made null and void and that the proper entry be made upon the

21  permanent files and records of such corporation to show such

22  forfeiture as of the date hereof.

23          Going to the two pages in where it says application

24  for reinstatement.  Application for reinstatement and request

25  to set aside revocation of forfeiture, name of organization,

1  Enpetro, LPC, Inc.  And it shows a file stamp of June 20, 1997.

2  And then it says, whereas the organization named above was

3  forfeited or the certificate of authority for the organization

4  was revoked on August 27th, 1996 for failure to pay state

5  franchise tax, whereas the organization has corrected the

6  default noted above and has paid all fees, taxes and penalties

7  due.  Now, therefore, the organization hereby applies for

8  reinstatement of its articles of -- or certificate of authority

9  and requests that the Secretary of State set aside the

10  forfeiture or revocation of its articles or certificate of

11  authority, and it's signed by someone who's the corporate

12  secretary and treasurer on May 23rd, 1997.

13           Going to the page that's titled at the top Enpetro,

14  LPC, Inc., dated June 19th, 1997.  It's a letter on Enpetro,

15  LPC, letterhead dated June 19th, 1997 to the Secretary of

16  State, Corporations Section, in Austin, Texas, re, Enpetro,

17  LPC, Inc., reinstatement.  To whom it may concern, enclosed

18  please find the reinstatement form for the above corporation,

19  the fee and additional check of $10 to cover the expedition of

20  the processing of the reinstatement today.  Thank you in

21  advance for your prompt attention to this matter, sincerely,

22  Stan Dedmon.  It's dated -- scroll down -- June 20, 1997

23  received, the Secretary of State's office.

24           Next page.  Again, on the letterhead of the Secretary

25  of State For the State of Texas, determination of forfeiture

1  pursuant to Section 171.309, Texas Tax Code Annotated.  Came to

2  be considered on the date shown hereon, forfeiture of the

3  charter or certificate of authority of the following

4  corporation.  The Secretary of State finds and determines the

5  following, corporation name, Enpetro, LPC, Inc., the right to

6  do business forfeited October 14th, 1998.  Certificate charter

7  forfeited February 12th of 1999.  That the comptroller of

8  public accounts has notified this office that said corporation

9  has failed to file a current year franchise tax report to

10  establish the existence of assets from which a judgment for the

11  franchise taxes, penalties and court costs may be satisfied.

12  That the comptroller of public accounts has further stated that

13  the said corporation has failed to refused to revive its right

14  to do business.

15          It is therefore ordered that the charter or

16  certificate of authority of the above-named corporation be and

17  the same is hereby forfeited without judicial ascertainment and

18  made null and void and that the proper entry be made upon the

19  permanent files and records of such corporation to show such

20  forfeiture as of the date hereof.  Going to the document that's

21  titled application for reinstatement and request to set aside

22  revocation of forfeiture dated July 13th, 1999.  Name of

23  organization, Enpetro, LPC, Inc.  Whereas the organization

24  named above was forfeited on or the certificate of authority

25  for the organization revoked on February 12th, 1999 for failure

60

1  to pay state franchise tax or whereas the organization has

2  corrected the default noted above has paid all fees, taxes and

3  penalties due, now, therefore, the organization hereby applies

4  for reinstatement of its articles or certificate of authority

5  and requests that the Secretary of State set aside the

6  forfeiture or revocation of its articles or certificate of

7  authority by Stan Dedmon, president.

8           Last page -- enlarge that.  Forfeiture pursuant to

9  Section 171.309 of the Texas Tax Code of Enpetro, LPC, Inc.

10  Certificate charter forfeited March 22nd, 2002.  The secretary

11  of State hereby determines and finds the following:  The

12  Secretary of State received certification from the comptroller

13  of public accounts under section 171.302 of the Texas Tax Code

14  that there are grounds for forfeiture of the charter or

15  certificate of authority of the referenced entity.

16           Two, that the entity has not revived its forfeited

17  corporate privileges within 120 days after the date that the

18  corporation privilege were forfeited.  Three, the comptroller

19  of public accounts has determined that the entity does not have

20  assets from which a judgment for any tax, penalty or court

21  costs imposed under chapter 171 of the code may be satisfied.

22  It is, therefore, ordered that the charter or certificate of

23  authority of the referenced entity be forfeited without

24  judicial ascertainment and that the proper entry be made upon

25  the permanent files of records of such entity to show such

1   forfeiture as of the date thereof, signed by Gwyn Shea,

2   Secretary of State.  Those are all the records on file

3   regarding Enpetro, LPC, at the Office of Secretary of State as

4   of that date.

5          The next document is Exhibit 28.1 A.  This is a

6   certified record from the State of Nevada Office of Secretary

7   of State.  It's AN affidavit of Scott W. Anderson, who is the

8   deputy secretary for commercial recordings.  It states as

9   follows:  I, Scott W. Anderson, after being duly sworn, deposed

10  and state under the penalty of perjury, I am the Deputy

11  Secretary of State For Commercial Recordings, and as such I am

12  the custodian of records for the commercial recordings division

13  of the Secretary of State's office.  To the best of my

14  knowledge, information and belief, based upon due diligence and

15  reasonable inquiry, the documents herewith constitute all of

16  the requested documents and records on file in the Office of

17  Secretary of State.  An employee of the Secretary of State

18  under my direction has certified said documents.

19         Three, the documents submitted pursuant to this

20  subpoena to testify at a hearing or trial in a criminal case,

21  United States District Court for the Middle District of

22  Pennsylvania, case number 3:CR-12-224 dated October 18th, 2013

23  due December 2nd, 2013.  No. 1, documents on file regarding

24  Enpetro, Inc., file number C. 10818-1989.  The first page --

25  next page -- is dated November 7th of 2013.  It says certified

1  copy, and it states as follows:  The undersigned filing officer

2  hereby certify that the attached copies are true and exact

3  copies of all requested statements and related subsequent

4  documentation filed with the Secretary of State's Office

5  Commercial Recordings Division listed on the attached report.

6  I will not read all of it.  It speaks for itself.  The first

7  entry is articles of incorporation.  Going to -- the next page

8  shows the last entry being annual list.  And the next page

9  after that is the articles of incorporation of Enpetro, Inc.,

10 in the Office of Secretary of State of the State of Nevada,

11 December 19th, 1989.

12          The name of the perpetual existence corporation is

13 Enpetro, Inc.  The principal place of business is at 4209 Bruce

14 Las Vegas, Clark County, Nevada, 89119.  Going to the -- about

15 four pages in, the document that says who the president and

16 officers of the corporation are -- right there.  As of May 1,

17 1996, it's listed Wayne Skinner is the president, Wayne Skinner

18 as secretary, Wayne Skinner as the treasurer, Wayne Skinner as

19 the director, and it appears Wayne Skinner's signature appears

20 on the bottom as of May 1, 1996.

21          Going to the next one, a list of officers as of March

22 28th, 1997.  Wayne Skinner's name appears again as the only

23 officer of the corporation.  Next page -- next page after that.

24 As of July 13th 1999, the officers of the corporation appear as

25 Stan Dedmon, president, William Trantham, secretary, William

1  Trantham, treasurer, Wayne Skinner, director.

2          Going to the officers December 5, 1999, appears Stan

3  Dedmon listed as president, William Trantham, secretary and

4  treasurer.  Moving ahead -- I don't believe there's any change

5  in the officers moving ahead.  So the last page of this record,

6  which is dated July 31st, 2013, the bottom right -- filing date

7  and time it says July 31, 2013.  Going to the body it shows

8  Stan Dedmon as president, William Trantham as secretary and

9  treasurer and Stan Dedmon as director.

10          28.1 B., certified copy of records from the Office of

11  the Secretary of State from the State of Texas Corporation

12  Bureau regarding Enpetro, Inc., it states as follows, the

13  undersigned as Secretary of State of Texas does hereby certify

14  that the attached is a true and correct copy of each document

15  on file in this office as described below.  Enpetro, Inc., it

16  says application for registration including certificate of

17  filing and acknowledgment letter, tax forfeiture.

18  Acknowledgment letter dated October 12, 2009 and tax forfeiture

19  date January 28th, 2011.  The document is dated October 11,

20  2013.

21          Next page.  Application for registration of a foreign

22  for profit corporation, Enpetro.  The entity is a foreign for

23  profit corporation.  The name of the entity is Enpetro, Inc.

24  Going to No. 4, it's incorporated under the laws of Nevada,

25  United States.  And the date of its formation in that

1 jurisdiction is December 19th, 1989.  Going to number seven,

2 the date on which the foreign entity intends to transact

3 business in Texas or the date on which the foreign entity first

4 transacted business in Texas is January 5th of 2009.  The

5 principal office address of the corporation is in Carrolton,

6 Texas.  9 B., the initial registered agent is an individual

7 resident in the state whose name is Stan Dedmon.  Going to the

8 document titled certificate of filing of Enpetro, Inc., the

9 undersigned as Secretary of State of Texas, hereby certifies

10 that an application for registration for the above-named

11 foreign for profit corporation to transact business in this

12 state has been received in this office and has been found to

13 conform to the applicable provisions of law.

14           Accordingly, the undersigned, the Secretary of State,

15 and by virtue of the authority vested in the Secretary by law,

16 hereby issues this certificate evidencing the authority of the

17 entity to transact business in this state from and after the

18 effective date shown below for the purpose or purposes set

19 forth in the application under the name of Enpetro, Inc.  The

20 issuance of this certificate does not authorize the use of a

21 name in this state in violation of the rights of another under

22 the Federal Trademark Act of 1946, the Texas Trademark Law, the

23 Assumed Business Or Professional Name Act or the Common Law

24 dated October 12th, 2009.

25           Going to the last document in this package titled

65

1   forfeiture pursuant to Section 171.309 of the Texas Tax Code of

2   Enpetro, Inc., dated January 28th, 2011 as the date the charter

3   was forfeited.  The Secretary of State finds that, one, the

4   secretary has received certification from the comptroller of

5   public accounts under Section 171.302 of the Texas Tax Code

6   indicating that there are grounds for the forfeiture of the

7   taxable entities charter, certificate or registration, and,

8   two, the comptroller of public accounts has determined that the

9   taxable entity has not revived its forfeited privileges within

10  120 days after the date that the privileges were forfeited.

11  Therefore, pursuant to Section 171.309 of the Texas Tax Code,

12  the Secretary of the State hereby forfeits the charter,

13  certificate or registration of the taxable entity as of the

14  date noted above and records this notice of forfeiture in the

15  permanent files and records of the entity.

16          The next document is exhibit 49.1.  And it's a

17  stipulation that's been agreed to by counsel on the document

18  titled United States of America versus Richard Harley.  The

19  United States of America and the defendant by their counsel

20  hereby stipulate and agree as follows:  The wire transfers of

21  funds which are the subject of counts one through eight of the

22  indictment and the e-mails which are the subject of counts nine

23  through 15 of the indictment traveled in interstate commerce.

24  We will introduce all those documents in evidence, Your Honor.

25          MR. O'BRIEN:  No objection.

66

1       THE COURT:  They'll be admitted.

2       MR. BRANDLER:  We will call Vincent Browning to the

3  stand.

4       VINCENT BROWNING, called as a witness, being duly

5  sworn, testified as follows:

6       MR. BRANDLER:  One moment.  I am looking for my

7  folder for Mr. Browning.  I don't see it in the courtroom.  I'm

8  sorry my folder is not here.  It has all my paperwork.  Can I

9  take a five minute recess to get my documents?

10       THE COURT:  No.

11       MR. BRANDLER:  Really?

12       THE COURT:  Of course.

13       MR. BRANDLER:  I apologize for the delay.

14  DIRECT EXAMINATION

15  BY MR. BRANDLER:

16  Q.   Please state your name.

17  A.   Vincent Browning.

18  Q.   And by whom are you employed?

19  A.   I'm a special agent with the FBI.

20  Q.   How long have you been with the FBI?

21  A.   Over 15 years now.

22  Q.   What is your current duty station?

23  A.   Scranton resident agency out of the Philadelphia division.

24  Q.   In your capacity as an FBI agent, did you have cause to

25  investigate a case involving the defendant, Mr. Harley?

1  A.    Yes, I did.

2  Q.    Approximately when did your investigation begin?

3  A.    September 2011.

4  Q.    And can you tell us what triggered the investigation?

5  A.    Yes, Marshall Silverstein approached the U. S. Attorney's

6  Office.  He felt he had been defrauded by Richard Harley.  The

7  U. S. Attorney's Office brought it to the FBI Scranton office.

8  Mr. Silverstein was interviewed by our supervisor at the time

9  along with Mr. Brandler, and the decision was made that there

10 was sufficient cause for us to open an investigation.

11 Q.    You were assigned to the case?

12 A.    Yes.

13 Q.    Did you have cause to interview Mr. Silverstein?

14 A.    I did.

15 Q.    When did you interview him?

16 A.    Around October of 2011.

17 Q.    And was Mr. Silverstein's attorney there as well?

18 A.    Yes, Mr. Fogerty -- Kevin Fogerty was there as well.

19 Q.    Did he turn over a large number of documents to you?

20 A.    He did.

21 Q.    Were those documents related to his interaction with Mr.

22 Harley?

23 A.    Yes, they were.

24 Q.    And can you briefly describe what those documents were

25 just generically?

1  A.    Well, there were communications consisting of fax -- fax

2  cover sheets, letters of Mr. Harley, there was a copy of oil

3  production -- oil production promissory note.   There were

4  copies of wire transfer records for moneys that Mr. Silverstein

5  had sent to Mr. Harley.   There was information about various

6  pieces art work that Mr. Harley claimed to have great value.

7  Q.    After taking possession of those documents -- just to put

8  it into context, at the time you interviewed Mr. Silverstein,

9  had he obtained a civil judgment against Mr. Harley?

10 A.    Yes, he had.

11 Q.    You learned during the course of this trial?

12 A.    Yes, that's correct.

13 Q.    And that judgment was for in excess of a million dollars?

14 A.    Yes.

15 Q.    Now, based upon Mr. Silverstein's complaint and the

16 documents, he turned over -- you said you opened an

17 investigation.   What does that mean, when the FBI opens an

18 investigation?

19 A.    Well, when we open an investigation, we typically now have

20 tools at our disposal to start looking into the case, working

21 with the U. S. Attorney's Office to, for example, issue

22 subpoenas.   We go out, and we start to interview witnesses,

23 locating them --

24 Q.    Did you do that in this case?   Did you obtain records via

25 grand jury subpoenas?

1  A.    Yes.

2  Q.    And what type of records did you obtain?

3  A.    We obtained bank records.  We obtained telephone records,

4  internet records, records from several accounts, several

5  accounts from Mr. Harley.

6  Q.    Did you get corporate filings such as what I just read

7  into the record here?

8  A.    Yes, we did.

9  Q.    And what about the FBI records from Alabama, such as what

10 we heard from --

11 A.    Yes, we obtained -- during the course of the investigation

12 as time went on, we determined there had been an investigation

13 in Alabama in around 1999.  We obtained a copy of that case

14 file from the Birmingham office.

15 Q.    You said you also interviewed witnesses in connection with

16 your investigation.

17 A.    Yes.

18 Q.    You interviewed numerous witnesses?

19 A.    Numerous, yes.

20 Q.    And what was the purpose of your investigation?

21 A.    To determine the scope of what had happened beyond what

22 was claimed to have happened with Mr. Silverstein to see the

23 full scope of the activities surrounding the -- Mr. Harley's

24 contact with Mr. Silverstein and others.

25 Q.    So in September, October of 2011 you opened the case.

1  Were you able to obtain records from directly from Mr. Harley?

2  A.    Later, yes.

3  Q.    And did you obtain a search warrant?

4  A.    Yes, we -- in August of 2012, we obtained a search warrant

5  for Mr. Harley's residence and obtained a voluminous amount of

6  documents and other evidence from the residence.

7  Q.    A little less than a year from the time you opened your

8  investigation?

9  A.    That's correct, yes.

10 Q.    Did you participate in the execution of the search

11 warrant?

12 A.    I did.

13 Q.    What was the date that the search was conducted?

14 A.    August 29th, 2012.

15 Q.    And where was the search conducted?

16 A.    Mr. Harley's residence.

17 Q.    What's the address?

18 A.    It was unit 45 A. in the North Slope Three Development,

19 Shawnee on Delaware, Pennsylvania.

20 Q.    And can you describe what that residence looks like?

21 A.    Yes.

22 Q.    Go ahead.

23 A.    It is an attached townhouse, three floors.  It's an end

24 unit with an attached one car garage and three floors.  Would

25 you like me to describe the interior of it?

71

1  Q.    Not yet.

2  A.    Okay.

3  Q.    What time did you arrive to execute the search warrant?

4  A.    Approximately 8:11 a.m.

5  Q.    About how many other law enforcement officials were with

6  you when you arrived at Mr. Harley's residence?

7  A.    Including myself there were 12 of us.

8  Q.    And were those both FBI and local law enforcement

9  officials?

10 A.    There were six FBI agents, two task force officers, two

11 FBI employees from our office, non-law enforcement employees

12 and two computer forensic examiners from our computer lab in

13 Radnor, Pennsylvania.  There was also a uniformed state trooper

14 in a marked patrol car who arrived to sit in the driveway.

15 Q.    And other than that marked car, would there -- certain law

16 enforcement officers wearing uniforms or identification

17 identifying themselves as law enforcement officers?

18 A.    Yes, we -- all the FBI and others had our -- task force

19 officers were clearly identified as FBI, FBI either wearing

20 jackets with FBI or FBI affixed to our --

21 Q.    Did you have a copy of the federal search warrant with you

22 at the time you arrived at the scene?

23 A.    Yes, I did.

24 Q.    And you were the lead agent during the execution of the

25 search warrant?

1  A.    Yes.

2  Q.    Tell us what happened when you arrived.

3  A.    When we arrived, we immediately -- what we did what's

4  called a knock and announce.  That basically amounts to

5  knocking loud.  They were pounding on the front door,

6  announcing ourselves as FBI with a warrant and in the hopes

7  that the residents -- occupants would open the door.  We did

8  this -- we started pounding on the front door saying FBI with a

9  warrant.  We also had personnel at the rear of -- the structure

10  had several exits.  One was a basement sliding door.  And we

11  had people knocking in the back as well there on the basement

12  side.

13  Q.    How long were you knocking on the doors before you got any

14  -- did you get any response?

15  A.    We never got any response while outside.

16  Q.    How long did you knock on the door waiting for a response?

17  A.    Five minutes.

18  Q.    And you said that was both at the front and rear of the

19  house?

20  A.    Yes.

21  Q.    And then what happened next?

22  A.    Well, four minutes into it, I placed two telephone calls

23  to the residence for the number I had going back to the

24  residence, which was 570-476-7600.  That was the phone number I

25  had for the residence.  I made two telephone calls.  I made a

1  call to that number.  Somebody picked up the telephone, but I

2  announced myself as FBI with a warrant, requesting the door be

3  open.  And it sounded to me like the phone was just hung up.

4  It went dead.  So I called back again, and it rolled over to a

5  voicemail.  So I left a message saying FBI, I'm outside with a

6  search warrant, please open the door.

7  Q.    Now, you indicated there was a police vehicle -- marked

8  police vehicle at the scene?

9  A.    There was.

10  Q.    Where was that located?

11  A.    Right in the driveway parked near the front of the

12  residence.

13  Q.    And after you left your voicemail on the second phone

14  call, what happened next?

15  A.    I made the decision after that -- after five minutes to

16  force entry into the residence.

17  Q.    So approximately how long after you had arrived did you

18  have -- did you wait before you forced entry?

19  A.    It was a full five minutes.

20  Q.    And what does that mean, forced entry?  What did you do?

21  A.    We open the door.  We use tools.  There was two doors.

22  There was an outer storm door or screen type door.  That was

23  popped open using a crowbar type device and then --

24  Q.    Go ahead.

25  A.    We broke open -- the next door was a metal -- like a

1  metallic front door, and we use what is called a ram to punch

2  that door open.

3  Q.    Were there any occupants inside the house when you got

4  inside?

5  A.    Yes.

6  Q.    Who was inside the house?

7  A.    Mr. Harley and his wife.

8  Q.    Where were they located?

9  A.    Mrs. Harley was located in the upstairs portion of -- it's

10  a three-story.  There was a main floor, upstairs bedroom area

11  and a basement area as well.  Mrs. Harley was upstairs.  She

12  was -- called down to us, and Mr. Harley was in the basement of

13  the residence and called up to the main floor.

14  Q.    Did they come to the main floor, both of them?

15  A.    They did.

16  Q.    Did you -- did Mr. Harley say anything at that point about

17  where he was?

18  A.    Yes, he did.  He said he heard the pounding but -- on his

19  door -- but was in the bathroom and could not respond.

20  Q.    And at that point, did you advise Mr. Harley about the

21  purpose of your visit?

22  A.    Yes.

23  Q.    What did you tell him?

24  A.    We had a search warrant for the premises.

25  Q.    Did you tell him whether or not he was under arrest?

1  A.    I told him he was not under arrest.

2  Q.    He was not?

3  A.    He was not.

4  Q.    Did you tell him he was free to leave?

5  A.    I told him he was free to leave and he did not have to

6  stay at the residence.

7  Q.    What did he choose to do?

8  A.    He chose to stay.

9  Q.    The same thing with the wife?

10 A.    Yes.  We just asked they sit quietly to the side until we

11 finish clearing the residence just so -- as a matter of safety

12 continue to look throughout the residence to make sure no one

13 is hiding that can come out later.  So that took some minutes

14 to complete.  During that time I asked they sit quietly off to

15 the -- on the main floor while we completed that clearing

16 process.

17 Q.    After the clearing process was completed, what happened

18 next?

19 A.    The search got underway.

20 Q.    And what does that mean?

21 A.    That consists --

22 Q.    Explain to the members of the jury how you do these

23 things.  What happens?

24 A.    Yes, the first thing we do is take photographs of the --

25 what we call pre-entry photographs of the residence and

1  determine what areas of the residence we are going to do

2  ourselves and do the effective search.

3  Q.    So now at this point describe the inside.

4  A.    Yes, it's -- it's a fairly large townhouse.  The square

5  feet -- perhaps 2,000 square feet or so consists of a main

6  floor where there's -- as you come in the front door there's --

7  off to the right is the access to the attached one-car garage.

8  There's a half bath immediately sort of once you're into the

9  door.  Then as you make a left, there's a kitchen area to the

10 left, dining room area and separated -- and like I said --

11 characterize as a living room that is separated -- dining room

12 and living room were separated by a large fireplace.

13 Q.    You mentioned a garage.

14 A.    Yes.

15 Q.    That was attached?

16 A.    Yes.

17 Q.    Was there an automobile in the garage?

18 A.    There was.

19 Q.    What kind of automobile?

20 A.    Black Lexus.

21 Q.    And did you also search the automobile?

22 A.    We did, yes.

23 Q.    How long did the search last?

24 A.    Until 1:30 approximately.

25 Q.    So about five hours?

1  A.    Yeah.

2  Q.    And what happened during those five hours as far as the

3  search was occurred?  What actually was going on?

4  A.    We were searching for -- excuse me -- the search

5  participants were looking for items that were delineated on the

6  attachment to the search warrant.

7  Q.    And were there voluminous records to go through at the

8  house?

9  A.    Yes, there were boxes of boxes of paperwork.

10  Q.    How many boxes of paperwork did you end up removing from

11  the home?

12  A.    Approximately 12.

13  Q.    And in addition to -- were those paper documents you're

14  talking about?

15  A.    In addition to paper -- yes, the predominant volume was

16  paper documents, but there were also -- also computers.

17  Q.    Let's talk about that, digital -- we will call that the

18  digital evidence.

19  A.    Yes.

20  Q.    What digital evidence did you seize?

21  A.    We seized -- well, I will say seized.  We seized some

22  digital items, and others were copied by the computer examiners

23  on scene and left there.

24  Q.    Why don't you go through it item by item?

25  A.    Okay.

1  Q.   You can -- if you need notes to refresh --

2  A.   I have notes that would be helpful if I can refer to just

3  to be accurate as to what we took.  There was a Hewlett Packard

4  desktop computer in an upstairs office or -- looked like a

5  bedroom converted to an office.  That was -- that was --

6  clearly had been used -- was being used.  That was copied.

7       We had forensic personnel copy that computer, not remove

8  the hard drive from it -- use a hardware device to do a copy of

9  the drive.  Also there's -- the upstairs consisted of --

10            MR. O'BRIEN:  Your Honor, just for the record, if

11  he's going to read from a list --

12            THE WITNESS:  I am not reading from it --

13            MR. O'BRIEN:  That's not a problem.  It should be

14  established his past recollection recorded he made a list of

15  what he took and that's fine.  For purpose of the record, I

16  want to be clear.  He's not -- doesn't appear to be refreshing

17  his recollection from it so -- it's not clear how he's using

18  the list.

19            THE COURT:  How are you using the list?  Are you able

20  to --

21            THE WITNESS:  I remember.  It's just -- I want to be

22  accurate in the description of the items that we took.

23            THE COURT:  Okay.  But that is your own list?

24            THE WITNESS:  Creation, yes.

25            THE COURT:  Without looking at the list, you can't

79

1  recite exactly what you did?

2          THE WITNESS:  No, I can.

3          THE COURT:  Exactly each item that you --

4          THE WITNESS:  Well, to be completely accurate.

5          THE COURT:  Yeah, that's the point Mr. O'Brien is

6  making.  It's -- either you can refresh your recollection by

7  looking at and put it down, but you probably have to keep doing

8  that or that is your recollection.

9          THE WITNESS:  Well, it is, yes.

10          THE COURT:  It's past recollection recorded.  If

11  that's the case, you can look at it and talk from it.

12          THE WITNESS:  It is past recollection.

13          THE COURT:  So that's what we will do.

14          MR. O'BRIEN:  Your Honor, just -- I think it should

15  be marked as an exhibit.

16          MR. BRANDLER:  Inventory.

17          MR. O'BRIEN:  Should be an exhibit if it's --

18          THE COURT:  Sure.  But I suspect he's going to put

19  that in anyway.

20  BY MR. BRANDLER:

21  Q.   Are you referring to the inventory that was filed as part

22  of your return?

23  A.   This is just notes or a spreadsheet I created.

24  Q.   Let me show you this document.  Maybe this will be better.

25  What is a search warrant inventory?

1 A.    It's returned to the Court when we file -- when the

2 warrant was returned to the Court, we provide an inventory of

3 what we seized.

4 Q.    And see if you can identify that document see if that's

5 the inventory.

6 A.    Yes, this is the inventory I created.

7 Q.    Does it have a date stamp it was filed?

8 A.    Yeah, September 11th -- looks like -- 2012, yeah.

9 Q.    Let me have it.  Thank you.

10          MR. BRANDLER:  Do you have an objection if we just go

11 through --

12          MR. O'BRIEN:  Can I see it?

13          MR. BRANDLER:  Yeah.  Let's mark this -- what's the

14 next number?  Let's make it 50.1.

15 BY MR. BRANDLER:

16 Q.    Is this the inventory you filed from the search in this

17 case?

18 A.    Yes.

19 Q.    It states the date and time the warrant was executed?

20 A.    Yes.

21 Q.    What was the date and time indicated?

22 A.    August 29, 2012 at 8:16 a.m.

23 Q.    This is a copy of the actual federal search warrant as you

24 executed that day?

25 A.    Yes, it is.

1  Q.    And attachment A. to that search warrant is a description

2  of the location?

3  A.    That's the description of the -- yes, the location.

4  Q.    Where you searched?

5  A.    Yes, including the car.

6  Q.    Attachment B. was the list of items you were authorized to

7  search for?

8  A.    That's correct.

9  Q.    And it lists various things relating to your investigation

10 after speaking to Mr. Silverstein and what other records you

11 were looking at?

12 A.    Yes.

13 Q.    And is this the portion what is known as the inventory

14 list of the items seized?

15 A.    Yes.

16 Q.    You put this list together?

17 A.    I did.

18 Q.    Let's go through the digital items.  There are nine items.

19 What do you have listed?

20 A.    There was a Seagate hard disk drive that contains a copy

21 of a Hewlett Packard desktop computer.  So that was the

22 computer that was copied from the upstairs, and what we left

23 with is that data on one of our hard drives, which is a Seagate

24 hard drive.

25 Q.    You left the computer and made a copy of the hard drive?

1 A.    Right, what we were seizing is data essentially.  So we

2 are walking out with a hard drive that contains an image of the

3 computer.

4 Q.    Number two.

5 A.    Seagate hard drive that contains a copy of an H. P. laptop

6 computer.  That computer was located in the upstairs -- there

7 was a loft -- as you come up the stairs to the right there was

8 a living area or a loft, T.V. watching area.  That's where the

9 laptop was located.  That was also copied by the forensic

10 personnel.  So we walked out with a Seagate hard drive that

11 contained a copy of that laptop computer.

12 Q.    All right.

13 A.    There was a blackberry Torch cell phone.  That was also

14 located in the loft area on a table next to the chair -- a

15 reclining chair there.  We seized that item.  It did contain an

16 S. D. card and a SIM card inside of it.

17 Q.    Not everyone knows what an S. D. card is and SIM card.

18 Explain that.

19 A.    Well, the S. D. card is just -- the small card -- media

20 card inside the phone where you can save data, pictures, you

21 know, various information.  And the S. D. card is what allows

22 the phone to communicate with a cell phone provider.

23 Q.    No. 4?

24 A.    Four gigabyte flash drive seized.  And that was the four

25 gig drive -- I have to refer to my note here -- that was in the

83

1  upstairs living area.

2  Q.    All right.

3  A.    There was a Verizon U.S.B. device that was seized.  That

4  was -- didn't contain any data.

5  Q.    What does that mean, Verizon --

6  A.    Looked like a U.S.B. thumb drive.  But it turned out it

7  was a wireless -- U.S.B. wireless device.  It didn't have data.

8  Q.    No. 6?

9  A.    SanDisk card reader containing eight gigabyte SanDisk

10  micro S. D. card.

11  Q.    What does that mean, SanDisk card reader?

12  A.    That one was also the upstairs loft living area.  What it

13  is the little tiny micro S. D. cards typically have a -- reader

14  is a bad choice -- but an adaptor you can put them into to

15  allow them to fit into a standard S. D. card reader.  So that's

16  what that was.  There was a micro S. D. card inside of a larger

17  shell.

18  Q.    Is it a device so you can read data that's on another

19  device?

20  A.    It allows you to read the data on the micro S. D. card.

21  Q.    All right.  No. 7?

22  A.    Two gigabyte U.S.B. flash drive.  That was found in a

23  brief case in the basement.

24  Q.    Eight?

25  A.    There was a Western Digital hard drive taken from a Dell

1 desktop tower.  That was located -- there was a disconnected

2 computer in the garage on the floor.  We chose to just --

3 rather than take the whole computer case in that instance, we

4 just took the hard drive out of it.  That is also a technique

5 that the computer forensic personnel will do for clearly older

6 machines that are off to the side, and they take the hard drive

7 out of it.  So that's what we did.

8 Q.    No. 9?

9 A.    There was a disconnected N. E. C. desktop computer in the

10 upstairs office area.  That was not connected.  It was

11 disconnected off to the side.  That was just seized in total.

12 Q.    So that's the digital evidence, electronic evidence?

13 A.    Yes.

14 Q.    Now, you have another category here of --

15         THE COURT:  Before we move on, we're going to adjourn

16 since you're at another topic.  We will adjourn for the day,

17 members of the jury.  Remember not to discuss the case among

18 yourselves or anyone else.  Should anyone talk to you about it,

19 bring it to my attention.  Don't expose yourself to any media

20 about this case.  I don't know there will be any.  I haven't

21 noticed.

22         The reason for that is you're to simply decide this

23 case on what you see and hear in this courtroom.  We will start

24 court tomorrow at ten because we have -- I have a proceeding at

25 nine tomorrow here, which -- ten will be perfect.  We'll keep

1    an eye on the weather.  Same thing, if anything -- there

2    doesn't appear anything predicted.  But then again, there was a

3    lot predicted and nothing happened.  So maybe the reverse will

4    happen.  In any event, you know the telephone number and what

5    to do.  So enjoy your evening.  We will see you tomorrow

6    morning at 10.

7                    (The jury was dismissed at this time.)

8                    MR. BRANDLER:  I know we have that motion.  But

9    scheduling purposes, I just want to go -- I advised counsel I

10   think we will be resting our case tomorrow after Mr. Browning

11   finishes his testimony.  I would expect it will go the entire

12   morning, and then we will be resting probably.  They will start

13   sometime in the afternoon.  I just want to put the Court on

14   notice of that for its own purposes.

15                   THE COURT:  Okay.  Mr. O'Brien, do you hear that?

16                   MR. O'BRIEN:  I'm sorry, Your Honor?

17                   THE COURT:  Mr. Brandler said this is his last

18   witness, he will be resting after this witness --

19                   MR. O'BRIEN:  He told me, Your Honor.

20                   THE COURT:  Probably be early afternoon.  Okay?

21                   MR. O'BRIEN:  Yep.

22                   THE COURT:  Okay.  So we will proceed.  Mr. Durkin.

23   Daniel Kuhn?  Hi, Mr. Kuhn, Judge Caputo here in Wilkes-Barre.

24   Presently I have Mr. Durkin here, who is your co-counsel.  Also

25   I have Mr. O'Brien who represents Mr. Harley, Mr. Harley, who

1  is the defendant in this case, and Mr. Brandler, who is the

2  assistant United States Attorney prosecuting the case.

3          MR. KUHN:  Hello, Your Honor.  Thank you for allowing

4  me to appear telephonically on this.

5          THE COURT:  Okay.  Now, who will put their oar in the

6  water?

7          MR. DURKIN:  I think I can start.  Larry Durkin on

8  behalf of the Federal Reserve Bank of New York.  And I along

9  with my co-counsel filed two motions to quash subpoenas that

10  were issued to both current employees of the Federal Reserve

11  Bank of New York as well as a former employee of the Federal

12  Reserve Bank of New York.  Before I came up, I did have

13  occasion to speak with Mr. O'Brien.

14          He asked if we could proceed on the -- the Hennessy

15  and Dages motion first -- so I think we were going to proceed

16  that way.  I also have a petition for the pro hac vice

17  admission of Mr. Kuhn, which I completed, and I will hand it up

18  to the Court.  And I think with that, I was going to ask if Mr.

19  Kuhn could go ahead and do the substantive argument on the

20  motion.

21          THE COURT:  Yes.

22          MR. KUHN:  Thank you, Your Honor.  Yeah, I suppose I

23  can handle the Hennessy and Dages subpoenas separately although

24  the arguments are pretty much the same for all the subpoenaed

25  individuals.

1          THE COURT:  All right.

2          MR. KUHN:  So I should note at the outset that we do

3    not have or -- I don't believe we have been served -- we

4    certainly don't have in our possession the Hennessy subpoena.

5    So we think that's a valid reason why he would not appear, but

6    I am going to proceed as if we do have it because I think we

7    know what it looks like and we expressed our willingness to

8    accept service of the subpoena.

9          THE COURT:  All right.

10          MR. KUHN:  So the standard here is whether the

11    subpoenaed individuals would offer material evidence that is

12    favorable to Mr. Harley.  The memorandum makes clear that in

13    each of the instances -- but particularly with regard to Mr.

14    Hennessy and Mr. Dages for purposes of arguing them first, they

15    don't have any substantive knowledge of the documents.  They

16    did not create the documents.  They did not sign the documents.

17          The documents did not in any way, shape or form come

18    from them.  For all intents and purposes, their only

19    involvement is by happenstance.  Somebody out there happened to

20    use their names and put their names on the documents and put a

21    signature on the documents that's not even theirs.  So the --

22    you know, there's really not much more to it.  I think their

23    affidavits say that much.  I don't think they can say any more

24    than that at trial, and those facts -- or what they can speak

25    to is because they have no personal knowledge of what's at

1  issue in these documents, they would not -- their testimony

2  would not be material nor favorable to Mr. Harley.  They'd

3  perhaps be detrimental to him, but I will leave that to the

4  attorneys there.

5           But I don't think there's -- I think that's

6  sufficient grounds for -- to quash.  I would also say the

7  argument is the same for Mr. McCurdy, but I will be happy to

8  repeat it.

9           THE COURT:  Let me say that, No. 1, I do have an

10 affidavit regarding Mr. Dages.  I don't have anything regarding

11 Mr. Hennessy.  You make a representation to me regarding facts

12 that Mr. Hennessy would stand behind.  But frankly, I have no

13 comfort of an affidavit as I do with Mr. Dages.  I am not so

14 sure it's a good idea to proceed with a motion to quash on Mr.

15 Hennessy on -- I will call it a deficient record.

16          MR. KUHN:  That is some sort of error somewhere along

17 the line because I see on the document that's filed -- E. C. F.

18 document 131 the attachment to my declaration has Mr.

19 Hennessy's affidavit on it.

20          THE COURT:  Wait a minute.  You're absolutely right.

21 I do have it.

22          MR. KUHN:  That's good to hear actually.

23          THE COURT:  It got by me.  My apologies.

24          MR. KUHN:  No, I am glad to hear you have it.

25          THE COURT:  I have it.  Let me look at it here.  I

1  must have looked at it before -- oh, okay.  Okay.  It does

2  essentially track Mr. Dages' affidavit.

3          MR. KUHN:  Yes, there may be one additional paragraph

4  in there because of the description of his position.

5          THE COURT:  Yes.

6          THE WITNESS:  At New York Fed.

7          THE COURT:  All right.  I do have it.  Mr. Durkin, do

8  you want to say something?

9          MR. DURKIN:  No.

10          THE COURT:  Mr. O'Brien?

11          MR. O'BRIEN:  Well, I think Mr. Harley would like to

12  respond.

13          THE COURT:  Well, okay.  Mr. Harley, I'm going to ask

14  you the same question I asked you regarding Dr. Bernanke.  Do

15  you have any independent evidence that -- that these gentlemen

16  signed these documents when they say they did not in an

17  affidavit?  Moreover, they say they don't really know anything

18  about any of this in their affidavits.  Now, do you have

19  anything other than you would like to hear them say that here

20  that would indicate that those statements are not so?

21          THE DEFENDANT:  I realized one thing, Your Honor.

22  When I was looking at the documents again, it appears to me

23  they are not actual signatures, they are stamped signatures,

24  which means that, yes, they didn't sign this particular

25  document.  It was stamped just like the seals and things were

90

1  stamped.  That's one thing.  Now, as far as Mr. Dages and Mr.

2  Hennessy and Mr. McCurdy, Mr. --

3  THE COURT:  I am not talking about McCurdy now.

4  THE DEFENDANT:  I'm sorry.

5  THE COURT:  Just talking Mr. Hennessy and Mr. Dages.

6  THE DEFENDANT:  Mr. Dages and Mr. Hennessy both sent

7  e-mails to -- not e-mails -- but documents to Joseph Teo Hui

8  Kiat, and they have his name on those documents.  They stamped

9  them with the -- what I call the signature stamp.

10  THE COURT:  They both say those signatures stamped or

11  otherwise don't resemble their own signatures.  That's what

12  they say in their affidavit.

13  THE DEFENDANT:  I would like to get an expert in here

14  to decide that.  That's what I would like to do then because --

15  THE COURT:  Have you had these examined by an expert?

16  THE DEFENDANT:  No, I have not.

17  THE COURT:  Okay.  That's where we are right now in

18  this proceeding.

19  THE DEFENDANT:  I would like to have that done

20  though.

21  THE COURT:  There's not time to do that.  Okay.  So

22  do you have any other evidence that what they say is not so?

23  THE DEFENDANT:  I can't prove it otherwise unless I

24  have a handwritten --

25  THE COURT:  You can't prove it with an expert either

1  that you know of.

2          THE DEFENDANT:  All I know is I got the documents the

3  same as -- as some of the other documents --

4          THE COURT:  And so did they.  They can conclude they

5  are not theirs.  Anything else, Mr. Durkin?

6          MR. DURKIN:  No, Your Honor.

7          MR. KUHN:  Your Honor, very quickly, of course, the

8  signature -- definition of a signature includes stamping with

9  an image.  Importantly these images do their resemble their

10 signatures.

11         THE COURT:  That's what their affidavit is saying.

12 All I'm suggesting is there any evidence to the contrary.  The

13 response I got is I need an expert to determine that.  And

14 that's not in the cards at the moment.  So as far as Mr. Dages

15 and Mr. Hennessy are concerned, their subpoenas will be

16 quashed.  There's no evidence that their testimony certainly

17 would be -- there's no evidence their testimony would be

18 favorable, and there's no indication at all that given their

19 statements about the validity of their signatures whether

20 facsimile or otherwise are relevant in an unfavorable way.  So

21 consequently, I am quashing their subpoenas.  Let's turn to Mr.

22 McCurdy.

23         MR. O'BRIEN:  I will ask Mr. Brandler to --

24         MR. KUHN:  Your Honor, so I am not going to reargue

25 the --

1          THE COURT:  Just a minute.  Just a minute.

2          MR. KUHN:  Oh, sure.

3          MR. BRANDLER:  He asked me to leave.  I think for the

4  benefit -- I will abide by Mr. O'Brien's wishes and step out

5  for the record.

6          MR. O'BRIEN:  And the FBI agents.  I ask we clear the

7  courtroom of witnesses.

8          MR. BRANDLER:  Well, Mr. Silverstein, I think he's in

9  a different situation.  He has a right under the rules to be

10  here for any public proceeding.  I will represent to the Court

11  I am not going to speak to Mr. Silverstein about what

12  transpires here.  And I think Mr. Silverstein is here hearing

13  that.  I think he has a right under Rule 60 to be here.

14          THE COURT:  I don't know that he has a right to hear

15  a confidential communication between lawyer and client or

16  client and lawyer.  Now, we can deal with this at sidebar.  I

17  mean, I don't want to inconvenience him, but I am not going to

18  -- I will not air out such communications in open court.

19          MR. BRANDLER:  I will leave and -- take Mr. O'Brien's

20  advice and leave.  If there's a privileged communication, I

21  agree with Your Honor, Mr. Silverstein doesn't have a right to

22  do that.  But I don't know that there is a privilege

23  communication.

24          THE COURT:  I don't either.

25          MR. BRANDLER:  They are going to leave.  It is a moot

93

1    point.

2              THE COURT:  That's good.  Mr. McCurdy, Mr. Kuhn?

3              MR. KUHN:  Yes, thank you, Your Honor.  So I -- like

4    I was saying, it's the same standard again as to whether Mr.

5    McCurdy could offer material and favorable testimony.  And in

6    this instance we're talking, I think, about four e-mails, maybe

7    five -- and a separate document that appears -- I think the

8    April 2010 document that he supposedly -- allegedly signed.

9              With regard to that document, again, it's not his

10   signature.  And moreover, it was purportedly signed in April

11   2010 after he retired from the New York Fed.  So that's a very

12   similar issue to the ones concerning Mr. Hennessy and Mr.

13   Dages.  All of the other documents are e-mails that supposedly

14   came from a Chris -- Chrismccurdy64@aol.com as Mr. McCurdy says

15   in his affidavit that's not his personal e-mail address.  That

16   e-mail address -- it's not an e-mail he created or ever used

17   and it's unfamiliar to him.  You don't need to -- anyone can

18   create an e-mail address with any name on it.

19             You don't have to authenticate it or prove that it's

20   you.  So it appears somebody created that out there and sent

21   the documents from that e-mail address, but it was not Mr.

22   McCurdy as his affidavit makes clear.  So there again we have

23   somebody who has no knowledge of the underlying documents and

24   they certainly did not create them, sign them or send them

25   using Mr. McCurdy's e-mail address.

94

1          THE COURT:  All right.

2          THE DEFENDANT:  Your Honor, I have an e-mail here Mr.

3  McCurdy's name on it, time it was sent out, who it was sent to.

4  And that person sent it to someone else, and it ended up with

5  me.  Now, I had a friend of mine search the e-mail address.  He

6  came back -- I wish I had the information with me -- but here's

7  what he came back with.  Please take my word for this.  This is

8  the truth.

9          THE COURT:  Go ahead.

10          THE DEFENDANT:  He came back, gave me Mr. McCurdy's

11  address, where he lives, how many children he has and his phone

12  number.  Mr. McCurdy, Ridgedale, New Jersey; is that not

13  correct?

14          THE COURT:  So what?

15          THE DEFENDANT:  Pardon me?

16          THE COURT:  So what?

17          THE DEFENDANT:  That is what I am saying came back

18  with this e-mail.  He took this e-mail address and got all that

19  information for me.

20          THE COURT:  So you're saying that Mr. McCurdy's

21  statement that that's not his e-mail is not true?

22          THE DEFENDANT:  It is -- that is --

23          THE COURT:  Do you have any evidence of that?

24          THE DEFENDANT:  Well, I didn't bring it with me

25  unfortunately.  I can get it for you.  That's what I am saying.

95

1  You see, Your Honor --

2          THE COURT:  Now is the time.

3          THE DEFENDANT:  I didn't know you were having this

4  hearing today, Your Honor.  I didn't know.  Nobody told me.

5          THE COURT:  All right.

6          THE DEFENDANT:  Had I known that, I would have

7  brought that with me.

8          THE COURT:  What evidence do you have?

9          THE DEFENDANT:  I have the e-mails here.

10         THE COURT:  No.  What evidence do you have that you

11 would have brought with you?

12         THE DEFENDANT:  That I would have brought with me?

13         THE COURT:  Yeah.

14         THE DEFENDANT:  Oh, the gentleman who did this for me

15 checked his e-mail address out for me and came back with his

16 information on it, where he lives, everything and his phone

17 number and how many children he has, everything.  And I'm just

18 saying it all -- e-mail is like a fingerprint once you been --

19 once you --

20         THE COURT:  I don't want a lecture about that.  I

21 just want you to tell me what evidence you have.  Now, if I put

22 somebody's name -- I make up an e-mail address, and I put

23 someone's name out for the investigation, I'm sure all I have

24 to do is match the name and they can give me that information.

25         THE DEFENDANT:  That's true.  That's true.

1           THE COURT:  That doesn't make it his e-mail address.

2           THE DEFENDANT:  In other words, if I take your e-mail

3   and I have someone look up the I. P. address -- that's what it

4   is called -- I. P. address and it comes back with all your

5   information, where you live and everything else because again

6   an e-mail they say is like a fingerprint.  They were doing that

7   in the bridge -- they call that the Bridge Gate thing with

8   Christie and them.  They were looking at all the e-mails for

9   evidence.  E-mails is evidence.

10          THE COURT:  They take e-mail when they take it off

11  the computer.  Listen, so you have some evidence that you can

12  deliver here tomorrow?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Okay.  What else do you have?

15          THE DEFENDANT:  I have the documentation.  In other

16  words when the e-mails went out, Your Honor, he lists in J. peg

17  -- he sent them out in J. peg.  He lists all the instruments

18  that went out with this e-mail.  They are listed on this

19  e-mail.  I am looking at it right now.  That's evidence.  I

20  have -- I have the documentation right behind it.

21          THE COURT:  That's evidence of what?

22          THE DEFENDANT:  Evidence -- he's saying that with

23  this e-mail he's sending out S. K. R., Joseph Teo Hui Kiat for

24  -- 1 J. peg, same thing, 2 J. peg and then other one that says

25  4 J. peg, 5 J. peg, 6 J. peg -- in other words, six different

1 pieces of paper that went out with this e-mail.  I have them

2 right here behind it.  They all match up.

3        THE COURT:  Same e-mail address?

4        THE DEFENDANT:  Same e-mail address.

5        THE COURT:  Right.  So you're saying that -- who did

6 he send this to?

7        THE DEFENDANT:  Joseph Teo Hui Kiat.

8        THE COURT:  He says he's not familiar with him.

9        THE DEFENDANT:  He may say that, Your Honor, but

10 that's not true.

11        THE COURT:  The evidence you offer for that is that

12 e-mail?

13        THE DEFENDANT:  Yes, yes.

14        THE COURT:  What else do you have?

15        THE DEFENDANT:  I said -- I thought the e-mail is --

16 is the most important thing because, again it's not --

17        THE COURT:  The man says that he's -- that's not his

18 e-mail address, he didn't create it and he's never used it.

19 That's what he said.  So you're going to produce evidence that

20 disproves that?

21        THE DEFENDANT:  I thought I did with the e-mail.

22 He's saying --

23        THE COURT:  No, wait a second.  You told me you had

24 some search that was done, okay.  Fine.  Then you either

25 produce the search which, I will give you until tomorrow to do

1   it.  But what you're telling me now, that's just compounding

2   perhaps a mistake.  That doesn't -- that's not evidence.  If

3   that's all of the evidence that you have, that's not going to

4   carry the day.  He says, that's not my e-mail and I never used

5   it, moreover, I am not familiar with Mr. Kiat.

6           THE DEFENDANT:  I understand that, Your Honor.  I

7   understand that.

8           THE COURT:  Okay.  All right.  Anything else?

9           MR. O'BRIEN:  Your Honor, may I jump in here, just

10  one point?  The e-mails that Mr. Harley has been referring to

11  are part of this record.  They have been admitted into the

12  record.  They have been admitted into evidence, identified and

13  admitted as part one of the government's exhibits.  And there

14  was testimony from -- from a government witness that -- from

15  the first gentleman, the gentleman from Atlanta, he -- on cross

16  examination begrudgingly perhaps but he did admit these e-mails

17  could be construed as evidence that Mr. McCurdy did send these

18  -- the checks in issue in this case to Mr. Harley.  So -- I

19  advised Mr. Harley that I didn't think Mr. McCurdy was a

20  central witness because we already had that in here .  If his

21  affidavit says I didn't do it, it will be harmful evidence.

22          THE COURT:  Well, all right.  That's between you and

23  he.

24          MR. O'BRIEN:  I want to make a point on that because

25  that's --

1          THE COURT:  Between you and he.  Anything else?

2          MR. KUHN:  No, Your Honor.  I'm sorry that there is

3   evidence potentially available that, I mean, I can't argue

4   against it in the abstract.  You point about how you can

5   connect a name to an e-mail address and just -- you know, then

6   find whatever -- whatever information you can about that name

7   is the point on that to be made.  But if this has to wait

8   another day, it's unfortunate.

9          THE COURT:  I don't think there's any other choice.

10  We're going to wait another day.  We will give Mr. Harley an

11  opportunity to indicate what I've asked for, which is

12  independent evidence that the statements that Mr. McCurdy makes

13  aren't so -- or at least that there could be a legitimate

14  dispute about it.  We'll just wait to see what his evidence

15  demonstrates.  I will -- I will review it when he comes in.  I

16  will call Mr. Durkin, and we will call your office if we need a

17  further hearing.

18          We will probably do it anyway, whichever way it goes

19  at some time during tomorrow.  Are you available tomorrow?

20          MR. KUHN:  I believe I am -- just a moment, please.

21  Yes, I am available.  So I can be pretty flexible.

22          MR. DURKIN:  Yes, Your Honor.

23          THE COURT:  I will take it under advisement, and we

24  will try to do this in the morning.  It will be sometime after

25  11.

1    MR. KUHN:  Mr. McCurdy will not plan on appearing

2  tomorrow?

3    THE COURT:  No.

4    MR. DURKIN:  Your Honor, if I can have one moment.

5  As I am standing here, I was watching the presentation.  I can

6  see the e-mail that my client included in its -- its documents,

7  and I see the one that's being referred to where it's -- you

8  know, from a S. K. R., Joseph Teo Hui Kiat -- there's a list of

9  attachments on it that the gentleman was referring to.  He has

10  the attachments.  We do not have the attachments.

11    I don't know enough about this case to know whether

12  that matters.  But if he has the attachments in his packet of

13  documents right here, we do not have them in our packet.  I

14  don't think we were ever given the attachments, so it might be

15  -- I guess I would say it would be helpful if we had the

16  attachments that he's referring to.  He has additional

17  documents that are not here from --

18    THE COURT:  I hear you, but I don't know what it

19  means.

20    MR. DURKIN:  I am not sure either.

21    THE COURT:  Are those available for him?

22    MR. O'BRIEN:  What I sent to counsel of New York was

23  the documents that had been admitted in Court.  They didn't

24  have the attachments.

25    MR. DURKIN:  I --

1          MR. KUHN:  I don't think it changes the overall

2   analysis much, although I -- a complete record is always good

3   to take Mr. Durkin's point.  I don't think it changes our

4   analysis very much.

5          THE COURT:  All right.  Thanks, Mr. Kuhn.  Sorry for

6   the delay.  That's the way it has to be, and we'll talk to you

7   tomorrow.

8          MR. KUHN:  Understood, Your Honor.  Did you indicate

9   a preference for time?

10          THE COURT:  I said sometime after 11 -- it will be

11   between 11 and 12:30.  I will try to narrow it.  That's the

12   best I can do.  Thank you.

13          MR. O'BRIEN:  Can I have one more -- Richard, stay

14   here, please.  Can I address two other issues at this time?

15          THE COURT:  Sure.  Do you need Mr. Brandler?

16          MR. O'BRIEN:  No, I don't.  Issue No. 1 involves the

17   question of the reference on the exhibit to the fact that the

18   judgment entered against Mr. Harley arose out of a criminal

19   matter, I believe the Court said to Mr. Harley the Court would

20   instruct the jury -- give a cautioning instruction and instruct

21   the jury not to -- not to consider that.

22          I've advised Mr. Harley that he should make up his

23   mind as to whether he wants a cautionary instruction before the

24   case goes out to the jury.

25          THE DEFENDANT:  He told me that before he -- yeah,

1  before the jury went out that he told me -- I have until that

2  point I thought.

3          THE COURT:  Yeah.  There's no need -- there's no need

4  -- the only thing I will say you may want an instruction before

5  closings just in the event it's put up on the board by anybody

6  in their closing.  So before closings I would say is probably

7  the best time.

8          THE DEFENDANT:  Thank you so much.

9          MR. O'BRIEN:  The second point, I have advised Mr.

10 Harley he should tell me before I open whether he's going to

11 testify.

12         THE COURT:  Well, that's again -- that's between you

13 and Mr. Harley.

14         MR. O'BRIEN:  I want to put that on the record.

15         THE DEFENDANT:  Thank you, Your Honor.

16         THE COURT:  Thank you.

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

1

2

3    I, LAURA BOYANOWSKI, Official Court Reporter for the

4 United States District Court for the Middle District of

5 Pennsylvania, appointed pursuant to the provisions of Title 28,

6 United States Code, Section 753, do hereby certify that the

7 foregoing is a true and correct transcript of the

8 within-mentioned proceedings had in the above-mentioned and

9 numbered cause on the date or dates hereinbefore set forth; and

10 I do further certify that the foregoing transcript has been

11 prepared by me or under my supervision.

12

13

14                          _____
                            Laura Boyanowski, RMR, CRR
15                          Official Court Reporter

16 REPORTED BY:

17     LAURA BOYANOWSKI, RMR, CRR
       Official Court Reporter
18     United States District Court
       Middle District of Pennsylvania
19     Scranton, PA  18503

20
          (The foregoing certificate of this transcript does not
21 apply to any reproduction of the same by any means unless under
   the direct control and/or supervision of the certifying
22 reporter.)

23

24

25

**$**

**$10** [1] - 58:19
**$200** [7] - 21:3, 23:1, 24:2, 24:13, 25:14, 25:24
**$500** [1] - 41:9

**'**

**'99** [1] - 52:1

**1**

**1** [9] - 1:11, 21:22, 56:7, 61:23, 62:16, 62:20, 88:9, 96:24, 101:16
**10** [4] - 1:14, 30:10, 53:20, 85:6
**10,000** [4] - 9:7, 9:10, 16:13, 16:14
**100** [1] - 24:2
**1022** [1] - 22:8
**1025** [1] - 56:23
**10818-1989** [1] - 61:24
**11** [18] - 9:21, 10:19, 11:8, 12:2, 12:4, 14:11, 15:8, 15:9, 15:11, 17:9, 17:10, 17:23, 21:11, 56:21, 63:19, 99:25, 101:10, 101:11
**11s** [1] - 10:17
**11th** [2] - 56:2, 80:8
**12** [6] - 3:3, 30:10, 31:2, 63:18, 71:7, 77:12
**120** [2] - 60:17, 65:10
**1212** [1] - 1:23
**12700** [1] - 56:18
**12:30** [2] - 3:9, 101:11
**12th** [5] - 24:3, 55:22, 59:7, 59:25, 64:24
**13** [3] - 9:19, 12:4, 55:23
**131** [1] - 88:18
**131463500** [1] - 55:19
**1341** [1] - 56:10
**13th** [2] - 59:22, 62:24
**1427** [1] - 24:5
**14th** [4] - 54:16, 54:23, 55:8, 59:6
**15** [2] - 65:23, 66:21
**16** [1] - 7:10
**17** [3] - 7:10, 39:9, 39:21
**171** [1] - 60:21
**171-309** [1] - 57:1
**171.302** [2] - 60:13,

65:5
**171.309** [4] - 59:1, 60:9, 65:1, 65:11
**17108** [1] - 1:20
**17th** [2] - 27:1, 28:8
**18** [2] - 2:6, 7:10
**180-day** [1] - 17:3
**18335** [1] - 22:4
**18356** [2] - 22:18, 24:4
**18411** [1] - 1:24
**18503** [1] - 103:19
**18th** [1] - 61:22
**19** [1] - 50:24
**1904** [1] - 56:18
**1946** [1] - 64:22
**1989** [2] - 62:11, 64:1
**1993** [1] - 25:3
**1993-ultimate** [1] - 23:16
**1994** [3] - 55:20, 56:6, 56:23
**1995** [1] - 57:8
**1996** [5] - 55:20, 57:9, 58:4, 62:17, 62:20
**1997** [8] - 55:21, 55:22, 58:1, 58:12, 58:14, 58:15, 58:22, 62:22
**1998** [1] - 59:6
**1999** [20] - 19:4, 21:11, 24:3, 27:1, 28:8, 28:10, 28:18, 49:19, 50:24, 51:2, 51:6, 52:10, 55:23, 59:7, 59:22, 59:25, 62:24, 63:2, 69:13
**19th** [8] - 28:10, 28:18, 49:18, 50:12, 58:14, 58:15, 62:11, 64:1
**1:00** [3] - 30:20, 30:23, 47:7
**1:30** [1] - 76:24

**2**

**2** [4] - 21:17, 21:23, 22:4, 96:24
**2,000** [1] - 76:5
**20** [6] - 10:22, 11:5, 11:10, 58:1, 58:22
**20.5** [1] - 4:24
**20.6** [9] - 4:20, 4:24, 6:9, 6:12, 7:5, 7:19, 47:11
**200** [6] - 22:15, 22:25, 24:12, 35:21, 56:11
**2002** [2] - 55:24, 60:10
**2009** [3] - 63:18, 64:4, 64:24
**2010** [2] - 93:8, 93:11

**2011** [7] - 35:11, 36:2, 63:19, 65:2, 67:3, 67:16, 69:25
**2012** [7] - 54:16, 54:23, 55:8, 70:4, 70:14, 80:8, 80:22
**2013** [7] - 56:2, 61:22, 61:23, 61:25, 63:6, 63:7, 63:20
**2014** [4] - 1:14, 40:13, 41:16, 41:20
**2015** [1] - 18:25
**20th** [1] - 55:22
**21** [1] - 57:8
**217** [1] - 1:19
**228** [1] - 1:19
**22nd** [2] - 55:24, 60:10
**23** [1] - 51:6
**23rd** [2] - 51:2, 58:12
**25.10** [4] - 21:6, 53:10, 53:13, 53:15
**25.11** [4] - 27:15, 51:4, 51:9, 51:24
**25.13** [3] - 52:8, 52:13, 52:18
**25.15** [3] - 28:12, 28:25, 29:3
**25.16** [1] - 27:15
**25.5** [3] - 26:9, 27:12, 27:17, 27:20, 28:6
**25.7** [3] - 50:15, 50:20, 50:22
**250** [1] - 11:25
**25th** [2] - 52:1, 52:10
**26.6** [1] - 6:12
**27th** [3] - 55:20, 57:9, 58:4
**28** [1] - 103:5
**28.1** [2] - 61:5, 63:10
**28th** [3] - 62:22, 63:19, 65:2
**29** [1] - 80:22
**29.1** [1] - 55:13
**29th** [1] - 70:14
**2nd** [1] - 61:23

**3**

**3** [3] - 21:19, 22:1, 54:23
**30** [1] - 33:24
**30.1** [2] - 54:15, 55:9
**300** [2] - 11:12, 11:23
**31** [2] - 35:11, 63:7
**31st** [1] - 63:6
**337** [2] - 22:17, 24:4
**35401** [1] - 24:6
**3:12-CR-224** [1] - 1:5
**3:CR-12-224** [1] - 61:22

**3rd** [3] - 55:20, 56:6, 56:23

**4**

**4** [5] - 22:5, 49:3, 63:24, 82:23, 96:25
**400** [4] - 11:9, 11:11, 11:21, 56:22
**4209** [1] - 62:13
**42701** [1] - 22:9
**45** [1] - 70:18
**458** [1] - 39:16
**49.1** [1] - 65:16
**4:00** [3] - 3:16, 30:16, 46:21
**4th** [1] - 55:21

**5**

**5** [6] - 54:22, 54:25, 55:3, 55:5, 63:2, 96:25
**50,000** [1] - 9:12
**50.1** [1] - 80:14
**500** [2] - 23:18, 25:5
**54** [1] - 2:6
**570-476-7600** [1] - 72:24
**58** [1] - 39:16
**5th** [3] - 40:13, 41:20, 64:4

**6**

**6** [2] - 83:8, 96:25
**60** [1] - 92:13
**66** [1] - 2:7
**6:30** [1] - 50:13

**7**

**7** [5] - 10:18, 10:24, 11:8, 12:4, 83:21
**75251** [1] - 56:19
**753** [1] - 103:6
**7:22** [1] - 35:11
**7s** [1] - 9:16
**7th** [1] - 61:25

**8**

**8** [1] - 2:5
**8/19/99** [1] - 50:18
**89119** [1] - 62:14
**8:11** [1] - 71:4
**8:16** [1] - 80:22

**9**

**9** [2] - 64:6, 84:8

**9:40** [1] - 41:21

**A**

**a.m** [4] - 35:11, 41:21, 71:4, 80:22
**abide** [1] - 92:4
**ABINGTON** [1] - 1:23
**able** [5] - 14:21, 40:19, 42:8, 70:1, 78:19
**above-mentioned** [2] - 21:20, 103:8
**above-named** [2] - 59:16, 64:10
**absolutely** [2] - 48:20, 88:20
**abstract** [1] - 99:4
**accelerated** [1] - 46:11
**accept** [8] - 43:25, 44:3, 45:7, 45:10, 45:12, 46:1, 46:5, 87:8
**acceptable** [1] - 3:19
**accepted** [1] - 43:22
**accepting** [2] - 27:5, 46:12
**access** [1] - 76:7
**accordance** [2] - 23:19, 25:6
**according** [1] - 35:3
**accordingly** [1] - 64:14
**accounts** [10] - 57:11, 57:15, 59:8, 59:12, 60:13, 60:19, 65:5, 65:8, 69:4, 69:5
**accurate** [3] - 78:3, 78:22, 79:4
**acknowledge** [2] - 22:22, 24:9
**acknowledged** [1] - 35:23
**acknowledging** [1] - 35:15
**acknowledgment** [2] - 63:17, 63:18
**Act** [2] - 64:22, 64:23
**action** [1] - 54:6
**activities** [1] - 69:23
**activity** [1] - 55:6
**actual** [4] - 26:13, 42:21, 80:23, 89:23
**adaptor** [1] - 83:14
**addition** [2] - 77:13, 77:15
**additional** [3] - 58:19, 89:3, 100:16
**address** [30] - 11:15, 22:3, 22:19, 24:1,

43:20, 56:9, 56:12, 56:15, 56:21, 64:5, 70:17, 93:15, 93:16, 93:18, 93:21, 93:25, 94:5, 94:11, 94:18, 95:15, 95:22, 96:1, 96:3, 96:4, 97:3, 97:4, 97:18, 99:5, 101:14
**addressed** [1] - 21:13
**adequate** [1] - 39:9
**adjourn** [2] - 84:15, 84:16
**admission** [5] - 27:11, 28:24, 51:9, 53:10, 86:17
**admit** [1] - 98:16
**admitted** [13] - 27:19, 29:2, 47:13, 51:12, 51:19, 52:17, 53:12, 53:17, 66:1, 98:11, 98:12, 98:13, 100:23
**Admitted** [1] - 55:12
**advance** [3] - 33:3, 33:7, 58:21
**advice** [1] - 92:20
**advise** [1] - 74:20
**advised** [4] - 85:9, 98:19, 101:22, 102:9
**advisement** [1] - 99:23
**affidavit** [18] - 31:6, 33:9, 33:19, 35:3, 35:4, 36:18, 36:25, 61:7, 88:10, 88:13, 88:19, 89:2, 89:17, 90:12, 91:11, 93:15, 93:22, 98:21
**affidavits** [2] - 87:23, 89:18
**affixed** [1] - 71:20
**aforementioned** [2] - 22:24, 24:11
**afternoon** [3] - 46:21, 85:13, 85:20
**agency** [2] - 51:6, 66:23
**agent** [12] - 18:18, 18:19, 18:24, 19:5, 19:22, 26:23, 28:19, 56:12, 64:6, 66:19, 66:24, 71:24
**agents** [4] - 29:17, 49:22, 71:10, 92:6
**ago** [1] - 54:5
**agree** [8] - 10:5, 15:11, 32:20, 32:23, 48:5, 65:20, 92:21
**agreed** [3] - 50:5, 50:7, 65:17

**ahead** [11] - 28:2, 30:6, 34:19, 49:10, 49:15, 63:4, 63:5, 70:22, 73:24, 86:19, 94:9
**air** [1] - 92:18
**al** [1] - 21:15
**Alabama** [12] - 18:18, 19:1, 19:2, 21:14, 21:21, 24:1, 24:6, 52:12, 53:2, 69:9, 69:13
**allegations** [2] - 16:23, 16:24
**alleged** [4] - 16:20, 44:20, 47:9, 47:14
**allegedly** [1] - 93:8
**alleges** [1] - 16:20
**alleging** [4] - 20:9, 36:20, 36:21, 36:22
**allow** [1] - 83:15
**allowed** [2] - 15:3, 32:6
**allowing** [2] - 46:18, 86:3
**allows** [3] - 39:17, 82:21, 83:20
**almost** [1] - 8:13
**alone** [1] - 38:22
**Amendment** [3] - 39:13, 39:17, 42:6
**America** [2] - 65:18, 65:19
**AMERICA** [1] - 1:3
**amount** [3] - 22:15, 40:3, 70:5
**amounts** [1] - 72:4
**Amy** [2] - 56:22, 56:23
**AN** [1] - 61:7
**analysis** [2] - 101:2, 101:4
**Anderson** [2] - 61:7, 61:9
**Annotated** [2] - 57:2, 59:1
**announce** [1] - 72:4
**announced** [1] - 73:2
**announcing** [1] - 72:6
**annual** [2] - 56:16, 62:8
**answer** [3] - 11:10, 33:10, 37:1
**anyway** [2] - 6:19, 79:19, 99:18
**apologies** [1] - 88:23
**apologize** [1] - 66:13
**appeal** [1] - 48:10
**appear** [8] - 23:24, 25:9, 33:15, 62:24, 78:16, 85:2, 86:4,

87:5
**APPEARANCES** [1] - 1:16
**appeared** [2] - 25:23, 39:4
**appearing** [3] - 22:20, 24:7, 100:1
**applicable** [1] - 64:13
**application** [7] - 57:23, 57:24, 59:21, 63:16, 63:21, 64:10, 64:19
**applies** [3] - 13:21, 58:7, 60:3
**apply** [4] - 13:24, 32:1, 46:23, 103:21
**appointed** [1] - 103:5
**appreciate** [1] - 46:18
**approach** [1] - 26:10
**approached** [1] - 67:5
**approved** [1] - 55:5
**April** [2] - 93:8, 93:10
**area** [11] - 30:13, 74:10, 74:11, 76:9, 76:10, 82:8, 82:14, 83:1, 83:12, 84:10
**areas** [1] - 76:1
**argue** [2] - 32:5, 99:3
**arguing** [1] - 87:14
**argument** [2] - 86:19, 88:7
**arguments** [1] - 86:24
**arising** [2] - 5:7, 54:4
**arose** [1] - 101:18
**arrest** [2] - 74:25, 75:1
**arrive** [1] - 71:3
**arrived** [6] - 71:6, 71:14, 71:22, 72:2, 72:3, 73:17
**art** [1] - 68:6
**article** [4] - 56:7, 56:8, 56:13, 56:21
**articles** [8] - 55:19, 56:4, 58:8, 58:10, 60:4, 60:6, 62:7, 62:9
**articulated** [1] - 40:3
**ascertainment** [3] - 57:19, 59:17, 60:24
**aside** [4] - 57:25, 58:9, 59:21, 60:5
**asset** [3] - 13:25, 15:19, 15:22
**assets** [18] - 11:15, 14:2, 14:8, 14:9, 14:14, 14:21, 15:1, 15:12, 15:23, 15:25, 17:7, 17:15, 17:17, 24:10, 57:13, 59:10, 60:20

**assets/securities** [1] - 22:23
**assigned** [3] - 19:2, 19:7, 67:11
**assignee** [2] - 23:11, 24:24
**assignment** [1] - 21:17
**assistant** [3] - 35:14, 43:13, 86:2
**assume** [2] - 5:16, 32:16
**Assumed** [1] - 64:23
**assure** [1] - 40:22
**Atlanta** [1] - 98:15
**attached** [8] - 55:17, 62:2, 62:5, 63:14, 70:23, 70:24, 76:7, 76:15
**attachment** [4] - 77:6, 81:1, 81:6, 88:18
**attachments** [7] - 100:9, 100:10, 100:12, 100:14, 100:16, 100:24
**attempt** [1] - 25:25
**attempts** [1] - 30:22
**attention** [7] - 7:25, 19:4, 26:8, 30:22, 53:23, 58:21, 84:19
**Attorney** [2] - 54:2, 86:2
**attorney** [4] - 6:18, 34:15, 47:17, 67:17
**Attorney's** [5] - 19:15, 53:2, 67:5, 67:7, 68:21
**attorney's** [1] - 7:24
**ATTORNEY'S** [1] - 1:18
**attorney/client** [2] - 32:1, 32:7
**attorneys** [1] - 88:4
**audible** [1] - 27:24
**August** [23] - 19:4, 21:11, 24:3, 27:1, 28:8, 28:10, 28:18, 49:18, 50:12, 50:24, 51:1, 51:6, 52:1, 52:10, 54:16, 54:22, 55:8, 55:20, 57:9, 58:4, 70:4, 70:14, 80:22
**AUSA** [1] - 19:14
**Austin** [2] - 56:2, 58:16
**authentic** [2] - 40:23, 40:25
**authenticate** [1] - 93:19

**authenticating** [1] - 23:22
**authorities** [1] - 40:21
**authority** [14] - 57:3, 57:18, 58:3, 58:8, 58:11, 59:3, 59:16, 59:24, 60:4, 60:7, 60:15, 60:23, 64:15, 64:16
**authorize** [1] - 64:20
**authorized** [4] - 22:19, 24:6, 46:2, 81:6
**automobile** [3] - 76:17, 76:19, 76:21
**available** [6] - 23:6, 24:19, 99:3, 99:19, 99:21, 100:21
**Avenue** [1] - 24:5
**average** [2] - 9:7, 9:10
**aware** [1] - 44:19

## B

**background** [2] - 35:2, 35:14
**bad** [3] - 16:16, 16:21, 83:14
**Bank** [10] - 19:16, 20:1, 21:21, 24:5, 25:7, 28:21, 42:20, 86:8, 86:11, 86:12
**bank** [34] - 19:25, 20:5, 20:23, 21:4, 21:9, 21:23, 22:13, 22:14, 22:18, 22:22, 23:5, 23:8, 23:10, 23:13, 23:21, 23:22, 24:1, 24:9, 24:18, 24:21, 24:23, 24:25, 25:12, 25:18, 25:24, 26:2, 26:25, 27:1, 27:8, 28:20, 28:22, 29:8, 69:3
**banking** [1] - 40:21
**bankruptcy** [11] - 8:20, 9:2, 12:10, 13:17, 13:18, 14:23, 15:2, 15:20, 16:11, 16:16, 17:7
**bar** [1] - 17:3
**barn** [1] - 5:19
**BARNES** [2] - 2:6, 18:11
**Barre** [2] - 34:11, 85:23
**BARRE** [1] - 1:12
**barring** [1] - 44:18
**based** [8] - 16:23, 22:20, 22:24, 24:7, 24:10, 44:25, 61:14,

68:15
**basement** [5] - 72:10, 72:11, 74:11, 74:12, 83:23
**bath** [1] - 76:8
**bathroom** [1] - 74:19
**bearing** [2] - 38:7, 38:8
**become** [1] - 13:19
**bedroom** [2] - 74:10, 78:5
**BEFORE** [1] - 1:10
**beg** [1] - 42:16
**begin** [2] - 3:2, 67:2
**begrudgingly** [1] - 98:16
**behalf** [5] - 23:4, 24:15, 42:5, 46:1, 86:8
**behind** [4] - 4:14, 88:12, 96:20, 97:2
**belief** [1] - 61:14
**bellow** [1] - 18:22
**below** [6] - 22:20, 24:7, 55:18, 57:10, 63:15, 64:18
**Ben** [2] - 36:5, 43:12
**beneficiary** [6] - 22:17, 23:7, 23:11, 24:3, 24:19, 24:23
**benefit** [1] - 92:4
**Bernal** [1] - 39:16
**Bernanke** [23] - 3:3, 31:2, 32:21, 33:8, 34:17, 34:22, 35:3, 35:16, 35:19, 35:24, 36:5, 38:9, 38:14, 38:25, 39:19, 39:23, 41:14, 41:17, 41:19, 43:12, 45:3, 46:23, 89:14
**Bernanke's** [14] - 35:3, 35:9, 35:12, 35:21, 37:11, 37:20, 39:3, 40:4, 40:12, 40:24, 41:3, 41:5, 42:24, 43:3
**best** [5] - 10:14, 38:25, 61:13, 101:12, 102:7
**better** [2] - 27:25, 79:24
**between** [10] - 29:17, 49:1, 50:9, 51:1, 52:1, 92:15, 98:22, 99:1, 101:11, 102:12
**beyond** [2] - 46:2, 69:21
**Bill** [1] - 27:1
**Birmingham** [8] - 18:18, 19:2, 19:15,

26:24, 26:25, 27:7, 49:25, 69:14
**bit** [2] - 8:11, 30:9
**black** [1] - 76:20
**blackberry** [1] - 82:13
**blank** [4] - 22:15, 22:18, 23:21, 23:23
**blanks** [2] - 23:21, 23:25
**board** [3] - 29:8, 56:14, 102:5
**Board** [1] - 43:12
**body** [2] - 39:24, 63:7
**bottom** [3] - 25:9, 62:20, 63:6
**Box** [2] - 22:17, 24:4
**boxes** [2] - 77:9, 77:10
**BOYANOWSKI** [2] - 103:3, 103:17
**Boyanowski** [1] - 103:14
**BRANDLER** [80] - 1:18, 3:14, 4:3, 4:22, 5:10, 6:3, 6:14, 7:6, 7:9, 7:15, 7:20, 8:2, 13:5, 13:8, 16:8, 16:10, 17:20, 18:2, 18:5, 18:10, 18:14, 20:17, 20:22, 26:10, 26:20, 27:11, 27:17, 27:20, 27:24, 28:3, 28:7, 28:14, 28:24, 29:4, 29:13, 29:20, 29:24, 30:3, 30:6, 30:9, 31:22, 31:25, 32:20, 32:24, 33:3, 33:21, 34:4, 41:25, 47:8, 48:23, 49:5, 49:8, 49:15, 49:17, 50:20, 50:23, 51:9, 51:14, 51:25, 52:13, 52:19, 53:9, 54:11, 54:13, 55:13, 66:2, 66:6, 66:11, 66:13, 66:15, 79:16, 79:20, 80:10, 80:13, 80:15, 85:8, 92:3, 92:8, 92:19, 92:25
**Brandler** [10] - 4:11, 31:20, 32:12, 34:15, 41:24, 67:9, 85:17, 86:1, 91:23, 101:15
**break** [3] - 30:10, 30:19, 47:8
**bridge** [1] - 96:7
**Bridge** [1] - 96:7
**brief** [1] - 83:23
**briefly** [2] - 20:11, 67:24
**bring** [9] - 7:21, 8:6,

30:22, 36:11, 36:17, 48:1, 53:23, 84:19, 94:24
**broke** [1] - 73:25
**brought** [8] - 7:22, 7:24, 15:25, 21:9, 67:7, 95:7, 95:11, 95:12
**BROWNING** [2] - 2:7, 66:4
**Browning** [4] - 66:2, 66:7, 66:17, 85:10
**BRUCE** [1] - 1:18
**Bruce** [2] - 34:15, 62:13
**BUILDING** [1] - 1:19
**burden** [1] - 38:25
**burdensome** [1] - 42:14
**Bureau** [1] - 63:12
**business** [10] - 57:6, 57:7, 57:17, 59:6, 59:14, 62:13, 64:3, 64:4, 64:11, 64:17
**Business** [1] - 64:23
**BY** [18] - 8:17, 9:15, 13:13, 16:10, 18:14, 20:22, 26:20, 28:7, 28:14, 49:17, 50:23, 51:25, 52:19, 54:1, 66:15, 79:20, 80:15, 103:16

## C

**cancellation** [1] - 15:21
**cancelled** [3] - 14:22, 15:17, 15:18
**capacity** [3] - 18:17, 44:21, 66:24
**caption** [1] - 47:12
**Caputo** [2] - 34:7, 85:23
**CAPUTO** [1] - 1:10
**car** [6] - 15:6, 70:24, 71:14, 71:15, 76:7, 81:5
**card** [14] - 82:16, 82:17, 82:19, 82:20, 82:21, 83:9, 83:10, 83:11, 83:15, 83:16, 83:20
**cards** [2] - 83:13, 91:14
**care** [1] - 13:6
**Carrollton** [2] - 21:14, 52:12
**Carrolton** [1] - 64:5
**carry** [1] - 98:4

**case** [64] - 5:6, 6:24, 9:7, 9:10, 9:23, 10:25, 11:22, 12:11, 12:20, 12:23, 13:25, 14:1, 14:6, 14:8, 14:11, 14:14, 14:17, 15:10, 15:12, 15:15, 15:22, 16:18, 17:9, 17:10, 17:19, 19:10, 19:19, 19:20, 20:21, 34:12, 34:14, 34:15, 39:4, 39:5, 39:16, 39:17, 39:23, 39:25, 42:9, 48:17, 52:20, 53:1, 53:22, 61:20, 61:22, 66:25, 67:11, 68:20, 68:24, 69:13, 69:25, 79:11, 80:17, 83:23, 84:3, 84:17, 84:20, 84:23, 85:10, 86:1, 86:2, 98:18, 100:11, 101:24
**cases** [11] - 9:8, 9:11, 12:7, 12:8, 12:9, 14:10, 14:12, 14:19, 31:18, 39:17, 40:2
**category** [1] - 84:14
**Cathy** [1] - 54:18
**caused** [1] - 56:1
**cautionary** [2] - 47:18, 101:23
**cautioning** [1] - 101:20
**Cave** [1] - 22:8
**cell** [2] - 82:13, 82:22
**central** [1] - 98:20
**Central** [1] - 56:18
**CEO** [1] - 22:11
**certain** [3] - 4:5, 54:14, 71:15
**certainly** [7] - 38:8, 44:14, 44:17, 48:17, 87:4, 91:16, 93:24
**certificate** [26] - 25:13, 57:3, 57:6, 57:8, 57:18, 58:3, 58:8, 58:10, 59:3, 59:6, 59:16, 59:24, 60:4, 60:6, 60:10, 60:15, 60:22, 63:16, 64:8, 64:16, 64:20, 65:7, 65:13, 103:20
**CERTIFICATE** [1] - 103:1
**certification** [2] - 60:12, 65:4
**certified** [11] - 21:18, 22:20, 22:24, 24:7, 24:11, 54:15, 55:14, 61:6, 61:18, 61:25,

63:10
**certifies** [1] - 64:9
**certify** [9] - 21:24, 22:23, 24:10, 54:19, 55:17, 62:2, 63:13, 103:6, 103:10
**certifying** [1] - 103:21
**Chadwick** [5] - 3:5, 3:15, 34:5, 34:10
**CHADWICK** [8] - 34:6, 34:9, 38:4, 44:7, 44:9, 45:24, 46:13, 46:17
**chair** [2] - 82:14, 82:15
**chairman** [5] - 35:14, 38:6, 43:14, 44:21, 45:17
**Chairman** [3] - 35:16, 35:24, 38:9
**Chamber** [2] - 23:17, 25:4
**chance** [1] - 36:2
**change** [2] - 43:4, 63:4
**changes** [2] - 101:1, 101:3
**chapter** [2] - 10:24, 60:21
**Chapter** [18] - 9:16, 9:19, 9:21, 10:17, 10:18, 10:19, 11:8, 12:2, 12:4, 14:11, 15:8, 15:9, 15:11, 17:9, 17:10, 17:23
**characterize** [2] - 52:7, 76:11
**charges** [1] - 53:5
**Charlotte** [5] - 43:21, 43:23, 44:5, 45:8, 45:19
**charter** [14] - 57:3, 57:5, 57:7, 57:8, 57:17, 59:3, 59:6, 59:15, 60:10, 60:14, 60:22, 65:2, 65:7, 65:12
**check** [1] - 58:19
**checked** [1] - 95:15
**checking** [1] - 48:25
**checks** [5] - 35:12, 41:10, 41:13, 41:15, 98:18
**chief** [1] - 43:13
**children** [2] - 94:11, 95:17
**choice** [3] - 47:25, 83:14, 99:9
**choose** [1] - 75:7
**chose** [3] - 8:1, 75:8,

84:2
**Chris** [1] - 93:14
**Chrismccurdy64@**
**aol.com** [1] - 93:14
**Christie** [1] - 96:8
**circumstance** [1] -
44:19
**circumstances** [5] -
19:12, 40:1, 40:4,
42:14, 52:4
**cited** [1] - 40:1
**citing** [1] - 39:17
**civil** [4] - 5:6, 5:8,
40:2, 68:9
**claim** [2] - 14:12,
14:13
**claimed** [2] - 68:6,
69:22
**Clark** [1] - 62:14
**CLARKS** [1] - 1:24
**clause** [1] - 39:13
**clear** [6] - 51:20,
78:16, 78:17, 87:12,
92:6, 93:22
**clearer** [1] - 27:21
**clearing** [3] - 75:11,
75:15, 75:17
**clearly** [3] - 71:19,
78:6, 84:5
**client** [6] - 3:22, 3:25,
32:11, 92:15, 92:16,
100:6
**Cliff** [1] - 21:15
**cliff** [1] - 22:9
**Cliffton** [1] - 20:4
**closed** [7] - 21:25,
23:1, 23:16, 23:18,
24:13, 25:3, 31:23
**closer** [1] - 9:13
**closing** [1] - 102:6
**closings** [2] - 102:5,
102:6
**co** [2] - 85:24, 86:9
**co-counsel** [2] -
85:24, 86:9
**code** [3] - 23:20, 25:7,
60:21
**Code** [8] - 57:2, 59:1,
60:9, 60:13, 65:1,
65:5, 65:11, 103:6
**collateral** [1] - 21:17
**colleague** [1] - 28:19
**colleges** [1] - 43:18
**colon** [1] - 22:14
**Columbia** [1] - 22:4
**comfort** [1] - 88:13
**comments** [1] - 38:1
**commerce** [1] - 65:23
**Commerce** [2] - 23:17,
25:4

**commercial** [2] - 61:8,
61:12
**Commercial** [2] -
61:11, 62:5
**Commission** [7] -
21:19, 22:21, 24:8,
54:16, 54:17, 54:19,
55:7
**commission** [5] -
54:19, 54:21, 55:1,
55:4, 55:6
**commission's** [1] -
54:22
**Common** [1] - 64:23
**communicate** [1] -
82:22
**communication** [3] -
92:15, 92:20, 92:23
**communications** [2] -
68:1, 92:18
**Company** [7] - 22:3,
22:17, 23:4, 24:3,
24:15, 55:2
**company** [2] - 45:6
**compel** [2] - 39:7,
39:25
**compelled** [1] - 39:22
**compelling** [1] - 39:10
**complaint** [1] - 68:15
**complete** [4] - 11:17,
38:24, 75:14, 101:2
**completed** [4] - 14:12,
75:15, 75:17, 86:17
**completely** [1] - 79:4
**complexity** [1] - 10:25
**complicated** [1] - 12:2
**component** [1] - 8:24
**compounding** [1] -
98:1
**comptroller** [8] -
57:10, 57:15, 59:7,
59:12, 60:12, 60:18,
65:4, 65:8
**compulsory** [1] -
39:18
**computer** [18] - 26:13,
71:12, 77:22, 78:4,
78:7, 81:21, 81:22,
81:25, 82:3, 82:6,
82:11, 84:2, 84:3,
84:5, 84:9, 96:11
**computerized** [1] -
54:22
**computers** [1] - 77:16
**concern** [1] - 58:17
**concerned** [1] - 91:15
**concerning** [2] -
16:21, 93:12
**concerns** [2] - 19:18,
39:12

**conclude** [1] - 91:4
**conducted** [3] - 20:18,
70:13, 70:15
**confidential** [4] -
37:10, 40:18, 41:6,
92:15
**confirm** [5] - 23:4,
23:7, 24:17, 24:20,
40:22
**confirmed** [8] - 15:16,
17:12, 17:25, 23:9,
23:14, 24:21, 25:1,
37:20
**conform** [1] - 64:13
**confrontation** [1] -
42:6
**confronted** [2] -
45:11, 45:13
**connect** [1] - 99:5
**connected** [1] - 84:10
**connection** [2] - 26:2,
69:15
**consequently** [1] -
91:21
**consider** [2] - 30:18,
101:21
**consideration** [1] -
22:10
**considered** [2] - 57:2,
59:2
**consisted** [1] - 78:9
**consisting** [1] - 68:1
**consists** [2] - 75:21,
76:5
**constitute** [1] - 61:15
**constitutes** [1] - 48:9
**constituting** [1] -
56:14
**constitutional** [1] -
39:12
**constitutionally** [1] -
39:11
**construed** [1] - 98:17
**contact** [2] - 45:8,
69:24
**contacted** [1] - 19:15
**contain** [2] - 82:15,
83:4
**contained** [1] - 37:3,
82:11
**containing** [1] - 83:9
**contains** [3] - 81:20,
82:2, 82:5
**contents** [1] - 28:15
**context** [2] - 40:2,
68:8
**continue** [3] - 13:10,
52:23, 75:12
**contradict** [4] - 34:21,
35:8, 36:8, 36:10

**contrary** [10] - 6:5,
31:9, 33:8, 33:13,
33:18, 39:5, 39:8,
39:11, 42:9, 91:12
**control** [2] - 54:24,
103:21
**conversation** [10] -
20:12, 26:1, 27:2,
27:4, 29:6, 29:15,
29:17, 29:25, 49:15,
52:5
**converted** [1] - 78:5
**convicted** [1] - 5:8
**cooperate** [1] - 50:7
**copied** [4] - 77:22,
78:6, 81:22, 82:9
**copies** [8] - 7:11, 7:21,
21:2, 21:25, 26:14,
62:2, 62:3, 68:4
**copy** [19] - 21:25,
22:2, 22:5, 23:12,
24:24, 55:17, 62:1,
63:10, 63:14, 68:2,
69:13, 71:21, 78:7,
78:8, 80:23, 81:20,
81:25, 82:5, 82:11
**corporate** [14] - 14:9,
15:8, 15:9, 15:15,
17:6, 17:10, 17:23,
45:18, 46:4, 46:6,
58:11, 60:17, 69:6
**Corporate** [1] - 15:11
**Corporation** [1] -
63:11
**corporation** [27] -
17:7, 55:19, 56:7,
56:10, 56:12, 56:14,
57:4, 57:11, 57:16,
57:18, 57:21, 58:18,
59:4, 59:5, 59:8,
59:13, 59:16, 59:19,
60:18, 62:12, 62:16,
62:23, 62:24, 63:22,
63:23, 64:5, 64:11
**Corporations** [2] -
55:14, 58:16
**correct** [15] - 9:18,
9:20, 9:22, 16:18,
17:5, 27:10, 47:10,
53:6, 55:17, 63:14,
68:12, 70:9, 81:8,
94:13, 103:7
**corrected** [2] - 58:5,
60:2
**correction** [1] - 11:19
**correspondence** [2] -
55:22, 55:23
**costs** [3] - 57:14,
59:11, 60:21
**counsel** [19] - 3:4,

10:1, 26:13, 32:14,
34:14, 38:3, 43:8,
44:18, 45:3, 45:4,
45:22, 46:10, 54:24,
65:17, 65:19, 85:9,
85:24, 86:9, 100:22
**counting** [1] - 11:1
**counts** [2] - 65:21,
65:22
**County** [2] - 54:18,
62:14
**couple** [3] - 21:8,
23:21, 53:18
**courier** [2] - 23:12,
24:25
**course** [7] - 21:1,
26:5, 54:6, 66:12,
68:11, 69:11, 91:7
**Court** [23] - 38:15,
39:12, 42:24, 44:2,
44:25, 45:2, 45:5,
47:11, 47:16, 61:21,
80:1, 80:2, 85:13,
86:18, 92:10,
100:23, 101:19,
103:3, 103:4,
103:15, 103:17,
103:18
**court** [7] - 7:21, 39:25,
57:14, 59:11, 60:20,
84:24, 92:18
**COURT** [190] - 1:1,
3:2, 3:15, 3:21, 3:24,
4:2, 4:18, 5:1, 5:4,
5:16, 5:20, 6:7, 6:25,
8:3, 8:8, 9:13, 13:6,
13:9, 13:11, 18:3,
18:6, 18:8, 20:13,
20:16, 20:19, 26:15,
26:19, 27:13, 27:19,
27:23, 28:2, 29:2,
29:19, 29:22, 30:2,
30:4, 30:8, 30:10,
30:25, 31:5, 31:15,
31:21, 31:24, 32:13,
32:17, 32:23, 33:1,
33:5, 33:18, 34:1,
34:5, 34:7, 34:10,
35:18, 35:22, 35:25,
36:4, 36:8, 36:11,
36:16, 36:22, 37:1,
37:6, 37:15, 37:22,
38:1, 38:3, 40:15,
41:1, 41:3, 41:7,
41:9, 41:16, 41:19,
41:23, 42:1, 42:3,
42:17, 43:4, 43:10,
44:23, 45:11, 45:16,
45:21, 46:7, 46:15,
46:20, 47:2, 47:4,

47:7, 47:22, 48:3,
48:6, 48:11, 48:14,
48:17, 48:20, 48:24,
49:14, 51:12, 51:16,
51:19, 51:23, 52:15,
52:17, 53:13, 53:15,
53:17, 53:19, 54:12,
55:10, 55:12, 66:1,
66:10, 66:12, 78:19,
78:23, 78:25, 79:3,
79:5, 79:10, 79:13,
79:18, 84:15, 85:15,
85:17, 85:20, 85:22,
86:5, 86:21, 87:1,
87:9, 88:9, 88:20,
88:23, 88:25, 89:5,
89:7, 89:10, 89:13,
90:3, 90:5, 90:10,
90:15, 90:17, 90:21,
90:25, 91:4, 91:11,
92:1, 92:14, 92:24,
93:2, 94:1, 94:9,
94:14, 94:16, 94:20,
94:23, 95:2, 95:5,
95:8, 95:10, 95:13,
95:20, 96:1, 96:10,
96:14, 96:21, 97:3,
97:5, 97:8, 97:11,
97:14, 97:17, 97:23,
98:8, 98:22, 99:1,
99:9, 99:23, 100:3,
100:18, 100:21,
101:5, 101:10,
101:15, 102:3,
102:12, 102:16
**Court's** [1] - 33:22
**courtroom** [8] - 8:7,
34:8, 34:11, 34:13,
48:22, 66:7, 84:23,
92:7
**COURTROOM** [1] -
1:11
**cover** [5] - 21:8, 22:1,
51:12, 58:19, 68:2
**cow** [1] - 5:18
**cramp** [1] - 3:11
**create** [4] - 87:16,
93:18, 93:24, 97:18
**created** [4] - 79:23,
80:6, 93:16, 93:20
**creation** [1] - 78:24
**credit** [4] - 23:7,
23:16, 24:20, 25:3
**creditors** [3] - 15:24,
16:1, 16:3
**credits** [1] - 11:15
**Creek** [1] - 22:4
**CREF** [5] - 43:17,
43:19, 43:21, 43:22,
45:18

**criminal** [15] - 4:7,
4:14, 5:2, 5:7, 5:11,
6:4, 6:15, 6:18, 7:4,
40:2, 47:10, 47:12,
54:3, 61:20, 101:18
**cross** [2] - 18:3, 98:15
**CROSS** [3] - 2:4, 8:16,
53:25
**crowbar** [1] - 73:23
**CRR** [2] - 103:14,
103:17
**cue** [1] - 33:23
**cued** [1] - 48:23
**cure** [1] - 5:21
**current** [6] - 22:24,
24:11, 57:12, 59:9,
66:22, 86:10
**custodial** [2] - 22:14,
24:2
**custodian** [2] - 54:20,
61:12
**custody** [4] - 23:2,
24:14, 27:5, 50:16
**customs** [1] - 23:15
**Customs** [1] - 25:2

# D

**Dages** [11] - 46:22,
86:15, 86:23, 87:14,
88:10, 88:13, 90:1,
90:5, 90:6, 91:14,
93:13
**Dages'** [1] - 89:2
**Dallas** [3] - 56:11,
56:18, 56:23
**damage** [1] - 39:5
**Daniel** [1] - 85:23
**data** [7] - 81:23, 82:1,
82:20, 83:4, 83:7,
83:18, 83:20
**database** [1] - 54:22
**DATE** [1] - 1:14
**date** [29] - 21:10,
22:16, 22:17, 23:19,
23:20, 24:2, 25:6,
50:12, 57:2, 57:22,
59:2, 59:20, 60:17,
61:1, 61:4, 63:6,
63:19, 63:25, 64:2,
64:3, 64:18, 65:2,
65:10, 65:14, 70:13,
80:7, 80:19, 80:21,
103:9
**dated** [12] - 54:16,
58:14, 58:15, 58:22,
59:22, 61:22, 61:25,
63:13, 63:18, 63:19,
64:24, 65:2
**dates** [1] - 103:9

**DAVIS** [2] - 2:6, 18:11
**Davis** [4] - 18:10,
18:15, 28:8, 49:18
**days** [4] - 28:9, 51:1,
60:17, 65:10
**dead** [1] - 73:4
**deal** [1] - 92:16
**dealing** [4] - 10:8,
27:16, 27:17, 50:4
**dealings** [2] - 31:8,
33:12
**Dear** [1] - 21:15
**Deborah** [1] - 22:8
**debt** [6] - 14:1, 14:2,
15:24, 16:1, 17:24,
17:25
**debtor** [3] - 9:25, 13:3,
15:3
**debts** [16] - 13:3,
13:18, 13:19, 13:22,
13:24, 14:9, 14:17,
14:22, 15:13, 15:17,
15:18, 15:21, 17:8,
17:11, 18:1
**December** [4] - 61:23,
62:11, 63:2, 64:1
**DECEMBER** [1] - 1:14
**decide** [2] - 84:22,
90:14
**decided** [2] - 4:16,
6:20
**decision** [10] - 11:5,
12:11, 43:5, 43:7,
48:6, 53:2, 53:7,
53:8, 67:9, 73:15
**declaration** [7] -
34:22, 38:15, 38:19,
40:5, 42:10, 54:7,
88:18
**declarations** [2] -
32:5, 46:25
**declare** [2] - 23:13,
24:25
**declared** [2] - 38:9,
38:15
**Dedmon** [8] - 56:18,
58:22, 60:7, 62:25,
63:3, 63:8, 63:9,
64:7
**default** [2] - 58:6, 60:2
**defend** [1] - 39:4
**Defendant** [1] - 1:21
**defendant** [9] - 19:10,
34:14, 39:7, 39:14,
39:18, 40:3, 65:19,
66:25, 86:1
**DEFENDANT** [82] -
4:4, 5:2, 5:12, 5:15,
5:18, 6:1, 6:8, 6:11,
6:17, 7:4, 7:8, 7:24,

33:16, 33:20, 34:24,
35:11, 35:19, 35:23,
36:1, 36:7, 36:10,
36:14, 36:19, 36:23,
37:5, 37:7, 37:19,
37:24, 40:9, 40:16,
41:2, 41:4, 41:8,
41:10, 41:17, 41:20,
42:2, 42:15, 42:18,
43:14, 47:1, 47:3,
47:6, 48:5, 48:12,
48:16, 48:19, 48:21,
89:21, 90:4, 90:6,
90:13, 90:16, 90:19,
90:23, 91:2, 94:2,
94:10, 94:15, 94:17,
94:22, 94:24, 95:3,
95:6, 95:9, 95:12,
95:14, 95:25, 96:2,
96:13, 96:15, 96:22,
97:4, 97:7, 97:9,
97:13, 97:15, 97:21,
98:6, 101:25, 102:8,
102:15
**defense** [2] - 39:9,
39:15
**deficiency** [1] - 5:21
**deficient** [1] - 88:15
**definition** [1] - 91:8
**defrauded** [1] - 67:6
**Delaware** [3] - 22:18,
24:4, 70:19
**delay** [2] - 66:13,
101:6
**delayed** [1] - 8:2
**delineated** [1] - 77:5
**deliver** [2] - 21:20,
96:12
**delivered** [3] - 23:12,
24:25, 50:1
**Dell** [1] - 83:25
**demand** [1] - 35:12
**demonstrates** [1] -
99:15
**Department** [4] - 8:23,
8:24, 41:11, 41:13
**department** [2] -
43:24, 45:14
**dependant** [1] - 39:13
**deposed** [1] - 61:9
**deputy** [1] - 61:8
**Deputy** [1] - 61:10
**describe** [4] - 67:24,
70:20, 70:25, 76:3
**described** [2] - 55:18,
63:15
**description** [4] -
78:22, 81:1, 81:3,
89:4
**designated** [3] -

23:11, 24:23, 44:4
**desktop** [4] - 78:4,
81:21, 84:1, 84:9
**despite** [1] - 6:4
**detail** [1] - 25:21
**determination** [2] -
57:1, 58:25
**determine** [4] - 20:1,
69:21, 76:1, 91:13
**determined** [3] -
60:19, 65:8, 69:12
**determines** [3] - 57:5,
59:4, 60:11
**detrimental** [1] - 88:3
**Development** [1] -
70:18
**device** [6] - 73:23,
78:8, 83:3, 83:7,
83:18, 83:19
**dial** [1] - 29:11
**dictates** [1] - 45:2
**difference** [2] - 6:20,
16:3
**different** [3] - 49:11,
92:9, 96:25
**differently** [1] - 38:22
**difficult** [1] - 10:14
**digital** [6] - 77:17,
77:18, 77:20, 77:22,
81:18, 84:12
**Digital** [1] - 83:25
**digitized** [1] - 26:12
**diligence** [2] - 40:19,
61:14
**diligent** [1] - 54:21
**dining** [2] - 76:10,
76:11
**DIRECT** [3] - 2:4,
18:13, 66:14
**direct** [5] - 13:14,
18:3, 19:4, 26:8,
103:21
**direction** [1] - 61:18
**directly** [1] - 70:1
**director** [4] - 56:16,
62:19, 63:1, 63:3
**directors** [2] - 56:13,
56:14
**discharge** [19] - 13:1,
13:2, 13:3, 13:14,
13:17, 13:21, 14:3,
14:10, 14:17, 14:19,
15:13, 15:14, 16:2,
16:4, 16:5, 16:6,
17:10, 17:24, 17:25
**discharged** [3] - 14:4,
14:12, 17:8
**disclosed** [1] - 32:18
**discloses** [1] - 54:25
**disconnected** [3] -

84:1, 84:9, 84:11
**discuss** [3] - 30:20, 53:21, 84:17
**discussed** [2] - 34:25, 52:5
**discussing** [1] - 29:5
**disk** [1] - 81:20
**dismiss** [2] - 16:15, 16:20
**dismissed** [1] - 85:7
**disposal** [1] - 68:20
**disproves** [1] - 97:20
**dispute** [1] - 99:14
**disregard** [1] - 5:22
**distinction** [1] - 20:20
**distribute** [2] - 16:1, 27:22
**distributed** [2] - 14:2, 15:23
**distribution** [1] - 16:3
**District** [6] - 61:21, 103:4, 103:18, 103:18
**DISTRICT** [2] - 1:1, 1:1
**division** [5] - 18:18, 19:2, 54:24, 61:12, 66:23
**Division** [1] - 62:5
**docket** [1] - 7:2
**document** [43] - 6:4, 6:6, 6:7, 6:19, 7:1, 8:4, 21:7, 21:10, 21:12, 23:3, 23:23, 23:24, 24:15, 25:11, 25:16, 38:10, 40:9, 40:24, 47:9, 47:10, 47:16, 47:21, 53:10, 55:18, 56:20, 56:24, 59:20, 61:5, 62:15, 63:14, 63:19, 64:8, 64:25, 65:16, 65:17, 79:24, 80:4, 88:17, 88:18, 89:25, 93:7, 93:8, 93:9
**documentary** [2] - 23:15, 25:3
**documentation** [3] - 62:4, 96:15, 96:20
**documents** [69] - 4:5, 4:7, 10:9, 14:5, 20:25, 21:2, 21:4, 21:8, 21:14, 21:16, 21:20, 22:20, 22:24, 24:7, 24:11, 25:17, 26:3, 31:7, 32:4, 33:11, 35:5, 35:9, 37:8, 37:11, 37:14, 38:10, 38:17, 39:6, 40:12, 40:19, 45:7, 50:2, 53:11, 54:14,

61:15, 61:16, 61:18, 61:19, 61:23, 65:24, 66:9, 67:19, 67:21, 67:24, 68:7, 68:16, 70:6, 77:13, 77:16, 87:15, 87:16, 87:17, 87:20, 87:21, 88:1, 89:16, 89:22, 90:7, 90:8, 91:2, 91:3, 93:13, 93:21, 93:23, 100:6, 100:13, 100:17, 100:23
**dollars** [6] - 22:15, 22:16, 23:1, 24:12, 24:13, 68:13
**Don** [2] - 22:21, 24:8
**Donald** [1] - 21:19
**done** [11] - 8:5, 12:7, 12:8, 12:9, 28:17, 34:19, 40:18, 44:14, 44:20, 90:19, 97:24
**door** [16] - 72:5, 72:7, 72:8, 72:10, 72:16, 73:2, 73:6, 73:21, 73:22, 73:25, 74:1, 74:2, 74:19, 76:6, 76:9
**doors** [2] - 72:13, 73:21
**down** [8] - 11:1, 17:11, 45:9, 54:12, 56:13, 58:22, 74:12, 79:7
**Dr** [13] - 31:1, 34:16, 34:21, 35:2, 35:3, 35:9, 38:14, 38:25, 39:3, 39:19, 39:23, 40:4, 89:14
**draft** [1] - 22:13
**drive** [15] - 78:8, 78:9, 81:20, 81:24, 81:25, 82:2, 82:5, 82:10, 82:24, 82:25, 83:6, 83:22, 83:25, 84:4, 84:6
**Drive** [3] - 22:4, 22:8, 56:18
**drives** [1] - 81:23
**driveway** [2] - 71:14, 73:11
**due** [6] - 39:13, 40:18, 58:7, 60:3, 61:14, 61:23
**duly** [3] - 18:11, 61:9, 66:4
**during** [12] - 4:4, 6:17, 20:25, 26:5, 28:22, 49:21, 68:11, 69:11, 71:24, 75:14, 77:2, 99:19
**DURKIN** [7] - 86:7,

89:9, 91:6, 99:22, 100:4, 100:20, 100:25
**Durkin** [7] - 3:6, 85:22, 85:24, 86:7, 89:7, 91:5, 99:16
**Durkin's** [1] - 101:3
**duty** [1] - 66:22

# E

**e-mail** [37] - 35:15, 37:14, 40:10, 42:22, 43:1, 43:15, 93:15, 93:16, 93:18, 93:21, 93:25, 94:2, 94:5, 94:18, 94:21, 95:15, 95:18, 95:22, 96:1, 96:2, 96:6, 96:10, 96:18, 96:19, 96:23, 97:1, 97:3, 97:4, 97:12, 97:15, 97:18, 97:21, 98:4, 99:5, 100:6
**e-mails** [17] - 38:12, 42:18, 42:20, 42:23, 43:2, 65:22, 90:7, 93:6, 93:13, 95:9, 96:8, 96:9, 96:16, 98:10, 98:16
**early** [2] - 3:16, 85:20
**East** [1] - 56:11
**effective** [2] - 64:18, 76:2
**eight** [6] - 18:20, 18:22, 18:25, 65:21, 83:9, 83:24
**either** [8] - 3:9, 44:3, 71:19, 79:6, 90:25, 92:24, 97:24, 100:20
**elected** [1] - 56:17
**electronic** [2] - 26:22, 84:12
**Elizabethtown** [1] - 22:9
**emphasizes** [1] - 48:4
**employed** [4] - 8:20, 8:22, 18:15, 66:18
**employee** [3] - 28:22, 61:17, 86:11
**employees** [3] - 71:11, 86:10
**enclosed** [2] - 21:15, 58:17
**end** [6] - 3:14, 28:4, 39:9, 45:25, 70:23, 77:10
**ended** [1] - 94:4
**enforcement** [5] - 71:5, 71:8, 71:11,

71:16, 71:17
**engages** [2] - 23:18, 25:5
**engaging** [1] - 55:5
**enjoy** [2] - 30:23, 85:5
**enlarge** [1] - 60:8
**Enpetro** [25] - 25:13, 55:2, 55:18, 56:5, 56:7, 57:5, 58:1, 58:13, 58:14, 58:16, 59:5, 59:23, 60:9, 61:3, 61:24, 62:9, 62:13, 63:12, 63:15, 63:22, 63:23, 64:8, 64:19, 65:2
**entered** [4] - 8:7, 14:19, 48:22, 101:18
**entire** [2] - 25:16, 85:11
**entities** [1] - 65:7
**entity** [14] - 13:20, 60:15, 60:16, 60:19, 60:23, 60:25, 63:22, 63:23, 64:2, 64:3, 64:17, 65:9, 65:13, 65:15
**entries** [1] - 55:24
**entry** [10] - 55:3, 57:20, 59:18, 60:24, 62:7, 62:8, 73:16, 73:18, 73:20, 75:25
**envelope** [8] - 26:22, 27:5, 27:6, 28:15, 28:16, 50:16, 51:5, 52:9
**environments** [1] - 3:18
**equal** [2] - 22:25, 24:12
**error** [1] - 88:16
**ESQ** [2] - 1:18, 1:22
**essentially** [2] - 82:1, 89:2
**establish** [3] - 42:8, 57:12, 59:10
**established** [3] - 42:4, 42:25, 78:14
**estate** [1] - 15:25
**et** [1] - 21:15
**evening** [4] - 50:12, 50:18, 50:24, 85:5
**event** [3] - 49:2, 85:4, 102:5
**eventually** [1] - 53:1
**evidence** [59] - 27:7, 31:3, 31:5, 31:9, 33:7, 33:8, 33:13, 33:16, 33:18, 34:21, 35:1, 35:7, 36:4, 36:7, 37:2, 37:6,

37:7, 37:16, 37:17, 37:23, 37:25, 46:24, 47:13, 51:5, 52:9, 52:13, 65:24, 70:6, 77:18, 77:20, 84:12, 87:11, 89:15, 90:22, 91:12, 91:16, 91:17, 94:23, 95:8, 95:10, 95:21, 96:9, 96:11, 96:19, 96:21, 96:22, 97:11, 97:19, 98:2, 98:3, 98:12, 98:17, 98:21, 99:3, 99:12, 99:14
**evidencing** [1] - 64:16
**exact** [5] - 10:4, 10:21, 12:1, 21:25, 62:2
**exactly** [2] - 79:1, 79:3
**exaggeration** [1] - 11:11
**examination** [2] - 13:14, 98:16
**EXAMINATION** [6] - 8:16, 16:9, 17:21, 18:13, 53:25, 66:14
**examined** [1] - 90:15
**examiners** [2] - 71:12, 77:22
**example** [2] - 37:17, 68:21
**exceed** [2] - 14:9, 14:14
**excess** [2] - 17:8, 68:13
**excluded** [1] - 33:4
**excluding** [1] - 33:22
**excuse** [1] - 77:4
**excused** [2] - 18:6, 18:8
**execute** [1] - 71:3
**executed** [4] - 49:23, 50:6, 80:19, 80:24
**execution** [2] - 70:10, 71:24
**exemption** [2] - 15:5, 15:6
**exemptions** [7] - 14:23, 14:24, 14:25, 15:1, 15:3, 15:8, 15:9
**exhibit** [13] - 4:25, 21:6, 26:9, 28:12, 28:25, 51:4, 52:8, 52:18, 53:10, 65:16, 79:15, 79:17, 101:17
**Exhibit** [5] - 28:6, 29:3, 50:22, 51:24, 61:5
**exhibits** [9] - 4:20, 4:23, 5:9, 7:6, 7:11,

7:16, 7:17, 7:18, 98:13
**existence** [3] - 57:13, 59:10, 62:12
**exits** [1] - 72:10
**expect** [1] - 85:11
**expedition** [1] - 58:19
**expense** [1] - 39:10
**expert** [4] - 90:13, 90:15, 90:25, 91:13
**explain** [7] - 9:24, 10:14, 13:1, 13:16, 15:19, 75:22, 82:18
**expose** [1] - 84:19
**Express** [2] - 22:3, 22:6
**expressed** [1] - 87:7
**extension** [1] - 35:20
**extraordinary** [2] - 40:1, 40:4
**extreme** [2] - 11:21, 11:24
**eye** [4] - 8:9, 30:16, 49:2, 85:1

## F

**facsimile** [1] - 91:20
**fact** [7] - 4:9, 16:22, 35:8, 36:20, 40:17, 52:6, 101:17
**facts** [3] - 38:5, 87:24, 88:11
**factual** [1] - 44:19
**fail** [1] - 57:12
**failed** [3] - 57:16, 59:9, 59:13
**failure** [3] - 48:9, 58:4, 59:25
**fair** [2] - 18:5, 31:15
**fairly** [1] - 76:4
**faith** [4] - 16:16, 16:21, 23:5, 24:18
**familiar** [2] - 97:8, 98:5
**far** [9] - 5:10, 15:12, 25:14, 29:21, 44:12, 77:2, 90:1, 91:14
**Farmer** [1] - 28:19
**farmer** [1] - 29:9
**fast** [1] - 44:2
**favor** [1] - 39:19
**favorable** [6] - 39:15, 42:5, 87:12, 88:2, 91:18, 93:5
**fax** [2] - 68:1
**FBI** [26] - 18:16, 18:19, 18:24, 19:5, 50:3, 51:2, 52:6, 66:19, 66:20, 66:24, 67:7,

68:17, 69:9, 71:8, 71:10, 71:11, 71:18, 71:19, 71:20, 72:6, 72:8, 73:2, 73:5, 92:6
**February** [6] - 18:20, 18:22, 18:25, 55:22, 59:7, 59:25
**Fed** [3] - 3:4, 89:6, 93:11
**FEDERAL** [1] - 1:19
**Federal** [9] - 22:3, 22:6, 42:20, 43:12, 44:21, 64:22, 86:8, 86:10, 86:11
**federal** [2] - 71:21, 80:23
**fee** [1] - 58:19
**fees** [2] - 58:6, 60:2
**feet** [2] - 76:5
**fellow** [1] - 3:4
**felt** [1] - 67:6
**Ferguson** [7] - 3:7, 43:13, 43:16, 44:1, 44:11, 44:16, 45:1, 45:16, 46:1, 46:10
**few** [2] - 10:4, 40:1
**fifteen** [1] - 54:5
**fifth** [1] - 52:1
**file** [11] - 55:1, 55:18, 58:1, 59:9, 61:2, 61:16, 61:23, 61:24, 63:15, 69:14, 80:1
**filed** [15] - 5:8, 14:13, 15:16, 16:15, 32:4, 45:4, 53:5, 56:5, 57:12, 62:4, 79:21, 80:7, 80:16, 86:9, 88:17
**files** [6] - 13:18, 54:20, 57:21, 59:19, 60:25, 65:15
**filing** [5] - 55:19, 62:1, 63:6, 63:17, 64:8
**filings** [2] - 14:9, 69:6
**fill** [3] - 11:2, 11:14, 12:12
**filled** [3] - 10:18, 10:20, 23:25
**filling** [2] - 3:12, 11:8
**finally** [2] - 25:11, 39:20
**financial** [1] - 40:21
**fine** [5] - 3:20, 9:14, 31:11, 48:11, 78:15, 97:24
**fingerprint** [2] - 95:18, 96:6
**finish** [1] - 75:11
**finishes** [1] - 85:11

**fireplace** [1] - 76:12
**first** [14] - 18:4, 20:1, 26:8, 34:25, 38:14, 56:4, 56:16, 61:24, 62:6, 64:3, 75:24, 86:15, 87:14, 98:15
**fit** [1] - 83:15
**five** [10] - 9:1, 9:5, 53:21, 66:9, 72:17, 73:15, 73:19, 76:25, 77:2, 93:7
**fix** [1] - 13:11
**fizzled** [1] - 3:19
**flash** [2] - 82:24, 83:22
**flexible** [1] - 99:21
**flip** [1] - 25:12
**floor** [6] - 74:10, 74:13, 74:14, 75:15, 76:6, 84:2
**floors** [2] - 70:23, 70:24
**Fogerty** [2] - 67:18
**folder** [2] - 66:7, 66:8
**folks** [2] - 3:7, 3:17
**follow** [2] - 18:2, 18:3
**follow-up** [1] - 18:2
**follow-ups** [1] - 18:3
**following** [11] - 21:16, 21:21, 22:3, 29:12, 56:20, 56:24, 57:4, 57:5, 59:3, 59:5, 60:11
**follows** [7] - 18:12, 55:15, 61:9, 62:1, 63:12, 65:20, 66:5
**FOR** [2] - 1:1, 2:4
**force** [3] - 71:10, 71:18, 73:16
**forced** [2] - 73:18, 73:20
**forecast** [1] - 8:10
**foregoing** [3] - 103:7, 103:10, 103:20
**foreign** [5] - 63:21, 63:22, 64:2, 64:3, 64:11
**forensic** [4] - 71:12, 78:7, 82:9, 84:5
**forfeited** [17] - 57:6, 57:7, 57:8, 57:19, 58:3, 59:6, 59:7, 59:17, 59:24, 60:10, 60:16, 60:18, 60:23, 65:3, 65:9, 65:10
**forfeits** [1] - 65:12
**forfeiture** [21] - 55:20, 55:22, 55:24, 57:1, 57:3, 57:22, 57:25, 58:10, 58:25, 59:2, 59:20, 59:22, 60:6,

60:8, 60:14, 61:1, 63:17, 63:18, 65:1, 65:6, 65:14
**forgot** [2] - 40:10, 42:15
**form** [3] - 54:25, 58:18, 87:17
**formation** [1] - 63:25
**former** [2] - 39:24, 86:11
**forms** [3] - 12:4, 12:14, 12:24
**forth** [2] - 64:19, 103:9
**forwarded** [1] - 35:12
**four** [11] - 8:12, 8:13, 11:19, 29:24, 34:3, 51:1, 62:15, 72:22, 82:24, 93:6
**four-way** [1] - 29:24
**fourth** [1] - 50:25
**franchise** [6] - 57:12, 57:13, 58:5, 59:9, 59:11, 60:1
**frankly** [1] - 88:12
**fraud** [1] - 25:23
**free** [2] - 75:4, 75:5
**freely** [1] - 23:6
**friend** [2] - 40:16, 94:5
**front** [6] - 72:5, 72:8, 72:18, 73:11, 74:1, 76:6
**full** [9] - 8:13, 8:18, 22:19, 22:22, 23:5, 24:9, 24:18, 69:23, 73:19
**fully** [3] - 23:14, 24:19, 25:1
**funds** [2] - 37:10, 65:21
**futility** [1] - 17:19

## G

**gap** [1] - 29:4
**garage** [5] - 70:24, 76:7, 76:13, 76:17, 84:2
**gas** [1] - 55:5
**Gate** [1] - 96:7
**general** [3] - 30:13, 42:6, 54:24
**generally** [1] - 10:16
**generically** [1] - 67:25
**gentleman** [7] - 40:10, 45:5, 45:8, 95:14, 98:15, 100:9
**gentlemen** [2] - 3:2, 89:15
**geologist** [1] - 21:19
**Gerald** [1] - 26:24

**germane** [1] - 29:19
**gig** [1] - 82:25
**gigabyte** [3] - 82:24, 83:9, 83:22
**given** [5] - 21:9, 42:10, 55:7, 91:18, 100:14
**glad** [1] - 88:24
**GOVERNMENT** [1] - 2:4
**government** [3] - 39:10, 39:24, 98:14
**government's** [1] - 98:13
**grand** [1] - 68:25
**great** [1] - 68:6
**Greensboro** [1] - 24:5
**Greenspan** [1] - 40:14
**greenspan** [1] - 40:17
**Gregory** [1] - 8:19
**GREGORY** [2] - 2:5, 8:15
**ground** [1] - 31:16
**grounds** [6] - 16:16, 20:14, 29:18, 60:14, 65:6, 88:6
**guarantee** [2] - 22:23, 24:10
**guess** [3] - 8:8, 29:24, 100:15
**Gwyn** [1] - 61:1

## H

**hac** [1] - 86:16
**half** [1] - 76:8
**hand** [5] - 5:24, 12:4, 47:11, 55:7, 86:17
**handle** [2] - 3:3, 86:23
**handwritten** [1] - 90:24
**happenstance** [1] - 87:19
**happy** [2] - 46:9, 88:7
**hard** [12] - 7:21, 78:8, 81:20, 81:23, 81:24, 81:25, 82:2, 82:5, 82:10, 83:25, 84:4, 84:6
**hardware** [1] - 78:8
**HARLEY** [1] - 1:7
**Harley** [74] - 12:11, 19:10, 19:16, 20:1, 22:11, 26:1, 27:2, 28:9, 28:18, 29:5, 29:10, 29:16, 29:21, 29:22, 29:25, 32:21, 33:5, 33:6, 33:23, 33:25, 34:12, 34:13, 34:20, 35:1, 35:2, 35:7, 47:9, 47:14,

47:17, 47:20, 49:9,
49:16, 50:5, 50:10,
50:17, 51:1, 51:7,
52:2, 52:10, 52:12,
52:21, 55:4, 65:18,
66:25, 67:6, 67:22,
68:2, 68:5, 68:6,
68:9, 69:5, 70:1,
74:7, 74:9, 74:11,
74:12, 74:16, 74:20,
85:25, 87:12, 88:2,
89:11, 89:13, 98:10,
98:18, 98:19, 99:10,
101:18, 101:19,
101:22, 102:10,
102:13
**Harley's** [9] - 6:4,
13:25, 14:12, 16:24,
27:2, 69:23, 70:5,
70:16, 71:6
**harmful** [1] - 98:21
**HARRISBURG** [1] -
1:20
**head** [2] - 43:24, 45:13
**headphones** [5] -
27:20, 27:22, 27:25,
28:1, 28:4
**headquarters** [2] -
44:4, 45:6
**heads** [1] - 47:4
**hear** [17] - 5:4, 13:5,
27:23, 28:3, 29:11,
34:5, 34:16, 38:3,
51:15, 51:17, 84:23,
85:15, 88:22, 88:24,
89:19, 92:14, 100:18
**heard** [5] - 44:11,
44:12, 46:14, 69:10,
74:18
**hearing** [10] - 16:25,
31:1, 33:7, 34:1,
43:6, 45:4, 61:20,
92:12, 95:4, 99:17
**hearsay** [2] - 20:15,
29:18
**held** [2] - 23:2, 24:14
**hello** [1] - 86:3
**help** [1] - 39:3
**helpful** [2] - 78:2,
100:15
**Hennessy** [13] - 46:22,
86:14, 86:23, 87:4,
87:14, 88:11, 88:12,
88:15, 90:2, 90:5,
90:6, 91:15, 93:12
**Hennessy's** [1] -
88:19
**hereby** [16] - 22:21,
24:8, 54:19, 55:16,
57:19, 58:7, 59:17,

60:3, 60:11, 62:2,
63:13, 64:9, 64:16,
65:12, 65:20, 103:6
**hereinbefore** [1] -
103:9
**hereof** [4] - 23:7,
24:19, 57:22, 59:20
**hereon** [3] - 56:1,
57:3, 59:2
**hereunto** [1] - 55:25
**herewith** [1] - 61:15
**Hewlett** [2] - 78:3,
81:21
**hi** [1] - 85:23
**hiding** [1] - 75:13
**highest** [1] - 40:20
**highly** [2] - 4:8, 6:23
**history** [1] - 4:7
**holding** [1] - 52:9
**home** [3] - 3:16,
30:17, 52:11, 52:12,
77:11
**homestead** [1] - 15:6
**Honor** [67] - 3:20,
3:22, 4:5, 5:10, 5:12,
6:3, 18:7, 18:9,
26:17, 27:11, 27:14,
28:24, 31:16, 33:21,
34:6, 34:24, 36:1,
36:20, 38:2, 38:4,
38:13, 39:16, 39:20,
40:2, 40:6, 40:9,
41:8, 42:2, 42:15,
43:8, 44:9, 44:22,
44:24, 45:25, 46:13,
46:17, 47:1, 48:8,
48:13, 49:6, 53:14,
65:24, 78:10, 79:14,
85:16, 85:19, 86:3,
86:22, 89:21, 91:6,
91:7, 91:24, 92:21,
93:3, 94:2, 95:1,
95:4, 96:16, 97:9,
98:6, 98:9, 99:2,
99:22, 100:4, 101:8,
102:15
**HONORABLE** [1] -
1:10
**hopes** [1] - 72:6
**Hopson** [2] - 56:22,
56:23
**hour** [1] - 53:20
**hours** [3] - 30:11,
76:25, 77:2
**house** [5] - 43:17,
72:19, 74:3, 74:6,
77:8
**Hui** [4] - 90:7, 96:23,
97:7, 100:8
**hundred** [2] - 11:19,

38:11
**hung** [1] - 73:3

I

**ICC** [1] - 23:17
**idea** [1] - 88:14
**identification** [1] -
71:16
**identified** [3] - 6:10,
71:19, 98:12
**identify** [5] - 21:6,
26:21, 28:12, 28:15,
80:4
**identifying** [1] - 71:17
**ignore** [2] - 45:2, 48:2
**ignoring** [1] - 45:5
**image** [2] - 82:2, 91:9
**images** [1] - 91:9
**imagine** [1] - 44:18
**immediately** [4] -
7:25, 30:23, 72:3,
76:8
**important** [7] - 31:10,
32:8, 32:9, 39:2,
42:15, 42:16, 97:16
**importantly** [1] - 91:9
**imposed** [1] - 60:21
**impossible** [1] - 17:19
**impressed** [1] - 56:1
**Inc** [28] - 22:4, 22:17,
23:4, 24:4, 24:16,
25:13, 55:2, 55:3,
55:19, 56:5, 56:8,
57:5, 58:1, 58:14,
58:17, 59:5, 59:23,
60:9, 61:24, 62:9,
62:13, 63:12, 63:15,
63:23, 64:8, 64:19,
65:2
**inches** [1] - 8:12
**incidentally** [1] -
30:11
**include** [1] - 33:25
**included** [1] - 100:6
**includes** [1] - 91:8
**including** [6] - 30:13,
55:21, 55:23, 63:16,
71:7, 81:5
**inconvenience** [1] -
92:17
**incorporated** [1] -
63:24
**incorporation** [3] -
56:5, 62:7, 62:9
**incorporator** [2] -
56:21, 56:24
**independent** [4] -
37:23, 37:25, 89:15,

99:12
**INDEX** [1] - 2:2
**indicate** [4] - 46:24,
89:20, 99:11, 101:8
**indicated** [4] - 13:21,
39:12, 73:7, 80:21
**indicates** [2] - 31:6,
35:3
**indicating** [3] - 54:3,
54:7, 65:6
**indication** [4] - 46:9,
49:1, 49:3, 91:18
**indictment** [2] - 65:22,
65:23
**individual** [10] - 11:8,
13:25, 14:11, 15:10,
15:20, 15:22, 20:3,
26:1, 46:5, 64:6
**individual's** [1] - 20:2
**individuals** [4] - 27:4,
43:11, 86:25, 87:11
**information** [13] -
11:17, 11:18, 12:5,
12:14, 61:14, 68:5,
82:21, 94:6, 94:19,
95:16, 95:24, 96:5,
99:6
**informed** [2] - 35:1,
35:7
**infrequently** [1] -
16:17
**infringing** [1] - 31:19
**initial** [6] - 20:12,
53:10, 56:9, 56:11,
56:14, 64:6
**inquiry** [3] - 23:9,
24:21, 61:15
**inside** [7] - 74:3, 74:4,
74:6, 76:3, 82:16,
82:20, 83:16
**instance** [2] - 84:3,
93:6
**instances** [1] - 87:13
**instruct** [5] - 5:17,
48:2, 48:7, 101:20
**instructing** [1] - 5:21
**instruction** [6] -
47:18, 47:23, 48:9,
101:20, 101:23,
102:4
**instructions** [1] -
21:22
**instrument** [7] - 23:6,
23:14, 24:18, 25:2,
41:12, 42:21
**instruments** [5] -
40:22, 41:14, 42:19,
43:2, 96:17
**intends** [1] - 64:2
**intents** [1] - 87:18

**interaction** [1] - 67:21
**interested** [1] - 30:7
**interests** [1] - 39:8
**interior** [1] - 70:25
**international** [1] -
23:17
**International** [1] -
25:4
**internet** [1] - 69:4
**interpreting** [1] - 14:6
**interstate** [1] - 65:23
**interview** [5] - 20:5,
50:3, 67:13, 67:15,
68:22
**interviewed** [5] -
20:23, 67:8, 68:8,
69:15, 69:18
**interviews** [1] - 21:1
**introduce** [1] - 65:24
**introduced** [1] - 5:9
**introducing** [1] -
54:14
**introduction** [1] -
50:20
**inventory** [8] - 79:16,
79:21, 79:25, 80:2,
80:5, 80:6, 80:16,
81:13
**investigate** [1] - 66:25
**investigating** [1] -
25:21
**investigation** [23] -
19:9, 19:13, 19:23,
20:18, 25:18, 25:22,
25:25, 26:6, 52:23,
54:4, 67:2, 67:4,
67:10, 68:17, 68:18,
68:19, 69:11, 69:12,
69:16, 69:20, 70:8,
81:9, 95:23
**investment** [1] - 43:17
**involve** [2] - 15:5,
33:22
**involved** [3] - 29:6,
45:22
**involvement** [1] -
87:19
**involves** [2] - 15:20,
101:16
**involving** [5] - 19:9,
28:9, 46:10, 66:25
**irrevocably** [2] -
22:22, 24:8
**issuance** [1] - 23:3,
24:15, 64:20
**issue** [15] - 3:25, 6:15,
22:16, 24:3, 31:18,
35:1, 43:9, 44:1,
44:24, 48:10, 68:21,
88:1, 93:12, 98:18,

101:16
**issued** [6] - 23:5, 24:17, 32:3, 44:11, 54:2, 86:10
**issuer** [2] - 40:23, 40:25
**issues** [3] - 31:19, 64:16, 101:14
**item** [6] - 42:16, 77:24, 79:3, 82:15
**items** [14] - 11:2, 11:17, 11:18, 12:13, 53:12, 77:5, 77:22, 78:22, 81:6, 81:14, 81:18
**itself** [3] - 27:5, 41:12, 62:6

## J

**jackets** [1] - 71:20
**January** [3] - 63:19, 64:4, 65:2
**Jerry** [1] - 49:25
**Jersey** [1] - 94:12
**Jim** [1] - 19:14
**job** [1] - 9:2
**John** [1] - 56:2
**joined** [1] - 27:3
**JOSEPH** [1] - 1:22
**Joseph** [5] - 34:14, 90:7, 96:23, 97:7, 100:8
**Joshua** [1] - 3:5
**judge** [2] - 16:22, 48:1
**Judge** [2] - 34:7, 85:23
**judgment** [7] - 5:7, 57:13, 59:10, 60:20, 68:9, 68:13, 101:18
**judicial** [3] - 57:19, 59:17, 60:24
**Judy** [1] - 13:6
**July** [5] - 55:23, 59:22, 62:24, 63:6, 63:7
**jump** [1] - 98:9
**June** [9] - 55:20, 55:21, 55:22, 56:6, 56:23, 58:1, 58:14, 58:15, 58:22
**jurisdiction** [2] - 55:6, 64:1
**jurors** [2] - 27:21, 47:20
**jury** [32] - 3:16, 4:8, 4:14, 5:17, 6:22, 8:6, 8:7, 13:2, 28:6, 28:25, 29:3, 30:24, 47:15, 47:23, 47:25, 48:1, 48:4, 48:18,

48:22, 48:24, 50:22, 51:24, 52:18, 53:19, 68:25, 75:22, 84:17, 85:7, 101:20, 101:21, 101:24, 102:1
**JURY** [1] - 1:13
**Justice** [2] - 8:23, 8:24

## K

**Kathy** [1] - 55:8
**keep** [7] - 8:9, 14:21, 15:4, 30:16, 49:2, 79:7, 84:25
**keeping** [17] - 21:22, 21:24, 22:2, 22:5, 22:14, 23:5, 23:8, 23:12, 23:13, 24:2, 24:17, 24:20, 24:24, 25:1, 35:20, 37:9, 41:5
**Kelly** [4] - 4:9, 26:24, 27:5, 49:25
**Kentucky** [1] - 22:9
**Kesterson** [4] - 21:20, 22:21, 24:8, 30:5
**Kevin** [1] - 67:18
**Kiat** [5] - 90:8, 96:23, 97:7, 98:5, 100:8
**kind** [2] - 22:10, 76:19
**kindly** [1] - 46:11
**kitchen** [1] - 76:9
**knock** [2] - 72:4, 72:16
**knocking** [3] - 72:5, 72:11, 72:13
**knowledge** [6] - 44:9, 44:13, 61:14, 87:15, 87:25, 93:23
**known** [4] - 4:17, 6:24, 81:13, 95:6
**knows** [6] - 4:15, 32:21, 35:2, 38:15, 82:17
**Kuhn** [6] - 85:23, 86:17, 86:19, 93:2, 101:5
**KUHN** [17] - 86:3, 86:22, 87:2, 87:10, 88:16, 88:22, 88:24, 89:3, 91:7, 91:24, 92:2, 93:3, 99:2, 99:20, 100:1, 101:1, 101:8

## L

**lab** [1] - 71:12
**Lackawanna** [1] - 30:14

**Lane** [1] - 56:11
**language** [1] - 10:11
**laptop** [3] - 82:5, 82:9, 82:11
**large** [4] - 4:13, 67:19, 76:4, 76:12
**larger** [1] - 83:16
**Larry** [2] - 3:6, 86:7
**Las** [1] - 62:14
**last** [12] - 9:5, 25:11, 44:10, 46:20, 52:5, 52:20, 60:8, 62:8, 63:5, 64:25, 76:23, 85:17
**latest** [1] - 30:11
**LAURA** [2] - 103:3, 103:17
**Laura** [1] - 103:14
**law** [10] - 5:23, 14:6, 39:25, 64:13, 64:15, 71:5, 71:8, 71:11, 71:15, 71:17
**Law** [2] - 64:22, 64:23
**Lawrence** [2] - 25:8, 28:20
**laws** [1] - 63:24
**lawyer** [3] - 3:5, 92:15, 92:16
**lawyer's** [1] - 32:10
**lawyer/client** [2] - 31:19, 32:10
**lawyers** [3] - 12:7, 12:8, 12:9
**lay** [2] - 10:8, 10:15
**lead** [2] - 19:22, 71:24
**lean** [1] - 9:14
**learned** [2] - 43:22, 68:11
**least** [4] - 11:5, 11:9, 45:5, 99:13
**leave** [11] - 5:25, 8:13, 47:18, 48:1, 75:4, 75:5, 88:3, 92:3, 92:19, 92:20, 92:25
**lecture** [1] - 95:20
**left** [12] - 21:2, 23:20, 25:14, 30:24, 33:6, 73:5, 73:13, 76:9, 76:10, 77:23, 81:22, 81:25
**legal** [8] - 10:8, 10:11, 32:5, 43:24, 44:4, 45:7, 45:14, 54:20
**legally** [1] - 13:19
**legitimacy** [1] - 21:3
**legitimate** [2] - 19:18, 99:13
**less** [1] - 70:7
**letter** [7] - 21:8, 22:2, 23:22, 54:3, 58:14,

63:17, 63:18
**letterhead** [4] - 22:13, 56:25, 58:15, 58:24
**letters** [2] - 37:10, 68:2
**letting** [1] - 42:24
**levels** [1] - 40:20
**Lexus** [1] - 76:20
**liabilities** [2] - 14:15, 15:12
**light** [1] - 40:4
**limits** [1] - 8:12
**line** [7] - 29:23, 30:2, 30:3, 34:2, 40:13, 43:9, 88:17
**liquidated** [1] - 17:16
**liquidation** [1] - 9:17
**list** [12] - 62:8, 62:21, 78:11, 78:14, 78:18, 78:19, 78:23, 78:25, 81:6, 81:14, 81:16, 100:8
**listed** [16] - 4:24, 13:18, 13:22, 13:24, 14:1, 14:3, 14:4, 15:21, 15:24, 16:1, 17:15, 62:5, 62:17, 63:3, 81:19, 96:18
**listen** [3] - 33:23, 52:7, 96:11
**listened** [1] - 29:21
**listing** [1] - 55:3
**lists** [4] - 13:3, 81:9, 96:16, 96:17
**live** [3] - 3:18, 8:10, 96:5
**lives** [4] - 30:14, 40:11, 94:11, 95:16
**living** [5] - 76:11, 76:12, 82:8, 83:1, 83:12
**load** [2] - 9:7, 9:10
**local** [3] - 19:17, 20:2, 71:8
**located** [9] - 22:19, 24:5, 73:10, 74:8, 74:9, 82:6, 82:9, 82:14, 84:1
**locating** [1] - 68:23
**location** [2] - 81:2, 81:3
**loft** [4] - 82:7, 82:8, 82:14, 83:12
**Lollar** [1] - 25:8
**look** [7] - 7:5, 31:17, 37:13, 75:12, 79:11, 88:25, 96:3
**looked** [4] - 47:8, 78:4, 83:6, 89:1
**looking** [9] - 66:6,

68:20, 77:5, 78:25, 79:7, 81:11, 89:22, 96:8, 96:19
**looks** [4] - 30:17, 70:20, 80:8, 87:7
**loose** [1] - 44:2
**losing** [1] - 25:24
**loud** [1] - 72:5
**LPC** [14] - 25:13, 55:2, 55:19, 56:5, 56:7, 57:5, 58:1, 58:14, 58:15, 58:17, 59:5, 59:23, 60:9, 61:3
**lunch** [4] - 30:19, 30:23, 30:24, 47:8
**Luzerne** [1] - 30:13

## M

**ma'am** [1] - 54:2
**machines** [1] - 84:6
**mail** [38] - 22:6, 35:15, 37:14, 40:10, 42:22, 43:1, 43:15, 93:15, 93:16, 93:18, 93:21, 93:25, 94:2, 94:5, 94:18, 94:21, 95:15, 95:18, 95:22, 96:1, 96:2, 96:6, 96:10, 96:18, 96:19, 96:23, 97:1, 97:3, 97:4, 97:12, 97:15, 97:18, 97:21, 98:4, 99:5, 100:6
**mails** [17] - 38:12, 42:18, 42:20, 42:23, 43:2, 65:22, 90:7, 93:6, 93:13, 95:9, 96:8, 96:9, 96:16, 98:10, 98:16
**main** [5] - 74:10, 74:13, 74:14, 75:15, 76:5
**maintained** [1] - 55:4
**man** [1] - 97:17
**manage** [1] - 38:11
**March** [3] - 55:24, 60:10, 62:21
**mark** [1] - 80:13
**marked** [4] - 71:14, 71:15, 73:7, 79:15
**marks** [1] - 21:24
**Marshal** [1] - 43:23
**marshal** [4] - 45:1, 45:9, 45:11, 46:8
**Marshall** [1] - 67:5
**Marshalls** [1] - 22:4
**Marshals** [1] - 43:18
**marshals** [1] - 44:14
**match** [2] - 95:24,

97:2
**material** [5] - 39:15, 42:4, 87:11, 88:2, 93:5
**matter** [6] - 32:18, 32:20, 39:22, 58:21, 75:11, 101:19
**matters** [1] - 100:12
**McCurdy** [16] - 3:7, 42:22, 46:22, 88:7, 90:2, 90:3, 91:22, 93:2, 93:5, 93:14, 93:22, 94:12, 98:17, 98:19, 99:12, 100:1
**McCurdy's** [4] - 93:25, 94:3, 94:10, 94:20
**mean** [13] - 16:4, 29:24, 31:10, 31:19, 44:7, 54:5, 68:17, 73:20, 75:20, 83:5, 83:11, 92:17, 99:3
**means** [10] - 9:25, 13:2, 13:3, 13:17, 15:3, 16:6, 42:21, 89:24, 100:19, 103:21
**meantime** [1] - 30:18
**media** [2] - 82:19, 84:19
**meeting** [3] - 40:14, 41:22, 56:16
**members** [4] - 48:24, 53:19, 75:22, 84:17
**memorandum** [1] - 87:12
**memos** [2] - 37:10, 41:6
**mentioned** [6] - 6:17, 21:20, 44:10, 76:13, 103:8
**mentor** [1] - 40:17
**Meredith** [1] - 22:8
**merits** [1] - 38:13
**message** [1] - 73:5
**messages** [2] - 35:15, 35:24
**metal** [1] - 73:25
**metallic** [1] - 74:1
**micro** [4] - 83:10, 83:13, 83:16, 83:20
**microphone** [2] - 9:13, 13:5
**Middle** [3] - 61:21, 103:4, 103:18
**MIDDLE** [1] - 1:1
**midst** [1] - 34:11
**might** [2] - 3:13, 100:14
**million** [14] - 21:3, 22:15, 22:25, 23:1,

24:2, 24:12, 24:13, 25:14, 25:24, 41:9, 68:13
**mind** [2] - 43:4, 101:23
**mine** [2] - 40:16, 94:5
**minute** [5] - 20:13, 66:9, 88:20, 92:1
**minutes** [9] - 34:3, 53:18, 53:19, 53:24, 72:17, 72:22, 73:15, 73:19, 75:13
**miscellaneous** [1] - 55:21
**mistake** [1] - 98:2
**mistakes** [6] - 10:6, 12:17, 12:18, 12:21, 12:23, 12:25
**Mockingbird** [1] - 56:10
**modified** [1] - 35:20
**moment** [6] - 30:16, 34:13, 66:6, 91:14, 99:20, 100:4
**Monday** [1] - 35:13
**moneys** [1] - 68:4
**Monroe** [2] - 30:14
**month** [2] - 23:3, 24:14
**moot** [1] - 92:25
**moreover** [3] - 89:17, 93:10, 98:5
**morning** [4] - 8:8, 85:6, 85:12, 99:24
**most** [5] - 12:7, 12:8, 12:9, 29:15, 97:16
**motion** [14] - 3:3, 16:15, 16:20, 16:23, 16:24, 31:1, 31:3, 31:14, 34:16, 46:22, 85:8, 86:15, 86:20, 88:14
**motions** [1] - 86:9
**move** [10] - 9:13, 13:5, 27:11, 28:24, 43:7, 50:20, 51:9, 53:10, 55:9, 84:15
**moving** [2] - 63:4, 63:5
**MR** [187] - 3:14, 3:20, 3:22, 3:25, 4:3, 4:20, 4:22, 4:23, 5:5, 5:10, 5:14, 6:3, 6:9, 6:12, 6:14, 7:2, 7:5, 7:6, 7:9, 7:13, 7:15, 7:18, 7:20, 8:2, 8:17, 9:15, 13:5, 13:8, 13:10, 13:13, 16:7, 16:8, 16:10, 17:20, 17:22, 18:2, 18:5, 18:7,

18:10, 18:14, 20:14, 20:17, 20:22, 26:10, 26:17, 26:20, 27:11, 27:14, 27:17, 27:18, 27:20, 27:24, 28:3, 28:7, 28:13, 28:14, 28:24, 29:1, 29:4, 29:13, 29:14, 29:20, 29:24, 30:3, 30:6, 30:9, 31:4, 31:13, 31:16, 31:22, 31:25, 32:8, 32:16, 32:20, 32:24, 33:3, 33:21, 34:4, 34:6, 34:9, 34:25, 38:2, 38:4, 40:7, 41:25, 43:8, 43:11, 43:15, 44:7, 44:8, 44:9, 44:24, 45:13, 45:17, 45:23, 45:24, 46:13, 46:17, 47:8, 47:24, 48:8, 48:23, 49:5, 49:6, 49:8, 49:13, 49:15, 49:17, 50:20, 50:23, 51:9, 51:11, 51:14, 51:18, 51:21, 51:25, 52:13, 52:16, 52:19, 53:9, 53:14, 53:16, 53:18, 54:1, 54:10, 54:11, 54:13, 55:11, 55:13, 65:25, 66:2, 66:6, 66:11, 66:13, 66:15, 78:10, 78:13, 79:14, 79:16, 79:17, 79:20, 80:10, 80:12, 80:13, 80:15, 85:8, 85:16, 85:19, 85:21, 86:3, 86:7, 86:22, 87:2, 87:10, 88:16, 88:22, 88:24, 89:3, 89:9, 89:11, 91:6, 91:7, 91:23, 91:24, 92:2, 92:3, 92:6, 92:8, 92:19, 92:25, 93:3, 98:9, 98:24, 99:2, 99:20, 99:22, 100:1, 100:4, 100:20, 100:22, 100:25, 101:1, 101:8, 101:13, 101:16, 102:9, 102:14
**must** [2] - 21:22, 89:1

---

# N

**name** [41] - 8:14, 11:15, 20:2, 25:13, 35:16, 35:21, 37:3, 37:4, 37:11, 37:13, 40:24, 41:3, 41:5,

42:24, 43:3, 55:25, 56:7, 56:11, 56:15, 56:21, 56:22, 57:19, 57:25, 59:5, 59:22, 62:12, 62:22, 63:23, 64:7, 64:19, 64:21, 66:16, 90:8, 93:18, 94:3, 95:22, 95:23, 95:24, 99:5, 99:6
**Name** [1] - 64:23
**named** [8] - 3:4, 23:6, 24:19, 57:18, 58:2, 59:16, 59:24, 64:10
**names** [4] - 3:8, 25:8, 87:20
**narrow** [1] - 101:11
**nature** [1] - 25:22
**near** [1] - 73:11
**necessarily** [1] - 13:23
**necessary** [1] - 39:9
**need** [17] - 6:25, 11:17, 25:16, 33:23, 42:7, 42:8, 45:21, 47:2, 52:7, 53:17, 78:1, 91:13, 93:17, 99:16, 101:15, 102:3
**needs** [1] - 6:5
**Nevada** [4] - 61:6, 62:10, 62:14, 63:24
**never** [9] - 31:8, 33:9, 33:12, 36:3, 38:9, 39:6, 72:15, 97:18, 98:4
**New** [9] - 43:19, 43:20, 86:8, 86:11, 86:12, 89:6, 93:11, 94:12, 100:22
**news** [1] - 40:21
**next** [24] - 22:7, 22:12, 23:23, 33:24, 49:9, 54:13, 56:4, 56:24, 58:24, 61:5, 61:25, 62:7, 62:8, 62:21, 62:23, 63:21, 65:16, 72:21, 73:14, 73:25, 75:18, 80:14, 82:14
**night** [1] - 44:10
**nine** [4] - 56:8, 65:22, 81:18, 84:25
**NO** [1] - 1:11
**nobody** [2] - 45:19, 95:4
**non** [1] - 71:11
**non-law** [1] - 71:11
**normal** [1] - 54:5
**North** [2] - 56:22, 70:18
**north** [2] - 8:10, 8:11
**northern** [1] - 3:18
**notarized** [1] - 22:1

**note** [8] - 21:3, 21:15, 21:17, 25:15, 27:15, 68:3, 82:25, 87:2
**noted** [3] - 58:6, 60:2, 65:14
**notes** [11] - 37:9, 41:1, 41:3, 41:4, 41:7, 41:8, 41:9, 41:14, 78:1, 78:2, 79:23
**nothing** [12] - 4:17, 5:24, 17:18, 35:6, 38:15, 39:23, 40:3, 40:7, 42:11, 44:11, 44:22, 85:3
**notice** [4] - 35:14, 47:19, 65:14, 85:14
**noticed** [3] - 4:6, 47:20, 84:21
**notified** [2] - 57:11, 59:8
**November** [2] - 57:8, 61:25
**null** [2] - 57:20, 59:18
**number** [29] - 4:14, 5:9, 7:3, 10:21, 11:21, 12:1, 12:25, 22:14, 23:18, 24:2, 25:5, 26:11, 38:10, 55:19, 56:13, 56:22, 57:5, 61:22, 61:24, 64:1, 67:19, 72:23, 72:24, 73:1, 80:14, 82:4, 85:4, 94:12, 95:17
**numbered** [1] - 103:9
**numbers** [1] - 15:25
**numerous** [2] - 69:18, 69:19

---

# O

**O'Brien** [16] - 5:13, 6:18, 17:6, 27:13, 31:2, 33:6, 34:14, 34:19, 38:1, 44:10, 46:7, 79:5, 85:15, 85:25, 86:13, 89:10
**O'BRIEN** [77] - 1:22, 3:20, 3:22, 3:25, 4:20, 4:23, 5:5, 5:14, 6:9, 6:12, 7:2, 7:5, 7:13, 7:18, 8:17, 9:15, 13:10, 13:13, 16:7, 17:22, 18:7, 20:14, 26:17, 27:14, 27:18, 28:13, 29:1, 29:14, 31:4, 31:13, 31:16, 32:8, 32:16, 34:25, 38:2, 40:7, 43:8, 43:11, 43:15,

44:8, 44:24, 45:13, 45:17, 45:23, 47:24, 48:8, 49:6, 49:13, 51:11, 51:18, 51:21, 52:16, 53:14, 53:16, 53:18, 54:1, 54:10, 55:11, 65:25, 78:10, 78:13, 79:14, 79:17, 80:12, 85:16, 85:19, 85:21, 89:11, 91:23, 92:6, 98:9, 98:24, 100:22, 101:13, 101:16, 102:9, 102:14

**O'Brien's** [2] - 92:4, 92:19

**oar** [1] - 86:5

**oath** [2] - 36:12, 36:24

**object** [2] - 20:14, 29:17

**objection** [20] - 20:20, 26:15, 27:15, 27:18, 28:2, 29:1, 49:13, 51:11, 51:15, 51:17, 51:18, 52:15, 52:16, 53:13, 53:15, 53:16, 55:10, 55:11, 65:25, 80:10

**objections** [1] - 45:4

**obligated** [1] - 37:15

**obligation** [3] - 40:23, 40:25, 46:3

**obtain** [9] - 20:25, 23:7, 24:19, 44:18, 49:23, 68:24, 69:2, 70:1, 70:3

**obtained** [9] - 5:6, 52:20, 68:9, 69:3, 69:11, 69:13, 70:4, 70:5

**obviously** [3] - 38:6, 47:15, 47:20

**occasion** [1] - 86:13

**occupants** [2] - 72:7, 74:3

**occurred** [3] - 8:5, 49:21, 77:3

**occurring** [1] - 49:22

**October** [8] - 56:2, 59:6, 61:22, 63:18, 63:19, 64:24, 67:16, 69:25

**OF** [2] - 1:1, 1:3

**offer** [8] - 33:8, 35:6, 35:8, 42:5, 52:13, 87:11, 93:5, 97:11

**offered** [2] - 20:17, 51:14

**offhand** [1] - 3:8

**OFFICE** [1] - 1:18

**office** [30] - 28:19, 35:12, 43:21, 44:4, 45:18, 45:19, 49:23, 50:17, 51:2, 51:6, 54:23, 55:18, 56:2, 56:6, 56:9, 57:11, 58:23, 59:8, 61:13, 63:15, 64:5, 64:12, 67:7, 69:14, 71:11, 78:4, 78:5, 84:10, 99:16

**Office** [13] - 8:22, 19:15, 53:2, 55:5, 61:3, 61:6, 61:16, 62:4, 62:10, 63:10, 67:6, 67:7, 68:21

**officer** [3] - 55:3, 62:1, 62:23

**officers** [9] - 62:16, 62:21, 62:24, 63:2, 63:5, 71:10, 71:16, 71:17, 71:19

**offices** [1] - 43:19

**official** [5] - 26:25, 27:1, 27:8, 39:24, 44:21

**Official** [3] - 103:3, 103:15, 103:17

**officially** [1] - 55:25

**officials** [9] - 19:25, 20:5, 20:23, 21:4, 23:22, 39:25, 43:22, 71:5, 71:9

**often** [2] - 10:6, 16:15

**oil** [6] - 21:15, 21:16, 25:15, 55:5, 68:2, 68:3

**older** [1] - 84:5

**OLIVER** [1] - 1:23

**once** [3] - 76:8, 95:18, 95:19

**one** [47] - 3:3, 5:2, 5:5, 7:12, 10:18, 11:15, 13:11, 13:14, 16:18, 20:19, 23:3, 24:14, 30:14, 34:7, 40:13, 42:15, 42:16, 42:19, 42:25, 44:12, 46:14, 46:20, 47:12, 51:13, 52:5, 56:15, 62:21, 65:3, 65:21, 66:6, 70:24, 72:10, 75:12, 76:7, 81:23, 83:12, 89:3, 89:21, 90:1, 96:24, 98:10, 98:13, 100:4, 100:7, 101:13

**one-car** [1] - 76:7

**ones** [2] - 6:14, 93:12

**open** [15] - 4:16, 19:9, 19:13, 19:19, 67:10,

68:19, 72:7, 73:3, 73:6, 73:21, 73:23, 73:25, 74:2, 92:18, 102:10

**opened** [5] - 19:20, 25:18, 68:16, 69:25, 70:7

**openly** [1] - 27:23

**opens** [1] - 68:17

**operating** [2] - 23:14, 25:1

**opportunity** [1] - 99:11

**opposed** [1] - 11:18

**oppressive** [1] - 38:24

**option** [2] - 44:17, 47:17

**ordered** [3] - 57:17, 59:15, 60:22

**organization** [11] - 55:1, 57:25, 58:2, 58:3, 58:5, 58:7, 59:23, 59:25, 60:1, 60:3

**original** [15] - 21:14, 21:16, 21:17, 21:18, 21:19, 21:22, 21:23, 21:25, 22:1, 23:11, 24:24, 26:11, 28:17, 52:9

**otherwise** [3] - 90:11, 90:23, 91:20

**ourselves** [4] - 23:2, 24:14, 72:6, 76:2

**outer** [2] - 8:11, 73:22

**outset** [1] - 87:2

**outside** [2] - 72:15, 73:5

**overall** [1] - 101:1

**overview** [1] - 20:8

**own** [4] - 12:12, 78:23, 85:14, 90:11

**owners** [1] - 42:22

---

## P

**P.A** [1] - 22:18

**p.m** [1] - 50:13

**PA** [3] - 1:20, 1:24, 103:19

**package** [1] - 64:25

**Packard** [2] - 78:3, 81:21

**packet** [2] - 100:12, 100:13

**page** [21] - 11:6, 22:7, 22:12, 23:23, 25:11, 56:4, 56:8, 56:20, 56:24, 58:13, 58:24, 60:8, 61:24, 61:25,

62:7, 62:8, 62:23, 63:5, 63:21

**pages** [7] - 10:17, 10:18, 10:22, 11:2, 11:10, 57:23, 62:15

**paid** [3] - 15:15, 58:6, 60:2

**paper** [4] - 77:13, 77:15, 77:16, 97:1

**papers** [8] - 34:18, 36:5, 36:9, 36:13, 37:2, 37:18, 40:2, 42:11

**paperwork** [3] - 66:8, 77:9, 77:10

**paragraph** [1] - 89:3

**paralegal** [2] - 7:13, 7:14

**pardon** [3] - 3:24, 9:9, 94:15

**parenthesis** [14] - 22:13, 23:1, 23:2, 23:10, 23:16, 23:17, 23:18, 24:12, 24:13, 24:22, 25:3, 25:4, 25:5

**Park** [1] - 56:18

**parked** [1] - 73:11

**part** [8] - 8:23, 9:2, 29:16, 29:20, 37:7, 79:21, 98:11, 98:13

**participants** [1] - 77:5

**participate** [2] - 46:18, 70:10

**particular** [6] - 6:24, 14:1, 15:24, 25:19, 26:24, 89:24

**particularly** [2] - 11:22, 87:13

**parties** [1] - 35:6

**party** [1] - 32:18

**past** [4] - 4:7, 78:14, 79:10, 79:12

**pate** [1] - 19:17

**Pate** [24] - 20:4, 21:2, 21:9, 21:13, 26:1, 27:3, 28:18, 29:7, 29:9, 49:8, 49:11, 50:2, 50:3, 50:6, 50:9, 50:17, 51:1, 51:7, 52:2, 52:6, 52:10, 52:11

**patrol** [1] - 71:14

**Paul** [1] - 56:22

**pay** [2] - 58:4, 60:1

**peel** [1] - 40:19

**peg** [10] - 42:20, 42:21, 43:1, 96:16, 96:17, 96:24, 96:25

**penalties** [4] - 57:14,

58:6, 59:11, 60:3

**penalty** [2] - 60:20, 61:10

**Pennsylvania** [8] - 22:4, 24:4, 34:11, 61:22, 70:19, 71:13, 103:5, 103:18

**PENNSYLVANIA** [2] - 1:1, 1:12

**people** [10] - 31:9, 32:3, 32:6, 33:12, 37:19, 38:5, 38:11, 42:12, 46:12, 72:11

**per** [1] - 9:11

**percentage** [2] - 10:2, 10:4

**perfect** [1] - 84:25

**performed** [1] - 54:22

**perhaps** [5] - 8:13, 76:5, 88:3, 98:2, 98:16

**period** [2] - 6:17, 29:5

**perjury** [1] - 61:10

**permanent** [4] - 57:21, 59:19, 60:25, 65:15

**perpetual** [1] - 62:12

**person** [19] - 10:8, 10:15, 10:16, 13:18, 13:20, 14:21, 32:14, 34:8, 37:17, 37:24, 42:8, 44:3, 44:4, 45:13, 49:10, 50:2, 56:15, 56:22, 94:4

**personal** [2] - 87:25, 93:15

**personally** [1] - 46:3

**personnel** [4] - 72:9, 78:7, 82:10, 84:5

**pertain** [1] - 49:16

**petition** [7] - 10:6, 10:19, 10:24, 11:9, 12:2, 16:15, 86:16

**petitions** [10] - 9:3, 9:5, 9:12, 9:16, 9:23, 10:2, 10:11, 12:19, 16:12, 16:19

**Philadelphia** [1] - 66:23

**Phillips** [1] - 19:14

**phone** [14] - 27:4, 29:10, 29:11, 29:14, 50:5, 72:24, 73:3, 73:13, 82:13, 82:20, 82:22, 94:11, 95:16

**phoney** [1] - 17:15

**photocopy** [1] - 21:23

**photographs** [2] - 75:24, 75:25

**pick** [1] - 45:1

**picked** [2] - 6:22, 73:1

**picture** [1] - 42:21
**pictures** [1] - 82:20
**pieces** [2] - 68:6, 97:1
**PLACE** [1] - 1:11
**place** [3] - 23:19, 23:20, 62:13
**placed** [1] - 72:22
**places** [1] - 29:25
**plan** [8] - 15:16, 17:12, 17:18, 17:25, 30:16, 31:25, 32:10, 100:1
**planning** [1] - 31:21
**play** [2] - 27:20, 28:4
**played** [12] - 27:12, 28:6, 28:25, 29:3, 50:21, 50:22, 51:10, 51:15, 51:16, 51:24, 52:14, 52:18
**playing** [2] - 26:12, 44:2
**plus** [1] - 25:3
**point** [16] - 6:23, 14:23, 32:6, 39:20, 74:16, 74:20, 76:3, 79:5, 93:1, 98:10, 98:24, 99:4, 99:7, 101:3, 102:2, 102:9
**points** [1] - 38:14
**police** [2] - 73:7, 73:8
**popped** [1] - 73:23
**portfolio** [1] - 37:8
**portion** [3] - 33:22, 74:9, 81:13
**pose** [1] - 38:25
**posing** [1] - 28:22
**position** [4] - 8:25, 34:18, 37:16, 89:4
**possession** [2] - 68:7, 87:4
**post** [1] - 56:8
**potentially** [1] - 99:3
**pounding** [3] - 72:5, 72:8, 74:18
**practice** [1] - 23:15
**Practice** [1] - 25:2
**pre** [1] - 75:25
**pre-entry** [1] - 75:25
**preamble** [1] - 51:8
**preceding** [1] - 51:13
**precisely** [1] - 38:19
**predicted** [2] - 85:2, 85:3
**predominant** [1] - 77:15
**preference** [1] - 101:9
**prejudice** [1] - 15:24
**prejudicial** [2] - 4:8, 6:23
**premises** [1] - 74:24
**prepared** [3] - 21:19,

31:13, 103:11
**prerequisite** [1] - 55:5
**presence** [1] - 32:14
**present** [3] - 32:12, 34:13, 53:1
**presentation** [1] - 100:5
**presented** [1] - 35:6
**presently** [2] - 36:20, 85:24
**president** [8] - 25:8, 25:9, 60:7, 62:15, 62:17, 62:25, 63:3, 63:8
**President** [1] - 22:11
**presidents** [2] - 42:19, 43:1
**pretty** [2] - 86:24, 99:21
**prevent** [1] - 25:24
**PRICE** [1] - 1:23
**principal** [2] - 62:13, 64:5
**print** [1] - 4:13
**private** [1] - 43:17
**privilege** [4] - 32:10, 32:22, 60:18, 92:22
**privileged** [3] - 32:18, 32:20, 92:20
**privileges** [3] - 60:17, 65:9, 65:10
**pro** [6] - 9:24, 10:3, 10:6, 12:18, 12:20, 86:16
**problem** [4] - 29:14, 30:13, 33:14, 78:13
**proceed** [9] - 8:14, 29:2, 34:17, 52:17, 85:22, 86:14, 86:15, 87:6, 88:14
**proceeding** [6] - 15:2, 31:22, 31:23, 84:24, 90:18, 92:10
**proceedings** [3] - 5:8, 32:2, 103:8
**PROCEEDINGS** [1] - 1:13
**process** [5] - 26:16, 39:13, 39:18, 75:16, 75:17
**processing** [1] - 58:20
**Proctor** [1] - 35:13
**produce** [2] - 97:19, 97:25
**product** [1] - 32:10
**production** [5] - 21:15, 21:17, 25:15, 68:3
**Professional** [1] - 64:23

**profit** [3] - 63:22, 63:23, 64:11
**program** [1] - 54:23
**project** [1] - 18:23
**promissory** [5] - 21:3, 21:15, 21:16, 25:15, 68:3
**prompt** [1] - 58:21
**proper** [2] - 57:20, 59:18, 60:24
**properly** [1] - 44:15
**property** [1] - 15:3
**prosecuting** [1] - 86:2
**prosecution** [5] - 5:7, 53:3, 54:3
**protestations** [1] - 6:5
**prove** [4] - 31:18, 90:23, 90:25, 93:19
**provide** [1] - 80:2
**provided** [1] - 51:21
**provider** [1] - 82:22
**provisions** [2] - 64:13, 103:5
**public** [12] - 31:22, 32:2, 32:4, 57:10, 57:15, 59:8, 59:12, 60:13, 60:19, 65:5, 65:8, 92:10
**publication** [2] - 23:18, 25:5
**punch** [1] - 74:1
**purportedly** [1] - 93:10
**purpose** [4] - 64:18, 69:20, 74:21, 78:15
**purposes** [5] - 64:18, 85:9, 85:14, 87:14, 87:18
**pursuant** [7] - 57:1, 59:1, 60:8, 61:19, 65:1, 65:11, 103:5
**put** [20] - 4:22, 6:14, 12:5, 12:14, 26:12, 33:17, 35:2, 68:7, 79:7, 79:18, 81:16, 83:14, 85:13, 86:5, 87:20, 95:21, 95:22, 102:5, 102:14

## Q

**qualified** [1] - 56:17
**quality** [1] - 27:25
**quash** [8] - 3:3, 31:1, 34:16, 42:12, 46:22, 86:9, 88:6, 88:14
**quashed** [4] - 40:6, 42:7, 43:5, 91:16
**quashing** [1] - 91:21
**questioned** [1] - 17:6

**questions** [12] - 11:9, 11:14, 11:18, 16:8, 16:11, 17:20, 31:17, 32:11, 32:14, 46:23, 53:9, 54:11
**quick** [1] - 38:14
**quickly** [1] - 91:7
**quietly** [2] - 75:10, 75:14
**quit** [1] - 49:3
**quite** [3] - 30:9, 39:4, 39:11
**quotation** [1] - 21:24
**quotations** [1] - 22:1
**quote** [5] - 39:8, 39:9, 39:15, 39:18, 40:1

## R

**R.s** [1] - 41:5
**RA** [1] - 19:7
**Radnor** [1] - 71:13
**Railroad** [7] - 21:18, 22:21, 24:8, 54:15, 54:17, 54:18, 55:7
**raise** [2] - 4:1, 43:9
**ram** [1] - 74:1
**Randy** [1] - 28:19
**rather** [2] - 5:24, 84:3
**re** [1] - 58:16
**reached** [1] - 38:7
**reaction** [1] - 5:23
**read** [11] - 21:12, 25:16, 32:4, 34:18, 40:13, 54:16, 62:6, 69:6, 78:11, 83:18, 83:20
**reader** [4] - 83:9, 83:11, 83:13, 83:15
**reading** [1] - 78:12
**ready** [4] - 4:10, 8:14, 29:10
**realized** [1] - 89:21
**really** [6] - 12:20, 20:19, 42:16, 66:11, 87:22, 89:17
**rear** [2] - 72:9, 72:18
**reargue** [1] - 91:24
**reason** [11] - 18:6, 32:8, 32:9, 38:11, 38:21, 39:1, 40:5, 84:22, 87:5
**reasonable** [1] - 61:15
**reasons** [1] - 40:6
**receipt** [17] - 21:22, 21:24, 22:2, 22:5, 22:14, 22:23, 23:5, 23:8, 23:12, 23:14, 24:2, 24:9, 24:17, 24:20, 24:24, 25:1,

35:20
**receipts** [2] - 37:9, 41:5
**received** [14] - 19:14, 21:4, 25:11, 25:17, 35:16, 35:18, 35:24, 38:12, 40:10, 40:23, 58:23, 60:12, 64:12, 65:4
**recent** [1] - 29:15
**recess** [2] - 30:24, 66:9
**recite** [1] - 79:1
**reclining** [1] - 82:15
**recollection** [6] - 78:14, 78:17, 79:6, 79:8, 79:10, 79:12
**recommend** [1] - 47:14
**record** [28] - 8:4, 26:1, 26:10, 29:4, 32:2, 32:4, 43:6, 44:25, 45:8, 50:5, 51:20, 52:11, 54:15, 54:17, 54:25, 55:14, 61:6, 63:5, 69:7, 78:10, 78:15, 88:15, 92:5, 98:11, 98:12, 101:2, 102:14
**recorded** [4] - 28:20, 52:10, 78:14, 79:10
**recorder** [1] - 52:11
**recording** [15] - 26:8, 26:24, 26:25, 28:9, 28:17, 49:18, 49:21, 49:22, 50:9, 50:16, 50:25, 51:5, 52:1, 52:9, 52:20
**Recordings** [2] - 61:11, 62:5
**recordings** [5] - 26:5, 26:23, 52:24, 61:8, 61:12
**records** [22] - 47:9, 54:20, 57:21, 59:19, 60:25, 61:2, 61:12, 61:16, 63:10, 65:14, 65:15, 68:4, 68:24, 69:2, 69:3, 69:4, 69:9, 70:1, 77:7, 81:10
**recross** [1] - 18:4
**RECROSS** [2] - 2:4, 17:21
**redacted** [2] - 47:16, 47:24
**REDIRECT** [2] - 2:4, 16:9
**redirect** [1] - 18:4
**refer** [2] - 78:2, 82:25

reference [1] - 101:17
referenced [2] - 60:15, 60:23
referred [5] - 9:23, 44:16, 45:14, 53:11, 100:7
referring [10] - 4:20, 4:25, 5:6, 29:20, 47:21, 79:21, 98:10, 100:9, 100:16
refresh [2] - 78:1, 79:6
refreshing [1] - 78:16
refuse [1] - 45:9
refused [5] - 43:20, 43:25, 45:11, 57:16, 59:13
refusing [1] - 44:3
regard [4] - 19:16, 22:10, 87:13, 93:9
regarding [14] - 4:6, 21:14, 22:14, 24:1, 25:18, 31:1, 46:23, 61:3, 61:23, 63:12, 88:10, 88:11, 89:14
regards [2] - 23:20, 25:7
registered [3] - 56:9, 56:12, 64:6
registration [5] - 63:16, 63:21, 64:10, 65:7, 65:13
reinstatement [10] - 55:21, 55:23, 57:24, 58:8, 58:17, 58:18, 58:20, 59:21, 60:4
related [3] - 46:5, 62:3, 67:21
relating [1] - 81:9
relatively [2] - 10:4, 16:17
relevant [1] - 91:20
rely [1] - 46:8
remain [2] - 22:10, 48:25
remember [5] - 4:19, 30:20, 53:21, 78:21, 84:17
remove [1] - 78:7
removing [1] - 77:10
reorganization [3] - 9:19, 9:21, 17:12
reorganize [1] - 17:18
repeat [3] - 38:19, 39:22, 88:8
report [5] - 21:19, 55:1, 57:12, 59:9, 62:5
REPORTED [1] - 103:16
Reporter [3] - 103:3,

103:15, 103:17
reporter [1] - 103:22
REPORTER'S [1] - 103:1
reporting [1] - 20:6
reports [1] - 21:18
represent [3] - 44:17, 44:20, 92:10
representation [1] - 88:11
representative [1] - 46:4
represented [1] - 9:25
representing [1] - 45:25
represents [2] - 3:6, 85:25
reproduction [1] - 103:21
request [4] - 27:2, 48:9, 57:24, 59:21
requested [2] - 61:16, 62:3
requesting [1] - 73:2
requests [2] - 58:9, 60:5
require [1] - 42:13
required [1] - 39:11
requirement [1] - 38:23
research [2] - 43:16, 47:5
resemble [2] - 90:11, 91:9
reserve [1] - 37:10
Reserve [7] - 42:20, 43:12, 44:12, 44:22, 86:8, 86:10, 86:12
residence [16] - 70:5, 70:6, 70:16, 70:20, 71:6, 72:23, 72:24, 72:25, 73:12, 73:16, 74:13, 75:6, 75:11, 75:12, 75:25, 76:1
resident [4] - 19:17, 51:6, 64:7, 66:23
residents [1] - 72:7
resolved [1] - 43:12
respect [3] - 13:17, 38:4, 45:2
respond [6] - 31:14, 32:11, 32:13, 37:3, 74:19, 89:12
responded [1] - 41:21
response [4] - 72:14, 72:15, 72:16, 91:13
responsibility [3] - 22:22, 24:9, 46:6
responsible [2] - 23:8, 24:21

rest [1] - 3:8
resting [3] - 85:10, 85:12, 85:18
result [3] - 17:3, 19:20, 25:25
resume [1] - 49:5
resumed [2] - 8:15
retired [1] - 93:11
return [1] - 79:22
returned [2] - 80:1, 80:2
returns [1] - 45:15
reverse [1] - 85:3
review [3] - 9:2, 16:12, 99:15
reviewed [1] - 9:5
revision [2] - 23:17, 25:4
revive [2] - 57:16, 59:13
revived [2] - 60:16, 65:9
revocation [4] - 57:25, 58:10, 59:22, 60:6
revoked [2] - 58:4, 59:25
RHODES [1] - 1:23
Richard [7] - 19:10, 22:11, 34:12, 55:4, 65:18, 67:6, 101:13
RICHARD [2] - 1:7, 1:10
riddled [1] - 12:23
Ridgedale [1] - 94:12
rightful [1] - 42:22
rights [1] - 64:21
Rita [1] - 35:13
RJH [7] - 22:3, 22:17, 23:4, 24:3, 24:15, 55:1, 55:2
RMR [2] - 103:14, 103:17
ROAD [1] - 1:23
Roger [1] - 43:13
rolled [1] - 73:4
room [6] - 29:6, 29:8, 76:10, 76:11, 76:12
ROOM [1] - 1:19
rule [2] - 14:6, 14:7
Rule [3] - 39:9, 39:21, 92:13
ruled [2] - 16:22, 51:17
rules [2] - 31:16, 92:9
ruling [2] - 17:4, 33:22

S

safe [18] - 21:22, 21:23, 22:2, 22:5,

22:14, 23:2, 23:4, 23:8, 23:12, 23:13, 24:2, 24:14, 24:17, 24:20, 25:1, 35:20, 37:9, 41:5
safety [1] - 75:11
Saint [1] - 56:22
SanDisk [3] - 83:9, 83:11
satisfactory [1] - 39:14
satisfied [3] - 57:14, 59:11, 60:21
save [1] - 82:20
saw [9] - 4:11, 5:13, 5:15, 5:22, 6:8, 7:8, 37:18
SCC [1] - 4:6
scene [3] - 71:22, 73:8, 77:23
schedule [1] - 13:22
scheduled [1] - 45:4
schedules [2] - 10:20, 13:19
scheduling [1] - 85:9
Schiller [6] - 4:5, 6:2, 7:7, 7:9, 7:23, 8:19
SCHILLER [2] - 2:5, 8:15
Schiller's [1] - 7:22
scope [2] - 69:21, 69:23
Scott [2] - 61:7, 61:9
Scranton [3] - 3:6, 66:23, 67:7, 103:19
screen [6] - 4:6, 4:13, 6:1, 7:8, 47:14, 73:22
scroll [1] - 58:22
scrolling [1] - 56:13
se [5] - 9:24, 10:3, 10:6, 12:18, 12:20
Seagate [4] - 81:20, 81:23, 82:5, 82:10
seal [3] - 54:20, 55:7, 56:1
seals [1] - 89:25
search [29] - 49:23, 49:25, 50:6, 54:21, 70:3, 70:4, 70:10, 70:13, 70:15, 71:3, 71:21, 71:25, 73:6, 74:24, 75:19, 76:2, 76:21, 76:23, 77:3, 77:4, 77:6, 79:25, 80:16, 80:23, 81:1, 81:7, 94:5, 97:24, 97:25
searched [1] - 81:4
searching [1] - 77:4

second [7] - 28:9, 39:2, 49:18, 53:14, 73:13, 97:23, 102:9
seconds [1] - 33:24
secrecy [1] - 40:20
secretary [12] - 38:6, 38:10, 54:18, 55:9, 58:12, 60:10, 61:8, 62:18, 62:25, 63:3, 63:8, 65:4
Secretary [29] - 55:15, 55:16, 56:3, 56:6, 56:25, 57:4, 58:9, 58:15, 58:23, 58:24, 59:4, 60:5, 60:12, 61:2, 61:3, 61:6, 61:11, 61:13, 61:17, 62:4, 62:10, 63:11, 63:13, 64:9, 64:14, 64:15, 65:3, 65:12
Section [55] - 55:14, 57:1, 58:16, 59:1, 60:9, 65:1, 65:5, 65:11, 103:6
section [2] - 33:24, 60:13
secured [1] - 11:15
securities [1] - 24:10
see [28] - 5:1, 5:10, 8:4, 12:16, 12:18, 12:20, 20:5, 26:2, 28:5, 30:23, 38:20, 40:13, 47:7, 47:12, 47:19, 53:23, 66:7, 69:22, 80:4, 80:12, 84:23, 85:5, 88:17, 95:1, 99:14, 100:6, 100:7
seeing [1] - 4:19
seem [2] - 29:15, 49:2
seize [1] - 77:20
seized [9] - 77:21, 80:3, 81:14, 82:15, 82:24, 83:3, 84:11
seizing [1] - 82:1
send [9] - 22:5, 38:5, 38:10, 40:15, 45:1, 46:8, 93:24, 97:6, 98:17
sending [1] - 96:23
senior [4] - 25:9, 39:24, 42:19, 43:1
sense [5] - 31:12, 36:11, 36:17, 38:20, 39:5
sent [30] - 22:2, 35:14, 35:19, 35:20, 37:2, 37:5, 37:14, 40:11, 41:16, 41:17, 41:20, 42:18, 42:19, 42:20,

42:22, 42:23, 43:1, 43:2, 43:18, 43:20, 45:6, 52:11, 68:5, 90:6, 93:20, 94:3, 94:4, 96:17, 100:22
**separate** [1] - 93:7
**separated** [3] - 76:10, 76:11, 76:12
**separately** [1] - 86:23
**September** [3] - 67:3, 69:25, 80:8
**series** [1] - 50:25
**serve** [3] - 45:19, 46:3, 56:16
**served** [4] - 44:15, 45:3, 50:1, 87:3
**Service** [1] - 43:18
**service** [3] - 46:1, 46:5, 87:8
**set** [6] - 57:25, 58:9, 59:21, 60:5, 64:18, 103:9
**setting** [1] - 17:7
**seven** [1] - 64:1
**several** [6] - 3:6, 16:8, 26:5, 69:4, 72:10
**shall** [3] - 13:10, 23:2, 24:13
**shape** [1] - 87:17
**shareholders** [1] - 56:17
**Shawnee** [3] - 22:18, 24:4, 70:19
**Shawness** [1] - 22:8
**Shea** [1] - 61:1
**sheets** [1] - 68:2
**Sheila** [1] - 54:23
**shell** [1] - 83:17
**show** [7] - 50:15, 51:4, 52:8, 57:21, 59:19, 60:25, 79:24
**showing** [1] - 39:14
**shown** [3] - 57:2, 59:2, 64:18
**shows** [4] - 27:5, 58:1, 62:8, 63:7
**side** [4] - 72:12, 75:10, 84:6, 84:11
**sidebar** [1] - 92:16
**sign** [15] - 23:21, 23:22, 31:7, 33:10, 36:9, 36:12, 37:4, 37:18, 38:16, 39:6, 42:11, 46:16, 87:16, 89:24, 93:24
**signatories** [2] - 22:20, 24:6
**signature** [15] - 35:9, 35:25, 36:3, 36:6, 36:21, 37:20, 37:25,

38:16, 40:12, 62:19, 87:21, 90:9, 91:8, 93:10
**signatures** [9] - 25:10, 35:16, 36:5, 89:23, 90:10, 90:11, 91:10, 91:19
**signed** [13] - 22:11, 23:20, 38:9, 41:14, 55:8, 55:25, 56:2, 56:23, 58:11, 61:1, 89:16, 93:8, 93:10
**significant** [2] - 12:25, 38:25
**Silverstein** [12] - 67:5, 67:8, 67:13, 68:4, 68:8, 69:22, 69:24, 81:10, 92:8, 92:11, 92:12, 92:21
**Silverstein's** [3] - 16:24, 67:17, 68:15
**SIM** [2] - 82:16, 82:17
**similar** [1] - 93:12
**simple** [1] - 42:3
**simply** [2] - 36:18, 84:22
**sincerely** [1] - 58:21
**sit** [3] - 71:14, 75:10, 75:14
**sitting** [2] - 11:1, 30:11
**situation** [5] - 4:15, 17:16, 20:20, 50:4, 92:9
**six** [2] - 71:10, 96:25
**Sixth** [2] - 39:12, 42:6
**sixth** [1] - 39:17
**Skinner** [5] - 62:17, 62:18, 63:1
**Skinner's** [2] - 62:19, 62:22
**skip** [3] - 30:6, 49:10, 49:15
**slash** [5] - 23:9, 23:11, 24:10, 24:23, 57:7
**sliding** [1] - 72:10
**Slope** [1] - 70:18
**small** [3] - 15:5, 15:6, 82:19
**snow** [4] - 3:18, 8:9, 8:11, 30:15
**snowing** [1] - 30:12
**someone** [5] - 44:2, 46:8, 58:11, 94:4, 96:3
**sometime** [3] - 85:13, 99:24, 101:10
**somewhat** [1] - 8:10
**somewhere** [1] - 88:16

**sooner** [1] - 49:4
**sorry** [10] - 4:24, 42:16, 47:3, 53:21, 57:7, 66:8, 85:16, 90:4, 99:2, 101:5
**sort** [2] - 76:8, 88:16
**sound** [5] - 13:8, 13:9, 13:11, 18:21, 26:12
**sounded** [1] - 73:3
**South** [7] - 19:16, 19:25, 21:21, 23:25, 24:5, 25:7, 28:20
**SOUTH** [1] - 1:23
**Southern** [1] - 21:13
**speaking** [1] - 81:10
**speaks** [1] - 62:6
**special** [3] - 18:18, 28:19, 66:19
**specialist** [1] - 54:23
**specialize** [1] - 12:9
**spreadsheet** [1] - 79:23
**square** [2] - 76:4, 76:5
**stairs** [1] - 82:7
**stamp** [3] - 58:1, 80:7, 90:9
**stamped** [6] - 35:21, 89:23, 89:25, 90:1, 90:8, 90:10
**stamping** [1] - 91:8
**Stan** [8] - 56:18, 58:22, 60:7, 62:25, 63:2, 63:8, 63:9, 64:7
**stand** [9] - 4:10, 8:15, 36:12, 36:14, 36:24, 38:19, 39:22, 66:3, 88:12
**standard** [4] - 39:10, 83:15, 87:10, 93:4
**standing** [1] - 100:5
**start** [6] - 49:9, 68:20, 68:22, 84:23, 85:12, 86:7
**started** [1] - 72:8
**State** [34] - 54:17, 55:14, 55:15, 55:16, 56:3, 56:6, 56:10, 56:25, 57:4, 58:9, 58:16, 58:25, 59:4, 60:5, 60:11, 60:12, 61:2, 61:3, 61:6, 61:7, 61:11, 61:17, 62:10, 63:11, 63:13, 64:9, 64:14, 65:3, 65:12
**state** [11] - 8:18, 56:1, 58:4, 60:1, 61:10, 64:7, 64:12, 64:17, 64:21, 66:16, 71:13

**State's** [3] - 58:23, 61:13, 62:4
**statement** [1] - 94:21
**statements** [5] - 34:21, 62:3, 89:20, 91:19, 99:12
**STATES** [2] - 1:1, 1:3
**states** [6] - 41:12, 55:15, 61:8, 62:1, 63:12, 80:19
**States** [22] - 1:17, 5:6, 8:20, 8:22, 22:16, 22:25, 24:12, 34:12, 34:15, 43:18, 43:23, 53:2, 54:2, 61:21, 63:25, 65:18, 65:19, 86:2, 103:4, 103:6, 103:18
**station** [1] - 66:22
**stay** [3] - 21:22, 75:6, 75:8, 101:13
**Steen** [1] - 56:3
**step** [2] - 54:12, 92:4
**sticking** [1] - 49:2
**still** [7] - 6:2, 10:14, 14:2, 14:19, 14:21, 16:2, 44:1
**stipulate** [1] - 65:20
**stipulation** [1] - 65:17
**stop** [1] - 4:11
**storage** [1] - 27:7
**store** [1] - 26:22
**storm** [2] - 8:9, 73:22
**story** [1] - 74:10
**STREET** [1] - 1:19
**structure** [1] - 72:9
**style** [1] - 3:11
**subject** [9] - 14:3, 16:2, 16:4, 16:5, 23:15, 25:2, 39:25, 65:21, 65:22
**submitted** [2] - 40:19, 61:19
**subpoena** [16] - 34:16, 38:23, 40:6, 42:7, 42:10, 42:13, 43:5, 43:15, 43:19, 43:25, 44:11, 44:15, 61:20, 87:4, 87:8
**subpoenaed** [5] - 3:7, 32:15, 43:11, 86:24, 87:11
**subpoenas** [10] - 32:3, 43:22, 44:3, 46:12, 68:22, 68:25, 86:9, 86:23, 91:15, 91:21
**subsequent** [1] - 62:3
**substantive** [2] - 86:19, 87:15
**successor** [1] - 56:17

**sufficient** [2] - 67:10, 88:6
**suggest** [1] - 46:10
**suggested** [2] - 38:5, 47:16
**suggesting** [1] - 91:12
**SUMMIT** [1] - 1:24
**supervised** [1] - 26:23
**supervision** [3] - 54:24, 103:11, 103:21
**supervisor** [1] - 67:8
**support** [1] - 21:3
**suppose** [1] - 86:22
**supposed** [2] - 8:12, 30:13
**supposedly** [2] - 93:8, 93:13
**Supreme** [1] - 39:11
**surrounding** [2] - 40:20, 69:23
**surveillance** [1] - 26:23
**suspect** [1] - 79:18
**suspicious** [1] - 20:6
**Susquehanna** [1] - 30:14
**sustained** [2] - 17:1, 20:21
**SWIFT** [3] - 23:10, 24:22, 24:23
**sworn** [5] - 18:12, 38:15, 40:5, 61:9, 66:5
**system** [1] - 26:13

## T

**T.V** [1] - 82:8
**table** [1] - 82:14
**tape** [12] - 26:1, 26:23, 26:25, 27:4, 27:6, 27:9, 27:12, 28:8, 28:18, 29:11, 48:23, 49:5
**tapes** [4] - 26:11, 26:13, 51:21, 53:12
**task** [2] - 71:10, 71:18
**tax** [10] - 55:20, 55:22, 55:24, 57:12, 58:5, 59:9, 60:1, 60:20, 63:17, 63:18
**Tax** [7] - 57:2, 59:1, 60:9, 60:13, 65:1, 65:5, 65:11
**taxable** [3] - 65:7, 65:9, 65:13
**taxes** [4] - 57:14, 58:6, 59:11, 60:2
**technician** [1] - 8:2

technique [1] - 84:4
telephone [10] - 3:4, 27:3, 46:18, 50:18, 50:25, 69:3, 72:22, 72:25, 73:1, 85:4
telephonically [1] - 86:4
Telex [2] - 23:9, 24:22
ten [5] - 53:19, 53:24, 56:13, 84:24, 84:25
Teo [4] - 90:7, 96:23, 97:7, 100:8
term [3] - 13:1, 13:2, 13:14
terms [6] - 3:11, 11:18, 15:15, 23:19, 25:6, 38:13
tested [2] - 23:9, 24:22
testified [3] - 7:16, 18:12, 66:5
testify [9] - 4:15, 4:16, 6:19, 32:6, 38:17, 38:21, 39:6, 61:20, 102:11
testifying [1] - 4:10
testimony [15] - 4:4, 16:25, 39:3, 39:7, 39:8, 39:10, 39:14, 39:25, 55:25, 85:11, 88:1, 91:16, 91:17, 93:5, 98:14
Texas [34] - 21:18, 22:21, 24:7, 54:15, 54:17, 54:18, 54:19, 55:6, 55:8, 55:15, 55:16, 56:2, 56:6, 56:10, 56:11, 56:19, 56:23, 56:25, 57:1, 58:16, 58:25, 59:1, 60:9, 60:13, 63:11, 63:13, 64:3, 64:4, 64:6, 64:9, 64:22, 65:1, 65:5, 65:11
THE [285] - 1:1, 1:1, 1:10, 3:2, 3:15, 3:21, 3:24, 4:2, 4:4, 4:18, 5:1, 5:2, 5:4, 5:12, 5:15, 5:16, 5:18, 5:20, 6:1, 6:7, 6:8, 6:11, 6:17, 6:25, 7:4, 7:8, 7:11, 7:24, 8:3, 8:8, 9:13, 13:6, 13:9, 13:11, 18:3, 18:6, 18:8, 18:9, 20:13, 20:16, 20:19, 26:15, 26:19, 27:13, 27:19, 27:23, 28:2, 29:2, 29:8, 29:19, 29:22, 30:2, 30:4, 30:8,

30:10, 30:25, 31:5, 31:15, 31:21, 31:24, 32:13, 32:17, 32:23, 33:1, 33:5, 33:16, 33:18, 33:20, 34:1, 34:5, 34:7, 34:10, 34:24, 35:11, 35:18, 35:19, 35:22, 35:23, 35:25, 36:1, 36:4, 36:7, 36:8, 36:10, 36:11, 36:14, 36:16, 36:19, 36:22, 36:23, 37:1, 37:5, 37:6, 37:7, 37:15, 37:19, 37:22, 37:24, 38:1, 38:3, 40:9, 40:15, 40:16, 41:1, 41:2, 41:3, 41:4, 41:7, 41:8, 41:9, 41:10, 41:16, 41:17, 41:19, 41:20, 41:23, 42:1, 42:2, 42:3, 42:15, 42:17, 42:18, 43:4, 43:10, 43:14, 44:23, 45:11, 45:16, 45:21, 46:7, 46:15, 46:20, 47:1, 47:2, 47:3, 47:4, 47:6, 47:7, 47:22, 48:3, 48:5, 48:6, 48:11, 48:12, 48:14, 48:16, 48:17, 48:19, 48:20, 48:21, 48:24, 49:14, 51:12, 51:16, 51:19, 51:23, 52:15, 52:17, 53:13, 53:15, 53:17, 53:19, 54:12, 55:10, 55:12, 56:1, 66:10, 66:12, 78:12, 78:19, 78:21, 78:23, 78:24, 78:25, 79:2, 79:3, 79:4, 79:5, 79:9, 79:10, 79:12, 79:13, 79:18, 84:15, 85:15, 85:17, 85:20, 85:22, 86:5, 86:21, 87:1, 87:9, 88:9, 88:20, 88:23, 88:25, 89:5, 89:6, 89:7, 89:10, 89:13, 89:21, 90:3, 90:4, 90:5, 90:6, 90:10, 90:13, 90:15, 90:16, 90:17, 90:19, 90:21, 90:23, 90:25, 91:2, 91:4, 91:11, 92:1, 92:14, 92:24, 93:2, 94:1, 94:2, 94:9, 94:10, 94:14, 94:15, 94:16, 94:17, 94:20, 94:22, 94:23, 94:24, 95:2, 95:3, 95:5,

95:6, 95:8, 95:9, 95:10, 95:12, 95:13, 95:14, 95:20, 95:25, 96:1, 96:2, 96:10, 96:13, 96:14, 96:15, 96:21, 96:22, 97:3, 97:4, 97:5, 97:7, 97:8, 97:9, 97:11, 97:13, 97:14, 97:15, 97:17, 97:21, 97:23, 98:6, 98:8, 98:22, 99:1, 99:9, 99:23, 100:3, 100:18, 100:21, 101:5, 101:10, 101:15, 101:25, 102:3, 102:8, 102:12, 102:15, 102:16
theirs [3] - 54:25, 87:21, 91:5
themselves [1] - 71:17
theory [1] - 15:23
there'd [1] - 15:14
therefore [6] - 57:17, 58:7, 59:15, 60:3, 60:22, 65:11
thereof [2] - 23:19, 25:6, 61:1
third [3] - 39:20, 50:9, 56:8
Thornton [2] - 27:1, 27:8
thorough [1] - 54:21
thousands [1] - 16:12
Three [1] - 70:18
three [10] - 27:4, 35:15, 35:23, 38:14, 50:25, 60:18, 61:19, 70:23, 70:24, 74:10
three-story [1] - 74:10
throughout [1] - 75:12
thumb [1] - 83:6
TIAA [5] - 43:17, 43:19, 43:21, 43:22, 45:18
TIAA-CREF [5] - 43:17, 43:19, 43:21, 43:22, 45:18
Timber [1] - 21:13
tiny [1] - 83:13
Title [1] - 103:5
titled [5] - 58:13, 59:21, 64:8, 64:25, 65:18
TO [1] - 2:2
today [5] - 8:9, 8:11, 8:13, 58:20, 95:4
together [1] - 81:16
tomorrow [10] - 84:24, 84:25, 85:5, 85:10,

96:12, 97:25, 99:19, 100:2, 101:7
took [6] - 75:13, 78:3, 78:15, 78:22, 84:4, 94:18
tools [4] - 68:20, 73:21
top [4] - 22:13, 24:1, 25:14, 58:13
topic [1] - 84:16
Torch [1] - 82:13
total [1] - 84:11
tower [1] - 84:1
townhouse [2] - 70:23, 76:4
track [1] - 89:2
Trademark [1] - 64:22
transact [2] - 64:2, 64:11, 64:17
transacted [1] - 64:4
transaction [5] - 19:16, 19:18, 23:20, 25:7, 25:19
transactions [1] - 20:6
transcript [4] - 49:12, 103:7, 103:10, 103:20
transcripts [1] - 51:22
transfer [2] - 23:10, 24:22, 68:4
transfers [1] - 65:20
transpires [1] - 92:12
Trantham [5] - 56:13, 62:25, 63:1, 63:3, 63:8
travel [1] - 38:18
traveled [1] - 65:23
Travis [1] - 54:18
treasurer [5] - 58:12, 62:18, 63:1, 63:4, 63:9
Treasury [2] - 41:11, 41:13
treated [1] - 17:11
treats [1] - 18:1
TRIAL [1] - 1:13
trial [7] - 18:4, 34:12, 38:17, 39:4, 61:20, 68:11, 87:24
tries [1] - 53:22
trigger [1] - 38:23
triggered [1] - 67:4
trooper [1] - 71:13
true [10] - 21:25, 46:24, 55:17, 62:2, 63:14, 94:21, 95:25, 97:10, 103:7
truly [1] - 22:10
trust [2] - 23:5, 24:18
Trust [7] - 19:16,

19:25, 21:21, 23:25, 24:5, 25:7, 28:21
trustee [1] - 8:21
Trustee [1] - 8:22
truth [2] - 20:17, 94:8
truthful [1] - 31:6
try [3] - 10:14, 99:24, 101:11
trying [4] - 25:23, 26:2, 30:4, 36:2
turn [3] - 45:25, 67:19, 91:21
turned [1] - 45:3, 68:16, 83:6
turning [1] - 27:6
Tuscaloosa [8] - 19:3, 19:7, 21:21, 24:1, 24:6, 28:21, 50:1, 51:6
twenty [3] - 18:20, 18:22, 18:25
twenty-eight [3] - 18:20, 18:22, 18:25
twice [1] - 37:5
two [20] - 3:2, 10:17, 17:24, 21:23, 28:9, 30:11, 43:11, 57:23, 60:16, 65:8, 71:10, 71:12, 72:22, 72:25, 73:21, 82:4, 83:22, 86:9, 101:14
type [6] - 15:1, 17:9, 57:6, 69:2, 73:22, 73:23
typically [2] - 68:19, 83:13

**U**

U.S [9] - 1:18, 19:14, 22:15, 23:1, 24:13, 39:16, 41:11, 41:13
U.S.B [4] - 83:3, 83:6, 83:7, 83:22
ultimate [1] - 25:3
ultimately [1] - 45:25
unable [1] - 17:15
unchanged [1] - 48:25
under [27] - 14:6, 23:5, 24:18, 36:12, 36:24, 39:12, 39:13, 39:21, 42:6, 42:14, 54:24, 55:7, 60:13, 60:21, 61:10, 61:18, 63:24, 64:19, 64:21, 65:5, 74:25, 75:1, 92:9, 92:13, 99:23, 103:11, 103:21
underlying [1] - 93:23
undersigned [5] -

55:16, 62:1, 63:13, 64:9, 64:14
**understandable** [1] - 46:4
**understood** [1] - 101:8
**undertake** [1] - 44:20
**underway** [1] - 75:19
**unenforceable** [1] - 13:19
**unfamiliar** [3] - 31:7, 33:11, 93:17
**unfavorable** [1] - 91:20
**unfortunate** [1] - 99:8
**unfortunately** [2] - 5:23, 94:25
**uniform** [1] - 23:15
**Uniform** [1] - 25:2
**uniformed** [1] - 71:13
**uniforms** [1] - 71:16
**unit** [2] - 70:18, 70:24
**UNITED** [2] - 1:1, 1:3
**United** [22] - 1:17, 5:6, 8:20, 8:22, 22:16, 22:25, 24:12, 34:12, 34:15, 43:18, 43:23, 53:1, 54:2, 61:21, 63:25, 65:18, 65:19, 86:2, 103:4, 103:6, 103:18
**unless** [4] - 15:9, 48:25, 90:23, 103:21
**unreasonable** [3] - 38:23, 39:21, 42:14
**unusual** [4] - 12:16, 12:18, 12:20, 12:22
**up** [32] - 4:5, 4:22, 5:12, 5:15, 6:2, 6:14, 6:21, 6:22, 7:9, 18:2, 33:24, 45:1, 45:25, 47:4, 47:11, 47:13, 48:11, 48:23, 49:9, 73:1, 73:3, 74:13, 77:10, 82:7, 86:12, 86:17, 94:4, 95:22, 96:3, 97:2, 101:22, 102:5
**ups** [1] - 18:3
**upstairs** [10] - 74:9, 74:10, 74:11, 78:4, 78:9, 81:22, 82:6, 83:1, 83:12, 84:10
**utilizing** [1] - 19:17

**V**

**Valenzuela** [1] - 39:16
**Valenzuela-Bernal** [1] - 39:16

**valid** [2] - 40:23, 87:5
**validity** [1] - 91:19
**value** [3] - 22:25, 24:11, 68:6
**various** [5] - 17:11, 19:25, 68:5, 81:9, 82:21
**vary** [1] - 10:20
**Vegas** [1] - 62:14
**vehicle** [2] - 73:7, 73:8
**veil** [1] - 40:20
**verified** [2] - 23:8, 24:21
**Verizon** [2] - 83:3, 83:5
**versions** [2] - 26:12, 26:14
**versus** [2] - 34:12, 65:18
**vested** [1] - 64:15
**via** [6] - 3:4, 22:3, 22:5, 23:12, 24:25, 68:24
**vice** [7] - 25:8, 25:9, 42:19, 43:1, 43:14, 44:21, 86:16
**Vicki** [1] - 18:10
**VICKI** [2] - 2:6, 18:11
**Vincent** [2] - 66:2, 66:17
**VINCENT** [2] - 2:7, 66:4
**violation** [1] - 64:21
**virtue** [1] - 64:15
**visit** [1] - 74:21
**voice** [1] - 27:8
**voicemail** [2] - 73:5, 73:13
**void** [2] - 57:20, 59:18
**volume** [1] - 77:15
**voluminous** [2] - 70:5, 77:7
**vs** [1] - 1:5

**W**

**wait** [11] - 7:17, 8:1, 13:10, 28:4, 34:4, 73:18, 88:20, 97:23, 99:7, 99:10, 99:14
**waiting** [2] - 34:7, 72:16
**waiver** [1] - 48:9
**walked** [1] - 82:10
**walking** [1] - 82:2
**WALNUT** [1] - 1:19
**wants** [3] - 45:1, 45:23, 101:23
**warrant** [20] - 49:23, 50:1, 50:6, 70:3,

70:4, 70:11, 71:3, 71:21, 71:25, 72:6, 72:9, 73:2, 73:6, 74:24, 77:6, 79:25, 80:2, 80:19, 80:23, 81:1
**Washington** [4] - 3:5, 38:18, 40:11, 40:16
**waste** [1] - 38:24
**watching** [2] - 82:8, 100:5
**water** [1] - 86:6
**Wayne** [8] - 30:14, 62:17, 62:18, 62:19, 62:22, 63:1
**wearing** [2] - 71:16, 71:19
**weather** [4] - 3:17, 30:12, 48:25, 85:1
**WEDNESDAY** [1] - 1:14
**Weigland** [1] - 54:23
**welcome** [2] - 46:20, 47:7
**Wendy** [2] - 25:8, 28:20
**West** [1] - 56:10
**Western** [1] - 83:25
**whatsoever** [2] - 39:3, 44:10
**whereas** [4] - 58:2, 58:5, 59:23, 60:1
**whereof** [1] - 55:25
**whichever** [1] - 99:18
**white** [1] - 43:24
**whole** [1] - 84:3
**wife** [2] - 74:7, 75:9
**Wilkes** [2] - 34:11, 85:23
**WILKES** [1] - 1:12
**Wilkes-Barre** [2] - 34:11, 85:23
**WILKES-BARRE** [1] - 1:12
**William** [6] - 27:1, 56:12, 62:25, 63:3, 63:8
**willingness** [1] - 87:7
**wire** [4] - 23:10, 24:22, 65:20, 68:4
**wireless** [2] - 83:7
**wiser** [1] - 3:13
**wish** [2] - 5:24, 94:6
**wishes** [1] - 92:4
**withhold** [1] - 15:1
**within-mentioned** [1] - 103:8
**WITNESS** [11] - 7:11, 18:9, 29:8, 78:12, 78:21, 78:24, 79:2,

79:4, 79:9, 79:12, 89:6
**witness** [13] - 8:15, 18:11, 36:12, 36:14, 39:18, 39:19, 39:21, 54:13, 66:4, 85:18, 98:14, 98:20
**WITNESSES** [1] - 2:2
**witnesses** [4] - 68:22, 69:15, 69:18, 92:7
**wondering** [1] - 44:5
**word** [9] - 5:11, 6:4, 6:15, 6:18, 46:14, 47:12, 47:15, 47:25, 94:7
**words** [4] - 38:24, 96:2, 96:16, 96:25
**works** [3] - 13:12, 28:5, 43:16
**worse** [1] - 30:17
**writing** [2] - 36:25, 54:6
**written** [1] - 22:16

**Y**

**year** [6] - 9:8, 9:11, 16:12, 23:3, 24:14, 57:12, 59:9, 70:7
**years** [7] - 9:1, 9:6, 18:20, 18:22, 18:25, 54:5, 66:21
**yesterday** [3] - 4:4, 7:16, 43:23
**York** [8] - 43:19, 43:20, 86:8, 86:11, 86:12, 89:6, 93:11, 100:22
**yourself** [1] - 84:19
**yourselves** [3] - 30:21, 53:22, 84:18