```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,    )
                             )
            Plaintiff        )
                             )
        vs                   )   3:12-CR-224
                             )
RICHARD J. HARLEY,           )
                             )
            Defendant        )
_____)


            TRANSCRIPT OF PROCEEDINGS - JURY TRIAL - DAY TWO
              BEFORE THE HONORABLE A. RICHARD CAPUTO
                THURSDAY, DECEMBER 4, 2014; 10:00 A.M.
                     WILKES-BARRE, PENNSYLVANIA


FOR THE GOVERNMENT:
    BRUCE BRANDLER, ESQ.
    Assistant United States Attorney
    Room 217, Federal Building
    228 Walnut Street
    Harrisburg, Pennsylvania  17108

FOR THE DEFENDANT:
    JOSEPH A. O'BRIEN, ESQ.
    Oliver, Price & Rhodes
    1212 South Abington Road
    Clarks Summit, Pennsylvania  18411




Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.
_____

                KRISTIN L. YEAGER, RMR, CRR
                CERTIFIED REALTIME REPORTER
                 235 N. WASHINGTON AVENUE
                SCRANTON, PENNSYLVANIA 18503
```

I N D E X

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Richard Jones | 7 | 27 | 56 | 59 |
| (Continued) | | | | |
| Leonard A. Zawistowski | 75 | 95 | -- | -- |
| Sahil Godiwala | 101 | 131 | -- | -- |
| Andrew Heckenberger | 139 | 167 | 171 | -- |
| Brian Pugh | 172 | -- | -- | -- |
| Neal Abrams | 183 | 199 | -- | -- |

E X H I B I T    I N D E X

For the Government:      Identified
No. 23.3A                 7           No. JD25.1        176
No. 15.3 (34)             8,121       No. 12.2 (848)    173
No. 15.3 (58)             10          No. 14.1          197
No. 23.3-B                13
No. 23.4                  16
No. 15.3 (28)             19             For the Defendant:
No. 15.3 (56)             22             Nos. 1&2          169
No. 23.5-A                23
No. 15.3 (93)             24
No. 15.3 (93-94)          35
No. 15.3 (56)             49,50,119,134
No. 15.3 (55)             50
No. 15.3 (53)             56
No. 15.3 (94)             57
No. 23.1-A                86
No. 23.2-B                88
No. 23.22                 91
No. 15.3                  114
No. 15.3 (3)              115,117
No. 15.3 (8)              117
No. 15.3 (10-13)          118
No. 15.3 (17)             120
No. 15.3 (37,34)          121
No. 15.3 (36,57)          122
No. 15.3 (59,76)          123
No. 15.3 (6,30)           124
No. 15.3 (31)             125
No. 15.3 (2,1,5)          126
No. 15.3 (65)             127
No. 15.3 (66)             128
No. 15.3 (69,67)          129
No. 15.3 (79)             130
No. 19.1 (3-B)            143
No. 45.1                  150
No. 12.1                  161,163
No. 12.2                  163
No. 12.1 (860)            166

1      (At this time a discussion was held on the record at

2       sidebar.)

3      THE COURT: Juror No. 9 made it known to my courtroom deputy

4  that she knows of a Dr. --

5      THE CLERK: Malcolm Caselle.

6      THE COURT: She knows someone -- a doctor by that name?

7      MR. BRANDLER: This guy is not a doctor.

8      THE COURT: Let me finish it out. How does she know him? She

9  worked in the hospital and he was present in the hospital going

10  back and forth -- she had no personal relationship with him,

11  never -- I don't suppose ever talked to him, really. Did she

12  say that she had conversed with him?

13      MR. BRANDLER: He's a doctor here in Pennsylvania?

14      THE COURT: Yes, up in the Poconos.

15      MR. BRANDLER: No, this guy is in California.

16      THE COURT: End of story.

17      MR. BRANDLER: Another story. This is Joe's story.

18      THE COURT: Who is James Gillotti?

19      MR. O'BRIEN: One of my partners.

20      THE COURT: Okay, so he's one of your partners, and she's a

21  cousin of one of your partners?

22      MR. O'BRIEN: I don't know her.

23      MR. BRANDLER: It's not clear to me that she even knows --

24      THE COURT: That he's a partner.

25      MR. BRANDLER: According to that, she said she told him

1  she's on jury duty. He didn't tell her, That's my partner's

2  case, and you're pretty sure about that?

3      MR. O'BRIEN: Yes.

4      MR. BRANDLER: If that's the case, I don't think there's a

5  problem.

6      THE COURT: I'll leave it to you, I'll do whatever you want.

7  It would impact you, unless, of course, she doesn't like her

8  cousin and, therefore, anybody associated with him.

9      MR. BRANDLER: I think, at this point, I'd rather have an

10 extra juror. I'm going to leave it as it is.

11     THE COURT: All right.

12     MR. BRANDLER: Could we just make that part of the record?

13     THE COURT: Absolutely. Make that a Court Exhibit. That was

14 discussed today with counsel.

15     THE CLERK: Okay.

16     (At this time the discussion at sidebar was concluded.)

17     MR. BRANDLER: Judge, one other thing. Mr. Silverstein, who

18 is one of the victims in this case is here, and he would like

19 to attend the proceedings. There's a Federal Rule of Criminal

20 Procedure Rule 60, which gives him the right to attend the

21 proceedings, and I just wanted to advise the Court and Mr.

22 O'Brien that he will be sitting in.

23     MR. O'BRIEN: He is a key witness, Victim No. 1, in the

24 indictment. He's the victim that produced a substantial part of

25 the financial loss. I think he should be sequestered.

1      MR. BRANDLER: Rule 60(b), I believe.

2      THE COURT: I'm looking at it. Well, it says that the Court

3  must not -- well, you guys can read it. Unless I determine by

4  clear and convincing evidence that his testimony would be

5  materially altered, if he heard other testimony. Do you have

6  anything --

7      MR. O'BRIEN: I have no clear and convincing proof that his

8  testimony would be altered.

9      THE COURT: I think he's allowed.

10     MR. BRANDLER: Thank you, Your Honor.

11     MR. O'BRIEN: Could we have five minutes before they bring

12  the jury in?

13     THE COURT: Yes.

14     MR. O'BRIEN: May we approach, Your Honor?

15     THE COURT: Sure.

16     (At this time a discussion was held on the record at

17      sidebar.)

18     MR. O'BRIEN: The deal Mr. Brandler offered and I've advised

19  my client to accept it, he won't accept it. Is there any chance

20  of putting that on the record?

21     MR. BRANDLER: That he rejected a plea offer? I think that

22  may be a good idea.

23     THE COURT: I don't mind you putting it on out of the

24  hearing of the jury. I don't mind.

25     MR. BRANDLER: Just do it in open court?

1      THE COURT: I'm not sure that I want to know about it. I'll

2  let you guys put it on the record quietly over here, and I'll

3  just remove myself. I think that would be better, if he's

4  convicted.

5      MR. BRANDLER: Right.

6      THE COURT: I'm going to be sentencing him, so I don't want

7  to be involved in that.

8      MR. BRANDLER: Very good.

9      THE COURT: Suffice it to say, there is a reason to preserve

10  it for the record, for purposes of some later proceeding, I

11  agree with that, it makes sense.

12      MR. BRANDLER: All right.

13      (At this time Judge Caputo removed himself from sidebar.)

14      (Richard Harley approached with counsel.)

15      MR. BRANDLER: All right, just as a preface here. Mr.

16  O'Brien requested to put on the record the fact that a plea

17  offer was made to Mr. Harley this morning, which he rejected

18  the terms of the plea offer, were that he would plead guilty to

19  two counts, Counts 1 and 2 of the indictment, charging wire

20  fraud, and that the loss, for purposes of the calculation of

21  the Sentencing Guidelines would be $323,000, and the only other

22  enhancement would be for sophisticated means that were employed

23  during the course of the offense.

24      There would be a two-level reduction for acceptance of

25  responsibility, and that the Government would recommend a

1  sentence within the applicable guideline range, which would

2  call for several years of incarceration. That offer was

3  transmitted to Mr. Harley and by me, personally, this morning,

4  and Mr. Harley has rejected it. Is that accurate, Mr. Harley?

5      THE DEFENDANT: That is correct.

6      MR. O'BRIEN: That is correct.

7      (At this time the discussion at sidebar was concluded.)

8      THE COURT: Do you want to get the jury?

9      THE CLERK: I have to power the monitors on and off.

10     (At this time the jury was returned to the courtroom.)

11     THE COURT: Good morning, members of the jury. My apologies

12  for the late start. We had some things we needed to deal with

13  that didn't concern you. And I don't like that to happen, but

14  unfortunately, it couldn't be avoided. So I apologize to you,

15  and we will try to keep things more on time. Thank you for your

16  patience. Mr. Brandler.

17     MR. BRANDLER: Thank you, Your Honor. Could we have Exhibit

18  23.3-A up on the screen again.

19     (At this time Richard Jones resumed the witness stand.)

20              DIRECT EXAMINATION(Cont'd.)

21  BY MR. BRANDLER:

22  Q.   Mr. Jones, we were discussing this letter yesterday, dated

23  March 3rd, 2011 to Dennis Lockhart, Federal Reserve Bank of

24  Atlanta, and we were going through some of the attached

25  documentation, and I wanted to finish that process.

1     Item No. 3, which is the custodial letter, was not gone

2 into yesterday, so I would like to bring that up, which is

3 Exhibit 15.3, Page 34. Do you see that document on the screen?

4 A.    Yes.

5 Q.    Do you recognize that letter?

6 A.    Yes, I do.

7 Q.    Was that part of the documentation that was submitted by

8 Mr. Harley to the Federal Reserve Bank of Atlanta?

9 A.    Yes, sir, it was part of the package.

10 Q.    Could you just indicate whether or not the logo at the

11 top, which says, Federal Reserve Board and Federal Reserve Bank

12 of New York is the same logo that appeared on the prior

13 documents we discussed yesterday?

14 A.    Yes, it is.

15 Q.    What is the date of this document?

16 A.    The date is March 31, 2006.

17 Q.    Who is it to?

18 A.    It is to Mr. Joseph Teo Hui Kiat, Custodial Trustee.

19 Q.    Can you just read the first paragraph?

20 A.    "Dear Mr. Joseph Teo Hui Kiat. This letter will serve as

21 confirmation that Mr. Joseph Teo Hui Kiat, owner of Singaporean

22 Passport No. 0059881Z, has full signatory authority over United

23 States Treasury checks in the amount of $1 billion U.S.

24 dollars."

25 Q.    Read the second paragraph, please.

1  A.    "We, the Federal Reserve Bank of New York, located at 33

2  Liberty Street, New York, New York 10045 U.S.A., with the

3  authorized signatures appearing below, hereby irrevocably

4  acknowledge with full bank responsibility our receipt and

5  custody of said assets."

6  Q.    Now, going to the second page, without reading the entire

7  document, the second page of this document, there is signatures

8  on it, with a seal?

9  A.    Yes, the signatures of those purporting to be for Chairman

10 Ben S. Bernanke and Vice-Chairman Roger Ferguson, and a seal

11 purporting to be that of the Federal Reserve Bank of New York.

12 Q.    Now, yesterday we were discussing who Mr. Bernanke is, and

13 I think you indicated he was, at the time, Chairman of the Fed

14 in Washington, D.C.

15 A.    Yes, he was the Chairman of the Federal Reserve, and has

16 been succeeded, now, by Ms. Janet Yellen.

17 Q.    Roger Ferguson was the Vice-Chairman, at the time?

18 A.    Yes, in 2006, Roger Ferguson was the Vice-Chairman.

19 Q.    Now, this letter purports to state, confirming that Mr.

20 Kiat, who has this Singaporean passport, has authority over a

21 billion dollars in the Federal Reserve Bank of New York.

22       Was Mr. Bernanke or Mr. Ferguson officials of the Federal

23 Reserve Bank of New York?

24 A.    No, they are not.

25 Q.    Did you explain that to Mr. Harley, when you discussed

1  these letters with him?

2  A.    I did, and I went to some lengths to try to explain the

3  nature of the Federal Reserve system and how you can never have

4  a Reserve Bank document being signed by people who are

5  Governors or on the Federal Reserve Board. They are not

6  employees or directors of the banks, the Reserve Banks, they

7  just are head of the Federal Reserve system.

8  Q.    And going to the last item that was on that March 3rd of

9  2011 letter, where it says two Federal Reserve grey screen

10  printouts. Could we have Page 58 of the Exhibit 15.3, please.

11       Do you recognize this document?

12  A.    Yes, I do.

13  Q.    What do you recognize it to be?

14  A.    A document that was included in the package sent to the

15  Federal Reserve Bank of Atlanta and a document that we had some

16  discussion about, as one that, supposedly, had the authority to

17  show that Mr. Teo Kiat had rightful ownership of these funds or

18  was rightfully entitled to these funds.

19  Q.    Now, going to the bottom of this particular document, it

20  says, Beneficial registered owner. Who does it appear

21  there -- whose name appears there?

22  A.    The Beneficial Registered Owner is said to be Mr. Yohannes

23  Riyadi.

24  Q.    And Custodial Trustee?

25  A.    Custodial Trustee was Mr. Joseph Teo Hui Kiat.

1 Q.    You mentioned yesterday that you had become familiar with

2 the name Johannes Riyadi, through your experience as general

3 counsel in the Federal Reserve Bank, correct?

4 A.    Yes, I had.

5 Q.    How did you become familiar with it?

6 A.    I actually became familiar with the -- after reading that

7 his name had been used in an attempt to scam to get money from

8 Federal Reserve Banks.

9 Q.    Did you explain that to Mr. Harley, during your

10 discussions?

11 A.    I later did, because I later had an opportunity to read

12 the background of the attempt to scam, and I shared it with Mr.

13 Harley that this was definitely a scam, and it had obviously

14 been tried before because the Reserve Bank of New York had

15 posted this information on this website.

16 Q.    What was Mr. Harley's response, when you explained that?

17 A.    The response was similar to previous responses. When I had

18 shared with him my sincere belief that the documents were bogus

19 and that someone was trying to keep money from him, that he

20 felt he was entitled to, and I think, at some point, he heard

21 me, but then he came right back with something else to say

22 these are legitimate.

23 Q.    Have you ever, in your experience as general counsel with

24 the Federal Reserve Bank, seen something called the grey

25 screen?

1  A.    Not really, I think it's just a common term to refer to

2  some sort of official indication that a transaction has taken

3  place. It wasn't a term that I was familiar with.

4  Q.    Do you know, as you sit here today, whether or not a Grey

5  Screen even exists in the Federal Reserve system?

6  A.    Not really. I don't think there's anything called a Grey

7  Screen that is in the parlance of Federal Reserve.

8  Q.    In his letter of March 3, '11, he said there was two

9  Federal Reserve Grey Screens. Could we go to Bates No. 59, the

10  next page in this document.

11      Do you recognize this as being the second Grey Screen that

12  he attached?

13  A.    I get confused. I know these were sort of the official

14  teletype documents that he felt had some authority to them, but

15  these are the documents he was calling the Grey Screen

16  printouts.

17  Q.    On this particular document, under custodial subaccount

18  number, the number ends in 1-7-3-1; do you see that?

19  A.    Yes.

20  Q.    And then goes back to the prior document, Bates No. 58.

21  The custodial sub-account number ends in 7-3-0.

22  A.    Um-hum.

23  Q.    Other than that, does it appear these documents are the

24  same?

25  A.    Yes.

1  Q.    Now, after that March 3rd, 2011 letter with the

2  attachments, was there follow-up correspondence from Mr. Harley

3  to the Federal Reserve Bank of Atlanta?

4  A.    After the March 3rd --

5  Q.    Yes.

6  A.    Yes, there was.

7  Q.    Could we have 23.3-B. Do you recognize this document?

8  A.    Yes, I do.

9  Q.    What do you recognize it to be?

10 A.    I recognize it to be a follow-up letter sent to President

11 Lockhart at Federal Reserve Bank of Atlanta, again, requesting

12 that the documents that had been sent to us be returned.

13 Q.    What's the date on this letter?

14 A.    The date is March 14, 2011.

15 Q.    Read the first paragraph, please.

16 A.    "Dear Mr. Lockhart, Based on statements by Richard A.

17 Jones made during my telephone conversation with him in which

18 Mr. Jones rejected RJH and Company request for transfer of

19 funds, we request the following:

20      "The immediate return of the following documents received

21 from us by your office via USPS on March 4, 2011."

22 Q.    And there appears to be asterisks next to your name and

23 that last sentence. Could we just go to the bottom of the page

24 to see what those asterisks mean. Just read what the first one

25 says.

1  A.    Yes, there was one asterisk by my name and two by the

2  statement. The one asterisk means Senior Vice-President General

3  Counsel for Federal Reserve Bank of Atlanta, telephone

4  conversation Friday, March 11, 2011 at approximately 3:00 p.m.

5  Two asterisks means United States Postal Service Confirmation

6  Receipt No. EG790870045.

7  Q.    All right, going back to the middle of the page. He

8  requested the return of the various documents that he had

9  submitted earlier on March 3rd. Is that basically what he's

10  asking for here?

11  A.    Yes.

12  Q.    And then item D below that, could we just scroll down,

13  please. What is his request in Item B?

14  A.    In Item B, he's requesting a written statement from my

15  president, Dennis Lockhart, explaining, I assume, the rejection

16  of the Federal Reserve Bank of Atlanta of RJH and Company's

17  request of both transfer of funds.

18  Q.    Going to the second page. Could you just read that and

19  tell us who it is signed by?

20  A.    Second page, salutation, "Thank you for your prompt

21  attention to this matter. We look forward to an early response.

22  Yours", and it appears to be signed by Richard Harley, CEO.

23  Q.    Are there, at the bottom of the page, indications of

24  carbon copies going to individuals?

25  A.    Yes.

1  Q.    Could you just read off the names of those individuals?

2  A.    So the letter is CC'd to Carl Ranno, Attorney, Donald

3  Sternberg, attorney, Joseph Teo Hui Kiat, Lester Dittersdorf,

4  and myself, Richard Jones, General Counsel.

5  Q.    You spoke to an attorney, someone who represented himself

6  to be an attorney for Mr. Harley, but you didn't know if you

7  could remember the name. Having seen this, does this refresh

8  your recollection?

9  A.    I think the person I spoke to was Carl Ranno.

10  Q.    I believe you said he was from Texas or Arizona?

11  A.    Texas or Arizona, yes.

12  Q.    Did you know Mr. Ranno, prior to that conversation?

13  A.    I did not.

14  Q.    You didn't know Mr. Harley, prior to these conversations?

15  A.    Absolutely not.

16  Q.    Other than yourself, did you know any of these people, who

17  they were or even if they existed?

18  A.    I did not.

19  Q.    After receiving this letter on March 14, which requested

20  the return of these documents, what action did you take or what

21  action did others on your behalf take, regarding this matter?

22  A.    My main objective was to make sure my president was not

23  bothered by what I felt was an attempted scam. And, really,

24  once it was clear that -- or appeared to be clear -- that Mr.

25  Harley was going away and my president wasn't going to be

1  bothered anymore, I really just sort of closed the book on the

2  matter to say, okay, hopefully, New York will have better

3  success than we did, and he will abandon this attempt.

4  Q.    After that March 14th letter, was there subsequent

5  correspondence received from Mr. Harley to you and your office?

6  A.    After March -- I think there was, yes.

7  Q.    Could we have Exhibit 23.4. Could you identify this

8  document, please?

9  A.    Yes, I can. This is yet another attempt to come back,

10 after a fair amount of conversations have taken place, about

11 the bogus nature of these documents. This is another attempt to

12 come back to the president to ask for payment.

13 Q.    What's the date on this letter?

14 A.    March 28, 2011.

15 Q.    And the letterhead on the top?

16 A.    RJH and Company, Inc.

17 Q.    Does the letter on the second page appear to be

18 signed -- could we go to the second page, please?

19 A.    Yes, the letter appears to bear the signature of Richard

20 Harley, CEO, Attorney in fact.

21 Q.    And going back to the first page. Just read the first

22 paragraph of the letter.

23 A.    "Dear Mr. Lockhart, RJH and Company, Inc. makes this

24 formal demand for immediate cash payment of one billion U.S.

25 dollars due against the following U.S. treasury checks."

1       And then he lists each of the treasury checks in 500

2  million-dollar amounts.

3  Q.    Just read the second paragraph.

4  A.    "RJH and Company, Inc. with authorization to make this

5  immediate cash payment demand is verified by its full bond

6  power. The validity of the U.S. treasury checks and the

7  supporting documentary evidence of our letter dated March 3,

8  2011 and delivered to your office via Express Mail at 12:21

9  p.m. on March 4, 2011 and signed by A. Watkins.

10      "Additional documentary evidence is being provided to

11 further substantiate our claims, which is as follows".

12 Q.    What does he list as the additional documentation?

13 A.    "A. Bond power.

14      "B. Statement of Readiness signed by James R. Hennessey,

15 Chief of Staff JRH55COS Federal Reserve Bank of New York, and

16 B. Gerard Dages, Vice-President BGD47VP.

17      "C. An email from Chris McCurdy, Senior Vice-President

18 Federal Reserve Bank of New York, Cheque Joseph 31730, Cheque

19 Joseph 317371."

20 Q.    Cheque being spelled C-H-E-Q-U-E?

21 A.    Yes.

22 Q.    Could we go to the second page. The last item he submitted

23 as further documentation under paragraph D.

24 A.    Yes. Paragraph D, an email from Chris McCurdy, Senior

25 Vice-President Federal Reserve Bank of New York.

1       "To whom it may concern. Joseph Teo Hui Kiat cash funds

2  are to be sent to the attached wiring instructions."

3  Q.   Now, continue reading.

4  A.   "Please note;

5       "1. Should we not receive satisfactory response by return

6  email or postal letter within three business days of the date

7  of this letter, we shall be compelled to initiate legal action.

8       "2. We also declare that this email and the attachments

9  will be valid and legal as the original."

10 Q.   Is there a carbon copy at the bottom after Mr. Harley's

11 signature?

12 A.   Yes, it appears to bear Mr. Harley's signature as CEO and

13 Attorney in fact.

14 Q.   On the carbon copies, who are listed?

15 A.   Carbon copies are Joseph Teo Hui Kiat, Carl Ranno,

16 attorney, and Donald Sternberg, attorney.

17 Q.   Now, in the March 14th letter that we just looked at, he

18 was demanding the return of the documents. Now, two weeks

19 later, he's yet again demanding payment for the documents.

20      Were you having discussions with him about this change of

21 course of action?

22 A.   I don't really recall if I had a discussion with him about

23 it. It sort of gets a little jumbled, but I think I may have.

24 But I would not have called him, he may have called me, and if

25 he did, I would have said, you know, the same things I had said

1  already.

2  Q.    So these further documents that he supplied didn't change

3  your opinion about the fraudulent nature of these checks?

4  A.    Absolutely not.

5  Q.    And looking at -- we already looked at -- could we have

6  Page 1 of that document.

7        On Item B at the bottom of the page, it's -- the new

8  document is something called a Statement of Readiness, signed

9  by James Hennessey. Could we go to Exhibit 15.3, Page 28?

10  Could you identify this document?

11  A.    It's the document entitled Statement of Readiness dated

12  September 19, 2008.

13  Q.    Who is it to?

14  A.    It's to Asset Management.

15  Q.    And a carbon copy to who?

16  A.    Mr. Yohannes Riyadi and Mr. Joseph Teo Hui Kiat, and it

17  lists accounts numbers, 021088506SKR --

18  Q.    You don't need to read the entire number. Just read the

19  body, the first couple sentences in the body of this document.

20  A.    Okay, Statement of Readiness.

21        "Dear Mr. Yohannes Riyadi/Mr. Joseph Teo Hui Kiat, At our

22  client's request, we, the Federal Reserve Bank of New York,

23  located at 33 Liberty Street, New York, New York 10045 U.S.A.,

24  with telephone number 212-720-5000, FAX No. 212-720-6331, Swift

25  Code Federal Reserve New York FRNY US33, irrevocably confirm,

1  with full bank responsibility for and on behalf of our client

2  Joseph Teo Hui Kiat, Singaporean passport no. S0059881Z.

3       "No. 2. Jalan Rajah Unite# 07-04, Singapore 329134

4  authorized on or signatory of SKR number Federal Reserve New

5  York, FRNY/0518844-03 valid until April 15, 2010 held on

6  deposit by us in form of two US Treasury checks" --

7  Q.   All right, you could just stop right there. This document

8  you reviewed, this additional documentation provided by Mr.

9  Harley didn't change your opinion?

10 A.   It absolutely did not.

11 Q.   Why didn't it?

12 A.   So my opinion wasn't going to be changed, because it was

13 pretty clear what was happening very, very early on. At some

14 point, it became, for lack of a better word, comic relief that,

15 in spite of everything that had been said, we are still getting

16 these documents.

17      MR. O'BRIEN: Your Honor, I'm going to object to the

18 continued editorializing by this person. This gentleman is a

19 member of the bar and should testify to facts.

20      MR. BRANDLER: If he could just make an objection without

21 argument.

22      MR. O'BRIEN: I could make argument if I want to.

23      THE COURT: Well, not that kind of argument, Mr. O'Brien.

24 Come on. Just make your objection.

25      MR. O'BRIEN: My objection is to the editorializing,

1  unfounded opinions --

2      THE COURT: I've got your point. Without volunteering any

3  opinions, just say it like it is.

4      THE WITNESS: Okay.

5  BY MR. BRANDLER:

6  Q.    It didn't change your opinions?

7  A.    No, it didn't.

8  Q.    Did you explain to Mr. Harley, yet again, that the Federal

9  Reserve Bank does not have individual clients, such as what

10  would be represented in this document, indicating that the

11  clients were Mr. Kiat and Mr. Riyadi of the Federal Reserve

12  Bank of New York?

13  A.    I'm sure I did, yes.

14  Q.    And that didn't change his position?

15  A.    No; it didn't seem to.

16  Q.    Going to the second page of this document. Does it appear

17  to have various signatures at the bottom?

18  A.    Yes.

19  Q.    Who signed -- purportedly signed this document?

20  A.    So these documents appear to be signed or bear the

21  signatures of James R. Hennessey, Chief of Staff, presumably,

22  at Federal Reserve Bank of New York, and B. Gerard Dages,

23  Vice-President at the -- presumably -- at Federal Reserve Bank

24  of New York.

25  Q.    Do you know if Mr. Hennessey or Mr. Dages were officials

1  of the Federal Reserve Bank of New York, at that time?

2  A.    I honestly don't.

3  Q.    All right, the next item that Mr. Harley referenced in his

4  new supporting documentation was various emails from someone

5  called Chris McCurdy, 23.4 on bottom of the page, Item C.

6        Could we go to Exhibit 15.3, Page 56.

7  A.    Yes.

8  Q.    And is this the document that was the additional documents

9  supplied by Mr. Harley, in connection with this submission?

10 A.    Yes, I think it was.

11 Q.    Can you just tell us what it says?

12 A.    To whom it may concern. Joseph Teo Hui Kiat, j-p-g,

13 forwarded message. To whom it may concern from Yohannes Riyadi.

14 Forwarded message from, apparently, Chris McCurdy. The name of

15 the person who had been -- purportedly being communicated with

16 as an official of the Reserve Bank of New York, date Monday,

17 May 4, 2009. To whom it may concern. Joseph Teo Hui Kiat, to

18 yriyadi@gmail.com.

19 Q.    What was the date -- it appears to be an email. What was

20 the date of the email?

21 A.    The date of the email was May 4, 2009.

22 Q.    It was from Riyadi to someone named Joseph Teo?

23 A.    Yes.

24 Q.    And the forwarded message below that states what?

25 A.    The forwarded message below that states, From Chris

1  McCurdy to Y. Riyadi, and the subject again is, To whom it may

2  concern. Joseph Teo Hui Kiat.

3  Q.   This email address of Chris McCurdy doesn't appear to be a

4  Government email address, does it?

5  A.   It isn't, no.

6  Q.   What email address -- you just said Chris McCurdy. What is

7  the entire email address?

8  A.   Entire email address is Chris McCurdy64@aol.com.

9  Q.   What is -- as far as Riyadi, what's his full email

10  address?

11  A.   Riyadi email address is yriyadi@gmail.com.

12  Q.   Now, after March 28 of 2011, when you sent this additional

13  documentation, did you have further communications with Mr.

14  Harley either by telephone or email?

15  A.   I think I did, I think, possibly, by email.

16  Q.   Could we have Exhibit 23.5(a). Going to the bottom of the

17  page, the last page, just that last section.

18       Did you send Mr. Harley an email on April 11, 2011?

19  A.   Yes, this appears to be an email I sent to Mr. Harley on

20  April 11, 2011.

21  Q.   Now, what's the title, the subject of the email?

22  A.   The subject is, Bogus documents. It's an email that I

23  wrote. And it reads;

24       "Mr. Harley, as I stated to you and your counsel several

25  times, the documents you presented to the Federal Reserve Bank

1  of Atlanta are completely bogus and do not entitle you or

2  anyone you represent to any payment from the Federal Reserve

3  Bank of Atlanta."

4  Q.   Did you attempt to send that several times before it

5  eventually went through? Could we have the entire document?

6  A.   I don't recall exactly, but it might have indicated -- I

7  might have gotten a failure report that it didn't send once and

8  I may have tried to send it again, but I don't recall how many

9  times.

10  Q.   Could we go to the top of the page? How many attempts does

11  it say?

12  A.   Third attempt, yes.

13  Q.   Now, after dealing with Mr. Harley during this time

14  period, you said you had a follow-up discussion with officials

15  from the Federal Reserve Bank of New York.

16  A.   Yes, I did.

17  Q.   Letting them know that they would be hearing from Mr.

18  Harley?

19  A.   I did.

20  Q.   Could we go back to 15.3, Page 94 -- actually starts on

21  Page 93, I'm sorry. At the bottom of Page 93, there's an email,

22  start there.

23       Did you send an email to someone named Thomas Baxter?

24  A.   Yes, I did.

25  Q.   Who is Thomas Baxter?

1  A.    Tom Baxter is the General Counsel of the Reserve Bank of

2  New York; my counterpart.

3  Q.    There's a CC to someone else named -- a guy named Robert

4  Amenta; who is he?

5  A.    Robert Amenta is an employee of the Reserve Bank of New

6  York who is the person responsible for maintaining the New York

7  website that keeps track of known scams or attempted frauds on

8  banks.

9  Q.    Going to the next page, Page No. 94. At the top of the

10 page what's the date of your email?

11 A.    I remember this date, it's my father's birthday,

12 4/13/2011.

13 Q.    What's the subject?

14 A.    The subject is, "Fraudulent items purporting to be

15 Treasury checks referring on their face to Federal Reserve Bank

16 of New York".

17 Q.    What does the body of the email say?

18 A.    The body of the email, my message;

19      "Tom, there's a gentleman named Richard Harley who is

20 convinced that these items have merit. He has been calling my

21 president repeatedly to press his claim for payment. I have

22 spoken to him, at least, half a dozen times in an effort to

23 convince him that the items and supporting documents are bogus.

24      "This morning, he called to thank me for helping him see

25 the light because he now understands that his claims belong to

1  New York instead of Atlanta. While he sounds reasonable, his

2  persistence with this claim suggests otherwise.

3       "I tried to convince him that contacting the New York

4  Reserve Bank would be as pointless as contacting Atlanta. He

5  ended our conversation asking if I could provide him with Bill

6  Dudley's phone number."

7       Bill Dudley was the president and is the president of the

8  Reserve Bank of New York.

9       "I told him I didn't have it handy, but gave him yours."

10      I know Tom, and I knew he would not want his president to

11 be bothered, just like I didn't want my president to be

12 bothered, so I gave him Tom's number.

13      "My guess is that you'll be contacted. Apologies and good

14 luck."

15 Q.   Now, in one of Mr. Harley's correspondence, he threatened

16 legal action if he didn't get his billion dollars. Did any

17 legal action get filed against Federal Reserve Bank of Atlanta?

18 A.   No.

19 Q.   You're general counsel, so you're aware of that, correct?

20 A.   Yes.

21 Q.   After referring this matter to your counterpart in New

22 York, did you ever hear from Mr. Harley again?

23 A.   I don't think I did.

24      MR. BRANDLER: I have no further questions, Your Honor.

25      THE COURT: Cross-examine.

1                    CROSS EXAMINATION

2 BY MR. O'BRIEN:

3 Q.    I have a couple things I'd like to ask about.

4       Sir, let me just ask you a couple questions about the

5 relationship between the Federal Reserve Board and the Federal

6 Reserve Banks. Now, they are both part of the same system?

7 A.    Yes.

8 Q.    And you indicated some comments about the logos that

9 appeared on some of these documents.

10 A.    Yes.

11 Q.    And the logo would be something that would be on the

12 stationery of, either, the Federal Reserve Board or one of the

13 individual banks?

14 A.    Presumably, yes.

15 Q.    And, now, your position at the Atlanta Bank -- what is

16 your position at Atlanta Bank?

17 A.    General Counsel and Ethics Officer.

18 Q.    Who is in charge of ordering and designing stationery at

19 Atlanta Bank?

20 A.    Presumably, the Atlanta Bank.

21 Q.    Who, at the bank?

22 A.    Stationery is something that is pretty much handled by the

23 president and senior officers of the bank, in terms of the

24 logos --

25 Q.    Have you ever participated in the designing of stationery

1  for the Atlanta Bank?

2  A.    I have participated in getting rights to the Federal

3  Reserve Bank of Atlanta's logo, its trademark, we have filed

4  legal documents to preserve that trademark as our official

5  symbol, our Reserve Banks have done the same.

6  Q.    Have you ever been involved in designing it, ordering it

7  or anything like that?

8  A.    I understand how our logo -- I did not design the logo, I

9  did not order it, it is an existing logo of the bank.

10  Q.    Have you ever participated in designing a logo of the

11  stationery from the Federal Reserve Board?

12  A.    No, I haven't.

13  Q.    Do you have any idea who does that?

14  A.    I don't.

15  Q.    Now, have you ever participated in the designing or the

16  ordering of the stationery and logo for Federal Reserve Bank of

17  New York?

18  A.    I have not.

19  Q.    Do you know who does that?

20  A.    No, I don't.

21  Q.    I'll show you something we have dug off the internet. I'll

22  put it on the screen there.

23       MR. BRANDLER: I'm going to object, at this point, Your

24  Honor. He said something off the internet. I haven't seen a

25  copy of this. There was no discovery given.

1        THE COURT: Take it down, Mr. O'Brien.

2        MR. BRANDLER: Could I see a copy of it?

3        THE COURT: Not only that, but could he identify this?

4        MR. O'BRIEN: I'm going to show him.

5        MR. BRANDLER: Could I see a copy before he shows the

6   witness?

7        THE COURT: Sure.

8        MR. BRANDLER: If you want to show him directly and see if

9   he knows about it.

10        THE COURT: I wouldn't put it up there, just show it to

11   him.

12   BY MR. O'BRIEN:

13   Q.   Do you recognize or could you identify that document?

14   A.   It appears to be a document that is an annual report of

15   the Federal Reserve Board. Do you want me to look at the logo?

16   Q.   Do you see the logo on there?

17   A.   I do.

18   Q.   Is that similar to the logo that's been on these

19   documents?

20   A.   This is the logo of an eagle that is on the front of the

21   building at the Federal Reserve Board in Washington on

22   Constitution Avenue. It is a very obvious --

23        MR. BRANDLER: Your Honor, I'm going to object. There's

24   been no foundation laid about the authenticity of this

25   document, except that he pulled it off the internet.

1      MR. O'BRIEN: Your Honor, I'm not moving to admit it.

2      MR. BRANDLER: Or that it was ever issued by the Federal

3  Reserve Board or anyone else.

4      THE COURT: First of all, he wasn't asked if he could -- he

5  was asked if he could identify it, I think, and then he just

6  said what he thought it was.

7      MR. BRANDLER: Yes, and I would just go to the first

8  question. Could you identify it, have you ever seen it before,

9  and do you know what it is, because I think that's the question

10  that's pending.

11      MR. O'BRIEN: He already said he knows what it is, it's the

12  financial statements. Your Honor, could I explain the purpose

13  of this?

14      THE COURT: Keep going, I'll let you keep going. Your

15  objection is overruled for the time being.

16  BY MR. O'BRIEN:

17  Q.   The logo that's on that document, isn't that very similar

18  to the logo that's on the documents that you just discussed?

19  A.   It's not so much the logo as it is the document. I can see

20  this logo on a document that is clearly not a document of the

21  Federal Reserve Board, and I would say that that logo is not

22  the Federal Reserve Bank's logo or the Federal Reserve Board's

23  logo, because they would never place its logo on a document

24  that is not theirs.

25  Q.   Well, let's let the jury decide if it's the same logo.

1      MR. BRANDLER: Object to the argument.

2      THE COURT: Sustained. The jury should disregard that

3  comment.

4  BY MR. O'BRIEN:

5  Q.    The Federal Reserve Bank -- the banks file combined

6  financial statements?

7  A.    Yes, consolidated financial reports.

8  Q.    And those financial statements are part of what's called

9  an annual report?

10  A.    Yes.

11  Q.    Okay, and you already indicated that's what that appears

12  to be is the Federal Reserve Bank combined financial

13  statements.

14  A.    No, what it appears to be --

15      MR. BRANDLER: I object to that. Let the Judge rule before

16  you answer, please. I object to that question. He's

17  characterizing, you already testified what that document

18  appears to be. He hasn't stated that it is the document, it's

19  just what it appears to be off the internet.

20      THE COURT: I agree with you. He's correct. Objection

21  sustained. Now, find out about that, if you want to pursue

22  this.

23      MR. O'BRIEN: Well, I can bring this in through another

24  witness, Your Honor, so I will not agree to have this witness

25  excused, so I will call him back. We can sit here for two

1  weeks.

2      MR. BRANDLER: We can sit here for however long, but I

3  don't think you've established this witness knows anything

4  about --

5      THE COURT: Let's not have a conversation with counsel.

6  Let's just move on.

7      MR. O'BRIEN: Your Honor, could we approach?

8      THE COURT: Yes.

9      (At this time a discussion was held on the record at

10      sidebar.)

11      MR. O'BRIEN: The documents this gentleman just said were

12  bogus, it also has Federal Reserve Bank Combined Financial

13  Statements.

14      THE COURT: That's all fine and dandy, but he has not

15  identified this, himself. It appears to be, that's the whole

16  point here. If it is, it is, but so far, there's no evidence

17  that it is, other than your statement that that's what it says.

18  He could be lying about it. Somebody has got to identify it.

19      MR. O'BRIEN: I can do that.

20      THE COURT: Well, I know --

21      MR. BRANDLER: I really do, because this is not -- I

22  guarantee you, as I stand here today, that this is not the

23  annual report from the Federal Reserve Board. I will stake my

24  career on that, and that's why --

25      THE COURT: You don't have to stake your career on it, I'm

1  sustaining your objection, let's move on. If you can do it with

2  somebody else, fine. What are you saying?

3       MR. BRANDLER: I don't know what that is. I'm telling you

4  that was not issued by the Federal Reserve Board, this is not

5  their logo, this is not their annual report, this is what I'm

6  saying. If you can get some witness in here to authenticate

7  this, I would be happy to deal with it, but no one has

8  authenticated this as such, and he certainly can't.

9       MR. O'BRIEN: All right.

10      THE COURT: Let's move on.

11      (At this time the discussion at sidebar was concluded.)

12 BY MR. O'BRIEN:

13 Q.   Now, sir, we have one of the documents that you commented

14 on just happens to be one of the checks. You said you were a

15 member of the bar, so, obviously, you attended law school and

16 dealt a lot with checks in law school and as a professional.

17 A.   I'm sorry, repeat the question.

18 Q.   You know what a check is, from your law school education

19 and from your years in banking?

20 A.   I knew what a check was long before law school and long

21 before I started in banking.

22 Q.   Would you agree with me, just as a matter of definition,

23 there are three parties to a check. One, there's the maker;

24 would you agree with that?

25 A.   Um-hum.

1  Q.    And the maker is the person whose money was being -- who

2  is making the check, who is ordering the transfer of their

3  money?

4  A.    Yes.

5  Q.    And then the other party to a check is what would be a

6  drawee bank, and that is a person who is holding the maker's

7  money.

8  A.    Yes.

9  Q.    And the other party to a check is a payee?

10  A.    Yes.

11  Q.    So we could say that a check is an order by a maker to a

12  bank who is holding their money to pay it to a payee?

13  A.    Yes.

14  Q.    The check also has a signature and date on it, usually.

15  A.    Yes.

16  Q.    And an amount of money. Now, looking at this check, up on

17  the top left-hand corner United States Treasury; maker, right?

18  A.    That would be the maker of the check.

19  Q.    Okay, and over on the right-hand corner, Federal Reserve

20  Bank of New York; bank, drawer, drawee?

21  A.    Yes.

22  Q.    Okay, and then in the middle, Mr. Joseph Teo Hui Kiat,

23  that is the payee?

24  A.    So is your question, What's on this check? Or is your

25  question, Are these the things that would make this check

1  legitimate?

2  Q.    My question is neither. Looking at this document, we

3  identified the United States Treasury as the person indicated

4  as the maker, the Federal Reserve Bank indicated as the drawee,

5  and Mr. Joseph Teo Hui Kiat is the payee?

6  A.    Yes.

7  Q.    Just like your paycheck, a bank would be -- the Federal

8  Reserve Bank would be the maker, maybe it's also the drawee, if

9  they use their own bank, I don't know. Now, it has a date March

10 31, 2011?

11 A.    Yes.

12 Q.    It has an amount of money?

13 A.    Yes.

14 Q.    It has a check number?

15 A.    Yes.

16 Q.    The other check is identical?

17 A.    Yes.

18 Q.    And when you commented -- could we look at document 15.3,

19 93-94.

20      MR. O'BRIEN: 15.3, Pages 93-94. The last document that Mr.

21 Brandler used.

22 BY MR. O'BRIEN:

23 Q.    Now, before that, it's the email that that gentleman sent

24 to, I believe, Mr. Baxter in New York, in which he says, "Mr.

25 Harley was convinced that the check was legitimate and sounded

1  reasonable."

2      The email to Baxter. It's hard to follow. They have

3  exhibits marked and a hundred pages, so it's hard for me to

4  figure out. I think it must be a little bit before that.

5      MR. BRANDLER: There's another email after on the next

6  page.

7      MR. O'BRIEN: Put the one up on the next page. Yes, okay.

8  BY MR. O'BRIEN:

9  Q.   Would you look at that document, please?

10  A.   Yes.

11  Q.   Okay, and that is -- looks like to me like it's an email

12  from you?

13  A.   Um-hum.

14  Q.   And it's dated the 13th of April 2011?

15  A.   Yes.

16  Q.   And the email is to -- is that Mr. Baxter?

17  A.   Yes.

18  Q.   And he is your -- he is the General Counsel at the New

19  York Bank?

20  A.   Right.

21  Q.   And you sent him a letter, you say, "Tom, there is a

22  gentleman named Richard Harley who is convinced that these

23  items have merit."

24  A.   Yes.

25  Q.   And one of the items you were talking about is the two

1 checks?

2 A.    Yes.

3 Q.    And those are checks that he sent to you and he was trying

4 to cash them?

5 A.    So I was actually talking about all of the documents, the

6 checks and all of the supporting documents.

7 Q.    I understand you were talking about all of them, but one

8 of the ones you were talking about is the checks?

9 A.    Yes.

10 Q.    Okay, you said that Mr. Harley was convinced that they

11 were valid?

12 A.    I did say that, yes.

13 Q.    And then, also, the last sentence says, "he sounds

14 reasonable".

15 A.    Yes.

16 Q.    So he sounded reasonable -- he was convinced they were

17 valid and he sounded reasonable.

18 A.    Yes, that's what I said in the email.

19 Q.    Now, you sent these to Mr. Baxter. Is my recollection

20 correct that that's the last you had to do with him?

21 A.    I don't recall having a conversation with Mr. Baxter or

22 with Mr. Harley after that.

23 Q.    Now, are you saying this is the last I had to do with Mr.

24 Baxter or Mr. Harley?

25 A.    With the checks, with the documents. I don't recall having

1  any more dealings with Mr. Harley regarding the documents after

2  this, yes.

3  Q.   Do you recall doing anything else with the documents,

4  other than sending them to a Mr. Baxter?

5  A.   What I really sent to Mr. Baxter was, you know, sort of a

6  little background and a hand-off, and that was to say, He's

7  going to be coming your way. I've tried to make it so you

8  wouldn't have to deal with this as I have, but I've been

9  unsuccessful.

10      And I don't want to make one of those conclusory

11 statements that I know you don't like me to make, but this is a

12 little tongue and cheek. I'm not trying to suggest to Mr.

13 Baxter, in any way, that Mr. Harley's being convinced that

14 these documents have merit have any meaning whatsoever. I'm

15 saying, believe it or not, this is how he talks about these

16 documents.

17 Q.   Let's read the first sentence.

18      "Tom, there's a gentleman named Richard Harley who is

19 convinced that these items have merit."

20 A.   Yes.

21 Q.   Where does it say, "Believe it or not", he is convinced

22 these items have merit"? Where does it say that?

23 A.   Quite honestly, if you look at these documents, you will

24 see that I'm saying, "Believe it or not, he believes these

25 documents have merit."

1 Q.   Where does it say, "If you look at these documents,

2 believe it or not, he thinks they have merit"?

3 A.   That's really the sort of tongue and cheek communication.

4 I know Tom, he knows me, we have seen things like this before,

5 we have talked about them, laughed about them, me and my

6 colleagues. So it's clear that I am telling him that, you know,

7 Here's another one, and I'm afraid you're going to have to

8 handle it.

9 Q.   Where does it say, "This is like that last case we had,

10 here's another one, you're going to have to handle it."  Where

11 does it say that?

12 A.   Not necessary to say all of that, we have a history of

13 dealing with each other and communicating in such a way he

14 knows what I'm talking about. And to say to him that he is

15 convinced that these documents have merit communicates to him

16 that he's going to try to press this claim, even though it's

17 clear that these documents are ridiculous.

18 Q.   Where does it say, "He's going to press his claim, even

19 though it's clear that these documents are ridiculous"?

20 A.   Again, it doesn't say that, but that's clearly the

21 message.

22 Q.   That's what you meant. Seems to me that you meant a lot of

23 things that aren't in this document.

24       MR. BRANDLER: I object. That's argumentative.

25       THE COURT: Overruled.

1  BY MR. O'BRIEN:

2  Q.    Now, what else have you testified today that you didn't

3  really mean, that it had a secret meaning? What other part of

4  your testimony, if you're the type of guy that talks in

5  innuendo and has secret meetings, can you tell us what else?

6  A.    I have no idea what that question means.

7  Q.    You said in the letter here -- it reads pretty clear to me

8  and I think anybody reading this would see what it says.

9  You said, I didn't really mean that, it was tongue and cheek,

10  this is like the last case we had where the documents weren't

11  real and this is another one. But it doesn't say any of that.

12        I'm asking you, if that's the way you communicate with

13  people, that you don't say exactly what you mean, you use it by

14  innuendo and tongue and cheek, what other part of your

15  testimony today was that way, that we shouldn't take by your

16  words, but we should read some tongue or cheek or innuendo into

17  it?

18  A.    I've taken an oath and I've honored that oath by telling

19  the entire truth about my involvement in this situation with

20  Mr. Harley. I have told the truth, and if there's any

21  particular comment or testimony I've given that you have a

22  question about, I'd be happy to answer it.

23  Q.    Fair enough. I accept that. How about in this letter?

24  Would you say that this letter is something you couldn't swear

25  to? I'll accept that you told the truth here, but you said in

1  the letter, I didn't really mean what I said. Would you be able

2  to swear to that, would you swear that --

3      MR. BRANDLER: Your Honor, I object. There's four questions

4  built into every --

5      THE COURT: There were several questions there. Rephrase.

6  BY MR. O'BRIEN:

7  Q.   Would you take an oath as to what you said in this letter?

8  A.   I absolutely would, yes, I have taken an oath.

9  Q.   As to this letter?

10 A.   Yes.

11 Q.   But you say it doesn't say what you really meant.

12 A.   What I'm saying is that there's a message, an unwritten

13 message, similar to an unspoken message that you may have with

14 people that you have common dealings with, that you have worked

15 with on a number of situations, who will get exactly your

16 meaning.

17      And the meaning I'm communicating to Mr. Baxter is that,

18 in spite of what you see, he seems to be convinced that these

19 items have merit. Now, I'm not going to write every single word

20 to someone I know, who will understand exactly what I'm talking

21 about, without me having to write every single word.

22 Q.   One more question and I'll move to something else. You

23 said there's an unspoken meaning or communication in this

24 email?

25 A.   I said the email was somewhat tongue and cheek, but there

1  clearly is a message I'm conveying that there's no chance that

2  these documents have merit. In spite of that, he seems to be

3  convinced that they do.

4  Q.    This unspoken meaning, it's not something you've used in

5  your testimony today, you used this in this communication but

6  not in your testimony?

7        MR. BRANDLER: I object.

8        MR. O'BRIEN: I think it's a fair question.

9        THE COURT: What was your objection?

10       MR. BRANDLER: It's argumentative. It's not asking

11  questions, it's making a statement.

12       THE COURT: It's cross examination. I'll allow it.

13  BY MR. O'BRIEN:

14  Q.    I'll move on to another issue. Let's move to the next

15  point.

16       You send this letter to your compatriot in New York?

17  A.    It's an email.

18  Q.    The email. And you send him the documents?

19  A.    Yes.

20  Q.    Okay, we're through fighting about what you meant. What do

21  you do next? You send him to them. Do you take those documents

22  and give them to anybody else, other than the guy in New York?

23  A.    No, I don't. I actually had previously given them to a

24  couple of other attorneys in my office, and I mentioned their

25  names, Richard Fraher and Rebecca Wasserman. Rebecca Wasserman

1  is sort of the repository for documents that come to us

2  attempting to commit fraud, either on banks or on the Reserve

3  Bank itself, so I gave it to her to put in our repository for

4  these kinds of documents.

5  Q.   Now, my understanding of the word, repository, is that is

6  putting it in the file?

7  A.   Oh, yeah. The documents, again, for me were -- you won't

8  like this -- but they were worthless, they were useless, and

9  for me, once I got him off my president's back, I was done with

10 it, and that was my sole objective.

11 Q.   Okay, now, when did you -- how long did it take you to

12 take these documents and take them to the FBI or U.S. Attorney

13 or somebody and say, Look, somebody has been trying to collect

14 on these fraudulent documents?

15 A.   How long did it take?

16 Q.   How long did it take you to do that or did you ever do it?

17 A.   I didn't do it.

18 Q.   Let me just suggest that the reason you didn't do it was

19 because there was no fraud because you knew this gentleman was

20 convinced they had merit and he sounded reasonable. You may

21 have thought he was wrong, you may have thought the documents

22 were bogus, but you didn't see any crime here, because you

23 thought he was reasonable, and he was convinced in it, you

24 didn't see he committed any fraud, so that's why you just put

25 them in the file, put them in the repository and didn't turn

1  them over to any prosecutorial agencies.

2      Let me suggest that to you.

3  A.   Is that a question?

4  Q.   That's a question.

5  A.   No, that is not the reason. I knew -- the Federal Reserve

6  Bank of New York has a more established practice of referring

7  these matters to the FBI and the U.S. Attorney, and I knew, by

8  also sending him to New York that they would actually make an

9  attempt to convince him that these documents were bogus, as I

10 had, but in the end, they would end up referring it to the U.S.

11 Attorney.

12 Q.   Let's talk about that practice. Is the practice of the

13 Federal Reserve Bank in New York, which you say is more

14 established, they're more likely to report a crime than you, is

15 that in writing?

16 A.   It's part of the practice. The Reserve Bank of New York

17 has 50 attorneys, I have 8. So they have people like Mr.

18 Amenta, who is solely dedicated to ferreting out fraud,

19 communicating on a regular basis with the FBI about fraudulent

20 attempts going on in and around banks and both Reserve banks,

21 so the reason why they maintain the website. They do it as a

22 Federal Reserve system function. They have more sophistication,

23 they have more dedicated staff.

24      So the first thing I might do or Rebecca Wasserman might

25 do on my staff is when we get something that appears to be

1  bogus or fraudulent, we will contact New York because they have

2  someone who is dedicated to looking at the kinds of frauds and

3  exams that are out there and making a referral.

4  Q.    Let's talk a little bit about Federal Reserve Bank of

5  Atlanta. How many employees?

6  A.    Currently, there are approximately 1500 employees.

7  Q.    How many lawyers on staff?

8  A.    There are currently eight lawyers on staff -- eight

9  lawyers in the Legal Department.

10  Q.    All right. How much money do you have on deposit there?

11  A.    It's kind of a confidential matter. But we -- suffice it

12  to say, we hold money for banks, so it's several hundreds of

13  millions of dollars.

14  Q.    Okay, now, is it your testimony, then, that your bank,

15  with 1500 employees and 8 lawyers and hundreds of millions of

16  lawyers, you're just not big enough to report fraud when you

17  suspect it, and you've got to rely on New York to do it for

18  you, is that what you're telling us?

19  A.    No, we report fraud all the time. But what we do is

20  examine banks, and we have relationships, we have some of the

21  same types of staff and employees as New York. What we do with

22  bogus scams is that we rely a lot on the expertise that New

23  York has developed in this area by having dedicated staff look

24  out and see what types of scams are out there, they actually

25  help educate and make other Reserve Banks familiar with these

1  scams.

2       So the fact that they had already recorded the fact that

3  this was a particular scam, they probably had more

4  understanding of it, they had, maybe, already established a

5  relationship with the local U.S. Attorney's Office concerning

6  the scam, so, in my view, handing it to New York was no

7  different than going directly to the U.S. Attorney, myself.

8  Q.   Now, this policy of the Atlanta Bank that says, when we

9  have fraud we rely on New York to report it, is that a written

10 policy?

11 A.   There is no such policy.

12 Q.   Is that a written practice --

13      MR. BRANDLER: I object. He interrupted him.

14      THE COURT: Let him finish his answer.

15      THE WITNESS: I said there is no such policy.

16 BY MR. O'BRIEN:

17 Q.   Is there a practice?

18 A.   There is a practice amongst the attorneys, regarding

19 scams, that if we need understanding background or more

20 information regarding a potential scam, we will consult and,

21 possibly, refer it to New York to take a look at it to see if

22 it's something they are familiar with or have seen before.

23      This is something I already knew they had seen before

24 because they posted it on their website. So I'm thinking there

25 are already some efforts made -- some efforts have already been

1  made to report the scam. It doesn't -- New York seems to be

2  fully aware of it.

3  Q.   If it's not a written policy, it's a practice, is there

4  any writing that would document or evidence that practice that

5  you know of?

6  A.   No.

7  Q.   Okay, so this is an unwritten practice in your office, you

8  and your eight attorneys?

9  A.   I think it's a practice throughout the system. Everyone

10 recognizes the amount of resources, New York is dedicated to

11 this, and we appreciate it.

12 Q.   Is that practice applied in all cases? Whenever you

13 suspect fraud, you just send it to New York?

14 A.   Absolutely not. As I said, we have relationships -- there

15 are different areas of the bank, there is an examinations,

16 supervision and regulatory area where we make suspicious

17 activity reports to the National Crime Institute almost on a

18 weekly basis, when we encounter something in banks that appears

19 to have a suspicious nature to it.

20      There would not have been any reason why I could not have

21 gone directly to the local U.S. Attorney or to the FBI. I've

22 done it on hundreds of occasions, not one or two, but hundreds

23 of them.

24      On this particular instance, this is something New York

25 already appeared to have expertise in because they posted it on

1  their website. On top of that, these were documents that had

2  Federal Reserve Bank of New York on them, so appropriately. It

3  probably was best to have New York deal with it for three or

4  four different reasons. And I had made my best effort to deal

5  with it.

6      My objective, again, was not to -- my objective, again,

7  was to make sure that my president wasn't even bothered by

8  this.

9  Q.   Now, is it a fact that you told him he had to submit this

10 claim to New York? You told Mr. Harley that?

11 A.   I'm sorry, state that again.

12 Q.   You told Mr. Harley that his claim belongs in New York

13 instead of Atlanta?

14 A.   I did.

15 Q.   Now, did you send any other email to anybody in New York,

16 other than the one on 4/13/2011, dealing with this?

17 A.   I think I did communicate directly with Mr. Amenta, at one

18 point.

19 Q.   Did, in any of that communication, you say to them, Look,

20 you have special expertise in this matter, and my previous

21 email is just tongue and cheek, there's some innuendo in there,

22 and I'm really telling you it's fraudulent, you said, Since you

23 have expertise, I think you should report this.

24 A.   I didn't have to, I didn't have to, and I didn't, and they

25 still reported it. So I knew that wouldn't be necessary.

1    MR. O'BRIEN: Can we put up those Chris McCurdy emails?

2    MR. BRANDLER: I don't know the numbers off the top of my

3 head.

4    MR. O'BRIEN: Well, you know, neither do I. You have an

5 that's Exhibit 23(b)5 and 80 pages of it. I have enough trouble

6 remembering your numbers, never mind what's on the 80-page

7 exhibit.

8    MR. BRANDLER: I would be happy to try and find it. It

9 won't be immediately. I think it's on Page -- 15.3, Page 56.

10    MR. O'BRIEN: That's it, yes.

11 BY MR. O'BRIEN:

12 Q.   This was one of the documents, To whom it may concern,

13 Joseph Teo Kiat, that was in the packet sent to you?

14 A.   Um-hum.

15 Q.   And this, to me, as I see it -- let's go through it. It

16 appears to be an email chain. Would you say that? Looks to me

17 like, maybe, three emails on here, a three email chain?

18 A.   Yes.

19 Q.   And I guess it involved this, To whom it may concern

20 letter.

21 A.   Yes, it appears to be.

22 Q.   I'm no expert, but it seems to me that what happened was

23 this, To whom it may concern, went from Chris McCurdy to Riyadi

24 and from Riyadi to Kiat and from Kiat to Harley; is that what

25 it looks like?

1  A.    I didn't really think that. I thought this document was

2  bogus, I didn't really think that it was a reflection of any

3  true email activity. But you could say that's what it looks

4  like.

5  Q.    Now, let's take a look at that, To whom it may concern

6  letter.

7        MR. BRANDLER: 15.3, Page 55. I mean, I don't have to

8  present your exhibits for you, Joe.

9        MR. O'BRIEN: You do, when you choose to put them on the

10 screen rather than give me copies.

11 BY MR. O'BRIEN:

12 Q.    Take a look at this To whom it may concern letter. What

13 does it involve? Read it out loud, please.

14 A.    "To whom it may concern. Please be advised the checks

15 numbered" -- and the two check numbers -- "and the safekeeping

16 receipt no. 021088506 dated April 14, 2008 issued to Mr. Joseph

17 Teo Hui Kiat in the amount of $1 billion United States Dollars

18 are valid and negotiable."

19 Q.    Let's go back to the previous one, just the previous one.

20        THE CLERK: Which one?

21        MR. O'BRIEN: The email chain.

22        THE CLERK: 56.

23 BY MR. O'BRIEN:

24 Q.    We know now, To whom it may concern, Joseph Teo Hui Kiat,

25 that dealt with the two checks we're talking about here for 500

1  million each?

2  A.    Yes.

3  Q.    One looking at this could conclude that it came from Chris

4  McCurdy to Riyadi on May 4, 2009, and it went from Riyadi to

5  Kiat on -- it says 2009, 11/19, and then goes to Joseph -- to

6  Mr. Harley from Teo Kiat?

7  A.    I didn't conclude that.

8  Q.    But you did say someone could look at it and could

9  conclude that. It looks that way, doesn't it?

10  A.    I didn't, but I thought the document was bogus and

11  probably created to make someone arrive at that assumption.

12  Q.    You know, that bring us back to one of the statements you

13  made on direct examination, when you were asked -- you said, I

14  absolutely would not change my mind.

15        You're not going to change your mind about any of this,

16  are you? I'm not going to convince you one way or the other, am

17  I?

18        MR. BRANDLER: Objection. Convince you of what? That these

19  are legitimate?

20        MR. O'BRIEN: The direct quote was, "My opinion on this was

21  not going to be changed."

22        MR. BRANDLER: On the legitimacy of these documents? That's

23  your question?

24        THE WITNESS: Absolutely, that was my opinion, and I stated

25  this to Mr. Harley on several occasions.

1 BY MR. O'BRIEN:

2 Q.    But at the same time, you also, on several occasions,

3 stated -- on a very important occasion -- to a bank in New

4 York, you stated that he was convinced they were valid. You

5 were concluded they were fraudulent, and you told him, but he

6 was convinced they were valid and he appeared reasonable.

7 A.    And I explained to you exactly what I meant, and I believe

8 100 percent that Mr. Baxter understood exactly what I meant in

9 that message.

10      MR. O'BRIEN: Your Honor, may I have a second to confer

11 with my client?

12      THE COURT: Sure.

13 BY MR. O'BRIEN:

14 Q.    You did say, on direct examination, that Reserve Banks do

15 give safekeeping receipts.

16 A.    Certainly, Reserve Banks hold deposits for commercial

17 banks, and we give confirmation of receipts to commercial banks

18 when those deposits are made. This is something that occurs on

19 a pretty routine -- even daily basis, you know.

20      Deposits are made by armored carrier, and deposits have to

21 be counted and verified, and receipts have to be given to

22 commercial banks that we have received the amount of deposits

23 that they made with us, yes.

24 Q.    I'll take that as a yes.

25      MR. BRANDLER: Well, I object to that. That's not a

1  question, that's just his statement of what he's going to take

2  it as.

3      MR. O'BRIEN: I'll withdraw it.

4      THE COURT: It has been withdrawn. The jury should

5  disregard it.

6  BY MR. O'BRIEN:

7  Q.    You said commercial banks deposit in a Federal Reserve

8  Bank?

9  A.    Yes.

10  Q.    Private individuals do not?

11  A.    Absolutely not.

12  Q.    How about, do any local governments deposit in any Federal

13  Reserve Bank?

14  A.    No.

15  Q.    State Government?

16  A.    State?

17  Q.    Yes.

18  A.    No.

19  Q.    How about United States Government, do they have any

20  deposits in the bank?

21  A.    Yes, we are the fiscal agent for the U.S. Government, yes.

22  Q.    So back to the check itself. We said that the maker of the

23  check, as someone looking at this would say that the maker was

24  the United States Treasurer?

25  A.    Yes.

1  Q.    As a matter of just general law, with checks, when someone

2  writes a check, they have to have money in that bank or it

3  doesn't mean anything, do they?

4  A.    That is correct.

5  Q.    So to have a check on the Federal Reserve Bank of New

6  York, if the maker were Joe Smith, you would be able to say,

7  That check is no good because we don't have any private

8  depositors?

9  A.    Yes.

10  Q.    Okay, but if the maker were another bank that had money on

11  deposit, that might be a valid check because banks can deposit

12  money in there, right?

13  A.    I'm not sure I follow you. Repeat it, please.

14  Q.    Let me say this. The maker of a check, in order for it to

15  be a valid check, must have deposits at the bank.

16  A.    Yes, among other things, in order for it to be a valid

17  check.

18  Q.    And the type of people who can have deposits at a Federal

19  Reserve Bank are other banks and the United States, because

20  you're the fiscal agent for the United States?

21  A.    Yes.

22  Q.    So it's conceivable, probably likely, that the United

23  States has money in all Federal Reserve Banks.

24  A.    Not true.

25  Q.    They have money in some of them?

1 A.    Yes, that is correct.

2 Q.    So it's not inconceivable that they would have money in a

3 Federal Reserve Bank?

4 A.    It's not inconceivable. So the way we're set up, the

5 fiscal agency services are performed out of the St. Louis

6 Reserve Bank, so they have the relationship with the Department

7 of Treasury. The Department of Treasury would never write a

8 check that's drawn on the Reserve Bank of New York, just

9 wouldn't happen. The New York Reserve Bank wouldn't have the

10 fiscal relationship.

11 Q.    So you're saying that the United States has money in

12 Federal Reserve banks, but just not St. Louis Bank?

13 A.    That's the way it works.

14 Q.    That's not a matter of common knowledge, the average guy

15 on the streets is not going to know that the United States only

16 deposits in one of the Federal Reserve Banks.

17      MR. BRANDLER: Objection. He has no way of knowing what's a

18 matter of common knowledge.

19      THE COURT: Overruled. I'll allow that question.

20      THE WITNESS: It's one of the things that may be recognized

21 right away that the checks were bogus.

22 BY MR. O'BRIEN:

23 Q.    You're a member of the Bar with how many years in banking?

24 A.    Thirty.

25 Q.    How many years did you work for a Federal Reserve Bank?

1  A.    Fourteen.

2  Q.    You have much more knowledge about the Federal Reserve

3  Bank and system than the average guy on the street?

4  A.    I would hope so.

5        MR. O'BRIEN: That's all I have, Your Honor.

6        THE COURT: Any redirect?

7        MR. BRANDLER: Yes, could we have Exhibit 15.3, Page 53.

8                       REDIRECT EXAMINATION

9  BY MR. BRANDLER:

10 Q.    It's a copy of one of the checks Mr. O'Brien questioned

11 you about.

12        Just to be clear here, in the packaging materials that Mr.

13 Harley sent the Federal Reserve Bank of Atlanta, did you ever

14 see a physical check or just an image of the check?

15 A.    That is correct, I never saw a physical check, I only saw

16 the image, the copy that was in the package.

17 Q.    During all of this discussion with Mr. Harley, when he was

18 mailing things in and emailing things, did he ever send you a

19 physical check?

20 A.    I never saw it, no.

21 Q.    Now, you mentioned that this matter was referred by you to

22 the New York Fed. Mr. O'Brien questioned you with this email

23 that he sent to your counterpart of New York, Mr. Baxter, I

24 believe, was his name?

25 A.    Yes.

1 Q.    And you said the reason you sent it there was because they

2 had a particular expertise in that area from their website?

3 A.    Yes, they did, they did. Mr. Amenta was a dedicated

4 resource that New York had. In fact, on many occasions, the

5 Federal Reserve Bank of New York would instruct the Reserve

6 Banks, if you get any attempt on this fraud, send the

7 information to us because we already have established a

8 relationship with the U.S. Attorney looking at these fraudulent

9 attempts.

10 Q.    Mr. O'Brien asked you if you had any communications with

11 anyone at the New York Bank in that vein, including Mr. Amenta?

12 A.    Yes.

13 Q.    Could we go to Exhibit 15.3, Page 94 again, to the bottom

14 of the page -- well, starting with, forwarded by Richard Jones

15 from Robert Amenta.

16      Is this an email that you received from Mr. Amenta to Mr.

17 Fraher and copied to you on March 29, 2:36 p.m., regarding this

18 referral that you're talking about?

19 A.    Yes.

20 Q.    Can you read what it says?

21 A.    3/29/2011, regarding fraudulent items purporting to be

22 Treasury checks referring on their face to Federal Reserve Bank

23 of New York.

24      "Hi, Richard. We are well aware of the below scam, as it's

25 featured on the Federal Reserve Bank of New York's Fraud and

1  Scams website. The representations regarding the Federal

2  Reserve are false, and we recommend that the alleged victim

3  refer this matter to law enforcement."

4       Then, there's a link to the New York website setting forth

5  the scams. Then, he basically re-printed the information on

6  their website regarding the scam. The scam involving Yohannes

7  Riyadi and/or Wilfredo Saurin. I never saw Saurin in any of the

8  documents I received.

9       November 2007. "The Federal Reserve is aware of a

10  fraudulent scam involving individuals using the names Yohannes

11  Riyadi and/or Wilfredo Saurin or persons claiming to be

12  representatives of these two men. In a typical version of the

13  scam, Mr. Riyadi and/or his delegates falsely claim that they

14  have on deposit with the Federal Reserve Bank of New York

15  several U.S. Treasury checks issued to Mr. Riyadi amounting to

16  billions of dollars.

17       "The Federal Reserve Bank of New York has been contacted

18  by several brokers and financial institutions world-wide,

19  inquiring about the validity of this fraudulent account

20  documentation, which is being offered as collateral for lines

21  of credit or other types of asset-based financing. The

22  fraudulent scheme includes multiple documents, which purport to

23  have the signatures of various Federal Reserve officials

24  including Chairman Ben Bernanke."

25  Q.   Next page, please.

1  A.    "In some instances, individuals involved in this

2  fraudulent scheme claim to have met with Federal Reserve

3  officials and claim to have verified that the alleged account

4  is in order. We have also learned that the fraud may include

5  the purchase of certain documents by the introducing brokers.

6      "If you have information regarding this fraud, please

7  contact either Robert Amenta, Special Investigator at the

8  Federal Reserve Bank of New York, or Eric Rosenblatt, Senior

9  Special Agent at the Department of Homeland Security,

10 Immigration and Customs Enforcement."

11 Q.    Is that why you referred it to the Federal Reserve Bank of

12 New York, at least, one of the reasons?

13 A.    Yes.

14 Q.    You said, during your direct testimony, that when you were

15 discussing this with Mr. Harley, that you referred him to this

16 particular website and to this link?

17 A.    Yes.

18      MR. BRANDLER: I have no further questions.

19      MR. O'BRIEN: Leave that up, please.

20                    RECROSS EXAMINATION

21 BY MR. O'BRIEN:

22 Q.    This document we're looking at, "Hi, Richard", that's you?

23 A.    Um-hum.

24 Q.    "We are well aware" --

25 A.    No, actually, that's Richard Fraher.

1  Q.    Can you identify him?

2  A.    He's the attorney that works in my office that I had

3  actually asked to contact New York about this earlier.

4  Q.    Read what the thing says to Richard Fraher.

5  A.    "Hi, Richard. We are well aware of the below scam, as it's

6  featured on the Federal Reserve Bank of New York's Frauds and

7  Scams website. Representations regarding the Federal Reserve

8  are false, and we recommend that their latest victim refer this

9  to law enforcement."

10 Q.    And you didn't refer it to law enforcement?

11 A.    I referred it to the Federal Reserve Bank of New York,

12 which already established our relationship with law enforcement

13 regarding this.

14 Q.    Does it say that in there? Referred back to us, because we

15 have already established a relationship with law enforcement?

16 It doesn't say that, does it?

17 A.    It doesn't have to, really. As I said, the practice is for

18 us to use New York. Every Reserve Bank can't have dedicated

19 resources to fraud, so it's an efficiency that's

20 well-recognized in the system.

21       In a situation where the New York Reserve Bank has already

22 established a relationship with law enforcement regarding the

23 matter, it's appropriate to go ahead and share that information

24 with them, so they can continue to share the information with

25 law enforcement.

1  Q.   They write to you and they say, We recommend the alleged

2  victim refer this matter to law enforcement.

3  A.   Yes.

4  Q.   Your testimony is, you didn't have the appropriate

5  resources to call the cops about it, did you?

6  A.   My testimony is, by providing this information to the

7  Reserve Bank of New York, which has been done on several

8  previous occasions, that this information would not only land

9  in the hand of law enforcement, but land in the hands of the

10  appropriate law enforcement that's already working on this

11  matter.

12       So it's much more efficient than me calling up someone and

13  having to give them background all over again on the scam.

14  Q.   That's not what they told you?

15  A.   I understand they're telling people this because of the

16  fact that they don't necessarily have all the relationships and

17  dealings with the Federal Reserve Bank of New York that the

18  Federal Reserve Bank of Atlanta does.

19       It's much more efficient for me to give it to New York,

20  because they are on it, they are on this. I don't really need

21  to re-invent the wheel by contacting law enforcement and

22  starting all over again.

23  Q.   Well, I guess this guy writes emails like you do, also, he

24  doesn't say what he means, he just kind of just conveys it

25  between --

1          MR. BRANDLER: I'm going to object.

2          THE COURT: Sustained.

3   BY MR. O'BRIEN:

4   Q.   Can you scroll up, please. I'm sorry, scroll down. A

5   little further. Okay, that's good.

6          Now, also, they sent you, along with that email that said

7   refer to law enforcement, they also said you should also

8   contact Amenta.

9          MR. BRANDLER: I'm going to object. The email is different.

10  That's the portion of the website, the link.

11         MR. O'BRIEN: Wasn't that sent with the email?

12         MR. BRANDLER: Yes, but you said, the link.

13  BY MR. O'BRIEN:

14  Q.   The email told you to report it to law enforcement, and

15  the link that was sent said, Contact Amenta?

16  A.   Yes.

17  Q.   You did that?

18  A.   Yeah. We had already contacted Amenta. I didn't really

19  know that this was a known scam, that's the thing. At the time,

20  I was just looking at the documents. I looked at the documents

21  and knew it was a scam, without having seen what New York had

22  done.

23         But once I realized that New York had posted it on its

24  website and that this was already in the hands of law

25  enforcement, it was appropriate for, actually, two reasons to

1  just go ahead and go to New York.

2  Q.    You just said, I didn't know it was a known scam. When did

3  you learn it was a known scam?

4  A.    When I learned that -- when I asked the people in my

5  office to contact Robert Amenta and find out if they have heard

6  anything about this situation -- about these scams. I knew it

7  was a scam, I didn't know it was a known scam. I knew it was a

8  scam just by seeing the package.

9       I didn't know it was a known scam until they got back to

10  me and said, Yes, New York has seen this, they are aware of it,

11  and they're on it.

12  Q.    When you knew it was a scam and not a known scam, why

13  didn't you go to law enforcement?

14  A.    As I have said, it was very clear to me, at the time -- so

15  your question is, when I first looked at the package, why

16  didn't I go to law enforcement?

17  Q.    Yes.

18  A.    I can tell you for a fact that this probably happens a

19  dozen times a year. People call trying to figure out what they

20  can do to get money out of the Reserve Bank. There's a lot of

21  lure out there about how wealthy the Reserving Banks are, and

22  someone will call and say, What can I do, how can I go about

23  getting money out of a Reserve Bank.

24       There's a group of individuals out there called The Posse

25  Comitatus and Independent Liberty Nation who will call and ask

1  about things they can do to get money out of a Reserve Bank. I

2  will talk to them -- I don't usually talk to people, but I will

3  talk to them to keep them from bothering my president. I will

4  say to them, You shouldn't be doing this.  You aren't going to

5  get anything out of it. Stop wasting your time.

6      My conversations with Mr. Harley started out in the same

7  vein, they continued in the same vein. I thought I was

8  performing a service, quite honestly, in trying to educate them

9  about all the reasons why these documents couldn't be

10 legitimate.

11     And at the point when I learned it was a known scam, that

12 was the point where I said, Okay, I've done as much as I need

13 to do here, there's already someone working on it, let's go

14 ahead and let New York handle it.

15 Q.    You concluded it was a scam, before you learned it was a

16 known scam. How much time expired between the time you

17 concluded it was a scam until you realized it was a known scam?

18 A.    I don't know, probably, a month or so. But there were

19 conversations going on the whole time. And quite honestly,

20 there was a few of those conversations where I said to Mr.

21 Harley, You really need to stop doing this, because even

22 attempting to negotiate these documents could be considered a

23 crime.

24     So, you know, in all seriousness -- I mean, we got -- as I

25 said, we got pretty familiar talking about these things. And

1 every time, he would come back with something. I said to him,

2 before I even knew it was a known scam, You need to stop this,

3 this is actually serious, there's a law that says, Attempting

4 to defraud a Federal Reserve Bank is a crime, and you need to

5 stop.

6       So if he hadn't gone away, I probably would have. But I

7 don't refer every single caller to the U.S. Attorney's Office,

8 and I would -- we would have, you know, no credibility, and we

9 would get the attention of, Okay, another one, if every time we

10 got calls trying to get money from the Reserve Bank, we

11 referred it to the U.S. Attorney's Office. That's one of the

12 reasons why New York is specializing in this area. They already

13 have their relationships.

14 Q.   This one-month period that you were talking to Mr. Harley,

15 that's the period that you were trying to unconvince him -- he

16 was convinced that they were valid, and you were trying to

17 unconvince him, right? That's true, isn't it?

18 A.   I was trying to educate him to make him understand that,

19 You are wasting your time, you're wasting our time. Please stop

20 wasting the time of my president by trying to contact him and

21 send documents to him. You aren't going to get anything, you

22 need to stop.

23 Q.   The reason you tried to educate him is he was convinced

24 that they were valid, just like you said in the email.

25 A.   You know, I thought about that, and there was a time that

1  I thought, just maybe he is, you know, crazy like a fox, and

2  there probably were more than one occasions when I said to him,

3  Mr. Harley, you sound like a very intelligent man, you should

4  know better than this. You seem to have some understanding of

5  financial markets, you seem to some understanding of finance,

6  it strikes me as very unusual for someone with your apparent

7  understanding to not realize these things are fraudulent.

8      I said that to him, so yes, I was trying to make sure that

9  he was aware these were fraud, and it seemed a little unusual

10 to me that he was so persistent for someone that seemed -- who

11 would seem to know better.

12 Q.   But all during this period, you believed he was convinced

13 they were valid?

14 A.   You know, probably, the first two conversations, I might

15 have believed that. By the time we got around to the fourth and

16 the fifth, and I had even told him about the fact that this is

17 a known scam, and I had gone through all of the exercises with

18 him, and he still called my president and demanded payment.

19     I said, Okay. I am not convinced that -- I am not

20 convinced that he doesn't know this is a scam.

21 Q.   But, sir, you just said, when you told him it was a known

22 scam -- and we're talking about that one-month period between

23 the time that you thought it was a scam and you learned it was

24 a known scam, when you were talking to Mr. Harley, trying to

25 unconvince him, you did not know it was a known scam, and you

1  believed he believed that?

2      MR. BRANDLER: Objection. Mr. O'Brien used the word

3  convince, the witness said educate him.

4      THE COURT: Fine. He can answer the question.

5      THE WITNESS: What's the question? I'm not sure.

6  BY MR. O'BRIEN:

7  Q.    The question is, you just testified -- previously, you

8  testified that there was a one-month period between the time

9  that you concluded it was a scam and that you realized it was a

10  known scam.

11  A.    Yes.

12  Q.    Okay. And then you were talking about the conversations

13  you had with Mr. Harley during that period.

14  A.    Um-hum.

15  Q.    And you said that, during the first two conversations or

16  first couple conversations with Mr. Harley, you believed he

17  thought they were valid.

18  A.    I thought, maybe, he needed to be educated a little bit

19  more about why it was so obvious that they were bogus, because

20  he didn't seem to understand how the system worked, he didn't

21  seem to understand -- the fact that he was presenting the

22  documents to the Reserve Bank of Atlanta, when, on the face of

23  the document, they had Reserve Bank of New York, indicated to

24  me that he doesn't understand that we are two separate

25  institutions. And we don't hold an account in Atlanta for the

1  Reserve Bank of New York.

2       And if he has a document drawn on the Reserve Bank of New

3  York, it's not like we are all one agency, a lot of people

4  don't understand that. So yes, there was a lot of education

5  that I was trying to convey to him to make him understand that,

6  not only are these things obviously bogus, but they've been put

7  together by someone that has not even a rudimentary

8  understanding of what the Federal Reserve is or how it does

9  business.

10 Q.   But didn't you say, previously, that, at the point when

11 you heard from New York and got that email and you realized it

12 was a known scam, your conversations with Mr. Harley were over?

13 A.   They were pretty much over. They were probably -- I had

14 reached a point where I realized I couldn't get anywhere

15 further with him. So I had made, I felt, like a valiant,

16 courageous effort to convince him to stop wasting my time and

17 his.

18      And I was at the point where -- and he would still come

19 back to my president, anyway. That was my main objective to

20 keep him from bothering the president. So I was about to

21 probably say, Okay, at this point, I've done all I can. So if I

22 hadn't gone to New York , if New York hadn't made it clear to

23 me that this was a known scam, I would have been making the

24 referral, myself, or I would have been referring it to New York

25 and make a referral on my behalf.

1 Q.   Let me just go to another area. You just made a statement

2 -- that was the first time you said this -- you said, Somebody

3 with a check in their hand that was drawn on the Federal Bank

4 of New York wouldn't try to cash it at the Federal Bank of

5 Atlanta.

6 A.   If they understood the Federal Reserves -- well, first of

7 all, no individual is going to have a check from a Federal

8 Reserve Bank, because we don't have any accounts with or for

9 individuals. So if, in fact, there is a check out there,

10 payable from the Federal Reserve Bank of New York, they

11 wouldn't try to cash it at a Federal Reserve Bank -- at another

12 Federal Reserve Bank.

13 Q.   Well, let's just talk generally about checks. I get a

14 paycheck from the guy I work for, he gives me a paycheck, I'm

15 the payee, he's the maker, and that check is drawn on the First

16 National Bank of Olyphant, Pennsylvania.

17      MR. BRANDLER: Your Honor, we are beyond the scope of

18 recross.

19      MR. O'BRIEN: No, it is not at all. Your Honor, he said --

20      THE COURT: He kind of opened up this area. I'll let you

21 pursue it.

22 BY MR. O'BRIEN:

23 Q.   Joe O'Brien works for a guy and his name is John Smith,

24 and he writes a check, John Smith, and his bank is the First

25 National Bank of Olyphant.

1  A.    Yes.

2  Q.    He writes that check to me, and the check says, pay Joe

3  O'Brien $500, and he signs it, and he has a date on it.

4  A.    Sure.

5  Q.    Okay, now, I don't do banking at First National Bank of

6  Olyphant, I can take that check to any bank and cash it, can't

7  I, if the bank is willing to cash it?

8  A.    You can't take it to any Federal Reserve Bank to cash it.

9  Q.    Well, it's drawn on the bank.

10  A.    It's not drawn on the Federal Reserve Bank, it's drawn on

11  First National Bank of Olyphant, which has an account at the

12  Federal Reserve Bank. Federal Reserve Bank does not do business

13  with individuals, you can't walk into a Federal Reserve Bank

14  and negotiate a check or withdraw money out of an account.

15  Q.    If the check is drawn on the bank?

16  A.    No, you can't.

17  Q.    Wouldn't you agree that the average person who had a check

18  that was drawn on a bank would assume you could cash the check

19  at that bank or any bank?

20        MR. BRANDLER: I'll object to what the average person -- I

21  don't think this witness can testify --

22        MR. O'BRIEN: No, the issue is --

23        THE COURT: I'm going to allow that. He has great

24  experience in the banking world.

25        THE WITNESS: So your question again is, can the average

1  person --

2  BY MR. O'BRIEN:

3  Q.   Well, let me go back. We talked about three parties. The

4  maker, that's the person who makes the check, that's the person

5  who signs our paychecks, and the payee is us, the person it's

6  paid to, and it's drawn on a bank. These checks were drawn on

7  Federal Reserve Bank of New York. That's what it said on them.

8  A.   That's what they were purported to, yes.

9  Q.   When someone has a check that is drawn on a bank, they can

10  present that to any bank, they don't have to present it to the

11  bank it's drawn on. I don't have to take my check to my boss'

12  bank, I can put it in my own bank.

13  A.   So you're making --

14  Q.   I'm not making anything, I'm asking the questions.

15  A.   You're confusing commercial banks with Federal Reserve

16  Banks. So, of course, if you have an account at a bank that's a

17  different bank than the check that it is drawn on, you can

18  certainly deposit that check into your account at a different

19  bank.

20      You don't have any right, you don't have any basis upon

21  which to present that check to a Federal Reserve Bank because

22  you don't have, as an individual, any depositary relationship

23  with the Federal Reserve Bank, because you can't. They can't

24  have account relationships with individuals.

25      So even if the First National Bank of Wilkes-Barre, the

1  bank that the check is drawn on has an account at the Federal

2  Reserve Bank of, in this case, Philadelphia, the person who

3  gets that check that's drawn on First National Bank of

4  Wilkes-Barre can't take that check to the Federal Reserve Bank

5  of Philadelphia. They can put it in 8,000 other banks in the

6  country, but they can't put it in a Federal Reserve Bank, they

7  can't present it to a Federal Reserve Bank, there would be no

8  facility -- they wouldn't even get in the building with it.

9  Q.    Okay. I appreciate the education on the Federal Reserve

10  system, but would you agree with me, the average person that

11  gets a check, and it's made by the United States, payable to

12  somebody, and drawn on the Federal Reserve Bank, it wouldn't be

13  unexpected that he would take it to a Federal Reserve Bank and

14  say, Give me my money.

15        MR. BRANDLER: I'm going to object to that, again, about

16  what the average person would expectedly or unexpectedly do. I

17  think that's beyond his expertise.

18        MR. O'BRIEN: I disagree, Your Honor. The charge in this

19  case is that my client knew these were false --

20        THE COURT: I understand that. I'll allow the question.

21        THE WITNESS: So another problem with the check is that you

22  would never see Federal Reserve Bank on an individual check. So

23  there would be nothing on the check that would indicate to the

24  average person that they could go to a Federal Reserve Bank.

25  Even a U.S. Government check would not indicate on the face of

1  it what Reserve Bank the funds were drawn on.

2        MR. O'BRIEN: That's it. Thank you, Your Honor.

3        MR. BRANDLER: I have a follow-up, Your Honor, based

4  exactly on two questions that he raised.

5        THE COURT: Wait a minute, wait a minute. I only allow for

6  recross. There's no re-redirect. He opened up a subject and he

7  properly examined him on it. End of story.

8        MR. BRANDLER: Could I be heard on this?

9        THE COURT: End of story. You can make an objection on the

10  record, which you have.

11        MR. BRANDLER: I would like to put the substance of what it

12  is on the record before you rule.

13        THE COURT: Okay.

14        (At this time a discussion was held on the record at

15         sidebar.)

16        MR. BRANDLER: I just wanted to go into two areas that

17  he -- that, I believe, were new, regarding, he thought Harley

18  was crazy like a fox, that was an area that was important that

19  came up for the first time on this recross, about what he

20  thought Mr. Harley's intent was, and I want to ask him what he

21  meant by that term.

22        And the second thing is that he told him -- that he told

23  Harley directly that he, in attempting to negotiate the checks,

24  was a crime. Those two areas.

25        THE COURT: You've made those statements, they're done,

1  your position is on the record. I'm not going to allow any

2  further questions.

3      MR. BRANDLER: Thank you.

4      (At this time the discussion at sidebar was concluded.)

5      THE COURT: All right, members of the jury, we are going to

6  adjourn for lunch, we will come back at 20 after 1, an hour and

7  10 minutes. Is that enough?

8      THE JURY: Yes.

9      THE COURT: I'll remind you not to discuss the case among

10 yourselves or anyone else. If anyone tries to approach you

11 about it, bring it to my attention. Enjoy your lunch, we will

12 see you back here at 1:20.

13     Mr. O'Brien, any reason you have to keep Mr. Jones? You

14 had made a statement before about keeping him. I think that

15 kind of got mooted.

16     MR. O'BRIEN: I'll release him.

17     THE COURT: All right. You're excused.

18     THE WITNESS: Thank you.

19     (At this time a luncheon recess was taken.)

20     THE COURT: Mr. Brandler.

21     MR. BRANDLER: Leonard Zawistowski.

22 L E O N A R D   A.   Z A W I S T O W S K I  IS CALLED, AND

23 HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

24     THE CLERK: Please state and spell your name for the

25 record.

1          THE WITNESS: Leonard A. Zawistowski, spelled

2   Z-A-W-I-S-T-O-W-S-K-I, and I'm a junior. J-R.

3          THE CLERK: Thank you. You may be seated.

4          MR. BRANDLER: May I inquire, Your Honor?

5          THE COURT: You may.

6                        DIRECT EXAMINATION

7   BY MR. BRANDLER:

8   Q.    Forgive me if I mispronounce your name. Are you currently

9   employed?

10  A.    Yes, I am.

11  Q.    Where are you employed?

12  A.    At J.P. Morgan Chase Bank.

13  Q.    In what position?

14  A.    I'm a Vice-president Compliance Manager.

15  Q.    Where is that -- the location of the bank that you work

16  at?

17  A.    That's in New York City.

18  Q.    How long have you worked with J.P. Morgan Chase?

19  A.    Since the end of September of this year, so that's like

20  two and a half months.

21  Q.    Prior to working with J.P. Morgan Chase, where were you

22  employed?

23  A.    The Board of Governors of the Federal Reserve System.

24  Q.    Where were you located, when you worked for the Board of

25  Governors?

1  A.    Washington, D.C.

2  Q.    How long did you work for the Board of Governors?

3  A.    Twenty-four years.

4  Q.    In what position?

5  A.    Initially, it was as Criminal Investigator in the Office

6  of Inspector General for three years, and then I was a Senior

7  Special Investigator in the Division of Banking Supervision for

8  the remaining 21 years of my career there.

9  Q.    So if my math is correct, you were starting in about 1990?

10 A.    That is correct.

11 Q.    And for the first three years, you were with the Office of

12 Inspector General?

13 A.    Yes.

14 Q.    And what were your duties and responsibilities, at that

15 time, generally?

16 A.    Investigating internal fraud against the Federal Reserve.

17 Q.    And after that period of time, in 1993 to 2014, you had a

18 different position?

19 A.    Yes, in banking supervision.

20 Q.    What does that mean? What kind of duties and

21 responsibilities did you have?

22 A.    I was responsible for investigating bank fraud and money

23 laundering that was occurring in the banking system with banks

24 that we supervise at the Federal Reserve.

25 Q.    Were you in a supervisory position in that role?

1  A.    No, I was not.

2  Q.    During the entire time, 1990 through 2014, were you based

3  in Washington, D.C.?

4  A.    Yes, sir, I was.

5  Q.    Did you have liaison with law enforcement agents, with

6  respect to your duties and responsibilities with the Federal

7  Reserve Board?

8  A.    I did.

9  Q.    And what would be the reasons you would contact law

10 enforcement authorities?

11 A.    Law enforcement liaison was a significant part of my

12 responsibility during those years.

13 Q.    And are you -- do you have a law degree?

14 A.    Yes, sir, I do.

15 Q.    And where did you go to law school?

16 A.    George Mason University School of Law in Arlington,

17 Virginia.

18 Q.    And what year did you get your law degree?

19 A.    1982.

20 Q.    And are you a member of any bar?

21 A.    Yes, sir; Pennsylvania.

22 Q.    How long have you been a member of the Pennsylvania bar?

23 A.    Since 1983.

24 Q.    In your capacity as a Special Investigator with the

25 Federal Reserve Board in Washington, D.C., did you have any

1  contact with the Defendant in this case, Mr. Harley?

2  A.    I had telephone contact with Mr. Harley.

3  Q.    And, approximately, when did that telephone contact occur?

4  A.    December of 2009.

5  Q.    How many phone calls did you have with Mr. Harley, during

6  that time?

7  A.    Two.

8  Q.    And tell us how that occurred, what triggered your contact

9  with Mr. Harley?

10 A.    Mr. Harley, prior to my becoming involved with calling him

11 and seeing the documents that were provided to me, apparently,

12 had sent information to the Federal Reserve for the attention

13 of Chairman Ben Bernanke, so that was -- had been sent in, and,

14 apparently, there were follow-up phone calls between the

15 secretary -- excuse me -- the Chairman's staff and the Legal

16 Division at the Federal Reserve with Mr. Harley, and that was

17 earlier, in August and November, as I understood.

18       But by December, the phone calls were continuing to occur,

19 and it was suggested that I be brought into those

20 conversations.

21 Q.    When you were brought into those conversations, were you

22 given access to the documents that Mr. Harley had submitted

23 earlier?

24 A.    Yes, I was.

25 Q.    Did you review those?

1 A.    I did review them.

2 Q.    What's your recollection about what Mr. Harley's documents

3 were requesting, at that time?

4 A.    Mr. Harley sent documents in that purported to have bond

5 power -- documents that related to something called Bond Power,

6 in which he was seeking to have those instruments recorded by

7 the Federal Reserve, and he was bringing that to the attention

8 of the Chairman, through these mailings and phone calls.

9 Q.    Did those documents indicate how much money he believed he

10 had bond power over, as you recall?

11 A.    Yes, it was trillions of dollars.

12 Q.    And what did Mr. Harley -- what was he requesting the

13 Federal Reserve Board to do with his bond power?

14     MR. O'BRIEN: Your Honor, we're really getting into a Best

15 Evidence Rule situation. He's testifying, specifically, what

16 was in the documents. I think that they ought to be identified

17 and we ought to show the document, rather than what he recalls

18 they said.

19     MR. BRANDLER: The Best Evidence Rule has no application to

20 this. I can ask him what his recollection of the documents are.

21     THE COURT: I don't see any problem with it. I'm going to

22 allow the question. I'll allow it. Go ahead.

23 BY MR. BRANDLER:

24 Q.    What was Mr. Harley requesting the Federal Reserve Board

25 to do with his bond power?

1  A.    Record these instruments, very unclear -- we don't do that

2  sort of thing, it threw everybody off because documents like

3  this aren't submitted to us -- we don't record anything, I

4  believe.

5  Q.    And when you saw the documents he had sent in, did you

6  recognize them?

7  A.    I did.

8  Q.    And what did you recognize them to be?

9  A.    That one of the parties involved with the documents,

10 specifically, in a power of attorney that was an attachment,

11 was a gentleman named Yohannes Riyadi, and I recognized that

12 name.

13 Q.    What did you recognize it to be?

14 A.    That Mr. Riyadi is a well-known fraudster, international

15 fraudster, and I had personally investigated him many times, as

16 well as consulted with other law enforcement agencies about his

17 activities.

18 Q.    Were you aware if there were any public information

19 available on any website relating to Mr. Riyadi and the fraud

20 that you were aware of?

21       MR. O'BRIEN: Your Honor, he's asking questions as to what

22 the content of a writing is.

23       MR. BRANDLER: I didn't ask him what the content was, I

24 asked him if he was aware of a website that had information

25 about Mr. Riyadi.

1      MR. O'BRIEN: Leading question, also. The best evidence of

2 what's on that website is the website. The best evidence of

3 what's in those documents is the document. That's what the Best

4 Evidence Rule is.

5      THE COURT: I don't know that he's asking what was in it,

6 he just said what -- he's not asking for the substance, he was

7 asking was he known on a website -- I'm going to allow it.

8      THE WITNESS: Could you repeat the question?

9 BY MR. BRANDLER:

10 Q.   Were you aware of any website issued in the Federal

11 Reserve system relating to Mr. Riyadi?

12 A.   Yes, I was.

13 Q.   What were you aware of?

14 A.   That the Federal Reserve Bank of New York had posted on

15 their website -- they had a Fraud and Scams section of their

16 website that the public could access, in order to see -- and

17 for various typologies on that scam and fraud portion of that

18 website, and there was a typology concerning Mr. Riyadi and his

19 fraudulent attempts, which are multiple, how he became known to

20 the Federal Reserve, and it was posting that information so

21 that the public could review that and for their interest.

22      MR. O'BRIEN: Renew my objection. He's clearly testifying

23 as to the terms of a right, he's testifying -- it is a

24 violation of the Best Evidence Rule, and it's hearsay. If this

25 website did say that, the best evidence of that is the website,

1 not what he saw on it.

2      THE COURT: I don't know that it's being offered to show

3 that Mr. Riyadi was a fraudster or people were on notice that

4 he might be or he was. I'm going to allow it. I presume you're

5 going to do more with this.

6      MR. BRANDLER: Yes, Your Honor. There's going to be a

7 telephone conversation.

8      THE COURT: Proceed.

9 BY MR. BRANDLER:

10 Q.   So you had a telephone conversation, you said you had two

11 telephone conversations with Mr. Harley in December of '09?

12 A.   Yes, I did.

13 Q.   Did you discuss that website with him?

14 A.   Yes, I did, I pointed out to Mr. Harley that having

15 reviewed the documents that showed involvement with Mr. Riyadi,

16 that he should, in his understanding of what he's dealing with,

17 he should read the information that's available on the Federal

18 Reserve Bank of New York website, and I pointed it out to him,

19 and I may have actually given him the website address, etc.

20 Q.   And did Mr. Harley respond whether or not he was aware

21 already of that website?

22 A.   In our conversation, Mr. Harley told me that he was aware

23 of that warning about Mr. Riyadi, but that his due diligence, I

24 believe, is the term he used, he felt that the information was

25 not specific enough, and he had considered it and was

1  continuing with the relationship with Mr. Riyadi in this

2  scheme.

3  Q.   Besides talking about the website, tell us what else was

4  discussed during -- let's break it down with the first

5  conversation and then the second conversation. So let's start

6  with the first conversation.

7       First of all, how long, approximately, did the

8  conversation last?

9  A.   Five to ten minutes.

10 Q.   And what else was discussed besides the website issue?

11 A.   Well, the Federal Reserve -- I was announcing, telling Mr.

12 Harley that the Federal Reserve was not going to respond to him

13 on his request about recording, and that we were not even going

14 to respond in writing, that we would not be responding to his

15 request because -- and I told him this is part of the

16 conversation is that, as we send out information in writing,

17 whether it's email or written letter, our experience has

18 been that people involved in frauds would take that

19 information, use the letterhead, counterfeit it, use it for

20 their own purposes, take the signatures on it, use it for their

21 own purposes, for illicit purposes, so he was getting a phone

22 call from me to tell him the result of his inquiry.

23 Q.   And during that conversation, did you tell him, besides

24 referring him to the website, that his documents were -- did

25 you tell him what your opinion was of the validity of the

1 documents?

2 A.    I explained to him that I was aware of the Riyadi, both

3 the warning and in my own personal experience with Mr. Riyadi,

4 in my own review of the documents, is that he was involved in a

5 fraudulent scheme, and that this is why we are not taking

6 part -- the Federal Reserve was not going to respond and did

7 not -- would not take any action in furtherance of this.

8 Q.    What was Mr. Harley's reaction?

9 A.    He was belligerent and badgering and basically made

10 inference that there would be Court action to follow, like a

11 lawsuit.

12 Q.    Did you give Mr. Harley your contact phone number?

13 A.    I did.

14 Q.    And what was the reason for that?

15 A.    Transparency. I was giving him a point of contact, if he

16 wanted to further discuss the issue, he could get back in touch

17 with me.

18 Q.    Did he get back in touch with you?

19 A.    Yes, he did, the following day.

20 Q.    Was that by telephone?

21 A.    Mr. Harley called my phone number at my desk.

22 Q.    How long did that telephone call last, approximately?

23 A.    Five minutes, maybe less than that.

24 Q.    Tell us what occurred during that telephone call?

25 A.    Mr. Harley called, I answered the phone, and he wanted to

1  let me know that -- something in China, the government or a

2  business -- something with China involved was suing or had

3  initiated some sort of a Court action against the Federal

4  Reserve, just straight up like that, and I took it as a threat

5  of a lawsuit, that if they can do that, he could do that or

6  people involved in this case in Malaysia or whatever.

7        So there was nothing really to discuss, he wasn't telling

8  me anything about the reason why he called initially or why we

9  had the discussion initially, but he was telling me about this

10 new lawsuit, Court action, about something in China.

11 Q.    After that phone call, did you refer this matter to any of

12 your other counterparts in the Federal Reserve System?

13 A.    Yes, I did, I made notification internally to the Federal

14 Reserve Board, colleagues in our Legal Division and the

15 Chairman's office, but then I also reached out to my

16 investigator colleagues at the Federal Reserve Bank of New

17 York, who, of course, were the people who posted the Riyadi

18 information on their website and other information about scams

19 and schemes of this nature.

20        I got in contact with them to notify them of my

21 conversations with Mr. Harley, and what Mr. Harley was

22 attempting to do, regarding the Federal Reserve System.

23 Q.    Was there one person, in particular, who you spoke to,

24 regarding this referral?

25 A.    Yes, sir, it was Robert Amenta.

1  Q.    Why did you reach out to him?

2  A.    He was like the same level within the Bank of New York as

3  I was at the Board.

4  Q.    Was his name mentioned in that website that you mentioned,

5  earlier, as a contact person?

6  A.    Either him or his supervisor were listed as points of

7  contact, if you had additional questions.

8  Q.    I want to show you some documents here. Could we go to

9  Exhibit 23.1-A.

10  A.    Yes, I have it.

11  Q.    Could you identify that document?

12  A.    I believe it's an email from Mr. Harley to the Federal

13  Reserve, to Rita C. Proctor at the Federal Reserve, an email

14  with, maybe, it was an attachment and letter, dated August 3,

15  2009 from Mr. Harley to Mr. Ben Bernanke, Chairman of Federal

16  Reserve.

17  Q.    Was this part of the documentation that you reviewed,

18  before you spoke to Mr. Harley in December of '09?

19  A.    Yes, it was.

20  Q.    And what is the -- could we just scroll up, please. Just

21  going to the top of the documents, it says, it's to a person

22  named Rita C. Proctor at FRB.gov. Who is Rita Proctor?

23  A.    Special Assistant to Chairman Bernanke at the Chairman's

24  Office.

25  Q.    Was the subject of the email?

1  A.    Subject reads bond power.

2  Q.    And the date on the email?

3  A.    August 3rd, 2009.

4  Q.    And it says, Please respond to -- what's the email

5  address?

6  A.    RJHCO@verizon.net.

7  Q.    Now, getting to the body of the communication, could you

8  just read it, please?

9  A.    Everything under the date of August 3rd?

10 Q.    Yes.

11 A.    August 3rd, 2009. "Dear Mr. Ben Bernanke, Chairman. On

12 April 13, 2009 and May 4, 2009, our firm RJH and Company, Inc.

13 received unrestricted bond power to act on behalf of Mr. Joseph

14 Teo Hui Kiat and Mr. Yohannes Riyadi, regarding 5,200,000,000

15 USD of bank instruments issued by the U.S. Federal Reserve

16 Bank, New York, New York.

17      "The validity of this bond power has been acknowledged by

18 the Deputy Governor Senior Miranda S. Goelton of the Bank of

19 Indonesia. In our telephone call to your office on July 31,

20 2009 detailing the above situation, we asked to speak with you

21 directly so that we may bring the matter to a satisfactory

22 conclusion.

23      "Ms. Rita C. Proctor recommended that we make this request

24 in the form of an email addressed to you. We can, upon your

25 official request, demonstrate our authority to act on this

1  matter by sending you a copy of the bond power and the other

2  supporting documentation. We look forward to your early

3  response and the opportunity to speak with you.

4      "Respectfully yours, Richard J Harley, CEO, with cc's to

5  Christy E. Bower, attorney, Joseph Teo Hui Kiat and Yohannes

6  Riyadi."

7  Q.    Now, let's go to Exhibit 23.2-B. Could you identify this

8  document?

9  A.    Yes, it's a letter from Richard Harley to the Honorable

10 Benjamin S. Bernanke on November 30, 2009.

11 Q.    Was this part of the documentation you reviewed, prior to

12 speaking to Mr. Harley in December?

13 A.    It is.

14 Q.    Can you just read the RE section?

15 A.    I'm sorry, what section?

16 Q.    Where it says R-E.

17 A.    Okay, RE: Custodial account number 021088506 and slash Mr.

18 Yohannes Riyadi, and custodial account number 021080740, Mr.

19 Joseph Teo Hui Kiat.

20 Q.    Read the body of the document.

21 A.    "Dear Mr. Bernanke, as you may recall from my

22 correspondence to you dated August 3rd, 2009, I am the lawful

23 attorney in fact for Mr. Yohannes Riyadi, a significant

24 creditor of the United States Government.

25      "As Mr. Riyadi's sole agent and duly-appointed

1   representative in this matter, I am enclosing herewith a true

2   copy of the limited power of attorney, authorization and bond

3   power, as referenced in your letter to Mr. Yohannes Riyadi

4   dated January 12, 2009, and your letter dated February 16, 2009

5   to Mr. Joseph Teo Hui Kiat.

6       "For your convenience, copies of both instruments are also

7   enclosed herewith. We hereby request that the two bond powers

8   be recorded in the Federal Reserve Bank of the United States,

9   and that, after recordation of these instruments, certified

10  true copies be remitted to me by email and return mail.

11      "Thanking you in advance for your timely response to this

12  instruction. I respectfully remain yours very truly, Richard

13  Harley, Chief Executive Officer."

14  Q.   There's a cc on the bottom. Could you scroll down, please?

15  A.   "Enclosures as stated and cc Yohannes Riyadi".

16  Q.   Second page.

17  A.   It lists, "Joseph Teo Hui Kiat".

18  Q.   Attachments. Could we go to the next page? It's kind of

19  difficult to see. Just read the title of the document.

20  A.   "Limited power of attorney, authorization and bond power".

21  Q.   It was to --

22  A.   "To Mr. Richard J. Harley, CEO, from Joseph Teo Hui Kiat,

23  Re: Power of Attorney, Authorization and Bond Power".

24  Q.   Go to the second page. Does it appear to be signed or have

25  signatures on it?

1  A.    Yes, it's executed on the 13th day of April 2009 and a

2  signature over the name Joseph Teo Hui Kiat.

3  Q.    Going to the next document, next attachment. Tell us what

4  this document is. What does the title on the top say?

5  A.    "Limited power of attorney, authorization and bond power".

6  Q.    After that, what is the name on that document?

7  A.    Letterhead of Yohannes Riyadi.

8  Q.    What does it say below, "Limited power of attorney"?

9  A.    "To Mr. Richard J. Harley, CEO. U.S. Passport No.

10  P461598327 from Mr. Yohannes Riyadi, Indonesia Passport No.

11  P437061. RE: Power of attorney, authorization and bond power."

12  Q.    Going to the second page. Does it have signatures on it?

13  A.    Yes, it's executed on this 4th day of May 2009, a

14  signature over the name Yohannes Riyadi.

15  Q.    Now, after reviewing this document and the attachments,

16  did you form an opinion as to the validity of these documents?

17  A.    Yes, I did.

18  Q.    What was your opinion?

19  A.    That this was part of a fraudulent scheme to obtain money

20  from -- somebody who was involved in this, somebody was going

21  to make money, somebody was going to lose money; it was a

22  fraudulent scheme.

23  Q.    Did you express that to Mr. Harley during his telephone

24  conversation with him in December?

25  A.    Yes, I did, especially, in light of why we were not going

1  to respond to it, because we saw this as a fraudulent scheme.

2  Q.    Could we have Exhibit 23.22. Could we go to the next page,

3  to the bottom of the page where it says, "Hi, Marie".

4        Did you get any emails when this was referred to you from

5  any of your associates at the Federal Reserve Board that caused

6  you to contact Mr. Harley?

7  A.    Yes, I did.

8  Q.    Who is Marie?

9  A.    Marie Speicher is also in the Chairman's Office at Federal

10 Reserve.

11 Q.    It says, at the bottom, "Len, I've attached a copy of the

12 letter FYI." Was that Len referring to you?

13 A.    It is.

14 Q.    Can you just read what the email says, what Marie says?

15 A.    "Hi, Marie, Ann and I met on Friday afternoon to discuss

16 the letters. This one is a scam. She recommended that it be

17 noted as NRN and that a copy be sent to Len Zawistowski. Ann is

18 in a meeting all day today at K Street, but I'll check with her

19 when she returns to see whether she should call him.

20       "Len, I've attached a copy of the letter FYI. Thanks,

21 Donna."

22 Q.    On the bottom, it has the date of that email, what's the

23 date of that email?

24 A.    December 14th, 2009.

25 Q.    Now, moving up the page, there's an email from you.

1 Actually, it starts on the first page. Could we go to the page

2 before that, at the bottom, where it says, Original message

3 from Donna Faircloth.

4        Who is Donna Faircloth?

5 A.    Donna Faircloth works in the Legal Division at the Federal

6 Reserve.

7 Q.    The Federal Reserve Board in Washington?

8 A.    The Federal Reserve Board in Washington, yes, sir.

9 Q.    And what's the date of this email?

10 A.   December 15th, 2009.

11 Q.   Going to the next page. Who is -- that email is to you?

12 A.   Yes.

13 Q.   With copies to Rita, Marie and Ann.

14 A.   Correct.

15 Q.   What does the body of that email say?

16 A.   "Len, Ann Misback has asked me to let you know that she

17 called Mr. Harley this morning and he was quite belligerent. If

18 she or the Chairman's Office hears from him again, she's going

19 to refer his call to you. Thanks, Donna."

20 Q.   Now, going to the first page of the email chain on the

21 bottom. Did you respond to Donna?

22 A.   Yes, I did.

23 Q.   What's the date of your response?

24 A.   December 15th, 2009.

25 Q.   What does the body say?

1 A.    "Mr. Harley remains belligerent and demands statements in

2 writing from the Federal Reserve regarding these documents. I

3 explained to him our policy of not responding in writing to

4 patently fraudulent inquiries because of the risk of the

5 response being used in a fraud.

6        "He acknowledged knowing about the fraud warning about

7 Riyadi posted on the FRB New York website. He says that the

8 warning is not specific enough, and that his due diligence

9 showed that there is an account or debt relationship between

10 the FR and parties associated with Riyadi.

11        "He continually said that he will have his attorneys bring

12 this matter to Court and that 'We don't want this to get out'.

13 I told him to take whatever legal action he thought was

14 appropriate."

15 Q.    So the portion that you have in quotes, what does that

16 indicate? Why did you put that in quotes?

17 A.    Because that was a direct statement from Mr. Harley.

18 Q.    Going to the top of the page. There's a follow up email

19 from you to these parties?

20 A.    Yes, this was an email from me on December 16th.

21 Q.    So putting this into context with your phone calls, was

22 this the time period when you had the phone calls with Mr.

23 Harley and you were reporting back to the parties?

24 A.    I wrote this email right after the phone call.

25 Q.    What is the date on this particular email?

1  A.    December 16, 2009.

2  Q.    What does this one say?

3  A.    "Mr. Harley called me this morning to get my reaction to

4  his claim that China has brought some sort of legal action

5  against the Federal Reserve. He may have said it was an

6  injunction. I told him I was unaware of this matter.

7        "I would categorize this call as harassment, based upon

8  the information and tone. I expect more of them.

9        "If this intensifies, we will have to get together to see

10 what can be done to protect ourselves from this conduct."

11 Q.    Now, after those communications, December 15th and 16th,

12 did you have any more contact with Mr. Harley?

13 A.    No, sir.

14 Q.    When was the next time you heard anything about Mr.

15 Harley, in relation to this contact back in 2009?

16 A.    Did I hear anything, at all?

17 Q.    Well, I mean, as far as, did you become aware that this

18 matter was under investigation after that by the FBI?

19 A.    Yes, I did hear that, and that was, I think, in 2013.

20 Q.    But you had no contact with him in between?

21 A.    No, sir, did not, no contact with Mr. Harley.

22 Q.    And since then, you have had no contact with him?

23 A.    No, sir.

24        MR. BRANDLER: Your Honor, I would offer Exhibits 23.1-A,

25 23.2-B and 23.22 into evidence, and I have no further

1  questions.

2       THE COURT: Any objection?

3       MR. O'BRIEN: I have no objection.

4       THE COURT: They'll be admitted.

5       (At this time Government Exhibit Nos. 23.1-A,23.2B and

6       23.22 were admitted into evidence.)

7       THE COURT: Cross-examine.

8       MR. O'BRIEN: A few questions, Your Honor.

9                    CROSS EXAMINATION

10 BY MR. O'BRIEN:

11 Q.   Mr. Zawistowski, tell me the month and year that you had

12 this communication with Mr. Harley.

13 A.   It was December 15th and 16th of 2009.

14 Q.   All over the course of two days?

15 A.   Yes, sir.

16 Q.   Tell me, again, just identify the documents that he had

17 sent wanting you to record?

18 A.   Identify them by exhibit number?

19 Q.   Just tell me what they were.

20 A.   All right, can I refer to my file?

21 Q.   Sure.

22 A.   As discussed, I have an August 3rd, 2009 letter from Mr.

23 Harley to Mr. Ben Bernanke, and then in addition to the,

24 apparently, the letter, there's also an email with similar

25 content or identical content.

1      And then on November 30, 2009 or dated November 30, 2009,

2   there's some more emails, certified mail letters written to

3   Benjamin Bernanke, Chairman of the Federal Reserve from Mr.

4   Harley. I would add to that, attached to those were the limited

5   powers of attorney, purportedly, from Mr. Riyadi and Mr. Kiat.

6   Q.    Could we agree, nowhere in any of those documents was a

7   request by Mr. Harley to the Federal Reserve Bank -- the

8   Federal Reserve to give him money?

9   A.    No, sir, there's no request to them to get money from the

10  Federal Reserve.

11  Q.    In fact, what he's saying is, I want you to record these

12  documents?

13  A.    That's what his request was, yes.

14  Q.    You've indicated -- we will move a little bit to this

15  gentleman named Riyadi. You indicated that he was a well-known,

16  international fraudster.

17  A.    Yes.

18  Q.    What do you mean by well-known? Did you know him?

19  A.    I've seen multiple pieces of correspondence from him.

20  Q.    But did you ever meet him?

21  A.    No, sir.

22  Q.    Okay, the next thing you said was, "from my personal

23  experience with Riyadi". Your personal experience didn't

24  involve a meeting but seeing correspondence?

25  A.    As well as talking to some people who had involvement with

1 him, as well. So my experience, through them, to Mr. Riyadi.

2 Q.    Let me just cut to the chase here. In your opinion, this

3 gentleman, who was well-known and you had personal

4 experience with, he exists, right?

5 A.    His passport, his name, he's in law enforcement databases,

6 he's in the Federal Reserve collection of documents that we put

7 on the internet, existed to that extent.

8 Q.    You had personal experience with him, and he was

9 well-known?

10 A.    My personal experience, as I said, I investigated things

11 that he was involved with that were brought to my attention by

12 other people who had direct contact with Mr. Riyadi, and were

13 in negotiations with Mr. Riyadi or whatever, so it wasn't like

14 I was reading an FBI report or a magazine article, it had come

15 to my attention, personally, by people who brought it to my

16 attention about Mr. Riyadi's conduct.

17       So I did have personal experience with him. And what was

18 the other part of your question?

19 Q.    My question really is, at this time, we're back on

20 December 2009, you believed that there was a gentleman

21 somewhere out there named Mr. Riyadi?

22 A.    I did.

23 Q.    And that belief -- and you're an individual who is a

24 member of the bar, has been an investigator, has held

25 high-level government positions, and with all that background

1  and experience and education you've had, that went into your

2  conclusion that this gentleman exists?

3  A.   With all that experience, personal knowledge and degrees

4  and interaction and being within law enforcement, I was well

5  aware that you can fabricate a passport, you can invent a

6  persona, but that somebody who was using these documents, that

7  was a passport and powers of attorney, had letterhead, had a

8  sort of an interesting marking on his letterhead, that was

9  Yohannes Riyadi.

10      So I believe somebody who -- there was a person out there,

11 an entity that was known as Yohannes Riyadi, but I also was

12 well aware that could be an impersonation, as well.

13 Q.   There's a guy out there who calls himself Riyadi?

14 A.   That is correct.

15 Q.   Now, final thing. Your interaction with Mr. Harley was a

16 little over two days?

17 A.   Yes.

18 Q.   And I think the one word you used was that he was

19 belligerent?

20 A.   Yes.

21 Q.   And this was a gentleman who wanted you to record certain

22 documents and you refused to do it?

23 A.   Yes.

24 Q.   Okay. And one of the ways he was belligerent, he said he

25 was going to sue you?

1  A.   No, it was more than that.

2  Q.   Well, that's one of the ways.

3  A.   That is one of the ways, that's correct.

4  Q.   Did you say you were a fraud investigator?

5  A.   I investigated bank frauds, yes, sir.

6  Q.   How do you define -- what's fraud?

7  A.   Let's see, where you create -- where you steal money from

8  some person through a scheme or artifice, where you convince

9  them it's worth some money that they exchange with you, and it

10  turns out it's not worth anything.

11  Q.   You're trying to get your hands in somebody's pocket in a

12  dishonest way?

13  A.   That is correct.

14  Q.   And now you did admit, just a few minutes ago, that in all

15  these documents Mr. Harley sent to you, he didn't ask you for

16  any money, at all, did he?

17  A.   Let's be specific.

18  Q.   Answer the question.

19  A.   The Federal Reserve Board Chairman Bernanke, he did not

20  ask for money.

21  Q.   Now, how do you define belligerent?

22  A.   Strident on the phone, forceful, wouldn't -- different

23  than other people, he wouldn't take that no answer, he was

24  making demands, and when his demands -- or initial requests

25  became demands, he raised the tone of the conversation.

1  Q.   And belligerent about -- he was being belligerent about

2  recording these documents?

3  A.   Both recording and the fact that he couldn't get a written

4  response, and he didn't like, say, the level of customer

5  service. It's a gentile place, and he was dealing with women

6  within the Chairman's Office and Legal Division, and they

7  weren't used to being badgered for requests.

8  Q.   Would you also agree with me, one more question, being

9  belligerent is not the same thing as fraudulently trying to get

10 somebody's money?

11 A.   No, sir.

12 Q.   You agree with me that that's not the same thing?

13 A.   Yes.

14      MR. O'BRIEN: That's all I have.

15      MR. BRANDLER: No further questions.

16      THE COURT: You may step down.

17      THE WITNESS: Thank you, Your Honor.

18      MR. BRANDLER: United States calls Sahil Godiwala.

19 S A H I L   G O D I W A L A   IS CALLED, AND HAVING BEEN DULY

20 SWORN, TESTIFIED AS FOLLOWS:

21      THE CLERK: Please state and spell your name for the

22 record.

23      THE WITNESS: First name Sahil, S-A-H-I-L, last name

24 Godiwala, G-O-D-I-W-A-L-A.

25      THE CLERK: Thank you. Please be seated.

1                        DIRECT EXAMINATION

2 BY MR. BRANDLER:

3 Q.    Mr. Godiwala, are you currently employed?

4 A.    Yes, sir.

5 Q.    Where are you employed?

6 A.    At the Bank of New York Mellon in New York.

7 Q.    What is your position with Bank of New York?

8 A.    I'm Managing Director and Senior Managing Counsel in the

9 Office of Public Policy and Regulatory Affairs in BNY Mellon's

10 Legal Department.

11 Q.    How long have you worked for BNY Mellon?

12 A.    Since, approximately, January or February of this year.

13 Q.    Prior to working for BNY Mellon, who were you employed by?

14 A.    Federal Reserve Bank of New York.

15 Q.    During what time period were you employed by Federal

16 Reserve Board of Bank of New York?

17 A.    Approximately, 2009 through 2013.

18 Q.    What was your position with the Federal Reserve Bank of

19 New York?

20 A.    From 2010 through 2013, I was a counsel to and an officer

21 of the New York Fed, within the Enforcement, Litigation,

22 Investigation and Protection Department, and prior to that,

23 from 2009 through 2010, I was an attorney within the New York

24 Fed Legal Department.

25 Q.    You said in the Legal Department. Are you a lawyer?

1  A.    Yes.

2  Q.    Where did you get that law degree?

3  A.    From Georgetown.

4  Q.    In what year?

5  A.    2002.

6  Q.    You said, while you were with the Fed, you were -- I

7  didn't get it all -- you were part of the Public Policy and

8  Regulatory Affairs?

9  A.    That was at BNY Mellon.

10  Q.    Oh, I'm sorry.

11  A.    At New York Fed, it was the Enforcement, Litigation,

12  Protection and Investigation Group.

13  Q.    What were the basic duties and responsibilities you had

14  within the Enforcement, Litigation, Protection and

15  Investigation Group?

16  A.    So enforcement is mostly creating enforcement actions

17  against financial institutions that are regulated by New York

18  Fed, which include institutions within New York State, Northern

19  New Jersey, Southern Connecticut and Puerto Rico.

20        An enforcement action would be if a bank had violated a

21  law or if a bank had less than safe and sound practices, we

22  would issue, either, a public or non-public enforcement action

23  against that institution.

24        Litigation is defending the bank or actively suing an

25  individual or institution.

1      The protection is -- the protection function is the law

2  enforcement function within the New York Fed.

3      And the investigations function is both internal and

4  external investigations that the New York Fed conducts, either,

5  within its walls, with employees who may be accused of insider

6  trading, for example, or externally at financial institutions.

7  Q.    Now, is the enforcement group part of what's known as

8  Fraud Prevention Division, or is there a Fraud Prevention

9  Division?

10  A.    There isn't a Fraud Prevention Division as such, but there

11  are investigators, within the Legal Department, who do either

12  receive notifications of potential fraudulent actions, either

13  from institutions or individuals who have been affected by

14  fraud, and those investigators work with attorneys and law

15  enforcement to either investigate or if fraud is discovered, to

16  pass off the fraud to the appropriate law enforcement agency.

17  Q.    I want to direct your attention to April of 2011, while

18  you were employed at Federal Reserve Bank of New York.

19      Did you have any contact with Richard Harley, the

20  Defendant in this case?

21  A.    Yes, sir.

22  Q.    Can you tell us the circumstances how that began?

23  A.    So it began with Mr. Harley attempting to contact the

24  president of the New York Fed, Mr. William Dudley, and the

25  General Counsel of the New York Fed, Mr. Tom Baxter.

1      Mr. Harley had -- he had called them a couple times and

2  had sent them a number of emails. And Mr. Dudley had sent the

3  information to Mr. Baxter, Mr. Baxter had sent the information

4  to an investigator who was out of town, at the time, and the

5  investigator asked me to look into this matter in his absence.

6  Q.   The investigator you're referring to, what was that

7  person's name?

8  A.   Sorry, it's Robert Amenta.

9  Q.   You said Amenta was out of town, so it was referred to

10  you?

11  A.   Yes, sir.

12  Q.   And when it was referred to you, what type of actions, if

13  any, did you take, with respect to Mr. Harley?

14  A.   Well, the first thing I did was a read the email from Mr.

15  Harley describing, essentially, what he wanted, and then I

16  looked at the documents that he had forwarded within the email

17  to, I guess it was Mr. Baxter, that was forwarded to me.

18  Q.   And after -- you said what he wanted. What did he want,

19  within those documents?

20  A.   He appeared to want the New York Fed to pay him on two

21  checks that he had. Each check was valued at, approximately,

22  $500 million.

23  Q.   So he wanted a billion dollars?

24  A.   Yes, sir.

25  Q.   How many contacts did you have with him, approximately?

1  A.    On the first day or?

2  Q.    No, throughout -- let's say you started the contacts in

3  April of 2011, how long did the contacts last, let's start with

4  that?

5  A.    I would say, approximately, 10 days, and within email

6  -- summing up the emails and phone calls -- I would say there

7  was, at least, one or two emails or phone calls per day for

8  most of those days, not counting the weekends.

9  Q.    Could you summarize for us the discussions that you had

10  with Mr. Harley, either, via telephone or email, progressing

11  through that time period?

12  A.    So what I did -- after I reviewed the documents that Mr.

13  Harley had sent, I called Mr. Harley and I said -- I identified

14  myself as an employee of the New York Fed and that I was

15  working on behalf of Mr. Baxter and Mr. Dudley, and could he

16  please tell me more about these documents, tell me what he

17  wanted, explain what the circumstances were, how had he pursued

18  them, what were they. So that was the first conversation.

19  Q.    Did he tell you who he was? Did you ask him who he was or

20  what his background was?

21  A.    He told me that he was the CEO of, I think it was, RJH and

22  Company or Richard Harley and Company.

23  Q.    Did he indicate he had any kind of educational degrees?

24  A.    He told me he had a Doctorate in, I believe it was

25  Holistic Medicine, and I don't remember where it was from, I

1 think it may have been from Eastern Europe somewhere, but I'm

2 not sure where.

3 Q.   As a result of him telling you he had a Doctorate in

4 Holistic Medicine, were you referring to him as Dr. Harley?

5 A.   I did, on occasion.

6 Q.   Did you ask him where he had gotten these documents from?

7 A.   Yes, sir. He told me that he had received them from Mr.

8 -- and I'm going butcher this last name, my apologies -- Mr.

9 Joseph Kiat, who, I believe, was either Singaporean or a

10 Malaysian National, that he had received these documents from a

11 Yohannes Riyadi.

12 Q.   Did he say whether or not he had met these people or how

13 he communicated with them?

14 A.   Yes, sir. He told me that he communicated with them via

15 Skype. And I don't think he told me he had met them in person.

16 Q.   Can you summarize for us what you told Harley about the

17 legitimacy of the documents that he had supplied the Federal

18 Reserve Bank of New York?

19 A.   I told him that the documents were fraudulent.

20 Q.   On how many occasions did you tell him that?

21 A.   On a number of occasions. I told him several times in

22 writing, I told him several times over the phone. Within each

23 phone call that we had, I would say, within each phone call we

24 had, after the initial two or three, I probably told him, at

25 least, three or four times, during the telephone conversation,

1  that these documents were fraudulent.

2  Q.    How did you know they were fraudulent?

3  A.    A number of ways. The style of document is none -- so the

4  documents that he provided were not in the same style as any

5  documents I was familiar with, either, as an employee of the

6  New York Fed or somebody who has familiarity with the Federal

7  Reserve Board of Governor's documents.

8      The documents internally contained a number of mistakes,

9  the style, the function, the format of the documents were

10 wildly inconsistent with anything that the New York Fed used or

11 uses, and, I mean, everything from the spelling of the word

12 check to the signatories on the documents was incorrect.

13 Q.    As far as the signatories being incorrect, what do you

14 mean by that?

15 A.    So some of the documents had Ben Bernanke, who, at the

16 time -- not at the time, I think, in 2008, the documents were

17 dated -- in 2008, he was Chairman of the Federal Reserve Board

18 of Governors, I should say Board of Governors of the Federal

19 Reserve System, and the letterhead that the documents were on

20 was the New York Fed's letterhead.

21     The Chairman of the Board of Governors wouldn't sign the

22 New York Fed's -- on the New York Fed's letterhead, he would

23 use the Board of Governors' letterhead. So a simple thing like

24 that. The other signatory was -- I guess it was 2006 then -- it

25 was Roger Ferguson, who was the Vice-chairman of the Board of

1  Governors of the Federal Reserve System.

2       Similarly, he would not sign a document purporting to be
3  from the New York Fed, if he is a representative of the Board
4  of Governors.

5  Q.   And were you aware of what the signatures of those
6  individuals looked like?

7  A.   Yes.

8  Q.   Did it match what was on those documents?

9  A.   Yes, they did.

10 Q.   Are you aware -- well, strike that. These inconsistencies
11 and mistakes that you have mentioned here that led you to
12 believe that these documents were fraudulent, did you point out
13 those items to Mr. Harley, during your discussions?

14 A.   Several times. After our initial conversation, I told Mr.
15 Harley or I asked Mr. Harley if I could have a day or so just
16 to review the documents again and to look at -- essentially, to
17 do an investigation of my own.

18       Then, the next time we spoke, I would go line by line
19 through the documents and explain to him why the letterhead was
20 incorrect, why the signature mark was incorrect, why the very
21 signatories were incorrect. And I had mentioned, earlier, that
22 the signatures for Chairman Bernanke and Vice-chairman were
23 correct, they were publicly available, I think they're on their
24 Wikipedia page, too, so I made sure that he understood what
25 each individual line in each individual document -- what was

1  contained was not correct, either, in form or function.

2  Q.    The documents indicated that these two gentlemen Kiat and

3  Riyadi had some accounts at the Federal Reserve Bank of New

4  York. Do private individuals have accounts at the Federal

5  Reserve Bank of New York?

6  A.    No.

7  Q.    Did you explain that to Mr. Harley?

8  A.    Yes.

9  Q.    Did you give him -- did you tell him whether or not he

10 could get in trouble, if he continued or if he tried to

11 negotiate these checks?

12 A.    Several times. I told Mr. Harley that the instruments were

13 fraudulent, that it was both a Federal and a State crime to

14 continue to try to pass these off as legitimate instruments,

15 and I told him this, on a number of occasions, both in writing

16 and over the phone, and I also told him that if he continued to

17 try to pass these off as legitimate instruments, he would face

18 consequences.

19 Q.    Did you ever email him any links on the internet showing

20 similar fraudulent documents that you had found?

21 A.    Yes, so I sent Mr. Harley a link to -- I don't know the

22 website, but I did a five-second Google search, and it was a

23 link that had almost verbatim, the documents that he was trying

24 to -- that he purported to be from the New York Fed. The only

25 differences were I think it didn't mention Mr. Harley's name,

1  it had somebody else's name.

2       I sent him a link to the U.S. -- the Department of

3  Treasury, where you can enter a check number to see if the

4  check is legitimate, and neither of the checks Mr. Harley had,

5  the issuing numbers were not legitimate.

6       I sent him a link to the New York Fed's internal -- I'm

7  sorry -- external website, the public-facing website where they

8  describe the exact type of scam that Mr. Harley was trying to

9  perpetrate.

10  Q.   Was there, also, a website where you could verify Treasury

11  checks?

12  A.   Yes.

13  Q.   So what's that?

14  A.   It's a website that the Department of Treasury hosts,

15  where you can enter a check number to verify if it was actually

16  issued by the Department of Treasury.

17  Q.   And had you checked to see if these checks he was

18  presenting to the Federal Reserve Bank of New York were on that

19  database as a legitimate check?

20  A.   Yes, neither check was issued by the U.S. Department of

21  Treasury.

22  Q.   What was Harley's reaction when you told him all of these

23  facts that you had uncovered, regarding the legitimacy of these

24  documents?

25  A.   Well, initially, he told me he would go back and speak to

1  Joseph Kiat, and he said something like, you know, If I'm

2  wrong, I will owe you the biggest apology ever. And then he

3  came back a day or so later -- called me a day or so later and

4  explained to me that I was incorrect, that these were real, and

5  he demanded proof that these checks were fraudulent, that these

6  documents were fraudulent.

7  Q.    Were any of the documents that he submitted purportedly

8  having a signature of individuals, someone named Hennessey and

9  Dages?

10  A.    Yes.

11  Q.    Who is Hennessey and Dages?

12  A.    Jim Hennessey was in the Legal Department, at the time. He

13  ultimately became the Chief of Staff for the head of the

14  Financial Institution Supervision Group for the New York Fed,

15  and Gerard Dages, I think was in the Markets Group, at the

16  time. I'm not sure if he's still at the New York Fed.

17  Q.    Were you familiar with their signatures?

18  A.    Yes.

19  Q.    Did the signatures on Harley's documents match their

20  signatures?

21  A.    No.

22  Q.    Did you tell him that?

23  A.    Yes.

24  Q.    There were various documents, one of which was called the

25  Statement of Readiness. Had you ever seen such a document, in

1  your experience in the Federal Reserve Bank of New York?

2  A.    No.

3  Q.    And a Safekeeping Receipt. Did you ever see such a

4  document in the Federal Reserve Bank of New York?

5  A.    No.

6  Q.    Does the Federal Reserve Bank of New York use wax seals on

7  their documents?

8  A.    No.

9  Q.    You're familiar with the logo of the Federal Reserve Bank,

10 correct?

11 A.    Yes.

12 Q.    And the documents that Mr. Harley had supplied had a logo

13 that purported to be associated with the Federal Reserve Board

14 or Bank?

15 A.    It did. So within the letterhead -- the New York Fed has a

16 particular eagle, a styled eagle, and the logo within the

17 documents that Mr. Harley purported to be from the New York Fed

18 was not that style of eagle.

19 Q.    There was some documents called Grey Screens. Were you

20 familiar with anything of that nature, Grey Screens at the

21 Federal Reserve Bank of New York?

22 A.    No.

23 Q.    There are certain documents, I think, on the Grey Screens

24 that are CUSIP numbers. What are CUSIP numbers?

25 A.    CUSIP numbers are generally used to identify securities.

1  Q.    Were the CUSIP numbers on the documents Mr. Harley

2  supplied in those Grey Screens in a proper format?

3  A.    They could have been, but what Mr. Harley was passing off

4  for checks, checks are not securities, so a check would not

5  have a CUSIP number.

6  Q.    Did you ever have any discussion with Mr. Harley where he

7  requested blank Federal Reserve blank stationery?

8  A.    Yes. After I explained to Mr. Harley, I forget which time

9  it was, I told Mr. Harley, once again, that the New York Fed's

10  letterhead looks entirely different from the letterhead he

11  provided. And he asked me to send him a blank piece of

12  stationery, and I politely declined.

13  Q.    Why did you decline?

14  A.    I thought he would use it for less than legitimate

15  purposes.

16  Q.    The end of your contact with him, what was the end result,

17  as far as your conversations?

18  A.    So Mr. Harley and I started off having very polite

19  discussions, the first couple of interactions. As I began to

20  explain the veracity and legitimacy of these documents, Mr.

21  Harley grew more belligerent towards the end of our

22  interactions, he was screaming so loud over the speaker phone

23  that my assistant, who sat about 15 feet away, could hear every

24  word.

25       So, basically, our interactions ended with him screaming

1  at me.

2  Q.   Was he still demanding payment, despite everything you

3  told him about the legitimacy of the documents?

4  A.   Yes. He repeatedly said -- I'm forgetting the phrase, now

5  -- "Govern yourself accordingly". He would say that at the end

6  of his emails, he would say that at the end of conversations.

7  But he demanded that we pay him the $1 billion or he threatened

8  legal action.

9  Q.   Was any legal action ever undertaken by Mr. Harley, to

10  your knowledge, against the Federal Reserve Bank of New York?

11  A.   I'm sorry?

12  Q.   Was any legal action instituted by Mr. Harley against the

13  Federal Reserve Bank of New York, that you're aware of?

14  A.   Not to my knowledge.

15  Q.   I want to show you some documents this morning. Exhibit

16  15.3.

17      Now, this document is the cover page of a much lengthier

18  document, Bates No. 1 through 96. Are you familiar with this

19  group of documents?

20  A.   Yes, sir.

21  Q.   What is it?

22  A.   These are documents that were provided by the Federal

23  Reserve Bank of New York.

24  Q.   Can you scroll up, please? So when I say Bates numbers,

25  you know what I'm referring to?

1  A.    Yes.

2  Q.    At the bottom right-hand corner.

3  A.    Yes.

4  Q.    It says, Federal Reserve Bank of New York. What does that

5  indicate?

6  A.    The documents came from the New York Fed.

7  Q.    And are these documents related to your contact with Mr.

8  Harley, so, basically, an archive of all of these

9  communications that you had with Mr. Harley and that he had

10  with the Federal Reserve Bank?

11  A.    I believe so, yes.

12  Q.    I want to take you through some of them. Can we go to Page

13  3. And the bottom of the page where it says, From Thomas Baxter

14  to Robert Amenta.

15  A.    Yes, sir.

16  Q.    First of all, who is Thomas Baxter?

17  A.    Thomas Baxter is the Executive Vice-president and General

18  Counsel of the Reserve Bank of New York.

19  Q.    Who is Robert Amenta?

20  A.    Robert Amenta, I think, he's a Vice-president. Robert

21  Amenta works within the Legal Department as an investigator. I

22  think his title is Vice-president and Senior Investigator.

23  Q.    What is the date on this particular email from Mr. Baxter

24  to Mr. Amenta?

25  A.    April 18, 2011.

1 Q.    It says, Demand notice, 1 of 4, William Dudley to Thomas

2 Baxter. Can we go to the next page. What does it say at the top

3 of the page?

4 A.    "I have no idea what this is, but someone should take a

5 look. I received four of these."

6 Q.    Then, it appears to have an email from Mr. Harley to Mr.

7 Dudley, Demand Notice 1 of 4 on April 18th, 2011.

8 A.    Mr. Dudley is the President and Chief Executive Officer of

9 the New York Fed, and Mr. Dudley forwarded this email to Mr.

10 Baxter, and then it looks like Mr. Dudley wrote, "I have no

11 idea what this is, but someone should take a look. I received

12 four of these."

13 Q.    What was the content of the email that Mr. Harley sent to

14 Mr. Dudley?

15 A.    Looks like Mr. Harley's email attaches 10 documents.

16 Q.    Read off what those documents are.

17 A.    1. Bond power with a modified extension letter.

18        2. Statement of Readiness signed by James R. Hennessey,

19 Chief of Staff, GRH55COS FRBNY, and B. Gerard Dages,

20 Vice-president, BGD47VP.

21        3. Email from Chris McCurdy, Senior Vice-president,

22 FRBNY, Check no. 31730, payable to Joseph Teo Hui Kiat. Check

23 No. 31731, payable to Joseph Teo Hui Kiat.

24        4. Email from Chris McCurdy, Senior Vice-president FRBNY,

25 To whom it may concern letter.

1          5.   Reserve funds letter.

2          6.   Custodial letter.

3          7.   Extend validity of safekeeping receipt.

4          8.   Confidential memo.

5          9.   Two Federal Reserve Grey Screen printouts.

6          10.  Wire instructions.

7   Q.    Then, if we go to the next page, it has who it came from.

8   A.    It came from R. Harley, CEO, RJH and Co., Inc.

9   Q.    Now, going back to the first page Bates No. 3 at the top

10  of the page. Is that what Mr. Amenta forwarded to you?

11  A.    Yes.

12  Q.    When did he forward it to you?

13  A.    April 18th, 2011.

14  Q.    After he forwarded it to you, you reviewed all those

15  documents, those 10 enclosures?

16  A.    Yes.

17  Q.    Can you go to Page 8, Exhibit 15.3. What is the title of

18  this document?

19  A.    Limited Power of Attorney, Authorization and Bond Power.

20  Q.    We have already read a number of these into the record

21  from all the witnesses, I'm not going to have you do that, but

22  is there a portion of this document, did you notice, when

23  you reviewed it, regarding the amounts that would go to Mr.

24  Harley and Mr. Kiat, regarding any remuneration for power of

25  attorney, any funds that would be following?

1  A.    I believe Mr. Harley would get a percentage of the amounts

2  he was able to recover of the $1 billion dollars; I don't

3  recall what the percentage was.

4  Q.    Let's see if I can find that. Going to Page 10, on the

5  bottom of the page, No. 4.

6  A.    Fifty percent.

7  Q.    What does it say?

8  A.    "Collection of payment. The percentage of ownership

9  interest in the net earnings generated under the agreement

10  dated April 13th of 2009 shall be 50 percent to RJH and

11  Company, Inc. and 50 percent to Joseph Teo Hui Kiat".

12  Q.    Can you go to Page 12 of this document? The Statement of

13  Readiness, and going to the signatures on Page 13. You

14  mentioned you were familiar with the signatures of Mr.

15  Hennessey and Dages; is that what you're referring to?

16  A.    Yes.

17  Q.    Is that the signature that you were familiar with?

18  A.    Neither of those.

19  Q.    And the seal that we were talking about, does the Federal

20  Reserve Bank of New York use that type of seal?

21  A.    No.

22  Q.    Going to the top of that page, scroll up, please. There's

23  a logo here with an eagle-type thing. Is that the logo of the

24  Federal Reserve Board or Federal Reserve Bank of New York?

25  A.    Neither.

1  Q.    Did you do some research to figure out where that came

2  from?

3  A.    Yes, it looked -- the closest approximation I could find

4  was -- this is a Google image search just for Eagles Statuary.

5  It looked like something on the Reichstag in Pre-Nazi Germany,

6  kind of a teutonic eagle.

7  Q.    Did you ever see any stationery from the Federal Reserve

8  Board or Bank of New York that had both of their named entities

9  on it at the same time?

10 A.    Never in this style, no.

11 Q.    Did you communicate all of this to Mr. Harley?

12 A.    Yes.

13 Q.    Could we go to Page 56?  Is this one of the documents that

14 Mr. Harley supplied?

15 A.    Yes.

16 Q.    And did you notice anything unusual about this email that

17 purportedly came from Chris McCurdy?

18 A.    It appears to have come from an AOL account.

19 Q.    Why was that unusual?

20 A.    New York Fed Senior Vice-president, as far as I know, or

21 anyone at New York Fed would not be using an AOL account to do

22 bank business; it's against bank policy.

23 Q.    Could we go to Page 16. It's another series of emails

24 supplied by Mr. Harley from Chris McCurdy -- or Mr. Riyadi, I'm

25 sorry.

1      Was there anything unusual about these documents that you

2   saw and pointed out to Mr. Harley?

3   A.    Once again, it's from an AOL account, and the dates and

4   times are different from the previous email purported to be

5   from Mr. McCurdy.

6   Q.    Did you notice anything about the time on McCurdy, the

7   bottom message?

8   A.    Yeah, it's 3:33 in the morning, which is an unusual time

9   to be doing, at least, as far as I'm concerned, an unusual time

10  to be doing business.

11  Q.    And the subject line has Cheque_Joseph. Did you notice

12  anything about the spelling there?

13  A.    The word cheque, C-H-E-Q-U-E, is not the Americanized

14  version, that would be C-H-E-C-K.  C-H-E-Q-U-E is more likely

15  to be used in Europe or Asia.

16  Q.    You said Mr. McCurdy was a Senior Vice-president of

17  Federal Reserve Bank of New York, correct?

18  A.    That is correct.

19  Q.    Was he from Asia or Europe, as far as you know?

20  A.    No.

21  Q.    Did you point all of this out to Mr. Harley?

22  A.    Yes.

23  Q.    Could we go to Page 17. Were these images of the checks

24  that were supplied to the Federal Reserve Bank of New York?

25  A.    Yes.

1  Q.    And was there anything that you saw unusual about them

2  that you discussed with Mr. Harley?

3  A.    Once again, the cheque, C-H-E-Q-U-E, is not the

4  Americanized version. I also mentioned that amounts of this

5  size are generally not sent by the U.S. Treasury in check form,

6  this would be -- it's more likely that this would have been a

7  wire transfer and not a check.

8        To my knowledge, the Treasury does not write checks for

9  $500 million. If they made that payment, it would be made

10 through a wire.

11 Q.    Could we go to Page 37, document entitled Reserve Funds

12 Letter.

13 A.    Yes, sir.

14 Q.    And have you ever seen a document like this before, in

15 your experience with the Federal Reserve Bank of New York?

16 A.    No.

17 Q.    Could we go to Page 34. This is a document called a

18 Custodial Letter, and I want to go to the fourth paragraph

19 where it says, "The asset shall be free and clear" -- could you

20 read that?

21 A.    "The asset shall be free and clear of any taxes, levies or

22 duties of any nature, present or future, imposed under the laws

23 of the European Union and Switzerland."

24 Q.    Did that make any sense to you, why the Federal Reserve

25 Board or Bank would be using language about the laws of the

1  European Union and Switzerland?

2  A.    None whatsoever.

3  Q.    Did you point that out to Mr. Harley?

4  A.    Yes.

5  Q.    Could we go to Page 36. It purports to be an extend

6  validity safekeeping receipt. Had you ever seen such a

7  document, safekeeping receipt, for any type of funds at the

8  Federal Reserve Bank of New York?

9  A.    No.

10 Q.    Page 57. This appears to be some type of document

11 entitled, Confidential Memo. Do you see anything unusual about

12 this document?

13 A.    There are a number of things. First and foremost, the

14 letterhead is incorrect, the reference number is FRNY. When you

15 refer to the New York Fed, it's FRBNY. Same with the

16 transaction code. Principal seller, I don't know why the

17 passport number is included. Issuer of checks, Federal Reserve

18 Bank, Central Bank, that's not an entity that's known or listed

19 within the Federal Reserve system.

20        The screening procedures, I don't really know what those

21 are and what they're trying to do. Once again, there's a CUSIP,

22 this is supposed to be for checks, not securities. The Swift

23 Code has FRNY and it's FRBNY. And once again, screening code,

24 whatever those are, they are, but this wasn't a document that I

25 had ever seen or had any familiarity with.

1  Q.    You explained that to Mr. Harley?

2  A.    Yes.

3  Q.    And going to Page 59, these Grey Screen documents. Had you

4  ever seen such a document before?

5  A.    No.

6  Q.    And was there anything unusual about these documents,

7  besides that you have never seen them before?

8  A.    Apart from the obvious, yeah. CUSIP number -- this one has

9  custodial account FRB-NY, and I had mentioned earlier, New York

10 Fed doesn't have accounts for individuals, and those are kind

11 of the big ones.

12     The account number could be anything, account number could

13 be anything.

14 Q.    Could we go to Page -- by the way, the images of the

15 checks that you referred to, did he ever submit any physical

16 checks or was it always images?

17 A.    I believe Mr. Harley said that the actual checks were in

18 the custodial accounts within the New York Fed.

19 Q.    That you guys had?

20 A.    Right. And when I explained we didn't have custodial

21 accounts, much less custodial accounts in either Mr. Riyadi or

22 Mr. Kiat's name, he basically called me a liar. But, no, he

23 never submitted any checks, physical checks.

24 Q.    Could we go to Page 76. Were these the wiring instructions

25 where he wanted you guys to send him a billion dollars?

1  A.    Yes.

2  Q.    Let me go to Page 6. Are you familiar with this letter

3  dated April 18 of 2011?

4  A.    Yes, this was the cover letter that Mr. Harley had. It is

5  emailed to -- embedded within his email to President Dudley.

6  Q.    Is there a reference to Richard Jones?

7  A.    Yes, sir.

8  Q.    And who is Richard Jones?

9  A.    He's a General Counsel for the Atlanta Fed.

10  Q.    Could you just read the first paragraph?

11  A.    "We have been advised by Richard Jones, General Counsel,

12  Senior Vice-president and Ethics Officer for the Federal

13  Reserve Bank of Atlanta that our cash payment demand letter for

14  Account No. 021088506 dated March 28, 2011 has been forwarded

15  to your office, Federal Reserve Bank of New York, along with

16  all the documents that was attached to said letter.

17  Q.    All right, I want to take you through a number of emails

18  that you had with Mr. Harley, and I'll try to do them

19  chronologically.

20        Could we go to Page 30? Is this an email that you sent to

21  Mr. Harley on April 20th of 2011?

22  A.    Yes.

23  Q.    Can you read it, please?

24  A.    "Dear Mr. Harley, As we discussed the documents and,

25  quote, facts, quote, you provided the Federal Reserve Bank of

1  New York, including account numbers and other identifying

2  numbers, Treasury checks and purported Federal Reserve Board

3  documents are forgeries and do not correspond to any accounts

4  at the New York Fed.

5      "As we discussed, these documents and accounts are

6  trademarks of a scam. For more information, please see our

7  website below.

8      "Additionally, as we discussed, it is both a Federal and

9  State crime to pass off fraudulent financial documents as

10  legitimate. I have warned you that the documents you purport to

11  be from the Federal Reserve or the Treasury Department are

12  forgeries."

13      And then I thank him and I forward him the New York Fed's

14  external website discussing these and other scams.

15  Q.   Could we go to Page 31? So that -- I'm sorry, if we go

16  back to Page 30, that was April 20th at 2:24 p.m., there's a

17  follow up email at 2:32 p.m. from you to Mr. Harley?

18  A.   Yes, this was at 2:24 p.m.

19  Q.   We're at the wrong page. 31, please. Yes, that one. The

20  one at 2:32.

21  A.   Yes.

22  Q.   What does that one say?

23  A.   "Mr. Harley, here's a link that contains virtually the

24  exact documents you provided us found during a one-minute

25  search on Google. As I said, we get a lot of these and none of

1  them are legitimate." And I forward him a link to the results

2  of my Google search.

3  Q.   On that link, if you go to it, what type of documents

4  appeared?

5  A.   Virtually, the same documents that Mr. Harley provided. I

6  think it was the Statement of Readiness, the lengthy letters

7  from Chairman Bernanke and Jim Hennessey.

8       MR. O'BRIEN: Your Honor, again, I'm going to reiterate the

9  objection I made many times. He is testifying to what's in the

10 document, without the document itself. The best evidence of

11 that is, Here's the link I sent him, not what was in them.

12      THE COURT: Overruled.

13 BY MR. BRANDLER:

14 Q.   Going forward chronologically, could we go to Page 2? Is

15 there an email to Mr. Harley from you on April 22, 2011 at

16 10:08 a.m.?

17 A.   So I write, "Mr. Harley, my assistant just let me know

18 that you called. I'm out of the office today but can give you a

19 call back either on Monday when I will be back in or later

20 today, if it is urgent. Please let me know."

21 Q.   And then, Page 1, there's an email on April 22 at 11:33

22 a.m.?

23 A.   Yes, Mr. Harley writes back, "Sahil, enjoy your weekend.

24 Let's speak on Monday when you return to your office. Kindest

25 regards."

1  Q.   We go to the next email on Exhibit 15.2, Page 5. April 27

2  at 2:13 p.m. Did you send Mr. Harley an email?

3  A.   Yes.

4  Q.   What does it say?

5  A.   So the title of the email is, "Proof your checks are

6  forgeries".

7       The email body states, "Mr. Harley, you had asked me to

8  provide, quote, proof, quote, that the documents you provided

9  are forgeries. Below please find a link to the U.S. Treasury's

10 Check Verification website. All you need to do is input the

11 check amount, the check number, and any valid routing transit

12 number.

13      "As you can see, the U.S. Treasury did not issue the

14 checks you provided nor does the U.S. Treasury write checks for

15 amounts as high as yours, amounts of that magnitude are sent by

16 a wire transfer, not physical check.

17      Nor does the U.S. Treasury use the term, "cheque",

18 preferring American vernacular instead of Asian/European. I've

19 included a PDF example of what a valid U.S. Treasury check

20 looks like, so you can compare for yourself.

21      "As far as the Federal Reserve Bank of New York is

22 concerned, this matter is closed. The documents you provided us

23 are forgeries, and as such, we will not honor them."

24      And I thank him and send the link to the two sites.

25 Q.   And going forward, back to Exhibit 15.3, Page 65, Mr.

1  Harley's response. At the bottom of the page, there's an email

2  at 3:07 p.m. on April 27, going to the next page.

3      This is an email from Mr. Harley, Subject, "Demanding

4  unmitigated proof".

5      It says, "Sahil, your statements, quote, that the

6  documents you provided are forgeries, quote, is absurd. First

7  and foremost, I asked you to provide strict and unmitigated

8  proof that the documents presented are forgeries. To date, you

9  have not provided unmitigated proof thereof.

10     "Most important, the U.S. Treasury checks, according to

11  the safekeeping receipt, have been placed in the Federal

12  Reserve Bank of New York under custodial accounts. Please be

13  advised this matter is far from being closed, in fact, we will

14  have obtained unmitigated proof regarding the emails belonging

15  to Chris McCurdy, Senior Vice-President. Please govern yourself

16  accordingly."

17     MR. O'BRIEN: What page is that?

18     MR. BRANDLER: Page 66 on Exhibit 15.3.

19  BY MR. BRANDLER:

20  Q.   You responded on Page 65 at 3:20 p.m.?

21  A.   Yes, I say, "Mr. Harley, as I have mentioned innumerable

22  times, we do not have any accounts for Mr. Riyadi, Mr. Kiat or

23  any individuals, and we certainly don't have Treasury checks

24  for either of these people.

25     "Second, the copies of the Treasury checks you provided

1  are of Treasury checks that were never issued and in a format

2  the Treasury does not use. How can you get any more clear than

3  that? You have provided us with forgeries, we will not honor

4  them, it is as simple as that and the matter is closed."

5  Q.    Page 69, Mr. Harley's response on the bottom.

6  A.    "Sahil, please be advised that we now have undisputed

7  proof that all the emails we have in our possession did, in

8  fact, come from Chris McCurdy, Senior Vice-president with the

9  Federal Reserve Bank, New York City, New York. Please govern

10 yourself accordingly."

11 Q.    That was April 28 at 11:58 a.m.?

12 A.    Yes.

13 Q.    Going forward, Page 67.

14 A.    So I write back, "Nothing attached", question mark. And

15 that's in reference to his statement that he had unmitigated

16 proof of Mr. McCurdy having sent those emails.

17        "As I have said repeatedly, the Treasury checks you sent

18 us and the FRBNY documents you sent us are all forgeries. I

19 sent you the website where you can confirm the validity of the

20 Treasury checks. I've explained, in detail, how each and every

21 one of the FRBNY documents you sent are fraudulent. There's

22 nothing more to say."

23 Q.    Then, we go to Page 69. Is there another email on April 28

24 at 11:58 a.m. from you to Mr. Harley?

25 A.    That's Mr. Harley saying, "Please be advised that we now

1  have undisputed proof that all the emails we have in our

2  possession did, in fact, come from Chris McCurdy, Senior

3  Vice-president with the Federal Reserve Bank, New York City,

4  New York. Please govern yourself accordingly."

5  Q.    And then you responded?

6  A.    "And, sir, as I've said before, those emails did not come

7  from Mr. McCurdy. They are fake, as well."

8  Q.    Then, going to Page 79. Did you have an email

9  communication with Mr. Amenta on April 21, 2011 about 5:28

10  p.m.?

11  A.    Right, so this was after our initial conversations where

12  Mr. Harley and I went through the documents fairly closely, and

13  he told me he would speak to Joseph Kiat and discuss it with

14  him. That's -- he called, again, said he was going to

15  double-check his documents.

16        If they're fake, he said he will owe us, quote, the

17  biggest apology possible, unquote, and I wrote, "Fingers

18  crossed."

19        MR. O'BRIEN: What page?

20        MR. BRANDLER: Page 79.

21  BY MR. BRANDLER:

22  Q.    So is it accurate that you basically said at ten-day

23  period, April 18, 2011 through April 28 of 2011?

24  A.    Yes.

25  Q.    Did you have any more contact with Mr. Harley after that?

1  A.    I don't believe so, no.

2  Q.    The next you heard was when the FBI contacted you

3  regarding this investigation?

4  A.    Yes.

5        MR. BRANDLER: Your Honor, I'd move for admission of

6  Exhibits 15.2 and 15.3.

7        THE COURT: Any objection?

8        MR. O'BRIEN: No objection.

9        THE COURT: They'll be admitted.

10       MR. BRANDLER: And I have no further questions for this

11  witness.

12       (At this time Government Exhibit Nos.15.2 & 15.3 were

13        admitted into evidence.)

14       THE COURT: Cross-examine.

15                     CROSS EXAMINATION

16  BY MR. O'BRIEN:

17  Q.    Sir, these documents we just talked about, Exhibit 15,

18  that you received from Mr. Harley, they didn't come right to

19  you, did they? I mean, they weren't from Harley to you?

20  A.    They were.

21  Q.    They came from Harley directly to you?

22  A.    I'm sorry, are you referring to the emails?

23  Q.    No, no, the documents, the documents that Mr. Harley sent,

24  did he send them directly to you?

25  A.    No.

1  Q.    Okay, well, who did he send them to?

2  A.    I believe he sent them to President Dudley, and I don't

3  know if he sent them to Tom Baxter, as well, but I know he sent

4  them to Bill Dudley.

5  Q.    And Baxter and Dudley are officials of the New York Fed?

6  A.    Yes.

7  Q.    They referred them to you?

8  A.    They referred them -- President Dudley referred it to Tom

9  Baxter who referred it to Rob Amenta who referred them to me.

10 Q.    You didn't make any payment on them?

11 A.    We made no payment on them.

12 Q.    And, then, over the course of the next month, on the phone

13 and in emails, you attempted to convince Mr. Harley they were

14 fraudulent?

15 A.    In the course of the next 10 days, that is correct.

16 Q.    And he resisted?

17 A.    I'm not sure --

18 Q.    He resisted your attempts to convince him they were

19 fraudulent?

20 A.    That's correct.

21 Q.    But at the end, he said, Okay, if you're right, I'll

22 apologize.

23 A.    No. In the beginning, he said, Okay, if you're right, I'll

24 apologize.

25 Q.    How did it end?

1  A.    With Mr. Harley saying, very vociferously, I was wrong,

2  string of expletives, I was the one who was making stuff up.

3  Q.    When did that occur?

4        MR. BRANDLER: Could we get a clarification of when you

5  say, "I was wrong", who are you referring to?

6        THE WITNESS: I, being myself.

7  BY MR. O'BRIEN:

8  Q.    You were wrong?

9  A.    Myself, yes.

10 Q.    Mr. Harley said you were wrong?

11 A.    Mr. Harley was accusing me of lying.

12 Q.    What was that? That was around the 10th day of this period

13 of communication between you and Harley?

14 A.    When he first accused me of lying?

15 Q.    No, at the end -- how did it end, I want you to tell me

16 how it ended, how this period of communication ended.

17       It started off, he submitted documents, you told him they

18 were fraudulent, he said, Prove it, if they're fraudulent, I'll

19 give you a big apology. Ten days of communications ensue, how

20 does it end?

21 A.    Ended with Mr. Harley -- with a phone call between myself

22 and Mr. Harley where he told me that these documents were 100

23 percent true, he had unmitigated proof of the veracity and

24 truth of each and every document and, essentially, I was lying.

25 Q.    Okay, so by the end, you weren't able to convince him, he

1  still believed they were true, as far as you know?

2  A.   I don't know what Mr. Harley believed. He told me they

3  were true.

4  Q.   He told you that they were true?

5  A.   Yes.

6  Q.   And then the unmitigated proof was the emails, the McCurdy

7  emails?

8  A.   He never provided it to me. I asked him for it.

9  Q.   Did he provide you the McCurdy emails -- the emails that

10  were supposedly from McCurdy?

11  A.   He provided those emails to President Dudley.

12  Q.   But you had them in your packet?

13  A.   Yes.

14       MR. O'BRIEN: Your Honor, if I may have a second.

15       THE COURT: Sure.

16       MR. O'BRIEN: I'd like the two different emails, May of

17  2009 and April of 2009.

18       MR. BRANDLER: 15.3, Page 56, and then I think 16.

19  BY MR. O'BRIEN:

20  Q.   15.3, Page 56. That is one of the emails that was in the

21  packet?

22  A.   Yes, sir.

23  Q.   Now, go to the next one. Page 16, please.

24  A.   (Witness complied.)

25  Q.   Okay, now, would you circle -- there's part of that email

1  at the top, these are the emails that Mr. Harley said came from

2  McCurdy to Riyadi and then to him, a three-email chain. There's

3  part of it that's hard to read. Do you know what that says?

4  A.    "Cheque Joseph", and then the jpeg image of the check, and

5  then "Cheque Joseph" and the jpeg image of the check.

6  Q.    Would you agree with me that those are the two checks

7  we're talking about, the two 500 million-dollar checks?

8  A.    Those are not checks, they're images of checks.

9  Q.    What's purported to be checks.

10 A.    Once again, those are images of checks, they're not

11 checks.

12 Q.    Images of the two checks?

13 A.    Yes, sir.

14       MR. O'BRIEN: Do you know why it's hard to read?

15       MR. BRANDLER: You could put it on Elmo, it may come up

16 better.

17       THE WITNESS: I could read it, if you'd like.

18 BY MR. O'BRIEN:

19 Q.    Why don't you do that?

20 A.    So first doc is cheque_Joseph_31730.jpeg. Second is

21 cheque_ Joseph_31731.jpeg.

22 Q.    So the reference on this, the three-email chain of April 9

23 is two checks -- the images of what purport to be checks?

24 A.    That is correct.

25 Q.    Now, the reference on the May 4th, three-email chain,

1 again, from McCurdy, Riyadi to Harley is to the, To whom it may
2 concern letter.
3 A.    I'm sorry, when you say, reference, do you mean the
4 subject line?
5 Q.    Yes.
6 A.    Yes, so this one is purportedly attaching the, To whom it
7 may concern, Joseph, J-O-S-E-P, Teo Hui Kiat.jpeg.
8 Q.    Now, when your communication with Mr. Harley broke off,
9 you're contending that everything is fraudulent, he's saying it
10 isn't?
11 A.    Yes, that's correct.
12 Q.    Give me a date and month on that again.
13 A.    I believe the email was April 28, 2011.
14 Q.    At any time after that, did he, again, present -- at any
15 time after that, did he present the original checks and request
16 payment from your bank?
17 A.    I'm sorry, could you say that again?
18 Q.    At any time after that, did he present originals of those
19 two checks and request payment from your bank?
20 A.    Not to me. I have no knowledge if he did it to somebody
21 else.
22 Q.    You don't know if he did. You have no evidence he did?
23 A.    He did not present them to me.
24 Q.    Do you have any evidence or any knowledge that he
25 presented them to anybody else at the bank?

1  A.    I have no knowledge -- I'm sorry, apart from President

2  Dudley.

3  Q.    After what you're talking about?

4  A.    No. You said the checks or the images of the checks.

5  Q.    Now, when someone presents a check -- when someone wants

6  to cash a check at a bank, you don't take a copy, do you, or an

7  image?

8  A.    Are you talking about a bank or the Federal Reserve Bank

9  of New York?

10 Q.    Well, let's talk about, if someone, as a general rule --

11 we will get into the Federal Reserve -- as a general rule, if

12 someone wants to cash or deposit a check at a bank, they must

13 deliver the original and not an image?

14 A.    I believe so.

15 Q.    And isn't it also required that banks, when someone

16 attempts to deposit a check, it has to be endorsed by the

17 payee?

18 A.    As a general rule, that is correct.

19 Q.    When Mr. Harley sent you these, what you call images, it

20 wasn't the original check and it wasn't endorsed by the payee?

21 A.    Mr. Harley wasn't attempting to deposit the checks with

22 us. Mr. Harley said that we had possession of the checks and

23 that we should turn these checks over to him or -- actually, we

24 should pay him the billion dollars, since we had the checks in

25 our possession.

1  Q.    He wasn't attempting to deposit or cash them.

2  A.    He was attempting to cash them.

3  Q.    Okay, let's talk about when you attempt to cash a check at

4  a bank. You go into the bank and the bank will cash it, if the

5  payee endorses it, and maybe if the payee has an account there

6  or if it's drawn on that account.

7  A.    I'm sorry, is that a question?

8  Q.    Yes.

9  A.    What was the question?

10 Q.    You said before that a bank will not accept for deposit a

11 check without an endorsement.

12 A.    I said that's most likely correct.

13 Q.    Is it also correct the bank won't deposit a check without

14 an endorsement by the payee?

15 A.    I'm assuming that's correct; I'm not a bank.

16 Q.    Well, you've deposited checks at a bank -- well, you're a

17 young person, you probably did everything electronically in

18 your life.

19       I can tell you, as an older person, if you deposit a check

20 at a bank, they want an endorsement.

21 A.    Okay.

22       MR. O'BRIEN: That's all I have.

23       THE COURT: Any redirect?

24       MR. BRANDLER: No.

25       THE COURT: You may step down. Any reason he can't be

1  excused?

2       MR. O'BRIEN: No, he can be excused.

3       THE COURT: You're excused.

4       MR. BRANDLER: Do you want to take a break or take the next

5  witness?

6       THE COURT: We will go at least 15 minutes and then take a

7  break.

8       MR. BRANDLER: That's fine. Andrew Heckenberger.

9  A N D R E W    H E C K E N B E R G E R   IS CALLED, AND HAVING

10 BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

11      THE CLERK: Please state and spell your name for the

12 record.

13      THE WITNESS: Andrew Heckenberger, H-E-C-K-E-N-B-E-R-G-E-R.

14      THE CLERK: Thank you. You may be seated.

15      THE WITNESS: Thank you.

16      MR. BRANDLER: May I inquire, Your Honor?

17      THE COURT: Yes.

18      MR. BRANDLER: Thank you.

19                    DIRECT EXAMINATION

20 BY MR. BRANDLER:

21 Q.   Mr. Heckenberger, are you currently employed?

22 A.   Yes, sir.

23 Q.   And what is the nature of your business?

24 A.   I'm a financial advisor.

25 Q.   And do you work for any particular company or are you

1  affiliated with a particular company?

2  A.    I work for Merrill Lynch.

3  Q.    Is that Merrill Lynch, Pierce, Fenner and Smith?

4  A.    That is correct. We are a subsidiary of Bank of America.

5  Q.    Do you work out of a particular branch office?

6  A.    I work out of the Wayne, Pennsylvania office.

7  Q.    And how long have you been with Merrill Lynch?

8  A.    I've been with Merrill Lynch for 15 years.

9  Q.    Have you been a financial advisor that entire time period?

10 A.    Twelve years.

11 Q.    Have you always worked at the Wayne, Pennsylvania branch?

12 A.    We actually started in King of Prussia and then moved to

13 Wayne in 2002.

14 Q.    Can you generally describe your duties and

15 responsibilities as a financial advisor at Merrill Lynch?

16 A.    I manage money for what we would determine to be high net

17 worth families, somebody who has more than 250,000 in

18 investable assets. I manage corporate cash management for

19 corporations, and I also do some endowment work with nonprofit

20 corporations.

21 Q.    And did you ever have Mr. Harley as a client?

22 A.    Yes, I did.

23 Q.    During what time period?

24 A.    Approximately, 2005 to 2009.

25 Q.    What type of client was he?

1  A.    He was a corporate client, it was under RJH, Incorporated.

2  Q.    How did you become his financial advisor?

3  A.    My father owned a medical software company, and his

4  partner Jacqui was working in a doctor's office, and the two of

5  them met each other.

6  Q.    When you say his partner Jacqui --

7  A.    His wife, his partner, I don't know the relationship

8  there.

9  Q.    You're talking about Mr. Harley's wife Jacqui?

10  A.    Yes.

11  Q.    You're saying his wife worked in a medical supply company?

12  A.    It was a doctor's office.

13  Q.    A doctor's office. And explain to me, again, your

14  father-in-law --

15  A.    My father owned a medical software company that would do

16  record-keeping for doctors' practices, and from what I was told

17  from my father, Jacqui ran a doctor's office that his medical

18  software company did the software for. That's how he met her,

19  that was the interaction.

20  Q.    So now once your father met Jacqui, how did you get

21  involved?

22  A.    I was contacted by -- to be honest, I don't remember if it

23  was Jacqui first or Richard, but one of the two did contact me.

24  Q.    Approximately, when did you have the first contact?

25  A.    It was around 2005.

1  Q.    How long did you remain their financial advisor?

2  A.    That relationship lasted until April of 2009, although,

3  there was a little bit of a break, at some point, when Mr.

4  Harley decided to move his account to another person within

5  Merrill Lynch.

6  Q.    Do you know what time period that was?

7  A.    Unfortunately, I do not know.

8  Q.    How long a period of time was there, that break?

9  A.    Six months to a year.

10 Q.    What type of services did you provide RJH -- you said it

11 was a corporate account?

12 A.    It was a corporate checking account.

13 Q.    What services did you provide for that account?

14 A.    Often, Jacqui would call and say that money was going to

15 be wired in, she would call and say, Did the money get there?

16 She would say, Can you cut a check and send it? It was a lot of

17 working with the cash flow. There was never any investments

18 that were in that account.

19 Q.    All right, so that's the point I want to get to. Generally

20 speaking, as a financial advisor, do you basically advise

21 clients on securities to purchase and investments to make, that

22 type of thing?

23 A.    For individual families, yes, but for corporate accounts,

24 we do short-term cash management, we do clearing, so it wasn't

25 out of the norm what Jacqui was doing.

1  Q.    But as far as that account was concerned, you weren't

2  giving them any financial advice?

3  A.    None whatsoever.

4  Q.    You were just providing services, in terms of, if someone

5  called you up about wired funds that were coming in, they would

6  want you to do something?

7  A.    It was a glorified checking account.

8  Q.    So it wasn't a traditional brokerage account?

9  A.    Not at all.

10  Q.    When they would call in, why would they call you? What

11  would you have to do, if funds were getting wired into the

12  account?

13  A.    They would call for confirmation.

14  Q.    You said there would also be calls coming to you,

15  regarding money going out of the account?

16  A.    Yes, that is correct.

17  Q.    What would be the reason for that?

18  A.    Once money came in and cleared, they might say, you know,

19  Send us a check for "X" amount of dollars, or they would call

20  and say, We are going to wire money from the corporate account

21  to another account, and they would get connected with the Wires

22  Department to do that.

23  Q.    You said they would say to send us a check, did they have

24  like a traditional checkbook?

25  A.    That account does offer a checkbook, but you can also call

1  an investment firm like Merrill Lynch and just say, Please cut

2  me a check and send it to "X".

3  Q.   And they had a checkbook associated with this account?

4  A.   I believe so, yes.

5  Q.   When you first got the account, did you have any

6  discussions with Mr. Harley about what his company was, RJH

7  Company?

8  A.   Yes, I did.

9  Q.   What did he tell you?

10 A.   Mr. Harley said that he was in possession of oil wells,

11 capped oil wells that could very quickly be uncapped, but the

12 price of petroleum, at that time, did not make it worth his

13 while to uncap them, but at some point, when he felt as though

14 petroleum prices were advantageous to him, that would be turned

15 on.

16 Q.   Did he mention anything else about what his business was

17 involved in, besides owning these oil wells? Did he say where

18 the oil wells were?

19 A.   Texas.

20 Q.   Did he say how many he owned?

21 A.   No.

22 Q.   Did he mention any other business -- businesses that his

23 company was involved in, besides the oil?

24 A.   He did not.

25 Q.   Did you ever meet Mr. Harley face to face?

1 A.    No. I offered to come up to his residency, I offered them

2 to come down to our office, I offered to meet him midway, but

3 that was not something that he was really interested in. He

4 kind of said, you know, down the road, when the big picture all

5 develops, we will get together.

6 Q.    What about Jacqueline Kube Harley?

7 A.    Never met Jacqueline, no.

8 Q.    So you had this account for about five years, I think you

9 said, from 2005 through 2009?

10 A.    Through April of '09 is when the account was terminated.

11 Q.    You never met them? During the entire period you dealt

12 with them over the phone and email?

13 A.    Email and over the phone, yes, sir.

14 Q.    How was the account set up -- first of all, when you

15 started with them in 2005, did they already have an existing

16 account with Merrill Lynch or was that the initial account?

17 A.    I was told that there was an account already established

18 at a Merrill Lynch New Jersey office, and could that account be

19 brought over to the Wayne, Pennsylvania office, and that's how

20 the initial account came over.

21 Q.    And you said you were told that. Who told you that?

22 A.    Mr. Harley did.

23 Q.    That's what happened, it got transferred over from New

24 Jersey?

25 A.    Yes, it got internally transferred within the Merrill

1  Lynch system.

2  Q.    You said there was a period of time within your

3  relationship with them that it got transferred out of your

4  office. Did it go back to New Jersey?

5  A.    It went back to New Jersey. The protocol when that happens

6  is to send the files to the new advisor, which we did, and the

7  RJH account was then gone from our office.

8  Q.    You said you deal with high wealth individuals, I think

9  was your term. Did you do any verification of the financial

10  assets of Mr. Harley, when you worked with him as a financial

11  advisor?

12  A.    No.

13  Q.    Did you know whether or not he really owned or his company

14  owned these oil wells in Texas?

15  A.    Did not know that, no.

16  Q.    You didn't do any verification of any type?

17  A.    No, I did not.

18  Q.    How frequently -- and I know it was a long four or

19  five-year period of time -- but how frequently would you be

20  getting phone calls or emails from either Jacqui or Richard?

21  A.    The majority of the calls came from Jacqui. I would

22  relegate her -- if I had to define her role, she was the

23  bookkeeper, she was the one who was calling the most, just to

24  see what the activity on the account was like.

25  Q.    What about when Richard would call?

1  A.     Richard was the big picture person.

2  Q.     Let's talk about what that would mean. What was the big

3  picture that he was communicating to you?

4  A.     He was very excited for the potential value of what the

5  petroleum was worth was his vision.

6  Q.     What did he want, if anything, from Merrill Lynch,

7  regarding the oil that he claimed to own in Texas?

8  A.     He wanted a safekeeping letter which, from what I learned

9  during this particular time, was something that in the '50s and

10 '60s and '70s banks would offer, but it's not something that is

11 done anymore.

12 Q.     When you say a safekeeping letter, what did he want you to

13 keep?

14 A.     He wanted a letter on Merrill Lynch letterhead stating

15 that we had seen his oil documents and either were holding them

16 in safe-keeping or had reviewed them.

17 Q.     Had he ever provided these documents to you?

18 A.     Documents did come into the office via email and sometimes

19 via the Postal Service, yes.

20 Q.     Did Merrill Lynch ever provide him with a safekeeping

21 receipt for these documents?

22 A.     No, again, when I had inquired about that with our

23 Compliance Department, they said that was a service that was

24 long, long gotten rid of.

25 Q.     What about a line of credit, did he ever request a line of

1  credit from Merrill Lynch?

2  A.    That would never be an option at Merrill Lynch, based on

3  petroleum.

4  Q.    I understand that, but did he request that, as far as the

5  oil that he had, did he ask for a line of credit, based on

6  that, as collateral?

7  A.    No, not to my knowledge at all.

8  Q.    The documents that you said he sent you, relating to the

9  oil that you said his company owned, can you further describe

10  what those documents were?

11  A.    There was a geological report from an individual who

12  specializes in being able to tell you what's in the ground, and

13  that report was verifying that this tract of land that Richard

14  said he owned had oil in it. There was, also, other documents

15  that came in that talked about, you know, where it was located

16  in Texas and things like that.

17  Q.    I want to go back to a point that you just raised. I asked

18  you about whether he ever requested a line of credit with

19  Merrill Lynch. You were interviewed by Mr. Browning,

20  previously, to your testimony here today?

21  A.    Yes.

22  Q.    I think you have a copy of the interview report with you.

23  A.    I don't have it on me right here.

24  Q.    But you've read it as early as yesterday, correct?

25  A.    Yes.

1  Q.    And it was accurate, you reviewed it, it was accurate?

2  A.    There was a couple -- we talked a couple times.

3  Q.    Okay, I just want to ask you to read a portion of this

4  document marked 3-B of 19.1, your interview report from May

5  15th, 2012.

6        Could you just read the last paragraph at the bottom of

7  the page going to the next page?

8  A.    "The Harley account was used like a checking account.

9  There were no securities or" --

10 Q.    No, last paragraph at the bottom of the page.

11 A.    "Harley was constantly claiming to have rights to oil

12 wells located in Texas. Harley wanted Heckenberger to

13 facilitate getting him a line of credit against the value of

14 the oil. Heckenberger recalls Harley sending a copy of an oil

15 certificate either as a photocopy in the mail or via electronic

16 mail."

17 Q.    Okay, you can stop right there. I just want to focus on

18 the part where he was -- you said that he was trying to get you

19 to facilitate a line of credit. Does that refresh your

20 recollection?

21 A.    Yeah, we talked about this, and on another form, I had

22 struck that out. I said there was never a time of getting a

23 line of credit for the oil, and we crossed that out and I

24 initialed it.

25 Q.    I don't have a copy of that one, but if you say so, I'll

1  take your word for it.

2  A.    Yes.

3        THE COURT: Mr. Brandler, I'm not sure I understood what

4  you were doing there. Were you trying to get him to refresh his

5  recollection?

6        MR. BRANDLER: Yes.

7        THE COURT: You know better. That's not the way you do it.

8  You hand it to him and let him read it to himself. You told him

9  to read it.

10        MR. BRANDLER: Yes, he started reading it out loud.

11        THE COURT: Given what's developed here, I want you to know

12  I would prefer that you follow that protocol.

13        MR. BRANDLER: I'm sorry, Your Honor. I didn't know he was

14  going to read it out loud.

15  BY MR. BRANDLER:

16  Q.    So going forward, you said he sent you various oil-related

17  documents, a geological report of some type?

18  A.    Yes.

19  Q.    Was there any promissory notes?

20  A.    I don't recall any.

21  Q.    I'll just show you -- one moment. I'll show you this

22  document, Government Exhibit 45.1.

23  A.    Yes, I do recall seeing this. This did come into my

24  office.

25  Q.    All right, could we have that up on the screen? Was this

1  document provided to you by Mr. Harley?

2  A.   Yes, it was.

3  Q.   Can you tell us what the title of the document is?

4  A.   It says, En Petro, LPC Promissory Oil Production Note.

5  Q.   What's the amount in the top --

6  A.   It says $200 million on the top right side. Could I read

7  the --

8  Q.   You could read this out loud, since you received this.

9  A.   "With rights of assignment to the sum of $200 million due

10  and payable upon demand after 380 days from date of issue. This

11  note is secured by the assignment of the oil reserves provided

12  pursuant to Division Order from BML, Incorporated Crude Oil

13  Marketing Company to Hayes (SIC) thereof for proper

14  identification."

15  Q.   I think you skipped a line.

16  A.   I apologize.

17      "To Hayes Hilltop Operating dated May 11, 1992. The

18  assignment agreement is made a part thereof for proper

19  identification. The principal and the accumulated interest of

20  this note is fully payable upon the due date. The maker hereof

21  waives presentation for payment, notice of non-payment, protest

22  and diligence in bringing suit against any party.

23      "In the event of a default, the undersigned agrees to pay

24  all reasonable attorney fees and costs of collections."

25  Q.   And what's the date on the bottom of that?

1  A.    September 24, 1997.

2  Q.    There's a signature under En Petro, LPC.

3  A.    I can't make out the signature below it, it says Corporate

4  Secretary.

5  Q.    But that was one of the documents he provided to you?

6  A.    That is correct, yes, sir.

7  Q.    What did he tell you, what did he explain to you -- what

8  did he say that represented?

9  A.    That was explaining to me or trying to prove to me that he

10  had this oil -- the ownership of this oil that the geological

11  report was confirming was there.

12  Q.    Well, the note is in the amount of $200 million, correct?

13  A.    That's what it says, yes, sir.

14  Q.    Did he indicate to you -- what did he say to you about

15  whether or not RJH, what its right was to this $200 million?

16  A.    That I do not remember.

17  Q.    What did he want you to do? He wanted you to give him a

18  safekeeping receipt for this note?

19  A.    He was looking for Merrill Lynch to provide him with a

20  safekeeping note for these potential assets that he said were

21  his.

22  Q.    On Merrill Lynch stationery?

23  A.    On Merrill Lynch letterhead, that is correct.

24  Q.    I think you said Merrill Lynch refused to do that?

25  A.    Merrill Lynch said to me, It's something that hasn't been

1  done for years.

2  Q.   Did you ever contact anyone from En Petro, LPC, Inc. to

3  verify whether or not, in fact, they had issued this note or

4  that Mr. Harley's company was owed $200 million?

5  A.   No.

6  Q.   Do you even know if En Petro, LPC exists?

7  A.   I do not.

8  Q.   You never did anything, as far as verifying that?

9  A.   It was put into his files.

10  Q.   Do you know if anyone at Merrill Lynch ever did any

11  investigation of the validity of this document?

12  A.   No.

13  Q.   But Mr. Harley told you it was a legitimate document?

14  A.   That is correct, on multiple times.

15  Q.   When you got these documents from Mr. Harley, what did you

16  do with them?

17  A.   They went into the RJH files.

18  Q.   Did you send them to anyone in New York to look at?

19  A.   No.

20  Q.   You never sent it to anyone for them to review?

21  A.   No.

22       MR. BRANDLER: Your Honor, this would be a good time for a

23  break, I think.

24       THE COURT: All right. Members of the jury, we will take a

25  break. We will come back in -- let's come back at quarter of,

1  we will give you about 17 minutes, you've been sitting for a

2  long time.

3        Remember not to discuss the case among yourselves or with

4  anyone else. If anyone tries to talk to you about it, bring it

5  to my attention. I'll see you back here at quarter to 4.

6         (At this time a recess was taken.)

7        THE COURT: Mr. Brandler.

8  BY MR. BRANDLER:

9  Q.    During the break, did we have an opportunity to speak

10  about some of your prior testimony?

11  A.    Yes.

12  Q.    During that break, did I show you one of your interview

13  reports?

14  A.    Yes.

15  Q.    And I want to direct your attention to a piece of your

16  prior testimony, regarding whether or not you forwarded

17  documents up to New York. The documents I'm referring to are

18  the notes that we just saw, the oil-related documents.

19  A.    Yes.

20  Q.    Did you refer any of those notes up to your Merrill Lynch

21  people in New York?

22  A.    Yes, I was wrong. We sent it up to the Investment Banking

23  Group to review, and they quickly came back and said it was --

24        MR. O'BRIEN: Objection, Your Honor. What somebody else

25  told him -- he can say he forwarded them there, he can't say

1 what that other individual said. That would be hearsay.

2        THE COURT: I agree with that.

3 BY MR. BRANDLER:

4 Q.    You got some communication back from them, regarding that

5 documentation?

6 A.    Correct.

7 Q.    And did you, then, have a conversation with Mr. Harley,

8 regarding the legitimacy of those documents, based upon what

9 you were told by the people in New York?

10 A.    Yes.

11 Q.    What did you tell Mr. Harley?

12 A.    They were worthless.

13 Q.    What was Mr. Harley's reaction?

14 A.    He was flustered.

15 Q.    And what did he do, if anything?

16 A.    Later on or shortly thereafter is when he decided to move

17 his account to the North Jersey Merrill Lynch Office.

18 Q.    Did he communicate with any of your superiors to complain?

19 A.    He made a phone call to Stan O'Neal who, at the time, was

20 the Chairman and President of Merrill Lynch, he did not get

21 through to Mr. O'Neal, but he wanted Mr. O'Neal to know that

22 there was a massive deal --

23        MR. O'BRIEN: Objection, again. This is clearly hearsay,

24 unless Mr. Heckenberger was on that phone call when Mr. Harley

25 was talking to Mr. O'Neal.

1    MR. BRANDLER: I don't think he said that he even got in

2  touch with Mr. O'Neal.

3    THE COURT: I don't know whether he learned this from Mr.

4  O'Neal or --

5    MR. O'BRIEN: He's trying to say what Mr. O'Neal said.

6    THE COURT: Just a minute. Clear it up, if you can.

7    MR. BRANDLER: I can.

8  BY MR. BRANDLER:

9  Q.   The information that you are providing, now, regarding the

10  conversation between Harley and his attempt to get in touch

11  with Mr. O'Neal, who did you learn that from? How did you learn

12  that he tried to contact O'Neal?

13  A.   O'Neal's office called our office and said, Somebody is

14  calling us --

15  Q.   And without saying --

16    MR. O'BRIEN: Objection.

17  BY MR. BRANDLER:

18  Q.   -- what anyone said during that conversation, did you have

19  a follow-up conversation with Mr. Harley where you discussed

20  whether or not he attempted to call Mr. O'Neal?

21  A.   Can you please repeat that? I'm sorry.

22  Q.   After you heard from the Chairman's Office or the

23  President of Merrill Lynch, Stan O'Neal, that someone had

24  contacted them regarding you, did you have a discussion with

25  Mr. Harley about what that was all about?

1 A.    Not that I can recall.

2 Q.    And did you ever learn from Mr. Harley what he was

3 complaining about? Did he ever tell you what his complaint was,

4 regarding these documents that you sent to New York?

5 A.    Mr. Harley said that we were missing out on one of the

6 biggest opportunities of our life times.

7 Q.    When you say, we --

8 A.    The firm, Merrill Lynch and me; the firm.

9 Q.    Did he say you, in particular, were missing out or just

10 the firm?

11 A.    Both.

12 Q.    When that conversation -- that took place -- Mr. Harley

13 told you that, personally, correct?

14 A.    Yes.

15 Q.    And did he say that in the same tone of voice that I'm

16 using now or was he a little bit -- was it a different tone of

17 voice?

18 A.    It's the same tone of voice you're using now.

19 Q.    What did you tell him when he told you that you were

20 passing up on the biggest financial deal in history?

21 A.    I don't recall.

22 Q.    What did he do after that conversation?

23 A.    Mr. Harley then, you know, came back to us and said that

24 the account was going to go to the North Jersey office, where

25 they could better serve his needs.

1  Q.    And, in fact, did he transfer his account to New Jersey?

2  A.    He did.

3  Q.    How long did it remain in New Jersey?

4  A.    It was there for six to twelve months before it came back

5  to our office.

6  Q.    Did you have any discussions with him about why he decided

7  to transfer it back, after he had that problem with you?

8  A.    He was unsatisfied with the level that they were doing up

9  there.

10  Q.    So you became his financial advisor again?

11  A.    For the second time, yes.

12  Q.    And did any of your duties and responsibilities change,

13  during that period of time, as opposed to the prior period of

14  time?

15  A.    No.

16  Q.    Did he make any more -- did you have any more discussions

17  with him about the oil business after that period of time?

18  A.    It became quiet.

19  Q.    Were there any other business opportunities that Mr.

20  Harley presented to you, when the account came back from New

21  Jersey? Any other financial transactions?

22  A.    Yes. One of the last bit of communications that I had with

23  Mr. Harley was when an email came in that showed two 500

24  million-dollar checks from the Federal Reserve Bank of New York

25  that Richard said he was entitled to deposit and clear for

1  another individual in a business relationship, and, at that

2  point, I handed it over to our Compliance Department at my

3  office within Merrill Lynch.

4  Q.    When did that occur?

5  A.    That was in April of 2009.

6  Q.    You said he sent you these two checks. Via email?

7  A.    Yes.

8  Q.    What did he want you to do with the checks -- what did he

9  want Merrill Lynch to do?

10 A.    He wanted the checks deposited into his RJH account.

11 Q.    Had you ever seen the actual checks or just the images of

12 the checks that he sent you?

13 A.    I don't recall.

14 Q.    Did he send you any backup documents to support his claim

15 that the checks were legitimate?

16 A.    Yes.

17 Q.    What type of documents?

18 A.    It was a letter that was -- that had some notary on it,

19 some official looking stamps.

20 Q.    Was it signed by any -- purportedly signed by any

21 government officials?

22 A.    Yes.

23 Q.    Who?

24 A.    I don't remember who -- I could take a look, if you'd like

25 me to.

1  Q.    If you could refresh your recollection, that would be

2  great.

3  A.    Sure. Okay, Ben Bernanke, Chairman of the Federal Reserve

4  and Donald Kohn, Vice-chairman is who signed this on Federal

5  Reserve Board letterhead.

6  Q.    So he provided you that documentation?

7  A.    That is also correct.

8  Q.    When you received those documents from him, the two

9  checks, the supporting documents, you said you gave it to

10 someone. Who did you give it to?

11 A.    When stuff like this comes in, it's so nonsensical. I went

12 right to my Compliance Department and said, you know, He's all

13 yours, and they took over.

14 Q.    Who, in particular, are you referring to in the Compliance

15 Department?

16 A.    Brian Pugh is our in-house Administrative Compliance

17 Officer.

18 Q.    And did he work -- at this point in time, you were not in

19 the Wayne office, I think you said you were in the King of

20 Prussia office?

21 A.    No, we were in Wayne. We left King of Prussia in 2002.

22 Q.    Did Brian Pugh work in Wayne?

23 A.    Yes, he did.

24 Q.    When you say you forwarded it over, he's just in the same

25 suite or office?

1  A.    He's in the same office -- same floor as me, yes.

2  Q.    And after you passed it off to Mr. Pugh, did you get any

3  further communications from Mr. Harley?

4  A.    No, I did not.

5  Q.    Did the firm --

6  A.    Well, I'll take a step back. I did get an email from Mr.

7  Harley, long after his account was closed, in December of 2009,

8  it was some cease and desist, pretend like we have never met

9  each other email. But the account was long closed, it was

10  comical that it came in the second week of December after the

11  account had been closed in April.

12  Q.    So you had no contact with him between April of '09 and

13  December of '09?

14  A.    The way that our computer systems work, when an account is

15  closed, for tax filing purposes, it actually stays on the

16  computer for thirteen months. There was a mistake in

17  August -- the account was closed in April, somehow, one wire

18  did get through and I caught it, and we just cut a check, so

19  there was that one little interaction.

20  Q.    Could we have Exhibit 12.1, please. Would you take a look

21  at this document, particularly, in the middle of the page, the

22  email from Mr. Harley dated April 20th of '09.

23  A.    Okay.

24  Q.    Do you recognize this document?

25  A.    Yes, I do.

1  Q.    What do you recognize it to be?

2  A.    It was a correspondence from Richard to myself.

3  Q.    And can you read the body of the document?

4  A.    Out loud?

5  Q.    Yes.

6  A.    "Andrew, as promised, see the attachment documents.

7  Please be advised our firm is seeking to deposit these

8  financial securities in our company account with Merrill Lynch.

9  Should you have any questions regarding this matter, please do

10 not hesitate to call."

11 Q.    Could we go to the next page, as far as the attachments.

12 Is that one of the checks?

13 A.    Yes, that is correct.

14 Q.    It was a 500 million-dollar check made payable to Joseph

15 Teo Hui Kiat?

16 A.    That is also correct.

17 Q.    There's another check?

18 A.    There was a second check, yes.

19 Q.    So two 500 million-dollar checks?

20 A.    Totaling a billion United States dollars.

21 Q.    That he wanted deposited into his Merrill Lynch account?

22 A.    Correct. That's when I handed it over to our Compliance

23 Department.

24 Q.    Could we go to the next page, please. Was this part of his

25 other documentation that he supplied?

1  A.    That was the Federal Reserve letterhead signed by Ben

2  Bernanke, which we spoke about a few moments ago, yes.

3  Q.    If you could scroll down, please. There's a signature that

4  purports to be Ben Bernanke.

5  A.    And Donald Kohn.

6  Q.    And that's what you were referring to?

7  A.    Yep. And like I said, there was a medallion on the bottom

8  from the Federal Reserve.

9  Q.    Could you go to the next page? This one is titled,

10  Confidential memo. Is that also in support of these two checks?

11  A.    That is correct.

12  Q.    Also purported to be signed by Ben Bernanke and Donald

13  Kohn?

14  A.    Correct.

15  Q.    Go to the front page of 12.1. That was on April 20th of

16  '09?

17  A.    Correct.

18  Q.    You said you passed it off to Mr. Pugh?

19  A.    At that point, I passed it off to our Compliance

20  Department, and my dealings with Mr. Harley were finished.

21  Q.    Could we go to Exhibit 12.2. Do you recognize this series

22  of emails?

23  A.    Yes, as I just said a couple minutes ago, from that April

24  deposit -- or the April deposit that he tried, I was done with

25  Mr. Harley, except for the brief little error in August, and

1  then I was surprised to see this come in on that morning.

2  Q.    In April, when you passed it off to Mr. Pugh, April of

3  '09, what happened to Harley's account?

4  A.    Within about a two-week period, Mr. Pugh terminated his

5  account and sent whatever remaining money was in the account to

6  the address of RJH.

7  Q.    Was it terminated because of this attempted financial

8  transaction?

9  A.    That is correct. Mr. Pugh did a lot of legwork, which I'm

10  sure he will discuss.

11  Q.    And going through Exhibit 12.2, there's an email from Mr.

12  Harley to you dated December 17 of '09?

13  A.    Yes.

14  Q.    And it says what? What does the email say in the body?

15  A.    It says, "RJH and Company" --

16  Q.    No, look on the screen.

17  A.    I'm sorry. "See attached cease and desist notice."

18  Q.    Now, going to the next page. Is this the attached cease

19  and desist notice that you received on December 17 of '09?

20  A.    That is also correct.

21  Q.    Can you just read what it says?

22  A.    Out loud?

23  Q.    Yes.

24  A.    "RJH and Company Cease and Desist Notice, December 17,

25  2009. Subject: Federal Reserve instruments. Attention: Andrew

1 Heckenberger.

2      "You and your associates are hereby ordered to immediately

3 cease and desist any further activities, representations or

4 involvement regarding RJH and Company, Inc.

5      "This Cease and Desist Notice hereby renders all related

6 prior agreements and documents null and void.

7      "RJH and Company, Incorporated hereby withdraws and

8 nullifies all agreements, authorities and obligations to each

9 and any party so involved, through yourself, as identified, and

10 your associates, as indicated.

11      "RJH and Company wishes to close this matter without any

12 further involvement.

13      "You are hereby directed to destroy the following

14 documents sent to you on April 20, 2009 immediately.

15      "1. A POA", which is a Power of Attorney.

16      "2. Extension letter.

17      "3. Conference memo. And;

18      "4. Treasury checks.

19      "You are also directed to destroy all documents pertaining

20 to this file sent via email or FAX, as you are hereby directed

21 to cease and desist any and all action.

22      "This notice is not a waiver of your firm's rights to seek

23 relief and cost for any damages that may have resulted in this

24 matter.

25      "Please note that facsimile and/or email copy of this

1  document is considered as the original. Sincerely, Richard

2  Harley, Chairman and CEO."

3  Q.    So as a result of getting this cease and desist notice,

4  what did you do? What did you do with it?

5  A.    I passed it to my compliance guy. I mean, we had ceased

6  and desisted back in April.

7  Q.    Did Mr. Harley ever file suit against Merrill Lynch, to

8  your knowledge?

9  A.    Not to my knowledge, no.

10 Q.    Exhibit 12.2, Bates No. 860. At the top of the page,

11 there's an email from you to Mr. Pugh dated April 28, 2009.

12 A.    Correct.

13 Q.    And did you send that email to Mr. Pugh?

14 A.    Correct, that's when I handed it off to him.

15 Q.    When you say those were the documents, you were referring

16 to the checks?

17 A.    The Federal Reserve information, correct.

18 Q.    And below that series of emails is the April 20th email

19 where Harley sent it to you?

20 A.    Yes, that is also correct.

21       MR. BRANDLER: Your Honor, I have no further questions. I

22 would move for admission of Exhibit 12.1 and 12.2.

23       MR. O'BRIEN: No objections, Your Honor.

24       THE COURT: They'll be admitted.

25       (At this time Government's Exhibit Nos. 12.1 & 12.2 were

1          admitted into evidence.)

2          THE COURT: Cross-examine.

3                    CROSS EXAMINATION

4  BY MR. O'BRIEN:

5  Q.   Mr. Heckenberger, do you have a file with you?

6  A.   I do.

7  Q.   Do you have Mr. Harley's -- or a letter from Christie

8  Bower to Richard Harley dated March 1, 1999?

9  A.   I can go through these things here, but that we will have

10  to confirm in a moment.

11         MR. BRANDLER: Could I see it before you show it to the

12  witness?

13         MR. O'BRIEN: I'm not showing it to him, I'm just asking if

14  he has it. He may not have it.

15  BY MR. O'BRIEN:

16  Q.   Christie E. Bower to Richard Harley, March 1st, 1999. You

17  may not have it.

18  A.   It does not ring a bell, but I will continue to page

19  through the documents that I do have to confirm that for you.

20  No, it does not look to be in my packet.

21  Q.   Do you have any report from a Donald C. Kesterson,

22  Petroleum Geologist?

23  A.   I do not have that in front of me, but that name does ring

24  a bell.

25  Q.   Do you have his report in the file?

1  A.    No, I do not.

2  Q.    Can you tell me why it rings a bell?

3  A.    I'm sorry?

4  Q.    Can you tell me why it rings a bell?

5  A.    That was -- I believe, Donald was the Geologist that did

6  the report on the proposed tract of land that had the oil under

7  it.

8  Q.    How did you know that?

9  A.    Richard sent it to me.

10  Q.    Sent you the report?

11  A.    Yes.

12  Q.    You just don't happen to have it with you?

13  A.    When Richard demanded that his account be moved to the

14  North Jersey Merrill Lynch Office, I followed protocol, and his

15  entire file was sent to the North Jersey office. When Richard

16  came back, within the six to twelve-month period, that file

17  never came back to me, unfortunately.

18  Q.    Did he, also, send you a document from En Petro entitled,

19  Assignment of Collateral?

20  A.    We looked at an En Petro document on the computer, and

21  that did come in to me, if it's the same one that you're

22  talking about that we looked at here.

23  Q.    Well, I have two documents in front of me, one is entitled

24  Assignment of Collateral, one is entitled, Promissory Note;

25  which one did you have?

1 A.    I took a look at the Promissory Note on the computer.

2 Q.    Did you ever have a document, Assignment of Collateral?

3 A.    I can't confirm that.

4      MR. O'BRIEN: Can I show it to him and see -- he says he's

5 not sure.

6      THE COURT: See if he can identify it, sure.

7      MR. BRANDLER: Can I see it before?

8 BY MR. O'BRIEN:

9 Q.    I'm going to hand you, first, a document marked as

10 Defendant's Exhibit 1. It's on stationery Donald C. Kesterson,

11 Petroleum Geologist. Could you identify that?

12 A.    This does look familiar, because the Kesterson name, for

13 some reason, Petroleum Geologist, just rings a bell in my head

14 for the longest of times.

15 Q.    Okay, other than the name, when you look at the report,

16 does that refresh your recollection, at all, as to whether you

17 got that report?

18 A.    Yes, I got this report.

19 Q.    You got that from Mr. Harley?

20 A.    Yes.

21 Q.    How about a document marked as Defendant's Exhibit 2 and

22 it's entitled, Assignment of Collateral. Would you take a look

23 at that, and hand me one, if you would, please.

24 A.    I can't confirm to you whether I saw this. What I can tell

25 you is, in the second paragraph, it talks about 10 million

1  barrels of oil. A barrel of oil -- and I told this to

2  Richard -- produces 50 gallons of gasoline. When Richard did

3  the quick math and thought that he had a billion dollars in

4  oil, he became extremely excited, and I remember that

5  conversation; giddy excited.

6  Q.    Can you read this one section from Page 3 of the report.

7         MR. BRANDLER: I can't hear a word he's saying.

8         MR. O'BRIEN: I'm sorry.

9  BY MR. O'BRIEN:

10 Q.    Read Paragraph 3 of the third page of the Kesterson

11 report.

12 A.    Out loud?

13 Q.    Please.

14 A.    "Once the total estimated volumetric reserves have been

15 calculated, then, their estimated value must be determined. The

16 estimated reserves were estimated by multiplying them by 1675,

17 which was the spot price for West Texas intermediate. Cushing

18 grade for Friday, July 2, 1999. No deductions were made for

19 lifting costs, additional development or for the operation of

20 wells past their economic limit and plugging of the same."

21 Q.    Read the next part.

22        MR. BRANDLER: What are we reading from now?

23        MR. O'BRIEN: The Kesterson report.

24        THE WITNESS: "Formation. Estimated barrels of crude oil.

25 Estimated value total 10.217369", that would be under the

1    estimated barrels of crude oil, "estimated value

2    $171,140,930.75."

3    BY MR. O'BRIEN:

4    Q.    And that estimated value of the crude was on the report

5    from Don Kesterson, Geologist, that Mr. Harley gave to you.

6    A.    Okay.

7    Q.    That was in your file, at least, at some point, went to

8    New Jersey, it is no longer in your file.

9    A.    The file never came back from Jersey.

10   Q.    And then, again, on the Assignment of Collateral, I think

11   you weren't terribly sure whether you saw that.

12   A.    Correct.

13         MR. O'BRIEN: That's all I have, Your Honor.

14         MR. BRANDLER: Follow-up questions, Your Honor.

15         THE COURT: Sure.

16                         REDIRECT EXAMINATION

17   BY MR. BRANDLER:

18   Q.    Did you ever meet Mr. Kesterson?

19   A.    No.

20   Q.    Did you ever verify any of the information that was in

21   that report?

22   A.    I did a Google search, but I could never find him.

23   Q.    You said that you sent these documents up to New York?

24   A.    Investment Banking took a look and came back, said they

25   were worthless.

1        MR. O'BRIEN: Objection to what New York Investment Banking

2 said.

3        THE COURT: Sustained. The jury should disregard what

4 somebody else said.

5 BY MR. BRANDLER:

6 Q.    You spoke to Mr. Harley and you told him what the

7 investment banking group told you?

8 A.    Correct, that's when he got very flustered.

9        MR. O'BRIEN: Objection; ask that that be stricken.

10       THE COURT: Well, that was already testified to earlier.

11 But I'll sustain the objection now. You should disregard that.

12       MR. BRANDLER: I have no further questions.

13       MR. O'BRIEN: No further questions.

14       THE COURT: You may step down.

15       THE WITNESS: Thank you.

16       MR. BRANDLER: Brian Pugh.

17 B R I A N      P U G H  IS CALLED, AND HAVING BEEN DULY SWORN,

18 TESTIFIED AS FOLLOWS:

19       THE CLERK: Please state and spell your name for the

20 record.

21       THE WITNESS: Brian Pugh. B-R-I-A-N, last name P-U-G-H.

22       THE CLERK: Thank you. You may be seated.

23       MR. BRANDLER: May I inquire, Your Honor?

24       THE COURT: Of course.

25       MR. BRANDLER: Thank you.

1                    DIRECT EXAMINATION

2  BY MR. BRANDLER:

3  Q.    Mr. Pugh, by whom are you currently employed?

4  A.    Merrill Lynch.

5  Q.    In what capacity?

6  A.    I'm the Administrative Manager for the Suburban

7  Philadelphia Complex.

8  Q.    Are you an officer of Merrill Lynch?

9  A.    I'm a Vice-president.

10 Q.    And how long have you been affiliated with Merrill Lynch?

11 A.    I was hired September 8, 1998.

12 Q.    So that would be about 16 years?

13 A.    Yes, sir.

14 Q.    Have you always worked in the Wayne, Pennsylvania branch?

15 A.    Not the entire time, no, sir.

16 Q.    When did you work in Wayne, Pennsylvania?

17 A.    I was in Wayne several times, from 1998 to approximately

18 the end of 2000, and I was back in 2005 for a short stent, and

19 then back from 2008 until present.

20 Q.    I want to direct your attention to April of 2009. Were you

21 working in the Wayne, Pennsylvania branch at that time?

22 A.    Yes, sir.

23 Q.    Did you have any contact with Mr. Heckenberger, regarding

24 a client of his, Mr. Harley?

25 A.    Yes, I did.

1  Q.   Did you receive any documents from Mr. Heckenberger

2  related to Mr. Harley?

3  A.   Yes, in April of 2009, Andrew Heckenberger forwarded an

4  email to myself which contained a copy of two checks totaling

5  500 million each, and two documents -- I don't recall the exact

6  names, but I believe one was a safekeeping document and another

7  certificate, I believe.

8  Q.   And on the backup documentation to the checks, did you see

9  who the checks were made payable to?

10  A.   The checks were made payable to, I believe it was,

11  Joseph -- no -- I'm confusing the two names, I apologize.

12  Joseph Kiat, and the other name on the check was Riyadi.

13  Q.   After you got those checks and the backup documentation

14  from Mr. Heckenberger, what did you do with them? Did you do

15  any research?

16  A.   Yes, sir, I did a personal research, just Googled the

17  checks and the names, just because -- I haven't seen 500

18  million-dollar checks before, to be honest with you. I

19  researched the names on the checks, found that, just from a

20  quick internet search, that the names were linked to a

21  fraudulent scheme.

22       I also reached out to the Bank of New York. I do not

23  recall who I spoke to at Bank of New York, but they confirmed

24  my findings.

25       MR. O'BRIEN: Objection as to what an unnamed person at

1  Bank of New York may have said.

2      THE COURT: Sustained. The jury should disregard that.

3  BY MR. BRANDLER:

4  Q.    As a result of your contact with the Bank of New York, did

5  you change your opinion of what your Google search had

6  uncovered?

7  A.    No, sir.

8  Q.    How long did this Google search take you to determine it

9  was associated with a fraud?

10  A.    It was a very quick search; just typed in the names,

11  presented the information.

12  Q.    Did you speak to anyone at Merrill Lynch about these

13  checks and backup documentation?

14  A.    Yes, I reached out to our Office of General Counsel, spoke

15  with a gentleman by the name of Jasper Wright.

16  Q.    Who is Jasper Wright?

17  A.    He's in the Global Financial Crimes and Anti-Money

18  laundering Unit.

19  Q.    Don't tell us what he told you, but after speaking -- you

20  spoke to Mr. Wright about these checks and the backup

21  documentation, correct?

22  A.    Yes, sir.

23  Q.    Did you, then, have a conversation with Mr. Harley?

24  A.    I did. Following my conversation with Mr. Wright, I called

25  Mr. Harley in April of 2009, explained to him the checks were

1  fraudulent and that we would not be accepting them.

2  Q.   And what did Mr. Harley say to you, after you told him the

3  checks were fraudulent and that you would not be accepting

4  them?

5  A.   He didn't agree with my assessment. He said he met with

6  folks in Singapore and that the checks were not fraudulent, and

7  that his folks had been in touch with the Federal Reserve, had

8  access to a Grey Screen and a Level 14 clearance, and that he

9  would -- he wanted the name of my superior and his superior,

10  and that was the end of our conversation, after I provided the

11  names.

12  Q.   Why did he say he wanted the names of your superiors?

13  A.   I don't know.

14  Q.   Did he say why he wanted the names?

15  A.   No.

16  Q.   How long did that phone conversation last, approximately?

17  A.   I don't recall exactly; it was probably a very brief

18  conversation.

19  Q.   You said that he told you he had met Mr. Kiat, correct?

20  A.   Yes, he had met him in Singapore.

21  Q.   Did he say he met Mr. Riyadi, also?

22  A.   I don't recall exactly, I would need to refer to my

23  statement.

24  Q.   Do you have that in front of you?

25  A.   I don't have anything with me, I'm sorry.

1      MR. BRANDLER: I'll show him JD-25.1.

2      THE WITNESS: From recollection of the memo, he said he met

3 with Joseph in Singapore and also had spoke to him on the

4 phone. And in the note, it says, Joseph was in touch with

5 Riyadi. I don't believe, from my note, it states he met with

6 Riyadi, as well.

7 BY MR. BRANDLER:

8 Q.   Did Mr. Harley indicate to you that he had been in contact

9 with the Federal Reserve, and that they had told him something

10 about whether or not these checks were valid?

11 A.   Yes. Mr. Harley had stated he did speak with the Federal

12 Reserve and that they claimed the checks were valid.

13 Q.   Did he tell you who he had spoken with at the Federal

14 Reserve who told him these checks were valid?

15 A.   No, sir, he didn't provide me any names of who he spoke

16 with.

17 Q.   Did you ask him for the names?

18 A.   Yes.

19 Q.   And --

20 A.   He wouldn't provide any names.

21 Q.   Did you have any discussion with him about Ken Lewis?

22 A.   He asked for my superior who, at the time, was a Regional

23 Manager Don Alverson, and his boss would have been CEO Ken

24 Lewis.

25 Q.   Is that the name of the person you gave him, as far as

1  your superior?

2  A.    I gave him both names.

3  Q.    What did he indicate to you, after he contacted your

4  superiors?

5  A.    He indicated he was going to call -- have his legal people

6  call Ken Lewis, and that Merrill Lynch would be embarrassed for

7  not accepting these checks.

8  Q.    Now, you had never met Harley, correct, prior to this

9  phone call?

10  A.    No.

11  Q.    You've never met him since?

12  A.    This is the first time I've met Mr. Harley.

13  Q.    You were aware, were you not, that his company had an

14  account with Merrill Lynch?

15  A.    Yes, he had a small working capital account, yes.

16  Q.    So after you had that discussion with Mr. Harley, what

17  actions did you take, in relation to his account?

18  A.    After speaking with Mr. Harley, I had another conversation

19  with Jasper Wright, and we agreed it was best to close his

20  account and terminate his relationship with Merrill Lynch.

21  Q.    Was his account closed with Merrill Lynch?

22  A.    Yes, I sent him a letter April 28, 2009 explaining his

23  account was closed, and we were issuing him a check for the

24  funds that were in the account.

25  Q.    Do you know if Mr. Harley called the Chairman of Merrill

1  Lynch, Mr. Ken Lewis?

2  A.    I was informed that a call was placed in to Ken Lewis by

3  another Merrill Lynch employee by the name of Lauren Sibolski.

4        MR. O'BRIEN: Your Honor, is the witness testifying from

5  recollection or from his statement?

6        THE COURT: I don't know.

7        MR. O'BRIEN: I can't tell sitting here.

8        THE COURT: I don't know what we're going to do about that.

9        MR. O'BRIEN: He was entitled to refresh his recollection

10  from the 302 but --

11       THE COURT: Are you making an objection?

12       MR. O'BRIEN: Pardon?

13       THE COURT: Are you making an objection?

14       MR. O'BRIEN: Yes.

15       THE COURT: Sustained. You should deal with this as though

16  he's refreshing his recollection, which means, you give it to

17  him, he looks at it, you ask him, Does that refresh your

18  recollection? Yes, it does. Good, give me back the paper. Now,

19  let him talk from his recollection. That's the rule. You know

20  that.

21       MR. BRANDLER: I didn't realize he was referring to the

22  paper, I thought he was just testifying.

23  BY MR. BRANDLER:

24  Q.    Were you referring to the paper or are you recalling this

25  as you speak?

1  A.    I referred to the paper for the first question, I asked

2  for a copy of it, but I'm talking from recollection.

3  Q.    If you have to refer to the paper, let us know in advance,

4  so we can handle that, okay?

5  A.    Yes, sir.

6        THE COURT: No, I don't agree with that. Take back the

7  document. If he's refreshing his recollection, he's going to

8  testify from his recollection. If he can't, then, you can deal

9  with it some other way.

10       MR. BRANDLER: Very good.

11 BY MR. BRANDLER:

12 Q.    After the account was closed, that was in April of '09?

13 A.    Yes, sir.

14 Q.    Did you have any more contact with Mr. Harley?

15 A.    Not that I recall. The last connection we would have is a

16 wire did come back into the account in August of '09.

17 Q.    A wire came in or went out?

18 A.    Yes, a transaction bringing cash into the account. I was

19 notified of the transaction, we sent the cash back.

20 Q.    Was there -- did you become aware of any email

21 communications from Mr. Harley to Mr. Heckenberger, in December

22 of '09?

23 A.    In December of 2009, a cease and desist letter was sent

24 over to Andrew.

25       MR. BRANDLER: Could we have Exhibit 12.2. Could we go to

1  Bates No. 848.

2  BY MR. BRANDLER:

3  Q.   Can you take a look on your screen and see if you

4  can -- can you enlarge that, please? Do you recognize this

5  document?

6  A.   Yes, sir, that's the letter I sent to Mr. Harley to close

7  his account.

8  Q.   What's the date on the letter?

9  A.   April 28, 2009.

10  Q.   It's on Merrill Lynch letterhead?

11  A.   Yes, sir, that's my stationery, Merrill Lynch stationery.

12  Q.   Just read what the letter says.

13  A.   "Dear Mr. Harley, Please be advised that the

14  above-referenced account will be closed on June 1, 2009. Please

15  be further advised that effective immediately Merrill Lynch

16  will not permit the creation of any new positions in this

17  account. As of the close of business April 27, 2009, the total

18  value of the your account" --

19  Q.   You have to go slower because we have a court reporter

20  here. So just speak slower, please.

21  A.   "As of the close of business April 27, 2009, the total

22  value of your account is $43 invested entirely in the WCMA

23  money fund. Therefore, if you have not instructed Merrill Lynch

24  to send you a check for the proceeds prior to June 1, we will

25  mail you a check for any cash balance and close the account.

1      "Furthermore, effective immediately, your WCMA service

2  Visa and check-writing privileges have been terminated.

3  Accordingly, you and any other individual you have authorized

4  must immediately discontinue any use of your Visa card and

5  checks. We request these cards and unused checks be returned to

6  the undersigned at your earliest convenience.

7      "Any outstanding charges and/or checks presented for

8  payment, prior to the termination date of your account, will be

9  honored, provided, of course, there's sufficient assets

10  available in your account to cover such transactions. You will

11  remain liable, in the event of any additional checks and/or

12  charges are honored, when presented for payment after the

13  termination date for your account occurs.

14      "Sincerely Brian P. Pugh, Vice-president, Administrative

15  Manager."

16      MR. BRANDLER: I have no further questions. This document

17  has already been admitted.

18      THE COURT: The last one?

19      MR. BRANDLER: 12.2, that was a part of 12.2, I think, that

20  was admitted through Mr. Heckenberger.

21      THE COURT: Cross-examine?

22      MR. O'BRIEN: No questions at all, Your Honor. Thank you.

23      THE COURT: You may step down.

24      MR. BRANDLER: Neal Abrams.

25  N E A L     A B R A M S   IS CALLED, AND HAVING BEEN DULY

1  SWORN, TESTIFIED AS FOLLOWS:

2      THE CLERK: Will you please state and spell your name for

3  the record.

4      THE WITNESS: Neal, N-E-A-L, Abrams A-B-R-A-M-S.

5                    DIRECT EXAMINATION

6  BY MR. BRANDLER:

7  Q.    Mr. Abrams, are you currently employed?

8  A.    Yes.

9  Q.    What is your occupation?

10 A.    Financial Planner.

11 Q.    Are you affiliated with a particular company?

12 A.    I am. I'm affiliated with an independent broker dealer

13 called H. Beck located in Bethesda, Maryland.

14 Q.    What is the name of it?

15 A.    H. Beck, B-E-C-K.

16 Q.    How long have you been affiliated with H. Beck?

17 A.    Three years now.

18 Q.    Is there an entity called Abrams Financial Group?

19 A.    It is, it's my boutique financial planning firm.

20 Q.    What's the connection between Abrams Financial Group and

21 H. Beck?

22 A.    H. Beck processes, trades and pays commissions. Other than

23 that, there's no connection.

24 Q.    So is it accurate you own your own company, Abrams

25 Financial Group?

1  A.    That's accurate.

2  Q.    What type of services do you provide your clients?

3  A.    Full financial planning, including stocks, bonds, mutual

4  funds, insurance, estate planning, etc.

5  Q.    How long have you been in the financial planning business?

6  A.    Thirty-four years.

7  Q.    Where is your office based?

8  A.    Haverford, Pennsylvania.

9  Q.    You mentioned H. Beck. Is that the brokerage company that

10  executes your trades for your clients?

11  A.    Currently, yes.

12  Q.    And prior to using H. Beck, did you use other brokerage

13  houses?

14  A.    I did. I used to be with LPL Financial out of San Diego

15  and Boston, which was the largest independent broker dealer in

16  the country.

17  Q.    I want to talk about LPL Financial, you said it's the

18  largest broker dealer in the country. What does that mean for

19  those of us who don't have brokerage accounts?

20  A.    Largest independent broker dealer. There are essentially

21  two kinds of broker dealers. There are wire houses, like,

22  Merrill Lynch, Smith Barney, Morgan Stanley, and there are

23  independent channels, such as LPL. Independent channels pay

24  higher commissions, yet, we pay all of our expenses. That's

25  essentially the difference.

1  Q.    So you said LPL is a national brokerage house?

2  A.    It is, it has 14,000 reps.

3  Q.    You would be one of those reps, at least, during that

4  period of time?

5  A.    Yes.

6  Q.    How long were you affiliated with LPL?

7  A.    A little over seven years.

8  Q.    You said that the home office of LPL is in San Diego?

9  A.    San Diego and Boston; it has dual offices.

10 Q.    At the time you were affiliated with LPL, where was your

11 office located?

12 A.    My office was in Newtown Square, Pennsylvania.

13 Q.    Where is that, approximately?

14 A.    It's on the main line, not far from where my office is

15 currently, probably, about three and a half miles away.

16 Q.    Is that outside of Philadelphia?

17 A.    It is.

18 Q.    When did you leave your affiliation with LPL?

19 A.    Sometime in November of 2011.

20 Q.    I want to direct your attention to the end of 2005. Did

21 you have any contact with Mr. Harley, at that time?

22 A.    Yes.

23 Q.    Can you tell us how that contact arose? How did it start?

24 A.    Mr. Harley was friends with a business associate of mine

25 named Henry Cohen, and I was in Mr. Cohen's car, and they were

1  talking on the phone, and Mr. Cohen introduced me to Richard.

2  Q.    How did you know Mr. Cohen?

3  A.    He referred me business, from time to time.

4  Q.    When you say, referred you business, you mean, clients for

5  your financial planning firm?

6  A.    Yes.

7  Q.    So I'm clear, he was on the phone with Mr. Harley, and you

8  were in the car together?

9  A.    Yes.

10 Q.    How did it come up that, other than overhearing the

11 conversation, that you would get in touch with Mr. Harley or he

12 would get in touch with you?

13 A.    Well, I didn't get in touch with him, initially. They were

14 talking about a specific situation in which Mr. Harley

15 purported to own capped oil wells in Texas, and the topic came

16 up that he wanted to figure out a way to pull money out of

17 them.

18 Q.    That was a discussion between Cohen and Harley that you

19 overheard or was that subsequent, when you started talking to

20 Harley, yourself?

21 A.    Both.

22 Q.    How did it come to be that, when you started talking to

23 Harley, did you start talking to him in the car ride there?

24 A.    Yes.

25 Q.    So you were handed the phone to talk to him?

1  A.    I think it was on speaker phone.

2  Q.    Speaker phone, maybe, it was before cell phones?

3  A.    Cell, speaker; it wasn't that long ago.

4  Q.    So this is, like, in 2005, I think you said?

5  A.    Yes.

6  Q.    What did you discuss with Mr. Harley on the phone, during

7  that time?

8  A.    He said he wanted to monetize the capped oil wells,

9  meaning, he wanted to pull money out of them. And I simply

10  asked him, Why don't you just sell them, if you own them? He

11  said, No, I want to keep the asset, own it, and I want to

12  essentially borrow against it.

13  Q.    Have you ever heard that before, monetizing the asset?

14  A.    I don't think that was a terminology he brought up, that

15  was my description of it.

16  Q.    By the way, what's your educational background?

17  A.    I have a degree from the Wharton School of Business at the

18  University of Pennsylvania.

19  Q.    That's an M.B.A.?

20  A.    Yes.

21  Q.    All right, so your terminology was monetizing the asset.

22  How did he describe what he wanted to do?

23  A.    He wanted to pull money out of it.

24  Q.    How did he say he wanted to pull money out of it?

25  A.    He wanted to pledge the capped oil wells as assets and

1 borrow against them.

2 Q.   What were you going to do for him, in terms of that

3 request or that desire of his?

4 A.   I think the idea was that I could investigate whether that

5 was something that my broker dealer was interested in, but it

6 didn't go anywhere.

7 Q.   Did he tell you how much these oil wells he owned -- did

8 he say where they were located?

9 A.   In Texas.

10 Q.   Did he tell you how much they were worth?

11 A.   In the hundreds of millions of dollars.

12 Q.   Did he tell you how he got it?

13 A.   I don't believe he told me, but Mr. Cohen told me.

14 Q.   Well, I don't want to hear what Mr. Cohen told you. You

15 said you asked him, Why don't you sell the oil?

16 A.   Yes.

17 Q.   What was his response?

18 A.   He wanted to maintain ownership of the asset.

19 Q.   Was there any discussion about documentation of his claim

20 that he owned hundreds of millions of dollars of oil in Texas?

21 A.   There was a brief discussion sometime soon thereafter,

22 where I asked him to produce ownership papers, and it didn't go

23 anywhere, I never saw any ownership papers.

24 Q.   But you requested them ?

25 A.   Yes.

1  Q.    And you say it didn't go anywhere. What do you mean by

2  that?

3  A.    Meaning, that he never produced anything.

4  Q.    So was the matter dropped at that time?

5  A.    It was.

6  Q.    So I want to move ahead in the chronology here. You didn't

7  establish Mr. Harley as a client, at that time?

8  A.    No.

9  Q.    Let's move ahead to 2007, about two years later after this

10  first contact. Did you have further contact with Mr. Harley,

11  regarding financial transactions?

12  A.    Yes.

13  Q.    What was that about?

14  A.    Mr. Harley said that he had two Treasury securities,

15  combined worth $1 billion, and that he was interested in

16  setting up --

17  Q.    Before we get to that, I want to make sure we're on the

18  same page. In 2007, before we get to the Treasury checks --

19  A.    Excuse me. Yes, in 2007, he called me, and we had a

20  discussion about a number of different items, but he wanted to

21  borrow money.

22        My wife and I, at the time, were within a number of weeks

23  of closing on a house, and I kind of needed every penny I had,

24  and I said something like, I can lend you some money, but

25  you've got to pay it back within two weeks.

1  Q.    How much was he looking to borrow from you?

2  A.    I think it was between 10 and $20,000.

3  Q.    Did he tell you why he needed this money, if he owned

4  hundreds of millions of dollars of oil in Texas?

5  A.    No, he didn't.

6  Q.    Did he say what he needed the money for?

7  A.    No, he didn't.

8  Q.    You hadn't spoken with him since 2005. Did you find it

9  unusual that he called you out of the blue and asked for a 10

10  to 20,000-dollar loan?

11  A.    We may have had intermittent conversations, but nothing

12  that I can recollect that had any real meaning to them. I found

13  it disconcerting that someone would want to borrow money, but I

14  always find it disconcerting if someone wants to borrow money.

15  Q.    Well, you're a financial planner.

16  A.    That's right.

17  Q.    You didn't consider him a personal friend of yours to loan

18  money to, correct?

19  A.    Never met him.

20  Q.    He was, at most, a business acquaintance that you had.

21  A.    Yeah, it was a voice on the phone.

22  Q.    So did he discuss the interest rate, did he discuss any

23  terms of this proposed loan with you? How much money you would

24  get back?

25  A.    Well, he indicated that it would be extremely lucrative,

1  but I cut it off pretty quickly because I told him I would need

2  the money back within two weeks because we were going to close

3  on a house.

4  Q.    When he said it would be extremely lucrative, did he get

5  into any more detail about it?

6  A.    Not really.

7  Q.    So what was your decision, regarding his request to borrow

8  this 10 to $20,000?

9  A.    He said it wouldn't be possible to pay it back within two

10  weeks, so I said, well, then, it's a discussion that has to

11  end.

12  Q.    So let's move ahead to April of 2009. Did you have any

13  further discussions with Mr. Harley?

14  A.    Yes.

15  Q.    Tell us about that.

16  A.    I received a phone call in which Mr. Harley said that he

17  had two Treasury certificates, each for $500 million, and that

18  he was potentially interested in opening an account, he would

19  be interested in setting up a trading account, and would I be

20  interested in possibly opening an account and depositing the

21  securities.

22  Q.    So this was a telephone call?

23  A.    It was.

24  Q.    Had you been maintaining contact with him, since his

25  request to borrow the money from you, or was that just another

1  call?

2  A.    I don't really remember.

3  Q.    You said he wanted to deposit two checks?

4  A.    Yes.

5  Q.    Did he have an ongoing account with your firm?

6  A.    No.

7  Q.    What was his proposal, as far as how that would happen?

8  A.    He said that he would email the documentation, that it was

9  highly confidential, that it was extremely complex, and he

10  explained a few things about the complexity to me.

11  Q.    What did he explain?

12  A.    He said that the Treasury securities were worth a billion

13  dollars, that they had some special Federal Reserve clearance

14  on the Grey Screen Level 12 clearance. He used terms, frankly,

15  in my 34 four years of business, I never heard.

16  Q.    Did he mention anything about The World Bank?

17  A.    Yes.

18  Q.    What did he say about that?

19  A.    I don't remember exactly.

20  Q.    Anything about trading platforms?

21  A.    Yes, he, again, wanted to establish a trading account, in

22  some connection with World Bank, but I don't remember exactly

23  what.

24  Q.    Did he mention that he had attempted to deposit those

25  checks in any other financial institution?

1   A.    No, but what he did say was that he had an account at

2   Merrill Lynch, and that this may be a competitive situation.

3   Q.    What did he --

4   A.    Meaning, who could give him the better deal.

5   Q.    Did he mention to you that Merrill Lynch had closed his

6   account in April of 2009?

7   A.    No.

8   Q.    Did he mention to you that Merrill Lynch had refused to

9   accept the deposit of those instruments?

10  A.    No.

11  Q.    You said there was something about clearances and Grey

12  Screens. Did he say he had any type of clearances, special

13  clearances, Level 12?

14  A.    Yes.

15  Q.    What did he say?

16  A.    He said he had special Federal Reserve clearance, I think

17  he called it Level 12, I believe he used the term Grey Screen,

18  maybe one or two other terms, again, that I had never heard.

19  Q.    So did he email you these documents?

20  A.    He did.

21  Q.    And what did you do with the documents once he emailed

22  them to you? Let me cut you off, before you get into that.

23        In terms of him depositing these two 500 million-dollar

24  checks, what was going to be in it for you and your firm?

25  A.    Well, he was going to open an account and he was going to,

1  essentially, have what's known as an advisory account. An

2  advisory account means that I would get paid a percentage of

3  the assets under management, so a percentage of a billion

4  dollars was significant revenue to me.

5  Q.   Was that what he proposed to you about this procedure that

6  he wanted to happen?

7  A.   Yes.

8  Q.   So once you received these documents, what did you do with

9  them?

10  A.   I called, first, Esther Stearns, who was President of LPL

11  who I had a personal relationship with. She referred me to a

12  Managing Director, I believe, by the name of Mark Helliker, he

13  then referred me to the Anti-Money Laundering Department. I

14  FAXed the documents to the AML Department, and soon thereafter,

15  received a return phone call from them.

16  Q.   And without telling us what they told you about these

17  documents, did you, also, give these documents to your wife?

18  A.   I did. My wife is a real estate attorney, and she looked

19  at them briefly, and she immediately said they were fraudulent.

20       MR. O'BRIEN: Objection, Your Honor, as to what his wife

21  said.

22       THE COURT: The jury should disregard what his wife said.

23  Members of the jury, let me explain this to you so you

24  understand why this happens.

25       You always hear, Hearsay. The reason that hearsay is

1 objectionable is because the person who made the statement is

2 not here to be cross-examined. So to offer that statement to

3 you as though it were fact is unfair, since there can be no

4 examination of that person's testimony. That's the basis of the

5 hearsay rule.

6     So when you hear objections to hearsay and I sustain it,

7 that's the reason, just so you understand. Okay, you may

8 proceed.

9     MR. BRANDLER: Thank you.

10 BY MR. BRANDLER:

11 Q.   So as I understand, you forwarded the documents to the

12 Anti-Money Laundering section at LPL, and you also had your

13 wife review it, and she's a lawyer?

14 A.   Yes.

15 Q.   Did you have any follow-up conversation with Mr. Harley

16 where you discussed the legitimacy of the documents that he

17 sent you?

18 A.   Yes, the next day, Mr. Harley called me -- I was directed

19 not to speak with him again by LPL. The next day, Mr. Harley

20 called me and asked me what the result was and I said that they

21 were securities that we just can't accept, and I left it at

22 that.

23 Q.   Did he mention to you -- did he try to make it more

24 attractive to you and your firm by sweetening the deal and

25 offering more funds?

1  A.    Not that I can recall. That was pretty much the end of it.

2        MR. BRANDLER: One moment.

3  BY MR. BRANDLER:

4  Q.    Did you have any discussion with Mr. Harley, where he said

5  he had contact with the Chairman of Merrill Lynch?

6  A.    Yes.

7  Q.    What did he say?

8  A.    He said he called Ken Lewis, and I thought that was really

9  odd. He specifically identified Ken Lewis as the Chairman of

10 Merrill Lynch, and I knew that Ken Lewis was the Chairman or

11 actually the President of Bank of America, prior to Bank of

12 America's purchase of Merrill Lynch, so the timing didn't seem

13 right to me, it didn't make any sense.

14 Q.    But he said he had talked to Ken Lewis, as Chairman of

15 Merrill Lynch?

16 A.    Yes.

17 Q.    You knew that could not be true?

18 A.    Yes, I knew it was false.

19 Q.    Did you tell him that? Did you confront him?

20 A.    No.

21 Q.    Did he say when he had spoken to Ken Lewis, in connection

22 with your discussions? How soon?

23 A.    I think the best way to describe that would be he said

24 recently.

25 Q.    I want to show you a document, Exhibit 14.1. Do you have

1  it up on your screen?

2  A.    I do.

3  Q.    Do you recognize this document?

4  A.    I do.

5  Q.    What do you recognize it to be?

6  A.    It's an email that I sent to Richard replying to his

7  original email that sent the documentation, with regard to the

8  Treasury securities. I admitted here, not really sure what it

9  is, I don't know what I'm looking at.

10 Q.    Without characterizing it, just read -- first of all,

11 let's say the date on the top there, what's the date of the

12 email?

13 A.    The date was the evening of Tuesday, April 28, 2009.

14 Q.    It was from you to what email address?

15 A.    It was from me to Richard Harley.

16 Q.    RJHCO@verizon.net.

17 A.    Yes.

18 Q.    And just read the body of the email.

19 A.    "Richard" -- this is from me.

20       "Richard, I don't know what I'm looking at, but it sure is

21 impressive. I'll work on it first thing in the morning and

22 apprise you of my progress. Whew. Neal."

23 Q.    Below that, is that the email from Richard to you which

24 supplied you with the documents that you were impressed with?

25 A.    It is.

1  Q.   That's the same date at 8:55 p.m. Read that email.

2  A.   "Neal, it was good speaking with you. As promised, see the

3  attached file. Kindest regards, Richard Harley."

4  Q.   Next page. Was this part of the documentation that he sent

5  you?

6  A.   It was.

7  Q.   It's entitled, Confidential Memo?

8  A.   It was.

9  Q.   Appearing with some logo of the Federal Reserve Board and

10 Federal Reserve Bank?

11 A.   Yes.

12 Q.   And then the next page. Was something called extend

13 validity of safekeeping receipt with the same logo?

14 A.   Yes.

15 Q.   Next page. Limited power of attorney from Mr. Kiat to Mr.

16 Harley.

17 A.   Yes.

18 Q.   And then the next page is the signature page, then, we

19 have the checks, themselves?

20 A.   Yes.

21 Q.   There's one for 500 million ending in check 730?

22 A.   Yes.

23 Q.   The one before that was the check ending in No. 731, both

24 for 500 million?

25 A.   Yes.

1  Q.    So these were the documents he sent you that he wanted to

2  deposit, set up his account, that you forwarded to --

3  A.    Yes, I forwarded them to the Anti-Money Laundering desk at

4  LPL.

5  Q.    After you forwarded it to them, I think you said you had a

6  conversation with Mr. Harley, you told him you guys were not

7  interested?

8  A.    I did.

9  Q.    Did you have any further contact with Mr. Harley, after

10 that period of time?

11 A.    No, I was instructed not to have any contact with him.

12 Q.    There were no attempts by Mr. Harley to get in touch with

13 you, after that period of time?

14 A.    No.

15 Q.    You never loaned him any money?

16 A.    No.

17      MR. BRANDLER: I have no further questions. I would move

18 for admission of 14.1.

19      MR. O'BRIEN: No objection to 14.1.

20      THE COURT: It will be admitted.

21      (At this time Government Exhibit No. 14.1 was admitted

22      into evidence.)

23      THE COURT: Cross-examine.

24                      CROSS EXAMINATION

25 BY MR. O'BRIEN:

1   Q.   Mr. Brandler asked you whether Mr. Harley attempted to

2   deposit those checks with your firm. Is that correct?

3   A.   Yes, he did.

4   Q.   Now, did he send you original checks?

5   A.   No, he didn't.

6   Q.   Did he send you copies?

7   A.   Yes.

8   Q.   Does your firm accept copies of checks for deposit?

9   A.   No.

10  Q.   Were the checks endorsed by the payee?

11  A.   No.

12  Q.   Okay, so does your firm accept copies of checks unendorsed

13  by payees?

14  A.   No.

15  Q.   Is there any writing in which Mr. Harley specifically

16  asked to deposit those checks?

17  A.   No.

18  Q.   So that's just your recollection?

19  A.   Yes.

20  Q.   When you got back to him -- I don't see any writing going

21  back saying, Hey, Richard, these are just copies of checks, we

22  can't deposit these?

23  A.   No, I didn't stay that.

24  Q.   Couldn't it be he was just sending these to you and

25  saying, I want you to look at these?

1  A.    That's not what he said to me.

2  Q.    But he didn't present them, he didn't give you a deposit

3  slip, did he?

4  A.    No.

5  Q.    He didn't endorse the checks, did he?

6  A.    No.

7  Q.    He didn't give you an original check to deposit?

8  A.    No.

9  Q.    So nothing he gave you -- there's no financial institute

10  in the world that would have deposited those?

11  A.    No.

12        MR. O'BRIEN: That's all I have. Thank you very much.

13        MR. BRANDLER: Nothing further, Your Honor.

14        THE COURT: You may step down.

15        THE WITNESS: Thank you, everyone. Have a happy holiday.

16        THE COURT: Any reason Mr. Abrams can't be excused?

17        MR. O'BRIEN: He's excused. Unless he wants to hang around.

18        THE COURT: I think we will conclude for the day. Members

19  of the jury, we will conclude for the day. Tomorrow we will

20  begin at 9:30. Is that okay with everybody?

21        All right, 9:30 it is. Remember not to discuss the case

22  among yourselves or with anyone else. If anybody should try to

23  talk to you about it, bring it to my attention immediately.

24  Again, no exposure to any media about the case or any

25  outside -- any information from the outside world about it.

1          You're to decide this case solely on what you see and hear

2     in this courtroom. Enjoy your evening, we will see you tomorrow

3     morning at 9:30.

4          (At this time the proceedings were adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3           I, KRISTIN L. YEAGER, Official Court Reporter for the

4    United States District Court for the Middle District of

5    Pennsylvania, appointed pursuant to the provisions of

6    Title 28, United States Code, Section 753, do hereby certify

7    that the foregoing is a true and correct transcript of the

8    within-mentioned proceedings had in the above-mentioned and

9    numbered cause on the date or dates hereinbefore set forth; and

10   I do further certify that the foregoing transcript has

11   been prepared by me or under my supervision.

12

13                          S/Kristin L. Yeager
                            KRISTIN L. YEAGER, RMR,CRR
14                          Official Court Reporter

15
     REPORTED BY:
16
          KRISTIN L. YEAGER, RMR,CRR
17        Official Court Reporter
          United States District Court
18        Middle District of Pennsylvania
          P.O. Box 5
19        Scranton, Pennsylvania  18501

20

21

22           (The foregoing certificate of this transcript
     does not apply to any reproduction of the same by any means
23   unless under the direct control and/or supervision of the
     certifying reporter.)
24

25