1

1          IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3   UNITED STATES OF AMERICA   :

4                              :

5      VS                      :   NO. 3:12-CR-00224

6                              :

7   RICHARD J. HARLEY,         :

8   Defendant                  :

9
                             __VOLUME 1__
10
        BEFORE:     HONORABLE A. RICHARD CAPUTO
11                  UNITED STATES DISTRICT JUDGE

12      PLACE:      WILKES-BARRE, PENNSYLVANIA

13      PROCEEDINGS:  JURY TRIAL

14      DATE:       WEDNESDAY, DECEMBER 3, 2014

15

16  APPEARANCES:

17  For the Government:    BRUCE D. BRANDLER, ESQ.
                           Assistant U.S. Attorney
18                         Room 217, Federal Building
                           228 Walnut Street
19                         Harrisburg, PA  17108

20

21  For the Defendant:     JOSEPH A. O'BRIEN, ESQ.
                           Oliver, Price & Rhodes
22                         1212 South Abington Road
                           Clarks Summit, PA  18411
23

24

25

2

## WITNESS INDEX

<u>FOR THE GOVERNMENT</u>          <u>DIRECT</u>          <u>CROSS</u>

Richard Jones                   43              --


## EXHIBIT INDEX

<u>FOR THE GOVERNMENT</u>                          <u>IDENTIFIED</u>

No. 23.8A                                          58
No. 23.3A                                          61
No. 15.3                                           64

1          THE COURT:  We will proceed now.

2          I'm going to give you some preliminary instructions

3    that will help guide you as you listen to this case.

4          First of all, I'm going to talk to you about your

5    role as jurors.

6          Under our system of justice, the role of the jury is

7    to find the facts of the case from the evidence presented in

8    trial.  You must decide the facts only from the evidence

9    presented to you here at trial.

10         From the evidence that you will hear and see in

11   court, you will decide what the facts are, and then apply to

12   those facts the law that I will give you in my final

13   instructions.  This is how you will reach your verdict.

14         Whatever your verdict, it will have to be unanimous.

15   All of you will have to agree on it, or there will be no

16   verdict.

17         In the jury room, you will discuss the case among

18   yourselves, but ultimately, each of you will have to make up

19   his or her own mind.  Therefore, each of you has a

20   responsibility which you cannot avoid, and you should do your

21   best throughout this trial to fulfill this responsibility.

22         I play no part in finding the facts.  You should not

23   take anything I may say or do during this trial as indicating

24   of what I think of the evidence or what your verdict should be.

25         My role is to make whatever legal decisions have to

**4**

1  be made during the course of this trial and to explain to you

2  the legal principles that must guide you in your decisions.

3          You must apply my instructions about the law.  Each

4  of the instructions is important.  You must not substitute

5  your own notion or opinion about what the law is or what it

6  ought to be.  You must follow the law that I give to you

7  whether you agree with it or not.

8          Perform your duties fairly and impartially.  Do not

9  allow sympathy, prejudice, fear or public opinion to influence

10  you.  You should not be influenced by any person's race, color,

11  religion, national ancestry or gender.

12          Your conduct as jurors.  Here is some important rules

13  about your conduct as jurors.  Keep an open mind.  Do not make

14  up your mind about the verdict until you have heard all of the

15  evidence, I have given final instructions about the law at the

16  end of the trial, and you have discussed the case with your

17  fellow jurors during your deliberations.

18          Second, do not discuss this case among yourselves

19  until the end of the trial when you retire to the jury room to

20  deliberate.

21          You need to allow each juror the opportunity to keep

22  an open mind throughout this entire trial.  During the trial,

23  you may talk to your fellow jurors about anything else of a

24  personal nature or of a common interest, but not about the

25  case.

1          Third, during the trial, you should not speak to any
2   of the parties or lawyer or witnesses involved in the case, not
3   even if they ask the time of day.

4          If any lawyer, party or witness does not speak to you
5   when you pass in the hall or out in the public streets,
6   remember, it's because they are trying to avoid the appearance
7   of impropriety as well.  You're not going to be rude by not
8   talking to them.  It's just to avoid any appearance that
9   anything is amiss.

10          Fourth, do not talk to anybody else or listen to
11  others talk about the case until after the trial is over and
12  you have been discharged as jurors.  It's important not only
13  that you do justice in this case, but you also give the
14  appearance of justice.

15          If anyone should try to talk to you about the case
16  during this trial, report this to me immediately through my
17  courtroom deputy.  Do not discuss the situation should it occur
18  with any other juror.

19          Fifth, do not discuss the case with anyone outside
20  the courtroom or at home, including your family and friends.
21  You may tell your family and friends that you have been
22  selected as a juror in this case -- in a case, and you may tell
23  them how long the trial is expected to last.

24          However, you should also tell them that the judge has
25  instructed you not to talk any more about the case and that

1    they should not talk to you about it.

2           The reason for this is that sometimes someone else's

3    thoughts can influence you.  Your thinking should be influenced

4    only by what you see and hear in this courtroom.

5           Sixth, until the trial is over and your verdict is

6    announced, do not watch or listen to any television, radio,

7    news program or reports about the case or read any news in the

8    newspapers or internet stories or articles about the case or

9    about anyone involved with it.

10          Again, if there is any -- I'm not suggesting to you

11   that there will be anything, but one never knows.  If there is,

12   you simply are to ignore it.

13          Seventh, do not use a computer, cellular phone or any

14   electronic device while in the courtroom or during

15   deliberations.  These devices may be used during breaks or

16   recesses for personal use, but not to obtain or disclose

17   information about the case.

18          Eighth, do not do any research or make any

19   investigation on your own about any matters relating to this

20   case or this type of case.

21          This means, for example, you should not consult any

22   reference works, dictionaries, search the internet for

23   additional information, your computer, cellular phone or other

24   electronic devices or any other method to obtain information

25   about this case or this type of case, the parties in this case

1  or anyone else involved in this case.

2         Now, I'm not going to give you every possible outlet

3  of social media that you could use, because, frankly, there is

4  probably five more that have popped up since we started today,

5  but you get the message; no outside influence, no outside

6  potential influence.  It's about what you see and hear in this

7  courtroom and nothing else, and your common sense.  Obviously,

8  you bring that with you.

9         You must decide this case based only on the evidence

10 presented in this courtroom and my instructions about the law.

11 It would not be proper for you to try to supplement that

12 information on your own.

13        Lastly, you should not concern yourself with the

14 possible punishment which would be imposed in the event you

15 return a verdict of guilty.

16        Bench or sidebar conferences.  You've already seen us

17 meet at sidebar.  During this trial, it may be necessary for me

18 to talk to the lawyers out of your hearing.  This is called a

19 bench or sidebar conference.  If that happens, please be

20 patient.  We also ask that you advise me through my courtroom

21 deputy if you are able to hear the bench or sidebar conference,

22 because the purpose of these discussions outside of your

23 hearing is for important reasons.  That's why we turn on that

24 obnoxious sound so nobody can hear anything that goes on over

25 here.

1    I know you might be curious of what's being talked

2  about, and I'm not trying to keep important information from

3  you, but these are conferences that are necessary for me to

4  discuss with the lawyers certain objections to evidence and be

5  sure that the evidence presented to you is correct under the

6  rules of evidence.

7    We will, of course, do what we can to keep the number

8  and length of these conferences to a minimum.  If I think a

9  conference will be long, I will call a recess.

10    I may not always grant a request for a sidebar

11  conference.  Do not consider my granting or denying a request

12  for a conference as suggesting my opinion about the case or

13  what your verdict should be.

14    I don't allow note taking.  You will have to make

15  your decision based on what you remember about the evidence.

16    Although we have a court reporter here, you will not

17  get a written transcript of the testimony either to review in

18  your deliberations.  Therefore, you must pay close attention to

19  the testimony.

20    Now, I don't allow note taking for a number of

21  reasons.  The first of which is, part of your role as a juror

22  is to observe a witness on the witness stand, because the

23  witness' demeanor, body motions, body language, are all

24  important things in your determining the witness' veracity or

25  believability.

1          So, consequently, if you're taking notes, basically
2   all you're doing is taking information based on what the
3   witness said.  Well, there is more to what a witness says and
4   does than just information.  That is reason number one.
5          Reason number two is, there's a tendency because
6   someone wrote something down to believe it has more force
7   because it's written down, rather than what you've collectively
8   remembered.  That is not necessarily true.
9          Also, the third reason is, that while you're writing
10  something down, you may miss something else.  It's very
11  important.
12         So, consequently, those are the reasons that I don't
13  allow note taking.  You are going to rely on your collective
14  memories.  That's why there are as many of you as there are,
15  and this has worked for a long time since there's been a jury
16  system.
17         Likewise, I don't allow jurors to ask questions.  We
18  have what's called an adversary system where lawyers are
19  trained to ask questions that are generally allowed under the
20  rules of evidence, and rather than get sidetracked with
21  questions from jurors -- I know some of you would like to ask
22  them, but I don't allow it, and that's the reason I don't allow
23  it.
24         By the way, if you can't hear somebody, though,
25  please raise your hand and let me know.

1          A description of the trial proceedings.  The trial is

2    going to proceed in the following way:

3          First, the lawyers will have an opportunity to make

4    opening statements to you.  The prosecuting attorney, the

5    Assistant United States Attorney, may make an opening statement

6    at the beginning of the case.

7          Mr. Harley's lawyer may make an opening statement

8    after Mr. Brandler's opening statement, or he may postpone the

9    making of an opening statement until after Mr. Brandler

10   finishes presenting his evidence.  Moreover, Mr. O'Brien is not

11   required to make an opening statement.

12         Opening statements are an outline to help you

13   understand what each one expects to show -- expects the

14   evidence to show.  What is said in opening statements is not

15   evidence.  I will get into what is and what isn't evidence.

16         Second, after opening statements, Mr. Brandler will

17   produce -- introduce, rather, evidence that he thinks proves

18   the charges in the indictment.  Mr. Brandler will present

19   witnesses, and Mr. O'Brien may cross-examine those witnesses.

20         Mr. Brandler may offer documents and other exhibits

21   into evidence.

22         Third, after Mr. Brandler has presented its evidence,

23   Mr. O'Brien may present evidence, but he is not required to

24   present evidence.

25         As I will tell you many times during this trial, the

1  Government always has the burden or obligation to prove each

2  and every element of the offenses charged beyond a reasonable

3  doubt.

4          Mr. Harley is presumed to be innocent of all the

5  charges.  The law never imposes on a defendant, such as

6  Mr. Harley, in a criminal case the burden of proving his

7  innocence by calling any witnesses, producing any exhibits or

8  introducing any evidence.

9          Fourth, after all the evidence has been presented,

10 the lawyers will have an opportunity to present closing

11 statements or arguments.

12         Closing statements or arguments are designed to

13 present to you the parties' theories about what they think the

14 evidence has shown and what conclusions may be drawn from that

15 evidence.

16         What is said in closing statements or arguments,

17 likewise, is not evidence, just as what is said in opening

18 statements is not evidence.

19         Fifth, after you have heard closing arguments --

20 statements, I will give you orally the final instructions

21 concerning the law that you must apply to the evidence

22 presented during trial.

23         Sixth, after my final instructions on the law, you

24 will retire to consider your verdict.  Your deliberations are

25 secret.  You will not be required to explain your verdict to

1  anyone.  Your verdict must be unanimous.  All 12 of you must

2  agree to it.  Whether it be guilty or not guilty, it must be

3  unanimous.

4          You must keep your minds open during this trial.  Do

5  not make up your mind about any of the questions in this case

6  until you have heard each piece of evidence and all of the law

7  that you must apply to that evidence; in other words, until you

8  begin your deliberations.

9          Now, you have heard the word evidence many times

10 already.  What is and what is not evidence.  You must make your

11 decision in this case based only on the evidence that you see

12 and hear in this courtroom.

13         Do not let rumors, suspicions or anything else that

14 you may see or hear outside of the court influence your

15 decision in any way.

16         The evidence from which you will find the facts

17 consist of the following:  The testimony of witnesses; second,

18 documents and other things that are received as exhibits;

19 third, any fact that is stipulated to; that is, formally agreed

20 to by the parties.  That's the evidence that you are going to

21 decide the case from.

22         The following things are not evidence:  Statements

23 and arguments of the lawyers in this case, questions by the

24 lawyers and questions that I might ask.  You must not assume

25 that a fact is true just because one of the lawyers or I ask a

question about it.  It is the witness' answers that are the evidence.  Of course, you may need to consider the question to know what a witness means by his or her answer.

For example, if a witness answers yes to a question, you will have to consider the question to understand what the witness is saying.

Objections by the lawyers, including objections in which the lawyers state facts, is not evidence.

Any testimony that I strike or tell you to disregard is not evidence.  Anything that you may see or hear about this case outside of the courtroom is not evidence.

You must decide this -- you must use your common sense in weighing the evidence.  Consider it in light of your everyday experience with people and events and give it whatever weight you believe it deserves.

If your experience and common sense tell you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

The rules of evidence control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence, and a lawyer on the other side thinks that it is not permitted by the rules, that lawyer may object.

An objection simply means the lawyer is asking me to decide whether this evidence should be allowed under the rules of evidence.

1        Lawyers have an obligation to their clients to make

2    objections when they think evidence being offered is not proper

3    under the rules of evidence.

4        You should not be influenced by the fact that an

5    objection is made.  You should also not be influenced by any

6    ruling that I make on the evidence.

7        If I overrule the objection, the question may be

8    answered and the exhibit may be received as evidence, and you

9    should treat that testimony or exhibit like any other.  I may

10   say, overruled, or I may say, I will allow it.

11       I may allow evidence only for a limited purpose.  If

12   I do that, I will instruct you to consider the evidence only

13   for that limited purpose, and you must follow that instruction.

14       If I sustain the objection, the question will not be

15   answered, or the exhibit will not be received as evidence.

16       Whenever I sustain an objection, you must disregard

17   the question or the exhibit entirely.  Do not think about it or

18   guess what the witness might have said in answer to that

19   question.  Do not think about or guess what the exhibit may

20   have shown.

21       Sometimes a witness may have answered before the

22   lawyer objects or before I rule on the objection.  If that

23   happens, and I sustain the objection, you should disregard the

24   answer that was given, and I will so instruct you.

25       Also, I may order that some testimony or other

1   evidence be stricken or removed from the record.

2          Should I do that, I will instruct you to disregard

3   that evidence.  That means that when you're deciding the case,

4   you must not consider or be influenced in any way by the

5   testimony or other evidence that I told you to disregard.

6          Although the lawyers may call your attention to

7   certain facts or factual conclusions they think are important,

8   what the lawyers say is not evidence and is not binding on you.

9   It is your recollection and interpretation of the evidence that

10  controls your decision.

11         Also, do not assume from anything I do or say during

12  this trial that I have an opinion about the evidence or about

13  any of the issues in the case or what your verdict should be.

14         Direct and circumstantial evidence.  There are two

15  types of evidence which will be used at this trial, direct and

16  circumstantial evidence.  Those are the two types of evidence.

17  You may use both types of evidence in reaching your verdict.

18         Direct evidence is simply evidence which, if

19  believed, directly proves a fact.  An example of direct

20  evidence occurs when a witness testifies about something the

21  witness knows from the witness' senses, something the witness

22  has seen, touched, heard or smelled.

23         Circumstantial evidence is evidence which, if

24  believed, indirectly proves a fact.  It is evidence that proves

25  one or more facts from which you can find or infer the

1  existence of some other fact or facts.

2          An inference is simply a deduction or conclusion that

3  reason, experience and common sense lead you to make from the

4  evidence.  An inference is not suspicion or a guess.  It is a

5  reasonable, logical decision that a disputed fact exists on the

6  basis of another fact.

7          For example, an example of direct evidence is if a

8  witness walked in here under oath and testified it was raining

9  outside, and you believed the witness, that would be direct

10  evidence that it was raining.

11          On the other hand, if someone walked into the

12  courtroom with a wet raincoat, carrying a wet umbrella, that

13  would be circumstantial evidence, or indirect evidence, from

14  which you could conclude that it was raining.  You would not

15  have to find that it was, but you could.

16          Sometimes different inferences could be drawn from

17  the same set of facts.  The Government may ask you to draw one

18  inference and the defense may ask you to draw another.

19          You, and you alone, must decide what inferences you

20  will draw based on the evidence.

21          You should consider all the evidence that is

22  presented at this trial, direct and circumstantial.  The law

23  makes no distinction between the weight that you should give to

24  either direct or circumstantial evidence.  It is for you to

25  decide how much weight to give to any evidence.

1          Now, the credibility of witnesses.  In determining

2    what the facts are, you must decide what testimony you believe,

3    what testimony you do not believe.  You are the sole judges of

4    the credibility of the witnesses.

5          Credibility of a witness is the witness' worthiness

6    of belief.  Is the witness truthful?  Is the witness' testimony

7    accurate?  You may believe everything a witness says, only part

8    of what a witness says, or none of what a witness says.

9          You may decide whether to believe a witness based on

10   his or her behavior and manner in testifying, the explanation a

11   witness gives, and all the other evidence in the case, just as

12   you would in any important matter where you are trying to

13   decide if a person is truthful, straightforward and accurate in

14   his or her recollection.

15         In deciding on the question of credibility, remember

16   to use your common sense, good judgment and your experience.

17         In deciding what to believe, you may consider the

18   following:  First, the opportunity and ability the witness had

19   to see or hear or know the things about which the witness

20   testified.

21         Second, the quality of the witness' knowledge,

22   understanding and memory.

23         Third, the witness' appearance, behavior and manner

24   while testifying.

25         Fourth, whether the witness has an interest in the

1  outcome of the case or any motive, bias or prejudice.

2          Fifth, any relation the witness may have to a party

3  in the case and any effect the verdict may have on that

4  witness.

5          Sixth, whether the witness said or wrote anything

6  before trial that is different from the witness' testimony in

7  court.

8          Seventh, whether a witness' testimony is consistent

9  or inconsistent with other evidence you believe.

10          Lastly, any other factor that bears on whether the

11  witness should be believed.

12          What I tell jurors is this; in determining

13  credibility, you should use all of the tests for truthfulness

14  that you would use in a matter of importance to you in your

15  everyday life.

16          If there's inconsistencies and discrepancies in a

17  witness' testimony or between testimony of different witnesses,

18  it may or may not cause you to believe that witness' testimony.

19          Two or more persons witnessing an event may simply

20  see it or hear it differently.

21          A mistake recollection, like failure to recall, is a

22  common human experience.  In weighing the effect of an

23  inconsistency, you should consider whether it is about a matter

24  of importance or a matter of insignificant detail.  You should

25  also consider whether the inconsistency is innocent or

1  intentional.

2        You are not required to accept testimony even if the

3  testimony is not contradicted and the witness is not impeached.

4  You may decide that the testimony is simply not worthy of

5  belief because of the witness' bearing or demeanor, manner

6  while testifying, or because of the inherent probability of the

7  testimony, or for other reasons that are sufficient to you.

8        After you make your own judgment about believability

9  of a witness, you can attach to that witness' testimony the

10  importance or weight that you think it deserves.

11        The weight of the evidence to prove a fact does not

12  necessarily depend on the number of witnesses who testify.

13  What's more important than numbers is how believable the

14  witnesses are and how much weight you think their testimony

15  deserves.

16        Nature of an indictment.  The Government has charged

17  Mr. Harley with violations of Federal Law, specifically the

18  crimes of wire fraud, bankruptcy fraud, making false statements

19  in bankruptcy filings and bank fraud.

20        The charges against Mr. Harley are contained in an

21  indictment.  An indictment is just a formal way of specifying

22  the exact crimes Mr. Harley is accused of committing.

23        An indictment is simply a description of the charges

24  against him.  It is an accusation only.  An indictment is not

25  evidence of anything, and you should not give any weight to the

1  fact that Mr. Harley has been indicted in making your decision

2  in this case.

3      Now I'm going to give you -- in order to help you

4  follow this case, I'm going to give you the elements of the

5  offenses charged.

6      The elements of the offenses charged here.  There are

7  four offenses, and I'm going to give you a summary of the

8  elements, recognizing that each of the elements -- with respect

9  to each of the elements, the Government must prove each beyond

10  a reasonable doubt in order to convict Mr. Harley of the

11  particular offense.

12      First, wire fraud.  Mr. Harley is charged with Counts

13  1 through 15 with wire fraud in violation of Federal Law.

14      In order to find Mr. Harley guilty of the offense

15  charged in Counts 1 through 15 of the indictment, you must find

16  that the Government proved each of the following three elements

17  beyond a reasonable doubt:  First, that Mr. Harley devised a

18  scheme to defraud or to obtain money or property by materially

19  false or fraudulent pretenses, representations or promises.

20      Second, that Mr. Harley acted with the intent to

21  defraud.

22      Third, that in advancing, furthering and carrying out

23  the scheme, Mr. Harley transmitted any writing, signal or sound

24  by means of wire or radio or television communication in

25  interstate commerce or caused the transmission of any writing,

signal or sound of some kind by means of wire, radio, television communication in interstate commerce.

He's charged with bankruptcy fraud, Counts 16 and 17. In order to find Mr. Harley guilty of the offense charged in Counts 16 and 17 of the indictment, you must find that the Government has proved each of the following four elements beyond a reasonable doubt:

One, Mr. Harley devised or intended a scheme -- or intended to devise a scheme or plan to defraud.

Second, that he acted with the intent to defraud.

Third, that his act was material.  That is, it had a natural tendency to influence or was capable of influencing the acts of an identifiable person, entity or group.

Four, that Mr. Harley filed a petition or filed a document in a proceeding or made a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under a Title 11 bankruptcy proceeding to carry out or attempt to carry out an essential part of the scheme.

False statements in bankruptcy filings.  Mr. Harley is charged in Counts 18 through 22 of the indictment with knowingly and fraudulently making false statements in bankruptcy filings in which he was a debtor on or about November 22nd, 2010, and March 24th, 2011, doing business as RJH & Company, Inc., and on or about May 29th, 2012, doing business as Richard Harley.

1    In order to find Mr. Harley guilty of this offense,

2    you must find that the Government has proved beyond a

3    reasonable doubt each of the following elements:

4    First, that on or about each of those above dates

5    that I just mentioned, a bankruptcy case was pending in the

6    United States Bankruptcy Court in which Mr. Harley was a

7    debtor.

8    Second, that Mr. Harley made a false statement

9    regarding a material matter in relation to the bankruptcy

10   proceeding.

11   Third, that Mr. Harley knew that the statement was

12   false when it was made.

13   Fourth, that Mr. Harley did so with the intent to

14   defraud.

15   Bank fraud.  Mr. Harley is charged in Count 23 of the

16   indictment with bank fraud, which is a violation of Federal

17   Law.

18   In order to find Mr. Harley guilty of this offense,

19   you must find that the Government proved each of the following

20   three elements beyond a reasonable doubt.

21   First, that Mr. Harley knowingly executed a scheme or

22   artifice to defraud the Federal Reserve Bank of New York, and

23   to obtain the money, funds or other property owned by or under

24   the control of the Federal Reserve Bank of New York by means of

25   material false or fraudulent pretenses, representations or

1  promises as detailed in the indictment.

2         Secondly, that Mr. Harley did so with the intent to

3  defraud the Federal Reserve Bank of New York.

4         Third, that the Federal Reserve Bank of New York was

5  chartered by the United States.

6         What I have just told you is a preliminary outline of

7  the elements of the offenses charged.

8         At the end of the trial, I will give you instructions

9  on the elements of the offenses charged and on other matters of

10  law.

11         Those final instructions will be more detailed.  They

12  will guide you in reaching your verdict in this case.

13         I'm now going to talk to you about the presumption of

14  innocence, the burden of proof and reasonable doubt.

15         Mr. Harley has pleaded not guilty to all of the

16  offenses charged.  He is presumed to be innocent.  He starts

17  the trial with a clean slate with no evidence against him.

18         The presumption of innocence stays with Mr. Harley

19  unless and until the Government presents evidence that

20  overcomes that presumption by convincing you that Mr. Harley is

21  guilty of the offenses charged beyond a reasonable doubt.

22         Presumption of innocence requires that you find

23  Mr. Harley not guilty, unless you are satisfied that the

24  Government has proved guilt beyond a reasonable doubt.

25         Presumption of innocence means that Mr. Harley has no

1  burden or obligation to present any evidence at all or to prove

2  that he is not guilty.  The burden or obligation of proof is on

3  the Government to prove that Mr. Harley is guilty, and that

4  burden stays with the Government throughout the trial.

5         In order to find Mr. Harley guilty of the offenses

6  charged, the Government must convince you that Mr. Harley is

7  guilty beyond a reasonable doubt.  That means that the

8  Government must prove each and every element of the offenses

9  charged beyond a reasonable doubt.

10         A Defendant, such as Mr. Harley, may not be convicted

11  based on suspicion, conjecture, but only on evidence proving

12  guilt beyond a reasonable doubt.

13         Now, proof beyond a reasonable doubt does not mean

14  proof beyond all possible doubt or to a mathematical certainty.

15  Possible doubts, or doubts based on conjecture or speculation,

16  are not reasonable doubts.

17         A reasonable doubt is a fair doubt based on reason,

18  logic, common sense or experience.

19         A reasonable doubt means a doubt that would cause an

20  ordinary reasonable person to hesitate to act in matters of

21  importance in his or her own life.

22         It may arise from the evidence.  It may arise from

23  the lack of evidence or from the nature of the evidence.

24         If after hearing all of the evidence, you are

25  convinced that the Government has proved Mr. Harley guilty

beyond a reasonable doubt, you should return a verdict of guilty.  However, if you have a reasonable doubt as to any element of any offense, then you must return a verdict of not guilty.

Separate consideration, single defendant charged with multiple offenses.

Mr. Harley is charged with more than one offense. Each offense is charged in a separate count of the indictment. The number of offenses charged is not evidence of guilt, and it should not influence your decision in any way.

You must separately consider the evidence that relates to each offense, and you must return a separate verdict for each offense.

For each offense charged, you must decide whether the Government has proved beyond a reasonable doubt if Mr. Harley is guilty of that particular offense.

The decision on one offense, whether guilty or not guilty, should not influence your decision on any other of the offenses charged.  Each offense should be considered separately.

Anything from counsel?

MR. O'BRIEN:  No, Your Honor.

MR. BRANDLER:  No, Your Honor.

THE COURT:  Now you will hear an opening from Mr. Brandler, and then it will be up to Mr. O'Brien whether he

1 wishes to open or not.

2          Are you ready to proceed?

3          MR. BRANDLER:  Yes, Your Honor.  Thank you.

4          Good afternoon, ladies and gentlemen.

5          I want you to imagine for a moment a person who lives

6 with his wife in a very modest condominium in the Poconos, a

7 place called Shawnee on Delaware, and they live on a very

8 modest income, Social Security income that they both are

9 receiving, approximately $500 a month.

10          Yet, at the same time, I want you to imagine that

11 this person, one of these people that lives in that home in the

12 Poconos, claims to own $5 trillion in valuable bank instruments

13 that are backed by the Federal Reserve Bank of New York.

14          I said trillion.  That was not a mistake.  I didn't

15 say million.  I didn't say billion.  I said trillion.

16          To put that into context, the last time I looked, the

17 entire debt of the United States, the national debt was about

18 17 or $18 trillion.  This individual claimed that he owned

19 personally $5 trillion of valuable bank instruments backed by

20 the Federal Reserve Bank of New York.

21          This same individual, I want you to imagine, claims

22 to be the CEO of a very big corporation by the name of RJH,

23 Inc., standing for Mr. Harley's initials, Richard J. Harley.

24 That corporation, he will tell you, owned over a billion

25 dollars worth of oil in Texas.

1          Imagine further that this individual tells you that
2   he owns very valuable artwork worth over a million dollars.
3   One in particular is by an Italian Renaissance master by the
4   name of Titian, another by a more modern artist by the name of
5   Lee Settlemyer, and as a matter of fact, he has them hanging on
6   his wall and he will show them to you, and they are worth over
7   a million dollars.

8          Now, this person is going to ask you to loan him some
9   money, and it's not going to be insubstantial amounts of money.
10  It's going to be thousands and thousands of dollars.  He's
11  going to tell you that this is a very attractive offer, because
12  he owns trillions of dollars of valuable bank instruments, he
13  owns a billion dollars of oil in Texas, he has valuable artwork
14  worth millions of dollars hanging on his wall, and he will
15  guarantee you the repayment of your loan with his assets and
16  his company's assets.

17         Not only that, he's going to make it more attractive
18  to you.  If you lend him $10,000, in 30 days, he will give you
19  $30,000, triple your money.

20         When those 30 days come around and you ask for your
21  money, he says, you know what?  I will make a better deal for
22  you.  I will give you ten times your money in 60 days.  So now
23  you will get $100,000, and this will go on and on and on with
24  no money ever being repaid on any of these loans.

25         Besides guaranteeing these loans with his valuable

1   assets, he's going to make other wild claims, which you will

2   hear during the course of this trial.

3          Now, if you're like me and most people, you would use

4   your common sense and say that this is ridiculous, and just

5   laugh in the man's face and you would walk away.

6          Unfortunately, there are people in our society who

7   don't have common sense and are very gullable and very

8   believing and very trusting, and Mr. Harley preys upon those

9   types of people, and that's what this case is about.

10          Mr. Harley, the evidence will show, spent his days

11   and nights, despite sitting in his modest condominium in the

12   Poconos on a retirement income, on the internet searching for

13   these gullable people, people he has not even met on some

14   occasions, and he will start conversing with them and e-mailing

15   back and forth and telephone calling back and forth and telling

16   them about his trillions of dollars of assets and his billions

17   of dollars of oil and get them all pumped up on this

18   get-rich-quick scheme and get them to invest money with him,

19   and that is how he lives.

20          This case is about Mr. Harley getting over $300,000,

21   $323,000 from multiple people in various walks of life through

22   this scheme.

23          Good afternoon.  I want to reintroduce some of the

24   people who are here.  You heard, my name is Bruce Brandler.

25   I'm an Assistant U.S. Attorney, and I work for the Federal

1    Government, the United States Attorney's Office.  I work out of

2    the Harrisburg office.  We also have a branch office in

3    Scranton, and I work cases all throughout our district, which

4    includes the Pocono region, and that's why this case is here,

5    because it's a branch courthouse closest to the Poconos.

6           Mr. Browning is with the FBI.  He was the lead

7    investigator assigned to this case.  He will testify during the

8    course of this trial.  April Phillips is also -- you can't

9    probably see her.  She is hiding behind one of the charts.  --

10   she is also with the FBI, and she will be assisting Vince and I

11   during the course of this prosecution.

12          Another person who wasn't here this morning is Cathy

13   Anders, and she is a very important person in this case.  She

14   works for the U.S. Attorney's Office as a litigation support

15   specialist.  What that means is, you might have noticed these

16   monitors in front of you, and those monitors, if everything

17   works as they should, and hopefully they will, when we call

18   evidence and we introduce evidence to the witness, you will be

19   able to see the evidence on those monitors just like you are

20   watching TV.

21          In the old days, when I first started, we had to show

22   the document to a witness, and then the juror would sit there,

23   and they wouldn't know what we were talking about as we are

24   talking about this document.

25          Now you will hopefully be able to see the documents

1 as we have this.  That is the purpose of that.  Cathy is in

2 charge.  So if anything breaks down, you direct your eyes at

3 Cathy, but she does a very good job, and I'm sure it will work

4 properly.

5 　　　　The Judge told you we're at the stage of the trial

6 known as the opening statements, and it's a very important

7 stage of the trial, because you know nothing about this case.

8 You came here this morning.  You got a notice in the mail that

9 you got called for jury duty.  You never heard of Richard

10 Harley.  You never heard of trillions of dollars.  You never

11 heard of billions of oil.

12 　　　　Vince Browning and myself, we have been living with

13 this case for years.  We're very fluent with the facts, and we

14 may assume that, you know, anyone else may know the facts as

15 well as we do, but it's obvious you don't.  You know nothing

16 about this case, and that's the way it should be, because you

17 will base your decision upon the evidence that comes in through

18 the course of this trial, which, unfortunately, is going to

19 last about two weeks, and I give that notice up front.  The

20 Judge mentioned that this morning, because there is just a lot

21 of the evidence in this case.

22 　　　　We have numerous witnesses.  I read the list this

23 morning, about 25 or so witnesses who we expect to call.  There

24 was a search warrant executed at Mr. Harley's residence where

25 we seized a large number of documents, both off of his computer

1  and just physical paper documents in his house, and those need

2  to be introduced, and we have a number of victims who will

3  testify in this case.

4          So there is a big story here, and hopefully, if I do

5  it right, if I do it the way I'm supposed to do it, you will

6  have a table of contents to that story going forward.

7          This opening summarizes, kind of think of it as a

8  preview of coming attractions, so you will be better to

9  understand the evidence as it comes in.

10          Since we have about 25 witnesses, and they all have

11  busy lives, just as you do -- they have schedules, they have

12  vacations, they have doctors's appointments -- sometimes we

13  call these witnesses not in the order that you would expect.

14  It's out of sync, or it's not a chronological sequence.

15          So it may be hard to understand, but, hopefully, if

16  you think back to my opening, you will be able to fit the

17  pieces of the puzzle together and understand it a little bit

18  better.

19          I'm going to try to attempt to tell you what I intend

20  to prove through these witnesses and through these documents

21  during the next two weeks.

22          I also want to warn you at some point in the trial,

23  it may get very repetitive and very boring, and you're going to

24  say, God, Brandler, we heard this already.  You know, we know.

25          Please bear with me.  Be patient.  I have a job to

1  do, and I take it very seriously, as does Mr. O'Brien.  This is

2  an important case for both sides.  It's an important case to

3  the United States.  It's an important case for Mr. Harley.  I

4  want to be as thorough as I can.

5          So if there comes a point in the time of the trial

6  where you just feel that it's overboard, don't take it out --

7  take it out on me.  Don't take it out on the case itself.  I

8  just ask you do that.

9          How did the case begin?  Well, there's a man named

10 Marshall Silverstein, and he is one of the biggest victims of

11 this fraud.  He lost over $250,000 to Mr. Harley, and he had

12 sued Mr. Harley in court, in civil court, in a civil

13 proceeding, and had gotten a judgments against Mr. Harley over

14 a million dollars, but he was having trouble collecting on that

15 judgment, and he also felt that he wanted more justice than

16 getting his judgment that he may or may not be able to collect

17 on, so he reported his interactions with Mr. Harley to the

18 United States Attorney's Office and to the FBI.

19         He had a lawyer.  The lawyer contacted the U.S.

20 Attorney's Office, we contacted the FBI, and we brought

21 Mr. Silverstein in and we interviewed him, and he told us his

22 story about how he interacted with Mr. Harley.

23         So, based upon that initial complaint, an

24 investigation started.  A number of subpoenas were issued,

25 documents were obtained from banks, from brokerage houses.  As

1  I said, we did a search at Mr. Harley's residence about a year

2  later.  We obtained a lot of evidence that way.  A number of

3  interviews were conducted.  We tried to piece together the

4  story and see whether or not it was bigger than

5  Mr. Silverstein.  That was basically the point of the

6  investigation.

7          We found out some interesting things during the

8  course of that investigation.  First of all, this was not the

9  first time that Mr. Harley was involved in this oil scheme with

10 law enforcement authorities.  You're going to hear evidence,

11 tape recordings, as a matter of fact, of Mr. Harley discussing

12 this oil scheme back in 1999 in Alabama.

13          There was a bank called South Trust Bank, and he was

14 trying to get a document from the bank what he called a

15 safekeeping receipt, and the bank was very suspicious of

16 Mr. Harley and this other gentleman who was seeking the

17 safekeeping receipt, and they contacted the FBI down in

18 Alabama, and the FBI was brought in, and you will hear from one

19 of the agents who was handling that Alabama investigation, a

20 woman by the name of Vicki Davis, who's going to come in from

21 Alabama and tell you about that investigation.  She recorded

22 Mr. Harley, so you will get to hear Mr. Harley speak about this

23 scam.  So that was one interesting thing that we found out.

24          The second portion that we found out is that

25 Mr. Harley has repeatedly filed for bankruptcy.  The Judge told

1   you that some of the charges in this case related to bankruptcy

2   fraud and making false statements to the bankruptcy.

3          What you're going to hear about is there's three

4   separate bankruptcy petitions that Mr. Harley filed.  One in

5   2010, one in 2011, and one in 2012.  The first two were

6   basically corporate bankruptcy filings for his company RJH,

7   which owned the billion dollars of oil, so he claimed.  The

8   third bankruptcy petition was a personal bankruptcy petition

9   for himself.  We allege that he made various false statements

10  on a number of those petitions and that he was attempting to

11  defraud Mr. Silverstein.

12         Because one of the things that you're going to hear

13  about is when you go into bankruptcy, the reason people declare

14  bankruptcy -- it's not such a great thing to declare

15  bankruptcy -- you list all your debts, and at the end of the

16  day, if you're successful in bankruptcy court, those debts get

17  wiped out.  That's why people enter into bankruptcy so that

18  they can start fresh.  He listed Mr. Silverstein down as one of

19  the debtors.  He acknowledged the judgment for over a million

20  dollars that Mr. Silverstein had gotten in that case, and he

21  was trying to wipe out the debt, which we say was a fraud.  It

22  was part of this scheme to defraud Mr. Silverstein.  So that's

23  kind of the bankruptcy fraud aspect of it that we found out

24  about.

25         I told you that we conducted a search at Mr. Harley's

1  residence.  That took place in August of 2012.  Mr. Silverstein

2  came in, I think it was September of 2011.  In August of 2012,

3  we conducted a search.  Mr. Browning was the lead agent, and he

4  will testify about a statement that Mr. Harley made during the

5  course of that search.

6         Mr. Harley was present with his wife.  He was

7  interviewed about these allegations that Mr. Silverstein had

8  made, and you will hear what Mr. Harley said during the course

9  of that interview, basically claiming that these were all

10  legitimate transactions.  He really does own the oil in Texas.

11  He does have the trillion dollars of bank instruments, and this

12  is all on the up and up, that it's legit, and you will be very

13  embarrassed when it all comes out in the end that this is a

14  real deal.

15         He also admitted that when he got that money from

16  Mr. Silverstein, over $250,000, they asked him, what did you

17  use it for?  Did you invest it in any of your companies?  Did

18  you try to get the oil off the ground?  No.  He used it for his

19  personal expenses.  He paid his mortgage, paid his utility

20  bills, bought a nice Lexus.

21         As a matter of fact, he bought two cars during this

22  time period with Mr. Silverstein's money.  So that was not even

23  in dispute, but the point is that you will see some of the

24  items that we seized during the course of that execution of the

25  search warrant.  You will hear the statements that Mr. Harley

1  made to Mr. Browning.

2        One of the things that Mr. Harley explained to Mr.

3  Browning is this Federal Reserve Note that he claimed he owns,

4  these trillions of dollars.  There were two checks in

5  particular, two $500 million checks that were issued, according

6  to Mr. Harley, by the Federal Reserve Bank of New York, and

7  Mr. Harley was claiming that those were legitimate checks.

8        One of the things you will hear in the trial, and

9  some of the witnesses, perhaps, this afternoon will tell you

10  that Mr. Harley contacted the Federal Reserve Bank on numerous

11  occasions regarding these checks and his claim about owning

12  trillions of dollars of Federal Reserve instruments, and he was

13  told repeatedly that this was totally bogus, that those checks

14  were illegitimate.  It was a known scam that was actually on

15  the Federal Reserve Board's website, where they directed him to

16  read the website.  This is just a scam.  Stop claiming these

17  checks are legitimate.

18        Despite all of these warnings, you're going to hear

19  that Mr. Harley continues on and tries to deposit these checks

20  at various financial institutions repeatedly, and that is the

21  subject of the bank fraud count in this case.

22        The way his scheme works is that he tries -- what

23  Mr. Harley explained is that he tries to monetize his assets.

24  So what that means is although he claims he owns a billion

25  dollars of oil, he doesn't sell the oil and get money.  He

1  tries to use that oil to get a loan from either a financial

2  institution or someone like Mr. Silverstein, claiming that he

3  owns a valuable asset that he can use as collateral.  He calls

4  that monetizing his valuable assets.

5          The only problem is, is that he doesn't have any

6  valuable assets.  He knows that it's all fake and a fraud and

7  has been repeatedly told as much, but he continues to tell

8  other people that there are these valuable assets, and he gets

9  them to give him money as a result.

10         Let me show you some charts that we have up there.

11 This first one here is simply a listing of the counts in the

12 indictment.  At the conclusion of the case, after all the

13 evidence is in and the Judge charges you, I will come back with

14 a closing statement, Mr. O'Brien will get a closing statement,

15 and the Judge will charge you on the law.

16         You will have to decide the verdict on these

17 particular counts, which there 23 counts in this indictment.

18         So, as Judge Caputo indicated, Counts 1 through 15

19 are wire fraud counts, and what this shows is that Counts 1

20 through 5 deal with a victim named Marshall Silverstein.

21         So what those counts are going to be are just

22 basically wire transfers of money.  Mr. Silverstein had a bank

23 account in Pennsylvania, and he would wire money to Mr. Harley

24 as a result of this scheme, and that's the interstate use of

25 the wire.  So each one of those transactions will generally be

1  the same.

2  Same thing, Count 6 is a wire fraud count.  The only

3  difference here is the victim was a guy named Maurice

4  Schufford.

5  Counts 7 through 10, the victim is Malcolm Casselle.

6  Now, in some of these cases, like Irene Randall, who

7  is in Count 11, it doesn't relate to the actual transfer of

8  money.

9  We heard, I can go to the bank and wire money.  You

10  wire it from your bank to their bank.  In Irene Randall's case,

11  it's an e-mail transmission where Mr. Harley was soliciting

12  funds from his potential victim, and he sent her an e-mail

13  basically telling her how valuable his company is and the

14  assets that he owns, trying to get her to invest money in his

15  company.  So that would be Irene Randall.

16  Counts 12, 13 and 14 are wire fraud counts, but they

17  relate to financial institutions.  In Count 12, the victim is

18  Merrill Lynch Pierce Fenner.

19  You will hear evidence that Mr. Harley had an account

20  at Merrill Lynch, and he actually used his brokerage account as

21  a checking account where he would write checks and deposit

22  money.  A lot of the victims' money ended up in the Merrill

23  Lynch account.

24  In this particular case, you will hear evidence that

25  he actually tried to defraud Merrill Lynch by depositing some

1   of these bogus checks, these two $500 million checks, into his

2   Merrill Lynch account, after he was told by numerous Federal

3   Reserve people that these checks were bogus, illegitimate.

4        The same thing with State Street Alternative

5   Investment Solutions, another financial institution he tried to

6   deposit checks in; LPL Financial and, of course, Count 15 is

7   the Federal Reserve Bank of New York, which supposedly would

8   have had to pay, once he deposited these instruments at the

9   bank, they would have been the debtor.

10       The bankruptcy court counts are Counts 16 through 22.

11  As I mentioned, there were three separate bankruptcy petitions.

12  One in 2010, one in 2011, and one in 2012.

13       Each one of those counts relate to the fraud against

14  Silverstein, trying to discharge his debt in bankruptcy court

15  for the 2010 and 2011 petitions, and then also bearing false

16  statements that he made on those petitions.

17       I think there was a gentleman here this morning that

18  said he actually filed for bankruptcy, but for those of you who

19  have never filed, you have to list all your assets, you have to

20  list all your debt, and the bankruptcy judge and your creditors

21  make a decision on what you have.

22       We allege that Mr. Harley made various false

23  statements claiming that he owned $765 million in oil from

24  Texas for RJH.

25       Failure to list in his personal petition -- those

1   were his corporate petitions -- failure to list Mr. Silverstein

2   as a debtor, and also the SEC, the Security and Exchange

3   Commission, and the United States.

4          You will hear evidence that besides Mr. Silverstein,

5   Mr. Harley owed money on separate matters to the Securities and

6   Exchange Commission and the United States.  These are

7   substantial amounts of money.  We're talking hundreds of

8   thousands of dollars that he failed to list on his personal

9   bankruptcy petition in 2012.

10          He also failed to list various personal properties,

11  such as the valuable artwork that he told Mr. Silverstein was

12  worth $1.8 million.  He even failed to list his affiliation

13  with RJH.  This is the company that he said he was the CEO of,

14  and the evidence will show that he has continually represented

15  himself to be the CEO of this company.

16          One of the questions asked, are you affiliated with

17  any corporation as an officer?  He didn't list it.

18          County 23 is the bank fraud count, which is related

19  to the Federal Reserve Bank of New York, which we have

20  discussed.  So that was supposedly who was the issuer of these

21  checks, supposedly who was holding the $5 trillion bank

22  instruments that he was trying to defraud.

23          The next charge is kind of a summary of what I just

24  told you, and I'm not going to go over it all, but the point of

25  this charge is to show you there's three things going on that

1  you will hear during the course of the trial.  They are all

2  related to one another, but they're separate because they have

3  different objects.

4        What we call the treasury check scheme is Mr. Harley

5  trying to get loans based on those false claims of owning $5

6  trillion in bank instruments and attempting to deposit the two

7  $500 million checks into these various financial institutions.

8        The oil scheme, which we call, is the second scheme

9  here, by claiming that he owns 10 million barrels of oil in

10 Texas worth over a billion dollars.

11       He has a promissory oil reduction note that he's

12 showing these various people, including Mr. Silverstein and the

13 other victims, which is a piece of paper, it's an IOU, a

14 promissory note, which he represents to be valid, and he

15 represents that his company, RJH, is owed $200 million dollars

16 from a company in Texas called Enpetro.

17       You will hear that that note is of no value.

18 Mr. Harley knew that it was of no value, but makes false

19 representations to get people to give him money.

20       The last scheme charged in the indictment that we

21 kind of discussed is the bankruptcy scheme.  So that is the

22 discharge of Mr. Silverstein's debts in the bankruptcy court

23 and making the false statements in his filing.

24       This is not a difficult case.  Although it will take

25 two weeks, and we will have a lot of witnesses here, and

1  there's going to be a lot of evidence, it's really, I submit to

2  you, fairly straightforward, and you're not going to have

3  difficulty with it.

4         The most important thing that you need to do is use

5  your common sense.  Judge Caputo told you that's what it all

6  comes down to.  That's why we have a jury system here is to

7  bring people in, lay people like yourselves, to make

8  common-sense judgments about common-sense facts, just like you

9  would do in your ordinary life.

10        Thank you for your attention.  As I said, it's an

11 important case for the United States.  It's an important case

12 for the victims who lost money here.  I appreciate the time

13 that you're going to spend in the next two weeks sitting and

14 deliberating on the facts of this case, and I hope you will

15 give Mr. O'Brien the same attention you have given me.

16        Thank you very much.

17        MR. O'BRIEN:  Your Honor, we would waive our opening

18 at this time, but I would request that the United States

19 Attorney provide me with two copies of those charts.

20        MR. BRANDLER:  You already have them, but I will give

21 you additional copies.

22        THE COURT:  All right.

23        As I indicated to you at the outset, Mr. O'Brien

24 does not have to make a statement at this time, and he's chosen

25 not to.  We're going to proceed.  The first witness.

1          MR. BRANDLER:  Richard Jones.

2  RICHARD JONES, having been duly sworn or affirmed according to

3  law, testified as follows:

4          MR. BRANDLER:  May I proceed, Your Honor?

5          THE COURT:  Yes.

6          MR. BRANDLER:  Thank you.

7                      DIRECT EXAMINATION

8  BY MR. BRANDLER

9  Q.    Good afternoon, Mr. Jones.

10 A.    Good afternoon.

11 Q.    Can you tell the members of the jury your current

12 occupation?

13 A.    I am general counsel for the Federal Reserve Bank of

14 Atlanta, and I'm also the ethics officer for the bank.

15 Q.    And how long have you been general counsel for the Federal

16 Reserve Bank in Atlanta?

17 A.    14 years.

18 Q.    Are you a lawyer?

19 A.    Yes, I am.

20 Q.    And where did you get your law degree?

21 A.    At George Washington University in Washington, D.C.

22 Q.    What year did you get it?

23 A.    1984.

24 Q.    For those of us who are not familiar with the Federal

25 Reserve Board and the Federal Reserve System, can you tell us,

1  what is the Federal Reserve Bank of Atlanta?

2  A.   The Federal Reserve Bank of Atlanta is one of the 12 banks

3  that are part of the Federal Reserve System.

4       There are 11 other banks in Philadelphia, New York,

5  Boston, Minneapolis, Chicago, San Francisco, Dallas, Cleveland,

6  Richmond, Kansas City and St. Louis.  Those are the 12 reserve

7  banks.

8       The Board of Governors on the Federal Reserve System is in

9  Washington, D.C., and they perform oversight functions for the

10 Federal Reserve Banks, but altogether, the Federal Reserve is

11 considered the nation's central bank.

12 Q.   When you say the Federal Reserve Bank of Atlanta is one of

13 12 regional banks, is that different than the Federal Reserve

14 Board in Washington, D.C.?

15 A.   Yes.  The Federal Reserve Banks are private.

16      The Federal Reserve Board in Washington, D.C. is a federal

17 agency, and the Federal Reserve was conceived as a private

18 public combination that would make the best use of private and

19 public resources.

20 Q.   If taken altogether, is that known as the Federal Reserve

21 System?

22 A.   Yes.

23 Q.   What is the purpose of this Federal Reserve System?

24      Why do we have this system set up?

25 A.   As I said, the purpose of the system is to serve as the

1  nation's central bank to perform fiscal agency functions for

2  the U.S. Government and the U.S. Treasury.

3        We monitor -- the Federal Reserve is responsible for

4  monetary policies.  It also regulates banks and bank holding

5  companies, and it also performs bank correspondent functions

6  for the banking industry.

7  Q.   Does the Federal Reserve Board have its power devised from

8  Congress?

9  A.   Yes.

10  Q.   So -- let's strike that.

11       Does the Federal Reserve Bank, the regional banks, do they

12  do business with private individuals?

13  A.   No.  The Federal Reserve Banks, they only hold deposits

14  and make loans to commercial banks.

15       So they are, in some respect, a banker's bank.  They don't

16  do business with individuals.  They don't hold accounts on

17  behalf of individuals.  No individual has any business

18  relationship with the Federal Reserve Bank.

19  Q.   So is it accurate to say that private individuals do not

20  have accounts at any of the Federal Reserve Banks?

21  A.   Yes, that would be accurate.

22  Q.   They don't take deposits from private individuals?

23  A.   Also accurate.

24  Q.   Is there money that's actually on deposit with the Federal

25  Reserve?

A.    Yes.   The banks have deposits at the Federal Reserve.

     The Federal Reserve in Atlanta, for example, has a vault
that is five-stories deep that holds cash on behalf of the
banks that are members of the Federal Reserve in the six
districts which is in the southeast.

     All of those banks have deposits.   They can take cash as
they need out of the reserve bank of Atlanta, and when they
have sufficient cash on hand in their banks, their own bank
logs, they can store money at the Federal Reserve Bank of
Atlanta.

Q.    Who is in charge of the Federal Reserve Board in
Washington, D.C.?

A.    So, the head of the Federal Reserve System, which includes
the Federal Reserve Board in Washington and all of the Federal
Reserve Banks, is the chairman of the Federal Reserve, and that
currently is Janet Yellen.

Q.    And you mentioned there's a Board of Governors?

A.    Yes.

Q.    How many people are on the Board of Governors for the
Federal Reserve Board?

A.    There are 7 governors that are appointed by the president,
confirmed by the Senate, and they're also -- the 12 presidents
of the Federal Reserve Banks also sit on, along with the 7
governors, sit on what's called the Federal Open Market
Committee, and that committee is the committee that actually

1  determines monetary policy.

2  Q.   You mentioned that Janet Yellen is currently the chairman

3  of the Federal Reserve Board?

4  A.   Yes, that's correct.

5  Q.   Is that a presidentially appointed position?

6  A.   Yes, it is.

7  Q.   In the time period of 2006 through 2014, prior to Ms.

8  Yellen taking that position, who was the chairman of the

9  Federal Reserve Board?

10  A.   The chairman prior to Janet Yellen was Ben Bernanke.

11  Q.   Was Ms. Yellen in any official capacity during that time

12  period?

13  A.   During a good period of time -- a good period of Ben

14  Bernanke's -- Chairman Bernanke's term, Ms. Yellen was the vice

15  chair.

16       She also was a sitting governor.  Not the chair, not the

17  vice chair, but a governor, and also during Ben Bernanke's

18  term, she was president of the Federal Reserve Bank of San

19  Francisco.

20  Q.   You mentioned that there are people in charge of the

21  regional banks, for instance, the regional bank in Atlanta that

22  they are associated with.

23       What's the title of those people that are in charge of the

24  regional bank?

25  A.   So each regional bank -- again, the regional banks are

1  independent.  They are their own president and first vice

2  president and board of directors.  So each president is a

3  person that's the senior executive of each regional bank.

4  Q.    So is the person in charge known as president of the

5  Federal Reserve Bank, the regional bank?

6  A.    Yes.

7  Q.    That president -- who appoints the president of the

8  regional bank?

9  A.    So, the president is actually appointed by the local board

10  of directors for the regional bank.

11  Q.    And is the Federal Reserve Board, or the Federal Reserve

12  Bank, part of the U.S. Treasury?

13  A.    No.

14      As I said, they are private, and they are considered

15  legally what is a called a federal instrumentality, meaning

16  that the reserve banks are an institution through which the

17  Government performs some of its official functions, and one of

18  the functions is a physical agency function.  We hold accounts

19  on behalf of the Federal Government, but it's not part of the

20  Federal Government.

21  Q.    Does the Federal Reserve Board or the Federal Reserve Bank

22  produce the currency and the coins that is legal tender in the

23  United States?

24  A.    So, the coins are produced under the auspices of the U.S.

25  Treasury Department and the Bureau of the Mint.  That's where

1  they are created, but they are held and deposited at the

2  Federal Reserve Bank.

3      So on dollar bills, you may see Federal Reserve Bank of

4  Atlanta, meaning that that dollar bill was created and

5  deposited in the Federal Reserve Bank of Atlanta on behalf of

6  the U.S. Government.

7  Q.    Does the Federal Reserve Board or Federal Reserve Bank

8  issue U.S. Treasury Checks?

9  A.    No, they do not.

10  Q.    In your role as general counsel for the Federal Reserve

11  Bank in Atlanta, did you have any contact with the Defendant in

12  this case, Mr. Harley?

13  A.    Yes.  I spoke with Mr. Harley by telephone on a number of

14  occasions.

15  Q.    Approximately what time period did you have contact with

16  him?

17  A.    This would have been the spring, late winter of 2011.

18  Q.    And during what period of time and how many months?

19      Was it just on one occasion, or did it play out over a

20  course of months?

21  A.    So it probably played out over a course of three months,

22  maybe late February, March and April of 2011.

23      We had approximately 5 to 6 telephone conversations.

24  Q.    And in addition to telephone conversations, did you have

25  any other communications with him via any other medias?

1  A.   I think we exchanged a few e-mails.  He wanted to send

2  some documents to me by e-mail that he asked on a couple of

3  occasions if I would provide him written confirmation of things

4  I had told him on the phone by e-mail.

5  Q.   And tell us how this matter first came to your attention

6  in February of 2011.

7  A.   It first came to my attention when I was informed by the

8  executive office, and that's an office where the president

9  sits, that Mr. Harley had sent some documents to the Reserve

10  Bank of Atlanta to the attention of my president -- his name is

11  Dennis Lockhart -- and they wanted to know if I would be able

12  to speak to him, because he was making a claim that the Federal

13  Reserve Bank of Atlanta owed him money, and they asked me to

14  speak to him.

15  Q.   Before you contacted Mr. Harley, did you review the

16  correspondence that was mailed in to Mr. Lockhart regarding

17  this demand by Mr. Harley?

18  A.   Yes, I did.

19  Q.   Can you just generally describe what you reviewed and the

20  nature of it?

21  A.   So, I looked at the documents.  I think they had been

22  FedExed to the Federal Reserve Bank of Atlanta.  It was a big,

23  thick stack of documents, and there were a couple documents

24  that purported to be U.S. Treasury Checks, and they were for

25  $500 million each as I recall.

1        Then there was a lot of supporting documentation that sort

2   of gave the background on how these checks came to be.

3        For me, I'm a banking attorney.  I've been a banking

4   attorney for probably 30 years, and at that time, you know,

5   I've seen lots of scams and lots of bogus efforts to get money

6   from banks primarily, not as much as from the reserve banks,

7   because it is pretty well known that the reserve banks don't do

8   business with the public.

9        I looked through all of these documents, and they were

10  clearly bogus.  They purported to be authorized by the Federal

11  Reserve Board and signed by Chairman Ben Bernanke during his

12  time as chairman.  It clearly was not his signature.

13       First of all, just the idea --

14            MR. O'BRIEN:  Objection, Your Honor.  There really

15  hasn't been a foundation laid.  We haven't even seen the

16  documents.  This jury is hearing testimony this witness

17  testified certain documents were bogus.  I think they should be

18  brought into evidence before somebody renders an opinion on

19  them.

20            MR. BRANDLER:  I don't think there's any rule in the

21  order that I need to introduce my evidence.  He can say what he

22  saw, and we're going to see the documents.

23            MR. O'BRIEN:  He can say what he saw, true, but he

24  talks about the contents of them being bogus.  I think that --

25            THE COURT:  Well, I'm going to allow it.

1    If it's not connected, you can move to strike.  Go

2  ahead.

3    THE WITNESS:  So my reaction was, this is ridiculous,

4  because, for me, it was yet another scam or attempt to obtain

5  something from the Federal Reserve Bank or from a bank in

6  general that was not appropriate.

7  BY MR. BRANDLER:

8  Q.   And after you reviewed the documents and came to that

9  opinion, you said you had some contact with Mr. Harley.

10    Approximately when did you have contact with him?

11  A.   So, I think he made another call to my president, and they

12  referred him to me, and that was the first opportunity I had to

13  speak with him directly.

14    I asked him about what his business was with the Reserve

15  Bank.  He described how these treasury notes were legitimate in

16  his opinion and what he had gone through in order to obtain

17  these from, I think, Mr. -- I forgot his name, but Mr. Kiat, or

18  something of that nature.

19  Q.   How would you spell that?

20  A.   Kiat.  It's an Indonesian name, I guess.  If I saw the

21  name, I would recall it.  I don't recall the spelling exactly,

22  but --

23  Q.   How did he say he obtained these checks and these valuable

24  bank instruments?

25  A.   As best as I could tell, he was describing how he had got

1  in the position to negotiate these treasury checks on behalf of

2  or instead of Mr. Kiat, and I will say Kiat just for lack of

3  knowing the exact name.

4       Therefore, because they were legitimate and they were

5  something that had long been held by Mr. Kiat, now he was in

6  the place of Mr. Kiat, either as Mr. Kiat's agent, or someone

7  that had actually purchased the right to press these checks or

8  make a claim on these checks against the Federal Reserve.

9  Q.   In addition to the name of Kiat, did the name of Yohannes

10 Riyadi come up?

11 A.   Riyadi, yes.  The name Riyadi, that's the name.  I'm

12 sorry.  Yes.

13 Q.   What came up?

14 A.   It seems like the same connection.

15      Mr. Riyadi was someone who had originally held the checks,

16 and supposedly, at some point in history, had paid something

17 dearly to get them, and now Mr. Harley says that they were his

18 and he had the right to negotiate.

19 Q.   During the course of -- how many discussions did you have

20 with him on the phone?

21 A.   I think I had five or six discussions with him on the

22 phone.

23 Q.   During the course of -- and they were in that same time

24 period in early 2011 that you mentioned?

25 A.   Yes.

1  Q.   Did Mr. Harley at any time during those discussions

2  indicate a willingness to negotiate how much money he would

3  accept from the Federal Reserve for the instruments?

4  A.   He initially said that he was owed $1 billion.  He said he

5  would be willing to settle for $500 million.

6       I told him that that was -- you know, I appreciate his

7  willingness to accept something less than what he thought he

8  was due, but these checks were not supportable, they were

9  bogus, and in my view, I told him that they were an attempt to

10 commit fraud on a Federal Reserve Bank.

11 Q.   How many times did you tell him that these checks were

12 bogus and fraudulent in your opinion?

13 A.   Yeah, so that's the interesting thing.

14      I told him a number of times, and we engaged in

15 significant discussions about why they were bogus and why they

16 couldn't be legitimate, and I reiterated time and time again

17 that there is no way they could possibly be legitimate, because

18 no individual could possibly have been given an account in a

19 Federal Reserve Bank.

20      So over the course of those five or six telephone calls,

21 you know, probably a half a dozen times on each call, I would

22 restate to him that these checks were bogus, and at one point,

23 I was asked to speak to someone representing himself as

24 Mr. Harley's counsel, and I told him the same thing.

25 Q.   How did that occur?

1  A.    Mr. Harley asked if I would be willing to speak to his

2  attorney, and, you know, at this point, probably by the second

3  or third telephone call, my conversations with Mr. Harley had

4  become to feel sort of common.

5      I mean, he constantly wanted to share something new about

6  why these were good checks and why the Reserve Bank should

7  honor them.  I would tell him over and over in no uncertain

8  terms that could not possibly happen.

9      After a while, I told him that you keep coming back with

10  something different, and what I need for you to understand is

11  there is nothing you can come back with that is going to wind

12  up allowing you to get a hundred million, 500 million, a

13  billion or one cent from a Reserve Bank, because what you are

14  trying to do are fraudulent and these documents are completely

15  bogus.

16      He asked if I would speak with his attorney, and I told

17  him I would be happy to, and I really was genuinely happy to,

18  because I thought maybe if I spoke to an attorney purporting to

19  represent Mr. Harley, that he might do a better job of

20  convincing him that his efforts were bogus than I had.

21  Q.    Did you eventually speak to a person who identified

22  himself as Mr. Harley's attorney?

23  A.    Yes, I did.

24  Q.    Do you remember that person's name?

25  A.    Again, I'm not 100 percent certain of the name.  If you

1  said it, I would recall it, but he was calling either from

2  Texas or Arizona, as I recall, and did represent himself as

3  Mr. Harley's attorney.

4  Q.   And what did you tell this individual regarding the

5  legitimacy of the checks?

6  A.   The exact same thing, that these checks were bogus, that,

7  quite honestly, if he continues to press this, we would need to

8  refer him to the U.S. Attorney, because what he's trying to do

9  is commit a fraud upon the Federal Reserve Bank.

10      The attorney -- actually, we had a good conversation.  He

11  said that --

12            MR. O'BRIEN:  I object to what --

13            THE COURT:  Sustained.

14  BY MR. BRANDLER:

15  Q.   Don't tell us what the attorney told you --

16  A.   Yes.

17  Q.   -- in response.

18      After you had these conversations that we discussed, did

19  you refer Mr. Harley to any other branches of the Federal

20  Reserve System?

21  A.   So, after a number of conversations, and even after

22  speaking to the attorney and feeling as though I had finally

23  made some headway, because I felt like the attorney understood

24  what I was saying, Mr. Harley made yet another effort to

25  collect on the fraudulent checks, and he called my president's

1  office once again.  So when I spoke --

2          MR. O'BRIEN:  Objection.  Foundation, hearsay.

3          THE COURT:  Pardon?

4          MR. O'BRIEN:  How would this gentleman have anything

5  but hearsay knowledge about what Mr. Harley would have said to

6  someone else?

7          He has to lay a foundation indicating he was on the

8  call or he heard the call.  There's got to be hearsay evidence.

9          THE COURT:  That's a legitimate objection.

10         Sustained.

11 BY MR. BRANDLER:

12 Q.   So without discussing what happened with this call that

13 led up to talking to Mr. Harley, did you end up referring this

14 matter to some other branch of the Federal Reserve System?

15 A.   So the checks were purported to be drawn on the Federal

16 Reserve Bank of New York.

17         So instead of -- even if they were, if they had any

18 legitimacy to them, they wouldn't have been negotiated at the

19 Federal Reserve Bank of Atlanta.  The banks are entirely

20 separate.  They are each separate corporations.

21         So I informed Mr. Harley that, first of all, you're coming

22 to the Federal Reserve Bank of Atlanta, I told you that these

23 are bogus repeatedly, but even if there was something to them,

24 the Federal Reserve back of Atlanta would never pay on a check

25 or a claim that was issued by the Federal Reserve Bank of New

1 York.

2      So if you really want to find out about these, you can go

3 to the Reserve Bank of New York because we're in two separate

4 institutions.

5 Q.    What did Mr. Harley respond as far as that suggestion?

6 A.    I think he said that he would and asked me if there was

7 someone in New York that he could contact to discuss this with.

8 Q.    Go ahead.  Did you refer him to anyone in particular?

9 A.    I gave him the name of my counterpart, the general counsel

10 of the Reserve Bank of New York.  His name is Tom Baxter.

11 Q.    And did you then communicate with Mr. Baxter as far as

12 that he could expect a call from Mr. Harley?

13 A.    So, I sent Mr. Baxter an e-mail warning him that

14 Mr. Harley would probably be contacting him and giving him an

15 indication of what Mr. Harley wanted.

16      I apologized.  I told him what he was trying to do was

17 ridiculous, but I told him that he would probably be coming his

18 way.

19 Q.    You said that through your role as general counsel with

20 the Federal Reserve Bank of Atlanta that you were familiar with

21 various scams against the Federal Reserve, right?

22 A.    Yes.

23 Q.    I want to show you an exhibit at this point.  It's been

24 marked as 23.8A.

25      Do you have that on the screen in front of you?

1 A.    Not yet.

2         MR. O'BRIEN:  Your Honor, before that is put up, I

3 understand what they're putting up is something that's on the

4 website, and I would object to that as hearsay.

5         That's an out-of-court statement on a website.  There

6 is no proof here that it was made as a business record or it's

7 otherwise --

8         THE COURT:  So there is no agreement about this?

9         MR. O'BRIEN:  There is an agreement that it is what

10 it says it is in terms of authenticity, but there is no

11 agreement that meets the rules -- substantive rules for

12 admissibility.

13        MR. BRANDLER:  Your Honor, the evidence is going to

14 be that Mr. Jones referred Mr. Harley to this particular

15 website -- that's how he was familiar with this being a known

16 scam -- and he told Mr. Harley and directed him to the website.

17        MR. O'BRIEN:  You can't offer the website for the

18 truth of the matter.

19        THE COURT:  Can you show me this document without

20 showing it to the jury?

21        MR. BRANDLER:  I have a physical copy of it.

22        THE COURT:  All right.

23        You're objecting to?

24        MR. O'BRIEN:  I'm objecting to it's hearsay that this

25 whole thing is a scam, and it is not admissible for that

1  because it is an out-of-court statement.

2          MR. BRANDLER:  That is not the purpose that it is

3  being admitted.

4          He directed Mr. Harley to that support for his verbal

5  statements that these were bogus checks and a known scam.

6          That's the purpose, that Mr. Harley was put on notice

7  that there was this information publically available.

8          THE COURT:  That's too fine a point.

9          I will sustain the objection.

10          You will have to do it some other way.  Talk to him

11  about referring him to things.

12          MR. BRANDLER:  I laid a foundation for it.

13          THE COURT:  I'm not going to allow it.  So you can

14  deal with it some other way.  Proceed.

15  BY MR. BRANDLER:

16  Q.   During the course of your discussions with Mr. Harley, did

17  you refer him to any official websites of the Federal Reserve

18  Bank that discuss this transaction that Mr. Harley was

19  attempting to engage in?

20  A.   Yes, I did.

21          In the course of the time that I had been speaking to

22  Mr. Harley, I asked another one of my attorneys to check with

23  New York.

24          The New York Reserve Bank keeps on its website a list or a

25  chronicle of some of the known scams that have been attempted,

1  and that website was for the benefit --

2          MR. O'BRIEN:  Same objection, Your Honor, getting

3  into trying to establish that this information on the website

4  is true.

5          They can say it's on the website, it was referred to

6  Mr. Harley and --

7          THE COURT:  Moreover, I don't know what it has to do

8  with Mr. Harley.

9          MR. BRANDLER:  Because this witness directed him to

10 that website.

11         THE COURT:  Fine.  It doesn't mean Mr. Harley knew

12 anything about what's on the website.

13         Move on, please.  Thank you.

14 BY MR. BRANDLER:

15 Q.   I want to show you another document which has been marked

16 23.3A.

17      Do you recognize this document?

18 A.   Yes, I do.

19 Q.   What do you recognize it to be?

20 A.   This is the cover sheet of the documents that were sent to

21 my president, Dennis Lockhart, by Mr. Harley -- I think by

22 Mr. Harley.

23 Q.   What is the date on the document?

24 A.   The date is March 3rd, 2011.

25 Q.   Who is it directed to?

1  A.    Again, it is directed to the president of the Federal Bank

2  of Atlanta, Dennis Lockhart.

3  Q.    What is the nature of the request?

4  A.    The request is to -- request for transfer of funds,

5  Custodial Account Number 021088506.

6  Q.    Going to the second page of this document, is this

7  document signed by anyone?

8  A.    Yes.  It appears to be signed by Richard Harley, CEO,

9  attorney-in-fact.

10 Q.    Going back to the front page, is this one of the documents

11 that you reviewed prior to contacting Mr. Harley that you were

12 asked to deal with him?

13 A.    Yes, it is.

14 Q.    I would like you to read the document to the jury, please.

15 A.    The whole document?

16 Q.    Yes.

17        THE COURT:  Any problem with that, Mr. O'Brien?

18        MR. O'BRIEN:  No, Your Honor.

19        THE COURT:  Fine.  You may do so.

20        THE WITNESS:  Dear Mr. Lockhart, in furtherance of

21 our conversation on Thursday, February 24, 2011, it was

22 requested that we send to you all the required documentation

23 pertaining to this matter.

24        Please be advised that our firm, RJH & Company, Inc.,

25 has unrestricted bond power over the instruments owned by

1  Joseph Teo Hui Kiat.  See bond power enclosed.

2          As the attorney-in-fact for Joseph Teo Hui Kiat, we

3  hereby request the transfer of $1 billion U.S.D. -- U.S.

4  Dollars, presumably -- under Custodial Account Number 021088506

5  to be deposited in our firm's attorney's custodial trust

6  account in 500 million U.S. Dollar denomination.  See writing

7  instructions enclosed.

8  BY MR. BRANDLER:

9  Q.    Wiring instructions?

10  A.    See wiring -- forgive me -- see wiring instructions

11  enclosed.

12      We are also providing all the instruments in the amount of

13  $1 billion U.S. Dollars consisting of the following:

14          1.   To Whom it May Concern letter.

15          2.   Reserve Funds letter.

16          3.   Custodial letter.

17          4.   Extend Validity of Safekeeping Receipt.

18          5.   Confidential Memo.

19          6.   Two U.S. Treasury Checks, Numbers 212210031730 and

20  317731.

21          7.   Two Federal Reserve Grey Screen Printouts.

22  Q.    Go to the next page, please.

23  A.    Your expeditious handling of the transfer of funds is

24  greatly appreciated.  Very truly yours, signed Richard Harley,

25  CEO, attorney-in-fact.  Please note our new e-mail address

1  R.Harley -- I can't make out the rest of it.

2  Q.    @RJH --

3  A.    @RJH3.com.

4  Q.    I want to refer you now to the attachment to the letter.

5        Can we have exhibit 15.3?

6        Can we go to the Bates No. Page 8?

7        Do you recognize this document?

8  A.    Yes.

9  Q.    What do you recognize it to be?

10 A.    It is one of the documents contained in the package that

11 was sent to my president, Dennis Lockhart, and one of the

12 documents purporting to support the claim that was being made

13 on the bank.

14 Q.    What is the title of the document?

15 A.    The title of the document is Limited Power of Attorney,

16 Authorization and Bond Power.

17 Q.    Just continue reading.

18 A.    To Richard J. Harley, CEO, from Joseph Teo Hui Kiat.

19 Reference; Power of Attorney, Authorization and Bond Power.

20 Q.    Just read the first paragraph.

21 A.    I, Joseph Teo Hui Kiat, the undersigned, do hereby give,

22 grant and appoint Mr. Richard J. Harley, CEO, and/or any

23 person, persons, entity and or assigns, duly appointed by him

24 or them, at his or their sole discretion, as my

25 attorney-in-fact to act in my capacity on my behalf as if I

1  were present in my place and stead and make and do any and all

2  of the following.

3  Q.   Can we go to the next page?

4       Going to the bottom of the page, is it dated and

5  purportedly signed by somebody?

6  A.   So, it's dated, executed on the 13th day of April 2009.

7  Purportedly, it bears the signature of Joseph Teo Hui Kiat.  It

8  has a notary acknowledgment and a witness to the above

9  signature and a notary stamp.

10  Q.   And can we go to the next page, please?

11       Do you recognize this document that's part of the package?

12           MR. O'BRIEN:  This is all in 15.3?

13           MR. BRANDLER:  Yes.  This is the next page.  It's

14  Bates No. 10 from the Federal Reserve package.

15           THE WITNESS:  Yes.  I recognize this document as

16  being part of the package.

17  BY MR. BRANDLER:

18  Q.   Can you just read the first paragraph?

19  A.   The first paragraph, the title of the document is Modified

20  Agreement to Extend Limited Power of Attorney, Authorization

21  and Bond Power.

22       This modified agreement to extend a limited power of

23  attorney authorization and bond power, the agreement is made

24  this 27th day of November 2010, by and between Richard Harley,

25  Chairman and Chief Executive Officer of RJH & Company, Inc.,

1  having its business address at P.O. Box 337 Shawnee on

2  Delaware, Pennsylvania, 18356, and its assignee, and Joseph Teo

3  Hui Kiat, a Singaporean citizen, having his address at No. 2

4  Jalan Rajah, No. 07-04, Singapore, 329134.

5  Q.    Going to the second page of this document, the next page,

6  Page No. 11, at the bottom, does it purport to be signed by

7  anybody?

8  A.    Yes.  The document purports to bear a signature of Joseph

9  Teo Hui Kiat and Richard Harley, CEO, and agent, RJH & Company,

10 Inc.

11 Q.    Now, in the cover letter that went to Mr. Lockhart, it

12 talked about wiring instructions.

13      I will show you in the same exhibit 15.3, the one that is

14 Bates No. 76 at the bottom, are these the wiring instructions?

15 A.    Yes, these wiring instructions were included in the

16 package.

17 Q.    Can you read what the wiring instructions indicate, where

18 this billion dollars, he wanted it to go?

19 A.    The wire instructions:  Bank name, Wachovia Bank; address,

20 3442 Orange Avenue, Northeast, Roanoke, Virginia, 24012; ABA

21 Routing Number 051400549; beneficiary, First Clearing, LLC,

22 Account No. 5050000000631.  Further credit, Donald E.

23 Sternberg, Attorney At Law, Enterprise Trust Account 5805-0455,

24 for the benefit of Joseph Teo Hui Kiat.  Final ultimate

25 beneficiary, RJH & Company, Inc., Richard Harley, CEO.

1  Q.   Now, the cover letter to Mr. Lockhart also talked about a

2  To Whom it May Concern Letter.  I would like to go to Page 55

3  of the same exhibit.

4       Do you recognize this document as being part of the

5  package to Mr. Lockhart?

6  A.   Yes, I recognize this document.

7       It was, again, one of the documents that was included in

8  the package of information that was sent to President Dennis

9  Lockhart.

10      It was one of the first indications to me that the

11 documents were bogus, a clear indication to me -- a

12 confirmation to me that the documents were bogus.

13 Q.   What was it about this particular document that gave you

14 that opinion?

15 A.   First of all, the very fact that it was a Reserve Bank

16 addressee, and the document was signed by Ben S. Bernanke, the

17 Chairman of the Federal Reserve, and Don Kohn, the Vice

18 Chairman, it would never -- Chairman Bernanke and Vice Chairman

19 Kohn would never sign a document that had the stamp of the

20 Federal Reserve Bank of New York on it, as if the documents

21 were coming from the Federal Reserve Bank of New York.  They

22 are two entirely separate institutions.

23      Though Mr. Bernanke, Chairman Bernanke, is the chairman of

24 the Federal Reserve System, it is recognized that the system is

25 made up of 12 individual, separately chartered created Reserve

1 Banks, and the Federal Reserve Board in Washington is a Federal

2 Agency, and the banks are independent and private.  So it would

3 just --

4         MR. O'BRIEN:  I object to these conclusions.

5         What does he know that these gentlemen could sign?

6 Does he even know who they are?  Does he know what they do?

7 There is just no foundation for all of these conclusions.

8         THE COURT:  Try to confine your opinions to the

9 facts.

10 BY MR. BRANDLER:

11 Q.    Being with the Federal Reserve Bank for 14 years, I think

12 you said, as general counsel, are you familiar with the logo of

13 the Federal Reserve Board and the Federal Reserve Bank?

14 A.    Yes, I am.

15 Q.    And is that any known logo that is used by the Federal

16 Reserve Board or the Federal Reserve Bank?

17     Have you ever seen anything of that nature?

18 A.    No.

19     I want to be careful here, but it was clear to me that the

20 logo was manufactured.  It's not authentic.

21         MR. O'BRIEN:  Objection.  It's not responsive.  He's

22 just speculating.  He said he's never seen that logo before.

23         THE COURT:  That's up to Mr. Brandler whether it's

24 not responsive.  Proceed.  Overruled.

25         MR. O'BRIEN:  I also object on the grounds of

1  speculation.

2          THE COURT:  He has some foundation for it.  He's been

3  around 14 years.

4          MR. O'BRIEN:  He also said that the two institutions

5  are separate.  Then he said they are part of the same system.

6          THE COURT:  That's for you to determine on cross

7  examination.  Overruled.

8  BY MR. BRANDLER:

9  Q.  You may continue.

10     I think the question was regarding the logos and the seal

11  that appears on this document and your knowledge of whether or

12  not that is used by the Federal Reserve Board or any of the

13  banks.

14  A.  Their logo looked to me to be bogus.

15  Q.  Have you ever seen it before in your 14 years?

16  A.  No.  It looked manufactured and it was not authentic.

17  It's not the logo of the Reserve Bank of New York, and it's not

18  the logo of the Federal Reserve Board.

19  Q.  Did you tell Mr. Harley that when you were discussing the

20  validity of these documents?

21  A.  I think I told him on numerous occasions all of the

22  reasons why these documents in my opinion were obviously bogus.

23  Q.  What were the reasons you told him?

24  A.  The fact that under no scenario would the chairman of the

25  Federal Reserve sign a document purporting to be from a Reserve

Bank.

Q.   And the reason you told him that was based on your understanding as general counsel for the Federal Reserve Bank in Atlanta, based on your experience?

A.   Yes.  Yes.  In my experience, and just an understanding of the statutory authority of our Federal Reserve Banks and that of the Board of Governors and the Chairman of the Federal Reserve, and the recognition of the fact that the system, the Federal Reserve System is made up of 12 separately chartered individual reserve banks with a separate board of directors and separate stockholders, and that they operate under the oversight of the Federal Reserve Board, but they are separate entities, meaning that they have their own independent corporate existence.

Q.   We didn't read the document.  What's the date on the document?

A.   The date on the document is May 4th, 2009.

Q.   What does the body of the document say?

A.   To Whom it May Concern, please be advised that checks numbered 212210031730, 212210031731, and Safekeeping Receipt number 021088506, dated April 14th, 2008, issued to Mr. Joseph Teo Hui Kiat, in the amount of $1 billion United States Dollars, U.S.D., 1 billion dollars, the denomination, are valid and negotiable.  Yours sincerely, Ben S. Bernanke, Chairman; Donald L. Kohn, Vice Chairman, and the document purports to

1 bear their signatures.

2 Q.   The second document that was referred to by Mr. Harley in

3 his March 3rd letter was something called the Reserve Funds

4 letter.  Can we go to Page 37 of this exhibit?

5      Do you recognize this document?

6 A.   Yes.

7 Q.   What do you recognize it to be?

8 A.   Another one of the documents included in the package that

9 was sent to the Reserve Bank of Atlanta.

10 Q.   What is the date on this document?

11 A.   The date on this document is March 31, 2006.

12 Q.   Who is it addressed to?

13 A.   It is addressed to Mr. Joseph Teo Hui Kiat, Custodial

14 Trustee, Custodial Account No. 021088506.

15 Q.   Going to the top of the page, who does it appear that it's

16 coming from, what entity or entities?

17 A.   Now, this document is coming from, at the top, the very

18 top, Federal Reserve Board, and then underneath Federal Reserve

19 Board is Federal Reserve Bank, which is the Federal Reserve

20 Bank of New York's address.

21      So that would never happen.  In my experience, I have

22 never seen anything like this.  It would --

23 Q.   Can you read the body of the letter?

24 A.   Dear Mr. Joseph Teo Hui Kiat -- Reserve Funds letter

25 title -- with reference to your request, we hereby confirm with

1  full authority and bank responsibility that the Federal Reserve

2  Bank of New York has blocked and reserved your U.S. Treasury

3  Checks No. 212210031730 up to 212210031731 inclusively with a

4  total amount of United States Dollars $1 billion U.S.D., 1

5  billion denomination, for the benefit of Mr. Joseph Teo Hui

6  Kiat, holder of Singaporean Passport Number 00598812.

7       These U.S. Treasury Checks have been blocked and reserved

8  from date of this letter for one year and one day renewable up

9  to five years.

10      We further confirm that these Treasury Checks can be

11 verified through a responsible bank inquiry.

12      Yours sincerely, Ben Bernanke, a signature purporting to

13 be that of Chairman Bernanke, and Roger W. Ferguson, Vice

14 Chairman, and a signature purporting to be that of former Vice

15 Chairman Roger Ferguson.

16 Q.   In your experience as general counsel for the Federal

17 Reserve Bank of Atlanta, have you ever seen a Reserve Funds

18 letter, such as this, blocking two U.S. Treasury Checks payable

19 to a Singaporean or a private individual?

20 A.   No.

21 Q.   The next document referred to by Mr. Harley was something

22 called Extend Validity of Safekeeping Receipt.

23      Can we go to Page 36?

24      Do you recognize this document?

25 A.   Yes.

1  Q.    What do you recognize?

2  A.    It was another one of the documents included in the

3  package.

4  Q.    What is the date on this document?

5  A.    The date of this document is April 14th, 2008.

6  Q.    Does it have the same logo that appeared on the prior one?

7  A.    It has the same logo.

8        On the top, Federal Reserve Board, and also the address --

9  well, it just has Feral Reserve Bank, but it's the address of

10 the Federal Reserve Bank of New York.

11 Q.    Can you read the body of the document?

12 A.    Extend Validity of Safekeeping Receipt.

13       We, the Federal Reserve Bank of New York, located at 33

14 Liberty Street, New York, New York, 10045, U.S.A., with

15 telephone number 212-720-5000, fax number 212-720-6331, SWIFT

16 Code FRNY, which is Federal Reserve New York, U.S. 33, hereby

17 confirms with full authority and responsibility that at the

18 request of our valued client, we extend the validity of SAR

19 number FRNY/0518844-03 up to April 15, 2010.

20       Type of funds/assets; U.S. Treasury Checks, check numbers

21 212210031730 up to 212210031731.  Registration on FED screen.

22 Access Code YR --

23 Q.    You don't need to read all of that.

24 A.    Thank you.

25 Q.    Can you continue on where it says date of issue?

A.    Date of issue, March 31, 2006.  Value date, March 31,
2011.  Callable and renewable annually.  Check denomination,
$500 million U.S. Dollars.  Total amount, $1 billion United
States Dollars.  These fund assets have been placed in our
capital safekeeping --

Q.    Custodial safekeeping?

A.    Forgive me.

      These fund assets have been placed in our custodial
keeping under Custodial Account Number 021088506; account name,
Yohannes Riyadi, safekeeping period from March 21 --

Q.    22?

A.    -- 22, 2006 to April 15, 2010.

      The safekeeping receipt is issued and effective from date
of issuance for the benefit of the custodial trustee and
signatories of the aforesaid funds/assets; namely, Mr. Joseph
Teo Hui Kiat, holder of Singaporean Passport Number 00598812 or
his assignees.

      We, Federal Reserve Bank, hereby confirm new Confidential
Memo per attached.

      Yours sincerely, Ben Bernanke and Donald L. Kohn, and
signatures purporting to be their signatures.

Q.    In your experience as general counsel with the Federal
Reserve Bank of Atlanta, have you ever seen a document such as
this called Extended Validity of Safekeeping Receipt?

A.    No.

Q.   And you indicated earlier that you had a discussion -- or you said that the Federal Reserve Banks do not have private accounts for anyone in its commercial bank, correct?

A.   And that's one of the things that makes this document unusual are one that I've never seen before.

     We do hold accounts, funds and safekeeping for financial institutions that are members of the Federal Reserve.  So the very fact that this was purporting to hold accounts in safekeeping for an individual made it, in my view, appear to be bogus.

Q.   And did you explain that to Mr. Harley during the telephone conversations?

A.   Numerous times.

Q.   And the name Yohannes Riyadi that appears in this document, was that a name that you were familiar with through your experience?

A.   It was a name that I became familiar with as a result of the conversations and the documents that Mr. Harley had shared, but I later learned, after reading information that had been put out by the Reserve Bank of New York, that that name had been used in an attempt --

          MR. O'BRIEN:  Objection, Your Honor.  Later learned that information.

          THE COURT:  Objection sustained.

BY MR. BRANDLER:

1  Q.   The next document that Mr. Harley attached to his letter

2  is something called a Confidential Memo.

3       Can we go to Page 57?

4           THE COURT:  Mr. Brandler, how much longer are you

5  going to be?

6           MR. BRANDLER:  We have quite a bit more.

7           THE COURT:  I usually go to 5.

8           MR. BRANDLER:  I think if I do the next two

9  documents, I think we can break there.

10          THE COURT:  That's fine.

11 BY MR. BRANDLER:

12 Q.   Can we go to Page 57?

13      Can you tell us, do you recognize this document?

14 A.   Yes.

15 Q.   What do you recognize it to be?

16 A.   It was another document included in the package.

17 Q.   It is the one that was called Confidential Memo.

18      Is this the Confidential Memo that was referred to that

19 you saw?

20 A.   Referring to when?  I'm sorry.

21 Q.   I'm sorry.

22      In his letter to Mr. Lockhart, March 3rd of 2011, you

23 listed seven items that he was a attaching, one was a

24 Confidential Memo.

25      Is this the Confidential Memo?

1  A.   Yes, it is.

2  Q.   And what's the date on this document?

3  A.   April 14th, 2008.

4  Q.   And it has the same logo at the top as appears on the

5  prior ones?

6  A.   It does.

7  Q.   And without reading the entire document, does it appear to

8  be signed by the same individuals as the other documents?

9  A.   Yes.   This one purports to be signed by Chairman Ben

10  Bernanke and Vice Chairman Donald Kohn.

11      I think another one of the documents purported to be

12  signed by Chairman Ben Bernanke and the former Vice Chairman

13  Roger Ferguson.   Vice Chairman Donald Kohn succeeded

14  Mr. Ferguson as Vice Chair of the Federal Reserve.

15  Q.   The next one that he referred to with the two U.S.

16  Treasury Checks and he gave various numbers to the checks.

17      Can we go to Page 53?

18      Do you recognize this document?

19  A.   Yes.   It is the U.S. Treasury -- purported U.S. Treasury

20  Check that was included in documents submitted on the Reserve

21  Bank.

22  Q.   And what is the check number?

23  A.   Number 212639974.

24  Q.   Under where it says check number, that number there.

25  A.   Check No. 212210031731.

1  Q.    Now, in the United States of America, are you familiar

2  with how the word check is spelled?

3  A.    Yes.

4  Q.    How is the word check spelled?

5  A.    C-H-E-C-K.

6  Q.    And have you ever seen a Government check with the

7  spelling C-H-E-Q-U-E?

8  A.    Not on a -- not a U.S. Treasury document, no.

9  Q.    On the upper left-hand corner, it says United States

10 Treasury.  Do you see where it says that?

11 A.    Yes.

12 Q.    Below that, where it says, paid to the order of, who is it

13 paid to the order of?

14 A.    It's paid to the order of Mr. Joseph Teo Hui Kiat.

15 Q.    And a value date?

16 A.    The value date is March 31, 2011.

17 Q.    Is there any indication about the Federal Reserve Bank of

18 New York on the top?

19 A.    It says, U.S. Treasury, and then it has the name Federal

20 Reserve Bank of New York, and after Federal Reserve Bank of New

21 York, valid after good value.  It's unusual wording.

22 Q.    Had you ever seen a check issued by the United States

23 Treasury or backed by Federal Reserve Bank of New York such as

24 this in your experience?

25 A.    No.

1  Q.   Did you explain that to Mr. Harley during your telephone

2  calls?

3  A.   It was another one of the things that made the documents

4  appear to me to be, you know, quite obviously bogus.

5  Q.   So that check was numbered 10031731.

6       I want to go to the next page, which is Bates No. 54.

7       What's the check number on this particular check?

8  A.   The check number here is 2122100 -- it's a little fuzzy

9  here -- I think it's 01730 or 230.

10 Q.   Is it in the same amount as the prior check that was

11 ending in 731?

12      What's the amount of the check?

13 A.   The amount of the check was $500 million.

14 Q.   Just going back to the other one, the one ending in 731,

15 what was the amount on there?

16 A.   $500 million.

17 Q.   And other than that, the numbers on these checks, did they

18 appear to be the same?

19 A.   Yes.

20           MR. BRANDLER:  That would be a good place to stop.

21           THE COURT:  Members of the jury, we are going to

22 adjourn for the day.  We are going to start tomorrow at 10.

23 Normally we will start at 9 or 9:30, but tomorrow we have to

24 start at 10.

25           Remember not to discuss the case among yourselves or

1  with anyone else.  If anybody tries to talk to you about it,

2  bring it to my attention.

3          Do not expose yourself to any media about this case.

4  I'm not saying there will be any, but if there is radio,

5  television, newspapers, whatever, no research.  You know the

6  rules.

7          You are to decide this case based solely on what you

8  see and hear in this courtroom during the course of this trial.

9          Enjoy your evening.  We will see you tomorrow morning

10  at 10.

11      (At this time, the proceedings in the above-captioned

12  matter adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE


        I, Suzanne A. Halko, Official Court Reporter for the United
States District Court for the Middle District of Pennsylvania,
appointed pursuant to the provisions of Title 28, United States
Code, Section 753, do hereby certify that the foregoing is a
true and correct transcript of the within-mentioned proceedings
had in the above-mentioned and numbered cause on the date or
dates hereinbefore set forth; and I do further   certify that
the foregoing transcript has been prepared by me or under my
supervision.


                        _____
                        Suzanne A. Halko, RMR, CRR
                        Official Court Reporter


REPORTED BY:

SUZANNE A. HALKO, RMR, CRR
        Official Court Reporter
        United States District Court
        Middle District of Pennsylvania
        Scranton, PA  18501-0090


        (The foregoing certificate of this transcript does not
apply to any reproduction of the same by any means unless under
the direct control and/or supervision of the certifying
reporter.)