1

### UNITED STATES DISTRICT COURT

### MIDDLE DISTRICT OF PENNSYLVANIA

United States of America,       )
                                )
          Plaintiff             )
                                )
      VS.                       )      CASE NO. 3:12-CR-00224
                                )
                                )
                                )
Richard J. Harley,              )
                                )
          Defendant             )
                                )
                                )
_____    )


### TRANSCRIPT OF PROCEEDINGS OF JURY TRIAL - VOLUME FOUR
### BEFORE THE HONORABLE A. RICHARD CAPUTO
### MONDAY, DECEMBER 8, 2014
### WILKES-BARRE, PENNSYLVANIA


**FOR THE PLAINTIFF:**

     Joseph A. O'Brien, Esq.
     Oliver, Price & Rhodes
     1212 South Abington Road
     Clarks Summit, PA  18411

**FOR THE DEFENDANT:**

     Bruce D. Brandler, AUSA
     U.S. Attorney's Office
     Room 217, Federal Building
     228 Walnut Street
     Harrisburg, PA  17108

_____

### DIANA GILBRIDE, RMR, FCRR
### FEDERAL OFFICIAL COURT REPORTER
### P.O. BOX G
### SCRANTON, PA 18501-0090

## INDEX TO WITNESSES
### MONDAY, DECEMBER 8, 2014; VOLUME FOUR

| FOR GOVERNMENT: | DIRECT | CROSS | REDIRECT | RECROSS | COURT |
|---|---|---|---|---|---|
| Marshall Silverstein | | | | | |
| by Mr. Brandler: | | | 19 | | |
| by Mr. O'Brien: | | 5 | | 23 | |
| Bertrand Falls | | | | | |
| by Mr. Brandler: | 25 | | | | |
| by Mr. O'Brien: | | 69 | | | |
| Maurice D. Schufford | | | | | |
| by Mr. Brandler: | 76 | | | | |
| by Mr. O'Brien: | | 92 | | | |
| Malcolm Westley Casselle | | | | | |
| by Mr. Brandler: | 94 | | | | |
| By Mr. O'Brien: | | | | | |
| Peter Gathings Bunche | | | | | |
| by Mr. Brandler | | | | | |
| by Mr. O'Brien: | | | | | |

## INDEX TO EXHIBITS

| GOVERNMENT: | IDENTIFIED | ADMITTED |
|---|---|---|
| Exhibit No. 27.8 | 20 | 69 |
| Exhibit No. 27.31 | 21 | 60 |
| Exhibit No. 27.10 | 22 | 69 |
| Exhibit No. 38.15 | 44 | 69 |
| Exhibit No. 38.14 | 49 | 69 |
| Exhibit No. 38.14A | 52 | 69 |
| Exhibit No. 38.1A | 53 | 69 |
| Exhibit No. 38.1B | 57 | 69 |
| Exhibit No. 38.12 | 60 | 69 |
| Exhibit No. 38.1C | 61 | 69 |
| Exhibit No. 38.5 | 62 | 69 |
| Exhibit No. 38.5A | 63 | 69 |
| Exhibit No. 38.5B | 64 | 69 |
| Exhibit No. 38.5C | 64 | 69 |
| Exhibit No. 38.6 | 66 | 69 |

## INDEX TO EXHIBITS

| GOVERNMENT: | IDENTIFIED | ADMITTED |
|---|---|---|
| Exhibit No. 38.7 | 67 | 69 |
| Exhibit No. 38.8 | 67 | 69 |
| Exhibit No. 38.9 | 67 | 69 |
| Exhibit No. 38.11 | 68 | 69 |
| Exhibit No. 47.1A | 86 | 92 |
| Exhibit No. 47.1 | 88 | 92 |
| Exhibit No. 6.1 | 90 | 92 |
| Exhibit No. 36.24 | 110 | 158 |
| Exhibit No. 7.1 | 114 | 158 |
| Exhibit No. 8.1 | 115 | 158 |
| Exhibit No. 36.1 | 115 | 158 |
| Exhibit No. 36.3 | 115 | 158 |
| Exhibit No. 36.18 | 117 | 158 |
| Exhibit No. 4.1 | 119 | 158 |
| Exhibit No. 4.2 | 119 | 158 |
| Exhibit No. 4.3 | 119 | 158 |
| Exhibit No. 4.4 | 119 | 158 |
| Exhibit No. 36.5 | 120 | 158 |
| Exhibit No. 36.10 | 121 | 158 |
| Exhibit No. 36.17 | 122 | 158 |
| Exhibit No. 36.13 | 138 | 158 |
| Exhibit No. 36.29 | 144 | 158 |
| Exhibit No. 36.14 | 145 | 158 |
| Exhibit No. 36.8 | 146 | 158 |
| Exhibit No. 36.6 | 149 | 158 |
| Exhibit No. 36.7 | 150 | 158 |
| Exhibit No. 10.1 | 152 | 158 |
| Exhibit No. 36.28 | 154 | 158 |
| Exhibit No. 9.1 | 154 | 158 |
| Exhibit No. 36.12 | 156 | 158 |
| Exhibit No. 36.25 | 182 | 199 |
| Exhibit No. 36.19 | 184 | 199 |
| Exhibit No. 36.20 | 187 | 199 |
| Exhibit No. 36.21 | 188 | 199 |
| Exhibit No. 36.27 | 189 | 199 |
| Exhibit No. 36.22 | 189 | 199 |
| Exhibit No. 36.31 | 191 | 199 |
| Exhibit No. 36.30 | 194 | 199 |

4

| DEFENDANT: | IDENTIFIED | ADMITTED |
|---|---|---|
| Exhibit No. 1 | | |
| Exhibit No. 2 | 216 | |

1               (9:33 a.m., convene.)

2                   (Jury not present.)

3           (Whereupon, the following discussion occurred at

4   side-bar between the Court and counsel:)

5               MR. BRANDLER:  One of the witnesses who I'm calling

6   after Mr. Silverstein is a guy name Maurice Schufford, one of

7   the victims.  He has a criminal record.  And I've given a copy

8   to Mr. O'Brien.

9               MR. O'BRIEN:  I don't have this.

10              MR. BRANDLER:  You can have that.  I think you

11  already do.  I'm giving you another copy.

12              THE COURT:  Is it another crime?

13              MR. BRANDLER:  What?

14              THE COURT:  Is it another crime?

15              MR. BRANDLER:  No.  He was convicted back in the

16  1960s.

17              THE COURT:  Just kidding.

18              MR. O'BRIEN:  Are you bringing it out?

19              MR. BRANDLER:  I'm not bringing it out.  I don't

20  think it's even relevant.

21              THE COURT:  The 1960s?

22              MR. BRANDLER:  The most recent one I think is from --

23  there is a narcotics conviction in 2006.

24              THE COURT:  Okay.

25              MR. BRANDLER:  I think for possession of cocaine,

6

1  that he gets no disposition listed on the thing.  He says he

2  doesn't think he ever pled guilty.  He's -- he went to rehab.

3  that was the end of it.  I don't know.  I don't think it really

4  makes a big difference.  But I just wanted to put everyone on

5  notice that it is out there.

6           THE COURT:  Fair enough.  Okay.

7           (Whereupon, the discussion held at side-bar between

8  the Court and counsel concluded.)

9           THE COURT:  Cross-examine.

10           MR. BRANDLER:  Bring the jury in.

11           THE COURT:  That's what we're going to do, right?

12  We're at cross examination.

13           MR. BRANDLER:  Yes.

14           THE COURT:  Yes.

15           (Jury entered courtroom at 9:34 a.m.)

16           THE COURT:  Good morning.  Sorry for the delay, but

17  we're still having some technology problems, and we needed to

18  straighten those out before we got started.  I don't mean to

19  have you wait around, but unfortunately that's what happened.

20  You'll recall, Mr. Silverstein was on the witness stand.  He's

21  back.  His direct examination has concluded.  Mr. O'Brien has

22  an opportunity now to cross-examine him.  Mr. O'Brien.

23           MR. O'BRIEN:  Thank you, your Honor.

24                          CROSS EXAMINATION

25  BY MR. O'BRIEN:

7

1  Q.   Mr. Silverstein, I'd like to go over a little bit your

2  education.  You said you had two degrees?

3  A.   Yes.

4  Q.   Where is your first degree from?

5  A.   Hum, industrial engineering for the fashion industry.

6  Q.   Okay.  When did you get that degree?

7  A.   1950 or '51.

8  Q.   Where is the Fashion Industry -- is that school in New

9  York?

10 A.   Could you speak a little louder, please?

11 Q.   Is that a New York school?  The Fashion Industry School in

12 New York?

13 A.   Yes.  Fashion Institute of Technology.

14 Q.   Is it still in existence?

15 A.   (No response.)

16 Q.   Is it still in existence, that school?

17 A.   Oh, yes.

18 Q.   And you got a B.S. degree sometime in the '50s?

19 A.   Yes.

20 Q.   Now, you said your second degree was from Columbia?

21 A.   Columbia University.

22 Q.   When did you get that degree?

23 A.   1957.

24 Q.   Okay.  And what was that degree in?

25 A.   Industrial engineering.

8

1  Q.    Now, when you finished Columbia did you go into business?

2  A.    Afterwards?

3  Q.    Yes.

4  A.    I was employed afterwards.

5  Q.    Who were you employed by?

6  A.    Hum, Northrop Aircraft.

7  Q.    And what did you do for them?

8  A.    Industrial engineering.

9  Q.    How long did you do that?

10 A.    For one year.

11 Q.    What did you do after Northrop?

12 A.    I joined a company called Atomics International, who made

13 Atomic Reactors for classroom and experimental work.

14 Q.    And how long did you stay with them?

15 A.    One year.

16 Q.    What did you do after Atomic?

17 A.    I manufactured ladies' handbags.

18 Q.    Okay.  Where did you do that?

19 A.    In Pennsburg and Red Hill, Pennsylvania.

20 Q.    And how long did you stay in that business?

21 A.    About 25 years.

22 Q.    Now, was that a business in which you were an owner rather

23 than an employee?

24 A.    Repeat, please.

25 Q.    Were you an owner of the handbag business?

1    A.    (No response.)

2    Q.    Okay.  Let me rephrase the question.  You testified that

3    you worked for Northrop, you were an employee at Northrop?

4    A.    Correct, correct.

5    Q.    You were an employee at Atomic?

6    A.    Correct.

7    Q.    Okay.  Then you said you went into the handbag

8    manufacturing business?

9    A.    Yes.

10   Q.    What was the name of the company?

11   A.    Charisma by Makewell.

12   Q.    Now, that company, what was your relationship to it?  Were

13   you an employee or were you an owner?

14   A.    An owner.

15   Q.    Okay.  And did you remain an owner for 20 years?

16   A.    25 years.

17   Q.    Were you the sole owner or did you have a partner?

18   A.    I had a partner.

19   Q.    What was your partner's name?

20   A.    Israel Rush.

21   Q.    Now, how many employees did you have?

22   A.    50 directly in our plant.

23   Q.    Okay.  Now, as the owner of the company were you also the

24   president?

25   A.    No.

1  Q.    Who was the president?

2  A.    Israel Rush.

3  Q.    What position did you hold?

4  A.    I guess vice-president.

5  Q.    Okay.  And as an owner of the company you would also be

6  responsible for the company's finances?

7  A.    I'm having difficulty understanding you.

8  Q.    Were you involved in the company's finances at all?

9  A.    Oh, yes.

10 Q.    Okay.  Tell me the extent of your involvement in the

11 company's finances?

12 A.    I was in direct responsibility for the company's

13 finances.

14 Q.    Okay.  And that would include paying of employees?

15 A.    Yes.

16 Q.    Purchasing necessary supplies to do your manufacturing?

17 A.    Yes.

18 Q.    Purchasing capital equipment?

19 A.    Yes.

20 Q.    Borrowing money when you needed it?

21 A.    Yes.

22 Q.    Okay.  So I think we -- you can agree -- we can agree then

23 that you were -- you have extensive education and experience in

24 business?

25 A.    Yes.

1  Q.    Okay.  And that that extensive education, experience in

2  business also involves the financial side of business?

3  A.    Correct.

4  Q.    Okay.  Now, who was Henry Cohen?

5  A.    Henry was a friend of mine.

6  Q.    Okay.  When did you first meet him?

7  A.    Approximately 20 years ago.

8  Q.    Okay.  And do you still -- is he still your friend?

9  A.    Yes.

10 Q.    Do you still have contact with him?

11 A.    Yes.

12 Q.    I understand he's also -- not only was he a friend to you,

13 he was your advisor?

14 A.    Say that again.

15 Q.    He was an advisor to you, he would give you advice?

16 A.    He gave the advice.

17 Q.    Okay.  Now, tell me, is Henry an experienced businessman?

18 A.    Was Henry?

19 Q.    Yes.

20 A.    Perhaps somewhat.

21 Q.    Okay.  What did he do for a living?

22 A.    He wrote personal and family trusts.

23 Q.    He wrote trusts you said?

24 A.    Yes.

25 Q.    Okay.  And who did he do that for?  Was he an attorney?

12

1    A.    Is he an attorney.

2    Q.    Yes.

3    A.    He's a graduate attorney, but did not take the bar.

4    Q.    Did he work for a company when you knew him?  In 20 the

5    years that you've known him?

6    A.    Yes.

7    Q.    What company was that?

8    A.    Kaehall.

9    Q.    And what type of company was it?

10   A.    K-A-E-H-A-L-L.  They did trust work.

11   Q.    Okay.  Was it a bank?

12   A.    No.

13   Q.    An accounting firm?

14   A.    (No response.)

15   Q.    An accounting firm?

16   A.    No.

17   Q.    It was a firm that did trust work?

18   A.    Right.

19   Q.    Okay.  And they advised people on trust matters?

20   A.    I'm having difficulty understanding some of your

21   questions.

22   Q.    When you say they did trust work, what do you mean?  What

23   is trust work?

24   A.    They wrote revocable and irrevocable trusts for

25   individuals and families.

13

1   Q.   And how did you come to know Henry?

2   A.   Through this company.

3   Q.   Okay.  Did the company do work for you?

4   A.   Yes.

5   Q.   Did work for you as an individual?

6   A.   Myself and my wife.

7   Q.   And did you come to respect Henry?

8   A.   Yes.

9   Q.   Okay.  And tell -- was Henry the individual who put you in

10  touch with Mr. Harley?

11  A.   Yes.

12  Q.   And did Henry recommend Mr. Harley to you?

13  A.   Yes.

14  Q.   And based on what you knew about Henry, did he give Mr.

15  Harley a favorable recommendation?

16  A.   A limited recommendation.

17  Q.   And did you rely on that?

18  A.   Yes.

19  Q.   And you believe Henry to be an honest man?

20  A.   Again.

21  Q.   You believe Henry to be an honest man?

22  A.   Absolutely.

23  Q.   And knowledgeable about investments?

24  A.   Yes.

25  Q.   And he introduced you to Mr. Harley, and that was what

1 began your association with Mr. Harley?

2 A.    Correct.

3 Q.    Now, according to the testimony you offered on Friday, you

4 made a number of wire transfers to Mr. Harley?

5 A.    Correct.

6 Q.    Okay.  And if I could be accurate, there were nine total

7 transfers?

8 A.    Again please.

9 Q.    And the first one was in September of 2006.

10 A.    I don't remember the date.

11 Q.    The last one in March of 2009?

12 A.    I don't remember the date.

13 Q.    And there were nine in total?

14 A.    What?

15 Q.    Nine total transfers?

16 A.    I don't know the total number.

17 Q.    Now, those transfers were all made by you, right?

18 A.    Yes.

19 Q.    And you made them voluntarily?

20 A.    Yes.

21 Q.    And you knew what you were doing?

22 A.    I thought so.

23 Q.    And you were an experienced businessman?

24 A.    Yes.

25 Q.    And you had an experienced businessman as an advisor?

1  A.    Yes.

2  Q.    Now, let's just talk about how you would make those

3  transfers.  What, would you call up your bank and tell them to

4  transfer, or did you have to fill some paperwork out?  How do

5  you go about making a wire transfer?

6  A.    You go to the bank.  You fill out a piece of paper from

7  whom it is and to where it goes, and the routing number of

8  where it goes, et cetera.

9  Q.    So, you would yourself go down to the bank?

10 A.    Yes.

11 Q.    Did you have a bank officer that you dealt with on a

12 regular basis?

13 A.    Several.

14 Q.    Okay.  And then you would go to the bank and ask them --

15 ask to see one of your bank officers?

16 A.    What was that?

17 Q.    You would go to the bank and meet with one of your bank

18 officers?

19 A.    I'm sorry.

20 Q.    Okay.  I'm just trying to understand exactly the process

21 of making a wire transfer.  Step one, you go to the bank?

22 A.    Correct.

23 Q.    Step two -- what bank are we talking about?

24 A.    The Embassy Bank of Lehigh Valley.

25 Q.    Okay.  And when you got to the bank you would meet with a

16

1  bank officer?

2  A.    Correct.

3  Q.    Okay.  Then you would tell the bank officer what you

4  wanted to do?

5  A.    Correct.

6  Q.    Then he would give you the paperwork?

7  A.    Or fill it out for me.

8  Q.    He'd fill it out for you.  Then would you sign it?

9  A.    Yes.

10  Q.    Did this bank officer at any time force you to do that?

11  A.    No.

12  Q.    Was Mr. Harley ever present when you filled out that

13  paperwork at the bank?

14  A.    No.

15  Q.    You did this all voluntarily on your own?

16  A.    Yes.

17  Q.    Now, this money that you sent to Mr. Harley, you

18  understood that as a loan, correct?

19  A.    It was a loan with a compound return.

20  Q.    So, you were transferring money to him with a promise that

21  you would get back money?

22  A.    Correct.

23  Q.    And the amount you were getting back was a lot more than

24  you were transferring?

25  A.    Yes.

17

1  Q.  Okay.  So you as an experienced businessman would just

2  understand that when you loan money there's risk involved?

3  A.  Yes.

4  Q.  Okay.  And you also have a return involved, right?

5  A.  Yes.

6  Q.  And you had in this case a pretty big -- a much bigger

7  return than you'd normally get in a loan?

8  A.  Yes.

9  Q.  Okay.  So you understood there was risk?

10  A.  No.

11  Q.  You didn't think there was any risk?

12  A.  I said I didn't understand the risk.

13  Q.  Okay.  But you knew there was one?

14  A.  I knew there was one.

15  Q.  Now, these loans to Mr. Harley, we counted them up, we

16  said they were made by nine separate wire transfers?

17          MR. BRANDLER:  I'm going to object.  He said he

18  didn't know how many.

19          THE COURT:  He did say that.  He did say that.  He

20  said he didn't know how many there were.

21  BY MR. O'BRIEN:

22  Q.  The loans to Mr. Harley were made in separate wire

23  transfers?

24  A.  Yes.

25  Q.  Not all at once?

1  A.    Also, checks and cash.

2  Q.    So checks and cash, yeah.  The checks were filled out by

3  you?

4  A.    Yes.

5  Q.    And sent to Mr. Harley, or to his wife?

6  A.    Sent and delivered some.  One of them was delivered.

7  Q.    Now, my recollection of the evidence was the first wire

8  transfer was in September of 2006, and the last one was March

9  of 2009.  That's two and a half years.  Do you disagree with

10  that?

11  A.    No.

12  Q.    And you continued to make these transfers even though you

13  weren't being paid?

14  A.    Correct.

15  Q.    And you realized when you made additional transfers that

16  there had been promises to pay that had not been fulfilled, yet

17  you continued to send him money?

18  A.    Correct.

19  Q.    Now, just a few more questions.  You testified on Friday.

20  And one of the things you said, I try to pride myself in taking

21  accurate quotes, but I'll ask you this.  Did you say he, Mr.

22  Harley, was going to sell out and then I would get my money?

23  A.    I didn't -- I did not use those words.

24  Q.    You did not use those words.  Did you understand that Mr.

25  Harley was going to sell some of his business or investments

1    and then you'd be paid?

2    A.    That's correct.

3    Q.    And as a businessman, when someone is going to pay you

4    when they get money in the future, you understand there's a

5    risk because that future deal might never occur?

6    A.    Correct.

7    Q.    And even some of the written documents that you receive

8    from Mr. Harley, that Mr. Brandler went over those and they're

9    in the record, the jury has seen them, indicated that the

10   payment you would be -- at least in one case -- from profits

11   generated by investments.  Do you recall that language?

12   A.    Could you repeat it, please?

13   Q.    Do you recall in some of the written documents the words

14   that the payment would come, quote, from profits generated by

15   investments?

16   A.    They were profits by investment, yes.

17   Q.    And there was also reference in there that the money might

18   come from the sale of a movie production?

19   A.    Yes.

20   Q.    Let me just check with --

21              (Pause.)

22              MR. O'BRIEN:  That's all I have.  Thank you.

23              THE COURT:  Mr.  Brandler.

24              MR. BRANDLER:  Yes, your Honor.

25                        REDIRECT EXAMINATION

20

1  BY MR. BRANDLER:

2  Q.    Mr. Silverstein, just a few questions.  Prior to wiring

3  that money to Mr. Harley, you indicated on Friday he made

4  certain claims to you about his company in its owning various

5  assets?

6  A.    I'm having a problem today hearing, so --

7  Q.    I'll speak up.  Could we have Exhibit 27.8.  Could we have

8  the next page?  Do you recognize this document?

9  A.    Yes.

10  Q.    Okay.  And did you have discussions with Mr. Harley prior

11  to wiring him the money about what this document was?

12  A.    Yes.

13  Q.    And how it related to Mr. Harley's business?

14  A.    Yes.

15  Q.    And what did he tell you?

16  A.    What did he tell me?

17  Q.    Yeah.

18  A.    He said this was oil in the ground.  And I said, you know,

19  this is the time where oil is at its peak.  How about taking it

20  out of the ground and harvest some of your money?  He says, no,

21  oil is going to go up and up.

22  Q.    Did he indicate to you that his company owned this oil in

23  the ground?

24  A.    Absolutely.

25  Q.    And you were loaning or wiring money to his company, RJH?

1  A.    Right.

2  Q.    And RJH was the one who was going to pay you back

3  supposedly?

4  A.    Yes.

5  Q.    With ten times the amount that you wired in, or up to ten

6  times the amount?

7  A.    Less than ten times, but a lot more -- I think it was

8  about five, six times.

9  Q.    Well, let's go to Exhibit 27.10 -- no, excuse me, 27.31.

10  This was one of the documents I showed you on Friday.

11  A.    Could you enlarge it, please.

12  Q.    Yes, the body there, right.  And then the next page.  I

13  believe this is the last promissory note that Mr. Harley issued

14  to you.  This is the one dated July 24 of 2009.  Do you see

15  that at the top?

16  A.    Uh-hum.

17  Q.    And it says, In return for the loan of $220,000 the

18  satisfactory and full receipt of which is hereby acknowledged

19  by RJH and Company, the borrower promises to pay Marshall

20  Silverstein, that's you, as follows in this note:  And then it

21  says on Paragraph 3 that he's going to pay you two million

22  dollars?

23  A.    Correct.

24  Q.    And then if you go to paragraph two, he's going to pay

25  that two million dollars on August 17, 2009?

1  A.    Correct.

2  Q.    Which is about six weeks after July 24 of 2009, correct?

3  A.    Correct.

4  Q.    So, this $220,000 is going to be about two million in six

5  weeks, correct, according to this promise?

6  A.    Yes.

7  Q.    And it was back --

8  A.    The sum of 220,000 was accumulated from the year 2006 and

9  on.

10 Q.    And RJH was going to pay you back this money from the oil

11 that it owned?

12 A.    Correct.

13 Q.    And if we go to the last page, besides RJH paying it back

14 there was a personal guarantee.  Who was the personal guarantor

15 on this note?

16 A.    Richard J. Harley.

17 Q.    If we go to Exhibit 27.10, that was another document I

18 showed you on Friday.  Mr. Harley indicated in this partnership

19 agreement that he owns an oil painting attributed to J. Lee

20 Settlemyre, which he says has a fair market value of 1.8

21 million dollars?

22 A.    Correct.

23 Q.    So this personal guarantee was of a man of great wealth --

24 A.    Correct.

25 Q.    -- did you believe that?

1  A.   Correct.

2  Q.   Now, if he didn't have artwork worth 1.8 million dollars,

3  or his company didn't own a billion dollars worth of oil, would

4  you have been giving him $220,000, believing that you were

5  going to get two million dollars back in six weeks?

6  A.   At first I thought these oil paintings were genuine.

7  There was an oil painting by Settlemyre and also a painting

8  from the house of Titian.

9  Q.   My question is, if you knew that this painting was worth

10 nothing, or worthless, and the company didn't own the oil,

11 would you have wired all that money to him in the first place?

12 A.   No.

13         MR. BRANDLER:  I have no further questions.

14         THE COURT:  Any recross?

15                    RECROSS EXAMINATION

16 BY MR. O'BRIEN:

17 Q.   Mr. Silverstein, isn't it a fact that you did advance

18 $75,000 before there was ever any mention of the painting?

19 A.   (No response.)

20         THE COURT:  Did you hear the question?

21         THE WITNESS:  No, sir.

22 BY MR. O'BRIEN:

23 Q.   Mr. Silverstein, isn't it a fact that you advanced to Mr.

24 Harley $75,000?  $10,000 on 9/21/2006, $10,000 on 10/20/2006

25 and $10,000 on 12/20/2006 before there was any mention of the

1  oil painting in any document or otherwise?

2  A.    No.

3  Q.    When was the first document in which this oil painting was

4  mentioned?

5  A.    Right at the beginning.

6  Q.    Can you identify that document?

7  A.    Say it again.

8  Q.    Can you identify that document right at the beginning that

9  talks about an oil painting?

10  A.    The document, I saw a picture of Settlemyre's -- I think

11  it was called Bust of a Lady.  And then I saw a document about

12  the House of Titian and its paintings.

13  Q.    Those mentions of those paintings first occur in the

14  partnership agreement of February 9, 2007, correct?

15  A.    Excuse me.  I'm having a difficult time understanding.

16  Q.    The mention of those paintings first occurs in the

17  partnership agreement of February 9, 2007, Exhibit 2710?

18  A.    Okay.

19  Q.    And prior to that time you had advanced a total of

20  $75,000?

21  A.    Yes.

22          MR. O'BRIEN:  That's all I have.

23          MR. BRANDLER:  Nothing further.

24          THE COURT:  You may step down.  Any reason to keep

25  Mr. Silverstein?

1      MR. O'BRIEN:  No, your Honor.

2      THE DEPUTY CLERK:  Please raise your right hand.

3                    BERTRAND FALLS,

4  called as a witness on behalf of the Government, having been

5  duly sworn or affirmed according to law, testified as follows:

6      THE DEPUTY CLERK:  Would you please state and spell

7  your name for the record.

8      THE WITNESS:  My name is Bertrand Falls,

9  B-E-R-T-R-A-N-D, last name F-A-L-L-S.

10      DEPUTY CLERK:  Thank you.  You may be seated.

11      MR. BRANDLER:  May I inquire?

12      THE COURT:  You may.

13                    DIRECT EXAMINATION

14  BY MR. BRANDLER:

15  Q.   Thank you.  Mr. Falls, how old are you, sir?

16  A.   I am 53.

17  Q.   And where do you live?

18  A.   Lawrenceville, Georgia.

19  Q.   Are you married?

20  A.   Yes, sir.

21  Q.   And do you have any children?

22  A.   Yes, sir, one child.

23  Q.   And are you currently employed?

24  A.   Yes, sir.

25  Q.   What's the nature of your employment?

1  A.    Business consulting service.

2  Q.    Try and keep your voice up.  I'm having -- is that --

3  A.    Yes, sir.  Can you hear me better?

4  Q.    You don't have to lean into it.  Actually, that microphone

5  will push back.  You can sit back in the chair.

6  A.    Okay.

7  Q.    You said you're a business consultant?

8  A.    That is correct.

9  Q.    Okay.  What type of business consulting do you do?

10 A.    I help businesses with planning and software

11 implementation.

12 Q.    Do you own your own company?

13 A.    Yes, sir.

14 Q.    What's the name of your company?

15 A.    Serenity Group Trust.

16 Q.    And are there any other owners or are you the sole owner?

17 A.    I'm a sole proprietor as trustee of Serenity Group Trust.

18 Q.    And do you have any employees?

19 A.    No.

20 Q.    So it's just you?

21 A.    That is correct, sir.

22 Q.    And you say you do consulting work in the software field?

23 A.    That is correct.

24 Q.    What's your educational background?

25 A.    I attended the University of Houston in Houston, Texas.  I

1  attended North Harris County College in Houston, Texas, Oakwood

2  College in Huntsville, Alabama.  And I was trained in corporate

3  insurance with Metropolitan Life, New York Life, John Hancock

4  for over 15 years with continuing education.  I was recruited

5  by North American Mortgage.

6  Q.    Okay.  Before we -- I'm trying to stick to your education.

7  A.    Yes, sir.

8  Q.    Did you get any degrees from those institutes that you

9  mentioned?  The University of Houston?

10 A.    I was awarded by assessment a bachelor's degree, and

11 also --

12 Q.    I'm sorry.  What do you mean by assessment?

13 A.    Assessment of all of my education, both corporate as well

14 as formal education.

15 Q.    Okay.  So you got a degree?

16 A.    That is correct, sir.

17 Q.    And what type of degree did you get?

18 A.    A bachelor's in business administration.

19 Q.    What year did you get it?

20 A.    In 2000 and -- I'm going to say 2005.

21 Q.    All right.  And this Serenity Group Trust, which is your

22 consulting firm?

23 A.    Yes, sir.

24 Q.    Do you have a business address for that?

25 A.    Yes.  I have a P.O. Box at 2090 Lawrenceville Suwanee

28

1  Road, Suwanee, Georgia.  It's a town where the Atlanta Falcons

2  first had their training camp.

3  Q.    But it's a P.O. Box?

4  A.    That is correct.

5  Q.    So, is it accurate that you work out of your home?

6  A.    That is correct, yes, sir.

7  Q.    And how long have you been doing that type of work for

8  Serenity Group Trust?

9  A.    Serenity Group Trust was formed in 2010, and the business

10  practice itself I've been doing since 1998 when I started an

11  educational process with Peter Merrill.  I sold 9,000 business

12  process services in Toronto, Canada.

13  Q.    Have you ever had any financial dealings with Richard

14  Harley, the defendant in this case?

15  A.    Yes, sir.

16  Q.    And can you tell us approximately when those transactions

17  occurred?

18  A.    I would say in the year of 2011, about the middle of the

19  year and the month of June.

20  Q.    And how did they begin?  How did you get -- find out about

21  Mr. Harley?

22  A.    I found out by -- about Mr. Harley through a referral from

23  a Mr. Ed White.  Mr. Ed White, who I never met in person,

24  reported to me that he was living in the State of Tennessee .

25  And he thought that Mr. Harley was a good contact to discuss

1    some business matters with.

2    Q.    And you said you had never met Edwin White, is that

3    correct?

4    A.    That's correct, sir.

5    Q.    And how did you know to get -- what was the basis for your

6    relationship with Edwin White that you were taking

7    recommendation from him to get in touch with Mr. Harley?

8    A.    Well, Mr. Ed White had a very good reputation.  It was

9    reported to me that at some point in time he was either a

10   congressman or U.S. senate in the State of Tennessee.  So I

11   took that as a very high recommendation and a respectable

12   office.  I thought for sure that, you know, out of that

13   recommendation he would be a good contact.

14   Q.    Did you ever verify any of that information about Edwin

15   White?

16   A.    No, sir.

17   Q.    Where did you get it from?

18   A.    Hum, he also has a son named Paul White.  And through his

19   son that reference material came to me.  So --

20   Q.    Did you ever meet Paul White?

21   A.    Yes.  I did meet Paul White for lunch in Atlanta one time.

22   Q.    On one occasion?

23   A.    On one occasion.

24   Q.    And he told you about his father?

25   A.    That is correct.

1  Q.   And then his father put you in touch with Mr. Harley?

2  A.   That is correct, sir.

3  Q.   June of 2011?

4  A.   That is correct.

5  Q.   And did you eventually talk to Mr. Harley around June of

6  2011?

7  A.   That is correct, yes, sir.

8  Q.   And who did Mr. Harley tell you he was?

9  A.   Mr. Harley -- Dr. Harley referred to himself as a

10 minister.  He also referred to himself as a businessman.  And

11 he just outlined some basic things that he did.

12 Q.   All right.  So you said two different things I want to go

13 into.  First you said Dr. Harley?

14 A.   Yes.

15 Q.   What did he say about that?

16 A.   Well, the Dr. Harley aspect, he told me he had some type

17 of medical invention that he had done in the past.

18 Q.   What type of medical invention?

19 A.   Hum, I believe from the point of reference it was for a

20 cure treatment of AIDS.

21 Q.   And what did he tell you that his -- he was a doctor.  And

22 what -- he had an invention to cure AIDS?

23 A.   That's correct, sir.

24 Q.   And you also said he told you he was a minister?

25 A.   That is correct.

1  Q.    Did he tell you what church he was affiliated with?

2  A.    Hum, I would say -- I'm trying to think of the exact name

3  of the church.   I know it was more on the Pentecostal side,

4  like -- I'm going to be very careful with people's

5  denominations.   But the point of reference I would have is like

6  Church of God and Christ.

7  Q.    And did he say how big his congregation was?

8  A.    He didn't state a specific congregation, he just mentioned

9  that his family was prominent in the ministry.

10 Q.    So, after he told you a background about himself, about

11 how he invented the cure for AIDS and he's a minister, did he

12 talk about anything he owned?

13 A.    He did talk about his assets.

14 Q.    And what did he tell you?

15 A.    Hum, through his ministry and his business contacts that

16 he amassed a certain amount of assets, substantial assets.

17 Q.    Well, tell us -- elaborate on that.   Through his ministry

18 he had amassed these assets.   What did he say?

19 A.    He had amassed assets of oil paintings, oil and gas

20 contracts, and he had some certain deposits from the Federal

21 Reserve through another business contract that he had.

22 Q.    And you said he got it through his ministry?   What did he

23 say?   How did he get it through his ministry?

24 A.    Well, some things were donations and other things were

25 just business relationships, contracts that he had entered

32

1   into.

2   Q.    Did he indicate who these people were who do donated these

3   items to him and his ministry?

4   A.    For the most part he didn't say, you know, specifically

5   who they were, but that they were interested in doing business

6   with him, and that was pretty much it.  It was not a real

7   elaboration on who or, you know, their role, but they were to

8   benefit obviously from their contractual relationship with him,

9   they would benefit from whatever he did.

10  Q.    Did he mention the name Joseph Teo Kiat?

11  A.    Yes, sir.

12  Q.    And how did he mention that name?

13  A.    That name was mentioned in the contracts that Mr. Kiat

14  owned a certain amount of assets that he had assigned to Dr.

15  Harley.

16  Q.    What kind of assets did he say he assigned to Dr. Harley?

17  A.    Well, in the instance that I'm aware of, it was in the

18  form of U.S. Treasury checks and deposits directly at the

19  Federal Reserve.

20  Q.    And what did Mr. Harley tell you the reason was that Mr.

21  Kiat had transferred these assets to Dr. Harley?

22  A.    I can't recall specifically what the reason or the

23  rationale or that particular transfer, but it did say the word

24  assignor, assignee in their agreement, and that's as far as I

25  would be able to assess that.

1 Q.    Was Mr. Kiat a member of his church or his congregation?

2 A.    Not that I'm aware of.  I didn't see anything indicating

3 membership.

4 Q.    No whether you saw it.  What did he tell you as far as --

5 he got this through his ministry.  I'm trying to get what's the

6 connection between Mr. Kiat and his ministry?

7 A.    That information I'm not privileged to know.

8 Q.    Okay.  And so that was the Federal Reserve, these Federal

9 Reserve checks, he says that's how he got those?

10 A.    Yes, sir.

11 Q.    What about the oil, what did he say how he got that?

12 A.    Again, there was no extensive explanation of how he came

13 into these assets, but with his reputation being in -- a

14 minister, being a businessman, you know, it's plausible that in

15 those arrangements that, you know -- that having access to

16 gifts and introductions of assets, that's not, you know,

17 impossible.  I know there are ministers who receive substantial

18 benefits from their congregation.  So, it wasn't a far-fetched

19 notion to see or hear of someone having these types of assets

20 available.  It just -- it didn't occur to me to keep asking

21 questions about that.

22 Q.    I understand.  You mentioned also that he claimed he had

23 some valuable paintings?

24 A.    Yes, sir.  He did say that.

25 Q.    Did he tell you what paintings they were?

1  A.   He didn't go into specifics on who the artist -- you know,

2  or any of the historical elements of it.  He just said he had

3  some substantial paintings that had substantial value, and that

4  was the course of conversation.  And I didn't delve into it

5  because I didn't have a particular interest in the paintings.

6  Q.   Did he say how he received the paintings?  How he had

7  obtained them?

8  A.   Yes.  He did say the word they were gifted to him.  Now,

9  whether -- again, how he got into that gifting process, that

10  wasn't laid out in any details to me.

11  Q.   Did he tell you about any vehicles that he owned?

12  A.   He did mention a vehicle at one point in time.  I know he

13  specifically mentioned a Lexus.  And he had mentioned Lexus and

14  he had mentioned some other types of vehicles of substantial

15  means.

16  Q.   Which ones?

17  A.   If I can recall, it was either a Bentley or a Rolls Royce,

18  it was something in that very classy category.

19  Q.   So he said he had owned a Bentley or a Rolls Royce?

20  A.   That's correct, and a Lexus, very specifically.

21  Q.   Did he ever tell you what his relationship was with the

22  Federal Reserve Bank in relation to these checks that he owned?

23  A.   The relationship with the Federal Reserve checks from what

24  I could recollect is that the checks were via Mr. Kiat, who you

25  mentioned earlier, that these were on deposit at the Federal

1  Reserve.

2  Q.   Now, you were dealing with him in June of 2011?

3  A.   Correct, sir.

4  Q.   Did Mr. Harley ever tell you that in 2009 that he had

5  spoken to general counsel at the Federal Reserve Bank of

6  Atlanta who told him that his checks were bogus?

7  A.   No, sir, that never came up in the conversation.

8  Q.   And did he ever tell you that other people had told him

9  that the checks were bogus from Merrill or from other

10 institutions, at other financial institutions?

11 A.   No, sir, that never came up in the conversations, neither

12 written communication or oral communication.  I don't recall

13 any of that being told to me.

14 Q.   To the contrary, he told you they were legitimate?

15 A.   That is correct, sir.

16 Q.   And you believed it?

17 A.   Oh, absolutely, sir, yes.

18 Q.   And did he tell you the denominations of these checks?

19 A.   Yes, sir.  They were quite substantial, 500 million

20 dollars each, and there were two that he specifically mentioned

21 and outlined.

22 Q.   And this business, after he told you who he was and what

23 his assets were, what was the business deal that was discussed

24 between you and Mr. Harley?

25 A.   Well, by contract, what Mr. Harley stated to me was, and

1  I'll say this exactly how he said it to me, I will make you a

2  very wealthy man.  And in the agreement it was

3  assignor/assignee.  And basically he was assigning the contract

4  with the checks, and in the specific check, the very first one,

5  the agreement outlined was 80 percent, 20 percent in the

6  agreement, 80 percent of whatever benefit came out of the

7  500,000 was to go to Mr. Harley's company, and 20 percent was

8  to go to the trust, which I outlined very specifically for the

9  use of businesses that were seeking capital to run their

10  companies, that had approached me at some point in time about

11  operation.

12  Q.    Were there various documents that you and Mr. Harley

13  signed indicating what this deal was that you were going to

14  have?

15  A.    Yes, sir.  There were several documents we signed.

16  Q.    And who prepared those documents?

17  A.    The documents were primarily prepared by Dr. Harley, Mr.

18  Harley.

19  Q.    And in relation to these checks, these Federal Reserve

20  checks, what was he going to do with those checks in connection

21  with you?  How were you going to benefit from this deal?

22  A.    Well, by the nature of them being Federal Reserve checks,

23  I thought of them in the credit rating of the country, the

24  United States of America, which at the time, you know, triple

25  A, double A rating, by, you know, credit rating agencies.  And

1  so with that in the marketplace, just like a credit report, the

2  higher the credit score the more substantial rates and terms as

3  far as, you know, the value of it.  I just thought of a high

4  loan to value to pledge the checks as collateral to raise a

5  credit line, to be able to fund businesses and take care of the

6  contractual obligations that I had entered into with Dr.

7  Harley.

8  Q.    So is it accurate that you were going to use his check to

9  get a credit line?

10  A.    Absolutely, sir, yes.

11  Q.    And with that money then you were going to use it for

12  whatever business reasons you wanted to use it for?

13  A.    Yes, sir, which primarily was to fund other businesses.

14  It wasn't just for my own self-gratification.  It was to

15  substantially fund other businesses that were seeking capital.

16  And this was going to be the basis for us -- if you want to

17  call it an economic stimulus for local businesses, that I was

18  aware of, you know, that at some point in time had spoken to me

19  or contracted with me to move forward.

20  Q.    And if you were successful in getting that financing or

21  that line of credit, then you said you were going to split it

22  80/20?

23  A.    Yes, sir.

24  Q.    And who was going to get the 80 and who was going to get

25  the 20?

38

A.    Dr. Harley's company was going to receive 80 percent of the proceeds and the other 20 percent was going to be used for the businesses that I had identified and outlined through the trust.

Q.    And for your use, for the privilege of using his assets, these 500 million dollar checks, what did you have to do?  Did you have to give him any money?

A.    Oh, yes, sir.

Q.    Okay.  Tell us about that?

A.    Well, in the engagement with Dr. Harley it was clearly outlined that there was an origination fee, which was due immediately, in the amount of $5,000.  Initially Dr. Harley had discussed he wanted $50,000.  I told him there was no way for me to raise that kind of money, borrow that kind of money or get that kind of money.  And so he lowered it down to $5,000, but he wanted it immediately.

Q.    And did you eventually give him $5,000 based on those promises?

A.    Yes.  Over a span of time, it took me at least, you know, a couple months, a wire transfer by Western Union, I think it was a little over $2600 that I immediately was able to get together.  I had to borrow that.  And then I had subsequent installments of $500.  And it was a difficult time.  It wasn't the easiest thing to do because I did have to borrow the money to pay Dr. Harley, but I wanted to move forward.  I thought

1 this was an opportunity of a lifetime, the way it was presented

2 to me.  It was pretty substantial.  And the numbers just were,

3 you know, it's like a kid at Christmastime.  I just really

4 thought I had arrived at something pretty substantial, and I

5 had every reason to believe it was legitimate because it had,

6 you know, the Federal Reserve marks and seals and stamps.  And

7 then it had the signature of Mr. Bernanke, chairman of the

8 Federal Reserve.  So I had every reason to believe that it was

9 worth the struggle to maintain the agreement.

10 Q.    So you mentioned these documents that had various stamps

11 from the Federal Reserve and the signature of Ben Bernanke.

12 Where did you get those documents from?

13 A.    They came via e-mail from Dr. Harley.

14 Q.    And you believed they were true, correct?

15 A.    Absolutely, sir, yes.

16 Q.    Now, after you sent them the $5,000, how did you transfer

17 that money to him, by the way?

18 A.    Primarily by Western Union, and MoneyGram, and there was a

19 wire transfer from one of my attorneys.

20 Q.    What is Creative Concepts Financial Strategies?

21 A.    That is another business consulting group out of San

22 Diego, California.  The managing director is A.J. Lewis out of

23 San Diego, California.  And he had some substantial contacts

24 and relationships throughout the country.  But in particular,

25 he had relationships on Wall Street and New York.

1  Q.    Had you ever met A.J. Lewis?

2  A.    Yes, I have, sir.

3  Q.    In person I mean.

4  A.    In person, yes, sir.

5  Q.    And was he someone that you had done business with prior

6  to your connection -- your dealings with Mr. Harley?

7  A.    Yes, sir.

8  Q.    So after you were in touch with Mr. Harley and you paid

9  him your $5,000, did you get involved with Lewis in terms of

10 this financing deal with Mr. Harley?

11 A.    Yes, sir.  I contacted Mr. Lewis because, again, I respect

12 Mr. Lewis -- I call him A.J.  And I knew he was the kind of

13 contact that could look at something, get it to Wall Street and

14 give me an honest answer as to the next steps and directions.

15 And he was willing to do so, more on a favor rather than me

16 having to pay him monies up front substantially.

17        So, he was already in New York at the time of the

18 initiation of the relationship with Dr. Harley.  I said, A.J.,

19 can you add this to your brief case?  I know you're already

20 burdened with several projects and obligations.  Can you

21 possibly take this in and take a closer look at it for me?

22 Q.    And what was his role going to be once you got Dr.

23 Harley's assets, these 500 million dollar checks to get

24 financing, what was A.J. going to do?

25 A.    A.J. was basically going to arrange the credit facility.

1  Once he could verify and validate the checks, he was going to

2  arrange the credit facility and then help manage the process of

3  funding the businesses.  For example, some of his contacts were

4  like Bank of New York, Mellon Bank, very substantial contacts.

5  And I know that those contacts exist because I filled out

6  paperwork related to make an application with him.  So, you

7  know, I've been in touch with different parties via the bank in

8  response to the application.  So that part of the equation I

9  knew was steady and available.

10 Q.   Is it accurate that you weren't going to go out and go to

11 Wall Street to get the financing, that was A.J.'s job?  You

12 were going to be a middleman between Mr. Harley and A.J.?

13 A.   That is correct, sir.

14 Q.   Now, after you sent the $5,000, were there requests for

15 more money?

16 A.   There was request for more money because initially the

17 5,000, I didn't send it all at one time, I sent an installment

18 for $2,650 plus or minus I can't remember the exact number, but

19 I think the record will show that I did wire transfers via

20 MoneyGram or Western Union, an allotment.  And then I wired --

21 transferred another $500, another $500, and most of this was

22 done by MoneyGram, Western Union, and then I had a thousand

23 dollars which was sent via my attorney's trust account.

24 Q.   After -- were you ever successful -- were you or A.J. ever

25 successful in getting lines of credit or financing as a result

1  of the assets that Dr. Harley claimed he controlled?

2  A.    We had absolutely no success closing on business with the

3  checks presented by Dr. Harley.

4  Q.    As a result of that, were there any requests by Mr. Harley

5  that you owed him more money?

6  A.    Oh, absolutely.

7  Q.    Tell us about that?

8  A.    Well, per the contract that we had engaged in, the first

9  amount being what they call the origination fee, which was

10  $5,000, which I shared with you already how that process went.

11      Then there was a demand for an additional million dollars

12  within a short period of time of presentment of these checks.

13  And then there was another substantial amount that was due on

14  having success with these checks, which was about ten percent,

15  which I think came to about 50 million dollars.  And keep in

16  mind when I say check and checks, there were two separate

17  checks, but there was one in particular that was used to

18  initiate the process.  So --

19  Q.    Go ahead, I'm sorry.

20  A.    So the total amount of the obligation via the contract was

21  a hundred million dollars.

22  Q.    And you believed you owed that money to Mr. Harley as a

23  result of the documents you signed?

24  A.    Via contract, yes, sir.

25  Q.    And he was demanding that money from you?

1  A.    Oh, absolutely, yes.

2  Q.    And how did you feel about that?  Did that concern you?

3  A.    It did concern me, yes.  But again, a hundred million on

4  500 million on an 80/20, it didn't seem far-fetched because,

5  again, we're dealing with the good faith and credit of the

6  United States of America on a Federal Reserve check, which

7  again had a credit rating of double A, triple A, whatever it

8  was at the time, is pretty substantial in the marketplace.

9       The market is driven by credit.  Anybody that owns a house

10 or a car knows credit ratings drive loan to value, drive the

11 interest rate as far as whether you're going to get a high one

12 or a low one, drives your payment term.

13      So everything in my thought business was centered around

14 the quality of the credit rating of the issuing institution.

15 And so demanding a hundred million on 500 million, again, where

16 I was sitting at the time did not seem far-fetched, because the

17 whole process was to fund businesses.  And from where I was

18 sitting, it just looked like a plausible, reasonable deal with

19 the basis that the checks were good and substantial.

20 Q.    All right.  Well, that's the point.  With the basis that

21 the checks were good and substantial, that was key, correct?

22 A.    Absolutely.

23 Q.    Now, when you didn't pay him the hundred million dollars

24 did he threaten to take legal action against you?

25 A.    Oh, absolutely, yes, sir.

1  Q.    And what did he say?

2  A.    First he sent out a cease and desist letter.  And then he

3  stated that he was going to come against me legally, against

4  myself and A.J.  and I pleaded with him, please don't bother

5  Mr. Lewis because really, he was doing a favor on my behalf.

6  He hadn't been paid or compensated in any way.  My

7  documentation entered into his briefcase on a relationship, not

8  on, you know, a retainer or any other financial obligation.

9        But Mr. Harley was very adamant and strong in his

10 statements that, you know, he was going to come against us

11 legally.  And you know, not having the wherewithal -- because I

12 didn't have a hundred million dollars.  I was basing the whole

13 relationship on the checks being good and substantial with the

14 good faith and credit of the United States Government of the

15 Federal Reserve.

16       So when I looked at where I was, I was in a deep, deep

17 crevice now because I had no means -- I couldn't cash the

18 checks, I couldn't raise a credit with them.  So know I'm

19 looking at a hundred million dollar deficit and I struggled

20 just to borrow the $5,000 to pay the initial part of the

21 contract.

22       And I'm just a common man.  You know, as a child, you

23 know, at the age of nine I used to deliver the Boston Globe in

24 snow, snow just like you have here.  And I would get up in the

25 morning and go out.  And for my part-time job when school was

1  out for Christmas break I would deliver a bitty newspaper,

2  local paper for one cent a paper.  And I could remember coming

3  in, my dad told me he was so proud of me.  He gave me a couple

4  extra bucks just because he saw that I was willing to work.

5  And that was from the age of nine to twelve.  So, he instilled

6  in me a work ethic, that there's no shame in working, just be

7  honest and work, and get an education.  And I tried on every

8  level to do that.

9      And so when I found myself in my 40s, 50s, facing a

10  situation that how did I get in a hundred-million-dollar

11  obligation, how did I do that?  Depending on that $500,000

12  contract and check to be good, that's what I was counting on.

13  That's why I signed the agreement.  I was counting on what I

14  saw as being substantially good.

15  Q.   I want to show you a couple of documents here.  Can we

16  have 38.15.  Do you have that on the screen in front of you?

17  A.   Yes, sir.

18  Q.   Take a moment and look at that and tell me if you

19  recognize that?

20  A.   Yes, I do recognize this document.

21  Q.   What do you recognize it to be?

22  A.   I recognize it to be one of the initial documents received

23  from Dr. Harley, a summary of the documents that would be

24  coming forth based on our initial conversations.

25  Q.   Well, is it an e-mail?

46

1  A.    It is an e-mail, sir.

2  Q.    And who is the e-mail from?

3  A.    It's from Dr. Harley, Richard Harley, CEO.

4  Q.    No, no, it's not that.  Below.

5  A.    Oh, it's from me.

6  Q.    Well, that's the part --

7  A.    Forwarding it to the offices, but it's the initial e-mail

8  dated June 27, 2011, is from Dr. Harley and it's to me

9  directly.  And then what you see at the top is when I forwarded

10 it at a later date.

11 Q.    To the FBI?

12 A.    Correct, sir.

13 Q.    All right.  So, can you just read what the e-mail says as

14 of June 27, 2011?  Just read it verbatim what it says.

15 A.    Okay.  It says, "Bert, as promised please see the attached

16 document which I will send in two e-mails due to the size."

17 Q.    And what does he list there that he's sending you?

18 A.    Bond power; modified extension; to whom it may concern

19 letter; two gray screen printouts; extension; statement of

20 readiness; demand letter to Ben Bernanke.  Signed R. Harley,

21 CEO.

22 Q.    And let's go to the next page.  Is that one of the

23 attachments?

24 A.    That is one of the attachments, sir, yes.

25 Q.    And that's called Federal Reserve gray screen?

1    A.    That is correct.

2    Q.    Had you ever heard of a gray screen prior to seeing this?

3    A.    I had heard of a gray screen.  Never saw a live gray

4    screen, but I have heard of one before.

5    Q.    And there's a name on the third line up from the bottom.

6    It says the beneficial registered owner, Yohannes Riyadi.  Do

7    you see that?

8    A.    Yes, sir.

9    Q.    And custodial trustee, Joseph Teo Nui Kiat.  Do you see

10   those names?

11   A.    Yes, sir.

12   Q.    And you mentioned earlier that Dr. Harley told you about

13   Mr. Kiat and how he had gotten this.  Did he mention anything

14   about Mr. Riyadi?

15   A.    Didn't go into any substantial conversation about Mr.

16   Riyadi, no.

17   Q.    And can we go to the next page?  That appears to be

18   another copy of another gray screen.  The next page.  Could we

19   just enlarge that, the top half?  Is that another attachment to

20   this e-mail?

21   A.    Yes, the limited power of attorney.

22   Q.    From?  Well, to and from, what does it say?

23   A.    Okay.  It's to Mr. Richard J. Harley, CEO from Joseph -- I

24   can barely read it, but I can see the last part is Kiat,

25   K-I-A-T.  And then it's referencing bond power of attorney --

1  oh, it says power of attorney, authorization of bond power.

2  Q.    All right.  And the next page has some signatures there

3  purportedly signed by Mr. Kiat in April of 2009?

4  A.    Correct.

5  Q.    And the next page?  It's a document titled Modified

6  Agreement to extend limited power of attorney, authorization of

7  bond power.  Was this the next attachment he e-mailed you?

8  A.    Yes, sir, uh-hum.

9  Q.    And the next page also has the signature purportedly of

10  Mr. Kiat and then of Mr. Harley, correct?

11  A.    Correct.

12  Q.    And then the next page.  Is that another attachment to the

13  e-mail?

14  A.    That is another attachment to the e-mail, yes, sir.

15  Q.    And you mentioned earlier that there were some documents

16  he sent you that had stamps and signatures.  Is this what you

17  were referring to?

18  A.    This is the document, yes, sir.

19  Q.    And it's got some letterhead at the top left saying

20  Federal Reserve Bank from New York and Federal Reserve Board.

21  Did you know who Ben Bernanke was at that time?

22  A.    Yes, he was the chairman of the Federal Reserve.

23  Q.    And you believed this was a legitimate document signed by

24  Mr. Bernanke, correct?

25  A.    Yes, sir.

1  Q.   And that's because Mr. Harley told you it was?

2  A.   Yes, sir.  And presented it in print, yes.

3  Q.   All right.  Now, after he showed you those documents, that

4  was June 27 I believe.  Can we go to 38.14?  There's another

5  e-mail here -- no, not the top Luann.  Just where it says sir,

6  right.

7       Did you receive another e-mail from Dr. Harley on the same

8  date, June 27th with the subject second e-mail?

9  A.   Yes, sir.

10 Q.   All right.  And going to the next page.  Is that the

11 attachment to the second e-mail?

12 A.   Yes, sir.

13 Q.   And what's the date of this letter?

14 A.   June 7, 2011.

15 Q.   And one of the items that was referenced in this initial

16 e-mail was a demand letter to Ben Bernanke.  Is this the demand

17 letter that was referred to in the initial e-mail?

18 A.   Yes, this is the letter.

19 Q.   And it's on his company letterhead, RJH.  Can you just

20 read what it says after Dear Mr. Bernanke?

21 A.   "Subject:  Demand for immediate release of all check

22 numbers" -- and you want me to read each number?

23 Q.   No, you don't need to do that.  Just go into the body of

24 the letter?

25 A.   "Dear Mr. Bernanke, Please be advised that on May 30, 2011

1   a cash payment demand on custodial account number was sent via

2   e-mail on Checks No." -- and then it's two check numbers --

3   "for a total of $200 billion USD.  The validity of the treasury

4   checks which are referenced in the SKR", which stands for safe

5   keeping receipt, "was also enclosed supporting the documentary

6   evidence has been acknowledged by your office.  Due to your

7   non-response within the 72 hour timeframe under the authority

8   of our bond power over the safe-keeping receipts account

9   number, I am hereby demanding immediate release of all checks

10  under account number.  The checks are to be delivered via

11  bonded courier to the address stated herein within 72 hours

12  firm receipt of this correspondence with enclosure of Richard

13  Harley, CEO, RJH and Company, Inc."

14  Q.    And go to the next page.

15  A.    Okay.  For your convenience we are also providing you here

16  with copies of the following that we have previously furnished

17  to your office.  Listed bond power, modified extension, safe

18  keeping receipt for 200 billion or 200 B.

19  Q.    All right.  Going back to the first page of that letter.

20  Okay.  In the first paragraph it says the validity of the U.S.

21  treasury checks which are referenced in the SKR was also

22  enclosed, supporting the documentary evidence has been

23  acknowledged by your office.  Did Mr. Harley tell you at any

24  time that in April of 2011 he had been in touch with a person

25  by the name of Sahil Godiwala at the Federal Reserve Bank of

1  New York, who repeatedly told him that these checks were bogus?

2  A.   No, sir.

3  Q.   Did he ever tell you that he had been in touch with a man

4  by the same of Len Zawistowski from the Federal Reserve Board

5  in Washington, DC in 2009 who told him that these checks were

6  bogus?

7  A.   No, sir.

8  Q.   Or that he was in touch with Richard Jones, the general

9  counsel general of the Federal Reserve Bank in Atlanta in 2011

10 who told him that these checks were bogus?

11 A.   No, sir.

12 Q.   When you saw the fact that Mr. Harley had sent this demand

13 letter to Mr. Bernanke, did that give you confidence that Mr.

14 Harley was on the up and up?

15 A.   Yes, sir.

16 Q.   All right.  Can we have the next -- after the letter.  Was

17 this also part of the second e-mail, something called extend

18 validity of safekeeping receipt?

19 A.   Yes, sir.

20 Q.   And it also has the seal and the signatures of Mr.

21 Bernanke on the bottom?

22 A.   Yes, sir.

23 Q.   And the next page, another document called Statement of

24 Readiness signed by two other officials, Hennessy and Dagas

25 with another stamp, that was another attachment to the e-mail?

1  A.    Yes, sir.

2  Q.    And the next page.  This document, Statement of readiness

3  with the Federal Reserve Bank letterhead, that was also an

4  attachment to the e-mail?

5  A.    Yes, sir.

6  Q.    All right.  So, after receiving those two e-mails June 27

7  of 11 -- can we go to 38.14A?

8            MR. O'BRIEN:  38 point --

9            MR. BRANDLER: .14A, letter A.

10           MR. O'BRIEN:  Not on the list.

11           MR. BRANDLER:  Not on the list?

12           MR. O'BRIEN:  Not what on I have.  38.14 to 38. --

13           MR. BRANDLER:  It's an e-mail.  I don't believe it's

14  on the system.

15           TECHNICIAN:  Okay.

16  BY MR. BRANDLER:

17  Q.    Can you take a moment and look at this and see if you

18  recognize this e-mail?

19  A.    Yes, I do recognize this e-mail.

20  Q.    And what do you recognize it to be?

21  A.    It's a communication from me to Dr. Harley related to the

22  initial payments due to him.

23  Q.    And the date is -- of the e-mail is what?

24  A.    I see June 30, 2011.

25  Q.    And it's from you?

1  A.    That's correct.

2  Q.    To R. Harley?

3  A.    That's correct.

4  Q.    Just read what your e-mail says?

5  A.    It says, "Richard, please note the attached.  Please be

6  merciful as I go through this process of raising capital for

7  this extraordinary unexpected opportunity with you.  So far I

8  have wired by Western Union $2,650.  I will do my best to come

9  of with" -- that should be up -- "with the balance of the

10 $2,350, so that the entire 5,000 is paid up on the attached

11 agreement.

12     "My process was to begin with the end in mind and count

13 the cost of completing the transaction as a good and faithful

14 steward is admonished to do.  I have been slow in the process

15 and that is why I asked for you to be merciful in this matter

16 so that we are evenly yoked as a team versus disconnected and

17 not at peace as adversaries.  Bert Falls."

18             MR. BRANDLER:  Could we have 38.1A?

19             (Pause.)

20             MR. O'BRIEN:  Just make sure that the documents that

21 aren't in get in the record.

22             MR. BRANDLER:  This one is on the system, 38.1A?

23             TECHNICIAN:  Yes.

24 BY MR. BRANDLER:

25 Q.    Can you take a look at this document and see if you

1  recognize it?

2  A.    Yes, sir.  It's Deed of Assignment Term Sheet, July 4,

3  2011.

4  Q.    And who drew up this document?

5  A.    This was drawn up by Dr. Harley.

6  Q.    And was this basically structuring the terms of the deal

7  that you were discussing with Dr. Harley?

8  A.    That is correct, yes, sir.

9  Q.    All right.  So why don't we just -- first of all, the date

10  of this document?

11  A.    July 4, 2011.

12  Q.    And who was the assignor?  Can you enlarge the top half,

13  please.

14  A.    The assignor, RJH and Company, Inc., Richard J. Harley,

15  CEO.

16  Q.    And going -- scrolling down the assignee?

17  A.    Is Bertrand Falls.

18  Q.    And then going where it says whereas, just read that

19  portion?

20  A.    "The assignee desires to have certain bank instruments

21  assigned to it as set forth in schedule A, the instruments from

22  the assignor.  The assignee confirms with full corporate and

23  legal responsibility that funds available to fulfill the

24  requirements for the assignment of these instruments is ready,

25  and assignee further confirm to corporate --

1  Q.    To cooperate?

2  A.    -- "to cooperate" -- sorry -- "with the assignor."

3  Q.    And just continue, the next paragraph.

4  A.    "Whereas, the assignor desires to assign all rights, title

5  and interest of the instruments as available to it to the

6  assignee.  Assignor represents and warrants that it has the

7  ability and resources to arrange through associates, contracts

8  and sources with full corporate responsibility, the instrument

9  in the term of assignment to be provided by assignee.

10      "Assignor hereby declares under penalty of perjury that

11 the instruments will be backed by funds that are good, clean,

12 clear and free of noncriminal origin.  The instruments will be

13 free and clear of all liens, encumbrances and third party

14 interests."

15 Q.    The next page, just the top portion there.  Just continue

16 reading.

17 A.    "Now, therefore, the assignor has -- agrees to assign the

18 instruments at 100 percent of their face value, and assignee

19 has agreed to accept the assignment of the instruments at 100

20 percent face value, and both parties hereby agree to the

21 following."

22 Q.    And just continue reading?

23 A.    "Instrument, U.S. treasury checks."  Do you want me to

24 read the No. 2?  "Two.  Total face value, $500 million USD.

25 Three, Term.  One year and one week from the date of receipt of

1   instruments.   Four, Origination fee.   5,000 USD due

2   immediately.   Five, fee.   50 million USD less deposit.

3        "Six, Deposit.   Two percent of fee.   One million USD to be

4   paid upon execution of term sheet.   Seven, Delivery.   Bonded

5   courier at closing.   Eight, Payment.   Wire transfer to

6   assignor."

7   BY MR. BRANDLER:

8   Q.   Scrolling down I just want you to read paragraph 1, 2 and

9   3, where it says numbers 1, 2 and 3.

10  A.   "Procedure, One.   Both parties, assignor and assignee

11  execute, sign and initiate the deed of assignment agreement,

12  which thereby automatically becomes a full commercial recourse

13  contract.

14       "Two.   Upon the parties executing the deed of agreement,

15  assignee will have his bank issue a wire for the entire fee to

16  the assignor and a separate wire to the brokers for their

17  commission.

18       "Three.   Immediately after assignor confirms assignee's

19  payment for fee and broker commission via wire transfer,

20  assignor will deliver the instrument to the assignee via bank

21  bonded courier in three banking days."

22  Q.   All right.   Going to the next page.   Just read the first

23  two paragraphs there?

24  A.   "Collection of Payments from Earnings.   The percentage of

25  earnings generated under the deed of assignment/term sheet

57

 1  shall be 50 percent to RJH and Company, Inc. and 50 percent to

 2  Bertrand Falls.

 3       "Timeframe.  Closing shall occur approximately 21 days of

 4  acceptance of the terms and conditions and the wiring of the

 5  initial deposit of one million USD due within seven days by the

 6  assignee upon receipt and review of the term sheet and

 7  acceptance thereof.  The fee of 49 million USD shall be wired

 8  within 21 day."

 9  Q.   Can we have 38.1B.  Is that on there?

10           MR. O'BRIEN:  38 point --

11           MR. BRANDLER:  No. 38.1B.

12           (Pause.)

13  BY MR. BRANDLER:

14  Q.   I want to direct your attention to this document I've

15  marked 38.1B.  This appears to be an e-mail dated July 20,

16  2011.  Do you recognize it?

17  A.   Yes, sir.

18  Q.   And who is it from?

19  A.   It's from R. Harley, CEO.

20  Q.   To?

21  A.   Bert Falls.

22  Q.   And then what does it say?

23  A.   "Bert, please be advised.  You and Mr. Lewis are in breach

24  of the deed of assignment term sheet dated July 4, 2011."

25  Q.   That was the sheet that we just read, the July 4 term of

58

1  assignment, correct?

2  A.    Correct, sir.

3  Q.    And then going to the next page, did you respond to his

4  e-mail?

5  A.    You just want me to read the body of it?

6  Q.    Yes.

7  A.    "Yes, sir.  I acknowledge the breach and will inform Mr.

8  Lewis.  I take full responsibility for the breach and request

9  that you hold Mr. Lewis harmless, as I failed my duties under

10 the private contract."

11 Q.    And then the next page.  Is that another e-mail on July 20

12 in the evening that you sent to Mr. Harley?

13 A.    Correct.

14 Q.    And I have it circled there, Dr. -- that's how you

15 addressed him?

16 A.    That is correct.

17 Q.    Based upon what he told you --

18 A.    Correct.

19 Q.    -- about his inventing the cure for AIDS?

20 A.    Correct.

21 Q.    Just read the e-mail.

22 A.    Can you raise it on the screen, please, sir?  Raise it up

23 just a little higher.  Okay.

24      "Dr. Harley, sir, I am updating you as best that I am able

25 to in this heat today.  Our collective work went very well

1  today via text, the updates I have so far is all went well.

2  But I must say, as you and I talked and you want to pull the

3  plug and send out a C and D", which is cease and desist, "I

4  don't know what you would be pulling the plug on right now.

5      "So I am asking to be just a little more patient.  When

6  the New York trip started, my package for you was the last item

7  in the brief case."  And this is referring to Mr. Lewis's

8  briefcase.

9      "Your offer is tremendous and good, but I had to prod it

10 into the schedule.  Wall Street meetings that were planned way

11 in advance, the conversations are positive and right now I am

12 like a kid at Christmas time.

13     "I can't wait to hear and see the offer, and I hope

14 Santa's credit card works.

15     "If you feel the burning desire to fire me, I understand

16 that you have a right to feel that way.

17     "I am trying to get enough money to send the rest of what

18 I owe you and to also get a ticket to go to New York and help

19 finish in any way that I can.

20     "I'm sure that this is not a waste of your time or mine,

21 and I know if you pull it from me I will learn a lesson, and if

22 you let me finish I will learn a lesson.  Either way, I will

23 learn a lesson.

24     "I came into this world with absolutely nothing, and as a

25 friend who has text me tonight, is sitting by his father's

1 death bed.  His father has no luggage beside his hospice bed

2 right now.  I am humbled to know that this journey on earth is

3 so short.  Bert."

4 Q.    Can we have 38.12?  All right.  So that e-mail was July

5 20.  I want to direct your attention now to a new deed of

6 assignment agreement that appears to be dated the next day,

7 July 21 of 2011.  Do you see that?

8 A.    Yes, sir.

9 Q.    And is this a deed of assignment -- who drew up this

10 document?

11 A.    This document was drawn up by Dr. Harley.

12 Q.    And it's between you and RJH on the same deal that you

13 were discussing earlier?

14 A.    Yes, sir.

15 Q.    But some of the terms have changed now on July 21, and I

16 want to go through those with you.  Can we go to page two of

17 this document.  And on the top it says -- just highlight the

18 top.  "We have the $5,000 origination fee"?

19 A.    Yes, sir.

20 Q.    "And the 50 million dollars fee", correct?

21 A.    Yes, sir.

22 Q.    "And two percent of the fee is now to be paid upon

23 execution of this agreement, which would be a million dollars"?

24 A.    Yes, sir.

25 Q.    And then going to -- scrolling down.  "Before it was 50/50

1  from the proceeds of the financing."  What's the percentage of

2  earnings now?  How is that going to be split?

3  A.    80 percent to RJH and Company Inc., and 20 percent to

4  Bertrand Falls, Serenity Group Trust.

5  Q.    And that's because you breached the agreement by not

6  giving him the money the last time so he upped the ante?

7  A.    That is correct, sir, it changed.

8  Q.    And what does paragraph one say?

9  A.    "Please take notice that the closing of this transaction

10  shall occur on Tuesday, July 26, 2011, no later than two p.m.,

11  at which time 50 million USD will be wired as per the wiring

12  instructions.  Time is hereby made of the essence of this deed

13  of assignment agreement.

14  Q.    And going to the last page, next page, this was signed by

15  you and Mr. Harley and by Mr. Lewis?

16  A.    That is correct.

17  Q.    Can we go to 38.1C?

18        (Pause.)

19  BY MR. BRANDLER:

20  Q.    I want to direct your attention to this document.  It

21  appears to be an e-mail dated July 22, 2011, from Mr. Harley to

22  yourself.  Do you recognize it?

23  A.    Yes, sir.

24  Q.    And what does it say?

25  A.    It says, "Dear Bert, it was good speaking with you today,

1 as always.  As per our discussion, we're requesting that 100

2 million USD be wired into our attorney's trust account on

3 Tuesday, July 26, 2011.  As promised, please see the attached

4 documents, pay order authorization and wiring instruction.

5 Kindest regards, R. Harley, CEO."

6 Q.    And that's why you thought you owed him a hundred million,

7 because of this demand, correct?

8 A.    That is correct, sir.

9 Q.    Could we have 38.5?  You said at some point he sent you a

10 cease and desist notice?

11 A.    That is correct, sir, yes.

12 Q.    Is this the cease and desist notice you were referring to?

13 A.    This is one of them, yes, sir.

14 Q.    All right.  Can we just enlarge the top half.  What's the

15 date of this letter?

16 A.    July 29, 2011.

17 Q.    And the subject?

18 A.    Federal Reserve Bank instruments.

19 Q.    And who is it going to the attention of?

20 A.    Bertrand Falls, CEO, Serenity Group Trust, Arthur Lewis,

21 CEO, Creative Concepts Financial Strategies.  And I might add

22 that Dr. Harley insisted that Mr. Lewis's name be added to the

23 documentation.  There wasn't anyone else demanding that.  That

24 was on the insistence on Dr. Harley's part, that he be added to

25 the documentation.

1  Q.    And what does he say in the first paragraph?

2  A.    "Due to your breach of our contract dated July 4, 2011,

3  you and your associates are hereby ordered to immediately cease

4  and desist any further activities, representations or

5  involvement regarding RJH and Company Inc."

6  Q.    All right.  Going to the -- scrolling down to the

7  paragraph that starts "You are hereby directed", what does that

8  say?

9  A.    "You are hereby directed to destroy the following

10  documents sent to you on June 27, 2011 immediately.  1.  Bond

11  power and modified extension.  2.  To whom it may concern

12  letter.  3.  Two gray screen printouts.  4.  Extension.  5.

13  Statement of readiness.  6.  Demand letter to Ben Bernanke."

14  Q.    Then the next paragraph?

15  A.    You are also directed to destroy all documents pertaining

16  to this file sent via e-mail or fax, as you are hereby directed

17  to cease and desist any and all action.

18  Q.    And then there's some bold print under that.  What does

19  that say?

20  A.    This notice is not a waiver of our firm's right to seek

21  relief and cost for any damages that may have resulted in this

22  matter.

23  Q.    All right.  Could we have 38.5A?  And I don't believe this

24  is going to be on there.  That cease and desist was July 29.  I

25  want to direct your attention now to an e-mail on August 10 of

1  2011.  Did you receive an e-mail from Mr. Harley as represented

2  here?

3  A.    Yes, sir.

4  Q.    And what does it say?

5  A.    It says, "Bert, please be advised as per our telephone

6  conversation this morning, RJH and Company hereby rescinds the

7  C and D notice dated July 29, 2011, on a temporary basis only

8  so that you are able to procure funds on our behalf.  Kindest

9  regards, R. Harley, CEO."

10 Q.    Can we go to 38.5B.  Three days later did you get another

11 e-mail on August 13 of 2011 from Dr. Harley?

12 A.    Yes, sir.

13 Q.    And what did it say?

14 A.    "Bert, the e-mail sent to you on August 10, 2011, is

15 hereby cancelled and the C and D notice is reinstated and is in

16 full force and effect.  Regards."

17 Q.    And then 38.5C, in September, September 14 of 2011, did

18 you get a letter from Dr. Harley relating to a demand for

19 payment again?

20 A.    Yes, sir.

21 Q.    And what does the first paragraph say?

22 A.    It says, "This letter will serve as formal notice to you

23 that you are in default of your obligations to pay the sum of

24 $100 million dollars, which was the fee you agreed to pay as

25 per our deed of assignment agreement dated July 21, 2011, due

1  by July 26, 2011."

2  Q.    And the next paragraph, just read that?

3  A.    "This amount has been overdue since July 26, 2011.  Data

4  maturity and you have failed to pay the same despite repeated

5  requests for payment."

6  Q.    And just finish it up at the last paragraph?

7  A.    "Unless payment of the above amount is received by us in

8  full within five days of this date of this letter, we will have

9  no alternative but to exercise whatever rights and remedies we

10  have under the law to enforce such payments, including but not

11  limited to the institution of legal proceedings against you to

12  recover the above amount, together with accrued interest and

13  legal expenses.  Kindly govern yourself accordingly."

14  Q.    And when you received this letter, this demand for

15  payment, how did you feel about that?

16  A.    I was rather distraught, and felt like somebody had just,

17  you know -- it was like sinking.  And the entire experience, it

18  was -- it felt like -- I don't know if you've ever set sail in

19  a little boat or on a big boat, but once you get away from the

20  shore line, when you get about midway, if somebody tells you,

21  you know, turn around, and you look at the other end and you

22  say, Well, we're almost there.  And it's that kind of feeling,

23  whether you've been on a cruise?  I was in the U.S. Navy, and

24  one thing you didn't do is you didn't miss the ship movement.

25  That was the worst thing you could do, is miss the ship moving.

1    And this experience felt like I got aboard the ship and I

2   was moving, and every time I would receive these documents it

3   was extreme pressure.  I wouldn't call it an ulcer, but it was

4   -- left a burning pit in my stomach.  What do I do?  I'm

5   looking at a hundred million dollar demand, and the thing that

6   I'm depending on to cure that demand I can't get an answer; I

7   can't get a breakthrough.  I'm dependent on the 500 million to

8   make the hundred million good.  But I can't get a solid answer

9   from the authority that's in the documentation, the Federal

10  Reserve, Ben Bernanke, I can't get a firm grip on where this

11  is.

12  Q.    I think we understand.  So you were worried you said you

13  were distraught?

14  A.    Extremely, yes, sir.

15  Q.    I want to show you some payment records here, because you

16  said you paid him $5,000.  Can we go to 38.6.  Can you just

17  enlarge that?  What is that?

18  A.    That's a $2,000 MoneyGram.

19  Q.    And did you take out that MoneyGram?

20  A.    Yes, sir.

21  Q.    Who did you send it to?

22  A.    It says Richard Harley.

23  Q.    And the date, right up here?

24  A.    June 27, 2011.

25  Q.    Okay.  Can we go to -- now, where did you get the money

1  from, $2,000?  Did you have that just laying around in your

2  bank account?

3  A.    No, sir.  I had to borrow the money.

4  Q.    Can we go to 38.7?  What is this?

5  A.    This is a Western Union from me to receiver, Richard

6  Harley for $500.

7  Q.    And the date on this one?

8  A.    This is June 30, 2011.

9  Q.    So that was three days later.  And the amount was you said

10  was 500?

11  A.    $500, yes.

12  Q.    Where did you get that money from?

13  A.    I had to borrow that money.

14  Q.    Can we go to 38.8.  Is this another Western Union?

15  A.    Yes, sir.

16  Q.    The date on this one?

17  A.    Is July 13, 2011.

18  Q.    And the amount?

19  A.    Is $500.

20  Q.    And is it from you the sender?

21  A.    Yes.

22  Q.    And then the receiver?

23  A.    Richard Harley.

24  Q.    Then 38.9.  The next day, July 14 of 2011, did you wire

25  him another $500?

68

1   A.   Yes, sir.

2   Q.   And that's another Western Union?

3   A.   That is another Western Union, yes, sir.

4   Q.   Then 38.10.  Is this another Western Union on August 19 of

5   2011?

6   A.   Yes, sir.

7   Q.   From you to Mr. Harley?

8   A.   Yes, sir.

9   Q.   And the amount?

10  A.   $500.

11  Q.   And where did you get that money?

12  A.   I had to borrow that money, sir.

13  Q.   And you borrowed this money because you thought this was

14  an extraordinary opportunity I think you said?

15  A.   Absolutely, yes.

16  Q.   And 38.11.  Can you just enlarge that, please.  What is

17  that?

18  A.   This is a transfer of funds from my attorney's account.

19  And the beneficiary, as I was directed, to send it to

20  Jacqueline Harley, who I was told by Dr. Harley, this is his

21  spouse.

22  Q.   And how much did you send on this occasion?

23  A.   $1,000, sir.

24  Q.   And the date?

25  A.   '08, 19 -- August 19, 2011.

69

1  Q.    So, there were six payments totalling $5,000, if I added

2  my math correctly?

3  A.    Yes, sir.

4  Q.    Would you have paid any of that money to Dr. Harley if you

5  knew that his 500 million dollar checks were totally bogus?

6  A.    No, sir, no way.

7        MR. BRANDLER:  All right.  I move the admission of

8  the previously identified documents of this witness, and I have

9  no further questions.

10        THE COURT:  Any objection?

11        MR. O'BRIEN:  No objection to the exhibits.

12        THE COURT:  They'll be admitted.  Cross-examine.

13        MR. O'BRIEN:  Thank you, your Honor.

14                    CROSS EXAMINATION

15  BY MR. O'BRIEN:

16  Q.    Now, Mr. Falls, when this transaction was completed Mr.

17  Harley never sued you, did he?

18  A.    He didn't sue me, sir.

19  Q.    And you haven't had to pay him this one million dollars?

20  A.    No, sir.

21  Q.    The only amount of money you ever paid him was the $5,000?

22  A.    That is the amount of money I paid, sir.

23  Q.    And you haven't had any communication with Mr. Harley in

24  the last two years or so?

25  A.    That is correct, sir.

1  Q.    Now, tell me about this gentleman named Lewis, this

2  gentleman named Lewis?

3  A.    Mr. A.J. Lewis, sir?

4  Q.    Yes.

5  A.    Yes.  He's a fine, upstanding gentleman.

6  Q.    And he has some business contacts on Wall Street?

7  A.    Absolutely, yes, sir.

8  Q.    And you sent him to Wall Street, or you requested him to

9  go to Wall Street with this proposal that Mr. Harley had made?

10 A.    Mr. Lewis was already scheduled to be on Wall Street for

11 other business, and he told me his itinerary.  And I said, by

12 the way, can you include this in your brief case while you're

13 in New York.

14 Q.    Okay.  Include this in your brief case.  Did you give him

15 the documents you received from Mr. Harley?

16 A.    I e-mailed him exactly what was e-mailed to me.

17 Q.    Okay.  And then Mr. Lewis got back to you.  And did he

18 tell you that the Wall Street meetings were positive?

19 A.    He did say they were positive in that he had

20 communication.  He didn't indicate if it had passed compliance,

21 he just said he had positive meetings.

22 Q.    And how did you take that?

23 A.    Well, that he had positive meetings.  That he at least had

24 a discussion.

25 Q.    Did you understand that to mean that he had presented this

1  proposal to people on Wall Street and they were positive about

2  it?

3  A.   When I said positive, I meant to the effect that

4  everything looked authentic on the surface.  So, that's

5  positive, that it looked authentic.

6  Q.   But you didn't say that the documents looked positive.

7  You said the meetings were positive?

8  A.   That's correct.  It just like --

9  Q.   Anything there that Mr. Lewis reported back to you that he

10  had made this proposal to Wall Street and there were people

11  interested?

12  A.   Sir, you have a positive color on, red.  Now, red in one

13  culture could mean stop, in another culture it could mean

14  everything is cheerful.  My statement is that it's positive.

15  Due diligence hadn't been done.  No compliance had been done.

16  No federal authority has said these are good checks.  So, to

17  keep the communication open, it's positive.  That was it.

18  Q.   But this would be something you'd expect Mr. Lewis to do,

19  right?  You gave him these documents and said you're on your

20  way to Wall Street, present them to bankers.

21  A.   Correct.

22  Q.   And he gets back to you and said he had meetings and they

23  were positive?

24  A.   He had meetings and they were positive.

25  Q.   And then you communicated that back to Mr. Harley?

1  A.    I said Mr. Harley, everything is positive.  Didn't

2  elaborate any further because I didn't know what documents had

3  been presented to which bank or to which bank officer.  So,

4  that's all I could state, is that it's positive.

5  Q.    And obviously they had been presented to somebody?

6  A.    That's the assumption.

7  Q.    Okay.  Because that's what Mr. Lewis told you?

8  A.    Again, there are no absolutes because I don't have any

9  documentation of a meeting, so all I can say is positive.

10  Q.    That's what he told you?

11  A.    That is it, sir.

12  Q.    Is that his word, positive?

13  A.    Positive.

14  Q.    And you accepted that word, then transferred -- and then

15  communicated it to Mr. Harley?

16  A.    Correct.

17  Q.    Now, these payments you made to Mr. Harley -- let me start

18  about the contract.  I think it's called -- I call it a

19  contract.  It's a deed of assignment.  You signed that?

20  A.    I did, sir.

21  Q.    And you understood that there was a potential big benefit

22  to you in this?

23  A.    Sir, a big benefit had -- I had been able to legitimize

24  the process.  So right now I'm actually infuriated, but out of

25  respect for the Court, for you, sir, and the people that are

1  sitting here, I just want to tell you, had he never presented

2  that to me we would not be sitting here today.  You'd have a

3  whole different schedule and agenda.  So if you're going to

4  attack me about anything, state anything to me, you must first

5  assume that your client presented the absolute truth.

6      And so any premise you come at me and question, sir,

7  respectfully first guard it as did your client present the

8  truth.  Are you able to today take those checks to the Federal

9  Reserve in Washington, D.C. or New York or whatever Federal

10 Reserve district and cash those checks?  If you can tell me

11 yes, then we have a conversation.

12         MR. O'BRIEN:  Your Honor, I --

13         THE COURT:  Just a minute.  Mr. Falls, I appreciate

14 your situation.  And you need to answer questions.

15         THE WITNESS:  Yes, sir.

16         THE COURT:  If there's something that needs to be

17 elicited about how you feel about things, I'm sure Mr. Brandler

18 will do it.  But right now it's inappropriate to make

19 statements which impugn counsel or anybody else.  Right now you

20 need to just answer the questions, and that's all we expect

21 from you, and nothing else needs to be said.  That's what I'm

22 telling you.

23         THE WITNESS:  Yes, I respect you, sir, and I'll

24 follow the Court's --

25         THE COURT:  All right.  Thank you.

1  BY MR. O'BRIEN:

2  Q.   Sir, you signed the contract?

3  A.   Yes, sir.

4  Q.   You did it voluntarily?

5  A.   Yes, I did.

6  Q.   And you did it knowingly?

7  A.   Yes, sir.

8  Q.   And you knew that there was a chance of a big benefit?

9  A.   Yes, sir.

10  Q.   But you knew there was a risk involved?

11  A.   I didn't know there was a risk, no, no.

12  Q.   If nobody loaned money on the documents?

13  A.   Pardon?  Say that again.

14  Q.   What if the meetings with the bank weren't positive?  What

15  if the bank said, We're not interested?  You'd be out the

16  money, right?

17  A.   Sir, I wouldn't be out of the money because I would have

18  never paid it.

19  Q.   You would have been out the $5,000?

20  A.   I wouldn't have been out of the $5,000 either because I

21  would have never paid it.

22  Q.   You paid the $5,000 before Lewis -- you paid some of the

23  5,000 because Lewis even took the money to New York?

24  A.   Sir --

25  Q.   Took the documents to New York.

1   A.   Assuming that those documents were authentic, true and

2   real.

3   Q.   You paid some of the money before Lewis ever took the

4   documents to New York?

5   A.   Correct.

6   Q.   And Lewis said, I took them to New York and my meetings

7   were positive?

8   A.   Correct.

9   Q.   And you signed the deed of assignment before some of that

10  happened?

11  A.   That is correct.

12  Q.   So you understood in this situation, like any business

13  deal, there's a potential reward and there's a potential risk?

14  A.   There -- that exists, yes, sir.

15          MR. O'BRIEN:  That's all I have.

16          MR. BRANDLER:  Nothing further.

17          THE COURT:  You may step down.

18          MR. BRANDLER:  Maurice Schufford.

19          THE COURT:  Just a minute.  We're going to take a --

20  we're going to take a 15-minute recess.

21          MR. BRANDLER:  All right.

22          THE COURT:  Members of the jury, we're going to take

23  a 15-minute recess.  Remember not to discuss the case among

24  yourselves or with anyone else.  If anybody tries to talk to

25  you about it bring it to my attention.  We'll take 15 minutes

1   and then we'll go, oh, maybe for 45 minutes to an hour and then

2   we'll break for lunch.  Is that okay?  Okay.

3          (Whereupon, a recess was taken from 11:30 a.m. to

4   11:45 a.m.)

5          THE DEPUTY CLERK:  Please raise your right-hand.

6                    MAURICE SCHUFFORD,

7   called as a witness on behalf of the Government, having been

8   duly sworn or affirmed according to law, testified as follows:

9          THE DEPUTY CLERK:  Would you please state and spell

10  your name for the record.

11         THE WITNESS:  My name is Maury Schufford, that's

12  M-A-U-R-I-C-E.  D in the middle for dog.  Schufford is spelled

13  S-C-H-U double F as in Frank, O-R-D, Jr.

14         THE DEPUTY CLERK:  Thank you, you may be seated.

15         MR. BRANDLER:  May I?

16         THE COURT:  You made proceed, yes.

17                   DIRECT EXAMINATION

18  BY MR. BRANDLER:

19  Q.   Mr. Schufford, how old are you, sir?

20  A.   74.

21  Q.   And where do you currently live?

22  A.   848740 LaSalle Boulevard, Los Angeles, California 90047.

23  Q.   Bring that microphone a little closer to your -- thank

24  you.  You can even bring it a little closer.  There you go.

25  And are you currently employed?

1  A.    No, I'm retired.

2  Q.    How long have you been retired?

3  A.    Oh, since 1995.

4  Q.    And prior to being retired, what kind of work did you do?

5  A.    I worked for the L.A. Unified School District.

6  Q.    What did you do with them?

7  A.    Heavy driver.

8  Q.    A what kind of driver?

9  A.    18-wheeler driver.

10 Q.    Like a truck driver?

11 A.    Right.

12 Q.    18-wheeler?

13 A.    Right.

14 Q.    I see.  And how long were you a truck driver for?

15 A.    24 years.

16 Q.    I want to direct your attention to 2007.  Did you have any

17 financial dealings with the defendant in this case, Richard

18 Harley?

19 A.    Yes, I did.

20 Q.    And tell us how that started.  What were the circumstances

21 how you first learned of Mr. Harley?

22 A.    Hum, Mr. Harley was introduced to me by two mutual

23 friends, Jerry Palma and the other gentleman's name was Ester

24 or something like that.

25 Q.    Lester?

78

1   A.   Lester.

2   Q.   All right.  And you say mutual friends.  As far as Lester

3   is concerned, how well did you know him?

4   A.   I knew him from Jerry Palma.

5   Q.   All right.  So did you ever meet Lester?

6   A.   No.

7   Q.   And do you know where Lester lived?

8   A.   No.

9   Q.   You were in Los Angeles?

10  A.   Correct.

11  Q.   All right.  The other person was Jerry Palma?

12  A.   He lives in LA.

13  Q.   He you know, you've met him?

14  A.   Yes.

15  Q.   And how did -- through your conversations with them, how

16  did the name Harley come up?

17  A.   Jerry Palma called me up and told me that Mr. Harley had

18  an oil deal going, and he was looking for funds to bring the

19  oil up out of the ground from what I hear.

20  Q.   So at this time, this was 2007, you were already retired

21  for almost 15 years or so?

22  A.   Yes.

23  Q.   All right.  And were you still looking to invest your

24  money so you could live in retirement?  Is that why you were

25  interested in this deal?

1  A.    Yes.

2  Q.    So, based upon -- did Mr. Palma tell you how he knew Mr.

3  Harley?

4  A.    From Lester.

5  Q.    What's that?

6  A.    From Lester.

7  Q.    I see.  So, as a result of that referral did you get in

8  touch with Mr. Harley?

9  A.    Yes, I did.

10  Q.    And did you talk to him on the phone and via e-mail?

11  A.    Quite a number of calls from him.  No e-mails.

12  Q.    Who did Mr. Harley tell you he was?

13  A.    He introduced himself as a -- representing this oil field

14  or owning the oil field.  That the oil -- old oil fields were

15  -- about 40 of them -- were closed.  And they were talking

16  about reopening them and reproducing the oil.

17  Q.    And what did he need your money for?

18  A.    For that purpose, I believe.

19  Q.    To re-open the oil fields?

20  A.    Right.

21  Q.    And did he tell you anything about his background?  His

22  affiliations with any organizations?

23  A.    Yes, he did.  He said he was a brother mason, which we hit

24  it off pretty well because my dad was a 33rd mason.  And I also

25  am a mason, but I'm not active at the moment.

1  Q.    When you say a mason, you mean a freemason?

2  A.    Freemason.

3  Q.    And you said a 33rd?

4  A.    A 33rd is the highest you can go.  My dad was at that

5  rank.

6  Q.    And did Mr. Harley say that he was also a mason?

7  A.    He was a mason, but he wasn't a 33rd.

8  Q.    Did he say what he was?

9  A.    No, he didn't, no.

10  Q.    Did you discuss freemasons?

11  A.    I think he did say he was a 32nd if I do remember.  It's

12  been a long time, so I -- he said he was a 32nd.

13  Q.    Is that pretty high up in freemasons?

14  A.    That's the next to the last step.

15  Q.    And did you believe him when he told you that?

16  A.    Well, as a mason we always believe what other masons refer

17  to us as true.

18  Q.    And was that one of the reasons you dealt with him?

19  A.    That was about the only -- that carried more weight than

20  anything else.

21  Q.    All right.  And he said he owned this oil and they were

22  closed, you said, and he needed money to get out of the ground?

23  A.    He had to re-open the -- re-open the oil wells up and

24  reproduce them.

25  Q.    Did he ever mention any other valuable assets he

1  controlled besides oil?

2  A.    Yes.  He mentioned some oil -- or artifacts.  But I wasn't

3  interested in that.  I wanted to get the oil first.

4  Q.    What do you many artifacts?

5  A.    Paintings, of that sort.

6  Q.    Did Mr. Harley ever send you any documents to support his

7  claim that he owned this oil in Texas?

8  A.    Yes.

9  Q.    What type of documents?

10 A.    I'm trying to think of the name I gave you yesterday.

11 Affidavit -- not an affidavit, but it was describing the oil

12 fields.  Describing the name of the company.  Describing what

13 he wanted to do.  And how much he wanted from me to invest.

14 And how much -- the profits that I would get in return.

15 Q.    So, did you do anything to checkout the validity of any of

16 the documents as far as his claim of owning this oil?

17 A.    As far as I could check was I went to the internet and

18 asked some other friends, and that was about it.

19 Q.    And you didn't see any reason to cause you concern, so you

20 went ahead and --

21 A.    Not at that time.

22 Q.    And what was the deal that he was proposing?  What was the

23 deal that was proposed by Mr. Harley as far as your investment?

24 A.    10,000 up and 10,000 back with repeat performance.

25 Q.    All right.  Well, elaborate what you mean by that.

1   A.   I would give him 10,000, and then he would give my 10,000

2   plus the 10,000.

3   Q.   So he'd double your money?

4   A.   That's right.

5   Q.   How soon would he double your money?

6   A.   Well, it was supposed to be in the 60 -- 45 to 60 days I

7   believe.

8   Q.   And then you said repeat performance.  What do you mean by

9   that?

10  A.   Well, you could reinvest again.

11  Q.   And was that going to be a different return, other than

12  double your money?

13  A.   Well, the -- you would put up ten or 20 and return 30 or

14  40 or 50,000.  It all depends on how much you would put into it

15  is that -- the way he explained it.

16  Q.   Did he ever talk about -- anything about the market

17  trading prices for the price of oil.  Would that play into it?

18  A.   Not that I remember.

19  Q.   And so did you decide to invest with Mr. Harley based upon

20  his claim of owning this oil?

21  A.   Yes.  And me and him also being a mason, yes.

22  Q.   I see.  And how much did you invest?

23  A.   10,000.

24  Q.   Where did you get the money from?

25  A.   I borrowed it from my mom.

1  Q.    And this happened in 2007.  How old was your mom at that

2  time?

3  A.    She had to be about 82.  81 or 82.

4  Q.    You're 74 or 75 now?

5  A.    Yes.

6  Q.    All right.  So, how did you get him the money?  You live

7  in Los Angeles.  He was in Pennsylvania?

8  A.    I wired it -- I was going to mail it to him.  But he was

9  pretty persistent.  So he asked where was I at at the time?  I

10  told him I was at my mom's credit union.  So he suggested to

11  wire it straight to his bank.

12  Q.    And did he give you wiring instructions?

13  A.    Yes, he did.

14  Q.    And did you follow those instructions --

15  A.    Yes, I did.

16  Q.    -- and wire the money?

17  A.    Correct.

18  Q.    And did you do it all in one lump sum?

19  A.    Yes.

20  Q.    And after you wired the money did you get a note from him,

21  a secured promissory note?

22  A.    A promissory note, yes.

23  Q.    And did that note spell out the deal that you had with

24  him?

25  A.    Yes, it did.

1  Q.    And after you got that note did you have more

2  conversations with Mr. Harley regarding your investment?

3  A.    Oh, for about 35, 45 days he was consistent with calling

4  us back.  I'd call him, he'd call back and we'd discuss it.  He

5  said that it was going to be taking a little longer than usual,

6  he ran into a few problems, so on and so on.

7  Q.    All right.  The so on and so on is what I'm kind of

8  interested in.

9  A.    Well --

10 Q.    What kind of excuses did he give?

11 A.    Well, he just said that it was going to take longer to

12 sell the oil.

13 Q.    And did he say why it was going to take longer?

14 A.    No.  I didn't -- I don't remember.

15 Q.    So, when the note became due I think you said it was about

16 45 days?

17 A.    Uh-hum.

18 Q.    Did you get any money back?

19 A.    I never received a dime.

20 Q.    And did you discuss that with Mr. Harley, the fact that

21 the note was due and you were owed double your money?

22 A.    Oh, sure, I called him quite a number of times.  But he

23 kept giving me excuses.

24 Q.    And then how long did you call him for asking for your

25 money?  Like how long did that go on for?

1  A.    Oh, I must have called him for six months.

2  Q.    And did he return your phone calls?

3  A.    Sometimes.

4  Q.    How frequently would he return your phone calls?

5  A.    I would call him on a Monday, maybe he would call me back

6  on that Wednesday or Tuesday.  Then the calls got frequently

7  less and less.  I'd call him and he would be home.  Or I'd call

8  him and his wife would answer the phone.  And he would be -- he

9  wouldn't be there, so I'd ask her to tell him to return my

10 call.

11 Q.    And would you get return phone calls later on in --

12 A.    Not often.  Sometimes.

13 Q.    And did you finally give up calling him?

14 A.    Oh, I gave up after the first year and a half.  I realized

15 it was a scam.

16 Q.    I want to show you some documents.  Can we have Exhibit

17 27.23?  And if we go to the last page -- that's already been

18 admitted into evidence.  Can we go to the last page of that

19 document?  The last -- that's not the last.  There we go?

20 A.    Here it is.

21         MR. BRANDLER:  Can you flip it?

22         TECHNICIAN:  Yeah.

23         THE WITNESS:  Yes.

24 BY MR. BRANDLER:

25 Q.    Do you recognize that?

1  A.    Yes, I do.

2  Q.    And what do you recognize it to be?

3  A.    That's one of the copies of the promissory note.

4  Q.    And when you say it's one of the copies of the promissory

5  note, who did you get it from?

6  A.    Mr. Harley.

7  Q.    And what did he explain that was?  What was the

8  significance --

9  A.    That was significant to be -- that the deal was legit.

10 Q.    And you received other documents besides this one from

11 him?

12 A.    I had some more paperwork along with that.  But after

13 about a year and a half until I realized, I just tore it up.

14 Q.    Did you ever go see a lawyer or anything of that nature?

15 A.    No.

16 Q.    Could we have Exhibit 47.1 -- oh, this one is not on that

17 sheet.  I'm going to show you 47.1A.  Do you see that on the

18 screen there?

19 A.    Yes, I do.

20 Q.    Is that an e-mail from Mr. Harley --

21 A.    Yes, it is.

22 Q.    -- to you?

23 A.    Yes.

24 Q.    The e-mail address, M-S Ruby S, is that an e-mail address

25 that you used, Maurice Schufford?

1  A.    That's my mom's e-mail.

2  Q.    Did you use her e-mail on occasion?

3  A.    Sometimes, yes.  But I don't remember using that computer

4  or her e-mail.

5  Q.    Well, this e-mail is directed to a Ms. Schufford?

6  A.    Yeah, that's her e-mail address, old e-mail -- that's her

7  old e-mail address.

8  Q.    Do you know if your mom -- your mom has passed away,

9  correct?

10  A.    True.

11  Q.    At the time you were dealing with Mr. Harley was he also

12  dealing with your mother, if you know?

13  A.    No.  He has no dealing with my mom.

14  Q.    So all those communications were with you?

15  A.    Yes.

16  Q.    All right.  So this e-mail is directed to Ms. Schufford.

17  Do you know why it's directed to Ms. Schufford?

18  A.    I have no idea.

19  Q.    All right.  But what does it say?

20  A.    It says, "Thank you very much for your kind consideration

21  in this matter, as promised.  And this cooperation and

22  promissory note to be construe" --

23  Q.    Construed?

24  A.    -- "as the original" and the wiring instructions.  "May

25  God bless you and may the holiday season bring you joy and

1  peace."

2  Q.    And who is it signed by?

3  A.    Richard Harley, Brother Richard Harley.

4  Q.    And what did you understand brother to mean?

5  A.    Brother means that he's a brother to Masonic Hall.

6  Q.    The Freemasons?

7  A.    Freemasons.

8  Q.    And then there were certain documents attached to this

9  e-mail?

10  A.    Yes.

11  Q.    And you received this e-mail?

12  A.    I had to if it came there, but I don't remember it.

13  Q.    All right.  Could we have 47.1.  After sending Mr. Harley

14  the money did you get a demand note from him representing the

15  transaction?

16  A.    Yeah, this is a promissory note.

17  Q.    And what's the date of this promissory note?

18  A.    19th of December, 2-0-7.

19  Q.    The same date as that e-mail we just read?

20  A.    Right.  And the address is my mom's address.

21  Q.    Were you living with your mom at that time?

22  A.    Yeah, 2-0-7, yes.  My father had passed a couple years

23  before that, and I had to move with her for care.

24  Q.    And what does it say -- well, let me read it.  Maybe it

25  will be easier.  Does it say, "In return for the loan of

1   $10,000, the satisfactory and full receipt of which is hereby

2   acknowledged by RJH and Company, Inc.", and it gives a

3   corporate address, "promises to pay Ruby L. Schufford, 2412

4   Rimpau Boulevard, LA, California, or his or her assignee

5   referred to as the lender, the principal amount borrowed in

6   addition to the fee stipulated in Section 3."  Is that what it

7   says?

8   A.    Uh-hum.

9   Q.    Do you know it's between RJH and Ruby Schufford?

10  A.    Mostly likely it was because the loan came from Connect --

11  the loan -- the credit union wired it, and the money was in my

12  mom's name.  So, that's why that transaction came out like

13  that.  They knew what it was going for, an investment.

14  Q.    So the to $10,000 you gave -- can we go to Paragraph 3?

15  You were promised to get $20,000, correct?

16  A.    Correct.

17  Q.    And in paragraph two, the maturity date, you were going to

18  get that $20,000 on or before February 4 of 2008?

19  A.    Correct.

20  Q.    So that's about six weeks or so from December 19, correct?

21  A.    Correct.

22  Q.    All right.  So that was the deal you had with Mr. Harley?

23  A.    That was the deal.

24  Q.    And he sent that to you.  Can we have the last page of

25  this document?  There's a signature page.  And it says

1  S/Richard J. Harley.  Do you see that under RJH and Company?

2  A.   Yes, I do.

3  Q.   And can we have Exhibit 6.1.  You said you wired the

4  $10,000 to Mr. Harley pursuant to his wiring instructions?

5  A.   Correct.

6  Q.   And I think you said it came from your mother's account.

7  Is that represented here?

8  A.   That's correct.

9  Q.   Ruby Schufford?

10  A.   Uh-hum, yes.

11  Q.   And the date is December 20 of 2007?

12  A.   Yes, correct.

13  Q.   And the amount of $10,000?

14  A.   Correct.

15  Q.   And it says, "Use Aircraft Employment Federal Credit

16  Union."

17  A.   Correct.

18  Q.   What, was that the bank where the money came from?

19  A.   Correct.  That's the credit union that my mom used from

20  the aircraft company.

21  Q.   Did you physically go to the credit union to wire the

22  funds?

23  A.   Yes, I did.

24  Q.   And then it went to here, the Merrill Lynch Pierce Fenner

25  and Smith account, Jacksonville, Florida.  Do you see that?

1  A.   Yes.

2  Q.   And can we scroll down?  And -- right there.  And for the

3  benefit of RJH and Company, right?

4  A.   Correct.

5  Q.   Now, can we have the next page?  This appears to be a --

6  can we just enlarge the top?  A bank statement from that

7  Merrill Lynch account in the name of RJH and Company.  A

8  statement being December 1 of '07 through December 31 of '07.

9  Do you see that over here?  Do you see that Mr. Schufford?

10  A.   Yes.

11  Q.   And just scrolling down, I just want to just confirm that

12  it went into the account.  12/20 it appears there's a wire

13  transfer in from Ruby Schufford, although it's spelled

14  Schuffon, for $10,000?

15  A.   That's correct.

16  Q.   All right.  And you said you never got that money back,

17  correct?

18  A.   Not a dime.

19  Q.   Did you ever seek any legal counsel or did you go see a

20  lawyer?

21  A.   No, I didn't, because it would probably cost more money

22  than -- to get the money back from the lawyer.

23  Q.   I'm sorry.  Did you pay your mom back or did you --

24  A.   Oh, yes.

25  Q.   But you were out that $10,000?

1  A.    Correct.

2          MR. BRANDLER:  I have no further questions.  I'd move

3  the introduction of Exhibit 6.1 and 47.1.

4          MR. O'BRIEN:  No objection.

5          MR. BRANDLER:  And 47.1A, yes.

6          THE COURT:  It will be admitted.  Cross-examine.

7                    CROSS EXAMINATION

8  BY MR. O'BRIEN:

9  Q.    Mr. Schufford, you just used the term investment in your

10 testimony?

11 A.    Pardon?

12 Q.    You used the term investment in your testimony?

13 A.    Yes.

14 Q.    When you use that term how do you understand it?  What

15 does that mean?

16 A.    Investment means you invest your money and you expect

17 profits from that.

18 Q.    And that's what you did here?

19 A.    Exactly.

20 Q.    You invested money.  And you understood that your profits

21 would only come if they were able to somehow get this oil out

22 of the ground?

23 A.    Somehow it was supposed to be definite, that's what the

24 promissory note says.

25 Q.    But you understood that if something happened, if the

93

1 price went down or whatever and they didn't do any drilling you

2 wouldn't get your money back?

3 A.   I understand that, but oil prices at that time were going

4 up.

5          MR. O'BRIEN:  Thank you.  That's all I have.

6          MR. BRANDLER:  No further questions.

7          THE COURT:  You may step down.

8          THE WITNESS:  Thank you.

9          MR. BRANDLER:  Do you want to call the next witness

10 or --

11          THE COURT:  Yes.

12          MR. BRANDLER:  Your Honor, we're going to go to about

13 12:30 you said?

14          THE COURT:  That will be fine.  Does that work for

15 you?

16          MR. BRANDLER:  No, that's fine.

17          THE COURT:  Okay, good.

18          THE DEPUTY CLERK:  Please raise your right hand.

19                  MALCOLM WESTLEY CASSELLE,

20 called as a witness on behalf of the Government, having been

21 duly sworn or affirmed according to law, testified as follows:

22          THE DEPUTY CLERK:  Would you please state and spell

23 your name for the record.

24          THE WITNESS:  Sure.  My name is Malcolm Westley

25 Casselle.  M-A-L-C-O-L-M  W-E-S-T-L-E-Y, Casselle,

94

1   C-A-S-S-E-L-L-E.

2               THE DEPUTY CLERK:  Thank you.

3               MR. BRANDLER:  May I inquire?

4               THE COURT:  You may.

5               MR. BRANDLER:  Thank you.

6                       DIRECT EXAMINATION

7   BY MR. BRANDLER:

8   Q.    Good morning, Mr. Casselle.

9   A.    Good morning.

10  Q.    How old are you, sir?

11  A.    44.

12  Q.    And what's your occupation?

13  A.    I'm CEO of a technology company called Timeline Labs.

14  Q.    And where is that company based?

15  A.    Santa Monica, California.

16  Q.    And do you live in California?

17  A.    I do.

18  Q.    And what city in California?

19  A.    Santa Monica, California.

20  Q.    And what type of business is Time Labs?

21  A.    Timeline Labs is a big data company.  We process social

22  media information for news media companies.

23  Q.    And can you just explain a little bit more detail, what

24  kind of processing of media you do for these companies?

25  A.    Sure.  We scan information on Twitter or facebook,

1  Instagram, et cetera, and we identify newsworthy pieces of

2  information, whether it's a plane crash or shooting or, you

3  know, celebrity sighting, those kind of things.

4  Q.    And then once you scan and find it, you give that

5  information to your customers or your clients?

6  A.    Yeah, yeah, we sell them as feeds to media organizations.

7  Q.    And I assume that they pay your company for that service?

8  A.    They do, yeah.

9  Q.    And that's how your company makes its money?

10  A.    Yes.

11  Q.    All right.  And are you familiar with an entity called

12  Light Entertainment?

13  A.    Yes.  That's a company I own which I use for my

14  investments.  Typically for, you know, investing in stocks,

15  early stage companies, real estate, things like that.

16  Q.    And is that what's known as an SPV?

17  A.    Yeah.  It's a special purpose vehicle set up for investing

18  purposes.  It's for tax purposes.  It's helpful to have a

19  special -- a company just for that.

20  Q.    And are you the -- for lack of a better word -- the owner

21  or controller of Light Entertainment?

22  A.    Yes, yes.

23  Q.    What about Capital Union Investments, what's that?

24  A.    That's another SPV I had established with a colleague of

25  mine in Hong Kong, because we were doing a lot of investments

1  that were international.  So we -- and since he's a Hong Kong

2  citizen we set up one there.

3  Q.   And it's based in Hong Kong?

4  A.   Yes.

5  Q.   Do you travel back and forth frequently to Hong Kong as a

6  result of that business?

7  A.   I do, yeah.

8  Q.   What's your educational background?

9  A.   I have a bachelor's degree in computer science from MIT

10  and master's in computer science from Stanford University.

11  Q.   And what year did you get those degrees?

12  A.   My bachelor's degree was 1991 and my master's degree was

13  in 1994.

14  Q.   I want to direct your attention to December of 2008.  Did

15  you have any financial dealings with the defendant in this

16  case, Richard Harley?

17  A.   I did.

18  Q.   And can you tell us how those financial dealings arose?

19  What the circumstance were?

20  A.   Yes.  I had a friend by the name of Peter Bunche who had

21  introduced me to Richard and suggested that there was an

22  investment opportunity, and it would be something that I would

23  be in a good position to help assess and potentially invest

24  with him.

25  Q.   And what was your relationship with Peter Bunche?  You

1  said it was a friend --

2  A.    Yeah.  Peter and I had known each other for many years.

3  We had not done any business together, but I had a high degree

4  of trust in Peter, so we -- I entertained the opportunity.

5  Q.    And was he like a college friend?  Did you know him from

6  college or your college days and not from the same college?

7  A.    College days.  You know, around when I was in graduate

8  school that's when I met Peter.  He was already working

9  professionally, but we had friends in common.

10 Q.    Did he say how he had met Mr. Harley?  How he had come

11 into --

12 A.    Yes.  If I remember correctly, I think he had known Mr.

13 Harley's daughter.  I think through work -- work environment,

14 had gotten to know her.  And then ultimately met Richard.

15 Q.    As a result of that referral did you then meet with Mr.

16 Harley and then subsequently communicate with him?

17 A.    Yes, I did.

18 Q.    And as far as the meeting, I want to direct your attention

19 to December 13 of 2008.  Did you meet with Mr. Harley on that

20 date?

21 A.    I did.

22 Q.    And where did that meeting take place?

23 A.    It took place in New York.

24 Q.    And was anyone else -- when you say New York, any specific

25 -- can you be a little bit more specific?

1  A.    Yeah.  I think it was Grand Central Station.

2  Q.    In Manhattan?  In New York?

3  A.    Yes, in Manhattan, yes.

4  Q.    Who else was present at that meeting?

5  A.    Peter Bunche was present, and another friend of mine from

6  Hong Kong, Jason.

7  Q.    And eventually did Mr. Harley also attend that meeting?

8  A.    Yes.

9  Q.    And prior to him attending, did you send him any money?

10  A.    Yes.  Richard said that, you know, he had described this

11  opportunity that was so exciting, but that for him to

12  participate he would need money to show our interest, an

13  earnest desire to participate in this business opportunity with

14  him.  And so he demanded $2,000 to be sent to him before the

15  meeting.

16  Q.    And you did that?

17  A.    We sent it to him, yes.

18  Q.    And you said he had described this opportunity, this

19  financial opportunity.  What did he say -- prior to you sending

20  the money, what did he tell you about the structure of this

21  financial opportunity?

22  A.    The way it was described was as a voluminous oil asset

23  that had been unrealized.  So, basically a large plot of land

24  that had been secured by various business dealings.  He had

25  described it as essentially the collateral on a note that had

1  default -- that had defaulted and that had come into his

2  possession.  And that the underlying asset was very, very

3  valuable.  And that that asset could be used to get lines of

4  credit, and then those funds could be used to invest in

5  income-generating opportunities.

6  Q.    And did he say where this oil was located?

7  A.    Yes.  He said it was located in I think it was Brown

8  County, Texas.

9  Q.    And he said it was valuable.  Did he say -- did he put a

10  number on it?

11  A.    Yes.  Various numbers were thrown out by him as upwards of

12  oil worth a billion dollars, and after discounts of various

13  amounts due to the unknown variables of extracting it, it could

14  be monetized to the level of, say, 400 million dollars.

15  Q.    And did you discuss with Mr. Harley how -- what portion of

16  these assets he was going to assign to you so you could get

17  this line of credit or financing?

18  A.    Yes.  He described a 50/50 joint venture after some funds

19  were advanced to him as to cover some of his costs.

20  Q.    But was he going to assign the entire billion dollars of

21  oil or was it just a lessor amount that he was going to assign?

22  A.    He was going to assign the entire asset to a joint

23  venture, and then we would jointly own the company.

24  Q.    Did he show you any documentation to support his claims of

25  owning this oil?

A.    Yes.  He produced a document that was three or so inches

thick, which included various letters back and forth between

the companies that owned -- or said -- claimed -- had some

claim on the asset, as well as information on the asset itself.

Q.    And this package of materials, you said it was three

inches thick, did it include something called an oil production

note from Enpetro?

A.    Yes.  Enpetro was the company that, at least according to

the documents, laid claim to this asset, and that Harley -- Mr.

Harley had claimed he had secured the asset from.  So,

basically it was a daisy chain, where the asset was assigned as

collateral to Enpetro for a note, and -- or -- and then Enpetro

defaulted on the note, and then he was able to take claim of

the asset from Enpetro.

Q.    And in addition to the note was that -- a lot of the

documentation, the three inches, some type of geological report

from a man named Kesterson?

A.    Yes.  A gentleman by the name of Don Kesterson was the key

man in terms of describing the value of the oil asset, and was

made available.  He was the one who generated a lot of

documentation, geological information and assessment, and was

considered an expert in that sort of field of geological

assessment.

Q.    Did Mr. Harley have that documentation with him when you

met with him on December 13 in New York City?

1  A.    Yes.  I had a chance to see it.  And then that information

2  was made available later to me.

3  Q.    When you say made available, it was sent to you?

4  A.    It was sent to me later, yeah.

5  Q.    And based on his representations that he and his company

6  had ownership interest in this valuable asset, this oil in

7  Texas, did you enter into an agreement with him, a joint

8  venture agreement?

9  A.    We drafted an agreement to work together, to monetize this

10  asset, but that agreement was never ratified.

11  Q.    And what do you mean by that, ratified?

12  A.    It means he never signed it.

13  Q.    And you never signed it?

14  A.    No.

15  Q.    But there were these discussions going back and forth

16  about it?

17  A.    Yes.

18  Q.    And those discussions took place over a pretty long period

19  of time?

20  A.    Hum, yes.  I mean, long I guess is relative.  I mean, we

21  discussed it for several months.  And you know, if we sent him

22  more money, as he demanded, to -- and to -- for him to engage

23  in negotiations.

24  Q.    And was there -- how much money in all did you send him?

25  A.    $10,000 U.S.

1  Q.    And was that all in December of 2008?

2  A.    No.  Some in December and I think the remaining was in

3  January, if I recall.  I don't remember the exact dates.  But

4  it was within a month or so, the entire $10,000 was sent to

5  him.

6  Q.    And that was all your money?

7  A.    Yes.  Well, it was from Light Entertainment, which was my

8  company.

9  Q.    And did you get any guarantees from anybody regarding your

10 investment in this field?

11 A.    Well, I had spoken to Peter.  Peter had said, Well, you

12 know, if this deal doesn't go well, you know, I will make good

13 on, you know, the money that you put up.

14 Q.    Is it accurate that you were basically doing your friend,

15 Mr. Bunche, a favor by getting involved in this?

16 A.    Yes.  I mean, I was quite busy with my own business at the

17 time, and I was doing this because I wanted to help Peter

18 potentially make money in this deal.  So my intention was, you

19 know, in the joint venture to give substantial amount of the

20 proceeds to Peter for bringing the deal.

21 Q.    And was there an entity formed called New Union?

22 A.    Yes.  We had originally looked at one company to use to

23 hold the assets and then we ultimately decided on another one.

24 But even though we decided, we never actually formed a deal

25 with Harley.

1 Q.    So, is it accurate Mr. Harley was going to provide these

2 assets that he claimed he controlled to your group, and then

3 you guys were going to obtain this financing or line of credit

4 based on those assets?

5 A.    Yes.  You know, we have banking relationships in the

6 normal course of doing business, and so we were talking to

7 various folks in the banking world to see how we could attain a

8 line of credit, and then use those funds for investing.

9 Q.    And the money you paid him, were those basically fees for

10 the use to go ahead with this deal?

11 A.    Yes.  Harley demanded to be paid to enter into

12 negotiations.  And that allowed us to go and talk to potential

13 financing sources.

14 Q.    And if the deal reached fruition, if you got a line of

15 credit or financing then you were going to split those proceeds

16 with Mr. Harley?

17 A.    Yes.  So the financing was intended not to merely put in

18 our pockets.  The idea was to take the financing and then

19 invest that in various income-producing opportunities.  So, you

20 know, mutual funds or other kinds of relatively secure

21 investment opportunities could -- you could take, say, 400

22 million dollars, generate, you know, five, ten percent interest

23 and make quite a bit of money for relatively low risk.  So the

24 idea was to use the credit line to go and produce income for

25 ourselves.

1  Q.    And in order to get these lines of credit or financing,

2  you would need copies of the various documents that he was

3  claiming, that would be the collateral for the financing and

4  the line of credit?

5  A.    Yes.  For a bank to accept any asset for collateral you

6  need substantial documentation, as you know.  I mean, you've

7  gone through it for mortgages.  So, for this it's even more

8  intricate.  Oil assets obviously have a lot of variables

9  associated with them, so --

10 Q.    And did you start to do due diligence on your own to

11 determine the validity of these underlying assets that Mr.

12 Harley claimed he owned?

13 A.    Yes.  I spent actually quite a bit of time investigating

14 Enpetro, talking to Don Kesterson, doing research on how you

15 actually finance against an oil asset.  These were all areas I

16 had no experience in before, so I had to do quite a bit of

17 homework.

18 Q.    After doing that research and homework, did certain

19 questions arise in your mind regarding the validity of these

20 assets?

21 A.    Yes.  More questions than answers.  You know, my

22 experience was the more questions I asked the more questions I

23 unraveled around this, because none of the assets could really

24 be substantiated.

25 Q.    And what type of -- you said you spoke to Mr. Kesterson?

1  A.   I did.  I had at least one extended call and maybe more

2  interactions with him, you know, via e-mail or phone following

3  up on trying to understand the report that he had created.

4  Q.   And he was not a lawyer, correct, he was a geologist?

5  A.   Yes.  Don's background was really geology, and all he

6  understood was really, you know, oil assets.

7  Q.   And did he tell you whether or not he had even been to

8  Brown County, Texas to see these oil wells?

9  A.   No, no, he had not, as far as I knew.

10 Q.   And --

11 A.   He basically looked at reports, did assessments on

12 reports, and then wrote another report, which was an analysis

13 of what he received.

14 Q.   Did you ever try to determine the ownership of the -- this

15 oil that Mr. Harley claimed he owned?

16 A.   Yes, yeah.  We did work to try and determine who actually

17 had title.  And it was not easy to determine who actually had

18 title.

19 Q.   And did you ever -- were you able to ever verify that Mr.

20 Harley ever owned any oil in Texas?

21 A.   No, no.  No verification, and those were part of the

22 questions that were really never answered in dealing with Mr.

23 Harley.

24 Q.   And as far as the value of the oil, were there also

25 questions raised after you reviewed the documentation?

1  A.    Yes.  Oil valuation is very complicated.  And I think we

2  never got a satisfactory answer.  I actually spoke to people in

3  the bank financing world around oil assets who do this for, you

4  know, well-known oil fields that, you know, we use oil from

5  every day.  And they were saying that those assets would be

6  very difficult to substantiate and/or generate a credit line

7  against.

8  Q.    Did you ever speak to anyone from Enpetro?  Were you able

9  to get in touch with anyone from Enpetro?

10 A.    No.  There was no one from Enpetro that was reachable.

11 Q.    And did you try to do any type of title searches of -- or

12 corporate data bank searches about Enpetro?

13 A.    We did, we did.  And they didn't result in any information

14 that was useful to validate their ownership of the asset or

15 their relationship to Harley.

16 Q.    When you say it wasn't useful, what did it turn up?

17 A.    Nothing that led anywhere.  I mean, you know, addresses

18 that were not -- didn't have anyone there to talk to.  There

19 were no names of people that we could reach, so they were dead

20 ends in -- from a due diligence standpoint.

21 Q.    So after you were doing your due diligence, you had all

22 these questions, is that why you didn't do the deal?  Or give

23 more money?

24 A.    Yeah.  I felt that putting -- spending good money after

25 bad was not a good idea in this scenario.  And I didn't think

1  that there was any opportunity to make this -- make a deal

2  work, given the unanswered questions.

3  Q.    Did you raise these questions directly to Mr. Harley when

4  you were communicating with him?

5  A.    I did.  I sent lists of questions repeatedly saying, Hey,

6  look, these are the things that we can't get answers to in our

7  due diligence here.  Please provide answers.

8  Q.    And did you get answers?  Satisfactory answers?

9  A.    Nothing that even was remotely satisfactory.

10  Q.    So is it accurate that no financing was ever obtained as a

11  result of these assets?

12  A.    No, no.

13  Q.    No, it's accurate?

14  A.    No financing.  It is accurate there was no financing ever

15  secured for these assets.

16  Q.    And directing your attention now, that was December of

17  2008 going forward into 2009.  I want to skip ahead to January

18  of 2010.  Did Mr. Harley present you with yet a new asset that

19  he said you could use to get a line of credit or financing?

20  A.    Yes, yes.  He came back with another proposition,

21  suggesting that there was something else that we could go get

22  financing against.

23  Q.    What was that?

24  A.    It was something called an insurance wrap.

25  Q.    Before we get to the insurance wrap, were there any

1  Federal Reserve instruments that he mentioned?

2  A.    Yes, yes, there were also Federal Reserve notes that were,

3  again, an asset that could be financed against.

4  Q.    And did he say how much in Federal Reserve instruments he

5  controlled?

6  A.    Hum, yes.  I'm not recalling the exact number, but I

7  believe it's in the exhibits that I sent you.  It was attached

8  in e-mails.  So, the numbers --

9  Q.    Was it a large number?

10  A.    It was large.  There were hundreds of millions of dollars.

11  More zeros than I think the mind could believe, but --

12  Q.    Did he ever produce any documents to you to verify these

13  treasury instruments that he claimed he controlled?

14  A.    Yes.  There were copies of these reserve notes, as well as

15  documents stating that he -- they were assigned to him and that

16  he had control over them to -- I think it was -- the comment

17  was bond power, which would allow him to put them in a security

18  position.

19  Q.    Did you do any due diligence regarding that claim of his

20  ownership of these assets?

21  A.    Yeah.  The due diligence was very brief and it was pretty

22  clear that it was part of other documented internet scams.

23  Q.    So you had no trouble documenting that?

24  A.    Well, I had no trouble ascertaining that this was yet

25  another --

1   Q.    Scam?

2   A.    -- fool's errand.

3   Q.    And did you tell that to Mr. Harley?

4   A.    I don't know if I said it directly to him.  You know, I am

5   respectful of elderly people, so I didn't want to tell him to

6   his face, I thought it was foolish.  But I certainly didn't

7   proceed with any business dealings.

8   Q.    During that period of time, when he sent you those

9   treasury instruments, did he ever tell you that he had already

10  been in communication with the Federal Reserve Bank of Atlanta,

11  the Federal Reserve Board in Washington, D.C., and the Federal

12  Reserve Bank in New York, and they had all told him that his

13  instruments were bogus and invalid?

14  A.    He had described a lot of conversations he had been having

15  with the Fed, and that they were getting nervous because he was

16  getting close to securing his asset, and that they would have

17  no choice but to pay him eventually.

18  Q.    So they were getting nervous?

19  A.    That was what he described, that he had them, you know, on

20  the run.

21  Q.    But he didn't tell you that they told him that his claims

22  were totally fraudulent?

23  A.    No.  He did say that they were trying, trying to deny his

24  claims, but he didn't say that they told him that they were

25  fraudulent.  He just said that they were trying to deny his

1  claim.

2  Q.    But he had them on the run?

3  A.    Yes.  That he felt he was very close to actually getting

4  them to give him the money that he deserved.

5          MR. BRANDLER:  Your Honor, I think this would be a

6  good time to break.  I'm going to go into the exhibits now.

7          THE COURT:  All right.  Members of the jury we'll

8  take a lunch break now.  We'll come back at ten minutes to two.

9  Remember not to discuss the case among yourselves or with

10  anyone else.  If anyone tries to talk to you about it bring it

11  to my attention immediately.  Enjoy your lunch.  We'll see you

12  back here at ten minutes to two.

13          THE DEPUTY CLERK:  All rise.

14          (Whereupon, a luncheon recess was taken from 12:36

15  p.m. to 1:50 p.m.)

16          THE COURT:  Counsel?

17          MR. BRANDLER:  Thank you, your Honor.  Can we have

18  Exhibit 36.24?

19  BY MR. BRANDLER:

20  Q.    Mr. Casselle, do you recognize this document?

21  A.    I do.

22  Q.    And what do you recognize it to be?

23  A.    This was a proof of a $2,000 wire transfer to Richard

24  Harley.

25  Q.    And the date next to Mr. Harley's signature?

1  A.    Started on, yes.

2  Q.    What is the date?

3  A.    13th of December, 2008.

4  Q.    And is that the date you met with him in New York City?

5  A.    Yes.

6  Q.    And he previously said that he wouldn't meet you unless

7  you wired him some money?

8  A.    Yes.

9  Q.    Is this the money you were talking about?

10  A.    Yes.

11  Q.    Can we go to the -- now, your name is spelled up there --

12  that's an incorrect spelling of --

13  A.    That's an incorrect spelling.

14  Q.    Did you fill this document out or did the clerk -- do you

15  know who filled the document out?

16  A.    This was -- I believe Mr. Harley filled this out.  This is

17  proof of receipt.

18  Q.    I see.  If we go to the second page.  This is also part of

19  that document showing that he cashed it at WalMart in East

20  Stroudsburg?

21  A.    Yes.

22  Q.    Can we go to 36.2.  And just the bottom half where it says

23  from here down.  Do you recognize this e-mail?

24  A.    Yes.  This is an e-mail that I sent.

25  Q.    And when -- what's the date of the e-mail?

112

1  A.    That was December 15.

2  Q.    That would be two days after the meeting in New York?

3  A.    Yes.

4  Q.    And who did you send it to?

5  A.    I sent it to Mr. Harley.

6  Q.    And is there a cc?

7  A.    Yes, I cc'd it to Peter Bunche.

8  Q.    That's the cc Bunche?

9  A.    Yes.

10 Q.    And can you read the body of the e-mail, please.

11 A.    Sure.  "Richard, thank you again for your time and energy

12 to come meet face to face in New York City this past Saturday.

13 Jason and I surely enjoyed meeting you.  As per our private

14 conversation and mutual agreement to date, please see receipt

15 for $3,000 wired to your account today, December 15, 2008, as

16 promised, in addition to the $2,000 already sent to you via

17 Moneygram on December 13, 2008.  I will transfers another

18 $5,000 within seven days time."

19 Q.    Go to the next page.

20 A.    "To clarify, there will be no further fees required from

21 my side for you" -- you can just leave it the way it is -- "for

22 you and your company to provide documentation and full

23 cooperation to execute the transaction."

24 Q.    Can you slow down because we have a court reporter, and

25 she --

1  A.   Can you blow it up a little bit?  Can you blow it up?  I

2  can't see it.

3           MR. BRANDLER:  Continuing --

4           TECHNICIAN:  Give me two seconds to fix it.

5           THE WITNESS:  "To clarify, there will be no further

6  fees required from my side" -- well, you can read it, right?

7  So I can --

8           THE REPORTER:  Now I can.  Now I can.

9           THE WITNESS:  All right.  No further fees required

10 from my side for you and your company to provide documentation

11 and full cooperation to execute the transaction proposed, i.e.,

12 the transfer of 400 million in assets to be used to

13 collateralize an investment platform.  You will be responsible

14 for all other legal, accounting, professional, travel and/or

15 other associated fees for your side to conduct this

16 transaction.

17           So far the main terms we have also agreed to are to

18 form a joint venture to share profits and for you to receive

19 some initial payment from the platform once a loan can be

20 obtained from the collateralized asset itself, the amount and

21 timing of that initial payment for yet to be determined."

22 BY MR. BRANDLER:

23 Q.   Basically you discussed in New York the structure of the

24 deal?

25 A.   Yes, that's correct.

1  Q.    This 400 million dollars in assets that Mr. Harley says

2  he's going to assign to you to collateralize this investment

3  platform, that was the oil that he represented his company

4  controlled and owned?

5  A.    Yes.

6          MR. BRANDLER:  And can we go to the last page of that

7  document.  Flip it.

8          TECHNICIAN:  Yes.

9  BY MR. BRANDLER:

10 Q.    And if you can enlarge that.  Was this the proof that you

11 had wired the funds that you referred to in your e-mail?

12 A.    Yes.

13 Q.    And how much did you wire?

14 A.    $3,000.

15 Q.    And it says here it came from an account?

16 A.    Yes, Light Entertainment.

17 Q.    Which you said was your SPD?

18 A.    Yes, was my investment company.

19 Q.    And it went as the beneficiary to?

20 A.    Richard J. Harley and Company.

21 Q.    At a certain bank, Mellon Bank?

22 A.    Yes.

23         MR. BRANDLER:  Can we have Exhibit 7.1.

24 BY MR. BRANDLER:

25 Q.    All right.  This is just an internal type document that

1  I'm going to introduce pursuant to agreement of counsel

2  representing that wire transfer that you just mentioned,

3  $3,000, on December 16, 2008, from Light Entertainment to RJH

4  and Company, to the Merrill Lynch Pierce Fenner and Smith

5  account, Jacksonville, Florida, for the benefit of RJH.  And

6  then similarly, can we have document 8.1.  After sending the

7  $3,000, the two and the three, did you then send an additional

8  $5,000 --

9  A.    I did.

10  Q.    -- wire?  Sorry.

11  A.    Yes.

12  Q.    And this is not -- yes, it is, okay.  Okay.  And 8.1 is an

13  additional internal bank document, the amount of $5,000,

14  December 22 of 2008, from Light Entertainment to Merrill Lynch

15  Pierce Fenner and Smith account to the benefit of RJH and

16  Company.  And 36.1 is a bank statement from the Merrill Lynch

17  account of RJH and company, the statement period November 29,

18  '08 through December 31 of '08, and if you scroll down to the

19  two incoming wires, one on December 16, one on December 22, one

20  for $3,000 and one for 5,000.

21      All right.  Could we have 36.3?

22      So prior to the third payment, which was December 22, did

23  you send an e-mail to Mr. Harley on December 16, which is

24  represented in this document?  Can we enlarge that, please, the

25  bottom half?  Is this an e-mail you sent on December 16 to Mr.

1  Harley with a copy to Mr. --

2  A.   Yes.

3  Q.   And the subject is today's call.  What does that mean?

4  A.   So we had a call planned for that day, and this was the

5  agenda of items to be discussed.

6  Q.   When you say a call, you mean a conference call?

7  A.   Yeah, a telephone conference call.

8  Q.   And what does the body of the e-mail say?

9  A.   After this morning's call here are some initial points to

10 cover.  Fee arrangements, No. 1.  Two, collateral valuation.

11 Three, joint venture structure.  Four, risk premium for oil

12 barrel price falling.  Five, how to handle things like make a

13 good clause that might acquire for asset or cash deposit.

14 Q.   Is that sort of like an agenda for the telephone call?

15 A.   Yes.

16 Q.   Can we have 36.4.  Are there also -- was there some

17 request for additional proof that you had wired the $3,000?

18 A.   I think the wire was returned for some reason, and so I

19 sent it again.

20 Q.   And is this e-mail to Mr. Harley with a copy to Bunche

21 confirming --

22 A.   Yeah, I don't recall whether the wire was returned and I

23 had to resend it, or I was just sending confirm.

24 Q.   And what does the body of the e-mail say?

25 A.   "I sent out the wire again using the sub account

1  information as indicated in the attachment.  Please let me know

2  when you receive it."

3  Q.    And going to the last page -- no, the last page.  Yeah,

4  that one.  Flip it.  Was that the confirmation you sent?

5  A.    Yes.  That was the additional -- no, sorry, that was

6  $3,000.

7  Q.    Fine, can we go to 36.18.  Did you put together a rough

8  draft of the deal that you were discussing with Mr. Harley?

9  A.    I did.

10 Q.    And this e-mail is dated December 22 of 2008 to Mr.

11 Bunche.  Is that the rough draft you would put together?

12 A.    Yes.

13 Q.    And what does the body of the e-mail say?

14 A.    "Peter, this is a rough draft.  Let me know your thoughts

15 on this."

16 Q.    Can we have the next page?  Now, who put together this

17 rough draft?  Is this a document that you put together or Mr.

18 Harley?

19 A.    I did.

20 Q.    And can you just read the first paragraph?

21 A.    Sure.  "Asset assignment and advisory agreement.  Whereas,

22 RJH Co., here and after Party A, seeks strategic advice

23 regarding its oil assets located in the State of Texas in the

24 United States of America.  Agrees to assign as collateral asset

25 and concurrently engage New Union International, here and after

1  Party B, as their strategic corporate advisor in global markets

2  to pursue investments."

3  Q.    And then go to paragraph two.  What does it say?

4  A.    "Party A agrees and appoints Party B as a contracted

5  consultant and party A's collateral asset for use in global

6  markets to invest as it sees fit related to clause three here

7  under."

8  Q.    And in Paragraph 3.1 does it talk about the value of the

9  asset?

10  A.    Yes.  Party B as consulting service provided to Party A

11  shall include 3.1 management and representation of Party A's

12  oil asset valued at a minimum of 400 million US dollars, oil.

13  During the period of Party A's assignment of its oil to Party

14  B, Party B shall pay Party A on the schedules attached, and

15  Party B's payments.

16  Q.    And as far as your responsibility, is that set out in 3.2?

17  A.    Yes.

18  Q.    What does it say?

19  A.    Responsibility to secure a credit line to credit capital

20  fund to invest in new initiatives generating substantial

21  returns, providing a framework for managing capital

22  investments, collecting key data on opportunities and securing

23  investment commitments.

24  Q.    Next page, please.  No, go down from four down where it

25  talks about payments.  Can you tell us what the payment

1  structure was?

2  A.    Sure.  Do you want me to read it or just describe --

3  Q.    It's actually easier if you just summarize it, since you

4  put together the document.  Why don't you just start with 4.1?

5  A.    Sure.  So, basically we'd have 30 days to get a credit

6  line, and after that period we would send a thousand -- a

7  hundred thousand dollars to Mr. Harley's company.

8  Q.    Then 4.2?

9  A.    Then within 45 days we would present five percent of the

10  credit line as a payment against future returns.

11  Q.    4.3?

12  A.    And then 4.3, basically if we didn't secure the credit

13  line we'd pay another hundred thousand dollars by February 23,

14  which was basically a penalty or any way of buying an extension

15  to go secure the credit line.

16  Q.    And 4.4?

17  A.    This basically said that on the proceeds, the net proceeds

18  of all investments we would share 50/50.

19  Q.    Can we have the next page?  And paragraph 7, was there

20  some contingencies that Mr. Harley had to give you proof of his

21  ownership of these assets?

22  A.    Yes.  So we're basically asking here that he provide a

23  detailed documentation showing ownership conveyance and

24  assignment.  And then provide access to geologist and other

25  professionals who can give references or detailed information

1  if necessary to secure the credit line.

2  Q.    Can we go to 36.5?  Did you receive an e-mail on December

3  27, 2008, from Mr. Bunche and with a copy to Mr. Harley

4  relating to that strap of the proposed deal?

5  A.    Yes.

6  Q.    And can you tell us what this e-mail says?

7  A.    Sure.  Well, one, Peter was making the point that Mr.

8  Harley would have sent the documentation for me to receive.

9  Q.    And the documentation, would that be the geologist report

10  that you referred to earlier?

11  A.    Yes, yes, the very thick document I referred to earlier.

12  Q.    Okay.

13  A.    The second point was that on receipt of the document I

14  would have 30 days to produce a line of credit in the 350 to

15  400 million dollar range.  The third point, Mr. Harley had said

16  that his company has been allowed to participate in an IMF

17  trading platform.

18  Q.    What does IMF stand for?

19  A.    I think it stands for the International Monetary Fund.

20  Q.    Go ahead.

21  A.    And that was a -- it was described as a selective trading

22  group that would allow substantial returns using the credit

23  line that we establish.

24  Q.    No. 4?

25  A.    Hum, the next is that we would receive two percent of the

1  credit line and two percent of the trade platform amount as our

2  fee.

3  Q.    And then going to No. 8?

4  A.    Let's see.  No. 8 is that I would get back to Mr. Harley

5  on the progress of our discussions with banks and lending

6  entities to provide the credit line.

7  Q.    And the next page?

8  A.    Hum, No. 9, Mr. Harley would make himself and the

9  geologist available for discussion via phone.

10  Q.    All right.  So, that was Mr. Bunche's characterization of

11  what was going on at the time?

12  A.    Yes.

13  Q.    And can we go to Exhibit 36.10.  Is there an e-mail dated

14  December 30, '08, from Mr. Bunche to Mr. Harley with a copy to

15  you forwarding the draft agreements that you had drawn up

16  relating to this deal?

17  A.    Yes.

18  Q.    Just read what it says.

19  A.    Richard, I am forwarding Malcolm's draft agreement.

20  Please sign and reply -- or make some notes and share these

21  docs with your people.  You will find his Hong Kong cell number

22  there also.  In interest of time, feel free to call him

23  directly.  Let's get everyone's paperwork together and let Mal

24  do his thing.  Thanks.

25  Q.    If we go to the third page of this document, this is in a

1  little bit different format than the original draft that you

2  had, correct?

3  A.    Yes.  We cleaned it up, made some modifications.

4  Q.    All right.  So it's now titled Advisory Agreement?

5  A.    Yes.

6  Q.    And the entity is no longer New Union.  Who is the entity

7  that's going to be involved on your side of it?

8  A.    We set up a different company called J & M Holdings.

9  Q.    And was that set up for this specific purpose or was that

10 already in existence?

11 A.    It was already in existence.

12 Q.    And did the rest of the document change in any significant

13 respect as far as the terms?

14 A.    No.  It was essentially the same commercial structure.

15 Q.    If we go to page -- the Bates No. -- this is 36.10.  The

16 7th page of this document which is the signature.  Did you ever

17 receive a signed version of this back from Mr. Harley?

18 A.    Not to my knowledge.

19 Q.    And then it says Exhibit A on the next page.  There was

20 supposed to be an attachment, this oil and gas geologist report

21 that he had previously mentioned to you, correct?

22 A.    Yes.

23 Q.    Can we go to 36.17.  Did you receive a copy of Mr.

24 Harley's geological -- oil geological report from Mr. Bunche on

25 December 31 of 2008?

1  A.    I did.

2  Q.    And is this the e-mail where it was sent to you?

3  A.    Yes.

4  Q.    And going to the next page, is that the form that was sent

5  to you?

6  A.    That's correct.

7  Q.    And the next page.

8  A.    Yes.

9  Q.    Could you just enlarge it so he can read that on the

10  screen.  Could you just read from what it says?

11  A.    Estimated reserve analysis for crude oil, six leases

12  containing 815 acres, Brown County, Texas.  Prepared by Donald

13  C. Kesterson, July 2, 1989, State of Pennsylvania, County of

14  Monroe.  I Judith A. Miller do -- something -- that this is a

15  true and exact of the original.

16  Q.    There's a notary stamp, correct?

17  A.    There appears to be a notary stamp.

18  Q.    So after you received this document did you review it?

19  A.    I did.

20  Q.    And I think you said it raised some questions in your

21  mind?

22  A.    Yes, quite a number of questions.

23  Q.    So, can we go to page 249 -- when I say 249 it's the Bates

24  number on the bottom of the page.  So it's going to be -- six

25  pages in from where we are now.  And if you just enlarge the

1  top half of the page.  It appears to be on the letterhead of

2  this Donald Kesterson, who is a petroleum geologist?

3  A.    Yes.

4  Q.    And the date of the letter?

5  A.    March 14, 2008.

6  Q.    And can you just read what the first RE under -- addressed

7  to Mr. Harley, it says RE?

8  A.    Sure.  Revision of July 3, 1999 report, analysis of oil

9  reserves in Brown County, Texas.

10  Q.    Just read the first paragraph.

11  A.    The purpose of this letter is to revise my original

12  analysis of your oil promissory note and collateral assignment

13  of Enpetro, LPC, Inc., Enpetro.  The reserve analysis was

14  prepared on six oil and gas leases in Brown County, Texas

15  totalling 815 acres plus or minus, for a total of 46 wells.  As

16  of this update, the Texas Railroad Commission has advised you

17  in writing there has been no change in the present status of

18  any of the 46 wells since my original report was prepared in

19  1999.  These wells remain on the active list, without

20  violation.

21  Q.    So, did you understand that this report was relating to

22  these six leases, oil and gas leases in Brown County, and

23  relating to various documents that Mr. Kesterson was reviewing?

24  A.    Yes.

25  Q.    Now, if we go to the next page.  The bottom of the page

1  under where it says Total.  Can you read for us what Mr.

2  Kesterson says in that paragraph?

3  A.    Sure.  Therefore, the value of crude oil --

4  Q.    As of the date -- as of this date?

5  A.    Oh, yeah.  As of this date no trips have been made to the

6  leases to determine their present condition, nor to Brown

7  County Courthouse to determine present status of the title.

8  However, the Texas Railroad Commission, the state's oil and gas

9  authority, has provided Mr. Harley with a certified letter

10  stating that the subject leases are still valid.  The title

11  abstracts should be sought to determine the status of these

12  leases, including the drilling depth rights.

13  Q.    What are title abstracts?

14  A.    Well, that would be a summary of the title of who actually

15  owns the title.

16  Q.    So, Mr. Kesterson is saying that title abstracts should be

17  sought to determine the status of these leases, including the

18  drilling depth rights.  Did you ever seek to hire anyone to do

19  a title search to find out who actually owns these leases

20  that's being opined on by Mr. Kesterson?

21  A.    That was our plan, but we didn't bother doing that.

22  Q.    Because you already had other conditions?

23  A.    Yes.  There were so many other questions we didn't feel it

24  was worth the cost.

25  Q.    But in any event, Mr. Kesterson was making no

1  representation about the ownership of the leases?

2  A.    No.  Mr. Kesterson was very clear.  He had no ability to

3  determine ownership.

4         MR. O'BRIEN:  What exhibit --

5         MR. BRANDLER:  That's Exhibit 36.17.

6  BY MR. BRANDLER:

7  Q.    And going -- staying on that page, let me just scroll up.

8  Keep on going.  Right there, stop.  Scroll down now.  Can you

9  just read what this paragraph says?

10 A.    The oil promissory note which covers crude oil only, not

11 natural gas, was issued on September 24, 1997 and covers a time

12 period of 380 days.  Therefore, after that date it can be

13 called or leveraged.  The assignment of collateral states that

14 the assignor, Enpetro, will maintain at all times crude oil

15 reserves.  Thereby, one half of the working interest reserves

16 would be equal to 9.5 million barrels to back up the oil

17 promissory note.

18 Q.    Now, the statement that Mr. Kesterson made, that after 380

19 days the note can be called, did you ever hire a lawyer or

20 determine from legal sources what the law was regarding the

21 statute of limitations of enforcing a promissory note in Texas?

22 A.    No, we did not.

23 Q.    So, did you know if that statement was true or not?

24 A.    I was not -- I was not aware whether that statement was

25 true or not.

1  Q.    In the next paragraph.  Can you just stop right there.

2  Where it says "According to the figures", can you just read

3  that paragraph?

4  A.    According to the figures provided by the Texas Railroad

5  Commission these leases have sold 20,629 mcf -- I think that's

6  metric -- no, something cubic feet -- of natural gas and 63,405

7  barrels of oil, and they're showing the history.  The oldest

8  wells were drilled in 1966, production covers to 1993.  Since

9  these wells are not currently in production no value can be

10 assigned to the proved, developed producing BVP reserves.

11 Q.    Did understand that paragraph to mean that there was no

12 production after 1993 on any of these wells?

13 A.    Yes, I understood that.

14 Q.    So there was no value that could be assigned or proved,

15 developed, producing under the --

16 A.    Right.

17 Q.    And can you read the next -- can we scroll up and read the

18 next?

19 A.    Because of the terms and conditions of the oil promissory

20 note and the collateral assignment, no time limit nor any

21 economic expense has been factored on the recovery of any of

22 these estimated reserves.  Therefore, the estimated recoverable

23 reserves under these leases net the amount of known crude oil

24 produced '66 to 1993 still exceeds the crude oil backing and

25 the subject note for an estimated 10 million barrels of crude

1  oil recoverable.

2  Q.   And what do you understand that paragraph to mean?

3  A.   Well, basically that there was still oil remaining --

4  potential oil remaining there.  And that the cost to actually

5  extract that hadn't been factored into the estimated reserves.

6  Q.   Did you ever determine through any professionals what the

7  cost would be to extract this oil, if it was even possible to

8  extract the oil?

9  A.   I did consult professionals, and they indicated that --

10         MR. O'BRIEN:  Objection, your Honor.

11  BY MR. BRANDLER:

12  Q.   I don't want to know what they told you, just did you

13  consult professionals --

14  A.   I did.

15  Q.   -- regarding -- that was something that was important to

16  you?

17  A.   Yes.

18  Q.   And after consulting with them that was one of the factors

19  that led you to make your ultimate decision in this case?

20  A.   Yes.

21         MR. O'BRIEN:  Can you scroll that up a little?  Down,

22  scroll it down.  Okay.  Stop.

23         MR. BRANDLER:  Can we go to the prior page, please?

24  BY MR. BRANDLER:

25  Q.   Going to the second paragraph, can you highlight the

1  second paragraph?  Can you read the first sentence where it

2  says "The method"?

3  A.    "The method for determining the value of the oil

4  promissory note or the collateral assignment was done by

5  estimating the volume metric reserves on 19 wells using

6  petroleum industry accepted formulas."

7  Q.    Okay.  In the prior paragraph you said there were 46

8  wells, correct?

9  A.    Yes.

10 Q.    And now he's saying that he did his estimate based on 19

11 wells using industry-accepted formulas.  Did you have some

12 questions regarding whether or not the industry-accepted

13 formulas were used in any of your later communications?

14 A.    Not so much.  These reserves were again estimates.  So, I

15 felt that unless I had real production capability estimates

16 from a producer, that these estimates were not going to be that

17 valuable.  So, I was curious, but it wasn't that relevant

18 because I needed more data to know whether that was going to be

19 valuable at all.

20 Q.    Can you just read starting here from "however"?

21 A.    "However, the estimation of these reserves does not

22 constitute any guarantees of production."

23 Q.    Now, was that important to you?

24 A.    Absolutely.

25 Q.    And continue reading?

1  A.    "To determine the total cumulative recoverable reserves,

2  including primary, secondary and tertiary, was a 25 percent

3  factor of in-place reserves."

4  Q.    Keep on going.

5  A.    "There are no depth limitations cited in either the

6  collateral assignment or oil promissory note, but electrical

7  log data is available only to a depth of 3500 feet.  There may

8  be deep formations containing untapped reserves, however, no

9  value can be assigned to them in the absence of electric logs

10  or other drilling data."

11  Q.    Did you have any knowledge or did Mr. Harley tell you

12  these leases, these six oil leases, what the depth of any

13  rights that were controlled by virtue of those leases?

14  A.    No.

15  Q.    So now going back to the next page, you make some

16  estimates of value here starting on the top.  Can you read that

17  paragraph, on what estimate he gives under that paragraph?

18  A.    He was using a per barrel price of $110.  And he estimated

19  there were over ten million barrels, which -- with a valuation

20  of 1.1 billion.

21  Q.    And then he makes a second estimate of value below that.

22         TECHNICIAN:  Down to the bottom?

23         MR. BRANDLER:  Yes.

24  BY MR. BRANDLER:

25  Q.    For a lessor amount of oil and value.  Do you see that?

1  A.    Yes.

2  Q.    And what was the difference -- did you understand what the

3  difference was between those two items?

4  A.    Hum, I would have to re-read this again, to tell you the

5  difference.  At the time I think I understood it, but I'd have

6  to review it.  This was six years ago.

7  Q.    I don't think it's necessary at this point.  Go to page --

8  the next page.  And just enlarge that paragraph.  Can you just

9  read what it says from "The above reserves"?

10  A.    "The above reserves and associated price is applicable by

11  today's standards, any change in the current market price could

12  have an effect on the estimated value.  Again, these reserves

13  were estimated volumetrically, using petroleum industry

14  accepted formulas.  However, they do not constitute any

15  guarantees of production.  These reserves should be viewed as

16  estimations, there are no assurances they can be recovered.  If

17  these reserves can be recovered through a variety of methods,

18  no representation of time or expense has been made regarding

19  their recovery.  Any lending institution must determine the

20  value of the reserves for their purposes."

21  Q.    All right.  Can we go to page 253 of this document which

22  is about three pages -- right there.  Was there a document

23  attached to this report -- can you enlarge the top half?  Now,

24  can you start it from the top.  Right there.  All right.

25  Something called Assignment of Collateral from Enpetro, LCP?

1  A.    Yes.

2  Q.    Can you just read what it says in the body there?

3  A.    That Enpetro LPC, Inc., a Texas corporation whose address

4  is 2243 Valleywood Parkway, Farmers Branch, Texas, 75234,

5  herein referred to as the assignor for sufficient consideration

6  paid by the assignee herein, and subject to the further terms

7  and conditions hereof, does hereby transfer, assign and convey

8  that certain corporate note as collateral for note numbered

9  M20092497, issued to RJH and Company, Inc., herein referred to

10  as assignee, approximately 9.5 million barrels of oil, being

11  approximately 9.5 million barrels of proven reserves of oil

12  underlying the following oil, gas and mineral lease covering

13  lands in Brown County, Texas, to wit.

14  Q.    And what does it say after to wit?

15  A.    Those leases located it in Brown County, Texas, described

16  as the Williams Group containing approximately ten million

17  barrels of oil.

18  Q.    Now, this terminology description, the Williams Group, was

19  that mentioned anywhere in Kesterson's report when he was

20  estimating value of six leases?

21  A.    No.

22  Q.    You haven't seen any of the due diligence, any document

23  referring to what the Williams Group was?

24  A.    No.

25  Q.    Did you know -- was that one of the issues you had in

1  terms of this document, that there was no way to tie in this

2  assignment of collateral to what Kesterson was even evaluating?

3  A.   That was one of the issues, yes.

4  Q.   And the next page of this document has a signature of

5  someone named Stan Dedmon at the bottom, says he's the

6  president of Enpetro LPC, Inc.?

7  A.   Yes.

8  Q.   Dated September 24th of '97.  Did you ever speak to Stan

9  Dedmon?

10  A.   No, I was not able to reach him.

11  Q.   I think you said you did some research trying to figure

12  out the status of Enpetro, LPC, Inc.?

13  A.   Yes.

14  Q.   And what did you find out?

15  A.   I -- the status was --

16       MR. O'BRIEN:  Objection, your Honor, as to what he

17  found out and researched.  That would be hearsay.

18       THE COURT:  Well, I mean, you can go a little

19  further.  It depends on where.  It would depend on where.  I'll

20  let you pursue it a little bit.

21       MR. BRANDLER:  I'll drop it.

22       THE COURT:  All right, fine.

23       MR. BRANDLER:  I withdraw the question.

24  BY MR. BRANDLER:

25  Q.   Did you ever -- you said you never spoke to Dedmon.  Did

1    you ever speak to anyone associated with Enpetro?

2    A.    I did not.

3    Q.    Did you ever determine whether even Enpetro was a viable

4    corporation?

5    A.    I did not.

6    Q.    If we can go to page 257 of this document, which is three

7    or four pages beyond this.  The document entitled to Railroad

8    Commission of Texas, Office of General Counsel, dated September

9    27 of 2005 addressed to Mr. Harley, do you see that?

10   A.    Yes.

11   Q.    I would like you to read what it says scrolling down.

12   Recoverable reserves where -- start reading here.

13   A.    Our research revealed that the operator of record for the

14   following leases is Haze Hilltop Operating Corp, Watson,

15   commission lease No. 14273; Joe A. Butler, commission lease No.

16   10455; and Bruce Harris, commission lease 11197; and Bruce

17   Harris, commission lease 1301.

18   Q.    The next paragraph.

19   A.    Our research has also revealed that the operator of record

20   for the following leases is MER Resources, commission lease No.

21   14272; and Tischler, commission lease 11842.

22   Q.    So, in reviewing that document there indicated to you that

23   the leases that were being reviewed were operated by two

24   entities, one being Hilltop Operating and the other one MER

25   Resources?

1  A.    Yes.

2  Q.    No mention of Enpetro, no mention of Mr. Harley.

3  A.    Yes.

4  Q.    Can you read what it says, "Please be informed"?

5  A.    Yeah.  Please be informed that the enclosed print screens

6  also indicates that Hays Hilltop Operating Corp became inactive

7  with the commission on November 26, 2003, and MER Resources is

8  an active operator.

9  Q.    If we can go to two-pages down, 259, the Bates number --

10  right there.  It lists the leases that the Texas Railroad

11  Commission was doing its -- or what Mr. Kesterson was doing his

12  analysis on the six different leases?

13  A.    Yes.

14  Q.    And just read on the left-hand side what the names of

15  those leases are?

16  A.    Busbee, J. A. Butler, some of these leases start out with

17  V. O. King, then the lease was sold to J. Butler.  Harris A,

18  Harris B, Tischler, Watson.

19  Q.    Nothing about the Williams group in that?

20  A.    No.

21  Q.    And could we go to page 262.  Further part of Mr.

22  Kesterson's report, if you go to the bottom of the page where

23  it says The information, what does it say there?

24  A.    "The information from the Texas Railroad Commission oil

25  promissory note and collateral assignment were accepted as

1  factual without further investigation."

2  Q.    What did you understand that to mean?

3  A.    Well, that there was no due diligence done in those

4  documents to determine their truthfulness.

5  Q.    By Mr. Kesterson?

6  A.    Yes.

7  Q.    And then in the next paragraph, I think you already read

8  it, it was the portion of his prior.

9  A.    Yes.  "No trips were made to the field to examine the

10  current equipment status on each of the wells on these leases.

11  No trip made to the Brown County Courthouse to determine the

12  present status of the leases, drilling depth rights or the

13  working interest ownership."

14  Q.    And then the last paragraph.

15  A.    There has been no production from any of these 46 wells

16  since 1993, according to the figures provided by the Railroad

17  Commission.  These leases have sold 20,000 mcf of natural gas

18  and 64,000 barrels of oil in their cumulative history.  There

19  are some inconsistency in reporting.

20  Q.    Going to page 263 at the bottom of the page, the last

21  paragraph, see what Mr. Kesterson says there.

22  A.    To prepare this analysis of crude oil reserves, it is

23  unique for several reasons, normally, an evaluation is prepared

24  based on historical gas and oil production, figures, cash flow,

25  lease operating expenses, net revenue interest of each of these

1  leases.   However, this situation does not apply to the terms of

2  the oil promissory note or the collateral assignment.   The

3  promissory note and collateral assignment states only that a

4  reserve must be maintained, without respect to expense or time.

5  To assign value to the estimated reserves requires the

6  following steps:

7  Q.    Slow down.

8  A.    Evaluating the nuclear and/or electric logs and/or

9  drilling core analysis run on the wells, if available.

10 Volumetric calculations must be done on each of these wells to

11 -- I can't see it -- derive, I think it says derive -- at the

12 in-place reserves.   Then the in-place reserves are reduced to

13 recoverable reserves by a percentage based on recovery methods

14 and estimated geological conditions.   For the purposes of this

15 report a 25-percent recovery factor was figured in for primary,

16 secondary and tertiary, if applicable.   Once the recoverable

17 reserves are determined then the amount of oil produced to

18 date --

19 Q.    Next page.

20 A.    -- must be subtracted from the estimated reserves to

21 determine the remaining recoverable proved developed

22 nonproducing reserve.   Since there has been no current

23 production from these wells, all of the reserves are grouped

24 into one category because there is no difference between

25 formations open for production and the up-hole behind pipe

1  reserves or undeveloped reserves.  By the terms and conditions

2  of the collateral assignment, no consideration was given to

3  expense to recover these reserves, nor the feasibility of

4  recovering them.

5  Q.   So, in terms of the areas I just read, in terms of the

6  unique situation Mr. Kesterson was talking about and the fact

7  that he didn't go to Brown County, didn't do a title search,

8  did that raise any questions in your mind of the due diligence

9  side of things?

10  A.   Yes.

11  Q.   And did you raise those questions with Mr. Harley and Mr.

12  Bunche?

13  A.   I did.

14  Q.   And can we go to 36.13?

15        THE COURT:  Can we remove those marks?

16        MR. BRANDLER:  Yes, sorry.

17        THE COURT:  That's good.  I think everybody is kind

18  of --

19        MR. BRANDLER:  I'm going to the second page of this

20  document.  Okay.  I need to scroll up, we have to get the day.

21  There you go.

22  BY MR. BRANDLER:

23  Q.   Did you send an e-mail to Mr. Harley raising those

24  concerns on January 4 of '09?

25  A.   I did.

1  Q.    Can you read what your e-mail says?

2  A.    Dear Richard, I trust you had a wonderful Christmas and

3  New Year with family and friends.  I'm still in Asia and I

4  spent time reviewing the geological report.  I have several

5  questions that I anticipate coming from the bankers.  It would

6  be helpful to discuss these now before I meet with my contacts

7  inside the bank.

8         The Enpetro note is dated 1997.  However, the Texas

9  Railroad Commission refers to it in a letter from 1995.  Can

10  you please explain this discrepancy?  Please show evidence of

11  Enpetro's good standing.  What is Enpetro's history, asset

12  base, who are the owners, et cetera.  Please show evidence that

13  Enpetro has not re-assigned the assets to others (despite their

14  assurance on paper in 1997).

15         As this note has been in existence for ten years,

16  please explain how it was evaluated prior to now for

17  collateralization.

18         Please show evidence of current cost of extraction of

19  oil reserves in the field.

20         This report does not indicate PV10, the generally

21  accepted standard for valuation of oil reserves.  Please

22  provide this estimate.

23  Q.    What is PV10?

24  A.    PV10 is terminology used to refer to the recoverable oil

25  reserves.

1  Q.    And was that something that you had found out during your

2  due diligence process here?

3  A.    Yes.  For any oil producer to go into some sort of

4  agreement on oil resource, they would need a PV10 assessment.

5  Q.    And that wasn't done by Kesterson?

6  A.    It was not.

7  Q.    All right.  Can we just go to the last two paragraphs of

8  your e-mail.

9  A.    Lastly, there was a single page that contained a

10  certificate in the original I viewed at our lunch together, but

11  I did not see it in the current copy.  Would you please

12  elaborate on that document and provide a copy of it?  I am

13  still in Asia and would like to discuss these on conference

14  call as soon as possible as I have a window of opportunity to

15  meet with Standard Chartered lending head this week.  Would it

16  be possible for us to speak Sunday evening, 8 p.m. your time?

17  Q.    All right.  The paragraph before that, the single page

18  that contains a certificate in the original, what were you

19  referring to?  Is that the oil production note?

20  A.    I don't recall what that certificate was.

21  Q.    And going to the first page of this document, did you get

22  a response from Mr. Bunche to some of those questions?

23  A.    I did receive a response.

24  Q.    Is this the response on January 6 of '09 at two o'clock in

25  the morning?

1   A.    Yes.

2   Q.    And -- can you just tell us what Mr. Bunche -- how he

3   intends to respond to your six questions?

4   A.    Okay.  The first response is referring to an insurance

5   wrap, which he's saying is not part of this deal.  And the oil

6   referred here is from a different part of the field.

7   Q.    Did that -- first of all, you had mentioned earlier this

8   morning something about a Prudential insurance wrap, and I cut

9   you off.  So did you raise any questions regarding the

10  Prudential insurance wrap, and what was the nature of that

11  discussion?

12  A.    Hum, no, I guess this was trying to get to a distinction

13  to exactly which reserves we were trying to use as a

14  collateralization, and establishing a chain of ownership.

15  Q.    And maybe it would be easier, why don't you just read what

16  Bunche said instead of characterizing?

17  A.    Sure.  The Enpetro note for 900 million with the

18  Prudential Insurance wrap is not part of this deal, and is

19  above and beyond the oil reserves reflected here.  That oil is

20  from a different part of the field.  I think this was made

21  clear several times.  So we were dealing with a ten million

22  reserve barrels from this field grouping.  To answer your

23  question directly, if you look at the July 9, 2008 certified

24  reassessing you will find answers as to reaffirmation of the

25  claims current state, Enpetro's assignment still in good

1  standing, et cetera.  I suggest you study that and we discuss

2  it with Don Kesterson and the Texas Railroad Commission.

3      2.   Enpetro company profile and history should be easy to

4  get --

5  Q.   Before we read two, going back to your question, your

6  question one was the Enpetro note is dated 1997, however, the

7  Texas Railroad Commission refers to it in a letter of 1995.

8  Did Mr. Bunche's answer that question?

9  A.   No, he didn't address the discrepancy.

10 Q.   All right.  Then your second question was, Please show

11 evidence of Enpetro's good standing, what is Enpetro's history,

12 asset base, who are the owners, et cetera.  What did Mr. Bunche

13 say?

14 A.   He said look it up online or ask the bankers to do it.

15 Q.   So that didn't answer that?

16 A.   That was not an answer.

17 Q.   And No. 3 says, Please show evidence that Enpetro has not

18 resigned the asset to others, despite their assurance on paper

19 in 1997.  What is his answer on that in No. 3?

20 A.   Once again, see page 1, paragraph 1, July 9 report or

21 contact Texas Railroad Commission or Enpetro directly.  I think

22 Kesterson may be helpful with the right names and numbers here

23 also.

24 Q.   So, in your opinion did that answer your question?

25 A.   No.  It was not an answer.

1  Q.    And No. 4 was you said the note was in existence for more

2  than ten years.  Please explain how it was evaluated prior to

3  now for collateralization purposes.  What does Mr. Bunche say?

4  A.    This is a question that I think answered the second and

5  third pages of the analysis report.

6  Q.    And did that answer your question?

7  A.    No, no, it wasn't an answer to that question.

8  Q.    And No. 5 was please show evidence of the current cost of

9  extraction of the oil reserves in the field.  What is his

10 answer to that?

11 A.    He says the cost of extraction is purely Kesterson's

12 business.  But Kesterson said clearly it wasn't.

13 Q.    And he says, Perhaps we can have Kesterson do a brief

14 budget or professional letter specific to the specs of Harley's

15 field, correct?

16 A.    Yes.  And Kesterson said explicitly he could not do that.

17 Q.    As far as the cost of extraction?

18 A.    Exactly.

19 Q.    So that didn't answer it.  And six was, This report does

20 not indicate PV10, the generally accepted standard for

21 valuation of oil reserves.  Please provide this estimate.  And

22 what does Bunche tell you?

23 A.    He points back to Kesterson as the source of that

24 information.

25 Q.    And he says that that's his job and that's why he's got an

1  official seal and certification?

2  A.    Yes.  That's what --

3  Q.    That's what it says?

4  A.    -- Peter has written here, yes.

5  Q.    And what does he say in closing to his response to you?

6  A.    He suggests that we have a call with Kesterson, and he

7  also suggests that I get a limited power of attorney to

8  represent the deal.

9  Q.    Is it accurate to say that Mr. Bunche was anxious to get

10  the deal done?

11  A.    Yes.

12  Q.    And he felt that he could make a lot of money here?

13  A.    He did, yes.

14  Q.    And you were a little bit more cautious than he was?

15  A.    Yes.  These were my banking relationships and my

16  reputation, so I was very cautious to determine the value of

17  these assets and whether or not they were real.

18  Q.    Okay.  Could we have 36.29?  And the second page.  On

19  January 7 of '09 at 3:45 in the morning does the e-mail

20  indicate that there was a conversation with Kesterson?

21  A.    Yes.

22  Q.    And what does Bunche tell you?

23  A.    He had spoken to Kesterson, and he wanted to schedule a

24  call with all of us to speak with him.

25  Q.    And the purpose of that is so you could do your due

1  diligence?

2  A.    Yes.

3  Q.    And then going to the first page of this document.  Can

4  you just read the third paragraph, please, Do be advised?

5  A.    Please do be advised that the bank note you keep harping

6  on is not, and you were told by Richard several times at the

7  table, was not part of this deal.  The IMF will obviously be

8  aware of it, but we need to craft this deal for a credit line

9  without that set of documents.  We need to get your due

10 diligence from Kesterson and the Texas Railroad Commission.  We

11 can do that by phone, e-mail, internet and Kesterson with ease.

12 Q.    So this bank note that you keep on harping on, that's not

13 going to be part of this deal but the IMF will be aware of it,

14 what are you referring to there?

15 A.    Yeah, it's -- it's really tangential to the main issue,

16 which was the oil asset.

17 Q.    So bank notes, was there some discussion about bank notes?

18 A.    It -- well, I'm not really clear what he's referring to

19 exactly.  I was just focused on is the oil asset real.  Can we

20 show ownership and can we use it as an asset in a loan.

21 Q.    And it appears you couldn't?

22 A.    Which we couldn't determine.

23 Q.    Can we have 36.14.  Did you send a reply e-mail to Mr.

24 Bunche letting him know that he really hadn't answered your

25 questions?

1    MR. O'BRIEN:  36 --

2    MR. BRANDLER.  .14.

3    MR. O'BRIEN:  14.

4    THE WITNESS:  Yes.  I said here, if you read on page

5  12 of the geological report, The assignment of collateral says

6  that a certain corporate note as collateral for note numbered

7  M20092497 issued to RJH and Company.  We need a copy of this

8  numbered note as part of the due diligence.  It has nothing to

9  do with the wrapped Prudential note.

10  BY MR. BRANDLER:

11  Q.    And then what do you say?

12  A.    Next, please explain the discrepancy of the dates I

13  discuss below.

14  Q.    And then No. 2?

15  A.    As for Enpetro, the application for the collateral line

16  must provide the information to the bankers.  It would be like

17  applying for a loan and asking the bank to get my tax records

18  themselves!  If RJH does not have any information on Enpetro,

19  the bankers will not proceed.  Will the CEO of the company be

20  cooperative?  I assume RJH will have a much easier time getting

21  this information -- getting this information than I do since

22  Enpetro does not know me.

23  Q.    All right.  And could we have 36.8.  Did Mr. Bunche then

24  send you a confidential e-mail which you didn't want Mr. Harley

25  to know that he sent to you, which was a copy of an e-mail he

1  sent to Mr. Harley?

2  A.    Yes.

3  Q.    And is that what's reflected on 36.8?

4  A.    Yes.

5  Q.    And that happened on January 15 of '09 at five o'clock in

6  the morning, 5:10 a.m.?

7  A.    Yes.

8  Q.    And what was Bunche's e-mail to Harley?

9          MR. O'BRIEN:  Your Honor, Bunche's e-mail -- okay, no

10 objection.

11         THE WITNESS:  So, Bunche's e-mail was really just

12 letting him know that he was working on this project, and that

13 he had trouble reaching him.

14 BY MR. BRANDLER:

15 Q.    And the last paragraph on that page, would you just read,

16 In late December?

17 A.    Sure.  In late December you told me to send you deals for

18 myself (based on our conversations - which you affirm) and

19 Malcolm and Jason's deal to get you the credit line (two

20 percent credit line and two percent first tranche).  You now

21 say, after agreeing in conferences and e-mails, that you want

22 to change this.  This is after (on December 28, 29, and --

23 Q.    Go to the next page.

24 A.    -- January 2, 4 and 6) telling me you'd approved but

25 adapted the limited Power of Attorney deal.

1    However, as of yesterday, after Malcolm set the bankers up

2  for your deal in Hong Kong for a week, then you decided you

3  wanted to revisit his situation and mine after discussions with

4  your attorney.  I am now very interested in hearing what you

5  want to do and seeing it in an e-mail, if you would indulge me

6  and Malcolm.  Let's memorialize the new scenarios (once agreed)

7  and work this deal through the Chinese bank system next week.

8  The original plan was to have liquidity around February 1.  We

9  can still do that if you can hold to the agreements we define.

10  Q.    And just read the next paragraph?

11  A.    Lastly, we have spoken with Kesterson at length.  He and I

12  have different understanding of your conversations --

13  Q.    Of our conversations?

14  A.    Sorry.  He and I have different understanding of our

15  conversations than you seem to.  I spoke with him yesterday and

16  we were on the same page.  You seem to feel differently.  We

17  should discuss it when we speak.  So you know, we only

18  requested he do a report on the costs associated with

19  extraction, for purposes of defining a bank evaluation.

20  Everybody wants this.  We will not get around it.  We should

21  have your guy do it.  Otherwise, an independent source provided

22  by the bankers will do so.  I think we want Don.  He does not

23  need to leave his house and he should do it in a day or two.

24  Hence, our request to him.

25  Q.    And the next paragraph?

149

1 A. Let's get my new deal on paper and Malcolm's redone (via

2 your attorney note and Malcolm's thoughts to you, privately.)

3 Before that, let's talk alone - then conference with Malcolm.

4 Lay it to bed and get this stuff done in two weeks.  Three

5 weeks from now you can have your 50 million dollar advance.

6 Please reviewing this scenario and call me ASAP.

7  Please please call me.  I need you, Richard.  We are

8 working hard and need you to be present for us.  This is a big

9 deal.  You are the big man.  Please be big for us.

10 Q. All right.  And you said you never got that report from

11 Kesterson on the cost of extraction, correct?

12 A. No.

13 Q. He said he wouldn't do it?

14 A. No.

15 Q. Could we have 36.6.  Is this an e-mail from Bunche to you

16 dated February 4 of '09, now related to this -- yet again, this

17 Prudential Insurance guarantee?

18 A. Yes.

19 Q. And is it -- what was your understanding -- what was this

20 all about?  Is this a new deal now?

21 A. This is a new deal.  This was essentially an insurance

22 policy that provided some guarantee of an underlying asset.

23 And again, this is an attempt to take an asset and a derivative

24 of that asset and obtain a credit line.

25 Q. Does Mr. Harley make any representations to you that he

1 had obtained an insurance company, Prudential Insurance

2 Company, that had guaranteed his asset?

3 A.    Yes.

4 Q.    And he sent you documentation purportedly from Prudential

5 Insurance Company to verify that and back up that claim?

6 A.    Yes.

7 Q.    And he says in the second -- just read what it says in the

8 second paragraph here of this e-mail.

9 A.    "Upon his receipt he tells me he's going to send you by

10 e-mail a draft of a Prudential insurance guarantee for a

11 hundred million.  Please call me when you rise this morning and

12 I'll fill you in.

13 Q.    Can we have 36.7?  And did Mr. Harley then send you on

14 February 4 of '09 this financial guarantee which he purported

15 came from this company, this insurance company?

16 A.    Yes.

17 Q.    And what does it say?

18 A.    It was good talking to you.  As promised, attached is a

19 copy of your firm's financial guarantee assignment.

20 Q.    Agreement?

21 A.    Sorry, agreement, to be utilized for a line of credit.

22 The underwriters have given permission to change the verbiage

23 if it does not meet with the bank's approval.  Please call me

24 when you receive the same.

25 Q.    And going to the next page, if you would highlight the top

1  half.  And did you review this document when you got it?

2  A.    I did.

3  Q.    And what did you notice about it?

4  A.    One, that company -- or I could not determine the

5  existence of that company.

6  Q.    It wasn't Prudential Insurance Company, it was Prudential

7  Life Assurance?

8  A.    Yes.

9  Q.    And it's -- it says it's a draft on the top left-hand

10 corner, correct?

11 A.    Yes.

12 Q.    Which indicates that it's not a finalized guarantee of

13 anything?

14 A.    Exactly.

15 Q.    And the amount -- the issue date of this purported

16 document from Prudential Life Assurance was what, the issue

17 date?

18 A.    Well, it was drafted in 2009, according to the document.

19 Q.    And the limits of this, purportedly?

20 A.    One hundred million U.S. dollars.

21 Q.    And scrolling down, there's a number of blanks that are in

22 here as far as who the parties are and what the terms are of

23 this agreement?

24 A.    Yes, yes.

25 Q.    So in your mind did this give you any assurance that he in

1  fact had a life -- a legitimate life insurance company who had

2  guaranteed his asset?

3  A.    I don't know.  I couldn't determine that the company even

4  existed after calling them and contacting other Prudential

5  agents.

6  Q.    Can we go to Exhibit 10.1.  So that draft, just to go

7  back, was February 4 of '09.  We're moving ahead now to April

8  28th of '09.  Did Mr. Harley then send you a finalized document

9  related to this Prudential Life Assurance company?

10 A.    Yes.

11 Q.    And what does the body of the e-mail say?

12 A.    As promised, see attached documents.

13 Q.    And was the purpose of this for the same purpose you

14 previously stated, that this document would be used to get a

15 line of credit because now an insurance company is backing the

16 assets?

17 A.    Yes.

18 Q.    And the next page.

19 A.    Hum, similar document.  Sample draft was removed, actual

20 dates been inserted, as well as what appears to be an actual

21 binding number -- a binder number with a letter of indemnity

22 number 091901A-T, and the beneficiary listed as Mr. Harley's

23 company.

24 Q.    And scrolling down right there, where it says, In

25 reference of your acquisition, does it say whether Prudential

1  Life Assurance is apparently -- I'm sorry.  Sorry about that.

2         (Whereupon, a cell phone rang and was turned off.)

3         THE WITNESS:  Could you repeat your question?

4  BY MR. BRANDLER:

5  Q.    Yes.  On the Prudential Life Assurance document, does this

6  appear to be a finalized document from this company relating to

7  the same deal presented to you in February?

8  A.    It does appear to be one.

9  Q.    On the paragraph that says in reference, does it say what

10 the company is purportedly guaranteeing in reference to your --

11 A.    Yes.  It's supposed to be a guarantee on the assignment of

12 collateral approving oil reserves.

13 Q.    And this document appears to be signed -- if we go to the

14 fourth page.  Signed by Mr. Harley?

15 A.    Yes.

16 Q.    And someone named Jared Clarke from Canada?

17 A.    Yes.  That's from Summit Underwriting.

18 Q.    Did you attempt to contact Mr. Clarke or anyone from

19 Prudential?

20 A.    I did.

21 Q.    Were you successful?

22 A.    Hum, yes.  I was successful in contacting people from

23 Prudential, but they were not aware of this document or any

24 such transaction.

25 Q.    So you decided not to go ahead with this?

154

1  A.    I decided not to go ahead with this.

2  Q.    Can we go to 36.28?  So that was April 28 of '09.  This is

3  now May 1 of '09.  Did you respond to Mr. Harley relating to

4  that proposal?

5  A.    You're talking about the SKR?

6  Q.    Yes.  Please let me know the status the SKR.  And then you

7  have something about the binder below that?

8  A.    Yes.  I was asking him about the stock keeping receipt.

9  Q.    What did you say below that?

10 A.    I said, The binder says that if the premium is not paid

11 the binder is not valid.  I'm afraid the document does not have

12 any teeth due to that fact.  If in fact the premium was paid,

13 however, how would the bank perform due diligence on the binder

14 number?  Who can they contact other than the underwriter?

15 Q.    Now, what did you mean by that?  What were you telling Mr.

16 Harley?

17 A.    Well, I was basically saying that the connection between

18 the actual payment against an SKR was not able to -- we were

19 unable to validate.

20 Q.    Is it accurate that if you don't pay the binder then the

21 document is not considered binding?

22 A.    Yeah, it's not considered valid.

23 Q.    All right.  We have 9.1.  So that was May 1.  Going to May

24 16 of '09, did Mr. Harley have a new deal for you?

25 A.    Yes.

1  Q.    And did he send you some documents via e-mail?

2  A.    Yes, the attachment should be here.

3  Q.    Yes.  The next page, sent you some treasury checks, what

4  purports to be treasury checks?

5  A.    Yes.

6  Q.    In the denomination of 500 million dollars?

7  A.    Yes.

8  Q.    And there are two of those.  Can we have the next page,

9  and then the next page after that?  The power of attorney from

10 someone named Kiat to Mr. Harley?

11 A.    Yes.

12 Q.    Go to the next page, the following page, there's something

13 from the Federal Reserve Bank of New York for about a billion

14 dollars being held at the bank.  Next page.  A confidential

15 memo of the Federal Reserve Bank.  And then the last page,

16 something called To whom it may concern, that's supposedly

17 signed by Ben Bernanke and Donald Cohen.  Do you see that?

18 A.    Yes.

19 Q.    What did Mr. Harley tell you these documents were and what

20 did he want you to do?

21 A.    He said that this represented a billion dollars in value,

22 and that by working with him I could potentially help get

23 access to some portion of that value.

24 Q.    And how would you get access to a portion of that value,

25 how was the deal as presented by Mr. Harley structured?

1  A.    You know, I was not very interested in it, so I didn't

2  spend a lot of time thinking about the deal structure.

3  Q.    Would these documents be used as collateral for financing?

4  A.    Yes.  It was exactly the same idea as before, where you

5  would use an asset and get some other entity to give you a

6  credit line against it.  I don't recall what financial

7  structure he was proposing, whether it was 50/50 or 60/40 or

8  whatever it was.  But it was the exact same idea of take an

9  asset and get a bank or some other financial entity to give you

10  a credit line against it.

11  Q.    Did you do any research on the validity of the checks?

12  A.    I did.

13  Q.    What type of research did you do?

14  A.    It was just a simple search, and it was pretty clear that

15  they were dubious, clear to me.

16  Q.    Can we have 36.12?  So that was, if I remember the date,

17  was May of 2009.  Now, moving ahead to January of 2010, did you

18  get another e-mail from Mr. Harley?

19  A.    Yes.

20  Q.    January 27 of 2010.  What did Mr. Harley say in this

21  e-mail?

22  A.    He sent an overview if this firm.

23  Q.    And did you request that from him?  Were you still in

24  contact with him at this time negotiating deals?

25  A.    I had requested it from him a long time prior to that, but

1  had never received it.

2  Q.    And going to the last page of this document.  Is this the

3  document he sent you regarding the overview?

4  A.    Yes.

5  Q.    Could you just read it starting with the date?

6  A.    Sure.  Federal Reserve Bank Instrument.

7  Q.    The date on it is January 26 of 2010, correct?

8  A.    Yes, January 26, 2010.  In furtherance of our telephone

9  conversation we are pleased to confirm that RJH and Company has

10 unrestricted bond power over the value of bank instruments of

11 one billion plus USD for the firm's utilization and credit

12 enhancements, private placement, high yield investment or

13 trading programs.

14        These bank instruments consist of reserve fund letters and

15 Federal Reserve Bank and safekeeping receipts and confidential

16 memos with screening procedures.  These funds/assets have been

17 placed in custodial safekeeping under custodial accounts with

18 Federal Reserve Bank in New York, and authenticity must be

19 confirmed by gray screen only to any responsible inquiring

20 bank.

21 Q.    And then if you scroll down it has your signature on it?

22 A.    Yes.  And basically this was supposedly --

23        MR. O'BRIEN:  Your Honor, I don't think there's a

24 question that's been asked.

25 BY MR. BRANDLER:

1  Q.    Did you have any discussion with him where he was

2  explaining that?

3  A.    Yes, yes.  I mean, this was referring to how you actually

4  validate the safekeeping receipts, and the gray screen was some

5  sort of secret computer network that certain people have access

6  to where you could enter these numbers and actually see the

7  values of these safekeeping receipts, and then once validated

8  you could use them as financial collateral.

9  Q.    So you decided not to engage with that at that point?

10  A.    Yes.

11  Q.    So at the end of the day you lost $10,000?

12  A.    Yes.

13  Q.    And did you ever get paid that back?  You said you had a

14  guarantee from Mr. Bunche?

15  A.    No.

16  Q.    Never requested Mr. Bunche to pay you back?

17  A.    No.

18  Q.    And in addition to losing $10,000, you got to make several

19  trips to Scranton and Wilkes-Barre for this trial?

20  A.    Yes.

21        MR. BRANDLER:  I have no further questions.  I would

22  move the admission of all the documents I previously identified

23  with Mr. Casselle.

24        MR. O'BRIEN:  No objection to the documents.

25        THE COURT:  They'll be admitted.

CROSS EXAMINATION

BY MR. O'BRIEN:

Q.   Mr. Casselle, I have a few questions.  The amount of money
that you lost, you paid Mr. Harley $2,000 on 12/13/2008.  Am I
correct about that?

A.   Hum, yes.

Q.   Okay.  And that payment was made to him right at the
beginning -- he wanted you -- he said I want this money and
then I'll sit down and talk to you?

A.   Yes.

Q.   Okay.  That was paid long before you did any of this
extensive due diligence you're talking about?

A.   Well, we discussed on the phone the structure of his deal
before we sat down.

Q.   It was long before you did any of this due diligence,
reviewing Kesterson's reports, reviewing all these documents?

A.   He would not release the documents until he received the
money.

Q.   Again, Mr. Casselle, it was long before -- when you gave
that money, it was long before you reviewed the documents?

A.   I had not received any documents prior, so --

Q.   Mr. Casselle, it was long before you reviewed the
documents?

A.   I said I sent him the money before I received any
documents.

1  Q.   And of course, you didn't review them before you received

2  them?

3  A.   I don't quite follow your logic.

4  Q.   Let's move on.  The next payment you made to him was on

5  December 16, $3,000?

6  A.   Yes.

7  Q.   Again, you hadn't received the documents by that time, had

8  you?

9  A.   I did not receive the documents.

10 Q.   Well, now let's talk -- you made these two payments at the

11 very beginning.  Then afterwards you received a lot of

12 documents from him, correct?

13 A.   I did receive documents from him, yes.

14 Q.   Now, it seems to me that the big thing you received are

15 these reports from Kesterson, Don Kesterson?

16 A.   I received documents from Richard Harley.

17 Q.   And included in those were estimates of value of oil

18 reserves performed by Don Kesterson?

19 A.   And there were other documents.

20 Q.   Other documents.  Okay.  Let's talk a little bit about the

21 Kesterson reports.  Those Kesterson reports said that the -- he

22 gave two values, between one and 1.12 billion, right?

23 A.   Yes.

24 Q.   Okay.  But he also had a lot of other stuff in there.  He

25 had a lot of other stuff.  He said, well, you know, I'm not

1  talking about the cost of getting it out, and I'm also not

2  talking about how a bank would value.  Banks have to value it

3  on their own.  He said that specifically, didn't he?

4  A.    He did.

5  Q.    And so when you were doing this due diligence you're

6  looking at Kesterson's report, there's some things in there

7  that are positive, but there's a lot of other stuff in there

8  that raises concerns?

9  A.    Yes.

10 Q.    And that was a report provided to you by Mr. Harley?

11 A.    Yes.

12 Q.    So the concerns you have about the deal that you decided

13 not to go into came substantially at least in terms of the

14 value from documents that Mr. Harley voluntarily provided to

15 you?

16 A.    Those documents contained inconsistencies, and I asked for

17 a clarification of those inconsistencies.

18 Q.    Those documents that had these inconsistencies were

19 provided to you by Mr. Harley?

20 A.    They were.

21 Q.    Okay.  And then you had the opportunity to talk to Mr.

22 Kesterson about them?

23 A.    Mr. Kesterson wasn't aware of all of the inconsistencies.

24 Q.    In his own report?

25 A.    Well, because some of the inconsistencies related back to

1  Enpetro, which was outside of Mr. Kesterson point of view.

2  Q.   Some of them related to Mr. Kesterson.  He made -- put a

3  lot of conditions on his report.  The big one was a bank is

4  going to have to decide how much we'd loan on this?

5  A.   Well, the inconsistency was not the fact that the cost of

6  retrieval of the oil asset was undetermined.  The inconsistency

7  was about the chain of the custody of the asset itself, the

8  role of Enpetro and Mr. Harley's relationship with Enpetro.

9  Q.   That's not in the Kesterson report, is it?

10 A.   I know, but it's in the documents that I received from Mr.

11 Harley, which is what you're asking about.

12 Q.   Let's focus on the Kesterson report.  Mr. Harley provided

13 you with a report from Don Kesterson, a geologist, right?

14 A.   Yes.

15 Q.   And that report had a value in it, right?

16 A.   Yes.

17 Q.   And also, he said, look it, this is what I think it's

18 worth, but.  But, but, but, but, but.  The big but being a bank

19 is going to have to really look at this themselves before they

20 loan money on it?

21 A.   That's true.

22 Q.   Okay.  Now, Mr. Harley also provided you with the Enpetro

23 note?

24 A.   Yes.

25 Q.   Okay.  And that note said who the -- the maker of the note

1  was Enpetro, right?

2  A.    Yes.

3  Q.    And the language was there, it said what it said?

4  A.    Yes.

5  Q.    And you had the opportunity to look into it?

6  A.    Yes.

7  Q.    Okay.  So, these two -- the two main documents, the actual

8  asset document, which is going to be the Enpetro note, and the

9  Kesterson report, which relates to value, these are the things

10 you were given to make your decision?

11 A.    Yes.

12 Q.    And you looked into them and then you decided not to go

13 into the deal?

14 A.    Yes.

15 Q.    And you did this all after you had given him the $5,000?

16 A.    Actually I had sent him $10,000.

17 Q.    All after you had given him the $10,000, I stand

18 corrected.  That's all I have.

19            MR. BRANDLER:  Nothing further.

20            THE COURT:  You may step down.

21            THE WITNESS:  Thanks.

22            MR. BRANDLER:  Peter Bunche.

23            THE DEPUTY CLERK:  Please raise your right hand.

24                        PETER BUNCHE,

25 called as a witness on behalf of the Government, having been

1   duly sworn or affirmed according to law, testified as follows:

2           THE DEPUTY CLERK:  Would you please state and spell

3   your name for the record.

4           THE WITNESS:  My name is Peter Gathings Bunche,

5   P-E-T-E-R  G-A-T-H-I-N-G-S  B-U-N-C-H-E.

6           THE DEPUTY CLERK:  Thank you.  You may be seated.

7           MR. BRANDLER:  May I inquire?

8           THE COURT:  You may.

9           MR. BRANDLER:  Thank you.

10                      DIRECT EXAMINATION

11  BY MR. BRANDLER:

12  Q.   Mr. Bunche, how old are you, sir?

13  A.   I am 55.

14  Q.   And are you currently employed?

15  A.   Hum, I am currently self-employed, yes.

16  Q.   And in what field are you self-employed?

17  A.   Hum, I'm a writer and a producer of media content and

18  television product.

19  Q.   And what kind of media content are you referring to?

20  A.   Hum, cable movies, internet, webisodes and feature film,

21  actually.

22  Q.   And do you have a business name that you go by?

23  A.   Yes, I do.

24  Q.   What is the name of the company?

25  A.   Actually, I have two, Artabus Media, which is probably the

1  one you're referring to.  Another one is Banana Republic

2  Productions, which may have some bearing in some of the

3  paperwork that you've seen related to this case.

4  Q.   And are you the sole owner of both of those businesses?

5  A.   Yes.

6  Q.   And are there any employees besides you?

7  A.   Hum, not full-time, no.

8  Q.   And where do you live?

9  A.   I live in New York City, in Manhattan, 170 West --

10  Q.   You don't need to give us the actual address.  What's your

11  educational background?

12  A.   Hum, I have a BFA from Emerson College in dramatic writing

13  and mass communications, and I have a few grad credits from

14  Hunter.

15  Q.   And a BFA, is that a bachelor of fine arts?

16  A.   Yes.

17  Q.   And prior to being involved with Artabus Media and Banana

18  Republic, did you work for an entity known as EMCI?

19  A.   Yes, I did.

20  Q.   What is EMCI?

21  A.   EMCI is Entertainment Marketing Communications

22  International.  At that time it was the premier entertainment

23  marketing company in the world.

24  Q.   And what was your position with EMCI?

25  A.   I was the producer and consultant and one of the corporate

1  -- yeah, I would not be considered a principal, but I was one

2  of the more important folks in the company for a long time.

3  And when I left the company I remained that, much of the time

4  on a consultary level with the actual principal.

5  Q.    Okay.  You aren't the owner of the business?

6  A.    No, I was not.

7  Q.    And what years did you work for EMCI?

8  A.    Hum, I would say '88, 89, til '93, '94.

9  Q.    And since '93, '94, was that when you branched out on your

10  own businesses as Artabus and Banana Republic?

11  A.    Yes, and started just independently directing shows and

12  writing movies, yes.

13  Q.    I want to direct your attention to May of 2008.  Did you

14  have any financial dealings with the defendant in this case,

15  Richard Harley?

16  A.    Yes, I did.

17  Q.    And how did you get first to know or get introduced to Mr.

18  Harley?

19  A.    I was introduced to Mr. Harley while looking for money to

20  start a film company and produce a picture, that being Banana

21  Republic.  Hum, I was introduced by a man named Maurice Tyner

22  who is a broker/dealer for entrepreneurs in a number of

23  different businesses, but entrepreneurs looking for money and a

24  broker/dealer for -- a broker/dealer between entrepreneurs

25  looking for money and between people with money looking to

1   invest in entrepreneurs.

2       So in our business there are a lot of those people.

3   Maurice Tyner was one of them.  And you often never physically

4   meet these people.  Even though you may know them for years,

5   you rarely meet because it's all telephone and internet.

6   Q.   So, did you ever meet Mr. Tyner?

7   A.   I have not to this day, no.

8   Q.   And so this was a referral from Mr. Tyner that he should

9   get in touch with Mr. Harley, and he was someone who could

10  basically finance your Banana Republic company for producing

11  movies?

12  A.   Hum, yes, that is almost accurate.  What would be accurate

13  is one, Mr. Harley with us was really going to be a collateral

14  provider, not an investor, so his relationship with us would

15  have been very different from inception.  The other -- and we

16  were not investing in him.  He was purely providing collateral

17  for us to get a loan.

18  Q.   When you say us, who are you referring to?

19  A.   For me and -- I really should say for me.  But for me and

20  my various producing partners, one of them being Preston

21  Holmes, who is an Oscar-nominated producer of a great number.

22  Q.   So, after Mr. Tyner suggested you get in touch with Mr.

23  Harley, did there come a time around May of 2008 where you did

24  get in touch with him and you talked to him?

25  A.   Yes.  And that was twofold.  Mr. Tyner organized a

1  conference call with us two or three different times, which is

2  how we initially met.  Which is how we initially -- which is

3  how we first had verbal contact.

4  Q.    I don't want to just cut you off, but let me just ask you.

5  Prior to this introduction from Mr. Tyner you didn't know Mr.

6  Harley from a hole in the wall?

7  A.    No.

8  Q.    All right.  From May of 2008 going forward for a period of

9  time, did you then have frequent discussions and communications

10 with Mr. Harley related to potential collateral -- using his

11 collateral for your purposes?

12 A.    I absolutely did, and quite often they were fore-mentioned

13 by him.

14 Q.    And did you develop a personal relationship besides this

15 business relationship?

16 A.    We absolutely did, a very -- a very affectionate bond

17 actually.

18 Q.    And regarding the business side of the relationship, what

19 did Mr. Harley tell you what assets he controlled and had?

20 A.    Mr. Harley told me that he had nearly a billion dollars

21 worth of oil in the ground in Texas.  Hum, he produced

22 documents related to that.  He also told me that he had one of

23 the more extensive Black African-American art collections in

24 America, and I've never seen that, but hadn't asked to see it.

25 But he stressed his oil, and was able to show me things related

1  to that.

2  Q.    So you say he showed you things related to it.  Are you

3  talking about documents?

4  A.    Yes.

5  Q.    And what type of documents are you referring to?

6  A.    They were documents from assay reports from a geologist

7  named Don Kesterson or Kesterman.  Kesterson I believe.  And

8  they were actual -- perhaps not actual, but they were documents

9  directly from the -- on the letterhead of the Texas Railroad

10  Commission, which is the governing body of the oil industry in

11  Texas.  And there were documents with a corporate seal of his

12  that certified X amount of gallons of oil -- X amount of

13  barrels of oil being allocated to this one, that one or the

14  other one.

15  Q.    Regarding the extensive art collection, you said it was

16  the most extensive art collection, African-American art

17  collection in the United States.  Did he tell you where that

18  art was located and the value of the art?

19  A.    Hum, yes.  I believe that he said he had it in the

20  Poconos, in storage in the Poconos.  I may be incorrect about

21  that, but I seem to recall that.

22  Q.    Did he say where he lived?

23  A.    Yes.  He said he lived in the Poconos.

24  Q.    Did he say what kind of place he lived in?

25  A.    Yes.  He said he had a large but modest house and he

1  lived, you know, a nice life-style, but not flash, hence, he

2  lived in the Poconos.

3  Q.   And regarding the oil that he claimed to own, did you ever

4  ask him why he didn't just pump it out of the ground and sell

5  it?

6  A.   I did, many, many, many times.  And this question, when I

7  would show people these documents or discuss this with people

8  that I was trying to use this as collateral with would always

9  say, well, you know, if he's going to lend you $25 million

10  dollars, why don't you just pump 25 million dollars worth of

11  oil out of the ground?  It does sound logical, but he would

12  often say no, I'm keeping this as an asset.  This is to build

13  the business that I'm in.  The price of oil changes and

14  fluctuates so drastically that to keep this oil in the ground

15  makes my investment worth so much more.

16      There is some validity to that, by the way.  Because the

17  price of oil in my time with Mr. Harley changed very

18  drastically.  It was one time 150 a barrel and then another

19  time is was 70 dollars a barrel.  So that was making sense to

20  me because I was seeing it actually play out.

21  Q.   Now, you said you also developed a personal relationship

22  with him.  What do you mean by that?

23  A.   Well, I like Mr. Harley.  He was a very sweet, endearing

24  man.  He would tell me a lot of stories, impart a lot of

25  personal thoughts, a lot of personal wisdom to me.  We would

1  talk about everything from each other's families to sports to

2  we both shared a passion for cigars, which if you're a cigar

3  smoker that's like a, you know, heavy male bonding thing that

4  guys are into.  We had that very seriously.  And I liked him.

5      And my understanding -- and he played on this, because my

6  understanding was if he had all of this oil, he was --

7  essentially after Bob Johnson and Oprah, he's essentially the

8  richest black man in America, if he actually had all of this.

9  And it was quite nice that he had taken me under his wing.  And

10  he would call me often and we'd just talk about the New York

11  Jets or the Yankees or, you know, what was happening in the

12  news.

13  Q.    Did you go places and socialize with him?

14  A.    Several times.  Had him come into the city.  He met -- he

15  came to EMCI.  He met Jay Coleman.

16  Q.    Who is Jay Coleman?

17  A.    Jay Coleman was the president of EMCI.  He's the person

18  that I worked for when I was there and became a close friend

19  with until -- and consulted with until his death.  And Jay is

20  the person I borrowed some money from several times to pay to

21  Mr. Harley.  And Jay wanted to meet this Harley, so we did that

22  a couple of times.

23  Q.    And other than coming into New York and sharing -- where

24  did you go when you would meet him in New York?

25  A.    Hum, we would go to lunch one time to -- twice to lunch

1  near the office at EMCI.  Another time to the Oyster Bar.  And

2  several times to cigar clubs.

3  Q.   Who would pay for those excursions, as far as picking up

4  the bills and tabs?

5  A.   I would pay for those.  I would.  One time Malcolm

6  Cassalle did.  And one time Jay Coleman did.  So we did.

7  Q.   Did Harley ever pay?

8  A.   No, Mr. Harley was always our guest.

9  Q.   And did you ever go to Nascar with him?

10 A.   Yes.  Actually, he's a car enthusiast, and I happen to

11 have a friend who is a -- who is the television media exec who

12 supervises the television -- the televising of Nascar.  So I

13 could kind of go to any event I wanted to go to as a VIP with

14 as many people as I wanted whenever I want to.

15     I expressed this to Mr. Harley, and we took he and his

16 family and his extended family to Dover to a Nascar race, and

17 you know, we got royal treatment.  We got to watch the race

18 from the pits and watch the race with the commentators as they

19 commentated, and it was a lot of fun.

20 Q.   And he was your guest?

21 A.   Yes.

22 Q.   You paid for it all?

23 A.   Hum, I provided it.  I didn't need to pay for it.  It was

24 a favor that ESPN did for me.

25 Q.   All right.  You said he was a car enthusiast.  Did he ever

1  tell you about his cars that he owned?

2  A.   He did.  He did tell me that he had a car collection.  But

3  the only car that I ever saw him drive was a Jeep.  It was a

4  kind of high-end Jeep.  It was a nice car, but nothing special.

5  It was, you know, just a nice car.  But I've never seen any of

6  his cars.

7  Q.   What kind of cars did he say he had in his collection?

8  A.   I must tell you, I've forgotten now.

9  Q.   All right.  Did you ever know Mr. Harley's daughter?

10  A.   I met his daughter at the Nascar event.  And I think one

11  other time in Manhattan with her fiance very briefly.  But I

12  did not know her well.

13  Q.   What was her name?

14  A.   I've forgotten.

15  Q.   Did she ever work at EMCI?

16  A.   No.

17  Q.   And is it accurate you had a dream of getting your movies

18  produced and you were looking for financing?

19  A.   Yes.

20  Q.   And did you engage in some financial plans and dealings

21  with Mr. Harley to get that dream to fruition?

22  A.   Absolutely.

23  Q.   So tell us what happened.  After he told you he had all

24  these assets and he's very wealthy, what was the deal?

25  A.   Well, remember, Mr. Harley was not really an investor per

1 se; he was a collateral provider, which means he would provide

2 collateral.  It's kind of like what many of you would probably

3 do with your children.  He would provide collateral against

4 which one could get a loan.

5 Q.    So what collateral could he agree to provide to you?

6 A.    The numbers changed several times, but we started off with

7 collateral in the amount of barrels of oil for about 20 million

8 dollars.  It then went to about 25 million dollars worth of

9 oil.  And continued to escalate as our relationship got better,

10 and as the price of oil changed.  And as Mr. Harley decided,

11 because sometimes he would just decide he wanted to be really

12 generous and give deeper.

13 Q.    So, did you have to pay Mr. Harley money for the privilege

14 of using his assets as collateral?

15 A.    Yes.

16 Q.    How much money did you pay?

17 A.    All in all, I think I was responsible for $33,000.

18 Q.    Well, when you say you were responsible for it, why don't

19 you break it out.  How much did you personally pay?

20 A.    Me personally?  I believe it was $11,000.  There would be

21 $11,300 from Jay Coleman.  There would be an additional five

22 and maybe eight from my mother that I borrowed.  And several

23 other thousands of dollars in dribs and drabs.

24 Q.    You said from Jay Coleman.  Was that money you borrowed

25 from Jay Coleman?

1  A.    Yes.

2  Q.    All right.  And money you borrowed from your mother?

3  A.    That's right, yeah.

4  Q.    So you didn't have this money just laying around, you had

5  to go out and borrow it?

6  A.    Yeah, and return it.

7  Q.    And was 20 -- I think 33,000 altogether, was that a lot of

8  money for you?

9  A.    Yes, it was.  Because I wasn't working, really.  I was

10  writing and I was -- I came back to New York to take care of my

11  mother who was dying, who has since died.  But that's really

12  the reason I was here.  My mother needed kind of 16-hour a day

13  monitoring and care.

14  Q.    And in exchange for that money, did you ever get any

15  documentation from Mr. Harley evidencing who transferred the

16  money or this collateral that he was providing to you?

17  A.    Hum, that documentation related to the collateral --

18  Q.    No.  I'm talking about the documentation regarding your

19  payment of the money, the agreement that you had between you?

20  A.    Never.

21  Q.    Was there something called an agreement for assignment of

22  collateral?

23  A.    There were a number of those.  They were changed with the

24  amount of the barrels of oil.  This is why I'm telling you that

25  the level of the collateral changed, always getting bigger, as

1  time went on and as our relationship went on.

2  Q.    And as the amount of the collateral got bigger your fees

3  got bigger?

4  A.    Yes, drastically bigger.

5  Q.    And were you able and successful in getting financing

6  using Mr. Harley's oil as collateral?

7  A.    No.

8  Q.    As a result of that, what happened when you weren't able

9  to get the financing?

10  A.    Well, two things happened.  One, we wasted a lot of time

11  and wasted the money and resources that we did have.  And

12  professionally with very high level banking and financing

13  contacts, that I went to using Mr. Harley's paperwork and using

14  Mr. Harley's -- what I thought was the collateral, it damaged

15  my relationships with those people, some of them irreparably,

16  because they did their due diligence, and understood that

17  something was wrong here.  Hence, it never worked.

18  Q.    So, when you were unsuccessful getting the financing, did

19  you contact your friend Malcolm Casselle in December of '08?

20  A.    I did.

21  Q.    To get involved and perhaps use his influence in the

22  banking industry?

23  A.    Absolutely did.

24  Q.    And how did you know Malcolm Casselle?

25  A.    I knew Malcolm Casselle from our unusual relationship with

1  -- my best friend is his mentor in business.  And we met

2  through my friend Gregory Brown about 20 years ago at Gregory's

3  -- Gregory's house in Los Angeles.

4  Q.    So you were a long-time friend with Mr. Casselle?

5  A.    Yes.  I knew Malcolm from when he had just gotten his

6  Ph.D. from MIT.  So he had been like 21 years old.

7  Q.    Directing your attention to December 13 of 2008, did you

8  all meet in New York City?  You, Malcolm, his friend Jason and

9  Mr. Harley?

10 A.    Yes, we did.  At The Oyster Bar restaurant in Grand

11 Central Station.

12 Q.    And at that point did the deal kind of shift to Casselle

13 trying to obtain the financing using Harley's assets, as

14 compared to earlier when you were just trying to do it on your

15 own?

16 A.    Yes.  Because Malcolm is an incredible young businessman,

17 as you probably already know, and -- I thought I was in over my

18 head because I had been unable to do anything with this asset

19 that I believed in.

20 Q.    But you already had a lot of money into this deal?

21 A.    Yes.

22 Q.    And was Malcolm successful in getting any financing using

23 Harley's assets?

24 A.    No.  He was not.  And that was to his surprise as well.

25 Q.    And as a result -- besides the money you paid him up

1  front, were there any demands for additional money as a result

2  of not being able to get the financing?

3  A.    All the time.

4  Q.    Tell us about that.

5  A.    Mr. Harley would -- and some of it really didn't have a

6  rhyme or reason to it.  But Mr. Harley would often, you know,

7  out of the blue just demand money on a very short time line.

8  Like I must have $5,000 in 72 hours, or I must have $3,000, you

9  know, by tomorrow morning.  Or I must have $10,000 on, you

10 know, Friday.  It would just change all the time.  And it was

11 odd.  But it was a constant mantra of shaking us down for

12 whatever was available.  So, if I had 500 -- if I had $5,000

13 he'd be interested in that.  If I had a thousand he'd be

14 interested in that.

15 Q.    Was there any claim that you owed him money as a result of

16 this deal?

17 A.    Yes.  But I always -- I always found that bizarre, because

18 Mr. Harley was not investing.  Mr. Harley was providing

19 collateral, and the collateral seemed to ultimately not

20 actually have value.  So, I always -- I always felt his demands

21 were odd.  But yes, and these demands grew bigger, they grew to

22 the hundreds of thousands of dollars.  That I was supposed to

23 raise and deliver, you know, in a matter of days or a matter of

24 a couple of weeks or this or that, or he would yank the deal

25 from me and from us, and at this time I was still believing in

1  it.

2  Q.   Had he threatened any legal action against you?

3  A.   All the time.  But Richard would say stuff like that and

4  then two days later he'd call me up and talk about the Jets,

5  and forget about that son and everything is cool and don't

6  worry about it and, you know --

7  Q.   Did he ever sue you?

8  A.   Did he ever sue me?

9  Q.   Yes.

10  A.   No.  And I never met an attorney.  And I asked to do this

11  quite a bit, because I am used to attorneys and I'm used to

12  dealing with people that have representation, like I do.  And I

13  never met an attorney with Mr. Harley, and asked about it quite

14  often.  He's talked to my attorney many times.

15  Q.   I'm sorry to interrupt you, but I think we're going beyond

16  what my question --

17  A.   I'm sorry.

18  Q.   So he never sued you and you never sued him?

19  A.   No.

20  Q.   All right.  And did you get what's known as cease and

21  desist letters?

22  A.   Yes.

23  Q.   And how long did the contact -- you said it started around

24  2008.  How long did your contact with Mr. Harley last?  Until

25  when?

180

1  A.    Into 2010.

2  Q.    And how did it end?  What were the circumstances?

3  A.    Hum, it ended when a gentleman named Stan Dedmon from the

4  oil field called me and asked if I was running around the

5  financial world with these documents from Richard Harley.  And

6  I said yes, I absolutely am.  And I thought he was going to

7  talk to me about investing some money since he knew this oil

8  thing so well.  And he told me no --

9              MR. O'BRIEN:  Objection, your Honor.

10             THE COURT:  Pardon?

11             MR. O'BRIEN:  Objection as to what Dedmon told him.

12             THE WITNESS:  Oh, sure.

13             THE COURT:  Sustained.

14             THE WITNESS:  Anyway, when Stan Dedmon called me I

15 called Richard and said this gentleman just called me.  Told me

16 a story.  What do you have to say?

17 BY MR. BRANDLER:

18 Q.    What was the story that you told Richard in that phone

19 call?

20             MR. O'BRIEN:  Objection.

21 BY MR. BRANDLER:

22 Q.    What did you say to Richard?

23             THE COURT:  Well, if it involves what he was told

24 obviously it's a problem.

25 BY MR. BRANDLER:

1 Q.    Just what did you tell Mr. Harley during that phone call?

2 I don't think there's any hearsay in that.

3 A.    Well, I think I can make it simple.  I think I see the

4 scope that you can't go into.

5          THE COURT:  You just can't now tell what Mr. Dedmon

6 told you, even if it's in the context of you telling -- or

7 talking to Mr. Harley.

8          THE WITNESS:  Right.  May I say what I told Mr.

9 Harley?

10          THE COURT:  As long as it doesn't include that.

11          THE WITNESS:  Sure.  What I told Mr. Harley was that

12 I had been informed --

13          MR. O'BRIEN:  Objection.  I've been informed.

14          THE WITNESS:  Okay.

15          MR. O'BRIEN:  It's really getting into hearsay.

16          THE WITNESS:  I'll leave this alone, if you want me

17 to.  But if you want to redirect me to a matter in which I can

18 answer it I'll be happy to do that.

19 BY MR. BRANDLER:

20 Q.    As a result of your conversation with Dedmon, did you tell

21 Harley whether you were going to pay him anymore money or

22 whether you owed him any money?

23 A.    Yes, I did.  I told him I was not going to pay him any

24 money and I was very angry.

25 Q.    Did you have any conversation with Mr. Harley in December

1    of 2012 when you were contacted by the FBI?

2    A.    Yes, I did.

3    Q.    And what were the circumstances of that?

4    A.    Hum, well, I had been contacted by the FBI as you

5    obviously know, and I wanted to call him and let him know that

6    I was going to cooperate fully.  And what I suggested he do was

7    put together money for restitution for people so that there

8    would be circumstances that could mitigate, because I actually

9    liked Mr. Harley a whole lot.  I liked his personality.  And he

10   was -- he seemed like a sweet man who had obviously done me

11   wrong.  I wanted to give him the chance to straighten it out.

12   Q.    And what did he tell you -- what did he say to you when

13   you suggested that he get his money together and make

14   restitution?

15   A.    He became belligerent and went on a verbal rampage and

16   then hung up on me.  And I have not had contact with him since.

17   Q.    And you never got paid back?

18   A.    Of course not, no.

19   Q.    There are some documents I want to you show, we'll start

20   with 36.25.  Do you recognize that document?

21   A.    I do.

22   Q.    What is it?

23   A.    It is an Agreement for Assignment of Collateral from May

24   2008.  It would have been one of the very, very, very first

25   ones we had.

1  Q.    And it's May 27 of '08?

2  A.    Yes.

3  Q.    It's between RJH and Banana Republic Productions, LLC?

4  A.    That's right.

5  Q.    And that's you?

6  A.    That's right.

7  Q.    What does it say in the first paragraph?

8  A.    Whereas, the assignor is the owner of approximately ten

9  million barrels of proven oil reserves and a certain corporate

10  note No. M20092497, which has been valued by Don Kesterson,

11  certified oil geologist, to have a current value of one billion

12  two hundred -- one billion, two hundred million dollars, 1.2

13  billion dollars.  And the assignment of collateral involving

14  proven reserves of crude oil which had been valued by Donald

15  Kesterson, certified oil geologist, to have a current value of

16  one billion two hundred million dollars.

17       Whereas, the assignee wishes to enhance its credit

18  worthiness with its bank with an assignment of 160,000 barrels

19  of the aforesaid proven reserves of crude oil.  The said

20  assignment, having a current value of 20,800,000 dollars.

21  Q.    All right.  And then if we go to the next page, in

22  consideration for him assigning that 20 million dollars worth

23  of oil?

24  A.    Right.

25  Q.    In paragraph one, what are you going to have to do?

1  A.    In consideration of assignee's initial payment of the sum

2  of three million dollars to assignor, assignor will execute an

3  assignment of collateral of 160,000 barrels of proven reserves

4  of crude oil having 20.8 --

5  Q.    So basically you had to pay him three million dollars?

6  A.    Yes.   Three million dollars for 160,000 barrels -- for 20

7  million dollars -- 21 million dollars worth of collateral.

8  Q.    And this document, if we go to the last page -- it's not

9  the last one, the one that's Bates 977?

10  A.    May I make a statement about the three million dollars?

11  Q.    Sure.

12        MR. O'BRIEN:  Your Honor, I object.  He can't make

13  statements.

14        THE WITNESS:  Okay, all right.

15        MR. BRANDLER:  I'm sorry, let's go to -- stick with

16  answering my questions.

17  BY MR. BRANDLER:

18  Q.    The signature page.  Does your signature appear there?

19  A.    Yes.

20  Q.    And Mr. Harley's above it?

21  A.    Yes.

22  Q.    And this document was signed by you based upon his

23  representation that he owned this oil?

24  A.    That's right.

25  Q.    Can we go to 36.19.  Do you recognize that?

185

1   A.    I do.

2   Q.    What is it?

3   A.    It is a receipt for -- a receipt from Western Union for a

4   thousand dollars.

5   Q.    Now, there's a series of documents in this exhibit.  If

6   you go to the next page.  It appears that there's a series of

7   one thousand dollar checks?

8   A.    That's right.

9   Q.    4,000 on June 6 of 2008?

10  A.    Can I explain to you why they are that way?

11  Q.    Yes.

12  A.    They're that way because my mother was ill and I really

13  needed to do this I thought for Mr. Harley, and I was under a

14  lot of pressure.  She could not properly do it in a way other

15  than to charge it by phone, because she was bedridden.  So

16  that's why you see each one is $1,000, because she had to

17  charge it several times.  I guess that was the maximum they

18  would take with whatever card she was using.

19  Q.    So the sender being Nancy G. Bunche, that's your mother?

20  A.    That's right.

21  Q.    And this is money you borrowed from her?

22  A.    Had to borrow it that day.

23  Q.    All right.  So this is June 6, and that, you know,

24  assignment of collateral we just looked at, that was May 27.

25  So this is like less than two weeks later you sent in 4,000

1  bucks?

2  A.    Exactly right.  Because he gave me two weeks to get three

3  million dollars, right?

4  Q.    Right.  But this is your upfront money?

5  A.    That's right.

6  Q.    All right.  And then if we go to the next page after this,

7  that's a series of these $1,000 Western Union checks totalling

8  $4,000.  Was it all wired via Western Union?

9  A.    Either wired into his account directly or sent -- yeah,

10 sent Western Union.  It's always -- it was always immediate

11 cash.

12 Q.    All right.  Can we have 36.26.  So that was on June 6.  We

13 have now a new agreement for assignment of collateral dated

14 June 20 of '08, correct?

15 A.    Yes, we do.

16 Q.    That's between you and Harley again and Banana Republic?

17 A.    Uh-hum.

18 Q.    But the terms have changed a little bit.  So in this one,

19 if we go to the whereas -- the second whereas, it's now 260,000

20 barrels of oil?

21 A.    Right.

22 Q.    Worth 35 million dollars, right?

23 A.    $4,000 bought me a lot of oil.

24 Q.    Right.  And the fee for that increased use of his

25 collateral, if we go to the next page, now you're going to have

1  to -- on paragraph one -- have a $40,000 immediate deposit,

2  correct, and a seven million dollar fee?

3  A.   That's right.

4  Q.   So it went up from 3 million to 7 million because you got

5  the use of this extra collateral, plus 40,000 immediately?

6  A.   And may I explain why -- why those numbers can jump like

7  that?

8  Q.   No, I don't think that's necessary.  I'm sure we can

9  figure it out.

10  A.   Actually, it's a philosophical reason, not --

11  Q.   I know.  I don't think it's necessary.  It's late and I

12  don't know if people want to hear the philosophy of it.

13  A.   Okay.

14  Q.   I'm sorry.  Can we go to 36.20.

15        TECHNICIAN:  36. --

16        MR. BRANDLER:  Point two zero.

17  BY MR. BRANDLER:

18  Q.   So, those were in June, and that last agreement was June

19  20.  I want to skip ahead now to July.  July 25 of '08.  Did

20  you wire more money to Mr. Harley?

21  A.   Yes.

22  Q.   And this document here, 36.20, it's an internal document,

23  a bank document.  It indicates $10,000 was wired July 25 of '08

24  from Banana Republic through -- excuse me, from EMCI --

25  A.   That's right.

1  Q.    -- to Mr. Harley's Merrill Lynch account, correct?

2  A.    That's exactly right.  Jay Coleman did that for me.

3  Q.    Is that money you borrowed from --

4  A.    Yes.

5  Q.    -- Mr. Coleman and that's why it came out of the EMCI?

6  A.    Uh-hum.

7  Q.    And that's money towards that $40,000 that you had to pay

8  him from your prior agreement?

9  A.    That's right.

10 Q.    But now I guess you were paying $14,000 worth from four

11 plus this ten, is that right?

12 A.    That would be the correct accounting, but I'm not really

13 sure Mr. Harley really was counting the 40.  You know, I mean,

14 if I could have given him $2,000 as opposed to nothing on the

15 day he would have taken that.  I mean -- you know --

16 Q.    Could we go to 36.21.  Moving ahead now to August 20,

17 2008, there's another internal bank document showing a wire

18 transfer from EMCI for $5,000 to Mr. Harley's Merrill Lynch

19 account.  Did you wire $5,000 to him pursuant to that agreement

20 that you had?

21 A.    Yes, we did.  And this was on very short notice.  I

22 vividly recall how irritating this was to do.  Because he

23 demanded that money from me at like nine o'clock in the

24 morning, that he had to have it.  And I -- it was a

25 particularly busy day for me and Jay, and I had to have Jay do

189

1   it -- Jay literally had to do it at lunch time and we did it

2   together, and I vividly recall how ridiculous I felt.

3   Q.   But you had to borrow this money again?

4   A.   Yes.

5   Q.   And then moving ahead, if we have 36.27.  That's a new

6   agreement for assignment of collateral dated September 30 of

7   2008 between Banana Republic and RJH?

8   A.   Yes.

9   Q.   Where Mr. Harley is still claiming to own the 10 million

10  barrels, and he's now going to assign to you in a second

11  whereas clause 460,000 barrels having a value of 45 million

12  dollars.  So you see that here?

13  A.   Yep.  Yes, sir.

14  Q.   And the exchange for that increased use of his assets, if

15  we go to the next page, paragraph one, now you're going to owe

16  9 million dollars instead of seven, correct?

17  A.   That's exactly right.

18  Q.   And that's going to be some lien?

19  A.   On the barrels, right.

20  Q.   And this document, if you go to the last page or the

21  signature page, was signed by you?

22  A.   Yes.

23  Q.   And as a result of that, now you owe him more money -- can

24  we go to 36.22?  Did you send him a check that's represented in

25  check -- Exhibit 36.22?

190

A.    Right, yes.  And this is also from EMCI.  As you see, Jay
was a very good friend that could move very quickly.

Q.    And what's the date of the check?

A.    It is October 3, '08.

Q.    And the amount?

A.    1,000.

Q.    And then 36.23?

A.    Yep.

Q.    Did you wire Mr. Harley additional money on December 5 of
'08?

A.    I did.  Another thousand dollars.

Q.    It was all pursuant to that agreement where you owe him
now nine million dollars?

A.    That's right.  A thousand was my down payment for nine
million, right.

Q.    So, did you ever pay him cash in addition to these wire
transfers that we just discussed?

A.    You know, I believe we did.  I believe Malcolm and I both
did.

Q.    I'm talking just about you.

A.    I'm having difficulty recalling the exact number.

Q.    Was there cash?

A.    Yes.

Q.    Approximately to your best --

A.    Approximately $2000.

1  Q.    And would that have been physically handed to Mr. Harley?

2  A.    If it was cash, yes.

3  Q.    So that last payment, at least the one that was wired, was

4  December of '08.  That's about the time you brought Mr.

5  Casselle into the deal?

6  A.    Yes.

7  Q.    Can we go to 36.31.  There is an e-mail here dated

8  November 4 of '08 to Casselle from you relating to PGB/oil

9  collateral promissory wire instruction.  Do you see that?

10 A.    Yes.

11 Q.    Is this an e-mail you sent Casselle relating to the deal?

12 A.    Yes, it is.

13 Q.    Can you just read it?

14 A.    Malcolm, when you get this -- when you read this Barack

15 Obama should be our new president.  This is a good omen

16 hopefully.  I have spoken with Richard Harley today.  I would

17 like to get him squared away so I can physically meet with him

18 on Friday or Saturday in our mutual interest.  Hence, I have

19 attached an additional promissory note, as I would like you to

20 wire the first 5,000 during your current business day.

21 Q.    Let me just stop you right there.  An additional

22 promissory note.  Were you promising to pay back Casselle some

23 of the money you were borrowing from him?

24 A.    Yes.

25 Q.    All right.  Continue.

1  A.   I have left the promissory in Word doc format.  If you

2  want to make any changes in language feel free.  I thought I

3  would make it short and complement previous promissory which is

4  still in effect.  I will produce a longer memorandum after I

5  get these oil docs from Harley.  This would detail the deal of

6  our compensation related to my collateral.

7       Additionally, I would like you to think about my film [ph]

8  of my compensation on yours, as I'm already contrite and

9  beholden to you, I'll be very reasonable.  Get this started

10 today.

11      First things first.  Let's get Harley's documents and

12 geologist availability secured by Thursday.  Everything moves

13 from the same docs.  Please find the wiring instructions below.

14 And we have --

15 Q.   Go to the next page, please.  The page after that.  The

16 promissory note relating to the $9,000 that you're going to

17 borrow?

18 A.   Right.  Do you want me to read this?

19 Q.   No.  It's just to summarize.  Is that accurate?  You were

20 borrowing $9,000?

21 A.   That's exactly right.

22 Q.   So you could pay Harley?

23 A.   That's right.

24 Q.   All right.  And then you said the meeting --

25 A.   And by the way, that 9,000, if you look at item No. 2, is

1  5,000 up front which is -- okay.  And then 4,000 upon getting

2  all of the necessary documentation from Harley.  Because Harley

3  hadn't -- Harley was -- we were Fed-Exing Malcolm some hard

4  copies of the geological report and all of the documentary --

5  all of the documents that Harley had shown.  But they were not

6  in copies, they were in an original kind of book formats that

7  he gave us.  And we made an arrangement to have $5,000

8  immediately, and 4,000 when he did that.

9  Q.    And then when Mr. Casselle was involved in the deal, did

10 he draft some agreements, potential agreements for this joint

11 venture that was being discussed for Mr. Harley?

12 A.    Yes.

13 Q.    Can we go to 36.10.  Did you forward those draft

14 agreements to Mr. Harley?

15 A.    Yes, uh-hum.

16 Q.    And to the third page.  That was the draft that Mr.

17 Casselle had put together, kind of documenting what the

18 proposed deal was going to be?

19 A.    That's right.  And the company, JMH stands for Jason,

20 Malcolm and Harley.  Jason being Malcolm's partner in China who

21 met with Harley and I with Malcolm at the Oyster Bar.

22 Q.    And then is it accurate at some point after Casselle got

23 involved he was trying to do due diligence and raised a lot of

24 questions about the legitimacy of the deal?

25 A.    Yes, that's true.

1  Q.   And the deal never got done?  No financing ever happened?

2  A.   No.  The only thing that happened was we were all

3  embarrassed yet again because these documents -- the people, if

4  they had any validity to, they were not complete and did not

5  prove that oil could be accessed.  And the people, if they had

6  -- other people --

7  Q.   All right.  I'm sorry, I'm cutting you go off again, but I

8  think you're going beyond what my question --

9  A.   Okay.

10 Q.   So can we have 36.30?  Moving ahead to now January 23 of

11 2010, did you get a cease and a desist letter?

12 A.   Hum, yes, I did.  But I had them before, so, yes, I got

13 one.

14 Q.   And this document here, was it something that was sent to

15 you from Mr. Harley relating to him withdrawing the collateral

16 that he previously provided to you?

17 A.   Yes.

18 Q.   And then --

19 A.   That is exactly it, yeah, uh-hum.

20 Q.   The next page is a document on his letterhead, Mr.

21 Harley's letterhead, dated January 25, 2010, which is known as

22 the cease and desist letter, correct?

23 A.   Right.

24 Q.   And he sent that to you?

25 A.   Yes, he did, on new letterhead.  Yes.

1  Q.   Now, in that letter it says to delete and destroy all the

2  documents that he had previously sent to you.   Did you do that?

3  A.   No, I didn't.

4  Q.   And a bold notice here that It's not a waiver of his

5  firm's rights to seek relief and costs or any damages that may

6  have resulted in this matter.   I think I asked you, there was

7  no legal action ever filed against you?

8  A.   Ah, no.

9  Q.   And can we go to March -- to the next Bates document 962.

10 Did you reply to Mr. Harley on March 1 of 2010 relating to that

11 cease and desist?

12 A.   Yes.

13 Q.   Just read it.

14 A.   Richard and Jacky, as per our conversation this morning I

15 will adhere to your wishes from today forward and any

16 subsequent information related to you or RJH and Company,

17 Incorporated, will be sourced through you, upon your approval

18 and advice.

19      I am sorry for any confusion and misunderstandings my

20 missives may have created in our relationship.   That was truly

21 not my intent.   However, I accept full responsibility and will

22 abide by your statement requirements for communications from

23 here on.   I have taken your advice to heart and will proceed

24 under that direction solely.

25 Q.   So at this point you still believed that?   You didn't

1 understand that this was an illegitimate deal?  You were

2 apologizing here?

3 A.    I was apologizing.  And after sending me the cease and

4 desist, Mr. Harley called me several times.  And as you see the

5 tone of this -- the tone of this is different than, you know,

6 the previous.  But yes.

7 Q.    All right.  So that was March 1 of 2010.  Can we go to the

8 next page, March 26 of 2010.  Who is Melvin Harris?

9 A.    Melvin Harris, right now Melvin Harris is senior

10 vice-president of Bloomberg Television.  But Melvin Harris at

11 this time was a hot young account guy at Hagan Investments, and

12 this was the perfect company to move this asset as collateral

13 if it was possible, because they specialized in that world.

14 Q.    So, you were still trying to use Harley's collateral to

15 get this financing for your movie?

16 A.    Yes.

17 Q.    All right.  And this is your letter to this Melvin to get

18 that deal done, right?

19 A.    Yes.

20 Q.    And in the first paragraph what does it say?  Can you read

21 that out loud?

22 A.    As of March 1 Artabus owes RJH and Company an origination

23 fee payment for their collateral provision 20,000 million

24 dollars -- excuse me, 820,000 barrels of light sweet crude --

25 820,000 barrels of light sweet crude.  These fees are common

1 and industry standard for collateral providers as you must

2 know.  I paid a fee some months ago and expected the lender's

3 fomentation of the loan and due diligence to move more swiftly.

4      Unfortunately they went past the afore-mentioned date and

5 have caused me to need these funds with immediacy to avoid

6 penalty.  Their system is costing me money and I simply don't

7 have any available at the moment.  Do you want me to continue?

8 Q.    Please.

9 A.    As we have a loan in process using the same asset and the

10 event has not -- excuse me.  As we have a loan in process using

11 the same asset and the event has not stopped I wish to keep my

12 agreement and my word to Mr. Harley.  He is a stickler for

13 dates and gets paid a seven-figure sum upon closing, so it's in

14 his interest to close and dispense finances.  I will gross 25

15 million dollars from that loan, hence I'm attempting to move

16 heaven and earth to keep Mr. Harley content.

17 Q.    All right.  Let me just stop you there.  So you thought

18 you were going to get 25 million dollars if this deal went

19 through?

20 A.    Yes.

21 Q.    And that's why you were so anxious to go ahead with it?

22 A.    That's right.

23 Q.    And then the next page, March 27 of 2010, did you get an

24 e-mail from Mr. Harley?

25 A.    As per our conversation today, you are not to mention my

1  name to anyone any time.  You only mention RJH and Company,

2  Inc.

3  Q.   And did he tell you why you weren't to mention his name

4  and only mention RJH and Company, Inc.?

5  A.   No, I don't believe he really did at this particular time.

6  Mr. Harley --

7  Q.   All right.  I just -- you answered the question.

8  A.   Okay.

9  Q.   Can we go to the next page, please?

10         MR. O'BRIEN:  What page are we talking about?

11         MR. BRANDLER:  Bates No. 930 at the bottom.  And it's

12  dated March 29 of 2010, and it's from Mr. Harley to Peter B.

13         THE WITNESS:  Do you want me to read it?

14  BY MR. BRANDLER:

15  Q.   Yes.

16  A.   Peter, as per our conversation, you are not supposed to

17  have a hundred page oil analysis report.  Therefore, you are

18  hereby ordered to delete the report from your computer.

19  Regards, Richard Harley, CEO.

20  Q.   And then the last page is dated May 7 of 2010 from Mr.

21  Harley to you?

22  A.   Dear Peter, as per our conversation on May 5, 2010, until

23  you have the money --

24  Q.   How much money?

25  A.   -- $200,000 ready to be deposited in our company account

1  there will be no further discussion.  Regards, Richard Harley,

2  CEO.

3  Q.   And why was he demanding 200,000 from you?  What was that

4  about?  Go to 9 million?

5  A.   Right.  I told you it changed, you know, on the day.  But

6  $200,000 I believe he felt was a fee that would keep the deal

7  alive and --

8  Q.   So you never paid him the 200,000?

9  A.   No, of course not.

10        MR. BRANDLER:  All right.  I have no further

11  questions, and I'm going to move for the admission of the

12  documents he previously identified.

13        MR. O'BRIEN:  No objection.

14        THE COURT:  They'll be admitted.  Cross-examine.

15              CROSS EXAMINATION

16  BY MR. O'BRIEN:

17  Q.   Now, Mr. Bunche, as I understand your testimony, it was in

18  June of 2008 that you signed your first agreement for

19  assignment of collateral with Mr. Harley?

20  A.   Hum, it was 2008, I think it may be May, but I think May

21  and then two weeks, and then it will now be June, and I think

22  we pick up in June, but it's about that, yes, sir.

23  Q.   And the -- that first agreement was for -- he was allowing

24  you to use as collateral 160,000 barrels of oil, which

25  according to Kesterson was worth about 20 million dollars,

1  allowing your company, Banana Republic, to use that?

2  A.   That sounds correct.

3  Q.   And your company is going to use that collateral to go to

4  a bank and try to raise money so that you could make a film?

5  A.   Raise money to start a picture, yes.  To make the picture,

6  correct.

7  Q.   And what -- did you deal directly with any banks or did

8  you deal with someone else who would then deal with the banks?

9  A.   Both.

10 Q.   Who was the broker?  Is that Harris?

11 A.   Hum, there would be a number of brokers.  One would be

12 Maurice Tyner.  One would be Melvin Hagan.  Melvin Harris.  One

13 would be Bert Pidel, the famous accountant.  One would be --

14 oh, there would be 20 of them.

15 Q.   20 different ones.  Now, at that point we're back at

16 the -- seems to me, my record, the assignment of collateral is

17 dated May 27, so May 27, 2008 you enter into this assignment of

18 collateral with Mr. Harley.  And now, what documents do you

19 give to these brokers for them to attempt to get the financing

20 so you could do your movie?

21 A.   The assignment of collateral, the geological booklet from

22 Kesterson.  And there was a short form, maybe -- I don't know,

23 maybe eight pages, which was from the Texas Railroad Commission

24 breaking the stuff down.  And it seemed to me to always be a

25 few new sheets and distillations of things that were in

1  Kesterson's report.  Made sense.

2  Q.    And where did you get these documents?

3  A.    From Richard Harley.

4  Q.    Okay.  And then you turned them over to your broker and

5  your broker went to banks?

6  A.    Or went to banks directly, showed them these documents.

7  Q.    Then -- now, then -- that's May 27.  June 20, three weeks

8  later, you enter into a second one for more collateral?

9  A.    Yes.

10 Q.    Why did you do that?

11 A.    Because I gave him some money and he allowed me to have

12 more collateral.  And he seemed to like me at the time when --

13 acting like he wanted to hook me up.

14 Q.    So you wanted -- did you need more collateral?  Did your

15 banks come and tell you you need more collateral?  Or did you

16 just ask him for it on your own?

17 A.    To be honest with you, I'm not sure how -- sometimes I

18 would ask him for more.  And sometimes it had to do with the

19 price of oil.  When the price of oil very drastically would

20 change on a week to week number, you need more oil to keep the

21 same 25 million dollars let's say that you had before.  But

22 what makes the deal that Mr. Harley was offering to me work so

23 wonderfully, if it worked, was that he was never an investor, I

24 would never owe him more than what I paid him off the top.

25 He'd be out of our lives.  That was a very attractive thing,

1  and that was also a very attractive thing for banks.  Because

2  they like -- they like to have -- making a lend that way, where

3  there's only one partner, and that partner is the hardhat,

4  that's the intellectual property.  I hope that's not too long

5  of an explanation.

6  Q.   Well, now, I'm interested -- who -- did your bank say to

7  you, Look at the price of oil, it's going down, therefore we

8  need more barrels as collateral?

9  A.   All the time.

10  Q.   All the time?

11  A.   Yeah.

12  Q.   Do you know, which broker conveyed those messages to you?

13  You said you had 20 brokers.  How many different banks?

14  A.   Well, I didn't say I had 20.  But there may have been --

15  there would have been more than 20 banks and brokers that we

16  went to with this deal.  We weren't very energetic about it.

17  It did not fail because of ineptitude.  It failed because it

18  was impossible.  And with any batting average that we had with

19  the amount of places we went and the way we went with the

20  people we went from, if it could have worked it really would

21  have.  So we were out there doing it on a daily basis, maybe

22  two or three banks -- three or four banks a week.

23  Q.   Okay.  Can you tell me -- I think there were three

24  assignments of collateral.  There was one on May 27, that was

25  for 160,000 barrels, 20 million.  There was one on June 20,

1  260,000 barrels, 35 million.  Then there's one on 8/20, 450,000

2  barrels worth 45 million?

3  A.    Yes.

4  Q.    Now, what banks -- can you identify any particular banks

5  that you took this assignment of collateral and said look it, I

6  need money for a play.  Here's my collateral, I need money for

7  a movie -- I'm sorry -- here's my collateral?

8  A.    Can I identify any banks?

9  Q.    Yes.

10 A.    Citi Bank, Wells Fargo, Bank of the West, J Morgan

11 Stanley, Chase.  Would you like to go on?

12 Q.    Yes.

13 A.    Look at the Yellow Pages basically.

   Q.    Who did you go to at Citi?

   A.    Who did we go to at Citi?

   Q.    Yeah, who did you talk to you there?

   A.    I don't recall, but I can tell you it would have been one

   person in Los Angeles, one person in New York.

   Q.    Who did you go with?  Who went with you to that meeting?

   A.    I don't know.  I probably -- probably went to Citi Bank

   alone.

   Q.    And did you give them the Kesterson report?

   A.    Depending on the banks, sometimes yes, sometimes no.

   Usually the Kesterson report would come -- remember, I told you

   there was a capitalization that was railroad -- Texas Railroad

letters and some of the stuff from Kesterson's, it was short, it's maybe like eight pages maybe.  That was very helpful.  But if people wanted to really get into it, yeah, we would show them the Kesterson report, absolutely.

Q.    Okay.  So, and then I guess Citi didn't loan you the money?

A.    No.

Q.    Okay.  Now, how about Wells Fargo, the same thing happen there?

A.    Absolutely.

Q.    Now, with Citi did you get any letter back from them saying, Hey, we're not interested in this deal?

A.    We may have.

Q.    Do you have that with you?

A.    No.

Q.    Okay.  How about Wells Fargo, it's the same thing, you went to them with the Kesterson report, they said we're not interested?

A.    Would have been the case.

Q.    Okay.  And --

A.    It would have been the case with everybody on the planet, my friend, you know, to save time.

Q.    Did you get any letters from any of them?

A.    I'm sure there are plenty of letters.  I wasn't asked to bring that.

Q.    Do you have any of them?

A.    No.  But I guess I could get those things.

Q.    Were your records ever subpoenaed by the FBI?

A.    My records were certainly looked -- I guess they were.
They were looked at by the FBI.

Q.    Did you produce --

A.    I'm not sure if it's a proper subpoena.  You'd have to ask
them.

Q.    Did you produce these bank rejection letters to the FBI?

A.    I was not asked for them.

Q.    Well, my experience with them is when they're looking for
records --

              MR. BRANDLER:  I object to what his experience --

              MR. O'BRIEN:  The question --

              MR. BRANDLER:  I think it's an improper question to
preface what his experience with the FBI --

              THE COURT:  I would agree with that.

              THE WITNESS:  And I'm not used to going into a bank
and having them not tell me yes or no. The next move is have
our attorneys draw it up and it usually goes to attorney to
attorney, since you want to know how it works in entertainment,
but you may have a different experience, sir.

BY MR. O'BRIEN:

Q.    Okay.  Eventually you go to all these banks and they all
turn you down, and you don't have any of the letters that say

so.  Now, tell me how you get involved with the gentleman Mr. Casselle?  How does he get involved with this?  He gets involved -- let me see if I can get a date, sometime around December of 2008?

A.    Yeah.  I called Malcolm for advice and for money that I desperately needed to borrow to pay Harley.  And I also thought that he would be of great advice and counsel to me in dealing with this, because he knew how to deal with -- hum, you know, Malcolm is used to dealing, one, with commodities.  And two, he is a much better and more savvy businessman in banking than I am.

Q.    And did you tell Mr. Casselle that you had taken this information and gone to a million banks and they wouldn't take it?

A.    I told him I had been to a number of people and had been having a very difficult time doing it.  But I believed that the collateral -- I believed in the collateral, and it was a highly sophisticated thing that just seemed to be above my pay grade and could he help.

Q.    That's when he got involved?

A.    Yes.

Q.    Now, prior to getting Mr. Casselle involved, did you ever talk to Mr. Kesterson?

A.    Yes.

Q.    Okay.  He read the report?

A.    Did I read the report?

Q.    Read the report that was provided to you, that he provided
to all these banks?

A.    Yes, uh-hum.

Q.    You saw in that report that there was a valuation of the
oil between 1.1 and 1.2 billion?

A.    Yes.

Q.    And you also saw in that report that there was
information -- he said, look it, there's some problems here, we
don't know what it's going to cost to get it out.  We don't
know a lot about the subsurface and the banks are going to have
to make their own judgment on that?

A.    I never heard all that.  Don Kesterson and I never had
that deep a conversation.

Q.    Well, how about in the report, was that type of
information in his reports?

A.    Hum, I don't know.

Q.    How -- you probably haven't read his reports in a while?

A.    Well, I haven't been a geologist for quite some time.

Q.    So then you go to see -- you get involved with Casselle --
now you were not present in the courtroom when Casselle
testified, were you?

A.    No.

Q.    And he takes it basically from December of 2008 up to when
the -- when it ends, sometime in January.  So, sometime in

208

early 2009?

A.    Right.

Q.    Now, are you familiar with the fact that there's no specific charge with respect to any of the payments you made?

        MR. BRANDLER:  I'm going to object.

        THE WITNESS:  No specific charge?

        THE COURT:  Just a minute.

        MR. BRANDLER:  I object to that question.  Are you familiar with the charges in the indictment?  I think that is an improper question.  What his knowledge is of the charges in the indictment?

        MR. O'BRIEN:  Yeah.

        MR. BRANDLER:  What's the relevance of that?  The indictment speaks for itself.

        MR. O'BRIEN:  Well, do you want me to -- I have it right out here, or --

        MR. BRANDLER:  Approach?

        THE COURT:  Come on, let's --

        (Whereupon, the following discussion occurred at side-bar between the Court and counsel:)

        MR. O'BRIEN:  I mean, it is what it is.  The witness spent most of the afternoon here with -- good part of the afternoon.  Didn't file -- no charges with respect to any of the money this guy paid.

        MR. BRANDLER:  There's no dispute.  The indictment is

what the indictment is.

        MR. O'BRIEN:  Such an objection in bringing it out --

        MR. BRANDLER:  It's not appropriate for this witness
to testify about what's in the indictment or not in the
indictment.

        MR. O'BRIEN:  I asked if he knew.

        THE COURT:  I understand your point, and I understand
your point.  And I think you certainly can ask him do you know
whether or not --

        MR. O'BRIEN:  I think that's what I said.

        THE COURT:  I don't remember your question, but I
think you can ask if he knows whether or not, and he probably
doesn't.  And you're going to be in a position to argue --

        MR. BRANDLER:  I mean, the indictment says what it
says.  Whether he knows it or not seems totally irrelevant.

        THE COURT:  Would you agree -- except I think that
he -- I would let him make the point if he asked the question
that way.

        MR. BRANDLER:  Fine.

        THE COURT:  Here's my thinking on it.  I can see his
argument if he wants to argue all these charges, doesn't think
that this guy was a victim, that's all.

        (Whereupon, the discussion held at side-bar between
the Court and counsel concluded.)

BY MR. O'BRIEN:

Q.    Sir, do you know whether or not there is a charge in the indictment in the case that Mr. Harley is charged under for any of the payments that you made to him?

A.    Hum, actually, I don't.

Q.    You don't know?

A.    No.

Q.    Would you be surprised --

A.    I don't believe I ever, to be honest with you, read Richard's indictment.

Q.    Would you be surprised if I told you that there is no charge in the indictment?

        MR. BRANDLER:  Objection.

        THE COURT:  Sustained.

        THE WITNESS:  Hum, I --

        THE COURT:  Sustained.

BY MR. O'BRIEN:

Q.    Did you ever write a letter of apology to Mr. Harley?

A.    I did at his insistence, yes.

Q.    Tell me about that.

A.    Hum, we were dealing with a company -- if I remember correctly, and I should, because it was weird.  We were dealing with a company called Oberon, who was a major broker/dealer, and Oberon had a lot of questions, required a lot of paperwork, wanted it really fast.  Richard wanted me to give it to them; I gave it to them, and it was everything.  Because these were

very serious people.  And they turned out to be quite prescient
in this situation.

     But Richard wanted me to do this thing.  I did it.  I
wrote a letter, put a signature on it, sent from both of us.
The next day he says, Why did you send this letter?  This is --
this is not something I wanted to have out there.  Why did you
send them all of this information.  Now, remember, I got this
information from him, the only place I could get it from.  But
-- the only place it existed.  But they demanded this
information and they got it.

     They were very serious about giving us a loan and we
almost got a 30-million dollar loan from those people that day.
So, yes, I do remember that.  And I'm happy to discuss it at
length.

Q.   Okay.  Oberon was a broker?

A.   Yes.

Q.   And they were one of the people you were trying to use to
get money?

A.   No.  They were one of the people that -- Oberon was a
company who had the wherewithal if this collateral was valid to
liquidate and give us a loan inside of a week.  And they were
trying really really hard to do that.  As you'll see from the
other e-mails, if you have them.

Q.   So Oberon was a broker.  They were going to get you money?
They were going to get a loan for you?  Or were they going to

make the loan, were they the actual lender or they were going
to find a lender?

A.    As I recall, Oberon -- this is -- I'm glad you mentioned
that.  Oberon was unique, because Oberon had hundreds of
millions of dollars under management, and they were trying to
do this with a private client.

       Mr. Harley knew about that and had even been on the phone
with the Oberon guys with me before this letter was written,
and knew it needed to be written and they were expecting it.
You will find the name of that individual cc'd on the letter to
Oberon, whoever that person is, I've forgotten now, but I'm
sure they're in my cell phone.

Q.    Okay.  Let me go back.  You just identified Oberon, so
everybody understands.  Are they someone who is going to lend
you money or are they a broker who was going to put you in
touch with a lender?

A.    They're both.  They represent -- kind of like if you went
to Schwab, Schwab as a company could lend you -- could make a
loan for you, or Schwab could provide a private individual,
whose money they manage, who could do that for you.

Q.    All right.  So they could do both?

A.    So it's the same kind of thing.

Q.    When you were dealing with them in 2010 I guess it was,
February/March of 2010, what were you asking them for?  Were
you asking them for money or were you asking them to get a

lender for you?

A.    To us it's the same thing.  The beauty of Richard's deal,
as I keep telling you, is that once Richard -- if it was to
work, once Richard got paid his money off the top he's gone.
He's not an investor, he's out of your life.  That's an unusual
situation for somebody who -- for somebody who facilitates that
much money, it's a perfect situation for an entrepreneur.  So
we were all very excited about that.

        And the Oberon people in particular could do it either
way.  If they did it with a private individual under their
management -- under their management, that person was going to
become an investor.  If they did it a different way by getting
a bank loan, then it would have just been a loan, which we
would have had to pay back the interest on, okay?  So, these
two deals really needed to be talked about.  Because if they
brought a private individual that put up 20 million dollars,
that person is now our partner.  If they brought us a bank,
Citi Bank, that person is purely our lender and we pay them
every month.

Q.    You wrote a letter to Oberon --

A.    Right.

Q.    -- and you signed Richard's name to it?

A.    That's right.

Q.    Okay.  What did you say in that letter?  Did you ask them
to loan you the money or get you a lender?

A.    No.  What it says in the letter is here's the stuff.
Basically, here's the stuff; here's the deal.  Read the letter.

Q.    What was -- I don't have the letter.  What was the -- what
was -- what were you asking them for?  I mean, you send them a
letter, and they're in the financial world.  You wanted
something from them.

A.    Hum, hum -- what -- here's what I can tell you without
rereading the letter.  Because as you can see, we wrote a lot
of letters.  But everything about Oberon was about, one,
proving to them that the oil was real.

     Two, structuring the deal -- structuring the deal and
payments with immediacy, because they really thought they could
do the deal.  They had people in the house right then who had
been on the phone with Richard with me, okay?  Who were ready
to go.

     So, the letter is going to say that, but I'm sorry, it's
been several years, I don't remember it off the top of my head,
but I've seen it recently.  I imagine it can be found in this
courtroom.

Q.    And they asked for a letter from you and Richard?

A.    No.  They asked for --

Q.    Let me ask the question.  Did they ask for a letter?

A.    Yes.

Q.    Did they tell you who should sign it?

A.    Yeah.  Actually, I think it is me and Richard now that I

think about it.

Q.    And did you send them this letter?

A.    I did.

Q.    And did you sign your name to it?

A.    Probably so.

Q.    And did you sign Richard's name to it?

A.    Absolutely, at his insistence.

Q.    And did you have authority to do so?

A.    Yeah.  He told me to.

Q.    He told you it was within -- didn't he ask you to apologize?

A.    Yeah.  Three days later he was unhappy he did this.  And he used to do that all the time my man.  That's the reason sometimes he's asking me for $200,000 and sometimes he's accepting a thousand on the same days, back to back, if you look at the calendar.  Richard would make stuff up as he went along and as he felt.  And you know, to me he was a nice, cool older gentleman that was trying to help me most of the time.  I was in need of help.  I was happy to write him this letter because he had written me a hundred cease and desist letters before, and then would call me up today and start talking about Willie Mays in the cease and desist, you know I was joking, okay?

      Follow your trail -- follow his e-mail trail.  See how cease and desists you have, and then see him talking to me and

sending me letters the very next day.

        MR. O'BRIEN:  I'm going to mark this as Defendant's Exhibit 2.

        MR. BRANDLER:  Just that one page, not the entire packet?

        MR. O'BRIEN:  Just the one page.

        THE DEPUTY CLERK:  Just this top page?

        MR. O'BRIEN:  Uh-hum.

BY MR. O'BRIEN:

Q.   Do you recognize this document?

A.   Not -- because it's not popped up here.

        (Pause.)

        THE WITNESS:  Yes.

BY MR. O'BRIEN:

Q.   Is that the letter of apology you wrote to Richard?

A.   It is.

Q.   And that -- that came out of the fact that you had signed his name?

        MR. BRANDLER:  I can't hear a word you said.  Maybe it's a private conversation, but maybe everyone else wants to hear it.

        THE WITNESS:  Yes.  I had signed his name at his insistence on the back of an NDNA.  In fact, that's what it was.  It was an NDNA.  I didn't sign his name on a contract. It was on a non-disclosure, non-compete letter, that's what it

is.  I wouldn't sign any checks for him.  It's a
non-disclosure, non-compete, okay?  That's what it is.  I
remember this very vividly, and now it's even sillier.  Okay.

And if I may read it to you, Feeling my deal slipping
away and having successfully negotiated away the hundred K up
front fee, which is what they wanted to charge us, okay?  I
made the mistake of writing your name into your signature place
and that is on the NDNA, yes.  And I did that when he asked me
to.  Because they would have taken this from me.

Q.   Okay.  Now I'm going to ask you to read the whole thing.
Start with Richard up at the top?

A.   Richard, as per your request I'm composing this letter to
apologize for my actions and express the profound sorrow I feel
for breaching your personal trust in me and our friendship
through this journey.  I truly apologize.  In January after a
lot of work in negotiations with Oberon regarding their
usurious upfront fee, they presented me with an engagement
letter, as you know.  Coupled with that letter and at the last
minute they wanted you and I to sign the NDNC.

Q.   Stop there.  Just explain to the jury what NDNC was?

A.   It's a non-disclosure non-compete agreement.  Okay?  It
means that you can't disclose what's in here and you can't
compete against them in this deal.

I sent you both at that time -- I sent you both at --
right.  Coupled with the letter and at the last minute they

wanted you and I to sign an NDNC. I sent you both at that time -- and we discussed the NDNC. I told you I felt it was very reasonable and had little effect, as everyone already knew that you and Mr. Edmonson had developed a relationship for six weeks already. Edmonson is the guy that was going to put this money together.

I asked you to sign it and you emphatically told me that you would not do so because you wanted no involvement with Oberon outside of assigning collateral and you and the lender had already worked out the loan deal to terms.

Q. Stop there.

A. Please stop right there, because I'm contradicting myself there, aren't I?

Q. Yes, you are.

A. They already worked out the deal that he wants no involvement. But -- because he's already worked out the deal, just to let you know.

Q. Will you read that last sentence again, starting with I asked you. Read that again.

A. I asked you to sign it and you emphatically told me that you would not do so because -- that you would not do so because you wanted no involvement with Oberon outside of assigning collateral. And you and the lender had already worked out the loan deal down to the terms.

Q. Didn't you just say no less than five minutes ago that

Richard told you to sign his name?

A.    Yeah, he did.

Q.    In this letter that you sent an apology you're apologizing for doing it?

A.    He asked me to write this letter back to him.  That's what I did.  This is why I'm saying this is so bizarre.  And if you look at the two sentences I just read, they contradict each other and they -- because he wants no involvement with Oberon outside of the assigning collateral, and you and the lender have already worked out the loan deal -- who is the loan deal with from Oberon?

Q.    Go to the next paragraph.

A.    The next paragraph or the next sentence?

Q.    Next paragraph starting, A week later.

A.    A week later with time wasting and Adam Breslawsky of Oberon promising an actual term sheet upon my signing -- upon my signing the letter of engagement without the up front fee now, and both you and I named on separate NDNCs, Adam told my attorney and myself that we would get a term sheet the same day we got him and signed the paperwork back.  Feeling my deal slipping away and having successfully negotiate d away the hundred thousand dollar fee, I made the mistake of writing your name in the signature space.

      I knew you did not want Mr. Edmonson to know you'd done anything with Oberon, but their document was moot -- standard

and moot.  In reality we both thought this.  However, this is no excuse for my transgression.  I would like to take it back. Yeah, he asked me to write all that.

Q.    You're saying this letter is just a big fake?  You're not really apologizing?

A.    Yeah, you're right, it is a big fake.  Because for one thing, we were running around defrauding Oberon.  We didn't have any collateral.  Okay?  We're doing NDNCs with people with nothing -- with nothing that we represent behind it.  And now I'm party to that.  Okay?

So, yes, I was happy to get out of that.  I negotiated away a hundred thousand dollar up front fee for this banking, and the reason they put that fee on there is because they knew that the deal was not going to work because they knew that oil was not real and they didn't want to be hanging out there having done nothing.  That's the reason they did it.  They would be happy to tell you that.

MR. O'BRIEN:  I don't have any further questions.

MR. BRANDLER:  Nothing further.

THE COURT:  You may step down.

THE WITNESS:  Thank you.

MR. BRANDLER:  Your Honor, I have two other witnesses who have been here, and I think I can get them in within 15 minutes.

THE COURT:  Well, the jury hasn't had a break.

MR. BRANDLER:  Oh, okay.

THE COURT:  We've been at this for three hours.

MR. BRANDLER:  No, I hear you.

THE COURT:  Is there any reason they can't come back tomorrow?

MR. BRANDLER:  No, they can both come back tomorrow.

THE COURT:  Members of the jury, I know you haven't had a break.  I think what we'll do is we'll adjourn for the day.  Is that suitable for everybody?  Now, there's some weather potential.  I don't know whether it will be tomorrow in the morning or not, or the next day.  But we will give you information.  There's a telephone number that you can call after 7 a.m. tomorrow morning to find out -- assuming that there's snow, to find out if there's court, or if there's a late start or anything like that.  What will end up happening is I will call in to that number prior to seven and let them know about any changes.  Now, if it's just a normal morning I probably won't call, but it won't hurt you if you want to call that number to call.

All right.  So we're going to adjourn for the day.  Remember not to discuss this case with anyone.  If anyone tries to talk to you about it bring it to my attention.  Don't expose yourself to any media about it, radio, television, newspaper, no matter what.  No research.  You know the drill.  You're to decide this case solely on what you're seeing and hearing in

this courtroom, and nothing else.  Enjoy your evening.  We'll

see you tomorrow morning at 9:30.

                    (4:45 p.m., court adjourned.)

REPORTER'S CERTIFICATE


I, DIANA L. GILBRIDE, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my supervision.



/s/ Diana L. Gilbride
Diana L. Gilbride, RMR, FCRR
Official Court Reporter

REPORTED BY:

    DIANA L. GILBRIDE, RPR
    Official Court Reporter
    United States District Court
    Middle District of Pennsylvania
    P.O. Box G
    Scranton, PA  18501-0090


        (The foregoing certificate of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)