1

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF PENNSYLVANIA**

United States of America,   )
                        )
      Plaintiff      )
                        )
     VS.            )   CASE NO. 3:12-CR-00224
                        )
                        )
Richard J. Harley,      )
                        )
      Defendant      )
                        )
                        )
_____ )

**TRANSCRIPT OF PROCEEDINGS OF JURY TRIAL - VOLUME FIVE**
**BEFORE THE HONORABLE A. RICHARD CAPUTO**
**TUESDAY, DECEMBER 9, 2014**
**WILKES-BARRE, PENNSYLVANIA**

**FOR THE PLAINTIFF:**

    Joseph A. O'Brien, Esq.
    Oliver, Price & Rhodes
    1212 South Abington Road
    Clarks Summit, PA  18411

**FOR THE DEFENDANT:**

    Bruce D. Brandler, AUSA
    U.S. Attorney's Office
    Room 217, Federal Building
    228 Walnut Street
    Harrisburg, PA  17108

**DIANA GILBRIDE, RMR, FCRR**
**FEDERAL OFFICIAL COURT REPORTER**
**P.O. BOX G**
**SCRANTON, PA 18501-0090**

## <u>INDEX TO WITNESSES</u>
## <u>{TUESDAY, DECEMBER 9, 2014} {VOLUME II}</u>

FOR GOVERNMENT:    DIRECT  CROSS  REDIRECT  RECROSS  COURT

Linda Murphy
 by Mr. Brandler:    18
 by Mr. O'Brien:             28

David Weiss
 by Mr. Brandler:    29

Bert V. Massey, II
(On qualifications)
 by Mr. Brandler:    37

 by Mr. Brandler:    43
 by Mr. O'Brien:             81

Irene Randall
 by Mr. Brandler:    100
 by Mr. O'Brien:             115

Gregory Schiller
 by Mr. Brandler:    116

### INDEX TO EXHIBITS

| GOVERNMENT: | IDENTIFIED | ADMITTED |
|---|---|---|
| Exhibit No. 20.6C | 5 | 13 |
| Exhibit No. 20.6F | 6 | 13 |
| Exhibit No. 20.6D | 8 | 13 |
| Exhibit No. 20.6H | 10 | 13 |
| Exhibit No. 20.6E | 11 | 13 |
| Exhibit No. 20.5A | 13 | 14 |
| Exhibit No. 20.5C | 14 | 17 |
| Exhibit No. 43.2 | 18 | 27 |
| Exhibit No. 43.8 | 19 | 27 |
| Exhibit No. 43.5 | 20 | 27 |
| Exhibit No. 43.1 | 21 | 27 |
| Exhibit No. 43.3 | 23 | 27 |
| Exhibit No. 43.4 | 25 | 27 |
| Exhibit No. 44.2 | 33 | -- |
| Exhibit No. 44.1 | 33 | -- |
| Exhibit No. 27.8 | 42 | -- |
| Exhibit No. 36.17 | 42 | -- |
| Exhibit No. 40.1 | 66 | 79 |
| Exhibit No. 11.2 | 106 | 179 |
| Exhibit No. 11.1 | 111 | 179 |
| Exhibit No. 16.6 | 122 | 179 |
| Exhibit No. 17.7 | 125 | 179 |
| Exhibit No. 20.7 | 127 | 179 |
| Exhibit No. 16.1 | 130 | 179 |
| Exhibit No. 16.2 | 152 | 179 |
| Exhibit No. 16.3 | 152 | 179 |
| Exhibit No. 16.4 | 153 | 179 |
| Exhibit No. 16.5 | 155 | 179 |
| Exhibit No. 16.6 | 156 | 179 |
| Exhibit No. 17.1 | 158 | 179 |
| Exhibit No. 17.9 | 161 | 179 |
| Exhibit No. 17.2 | 161 | 179 |
| Exhibit No. 17.3 | 165 | 179 |
| Exhibit No. 17.4 | 168 | 179 |
| Exhibit No. 17.5 | 168 | 179 |
| Exhibit No. 17.6 | 169 | 179 |
| Exhibit No. 20.7 | 169 | 179 |
| Exhibit No. 20.1 | 170 | 179 |
| Exhibit No. 20.3 | 175 | 179 |

4

1          (10:45 a.m., convene.)

2          THE COURT:  Good morning.  We'll keep an eye on the

3    weather and the possibility that it's supposed to start snowing

4    later today.  We'll keep an eye on it.  If we think we should

5    adjourn early we'll do that.  So I am mindful of it, and I hope

6    everybody was all right coming in this morning.  And we're

7    going to proceed.

8          MR. BRANDLER:  Karen Musloski.

9          THE DEPUTY CLERK:  Please raise your right hand.

10                    KAREN MUSLOSKI,

11   called as a witness on behalf of the Government, having been

12   duly sworn or affirmed according to law, testified as follows:

13         THE DEPUTY CLERK:  Could you please state and spell

14   your name for the record.

15         THE WITNESS:  Karen Musloski, M-U-S-L-O-S-K-I.

16         MR. BRANDLER:  May I inquire?

17         THE COURT:  You may.

18         MR. BRANDLER:  Thank you.

19                    DIRECT EXAMINATION

20   BY MR. BRANDLER:

21   Q.   Ms. Musloski, by whom are you employed?

22   A.   The U.S. Attorney's Office for the Middle District.

23   Q.   And what is your position with the United States

24   Attorney's office?

25   A.   Paralegal specialist.

1  Q.    And what office do you work out of?

2  A.    The Scranton office.

3  Q.    How long have you been a paralegal specialist with the

4  U.S. attorney's office?

5  A.    25 years.

6  Q.    And can you just briefly describe your duties and

7  responsibilities with the U.S. Attorney's office?

8  A.    I enforce judgments and collect money.

9  Q.    And is that on monetary judgments that are owed to the

10 United States?

11 A.    Yes.

12 Q.    And you work in the same office as I do?

13 A.    Yes.

14 Q.    I'm in Harrisburg, you're in Scranton?

15 A.    Right.

16 Q.    But it's the same U.S. Attorney's office?

17 A.    Right.

18 Q.    As of May 29, 2012, which prior evidence showed was the

19 date of the filing of Mr. Harley's personal bankruptcy

20 petition, did the United States have an outstanding monetary

21 judgment against Mr. Harley?

22 A.    Yes.

23 Q.    How much was the monetary judgment?

24 A.    The original amount was $168,802.

25 Q.    And what was the date that that judgment was entered?

1  A.    March 30, 2001.

2  Q.    Can we have Exhibit 20.6C?  Are you familiar with this

3  document?

4  A.    Yes.

5  Q.    What is it?

6  A.    It's a payment history.

7  Q.    And does it come off a certain computer system that you

8  use in connection with your duties and responsibilities?

9  A.    Yes.  It's the consolidated debt collection system.

10  Q.    And is this a payment history for the defendant in this

11  case, Mr. Harley, relating to that judgment you previously

12  testified about?

13  A.    Yes.

14  Q.    And on the top right it says Report Date.  What is the

15  date of that report?

16  A.    July 26, 2012.

17  Q.    So, this was accurate as of that date?

18  A.    Yes.

19  Q.    And it says the current liability underneath that.  What

20  was the current balance as of July 26, 2012?

21  A.    $167,855.74.

22  Q.    And below that, does it show various payments being made

23  on various dates prior to that time?

24  A.    Yes.

25  Q.    And how many payments were made prior to the run date on

1  this report?

2  A.    There were six payments made sporadically between 2003 and

3  2005.

4  Q.    And the total amount of those payments?

5  A.    296,226.

6  Q.    And you said the original judgment was 168,802 I believe?

7  A.    Yes.

8  Q.    And were there other deductions made not related to this

9  payment process?

10  A.    Yes.

11  Q.    And that's the discrepancy in the number here?

12  A.    Right.

13  Q.    Was Mr. Harley notified by you personally and by the

14  United States Attorney's Office regarding the outstanding

15  amount of this judgment as of May 29, 2012, when he filed his

16  bankruptcy petition?

17  A.    Yes.

18  Q.    Can we have Exhibit 20.6F.  Actually, that's -- I'm sorry.

19        (Pause.)

20  BY MR. BRANDLER:

21  Q.    After the United States obtains a judgment against an

22  individual in terms of collecting on the judgment, do you file

23  those judgments with the recorder, the clerk's office, in the

24  county of residence for the individual?

25  A.    Yes.

1  Q.    And do you recognize this document?

2  A.    Yes.

3  Q.    And what is it?

4  A.    It's a lien filed in the County of Monroe for the amount

5  of $168,802.

6  Q.    For Mr. Harley?

7  A.    Yes.

8  Q.    And was this something that was sent out by you on behalf

9  of Michael Thiel, an Assistant U.S. Attorney in the middle

10 district?

11 A.    Yes.

12 Q.    So you would send this to the county courthouse for

13 filing?

14 A.    Yes.

15 Q.    And going to the second page here, there's something

16 called Notice of Lien?

17 A.    Yes.

18 Q.    For Fine and/or Restitution Imposed Pursuant to the

19 Antiterrorism and Effective Death Penalty Act of 1996.  Is that

20 what you sent to the clerk for filing?

21 A.    Yes.

22 Q.    And does it have the name of the defendant?

23 A.    It has the name of the defendant and the amount.

24 Q.    That would be Richard Harley in the amount of 168,802.

25 And the date that this notice was prepared?

1  A.    March 6, 2009.

2  Q.    Now, going back to the front page, does it indicate the

3  stamp from the clerk's office in Monroe County about when it

4  was filed?

5  A.    Yes.

6  Q.    What's the date?

7  A.    April 14, 2009.

8  Q.    Now, after you filed these judgments in the county

9  courthouse do you get notice back from the clerk's office that

10 notice was sent to Mr. Harley about the recording?

11 A.    Yes.

12 Q.    Could we have 20.6D.  And that's another one.  Do you

13 recognize this document?

14 A.    Yes.

15 Q.    What is it?

16 A.    That's the notice to Mr. Harley that the judgment was

17 filed in Monroe County.

18 Q.    And do you get a copy of that notice as well?

19 A.    Yes.

20 Q.    And could you just read what the body of the notice says?

21 A.    It's the notice that you are hereby notified that a

22 judgment in the amount of $168,802 has been entered against you

23 on April 14, 2009 in the Court of Common Pleas of Monroe

24 County, Pennsylvania, at the above number and term.  Please

25 note, this is not a lawsuit or a bill, it is simply a

1  notification of the recording.  And it's signed by the

2  prothonotary of Monroe County.

3  Q.    And then going to the second page, I guess a summary of

4  the judgments, some back-up material relating to that which was

5  filed?

6  A.    Right, and the filing fee.

7  Q.    Which our office paid to have filed?

8  A.    Which our office paid, uh-hum.

9  Q.    And then the third page, does that appear to be the actual

10  judgment itself that's filed?

11  A.    Yes.

12  Q.    And the next page is the notice that we previously saw

13  that you mailed in to have filed, correct?

14  A.    Right.

15  Q.    With the last page being the second page of the notice

16  that you sent to have filed, is that correct?

17  A.    Yes, yes.

18  Q.    And you got this back from the clerk's office as indicated

19  that it was filed and sent to Mr. Harley?

20  A.    Yes.

21  Q.    Now, after you filed the lien do you also follow up to

22  collect on the judgment?  Do you take certain steps to collect?

23  A.    Yes.

24  Q.    And did you take certain steps in this case to collect

25  when you notified Mr. Harley?

1  A.    Yes.

2          MR. BRANDLER:  Could we have 20.6H, which I'll have

3  to put up here.

4  BY MR. BRANDLER:

5  Q.    Do you recognize this document?

6  A.    Yes, I do.

7  Q.    What is it?

8  A.    It's a notice of interrogatories to Mr. Harley.

9  Q.    And what is the date on this notice of interrogatories?

10 A.    May 20, 2011.

11 Q.    And is this something that you personally prepared?

12 A.    Yes.

13 Q.    And although it's on the signature of Michael Thiel, who

14 is Michael Thiel?

15 A.    Michael Thiel was the attorney in the financial litigation

16 division at the time.

17 Q.    There's a certificate of service on the second page, and

18 your name appears there?

19 A.    Yes.

20 Q.    And what does the certificate of service indicate?

21 A.    It indicates that I put the paperwork together and put it

22 in the mail and personally sent it to Mr. Harley.

23 Q.    At what address?

24 A.    P.O. Box 306, Shawnee on the Delaware, PA 18356.

25 Q.    And what did the notice of interrogatories request?

1  A.    It requested financial information for Mr. Harley.

2  Q.    Did you ever get a response from Mr. Harley?

3  A.    No.

4  Q.    Was the mail ever returned as undelivered?

5  A.    No.

6         MR. O'BRIEN:  20.6H, is that --

7         MR. BRANDLER:  H.

8  BY MR. BRANDLER:

9  Q.    The next one I want to show you is 20.6E.  Was there more

10 correspondence after that on August 3, 2011 to Mr. Harley?

11 A.    Yes.

12 Q.    And did you personally prepare that letter?

13 A.    Yes, I did.

14 Q.    Indicated by your signature at the bottom of the page?

15 A.    Yes.

16 Q.    And what was this letter?

17 A.    That's a letter reminding him again that he was ordered to

18 pay the $168,802, and he's failed to pay it and it's past-due.

19 Q.    All right.  Can you just read what the body of the letter

20 says?

21 A.    On March 30, 2001, you were ordered to pay the sum of

22 $168,802 as part of the judgment of the court.  Our records

23 reflect a past-due balance.  Failure to make payment within ten

24 days from the date of this letter may result in further legal

25 action, which could include garnishment of your wages and/or

1  attachment of your personal property.  Check or money order

2  should be made payable to Clerk, U.S. District Court, and

3  mailed to the Clerk's Office, P.O. Box 1148, Scranton, PA

4  18503.  If you have any other questions, please do not hesitate

5  to contact me.  It is in your best interest to take care of

6  this obligation immediately.

7  Q.    Did you get any follow-up contact from Mr. Harley?

8  A.    No.

9  Q.    Did he submit payment?

10 A.    No.

11 Q.    And you previously testified that as of the date of the

12 filing of the bankruptcy petition there was still an

13 outstanding balance of over $167,000?

14 A.    Right.

15          MR. BRANDLER:  I have no further questions.  I would

16 introduce as evidence the documents previously identified by

17 Ms. Musloski.

18          MR. O'BRIEN:  I have no questions and I have no

19 objections.

20          THE COURT:  They will be admitted.  You may step

21 down.

22          THE WITNESS:  Thank you.

23          MR. BRANDLER:  Your Honor, at this time we also have

24 similar documents that with agreement of counsel we're just

25 going to submit as evidence.  And these are on the computer.

1    20.5A.

2            TECHNICIAN:  Would you say that again Bruce?

3            MR. BRANDLER:  20.5A.

4            MR. BRANDLER:  Your Honor, by agreement of counsel

5    we're admitting this document, which is a judgment referring to

6    case No. 3:CV-96-0705 titled, Securities and Exchange

7    Commission versus Lazar Industries, Inc., Richard Harley and

8    Jacqueline Kube, and the judgment reads, Final Judgment and

9    Order directing payment of disgorgement, pre-judgment interest

10   and civil penalties."  Can we just go back to the first page

11   before I -- "Whereas, on May 20, 1996, this Court entered a

12   permanent injunction by consent and continued asset freeze.

13   The permanent injunction, reserving only the issue of whether

14   the defendants and relief defendant must disgorge funds, the

15   amount of digorgement, if any, and whether civil penalties, if

16   any, should be assessed against the defendants.

17           And whereas, now the plaintiff, the Securities and

18   Exchange Commission, has moved this Court for an order

19   directing payment of disgorgement, pre-judgment interest and

20   civil penalties, the commission's motion, it is hereby ordered,

21   adjudged and decreed that on this 4th day of January, 2008,

22   upon consideration of the commission's motion and of all

23   responses and replies to that motion, and that the no just

24   reason for delay, the plaintiff's motion is hereby granted in

25   full and it is hereby ordered, adjudged and decreed that the

1   Defendants, Lazar Industries, Inc., Richard J. Harley and

2   relief defendant Jacqueline Kube are jointly and severally

3   liable for disgorgement of $424,250 representing profits gained

4   as a result of the conduct alleged in the complaint in the

5   captioned action, together with pre-judgment interest thereon

6   in the amount of $551,661, for a total of $975,911.  The

7   commission may enforce the Court's judgment for disgorgement

8   and pre-judgment interest."

9           And I don't believe it's necessary to continue

10  reading.  I just want to go to page four.  "It is further

11  ordered, adjudged and decreed that pursuant to Section 21(d)(3)

12  of the Exchange Act, 15 USC 78u(d) and Section 20d of the

13  Securities Act, 15 USC 77t(d), Defendant Harley shall pay a

14  third tier civil penalty in the amount of $500,000.

15          And if we go to the last page.  The order is dated

16  January 4 of 2008 and it's signed by Thomas I. Vanaskie, Chief

17  United States District Judge.

18          Exhibit 20.5C is a declaration of an official from

19  the Securities Exchange Commission relating to that judgment

20  indicating that the following document is a business record

21  kept and filed by the Securities and Exchange Commission.  And

22  if we go to Exhibit A, about the third page down, there's a

23  letter from the Securities and Exchange Commission dated August

24  26 of 2010 to Mr. Harley at P.O. Box 306, Shawnee on Delaware.

25  And it's relating to past-due disgorgement amount, $975,911,

1    plus additional interest, late payment penalties and collection

2    fees as allowed by law.  Date disgorgement amount became

3    past-due January 8, 2008.  Past-due penalty amount, 500,000

4    plus additional interest, late payment penalties and collection

5    fees as allowed by law.  Date penalty amount became past-due:

6    January 22, 2008.  And then it gives the name of the case, SEC

7    v. Lazar Industries, Inc., et al., Civil Action 1996-CV-00705

8    MDPA.  Reply date:  October 25, 2010.

9            "Dear Mr. Harley, you have not paid the amounts

10   ordered in the above captioned proceedings.  A copy of the

11   order or judgment entered against you in the proceedings is

12   enclosed.  If you do not pay the required amounts, or if you do

13   not take other action described in this letter before the reply

14   date given above, the commission may seek to collect the

15   amounts you owe by taking any and all of the measures described

16   in this notice.

17           "Providing you with this notice does not prevent the

18   commission from seeking to collect the amounts you owe by using

19   any other means permitted by law.  We will continue to add

20   interests, late payment penalties and collection fees to unpaid

21   amounts as allowed by law."

22           And then going to the last page, page five of five.

23   It's signed by an attorney with the Securities and Exchange

24   Commission, Catherine E. Pappas, and the enclosure on the next

25   page is the copy of the judgment which was previously

1  introduced as 20.5A.

2          Going back to the first page of this document -- the

3  second page, I'm sorry.  Paragraph three says, "I have reviewed

4  the collection file from Mr. Harley maintained by the

5  Philadelphia office.  I've determined that on or about August

6  26, 2010, the SEC sent Exhibit A to Richard Harley by U.S.

7  mail, postage prepaid.  Exhibit A was not returned to the SEC

8  as undeliverable or otherwise, and the SEC did not receive any

9  response to Exhibit A from Mr. Harley or anyone on his behalf.

10 As of the date of this declaration Mr. Harley still owes the

11 SEC the debt identified in Exhibit A, plus accrued

12 post-judgment and interest", and it's signed under declaration

13 of penalty of perjury by a person named Eric Hellmer on October

14 28, 2013.  We've similarly introduced 20.5C.

15          MR. O'BRIEN:  No objection.

16          THE COURT:  It will be admitted.

17          MR. BRANDLER:  Can we have Linda Murphy.

18                      LINDA MURPHY,

19 called as a witness on behalf of the Government, having been

20 duly sworn or affirmed according to law, testified as follows:

21          THE DEPUTY CLERK:  Would you please state and spell

22 your name for the record?

23          THE WITNESS:  Linda Murphy, L-I-N-D-A  M-U-R-P-H-Y.

24          THE DEPUTY CLERK:  Thank you, you may be seated.

25          MR. BRANDLER:  May I inquire?

1          THE COURT:  You may.

2                         DIRECT EXAMINATION

3     BY MR. BRANDLER:

4     Q.    Ms. Murphy, by whom are you employed?

5     A.    Motorworld Automotive Group.

6     Q.    And what is Motorworld Automotive Group?

7     A.    It's an auto dealer in Wilkes-Barre, Pennsylvania.

8     Q.    And what is your position with Motorworld?

9     A.    I am the office manager.

10    Q.    And how long have you been the office manager?

11    A.    14 years.

12    Q.    And in general, what are your duties and responsibilities

13    as office manager there?

14    A.    I deal with accounting, maintaining the records, a lot of

15    office work, oversee people.

16    Q.    Do you oversee the day-to-day operations in terms of the

17    financial -- some of the financial aspects?

18    A.    Yes, banking, things of that nature.

19    Q.    Are you familiar with the paperwork associated with sales

20    of automobiles?

21    A.    Yes.

22    Q.    Through the dealership?  And is that paperwork kept on

23    file at the dealership after an automobile is sold?

24    A.    Yes.

25    Q.    Have you researched your records for paperwork associated

1  with sales of motor vehicles by Motorworld to Richard Harley,

2  the defendant in this case?

3  A.   Yes, I have.

4  Q.   How many automobiles were sold by Motorworld to Richard

5  Harley according to your records?

6  A.   Two.

7  Q.   And what was the date and the type of vehicle of the first

8  transaction?

9  A.   If you pardon me, I have to look at my files, I don't have

10  it memorized.  The first one was in July of 2007.  And it was a

11  2007 Jeep.  And the other one was in April of 2008, and it was

12  an '08 Lexus.

13  Q.   I want to direct your attention to Exhibit 43.2.

14  A.   Okay.

15  Q.   It should come up on the computer screen.  Are you

16  familiar with this document?

17  A.   Yes.

18  Q.   What is it?

19  A.   We refer to it as a bill of sale.

20  Q.   And is it a bill of sale relating to one of the

21  transactions you just talked about with Mr. Harley?

22  A.   Yes, it is.

23  Q.   Which one?

24  A.   For the 2007 Jeep.

25  Q.   And what is the date of this -- well, the order date.  But

20

1  what's the sale date?

2  A.   The sale date was ultimately July 12.

3  Q.   Of 2007?

4  A.   Seven, yes.

5  Q.   And what was the purchase -- first of all, you said it was

6  a Jeep?

7  A.   Yes.

8  Q.   What was the retail --

9  A.   The Grand --

10  Q.   What's that?

11  A.   I'm sorry.  It was a Jeep Grand Cherokee.

12  Q.   What was the -- can you go through the price of the

13  vehicle?  Can you scroll down there?  So the first -- you went

14  too far.  Right there.

15  A.   Okay.  The manufacturer suggested retail price was 45,340.

16  The sale price was 43-8, plus tax and tag fees.

17  Q.   And so the price was 43-8.  If we keep on going down there

18  was sales tax --

19  A.   Yes.

20  Q.   -- of $2628?

21  A.   Yes.  And $154 for title, tags, registration fees.

22  Q.   And the total amount due from the purchaser?

23  A.   $46,582.

24  Q.   And it appears there was a $1,000 deposit?

25  A.   Yes.  That was on a credit card.

1  Q.    And then there was an unpaid balance due of how much?

2  A.    $45,582.

3  Q.    Was any of that purchase price financed?  How was that

4  paid?

5  A.    It was paid by check.

6  Q.    So it was not financed?

7  A.    No.

8  Q.    And staying on this document.  Is it signed by Mr. Harley

9  at the bottom there?

10 A.    Yes, it is.

11 Q.    And what's the date across from his signature?

12 A.    July 12, 2007.

13 Q.    Could we go to the ninth page in on this document?

14 A.    Okay.

15 Q.    Actually, let's go to the 10th page in.  Let's go to 43.5.

16 Can you identify that document?

17 A.    Yes.  That is the check that we received for payment of

18 the Jeep.

19 Q.    And on what account was that check drawn?

20 A.    Merrill Lynch.

21 Q.    Well, on the top left?

22 A.    Oh, RJ and H Company.

23 Q.    RJH and Company, Inc.?

24 A.    Yes.

25 Q.    And it's paid to the order of Motorworld for the balance

1  of 45,582?

2  A.    That's correct.

3  Q.    And it's signed by who?

4  A.    Richard J. Harley.

5  Q.    And the same date, July 12 of '07?

6  A.    Yes.

7  Q.    And you said there was a $1,000 also credit card payment

8  in addition to the check?

9  A.    Yes.

10  Q.    And if we go back to Exhibit 43.2, to the last page.

11  Right there.  Does it show the credit card payment as well as

12  the check payment?

13  A.    Yes.  The lower one is our internal receipt showing that

14  it was a Master Card or Visa payment of $1,000.

15  Q.    And does it show that it came from RJH and Company, Inc.?

16  A.    Yes.

17  Q.    All right.  So that was the first transaction.  The second

18  transaction you said occurred in April of 2008?

19  A.    That's correct.

20  Q.    Can we go to Exhibit 43.1.  Do you recognize this

21  document?

22  A.    Yes.  It is a bill of sale.

23  Q.    And is this the bill of sale for the 2008 transaction you

24  testified about?

25  A.    Yes, it is.

1  Q.   And what was the vehicle sold on this transaction?

2  A.   2008 Lexus GX470.

3  Q.   Who was it sold to as the purchaser?

4  A.   RJH and Company, Incorporated.

5  Q.   Is it signed by Mr. Harley on the lower left?

6  A.   Yes.

7  Q.   And the date appearing next to his signature?

8  A.   Was April 30.  He had ordered on the 7th, but the

9  finalization of the deal was the 30th.  And that's the date he

10 signed.

11 Q.   All right.  Let's go through the price again for this

12 vehicle.  What was the retail price?

13 A.   It was $55,218.

14 Q.   And just walk us through it.

15 A.   He had a trade vehicle.

16 Q.   Does it indicate what the trade vehicle was?  Do you know

17 what the trade vehicle was?

18 A.   Yes.  Over to the left it shows it was a 2003 Lexus GX470

19 and that was valued at 25,318.

20 Q.   All right.  So he traded in the other Lexus.  And then

21 what was the balance after the trade-in?

22 A.   Was $29,900, plus the sales tax of 1794.  And the license,

23 registration transfer fees of 114, for a total of -- I'm sorry.

24 Q.   Go ahead what was the total?

25 A.   For a total of 31,808.

24

1  Q.    And that was the total amount due from Mr. Harley to

2  purchase this Lexus, correct?

3  A.    Yes.

4  Q.    And did he finance this transaction?

5  A.    No.

6  Q.    He paid cash again or check?

7  A.    He paid by check, yes.

8  Q.    Can we have Exhibit 43.3?  And can you identify this

9  document?

10  A.    Yes.  This is the check we received on April 30 from RJH

11  and Company drawn on the Merrill Lynch account.

12  Q.    The same account as the other check for the Jeep?

13  A.    Yes.

14  Q.    And it was signed by Mr. Harley as CEO?

15  A.    Yes.

16  Q.    And what was the amount of this check?

17  A.    $31,808.

18  Q.    Which was the total balance due?

19  A.    Yes.

20  Q.    Did you -- did you or somebody at the bank present this

21  check to your bank for payment?

22  A.    Yes, we did.

23  Q.    And what happened?

24  A.    The check was returned.

25  Q.    Did it bounce?

1  A.    Yes.   Insufficient funds.

2  Q.    So, can we go back to 43.3?  Sorry.  There was a second

3  check on April 30 of '08, correct, besides the 31,808?

4  A.    Yes, that was for --

5  Q.    The next page, please.  That check is for how much?

6  A.    $412.34.

7  Q.    From the same account, RJH?

8  A.    From -- yes, from the same account.  And it was for a

9  warranty that he had purchased after the agreed-upon price.

10 Q.    And did that bounce as well, or did that go through?

11 A.    That went through.

12 Q.    So, going back to 43.1, was there a memo in your paperwork

13 that Mr. Harley asked -- go to the third page -- is there any

14 memos in the file indicating about holding the check until a

15 certain amount of time?

16 A.    Yes.  It had been agreed upon between Mr. Harley and our

17 salesperson that we would hold the check and wouldn't deposit

18 it until the 15th of the month.

19 Q.    So he actually picked up the vehicle, drove off the lot

20 with this agreement to later present the check?

21 A.    Yes.

22 Q.    When you -- did you respect that wish and present the

23 check after May 15?

24 A.    Yes.

25 Q.    And that's when it bounced?

1  A.    Yes.

2  Q.    So did the dealership take any actions to collect on the

3  payment?

4  A.    Yes.  We had phone calls and e-mail communication.

5  Q.    And did you eventually have to file a lawsuit in

6  magistrate's court?

7  A.    No.  We were eventually paid in July.

8  Q.    Did you file anything with the magistrate's court?

9  A.    No, not pertaining to this.

10 Q.    And how were you paid in July?

11 A.    We were paid via wire transfer.

12 Q.    Can we go to Exhibit 43.4.  And what is that?

13 A.    That is a copy of our banking reports for the date of July

14 25, 2008.

15 Q.    And what is reflected on your banking reports for that

16 date?

17 A.    It's the incoming wire.  And it shows down there the

18 origin was from RJH and Company.

19 Q.    From the Merrill Lynch account?

20 A.    Yes.  It does say that as well.

21 Q.    And how much was wired in?

22 A.    $33,514.99.

23 Q.    And that was more than what the balance was originally on

24 the sale price, correct?

25 A.    Yes.

1  Q.    And what was the reason for the extra charge?

2  A.    There was a $35 bounced check fee.  But we also had found

3  out after he traded his vehicle in to us that it was a leased

4  vehicle he had never paid tax on.  So, we needed to collect the

5  sale tax on that vehicle.

6  Q.    On the trade-in?

7  A.    Yes.  So that was to cover the sales tax on the traded

8  vehicle.

9  Q.    So this money was wired in on what date did you say?

10 A.    July 25.

11 Q.    Of 2008?

12 A.    That's correct.

13 Q.    All right.  And the actual purchase took place on April 30

14 of '08?

15 A.    That's correct.

16 Q.    So about three months later you got paid?

17 A.    Yes.

18 Q.    I have no further questions.  And would move the

19 introduction of those previously identified documents by the

20 witness?

21        MR. O'BRIEN:  No objection to the documents.  Just a

22 few questions.

23        THE COURT:  They'll be admitted.

24                     CROSS EXAMINATION

25 BY MR. O'BRIEN:

1  Q.   Just one area I want to go into.  You testified on direct

2  that Mr. Harley had purchased these vehicles from you?

3  A.   Yes.

4  Q.   The documentation, as I see it, seems to say it was RJH,

5  Inc.?

6  A.   Hum, Mr. Harley was the one that came in and conducted the

7  business.

8  Q.   But the bill of sale was to a company?

9  A.   Yes.

10 Q.   And the checks were signed -- they were company checks?

11 A.   Company checks signed by Mr. Harley.

12 Q.   And the title would have been put in the company?

13 A.   Yes.

14         MR. O'BRIEN:  That's all I have.

15         MR. BRANDLER:  Nothing further.

16         THE COURT:  You may step down.

17         THE WITNESS:  Thank you.

18         MR. BRANDLER:  David Weiss.

19         (Pause.)

20         THE DEPUTY CLERK:  Would you please raise your right

21 hand?

22                         DAVID WEISS,

23 called as a witness on behalf of the Government, having been

24 duly sworn or affirmed according to law, testified as follows:

25         THE DEPUTY CLERK:  Would you please state and spell

29

1   your name for the record.

2          THE WITNESS:  David Weiss, W-E-I-S-S.

3          THE DEPUTY CLERK:  Thank you.  You may be seated.

4          MR. BRANDLER:  May I inquire, your Honor?

5          THE COURT:  You may.

6                    DIRECT EXAMINATION

7   BY MR. BRANDLER:

8   Q.    Mr. Weiss, are you employed?

9   A.    Yes, I am.

10  Q.    By whom are you employed?

11  A.    I'm employed by Freeman's Auction House in Philadelphia,

12  Pennsylvania.

13  Q.    What's your position with Freeman's Auction House?

14  A.    Senior vice-president.

15  Q.    And what type of organization is Freeman's Auction House?

16  What does it do?

17  A.    It is the oldest auction house in America.  We hold

18  regular auctions and we also conduct appraisals.

19  Q.    And how long have you been associated with Freeman's?

20  A.    Since 2002.

21  Q.    So that would be about 12 years?

22  A.    Correct.

23  Q.    And have you been appraising artwork while you've been

24  associated with Freeman's?

25  A.    Yes.

1  Q.    And when did you start to appraise artwork?

2  A.    I started to appraise artwork in 1988.  I worked for a

3  different auction house prior to joining Freeman's.

4  Q.    And what is your educational background?

5  A.    Educational background is a graduate of Dickinson College.

6  And did a course called The Works of Art course in London.   I

7  did not complete the course.  I also worked for an art dealer

8  in my native Washington, DC prior to joining another auction

9  house in suburban Washington.

10 Q.    Were you an art minor at Dickinson?

11 A.    Yes.

12 Q.    And did you ever work for Sotheby's?

13 A.    No.

14 Q.    Did you ever have any association with Sotheby's?

15 A.    The only association was that they taught The Works of Art

16 course.

17 Q.    Where you attended?

18 A.    Where I attended in London, England.

19 Q.    And what is OSUMA?

20 A.    O-S-U-N-A is Osuna, who is the name of the art dealer in

21 Washington, DC, for whom I worked prior to joining the auction

22 house in Washington.

23 Q.    And were you doing -- what was your position there?

24 A.    Assistant to the president.

25 Q.    And at the art gallery in Washington, DC what type of work

1  were you doing there?

2  A.    The art gallery in Washington, DC, working for Mr. Osuna,

3  I was involved with sales of contemporary art and I also

4  assisted Mr. Osuna in the capacity of writing an auction -- or

5  a catalog I should say for an exhibition of old master

6  paintings.

7  Q.    And what is Sloan's Auction House?

8  A.    Sloan's is the auction house where I first worked.  And I

9  worked from 1988 through as I recall 2012.

10 Q.    And what did you do at Sloan's?

11 A.    At Sloan's I had a variety of jobs.  And ultimately I was

12 one of the senior officers before I left.  And I started as an

13 intern.  My duties included being a specialist and appraiser in

14 the areas of American paintings, European paintings, works on

15 paper, as well as oriental rugs and carpets.

16 Q.    Have you ever been a professor at any institutions of

17 higher learning?

18 A.    I'm an adjunct professor at Drexel University in

19 Philadelphia.

20 Q.    And how long have you been an adjunct professor there?

21 A.    I believe I have taught a course which is called Fine Art

22 Market Development I believe for three semesters, and I'm about

23 to start my fourth in January.

24 Q.    Have you ever -- are you a member of any organizations

25 that certifies art appraisers?

1  A.    Yes.

2  Q.    What organizations?

3  A.    The Appraisers Association of America based in Manhattan.

4  Q.    And is there a specific subgroup within that association

5  that you specialize in?

6  A.    I'm a member in that group in two categories, American

7  Paintings and Works on Paper.  As I recall it's called Works on

8  Paper.  And Oriental Rugs and Carpets, as well as American

9  Prints.

10  Q.    And are you familiar with the usual standards and

11  appraisal practices for appraising pieces of art?

12  A.    Yes, I am, uniform, yes.

13  Q.    And have you given professional opinions on artwork in the

14  past through the course of your numerous jobs in this area?

15  A.    Yes.  In the capacity of doing appraisals for Freeman's,

16  typically part of the boiler plate that's used prior to

17  describing the exact objects, there is biographical information

18  about the appraiser.  And to the best of my knowledge, USPAP is

19  the acronym, USPAP certification is part of the description of

20  the appraiser.

21  Q.    Have you ever been an author for the Pennsylvania

22  Association, Bar Association?

23  A.    I did two articles, as I recall, and I believe it was for

24  that organization, on-line articles that appeared for that

25  organization.

1   Q.    Was that on the probate and trust newsletter?

2   A.    Yes.

3   Q.    And have you juried art shows in the past?

4   A.    I juried one art show within the last two years, as I

5   recall, in New York City.

6   Q.    And there's a television program called Antique Road Show.

7   Are you familiar with that?

8   A.    Yes.

9   Q.    And have you had any association with that television

10  show?

11  A.    Yes, for many years.

12  Q.    What has been your connection to that television show?

13  A.    I am one of the appraisers on Antiques Road Show.  And I

14  am generally one of the painting appraisers on the Antiques

15  Road Show.  I served once as one of the appraisers at the

16  oriental rugs table on the Antiques Road Show.

17  Q.    And have you done numerous appraisals for the Antiques

18  Road Show as well?

19  A.    Yes.  I should qualify that.  When you are one of the

20  appraisers on the Antiques Road Show the term appraisal must be

21  carefully applied.  You provide a valuation either based on

22  fair market value or insurance value, but you don't give

23  strictly speaking written appraisals.

24  Q.    All right.  At my request have you examined those two

25  pictures, for lack of a better word, that are to your right to

34

1    give an appraisal of the market value of those items?

2    A.    Yes.

3    Q.    And starting with the one that's closest to you, which

4    we'll call the Settlemyre, Liberation of the Lady?

5            THE COURT:  Why don't you affix a number for the

6    purposes of the record?

7            MR. BRANDLER:  I think it's already been marked as

8    44.1.

9            THE COURT:  Okay.  But if you'd refer to it that way

10   at lease once.

11           MR. BRANDLER:  Very good.  Oh, I'm sorry, 44.2.  I

12   don't know that there is a sticker on it.

13           THE COURT:  Doesn't matter.  As long as I -- for the

14   record, as long as it designates a number, at least people

15   reading the record will know what's being talked about.

16   BY MR. BRANDLER:

17   Q.    So we're talking about 44.2 now, the painting that's

18   closest to you.  Are you familiar with that painting?

19   A.    Yes.

20   Q.    And have you given -- do you have an opinion of its fair

21   market value?

22   A.    The opinion of its fair market value is $150.

23   Q.    And going to the picture next to it, which is 44.1, which

24   for the record I'll call Vitellius, Roman Emperor Titian, do

25   you have an opinion of its fair market value?

1  A.    Yes.

2  Q.    And what is your opinion of its fair market value?

3  A.    $50.

4  Q.    And that picture, this 44.1, is that even an art painting?

5  A.    The gentleman, the emperor, is not a painting.

6  Q.    What is it?

7  A.    It is a photomechanical reproduction of a painting that is

8  modern.

9  Q.    And when you say a photo mechanical reproduction, is that

10 like a poster?

11 A.    It is more akin to a poster than it is an oil painting.

12 Q.    And the other one that we discussed, the 44.2, is that one

13 an actual painting?

14 A.    Yes.

15 Q.    I have no further questions.  I would move -- well, I'm

16 not going to move the admission.  It's just for identification

17 at this point.  Those two items.

18         THE COURT:  Cross-examine.

19         MR. O'BRIEN:  I don't have any questions.  We'd

20 reserve the right to recall this gentleman.

21         THE COURT:  Pardon?

22         MR. O'BRIEN:  We reserve the right to recall this

23 gentleman later.

24         THE COURT:  All right.  You may step down.

25         MR. BRANDLER:  Bert Massey.  Your Honor, can we just

36

1   get some clarification on whether he can leave?  I know he

2   reserved to call him back.  Can he leave today though?

3            MR. O'BRIEN:  He can leave today.

4            MR. BRANDLER:  Very good.

5            THE COURT:  Is he under subpoena?

6            MR. O'BRIEN:  No.

7            MR. BRANDLER:  Because he's in Philadelphia.

8            THE COURT:  Do you have an arrangement?

9            MR. O'BRIEN:  Do not.

10           MR. BRANDLER:  No.  And he's from Philadelphia, and I

11  don't want to keep him --

12           THE COURT:  No, I understand that.  Neither do I.

13           MR. O'BRIEN:  We'll let him go now, and if he agrees

14  to come back --

15           THE COURT:  You may be recalled.

16           THE WITNESS:  Okay.

17           THE COURT:  All right?

18           THE WITNESS:  Okay.  Bert Massey.

19           THE DEPUTY CLERK:  Please raise your right hand.

20                         BERT MASSEY,

21  called as a witness on behalf of the Government, having been

22  duly sworn or affirmed according to law, testified as follows:

23           THE DEPUTY CLERK:  Would you please state and spell

24  your name for the record.

25           THE WITNESS:  Bert V. Massey, II.  B-E-R-T, middle

1  initial V, Massey, M-A-S-S-E-Y, the second, Roman Numeral II.

2            THE DEPUTY CLERK:  Thank you.  You may be seated.

3            MR. BRANDLER:  May I inquire, your Honor?

4            THE COURT:  You may.

5            MR. BRANDLER:  Thank you.

6                 DIRECT EXAMINATION (on qualifications)

7  BY MR. BRANDLER:

8  Q.    Mr. Massey, what's your occupation?

9  A.    I am an attorney at law, and the sole shareholder and

10 president of an independent title insurance agency in

11 Brownwood, Texas.

12 Q.    And what law school did you go to?

13 A.    The University of Texas.

14 Q.    And what year did you get your law degree?

15 A.    January of 1969.

16 Q.    And are you licensed in the State of Texas to practice

17 law?

18 A.    I am.

19 Q.    And is that where your office is located?

20 A.    In the State of Texas, yes, sir.

21 Q.    Where is your office located?

22 A.    In Brownwood, Texas.

23 Q.    Is that in Brown County, Texas?

24 A.    Yes, sir.

25 Q.    And how long have you had your office located in Brown

1  County, Texas?

2  A.    Since May of 1972.

3  Q.    Are you a solo practitioner or are you a partner with

4  someone in your law practice?

5  A.    I have one law partner and one associate for the law firm.

6  Q.    And what's the name of your firm?

7  A.    Massey and West.

8  Q.    Does your law practice specialize in any types of fields

9  of law?

10  A.    Yes.  What we primarily do is real estate.  Some probate,

11  some general business practice.  And we do title examinations

12  for oil and gas leaseholds.

13  Q.    You also mention that you are affiliated with an abstract

14  company?

15  A.    That is correct.  It's called the Brown County Abstract

16  Company, Incorporated.

17  Q.    What is an abstract company?

18  A.    An abstract company is a privately-owned operation that

19  takes the records of real property transactions in the county

20  clerk's office in the courthouse, which are put together by

21  seller, buyer, borrower, lender and so forth, and organizes

22  them geographically into an index.  In the case of property

23  within communities that have been platted into subdivisions by

24  subdivision name, lot and block.  And in connection with

25  property that is acreage or rural property, organized by the

1  patented survey from -- created by the State of Texas.

2  Conveyances from the State of Texas to individuals are called

3  patents.  And each of those conveyances is assigned a patent

4  number and an abstract number.

5  Q.    So do you own this abstract company called Brown County

6  Abstract Company?

7  A.    I own all of the stock in the Brown County Abstract

8  Company, Incorporated, yes, sir.

9  Q.    And in connection with your law practice and your

10  ownership of the Brown County Abstract Company, do you give

11  what's known as title insurance opinions?

12  A.    We do title examinations for the purpose -- we the lawyers

13  do title examinations for the purpose of the title insurance

14  agency, writing title insurance policies in connection with

15  real estate transactions, yes, sir.

16  Q.    And do you do those title examinations in connection with

17  oil and gas leases?

18  A.    We do, yes, sir.

19  Q.    And how long have you been doing that for?

20  A.    Since I would say probably mid -- the mid 1970s.

21  Q.    And how many title examinations would you estimate you've

22  done since the 1970s in the field of oil and gas leases and oil

23  and gas interests?

24  A.    I didn't count them up.  Several hundred, I'm sure.

25  Q.    And you said I think you issue title insurance opinions

1  for the underwriters who issue the insurance?

2  A.    Actually the agency issues them, but we do title opinions

3  for the agency, which has binding authority for the

4  underwriters.

5  Q.    And how many of those type of opinions have you --

6  A.    Thousands.  I have no idea.

7  Q.    Have you served as an officer of any organizations related

8  to this work, title examinations?

9  A.    Yes.  I am a past president of the Texas Land Title

10  Association, which is the trade organization for title

11  insurance agents and underwriters.  I have been selected their

12  Title Man of the Year in the past.  I chair the political

13  action committee for the Texas Land Title Association and have

14  for 30 years.

15       I've been a member of the Board of Governors of the

16  American Land Title Association twice.  I chaired its political

17  action committee at one point in time.  So I'm very involved,

18  very active with those who are involved in similar business to

19  mine, one of mine, which is the title insurance business.  And

20  of course, many of those people are lawyers as well.

21  Q.    Have you ever served as counsel for the Independent Title

22  Agents of Texas?

23  A.    I have been and am counsel to the Independent Title Agents

24  of Texas, which is something of a suborganization for smaller,

25  independent title insurance agencies within the purview of the

1  Texas Land Title Association.  I guess not everybody is small

2  anymore.  Several metropolitan companies belong to it.

3  Q.    Have you ever testified as an expert witness in any court

4  or administrative proceedings?

5  A.    Yes, I have.

6  Q.    And what type of proceedings?

7  A.    Well, I've appeared as an expert witness several times and

8  have been designated and accepted as such before the State

9  Department of Insurance, the original old three-person

10 insurance board.  Lately the insurance commissioner is an

11 expert on title insurance rating and rule-making matters.

12      I have appeared as an expert witness in connection with a

13 suit over a title policy coverage.  I have appeared -- I've

14 been designated an expert witness in two or three civil

15 lawsuits where I've given an opinion, and in one or two of

16 those cases been deposed but didn't testify.  And I did testify

17 in Pecos County in a dispute that related in part to the sale

18 of a title insurance agency and the building that the property

19 was in.

20 Q.    Have you ever served in any political offices?

21 A.    I served on the Brownwood City Council and then served as

22 mayor of the City of Brownwood a total of 35 years, 26 of those

23 as mayor, which would give you an idea I'm not a very smart

24 person.

25 Q.    Is there an organization called the American Land Title

1  Association that you were the director of?

2  A.    That's correct.  That's a the national trade association

3  for those in the title insurance business.

4  Q.    And have you ever won any awards for economic development

5  in Brownwood, Texas?

6  A.    Considering that I've been on the city council -- or was

7  all that period of time and also been president of the

8  Brownwood Chamber of Commerce and Brownwood Industrial

9  Foundation and during my term in office we created the economic

10  development corporation, I've been given most of the economic

11  development awards that there are available to give.  The most

12  recent being for sustained meritorious service over a lifetime

13  of involvement.

14  Q.    And besides working in Brown County, Brownwood Texas, have

15  you resided in Brownwood as well?

16  A.    I was born and raised in Brownwood.  Went off to college

17  and law school, and practiced law in Dallas for about two and a

18  half years, and returned to my home in Brownwood in May of

19  1972, and I have lived there and conducted my business and my

20  practice there ever since that time.

21            MR. BRANDLER:  Your Honor, at this point I'd ask him

22  to be declared an expert in the field of title examinations for

23  oil and gas leases, as well as commercial business law in the

24  State of Texas.

25            THE COURT:  Any voir dire?

43

1      MR. O'BRIEN:  No objection, and no questions.

2      THE COURT:  All right.  You may proceed.

3                    DIRECT EXAMINATION

4  BY MR. BRANDLER:

5  Q.    Now, Mr. Massey, at my request have you examined various

6  documents associated with this case, including -- can we have

7  Exhibit 27.8 on the screen?  And the second to next page?

8  A.    Yes, sir, I have.

9  Q.    I'm going to designate Exhibit 27.8 for the purpose of

10  this examination the Oil Production Note dated September 24,

11  1997, from Enpetro LPC, Inc., to RJH and Company, Inc.  And in

12  addition, can we go to Exhibit 36.17, page 253 in the Bates

13  numbers on the bottom right.  Did you examine this document as

14  well?

15  A.    This is the assignment of -- the document is styled

16  Assignment of Collateral.

17  Q.    Yes.

18  A.    Yes, sir, I have examined it.

19  Q.    The assignment of collateral, I'll designate that as from

20  Enpetro, LPC, Inc. to RJH & Company, Inc., dated September 24,

21  1997.  And in addition, Exhibit 36.17, the next page, something

22  called a Certified Oil Geological and Appraisal Report, if we

23  go to the next page, sorry, prepared by Donald Kesterson as of

24  July 2, 1999.  Is that another document?

25  A.    Yes, sir, I've examined that document.

44

1  Q.   And have you examined those documents to give an opinion

2  on whether Mr. Harley, the defendant in this case, has any

3  legally enforceable ownership interest in any of the oil

4  reserves that are subject of those documents?

5  A.   Yes, sir.

6  Q.   And what is your opinion?

7  A.   He does not.

8  Q.   And I want to take you through what the basis of your

9  opinion is.  And you issued a report in this matter, correct?

10  A.   Yes, sir.

11  Q.   And do you have a copy of your report in front of you?

12  A.   I do.

13  Q.   I want to go through -- starting on page 5.

14  A.   Right.  I don't have a copy of those documents that you

15  had on the screen.

16  Q.   I can give those to you.  But we'll put them up on the

17  screen as you've discussed them, but just hard copies.

18  A.   Okay, good.  The screen is a little hard to read.  Thank

19  you.

20  Q.   All right.  Now, can we have Exhibit 27.8 up on the screen

21  again, which was the oil production note, the second page.

22          MR. O'BRIEN:  What number was that?

23          MR. BRANDLER:  27.8.

24          MR. O'BRIEN:  .8, okay.  I thought you said 27.

25  BY MR. BRANDLER:

1  Q.    On page five, paragraph 1 of your report did you give an

2  opinion regarding the enforceability of this note?

3  A.    I did.

4  Q.    And can you tell us what that opinion was?

5  A.    Well, the note says it is payable on demand after 380 days

6  from date of issue.  The date of issue is shown to be September

7  24, 1997.  Under Texas law, in my opinion, four years after the

8  expiration of 380 days from September 24, 1997, the note would

9  be barred from collection by the statute of limitations.  So,

10 if a collection effort were made, then Enpetro LPC, Inc., would

11 only have to raise the statute of limitations and a claim

12 trying to collect the note would be futile, in my opinion.

13 Q.    So the statute of limitations would expire sometime in

14 2002 by the terms of this note?

15 A.    I didn't try to calculate it, but that sounds about right,

16 yes, sir.

17 Q.    And in paragraph -- staying with this order, directing

18 your attention to paragraph 2 of your report, you gave an

19 opinion regarding the division order from BML, Inc.  Can we

20 just enlarge the body of -- maybe for the benefit of the jury

21 why don't you just read it out loud?

22 A.    This note is secured by the assignment of the oil reserves

23 produced pursuant to division order from BML, Inc. Crude Oil

24 Marketing Company to Hayes Hilltop Operating dated May 11,

25 1992.  This -- the assignment agreement is made a part hereof

1  for all proper identification.  The principal and the

2  accumulated interest of this note is fully payable upon the due

3  date.  The maker hereof waives presentation for payment, notice

4  of nonpayment protest and diligence at bringing suit against

5  any party.  In the event of default, the undersigned agrees to

6  pay all reasonable attorneys fees and cost of collection.

7  Q.    The reference to this division order from BML, Inc. --

8  first of all, what is a division order?

9  A.    A division order is a document that is prepared by the

10 buyer of the product from a producing oil and gas lease, the

11 company that is buying the oil or the company that is buying

12 the natural gas.  And the division order is designed to have

13 the royalty owners and the working interest owners and the

14 overriding royalty interest owners on a lease confirm what

15 their interest is in the production.  It's basically a document

16 for the benefit of the product buyer.

17     I have seen them recorded, but it is very rare for them to

18 be recorded because they're a private document between those

19 who sign, royalty owner, working interest owner, overriding

20 royalty interest owner, and the company buying the product.

21 Q.    Have you ever seen the division order from BML, Inc.,

22 that's referred to in this note?

23 A.    I would not.  I have no way to see it because it's not of

24 record in Brown County.

25 Q.    And you checked the records of Brown County relating to

1  six leases that were identified in the Kesterson report that he

2  contended was somehow connected to this note?

3  A.    I did.

4  Q.    And there was no reference to this BML Inc. division

5  order?

6  A.    None whatsoever.

7  Q.    And without knowing what the oil is referred to in the BML

8  Inc. division order, can you make any determination about what

9  is being referred to in this note as securing the note?

10  A.    No, sir.

11  Q.    Now, is there anything else in this document that you

12  thought was unusual.

13  A.    Well, the note contains the phrase in the second

14  paragraph, The assignment agreement is made a part hereof for

15  proper identification.  Hum, there's no such assignment

16  agreement document of record in Brown County.  So, it's

17  difficult to know what is -- what the assignment agreement is

18  and what it covers.

19  Q.    Because there's nothing that ties in with that language?

20  A.    I'm sorry?

21  Q.    Is there anything that ties in with that language of

22  record in Brown County?

23  A.    No, sir.

24  Q.    Can we go to Exhibit 36.17, page 253, the assignment of

25  collateral document.  You said you examined this document as

48

1  well?

2  A.    I did.

3  Q.    And can we just enlarge that and read that first section

4  into the record?

5  A.    Do you want me to read it?

6  Q.    Yes, please.

7  A.    That Enpetro, LPC, Inc. a Texas corporation whose address

8  is 2243 Valwood Parkway, Farmers Branch, Texas 75234, herein

9  referred to assignor for a sufficient consideration paid by the

10  assignee herein and subject to the further terms and conditions

11  hereof does hereby transfer, assign and convey that certain

12  corporate note as collateral for Note No. M20092497 issued to

13  RJH and Company, Inc., herein referred to as assignee,

14  approximately 9,524,000 barrels of oil being approximately

15  9,524,000 barrels of the proven reserves of oil underlying the

16  following oil, gas and mineral lease covering lands in Brown

17  County, Texas, to wit:  Those leases located in Brown County,

18  Texas, described as the Williams Group containing approximately

19  10 million barrels of oil reserve.  Do you want me to read the

20  next paragraph?

21  Q.    Yes.

22  A.    The estimated reserves underlying each of the above leases

23  have been arrived at by the use of standard reservoir

24  engineering procedures and production histories of the

25  producing reservoirs.

1  Q.   First of all, has this assignment of collateral document

2  ever been recorded in Brown County?

3  A.   Not that I could find.

4  Q.   And speaking now to the portion that says, Those leases

5  located in Brown County, Texas, described as the Williams

6  Group, have you ever seen any document that defines what the

7  Williams Group is?

8  A.   No, sir, I have not.  There is no such document of record

9  defining, quote, The Williams Group, unquote.

10 Q.   And is there any document of record which would indicate

11 that The Williams Group has something to do with BML, the

12 division order from BML?

13 A.   None whatsoever.  No way -- no -- you can't match that

14 determination because there's nothing of record to help you.

15 Q.   And have you ever even heard of The Williams Group?

16 You've lived in Texas in that county for many years, you're

17 familiar with this industry.  Did you ever hear of anything

18 called The Williams Group?

19 A.   Oh, a lady named Alameda Williams owned a lot of land up

20 in the area where these seven leases that are part of this case

21 are located, but that's not all the land she owned.  And I have

22 no idea, of course, whether this particular property is out of

23 Alameda Williams' property or not.  They could be referring to

24 a lot of property that was owned by that large and prolific

25 family for many years.

1  Q.   So, if the leases that are described in this assignment of

2  collateral are described as The Williams Group without further

3  definition, would the holder of this assignment have any

4  legally enforceable right to any oil anywhere in your opinion?

5  A.   Not in my opinion, no.  Furthermore, this thing doesn't

6  assign leases, it assigns a corporate note.

7  Q.   That's what I wanted to get to as my next point.  So can

8  you tell us what you're referring to?

9  A.   Well, if you go down about into the end of the third line,

10  it says, "Does transfer, assign and convey", and the key words

11  are here "that certain corporate note as collateral for note

12  numbered", and that is the number that's on the promissory note

13  from Enpetro, LPC, Inc., that is an exhibit in this trial.

14  Q.   So have you ever seen that certain corporate note that is

15  not further defined in this document, which is the collateral

16  for the note that you have seen?

17  A.   No, sir.

18  Q.   Would that also make this invalid?

19  A.   In my opinion it would.

20        MR. O'BRIEN:  Could I have a repeat?  I didn't hear

21  that question.  I got the answer, but I didn't pick up the

22  question.

23        MR. BRANDLER:  Would this -- well --

24        (RECORD READ.)

25  BY MR. BRANDLER:

1    Q.    And impossible to enforce?

2    A.    Yes, sir.  You can't find what it's talking about.

3    Q.    You don't have the note that it's referring to?

4    A.    No.

5    Q.    Now, if we go to the next page of this document, in

6    paragraph one.  Well, let's go -- I'm sorry, let's go to the

7    prior page because it continues on.  Under Roman Numeral II at

8    the bottom it says, Use of assigned reserves.  Can you read

9    what it says underneath that?

10   A.    "In the event of default of any loan in which the assigned

11   reserves have been pledged as collateral" --

12   Q.    Now going to the next page.

13   A.    "The creditor shall be paid monthly from the production of

14   wells located on the referenced lease a sum of money equal to

15   one half of the oil produced and sold during the preceding

16   month which would otherwise be credited to the full leasehold

17   working interest."

18   Q.    And can you explain what that means?  What happens if

19   there's a default on the loan which the assigned reserves have

20   been pledged as collateral?

21   A.    Well, it's not written very clearly.  But what I -- excuse

22   me.

23   Q.    No, go ahead.

24   A.    It's not written very clearly.  But what I get out of it

25   is if the note goes in default, it's not paid off at the end of

52

1  380 days from this date, that the idea is that whoever holds

2  the note is to be paid from the production of the wells that

3  are located on -- (gestured) -- The Williams Group, whatever

4  that may be.

5  Q.    So there's no assignment of oil?

6  A.    No.  It's a full consignment of half of the production

7  from the leases comprising The Williams Group.

8  Q.    And in the Kesterson -- not to jump ahead here, but the

9  jury has already seen it -- in the Kesterson report did he make

10  any statements regarding what the production from these

11  purported wells has been?

12  A.    He said there has been no production since 1993.

13  Q.    So is it accurate then that the default would lead to

14  money from the production of these wells that hadn't been

15  produced since 1993?

16  A.    How can you pay somebody from production if there is no

17  production?  So you're absolutely correct.  Not that this

18  document actually assigns any production, it talks about

19  assigning corporate note, but anyway --

20  Q.    Can we go to Exhibit 36.17.  And the Bates number at the

21  bottom of the page is 259.  And in Mr. Kesterson's report he

22  lists six leases which he purports -- and gave an estimate of

23  value for certain oil that was connected to those leases.  Do

24  you remember reviewing that as part of your examination?

25  A.    Yes, sir.

53

1  Q.    Do any of these leases tie in with either the assignment

2  of collateral that we just looked at or the oil production note

3  that we just looked at?

4  A.    I saw nothing in either document, neither the oil

5  production note or the assignment of collateral that tied to

6  the leases that Mr. Kesterson analyzed in his report.

7  Q.    And Mr. Kesterson's report was not on file anywhere in any

8  government agency, either with a recorder, the clerk's office

9  in Brown County, or anyplace that you saw where government

10 documents would be filed?

11 A.    I don't know of any place where you would file such a

12 document.  It's a document -- a private document prepared for

13 whomever retained Mr. Kesterson to prepare it.

14 Q.    Right.  Now, at the -- on the same exhibit, at the bottom

15 of the page that's Bates No. 250.  The last paragraph at the

16 bottom, can you just read that out loud?

17 A.    Beginning with therefore?

18 Q.    No.  As of this date.

19 A.    All right.  "As of this date no trips have been made to

20 the leases to determine their present condition, nor to the

21 Brown County Courthouse to determine the present status of the

22 title.  However, the Texas Railroad Commission, the state's oil

23 and gas authority, have provided Mr. Harley with a certified

24 letter stating the subject leases are still valid.  The

25 abstracts should be sought" --

1  Q.    Title abstracts?

2  A.    Excuse me.  "Title abstracts should be sought to determine

3  the status of these leases, including the drilling depth

4  rights."

5  Q.    And as part of my request to you, I asked you to do a

6  title examination as suggested by Mr. Kesterson in this

7  document, correct?

8  A.    Yes, sir, that's correct.

9  Q.    And you did that?

10  A.    Yes, sir.

11  Q.    And you checked the title history for each of these six

12  leases that Mr. Kesterson was referring to in his report?

13  A.    Yes, sir, I did.  I began with the initial date -- with

14  the date of what I believed to be the operating leases.

15  Q.    And did you see any mention of Richard Harley in any of

16  that documentation?

17  A.    No, sir.

18  Q.    Any mention of RJH, Inc. in that?

19  A.    No, sir.

20  Q.    Now, Mr. Kesterson talks about drilling depth rights.

21  What does that mean?

22  A.    Well, it is possible for the subsurface of a particular

23  piece of property to be cut into segments.  And in several of

24  the leases that he refers to in his report the leasehold is

25  severed.  Some have -- one has leasehold rights -- and these

1  leases have a terrible title history.  But one has leasehold

2  rights from the surface down to 1500 feet.  Another person has

3  leasehold rights below 1500 feet.  And what that means, of

4  course, is that the person whose lease rights -- whose rights

5  under the lease only go from the surface down to 1500 feet has

6  to stop drilling when it gets to 1500 feet.  He can't explore

7  for oil and gas below that.  The fella who's got the rights

8  below 1500 feet has to drill from the surface down to -- make

9  his bore hole down to 1500 feet before he can start looking for

10 zones that might produce oil or gas.

11 Q.    And in these leases that you looked at, these six leases,

12 was there various drilling depth rights associated with each

13 one of the leases?

14 A.    Not every one of them, but with most of them, yes.

15 Q.    And we'll go through them individually at a later point

16 and say what those drilling depth rights was.  But did Mr.

17 Kesterson in your review of his report indicate when he was

18 valuing this supposed oil that was associated with these

19 leases, indicate at what depth this oil was located?

20 A.    I don't believe he did.  He said he looked at electric

21 logs and sort of familiarized himself with four or five

22 different subsurface formations, which are historically

23 producers in Brown County, not terribly great producers but

24 producers in Brown County.  But he did not list in his report

25 that I remember the depth of those formations, nor the depth of

1   the wells that had previously produced prior to 1993.

2   Q.   And do these oil and gas leases have expiration terms?

3   A.   Yes, they do.  They have -- and I don't have it in front

4   of me for each one of all of them, but all of them have what is

5   called a primary term.  In other words, the lease provides that

6   the lessee must begin drilling within a specified period of

7   time, let's say a year by way of example.  And if he hasn't hit

8   something that's producing in commercial paying quantities at

9   the end of that year, then the lease expires.

10      The term may be three years, that may be paid for in

11  advance, or there may be the requirement after the first year,

12  which is paid for by what's called the lease bonus usually.

13  There's a delay rental that's payable so you can extend the

14  lease another year and later you can extend it another year.

15      But the long and the short of it is, all these leases that

16  Mr. Kesterson looked at are long past their primary terms.  And

17  if not producing would, in my opinion -- of course, obviously

18  this would be up to the mineral owner to enforce -- but in my

19  opinion those leases have expired by their own terms some time

20  ago.

21  Q.   So those leases have expired.  What's the legal effect of

22  that even if you had -- could you recover any oil on an expired

23  lease?

24  A.   Unless you had an agreement of some kind with the owners

25  of that oil or gas in place, I suppose the effect would be

1   theft.  You don't have a lease to cover it.

2   Q.    And Mr. Kesterson also mentioned in his report that there

3   were some documents from the Texas Railroad Commission relating

4   to these leases.  Do you remember that section of his report?

5   A.    Yes, sir.

6   Q.    And he indicated in his report that according to those

7   records from the Texas Railroad Commission the operators of

8   these leases were something called Hayes Hilltop and MER?

9   A.    Hayes Hilltop Operating Corp and MER Resources, yes, sir,

10  that's what he said the Railroad Commission's records show.

11  Q.    Just so the jury understands, what's the function of the

12  Texas Railroad Commission, as opposed to you, what you do when

13  you look at ownership issues?

14  A.    The Texas Railroad Commission regulates the production of

15  oil and natural gas in Texas.  Its primary concern is to know

16  whom is operating a given lease, what is being produced from

17  that lease, and if the lease has ceased to produce, to be

18  certain that the bore hole is plugged, a cement plug put in

19  sealing off the well, and certainly, sealing it off from any

20  potable subsurface water.

21      It goes -- it makes its records based on the document

22  called P-4s that are filed by the operators that say okay, I've

23  assigned my operating rights from the Hayes Hilltop Operating

24  Corp to MER Resources.

25  Q.    Did Mr. Harley's name appear as an operator in any of the

1  records you saw from the Texas Railroad Commission?

2  A.    No, sir.

3  Q.    And the only operator was this Hayes Hilltop Group and MER

4  Resources Group?

5  A.    I believe that's correct.

6  Q.    And were those operators still in active operation or were

7  they inactive, to your recollection?

8  A.    Well, I believe Mr. Kesterson's report, from the Railroad

9  Commission is where he got his confirmation, that the leases

10 had not produced since various dates in 1993.

11 Q.    What is the difference between recoverable oil and

12 unrecoverable oil?

13 A.    Well, I can only look at that from a layman's standpoint.

14 Recoverable oil means something that you can drill for

15 economically and produce and sell.  Unrecoverable oil would be

16 something that may or may not be there.  But even if it is

17 there, it's too expensive to drill for it and bring it up and

18 try to sell it if you hit it based on the price per barrel of

19 oil sold in the open market.

20 Q.    And assuming for the sake of argument there were ten

21 million barrels of oil in the ground at some depth below these

22 six leases, did you see anything in Mr. Kesterson's report that

23 would indicate that that oil was recoverable so it could be

24 brought to the surface and sold?

25 A.    I didn't see anything.  And I think he actually negated --

1  he said that if this is there I've not made any study of what

2  it cost -- would cost to recover it.  And in other words, to

3  drill for it, and to produce it.  But he didn't go on the

4  ground.  He looked at some electric logs and looked at

5  formation, geological formation maps specifically to the four

6  or five you mentioned, and that's about the --  How he came to

7  the conclusion of ten million barrels of oil is frankly beyond

8  my expertise and knowledge and belief.

9  Q.   Well --

10         MR. O'BRIEN:  Objection.  Would strike the last

11  remark about belief.  He's already said he's not an expert in

12  geology, it's beyond his knowledge.  But he's not an expert in

13  geology; he shouldn't be testifying as to his opinion, a belief

14  as to whether or not an expert's report is valid.

15         MR. BRANDLER:  I think I can lay a foundation for

16  that, if I ask a follow-up question.

17         THE COURT:  Go ahead, I'll let you do it, but I'm

18  prepared to sustain his objection.

19         MR. BRANDLER:  No, I understand.

20         THE COURT:  Go ahead.

21  BY MR. BRANDLER:

22  Q.   As a lawyer in the oil and gas industry in Brown County

23  and Brownwood, Texas for the last 30 or so years, are you

24  familiar with how much gas -- oil has been pumped out of the

25  ground in Brown County?

1  A.    I have some knowledge of it from discussion with clients,

2  yes.

3  Q.    And Mr. Kesterson says there's ten million barrels of oil

4  under the ground in that -- for these six particular leases.

5  Has anywhere near close of ten million barrels of oil ever been

6  pumped out of the ground in Brown County,  Texas?

7  A.    Not to my knowledge.

8  Q.    And how much oil has been pumped out of the ground -- I

9  think it's in Kesterson's report.  He says how much gas -- how

10 much oil has been pumped out of the ground during the period

11 that these were operating until 1993, and it was in the

12 thousands of barrels?

13 A.    It's either 63,000 -- 63,600 and -- yeah, 63,000 I think.

14 I don't have that report right in front of me.  But nowhere

15 near -- well, wait a minute.  Nowhere near ten million barrels.

16 What he says I believe is that from 1996 to 1993, according to

17 the records of the Railroad Commission, only 64,000 --

18 Q.    1966 to -- 1966 I think it says?

19 A.    For the period of time 19 -- yes, 1966 to 1993 the amount

20 of oil produced was 64,405 barrels of oil, that Mr. Kesterson

21 suggested there's 10,217,000 barrels of proven reserves

22 remaining.

23 Q.    As far as a lease is concerned, are there wells associated

24 with each lease?

25         MR. O'BRIEN:  Are you moving on?  I think we have a

1 ruling on the objection.

2          MR. BRANDLER:  Well, I think he addressed it.

3          THE COURT:  Are you finished?

4          MR. BRANDLER:  I'm done with that area, yeah.

5          THE COURT:  I'm going to sustain his objection.  I

6 think it's speculation at the moment.  It's a belief.  We don't

7 deal in beliefs.  Proceed.

8 BY MR. BRANDLER:

9 Q.    Regarding leases in general, how does it work as far as

10 leasehold interests in oil?  Are there numbers of wells that

11 are associated with a particular lease?

12 A.    A well or wells, yes.

13 Q.    And in this particular case Mr. Kesterson reported that

14 there were 46 wells associated with these six leases, correct?

15 A.    I think so.

16 Q.    And I think he also said in his report that his estimates

17 were based on documentation from 19 of those wells?

18 A.    Best I recall, yes, sir.

19 Q.    When you did your examination of the records in this case

20 did you notice that the number of these leases had wells that

21 were capped or plugged?

22 A.    I've seen that in the Railroad Commission records, yes,

23 sir.

24 Q.    And what does that mean, capped or plugged?

25 A.    Just what I said awhile ago.  That means that the Railroad

1  Commission has determined that the wells are no longer

2  producing, and in order to protect the environment, both

3  surface and subsurface, they want those wells plugged off.  And

4  that means that a contractor goes in and sets a cement plug at

5  a depth just below the last producing formation, and certainly

6  above any fresh water bearing formation, and that -- puts a

7  cement plug in and he puts the cement plug at the top of the

8  well in order to keep obviously any remaining product leaking

9  into subsurface formations and polluting particularly fresh

10  water, or leaking onto the surface of the land and doing damage

11  to the surface.

12  Q.    You said earlier that the leases, the six leases that

13  Kesterson was talking about had expired by their own terms at

14  the time Mr. Kesterson did his report in 1999.  Did your

15  examination of the titles for those leases reveal any

16  extensions to the leases to cause them to remain in force and

17  effect?

18  A.    It did not.

19  Q.    Going to paragraph six of your opinion, which is on page

20  six.

21            MR. O'BRIEN:  What Bates number?

22            MR. BRANDLER:  There is no Bates number.  It's page 6

23  of his report from December 3 of 2013.

24            MR. O'BRIEN:  It's not going to be on the --

25            MR. BRANDLER:  It's not going to be an exhibit, no.

BY MR. BRANDLER:

Q.   So, you made a statement here, you made some assumptions that the Kesterson report is correct as to the last time any production was had by many of the above-referenced oil, gas and mineral leases, and subject to the fact that it would probably take new leases in order to begin production.  Again, you said I find ownership of the working interest in the above-referenced oil, gas and other mineral leases to be as follows, but in each instance the ownership recited is subject to numerous title objections which, if cureable, would require considerable work to do so.  What do you mean by working interest?

A.   Working interest is what the lessee owns in the lease. The lease reserves certain royalty from production to the lessor, that's the owner of the minerals in place. Traditionally in the Texas oil fields it was one-eighth. Nowadays it may be much higher.  In other words, one out of every eight barrels produced goes to the mineral owner.  The lessee has the working interest, which under a one-eighth lease would be point 875 or 87 and a half percent of the production of oil, but the lessee carries all the costs of production. That's what I mean by working interest.

Q.   I see, and you previously said that Mr. Harley or RJH and company was not listed as the lessee for any of these leases in your direct examination?

1  A.    That's correct.

2  Q.    Now I want to go through each lease individually.  On the

3  bottom of page 6, small letter a, you start talking about the

4  Watson lease.

5  A.    All right.

6  Q.    And can you just briefly describe what your title

7  examination showed for the Watson lease?

8  A.    Well, what I found is that the operating lease is one for

9  Horton Demore [ph] given in September of 1972.  And there are

10  some extensions given, but all of them predate 1993 and go to

11  dates prior to 1993.  There is also a lease in 1984 between the

12  owners, Willard Watson and wife, to Semco Energy.  Semco Energy

13  assigns their leasehold interest to Weldon Hayes.  And for some

14  reason Enpetro, Inc. made an assignment of oil, gas and mineral

15  lease to Reata Petroleum, Limited, it's the last document that

16  I found of record.

17  Q.    What was the date of that assignment?

18  A.    February 10, 2013.

19  Q.    Now, that -- the way you have it listed there is Enpetro,

20  Inc., made an assignment of oil, gas and mineral lease to some

21  organization called Reata Petroleum, Limited?

22  A.    Yes.

23  Q.    Is Enpetro, Inc. to the same as Enpetro LPC, Inc., which

24  is on the note, the oil production note and the assignment of

25  collateral?

1  A.    Not in my opinion.  There is no assumed name certificate

2  of record in Brown County that says Enpetro, Inc., does

3  business by -- under the assumed name of Enpetro, LPC, Inc..

4  And because both corporations have the word Inc. at the end of

5  their name, Enpretol, Inc., Enpetro LPC, Inc., that connotes

6  corporations.  I would take them to be two separate

7  corporations.

8  Q.    And we're going to have evidence in this case later on,

9  but maybe -- did you review as part of your examination

10  certificates of incorporation from the State of Texas and

11  Nevada indicating that there are two separate records for those

12  two separate organizations?

13  A.    No, sir, I did not.

14  Q.    All right.  We'll get to that later on from a different

15  witness.  Let me ask you this.  You say that the ownership was

16  showed -- transferred from the owner Watson, Willard Watson and

17  Semco Energy to someone named Weldon Hayes, correct?

18  A.    Semco Energy was the lessee.  Semco Energy and Carr [ph],

19  Inc., Incorporated, was the lessee of a 1984 lease from Willard

20  Watson and wife, and Semco Energy assigned this interest to

21  Weldon Hayes.

22  Q.    Okay.  So Weldon Hayes is the last registered owner

23  according to the title examination?

24  A.    In my opinion, the last one I could say was the owner

25  based on my background, training, experience and examination.

1  Q.    But Enpetro, Inc. you say made an assignment of oil, gas

2  and mineral lease to some -- called Reata Petroleum sometime in

3  2013.  How can they do that if Mr. Hayes owns the lease?

4  A.    The fact that they put that document of record doesn't

5  mean it has any impact.  It just simply means that somebody put

6  a document of record, but if you look at the background, they

7  didn't have anything to assign so nothing was transferred by

8  means of their assigning.

9  Q.    Now going to the next --

10          THE COURT:  What was the name of the assignee?

11          MR. BRANDLER:  The assignee from Enpetro?

12          THE COURT:  Yes.

13          MR. BRANDLER:  Reata, R-E-A-T-A, Petroleum.

14          THE WITNESS:  Limited, your Honor.

15  BY MR. BRANDLER:

16  Q.    Can we go to the Harris B lease, which is the next item in

17  your report?

18  A.    Yes, sir.

19  Q.    And it might be easier, and I don't know if there's an

20  objection from counsel, this is a scanned exhibit.  You can put

21  it up on the screen, instead of having him read it.

22          MR. O'BRIEN:  Are you going through the whole thing?

23          MR. BRANDLER:  Yeah.

24          MR. O'BRIEN:  My problem with the actual reports is

25  always this, is that if the counsel goes through half of it and

1  not the other half.

2          MR. BRANDLER:  No, he's going to go through the whole

3  thing.

4          MR. O'BRIEN:  And you're going through every section,

5  every paragraph?

6          MR. BRANDLER:  I can.

7          MR. O'BRIEN:  Well --

8          MR. BRANDLER: I will.

9          MR. O'BRIEN:  That was your plan?

10         MR. BRANDLER:  Yeah, that was my plan.

11         MR. O'BRIEN:  All right.

12         MR. BRANDLER:  What exhibit number is it?  Can we put

13  40.1 on the screen?

14  BY MR. BRANDLER:

15  Q.   So this is your report that you gave to me dated December

16  3 of 2013?

17  A.   Yes, sir.

18  Q.   And just to put it in context here, pages one, two and the

19  first half of page 3 are basically your credentials that you've

20  already testified about?

21  A.   Yes, sir.

22  Q.   And then starting on page 3, you talked about the

23  documents you examined, correct?

24  A.   Yes, sir.

25  Q.   And that continues to page four to the middle of page

1  five?

2  A.    Yes, sir.

3  Q.    And then I took you through on page 5 certain numbers.  It

4  says 1, 2 and 3.  Is item one what we've talked about, the

5  statute of limitations issue on the oil production note?

6  A.    Yes, sir.

7  Q.    And No. 2 was the issue relating to BML, Inc., and it not

8  being registered and defined?

9  A.    Yes, sir.

10  Q.    And No. 3 was the assignment of collateral issue you

11  discussed where it purports to convey a note as well as

12  something from The Williams Group?

13  A.    Yes, sir.

14  Q.    That was that portion of the testimony in paragraph three.

15  Going to the next page, item four, you said earlier that no

16  document of record lists Mr. Harley or RJH has any ownership

17  interest in any of the oil reserves referred to in any of the

18  documents?

19  A.    Yes, sir.

20  Q.    No. 5 you said that the oil, gas leases referred to

21  Kesterson had expired?

22  A.    Yes, sir.

23  Q.    And that there was no -- nothing on file indicating that

24  they had been extended?

25  A.    Correct.

1 Q.   And No. 6, we were going through -- assuming that these

2 leases were not expired in Kesterson's report, those six leases

3 tied-in to these notes and assignments, we were going through

4 the title examination for each one?

5 A.   Yes, sir.

6 Q.   So we did Watson.  And if we go to the next page we're at

7 B, Harris B, and tell us what your examination showed for

8 Harris B?

9 A.   Well, the Harris B lease, again, subject to if I were

10 giving this opinion to a product buyer I would have some

11 requirements.  But nevertheless, the leasehold estate appears

12 to be vested as Weldon Hayes, but only to a depth of 1500 feet

13 below the surface of the land.  I couldn't tell from

14 Kesterson's report -- and don't know -- whether all the

15 formations, the geological formations he referred to are above

16 1500 feet below the surface.  At any rate, Weldon Hayes only

17 appears to own down to a depth of 1500 feet from the surface of

18 the land.

19 Q.   And there's no listing of Enpetro, Inc., Enpetro, LPC,

20 Inc., Richard Harley or RJH?

21 A.   There's nothing that I could call their ownership.  Now,

22 there have been documents floating around that involve Enpetro,

23 LPC and Enpetro, LPC, Inc. -- Enpetro, Inc. and and Enpetro

24 LPC, Inc., but I don't find any documents that definitively

25 place title in Enpetro, LPC, Inc.

70

1  Q.    Regarding specifically -- let's limit it to the Harris B

2  lease.  Is there any document --

3  A.    No.

4  Q.    -- relating to Enpetro, Inc., Enpetro, LPC, Inc., RJH or

5  Mr. Harley in a title of the Harris B lease?

6  A.    No.

7  Q.    All right.  And then let's go to the Butler lease.

8  A.    Do you want me to summarize?

9  Q.    Yeah, summarize what's in there?

10  A.    It appears to me that the leasehold is owned by Weldon

11  Hayes, but there is of record an order from the Railroad

12  Commission dated June 3, 1999, telling them to plug that lease

13  because the wells are not producing.  Hayes does not appear to

14  own the leasehold estate below 1500 feet from the surface.

15  1987 a Robert L. Cochran, who owned the leasehold both from the

16  surface to 1500 feet and below 1500 feet recited that all

17  production from the lease was from a depth of 1500 feet or less

18  below the surface.

19  Q.    So, again, there's nothing in the title that indicates

20  that Enpetro, Inc., Enpetro, LPC, Inc., Richard Harley or RJH

21  has any ownership interest in that lease or oil associated with

22  that lease?

23  A.    Again, without looking at my detailed examination, I can't

24  say that there was never some kind of an assignment or pledge,

25  but my conclusion was that Enpetro, Inc. and Enpetro LPC, Inc.,

1  owned no interest in the leasehold, and Richard Harley and RJH

2  and Company are never mentioned at all.

3  Q.    Can we go to the next one, the Tischler lease.

4  A.    That particular leasehold estate, assuming the lease is

5  enforceable, appears to be owned by Enpetro, Inc.

6  Q.    When you say enforceable, do you mean expired or --

7  A.    That means if the mineral owner would agree to an

8  extension and let someone be -- and let the owner of the

9  expired lease begin drilling then it would appear to me that

10  that particular leasehold is invested in Enpetro, Inc.

11  Q.    And was there anything in the title record indicating that

12  this lease, which you say was expired, was extended or assigned

13  to anybody?

14  A.    I didn't find any extension, nor did I find an assignment.

15  Q.    Can we go to the next one, Harris A lease?

16  A.    That particular -- my conclusion is that that leasehold

17  estate appears to be owned by Weldon Hayes, but only from a

18  depth of 1500 feet below the surface of the land.  He doesn't

19  own the, quote, deep rights below 1500 feet.  Nor does Enpetro,

20  LPC, Inc., Enpetro, Inc., RJ Harley, Richard J. Harley or RJH

21  and Company.

22  Q.    And the last one is called the Busbee lease.  Can you

23  summarize what your findings were relating to the Busbee lease?

24  A.    The Busbee lease appears to be owned by Enpetro, Inc., but

25  only as to 109 acres of the leasehold.  60 acres of it had been

1  conveyed away by prior owners of the leasehold to a third

2  party, and it was never gotten back.  There is an order of the

3  Railroad Commission of Texas to Hayes Hilltop Operating

4  directing that the 15 oil and gas wells on the Busbee lease

5  have been examined and were in ecological danger and need to be

6  plugged and cleaned up.

7  Q.    You said examined.  I think you meant to read abandoned?

8  A.    Excuse me, yes.  Have been abandoned and were in

9  ecological danger and must be plugged and cleaned up.

10  Q.    So this portion that your title examination showed was

11  owned by Enpetro, Inc., that was not Enpetro, LPC, Inc.?

12  A.    Correct.

13  Q.    And there was no -- nothing on the title examination

14  document showing assignment to anyone, Richard J. Harley, RJH

15  or anyone else?

16  A.    No, sir.

17  Q.    So below that you made the statement, "I have numerous

18  objections and requirements that must be met before I can make

19  the statement that all of the working interest in the leases is

20  safely vested as outlined above."  What did you mean by that?

21  A.    Well, and if I were called upon to tell a product buyer

22  who owns the working interest, who owns the royalty interest,

23  who owns the overriding royalty interest, there's a number of

24  very poorly drafted documents, let me say, in the title history

25  of all of the leases that I looked at that I would require some

1  explanation of, require correction of, require documents from

2  others.  For example, there's a -- I think it's subsurface

3  operations, it's recited to be composed of three partners and a

4  general partnership, but yet its assignment was made by only

5  one partner.  There's no way to tell whether he had authority

6  to act for the entire general partnership.  That kind of thing

7  that I would require be cleaned up.

8  Q.   And the second sentence at the bottom of the page says,

9  "Further, all of said leases are subject to prior reservations

10  of overriding royalty.  Overriding royalty being a portion of

11  the working interest in the lease, but not subject to

12  contribution to pay expenses of drilling and operation of the

13  leasehold."  What does that mean?

14  A.   Well, when you start out with a lease it has two

15  components, the landowner's royalty, which is usually expressed

16  as a fraction or a decimal.  And I mentioned earlier, for years

17  the standard royalty to the mineral owner was one-eighth.  And

18  then you've got the working interest.  And standard working

19  interests for many, many years, not now, was point 875 or 87

20  and a half percent.  Out of that working interest the lessee

21  may sell a fractional interest called an overriding royalty

22  interest.  That can't come from anywhere but the working

23  interest.  That's all the lessee owns.  And it gives someone,

24  an investor, a buyer, a percentage of the royalty, but it has

25  to come out of the working interest.  But that overriding

1  royalty interest owner doesn't have to pay any cost of

2  production, transportation, compression, if it's gas, that kind

3  of thing.

4  Q.    Okay.   The next paragraph says -- it references a report

5  from DB Associates regarding an examination of the Texas

6  Railroad Commission records?

7  A.    Yes, sir.

8  Q.    And did you review that to update what Mr. Kesterson had

9  reported in his report regarding the Texas Railroad Commission?

10  A.    I did.

11  Q.    And let's go through the leases.   It's No. A.   What did

12  that report indicate regarding the Butler lease?

13  A.    The Railroad Commission records showed that the Butler --

14  Joe A. Butler lease had not had any production since October of

15  1993.   And wells from one through ten on the leasehold were

16  plugged in May of 1999 by the Railroad Commission, and that the

17  last operator of the lease, according to the Railroad

18  Commission records, was Hayes Hilltop Operating Corp.

19  Q.    And let's go to the next one, Harris B lease?

20  A.    The Harris B lease does not show, according to the

21  Railroad Commission records, any production after October of

22  1993, and the three wells on the lease were plugged in January

23  of 2000 by Hayes Hilltop Operating Corp.

24  Q.    The next one, Bruce Harris A?

25  A.    What the Bruce Harris or Bruce Harris A lease, according

1  to the Railroad Commission, had no production after April of

2  1993, and all seven wells on the lease were plugged in January

3  of 2000.  The last operator or holder of the P4 certificate was

4  Hayes Hilltop Operating Corp.

5  Q.    And the Tischler lease?

6  A.    The Tischler lease, according to the Railroad Commission's

7  record, had had no production since 1993.  There were five

8  wells on the lease.  One well according to the Railroad

9  Commission was, quote, shut in, and the other four wells were

10 plugged in September of 1985.  According to the Railroad

11 Commission's records, the current operator is MER, M-E-R

12 Resources.  I don't know who MER Resources is.

13 Q.    And the Busbee lease?

14 A.    According to the Railroad Commission records, the Busbee

15 lease did not have any production after 1993 until January of

16 2009, with last production being reported in December of 2012.

17 In other words, no production from 1993 to 2009, and then some

18 production from 2009 to December of 2012.  According to the

19 Railroad Commission records there were 15 wells on the lease.

20 One well was plugged in September of 1991.  12 of the 15 wells

21 are listed as producing, but three of them are injection wells.

22 And again, the Railroad Commission shows the operator to be MER

23 Resources.

24 Q.    And F, the Watson lease?

25 A.    The Watson lease, according to the Railroad Commission

1   records, had its last production in August of 1993.  There were

2   two wells located on the lease.  Both of them plugged in

3   January of 2000 by Hayes Hilltop Operating Corp.  And that

4   report goes -- from Railroad Commission goes on to show one

5   agreed order between the Railroad Commission and Hayes Hilltop

6   Operating Corp providing for reimbursement penalties and the

7   like from Hayes Hilltop Operating Corp paid to the Railroad

8   Commission of the state which did the actual plugging.

9   Q.    And did you make some comment at the end regarding your

10  summary of your findings in this case?

11  A.    I did.

12  Q.    And can you read that?

13  A.    The whole thing?

14  Q.    Yes.

15  A.    Under Advisory Comments?

16  Q.    Yes.

17  A.    "I'm not a petroleum engineer, nor a geologist, and thus

18  I'm not qualified to comment upon the opinions stated in

19  documents referred to above as to the amount of recoverable oil

20  that remains in the ground in connection with the

21  above-referenced leases.  However, the Kesterson report recites

22  that as of its date the total production from the leaseholds,

23  according to the records of the Railroad Commission for a

24  period of time 1966 to 1993 was only 64,405 barrels of oil.

25       "Kesterson estimates that there remains under the ground

1  10,217,369 barrels of crude oil.  This is a giant leap.  There
2  is of course a difference between oil in place and recoverable
3  oil in place.  Secondary recovery methods such as water
4  flooding are possible, even though a leasehold is not producing
5  oil by standard methods.  Such is expensive and it is hard to
6  believe that much oil remains in place, particularly under the
7  leaseholds owned by Hayes or Enpetro, Inc.,  which only cover a
8  depth -- cover to a depth of 1500 feet below the surface.
9       "To my knowledge there has been no successful drilling in
10 Brown County, Texas, by directional methods into shale reefs.
11 I've only heard of one such effort, which well I am told has
12 been plugged."  Keep going?
13 Q.    Yes.
14 A.    "In giving this report I have not made any effort to
15 determine whether or not Enpetro, Inc., or Enpetro, LPC, Inc.,
16 remain viable corporations in the state in which they are
17 allegedly incorporated.
18      "Further, I have made no investigation as to the status of
19 RJH and Company, Inc., and accordingly I cannot state whether
20 it is a viable corporation incorporated under the laws of any
21 state in the United States."
22 Q.    So, just to end where we started here, is it still your
23 opinion that Mr. Richard Harley and his company, RJH and
24 Company, Inc., has no legally enforceable ownership interest in
25 any of the oil reserves that are referred to in any of these

1    documents that you examined?

2    A.    I could not find that RJH and Company, Incorporated,

3    Richard Harley, RJ Harley, had any ownership interest or any

4    lien against any leasehold -- the six leasehold estates or the

5    production therefrom.

6          MR. BRANDLER: I have no further questions, and I move

7    the admission of Exhibit 40.1.

8          THE WITNESS:  May I mention two corrections that need

9    to be made in that exhibit?

10   BY MR. BRANDLER:

11   Q.    Yes.

12   A.    On page three, item three, I stated a document stamped

13   Copy and titled Assignment of Collateral and signed by Richard

14   J. Harley, that's incorrect.

15   Q.    Where are you referring to on page 3?

16   A.    I'm referring to on page three under No. 2, Documents

17   Examined, and under that subparagraph three.

18   Q.    And what is the correction?

19   A.    Where I say a document stamped Copy and titled Assignment

20   of Collateral and signed by Richard J. Harley.  Instead, that

21   should read, signed by Stan Dedmon.

22   Q.    And what's the other correction?

23   A.    Secondly, on page four, paragraphs small b at the top of

24   that page, it's the first full paragraph on that page, 1, 2, 3,

25   4 lines from the top, I speak in that sentence to block four of

1  the Simeon and Saunders survey, Section 787, Abstract No. 289.

2  That's a typographical order -- or typographical error.  It

3  should read, Abstract No. 829.  That's all.

4           MR. BRANDLER:  No further questions.  Move for the

5  admission of 40.1.

6           MR. O'BRIEN:  No objection .  I do have some

7  questions.  Of course, Your Honor, I'd like to take the lunch

8  break before I begin my cross exam.

9           THE COURT:  Pardon?

10           MR. O'BRIEN:  I'd like to have a lunch break before I

11  begin my cross examination.

12           THE COURT:  All right.  The exhibits will be

13  admitted.  Members of the jury, we're going to take a luncheon

14  recess.  We'll come back in an hour and ten minutes, ten

15  minutes to two.

16           Remember not to discuss the case among yourselves or

17  with anyone else.  If anyone tries to talk to you about it

18  bring it to my attention immediately.  We'll keep an eye on the

19  weather.  Enjoy your lunch.  We'll see you back here at ten

20  minutes to two.

21           You'll be back for cross?

22           THE WITNESS:  Yes.  I'm under subpoena, so --

23           (Whereupon, a recess was taken from 12:40 p.m. to 1:50

24  p.m.)

25                     (Jury not present.)

1          MR. BRANDLER:  During the lunch break I was informed

2    by AUSA Thiel that he had filed a motion to quash on behalf of

3    some defense witnesses.  I had not been consulted by Mr. Thiel

4    regarding that filing.  I have not read it.  And I told Mr.

5    Thiel to please withdraw that motion because I don't believe

6    the United States should be a party to the motion to quash.

7          I believe these individuals should have their own

8    counsel, and the Court should take whatever position it's going

9    to take between the Court and them, but I don't want to be a

10   party to that proceeding to avoid any issues later on that we

11   prevented Mr. Harley from calling witnesses.

12          THE COURT:  Okay.  So we're not going to deal with

13   that motion?

14          MR. BRANDLER:  I told Mr. Thiel to withdraw the

15   motion and have people from the Federal Reserve or whatever --

16          THE COURT:  Our office was told that it's going to be

17   withdrawn.

18          MR. BRANDLER:  Yes.

19          THE COURT:  My office was told it was going to be

20   withdrawn.

21          MR. BRANDLER:  I think what will happen is someone

22   else, not from the United States --

23          THE COURT:  Will re-file it?

24          MR. BRANDLER:  -- will re-file it, which is I think

25   the way it should go.

81

1          MR. O'BRIEN:  Can I jump in?

2          MR. BRANDLER:  Yeah.

3          MR. O'BRIEN:  Here's what I was told.  Mr. Thiel is

4   going to withdrew the motion, and then a gentleman by the name

5   of Dan Kuhn, who has already filed on behalf of the bank

6   witnesses, will also file on behalf of the reserve witnesses.

7          THE COURT:  He's filed?

8          MR. O'BRIEN:  Well, he's going to file on behalf of

9   the bank witnesses.

10          THE COURT:  Oh.  Because he hasn't filed yet.

11          MR. O'BRIEN:  Then he's going to file --

12          THE COURT:  Okay.

13          MR. O'BRIEN:  Then he's going to file on behalf of --

14          THE COURT:  All right, fine.  Thank you.

15   Cross-examine.  Oh, we can't cross-examine until the jury comes

16   in.

17          (Pause.)

18          (Whereupon, the jury entered the courtroom at 1:52

19   p.m.)

20          THE COURT:  Cross-examine.

21                    CROSS EXAMINATION

22   BY MR. O'BRIEN:

23   Q.   Good afternoon Mr. Massey.  Mr. Massey, one of the areas

24   that you were qualified as a witness is commercial practice?

25   A.   Yes, sir.

1  Q.    And let me talk a little bit about your practice.  You're

2  an attorney at law?

3  A.    Yes, sir.

4  Q.    Okay.  You are also the owner of a title insurance agency?

5  A.    Yes, sir.

6  Q.    Okay.  And the way that works is if -- let me say, title

7  insurance is insurance that insures real property?

8  A.    Yes, sir.

9  Q.    And it would insure it for a bank or for a purchaser of

10 real property?

11 A.    Yes, sir.

12 Q.    Up here we have lender's policies and owner's policies.

13 Do you have the same down there?

14 A.    Owner's policies and loan policies is what the lender's

15 policy's called.

16 Q.    And the way your office works is if someone wants to buy

17 real estate they would come into your office and you, the

18 attorney side of the office, would do what we call a title

19 search to determine whether the title to the property is good?

20 A.    We would give that opinion.  We would give the opinion as

21 to whether the title was good, bad or indifferent.

22 Q.    And do you have title abstractors who do your searches?

23 A.    Yes.  I have abstractors who search the abstract plan.

24 Once they listed the title as they see it, then I tell them

25 what I want to read the pictures of.  My son-in-law is more

1  computer literate.  He can see it on the computer, but I don't.

2  Q.   So when the title abstractor gives the report to you, you

3  then look at it and tell them what else you need?

4  A.   Yes.

5  Q.   And then you give an opinion to a title insurance agency

6  as to the quality of the title?

7  A.   Yes, sir.

8  Q.   And then the title insurance agency authorized by a title

9  insurance company, Stewart Title or American Land or whatever,

10  then they issue a policy?

11  A.   Issue a commitment.

12  Q.   Issue a commitment?

13  A.   That's -- the commitment -- that if the deal closes this

14  is how we see the title and here's our requirements that need

15  to be met before the transaction closes.

16  Q.   And then when it does close they issue a policy?

17  A.   Yes, sir.

18  Q.   I guess the title insurance company would issue the policy

19  through the agency, right?

20  A.   The agency would actually issue it.  We have binding

21  authority on the underwriter.

22  Q.   I think you mentioned that.  And now, this type of

23  commercial transaction at work would come up if you were

24  representing the purchaser of an asset or if you were

25  representing a bank, it's much the same, right?

1  A.   True.

2  Q.   Now, when you get a report from your title abstractor as

3  to a title, you review it?

4  A.   Yes.

5  Q.   Okay.  And if I can remember exactly what you said, that

6  you -- you ask -- often ask for explanation, correction or

7  additional documents?

8  A.   And the commitment, yes.

9  Q.   Okay.  And that would be if you -- if you're -- in

10 searching this title you saw -- if it was a problem, you'd say

11 I need this, I need an explanation of this problem, or I need

12 something corrected here, or maybe I need some additional

13 documents?

14 A.   Yes.

15 Q.   Okay.  And that's your way in -- that's your professional

16 way of ensuring that your client who is either a purchaser of a

17 product or perhaps a bank, a lender of money, is getting good

18 collateral?

19 A.   What's called good and indefeasible title, or in the case

20 of the bank, a good lien, first and superior lien on the

21 property.

22 Q.   And now, it's not unusual, as I said, especially in Texas,

23 I know from up here now with all this oil and gas up here that

24 there can be problems with title that have to be cleared up.

25 Very seldom do you get something that's perfect?

1  A.    I don't believe I've ever reviewed a perfect title.   Oil

2  and gas is usually a bigger mess than surface estate.

3  Q.    I agree with that.   And you very often ask for

4  explanations, corrections or additional documents?

5  A.    True.

6  Q.    Okay.   Now, it seems to me from that -- the way you just

7  very clearly explained your practice, is what you did in this

8  case is a lot like what you do in other cases, if you're

9  representing the buyer of an asset or if you represent a bank,

10 in this case you reviewed all the documents to determine

11 whether or not there was good title to this mineral interest,

12 is that right?

13 A.    Well, certainly.   I did the abstracting myself,

14 incidentally.   But yes, I was asked to express an opinion of

15 title on the ownership of the six oil and gas leases, and I was

16 asked to express some opinions as shown in my report on the

17 promissory note and the collateral assignment document and so

18 forth.

19 Q.    And that's not very much different from what you do every

20 day, right?

21 A.    That's true.

22 Q.    So here -- although you're not representing a client here,

23 you're testifying as an expert.   You analyze the legal

24 situation in the same way that you do regularly?

25 A.    True.

1  Q.   Now, you pointed out some problems from analyzing these

2  documents and the records and everything, and I'm going to go

3  through some of them, I'm not going to go through everything.

4  The first problem you pointed out you said enforcement.  And

5  you said that this promissory note -- this oil promissory note,

6  if I can call it that, I'm just going to call it the note.

7  This note was old and that the statute of limitations may have

8  expired?

9  A.   If there was an effort to file a lawsuit and collect the

10  note, if the lawsuit was -- and I don't see any evidence that

11  there was such a lawsuit, but if one was filed more than four

12  years after the due date of the note, then I would think the

13  maker of the note, the signer of the note would have a perfect

14  defense to judgment in saying this note is barred by the

15  statute of limitations.

16  Q.   Now, the statute of limitations doesn't go to validity of

17  the document, does it?

18  A.   No.

19  Q.   It just goes to whether it's enforceable?

20  A.   Yes.

21  Q.   And as you said, if a -- if someone -- if the statute of

22  limitations on a debt is expired and the owner, the obligator

23  still acknowledges it, that's still a valid dec [ph]?

24  A.   True, but they would have to be --

25  Q.   Just not enforceable.

1  A.    True, there has to be some overt, as you put it,

2  acknowledgement of debt, that the note is still valid, I think,

3  to defeat a limitations defense.

4  Q.    You mentioned that the statute of limitations in Texas is

5  four years?

6  A.    From the maturity date.

7  Q.    Has that been changed to six years in Texas by -- in 1995?

8  A.    I don't think so.  There are a number of statutes of

9  limitation that deal with different circumstances, claims, but

10 I am not aware of the four-year bar rule being changed as to

11 collection of a promissory note.

12 Q.    Are you talking about the section of the statute that I

13 see as 3118?

14 A.    I don't remember what section you were talking about.

15 There's a whole lot of that in the civil remedies and practice

16 code.

17            (Whereupon, Mr. O'Brien and Mr. Brandler conferred.)

18            MR. BRANDLER:  I'm sorry for the delay, your Honor.

19            THE COURT:  That's all right.

20            (Pause.)

21 BY MR. O'BRIEN:

22 Q.    Now, I'm not sure exactly what the statute of limitations

23 was in Texas, so I'm just going to ask you to look at some

24 documents, and take your time to look at them.  First, Section

25 3118 of the Texas Code.  We only have two cases here, the case

1  of Pancow v. Peck from the Court of Appeals, and that's on the

2  second page.  I just marked off the section.  And the case of

3  Whittle v. McCorp, also from the Court of Appeals, and that's

4  also the middle of the section, at the bottom of page two of

5  each of those cases.  So, take a look at that.

6  A.     Okay.

7              (Pause.)

8              THE WITNESS:  All right.

9  BY MR. O'BRIEN:

10 Q.     Did you have a chance to review those documents?

11 A.     I did.

12 Q.     And do you agree with me that the statute in Texas is six

13 years --

14 A.     Well, I think that's -- I think you may well be right.  I

15 do notice that in the Section 3.118 it states that it does not

16 apply to an action involving a real property and covered by

17 Section 16.035 or 16.036 Civil Practices and Remedies Code.

18 Since I don't have the Civil Practices and Remedies Code

19 memorized, I can't tell you what those sections say.

20        And the one I was referring to was the section under the

21 Civil Practices and Remedies Act, this, what you've given me

22 here, seems to be under the Business and Commerce Code.  All I

23 can tell you is what I have generally understood, and

24 underwriting companies that we do business with through their

25 counsel have not told me anything different.  But I wouldn't

1  argue with you over -- as between four and six.

2  Q.    Probably wouldn't come up -- under the six or four-year

3  statute?

4  A.    Oh, well, it does, but yeah, I wouldn't argue whether it

5  was four or six.  Doesn't make any difference.  Both have

6  passed in this case.

7  Q.    Okay.  Now, let me talk about some of the problems that

8  you noted when you researched this issue.  One of the things

9  you saw, you had the note and the assignment and you pointed to

10  the fact that you thought you saw some ambiguities in both

11  documents, you used that term?

12  A.    Yes, sir.

13  Q.    And one of the ambiguities you said you saw was -- it

14  wasn't clear that there could be a tie-in between the note and

15  the assignment and the particular leases that were involved?

16  A.    Yes, sir.

17  Q.    And another ambiguity you saw -- you thought you noted was

18  the question of whether or not the security, whether or not the

19  collateral was the actual mineral interest or the production.

20  Am I right on that?

21  A.    I'm not sure I understood the last statement.

22  Q.    Whether or not the note gave a collateral in a mineral

23  interest or it just gave some type of lien on the money

24  produced by that interest?

25  A.    Well, I think it's questionable whether the assignment of

1    collateral document gives a lien on the oil and gas leases

2    period, because it talks about -- it talks about corporate

3    note.

4    Q.    That's because -- production.

5    A.    Beg your pardon?

6    Q.    Because it referred to the production?

7    A.    Yes, sir.

8    Q.    Okay.  So that's -- now, that's something -- when you're

9    examining a title and you see that ambiguity, that's something

10   that you're going to go back to the people and say, I need an

11   explanation or correction or some additional documents to clear

12   this up?

13   A.    If I'm about to write a title policy or an oil and gas

14   opinion for a crude buyer, sure.

15   Q.    Another point you pointed out was you said that there were

16   some documents that had a division order.  And I think you

17   explained the division order pretty well.  That's an order that

18   divides up mineral interest between different parties, maybe an

19   owner, a lessor, or a royalty interest or something like that?

20   A.    Yes, sir.

21   Q.    Or maybe between individual people?

22   A.    Well, if it -- if there are a number of mineral owners and

23   working interest owners, it affects those individual people,

24   yes.  But in my opinion, a division order has as its purpose

25   confirming to the product buyer that the people who own the

1  minerals in place are who have an interest in the lease agree

2  with what the examining attorneys for the product buyer

3  discover.  It's basically a -- if your Honor will pardon me --

4  a cover your fanny document for the product buyer.

5  Q.    And then you also pointed out that the owner of the

6  mineral interest usually gets one-eighth, that's standard

7  practice?

8  A.    Was for many years.  It's not necessarily standard

9  anymore.

10  Q.    And then you have the lessor of the interest, the lessee

11  of the interest gets 87.5 percent, or that was the standard

12  that --

13  A.    87 and a half.

14  Q.    And then the lessee may also give out royalties to some

15  other parties, they're called ORIs?

16  A.    That's right.

17  Q.    And that's what the division order would state.  Here's

18  how this money is going to be divided up?

19  A.    Yes.

20  Q.    Okay.  And then you also pointed out that this -- that

21  your search showed that the division order had not been

22  recorded?

23  A.    I didn't find it recorded, no, sir.

24  Q.    It doesn't have to be recorded, does it?

25  A.    No, sir.

92

1  Q.   And when it's not recorded like this you as the title

2  abstractor go back to the people who gave you this deal and

3  said, I need an explanation, correction or additional

4  documents?

5  A.   Yes, sir.  I'm not sure I could correct something with a

6  division order, which is not a sworn document, but yes, I would

7  ask for that.

8  Q.   And now the same thing with the assignment, you said that

9  the assignment transferring this interest from the record owner

10  and the courthouse and the Enpetro, that wasn't recorded?  Or

11  to Harley that wasn't recorded, right?

12  A.   If I were representing Mr. Harley and I wanted to know

13  exactly what he had as collateral, yes, I would ask for a

14  correction, assignment of collateral.  If I were representing

15  the Enpetro, LPC, Incorporated, I might tell them that they

16  probably had a pretty good defense to collection.

17  Q.   Okay.  Then you also pointed out that when you read some

18  of these leases of record that they may have been expired and

19  not have been extended?

20  A.   I could not find any extensions of record, no, sir.

21  Q.   Now, again, you're representing the bank that's asked to

22  loan money on this.  This is common.  Did you go back and say,

23  Let me have some additional documents or do you have additional

24  evidence, they haven't expired or extended?

25  A.   I would require an extension of lease between the mineral

1  owners and the lessee, yes, sir.

2  Q.    Then you pointed out that there seemed to be some kind of

3  conflict, that the note between Enpetro, LLC, the maker of the

4  note, and Enpetro, Inc., which seemed to have some interest in

5  the minerals as per the official records?

6  A.    You're talking about Enpetro?

7  Q.    Enpetro, yeah.

8  A.    I don't believe I talked about there being a relationship

9  between the two.  I think what I said was it looks like two

10  different corporations.

11  Q.    Oh, that's right.  You pointed out the inconsistencies?

12  A.    Yes, yes, I did.

13  Q.    And again, in your job, you were doing this job, in your

14  normal practice would you go back to people and say, You have

15  to clear this up?

16  A.    Sure.

17  Q.    And then there was a question about the value.  That's

18  going to be very important if you're representing a purchaser

19  of the product or if you're representing somebody who is

20  lending on it, right?

21  A.    You're talking about the so-called proven reserves?

22  Q.    Yeah, yeah.

23  A.    It would be more important to a lender who is going to

24  loan money on the development program to drill up the oil and

25  gas leasehold.

94

1  Q.    It would also be important if you were representing

2  somebody who was going to buy it?

3  A.    Well, yes.

4  Q.    Okay.  And in those cases what the normal commercial

5  practice is that the lender or the buyer would have an

6  appraisal done?

7  A.    Yes.

8  Q.    Would have an appraisal done?

9  A.    Well, on an oil and gas lease, yes, they'd have an

10  appraisal done, and they'd want an engineering report.

11  Q.    In this case there was an appraisal provided by Mr.

12  Harley, by Harley, the Kesterson --

13  A.    I don't know who hired Mr. Kesterson, I just know he

14  provided a report.

15  Q.    But even so, these transactions, there's going to be an

16  appraisal.  No one is going to loan a hundred million dollars

17  without an appraisal?

18  A.    Certainly true.

19  Q.    And under normal circumstances a bank or a purchaser gets

20  their own appraisal?

21  A.    Correct.

22  Q.    Okay.  Now, the Kesterson report, I don't want to spend a

23  lot of time on this, but I have -- he wrote three different

24  letters that I happen to have in front of me, June 6, 2007,

25  December 13, 2005 and June 9, 2008, and they have some

1   similarities.  Every one of them says any lending institution

2   must determine the value of reserves for their purposes?

3   A.   Sure.

4   Q.   That's Kesterson?

5   A.   I didn't see all three of those.  What I've seen says that

6   kind of thing two or three times.

7   Q.   And Mr. Kesterson is saying, here's my opinion as to

8   value, but if you're going to rely on this you better get your

9   own guy.  And also as to the -- you also pointed out some other

10  problems with this matter, that it did not -- I may have

11  covered this -- did not delineate the respective interest of

12  the owner/lessee and the ORI?

13  A.   I'm sorry, would you repeat that?  My phone started to

14  ring and I did not want to get in trouble with the Judge, so I

15  took it out and turned it off.

16  Q.   The documents you received did not distinguish the

17  different rights of the owner/lessee or ORI holder?

18  A.   Well, the documents, no.  Anything that was furnished to

19  me didn't set that forth.  Obviously I found assignments of

20  overriding royalty interest and working interest when I was

21  examining the titles to the leases, yes.

22  Q.   And there was also from your examination of title some

23  severance issues that maybe the oil for the first thousand feet

24  was in one person's hands, and then down below that in somebody

25  else's hands?

1   A.   Well, I found that the lease was severed in the case of

2   two or three of the leases, that the leasehold subject to my

3   requirements for corrections was from the surface of the land

4   down to 1500 feet was vested in one person or entity, and below

5   1500 feet was vested in somebody else.

6   Q.   And then there was some issues about the production, the

7   historic production in this area had not been nearly as great

8   as Mr. Kesterson had suspected it could possibly be?

9   A.   Well, he apparently had the right numbers for -- I assume

10  he had the right numbers for historic production for the period

11  of time he recited in his report because he said he got that

12  from the Railroad Commission.  But as I said in my report, from

13  that 63,000 barrels of oil over those several years to ten

14  million barrels of proven reserves is a big jump.

15  Q.   Now, you'd agree with me that on the basis of the note and

16  the Kesterson report, that no bank would loan money just on the

17  basis of that without the due diligence you did?

18  A.   I think it's a correct statement that nobody would loan

19  money against the note, and with the assignment of collateral

20  as it exists without considerable due diligence on the part of

21  the lender, unless it was a really dumb lender.

22  Q.   And nobody would buy this interest based on what you

23  determined without the due diligence that you did?

24  A.   Well, I can't --

25  Q.   Unless they're a really dumb buyer?

1  A.    Yeah, well, I can't say with a motivated buyer.  I can

2  only tell you what I'd do.  I wouldn't buy up any interest in

3  it without due diligence, no.

4  Q.    Okay.  Now, you found all these problems.  These are the

5  type of problems you find, right?

6  A.    Sure.

7  Q.    They may have been more or less in this deal than others,

8  but these are normal problems?

9  A.    Yes, sir.

10 Q.    Did you find like -- let's just go through a couple of

11 them.  Did you find any evidence, you know, in the records you

12 searched that Harley had done anything with those records that

13 were in the courthouse that were designed to mislead or trick

14 anybody?

15 A.    No, sir.

16 Q.    In fact, you didn't even see his name anywhere?

17 A.    That's correct.

18 Q.    And when you saw these in -- got these corporate records,

19 Enpetro, Enpetro LLC, Enpetro Inc., did you see any evidence in

20 any of those that Harley had done anything to trick or deceive

21 people about those?

22 A.    No, sir, I didn't see his name at all.

23 Q.    In fact, to a layperson, Enpetro, LLC and Enpetro Inc., it

24 may not mean the big difference it means to you and I?

25 A.    I couldn't say.

1  Q.    Now, in the terms of the Kesterson report that Mr. Harley

2  provided, wouldn't you agree with me that Mr. Kesterson -- he

3  gave his opinion but he conditioned it?  He said, Look it,

4  don't rely on this, don't anybody buy anything on this, don't

5  anybody lend any money on this, do your own work.  Check

6  yourself.

7  A.    I would agree with you that he conditioned the hound down

8  of it, yes, sir.

9  Q.    I agree, I agree.  So there's nothing in that report that

10 you can say in that report there's evidence that they were

11 trying to trick people into loaning or parting with money that

12 they should not otherwise part with?

13          MR. BRANDLER:  Objection, that's way beyond his

14 ability to -- whether that's anything to trick anybody out

15 there --

16          THE COURT:  Overruled.  The report's up for grabs.

17          THE WITNESS:  I'm sorry.  Would you repeat it?

18          MR. O'BRIEN:  Repeat it.

19          (Record read.)

20          THE WITNESS:  I didn't see anything that was very

21 overt.  I think it's -- well, the statement that 63,000 barrels

22 of oil over so many years can morph into ten billion barrels of

23 proven reduction -- of proven reserves, my opinion only, since

24 you asked me, is designed to trick somebody.

25 Q.    Well, you said it was a stretch, right?

99

1  A.    You bet.

2  Q.    And he said right in here that -- any institution must

3  determine the value of reserves for their own purpose?

4  A.    Yeah.

5            MR. O'BRIEN:  That's all I have.

6            MR. BRANDLER:  Nothing further, your Honor.

7            THE COURT:  All right.  You may step down.

8            THE WITNESS:  May I be excused, your Honor, and not

9  subject to recall?

10           THE COURT:  Any reason he can't be excused?

11           MR. O'BRIEN:  He's excused.

12           THE COURT:  You're excused.

13           THE WITNESS:  Thank you, your Honor.

14           THE COURT:  Have a nice trip back.

15           THE WITNESS:  Thank you very much.  I'd like to stay

16  longer, but I don't do well in snow.

17           MR. BRANDLER:  The government calls Irene Randall.

18           THE DEPUTY CLERK:  Please raise your right hand.

19                        IRENE RANDALL,

20  called as a witness on behalf of the Government, having been

21  duly sworn or affirmed according to law, testified as follows:

22           THE DEPUTY CLERK:  Would you please state and spell

23  your name for the record.

24           THE WITNESS:  Irene Randall, I-R-E-N-E

25  R-A-N-D-A-L-L.

1          THE DEPUTY CLERK:  Thank you, you may be seated.

2          MR. BRANDLER:  May I inquire?

3          THE COURT:  You may.

4                    DIRECT EXAMINATION

5    BY MR. BRANDLER:

6    Q.    Good afternoon Ms. Randall.  How old are you?

7    A.    60.

8    Q.    And where do you currently live?

9    A.    Fort Lauderdale, Florida.

10   Q.    And are you employed?

11   A.    I have my own company.

12   Q.    And what's the name of your company?

13   A.    Custom Financial.

14   Q.    And what type of work is Custom Financial involved in?

15   A.    Commercial Financing.

16   Q.    And are you in the real estate --

17   A.    Yes, real estate.

18   Q.    -- commercial real estate?

19   A.    Commercial real estate.

20   Q.    And where is that business located?

21   A.    Fort Lauderdale.

22   Q.    How long have you been in the commercial real estate

23   business?

24   A.    Since 1998.

25   Q.    And can you just describe in a little bit more detail what

1  you mean by commercial real estate?  Do you buy and sell

2  properties?

3  A.   Well, I have done that, but right now we -- I just offer

4  financing.

5  Q.   So you're a lender?

6  A.   I work with a lender.

7  Q.   And what type of work do you do for the lender?

8  A.   I find them projects for financing.

9  Q.   So you get like --

10 A.   Borrowers.

11 Q.   You find them potential clients?

12 A.   Yes.

13 Q.   I see.  And you get a fee for that?

14 A.   Yes.

15 Q.   I want to direct your --

16 A.   And I also manage my own four office buildings that I own.

17 Q.   I see.  So you own the buildings?

18 A.   Yes.

19 Q.   Are they in Fort Lauderdale?

20 A.   No.  They're in New Mexico.

21 Q.   And Albuquerque?

22 A.   Albuquerque.

23 Q.   When you say you manage them, what do you mean?

24 A.   I do my own management.  I have local maintenance and I,

25 you know, oversee the whole thing.

1  Q.   Okay.  So do you live part-time of the year in New Mexico

2  as well as Ford Lauderdale?

3  A.   I used to, but I have an elderly parent that I take care

4  of, so I'm mainly in Fort Lauderdale.

5  Q.   I want to direct your attention to December of 2009.  Did

6  you have occasion to have any financial dealings with the

7  defendant in this case, Richard Harley?

8  A.   I met him via phone, he contacted me.  But I had a rip off

9  -- something I had written in a rip off report, and he

10 comment- -- he called me in regard to it.

11 Q.   All right.  Well, let's get into that.  Had you lost a

12 substantial bit of money prior to December of 2009 --

13 A.   Yes.

14 Q.   -- in a scam?

15 A.   Uh-hum.

16 Q.   And how much money did you lose?

17 A.   A half a million dollars.

18 Q.   And you said rip off.com.  Is that a website?

19 A.   Yes.

20 Q.   What did you do in connection with --

21 A.   I wanted to let the public know that what had happened to

22 me with this individual who was a lawyer, who was my attorney

23 at the time.  And so I put what had happened on

24 ripoffreport.com.

25 Q.   And the attorney that ripped you off, what was his name?

1  A.    Paul Ward.

2  Q.    Is this kind of like a database to warn other people --

3  A.    Yes.

4  Q.    -- don't deal with this man because he ripped me off type

5  of thing?

6  A.    Yes.  It's to inform the public of your experience.

7  Q.    Now, you said you dealt with Mr. Harley in December of

8  2009.  Did he mention to you how he came to know about you?

9  A.    Yes.  He said he knew Paul Ward.  That he had a bad

10  experience with him as well.  And that's how he found me.

11  Q.    This list or this database on the internet that you put

12  your name on as a victim in these kind of -- was it an

13  investment fraud, by the way?

14  A.    Yes, uh-hum.

15  Q.    Is that accessible to other people?

16  A.    Yes.

17  Q.    For instance, you can access and see your name there?

18  A.    Yes.

19  Q.    Does it have your contact information as well?

20  A.    On certain browsers it does.  But they try to block the

21  phone -- you know, phone numbers.  But I did put my phone

22  number to be able to warn other people.

23  Q.    I see.  So that was publically available --

24  A.    Yes.

25  Q.    -- to Mr. Harley or anyone else who went on that website?

1  A.    Yes.

2  Q.    And he told you he knew Mr. Ward?

3  A.    Yes.

4  Q.    And he's a bad guy?

5  A.    Yes.

6  Q.    And what else did he tell you during this phone call?

7  A.    That he had -- you know, his situ- -- he had an investment

8  that was the real thing and that -- he started talking to me

9  about what he was doing.

10  Q.    And can you tell us, elaborate, what kind of investment

11  thing was he proposing that he had that was the real thing?

12  A.    He said he had oil in Texas and some sort of government

13  bond or security, and --

14  Q.    Did he -- go ahead.

15  A.    He asked me to sign a non-circumvention -- or

16  nondisclosure agreement.  And then he released -- a few months

17  later -- at the time I wasn't interested or I didn't have the

18  funds that he wanted.  And I kept in touch with him.  And he

19  sent me additional information a few months later.

20  Q.    All right.  Well, let's break it down one piece at a time.

21  So, on the initial phone call he explained how he got to meet

22  you.  And he said he had these investments opportunities?

23  A.    Yes.

24  Q.    And he said something about oil in Texas.  Did he say how

25  much oil in Texas he had?

1  A.    A lot.  Billions of dollars worth.

2  Q.    And he said something about Federal Reserve bonds I

3  believe?

4  A.    Yeah.  He said he had rights to original currency, bonds,

5  I didn't really understand it, but --

6  Q.    How much did he say he had in currency and bonds?

7  A.    A lot.  Billions.

8  Q.    And what was the deal that he proposed?  You were going to

9  invest money to do what?

10  A.    He had something to do with some platform.  Some monetary

11  platform that he wanted to use this towards that as a -- to

12  qualify for the training platform.  And he would put me in it

13  and I would get a really good return on my money.

14  Q.    Did he say how much of a return on your money you would

15  get?

16  A.    It was at least ten times, but I don't remember the exact

17  amount.

18  Q.    And how short a time would you get your ten times your

19  money back if you invested with him?

20  A.    Hum, it wasn't a long period of time.

21  Q.    Months?

22  A.    Yeah.  Within months.

23  Q.    And you said he sent you some documents to follow-up on

24  this proposal?

25  A.    Uh-hum.

1 Q.   But before he did that he made you sign a non-disclosure

2 or confidentiality agreement?

3 A.   Uh-hum.

4 Q.   Can we have Exhibit 11.2?

5         (Pause.)

6 BY MR. BRANDLER:

7 Q.   I'm going to show you a document that should appear on the

8 computer screen Ms. Randall, right there in front of you?

9 A.   Uh-hum.

10 Q.   And it's a two-page document and it appears that there are

11 some signatures on --

12 A.   Uh-hum.

13 Q.   Is that your signature on --

14 A.   Yes.

15 Q.   And it's dated December 28 of '09?

16 A.   Yes.

17 Q.   Which one of these is your signature?

18 A.   The first one.

19 Q.   The top, okay.

20 A.   And the second one is Howard Herrick.

21 Q.   Who is Howard Herrick?

22 A.   Another con artist.

23 Q.   Okay.  Well, tell us how he -- was he involved --

24 A.   Well, unfortunately, I didn't realize this, but you become

25 a target when you put your name out there that you are a

1  victim.  It seems like other con artists see you as an easy

2  mark.  And so I thought I was putting my name out there to warn

3  people, but it also made me a target.

4  Q.    Did you get contacted by this Howard Herrick?

5  A.    Yes, before Richard.

6  Q.    Before Mr. Harley?

7  A.    Uh-hum.

8  Q.    Okay.  So tell us about that.  He contacted you.  And did

9  he solicit money from you as well?

10  A.    Yes.

11  Q.    Was that an investment scheme also?

12  A.    It was another trading platform.

13  Q.    Trading platform?

14  A.    It was along the same theme as Paul Ward.

15  Q.    Right.

16  A.    But Howard Herrick was the real McCoy, and of course

17  Richard was the real McCoy too.  So I fell -- unfortunately I

18  was under extreme -- after the first theft I saw myself losing

19  a lot of other assets because I couldn't keep up the payments.

20  So I was vulnerable to, you know, making money quickly, and I

21  was a good target.

22  Q.    So, at the time Mr. Herrick got involved with you you had

23  already lost your $500,000 from Mr. Ward?

24  A.    Yes, yes.

25  Q.    And did you invest with Mr. Herrick?

1  A.    I invested 50,000 with Mr. Herrick.

2  Q.    And did you lose that money?

3  A.    Yes.

4  Q.    So at the time that you -- you said this is on RJH &

5  Company letterhead, this confidentiality agreement?

6  A.    Uh-hum.

7  Q.    Why would Mr. Herrick have signed this particular

8  document?

9  A.    Because I really didn't understand it.  I didn't

10  understand the platform.  I didn't understand the business as

11  well as I thought this Herrick did.  So I wanted him on the

12  phone with me.

13  Q.    I see.  At the time you trusted Mr. Herrick?

14  A.    Yes.

15  Q.    And Mr. Harley was a new person?

16  A.    Yes, yes.

17  Q.    Did you have like a three-way conference call --

18  A.    Yes.

19  Q.    -- where you all three talked about this?

20  A.    Yes.

21  Q.    Okay.  Tell us about that conference call.  What was

22  discussed?

23  A.    Basically Howard let Richard know that I was already with

24  him.  So, like hands off, she's mine type of deal.  I didn't

25  really understand it until a little later.

1  Q.    All right.  And what else was discussed besides hands off,

2  she's mine?

3  A.    Well, he was -- there were --

4  Q.    You say he.  Let's break it out.  Mr. Harley --

5  A.    Richard was -- yeah, was explaining the opportunity, and

6  Howard Herrick, you know, just said look at my website, which

7  was about the same type of training platform.  And I --

8  Q.    So they were competing for you, your investments?

9  A.    Yes, they were competing.  And I found out later that this

10  information on the internet was actually created by Howard

11  Herrick, whereas I -- he made it seem like it came from the

12  government.

13  Q.    And this information --

14  A.    Or a foreign government.

15  Q.    Okay.  What are you referring to when you say this

16  information that he put on the internet?

17  A.    It was about the securities for the platform and the

18  currency, and it was giving information about that.  It was the

19  foreign currency.

20  Q.    And what about -- so that was his proposal, where he

21  wanted you to invest?

22  A.    Yes.

23  Q.    And you said you lost $50,000 on that?

24  A.    Yes.

25  Q.    What was Mr. Harley's proposal?

1  A.    He had original government currency or bonds, and he

2  needed to attain those to go into the platform.

3  Q.    And how much did he solicit from you to invest?

4  A.    A half a million.  Because I had already lost a lot of

5  money, so I didn't -- wasn't in a position to help him.

6  Q.    So you didn't have the money to do it?

7  A.    No.

8  Q.    But did it sound like something you would have done?

9  A.    Yes.  I hate to admit it, but yes.  Hum?

10  Q.    If you had the money would you have done it?

11  A.    Probably.

12  Q.    And that's without even having met Mr. Harley, right?

13  This is all done over the phone and e-mail?

14  A.    He was very convincing.  I was sorry I didn't have the

15  money to invest with him.

16  Q.    So that didn't go anywhere with Mr. Harley, but you lost

17  $50,000 with Herrick?

18  A.    Yes, yes.

19  Q.    Now, moving ahead.  Did you continue to communicate with

20  Mr. Harley after December of 2009 about these investment

21  opportunities?

22  A.    I did.  And he sent me additional information.

23  Q.    And would he be contacting you, or would you be contacting

24  him or both?

25  A.    Both.

1  Q.    And the information he would send you, what kind of

2  information was he sending you?

3  A.    About his company.

4  Q.    And --

5  A.    About the assets he had, about the oil in Texas and --

6  Q.    Like company profile?

7  A.    Yes.

8  Q.    I'm going to direct your attention to Exhibit 11.1, and

9  that should be on the computer screen.

10  A.    Uh-hum.

11  Q.    Is this an e-mail that you received from Mr. Harley --

12  A.    Yes.

13  Q.    -- on May 4, 2010?

14  A.    Yes.

15  Q.    And can you just read what it says?  I know a portion is

16  cut off, but --

17  A.    "It was certainly good speaking with you today as

18  promised.  Please see the attached corporate profile.  We're

19  looking forward to a long working relationship.  Kindest

20  regards."

21  Q.    Richard Harley?

22  A.    "Richard Harley CEO, RJH and Company."

23  Q.    And can we go to the next page?

24  A.    Can you make it bigger?

25  Q.    No, start at the top with the letterhead, please.

A.    Oh.   "The communication is confidential and privileged.
Information may only be used for discussion, evaluation
purposes by the recipient."

Q.    What's the date on this letter?

A.    May 4, 2010.

Q.    And it's on the letterhead of a particular company?

A.    RJH and Company, Inc.

Q.    And then it has his e-mail address below it?

A.    His phone number and e-mail address.

Q.    Okay.   Now read what it says below?

A.    "Corporate profile, name and address of company, RJH and
Company, Inc., P.O. Box Shawnee on Delaware, Pennsylvania.
18356.   State and date of incorporation, subchapter S
corporation, State of New York, New Jersey in 1989.

      "Principal officer Richard Harley, CEO.   Purpose of
Company:   RJH and Company, Inc. is a vertically integrated
holding company owning, controlling, leasing, developing and
administering assets in commercial and residential real estate,
petroleum products and commodities.

      "Assets and liabilities.   The principal asset of RJH and
Company.   RJH is a privately held New York, New Jersey
corporation.   Provable in the ground petroleum reserves of
approximately ten million barrels of oil located in Brown
County, Texas.   These reserves are wholly owned by RJH and are
documented in a geological report dated March 14, 2008, with a

1  value in excess of US one billion I believe it is.  One billion

2  dollars.  RJH has been the sole owner of these reserves since

3  September 24, 1997.  This opinion and its accompanying

4  documentation and data were prepared by Donald Kesterson, a

5  petroleum geologist licensed by and in the state of West

6  Virginia.

7       "The company also owns investment grade debt instruments

8  valued in excess of U.S.D. one billion dollars.  The foregoing

9  assets or material information pertaining thereto can be

10 produced and examined subsequent to the negotiation and

11 acceptance of appropriate terms to safeguard their use and

12 confidentiality.

13      "We are pleased to confirm as of April 2009 RJH and

14 Company Inc. has unrestricted bond power over valuable bank

15 instruments totaling more than 700 billion USD.  RJH and

16 Company is seeking an institution large enough to place our

17 firms instruments in a brokerage account and/or custodial

18 account in the name of RJH and company for the utilization to

19 obtain credit enhancements or private placement.

20      "These bank instruments consists of reserve fund letters,

21 safekeeping receipts and confidential memos with screening

22 procedures consisting of CUSIPISIN and DT-C codes.

23      "RJH has no current liabilities in excess of normal and

24 ordinary operating expenses.  Thank you for your consideration

25 in this matter.  Should you have any questions please do not

1  hesitate to contact me.  Very truly yours, Richard Harley,

2  CEO."

3  Q.   Now, after you received this document did you believe what

4  it said in it?

5  A.   I don't know.  It seemed like a little bit outrageous, and

6  I wasn't in a financial positions to invest, so --

7  Q.   But did you rule it out of hand because of financial

8  reasons or did you rule it out of hand --

9  A.   I'm not -- I think I ruled it out of hand for financial

10  reasons.  But I may have been susceptible to -- he was

11  extremely convincing.

12  Q.   And did he follow up after sending you this corporate

13  profile with any documents to support his claims about having

14  700 billion dollars in Federal Reserve instruments and oil in

15  Texas.  Did he send you additional documents?

16  A.   No, because I wasn't in a financial position to proceed

17  with him.

18  Q.   And you told him that?

19  A.   Yes.

20  Q.   Now, he also says -- can we scroll up?  "RJH has no

21  current liabilities in excess of normal and ordinary operating

22  expenses."  Did he ever tell you that there were various

23  judgments against him and his company, RJH --

24  A.   No, no, he did not.

25  Q.   -- by the SEC?

115

1  A.    No.

2        MR. BRANDLER:  I have no further questions.  I'd move

3  the admission of 11.1 and 11.2.

4        THE COURT:  Any objection to the document?

5        MR. O'BRIEN:  No objection to the documents.

6        THE COURT:  All right.  There are two of them, I

7  guess.

8        MR. BRANDLER:  Yes.  11.1 and 11.2.

9        THE COURT:  Okay.  They'll be admitted.

10  Cross-examine.

11                      CROSS EXAMINATION

12  BY MR. O'BRIEN:

13  Q.    Did Mr. Harley ever ask you for a specific sum of money?

14  A.    I don't recall.  But he did say that he would have wanted

15  a half million dollar -- that I should invest a half million

16  dollars with him.

17  Q.    Okay, that's all.  You should do so and you said no?

18  A.    I just was already ripped off for that amount of money.  I

19  just didn't have it available.

20        MR. O'BRIEN:  That's all I have.

21        THE COURT:  Any questions?

22        MR. BRANDLER:  No.

23        THE COURT:  You may step down.

24        THE WITNESS:  Thank you.

25        THE COURT:  Any reason not to excuse Ms. Randall?

1          MR. O'BRIEN:  No reason.

2          THE COURT:  You're excused.

3          THE WITNESS:  Thank you.

4          MR. BRANDLER:  Thank you Ms. Randall.  Greg Schiller.

5          THE DEPUTY CLERK:  Please raise your right hand.

6                    GREGORY SCHILLER,

7  called as a witness on behalf of the Government, having been

8  duly sworn or affirmed according to law, testified as follows:

9          THE DEPUTY CLERK:  Would you please state and spell

10  your name for the record.

11          THE WITNESS:  Gregory Schiller, S-C-H-I-L-L-E-R.

12          THE DEPUTY CLERK:  Thank you.  You may be seated.

13          THE WITNESS:  Thank you.

14          MR. BRANDLER:  May I inquire?

15          THE COURT:  You may.

16          MR. BRANDLER:  Thank you, your Honor.

17                    DIRECT EXAMINATION

18  BY MR. BRANDLER:

19  Q.    Mr. Schiller, good afternoon.

20  A.    Good afternoon.

21  Q.    By whom are you employed?

22  A.    I'm employed by the Office of U.S. Trustee for the Middle

23  District of Pennsylvania.

24  Q.    And are you an attorney?

25  A.    I am.

1  Q.    And is the U.S. Trustee for the office of the Middle

2  District of Pennsylvania part of the Department of Justice?

3  A.    Yes.  It's a component of the Department of Justice.

4  Q.    And what does the Office of Trustee do?

5  A.    We are essentially a watchdog organization.  We oversee

6  the administration of the bankruptcy laws.  And our job is

7  essentially to make sure that all of the players in the

8  bankruptcy process are playing according to the rules.

9  Q.    And how long have you been an attorney with the office of

10  U.S. Trustee?

11  A.    Approximately five and a half years.

12  Q.    And you're a lawyer.  Where did you get your law degree?

13  A.    Western New England University.

14  Q.    And what year did you get it?

15  A.    1997.

16  Q.    What office do you work out of?  What location?

17  A.    The Harrisburg office.

18  Q.    And how many bankruptcy courts are there in the Middle

19  District of Pennsylvania?

20  A.    There are three.  There is one in Williamsport; one in

21  Harrisburg; and one here in Wilkes-Barre.

22  Q.    And you work out of the Harrisburg office?

23  A.    I do.

24  Q.    And do you handle filings in all three of those offices?

25  A.    We oversee filings in all three offices, yes.

118

1   Q.    And are there separate bankruptcy judges separate and

2   apart from United States District Court judges like Judge

3   Caputo?

4   A.    Yes.  There are three in this district.

5   Q.    Who are the bankruptcy judges in the district?

6   A.    Judge Mary France is the chief bankruptcy judge.  Also

7   Judge Robert Opel and Judge John Thomas.

8   Q.    And one of those bankruptcy courtrooms is in this

9   building, correct?

10   A.    That's correct.

11   Q.    And who is the bankruptcy judge in this building?

12   A.    Both Judge Opel and Judge Thomas are seated here.

13   Q.    Now, you mentioned that you're kind of the watchdog for

14   the United States over bankruptcy filings?

15   A.    That's correct.

16   Q.    Are bankruptcy filings made under a specific title of the

17   United States Code?

18   A.    Yes.  They're made under Title 11 of the United States

19   Code, which is the bankruptcy code.

20   Q.    And for those of us who haven't had the unfortunate

21   circumstance of having to file for bankruptcy, are there fees

22   associated with petitions to file for bankruptcy?

23   A.    There are.  There are different fees for each chapter.

24   Q.    Okay.  And then you mentioned chapters.  What do you mean

25   by that?

1  A.    Are there certain chapters of the bankruptcy code under

2  which debtors, that is people who file bankruptcy, may file

3  commonly for individuals?  They normally file under Chapter 7.

4  Q.    Let me stop you before you go there.

5  A.    Yes.

6  Q.    Is it chapters of Title 11 that you're referring to?

7  A.    That's correct.

8  Q.    Okay.  So Chapter 7, what does that have to do with?

9  A.    Chapter 7 is essentially the liquidation provision.  That

10 basically means that in exchange for giving up certain property

11 a person in bankruptcy gets a discharge of his or her debts.

12 That means the debts are no longer legally enforceable.

13 Q.    So how does that work?  How does that -- if somebody files

14 for Chapter 7?

15 A.    Basically they fill out a petition and schedules.  Those

16 are filed with the Court.  The petition initiates the

17 bankruptcy process.  A bankruptcy trustee is assigned to the

18 case.

19 Q.    Is that separate and apart from your office, the U.S.

20 Trustee?

21 A.    Yes.  That's what we call a Chapter 7 panel trustee.

22 Q.    All right.

23 A.    And that person is responsible for collecting and

24 liquidating that person's assets and making distributions to

25 creditors.

1  Q.    And at the end of the process what happens to the debts of

2  the debtor?

3  A.    They no longer are legally enforceable.  We call that a

4  discharge.

5  Q.    And before we go forward, is there something called the

6  automatic stay regarding petitions and filings for bankruptcy?

7  A.    There is.  Essentially the automatic stay prevents

8  creditors from taking any actions against the debtor for

9  collection or enforcement of debts of any kind without

10  permission of the bankruptcy court.

11  Q.    So if somebody files for bankruptcy, files a petition and

12  they have a state court proceeding going on, what's the impact

13  on that state court proceeding?

14  A.    That state court proceeding is stayed or stopped in its

15  tracks.  It can't proceed.

16  Q.    You mentioned Chapter 7.  What are the other chapters that

17  you commonly see in bankruptcy filings?

18  A.    Most commonly for individuals we also see Chapter 13.

19  That's known as the wage earner plan.  Essentially what it

20  means is that a debtor can pay arrearages on secured debts over

21  time.  So, for example, if I fell behind on my mortgage and

22  owed a year's worth of the payment I could file Chapter 13 and

23  pay that arrearage going forward in a plan.

24  Q.    And is there something known as like a reorganization

25  plan?

A.    That's Chapter 11.  That's available for both individuals

and also for businesses.

Q.    But under Chapter 13 is it accurate that the individuals

reorganize under Chapter 13, as opposed where there is a

liquidation in Chapter 7, or do I have it completely wrong?

A.    It is more of a reorganization than Chapter 7, but less so

than Chapter 11.

Q.    And is there also a trustee that's appointed in Chapter 13

cases?

A.    In Chapter 13 there is one trustee for the district.

Q.    And who is that?

A.    His name is Charles DeHart.

Q.    And does the debtor get discharged of his debts at the end

of Chapter 13 filing?

A.    When the plan is completed, yes.

Q.    And now, there's another one that you mentioned, Chapter

11.  Tell us what Chapter 11 is?

A.    Chapter 11 is essentially the reorganization provision of

the Code.  It can be used for both --

Q.    Keep your voice up.

A.    I'm sorry.  It can be used for both individuals and

business, although it's more commonly a business chapter.  When

you hear of major reorganizations, for example, for airlines,

that's normally Chapter 11.  And essentially what it involves

is the creditor -- or I'm sorry, the debtor proposing a plan of

1  repayment to the creditors.  And creditors then get to vote on

2  the plan and decide whether it will be accepted or not.

3  Q.    And you said the vast majority of these are filed by

4  businesses?

5  A.    The vast majority are, although it is available to

6  individuals.

7  Q.    And if that plan is confirmed by the bankruptcy court,

8  what happens to the debtor's debts?

9  A.    The plan is essentially a contract between the debtor and

10 the creditors.  And when the plan is confirmed the debts as

11 they've been restructured are paid to creditors over time.

12 Q.    Now, you said you've been with the Office of U.S. Trustee

13 for a number of years.  Were you involved in any bankruptcy

14 filings by the defendant in this case, Mr. Harley?

15 A.    Yes, I was.

16 Q.    And also by a business that he's affiliated with, RJH?

17 A.    Yes, I was.

18 Q.    And I want to take you through those petitions.  How many

19 were there?

20 A.    There were two for RJH and Company and there was one for

21 Mr. Harley individually.

22 Q.    Can we have Exhibit 16.6?  And do you recognize this

23 document, what it is?

24 A.    Yes.  That is the bankruptcy docket for the case of RJH

25 and Company, Inc.  And this was filed on November 22 of 2010.

1 Q.   And was that the first bankruptcy petition relating to

2 this defendant and this company that you were involved with?

3 A.   Yes.

4 Q.   And you said the filing date was November 22 of 2010.  Is

5 that indicated in docket No. 1?

6 A.   Yes.

7 Q.   The first entry?

8 A.   Yes, it is.

9 Q.   And it says, "Filing fee due in the amount of $1,039?

10 A.   Yes.

11 Q.   Is that the normal filing fee for a -- now, this was --

12 what chapter filing was this?

13 A.   This was Chapter 11.

14 Q.   And that's the one you said is used for businesses?

15 A.   It can be -- it's used for businesses.  It can also be

16 used for individuals in some cases.

17 Q.   Was this a business or a personal filing?

18 A.   It was a business filing.

19 Q.   And is that the normal fee associated with this type of

20 filing?

21 A.   It was at the time, yes.

22 Q.   And going back to the top of the page, scrolling up.  It

23 shows who the debtor is, as RJH and Company, Inc.?

24 A.   Yes.

25 Q.   And then it shows across from that "represented by RJH and

1  Company, Inc. pro se".  What does that mean?

2  A.    Pro se means that the company is being represented without

3  counsel, without an attorney.

4  Q.    And in this particular case, were you involved in this

5  particular filing?

6  A.    Hum, we were involved in it to the extent that we reviewed

7  it.  I believe it was dismissed for failure to pay the filing

8  fee.

9  Q.    Was Mr. Harley the person who is involved in filing on

10  behalf of RJH and Company?

11  A.    Yes.

12  Q.    And you said it was dismissed for failure to pay the

13  filing fee.  What -- if we scroll to the top does it give the

14  date of dismissal?

15  A.    Yes, December 28th of 2010.

16  Q.    So it was a little over a month that it was pending?

17  A.    Correct.

18  Q.    And does that entry appear on the third page on docket

19  entry 27?  The next page?

20  A.    It does.

21  Q.    And it says why it was dismissed?

22  A.    Failure to pay the filing fee.

23  Q.    Now, would the automatic stay provisions have kicked in as

24  a result of this?

25  A.    Bankruptcy filing, yes.

1 Q.   Now, I want to take you through some of the schedules that

2 are associated with this particular filing.  You know what,

3 before I do that, let's get the other one in the record.  Can

4 we have Exhibit 17.7.  Can you tell us what this document is?

5 A.   Yes.  This is the docket sheet for the case of RJH and

6 Company incorporated.  This case was filed on March 24 of 2011.

7 Q.   So the last one was filed November 22 of 2010.  This

8 was -- and it was dismissed in December of 2010.  This would

9 just be about three months later?

10 A.   Correct.

11 Q.   All right.  And it's for the same entity, RJH?

12 A.   Correct.

13 Q.   And what chapter was this one?

14 A.   This was also Chapter 11.

15 Q.   And there was -- it says represented by RJH and Company,

16 also pro se?

17 A.   Yes.

18 Q.   And what was the date this petition was terminated?

19 A.   This was dismissed on May 12 of 2011.

20 Q.   And did you participate in this bankruptcy proceeding?

21 A.   I did.

22 Q.   Is that your name where it says "represented by Greg

23 Schiller, U.S. Department of Justice" right there at the bottom

24 right?

25 A.   Yes.

1  Q.    And going to Docket No. 1.  It's the same filing fee that

2  was due?

3  A.    Yes.

4  Q.    And was there any motions filed by your office to dismiss

5  this bankruptcy petition?

6  A.    Yes.  Our office did file a motion to dismiss this case.

7  Q.    And what was the basis for your motion?

8  A.    There were several.  The debtor again was represented pro

9  se.  That's not permitted for a corporate debtor in bankruptcy.

10 We also moved to dismiss for bad faith.

11 Q.    And what did you mean by that, bad faith?

12 A.    Hum, bad faith in bankruptcy essentially means that the

13 bankruptcy is filed for an improper purpose, such as to

14 repeatedly delay a creditor, for example, in a previous case

15 that's been filed.

16 Q.    Was there a creditor listed in the prior petition as well

17 as this one by the name of Marshall Silverstein?

18 A.    Yes.

19 Q.    And was that the basis for the motion to dismiss?

20 A.    Yes.

21 Q.    That it was sought to delay proceedings related to his

22 civil case?

23 A.    Correct.

24 Q.    And was that motion successful?

25 A.    Yes, it was.

1  Q.    And what was the -- after the order was granted dismissing

2  the case, was there a bar from further filings by Mr. Harley?

3  A.    Yes.  We had requested and the Court imposed a 180-day bar

4  to both RJH and Mr. Harley filing bankruptcy without the

5  consent of the bankruptcy court.

6  Q.    And that would be about six months?

7  A.    Correct.

8  Q.    And did Mr. Harley file an appeal for that order?

9  A.    He did.

10 Q.    And where do appeals from bankruptcy court go?

11 A.    To the district court.

12 Q.    And was that appeal eventually dismissed?

13 A.    It was.

14 Q.    In 2011?

15 A.    It was.

16 Q.    Now, going to the third bankruptcy petition.  Could we

17 have Exhibit 20.7.  Do you recognize this document?

18 A.    I do.

19 Q.    What is it?

20 A.    This is the docket for Mr. Harley's individual bankruptcy

21 case, which was filed under Chapter 13 on May 29 of 2012.

22 Q.    You said filed under Chapter 13.  On the top left it says

23 Chapter 7 and then previous Chapter 13.  What does that mean?

24 A.    That's correct.  It was initially filed under Chapter 13

25 and then Mr. Harley voluntarily converted it to Chapter 7,

1  which he has the right to do.

2  Q.    And in both situations would the debtor's debt be

3  discharged?

4  A.    In Chapter 7 they would be discharged.  In Chapter 13 they

5  would have been discharged after the completion of a plan, yes.

6  Q.    And prior to petitions, similarly the Chapter 11 filings,

7  the debts would be discharged?

8  A.    The debts would be discharged again after the completion

9  of a plan.

10  Q.    Now, compared to the prior two filings -- first of all,

11  the date of this filing you said was when?

12  A.    May 29, 2012.

13  Q.    Was this beyond the 180-day bar that was previously

14  imposed in the second case?

15  A.    It was.

16  Q.    And it says date converted.  What does that mean?

17  A.    That means the date it was converted from Chapter 13 to

18  Chapter 7.

19  Q.    And what was that date?

20  A.    June 7 of 2012.

21  Q.    And then the next entry says "Date terminated, October 2

22  of 2012".  What does that mean?

23  A.    That's the date that the case was dismissed by the court.

24  Q.    And what was the basis for the dismissal on this occasion?

25  A.    The debtor failed to pay the filing fee.

1  Q.    Did Mr. Harley pay any of the filing fees for any of the

2  three petitions?

3  A.    Not to my knowledge, sir.

4  Q.    But did he get automatic stays on each case?

5  A.    He did.

6  Q.    And after this case was dismissed, did your office refer

7  this case to the United States Attorney's office, the case that

8  I'm with, for potential criminal prosecution?

9  A.    We did.

10  Q.    Now, are bankruptcy petitions filed under oath?

11  A.    Yes, they are.

12  Q.    And can you elaborate what you mean by that?

13  A.    The debtor has to certify both in writing and orally at

14  his or her meeting of creditors that the schedules are true,

15  correct and complete to the best of their knowledge,

16  information and belief.

17  Q.    And is that certification under penalty of perjury?

18  A.    It is.

19  Q.    And in connection with those sworn certifications, are

20  petitioners required to file various schedules indicating what

21  their assets are, their liabilities, their income and all their

22  financial --

23  A.    Yes.   It's designed -- the schedules are designed to give

24  a complete financial picture.

25  Q.    And that's all filed under oath?

130

1   A.    It's all filed under oath, yes.

2   Q.    Were Mr. Harley's bankruptcy petitions and schedules

3   signed by him under penalty of perjury?

4   A.    Yes, they were.

5   Q.    Can we have Exhibit 16.1?  Can we just enlarge the top

6   half, please.  Can you identify this document?

7   A.    Yes.  That is the petition page for RJH and Company.  And

8   I believe this is the 2010 case.

9   Q.    And there appears -- under the name of the debtor it says

10  RJ and Company, Inc., and Richard Harley, and then it's crossed

11  out with some initials?

12  A.    Yes.

13  Q.    And do you know whose initials those are?

14  A.    Those appear to be Mr. Harley's initials.

15  Q.    And it says under that "other names used."  Mr. Harley's

16  name appears?

17  A.    Yes.

18  Q.    And this particular -- if we scroll down on the page.

19  It's got a date stamp filed.  What does it say?

20  A.    November 22, 2010.

21  Q.    And where was it filed?

22  A.    In Wilkes-Barre.

23  Q.    Right here in this courthouse?

24  A.    Correct.

25  Q.    In the clerk's office?

1  A.    Correct.

2  Q.    All right.  So can we go to page three of this document?

3  On the top left where there's handwriting, can you just enlarge

4  that?  Can you read what is stated in that box?

5  A.    I'm sorry, the entire box?

6  Q.    Yes?

7  A.    "I declare under penalty of perjury that the information

8  provided in this petition is true and correct.  I request

9  relief in accordance with the chapter of" --

10  Q.    No, I think there's stuff that you skipped.  I want you to

11  read the entire thing?

12  A.    I'm sorry.  "If petitioner is an individual whose debts

13  are primarily consumer debts and has chosen to file under

14  Chapter 7, I am aware that I may proceed under Chapter 7, 11,

15  12, or 13 of Title 11, United States Code.  I understand the

16  relief available under each such chapter and choose to proceed

17  under Chapter 7.

18      "If no attorney represents me and no bankruptcy petition

19  preparer signs the petition I have obtained and read the notice

20  required by 11 U.S.C. Section 342(b).  I request relief in

21  accordance with the Chapter of Title 11, United States Code,

22  specified in this petition.

23  Q.    And then what does it say under that?

24  A.    I'm sorry, I'm not able to see that on the screen.

25  Q.    Can you scroll up?  No, this -- who signed it here?

1  A.    Oh, I'm sorry, Richard J. Harley, Chief Executive Officer,

2  RJH and Company, Inc.

3  Q.    Can we go to page 4, the next page.  Can you read what

4  that says?

5  A.    Yes.  "Declaration under penalty of perjury on behalf of a

6  corporation or partnership.  I, the president or other officer

7  or an authorized agent of the corporation, or a member or an

8  authorized agent of the partnership named as the debtor in this

9  case declare under penalty of perjury that I have read the

10  foregoing list or schedule or amendment or other document, and

11  that it is true and correct to the best of my information and

12  belief.

13  Q.    And is it dated?

14  A.    It is.  It's dated November 22, 2010.

15  Q.    And signed?

16  A.    By Richard J. Harley, chief executive officer.

17  Q.    Now, going back to page one, the first page of this

18  document, there are various boxes checked.  Can we go back?

19  Right.  On the bottom -- the bottom section.

20  A.    Yes.

21  Q.    In the box that says "estimated number of creditors", what

22  is checked?

23  A.    1 to 49.

24  Q.    And estimated assets, what box is checked?

25  A.    500 million and one dollar to one billion dollars.

1  Q.    And estimated liabilities?

2  A.    Hum, one million one dollar to ten million dollars.

3  Q.    And going forward there's a document Schedule A, which is

4  after that declaration of under penalty of perjury that we just

5  looked at?

6  A.    Uh-hum.

7  Q.    The next page, please.  What is schedule A?

8  A.    That is the schedule where the debtor would list its real

9  estate.

10  Q.    And is this something -- these schedules, they have

11  various letters associated with them?

12  A.    They do.

13  Q.    And the one that's for real estate is Schedule A?

14  A.    That's correct.

15  Q.    All right.  And was this the schedule A submitted by Mr.

16  Harley in connection with his 2010 bankruptcy petition?

17  A.    Yes.

18  Q.    And what is supposed to be listed on schedule A?

19  A.    What should be listed is real property owned by the

20  debtor, that is the entity filing for bankruptcy.

21  Q.    And in this case that was RJH?

22  A.    Correct.

23  Q.    And what was listed as far as the real property owned by

24  RJH?

25  A.    Real property located -- I'm sorry, owned by RJH, I

1  believe nothing.  But --

2  Q.   Can you scroll up?  No.  Scroll down.  I'm sorry.

3  A.   Yes.  What was listed was I believe a condominium unit.

4  Q.   What is exactly listed?  What's the address?

5  A.   North Slope 3, 45A, Shawnee on Delaware, Pennsylvania

6  18356.

7  Q.   And it says "Nature of debt is interest in property".

8  What is the nature of debtor's interest?

9  A.   Owner.

10 Q.   And then it says, "Husband, wife, joint or community", and

11 there's the letter H.  What does that mean?

12 A.   It means that the property is owned by the husband only.

13 Q.   And then current value of the debtor's interest in the

14 property, what's the amount listed?

15 A.   $159,958.14.

16 Q.   And the amount of secured claim, what's listed?

17 A.   $159,958.14.

18 Q.   And scrolling down.  The total for Schedule A?

19 A.   $159,958.14.

20 Q.   And do you know -- being associated with this case -- that

21 North Slope 3, 45A, is that Mr. Harley's residence?

22 A.   I believe it is.

23 Q.   So that's the only real property he's claiming owned by

24 RJH?

25 A.   Correct.

1  Q.   And then can we go to Schedule D, which is the next page.

2  That's not my next page.  Can we go back -- no.  Go back to

3  where we just were with Schedule A.  It's in the beginning of

4  the document.  There it is.  Can we just highlight the top

5  half?  What is Schedule B?

6  A.   Schedule B is a list of the debtor's personal property.

7  That is, property other than real estate.

8  Q.   And the debtor in this case was RJH, Inc.?

9  A.   Correct.

10  Q.   And what personal property is listed by RJH in this

11  petition?

12  A.   Hum, various wearing apparel, shoes, suits, coats.

13  Q.   Can you scroll down, please, so we can see what's listed?

14  A.   And also under "Furs and jewelry", rings and watches are

15  listed.

16  Q.   Those are the only two items that are listed as personal

17  property?  Can we go to the next page as well?

18  A.   Yes, those are the only items listed.

19  Q.   So, going back to item two, go to the left, there's

20  numbered categories?

21  A.   Yes.

22  Q.   Can you enlarge this section going down?  In No. 2 what is

23  required to be listed?

24  A.   Any interest that the debtor has in financial accounts,

25  checking accounts, savings accounts, certificates of deposits,

1  shares in banks.  Credit unions, brokerage houses,

2  cooperatives, any bank accounts of any kind.

3  Q.   So there's nothing listed here as far as any bank accounts

4  by RJH?

5  A.   Correct.

6  Q.   Can we go to No. 5?  What's supposed to be listed under

7  No. 5?

8  A.   Books, pictures or other art objects, antiques, stamp,

9  coin, record, tape, compact disc and other collections or

10  collectibles of any kind.

11  Q.   There's no -- nothing listed there, no artwork of any

12  type?

13  A.   There is nothing listed.

14  Q.   No treasury notes of any type?

15  A.   None.

16  Q.   Can we go to No. 14?  What is supposed to be listed in 14?

17  A.   Any of the debtor's interest in partnerships or joint

18  ventures of any kind.

19  Q.   And was there anything listed there?

20  A.   No.

21  Q.   And No. 15?

22  A.   Government and corporate bonds and other negotiable and

23  non-negotiable instruments.

24  Q.   Nothing about billions of dollars of Federal Reserve

25  notes?

1  A.    There is nothing listed.

2  Q.    And No. 28?

3  A.    Office equipment, furnishings and supplies.

4  Q.    So is there anything listed there in the office equipment

5  for RJH, any business furnishings?

6  A.    No.

7  Q.    And if you had a car titled to your corporation, would

8  that have to go on this list of assets?

9  A.    Yes.  It would be listed under Item 25.

10  Q.    And there's nothing listed there, correct?

11  A.    Correct.

12  Q.    All right.  Can we go to the next schedule, which is

13  Schedule C?  What type of property is supposed to be listed on

14  Schedule C?

15  A.    In a -- in an individual case, which this is not, this

16  would be property that the debtor would be entitled to claim an

17  exemption in.  That means property the debtor can keep in spite

18  of the fact that they're filing for bankruptcy.  But Schedule C

19  does not apply in the corporate case.

20  Q.    What did Mr. Harley list as being exempt on Schedule C?

21  A.    His town home and SUV automobile, household goods and

22  other assets which are not described.

23  Q.    All right.  And the value he gave for each one of those

24  items?

25  A.    For town home the value is 159,958.14; for the SUV,

1  49,000; for household goods 20,000; and no value was given for

2  the other assets.

3  Q.    Can we go to the next schedule, Schedule D.  What type of

4  information is supposed to be reported on Schedule D?

5  A.    This is a list of the debtor's secured claims.  That is,

6  debts for which there is collateral.

7  Q.    And are there any debts listed by Mr. Harley for which

8  there is collateral?

9  A.    Yes.  He lists the debt to IndyMac Bank, which is

10  collateralized by the town home.  He also listed that payable

11  to Jacqueline Kube, but it doesn't say what the collateral is.

12  Q.    Now, the one that's for IndyMac Bank, is that his

13  mortgage?

14  A.    I would believe so, yes.

15  Q.    And what's the date that he's claiming that mortgage was

16  incurred or that item was incurred?

17  A.    April 13th of 2010.

18  Q.    And for the entire amount of the value he said of the town

19  home?

20  A.    Yes.

21  Q.    So there would be no equity?

22  A.    Correct.

23  Q.    And this secured debt from Jacqueline Kube for $50,000, is

24  there any other description -- there's an X next to that.  What

25  does that X mean?

1  A.    The debt is marked as contingent, which means that in

2  order for the debt to actually accrue some other condition

3  would have to occur.

4  Q.    And is that listed anywhere, what that contingency is?

5  A.    It is not.

6  Q.    And if we scroll down to the bottom, the total amount on

7  Schedule C that's listed of creditor's holding secured claims

8  is how much?

9  A.    $209,958.14.

10 Q.    If we go to Schedule E.  What type of information is

11 supposed to be reported on Schedule E?

12 A.    Schedule E is a list of what are called unsecured priority

13 claims.  Those are unsecured claims which receive a higher

14 payment priority than general unsecured claims.  As an example,

15 an unsecured priority claim would be taxes owed to the federal

16 government, where the normal unsecured claim would be, credit

17 card debt.

18 Q.    What about judgments to the Federal Government?

19 A.    That would be normally listed on the schedule.

20 Q.    Or judgments to federal agencies, like the Securities and

21 Exchange Commission?

22 A.    That would also be listed here.

23 Q.    And can we go -- scroll down?  And what -- is there

24 anything checked?

25 A.    No.

1  Q.    So he said there's no creditors holding unsecured priority

2  claims to report?

3  A.    Correct.

4  Q.    And can we go to Schedule F?  What type of information is

5  supposed to be reported on Schedule F?

6  A.    This should be a list of the debtor's general unsecured

7  claims, which is the lowest priority for payment.

8  Q.    And scrolling down, are there any debts listed for RJH as

9  an unsecured nonpriority claim?

10 A.    There are none.

11 Q.    Can we go to Schedule G.  What is supposed to be reported

12 on Schedule G?

13 A.    This would be a list of any contracts or leases to which

14 the debtor is a party.

15 Q.    And the debtor in this case, RJH.  So any contracts or

16 unexpired leases would have to be recorded?

17 A.    Correct.

18 Q.    And scrolling down, is there anything reported?

19 A.    No.

20 Q.    Can we have Schedule H?  What's supposed to be reported on

21 Schedule H?

22 A.    This is a list of co-debtors, which means individuals or

23 entities which are also liable on the debts of the debtor.  For

24 example, a personal guarantor.

25 Q.    And he doesn't list anybody?

1  A.    No.

2  Q.    Could we have Schedule I?  What type of information is

3  supposed to be reported on Schedule I?

4  A.    This is the current income of the debtor.  It should list

5  income from all sources on a monthly basis, as well as any

6  deductions from that income.

7  Q.    So, scrolling down, tell us what income is reported on

8  this particular -- well, before we get to that, it says

9  Debtor's marital status, and it shows Relationships, Jacqueline

10 Harley, correct?

11 A.    Correct.

12 Q.    So M means married?

13 A.    Correct.

14 Q.    All right.  So it has debtor and spouse.  And debtor in

15 this case would be Mr. Harley and spouse would be Jacqueline

16 Harley?

17 A.    Well, the debtor would actually be RJH and Company.

18 Q.    RJH, excuse me.

19 A.    But he's -- yes.  He's listing it as though it's husband

20 and wife.

21 Q.    Right.  So as far as the income, what's listed for the

22 debtor?

23 A.    $517 a month in wage income.

24 Q.    Well, it doesn't -- it says it can be monthly gross wages,

25 salary, commissions.  It doesn't necessarily --

1  A.    Yes, I'm sorry, correct.

2  Q.    And for the spouse?

3  A.    $527 in the same category.

4  Q.    And then other than those two items, if you scroll down

5  the entire page, if we go to No. 11.

6  A.    Uh-hum.

7  Q.    What does it indicate under No. 11?

8  A.    Hum, that Mr. Harley is receiving Social Security income

9  of 517.00 monthly.

10  Q.    Which was the same item number in No. 1?

11  A.    Yes.  I think it's a duplicate.

12  Q.    So his income was $517 a month in Social Security

13  benefits?

14  A.    Correct.

15  Q.    And as far as his wife, it says on No. 13, SSD.  Do you

16  know what that stands for?

17  A.    Social Security Disability.

18  Q.    And how much does she receive on a monthly basis?

19  A.    $527.

20  Q.    And if we scroll down, that's the total combined monthly

21  income for both of them, $1,044?

22  A.    That's right.

23  Q.    And that's the only income that's listed for this debtor,

24  RJH?

25  A.    Correct.

1  Q.    Can we go to Schedule J?  What kind of information is

2  supposed to be reported on Schedule J?

3  A.    These are the current monthly expenditures of the debtor

4  as of the date of filing.

5  Q.    Are these basically like expenses?

6  A.    Yes.

7  Q.    And can you tell us what's reported on schedule J?

8  A.    On item one there is a renter/home mortgage payment, $635

9  dollars.

10  Q.    So RJH being the debtor is claiming a mortgage payment of

11  $635 a month?

12  A.    Correct.

13  Q.    All right.  Continue?

14  A.    Then there's a second entry for $40.  I'm not sure what

15  that is.  I believe it would be either real estate taxes or

16  property insurance, but it doesn't indicate which.

17  Q.    All right.

18  A.    In line two, electricity and heating fuel, $83.  Water and

19  sewer, $119.  And skipping down to line 7, medical and dental

20  expenses is $60.  Skipping to line 11A, homeowners or renter's

21  insurance of $103.  Skipping to 11D, auto insurance of $108.

22  Line 12, real estate and school taxes of $6,418.42.

23  Q.    And scrolling down he has the total average monthly

24  expenses is how much?

25  A.    $1,682.87.

1  Q.    And in line 20 he gives the monthly net income for this

2  company RJH?

3  A.    Right.

4  Q.    And what is the monthly net income that he's reporting?

5  A.    It is negative $638.87.

6  Q.    For RJH and Company, Inc.?

7  A.    Correct.

8  Q.    Now, the next page has something called summary of

9  schedules?

10  A.    Yes.

11  Q.    And there's some additional -- what type of information is

12  supposed to be on the summary?

13  A.    It's basically a summary of all the schedules that we just

14  went over.  It's essentially a snapshot of the debtor's assets

15  versus its liabilities.  And then a summary of all the numbers

16  that are in foregoing schedules.

17  Q.    Under real property, it's the same amount that was

18  reported on schedule A?

19  A.    Yes.

20  Q.    Schedule --  Item B, Schedule B, is there a new number

21  here?

22  A.    Yes.  There is a figure of 745 million dollars listed,

23  which was not on Schedule B.

24  Q.    And then in No. D, creditors holding secured claims, is

25  there an entry for a liability?

1    A.    Yes.  $2,050,000, which is also drastically different from

2    what was on Schedule D.

3    Q.    And on item F?

4    A.    $42,939.45, which is also different from what was on

5    Schedule F.

6    Q.    And scrolling down to the bottom of the page, it's got the

7    totals.  So the total assets, according to Mr. Harley, is how

8    much?

9    A.    745 million, one-hundred and fifty-nine --  I'm sorry.

10   159 thousand, nine hundred and fifty-eight dollars.

11   Q.    And the total liabilities?

12   A.    $2,092,939.45.

13   Q.    Can we go to the next page?  And the next page after that.

14   All right.  Is there a document listed -- titled Assets of

15   Corporation?

16   A.    Yes.

17   Q.    And can you read what it says?

18   A.    "Approximately ten million barrels of proven reserves

19   valued at 700 million U.S. dollars.  Automobile valued at

20   45,000 U.S. dollars.  Furniture and fixtures valued as 20,000

21   U.S. dollars.  Total, 765 million U.S. dollars.

22   Q.    Now, going back to the summary of schedules, two pages

23   back, under item B, he's got 745 million dollars?

24   A.    Yes.

25   Q.    And total assets of 745 million?

1  A.    Yes.

2  Q.    Now, going forward here to where we were, he's got total

3  assets of 765 million dollars?

4  A.    Yes.

5  Q.    Which is a 20 million dollar difference?

6  A.    Correct.

7  Q.    And the assets -- does it add up, 1, 2 and 3?

8  A.    No it doesn't.  It should be $7,065,000.

9  Q.    700 million --

10  A.    700,065,000.

11  Q.    -- 65,000?

12  A.    Sorry.

13  Q.    Can we go to the next page.  What is this schedule that

14  says Statement of Financial Affairs?  What is that?

15  A.    This is a list of miscellaneous questions which are meant

16  to supplement the financial picture of the debtor, going back

17  from the date the bankruptcy was filed, approximately three

18  years back.

19  Q.    So, scrolling down the page, the first item No. 1 is

20  titled income from employment or operational business.  And

21  what has Mr. Harley indicated in that box?

22  A.    That he has none for the year in which the bankruptcy case

23  was filed and none for the preceding two years.

24  Q.    And if we go to the next page, what information is

25  reflected on income other than from employment or operation of

1  business?

2  A.    That none has been received in the year the case was filed

3  or in the immediately preceding two years.

4  Q.    So, no income?

5  A.    Correct.

6  Q.    Can we go to the next page?  And it's under item four, a

7  category called Suits and administrative proceedings,

8  executions, garnishments and attachments.  Is there anything

9  listed?

10 A.    There is not.

11 Q.    Does it say See attached?

12 A.    I'm sorry, it does say See attached, yes.  And on the

13 attachment he does list three lawsuits.

14 Q.    Oh.  I don't know -- I'll take it in order here.  I know

15 you're skipping ahead with the attachment, but I'm going to get

16 too confused if I do it that way.

17 A.    Sure.

18 Q.    In No. 8 --

19 A.    Yes.

20 Q.    -- what type of information is requested in this statement

21 of financial affairs?

22 A.    That would be financial losses from fire, theft, other

23 casualty or gambling within one year of the filing date of the

24 bankruptcy case.

25 Q.    And that's none as well?

148

1  A.   Correct.

2  Q.   Can we go to No. 14?  What's that category for?

3  A.   This would be property that the debtor is holding for

4  another person that the debtor holds or controls.  For example,

5  if he was the trustee of the trust.

6  Q.   So in this case, RJH, if it was holding property for

7  another person they would list it there?

8  A.   It would be listed here, yes.

9  Q.   And nothing is listed?

10  A.   Correct.

11  Q.   And skipping ahead, there's a signature section to this

12  Statement of financial affairs.  Can we go to the following --

13  four pages from here -- maybe you have it.  Yep.  That's it,

14  yeah.  Is that Statement of financial affairs signed by Mr.

15  Harley under penalty of perjury as reflected on the screen?

16  A.   It is.

17  Q.   And what's the date?

18  A.   November 22, 2010.

19  Q.   And below that it says, If completed on behalf of a

20  partnership or corporation there's a similar declaration under

21  penalty and perjury?

22  A.   Correct.

23  Q.   Same thing signed by Mr. Harley as CEO.  So he signed this

24  CEO and personally?

25  A.   He did.

1  Q.   All right.  Now, the next page has some administrative

2  proceedings listed.  And in Item No. 1, what does he list?

3  A.   Marshall Silverstein vs. RJH and Company, Richard Harley

4  and Jacqueline Harley.

5  Q.   And it's pending in the Lehigh County Court?

6  A.   Correct.

7  Q.   And he's got another proceeding, North Slope Owners vs.

8  Richard Harley?

9  A.   Yes.

10  Q.   And then another one, Deutsch Bank National Trust as

11  trustee for the home equity mortgage against Richard Harley?

12  A.   Correct.

13  Q.   Now, corporate officers relating to RJH.  What does he

14  list?

15  A.   He lists himself as owning none of the stock.

16  Jacqueline --

17  Q.   What's his position?

18  A.   I'm sorry.  Chairman and CEO.

19  Q.   And his ownership of stock is how much?

20  A.   Zero.

21  Q.   Who does he say the owners of the stock are?

22  A.   Jacqueline Kube, 20 percent, Tonya Harley, ten percent.

23  And Rodney Harley, ten percent.

24  Q.   And that adds up to 40 percent.  Does he indicate who owns

25  the other 60 percent?

1  A.    He does not.

2  Q.    And what are the positions of Jacqueline Kube and Tonya

3  Harley?

4  A.    Jacqueline Kube is listed as vice-president; Tonya Harley

5  is listed as secretary.

6  Q.    And there's nothing for Rodney?

7  A.    Correct.

8  Q.    Go to the next page.  What is this document?

9  A.    This is what we call the Chapter 11 statement of current

10  monthly income.  More commonly it's called the means test.  In

11  this particular case this should not have been filled out,

12  because again we have a corporate debtor here.  This would be

13  designed for individuals.

14  Q.    The only thing listed here would be on item six, Pension

15  and retirement income?

16  A.    Yes.

17  Q.    Which is the Social Security income he previously listed

18  at 517 a month?

19  A.    Correct.

20  Q.    And below that, 527 for his wife, correct?

21  A.    Correct.

22  Q.    And then that is also -- the next page.  Signed under

23  penalty of perjury?

24  A.    Yes.

25  Q.    November 22, 2010?

1  A.   Yes.

2  Q.   And can we go two pages in, where it says list of

3  creditors holding 20 largest unsecured claims.  The next page,

4  who does he -- I think this is the attachment you were

5  referring to when it says see attached?

6  A.   Yes.

7  Q.   And what's listed?

8  A.   He lists no creditors.  I'm sorry, See attached, pardon

9  me.  Yes.  He lists three.  Kevin Fogarty.

10  Q.   And what does he say next to Mr. Fogarty's name?

11  A.   Fees disputed.

12  Q.   How much?

13  A.   I believe he meant to say --

14  Q.   Well, can you just look on the computer screen instead of

15  your record, because it might be easier?

16  A.   Sure.  It appears to me that he meant to say two million.

17  The number doesn't really make sense.

18  Q.   Well, just read what it says.  If it doesn't make sense

19  after the --

20  A.   2 zero zero zero comma zero zero.  2000 -- I can't tell.

21  Q.   And then below that?

22  A.   Marshall Silverstein for a loan, two million dollars.

23  Q.   And below that?

24  A.   North Slope Owner's Association, fees disputed,

25  $39,939.45.

1 Q.    So the entry for Marshall Silverstein is not disputed as

2 the other two are?

3 A.    Correct.

4 Q.    For two million dollars, correct?

5 A.    Correct.

6 Q.    And if he had been successful in this petition, that would

7 have been discharged?

8 A.    Correct.

9 Q.    Now, can we go to 16.2?  What is 16.2?

10 A.    This is what we call the creditor mailing matrix.  This

11 would be provided to the clerk's office, and these are the

12 parties that would receive notice of the bankruptcy filing.

13 Q.    And who provides it to the bankruptcy court?

14 A.    The debtor.

15 Q.    So these are the people who get notice of the proceedings,

16 correct?

17 A.    Correct.

18 Q.    Can we have 16.3?  Is there a schedule called Corporate

19 shareholders?

20 A.    Yes.

21 Q.    And for RJH and Company, what is listed as the corporate

22 shareholders here?

23 A.    Jacqueline Kube is listed at ten percent; Tonya Harley is

24 listed at ten percent; and Rodney Harley is listed at ten

25 percent.

1  Q.    Now, in the prior schedule of corporate ownership that we

2  looked at it added up to 40 percent?

3  A.    That's right.

4  Q.    And do you recall what Jacqueline Kube's ownership

5  interest was on the prior schedule?

6  A.    I believe it was 20 percent.

7  Q.    And Tonya and Rodney had ten?

8  A.    Correct.

9  Q.    So between the two schedules there's an inconsistency?

10  A.    Yes.

11  Q.    And still Mr. Harley is not listing himself as a

12  shareholder?

13  A.    Correct.

14  Q.    And is it recorded anywhere in this petition who owns the

15  other 70 percent?

16  A.    No.

17  Q.    Can we have Exhibit 16.4?  Can you tell us what this

18  document is?

19  A.    Yes.  This is a letter that Mr. Harley sent to the clerk

20  of the bankruptcy court in response to a deficiency notice that

21  was issued with respect to the 2010 case of RJH.

22  Q.    And was this document filed with the court?

23  A.    Yes.

24  Q.    And the stamped Date Filed shows what date?

25  A.    December 14, 2010.

1  Q.    Actually if you look on the screen --

2  A.    I'm sorry, December 9, 2010, pardon me.

3  Q.    Yeah.  I know you're looking at your records, and

4  sometimes what's on the screen may be different.

5  A.    Yes, correct.  I'm sorry.

6  Q.    So just read what the letter says?

7  A.    "Dear Clerk of Courts:  As per the Court's order dated

8  November 23, 2010, and received in the mail on November 30,

9  2010, enclosed herein is the debtor's response regarding the

10 Court's order on paragraph one and a corrected copy on the

11 summary of schedules and statistical summary of certain

12 liabilities and related data, which was filed on November 22,

13 2010 with the clerk's office.  Please stamp and file the same

14 accordingly.  Very truly yours, Richard J. Harley."

15 Q.    And the next page, just read what that says.

16 A.    "RJH and Company Inc., as per the Court's order dated

17 November 23, 2010, which was received in the mail on November

18 30, 2010, regarding the most recent balance sheet, statement of

19 operation, et cetera, the debtor states the following under

20 1116(1)(b).

21     "Because RJH and Company, Inc., is a vertically integrated

22 holding company owning, controlling and administering asset in

23 petroleum products and investment grade debt instruments, such

24 documents have not been prepared.

25     "I declare under penalty of perjury that the foregoing is

1 true and correct, executed on 7th day of December, 2010, RJH

2 and Company and by Richard J. Harley."

3 Q.    So this was a request from the clerk for financial

4 statements of RJH, balance sheets, statements of operation --

5 A.    Correct.

6 Q.    And that was his response?

7 A.    Correct.

8 Q.    Can we go to 16.5.  Is this the corrected copy of the

9 summary schedule that he filed on December 9?  There's a date

10 stamp at the bottom.

11 A.    Yes, it is.

12 Q.    December 9 of 2010?

13 A.    Correct.

14 Q.    And does this make any changes from the prior summary that

15 he filed?

16 A.    It does not appear to.

17 Q.    The total amount of assets he's claiming for RJH is how

18 much?

19 A.    745,159,958.

20 Q.    And the total liabilities?

21 A.    2,251,897.55.

22 Q.    Can we go back to the other summary schedule that he

23 filed, which is Exhibit 16.1.  Do you have that in front of you

24 in your own paperwork?  It might be quicker than finding it on

25 this equipment here.

156

1  A.    The summary of schedules?

2  Q.    Yes.

3  A.    Just bear with me one second.  Yes, I have it.

4  Q.    And what is listed as the liabilities on that initial

5  schedule?

6  A.    $2,092,939.45.  So there is a difference between the first

7  one and the second one.

8  Q.    And the total on the second schedule for liabilities is

9  how much?  If you go back to 16.5.

10 A.    Yes.  $2,251,897.55

11 Q.    So about another $250,000 in liabilities are added?

12 A.    Yes.

13 Q.    And going to Exhibit 16.6, to docket entry 27?

14 A.    Yes.

15 Q.    That indicates it was dismissed for failing to pay the

16 filing fee on December 28?

17 A.    That's right.

18        MR. BRANDLER:  Your Honor, this would be -- I don't

19 know how --

20        THE COURT:  Are you at a good stopping point?

21        MR. BRANDLER:  I think I am.  Unless you -- I thought

22 the Court was going to let people out early today.

23        THE COURT:  Well, I'm not sure we're going to do it

24 because the last -- I'll check right now.  But the last count I

25 had, it said it was supposed to start snowing around eight

1  o'clock.  But of course, I don't know what to rely on.  But

2  we'll check right now.  But meanwhile we'll take a 15-minute

3  recess, and when we come back we'll let you know where we are.

4  Remember not to discuss the case among yourselves or with

5  anyone else.  Should anyone try to speak with you about it

6  bring it to my attention immediately.  See you back here in 15

7  minutes.

8          (Whereupon, a recess was taken from 3:42 p.m. to 3:57

9  p.m.)

10         (Jury not present.)

11         MR. O'BRIEN:  Your Honor, during the break -- may I

12  raise an issue?  During the break I got an e-mail with a lot of

13  motions in -- it looks like Larry Durkin moved on behalf of

14  both group of witnesses.

15         THE COURT:  Yeah.  After we let the jury go we'll

16  talk about what we're going to do.

17         (Jury entered courtroom.)

18         THE DEPUTY CLERK:  Please be seated.  Court is

19  reconvened.

20         THE COURT:  All right.  Members of the jury, I have a

21  report here from the weather people.  And it says that --

22  essentially between 8 p.m. and eleven a mix of rain and snow

23  will begin.  It's expected we'll probably have under two inches

24  by 8 a.m. tomorrow morning.  But, thereafter, apparently it may

25  continue to snow.  So, what we'll do today is we will just go

1  -- let's just go until 4:30, another half hour.  I'll get you

2  out of here tonight.  And be sure to check tomorrow morning

3  with the number that you have.  I'll be calling in before seven

4  as soon as I know what the circumstances are.  And I recognize

5  that some of you live some distance away, because I did note

6  that this morning there was snow in Monroe County.  So I will

7  be checking that out and we'll make the call tomorrow morning

8  as to whether we'll start on time, whether we'll start late, or

9  whether we won't have court at all.  Okay?  All right.

10           MR. BRANDLER:  Thank you, your Honor.

11           THE COURT:  Mr. Brandler?

12           MR. BRANDLER:  Yes.

13  BY MR. BRANDLER:

14  Q.   Mr. Schiller, we finished the 2010 petition.  I want to

15  move to the 2011 petition.  Can we have Exhibit 17.1.  Can you

16  identify this document?

17  A.   Yes.  That is the petition which initiated the Chapter 11

18  case for RJH and Company, Inc., in 2011.

19  Q.   And I believe you said you previously -- you previously

20  stated that was filed on March 24 of 2011?

21  A.   That's correct.

22  Q.   And that's the signature stamp at the bottom right if you

23  scroll down?

24  A.   Yes.

25  Q.   Does that indicate March 24?

159

1  A.    It does.

2  Q.    And filed in this courthouse, Wilkes-Barre?

3  A.    Yes.

4  Q.    And scrolling back to the top of the page, is this the

5  petition for RJH and Company, and the name of joint debtor

6  listed on the top right?

7  A.    Richard Harley.

8  Q.    And going -- scrolling down it says Type of debtor.  What

9  is checked?

10  A.    Corporation.

11  Q.    And the nature of business?

12  A.    Other.

13  Q.    And Chapter?

14  A.    11.

15  Q.    And below that, Nature of debts?

16  A.    Debts are primarily business.

17  Q.    And going to the bottom of the page, the estimated number

18  of creditors?

19  A.    Between one and 49.

20  Q.    The estimated assets?

21  A.    Between 500 million and one billion.

22  Q.    And estimated liabilities?

23  A.    Between one million and ten million.

24  Q.    And going to the third page of this document.  Was this

25  petition also filed under penalty of perjury?

1  A.    Yes, it was.

2  Q.    Can we enlarge that section?  Will you just state what it

3  says in the first sentence?

4  A.    "I declare under penalty of perjury that the information

5  provided in this petition is true and correct."

6  Q.    And then it's signed below that?

7  A.    Richard Harley, Chief Executive Officer, RJH and Company,

8  Inc.

9  Q.    And then all the way at the bottom it's got another

10  signature for the debtor as a corporation or partnership

11  similar by Mr. Harley as CEO?

12  A.    Yes.

13  Q.    And then yet again the next page, there's another

14  declaration of perjury under penalty of perjury, correct?

15  A.    Yes.

16  Q.    And what does that say?

17  A.    "I, the president or other officer or an authorized agent

18  of the corporation or a member or an authorized agent of the

19  partnership named as the debtor in this case declare under

20  penalty of perjury that I have read the foregoing list or

21  schedule or amendment or other document, and that it is true

22  and correct to the best of my information and belief."

23  Q.    And dated?

24  A.    March 23, 2011.

25  Q.    Signed by Mr. Harley?

1  A.    Yes.

2  Q.    And skipping ahead to Exhibit 17.9, what is this document?

3  A.    This is the order of the bankruptcy court dismissing the

4  case.

5  Q.    Okay.  And can you just read what the order says?

6  A.    Yes.  "And now upon consideration or the motions filed on

7  behalf of creditor Marshall Silverstein and the United States

8  Trustee to dismiss bankruptcy petition and to bar debtor and

9  related individuals from filing any bankruptcy petitions within

10 180 days of this Court's order, and after hearing thereon, it

11 is ordered that this bankruptcy case is dismissed with

12 prejudice.

13      It is further ordered that RJH and Company, Inc., Richard

14 Harley is barred and precluded from filing any further

15 bankruptcy proceedings for a period of 180 days from the date

16 of this order without prior bankruptcy court authorization by

17 the Court, John J. Thomas, Bankruptcy Judge.

18 Q.    May 12, 2011?

19 A.    Correct.

20 Q.    And going to the contents of the petition, can we have

21 17.2.  Is this the summary of schedule similar to what we saw

22 in the last 2010 case?

23 A.    It is.

24 Q.    And can you just tell us what information is reflected on

25 Mr. Harley's 2011 petition?

1  A.    Yes.  It lists real property valued at $159,958.48.

2  Personal property listed at 745 million dollars.  The assets

3  total $745,159,158.  Under liabilities he lists creditors

4  holding secured claims of 209,958.14.  And creditors holding

5  unsecured nonpriority claims of 2,045,209.79, for total

6  liabilities of $2,255,167.93.  It shows current income of the

7  individual debtor $517 per month and current expenditures on a

8  monthly basis of $1,682.87.

9  Q.    Going to Schedule A, three pages in.  What is reflected on

10  Schedule A, the real property schedule?

11  A.    Ownership of the unit at North Slope 345A, Shawnee on

12  Delaware, Pennsylvania.

13  Q.    And again, this was a corporate filing, correct?

14  A.    Correct.

15  Q.    Schedule B?

16  A.    It lists wearing apparel under item six, rings and

17  watches, under item seven.  And no other personal property on

18  Schedule B, although there is a page following that says Assets

19  of corporation.

20  Q.    Okay.  Well, we'll get to the assets of corporation.  But

21  under personal property, other than the shoes, suits, coats

22  rings and watches which he totals as $3500 there's nothing

23  listed?

24  A.    That's correct.

25  Q.    No bank accounts?

1  A.    No bank accounts.

2  Q.    No automobiles?

3  A.    No automobiles.

4  Q.    Can we go to the assets of corporation.  And what's listed

5  there?

6  A.    Item one, approximately ten million barrels of proven

7  reserves valued at 700 million U.S. dollars.  Item two, an

8  automobile valued at 40,000 U.S. dollars.  Item three,

9  furniture and fixtures valued at 20,000 U.S. dollars.  Total,

10 765 million.

11 Q.    And that doesn't add up to 765 million, does it?

12 A.    It does not.

13 Q.    What does it add up to?

14 A.    $700,060,000.

15 Q.    And go to Schedule C.  What property is claimed as exempt?

16 A.    The town home, the SUV, household goods and other assets

17 which are not described.

18 Q.    Which is all the assets except for the oil that he has

19 claimed, correct?

20 A.    Correct.

21 Q.    Can we go to Schedule D?  What's listed on the creditors

22 holding secured claim?

23 A.    Again, the mortgage payable to IndyMac Bank and the

24 obligation payable to Jacqueline Kube.

25 Q.    With no further description about the $50,000 owed to

1  Jacqueline Kube?

2  A.    Correct.  No collateral listed.

3  Q.    And Schedule F?

4  A.    I'm sorry, your Schedule --

5  Q.    F.

6  A.    Okay.

7  Q.    Did I skip one?  I'm sorry.  Oh, I'm sorry.  Let's --

8  Schedule E.

9  A.    This is a list of creditors holding unsecured priority

10 claims, and there are none listed.

11 Q.    Okay.  Now we'll go to F.

12 A.    F is the list of general unsecured nonpriority claims.

13 There is a debt listed to Kevin Fogarty for 2000, which is

14 disputed.  And there's also an indication that there's a

15 co-debtor for this debt.  There's a debt listed to Marshall

16 Silverstein which is listed as contingent for two million

17 dollars.

18     And there's a debt listed to North Slope Owners

19 Association, which is disputed, for $43,209.79.  And there's

20 also an indication that there's a co-debtor with respect to

21 that debt.

22 Q.    And would this yet again, if this petition had been

23 successful, discharge the debt to Mr. Silverstein?

24 A.    Yes.

25 Q.    Now, can we go to Schedule H, co-debtors?  What is

1  reflected on Schedule H?

2  A.    Hum, this doesn't appear to be properly completed to me.

3  This -- it says that Mr. Harley is the -- I'm sorry, is the

4  co-debtor.

5  Q.    For the company RJH?

6  A.    Yes, for the company, I'm sorry.  With respect to the

7  debts of Kevin Fogarty, Marshall Silverstein, North Slope,

8  IndyMac Bank and Jacqueline Kube.

9  Q.    And Schedule I?

10  A.    Again, this is the list of current income with the same

11  figures as the last petition.  $517 a month in Social Security

12  for Mr. Harley, $527 dollars a month for Jacqueline Kube from

13  Social Security Disability for her.

14  Q.    Can we go to 17.3?  Is this a Statement of financial

15  affairs for the 2011 petition?

16  A.    It is.

17  Q.    And what's listed at the bottom of the page for income?

18  A.    None for the year in which the case was filed and none for

19  the preceding two years.

20  Q.    And the next page, item two?

21  A.    Same thing.

22  Q.    Income other than from employment or operation of

23  business, none?

24  A.    None.

25  Q.    Going to No. 18.  Can you read what that says?

1  A.    Yes.   "Nature, location, name of business.  If the debtor

2  is an individual, list the names, addresses, taxpayer

3  identification numbers, nature of the businesses and beginning

4  and ending dates of all businesses in which the debtor was an

5  officer, director, partner or managing executive of a

6  corporation, partner to partnership."

7  Q.    Stop reading because he wasn't -- the debtor wasn't an

8  individual.

9  A.    Right.

10  Q.    But below that it says, "If the debtor is a corporation."

11  A.    Certainly.

12  Q.    What does it say there?

13  A.    "If the debtor is a corporation list the names, addresses,

14  taxpayer identification numbers, nature of the businesses and

15  beginning and ending dates of all businesses in which the

16  debtor was a partner who owned five percent or more of the

17  voting or equity securities within six years immediately

18  preceding the commencement of this case."

19  Q.    And what's listed there as far as the names of debtors who

20  were a partner-owned five percent or more of the building or

21  equity within the last six years?

22  A.    RJH and Company, Inc. and Richard Harley.

23  Q.    And across the page, beginning and ending dates, what's

24  listed?

25  A.    1989 is the beginning date.  There's no ending date

1  listed.

2  Q.   Can we go to item 21, 21B?

3  A.   21B.   "If the debtor is a corporation list all officers

4  and directors of the corporation, and each stockholder who

5  directly or indirectly owns, controls or holds five percent or

6  more of the voting or equity securities of the corporation."

7  Q.   And then it says "See attached"?

8  A.   Yes.

9  Q.   And the next page?

10  A.   It lists Jacqueline Kube at ten percent; Tonya Harley at

11  ten percent; and Rodney Harley at ten percent.

12  Q.   And Mr. Harley is not listed?

13  A.   Correct.

14  Q.   And nor is any -- the other 70 percent of the owners of

15  this corporation?

16  A.   Correct.

17  Q.   And then the next page, there's a document called

18  Administrative Proceedings?

19  A.   Yes.

20  Q.   And is it the same administrative proceedings that was

21  listed on the last 2010 petition?

22  A.   It is.

23  Q.   And again, on the corporate officers, it lists Mr. Harley

24  as chairman and CEO with no ownership interest?

25  A.   That's right.

1  Q.   And 30 percent by Kube, Harley, Tonya Harley and Rodney

2  Harley for the remaining?

3  A.   Yes.

4  Q.   And then the last page of this statement of financial

5  affairs, is that also signed under penalty of perjury?

6  A.   It is.

7  Q.   And the date that it's signed by Mr. Harley?

8  A.   March 23, 2011.

9  Q.   Both as CEO and personally, correct?

10  A.   Yes.

11  Q.   And go to 17.4.  What is this document?

12  A.   Again, this is the Chapter 11 statement of current monthly

13  income or the means test.  And again, this indicates that the

14  only sources of income are Social Security to Mr. Harley of

15  $517 a month and $527 a month in Social Security Disability to

16  Jacqueline Kube.

17  Q.   And that's also signed under penalty of perjury on the

18  next page?

19  A.   It is.

20  Q.   And the date, March 23rd of 2011?

21  A.   Yes.

22  Q.   17.5.

23  A.   That is the mailing matrix for this case that was provided

24  by the debtor to the clerk's office.

25  Q.   These would be the listing of all the creditors?

1  A.   Correct.

2  Q.   And Mr. Silverstein is listed?

3  A.   Yes.

4  Q.   17.6?

5  A.   Hum, this is a list of creditors holding the 20 largest

6  unsecured claims in the case.

7  Q.   Does it say "See attached"?

8  A.   Yes.  And there are three listed.  Kevin Fogarty for fees

9  disputed of $2000, Marshall Silverstein for a loan of two

10  million dollars.  And North Slope Owners Association, disputed

11  fees, $43,209.79.

12  Q.   And for Mr. Silverstein it doesn't indicate it's disputed?

13  A.   Correct.

14  Q.   And after the case was dismissed, you said that it was

15  appealed to the District Court, correct?

16  A.   That's right.

17  Q.   And that appeal was dismissed in November of 2011?

18  A.   Correct.

19  Q.   Let's move to the 2012 petition.  Do we have Exhibit 20.7?

20  This one was filed May 29 of 2012?

21  A.   Yes.

22  Q.   Now, this was personal as opposed to corporate, correct?

23  A.   Correct.

24  Q.   And personal for Mr. Harley?

25  A.   Correct.

1  Q.    Can we go to 20.1.  What is that document?

2  A.    This is the bankruptcy petition which initiated Mr.

3  Harley's individual case in 2012.

4  Q.    And under Type of Debtor it indicates individual as

5  opposed to corporation?

6  A.    Yes, it does.

7  Q.    And what Chapter is reflected -- can you scroll down,

8  please?

9  A.    Chapter 13.

10 Q.    And the filing fee, what does it say there?  Scroll down,

11 please.

12 A.    It says filing fee to be paid in installments.

13 Q.    And the scrolling down, it shows the date filed with the

14 clerk here in Wilkes-Barre?

15 A.    May 29, 2012.

16 Q.    And the estimated number of creditors?

17 A.    Between 1 and 49.

18 Q.    The estimated assets?

19 A.    Between zero and 50,000.

20 Q.    And the estimated liabilities?

21 A.    Between 100,000 and 500,000.

22 Q.    Going to the third page in, is this petition filed under

23 penalty of perjury?

24 A.    Yes, it is.

25 Q.    And does that box there reflect -- what does it say?

1  A.   "I declare under penalty of perjury that the information

2  provided in this petition is true and correct.  If petitioner

3  is an individual whose debts are primarily consumer debts and

4  has" --

5  Q.   You don't need to read the entire thing.

6  A.   Okay.

7  Q.   Is this signed by him?

8  A.   It is.

9  Q.   All right.  And the date is May 28 of 2012?

10  A.   It is.

11  Q.   All right.  Going to Schedule A.  Well, before we get to

12  that.  Go back to Exhibit 20.7, Docket No. 11.  What was filed

13  on June 5 of 2012?

14  A.   The Chapter 13 trustee moved to dismiss Mr. Harley's case,

15  prepared to file a complete list of creditors, that would be

16  the mailing matrix.

17  Q.   Was Mr. Silverstein listed as a debtor on this 2012

18  petition?  As a creditor, I'm sorry.

19  A.   I'm sorry, as a creditor?

20  Q.   Yes.

21  A.   No, he was not.

22  Q.   Was the United States of America listed as a creditor on

23  this 2012 personal petition?

24  A.   No, it was not.

25  Q.   Was the Securities and Exchange Commission listed as a

172

1  debtor?

2  A.    No.

3  Q.    As a creditor, I'm sorry, as a creditor on this petition?

4  A.    No, it was not.

5  Q.    All right.  Going back to Schedule A on Exhibit 20.1.

6  What's the personal property listed for Mr. Harley now?

7  A.    A town home located at 45 Skyview Circle.  The city is not

8  indicated.  Owned solely by Mr. Harley with a value of 195,000.

9  Q.    Does it appear to be the same home that was listed on the

10  corporate filing?

11  A.    I believe so.

12  Q.    That you said the corporation owns?

13  A.    I believe so.

14  Q.    Can we go to Schedule D, which is the following page?

15  A.    There is a mortgage listed to IndyMac Bank.  The value of

16  the collateral is indicated at $194,482.82.

17  Q.    And that's the same mortgage that was listed on the

18  corporate filing, correct?

19  A.    Yes.

20  Q.    And can we go to Schedule I, the next page?

21  A.    Again, this is the current income on a monthly basis.  It

22  indicates Social Security of $535 a month payable to Mr. Harley

23  and $535 a month payable to Jacqueline Kube.

24  Q.    So that hers went up a little bit?

25  A.    Yes.

1  Q.    Going to the statement of financial affairs on the next

2  page.  Does Mr. Harley indicate any personal income from

3  employment or operation of the business?

4  A.    He does not.

5  Q.    And the next page, income from other than from employment

6  or operation of a business?

7  A.    No income is indicated.

8  Q.    And other -- can we go to No. 4 on the next page.  Does he

9  list any lawsuits that he's personally involved in?

10  A.    He does.  He lists North Slope, Three Owners Association,

11  the nature of the proceeding is civil contempt located in the

12  Monroe County Court of Common Pleas.

13  Q.    He didn't list Mr. Silverstein's lawsuit in that entry,

14  did he?

15  A.    He did not.

16  Q.    And going to No. 18 can, you read what that says?

17  A.    "If a debtor is an individual list the names, addresses,

18  taxpayer identification numbers, nature of the businesses and

19  beginning and ending dates of all businesses in which the

20  debtor was an officer, director, partner or managing member --

21  or I'm sorry -- managing executive of a corporation, partner to

22  partnership, sole proprietor or was self-employed in a trade,

23  profession or other activity, either full or part-time within

24  six years immediately preceding the commencement of this case,

25  or in which the debtor owned five percent or more of the voting

1  or equity securities within six years immediately preceding the

2  commencement of this case."

3  Q.    Did Mr. Harley list himself as officer, chairman, CEO of

4  any company like RJH --

5  A.    He did not.

6  Q.    -- on this personal petition?

7  A.    He did not.

8  Q.    And was this also filed under penalty of perjury?

9  A.    Yes, it was.

10 Q.    Can we go to the last page and see the date that he signed

11 it?

12 A.    May 28, 2012.

13 Q.    The last page of this document is a document called list

14 of creditors holding 20 largest unsecured claims?

15 A.    Yes.

16 Q.    And are there two entries there?

17 A.    There are.  North Slope, Three Owners Association,

18 disputed for dues, $36,827.27.  And Kevin Hardy for attorneys

19 fees also disputed, $13,637.63.

20 Q.    So there's nothing listed for Mr. Silverstein?

21 A.    There is not.

22 Q.    The United States of America?

23 A.    There is not.

24 Q.    The Securities and Exchange Commission?

25 A.    There is not.

1  Q.    Can we go to 20.2.  Is this his income statement

2  personally on the 2012 petition?

3  A.    Yes.  It says Chapter 13 means test.

4  Q.    And on item six the income remains the same?

5  A.    Yes, $535.

6  Q.    And going to page two and following, there's no other

7  income that he's declaring personally?

8  A.    Correct.

9  Q.    And item Box No. 61, there's also indication he signed

10 this under penalty of perjury?

11 A.    Yes.

12 Q.    Go to 20.3.  What is 20.3?

13 A.    This is Mr. Harley's certificate of credit counseling.  In

14 order for an individual to file bankruptcy they have to receive

15 credit counseling in the form of a short course.  It's taken

16 usually over the internet or by telephone.  And this is a

17 certificate showing that he completed that course.

18 Q.    And as part of that certificate of counseling he has to

19 again report any income that he has personally, correct?

20 A.    Yes.

21 Q.    And he makes the same on the third page, the same $535 a

22 month, no change?

23 A.    Correct.

24 Q.    And with him and his wife, the total income is $1,070, no

25 other income coming in?

176

1  A.    That's right.

2  Q.    And going to page 8 of this document where it says

3  Determination of 707(b)(2) presumption.  It's Box 50 on the --

4  yeah, Box 50, right there.

5  A.    Yes.

6  Q.    What does it show as far as his monthly disposable income?

7  A.    Negative $2,280.

8  Q.    So his liabilities, his expenses are more than his income?

9  A.    Correct.

10 Q.    And in Box 53 what does he indicate his total nonpriority

11 unsecured debt is?

12 A.    $56,175.32.

13 Q.    If we go to the next page, this document is also signed

14 under penalty of perjury?

15 A.    It is.

16 Q.    Now on May 30 of 2012?

17 A.    Correct.

18 Q.    Now, going to the next page is yet another Schedule A

19 that's filed, correct, for him personally?

20 A.    Correct.

21 Q.    This one is filed, if you'll scroll down to the bottom of

22 the page?

23 A.    June 7, 2012.

24 Q.    And it's still listing just the residence?

25 A.    Correct.

1  Q.    The same thing, the next page with personal property?

2  A.    Yes.

3  Q.    But now it's listing a checking account?

4  A.    Yes, with a balance of three dollars.

5  Q.    Nothing about a Merrill Lynch account?

6  A.    No.

7  Q.    Any -- item five it asks for books, pictures and other art

8  objects.  Anything listed there?

9  A.    There is nothing listed.

10  Q.    1.8 million dollars of art?

11  A.    No.

12  Q.    And going to property claimed as exempt, three pages down,

13  what does he list as exempt?

14  A.    He's claiming exemption in the town home, personal, which

15  I assume means his personal effects, clothing and the like, and

16  the car.

17  Q.    And how much is he saying the car is valued at, or the

18  exemption?

19  A.    He's claiming the exemption is valued at $3,225.  He's

20  claiming the value of the car is $1,800.

21  Q.    Does he list what kind of car that is?

22  A.    He does not.

23  Q.    And Schedule D, that's a personal -- as creditors holding

24  secured claims against him personally, who does he list?

25  A.    He list IndyMac Bank for the mortgage.

1  Q.    The mortgage company?

2  A.    Yes.

3  Q.    And it's Schedule E, creditors holding unsecured priority

4  claims?

5  A.    None.

6  Q.    Schedule F, nonpriority claims.

7  A.    A debt to North Slope Owners Association.

8  Q.    For how much?

9  A.    $37,793.61 and listed as disputed.  Debt to Kevin Hardy

10 for $18,575.32 listed as disputed.

11 Q.    But stopping there.  Kevin Hardy, he was the lawyer for

12 North Slope, wasn't he?

13 A.    That's correct.

14 Q.    Go ahead.

15 A.    A debt to Capital One, appears to be a credit card,

16 $1,624.  Another debt to Brooks Brothers for $1,000.  A debt to

17 JC Penny's for $366.  A debt to Household Finance for $874.  A

18 debt to Sears for $1,279.  And a debt to Chase Card Services

19 for $2,897.

20 Q.    And the total amount of unsecured nonpriority claims?

21 A.    $64,408.93.

22 Q.    Nothing about Mr. Silverstein?

23 A.    No.

24 Q.    The United States?

25 A.    No.

1  Q.    Or the SEC?

2  A.    No.

3  Q.    And going to Schedule G.

4  A.    He lists no executory contracts or unexpired leases to

5  which he's a party.

6  Q.    And then --

7          MR. BRANDLER:  I have no further questions, and I'd

8  move the admission of all the previously identified documents.

9          THE COURT:  Any objections?

10          MR. O'BRIEN:  No objections.

11          THE COURT:  They'll be admitted.  We're going to

12  adjourn.

13          MR. BRANDLER:  Your Honor, may I just ask, and if Mr.

14  O'Brien's cross is not going to be lengthy.  This witness is

15  from Harrisburg, and I know the weather is going to be bad

16  possibly tomorrow.  I don't know how lengthy your examination

17  is going to be?

18          MR. O'BRIEN:  Well, your examination has been very

19  lengthy.  In any case, I -- but I must speak to my client.

20          MR. BRANDLER:  All right.  If it's going to be like

21  five minutes I would ask that the witness --

22          THE COURT:  Well, I said to the jury -- I said I

23  would send you home at 4:30.  Are you willing to stay a little

24  longer?

25          MR. O'BRIEN:  Your Honor?

1          THE COURT:  Yes.

2          MR. O'BRIEN:  Mr. Harley would like to confer with me

3    about this, and he'd like the cross examination to be tomorrow.

4          THE COURT:  Pardon?

5          MR. O'BRIEN:  Mr. Harley would like to confer with me

6    about some of these matters and would like the cross

7    examination to be tomorrow.

8          THE COURT:  All right.  Can Mr. Schiller remain in

9    the area?

10          MR. BRANDLER:  I don't know.

11          THE WITNESS:  Your Honor, I would have to go back to

12    Harrisburg this evening, but I can certainly come back if it's

13    necessary.

14          THE COURT:  Well, all right.  There's a number you

15    should call.  But you can't call it until after seven because

16    I'll be calling in about the weather.  So, it still shouldn't

17    -- you still should get here in time anyway, even if we start

18    at 9:30.

19          THE WITNESS:  Yes.

20          THE COURT:  All right.  Members of the jury, we're

21    going to adjourn as promised.  And remember not to discuss the

22    case among yourselves or with anyone else.  Don't expose

23    yourself to any media.  You're to decide this case solely on

24    what you see and hear in this courtroom.

25          We'll start tomorrow at 9:30.  You have the sheet.

1  If there's any question about the weather, be sure to call

2  after seven and see where we are.  Enjoy your evening and we'll

3  see you tomorrow morning.

4             THE DEPUTY CLERK:  All rise.

5                  (4:34 p.m., court adjourned.)

182

REPORTER'S CERTIFICATE

1

2

3      I, DIANA L. GILBRIDE, Official Court Reporter for the

4  United States District Court for the Middle District of

5  Pennsylvania, appointed pursuant to the provisions of Title 28,

6  United States Code, Section 753, do hereby certify that the

7  foregoing is a true and correct transcript of the

8  within-mentioned proceedings had in the above-mentioned and

9  numbered cause on the date or dates hereinbefore set forth; and

10  I do further certify that the foregoing transcript has been

11  prepared by me or under my supervision.

12

13                       /s/ Diana L. Gilbride
                    _____
14                    Diana L. Gilbride, RMR, FCRR
                    Official Court Reporter
15
REPORTED BY:
16
    DIANA L. GILBRIDE, RPR
17    Official Court Reporter
    United States District Court
18    Middle District of Pennsylvania
    P.O. Box G
19    Scranton, PA  18501-0090

20

21        (The foregoing certificate of this transcript does not
apply to any reproduction of the same by any means unless under
   the direct control and/or supervision of the certifying
22  reporter.)

23

24

25