1

1    UNITED STATES DISTRICT COURT

2    MIDDLE DISTRICT OF PENNSYLVANIA

3

4    United States of America,    )
                                   )
5         Plaintiff               )
                                   )
6    VS.                          )    CASE NO. 3:12-CR-00224
                                   )
7                                  )
                                   )
8    Richard J. Harley,           )
                                   )
9         Defendant               )
                                   )
10                                 )
     _____ )
11

12    TRANSCRIPT OF PROCEEDINGS OF JURY TRIAL - VOLUME EIGHT
          BEFORE THE HONORABLE A. RICHARD CAPUTO
13            FRIDAY, DECEMBER 12, 2014
             WILKES-BARRE, PENNSYLVANIA
14

15   FOR THE PLAINTIFF:

16       Joseph A. O'Brien, Esq.
         Oliver, Price & Rhodes
17       1212 South Abington Road
         Clarks Summit, PA  18411
18

     FOR THE DEFENDANT:
19
         Bruce D. Brandler, AUSA
20       U.S. Attorney's Office
         Room 217, Federal Building
21       228 Walnut Street
         Harrisburg, PA  17108
22       _____

23            DIANA GILBRIDE, RMR, FCRR
            FEDERAL OFFICIAL COURT REPORTER
24                  P.O. BOX G
             SCRANTON, PA 18501-0090
25

**INDEX TO WITNESSES**
**FRIDAY, DECEMBER 12, 2014 - VOLUME EIGHT**

| FOR DEFENDANT: | DIRECT | CROSS | REDIRECT | RECROSS | COURT |
|---|---|---|---|---|---|
| Donald C. Kesterson (on qualifications) by Mr. O'Brien: | 3 | | | | |
| by Mr. O'Brien: | 8 | | 118 | | |
| by Mr. Brandler: | | 30 | | 132 | |

**INDEX TO EXHIBITS**

| GOVERNMENT: | IDENTIFIED | ADMITTED |
|---|---|---|
| Exhibit No. 32.6 | 9 | 118 |
| Exhibit No. 32.12 | 18 | 118 |
| Exhibit No. 32.14 | 21 | 118 |
| Exhibit No. 32.16 | 24 | 118 |
| Exhibit No. 32.17 | 25 | 118 |
| Exhibit No. 27.8 | 44 | 118 |
| Exhibit No. 32.1 | 45 | 118 |
| Exhibit No. 52.1 | 52 | 118 |
| Exhibit No. 32.6 | 58 | 118 |
| Exhibit No. 32.2 | 69 | 118 |
| Exhibit No. 32.10 | 72 | 118 |
| Exhibit No. 32.3 | 86 | 118 |
| Exhibit No. 32.4 | 89 | 118 |
| Exhibit No. 32.5 | 93 | 118 |
| Exhibit No. 32.6 | 97 | 118 |
| Exhibit No. 32.7 | 98 | 118 |
| Exhibit No. 36.17 | 100 | 118 |
| Exhibit No. 32.8 | 107 | 118 |
| Exhibit No. 32.18 | 111 | 118 |
| Exhibit No. 32.9 | 113 | 118 |
| Exhibit No. 53.1 | 115 | 118 |
| Exhibit No. 31.3 | 117 | -- |
| Exhibit No. 32.6 | 118 | 118 |
| Exhibit No. 36.17 | 134 | 118 |
| Exhibit No. 32.17 | 134 | 118 |

1              (9:30 a.m., convene.)

2          THE COURT:  Good morning.  We're going to proceed now

3  with testimony from the defense side of the case.  Mr. O'Brien.

4          MR. O'BRIEN:  Your Honor, Don Kesterson.

5          THE DEPUTY CLERK:  Please raise your right-hand.

6                    DONALD C. KESTERSON,

7  called as a witness on behalf of the Defendant, having been

8  duly sworn or affirmed according to law, testified as follows:

9          THE DEPUTY CLERK:  Would you please state and spell

10  your name for the record?

11         THE WITNESS:  Donald C. Kesterson, K-E-S-T-E-R-S-O-N.

12         THE DEPUTY CLERK:  Thank you.

13                   DIRECT EXAMINATION

14  BY MR. O'BRIEN:

15  Q.   Mr. Kesterson, can you state your full name again, please?

16  A.   Donald C. Kesterson.

17  Q.   And what is your business address?

18  A.   P.O. Box 2036, Parkersburg, West Virginia 26102.

19  Q.   In what business are you engaged?

20  A.   I'm a petroleum geologist, a consulting petroleum

21  geologist.

22  Q.   And are you a licensed petroleum geologist?

23  A.   I am licensed in the State of Kentucky, which is the

24  closest state that authorizes that licensing.

25  Q.   Okay.  How long have you been a petroleum geologist?

1  A.    Since 1977.

2  Q.    And how long have you been licensed?

3  A.    I've been certified by the American Association of

4  Petroleum Geologists since 1989.  And I've been licensed in the

5  State of Kentucky I believe since 1993.

6  Q.    And what do you do -- what is the job of a petroleum

7  geologist?  Tell us what you do?

8  A.    I do a variety of things.  I write reports, supervise

9  drilling, completion and production, depending on the needs of

10  the companies that hire me.  That's about it.

11  Q.    Okay.  You talk about writing reports.  In one of the type

12  of reports you write do you estimate the amount of petroleum

13  under a particular tract of land?

14  A.    Yes, sir.

15  Q.    Okay.  And is there a way you do that?

16  A.    Yes, sir.  I follow industry standards, which has been

17  laid out for more than a hundred years on how you evaluate oil

18  and gas.  All the information that's available, you bring it

19  in, you study it, and you draw conclusions.

20  Q.    Okay.  And is that something that's part of your training

21  as a geologist?

22  A.    Yes, sir, it is.

23  Q.    And it's something you've done before, before this case?

24  A.    I've done it for more than 30 years.

25  Q.    And have you done it in conjunction with any legal

5

1    proceedings?

2    A.    Yes, sir.

3    Q.    Okay.  And have you submitted reports in legal

4    proceedings?

5    A.    I believe so.  I don't recall.

6    Q.    Have you ever testified in any type of legal proceeding?

7    A.    Yes, sir, I have.

8    Q.    And have you been admitted as an expert in legal

9    proceedings?

10    A.    Yes, sir, I have.

11    Q.    Now tell us, in addition to your -- where do you have your

12    degree in petroleum geology?

13    A.    My degree comes from the University of South Carolina.

14    Q.    And what is the degree in exactly?

15    A.    The degree is in geology.

16    Q.    And is that a four-year degree?

17    A.    Yes, sir, it is.

18    Q.    And have you taken any courses since then, continuing

19    education courses or anything like that?

20    A.    No, sir.

21    Q.    Okay.  And do you have special expertise in the field of

22    petroleum geology?

23    A.    Hum --

24    Q.    Does a petroleum geologist have special expertise, more

25    than a layman?

6

1  A.   Yes.   Analyzing, supervising drilling.  Right now I'm

2  involved in horizontal drilling the Marcellus and the Utica.

3         MR. O'BRIEN:  I would offer the defendant as an

4  expert witness in the field of petroleum geology, specifically

5  in the field of estimating the amount of petroleum reserves

6  under particular tracts of land.

7         THE COURT:  Any voir dire?

8         MR. BRANDLER:  I'd like to approach on that, your

9  Honor.  May we approach?

10        THE COURT:  Yeah.

11        (Whereupon, the following discussion occurred at

12 side-bar between the Court and counsel:)

13        MR. BRANDLER:  I have no objection to him testifying

14 as a fact witness about what he did for Mr. Harley, what

15 estimates he made for Mr. Harley.  But as far as being an

16 expert witness to offer opinions outside of facts of his

17 involvement I do object.

18        We got no notice from the defense that he was going

19 to be testifying as an expert witness or otherwise, and I don't

20 believe that his testimony of an opinion regarding anything

21 other than what he's already done is even relevant to this

22 proceeding.

23        THE COURT:  Well, well -- go ahead.

24        MR. O'BRIEN:  We had his report.  And it's listed as

25 one of his exhibits.

1    THE COURT:  I don't -- what's the distinction of it?

2  What is it that he's going to testify to that he's going to

3  be --

4    MR. O'BRIEN:  He's going to testify -- he's going to

5  estimate -- nothing.

6    MR. BRANDLER:  But I don't want him testifying as an

7  expert.  I don't want him declared by the Court to be an

8  expert.

9    THE COURT:  You notice I don't declare anybody.

10    MR. BRANDLER:  Okay.  But I just don't think he's an

11  expert.  He's a fact witness without involvement in this case.

12    MR. O'BRIEN:  He's giving an opinion beyond the realm

13  of --

14    THE COURT:  Without my going to making a

15  pronouncement, he stated his qualifications.  You've had the

16  report.

17    MR. BRANDLER:  Right.

18    THE COURT:  If you want to voir dire him I'll allow

19  it.  If he testifies I will probably give an instruction that

20  an expert -- that he's an expert witness.  And expert witnesses

21  can give opinions.  Now, essentially, if all he's going to do

22  is say what he said in the report, I can't -- I don't

23  understand why you have a problem with that.

24    MR. BRANDLER:  Because I got no notice that he's

25  testifying as an expert.  I would have brought in an expert,

1  another petroleum engineer to say something different than what

2  is in his report to counter it.  I was under the impression

3  he's testifying as a fact witness only.  There was no notice by

4  the defense.  They asked for notice of my experts.  I gave them

5  notice of Mr. Massey and the art expert who testified.  They

6  were required to give notice of their experts.

7         Like I said, he can testify from this point forward

8  about anything he did with Mr. Harley, whatever report he

9  submitted, but not as an expert, as a fact witness, and I think

10 that's an important distinction.

11        THE COURT:  Without getting too far afield, I'm not

12 going to sustain your objection.  I'm going to listen to the

13 testimony.  I'm making no declaration at the moment.  If I

14 decide that something's gone beyond somewhere or he's given

15 some opinion, I'll determine whether or not I'm going to give

16 an expert opinion instruction, but I'm not going to sustain

17 your position at this point.

18        MR. O'BRIEN:  Okay.

19        MR. BRANDLER:  Thank you.

20     (Whereupon, the discussion held at side-bar between

21 the Court and counsel concluded.)

22                 DIRECT EXAMINATION

23 BY MR. O'BRIEN:

24 Q.   Mr. Kesterson, do you know Richard Harley?

25 A.   Yes, sir.

1  Q.   Were you called upon by Richard Harley to give an estimate

2  of the crude oil reserves under a parcel of land involving six

3  leases in Brown County, Texas?

4  A.   Yes, sir.

5  Q.   And did you give him an estimate of the reserves under

6  that land?

7  A.   Yes, sir.

8  Q.   And was it in -- was your initial report July 3, 1999?

9  A.   Yes, sir.

10        MR. O'BRIEN:  32.6 please.

11  BY MR. O'BRIEN:

12  Q.   If you look at your screen.  Take the time to look through

13  that.  Does that look like your report?  When you're finished

14  with the first page, let me know and we'll go through it.

15  A.   Yes, I'm finished.

16  Q.   Would you go to page two, please.  Does that look like the

17  first page of your report?

18  A.   It's kind of blurred.  Is there some way I can see it

19  better, please.  Scroll up.  Scroll down, please.

20  Q.   And can you look at the next page, please.

21  A.   I'm not ready, sir.

22  Q.   I'm sorry.

23  A.   Can you scroll down a little bit farther?  Okay.  I'm

24  ready for the next page.

25  Q.   Okay.  Can we go to the next page?

1  A.    Please.  Scroll down, please.  A little bit farther,

2  please.  Okay.  Next page.

3  Q.    And can you look at the third page?  Scroll down, please.

4  Okay.  And the next page, please.

5  A.    Yes.  Scroll down.  Okay.  Next page.

6  Q.    The next page entitled, Lease List and Data.

7  A.    Okay.

8  Q.    And the next page, Criteria for Evaluating Reserves.

9  A.    Scroll down.  Okay.

10  Q.    Next page is entitled, Definition of Reserved Categories.

11  A.    Okay.

12  Q.    Okay.  And then the next -- after that there are three

13  pages that are titled Discussion, actually four pages there.

14  A.    Can you go down just a little bit farther, sir.  Okay.

15  Q.    And the next four pages are entitled Discussion.  Would

16  you look at those, please.

17  A.    Okay.

18  Q.    Four pages.

19  A.    Okay.  Okay.

20  Q.    And the final section of the report is entitled Summary

21  Sheet?

22  A.    You just showed me the first page of the four-page

23  discussion.

24  Q.    Okay.  Would you look at the second page of the

25  discussion.

1  A.    Scroll down, please.  Scroll down, please.  Okay.

2  Q.    Okay.  And look at the next page of the discussion.

3  A.    Scroll down please.  Okay.

4  Q.    I think there's one more page of the discussion.

5  A.    Okay.

6  Q.    Actually, there's two more -- one more page.  Can you look

7  at that page?

8  A.    Okay.

9  Q.    And finally, the summary sheet.

10  A.    Okay.

11  Q.    Whenever you're finished.

12  A.    Yes, sir.

13  Q.    My question to you is, is this document that you have just

14  reviewed page by page that's marked as defendant -- it's marked

15  as Government Exhibit 32.6 and it's on the screen before you,

16  is that a true and correct copy of the report you submitted to

17  Mr. Harley on July 2, 1999?

18  A.    What you showed me of that, yes, there were additional

19  pages.

20  Q.    There were some additional pages?  The calculations and so

21  forth?

22  A.    Yes, sir, calculations, maps.

23  Q.    In fact, I have a copy -- the additional pages included

24  some reference to all the calculations for each and every lease

25  and so forth, right?  Okay.  I'll get back to that later.

1      Now, what information and what documents did Mr. Harley

2  give you before you prepared the report?

3  A.    Hum, he provided to me a report from the Texas Railroad

4  Commission that was certified documents on all the wells as all

5  the paperwork, permits and forms that were filed with the Texas

6  Railroad Commission, and a report from a Phillip Page.

7  Q.    And did he give you the report -- did he give you a copy

8  of the promissory original, or the copy or original of the

9  promissory note from Enpetro?

10  A.    Yes, sir.

11  Q.    And what -- just in terms of documentation, Texas Railroad

12  Commission records, a copy of the note.  Did you obtain any

13  other documentation in preparing your report?

14  A.    I did research on my own to come up with production

15  information that's on-line with the Texas Railroad Commission

16  and structure maps, the normal procedures that a geologist

17  would go through in order to do this type of a report.

18  Q.    Okay.  Can you tell us, just summarize, what the

19  procedures you did?  What are those normal procedures?

20  A.    I acquire all the logs that I can find through a variety

21  of sources, including those with the Texas Railroad Commission

22  method and hole logs, production histories as filed with the

23  state, and then go through step by step process to verify that

24  the information that came from the Texas Railroad Commission

25  was in fact authentic.  I called and talked to the clerk at

1  that office to verify that that information was in fact

2  authentic.  This is the normal procedure that I go through in

3  preparing any report.

4  Q.   Okay.  So after you finished acquiring information and

5  authenticating it, what's the next step in preparing the

6  report?

7  A.   You start analyzing -- doing volumetric reserves on the

8  logs that you have available, which there are industry formulas

9  that you use in order to do that.  Then look at -- spot the

10  wells on a map and then overlay it on any available structure

11  maps that you may be able to acquire in order to see if there's

12  any geological anomalies that would cause the wells to pinch

13  out or if the formation was consistent across these specific

14  leases that you're evaluating in the study area.

15      And you sort of build your report off from that

16  information and draw your conclusion at that point, once you

17  feel like you've accumulated all the necessary data that one

18  needs in order to do this type of report.

19  Q.   Did you in this case accumulate all the necessary data

20  that you would need to estimate the oil reserves involved with

21  these six particular leases?

22  A.   I believe I covered all the available data through my own

23  network of resources, yes, sir.

24  Q.   And then did you do the analysis that needs to be done to

25  make your estimates as to the amount of reserves under that

1  land?

2  A.   Yes, sir.

3  Q.   Okay.  Now, can you just explain a little bit more about

4  how you do the analysis step, gathering information step one,

5  gathering analysis step two, in layman's terms if you could?

6  A.   There are formulas that we use with open hole logs that we

7  take.  And those formulas determine by -- there's a variety of

8  psalms [ph] that we call them that we stick down in the well

9  and we pull them back up across all the formations that give

10  you readings, such as a gamma ray, a neutron, induction, which

11  an induction in essence is we bombard the formation with an

12  electrical current and then measures how it comes back.  And

13  all that data is then inferred into reserve numbers that we

14  use, the industry has used for, again, more than a hundred

15  years to come up with an estimated value of oil and gas and

16  water in the ground.  That's the process.

17  Q.   After you gather the information, verified it and did your

18  analysis, and according to the hundred year standards, did you

19  then reach an opinion as to the amount of recoverable oil

20  reserves under this particular tract of land?

21  A.   Under the six tracts, yes, sir.

22  Q.   Six tracts?

23  A.   Yes, sir, I did.

24  Q.   And can you refer us in your report to your opinion, where

25  that is?

1  A.    Hum, it was the last pages in the discussion that goes

2  through by formation and by lease name.  That was my

3  conclusions, and I did so in a conservative manner.

4  Q.    Would you look at the sheet you have in front of you, is

5  that it?

6  A.    If you can blow it up, please.  Yes, and that is based

7  on -- we have categories of reserves.  There's a variety of

8  definitions that we use in the industry.  Those reserve figures

9  that are there are proved, developed, non-producing reserves.

10          MR. BRANDLER:  I don't believe that's what's on the

11  screen.  Can you scroll up to the label on top of what he's

12  looking at?  Scroll up.  No.  Right there.

13  BY MR. O'BRIEN:

14  Q.    Let me stop there and ask you a question.  What is the

15  concept of proved developed producing reserves?  Can you define

16  that concept and explain what you found?

17  A.    Yes, sir.  Proved, developed, producing, or PDP, amounts

18  to reserves that have been -- formations that have been

19  perforated, fraced and are currently in production producing

20  oil, gas, water, whatever, into a tank or into a pipeline.  And

21  those are flowing currently.

22  Q.    Did you -- what opinion did you reach about the amount of

23  proved, current, flowing reserves on those six tracts?

24  A.    According to my research from the Texas Railroad

25  Commission, there had been no production from these wells since

1  1993, which would have all fallen into the proved, developed,

2  producing.

3  Q.    Now, can you define the concept proved non-producing and

4  proved undeveloped reserves?

5  A.    Okay.  Proved, non-producing reserves are basically two

6  different types of reserves.  One, the well has been drilled.

7  It may or may not have been cased.  But we've run those open

8  hole logs that I've described.  We've evaluated the logs and we

9  say yes, there's reserves there.  We think that they're

10 productive.

11     Or there's another category where the wells have been

12 drilled, cased, perforated, maybe been fraced, they may have

13 been in production, they may have not been in production.  And

14 if they had been shut in for whatever reason, then you move

15 those reserves from the proved, developed, producing into the

16 proved, developed, non-producing, because they're not flowing

17 at that particular moment.

18     It just depends on a time period.  Then what we call the

19 proved undeveloped reserves are locations that are one drill

20 site away that has not been drilled.  In other words, if I have

21 a well here and there's a -- in Texas in particular -- there's

22 a spacing requirement, and you step out one site, no hole has

23 been drilled, but you can infer from this log here and this

24 well here that you'll have a well here, here, here and here,

25 that all has the potential, based on this -- based on this log.

1  We have to discount those reserves because of the risk that it

2  takes money, drilling, drilling problems, et cetera.  But

3  that's what proved, undeveloped reserves are.

4  Q.    Now, can you scroll up please?  Now, can you tell us what

5  your conclusion was on the estimated barrels of the undeveloped

6  reserves?

7  A.    My estimated volumetric numbers were 10,217,369.

8  Q.    Now, you break that estimate into five categories, right?

9  A.    Yes, sir, that's by formation.

10  Q.    You know, you talked about six leases.  What's the

11  difference between a formation and a lease?

12  A.    Okay.  A lease is somebody owns a tract of land that's a

13  surface, surface representation, there may be a difference

14  between who owns the surface and who owns the royalty.  And

15  then you will encounter as you drill various formations down to

16  whatever the depth of the well drilled or the information that

17  you have available.  And in this area there were five subject

18  formations that we had data on, that had accumulated down to

19  3,500 feet.

20      There may be deeper reserves, but for the purposes of this

21  type of report, I can only use information that I have to the

22  rights of the deepest depth drilled, or in the case -- if there

23  were different leases, you might be limited if you're doing a

24  report for XYZ oil company, and they only had a lease down to

25  3,000 feet, then you'd only do the report for that company, you

18

1  do the reserves to that company.  Some other company may own

2  the deeper rights and deeper reserves so you don't assign those

3  reserves to that company.

4  Q.   Now, you also referred to estimated value.  Can you tell

5  us how you got the value of each of the formations?

6  A.   The estimated value was -- is a very simple process.  At

7  the end of a given business day NYMEX, which is the New York

8  commodities, post a closing price of commodities, oil, gas,

9  gold, et cetera, and you look at that price at the close of

10 business on that day and you input that number times the barrel

11 of oil to come up with the estimated value.

12 Q.   Now, Mr. Kesterson, do you stand by this report?  Is your

13 opinion as a professional geologist?

14 A.   Yes, sir, I do.

15 Q.   Did you issue revisions to the report on I believe five

16 occasions to Mr. Harley?

17 A.   Yes, sir, I did.

18 Q.   Okay.  Can we have Exhibit 32.1?

19          TECHNICIAN:  32.1?

20          MR. O'BRIEN:  32.12, I'm sorry.

21 BY MR. O'BRIEN:

22 Q.   Now, can you take a look at this and see if this is the

23 revision you issued to him on January 26, 2000?

24 A.   Could you blow it up, please?

25 Q.   I believe this is two or three pages.

1  A.    Scroll down, please.  Scroll down, please.  Next page,

2  please.  Scroll down.  Scroll down.  Yes, that is my letter.

3  Q.    Okay.  Can you scroll up just a little bit?  Now, can you

4  tell us why you issued this letter?

5  A.    Hum, Mr. Harley called and asked me to update the cover

6  letter for the revision of the report.  All other data had

7  remained the same.  There had been no production.  So, my

8  reserve calculations remained the same.  And I just updated the

9  letter as of the NYMEX closing price on that particular day.

10  Q.    So what you're saying is the total reserves remains at

11  $10,217,369, but the value goes up because the price had gone

12  up since the first report?

13  A.    Yes, sir.  There had been no production, so therefore the

14  reserves estimated, calculated had not changed.

15  Q.    Producing reserves remained at zero, non-producing

16  reserves were the same.  The price went up because the value

17  went up?

18  A.    Yes, sir.

19  Q.    And how about the -- the total reserves by assignment,

20  just explain that to a jury.

21  A.    Where -- where are you pointing at?

22  Q.    Below, The total reserves calculated, you have a point,

23  Total reserves by assignment, that figure?

24  A.    Okay.  By assignment, that was one of the provisions under

25  the promissory note, Assignment of reserves.  That that number

1  came from the documentation that was between Enpetro and Mr.

2  Harley.

3  Q.    And what does it mean?  What does that mean?

4  A.    Well, that there was a certain number of reserves that

5  Enpetro promised to maintain that base at all times for

6  whatever the terms were.

7  Q.    These oil reserves were collateral for the note, correct?

8  A.    Right, yes, sir.

9  Q.    And they said they'd maintain them at that level?

10  A.    Yes, sir.

11  Q.    And if they did some drilling and drilled below that

12  they'd have to replenish or something?

13  A.    Well, they had to maintain those reserves at all times in

14  accordance with the agreement.

15  Q.    Okay.  Now, can you scroll to the -- I'm sorry, stay right

16  where you are.  There's the next paragraph, just read the last

17  sentence?

18  A.    Starting about ending?

19  Q.    Yes.

20  A.    Any lending institute must determine the value of the

21  reserves for their own purposes.

22  Q.    Now, that sentence is in your first report, right?

23  A.    Yes, sir.

24  Q.    And it's in all your revisions?

25  A.    Yes, sir.

1  Q.    Tell us about that?

2  A.    Well, normally, under these types of situations, if I

3  write a report for somebody and they are to attempt to seek

4  loans or other methods of determining gaining money, loans, et

5  cetera, they will go to a bank.  The bank will have their own

6  petroleum engineers or geologists that will come in and do a

7  report on behalf of that lending institute, whoever it is.

8  They'll look at my report.  And then they will go off and do a

9  report on their own, or validate that through other means.  But

10 they will not accept my report under some conditions.

11 Q.    Now, if a lending institution perhaps might ask you for a

12 report, right?

13 A.    Yes, sir.

14 Q.    And you would issue it to them?

15 A.    Yes.

16 Q.    You would expect them to rely on it?

17 A.    Yes.  I've done that before.

18 Q.    This report was issued to Mr. Harley?

19 A.    Yes.

20        MR. O'BRIEN:  Okay.  Could we have Exhibit 32.14?

21 BY MR. O'BRIEN:

22 Q.    Can you take a look at that document, sir?

23 A.    Scroll down, please.  Okay.

24 Q.    Next page, please.

25 A.    Okay .

1 Q.   Okay.  Can you scroll up a little?  Can you identify this

2 document as a report issued to Mr. Harley on December 13, 2005?

3 A.   Could you scroll up a little bit more, please.  Again,

4 this is just the next cover letter, because nothing else had

5 changed in the volume of the report.

6 Q.   Why did you issue this -- if you want to call it the next

7 cover letter?

8 A.   Mr. Harley called and requested it.

9 Q.   Now, what was different in this from the previous report

10 and cover letter?

11 A.   The only thing that changed is the NYMEX number.  I

12 changed the format just a little bit.  I moved the reserves in

13 the ground to a different part of the report, but the numbers

14 are the same.  But that was the only thing that changed, was

15 the value based on the NYMEX price at the close of business on

16 that day.

17 Q.   Okay.  So -- because the price of oil had gone up?

18 A.   Yes, sir.

19 Q.   Can you scroll up a little bit, please?  Actually scroll

20 down, let me get that right.  Scroll down a little bit -- up,

21 I'm sorry.  Okay, stop there, please.  Can you read the

22 paragraph that says because?

23 A.   Because of the terms and the conditions of the oral

24 promissory note and the collateral assignment no time limit or

25 any economic expense has been factored on the recovery of any

1  of these estimated reserves.  Therefore, the estimated

2  recoverable reserves under these leases that the amount of

3  known crude oil produced 1996 -- or I'm sorry, 1966 to 1993

4  still exceeds the crude oil backing the subject note for the

5  estimated one -- 10,153,164 barrels of crude oil recoverable.

6  Q.    Okay.  Then your next paragraph you have a value, and

7  there you're just valuating the minimum amount of oil they had

8  to keep as collateral, right?

9  A.    Yes.  In essence it was like the value over

10 collateralizing.

11 Q.    3215, please.  Now, can you take a look at this and see if

12 you can identify that as a subsequent revision to your report

13 that you gave to Mr. Harley on June 6, 2007?

14 A.    Okay.

15        (Whereupon, the witness reviewed the document.)

16 BY MR. O'BRIEN:

17 Q.    Now, you identified that as your report of June 6, 2007?

18 A.    Yes, sir.

19 Q.    And again, there's no changes to your opinion as to the

20 proved developed, which is still zero?

21 A.    That's correct.

22 Q.    Okay.  And your opinion as to the proved undeveloped is

23 still about 10 billion --

24 A.    Yes.

25 Q.    -- 10 million?

24

1    A.    Yes.

2    Q.    The only thing that's changed is the price, because the

3    price flucuates every day?

4    A.    Yes, sir.

5    Q.    Exhibit 32.16, please.  Can you tell us whether that's a

6    copy of your revised report of September 28, 2007?

7    A.    Scroll up, please.  Scroll up, please.  Okay.  Okay.

8                   (Witness reviewing document.)

9    BY MR. O'BRIEN:

10   Q.    Okay, Mr. Kesterson, can you identify Document 32.16 as a

11   true and correct copy of your report --

12   A.    Yes, sir, it appears --

13   Q.    -- on December 28th, 2007?

14   A.    Yes, sir, it appears to be.

15   Q.    And again, to speed things up a little, you make no

16   changes to the amount of proved developed reserves, do you?

17            MR. BRANDLER:  There's no indication of proved

18   developed.

19            MR. O'BRIEN:  That doesn't mean that there aren't

20   any.  And he hasn't changed them.  That's what my question is.

21            MR. BRANDLER:  I'll do it on cross.

22            THE WITNESS:  Yes.  This is my report.  It appears to

23   be.

24   BY MR. O'BRIEN:

25   Q.    And you haven't changed your opinion as to proved

1  undeveloped resources?

2  A.    Proved non-producing.

3  Q.    Non-producing, I'm sorry, non-producing?

4  A.    Yes, sir.

5  Q.    Still approximately 10 million barrels?

6  A.    Yes, sir.

7  Q.    The only thing that's changed is the value of the proved

8  non-producing?

9  A.    Based on the NYMEX close of that day.

10  Q.    And the value at this time is going up and up and up?

11  It's much higher than it originally was?

12  A.    Yes, sir.

13  Q.    Because the price of oil went up?

14  A.    Yes, sir.

15  Q.    Okay.  Finally Document 32.17.  I ask you to look at this.

16  This is a letter dated February 28, 2008, to Mr. Harley.  And

17  would you look at that and tell us if that's a true and correct

18  copy of your report on that date?

19  A.    Scroll up, please.  Okay.  Okay.  Okay.  Okay.  Okay.

20  Yes, sir.

21  Q.    Now, this February 28th, is that a true and correct copy

22  of your report of February 28th?

23  A.    Yes, sir, it appears to be.

24  Q.    And again, you haven't changed your opinion about the

25  developed reserve, it's still zero.  Undeveloped reserve, still

1  approximately 10 million?

2  A.    Yes, sir.

3  Q.    Yes.  The court reporter can only take down --

4  A.    Yes, sir, I'm sorry.

5  Q.    And what you have is a change in the value?

6  A.    Yes, sir, by the basis of NYMEX.

7  Q.    Now, Mr. Kesterson, we've gone over one report and five

8  revisions?

9  A.    Yes, sir.

10  Q.   And they start in 1999 and end in 2008, a period of nine

11  years?

12  A.   (Nodded.)

13  Q.   And it's your testimony here today that those reports

14  accurately reflect your honest opinion as to the matters set

15  forth thereon?

16  A.   They do reflect my honest opinion, yes, sir.

17  Q.   And that is also an opinion that you stand behind in terms

18  of honesty and integrity, and also professionally?

19  A.   Yes, sir.

20  Q.   Based on your education and experience?

21  A.   Yes, sir.

22  Q.   And you submitted that report to Mr. Harley?

23  A.   Yes, sir.

24  Q.   Each one of them?

25  A.   Yes.

1  Q.    Now, I have a copy of an original copy of your original

2  report, and it has a sort of encased -- you know, embossed sort

3  of -- well, strike that, strike that question.  Strike that

4  question.  Let me talk -- before you do that, let me talk about

5  the things you didn't do.  You're a professional geologist?

6  A.    Yes, sir.

7  Q.    Certain things you didn't do.  No. 1, you were given a

8  copy of the Enpetro note, weren't you?

9  A.    Yes.

10 Q.    Did you -- and you notice that there's a 200 million

11 dollar note, and the collateral for it is the oil reserves

12 under six leases?

13 A.    Yes, sir.

14 Q.    Okay.  Did you do any research into the corporate

15 structure of Entrepo?

16 A.    Enpetro.

17 Q.    Enpetro, I'm sorry.

18 A.    No, sir, I did not.

19 Q.    That's not your field?

20 A.    No, sir.

21 Q.    You assumed the note to be valid?

22 A.    Yes.

23 Q.    Now, did you do a title or a search of the area to

24 determine the ownership of the leases?

25 A.    No, sir.

1  Q.   Okay.  That again is not your field?

2  A.   No, sir, it is not.

3  Q.   Your field is to determine the value of the oil under

4  these leases.  Okay.  Now, did you make any determination as to

5  how much it might cost to take this oil out of the ground?

6  A.   No, sir.

7  Q.   Okay.  And that's going to be important to someone who is

8  either buying the rights or lending money on them, right?

9  A.   Could you repeat that question, please.

10 Q.   The cost of extracting the oil from the ground is

11 important to someone who is looking at the value of the asset?

12 A.   That's an ambiguous question.  It's very difficult to

13 answer as you've asked me.

14 Q.   Let me go with this.  You made no opinion on that, as to

15 what it would cost to get this oil out?

16 A.   No, sir.

17 Q.   And that's not your job?

18 A.   Not for this particular report.

19 Q.   How about this particular transaction?  You were asked to

20 estimate the total oil reserves under the tracts?

21 A.   Yes, sir.

22 Q.   And again, your initial report and all the other ones, you

23 said that this is issued to Mr. Harley, it's my opinion, but

24 you're not issuing it to any banks?

25 A.   That's correct, sir.

29

1  Q.    Any lending institution or any purchaser, they're free to

2  get their own appraisal?

3  A.    Yes, sir.

4  Q.    Okay.  Now, two issues came up during the testimony of

5  other witnesses that I'd like to question you about.  A

6  gentleman, I believe he was from Merrill Lynch, said -- I think

7  this is the answer, this is obvious, but he was asked about

8  your report and he said he attempted to Google you and couldn't

9  find you.  You do exist, sir, right?

10 A.    Yes, sir.

11 Q.    And you're here today?

12 A.    Yes, sir.

13 Q.    And you've been in business for 30 years doing this type

14 of work?

15 A.    Since 1977.

16 Q.    And you do have a website, don't you?

17 A.    Hum, I do not have a website that pertains to petroleum

18 geology.

19 Q.    Maybe that's why he couldn't find you Googling you?

20 A.    Probably not.

21 Q.    Okay.  Now, it was also -- there was an individual by the

22 name of Massey, who is a lawyer from Brown County, Texas.  He

23 suggested that you might have ginned up your total estimated

24 production in your reports.  He said this, he said that the

25 total history on the tracts is only about 60,000 developed

1  barrels, and he finds it hard to imagine how a geologist could

2  predict that there's another ten million non-produced barrels

3  down there.  Can you comment on that?

4  A.   Well, just because so many barrels have been produced

5  versus how many barrels are in the ground are two completely

6  different things.  The most valuable day in any given well is

7  the day it's first turned into production, because that's when

8  it has the greatest potential before ever a barrel was

9  produced.

10      So for him to make that comment, not knowing how the

11  volumetric reserves would be calculated, and while production

12  is relevant, it has no bearing on the volumetric reserves that

13  were calculated prior to the first production gained from that

14  particular well or wells.

15  Q.   And again, as you said before, you stand by your data

16  collection and your analysis and the integrity of your report?

17  A.   I contend that my report was prepared in a conservative

18  manner, using industry-accepted standards.

19          MR. O'BRIEN:  That's all I have.

20          THE COURT:  Cross-examine.

21                    CROSS EXAMINATION

22  BY MR. BRANDLER:

23  Q.   Good Morning, Mr. Kesterson.

24  A.   Good morning, sir.

25  Q.   You were previously interviewed by the FBI on two

31

1  occasions, correct?

2  A.    Yes, sir.

3  Q.    And the first time was August 4 of 2000, correct?

4  A.    I believe that's a correct date, sir.

5  Q.    That was in connection with an investigation being

6  conducted in Alabama of Mr. Harley?

7  A.    Yes, sir.

8  Q.    And then you were interviewed again on February 22, 2012

9  in Harrisburg, Pennsylvania, by Mr. Browning and myself,

10 correct?

11 A.    Yes, sir.

12 Q.    Immediately prior to you testifying to a grand jury?

13 A.    Yes, sir.

14 Q.    And you did testify at a grand jury?

15 A.    Yes, sir.

16 Q.    And you had a lawyer for that testimony?

17 A.    Yes, sir.

18 Q.    And you have a lawyer today?

19 A.    Yes, sir.

20 Q.    Who sits in the courtroom?

21 A.    Yes, sir.

22 Q.    And his name is Pat Casey?

23 A.    Yes, sir.

24 Q.    It's not the same lawyer you had when you testified in a

25 grand jury, correct?

32

1  A.    That is correct, sir.

2  Q.    All right.  I just want to go through some things with you

3  here.  You said you were a petroleum geologist, correct?

4  A.    Yes, sir.

5  Q.    So, you're not an accountant?

6  A.    No, sir.

7  Q.    You're not an economist?

8  A.    No, sir.

9  Q.    You're not a lawyer?

10  A.    No, sir.

11  Q.    And you're not even a petroleum engineer?

12  A.    That is correct, sir.

13  Q.    Those are two different fields, correct?

14  A.    Yes, sir.

15  Q.    And would you agree with me that the primary job of a

16  petroleum geologist like yourself is to examine various

17  locations and get data from various locations and assess the

18  possibility that those locations have oil or gas or some other

19  mineral that would be valuable to someone who wants to extract

20  it from the ground?

21  A.    That is one of the attributes, yes, sir.

22  Q.    And then after the petroleum geologist does that, he would

23  consult with a petroleum engineer to pick a suitable location

24  and method of extraction, perform some test drillings to see if

25  it was economically feasible to get the oil or gas or other

1  mineral out of the ground, is that what petroleum geologists

2  generally do?

3  A.    Sometimes, but not limited to that, sir.

4  Q.    And if oil is discovered or gas is discovered in those

5  test drillings, you'll aid the company that you're working for

6  or the petroleum engineer to developing methods to extract that

7  mineral from the ground, correct?

8  A.    Yes, sir.

9  Q.    And that usually encompasses a lot of labor and leg work

10  to do that?

11  A.    Yes, sir.

12  Q.    Inspections of the site?

13  A.    Yes, sir, it can be.

14  Q.    And would you agree with me also that most petroleum

15  geologists hold at least a master's degree in either

16  geoscience, geology or geophysics?

17  A.    Not necessarily.

18  Q.    Well, you don't have a master's degree, do you?

19  A.    No, sir, I don't.

20  Q.    And what's your degree?

21  A.    My degree is a BS in geology.

22  Q.    Where did you get your bachelor of science in geology?

23  A.    From the University of South Carolina.

24  Q.    In what year did you get it?

25  A.    1977.

1  Q.    And you didn't go there for all four years, did you?

2  A.    No, sir, I did not.

3  Q.    Where did you start your education?

4  A.    At West Virginia University.

5  Q.    And then you transferred out?

6  A.    Yes, sir.

7  Q.    All right.  And you said you're self-employed, correct?

8  A.    Yes, sir.

9  Q.    So you don't work for any major oil company as an

10 employee?

11 A.    Not as an employee, sir.

12 Q.    And you've never worked for any major oil company like

13 Exxon or Mobile or Shell or BP as an employee?

14 A.    No, sir.

15 Q.    You work out of your home?

16 A.    Yes, sir.

17 Q.    You said your business address was a post office box,

18 correct?

19 A.    Yes, sir.

20 Q.    So you don't have a business address, your post office box

21 is your business address?

22 A.    Yes, sir.

23 Q.    And you don't have a website?

24 A.    No, sir.

25 Q.    All right.  Now, would you agree with me as a petroleum

1  geologist that you're not qualified to give any legal opinions?

2  A.   Yes, sir, I would agree to that.

3  Q.   Because you're not a lawyer?

4  A.   That is correct, sir.

5  Q.   And would you also agree with me that as a petroleum

6  geologist you're not qualified to interpret any legal

7  documents?

8  A.   I would agree with that, sir.

9  Q.   And would you agree with me that a promissory note is a

10 legal document?

11 A.   Yes, sir.

12 Q.   And would you agree with me that an assignment of

13 collateral is a legal document?

14 A.   Yes, sir.

15 Q.   So you have no qualifications to interpret a promissory

16 note or an assignment of collateral based on being a petroleum

17 geologist?

18 A.   That would be fair, sir.

19 Q.   And you're also not qualified to do title searches?

20 A.   No, sir.

21 Q.   You've never done a title search, correct?

22 A.   No, sir.

23 Q.   Do you even know how to do a title search?

24 A.   No, sir.

25 Q.   I didn't hear you?

36

1  A.    No, sir.

2  Q.    Okay.  Now, in this case, you never met Mr. Richard

3  Harley, correct?

4  A.    No, sir.

5  Q.    Is this the first time you ever met him face to face?

6  A.    Yes, sir, it is.

7  Q.    And you would -- issuing these reports you said from 1999

8  through I think Mr. O'Brien said 2008.  But isn't it a fact you

9  were issued revisions even after that, up to 2011?

10  A.    I believe that's correct, sir.

11  Q.    And you've never met him?

12  A.    No, sir.

13  Q.    You're based in West Virginia?

14  A.    Yes, sir.

15  Q.    And he's in Pennsylvania?

16  A.    Yes, sir.

17  Q.    And all your communications were either over the phone or

18  via the internet, on e-mail?

19  A.    Yes, sir.

20  Q.    And you never met his attorney, Christie Bower, correct?

21  A.    That's correct, sir.

22  Q.    And she sent some -- or he sent you some certified

23  documents that said certified by -- as true and correct copies

24  of the original, and she certified them as such, correct?

25  A.    Yes, sir.

1  Q.    And you never met her or talked to her?

2  A.    I -- no, sir, I did not.  I don't believe I talked to her.

3  Q.    And you never met anyone from Enpetro?

4  A.    No, sir.

5  Q.    You never met Stan Dedmon?

6  A.    No, sir.

7  Q.    Never William Trantham?

8  A.    No, sir.

9  Q.    You never talked to them?

10 A.    No, sir.

11 Q.    And there was a -- part of the documents that you got from

12 Mr. Harley was by a gentleman named Richard Gleason, an

13 attorney who purported to represent Enpetro.  Did you ever talk

14 to Richard Gleason?

15 A.    No, sir.

16 Q.    Do you even know if Richard Gleason exists?

17 A.    No, sir.

18 Q.    And there was another group of documents you received from

19 Mr. Harley by a guy named Phil Page?

20 A.    Yes, sir.

21 Q.    Who purported to be another -- well, he wasn't a petroleum

22 geologist, he was a petroleum engineer I believe?

23 A.    That is correct, according to the documentation that I was

24 provided.

25 Q.    Right.  And you never verified that?

1  A.    No, sir.

2  Q.    And you never spoke to Mr. Page?

3  A.    I don't believe so.

4  Q.    You accepted that at face value, what Mr. Page had

5  submitted, or at least what Mr. Harley submitted to you, which

6  supposedly came from Mr. Page?

7  A.    Well, Mr. Page's report was irrelevant to my report.

8  Q.    Well, we'll get to that.  But my question is, did you

9  accept it as true?

10  A.    (No response.)

11  Q.    Did you do any verification of Mr. Page's -- the excerpts

12  that you received from Mr. Page?  Or you did your own report?

13  A.    I did my own report, sir.

14  Q.    All right.  But is it accurate that you never verified any

15  of the information regarding the note or the assignment of

16  collateral that you had received from Mr. Harley, as far as the

17  legitimacy of it, how he obtained it?

18  A.    No, sir.  That was not part of the assignment, sir.

19  Q.    And you never visited Texas to inspect the wells?

20  A.    No, sir.

21  Q.    You never went to the Brown County Courthouse to do a

22  title search on these six leases?

23  A.    No, sir.

24  Q.    You mentioned drilling depth rights, and that's important

25  in terms of estimating the volumetric reserves --

1  A.    Yes, sir.

2  Q.    -- on any particular tract of land.  You never did

3  ascertain what the drilling depth rights for any of these

4  leases were, correct?

5  A.    Could you rephrase that question, please.

6  Q.    Did you ever ascertain the drilling depth rights for any

7  of these six leases?

8  A.    Could you rephrase that question, please.

9  Q.    Well, is there some part of that question that is

10  confusing you?  Because in your report I think you specifically

11  say that you didn't determine the drilling depth rights for any

12  of these leases, and that your estimations were based upon

13  going to 3,500 feet?

14  A.    They could -- yes, sir, that's correct, because of the

15  information provided on the open hole logs.

16  Q.    So now let me ask you my question again.  Did you ever

17  ascertain what the drilling depth rights were for any of these

18  leases, and whether or not they went to 3,500?  Or maybe they

19  went to 1500 feet, and you were estimating an additional 2000

20  feet of oil reserves that had nothing to do with these leases?

21  A.    That's true, sir.

22  Q.    That's a possibility, right?

23  A.    Yes, sir, that is.

24  Q.    You never went to the courthouse and looked at the titles

25  to see what the drilling depth rights were?

1  A.    No, sir.

2  Q.    You never consulted any attorneys while you were doing all

3  this consulting work for Mr. Harley to get legal opinions on

4  any of these documents, did you?

5  A.    No, sir.

6  Q.    And you mentioned something about nuclear logs, and it's

7  mentioned in your reports, about how customarily people like

8  yourself, petroleum geologists, if they want to do volumetric

9  estimations they do something called nuclear log testing,

10 correct?

11 A.    Yes.  Those are provided during the drilling or after the

12 drilling is completed.  So, some wells may have been drilled

13 and not logged, while some may have had logs after they were

14 drilled.

15 Q.    You never did any nuclear testing of any of these sites,

16 correct?

17 A.    No, sir.

18 Q.    You relied on data from other people?

19 A.    Other logging companies, yes, sir.

20 Q.    And that data was supplied to you by Mr. Harley?

21 A.    It was, but it was verified.

22 Q.    That was not my question.  Did you get it from Mr. Harley?

23 A.    Yes, sir.

24 Q.    All right.  And you say it was verified.  You're relying

25 upon whatever he told you?

1  A.    That's not true, sir.

2  Q.    You're talking about when you spoke to the Texas Railroad

3  Commission?

4  A.    Yes, sir.

5  Q.    And they told you that the reports were authentic?

6  A.    Yes, sir.

7  Q.    All right.  Now other than that document, you were relying

8  on what Mr. Harley was telling you in connection with these

9  documents?

10  A.    There are businesses that provide logs that you can verify

11  and get your own log information from.

12  Q.    You said you didn't go to the Brown County Courthouse or

13  do any type of title search in this case, correct?

14  A.    Yes, sir.

15  Q.    Did you ever determine if any of these leases were

16  expired?

17  A.    No, sir.

18  Q.    So, for all you know when you wrote your report you said

19  Mr. Harley had a billion dollars of oil as collateral, those

20  could have all been expired leases?

21  A.    Yes, sir.

22        MR. O'BRIEN:  Objection, your Honor.  That really

23  assumes facts not in evidence.  What his report says and what

24  the estimated volume of --

25        MR. BRANDLER:  I object to his argument.  I object

 1  to --

 2          THE COURT:  Just a minute, just a minute.  Make an

 3  objection, go ahead.

 4          MR. O'BRIEN:  Objection.  It assumes facts not in

 5  evidence.  He did not say to Mr. Harley, you have this oil as

 6  collateral.  What he said to Mr. Harley is the estimated oil

 7  under this property is as follows:

 8          THE COURT:  What's the objection?

 9          MR. O'BRIEN:  The objection is that it assumes facts

10  not in evidence.

11          THE COURT:  Overruled.

12  BY MR. BRANDLER:

13  Q.    You never determined if these leases were expired?

14  A.    No, sir.

15  Q.    And if you had gone to the courthouse you might have found

16  that out?

17  A.    Maybe.

18  Q.    But you didn't think that was important?

19  A.    No, sir, it's not.

20  Q.    Now, if Mr. Harley, assuming he wasn't honest with you in

21  terms of what he was telling you about this assignment of

22  collateral and this note, that would have an impact on your

23  conclusions, correct?

24  A.    No, sir.

25  Q.    It wouldn't matter?

1  A.    No, sir.

2  Q.    If he lied to you that that note is completely invalid and

3  illegitimate, as well as the assignment of collateral, that

4  wouldn't have had any impact on you, your actions in this case?

5  A.    My job was to evaluate the reserves under those leases.

6  Q.    Well, your report -- and we're going to go through it --

7  went way beyond that, didn't it?  You made an analysis of the

8  note and the assignment of collateral, and made some

9  conclusions, is it not a fact that those six leases were

10 somehow tied-in to that note and that assignment of collateral?

11 A.    That's true.

12 Q.    And you had no basis whatsoever as a petroleum geologist

13 to make that connection?  You have no legal experience to

14 analyze those documents to say that those six leases are in any

15 way connected with the note or assignment of collateral?

16 A.    Could you rephrase that question?

17 Q.    What was the basis for you to conclude in your report that

18 there were six leases, and you listed them, Mr. O'Brien showed

19 them to you, that somehow the oil connected with those leases

20 was the collateral for the note and the assignment of

21 collateral?  Were the names of those six leases, did they

22 appear anywhere in the note or the assignment of collateral?

23 A.    I don't believe so, sir.

24 Q.    In fact, the note talks about a division order from BML.

25 Do you recall that?

1  A.    I don't recall that.

2  Q.    Can we get Exhibit 27.8.  The next page.  This is a copy

3  of the oil production note, correct, that you received from Mr.

4  Harley?

5  A.    I believe so.

6  Q.    And it says certified, it's a true and correct copy from

7  the original from this woman Christie Bower.  Do you see it?

8  A.    Could you blow it up?

9  Q.    Yeah, enlarge it for him.  Is this the copy of the note

10  you got from Mr. Harley, right?

11  A.    Yes, sir.

12  Q.    Two-hundred million dollar note, Enpetro, LPC, correct?

13  A.    Yes, sir.

14  Q.    Tell me where in that note it lists the six leases that

15  you did an estimate of the value on?

16  A.    It does not, sir.

17  Q.    In fact, it says, This note is secured by the assignment

18  of the oil reserve to be pursuant to a division order of BML,

19  Inc., Crude Oil Marketing Company, to Hays Hilltop Operating,

20  dated May 11, 1992, isn't that what it says?

21  A.    Yes, sir.

22  Q.    And you never saw the BML, Inc. crude oil division order?

23  A.    No, sir.

24  Q.    Mr. Harley never gave that to you?

25  A.    No, sir.

1  Q.   So there's nothing in this note that would indicate that

2  your report talking about the value of six -- of oil for six

3  leases backs up this note?

4  A.   Yes, sir.

5  Q.   And your report from 1999 to 2011, with all your

6  revisions, claims that it does?

7  A.   Yes, sir.

8  Q.   And you were wrong?

9        THE COURT:  Is that a question?

10       MR. BRANDLER:  Yeah.

11  BY MR. BRANDLER:

12  Q.   Weren't you wrong?  There's nothing in this note that ties

13  into those six leases?

14  A.   Not necessarily.

15  Q.   Well, what do you mean not necessarily?  What is in this

16  note that lists those six leases?

17  A.   Nothing.

18  Q.   All right.  Let's go to the assignment of collateral.

19  That's -- go to 32.1.  And these are the lists of documents Mr.

20  Harley sent you on June 1 of 1999?

21  A.   Yes.

22  Q.   All right.  So No. 2 was the promissory note, we already

23  looked at that.  We scrolled to the assignment of collateral.

24  Right there.  And let's just blow up -- yeah, the first

25  paragraph.  Why don't you read that out loud?

1  A.    That Enpetro, LPC, Inc., a Texas corporation, its address

2  is 2243 Valwood Parkway, Farmers Branch, Texas  75234, herein

3  referred to as assignor for sufficient consideration paid by

4  the assignee herein and subject to the further terms and

5  conditions hereof does hereby transfer, sign and convey that

6  certain corporate note as collateral for --

7  Q.    Let me stop you right there.  Does hereby transfer, assign

8  and convey that certain corporate note, do you know what

9  corporate note is being referred to in that sentence?

10  A.    No, sir.

11  Q.    All right.  Keep on reading?

12  A.    Corporate note as collateral for Note No. M20092497.

13  Q.    Let me stop you right there.  That's the note, the 200

14  million dollar note we just looked at, correct?

15  A.    I -- I'd have to look back at it.

16  Q.    Let's scroll back.  It's in this document.  It was part of

17  this attachment.  Let's go to note -- if that's M20092497.

18  Flip it.  And then on the bottom left is there a certificate

19  number?

20  A.    M2009249- -- yes, sir.

21  Q.    All right.  So now let's go back to the assignment of

22  collateral.  So continue reading.

23  A.    M2009- -- issued to RJH and Company, Inc., herein referred

24  to as assignee, approximately 9,524,000 barrels of oil being

25  approximately 9,000 or 9,524,000 barrels of proven reserves of

1   oil underlying the following oil and gas mineral leases

2   covering lands in Brown County, Texas, to wit.

3   Q.   And keep on reading, and stop right there.

4   A.   These leases located in Brown County, Texas, described as

5   the Williams Group, contained approximately 10 million barrels

6   of crude oil -- I'm sorry, oil reserves.  The estimated

7   reserves underlying each of the above leases have been arrived

8   at by the use of standard reservoir engineering procedures and

9   production histories of producing reservoirs.

10  Q.   And you said you never spoke to anyone from Enpetro?

11  A.   No, sir.

12  Q.   So, when they talked about those leases located in Brown

13  County, Texas, described as the Williams Group, you had no idea

14  what the Williams Group was, correct?

15  A.   No, sir.

16  Q.   And you assumed that the Williams Group was the six leases

17  that you did your evaluation on?

18  A.   Yes, sir, from the Phil Page report.

19  Q.   So you relied totally on that report to make that

20  assumption?

21  A.   Of the leases, yes, sir.

22  Q.   You did no independent verification that there is such a

23  thing as the Williams Group, or if there is, that it has

24  anything to do with the six leases you were doing evaluation

25  on?

1  A.    Yes, sir.

2  Q.    And about ten minutes ago in your testimony you said the

3  Phil Page report was irrelevant to your report because you did

4  your own report.  So, tell me, what did you do in your report

5  to determine that the Williams Group was the six leases you did

6  your evaluation on?

7  A.    What I did is I took the data from the six leases in the

8  Phil Page report, but I did my own report on those leases and

9  wells.  I did not take and use his report, other than

10  determining the leases that he put in that report.

11  Q.    And you never verified that?

12  A.    No, sir.

13  Q.    So, assuming that Mr. Page was wrong about the Williams

14  Group and connecting it to those six leases, your analysis,

15  your report, would have nothing to do with what's in this

16  assignment of collateral?

17  A.    That is true, sir.

18  Q.    And there's some other problems that I want to ask you

19  about to see if you recognize them when you were doing your

20  analysis of this note.  Because it said in the body, Does

21  hereby transfer, assign and convey that certain corporate note

22  as collateral -- well, that certain corporate note as

23  collateral for a different note.  How did you -- didn't you

24  interpret that to mean that it's a note -- an unspecified note

25  is being transferred as collateral for another note?

1   A.    No, sir.

2   Q.    Well, what did you understand that to mean?

3   A.    Again, I did not look at this -- Enpetro tried to analyze

4   it.  I was trying to analyze the reserves on the six leases,

5   that was my job.

6   Q.    Well, your report says you made an analysis of the note

7   and the assignment of collateral, which is way beyond what a

8   normal petroleum geologist does, correct?

9   A.    Yes, sir.

10  Q.    So, why did you do that?  Why did you go so far out of

11  your way to analyze legal documents for this man -- let me

12  withdraw that.  Had you ever met Mr. Harley before 1999 when

13  you started doing business with him?

14  A.    No, sir.

15  Q.    This was a cold call?

16  A.    Yes, sir.

17  Q.    And do you know how he came to be referred to you?

18  A.    Hum, I believe through a mutual friend, but I do not

19  recall.

20  Q.    Who was the mutual friend you're referring to?

21  A.    I believe it was Edwin White.

22  Q.    And who is Edwin White?

23  A.    Edwin White is a business associate, friend of mine.

24  Q.    And where is he located?

25  A.    Mississippi.

1  Q.    And is he some type of politician in the State of

2  Mississippi?

3  A.    He's a real estate man.

4  Q.    Had you ever met Mr. White?

5  A.    Yes.

6  Q.    And did he ever hold a political office as far as you

7  know?

8  A.    Not an elected office.

9  Q.    What office did he hold?

10 A.    He has advised me that he was in charge of the Mississippi

11 Republican Party.

12 Q.    And did you ever verify that?

13 A.    No, sir.

14 Q.    And what was your connection to Mr. White?  Did you ever

15 have any business dealings with him?

16 A.    Just I became friends with him over the years because we

17 had another mutual friend that I was introduced to him.

18 Q.    Did he refer clients to you, potential clients?

19 A.    From time to time he would mention that he might have

20 somebody that needed a geology report.

21 Q.    And this was one of those occasions?

22 A.    Yes, sir.

23 Q.    And that's how Mr. Harley called you?

24 A.    I believe so, sir.

25 Q.    So you didn't know Mr. Harley from a hole in the wall,

1 right?

2 A.    No, sir.

3 Q.    And he asked you to do an analysis of what he claimed was

4 oil that his company RJH owned in Texas?

5 A.    Analyze reserves of the oil.

6 Q.    He told you his company owned that oil?

7 A.    He -- yes, he might have.  I don't know.  Don't remember.

8 Q.    And you never did anything to verify that?

9 A.    No, sir.

10 Q.    He sent you this note and the assignment of collateral and

11 you accepted it at face value?

12 A.    Yes, sir.

13 Q.    So, let me ask again, did -- you never knew who this man

14 was, he's in Pennsylvania.  No prior history with him.  He sent

15 you all these legal documents.  And then you start doing an

16 analysis of these legal documents.  Why would you do that for

17 some stranger?

18 A.    I was asked to do the report.

19 Q.    Well, isn't it true you had a financial interest here?

20 A.    No, sir.  Other than being paid for doing the report

21 itself.

22 Q.    Well, let's go through your chronology with Mr. Harley.

23 You first sent him your resume on May 27, 1999, correct?

24 A.    Hum, I did send him my resume.

25 Q.    Well, let's get the date, because I think the dates are

1    important.

2              THE COURT:   Suppose we keep the comments to one's

3    self-

4              MR. BRANDLER:   All right.   I'm going to mark this as

5    Exhibit -- what are we up to, 52?   52.1.

6    BY MR. BRANDLER:

7    Q.   Can you identify this document?

8    A.   Yes, sir.

9    Q.   And what is it?

10   A.   It is a fax cover letter.

11   Q.   From you?

12   A.   Yes.

13   Q.   And it was to Mr. Harley?

14   A.   Yes.

15   Q.   And what does it say?

16   A.   Attached please find my resume.   If you wish, I do have a

17   more detailed resume, but it is rather long.   I use it only

18   when people want to have a little deeper -- look a little

19   deeper.   I have no problem at all with supplying you with same.

20        I enjoyed visiting with you and look forward to working

21   with you on a project as we discussed.   As soon as I receive

22   this overview and related materials, perhaps we should visit on

23   the phone again to discuss the direction of this project.

24   Q.   And it's signed by you, correct?

25   A.   Yes, sir.

1  Q.   And this was on May 27, 1999?

2  A.   Yes, sir.

3  Q.   And attached to that was your resume, correct?

4  A.   Yes.  That's the front page.

5  Q.   And then after sending him the resume and chatting with

6  him on the phone Mr. Harley sent you a bunch of documents,

7  correct?

8  A.   Yes, sir.

9  Q.   Can we go do 32.1 again.  Enlarge the top half.  Did Mr.

10 Harley send you -- it looks like a fax header at the top.  Did

11 he fax to you documents on June 1, 1999, pursuant to your

12 conversation with him about what he was requesting you to do?

13 A.   May I see the top, please, sir?  Yes.

14 Q.   And what did he send to you?  List the items.

15 A.   Enclosed are the following documents for your personal --

16 perusal, I'm sorry.  Safekeeping receipt, promissory note,

17 executive summary on Enpetro, assignment of collateral,

18 geologic reports, partial.  Let me know ASAP as to your

19 opinion.

20 Q.   And going to the next page.  Is that the safe keeping

21 receipt that's referred to on the earlier page?

22 A.   It appears to be, sir.

23 Q.   What's the date of that?

24 A.   March 1, 1999.

25 Q.   Why don't you read what that says?

1  A.    This is to verify the following documents which you gave

2  to me to place in safekeeping are contained in a safety deposit

3  box rented by me in Marshall Creek branch of Mellon Bank.

4       No. 1.  Original promissory oil production note payable to

5  RJH and Company dated September 24, 1997.  Certificate No.

6  M20092497 in the amount of 200 million dollars, words and

7  figures.

8       No. 2.  The original assignment of collateral dated

9  September 24, 1997, of approximately 9,524,000, words and

10  figures, barrels of oil reserves and excerpts of geological

11  reports.  Thank you for your consideration in this matter.

12  Very truly yours, Christie Bower.

13  Q.    Now, you said you never spoke to Christie Bower, correct?

14  A.    I don't recall.

15  Q.    And you never verified what she had in safekeeping or what

16  she didn't have in safekeeping, correct?

17  A.    I'm not sure.  I don't believe I did.

18  Q.    And were you impressed that Mr. Harley -- you didn't know

19  him.  Were you impressed that he appeared to have a lawyer who

20  was willing to write something on her letterhead attesting that

21  she had these important documents -- what did she say?  They

22  were in her safety deposit box in a bank?

23  A.    It didn't particularly impress me or not impress me.

24  Q.    And then the next document is the note.  We already went

25  through that, correct?

1   A.    It appears to be the same, sir.

2   Q.    And then the next document is something called an

3   executive summary on Enpetro, Inc. written by Richard Gleason,

4   attorney for Stan Dedmon, president, on September 30, 1997,

5   correct?  Can you enlarge that?

6   A.    That part looks right.

7   Q.    Well, look at the rest of it and see if the rest of it

8   looks right.

9   A.    Okay.  Scroll down.  Scroll down, please.

10  Q.    Is this the executive summary that was referred to on the

11  first page of the faxed cover sheet?  Can we go to the first

12  page?

13  A.    It appears to be.

14  Q.    By the way, when you came to the grand jury you were

15  required to bring all of your documents related to Mr. Harley,

16  correct?

17  A.    Yes, sir.

18  Q.    Didn't you provide me with these documents?

19  A.    I believe I did.

20  Q.    All right.  So, you produced them saying that these were

21  documents he sent you?

22  A.    Yes.

23  Q.    All right.  And did you know in reading this, when you

24  first got them from Mr. Harley, this particular document June 1

25  of 1999, that there's no -- well, first of all, let's go to the

1   second page.  It's signed by Mr. Harley.

2            TECHNICIAN:  Which page?

3            MR. BRANDLER:  That page right there.

4   BY MR. BRANDLER:

5   Q.   That this document that supposedly was authored, written

6   by Mr. Gleason was signed by Richard Harley?

7   A.   I did not.

8   Q.   Did you notice that that was apparently inconsistent, that

9   Mr. Harley would be signing a document purportedly written by

10  Mr. Gleason?

11  A.   I do now.

12  Q.   You do now, but you didn't realize it then?

13  A.   No, sir.

14  Q.   All right.  And going to the next document, that's the

15  assignment of collateral, we went through that.  You received

16  that too, right?

17  A.   Yes, sir.

18  Q.   Going to the second page of the assignment of collateral,

19  can you read what it says under No. 1?

20  A.   Creditor shall be paid monthly from production of wells.

21  Q.   You know what, I'm sorry, that was my mistake, because it

22  starts on the prior page.  If we can go back to the prior page.

23  The bottom of the page it says use of assigned reserves, at the

24  bottom right there.  Start reading there.

25  A.   In the event of default of any loan in which the assigned

1  reserves have been pledged as collateral --

2  Q.    Now, let's go to the next page.

3  A.    Creditors shall be paid from the production of wells

4  located on the referenced lease a sum of money equal to one

5  half of the oil produced and sold during the preceding month

6  which would otherwise be credited to the full lease-holding

7  working interest.

8  Q.    And isn't it true that what that means is that in case of

9  a default Mr. Harley gets paid money based upon the production

10 of the wells?

11              MR. O'BRIEN:  Objection.  Only if he knows that.

12 He's already testified he's not a lawyer.  And it's been

13 brought up a number of times that he's not able to interpret

14 legal documents.

15              THE COURT:  I thought you were trying to point out

16 that he shouldn't be interpreting legal documents?

17              MR. BRANDLER:  Exactly.  But he did -- his report.

18              THE COURT:  Well, just a minute.

19              MR. BRANDLER:  Yes.

20              THE COURT:  You're asking him to interpret this

21 document.

22              MR. BRANDLER:  I'm asking him -- I'm going to ask him

23 what's the basis --

24              THE COURT:  Is that what you're doing?

25              MR. BRANDLER:  I'm going to ask him the basis of his

1  statement in his report.

2          THE COURT:  All right.  Fine, then do that.

3  BY MR. BRANDLER:

4  Q.    All right.  In your report you said there was a billion

5  dollars of oil under those six leases that was the collateral

6  as represented in this note?

7  A.    Actually, my report represents that there's an amount of

8  oil.  The dollar figure varies with the NYMEX price.

9  Q.    Did you understand my question?  Let's go to your report

10  then, we'll skip ahead.  Can we have Exhibit 32.6?  It's a copy

11  of your report, correct?

12  A.    It appears to be.

13  Q.    Can we go to the first page of what Mr. O'Brien showed

14  you?  Read the first paragraph out loud.

15  A.    As per your request, a complete analysis of the

16  recoverable volumes of crude oil reserves has been prepared on

17  the oil and gas leases in Brown County, Texas, pertaining to

18  your oil promissory note and collateral assignment from Enpetro

19  LPC, Inc., Enpetro in brackets.  The reserve analysis was

20  prepared on six leases totalling 815 acres more or less with a

21  total of 46 wells.

22  Q.    So, isn't it right that you gave Mr. Harley a report as

23  per his request of a complete analysis of the recoverable

24  volumes of crude oil reserves pertaining to your oil promissory

25  note and collateral assignment from Enpetro, LPC?

1  A.    Again, I prepared a recoverable volume of crude oil

2  reserves.

3  Q.    Well, that's not what the report says.  Doesn't your

4  report say that your analysis has to pertain to the oil

5  promissory note and the collateral assignment?

6          MR. O'BRIEN:  What page are you on?

7          MR. BRANDLER:  Right there, the first paragraph on

8  the first page.

9          THE WITNESS:  That's what it says.  But it also says

10 the reserve analysis was prepared on six leases totalling --

11 BY MR. BRANDLER:

12 Q.    And we went through that, that you had no basis to connect

13 those six leases to anything in the note or the assignment of

14 collateral?

15 A.    Well, that's what I based --

16         MR. O'BRIEN:  Objection, again, he was told by an

17 engineer and by Mr. Harley that these are the leases.  He was

18 told that.

19         THE COURT:  You can clear that up on redirect.

20 Proceed.

21         MR. BRANDLER:  All right.

22 BY MR. BRANDLER:

23 Q.    So, going back to the assignment of collateral in 32.1,

24 and at the bottom of that page it says, In the event of a

25 default of any loan in which the assigned reserves has been

1  pledged as collateral, going to No. 1 on the next page, the

2  creditor, that being Mr. Harley, is going to be paid monthly

3  from the production of the wells.  Isn't that what it says?

4  A.    That's what it says, sir.

5  Q.    You said that there was no production on any of these

6  wells since 19 -- after 1993?

7  A.    Yes, sir, I did.

8  Q.    So, that means someone is going to have to start drilling,

9  extract the oil, sell the oil, and then pay Mr. Harley?

10 A.    That's not my call though.

11 Q.    But that's what your opinion says in your report?

12         THE COURT:  Can I see counsel at side-bar?

13         (Whereupon, the following discussion occurred at

14 side-bar between the Court and counsel:)

15         THE COURT:  I'm not sure where you're going, but

16 what's troubling me is it says upon default.  Have you

17 established that there was a default in the note?

18         MR. BRANDLER:  No.

19         THE COURT:  The assumption is there's a default.

20 You're misleading him.

21         MR. BRANDLER:  I think Mr. O'Brien -- I don't believe

22 it's misleading.

23         THE COURT:  Well, what is it?

24         MR. BRANDLER:  The default would be calling the note

25 due, and that they don't have enough money, 200 million

 1  dollars, to pay him.

 2          THE COURT:  I understand that, but there's been no

 3  default, has there?

 4          MR. BRANDLER:  Not that I know of.  Mr. Harley called

 5  the --

 6          THE COURT:  Well then, why are you going down this

 7  road?

 8          MR. BRANDLER:  Because his report says that this note

 9  is worth a billion dollars.

10          MR. O'BRIEN:  It doesn't say that.

11          MR. BRANDLER:  He says the collateral --

12          THE COURT:  All right, okay, okay.  I'm just

13  cautioning you, I think you're misleading him.  Proceed as you

14  see fit.

15          (Whereupon, the discussion held at side-bar between

16  the Court and counsel concluded.)

17  BY MR. BRANDLER:

18  Q.   And continuing to the next document in this series of

19  documents, there's a document called Enpetro, Inc., Hays

20  Hilltop Operating Corporation, Brown County leases, geological

21  report and reserve analysis.  Is this the document you've been

22  referring to as the Phil Page excerpt?

23  A.   That's a cover sheet.

24  Q.   Is that the cover sheet for the Phil Page?

25  A.   It may be.  Until I --

1  Q.   Let's go to the next page.  And can we go to the bottom

2  left-hand corner, there's a signature.

3  A.   May I read the whole thing, please, sir?

4  Q.   Yes, but I just wanted to draw your attention --

5  A.   Yes.  That does say Phil Page.

6  Q.   All right.

7          MR. O'BRIEN:  What exhibit is this again?

8          MR. BRANDLER:  This is 32.1.

9          THE WITNESS:  Okay, scroll down please.  Okay.

10 BY MR. BRANDLER:

11 Q.   Go ahead, just continue reading it and then I'll ask my

12 questions.

13 A.   Scroll down, please.  Yes, sir.

14 Q.   Is this the Phil Page geological reports you were

15 previously referring to?

16 A.   It's the first and the second page.

17 Q.   Well, keep scrolling then.  Go to the next page?

18 A.   Scroll down.

19 Q.   Go to the next page.

20 A.   Okay.

21 Q.   I think you're going to have to scroll down.

22 A.   Please, I haven't read it.

23 Q.   Sorry.

24 A.   I'm sorry, I'm a slow reader.

25 Q.   No, take your time.

1    (Whereupon, the witness reviewed the document.)

2  Q.    Next page.

3  A.    Okay.  Okay.  Okay.

4  Q.    That's the last page.  Is that document part of the

5  attachments that Mr. Harley faxed to you on June 1 of 1999?

6  A.    I believe so.

7  Q.    And that's what you were referring to about Phil Page

8  geological reports?

9  A.    Yes, sir.

10 Q.    And in this document is where the six leases first

11 appeared, the names of the six leases?  Can we go to the first

12 page.  Now right here at the top?

13 A.    Yes.

14 Q.    But it doesn't say anything about the Williams Group,

15 correct?

16 A.    It does not.

17 Q.    Doesn't say anything about a division order from BML?

18 A.    It does not.

19 Q.    So, it doesn't tie in to the note, the oil production note

20 or the assignment of collateral?

21 A.    The document does not.

22 Q.    You assumed it tied-in?  That's why you did your report on

23 six leases?

24 A.    Yes.

25 Q.    And if that assumption was wrong your report would have no

1  validity towards the value of the collateral on the note or the

2  assignment of collateral?

3           MR. O'BRIEN:  I think that's asking a legal question,

4  your Honor.

5           THE COURT:  Pardon?

6           MR. O'BRIEN:  I think that's asking for a legal

7  question, whether it would have any validity to the assignment

8  of collateral.  If he wants to ask another -- change his

9  opinion it's okay.

10          THE COURT:  Well, I think he can ask that question.

11          THE WITNESS:  Would you ask me the question again,

12  please.

13          MR. BRANDLER:  I think I'm going to ask you what Mr.

14  O'Brien suggested.

15  BY MR. BRANDLER:

16  Q.   If you had known that these six leases have nothing to do

17  with the oil production over the assignment of collateral would

18  you have written your report in the same way you did when you

19  said you were -- going back to what you said in that first

20  paragraph that we just read -- that your analysis was

21  pertaining to that note and that assignment of collateral?

22  A.   No, sir.

23  Q.   You wouldn't have written it that way?

24  A.   No, sir.

25          THE COURT:  Are you moving on?

1          MR. BRANDLER:  Yes.

2          THE COURT:  Members of the jury, we'll take a

3     15-minute recess.  Remember not to discuss the case among

4     yourselves or with anyone else.  If anybody tries to talk to

5     you about it bring it to my attention immediately.  See you

6     back here in 15 minutes.  We'll go for an hour and then we'll

7     break for lunch.

8          THE DEPUTY CLERK:  All rise.

9          (Whereupon, a recess was taken from 11:15 a.m. to

10    11:27 a.m.)

11         (Whereupon, the following discussion occurred at

12    side-bar between the Court and counsel:)

13         THE COURT:  Juror No. 1 mentioned to my courtroom

14    deputy and wanted her to know she's very friendly with the

15    Casey family.  And she knows that now that --

16         MR. O'BRIEN:  Has she got the right family?

17         THE COURT:  Yeah, yeah.

18         MR. BRANDLER:  Is this the Asian lady?

19         THE COURT:  Yes.  She knows Pat Casey and she knows

20    that he's a lawyer for this man, and she knows he's in the

21    courtroom.  She said she wanted her to know that, but it makes

22    no difference.

23         MR. BRANDLER:  Is that the Asian lady?

24         THE COURT:  Yes, yes.  So I'm letting you know.  Do

25    you want me to do anything?

1          MR. BRANDLER:  No.

2          THE COURT:  I didn't think so, but I needed to tell

3   you it happened and that's the situation.

4          MR. BRANDLER:  As long as she said it makes no

5   difference.

6          THE COURT:  Yeah, she said it makes no difference.

7   She knows him.  There you go.

8          MR. BRANDLER:  Thank you.

9          (Whereupon, the discussion held at side-bar between

10  the Court and counsel concluded.)

11         MR. BRANDLER:  Can we have Exhibit 32.1 back up on

12  the screen, to the page we were discussing, the Phil Page

13  report.

14  BY MR. BRANDLER:

15  Q.   Now, we'll go to the next page.  And yeah, highlight --

16  underneath where he list the six leases, can you read what it

17  says?

18  A.   Underneath it, sir?

19  Q.   Yes.

20  A.   Okay.  The above number of wells are currently -- are

21  current active wells.  Geology --

22  Q.   No, just that sentence right there.  The above number of

23  wells are the current active wells, correct?

24  A.   That is what it says, sir.

25  Q.   Is this document dated in any way?

1  A.    I think his report stated it was done in '96.

2  Q.    Tell me where on this document it says that.

3  A.    It's not on this particular page.  I think it was on the

4  previous page.

5  Q.    Go to the previous page.

6  A.    No.  It's down at the bottom.  It was '93.

7  Q.    So as of July 26, 1993?

8  A.    That's the closest thing that would come -- because he

9  states that that's where his reserve calculations were

10 available as of that date.

11 Q.    That's what he said?

12 A.    That's what he says.

13 Q.    Correct.  And you determined that that's when they stopped

14 producing?

15 A.    Yes.

16 Q.    According to the Texas Railroad Commission?

17 A.    I don't have the exact date, but it did say somewhere in

18 1993.

19 Q.    All right.  And then going to the next page, the -- the

20 page that says Reserve analysis of oil in place.  To the second

21 paragraph, the second paragraph.  He came up in the second --

22 third sentence, the total calculated amount of oil in place was

23 10,067,310 barrels?

24 A.    Yes.

25 Q.    And you came up with about the same, you came up with

1  more, 10,200,000 barrels.  It was very close?

2  A.   Very close numbers.

3  Q.   But you never spoke to Phil Page?

4  A.   I don't believe so, sir.

5  Q.   And those calculations that he has at the back of his

6  report here, if you just go ahead, the next page, all these

7  calculations, you didn't rely on those, correct?

8  A.   No, sir.

9  Q.   The next one.  Correct, you didn't rely on any of that?

10  A.   No, sir.

11  Q.   Now, when you received this package from Mr. Harley, that

12  was June 1 of 1999.  Didn't that raise some questions in your

13  mind?

14  A.   That our figures were -- just your --

15  Q.   When you got this documentation from Mr. Harley you said

16  he had asked you to do a report.  Did that satisfy you that you

17  were able to do the report?  Or did you have follow-up

18  questions?

19  A.   I don't understand the question.

20  Q.   What part of it don't you understand?

21  A.   What you're asking me to testify to.

22  Q.   Was that sufficient information for you to do your report,

23  or did you need additional information that you needed from Mr.

24  Harley?

25  A.   I didn't need any additional information from Mr. Harley

1  in order for me to do the report.  I had to go to my own

2  sources of information.

3  Q.    So can we go to Exhibit 32.2.  Could you look at this and

4  see if it's a fax that you sent to Mr. Harley the following

5  day?

6  A.    It appears to be, yes.

7  Q.    June 2 of 1999?

8  A.    Yes.

9  Q.    And what does it say in the body of the fax?

10  A.    Please see attached letter, as we discussed over the

11  telephone.

12  Q.    All right.  Now, let's go to the next page.  That's signed

13  by you -- before we highlight it.  That's the letter that you

14  sent to Mr. Harley?

15  A.    I can't read it.

16  Q.    But that's your signature at the bottom?

17  A.    That is my signature.

18  Q.    All right.  So let's enlarge it so you can read it.

19  A.    I'm finished, sir.

20  Q.    All right.  Is that the letter you sent to Mr. Harley the

21  day after he sent you that package of materials?

22  A.    Yes, sir.

23  Q.    Let me ask again.  Did you have follow-up questions that

24  you needed answered from Mr. Harley so you could do your

25  report?

1  A.    Yes, sir.

2  Q.    And why don't you read us the first sentence of your

3  letter.

4  A.    The purpose of this letter is to advise you that I have

5  spoken -- I have spoken to company officials evaluating your

6  assets this afternoon, and they have requested the following

7  items.

8  Q.    And then skipping ahead, let's go to the last -- the

9  second to last paragraph where it says be advised?

10  A.    Okay.  Be advised that I have sent the promissory note

11  related documents to the insurance company for their

12  evaluation.  If they find within -- if they find everything

13  within reason I will have them contact you directly to complete

14  their process.

15  Q.    Why are you sending documents to an insurance company if

16  you're just doing a report for Mr. Harley?

17  A.    I cannot recall.

18  Q.    Well, let me see if I can refresh your recollection?

19  A.    Okay.

20  Q.    Who was Larry Basheer?

21  A.    Larry Basheer was a friend, associate of mine, who was an

22  insurance broker.

23  Q.    And did you consult with Mr. Larry Basheer regarding these

24  documents that we're looking at today in court?

25  A.    Yes.

1  Q.    And what was the purpose for your collaboration with Mr.

2  Basheer on these documents?

3  A.    Could you rephrase the question?

4  Q.    Why did you talk to Mr. Larry Basheer?  Mr. Harley called

5  you up, he wanted you to do a report.  Why did you bring Mr.

6  Basheer into it, an insurance broker?

7  A.    Hum, to provide him with the information that was in the

8  initial report.

9  Q.    Why?  Did you give it to all your friends?

10 A.    No, sir.

11 Q.    Why did you give it to the insurance broker friend?

12 A.    Hum, I was asked if I knew companies that did insurance

13 wraps.

14 Q.    Who asked you if you knew companies that did insurance

15 wraps?

16 A.    Mr. Harley.

17 Q.    So that was something in addition to doing a report?

18 A.    Yes.

19 Q.    Two separate things, correct?

20 A.    Yes.

21 Q.    What is an insurance wrap?  Explain that to the jury.

22 A.    An insurance wrap is something that some companies use to

23 have an insurance company come in and they do their own

24 analysis on in-ground reserves.  And they will look at those

25 assets, do their own evaluation.  That's the purpose of the

1  insurance company.

2  Q.    And isn't it true that if an insurance company does a wrap

3  for the asset, that the value of that asset is considered more

4  valuable because an insurance company has guaranteed the value?

5  A.    Don't know that I would say more value, but it would add

6  credence to the value.

7  Q.    And to get an insurance wrap you have to pay the insurance

8  company some money, a premium?

9  A.    Yes.

10 Q.    And you and Mr. Basheer were contacting insurance

11 companies to get an insurance wrap --

12 A.    I --

13 Q.    -- for Mr. Harley's collateral?

14 A.    I was not.

15 Q.    Well, you asked Mr. Basheer to do it for you?

16 A.    I didn't ask him to do it for me.

17 Q.    Who did you ask him to do it for?

18 A.    I put him in contact with Mr. Harley.

19 Q.    And what were you going to get out of it?

20 A.    Nothing.

21        MR. BRANDLER:  Can we have Exhibit 32.10.  Can you

22 enlarge the top portion?

23 BY MR. BRANDLER:

24 Q.    What's the title of this document?

25 A.    Financial Procurement Fee Agreement.

73

1  Q.    And read what it says in the first paragraph?

2  A.    I, we, agree to pay Donald C. Kesterson or his assigns or

3  nominate a fee of two and one-half percent, words and figures,

4  of the gross amount of any loan from or deposit of funds to an

5  institution concurrently with closing and/or within three

6  banking days of any subsequent closing of any said loan or

7  procurement of funds, arranged, secured, or placed by Donald C.

8  Kesterson or his assigns.

9  Q.    Keep on reading.

10  A.    The fees set forth herein is due and payable if a loan or

11  placement of funds is arranged closed in any amount without

12  regard to the specific amount originally requested.  Further,

13  it is my/our understanding that the fee is contingent upon

14  closing or placement of funds, and it is further understood

15  that no fee is due if a closing or deposit is not effected.

16  Q.    Keep reading.

17  A.    I/we further understand that the fee recited herein is due

18  and payable -- payable contingency of a closing or deposit, and

19  is in addition to and is not affected by any other fee,

20  discount, emissions rate, et cetera, provided for the loan

21  request agreed to with the lender or depositor or provided for

22  any closing documents.  It is further understood that any and

23  all subsequent funds secured as a result of the above loan from

24  the lender contact provided by said Donald C. Kesterson or his

25  assigns are subject to the same fee arrangement unless changed

1  in writing and/or agreement by said Donald C. Kesterson.

2  Q.    And it is signed and dated?

3  A.    It is signed and dated.

4  Q.    And what's the date?

5  A.    August 26, 1999.

6  Q.    And who signed it?

7  A.    Richard J. Harley.

8  Q.    Let me ask you again.  What were you going to get out of

9  it?

10 A.    Nothing.

11 Q.    Well, doesn't this document say you're going to get 2.5

12 percent of any loan that's obtained using Mr. Harley's

13 collateral?

14 A.    That's what the document says, but I rejected it.

15 Q.    So if Mr. Harley had used your report and submitted it to

16 an insurance company -- or to a lender and they had loaned him

17 let's say a hundred million dollars, by the terms of this

18 document you would be getting two and a half million dollars?

19 A.    By the terms of that agreement, yes.

20 Q.    And you rejected it?

21 A.    I rejected it.

22 Q.    Why would you reject that?

23 A.    Because I am an independent third-party appraiser, and so

24 I have to remain what we call arm's length from a deal in order

25 to be able to act as an independent appraiser.

75

1  Q.   Because it would be a conflict of interest for you to have

2  to get some benefit out of a deal when you're supposed to be

3  doing an independent report for Mr. Harley?  You had a

4  financial interest?

5  A.   I rejected it.

6  Q.   That's not my question.  My question is, if you had such a

7  deal --

8            THE COURT:  Can we come to side-bar, please.

9            (Whereupon, the following discussion occurred at

10  side-bar between the Court and counsel:)

11            THE COURT:  I don't get this.

12            MR. BRANDLER:  We had a bias --

13            THE COURT:  No, wait a second.  You put up a

14  document.  It says in witness hereof our hand -- we signed this

15  agreement.  His name is not on this.  Why are you parading this

16  out like it's an agreement?

17            MR. BRANDLER:  Because it is an agreement.

18            THE COURT:  Wait, whoa, whoa.

19            MR. BRANDLER:  I'm sorry.  It's cross examination.  I

20  don't accept --

21            THE COURT:  Wait, wait.  It's an agreement?

22            MR. BRANDLER:  Yes.  I believe they had an agreement.

23            THE COURT:  Signed by Mr. Harley and not him?

24            MR. BRANDLER:  Yes.  Mr. Harley agreed to pay him 2.5

25  percent.

1         THE COURT:  How do you have agreement with two people

2  when only one signs it?

3         MR. BRANDLER:  And he's saying that.  This is their

4  witness who they say gave Mr. Harley a report that Mr. Harley

5  relied on in good faith to shop around.  He has bias.

6         THE COURT:  I understand where you're going, but this

7  is not evidence of that.  You can talk about it, but to call it

8  an agreement, to call that an agreement isn't right.

9         MR. BRANDLER:  All right.  Well --

10        THE COURT:  It's not fair to the witness.

11        MR. BRANDLER:  I think Mr. O'Brien --

12        THE COURT:  That's all I have to say.  I mean, other

13 than that, I'm not trying to foreclose you from developing the

14 fact that this guy may have had skin in the game or anything

15 like that.  I'm not trying to foreclose you from that.

16        MR. BRANDLER:  All right.

17        THE COURT:  This by itself is somewhat misleading.

18        MR. BRANDLER:  I think I'm allowed to test him and

19 ask him about the document and see what he says.  And if he

20 says he rejected it, that's fine.

21        THE COURT:  He said it more than twice -- he said it

22 more than once.

23        MR. O'BRIEN:  Continue because you're killing

24 yourself.  Continue all you want.

25        THE COURT:  Well, that's beside the point.

1    MR. BRANDLER:  Continue all you want as far as you're

2  concerned?

3    THE COURT:  Well, that's not as far as I'm concerned.

4    MR. BRANDLER:  Okay, I'm not going to --

5    (Whereupon, the discussion held at side-bar between

6  the Court and counsel concluded.)

7  BY MR. BRANDLER:

8  Q.    Can we have that back up?  What insurance company did Mr.

9  Basheer go to to get the insurance wrap?

10 A.    I don't know.

11 Q.    Did he go to more than one?

12 A.    I have no idea, sir.

13 Q.    Who is Bill Bernard?

14 A.    (No response.)

15 Q.    Do you know who that person is?

16 A.    No.  What's the question?

17 Q.    Have you ever heard of a person by the name of Bill

18 Bernard?

19 A.    Yes.

20 Q.    Who is Bill Bernard?

21 A.    Bill Bernard was a business associate that I knew that --

22 I had met.

23 Q.    What type of business is Mr. Bernard connected with?

24 A.    Banking.

25 Q.    Is he affiliated with the company -- what's the name of

1  his company?

2  A.   Capital Alliance.

3  Q.   And what type of business is Capital Alliance?

4  A.   In -- in a word, they would be like an equity company.

5  It's more --

6  Q.   A lender?

7  A.   A banking lender, equity, yes.

8  Q.   And Mr. Bernard was a friend of yours, business

9  acquaintance?

10 A.   Business acquaintance.

11 Q.   And he was involved with a company that lends people

12 money, Capital Alliance?

13 A.   Yes, sir.

14 Q.   And isn't it a fact that you put Mr. Harley in touch with

15 Mr. Bernard so his company RJH could get a loan based upon the

16 assets that you were making evaluation of in that report?

17 A.   Could you rephrase the question?

18          MR. BRANDLER:  Can you read that back, please?

19          (Whereupon, record read.)

20          THE WITNESS:  No.

21 BY MR. BRANDLER:

22 Q.   No?

23 A.   No.

24 Q.   Do you remember testifying in the grand jury?

25 A.   Yes.  I introduced them.

1  Q.    What was the purpose of the introduction?

2  A.    For them to conduct business between themselves.

3  Q.    What was the nature of the business -- why did you

4  introduce them?  What type of business?

5  A.    Mr. Harley asked if I knew people who lent money on

6  in-ground assets.  I said I might.

7  Q.    And Mr. Bernard was someone who does lend money based on

8  in-ground assets, or his company was?

9  A.    They might.  I did not know that for sure.  I thought they

10  would.

11  Q.    But that was the reason for the introduction?

12  A.    Potentially.

13  Q.    And if his company had lent -- before we get there, in

14  terms of them making the decision on whether they would lend

15  Mr. Harley money, one of the documents they would rely on would

16  be a petroleum geologist report regarding Mr. Harley's asset,

17  the oil?

18  A.    They would rely on a report, yes, sir.

19  Q.    And in this case that would be about the report that you

20  prepared?

21  A.    Not necessarily, sir.

22  Q.    Well, is there any other report that you're aware of that

23  was done by Mr. Harley at the time that you introduced him to

24  Mr. Bernard?

25  A.    I can't answer that question .  I don't know.

1  Q.   Well, to your knowledge?

2  A.   I don't know.

3  Q.   And isn't it a fact that if Capital Alliance group had

4  lent Mr. Harley a hundred million dollars because he had a

5  billion dollars worth of oil, you would have gotten two and a

6  half percent?

7  A.   No, sir.

8          MR. O'BRIEN:  Object -- well -- withdrawn.

9  BY MR. BRANDLER:

10  Q.   Going back to Exhibit 32.2.  This was your follow-up fax

11  after you received the documents?

12  A.   Uh-hum.

13  Q.   The next page.  You asked six questions.

14  A.   Yes.

15  Q.   And you say the purpose of the letter is to advise you

16  I've spoken to company officials evaluating your assets this

17  afternoon, and they have requested the following items.  Who

18  are the company officials you're referring to in that first

19  sentence?

20  A.   I do not recall.

21  Q.   Was it some insurance company?

22  A.   I would not have spoken to an insurance company because I

23  don't know insurance companies.  I knew the broker.

24  Q.   Was it a lender?

25  A.   Hum, no.

81

1  Q.    Who was it?

2  A.    I do not recall.

3  Q.    What was the purpose of showing these documents to company

4  officials?

5  A.    For them to evaluate the documents.

6  Q.    For what reason?

7  A.    For whatever purpose that Mr. Harley might have wanted to

8  do.

9  Q.    Now this is -- your report was dated July 2?

10 A.    Yes.

11 Q.    This is a month before your report?

12 A.    Yes, sir.

13 Q.    And you were already dealing with company officials,

14 correct?

15 A.    Yes, sir.

16 Q.    And you were already dealing with -- the last sentence,

17 you were already dealing with an insurance company?

18 A.    That's what it says, but I was dealing with Mr. Basheer.

19 Q.    Who was going through -- he was an insurance broker who

20 was going to insurance companies to get an insurance wrap?

21 A.    I would assume so.

22 Q.    This is before you even did the report?

23 A.    Yes, sir.

24 Q.    So the first question, read what it says.

25 A.    What relationship does your company have with Hays Hilltop

1   Operating.

2   Q.   And did you get an answer?

3   A.   Yes.

4   Q.   What was the answer you got?

5   A.   No relation.

6   Q.   What was your second question?

7   A.   What relationship does your company have with BML, Inc.

8   Crude Oil Marketing Company.

9   Q.   Did you get an answer?

10  A.   No relation.

11  Q.   What was your third question?

12  A.   What relationship does your company have with Enpetro,

13  LPC, Inc.?

14  Q.   Did you get an answer?

15  A.   The promissory note and collateral assignment.

16  Q.   What about it?

17  A.   That was the relationship.

18  Q.   That they gave it to him?

19  A.   That they gave it to him.

20  Q.   What's your fourth question?

21  A.   Do you know whether any working interest in these leases

22  have been sold?

23  Q.   What answer did you get?

24  A.   He didn't know and I didn't know.

25  Q.   Did you ever try and find out?

1  A.    No, sir.

2  Q.    Would that have been important to the value of the

3  collateral?

4  A.    It was a question at the time that I asked on my own to

5  see if it had relevance.

6  Q.    Well, if there was working interest the leases that were

7  already sold to third parties, what significance would that

8  have on the valuation of the collateral?

9  A.    It might not have had any.  It might have had a bearing.

10 I'd have to think about that for a moment.

11 Q.    But at the time you asked the question you thought it was

12 an important question?

13 A.    It was a fact-finding letter that I was trying to find and

14 gather as much information as I could.

15 Q.    And what was No. 5?  What's your fifth question?

16 A.    Would it be permissible to speak with Christina --

17 Christie E. Bower regarding a safe-keeping receipt and Phil

18 Page regarding the geology report?

19 Q.    What was the answer you got?

20 A.    I believe the answer was, yes, I could.

21 Q.    Did you talk to Christie Bower and Phil Page?  I think you

22 said you didn't?

23 A.    I don't recall speaking to Christie Bower, and I did not

24 speak with Phil Page.

25 Q.    And what's your sixth question?

1  A.    You have confirmed to me verbally but could not confirm to

2  me in writing --

3  Q.    But could you --

4  A.    Oh, I'm sorry, I'm sorry.  I'm not a very good reader

5  sometimes.  You have confirmed to me verbally, but could you

6  confirm to me in writing that these leases are all currently in

7  production and at what rates.

8  Q.    Now, this letter was dated what, at the top right?

9  A.    June 2, 1999.

10 Q.    And you're saying that Mr. Harley confirmed to you

11 verbally that all these leases are currently in production,

12 correct?

13 A.    Yes.

14 Q.    That was inaccurate?

15 A.    No, sir, that's not.

16 Q.    They were all in production?

17 A.    No.  I did not know.  Sometime you can take a well out of

18 production and then put it back in production.  What I was

19 trying to ascertain was had the wells been put back into

20 production since 1993.

21 Q.    Your question was you have confirmed for me verbally, but

22 could you confirm to me in writing that these leases are all

23 currently in production and at what rates.  That's your

24 question, correct?

25 A.    That is my question.

1  Q.    So that -- isn't it true that that means that Mr. Harley

2  told you verbally that these leases as of June 2, 1999, are all

3  currently in production, and you wanted written confirmation of

4  that?

5  A.    It may not be a well-worded question, but I can tell you

6  that that's what I was thinking at the time.

7  Q.    What were you thinking at the time?

8  A.    I wanted to know whether they had been put back in

9  production, or whether they were still out of production.

10 Q.    Well, at this time, on June 2, 1999, you didn't have the

11 Texas Railroad reports, did you?

12 A.    No, sir.

13 Q.    So you had no way of knowing that they were out of

14 production since 1993?

15 A.    That's the reason for the question, is I was trying to --

16 Q.    But Mr. Harley --

17 A.    -- ascertain.

18 Q.    But Mr. Harley told you they were in production, and you

19 wanted written verification, that's why you got the reports,

20 the Texas Railroad Commission reports, that contradicted what

21 Mr. Harley told you verbally?

22 A.    Yes.

23 Q.    Did that cause you any concern that you were doing

24 business with this man whom you had never met who verbally told

25 you something than didn't turn out to be true?

1  A.    No.

2  Q.    And then we read the last sentence that deals with the

3  insurance company, and you don't remember what insurance

4  company that was?

5  A.    No, sir.

6  Q.    And then the next day Mr. Harley sent you an executive

7  summary of his company, RJH, correct?

8  A.    I don't know.  If it was the next day I did receive an

9  executive summary.

10  Q.    Can we go to 32.3.  Is that a fax that you received from

11  Mr. Harley on June 3 of 1999?

12  A.    Yes, sir.

13  Q.    And what does it say?

14  A.    Enclosed is the executive summary on RJH and Company,

15  Inc., FYI, we just received information that every Indian

16  reservation wants RJH and company to put a holistic center -- I

17  think that's using our patent-pending therapy and methodology

18  treatment with them.

19  Q.    Best regards, RJH?

20  A.    I'm sorry, yes, sir.

21  Q.    And did Mr. Harley explain to you that he had a holistic

22  center using his patent-pending therapy and methodology?

23  A.    He mentioned it to me.

24  Q.    Well, what did he say?

25  A.    That he was into holistic medicine.

1  Q.    Well, let's go to the document.  Can we get the next page,

2  the first paragraph.  Can you read what it says?

3  A.    Yes, sir.  RJH and Company, Inc., a New Jersey

4  Corporation, has developed patent-pending, in brackets, a

5  therapy using a precise mixture of ozone/oxygen which has

6  proven in limited but controlled clinical tests to be effective

7  in inactivating blood-born viruses, HIV in brackets, with no

8  toxicity to the patients.  The urgency for resolving the

9  worldwide AIDS dilemma now is self-evident.  It dictates that

10  RJH and Company, Inc., treatment modality be made available to

11  these infected with this virus as soon as possible.

12  Q.    And scrolling down to the paragraph that states Richard J.

13  Harley is the founder, what does that say?

14  A.    Richard J. Harley is the founder and president of RJH and

15  Company, Inc.  Ten years has been devoted solely to research

16  and marketing of this much-needed therapy.  My background in

17  holistic healing has been part of my life since birth, which

18  was instilled in me through my parents, the late Reverend and

19  Mrs. Denvil Harley.

20        God has always been the forefront of my life, which has

21  taught me faith healing.  When I was introduced to oxygen ozone

22  -- I'm sorry, ozone/oxygen back in September of 1988 I could

23  relate to the causes and effects of such simple modality.

24  Q.    Keep on reading.

25  A.    RJH and Company intends to establish holistic healing

1    centers worldwide.  In order for us to meet their needs

2    millions of dollars are required.  This capital would be used

3    to continue with more intensive clinical study to prove the

4    efficacy of many more diseases that ozone has been known for,

5    and in conjunction begin to build more healing centers.

6    Thereby, enabling RJH to deliver this therapy more rapidly to

7    those in need.

8    Q.    Keep on reading.

9    A.    RJH and Company, Inc., would like -- would also like to

10   dispense the treatment once implemented to all infants who have

11   AIDS and who have -- or who have tested HIV positive at no cost

12   to their parents or guardians so that they too will have a

13   chance at life.

14   Q.    And the next page?

15   A.    On behalf of RJH and Company we would like to take this

16   time to thank those at Enpetro for the collateral to extend to

17   us --

18   Q.    It has extended?

19   A.    I'm sorry.  -- it has extended to us to fund an investment

20   program to establish healing centers worldwide.  Signed by

21   Richard J. Harley, President.

22   Q.    So, Mr. Harley sent you this corporate profile saying that

23   he was trying to set up these holistic healing centers

24   worldwide, correct?

25   A.    Yes, sir, that's why --

1  Q.   And he said that every Indian reservation wants a holistic

2  center?

3  A.   That's what he said.

4  Q.   Right.  And the reason he sent it to you was because you

5  were providing this document to company officials who were

6  going to lend Mr. Harley money based on his collateral?

7  A.   I don't recall that I asked him to send it to me.

8  Q.   So are you saying he just sent it to you randomly out of

9  the blue?

10  A.   Yes, yes.

11  Q.   And you didn't ask for it?

12  A.   No, sir.

13  Q.   No company officials that you were dealing with or Mr.

14  Basheer was dealing with reflected a corporate profile of the

15  entity that they were going to lend this money to?

16  A.   I would anticipate if they wanted that they would have

17  corresponded that directly to Mr. Harley.

18  Q.   Can we go to 32.4.  Two days later did you send a fax to

19  Mr. Harley regarding this whole deal with Basheer?

20  A.   Yes.

21  Q.   And what does it say?

22  A.   Mr. Basheer and myself have composed the attached letter

23  to our four-year consideration.  Mr. Basheer is a consultant

24  that works with me and also handles getting insurance wraps.

25  Q.   Always handles?

1  A.    Pardon me?

2  Q.    You said also.

3  A.    Oh.  Mr. Basheer is a consultant that works with me and

4  always handles getting insurance wraps.  He is the one who made

5  the initial inquiry with the insurance company.  This will

6  expedite the matter with the insurance company we are working

7  with.  This is a formality step that must be met.  The text of

8  this letter is only a suggestion and may -- you may alter it

9  accordingly.  Further, you may ask any questions to this letter

10 to allow the insurance companies to be more effective --

11 Q.    Efficient?

12 A.    I'm sorry.  Efficient in their response to best utilize

13 time.  After reviewing alterations please return same to me at

14 your convenience.  Thank you.  And I signed it.

15 Q.    And then the next page is a suggested sample letter that

16 you sent to Mr. Harley?

17 A.    Yes.

18 Q.    And what does it say?

19 A.    We, RJH, a New Jersey corporation, request assistance --

20 request the assistance of Mr. Donald C. Kesterson and Mr. Larry

21 Basheer with the acquisition of a financial guaranty bond from

22 the insurance company that they are currently working with,

23 which is double A or better rated, in the amount of blank.  We

24 offer as collateral for such guarantee the original promissory

25 note, in brackets, currently not rated by Standard and Poor's,

1   assigned and payable to our company dated September 24, 1997,

2   in the amount of blank dollars, which is backed by 5,524 -- I'm

3   sorry -- 9,524,000 barrels of oil reserves.  Based on the value

4   of the promissory oil note versus the actual estimated value of

5   the reserves, they may have been discounted 20 to 25 percent.

6   Further, we have all necessary geologic reports analysis,

7   evaluations prepared by industry professionals for your review

8   should you wish to proceed.

9       We feel that you will find the issuer of the note to be

10  well-positioned to do so.  RJH and Company has developed

11  patent-pending, in brackets, a therapy using precise mixture of

12  ozone and oxygen which has proven in limited controlled

13  clinical tests to be effective in inactivating blood-born

14  viruses, HIV in brackets, with non-toxicity to patients.

15      The urgency for unresolved worldwide AIDS epidemic dilemma

16  now is self-evident.  It dictates that RJH and Company, Inc.,

17  treatment modality be available to those infected with the

18  virus as soon as possible.

19      We stand ready to provide you with needed information for

20  your due diligence in the form of executive summary.  Please

21  advise us of any specific documentation needed.  Thank you.  We

22  await your reply.  Best regards.

23  Q.   So this is a suggested letter that you sent to Mr. Harley

24  asking him to fill it out and send back to you, correct?

25  A.   Mr. Basheer sent it to me.  I sent it to Mr. Harley.

1  Q.   And if you signed it it was authorizing you and Mr.

2  Basheer to act as Mr. Harley's consultant to get this financial

3  guarantee bond from an insurance company.  Is that what it says

4  in the first paragraph?

5  A.   Well, it says I will assist.

6  Q.   Right.

7  A.   Assisting could be introducing him to Mr. Basheer.

8  Q.   And it was in connection with getting a financial

9  guarantee bond from an insurance company?

10 A.   Yes.

11 Q.   And in the second paragraph it says, and the line -- the

12 sentence that says further.  Further we have all the necessary

13 geological reports, analysis and evaluations prepared by

14 industry professionals for your review.  Correct?

15 A.   Yes, sir.

16 Q.   So, if Mr. Harley signed that letter, he would be

17 referring to the geological reports that you, Mr. Kesterson,

18 had prepared?

19 A.   Not necessarily, because I wasn't done with my report at

20 that time.

21 Q.   And as far as this business about a patent-pending therapy

22 for AIDS, did you believe all that to be true?

23 A.   I had no opinion.

24 Q.   What's that?

25 A.   I had no opinion.

1  Q.    You didn't care if it was true or not?

2  A.    No, sir.

3  Q.    Well, what if it was totally fraudulent, would you have

4  continued to deal with this man?

5  A.    No, sir.

6  Q.    So, did it make a difference to you?

7  A.    Yes, it did.

8  Q.    So let me ask again, did you believe it to be true?

9  A.    I did not have enough information at that time to know

10 whether it was true or not.

11 Q.    Now, that request to Mr. Harley to sign that letter, that

12 was also almost a month before you actually did your report?

13 A.    Yes, sir.

14 Q.    And can we go to 32.5?  Is this another fax you sent to

15 Mr. Harley about two weeks before you prepared your report?

16 A.    Yes.

17 Q.    And it's dated June 15 of '99?

18 A.    Yes, sir.

19 Q.    Can we go to the first page?  What does this document

20 represent?

21 A.    It represents the information that was sent to me by Mr.

22 Harley.

23 Q.    And it's you telling Mr. Harley what that information

24 means to you?  Does that say under No. 1, 2, 3 and 4, it says,

25 Now let me review this documentation with you and what it means

1  to me?

2  A.   That's what it says, as far as I can read.

3  Q.   And No. 3 -- keep on going down, scrolling down.  Can you

4  read what it says under No. 3?

5  A.   The oil promissory note clearly covers only -- or oil

6  only, not gas.  The 380-day time limit has passed, which does

7  make the note payable or usable.

8  Q.   That was a legal conclusion, wasn't it?

9  A.   Yes.

10  Q.   And you have no legal expertise, correct?

11  A.   That is correct.

12  Q.   But this time you were working with the insurance

13  companies, Mr. Basheer, to get this potential loan to Mr.

14  Harley so he could set up these holistic healing centers?

15  A.   No, I was not.

16  Q.   Can we go to the next page where it says -- yeah, that's

17  fine.  There's a sentence, To prepare a report assigning value

18  to the reserves will require the following steps.  And can you

19  go to No. 1?

20  A.   Evaluate the nuclear logs or drilling core analysis run on

21  the wells if available.  The reason being is volumetric

22  calculations must be done on each of these wells to derive

23  recoverable reserves, much like the process that Mr. Page has

24  already prepared.

25       Once the recoverable reserves are determined then the

1  amount of oil produced to date must be subtracted from the

2  estimated reserve to determine the remaining recoverable,

3  proved, developed non-producing reserves, then a value must be

4  determined to return the leasehold production equipment to

5  working order.  This may or may not be a simple task.

6  Q.    And you didn't do that, correct?

7  A.    Could you --

8  Q.    You didn't do what's said in No. 1, as far as

9  determining --

10 A.    No, I did do that.  I did do the log analysis and core

11 analysis -- or analyze the core data and the four-point

12 drawdown test.

13 Q.    What was the amount of recoverable reserves determined to

14 be with these six leases?

15 A.    The 10 million some odd barrels.

16 Q.    Of recoverable reserves?

17 A.    Proved, developed, non-producing reserves.

18 Q.    That wasn't my question.  Because this paragraph talks

19 about recoverable reserves.  How do you determine that?

20 A.    It's the same process.

21 Q.    Well, recoverable reserves, isn't it a fact, is saying as

22 an expert that these -- this oil can get recovered?  That

23 there's an economically feasible way to get it out of the

24 ground and sell it?  That's different than whether it's

25 producing or non-producing.  It has nothing to do with cost

1 factor?

2 A.    Recoverable reserves is an all-encompassing oil and gas

3 term that can take into effect PDPs, PDNPs and -- that would

4 be the limit.

5 Q.    Skipping down to the bottom of the page after No. 3.  It

6 says, Now all of this having been said, most of it does not

7 pertain to your company, since as you pointed out, Enpetro must

8 maintain these oil reserves on your behalf.  However, consider

9 the following -- these steps reviewed above are the same for

10 any professional to prepare this type of report.  I must assume

11 that time is of the essence in preparing this report to meet

12 this project.

13      Why was time of the essence to meet the project?

14 A.    Harley was in a hurry to get the report done.

15 Q.    Why?

16 A.    You'd have to ask him.

17 Q.    Well, I'm asking you.  So the insurance company, weren't

18 they demanding a report so they could go ahead with this

19 lending deal?

20 A.    I have no idea.

21 Q.    And then at the bottom of the page you say frankly.  Read

22 what it says?

23 A.    Frankly, for me to do such a report above and beyond

24 assigning a value to proved, developed producing reserves would

25 require a trip to Texas, one.  Two, an attempt to find nuclear

1  logs.  Three, time to prepare the report, I would estimate to

2  be on the order of two to three weeks.

3  Q.    And you never went to Texas, correct?

4  A.    That's correct.  Because that pertained to proved,

5  developed, producing reserves.

6  Q.    And go to the next paragraph.

7  A.    I would like to help you, particularly considering the

8  cause, AIDS in brackets, you are working on.  However, it seems

9  redundant to have you retain my services to prepare a report

10 that somebody may have only needed to update.  Whereas, I

11 cannot certify Mr. Page or anybody else's calculations, I must

12 prepare my own.  In the beginning I felt as though I could do

13 some reserve calculations on PDP and write a cover letter and

14 prepare a summary sheet, thus provide your company with what

15 was needed to consummate your business.  Unfortunately it did

16 not turn out this simple.  I look forward to your comments

17 regarding my analysis.

18 Q.    And did you get comments from him regarding your analysis?

19 A.    I'm sure I did, but I don't remember them.

20 Q.    Well, did he engage you to do that report --

21 A.    Yes.

22 Q.    -- even under that time pressure?

23 A.    I'm sorry, yes, sir.

24 Q.    And you make the report, which came in evidence as 32.6

25 dated July 2, 1999, correct?

1  A.    Yes.

2  Q.    That's Exhibit 32.6.  And how much did you charge Mr.

3  Harley for the preparation of that report?

4  A.    Approximately $2700.

5  Q.    And did you ever get paid?

6  A.    No, sir.

7  Q.    Did you invoice him?

8  A.    Yes, sir.

9         MR. BRANDLER:  Could we have 32.7.  Is this your

10  invoice.

11  A.    It sure looks like it, sir.

12  Q.    And scrolling down it shows all the dates and the hours

13  that you did compiling your report?

14  A.    Yes, sir.

15  Q.    And to the next page?  And at the bottom of the page says

16  total fee $2,775?

17  A.    Yes.

18  Q.    For 74 hours worth of work?

19  A.    Yes.

20  Q.    But it indicates that there was a thousand dollars -- what

21  does that mean, the thousand that's on the bottom?

22  A.    It says, Bid for report $1,000.  Please pay $1,000.  Which

23  can be interpreted as a retainer that I never received.

24  Q.    Did you receive any money from Mr. Harley in connection

25  with this report?

99

1  A.    No, sir.

2  Q.    And besides sending out this invoice, did you repeatedly

3  demand payment for your report?

4  A.    Yes, sir.

5  Q.    You were dealing with him you said from 1999 up to 2011

6  you were sending out revisions of this report?

7  A.    Yes, sir.

8  Q.    You never got a time?

9  A.    No, sir.

10 Q.    Why did you keep sending out revisions and doing work on

11 this report for a period of 12 years when you had gotten

12 stiffed back in 1999?

13 A.    I wanted to get paid my invoice.  It was important to me

14 to receive my time payment.

15 Q.    That's not my question.  My question is why did you

16 continue to do additional work where you were not going to get

17 compensated if you had already not been compensated for the

18 work you had done in 1999?

19 A.    It is -- it was my goal to update the reports in hopes

20 that I would eventually get paid.

21 Q.    And the way you were going to get paid is if Mr. Harley

22 used your report, your engineering report, and eventually got a

23 loan by some lending institution, and you could get your 2.5

24 percent?

25 A.    No, sir.

1  Q.   Now, didn't you tell me at one -- in the grand jury that

2  the thousand dollars on this invoice was a mistake and it was a

3  cut and paste job from another invoice?

4  A.   Yes, sir.

5  Q.   Is that true?

6  A.   Yes, sir.

7  Q.   So you cut and pasted this together?

8  A.   Hum, when I prepare an invoice, what I'll do is I'll cut

9  and paste the bottom where it shows the total on down to have

10 my signature line, so that I have the same format to the end of

11 my invoice.  So I cut and pasted that part into the invoice,

12 and didn't pay attention that that came over as well.

13 Q.   And your report itself, 32.6 -- well, actually, let's go

14 to 36.17.  The second page, this cover page, that's not

15 something you put together, is it?

16 A.   No, sir.

17 Q.   The words certified, oil and geological appraisal report,

18 that's not your language?

19 A.   No, sir.

20 Q.   And the next page, that's where your report starts?

21 A.   It appears to, yes, sir.

22 Q.   July 2, 1999?

23 A.   Yes, sir.

24 Q.   Do you know why this woman Judith Miller was certifying

25 this as a true and exact copy of the original?

1  A.   No, sir.

2  Q.   Did you know who Mr. Harley was providing this report to

3  during the 12 years that you were revising your reports?

4  A.   No, sir.

5  Q.   And the next page.  You included various documents in this

6  full report here, which included the log data, correct?

7  A.   Yes, sir.

8  Q.   But I notice you didn't include the actual oil promissory

9  note, you just included the assignment of collateral.  Why is

10  that?

11  A.   I think it's in the actual body of the report, it just may

12  not have made it to the table.  I'd have to look all the way.

13  In my original report it's there.

14  Q.   Well, there's a table of contents here.  Is the oil

15  promissory note listed?

16  A.   It is not.

17           MR. BRANDLER:  Your Honor, this would be a good time

18  to break for lunch.

19           THE COURT:  What do you have?

20           MR. BRANDLER:  I have probably another half hour.

21           THE COURT:  Okay, fine.  Members of the jury, we'll

22  break for lunch.  Remember not to discuss the case among

23  yourselves or with anyone else, and if anybody tries to talk to

24  you about it bring it to my attention.  We're going to break

25  for lunch now.  We'll come back at -- an hour and 15 minutes.

1  We'll come back at 20 of.  Enjoy your lunch, see you back.

2          (Whereupon, a recess was taken from 12:25 p.m. to 1:40

3  p.m.)

4          THE COURT:  You may proceed.

5  BY MR. BRANDLER:

6  Q.   Can we have 32.10?  This is the -- can you just enlarge it

7  -- the financial procurement fee agreement.  Early this morning

8  you said you rejected this?

9  A.   Yes, sir.

10 Q.   When you came and testified to the grand jury in February

11 of 2012 this is one of the documents that you brought with you?

12 A.   Yes, sir.

13 Q.   That's how I got it?

14 A.   Yes, sir.

15 Q.   The date on this letter is August 29.  Can you scroll

16 down?  You saved this document for about 12 and a half years?

17 A.   Yes, sir.

18 Q.   Why did you save it?

19 A.   Just stuck it in a file and forget about it.

20 Q.   Did you ever notify Mr. Harley in writing that you were

21 rejecting this proposal?

22 A.   Not in writing, sir.

23 Q.   Would that be standard procedure, if you got a written

24 offer of this nature?

25 A.   Not necessarily.

1  Q.    All right.  Mr. O'Brien showed you the original report.

2  Can we have 32.6, and the last page.  On the top of the last

3  page there we had it broken out and proved developing

4  producing.  And you have all zeros?

5  A.    Yes.

6  Q.    I notice in your revisions, when Mr. O'Brien took you

7  through a whole series of them, that information never

8  appeared?

9  A.    Could you ask me that again, please, sir?

10 Q.    Did the information regarding zero value approved

11 developing producing ever appear in any of the revisions after

12 your report?

13 A.    I believe so.  I believe I mentioned there was no value of

14 producing.

15 Q.    Can we have 32.14?  This is the revision on December 13,

16 '05?

17 A.    (No response.)

18 Q.    Is this the revision on December 13 of 2005?

19 A.    The top part appears to be.  I can't see the rest of it.

20 Q.    I'll give you an opportunity to look through the whole

21 thing.  I just want to direct your attention to the second

22 page.  There's a lot of numbers there and values.  Do you see

23 that, where it says all five formations, 10,217,369 for a value

24 of 26 -- 20 million dollars?

25 A.    Yes.

1  Q.    Below that it has the value of the purported assignment of

2  collateral 1,500,000 barrels of oil?

3  A.    Yes.

4  Q.    For 578 million?

5  A.    Yes, sir.

6  Q.    You didn't mention -- I don't see any numbers here about

7  zeros that you had in your initial report deciding why you

8  decided to omit that?

9  A.    If you saw it backed up it is mentioned.  Go a little bit

10 farther, please.  Right there.  No value can be assigned to --

11 Q.    In the initial report there's a whole section -- series of

12 zeros, correct?

13 A.    Yes, sir.

14 Q.    And you reformatted it for these revisions, correct?  I'm

15 just wondering why did you do that?

16 A.    Well, this is the cover letter.  What you showed earlier

17 is the summary sheet, two different things.

18 Q.    Was there a reason for reformatting it?

19 A.    I followed the format of the cover letter as already

20 provided, because all the other conditions remain the same,

21 sir.

22 Q.    All right.  You had no idea of Enpetro's ability to pay

23 the 200 million dollars owed to Mr. Harley on the note,

24 correct?

25 A.    That is correct, sir.

1  Q.    And you told Mr. Harley that if the oil hit the surface,

2  it was extracted, it wasn't his anymore?

3  A.    That is correct, sir.

4  Q.    You told him that?

5  A.    Yes, sir.

6  Q.    So if Mr. Harley told one of the victims in this case that

7  he needed their money so he could extract the oil and sell it,

8  that would have been an incorrect statement?

9  A.    With respect to my report, yes, sir.

10 Q.    Well, with respect to what you told him?

11 A.    Yes, yes, sir.

12 Q.    And going to 36.17.  To the page that's Bates numbered at

13 the bottom 262.  And the last three paragraphs.  Can you just

14 enlarge those?  Would you just read where it says The

15 information?

16 A.    The information from Texas Railroad Commission oil

17 promissory note and collateral assignment were accepted as

18 factual without further investigation.

19 Q.    That's accurate, correct?

20 A.    Yes, sir.

21 Q.    And read the second paragraph?

22 A.    No trips were made to the field to examine the current

23 equipment status of each of the wells on these leases.  No

24 trips were made to Brown County Courthouse to determine the

25 present status of the leases, drilling depth rights or the

106

1  working interest ownership.

2  Q.    That's all accurate?

3  A.    Yes, sir.

4  Q.    Next paragraph?

5  A.    There has been no production from any of the these 46

6  wells since 1993.  According to the figures provided by the

7  Railroad Commission, these leases have sold 20,629 mcf of gas,

8  63,405 barrels of oil in their cumulative history.

9  Q.    You can stop right there.  And that was accurate?

10  A.    Yes, sir.

11  Q.    And the next page, the last paragraph.  Can you just read

12  what the first sentence says?

13  A.    To prepare this analysis of the crude oil reserves, it is

14  unique for several reasons.  Normally, an evaluation is

15  prepared based on historical gas and oil production figures,

16  cash flow, lease operating expenses, net revenue interests of

17  each of these leases.  However, the situation does not apply to

18  the terms of the oil promissory note or the collateral

19  assignment.

20  Q.    Let me just stop you right there.  That was based on your

21  interpretation of the oil promissory note and collateral

22  assignment?

23  A.    Right.  I'd have to see all these pages in order to see if

24  this is mine, but yes, that is basically what my opinion was at

25  that time.

1  Q.    Which you accepted as true without verification?

2  A.    Yes, sir.

3  Q.    All right.  Continue reading.

4  A.    The oil promissory note and collateral assignment states

5  only that a reserve base must be maintained without respect to

6  expense or time.  To assign value to the estimated reserves

7  requires the following steps:  Evaluate nuclear logs and/or --

8  I'm sorry.

9  Q.    I think you read that portion earlier, so you don't need

10  to continue reading that.  So that report was dated July 2 of

11  1999.  Shortly thereafter did you have communications with Mr.

12  Basheer regarding the insurance wrap?

13  A.    No, sir, not that I recall.

14  Q.    Can we have Exhibit 32.8?  Can you identify this document?

15  A.    Yes.

16  Q.    What is it?

17  A.    July 2nd -- or July 4, 1999.

18  Q.    That would be two days after you prepared the report?

19  A.    Okay.

20  Q.    Is that correct?

21  A.    The cover sheet says that it's two days after.

22  Q.    Well, is there any reason why you would put the wrong date

23  on the cover sheet?

24  A.    No, no, that's mine.

25  Q.    All right.  And who is this cover sheet indicating that it

1  went to?

2  A.    Mr. Richard J. Harley.

3  Q.    Going to the second page.  What does it say -- I'm sorry,

4  what does the body of the fax say?

5  A.    5:30 p.m. to Richard J. Harley, company RJH, his fax

6  number (570)223-9468.  Number of pages including cover page,

7  four.  Please see attached.  Hard copy of report will be mailed

8  ASAP.

9  Q.    And going to the next page.  There's a letter dated July 8

10 of 1999?

11 A.    Dear Mr. Basheer, I --

12 Q.    First of all, it's on your letterhead, correct?

13 A.    Yes.

14 Q.    All right.  What does it say?

15 A.    Dear Mr. A. Larry Basheer:  I Donald C. Kesterson,

16 Consulting Petroleum Geologist, have been retained to assist

17 RJH and Company, a New Jersey corporation, with acquisition of

18 the financial guarantee bond with an insurance company, which

19 is double A or better rated in the amount of 200 million

20 dollars.

21 Q.    Well, it says now that you've been retained by RJH for the

22 acquisition of a financial guarantee bond from an insurance

23 company.  That's what you told Mr. Basheer, correct?

24 A.    That's what it says, yes, sir.

25 Q.    You wrote it?

1  A.    My use of retain may not have been proper, but yes, I

2  wrote that.

3  Q.    Well, retained means that you had an agreement with Mr.

4  Harley, correct?  He retained you?  What's your definition of

5  retained?

6  A.    He asked me to help him find an insurance company.  So, I

7  introduced him to Mr. Basheer.

8  Q.    I know this morning you said you were just assisting him?

9  A.    That's what I just said again, that I was introducing him

10 to somebody who could do an insurance wrap.

11 Q.    And you used the word retained, which indicates that

12 there's a contract of some type where there is going to be an

13 exchange, an exchange for you --

14           THE COURT:  Just a minute.  Are you going to ask him

15 a question or are you going to make a statement?  You're giving

16 an opinion about retained.

17           MR. BRANDLER:  All right.

18           THE COURT:  And you shouldn't do that either.

19 BY MR. BRANDLER:

20 Q.    Isn't it a fact, Mr. Kesterson, that your use of the word

21 retained here meant that you had an agreement with Mr. Harley

22 that there was money that was going to change hands back and

23 forth between you and him regarding this financial guarantee

24 bond from the insurance company?

25 A.    No, sir.  I used the wrong term in retained.

1  Q.    And going to the third paragraph, can you read what that

2  says?

3  A.    Since entering initial discussions with RJH and Company, I

4  have prepared my own reserve analysis on the leases backed by

5  the value of the oil promissory note.  Prior to being retained

6  by my client it was my desire to justify estimated -- justify

7  these estimated oil reserves --

8  Q.    So you used the word retained again?

9  A.    Yes.

10  Q.    All right.  Continue reading.

11  A.    Based on my own estimations, the oil reserves called for

12  in these documents appear to be reasonable.  Should your

13  insurance company wish to proceed with this proposed -- with

14  this proposal, my client is prepared to produce the oil -- the

15  necessary oil promissory note, collateral assignment, geologic

16  reports estimating the recoverable reserves.  Further, it is

17  the opinion of RJH and Company that the issuer of the note to

18  be well positioned to maintain this note and related documents.

19  Q.    So you referred to Mr. Harley as your client?

20  A.    Yes.

21  Q.    And then you -- in the next paragraph you talk about his

22  patent pending therapy for ozone oxygen treating AIDS patients,

23  correct?

24  A.    Yes.

25  Q.    And then read the last paragraph.

1  A.    My client stands ready to provide you with the needed

2  information for your due diligence in the form of an executive

3  summary.  Please advise us of any specific documentation

4  needed.  Thank you.  We await your reply.

5  Q.    And what was the purpose of you sending this letter to Mr.

6  Basheer?

7  A.    It was a follow-up to introducing him as the -- to be

8  an -- find him an insurance wrap.

9  Q.    So, that was July 4 of 1999, two days after the report.

10  Can we have Exhibit 32.18?

11          THE COURT:  What was July 4?

12          MR. BRANDLER:  The fax cover sheet that he sent to

13  Mr. Harley which attached the letter dated July 8.

14          THE COURT:  Oh, okay.

15          MR. BRANDLER:  Can we have 32.18?

16          TECHNICIAN:  I don't have that.

17          MR. BRANDLER:  You don't have that?

18  BY MR. BRANDLER:

19  Q.    Take a look at this document.  Is this one of the

20  documents you brought with you to the grand jury?

21  A.    Yes, sir.

22  Q.    And is it a fax that you received from Mr. Harley on or

23  about July 28, 1999?

24  A.    It appears to be, sir.

25  Q.    What does it say in the special instructions?

1  A.   Verbiage for safe keeping receipt.  Sorry for the delay.

2  Q.   What was the purpose of Mr. Harley sending you verbiage

3  for a safe keeping receipt?

4  A.   I do not recall.

5  Q.   Were you asking -- it says sorry for the delay.  Were you

6  asking him for some safe keeping receipt quickly?

7  A.   I do not recall.

8  Q.   You had already done your report on July 2, so it doesn't

9  relate to doing your report, correct?

10  A.   I can't -- I don't know.  I don't remember.

11  Q.   Well, you know it doesn't relate to your report.  That was

12  already done?

13  A.   Yes, sir.

14  Q.   And what other business do you have with Mr. Harley after

15  your report was done?

16  A.   None.

17  Q.   What about the insurance?

18  A.   Well, that was an introduction.

19  Q.   Let's go to the second page.  There appears to be a form.

20  It says, Banks, letterhead, draft verbiage.  And then the

21  foundation name is crossed out and RJH and Company, P.O. Box,

22  Shawnee on Delaware.  First of all, where did you get this form

23  from, the blank form?

24  A.   I do not recall.

25  Q.   This is -- I'm sorry, I'm going to withdraw that question.

1  This fax was from Mr. Harley to you, correct?

2  A.    Yes.

3  Q.    And he says -- he's giving you verbiage for a safe-keeping

4  agreement.  Do you recall anything about why he sent you this

5  document?  What he wanted you to do with it?

6  A.    Sir, I do not recall.

7  Q.    Did he want you to hold some documents in safe keeping and

8  give him a receipt?

9  A.    No, sir.

10 Q.    And -- but in any event, all he sent to you, he faxed to,

11 you have no idea why?

12 A.    I don't recall, no, sir.

13 Q.    And then on August 2 of 1999 -- this is 32.9.

14        TECHNICIAN:  Yeah, I have that.

15 BY MR. BRANDLER:

16 Q.    Is this another fax you received from Mr. Harley?

17 A.    Yes.

18 Q.    And your report was done a month earlier?

19 A.    Yes.

20 Q.    Why is he still sending you complete executive summaries

21 on RJH and Company?

22 A.    I do not recall.

23 Q.    And the next page is dated what?

24 A.    Executive summary.

25 Q.    From RJH?

1  A.    Yes, sir.

2  Q.    Dated June 17 of 1998?

3  A.    Yes, sir.

4  Q.    And the second page is signed by Mr. Harley?

5  A.    It appears to be, sir.

6  Q.    And if we go to the next page, it's a more in-depth

7  explanation of the business of RJH, the ozone/oxygen therapy

8  that he's claiming the Indian reservations want.  Scroll

9  through, go to the next page.  Next, next, next.

10       Now, these financial figures, why was he sending you --

11  can you just enlarge -- yeah, enlarge it.  Why was he sending

12  you these projected income statements from RJH and Company

13  after you had done your report?

14  A.    I don't know.

15  Q.    Did it have anything to do with the fact that you and Mr.

16  Basheer were trying to get him an insurance wrap?

17  A.    Well, Mr. Basheer might have been trying to, but I wasn't.

18  I don't have any insurance companies that I work with.

19  Q.    Well, what about your friend from Capital Alliance, the

20  equity lending program?

21  A.    Again, I introduced him to that.  I have no direct

22  business with them.

23  Q.    So why is Mr. Harley sending you these documents after you

24  did your report?

25  A.    I do not recall.

1  Q.    That was August 2 of 1999.  Can we go to -- I know this

2  one is not in the system.  We'll mark this 53.1.  Do you

3  recognize that document?

4  A.    Yes, sir.

5  Q.    What is it?

6  A.    It is my fax cover sheet.

7  Q.    And it's from you to who?

8  A.    Mr. Harley.

9  Q.    And dated?

10  A.    October 7, 1999.

11  Q.    And what does the body of the document say?

12  A.    Hello.  Please find my payment information attached to the

13  revised cover letter summary sheet.  I will be mailing hard

14  copy to you today via regular mail service.  When you're

15  prepared send me funds, wire my money to the following account.

16  And it lays out my banking.  Do you need me to redact --

17  Q.    No.  What funds were you asking him to send you to wire?

18  A.    Payment for my report.

19  Q.    For $2700?

20  A.    Yes, sir.

21  Q.    You hadn't received it yet by October of 1999?

22  A.    No, sir.

23  Q.    And then there's some attachments here, which is those

24  financial statements it looks like for RJH, which are blank.

25  It says for discussion purposes only, pro forma, some document

1  from an accountant, CPA Stanley Warren to Mr. Harley.  Why did

2  you have these documents?  These are documents that you brought

3  to the grand jury that you had in your file, correct?

4  A.    Yes.

5  Q.    So why do you have documents from a certified public

6  accountant that are addressed to Mr. Harley regarding financial

7  statements for RJH?

8  A.    He sent them to me and you requested I bring everything to

9  the grand jury.

10 Q.    I understand that.  But why did Mr. Harley send them to

11 you in 1999 if you had already done your report?

12 A.    I don't know.

13 Q.    Now, eventually you got contacted by some of the

14 individuals who have testified in this case.  Did you get phone

15 calls from a Peter Bunche and a Malcolm Casselle?

16 A.    You'll have to refresh me on those names.  I don't --

17 Q.    I know it's been some time.  But in about 2009 did someone

18 call you up asking you to verify your report because they

19 were --

20        MR. O'BRIEN:  Objection, hearsay.  Some unidentified

21 person called him up and said --

22        MR. BRANDLER:  There's been testimony in this case

23 about Mr. Bunche and Mr. Casselle.

24        THE COURT:  If he knows who called him, I mean, I

25 have no problem with that.  But if he doesn't know then let's

117

1  move on.

2  BY MR. BRANDLER:

3  Q.    Did you get phone calls from anyone asking you to verify

4  the contents of your report in 2009?

5  A.    At one point in time I do remember getting a phone call.

6  I do not remember the date.  I do not remember the name.

7  Q.    And you verified the contents of your report to these

8  people, correct?

9  A.    I stood by my report.

10  Q.    And then sometime in 2010 you got an e-mail copied to you

11  from Stan Dedmon, a person affiliated with Enpetro, Inc.?

12  A.    I received an e-mail from Stan Dedmon?

13  Q.    You were cc'd on it.

14  A.    I -- without seeing it, I have no idea.

15  Q.    Can we have 31.3?

16          MR. O'BRIEN:  Show it to him.

17          MR. BRANDLER:  All right.

18          MR. O'BRIEN:  Let me see a copy.

19          (Pause.)

20          (Whereupon, counsel conferred regarding the proposed

21  exhibit.)

22  BY MR. BRANDLER:

23  Q.    I'm going to show you this document, which is part of

24  Exhibit 31.3.

25          THE COURT:  Don't put it up.

1           MR. BRANDLER:  No.

2   BY MR. BRANDLER:

3   Q.   I just want you to read it and then look on the cc's at

4   the back, see if you can identify it.

5   A.   Read the whole thing?

6   Q.   No, just read it to yourself.

7   A.   Oh.

8   Q.   Yeah.

9           (Pause.)

10  BY MR. BRANDLER:

11  Q.   Did you receive that?

12  A.   This is the first time I've seen it, sir.

13  Q.   That's not my question.  Did you receive it?

14  A.   No, sir.

15  Q.   I'll take it back.  I have no further questions and I

16  would move to introduce the exhibits briefly identified by the

17  witness.  Not this document 31.3, but all the others.

18          MR. O'BRIEN:  No objection.

19          THE COURT:  They'll be admitted.  Cross-examine -- or

20  I mean redirect.

21          MR. O'BRIEN:  32.6.

22                      REDIRECT EXAMINATION

23  BY MR. O'BRIEN:

24  Q.   Mr. Kesterson, I just have a few questions.  Let me start

25  first.  This is not the first time you've performed an

1  evaluation of the amount of oil in a particular parcel of

2  ground, is it?

3  A.   No, sir.

4  Q.   Okay.  In this case you got -- you did that on the basis

5  of information you received from your client Mr. Harley and

6  some other people?

7  A.   Yes, sir.

8  Q.   You received information from Mr. Harley?

9  A.   Yes, sir.

10  Q.   Along with some documents?

11  A.   Yes, sir.

12  Q.   You received information from a Mr. Page on behalf of Mr.

13  Harley?

14  A.   Through Mr. Harley.

15  Q.   Through Mr. Harley.  You received information from a

16  Christie Bower through Mr. Harley?

17  A.   Yes, sir.

18  Q.   You received information from the Texas Railroad

19  Commission?

20  A.   Yes, sir.

21  Q.   Now, that's not unusual for you to do reports based on

22  information you receive from a client and through a client?

23  A.   No, sir.  It's not unusual.

24  Q.   Okay.  And you are -- you are not a lawyer?

25  A.   No, sir.

1  Q.    So you don't perform title searches?

2  A.    No, sir.

3  Q.    And you're not an engineer and you don't do the

4  engineering side of oil exploration?

5  A.    No, sir.

6  Q.    And you're not an accountant?

7  A.    No, sir.

8  Q.    And you're not a corporate lawyer who analyzes documents?

9  A.    No, sir.

10 Q.    You got this information and these documents from Mr.

11 Harley and some of his people, you believed them to be true and

12 you did your report based on that?

13 A.    As I stated in the report, yes, sir.

14 Q.    You stated that in the report, you assumed this to be

15 true.  And that's not unusual, is it?

16 A.    No, sir.

17 Q.    And in fact, just a matter of common sense, when people

18 deal with --

19        MR. BRANDLER:  I'm going to object to leading here,

20 he's just --

21        MR. O'BRIEN:  There's been leading for about eight

22 days here, your Honor.

23        THE COURT:  Pardon?

24        MR. BRANDLER:  This is supposed to be direct

25 examination.

1       THE COURT:  You're right.  Tone it down, Mr. O'Brien.

2  BY MR. O'BRIEN:

3  Q.    Now, before you accept retention from a client you ask

4  them for documents and information, right?

5  A.    Yes, sir.

6  Q.    And is it your practice to demand that they verify

7  everything they give you?

8  A.    No, sir.

9  Q.    And is it your practice, you basically rely on what your

10 clients tell you?

11 A.    Yes, sir.

12 Q.    Now, in this case you received information from Harley,

13 Mr. Harley about this note and so forth.  And you believed it

14 to be true?

15 A.    Yes, sir.

16 Q.    And you felt he believed it to be true?

17        MR. BRANDLER:  I object.

18        THE COURT:  Sustained.

19 BY MR. O'BRIEN:

20 Q.    Now, the way you handled this case, receiving the

21 information, analyzing it, issuing the report as to the value

22 of oil underground, did you follow standard procedures?

23 A.    Yes, sir.

24 Q.    Now, let me move to another area.  You mentioned to Mr.

25 Harley that you as a consultant had to be independent.  What

1 did you mean by that?

2 A.    Hum, I can only be compensated for writing the report

3 itself.  I -- that's it.  That's what we call arm's length.

4 Q.    And if you have side or prior or frequent dealings with

5 the people you represented you might not be arm's length or

6 objective or independent?

7 A.    With respect to this report I have to be at arm's length

8 in order to be an independent appraiser.

9 Q.    Was this an arm's length report?

10 A.    Yes.

11 Q.    Was it an objective report?

12 A.    It was objective.

13 Q.    Was it an honest report?

14 A.    Yes, sir, it was.

15 Q.    Now, I'm going to go through a couple of the challenges

16 Mr. Brandler made to your objectivity.  He asked you a

17 question.  You said you work from your home, and you don't have

18 an office or a big website.  Does that in any way indicate that

19 you weren't independent or objective?

20 A.    No, sir.

21 Q.    In your opinion?

22 A.    No, sir.

23 Q.    And it said that -- you brought up the point that you

24 didn't work for any big oil companies.  You didn't have any big

25 employment with anybody.  Does that retract -- does that

1  indicate that you're not independent or objective?

2  A.    No, sir.  I've been a consultant for 30 years.

3  Q.    As a consultant you work for yourself?

4  A.    Yes, sir, and for companies.

5  Q.    Now, you didn't know Mr. Harley before that, before this

6  came, he called you on the phone?

7  A.    Yes, sir.

8  Q.    Does that to you challenge your objectivity or your

9  independence?

10  A.    No, sir.

11  Q.    Just the opposite, right?

12  A.    Yes, sir.

13  Q.    And you didn't know the other people?

14  A.    No, sir.

15  Q.    And had no prior business dealings with them?

16  A.    No, sir.

17  Q.    Is that a red flag, that I may not have been independent.

18  I represented somebody I knew?

19  A.    No, sir.

20  Q.    In fact, you were never paid, never got any money out of

21  this?

22  A.    No, sir.

23  Q.    And the fact that you made a business referral.  Let me

24  talk about that.  This business with -- I guess there are two

25  separate ones here.  There was some guy in the capital markets

124

1  business.  What was that gentleman's name?

2  A.    Jim -- Bill Bernard.

3  Q.    And I guess at some point you might have referred Mr.

4  Harley to Bernard?

5  A.    Yes, sir.

6  Q.    Now, do you, as a professional field, does that reflect a

7  lack of independence or objectivity?

8  A.    No, sir.  It's very common for me because of my business

9  and of my business associations to make reference to people who

10  are outside business.  You know, it wouldn't be any different

11  than referring them to Halliburton or Schlumberger for cement

12  jobs or drilling.

13  Q.    When one of your clients asks you, Do you know anybody who

14  shovels walks, what do you tell them?

15  A.    Yes, sir, I probably could find them.

16  Q.    Do you agree with me that's standard business practice for

17  those of us in the real world?

18  A.    Yes, sir.

19  Q.    Business referrals, right?

20  A.    Yes, sir.

21  Q.    Now, let's refer to the other one with this insurance.

22  Why did you refer Mr. Harley to Basheer for insurance?

23  A.    Mr. Basheer has been in the insurance business -- I did

24  know him prior, and he said that he could possibly provide

25  insurance wraps.

1  Q.    Okay.  All right.  And Mr. Harley indicated he might want

2  to wrap to insure this investment?

3  A.    Yes, sir.

4  Q.    And you referred him to Mr. Basheer?

5  A.    Yes, sir.

6  Q.    And then you kind of served as an intermediary in a way?

7          MR. BRANDLER:  Object to the leading.  I mean, this

8  is straight leading.

9          THE COURT:  That is leading.

10  BY MR. O'BRIEN:

11  Q.    Okay.  What did you do -- did you -- after referring him

12  to Mr. Basheer did you do anything else with respect to him and

13  Mr. Basheer?

14  A.    I made the introduction.  I passed some documents back and

15  forth that were sent to me.  That's it.

16  Q.    Did you have any agreement with Mr. Harley or Mr. Basheer

17  or Mr. Bernard that you were going to get a cut of any of that?

18  A.    No, sir.

19  Q.    Did you get a cut of any of that?

20  A.    No, sir.

21  Q.    Now, there was also a question about the verbiage for the

22  safekeeping agreement, some type of e-mails going back and

23  forth.  Does that correspondence indicate to you at all that

24  you were not acting independently and objective?

25  A.    I don't believe so, sir.

1  Q.    Now, as you look back at this transaction, do you believe,

2  evaluating your own conduct, that you acted independently and

3  objectively --

4  A.    Yes, sir.

5  Q.    -- in issuing this report?  Now, let me ask you this

6  question.  The challenges to your report, basically you said

7  ten million dollars in provable reserves, right?

8  A.    About ten million barrels, sir, not dollars.

9  Q.    Now, what are the barrels and reserves in the report that

10  Mr. Brandler had done on this?  Did he ever show you a report?

11  A.    No, sir.

12  Q.    Did he ever tell you that he had a report done?

13  A.    No.

14         MR. BRANDLER:  I'm going to object.  I don't even

15  understand --

16         THE COURT:  Pardon?

17         MR. BRANDLER:  I didn't understand his question and I

18  didn't understand the --  can you just --

19         MR. O'BRIEN:  I asked him how many barrels of

20  reserves were estimated in any report that Mr. Brandler showed

21  him and he said none.  And then I asked him did Mr. Brandler

22  have his own report done, if you know, and he said no.

23         MR. BRANDLER:  I have no objection to that.

24         THE COURT:  All right.

25  BY MR. O'BRIEN:

1  Q.    Okay.  Now, in front of you on the screen is Government's

2  Exhibit 32.6.  Now, one of the areas that Mr. Brandler

3  questioned you was whether or not you gave a report -- whether

4  or not you opined on the issue of whether the leases that

5  you -- the leases that you gave an opinion on were the same

6  leases covered by the note.  There was a lot of questioning on

7  that issue.  Okay.  Now, do you know the answer to that?

8  A.    No, sir.

9  Q.    Pardon?

10  A.    No, sir.

11  Q.    No?  You assumed it was because your client told you?

12  A.    Yes, sir.

13  Q.    Okay.  Now, let's just spend -- I want to go through your

14  report.  And I want to see, do you ever -- you really never

15  even said that.  Now, let's look at the first page.  And I want

16  you to read the first -- the second page, I'm sorry.  I want

17  you to read that first paragraph.

18  A.    Can I see the top of it, just to make sure that -- okay,

19  all right.  Thank you.

20          THE COURT:  Do you want to go to the first page or

21  the second page?

22          MR. O'BRIEN:  The page that's there, your Honor, the

23  second page.

24          THE WITNESS:  As per your request, a complete

25  analysis of recoverable volumes of crude oil reserves has been

1  prepared on oil and gas leases in Brown County, Texas,

2  pertaining to your oil promissory note and collateral

3  assignment from Enpetro, LPC, Inc.

4  Q.   Okay, stop there.  Now, if you were to excise from that

5  report the words pertaining to your oil promissory note and

6  collateral assignment from Enpetro LPC, Inc. (Enpetro), would

7  that in any way affect the opinion you gave on the amount of

8  oil reserves under those leases?

9  A.   No, sir.

10  Q.   When you put that clause in there pertaining to your oil

11  promissory note and collateral assignment from Enpetro LPC --

12          THE REPORTER:  One more time, please.

13  BY MR. O'BRIEN:

14  Q.   When you put that clause in there were you intending to

15  give a report that these leases are directly tied into that

16  note?

17  A.   It was strictly for oil reserves, period.

18  Q.   You were not intending a legal report that these leases

19  are the leases mentioned in the note?

20          MR. BRANDLER:  This is just leading.  I mean, it's

21  wholesale leading.

22          THE COURT:  It is, I agree.

23          MR. BRANDLER:  I object.

24          THE COURT:  So rephrase the question.

25  BY MR. O'BRIEN:

1  Q.    Do you know whether the leases -- strike that.  Do you

2  have any other information, other than what you were told by

3  the people we mentioned, that the leases on which you gave your

4  opinion, are the same leases referred to in the note?

5  A.    Could you ask that question again please.

6  Q.    Other than what you were told by Clifford, Mr. Harley,

7  Railroad Commission and so forth, other than that, do you have

8  any other information that the leases upon which you gave your

9  opinion, were the leases referred to in the note?

10 A.    No.

11 Q.    Okay.

12 A.    No, sir.

13 Q.    Now, did you intend to say that with the words pertaining?

14 Did you intend to give that legal opinion?

15 A.    My report was strictly for the crude oil reserves.

16 Q.    If you took out the words pertaining down to Enpetro would

17 that in any way affect your report on the amount of crude oil

18 reserves?

19 A.    No, sir.

20 Q.    Now, would you turn to page -- the page, it's page four,

21 but it's really like about page 8 -- discussion.  Keep going --

22 no, the title page is discussion.  It's at No. 4.  Now, would

23 you read the first paragraph, please?

24 A.    In order to appraise the crude oil reserves on the oil and

25 gas leases in Brown County, Texas, backing the oil promissory

1  note and collateral assignment from Enpetro LPC, Inc., Enpetro

2  in brackets, the information was compiled as following.

3  Q.   Why did you put in there the words backing the oil

4  promissory note and collateral assignment from Enpetro?

5  A.   I assumed that the leases were the properties that had

6  been pledged to --

7  Q.   Were you told that by your client and other people?

8  A.   Yes.

9  Q.   Now, let's go down -- scroll up, please.  Keep going,

10  please.  Stop please.  Would you read this paragraph beginning

11  with The information?

12  A.   The information from the Texas Railroad Commission oil

13  promissory note and collateral assignment were accepted as

14  factual without further investigation.

15  Q.   And scroll down please.  And the other way, scroll up,

16  please.  Keep going.  Thank you.  Look at the first paragraph

17  there.  And if we were to take out the words backing the oil

18  promissory note and assignment from Enpetro LLC, take that word

19  out of that, would that affect your report of the amount of the

20  oil reserves under these leases?

21  A.   No, sir.

22  Q.   Scroll.  Stop please.  Now, there's paragraphs -- just a

23  little bit more down.  There's a paragraph there, collateral

24  assignment.  Would you read that, please.  You don't have to

25  read it aloud, just read it.

1        (Pause.)

2        THE WITNESS:  Okay, I finished reading what's on the

3  screen.

4        MR. O'BRIEN:  Scroll up a little.

5        THE WITNESS:  Yes, sir.

6  BY MR. O'BRIEN:

7  Q.    And would you scroll -- the other way, the other way.

8  Read the paragraph three, the oil promissory note?

9  A.    Yes, sir.

10 Q.    Now, those two paragraphs you wrote, did you intend those

11 paragraphs to convey the opinion that the leases that you

12 examined were the same leases that happened to be referred to

13 in that note?

14 A.    I assumed that they were.

15 Q.    And did you, in your opinion, intend to give any legal

16 opinions on that or any other issue?

17 A.    No, sir.

18 Q.    And can you tell us again what your assignment was?  What

19 were you supposed to do in this case?

20 A.    I was to calculate -- sorry, estimate the amount of

21 reserves in the ground under the six leases to determine the

22 amount of oil in place.

23 Q.    And is that something that you are asked to do as a

24 geologist?

25 A.    Yes, sir.

1  Q.    Is that something you do in your experience as a

2  geologist?

3  A.    Yes, sir.

4  Q.    Did you do what you were asked to do?

5  A.    Yes, sir.

6  Q.    Did you do so honestly and professionally?

7  A.    Yes, sir.

8  Q.    Do you stand by your report?

9  A.    I do stand by my report, sir.

10 Q.    On that issue?

11 A.    Yes, sir.

12 Q.    Is there anything that happened in the last four hours,

13 any questions or any suggestions that would create a situation

14 where you would question the integrity of your report?

15 A.    I do not question my report.  I stand by it.

16        MR. O'BRIEN:  No further questions.

17        THE COURT:  Any recross?

18        MR. BRANDLER:  Yes.

19                    RECROSS EXAMINATION

20 BY MR. BRANDLER:

21 Q.    So Mr. O'Brien asked you hypothetically if you would take

22 out certain language in your report pertaining to the oil

23 promissory note and the assignment of collateral and backing

24 the note, all the things that connect the value to the note and

25 the assignment of collateral.  Would that change your report,

1  that you were asked that question?

2  A.    No.  I was evaluating the oil and gas on the six lease --

3  or I'm sorry.  The gas -- excuse me.  The crude oil under the

4  six leases.

5  Q.    That wasn't really my question.  My question was just

6  directing your attention to Mr. O'Brien's questions.  He asked

7  you about that?

8  A.    Yes.

9  Q.    And if you had omitted that language would you agree with

10 me that this would be a completely different report, but there

11 would be just a discussion about six leases and nothing about

12 an oil promissory note or an assignment of collateral?

13 A.    Can you be more specific with that question, please.

14 Q.    Well, you said that you assumed that those six leases

15 related to the note and the assignment of collateral?

16 A.    Yes, sir.

17 Q.    And that's the way you wrote it in your report?

18 A.    Yes, sir.

19 Q.    And any reasonable person who read that report would have

20 that same assumption?

21         MR. O'BRIEN:  Oh, your Honor, I don't know that he

22 knows --

23         THE COURT:  Well, it's a statement also.  I mean --

24 come on Mr. Brandler.

25 BY MR. BRANDLER:

1  Q.   When you wrote the report that's what you meant to convey,

2  that the leases were connected to the note and the assignment?

3  A.   My objective was to evaluate the crude oil under the six

4  leases.

5  Q.   Can we have Exhibit 36.17.  Mr. O'Brien showed you 32.6,

6  which is accurate, that's just a portion of your report,

7  correct?

8  A.   (No response.)

9  Q.   The six pages here that he showed you that he had you read

10  from, that's not the entire report?

11  A.   It's --

12  Q.   The one he referred to earlier, the blue one, the thick

13  one with all the calculations, isn't that the full report?

14  A.   (Gestured.)

15  Q.   Let's go to 32.17, the third page in, the next page, the

16  next page after that, there you go.  Isn't this your full

17  report, the table of contents?

18  A.   I'm not sure about the table of contents page.  That

19  just -- I'm not sure.  That's the material that was in my

20  report, but I'm not sure that that's one I prepared.

21  Q.   So, in the first page, if we go back to the first page.

22  Back.  There.  Where it says -- no, before that.  Even the page

23  before that.  Certified oil geological and appraisal report.

24  You're saying stuff that appeared after that was not part of

25  your report?

135

1  A.    And that's not my cover sheet.

2  Q.    I know you said that earlier.  So, I'm asking you now, the

3  next page, that is yours?

4  A.    Yes, sir.

5  Q.    And the next page, is that yours?

6  A.    I don't remember preparing anything that looked like that.

7  Q.    So on this page, Roman Numeral III, there's attached the

8  assignment of collateral?

9          THE COURT:  He just said he didn't know that he

10 prepared that.  Why are we questioning about it?  He said he

11 can't identify that as something he prepared.  Why would you

12 question about it?

13         MR. BRANDLER:  Because in the report --

14         THE COURT:  I'm not going to allow it.  He's not

15 identified that as part of his report.

16         MR. BRANDLER:  As the table of contents.

17         THE COURT:  Let's move on.

18 BY MR. BRANDLER:

19 Q.    Did you include the assignment of collateral in your

20 report?

21 A.    In my report it was in there.  This --

22 Q.    Correct.  So why did you include the actual assignment of

23 collateral in your report if it had nothing to do with the six

24 leases?

25 A.    Quite often when I'm preparing reports, if people send me

1  information -- for example, I just did a report recently where

2  somebody died and I'm doing an estate appraisal, I put in their

3  death certificate and the executor -- I can't think of the

4  legal term -- but the appointment of the executor in my report.

5  Anything that's sent to me, sometimes I put it in there just to

6  be part of the body of the report.

7  Q.    Because it's the background of the report?

8  A.    Not necessarily.  It would --

9  Q.    Well, why did you decide to put the assignment of

10  collateral in this report?

11  A.    I need you to be more clear with the question, because

12  this is not my table of contents.

13  Q.    All right.  We've established that.  But you established

14  that you did put a copy of the assignment of collateral in your

15  report?

16  A.    Yes.

17  Q.    Why did you do that?

18  A.    Because, again, if I have information that's sent to me

19  I'll put that in there.  I believe I also put in the promissory

20  note.

21  Q.    Wasn't it meant -- isn't it a fact that the reason you put

22  it in there was to convey to whoever received this report the

23  fact that the valuations you were giving for those six leases

24  related to that assignment of collateral?

25  A.    Could you rephrase the question?

1  Q.   Isn't it a fact that the reason you put the assignment of

2  collateral in your report was to convey to the reader of the

3  report that the valuations you were doing related to the

4  assignment of collateral, which is what you said you assumed?

5  A.   But the objective of my report was to do an estimate of

6  the crude oil on the six leases.

7  Q.   Did you understand -- I'm going to stop.  I have no

8  further questions.

9          THE COURT:  All right.  You may step down.

10          MR. O'BRIEN:  Your Honor, we have a couple of issues.

11          THE COURT:  Pardon?

12          MR. O'BRIEN:  We have a couple of issues.  May we

13  have a brief break to meet with the Court?

14          THE COURT:  Sure.  Members of the jury, we'll take an

15  early break this afternoon.  We'll break now for -- we've been

16  at it an hour only.  We'll break for 15 minutes.  Remember not

17  to discuss the case among yourselves or with anyone else.  If

18  anyone tries to talk to you about it bring it to my attention.

19  See you back here in 15 minutes.

20          THE DEPUTY CLERK:  All rise.

21          MR. O'BRIEN:  Your Honor --

22          THE COURT:  Wait.

23          (Whereupon, the jury left the courtroom at 2:34 p.m.)

24          THE COURT:  All right.

25          MR. O'BRIEN:  We have come to that point in the trial

1  where I'm planning on putting Mr. Harley on the stand.  And he

2  has something he would like to bring to the attention of the

3  Court.

4          DEFT. HARLEY:  I've been asking for my accounts

5  receivables file that was taken during the raid, your Honor.

6  And I've been asking for it for months now really.  I haven't

7  gotten anyplace with it.  I need that file in order to testify,

8  and I know they have it.  It's a thick file.  And also Peter

9  Bunche's file is also a thick file.  They were in a storage

10 box, all of them together, in green folders, and they're

11 labeled Accounts Receivable, Peter Bunche, everything is

12 labeled.  And I've been asking for quite some time now, and I

13 have not gotten it.  I need that in order to present my

14 testimony.

15         MR. BRANDLER:  We've given them copies.  They've had

16 two years, everything that we seized during the search warrant.

17         DEFT. HARLEY:  For two years I've been asking for it.

18         MR. BRANDLER:  I've dealt with your counsel that

19 you've had in this case, and I've given them everything they've

20 asked for.  I think whatever he's talking about, asked for,

21 it's between him and whatever request he's made to his lawyers.

22 I've not been in contact directly with Mr. Harley regarding any

23 request.

24         THE COURT:  Okay, I understand.

25         MR. BRANDLER:  And I would just put for the record

1  that we've made full discovery to the defense from the outset

2  of the case.

3          DEFT. HARLEY:  He's taken this file, Mr. Brandler.  I

4  remember that.  Because I had them in all the boxes --

5          THE COURT:  You're talking --

6          THE WITNESS:  I'm sorry.

7          THE COURT:  First of all, we don't know that he

8  doesn't have it.

9          DEFT. HARLEY: Judge --

10          THE COURT:  He's saying -- just a minute.  He's

11  saying he supplied it.  Now, let me ask you this question.  Do

12  you have it?

13          MR. BRANDLER:  I don't know.  There's 16 boxes of

14  documents.  I can say this, when I went through them I didn't

15  see anything that said accounts receivable.  But I can't

16  dismiss the possibility that it's in there.  They have access

17  to them.  Like I said, we made copies, electronic copies of all

18  those documents and put them on CDs, given them to the defense,

19  and they've had these for two years if they wanted the

20  documents.

21          DEFT. HARLEY:  And I've been asking for them for two

22  years.  I have --

23          THE COURT:  I'm not going to get into that.  The

24  question is, is it retrievable now or in short order, that's

25  the question right now.  That's all I want to know.  Is there

1  an inventory?

2      MR. BRANDLER:  No, not of that detail where we'd be

3  able to find a particular document.

4      THE COURT:  And this relates to -- you say

5  receivables, and what was the other file?

6      DEFT. HARLEY:  Accounts receivable, Peter Bunche, all

7  the contracts that we had entered into, he and I back and

8  forth, and I need them to be able to expound on my testimony.

9      THE COURT:  Peter Bunche's file?

10     MR. BRANDLER:  There were documents, I introduced

11 them during the course of Mr. Bunche's testimony relating to

12 Mr. Bunche.  There were many documents relating to Mr. Bunche.

13 Let me make a suggestion here, and see if this maybe alleviates

14 the problem.  I know it's 2:30, or after 2:30 on a Friday

15 afternoon.  The case is obviously going to continue until

16 Monday.  I have no problem giving them access to the documents

17 over the weekend.  They can pull out whatever documents they

18 want or don't want or they can go back in the computers and

19 look at the CDs.

20     THE COURT:  Okay.

21     MR. BRANDLER:  And Mr. Harley can start his testimony

22 on Monday morning.

23     THE COURT:  Are you saying you can't start the

24 testimony?

25     MR. HARLEY:  No.

1      THE COURT:  You can't start the testimony?

2      THE WITNESS:  No, I can't, your Honor, because

3  they're critical to the way I'm going to start.  I planned this

4  already out on how I'm going to begin to expound on my

5  testimony.  I have to talk some things over with my counsel

6  about that also.

7      THE COURT:  Okay.  All right.  It seems like a

8  reasonable suggestion if everybody is willing to do it.  I have

9  no problem with that.  I hate to send them home early, but if

10  you're going to send them home early Friday is a good day to do

11  it.  All right.  Well, that's what we'll do.  So we'll begin

12  again Monday morning, presumably if those things are there,

13  you'll get them and we'll move on.

14      MR. BRANDLER:  The only thing I would say is let me

15  know -- if they want me to look at the actual boxes, those are

16  up in Scranton.  They have copies, electronic copies of

17  everything that's in those boxes.  So, you know, somebody needs

18  to come in on the weekend to be with them while they're going

19  through boxes.  I mean, they'll have to make arrangements.

20      THE COURT:  Well, Mr. O'Brien will work that out with

21  you.

22      MR. O'BRIEN:  We'll work it out when we get back.

23      MR. HARLEY:  We'll coordinate a time.  Thank you,

24  your Honor.

25      THE COURT:  All right.

1          MR. HARLEY:  Thank you, your Honor.

2          THE COURT:  Thank you.  Well, rather than keep the

3  jury out we might as well bring them back and we'll send them

4  home.  Now, I'm going to tell the jury that we're going to

5  resume Monday morning and Mr. Harley is going to testify.  Am I

6  in order saying that?

7          MR. HARLEY:  I'm testifying, but I have another

8  witness before myself Monday morning.

9          THE COURT:  All right.  So there will be another

10  witness and then you?

11          DEFT. HARLEY:  Yes.

12          THE COURT:  Okay, fine.

13          MR. BRANDLER:  Another witness?  I didn't hear it.  I

14  didn't know about that.  He mentioned another witness that was

15  not previously disclosed.  I guess it's an evolving process.

16          MR. O'BRIEN:  I think she's -- half a file exists on

17  the exhibits.  You told me you were going to call her.  You

18  knew darn well she was going to be a witness, and I'm not sure

19  he's going to.

20          MR. BRANDLER:  I'm not objecting.  You can call

21  whoever you want.  I'm just saying that's not what you said

22  yesterday.  You said you had two witnesses, Kesterson and

23  Harley.

24          THE COURT:  Gentlemen.

25          MR. BRANDLER:  Call whoever you want.

1        (WHEREUPON, the jury returned to the courtroom at

2    2:42 p.m.)

3        THE COURT:  All right.  Members of the jury, I'm

4    going to send you home early.  We're going to have to adjourn

5    for the day because there are some things that need to be done

6    that don't involve you.  They're critical or I wouldn't

7    interrupt the flow of things, but it's the way it has to be.  I

8    apologize for it, but there's nothing that can be done about

9    it.

10        But we will reconvene Monday.  Chances are you'll

11   probably get the case on Tuesday.  There -- we'll convene again

12   on Monday morning at 9:30.  Remember, again, this is a long

13   weekend, or it's a weekend.  You're not to discuss the case

14   among yourselves or with anyone else.  No research, no

15   anything.  You'll realize you're to decide this case solely on

16   what you see and hear in this courtroom.

17        Don't expose yourself to any media.  Again, I don't

18   know that there has been any, but if there is you simply should

19   ignore it.  Other than that, enjoy your weekend.  Sorry to quit

20   early.  But it is one of those things that occurs now and then

21   during the course of a trial, and I don't mean to inconvenience

22   you that much, but there's not much we can do about it.  So

23   thank you for your patience and your perseverance, and we'll

24   see you here on Monday morning at 9:30.  Again, in case of

25   weather, you know the drill.  Enjoy your weekend.

1              (2:44 p.m., court adjourned.)

REPORTER'S CERTIFICATE

   I, DIANA L. GILBRIDE, Official Court Reporter for the
United States District Court for the Middle District of
Pennsylvania, appointed pursuant to the provisions of Title 28,
United States Code, Section 753, do hereby certify that the
foregoing is a true and correct transcript of the
within-mentioned proceedings had in the above-mentioned and
numbered cause on the date or dates hereinbefore set forth; and
I do further certify that the foregoing transcript has been
prepared by me or under my supervision.


                         /s/ Diana L. Gilbride
                         _____
                         Diana L. Gilbride, RMR, FCRR
                         Official Court Reporter

REPORTED BY:

     DIANA L. GILBRIDE, RPR
     Official Court Reporter
     United States District Court
     Middle District of Pennsylvania
     P.O. Box G
     Scranton, PA  18501-0090


          (The foregoing certificate of this transcript does not
apply to any reproduction of the same by any means unless under
the direct control and/or supervision of the certifying
reporter.)