1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA

United States of America,    )
                             )
        Plaintiff            )
                             )
     VS.                     )    CASE NO. 3:12-CR-00224
                             )
                             )
Richard J. Harley,           )
                             )
        Defendant            )
                             )
                             )
_____    )

TRANSCRIPT OF PROCEEDINGS OF JURY TRIAL - VOLUME NINE
BEFORE THE HONORABLE A. RICHARD CAPUTO
MONDAY, DECEMBER 15, 2014
WILKES-BARRE, PENNSYLVANIA

FOR THE PLAINTIFF:

    Joseph A. O'Brien, Esq.
    Oliver, Price & Rhodes
    1212 South Abington Road
    Clarks Summit, PA  18411

FOR THE DEFENDANT:

    Bruce D. Brandler, AUSA
    U.S. Attorney's Office
    Room 217, Federal Building
    228 Walnut Street
    Harrisburg, PA  17108

_____

DIANA GILBRIDE, RMR, FCRR
FEDERAL OFFICIAL COURT REPORTER
P.O. BOX G
SCRANTON, PA 18501-0090

2

1

**INDEX TO WITNESSES**
2                **MONDAY, DECEMBER 15, 2014 {VOLUME NINE}**

3   **FOR GOVERNMENT:   DIRECT  CROSS  REDIRECT  RECROSS   COURT**

4
    Charge Conference:   29
5
    Closing Statement
6    by Mr. Brandler:    40

7   Judge's Charge:                                          105

8   Verdict:                                                 146

9   Sentencing Regiment
    and Disposition:                                         149
10

11  **FOR DEFENDANT:    DIRECT  CROSS  REDIRECT  RECROSS   COURT**

12  Motion for Judgment
    Of Acquittal:         7
13
    Closing Statement
14   by Mr. O'Brien:    75

15

16

17
                      **INDEX TO EXHIBITS**
18
    **GOVERNMENT:**                        **IDENTIFIED   ADMITTED**
19
    Exhibit No. 32.6                                     6
20  Exhibit No. 32.12                                    6
    Exhibit No. 32.14                                    6
21  Exhibit No. 32.15                                    6
    Exhibit No. 32.16                                    6
22  Exhibit No. 32.17                                    6

23
    **DEFENDANT:**                         **IDENTIFIED   ADMITTED**
24
    Exhibit No. 2                              6             6
25

1                (9:30 a.m., convene.)

2                (Jury not present.)

3        THE COURT:  Counsel, do you want to see me?

4        MR. BRANDLER:  Yes.

5        MR. O'BRIEN:  We have a couple matters, Judge.

6        MR. BRANDLER:  We can say it from here.  There were

7 some scheduling issues.  One has been resolved.

8        MR. O'BRIEN:  One has been resolved.

9        MR. BRANDLER:  I think what's going to happen, I

10 don't want to speak out of turn here.  Mr. O'Brien told me Mr.

11 Harley is not going to be testifying.  He's chosen not to

12 testify.  And Mr. O'Brien is going to rest his case this

13 morning.  So I believe the next order of business is a charge

14 conference on the jury charge, which we haven't resolved and

15 then move to closing arguments.

16        THE COURT:  So, there will be no witnesses?

17        MR. O'BRIEN:  No.  There were two witnesses scheduled

18 today, Christie Bowers, her name was mentioned a couple times

19 here in the courtroom.  Mr. Harley authorized me to release

20 her.  I'm not offering her as a witness.  Is that correct?

21        MR. HARLEY:  That's correct.

22        MR. O'BRIEN:  The second witness was Mr. Harley.

23 Earlier last night he told me he's not going to testify and he

24 reiterated this morning, so he will not be testifying.  Is that

25 correct?

4

1          MR. HARLEY:  That's correct.

2          THE COURT:  All right.  So, let's see.

3          MR. O'BRIEN:  Your Honor, if I may jump in?

4          THE COURT:  You may.

5          MR. O'BRIEN:  I have to move my exhibits into

6   evidence; I have to make my motion.  As I see it, I don't want

7   to interfere on your jurisdiction.  I think that would be the

8   next step, to move my exhibits into evidence, rest my case,

9   make my motion.

10          THE COURT:  Yeah, I would agree with that.  You know

11  what, you can move your exhibits in without the jury being

12  present.  You can make your motion without the jury, which is

13  what you're supposed to do.  What I was trying to determine is

14  what am I going to do with the jury in the meantime, because I

15  -- it makes no sense to bring them back, have you rest, and

16  then send them back out because they still don't have the case,

17  and I don't want to even tempt them.

18          So, what I'm going to do is let's do all of that.

19  We'll let the jury know we have some things to deal with, and

20  that they're going to probably be about an hour, because we'll

21  have the charge conference after we finish this.  So if that's

22  true, can they walk -- can you let them --

23          THE DEPUTY CLERK:  They can go and shop, get coffee.

24          THE COURT:  Yeah.  Why don't you just tell them that,

25  and tell them to be back at 10:30.

5

1          MR. BRANDLER:  At some point though defense counsel

2  will rest in front of the jury?

3          THE COURT:  Of course.  But I would bring them in,

4  have them rest, and then you fellas will start your closings.

5          MR. BRANDLER:  Right.

6          THE COURT:  So that way they're here and they don't

7  have to, you know, play shuttle games.

8          MR. BRANDLER:  I just wanted to make sure it's on the

9  record.

10          THE COURT:  No, no, no, that's a fact.  Okay.  Let's,

11  move your -- well, let her do that, and then we'll move your

12  exhibits, Mr. O'Brien, and then we'll have the motion.  All

13  right.

14          (Pause.)

15          THE COURT:  Mr. O'Brien.

16          MR. O'BRIEN:  Yeah, thank you, your Honor.  At this

17  point I would move the admission of the following exhibits:

18  Government 32.6, that is the Kesterson report of July 2, 1999.

19  No. 32.12, that's the Kesterson report I believe of January 26,

20  2000.  Government 32.14, Kesterson report December 13, 2005.

21  Government 32.15 Kesterson report, July, 2007.  Government

22  32.16, Kesterson report, September 28, 2007.  Government 32.17,

23  Kesterson report February 20, 2008.

24          MR. BRANDLER:  Is that it?

25          MR. O'BRIEN:  That's it.

6

1          MR. BRANDLER:  32.6.  32.12 -- let met just -- I

2  don't have them in front of me here.  32.6, we have no

3  objection.  32.12, no objection.  32.14, no objection.  32.15,

4  no objection.  32.16, no objection.  32.17, no objection.

5          MR. O'BRIEN:  And also your Honor --

6          THE COURT:  They'll be admitted.

7          MR. O'BRIEN:  Defendant Exhibit No. 2 is the Bunche

8  letter apology, March 2, 2010.

9          MR. BRANDLER:  I don't remember that that was ever

10  identified.

11          THE DEPUTY CLERK:  Yes, it was.

12          MR. BRANDLER:  By Mr. Bunche?

13          THE COURT:  Mr. Bunche identified it, I believe.

14          MR. BRANDLER:  No objection.

15          THE COURT:  All right.  That will be admitted.

16          MR. BRANDLER:  We're going to do the charge in open

17  court or in chambers?

18          THE COURT:  We'll do it in chambers.

19          MR. O'BRIEN:  Your Honor, in terms of my motion, I

20  would ask the Court, I have a motion to make.  Mr. Harley has

21  some additions he'd like to make too.  Can we do things that

22  way?

23          THE COURT:  I don't understand.

24          MR. O'BRIEN:  He has a motion he would like to make.

25          THE COURT:  A motion?

1          MR. O'BRIEN:  (Nodded.)

2          THE COURT:  What sort of a motion?

3          MR. HARLEY:  It's -- well, I wouldn't call it a

4 motion, your Honor.  It's some concerns I have about the entire

5 process regarding the grand jury testimony.

6          THE COURT:  Well, it's unorthodoxed.  I don't usually

7 allow that.  I don't quite understand what -- why your lawyer

8 can't make that argument.

9          MR. HARLEY:  Well, we discussed it.  I was hoping he

10 would, but I can elaborate on it if you wish.

11          THE COURT:  No need to elaborate.  All right.  Go

12 ahead Mr. O'Brien.  I'll allow that process.

13          (Pause.)

14          MR. O'BRIEN:  Your Honor, at this time the defendant

15 would move for a motion for judgment of acquittal on all of the

16 23 counts.  Your Honor, the basis for the motion is that the

17 evidence submitted in this case is legally insufficient to

18 establish a scheme to defraud or intent to defraud by Mr.

19 Harley.  And that as the Court instructed the jury at the

20 beginning of the case, that the intent to defraud is an element

21 of every one of the offenses.  We'll briefly go through the

22 offenses, your Honor.

23          Count 1 through 5 involved Marshall Silverstein.

24 Your Honor, this involves -- it also involves the note, the

25 Enpetro notes.  The evidence establishes that Mr. Silverstein

1  was a sophisticated, educated businessman, and that he was in a

2  position -- he negotiated with Mr. Harley.  He advanced some

3  money for a percentage of Mr. Harley's recovery on the note.

4  He advanced more money but got a higher percentage.  There's no

5  evidence on that that there was any intent to defraud Mr.

6  Silverstein.

7         He understood that this note was something that Mr.

8  Harley was trying to monetize.  He advanced money.  He

9  testified he understood there was a risk.  He understood he

10  wouldn't get his money back if the note was not paid.  And he

11  understood that this was simply a loan, a contingent loan, a

12  business investment, whatever you want to call it.  And there's

13  no evidence that Mr. Harley intended to defraud him.

14         I would also point to the fact that this note, the

15  evidence in this case indicates that Mr. Harley had the

16  original of this note.  He submitted it to Mr. Silverstein.  He

17  didn't submit any fraudulent documents.  He submitted the

18  appraisal of the oil, which is the collateral for the note done

19  by Don Kesterson.  He submitted other documents.  And that

20  these -- Mr. Silverstein had every opportunity to consider

21  whether or not he wanted to enter into this investment, and he

22  did so.  And there was no evidence that he was fraudulently

23  tricked or somehow forced into this investment.

24         He had the time to consider it, he had the

25  information to consider it.  He had the intelligent background

1  to consider it.  He had a professional advisor, and voluntarily

2  chose to do this.  There's no evidence that he was deceived or

3  that Mr. Harley deceived him.

4         That's our motion with respect to Mr. Silverstein.

5  That covers Counts 1 through 5.

6         Count 6 is Mr. Schufford, and I would just submit the

7  same argument there.  That there's no evidence.  Here again, it

8  involved the note.  And Mr. Harley had the original of this

9  note.  He obtained it.  He submitted it to Mr. Schufford.  Mr.

10 Schufford understood there was risk in getting involved in it.

11 He advanced money on it.  He understood that he may not get it

12 back if Mr. -- he said Mr. Harley was -- just used the term

13 monetize it.  There was nothing concealed from him.  And we

14 believe that the evidence is insufficient on that count also.

15        Count 7 and 8 involves Casselle, again 8 and 9

16 involved Casselle.  The same argument with respect to Casselle.

17 There's no evidence that Mr. Harley intended to deceive him.

18 There's no evidence that Mr. Harley knew that anything he was

19 giving him was fraudulent.  Mr. Casselle again had the

20 opportunity to consider everything.  Voluntarily chose to

21 invest, even negotiated with Mr. Harley for a better deal as

22 time passed.  So, I don't think there's a basis for the charges

23 of 7, 8, 9 or 10 with Mr. Casselle.  Also, the same with Ms.

24 Randall, the same issue.

25        Now, I pointed out to your Honor, in cases involving

1  the note, Mr. Harley had the note.  He had it appraised.  He

2  tried to get it insured.  There's no evidence here that he hid

3  anything.  In fact, remember the testimony of government expert

4  Mr. Massey.  Mr. Massey said he didn't see anything improper by

5  Mr. Harley.  These documents were submitted to people.  People

6  had the opportunity to consider them.  And it was their

7  voluntary choice whether or not they wanted to invest.  I don't

8  think there is evidence there which the jury could conclude

9  that any of these transactions involving the note with the

10  private individuals was fraudulent, had the elements of fraud

11  in them.

12          As to the checks, similar.  The evidence in this

13  case, Mr. Harley obtained these checks, there were e-mails in

14  the case that seem to indicate that they were coming from a

15  Kiat to the Federal Reserve Bank.  Took the checks, submitted

16  them to financial institutions and asked them to cash them.

17  They investigated them, as Mr. Massey said they would, they

18  looked everything up and they decided not to.  No evidence of

19  fraud here.  They were presented.  They were asked to cash

20  them.  They said no.  No evidence of fraud.

21          So, as to the financial institutions, I think it's

22  especially true.  That would be Counts 12, Count 13, Count 14

23  and Count 15.  He was dealing with sophisticated people.  He

24  presented what documents he had.  He believed them to be true.

25  The gentleman from the Fed said that he's convinced these were

1  (inaudible).  There's no evidence he withheld anything.  He

2  gave everybody what he had.  And decided not to cash them.  I

3  don't think there's sufficient evidence to submit to the

4  jury -- for the jury to conclude beyond a reasonable doubt that

5  he acted in a fraudulent way with respect to the checks or with

6  respect to the -- with respect to the private individuals he

7  dealt with or with respect to the financial institutions.

8          Moving forward, your Honor, to the bankruptcy

9  charges.  Count 16 and 17 are allegations that the corporate

10 bankruptcy were charged -- were filed with fraudulent intent.

11 I don't think there's any evidence of that.  As your Honor

12 knows, you have a right to file a bankruptcy, to get a stay of

13 the claims of creditors against you.  The only evidence here

14 is, well, there may have been some creditors filed against him

15 and he filed bankruptcy to take advantage of the statute.  I

16 don't think that establishes the fraudulent intent when you're

17 just taking advantage of what the law provides.

18         Count 18 and Count 19 and Count 20 and Count 21 and

19 Count 22 involve false statements.  Again, in a false statement

20 case, false statements of the bankruptcy, here the government

21 has the same obligation, an obligation to establish beyond a

22 reasonable doubt that there were false statements made and done

23 with the intent to defraud.  They have to establish beyond a

24 reasonable doubt that the statement -- not made on the basis of

25 a stake or not in good faith or not made on the basis of

1  inadvertence.  I would submit the evidence is not sufficient to

2  establish that, your Honor, that there was false statements,

3  that any statement made in any of those were intentionally and

4  maliciously false, or just intentionally fraud and done with

5  fraudulent intent.

6          Mr. Harley filed of a pro se -- the government had to

7  bring a lawyer to explain all this, because it's not something

8  in the realm of ordinary knowledge of bankruptcies, so I don't

9  believe that's been established.  I ask the Court to grant the

10 motion.

11         The final count, your Honor, is Count 23, bank fraud.

12 This count your Honor seems to be some type of cumulative count

13 that alleges a scheme or artifice to defraud the bank

14 between -- in a three-year period.  I think No. 1, again, I

15 would say that there's no evidence that would establish beyond

16 a reasonable doubt a scheme to defraud with either the checks

17 or with the other documents.  There's no evidence that Mr.

18 Harley knew they were false.  He didn't hide anything from any

19 of the banks, the Federal Reserve Bank in this case.

20         He submitted documents to him and asked them to cash

21 them, and they said no.  End of the story.  They had the

22 opportunity to have them examined.  They weren't under any time

23 pressure.  He didn't trick them.  They were in the mail.  Sent

24 through the mail or e-mail, and they decided not to cash them.

25 I don't think that establishes his fraudulent intent.

1          And also I would say -- it also seems to be covered

2    by some of the other charges.  There are specific charges in

3    the first 22 counts involving the banks.  Count 15 involving --

4    specifically involved the Federal Reserve Bank.  The general

5    count doesn't give any date at any particular documents.

6    During this time there was a scheme and artifice to defraud.

7    It involved checks which were really covered by Count 15.  So I

8    don't know whether that's duplicative.  But continuing, it's

9    really covered by Count 15.

10          It looks to me like an attempt to make a one-man

11   conspiracy, your Honor.  This reads to me like a conspiracy

12   count, except there aren't two people involved, more than one

13   person.  So that's my argument on that count.

14          And Mr. Harley.  Mr. Harley is convinced that

15   there's -- your Honor, one of the issues in this case, at least

16   at the beginning of the case, I always thought was whether or

17   not Mr. Harley had an original of the note.  And he's always

18   insisted he got -- it seems to me as the case developed that

19   the government really isn't contesting that issue.  Their own

20   witness, Mr. Blau, he said, yeah, we found what we thought was

21   the original.  They haven't produced any evidence that there

22   wasn't an original.

23          Now, Mr. Harley believes that there was testimony, a

24   very inconsistent testimony through the discovery shown on this

25   issue.  First there were statements by Mr. Dedmon and Mr.

14

1  Trantham that Mr. Harley had the original of the note.  Then

2  there was another statement that they didn't.  And then at the

3  grand jury he said no, he didn't have the original.  And Mr.

4  Harley believes that those inconsistent statements, even though

5  they didn't come through with the court, the fact that before

6  the grand jury the testimony was he didn't have the original in

7  court and the government didn't contest our position that he

8  did have the original demands dismissal of the case.  Is that

9  accurate?

10          THE COURT:  I'm confused.

11          MR. HARLEY:  Not quite, your Honor.  What has been

12  established here in the beginning --

13          THE COURT:  The beginning of what?

14          MR. HARLEY:  When Mr. Dedmon and Mr. Trantham, the

15  two gentlemen that owned the oil leases in Texas in 2000, as

16  the FBI had testified here -- when they came up to testify she

17  had reported different information about Stan Dedmon and

18  Trantham.  And one of the FBI agents took their 302 statements.

19          THE COURT:  None of this is in the record.

20          MR. HARLEY:  No, I understand that, your Honor.  I'm

21  getting to the grand jury.  I'm getting to the grand jury, your

22  Honor.

23          THE COURT:  But what does that have to do with this

24  trial?

25          MR. HARLEY:  It has a lot to do with it, because in

1  the grand jury -- let me just go back a minute.

2           THE COURT:  Go ahead.

3           MR. HARLEY:  In the grand jury testimony they both

4  said -- the question was asked, Did you ever send Mr. Harley

5  the original note and collateral assignment.  They both said no

6  in their grand jury testimony.  That was false.  And had they

7  said yes, I might not have been indicted, I don't know.

8           THE COURT:  You don't know that you wouldn't have

9  been.

10          MR. HARLEY:  But that was a big issue there.  See,

11  it --

12          THE COURT:  But you're trying to second guess the

13  grand jury, and I can't do that.

14          MR. HARLEY:  But they were lied to, your Honor.

15  That's what I'm saying.  They were lied to, the grand jury

16  level.  Had they told the truth to the grand jury, we don't

17  know the outcome, but still they still lied.  They perjured

18  themselves is what I'm trying to say, both of them.  And I feel

19  as though that alone, you know, the fact that the grand jury

20  was perjured, used perjured testimony to get an indictment,

21  that's not right.

22          THE COURT:  You don't know what place, if at all,

23  having or not having the original note played in whether or not

24  you were indicted.  There's no way for you to know that.

25          MR. HARLEY:  Well, they even expound on it.  In one

1  case they said that -- when they look at the copy of what I

2  had, Stan Dedmon said, well, that's a copy he had to fix up

3  from somewhere else.  I mean, they elaborated on this thing.

4          THE COURT:  I understand.

5          MR. HARLEY:  To make it look like I was a real

6  scoundrel and that I had made this stuff up.  That's what I'm

7  saying.

8          THE COURT:  But there's been nothing before this jury

9  that would indicate there was not an original note in your

10 possession.

11         MR. HARLEY:  I understand that.  But the prosecutor

12 kept that -- until they came to trial, we didn't even -- they

13 wouldn't even let anybody else know, my lawyer and myself know

14 that they had the originals.  I asked my lawyer to check it

15 out.  That never happened.  What I'm trying to say is, Your

16 Honor, they hid that until the -- until Mr. Browning testified.

17 And under oath he said yes, we have the originals.  That's the

18 first time I heard them say they had the originals.  So they

19 kept that all a secret, and that's not right.

20         THE COURT:  How did that affect you?

21         MR. HARLEY:  How does it affect me?  It goes back to

22 the grand jury.  Had the grand jury known that I had the

23 original documents, the oil and the collateral assignment,

24 which makes my company legit now, because they're saying that I

25 didn't have them, they had to be bogus.  Everything about me --

1          THE COURT:  You don't know that.  You can't make --

2   that's speculation on your part.  There's no way you would know

3   that.  You don't know what was in the mind of the grand jury.

4   You don't know whether that had anything to do --

5          MR. HARLEY:  Let's put it this way, they planted a

6   seed in their mind your Honor, they planted a seed.

7          THE COURT:  There's no way of knowing that.  All

8   right.  I understand your point.  What are you asking me to do?

9          MR. HARLEY:  I think the whole thing should be

10  squashed based on the lies to the grand jury.

11         THE COURT:  Okay.

12         MR. HARLEY:  That's what I'm saying.

13         THE COURT:  Well, your position is on the record.

14  I'm going to deny that motion.  Now, as far as your motion --

15         MR. O'BRIEN:  One other point, your Honor, just to

16  clear this up.  My argument about the bank fraud, I think Count

17  15 -- Count 15 and Count 23 is really already included in Count

18  15.  So --

19         THE COURT:  All right.  I'll hear from Mr. Brandler.

20         MR. BRANDLER:  Your Honor, the government would

21  submit that there's more than sufficient evidence to warrant

22  submitting the case to the jury on each and every count of the

23  indictment, and I'll briefly go through the counts.  Counts 1

24  through 5 are wire fraud counts alleging that there was a

25  scheme to defraud Mr. Silverstein regarding money that he gave

1 to Mr. Harley based upon false representations that Mr. Harley

2 made to him, that Mr. Harley's company owned extraordinary --

3 billions -- over a billion dollars worth of oil in Texas, as

4 well as 1.8 million dollars in artwork.  The Court has seen all

5 the paperwork.  There's evidence in this case that those claims

6 were false.  Mr. Massey testified he did a title search on the

7 leases that supposedly back up these notes, indicated that Mr.

8 Harley does not own any oil in Texas.

9        There was an expert, David Weiss, opined on the value

10 of the artwork.  Said one piece of art was worth $50 dollars;

11 the other was $150.  Certainly not 1.8 million dollars.

12 Certainly acknowledge that those representations led to Mr.

13 Silverstein giving that money to Mr. Harley, and that is

14 sufficient under Counts 1 through 5.  Under Count -- I would

15 also point out the stipulation about the interstate nexus on

16 each one of those transfers of money.

17        Count 6 is -- relates to Mr. Schufford, similar

18 fraudulent statements were made to Mr. Schufford regarding Mr.

19 Harley's company's claim of ownership of oil, over a billion

20 dollars worth of oil in Texas.  Based upon those false

21 representations Mr. Schufford wired $10,000 to Mr. Harley with

22 a promise that he was going to double his money in a very short

23 amount of time.  Those false representations establish more

24 than sufficient evidence that there was a scheme to defraud

25 here.

1        Counts 7 and 8 are wire transfers of funds from Mr.

2  Casselle, also based upon the oil -- false representations that

3  Mr. Harley owned oil in Texas, many fraudulent documents

4  associated with that ownership claim.  And it would be the same

5  argument for Mr. Silverstein and Mr. Schufford on Counts 7 and

6  8 as relates to Mr. Casselle.

7        Counts 9, 10 are also wire fraud counts involving Mr.

8  Casselle, but those are e-mails, not wire transfers of money.

9  Count 9 involved the e-mail communication on May 16, 2009, in

10  which Mr. Harley sent -- e-mailed Mr. Casselle two United

11  States Treasury checks which the evidence has shown were

12  completely fraudulent, with the intent to get more money from

13  Mr. Casselle using those checks as collateral for various loans

14  that he wanted to engage in with Mr. Casselle.

15        There was also obviously backup documentation, which

16  has been established by beyond any doubt.  It's fraudulent,

17  that he e-mailed to Mr. Casselle limited powers of attorney

18  purportedly signed by Kiat on the documents to -- purportedly

19  on the letterhead of the Federal Reserve Bank with Mr.

20  Bernanke's signature.

21        As far as these Federal Reserve Bank documents are

22  concerned, we would submit there's actual notice to Mr. Harley

23  through various federal officials, told him time and time and

24  time again that these documents were fraudulent, yet he

25  continued to submit them to victims alleging that they were

1  legitimate documents in an attempt to get money or other

2  valuable consideration from them.

3          So, that would be Count 9 was the e-mail to Mr.

4  Casselle relating to those two checks, on May 16 of '09.  Count

5  10 is a similar e-mail on April 28 of '09 from Mr. Casselle to

6  Mr. Harley.  This one is a fraudulent attachment relating to a

7  company named Prudential Life Assurance, where Mr. Harley

8  falsely alleged that this company insured for a hundred million

9  dollars the oil asset in an attempt to get Mr. Casselle to

10 invest money and basically to get Mr. Casselle to believe that

11 there was some insurance company out there that believed that

12 this asset was valid.  Mr. Casselle testified he checked on

13 Prudential Life Assurance and found out it was a totally bogus

14 company subsequently.  So that was Count 10.

15         Count 11 is the e-mail that Mr. Harley sent to Irene

16 Randall on May 4 of 2010.  You'll recall Ms. Randall, one of

17 the later witnesses, testified here she had already lost

18 $500,000 from another fraudster, and put her name on a website

19 where you can list these kind of fraudulent transactions.  And

20 Mr. Harley apparently told her that he got her name off that

21 website.

22         Contacted her as a potential -- with this potential

23 deal regarding the fraudulent Federal Reserve documents.  Sent

24 her a corporate profile of his company alleging that his

25 company had 700 billion dollars in Federal Reserve documents,

1  which was totally fabricated, in an attempt to get her to send

2  him money.  So that would be Count 11.

3          Count 12 is an e-mail on April 20, 2009, from Mr.

4  Harley to Mr. Heckenberger, who was account executive at

5  Merrill Lynch Pearce Fenner and Smith, where Mr. Harley says in

6  e-mails please be advised our firm is seeking to audit the

7  financial securities in a company account with Merrill Lynch.

8  At that time he did have an account with Merrill Lynch.  And he

9  sends images of two fraudulent checks.  Attempted to deposit

10 those checks into his account for the purpose of getting the

11 line of credit from Merrill Lynch.  That is more than

12 sufficient to establish an intent to defraud on the part of Mr.

13 Harley.

14         Count 13 is a similar situation involving a different

15 victim.  This was Ed Sigel, who was a vice-president at State

16 Street Alternative Investments, which is another financial

17 institution.  Mr. Harley -- as soon as he had been rejected by

18 Merrill Lynch to deposit these instruments and he closed

19 accounts and went right to another financial institution, sent

20 them a copy of bogus corporate e-mails saying he owned seven

21 billion dollars -- or bond power over 700 billion dollars in

22 Federal Reserve Bank instruments, as well as the oil, in an

23 attempt to negotiate and leverage those assets into lines of

24 credit from State Street Alternative Investments.  That, we

25 would submit, is more than sufficient for wire fraud.

1          Count 14 is another financial institution.  This one

2  is LPL, which the person who testified was Neal Abrams.  Mr.

3  Harley sent him an e-mail on April 28 of 2009 with a bogus

4  Federal Reserve document, the confidential memo and so forth,

5  which he was aware of, totally fraudulent from his prior

6  conversations with people from Merrill Lynch.

7          As a matter of fact, there's evidence from Mr.

8  Browning that Mr. Harley even had on his home computer a

9  portion of the website that told him that these documents were

10  fraudulent.

11          Count 15, the victim is the Federal Reserve Bank of

12  New York.  There were four e-mails that were part of Exhibit

13  15.3 that were demands for payment to the Federal Reserve Bank

14  of New York directed to Bill Dudley, who was the president of

15  the Federal Reserve Bank.  Mr. Godiwala testified, introduced

16  Exhibit 15.2 into evidence.  Repeatedly told Mr. Harley that

17  the documents were fraudulent, but Mr. Harley continued to make

18  demands for a billion dollars to be sent to him from the

19  Federal Reserve Bank.  Those four e-mails on April 11th, 2011,

20  more than sufficient to establish an attempt to defraud and

21  attempt to defraud the Federal Reserve Bank of New York.

22          Count 16 and 17 are bankruptcy fraud counts.  The

23  bankruptcy Count 16 relates to the 2010 corporate bankruptcy

24  petition, Count 17 the 2011 bankruptcy fraud, bankruptcy

25  petition, corporate bankruptcy petition by Mr. Harley.  Both --

1    the evidence in this case from Mr. Fogerty and Mr. Silverstein,

2    as well as Mr. Schufford, established that there was bad faith

3    in filing those bankruptcy fraud petitions.  They were done to

4    frustrate Mr. Silverstein's judgment, which he had already

5    obtained.  He attempted to discharge the debt of Mr.

6    Silverstein, which was listed as a debt on both of those

7    petitions.  He attempted to also frustrate Mr. Silverstein by

8    delaying the civil court case that was proceeding at that time,

9    various hearings that were schedule and so forth.

10           So, we believe that there's been sufficient

11   allegations to show that he used the bankruptcy court as an

12   instrument of fraud in 2010 and 2011 due to the bankruptcy

13   court in connection with Mr. Silverstein.

14           Count 18 is a false statements count relating to the

15   2010 bankruptcy petition, the false declaration specifically

16   being submitted, a schedule showing he had 765 million dollars

17   of assets, his company did.  And -- which was represented by

18   this ten million barrels of proven reserves, which he valued at

19   700 million dollars, the other 65 million was never accounted

20   for in the petition.

21           Whatever value he put on it, there's been sufficient

22   evidence that he did not own oil in Texas of any value, and

23   that was a false statement knowingly made on his bankruptcy

24   petition.

25           Count 19 is a similar allegation regarding the 2011

1  petition where he also made the statement that his company,

2  RJH, had 170 million dollars in assets, 10 million barrels of

3  oil.  And interestingly, he did not include any of the Federal

4  Reserve notes, the five trillion dollars in Federal Reserve

5  notes as an asset for his company.  So leaving that aside,

6  there's a false statement here regarding the oil that he

7  claimed he owned.

8         Count 20 relates to the 2012 personal bankruptcy

9  petition, and it's a false statement where he submitted a list

10  of creditors which omitted three creditors that he knew that he

11  had.  Mr. Silverstein, which was a judgment for over a million

12  dollars against him.  We've been on notice of that multiple

13  times through those proceedings after the judgment he gave.

14  The Securities and Exchange Commission had a judgment for over

15  a million dollars, he was notified by that throughout the

16  course of those proceedings.  And of course the United States

17  of America, from his prior case, we had a judgment for about

18  $168,000 against him, which he omitted, which the evidence

19  showed through Ms. Musloski, had repeatedly notified him in

20  terms of trying to collect that money, and yet he didn't list

21  any of those creditors on his bankruptcy petitions.

22         Count 21 is a false statement count also relating to

23  the personal bankruptcy petition, in that he submitted a false

24  statement of financial affairs where he claimed that he had no

25  businesses in which he was an officer.  And the testimony is

1  replete, and it's not disputed he claims to be an officer of

2  RJH, Inc., a company which he claims is a legitimate company

3  based out of New Jersey.  He did not list his affiliation with

4  RJH on his personal bankruptcy petition, I believe that was a

5  false statement knowingly made.

6           Count 22 is also a false statement relating to the

7  personal bankruptcy petition.  This one where he's required to

8  list all personal property owned by him and his wife, including

9  art objects, he claimed to Mr. Silverstein that he had 1.8

10 million dollars in art.  It was not listed.  Whatever the value

11 was, 150 dollars, 50 dollars or 1.8 million, he didn't list

12 anything on that bankruptcy petition.  And we believe that was

13 a false statement knowingly made.

14          Count 23 is the bank fraud count.  We don't believe

15 it's duplicative of Count 15.  It is not a conspiracy charge

16 contrary to what Mr. O'Brien says.  That bank fraud charge

17 alleges that Mr. Harley -- the Count 15 was a wire fraud charge

18 against the bank related to specific statements that were

19 transferred to interstate commerce through the Federal Reserve

20 Bank of New York.  This is an all-encompassing scheme to

21 defraud the different time period, April 2009 through April of

22 2012, where Mr. Harley is repeatedly attempting to negotiate

23 these fraudulent documents through various financial

24 institutions, and thereby defraud the Federal Reserve Bank of

25 New York, which is an institution covered by the bank fraud

26

1   statute.  So those are the 23 charges we believe --

2           THE COURT:  So your last one is -- your No. 23 is all

3   the other banks, really aimed at The Fed?

4           MR. O'BRIEN:  Both.

5           MR. BRANDLER:  Both.  All the other banks he tried to

6   negotiate the checks, had they done that, it would have been

7   The Fed's money.

8           THE COURT:  Right.  But --

9           MR. BRANDLER:  And also, making demand on The Fed

10  itself.

11          THE COURT:  But don't you have the other banks

12  covered in other counts?

13          MR. BRANDLER:  We have as victims on wire fraud

14  counts.

15          THE COURT:  Right.

16          MR. BRANDLER:  But the victim of the bank fraud is

17  the Federal Reserve.

18          THE COURT:  That what's I asked.

19          MR. BRANDLER:  Yeah, different victims.

20          THE COURT:  I got it.  All right.  Now, the other one

21  was No. 22?

22          MR. BRANDLER:  Yes.

23          THE COURT:  You say the false statement is the

24  failure to include the art?

25          MR. BRANDLER:  (Gestured.)  Well, he says it's worth

1  1.8 million dollars.  And the evidence that we have is that

2  it's worth 200 dollars.  So, whatever value it is, we say it

3  wasn't included.

4          THE COURT:  Okay.  All right.  Mr. O'Brien, any

5  rejoinder?

6          (Pause.)

7          THE COURT:  Mr. O'Brien, any rebuttal?

8          MR. O'BRIEN:  Nothing, no rebuttal.

9          THE COURT:  All right.  As far as the -- all the

10  counts, it's true they require an intent to defraud.

11  Essentially, I have to decide whether or not the evidence is

12  insufficient to sustain a conviction.  That's the standard

13  under Rule 29.  And I'm supposed to look at the record in a

14  light most favorable to the prosecution to determine whether

15  any rationale trier of fact could have found proof of guilt

16  beyond a reasonable doubt based on the available evidence.

17          Essentially, it seems to me these counts all reduce

18  themselves to whether or not there was intent to defraud.  And

19  that is, in my mind, a jury question simply because there are

20  issues as to whether or not Mr. Harley knew or had reason to

21  know that, for example, the checks were not any good.  He says

22  he believes they were.  The government's position is you

23  couldn't have believed that.  It seems to me that's classically

24  a jury question.

25          Similarly, with regard to the oil, Mr. Harley

1  believed in the information that we have that the oil was his.

2  It was there.  He had the Kesterson report.  The question is,

3  did he?  Or did he have reason to believe that there was no oil

4  there supported by -- or the note wasn't supported by the oil.

5  These are questions of fact which are up to the jury to decide

6  and not for me to decide.

7         So, consequently, whether or not the checks were real

8  or not real is a question of fact for the jury, and that really

9  underlies whether or not there was an intent to defraud in

10  terms of whether Mr. Harley knew or had reason to know.

11  Likewise, the same is true with the oil.

12         On the other side of the coin, whether or not the

13  people who claim to have been victims, whether or not they

14  should have known better, or a reasonably prudent person would

15  have known better, again, that's a jury question.  It's not for

16  me to decide whether or not they would -- should have known or

17  should not have known.

18         So consequently, I'm going to deny the motion for

19  judgment of acquittal for those reasons because I believe that

20  they are jury questions in the case remaining, which is how --

21  which are those which I outlined.

22         All right.  That done, we're going to move on.  We'll

23  adjourn for the time being to have a charge conference.  After

24  which we'll come back in open court, Mr. O'Brien will rest and

25  we'll proceed to closings.  Okay?  I'll see everybody in my

 1  chambers in five minutes.

 2          (Recess taken.)

 3          (Whereupon, the following charge conference was held

 4  in chambers.)

 5          THE COURT:  We're on the record.  There's a charge

 6  conference this morning before we're going to charge the jury.

 7  First of all, there's an open question about a document.  There

 8  was a document that was -- it got up on the board -- is it in

 9  evidence?

10          MR. BRANDLER:  It is in evidence.

11          THE COURT:  Are you redacting that word?

12          MR. BRANDLER:  It was already redacted.

13          THE COURT:  Okay.  And the word criminal appears in

14  the In Re portion of the letter that is the piece of evidence.

15  There was some question during the course of trial whether the

16  defense wanted an instruction, that the jury should ignore

17  that, or words to that effect.  Mr. O'Brien has made known that

18  he does not wish to have an instruction to the jury on that.

19  It is also noted that that word has been redacted so that the

20  exhibit as it now appears does not display the word criminal.

21          All right.  We'll go through the -- where we are, and

22  then if you have another point you want to make, go ahead.

23  Here are the instructions I'm going to give.  And essentially,

24  these are all Third Circuit pattern instructions.  Role of the

25  jury, evidence, these I've already given, what is evidence.  In

1  other words, direct and circumstantial evidence; credibility of

2  witnesses; not all witnesses needed; presumption of innocence;

3  burden of proof; reasonable doubt; nature of the indictment.

4  Again, I don't give the indictment to the jury, they don't see

5  it.  What's on or about mean.  Audio recordings, consensual,

6  there's an instruction on that.

7        I know that you don't want me to give an opinion --

8  or an instruction on opinion evidence by Mr. Kesterson.  I am

9  going to do that, because in my view he gave opinion evidence

10  that's beyond the lay opinion.

11        MR. O'BRIEN:  How about Mr. Massey, is your opinion

12  instruction just going to be covered generally?

13        THE COURT:  Going to cover the art guy, Mr.

14  Kesterson, Mr. Massey.  Who else was there?

15        MR. BRANDLER:  That was it.

16        THE COURT:  I think that was it.  And basically it's

17  a very -- you know the instruction, it's very vanilla.  Judge

18  your credibility also as you would judge anybody else's.  I'm

19  going to give a credibility of the witness instruction as to a

20  law enforcement officer, impeachment of witnesses, prior

21  inconsistent statements for credibility only.  Now, there's a

22  proposed instruction of defendant's choice not to testify or

23  present evidence.  There's a stock instruction from the Third

24  Circuit pattern jury instructions, and I will tell you what

25  that says.  Mr. Harley did not testify or present evidence in

1  this case.

2           MR. BRANDLER:  Well, he did present evidence.  He did

3  not testify.

4           THE COURT:  That's true.  Let me just make sure I've

5  got this right.  Yeah, not to testify.  Okay.  A defendant has

6  an absolute constitutional right not to testify.  The burden of

7  proof remains with the prosecution throughout the entire trial

8  and never shifts to a defendant.  The defendant is never

9  required to prove he is innocent.  You must not attach any

10  significance to the fact that Mr. Harley did not testify.  You

11  must not draw any adverse inference against him because he did

12  not take the witness stand.  Do not consider for any reason at

13  all the fact that he did not testify.  Do not discuss that fact

14  during your deliberations or let it influence your decision in

15  any way.  That's the instruction.  Okay?

16           MR. O'BRIEN:  Fine.  Oh, I'm sorry, your Honor.  I

17  accept that instruction, and we requested that.

18           THE COURT:  Okay.  Next.  Let's see, his prior bad

19  acts.  What were they?

20           MR. BRANDLER:  All right.  Well, this is -- Mr.

21  O'Brien I think even in his opening mentioned that some of the

22  victims who testified here were not charged as counts in the

23  indictment.  We put on the record during the motion phase of

24  the case, we didn't think that was 404(b) evidence.  That was

25  part of the intrinsic underlying scheme.  But if Mr. O'Brien is

1   requesting a 404(b) instruction for those other victims who

2   testified, I have no objection to that.

3          MR. O'BRIEN:  I'm not requesting that instruction.  I

4   don't think it would be appropriate because we did agree ahead

5   of time that it wasn't 404(b).

6          THE COURT:  All right.

7          MR. BRANDLER:  I mean, other than that, I don't

8   remember any other prior bad act, because the 1999 Alabama

9   stuff is in the indictment.

10          THE COURT:  So, do you propose that I not give any

11   instruction at all on this?

12          MR. O'BRIEN:  I do.

13          MR. BRANDLER:  I have no objection.

14          THE COURT:  In other words, you don't want me to say

15   you heard testimony about he did other things?  And you don't

16   want me to say the evidence of other acts admitted only for a

17   limited purpose?  You want nothing on that?

18          MR. O'BRIEN:  Read it to me.

19          THE COURT:  Let me read it to you.  You've heard

20   testimony that the defendant -- I don't know what other acts we

21   would summarize.  He did -- he exhibited conduct towards other

22   people that he exhibited towards the people against -- with

23   whom he's charged with having committed a crime.  I can say

24   that.  Evidence of these other acts was admitted only for

25   limited purposes.  You may consider this evidence only for the

1   purpose of deciding whether he had a state of mind, had

2   knowledge or intent necessary to commit the crime charged in

3   the indictment or motive and opportunity.  I don't know -- I

4   don't know if you want me to focus on --

5         MR. O'BRIEN:  I'm going to waive the charge.

6         THE COURT:  You waive the charge completely.  Okay,

7   we won't give it then.  That's fine.  Okay.  How about the

8   statement on -- how about the instruction on the statement

9   given to Mr. Browning by Mr. Harley, any instruction on that?

10        MR. O'BRIEN:  (Gestured.)

11        MR. BRANDLER:  There's a model jury instruction for

12  law enforcement.  Is that the one you're talking about?

13        THE COURT:  No.  I'm talking about the government

14  introduced evidence that Mr. Harley made a statement to Special

15  Agent Browning.  You must decide whether he made the statement.

16  There really wasn't anything that was -- I would think that Mr.

17  Harley would disagree with.

18        MR. O'BRIEN:  No, no.

19        THE COURT:  Was there?

20        MR. O'BRIEN:  I don't think so.

21        MR. BRANDLER:  Fine.

22        THE COURT:  No statement -- nothing on that, okay.

23  Good.  Okay.  Then I have proof of state of mind, knowing,

24  intentionally, knowingly and willfully.  And then knowingly,

25  separate one, intentionally, separate one, motive explained,

1  willfully explained, willful blindness.  All these are pattern

2  instructions.

3         Good faith defense.  Now, you have submitted --

4  requested instruction on that.  I'm not going to give your

5  instruction.  I don't know that that's good law at the moment.

6  The pattern instructions from the Third Circuit seem to rely

7  heavily on the 8th Circuit's instruction on the good faith

8  defense, and I'm going to give that.  I think it's essentially

9  covered by what you're aiming at, Mr. O'Brien.  I think you'll

10  be satisfied with the instruction.

11         If you're not -- by the way, you don't have to make

12  an objection here.  What I do generally is this:  I'll read my

13  instructions, I'll conclude.  I'll turn to you each and I will

14  say, Anything from counsel?  If you have something that you

15  think was a misstep on my part in the instructions, whether or

16  not we've talked about them or not, anything, just say yes, and

17  I'll call you to side-bar and we'll put on the record whatever

18  your objection may be.

19         MR. BRANDLER:  Can we get copies of what you're

20  reading.

21         THE COURT:  No.

22         MR. BRANDLER:  So we have to just write it down and

23  remember?

24         THE COURT:  Well, yes.  Sorry about that, but I don't

25  know that I'll have everything ready for you.  And besides,

1 sometimes I ad lib in the course of giving it. What I do do,

2 it won't help you, is I record the instruction at the same time

3 I'm giving it so that the jury has it in the jury room in case

4 they want to refer back. But normally what counsel will do is

5 they'll write down -- I announce what my instruction is, say

6 knowingly, and then I give the instruction. So you would you

7 know where it is, and if you had some objection you would --

8 essentially you have most of these instructions.

9           MR. BRANDLER: I understand. I just want -- yeah, if

10 there was something like the 8th Circuit good faith, I didn't

11 know what that was.

12           THE COURT: Well, that's essentially what the Third

13 Circuit one is.

14           MR. BRANDLER: It's the same, the Third Circuit.

15           THE COURT: Yeah. Okay. Other than that, then the

16 rest of them are the substantive instructions on the offenses.

17           MR. BRANDLER: What about -- I'm sorry.

18           MR. O'BRIEN: Go ahead.

19           THE COURT: Go ahead.

20           MR. BRANDLER: Stipulations, we had stipulations in

21 this case.

22           THE COURT: I thought they were gone.

23           MR. BRANDLER: No. We have several stipulations

24 on -- there were stipulations regarding the interstate wire

25 element for Counts 1 through 15.

36

1          THE COURT:  Okay.  Stipulations of fact.

2          MR. BRANDLER:  Right.  And then --

3          THE COURT:  Yeah, okay, back in, all right.

4          MR. O'BRIEN:  Stipulation on authenticity of

5    exhibits, I don't think that has to be.

6          MR. BRANDLER:  I don't think that needs to be --

7    there's a charge for separate consideration of each count in --

8          THE COURT:  Yeah.

9          MR. BRANDLER:  All right.

10          THE COURT:  I think we have that.  Let me just see.

11   Separate consideration, single defendant, charged with

12   multiple.

13          MR. BRANDLER:  Right.

14          THE COURT:  Election of foreperson -- yeah, okay,

15   what else?

16          MR. BRANDLER:  On or about.

17          THE COURT:  On or about, I'm giving that.

18          MR. BRANDLER:  You got that.  I think that would

19   be -- other than obviously the substantive elements.

20          THE COURT:  Well, you heard those already.

21          MR. BRANDLER:  Yeah, I know what they are.  Those are

22   the model jury instructions for each.

23          THE COURT:  What are the stipulated facts, by the

24   way, so at least I -- because I don't think I have them

25   anywhere.

1          MR. BRANDLER:  I think the interstate commerce is the

2   only one, that Counts 1 through 15, all the wire communications

3   traveled in interstate commerce.

4          THE COURT:  Okay.  And that's it?

5          MR. BRANDLER:  I think that was it.  I mean, we had

6   stipulations on certain things can be admitted, but those were

7   not --

8          THE COURT:  I don't think you need to worry about

9   that.

10          MR. BRANDLER:  No.

11          THE COURT:  Okay.  That one is back.  I've eliminated

12   judicial notice because I don't think anybody asked me to take

13   judicial notice of anything.

14          MR. BRANDLER:  Correct.

15          THE COURT:  And that's it.  Okay.  And as I say, if

16   there's a problem, just call it to my attention.  You may

17   determine maybe something that you thought should be in wasn't,

18   in which case we can deal with that too.  So, all right.  So,

19   what do you anticipate -- off the record now.

20          (Whereupon, there was an off-the-record discussion

21   between the Court and counsel.)

22          THE COURT:  Okay.  The offenses of wire, bank and

23   bankruptcy fraud and false statements in a bankruptcy filing

24   charged in the indictment require proof Mr. Harley acted with

25   the intent to defraud.  If you find Mr. Harley acted in good

1 faith that would be a complete defense of the charge, because

2 good faith on the part of Mr. Harley would be inconsistent with

3 acting with the intent to defraud.

4        A person acts in good faith when he or she has an

5 honestly held belief, opinion or understanding that his

6 statements are true, even though the belief, opinion or

7 understanding turns out to be inaccurate or incorrect.  Thus,

8 Mr. Harley -- if Mr. Harley made an honest mistake or had an

9 honest misunderstanding about the truth of his statements, then

10 he did not act with the intent to defraud.

11        Mr. Harley does not have the burden of proving good

12 faith.  Good faith is not a defense because it is inconsistent

13 with the requirements of the offenses charged that Mr. Harley

14 acted with the intent to defraud.  As I told you, it's the

15 government's burden of proof to prove each and every element of

16 the offense, including mental state.

17        In deciding whether the government proved he acted

18 with intent to defraud or instead acted in good faith, you

19 should consider all of the evidence presented in the case that

20 may bear on his state of mind.  If you find from the evidence

21 that Mr. Harley acted in good faith as I have defined it, or if

22 you find for any other reason that the government has not

23 proved beyond a reasonable doubt he acted with intent to

24 defraud you must find him not guilty of the offenses of wire

25 fraud and bank and bankruptcy fraud and false statements in a

39

1   bankruptcy filing.

2          MR. BRANDLER:  The Third Circuit has a model.

3          THE COURT:  That's it.

4          MR. BRANDLER:  5.07, willful blindness.  Is it the

5   same one, it's the model instruction?  All right.

6          MR. O'BRIEN:  Just so I'm clear, if I heard you

7   right, one of the things you're going to say in there, if you

8   find if he acted in good faith or for any other reason did not

9   from the intent to defraud, then you must find him not guilty.

10  Did I copy that down correctly?

11         THE COURT:  Wait a minute.  You find as I defined or

12  any other reason has not proved that he acted with intent to

13  defraud.  That's right.  Okay.

14         MR. O'BRIEN:  Just looking for something to argue,

15  make a point.

16         THE COURT:  No problem, all right.

17         (Whereupon, a recess was taken from 10:54 a.m. to

18  11:05 a.m.)

19         MR. BRANDLER:  15.3.  Your Honor, there's one

20  document I'd like to use in the closing.  It's in document

21  15.3.  Can I have just a minute?

22         THE COURT:  Take your time.

23         (Pause.)

24         THE COURT:  Good morning, members of the jury my

25  apologies for having to excuse you that way, but there are

1  things we had to do that are not foreseen.  I apologize to you.

2  The last thing I want you to do is have to sit around and wait.

3  It's not the way it ought to be.  It simply couldn't be helped,

4  but I do apologize.  We're going to proceed now.  Mr. O'Brien.

5          MR. O'BRIEN:  Yes, I'm sorry.  The defense rests.

6  I'm sorry.

7          THE COURT:  All right.  The defense rests?

8          MR. O'BRIEN:  Yes.

9          THE COURT:  One of the things we've done in the

10  interim, there were some exhibits that the defense put in,

11  they're in evidence, you'll see them when you retire.  The way

12  we will proceed now is you'll hear closings.

13          Remember, closing arguments are not evidence, but

14  they are a summary of the evidence as a particular counsel sees

15  the evidence.  And you should keep that in mind.  The process

16  is Mr. Brandler goes first, thereafter Mr. O'Brien goes.  And

17  Mr. Brandler then has an opportunity if he so desires to give a

18  brief rebuttal.  Mr. Brandler.

19          MR. BRANDLER:  Thank you, your Honor.  Good morning

20  ladies and gentlemen.  While it's been about two weeks, we

21  predicted it would last two weeks, so hopefully you're not too

22  disappointed that we're not going the full two weeks to

23  Wednesday.  But we tried, as far as the government is

24  concerned, to present you with all the evidence that we had in

25  this case that would prove to you so I could stand here today

1  to tell you we proved our case beyond a reasonable doubt each

2  and every count of this indictment.

3       I want to thank you for your patience throughout

4  these past two weeks.  We really do appreciate your service as

5  jurors.  It's very important what you do.  This case is an

6  important case.  It's an important case for the United States

7  of America; it's an important case for Mr. Harley.  It's

8  serious.  A lot of people lost a lot of money.

9       Mr. Silverstein, who's been here, he lost over

10 $250,000.  Some of the other people lost lessor amounts, but to

11 them that was a lot of money.  They were not rich people.  They

12 borrowed money from their relatives, from their mothers, a

13 woman borrowed from her daughter.  Even though it may seem like

14 a small amount of money in the grand scheme of things, this was

15 very important to them.

16       And I want to tell you this morning why we believe

17 the evidence has proved Mr. Harley guilty beyond a reasonable

18 doubt.  I told you at the outset that I didn't believe this was

19 a difficult case, and I hope I'm not found wrong, to be

20 incorrect on that assessment.  I said if you use your common

21 sense you can have no problem reaching a fair and proper

22 verdict.  This is a case really about common sense.

23       The claims that Mr. Harley was making to these people

24 were frankly ridiculous, outrageous, ludicrous.  But as I also

25 said in my opening statement, there are certain people in

1  society who are very gullible and will believe anything and are

2  very trusting.

3          And you heard Mr. Harley on tape in his own voice,

4  and perhaps you could put yourself in their position when they

5  were listening to Mr. Harley.  Some of these people are not

6  sophisticated people.  Mr. Harley is obviously very articulate,

7  intelligent, well spoken, a well-dressed man.

8          And when he was giving this sales pitch to some of

9  these people maybe you could understand why they would find him

10 believable or trustworthy, despite the ridiculousness of what

11 on its face appeared to be too good to be true.  You all heard

12 that saying if it's too good to be true it probably is.  Well,

13 in this case it was all fabrication.  It's been established

14 beyond any doubt that all of Mr. Harley's claims to any of

15 these people were lies upon lies upon lies.

16         He sat at home in his condo in the Poconos with his

17 wife collecting Social Security.  $500, about $500 a month for

18 him, about $500 a month for her.  And he found a really nice

19 way to supplement his income, by defrauding the most helpless

20 and vulnerable people in our society.  People that really

21 didn't know any better.

22         And he would troll the internet morning, noon and

23 night looking for potential victims of his scheme.  It was a

24 full-time job.  That was his only full-time job.  You saw in

25 his bankruptcy petition he had no employment, no legitimate

1   employment.  What he would do is get on the internet and look

2   for gullible victims to present these false claims of ownership

3   of oil; false claims of ownership of 5 trillion dollars in

4   Federal Reserve notes; false claims of owning 1.8 million

5   dollars in art; false claims of having Rolls Royces and a

6   Mercedes Benz.  Owning -- having invented a miracle cure for

7   AIDS, my gosh.  A Ph.D. from Temple University.  It was

8   outrageous beyond any sense of that word.  And I don't want to

9   use that word belittlely.  But these claims are really

10  outrageous, but people believed it.

11          And of course, Mr. Harley told you in his own voice

12  -- you know on this case I want to read some of these notes

13  because I thought they were -- kind of puts Mr. Harley into

14  perspective.  Actually, you don't get this in every case.  You

15  got to hear it from Mr. Harley.  Besides having a Ph.D. from

16  Temple in science, you know, for his miracle cure for AIDS, he

17  told Mr. Browning that really that was just an honorary degree

18  from something called The Inventors Club of America.

19          You know, it doesn't really matter what educational

20  background he has, but the fact he has to fabricate and pump

21  himself up is really typical of how this scheme works.  He

22  tries to present himself as someone very knowledgeable in

23  finance, actual monetary platforms, trading platforms, Level 14

24  access on the gray screen.  These are things that people --

25  common people have no idea about.  But he says it in such a way

1  that they believe that he knows what he's talking about, and

2  not to appear dumb, they go along with it.  And unfortunately

3  they part with their money based upon those false

4  representations.

5          But he will tell them -- and he said on tape, and I

6  wrote some quotes down that I want to share with you this

7  morning.  I'm a stand-up -- and this is what he told to Vickie

8  Davis when she was posing as an FBI agent at one of the

9  meetings that was tape-recorded down in Alabama back in 1999.

10 I'm a stand-up kind of guy and I'm not going to tell you

11 something that I can't back up.

12         Well, that's not true.  You know, we've seen through

13 this trial that he repeatedly lies to people.  Said, you know,

14 he was running this House of Lazarus Holistic Center for the

15 miracle cure of AIDS and he was a humanitarian.  His main

16 concern he said was healing people who are destitute and sick

17 and have disease problems.  That is my forte in life, to help

18 those people out that are suffering.  Well, I submit to you

19 ladies and gentlemen, the people that he defrauded out of their

20 money, that blind lady who came in on the first day, Maryann

21 Alexander, she's suffering.

22         And the money she felt so bad about, that extra $500

23 that she borrowed from her daughter, and her daughter was

24 saving up for a car, because Mr. Harley told you what a

25 magnificent deal was coming down the road, you better throw in

45

1    another 500 dollars.  She believed him.  She suffered, as well

2    as all the other victims in this case.

3          He said to Ms. Davis, That's what God told me to do,

4    and I have to do what he says.  And if you think it was

5    despicable, he uses religion to defraud these people, he claims

6    he's a minister from a family of ministers and quotes scripture

7    and says, this is God's work, helping people, and gives them

8    that type of belief, that's particularly egregious.

9          In fact, everything he told these people was a total

10   scam.  And I'm going to go through with you the indictment in

11   some detail and depth.  There's been a lot of documents in this

12   the last two weeks, and I just want to highlight some of what I

13   think are key to show what a fraud Mr. Harley is.

14         Let's talk about some of the victims, just to refresh

15   your recollection.  I mentioned Maryann Alexander, who's been

16   blind since birth.  He told her that only a select few

17   individuals were being offered this great investment

18   opportunity based on oil in Texas, only a select few.  Well, we

19   know that's not true.  He offered this to whoever he came in

20   contact with; whoever he thinks was gullible enough.

21         He didn't want her to tell her boss, Christie Bower.

22   Remember, she was a legal secretary.  Don't tell your boss.

23   Why?  Why not?  You know, this isn't on the up and up.  Was he

24   afraid that what Ms. Bower might tell her, not to do it?

25   Magnificent things were going to happen.

1          Well, she didn't get her investment back, a couple of

2    thousand dollars plus the 500 dollars.  What else did he tell

3    her?  He told her he needed her money to avoid taxes on his oil

4    profits.  What was that all about?  It seems ridiculous.  But

5    you know, this is a woman who trusted him.  This is a client of

6    her boss Christie Bower.  He's in there all the time dealing

7    with the attorney.  I mean, who would think that he's going to

8    defraud a blind lady.  She trusted him implicitly.  She told

9    you that on the witness stand.  But his depravity really knows

10   no bounds.

11         Irene Randall.  Skip ahead to one of the last

12   witnesses.  She already lost $500,000 to somebody else.  And

13   how did he find her?  My God, he trolls the internet.  She put

14   her name up on the internet site, ripoff.com, something of this

15   nature, where you can report the people that defraud you.  Some

16   attorney she says defrauded her $500,000 on an investment scam.

17   So how does he find victims?  Well, they got suckered once.

18   They may get suckered again.

19         And then she had the conference call where they're

20   fighting over her.  Mr. Harley and this other guy -- I think

21   his name is Herrick -- also found her on this ripoff.com

22   website.  Herrick tells Harley, Hey, she's mine.  This is a

23   fish here.  And they're actually fighting over her.  And you

24   know, that's how Harley finds her.  Anyone, and anyone that he

25   can get his hands into.

1    So she told you, she would have -- even though she

2   had lost $500,000, and she lost 50,000 from the guy that was on

3   the conference call, Harley kept on coming back to her because

4   he knew he had a live one with her.

5    And presented all his bogus -- he sent to her a

6   corporate profile, Exhibit 11.1, you know, saying that he had

7   700 billion dollars in these Federal Reserve Instruments, which

8   he had been repeatedly, repeatedly told were false by people

9   directly from the Federal Reserve Bank, and I'll go into that

10  in a little bit more detail.  I mean, one guy in an e-mail told

11  him it's a crime, Stop doing this.  You know, you're going to

12  get prosecuted.  Harley just ignores it.  Keeps on shopping

13  these fraudulent documents to people, so he can get money.

14  He's not satisfied to live on Social Security, he just wants

15  other people's money.  He doesn't want to work.

16   So, Irene Randall, you know, just shows you where he

17  finds his victims.  And he knew the attorney who ripped her

18  off, and yeah, he's a bad guy, but you know, he's going to give

19  her a great deal.  Promised her ten times her money that she

20  invested.  How much did he want?  Oh, 500,000.  That's how much

21  she invested the last time and lost.  You've got 500,000?  You

22  know, put it in with me.

23   How about Kathleen Kelly?  Remember her, she's the

24  woman who is on disability.  She met Harley through Harley's

25  wife.  Harley's wife worked at a doctor's office.  And she was

1  seeing this doctor, she had some medical injury, she was on

2  Worker's Comp.  She had dinner, socialized with the Harleys.

3  Very good friends.  She said best friends with Jacqueline

4  Harley, Jacqueline Kube.  And this is who he ripped off.  I

5  mean, you know, these people that were sitting down to dinner

6  with them as well, socialized together.  She got this large

7  disability payment.  I think she said she had brain aneurysms.

8  About -- I don't remember.  It was a sizeable amount of money.

9  He wanted it all, the money that she needed to live on.  She

10  said she couldn't work anymore.

11        And he told her that, you know, once he sold his oil

12  he could triple her money.  And you know, who would believe

13  that somebody you're sitting down to have dinner with, best

14  friends of your wife, is going to rip you off like that?

15        I mean even Kesterson, his own witness, who we'll

16  talk about a little bit later -- told him once the oil was

17  separated from the ground it wasn't his anymore to sell.  I

18  mean, his interest, his asset was while it was in the ground

19  unrecoverable, even if it was attached to the note as

20  collateral, and the assignment of collateral.  He's going to

21  sell it to multiple victims.  Once the oil comes out of ground,

22  and I think it was Bert Falls or Maury Schufford, he said he

23  needed this money from them so he could re-open up his wells

24  and sell his oil.  Total fabrication.

25        Peter Blau, the elderly man, the guy from California,

1  he thinks he's a businessman, I forget the name of his company,

2  but he closed one deal in the last 20 years, remember him?  I

3  mean, these are people that are not altogether, you know, are

4  not the smartest people in the world, to be kind.  But you

5  know, they have money, and with a convincing story they will

6  part with that money.

7           And he actually -- there was an e-mail, Harley sent

8  him a copy of the letter that he sent to Ben Bernanke demanding

9  the billion dollars, and Blau's response to that was I think

10 that was an excellent letter.  That's a very good letter.  I

11 mean, these are the people we're dealing with here.

12          And just because they're gullible or maybe silly or

13 not the brightest doesn't mean they're not victims.  That's not

14 how they're -- the Judge is going to charge you on the law.

15 Anyone can be a victim here.  The gullibility is not a factor

16 for you to take into consideration.  It's Harley's state of

17 mind.  That he intended to defraud those people, and was he

18 choosing them specifically for that reason, that they were

19 susceptible to his lies.

20          You know, he took out just about $5,000 in October of

21 2011, and Harley promised to pay him a million dollars in four

22 months, and he believed it.  That's what Harley told him.  And

23 Harley wants you to believe that he believed it.  He was going

24 to give him a million dollars for his $5,000 investment in four

25 months.

1    How about Bert Falls, the guy from Georgia, Serenity

2  Group Trust, Lawrenceville, Georgia.  It's just another

3  businessman whose business address is a post office box.

4  Harley told him he had invented this miracle cure for AIDS,

5  told him he was a minister from a family of ministers, he said

6  he got those checks, the phony checks through the ministry.

7    Mr. Kiat, part of his ministry, told Mr. Falls that

8  he owned a Rolls Royce, a Bentley.  Mr. Falls was so taken he

9  thought -- what did Mr. Falls say?  He thought Christmas had

10  come.  He thought Santa -- he thought it was Christmas and

11  Santa's credit card was just delivered to his door.  He bought

12  it hook, line and sinker.  He borrowed money from all of his

13  friends and associates.  Look, this has got to be good.  Look

14  at these checks, it's the Federal Reserve, backed with the full

15  faith and credit of the United States.

16    Does Harley tell any of these people that he's had 25

17  conversations with people at The Fed where they told him that

18  all of these documents are bogus?  No.  He tells them he's got

19  them on the run.  He tells the one victim, I've got The Fed,

20  they're on the run now.  They're worried about me.

21    Peter Bunche, okay, that was the guy, the movie

22  director from New York, he was tied-in with Casselle.  He

23  brought Casselle into it.  Now, Casselle is not a dummy.

24  Casselle has a degree from Stanford; Casselle has a degree from

25  MIT.  He knows better.  But he's the only one, if you'll

1  notice, who did any kind of due diligence on this thing.  And

2  he quickly found out through a 30-second Google search that

3  this was all baloney.  But he -- he even lost $10,000.

4          And why?  Because he was brought into it by his good

5  friend Bunche, who is not the smartest guy in the world.  And

6  Bunche guaranteed him if he lost any money that he would pay

7  him back the $10,000.  But he didn't really have that much at

8  stake.  He was really helping his friend Bunche out more than

9  he was doing it for himself.  But he got the documents, he got

10  the Kesterson report, the oil, the note, the assignment of

11  collateral, he had it checked out.  Nothing added up.  It was

12  all bogus.

13          And then Harley even -- when the oil scheme didn't

14  pan out Harley says, Well, if you don't like that I've got this

15  insurance wrap from Prudential Assurance Corporation, not

16  Prudential Insurance, Prudential Assurance Corporation, some

17  totally made-up company Harley just made up, gave him --

18  e-mailed Casselle those documents, that are supposedly now a

19  hundred million dollar guarantee on the oil.

20          And I bring that up because Harley tries to air --

21  convince people that this is legitimate by surrounding himself

22  with fancy documents and people with fancy titles.  So you'll

23  always notice -- you heard it on the tape -- This is my

24  certified oil report from Kesterson.  It's certified.  Like the

25  word certification means something.  And he stamps on all the

1  Federal Reserve documents blue ribbons and such, as to impress

2  people.  And you know, Kesterson is the oil geologist.  I don't

3  dispute that he does have a degree in geology from whatever

4  university he went to.

5          But he had some skin in this game.  Because he

6  thought he was going to get two and a half percent before he

7  even wrote his report.  I mean, immediately, within days of

8  being contacted by Harley they worked up this deal where he's

9  contacting his friend Bashir, and Bashir is an insurance

10 broker, they're going to go through this insurance company, get

11 this guarantee, get financing based on the oil, and he was

12 getting two and a half percent, a lot of money.  They were

13 looking for like a hundred million dollar loan based on this

14 oil.

15         Great.  He could write the report, give it an air of

16 legitimacy, have it submitted to the insurance company.  They

17 loan Harley a hundred million dollars based on his bogus report

18 and he gets two and a half million dollars.  He said he

19 rejected it.  Well, you're going to have to decide for

20 yourselves whether that's reasonable or not, why he saved that

21 document for 12 years, and if he rejected it why he never wrote

22 Harley a rejection letter.

23         Why he continued to work and do these revisions, year

24 after year after year, where he had never been paid.  Harley

25 stiffed him on the original deal.  He didn't think he was going

1   to get something out of it.  And you know, it talks about

2   Kesterson -- Mr. O'Brien brought into evidence a lot of the

3   revisions that he was doing in 2005, 2006, 2007.  And let me

4   just bring up 32.14 for a second.

5           TECHNICIAN:  32.14?

6           MR. BRANDLER:  Yes.  I mean, this is one of

7   Kesterson's revisions here.  This one is dated December 13,

8   2005, but they're all in the same format.  Look at the first

9   sentence.  The purpose of this letter is to revise my original

10  analysis of your oil promissory note and collateral assignment

11  from Enpetro LPC, Inc.  Why does an oil geologist have any

12  basis to give an analysis of legal documents, an oil promissory

13  note and a collateral assignment?  I mean, where does he come

14  off to tell anybody and analyze those legal documents?  I mean,

15  it just shows you how much of an interest he had in this thing.

16          If he was on the up and up he'd say, Listen, I did an

17  analysis of these six leases that Harley represented had

18  something to do with this note and this assignment of

19  collateral.  I don't know.  I didn't go to Texas; I didn't go

20  to the courthouse; I don't know who owns it.  This is what he

21  says.  So he's checking -- he's making an analysis of the note,

22  Mr. geologist.  He's not an accountant; he's not an attorney.

23  Why?  Because he's greedy.

24          Now, whether or not he's culpable and he knew that

25  Harley knew he didn't own the oil or not, that's an issue for a

1  different day.  You're not here to decide that; that's not what

2  the case is about.  But at the least it's another way that

3  Harley dresses up what he's doing by surrounding himself with

4  these type of people, where other people would be convinced,

5  Call up Kesterson.  He's my geologist.  He'll tell you I own

6  this oil and it's worth a billion dollars.  So that's how he

7  gives himself the air of legitimacy, by surrounding himself

8  with these people.

9         We saw letters from his lawyer Christie Bower.  You

10 know, I have a lawyer.  The note that he sent to Marshall

11 Silverstein, the promissory note, it was certified as a true

12 and correct copy by Christie Bower, as if that means anything.

13 First of all, why does a lawyer -- she's not a notary public,

14 at least there's no evidence she was a notary.  Why is she

15 certifying anything?  I mean, lawyers don't do that.  You know,

16 certifying copies of documents.

17        But it gives Harley the opportunity to tell someone,

18 Hey, this is a certified document.  This has to be real.  My

19 lawyer is holding it in a safety deposit box.  It must be

20 valuable.  I have a lawyer.  I'm a legitimate guy.  I not only

21 have a lawyer, I have a geologist.  This is how he convinces

22 people.

23        Who is next?  We talked about Bunche, we talked about

24 Casselle.  How much Maury Schufford, 74 years old.  He was

25 impressed because Harley told him that he was a free mason, a

1  32nd degree freemason, and he could double his money in two

2  months.  He borrowed his money from his mother.  It was too

3  good to be true.  He told Mr. Schufford that he was going to

4  use Mr. Schufford's money to re-open his oil fields in Texas.

5          Now, Mr. Silverstein was obviously the largest victim

6  here, and that went on about three years, 2006 to 2009.  Mr.

7  Silverstein lost over $250,000, based upon fraud upon fraud

8  upon fraud.  But this was Harley's big pay day here.  He knew

9  that he had really gotten somebody to trust him who had a lot

10 of money, and he took advantage of it.

11         Mr. Silverstein testified -- he was the gentleman in

12 the wheelchair, his wife has dementia.  A series of lies.  This

13 art, you know.  What's interesting about the Silverstein

14 situation is he gave him even extra lies to Mr. Silverstein

15 than he does to other people.  He personally guarantees all

16 those personal notes.  It's not just a loan to RJH, but it's

17 personally guaranteed by Mr. Harley.  Why is that important?

18         Well, Mr. Harley, according to him he's one of the

19 wealthiest men if not in the United States in the world.  If

20 you read the newspaper, the United States Government, the

21 Congress, passed its operating budget for the next fiscal year,

22 2015, and it's 1.1 trillion dollars.  The entire operation of

23 the budget, the United States of America in 2015, and Barack

24 Obama is supposed to sign that to avoid a government shutdown.

25 But that's not necessarily the context.

1        Mr. Harley said he went to Ben Bernanke and other

2   people, victims, and he has 5 trillion dollars of the United

3   States' money.  He can run the government four times over, and

4   he wants you to believe that he believes that.  And that's a

5   good faith belief.

6        So, Mr. Silverstein is told a series of lies over

7   three years, including the oil, phony oil asset and this art,

8   that we heard an expert Mr. Weiss come in and opine was not

9   worth 1.8 million dollars that Mr. Harley claimed, but one was

10  worth 50 dollars.  It was actually a poster.  That's the one of

11  the Roman emporer, it's not by Titian, one of the Italian

12  renaissance masters.  And the other one, the Settlemyre, is

13  worth about $150.  But according to Mr. Harley, you know, it's

14  worth 1.8, and his deal with Mr. Silverstein is, Hey, listen,

15  we can sell that painting, get -- you'll get cash.  If you'll

16  give me $75,000, I'll give you a half interest in my valuable

17  1.8 million dollar painting, that's worth 900,000 right there.

18  For 75,000 you can make 900.  That's a fantastic deal.  Look,

19  here's the painting right here up on my wall.  Don't you see

20  it?  It 's a beautiful painting.

21        Of course Mr. Harley never declared the artwork on

22  his bankruptcy petitioning when they asked him for all his

23  valuable art, he didn't mention that.  Nor did he mention the

24  five trillion dollars that he or the company claims to own from

25  the Federal Reserve.  He mentioned the 765 million dollars in

1  oil, but not the five trillion in the Federal Reserve.  He

2  can't even keep his own lies straight is what it basically

3  comes down to.  It's so ridiculous and outrageous, he's

4  scrambling around to put paperwork together that, you know, he

5  can't keep his own lies straight.  That's what it comes down

6  to.

7          Let's get back to religion.  He prayed on Mr.

8  Silverstein's, you know, religious affiliation.  Said he was

9  going to make donations to Mr. Silverstein's synagogue.

10  Remember that document?  He was going to make a $500,000

11  contribution from the proceeds of this scheme to the synagogue,

12  and then give them an interest-free loan on top of that.  He'll

13  do and say anything to get this money.

14          And of course, these notes would come due 30 days, 60

15  days, you're supposed to double, triple your money.  Never

16  happens.  Excuse upon excuse.  Every witness who testified here

17  today, it was just one excuse after the other.  There's another

18  deal right around the corner.  You know, just wait.  Miracle,

19  opportunity, give me more money.  And Mr. Silverstein

20  unfortunately succumbed to that, and it got drawn out for three

21  years, until the end of the day the last note was for $200,000

22  -- or $220,000 I believe.  Where he'd get two million dollars,

23  about ten times the amount of his money, in about a month's

24  time.

25          So, you know, for three years, it took three years

1   for Mr. Silverstein to catch on.  But he finally did.  And he

2   went to see a lawyer.  And the lawyer sued Mr. Harley and there

3   was a judgment in that case.  It was delayed for over two years

4   because Harley kept on filing bankruptcy petition after

5   bankruptcy petition, delaying the proceedings, but eventually

6   they got a judgment of over a million dollars against Mr.

7   Harley personally, against RJH, against his wife, Ms. Kube, and

8   you know, they proceeded to try and collect.

9           And what did he get out of it?  He got one

10  automobile, a $40,000 Lexus that Harley bought with Mr.

11  Silverstein's money, because there's no other income here.  The

12  only income that Mr. Harley and his wife had was Social

13  Security income.  He's out in 2007 buying a brand-new Grand

14  Jeep Cherokee.  No financing.  2008 he's buying a Lexus SUV,

15  brand-new, no financing for sizable amounts of money.  Why?

16  All the money that was coming in from Mr. Silverstein and all

17  these other victims, so he could live large.

18          So, all those documents in the bankruptcy case were

19  obviously signed under penalty of perjury, we went through them

20  time and time again.  Multiple times he swore that he was

21  telling the truth, but of course he wasn't.

22          Let me -- you know, I hate to insult your

23  intelligence by standing here and just repeating it over and

24  over again.  I really hate to do that.  And I'm very tempted to

25  just sit down, and I've never done that.  But -- and I feel

1  it's my obligation as a representative of the United States to

2  present this case fully and go through some of the documents

3  with you.  And I'm going to do that, because as I said, it is

4  an important case and I'm going to do everything I can to make

5  sure that justice is served.  Please bear with me, and don't

6  take it out on my case if I'm boring you or insulting your

7  intelligence.

8          Can we have -- I'm going to go through each of the

9  counts of the indictment.  So, even at the end of the day

10  you're going to get a verdict slip from the Judge, and it's

11  going to ask you to give a verdict on each one of these 23

12  counts in the indictment.  And as I said in the beginning of

13  the case, there's three basic schemes here.  There's a treasury

14  check scheme, the oil scheme and the bankruptcy fraud scheme.

15          These counts all relate to one or more of those three

16  schemes.  And there are various victims associated in each one

17  of the counts.  So, for instance, Counts 1 through 5 all deal

18  with Mr. Silverstein, transfers of money that he made to Mr.

19  Harley based upon these false representation claims of owning

20  valuable oil and valuable artwork of various kinds.

21          There's been a stipulation in this case between

22  myself and defense counsel.  This is a wire fraud, one of the

23  elements of the offense is wire travel in interstate commerce.

24  There's no dispute about that.  Both sides agree that did

25  happen, that all these wires traveled in interstate commerce.

1  So you have Counts 1 through 5, on a specific occasion Mr.

2  Silverstein wired money to Mr. Harley based upon these false

3  claims that Mr. Harley was making.

4          Count 6 is similar to that.  It's a wire fraud from

5  Maurice Schufford to Mr. Harley.  I think his was $10,000,

6  where he was going to double his money.

7          Counts 7 through 10 are a little bit different, but

8  they all involve Malcolm Casselle.  But some of them are -- 7

9  and 8 deal with money that he sent to Mr. Harley through

10  MoneyGram or other wires based on Harley's claim about owning

11  the oil and this investment opportunity that he was presenting.

12          But Counts 9 and 10 are e-mails, which are also the

13  Judge will tell you if it travels through the internet.  The

14  e-mail is considered a wire that travels through interstate

15  commerce.  So, for instance, 9 and 10, where Mr. Casselle -- if

16  we can have Exhibit 9.1?  You'll see, the way -- on your

17  exhibit list when you get the exhibits, and I know there's a

18  ton of exhibits in this case.  But the way it works is,

19  generally speaking, Exhibit No. 9, and it will relate to Count

20  9, so then it will make it easier so you can work it together,

21  that doesn't happen in all cases.  There are many documents

22  that go beyond the 23 that pertain to the case.

23          But the specific substance of any particular count is

24  usually going to happen -- is going to be connected by virtue

25  of the exhibit number.  So, for instance, this is Exhibit 9.1.

1  And it's the e-mail that Mr. Harley sent to Malcolm Casselle on

2  May 16, 2009.  And if you go to the next page, and it's got the

3  phony U.S. Treasury checks for 500 million dollars.  Flip

4  through it, please.  Go to the next page.  Next page.  You

5  know, besides the fact that Mr. Harley was told by all these

6  people that these documents were phony, you heard from Mr.

7  Brown when we did the search warrant at his house, you saw the

8  evidence of his doctoring -- you know, creating documents, he

9  had Kiat's signature and computer files, he had an e-mail from

10  someone named Kiat where he's suggesting verbiage on the

11  document, to whom it may concern letter, fill in the blanks

12  here, date it.  It actually looks like Harley who is directing

13  somebody else to do something in terms of this well-known

14  scheme.

15         I mean, on Mr. Harley's computer is the website from

16  the federal -- is the website from the Federal Reserve Bank in

17  New York, where he describes this whole scheme, scheme in

18  chapter and verse about Riyadi.  Harley has got Riyadi's blank

19  letterhead on his computer.  He's got Riyadi's passport on this

20  computer.  And he knows this thing is a fraud based on the

21  evidence that he found his house, besides what these people

22  told him repeatedly.

23         But in any event, this is what he's selling to Mr.

24  Casselle in terms of Count 9.  If you'll just keep on scrolling

25  through it, please.  All right.  And in Count 10, if we go to

1  10.1.  Similar things, it's another e-mail, but this now is on

2  April 28 of 2009 from Mr. Harley to Mr. Casselle.  And if we go

3  to the next page, this has to do with that phony Prudential

4  Life Assurance, insurance wrap that he calls it up here

5  underneath financial guarantee agreement, that supposedly this

6  company guaranteed his oil for a hundred million dollars and

7  he's sending it to Casselle and Casselle checked it out and

8  found out it was totally bogus.  Didn't part with any more

9  money.

10          You're going to hear about that.  Some of these

11  counts relate to people who didn't lose money as a result of

12  this wire.  That's not an element to the offense.  You don't --

13  the attempt to defraud somebody using the wire is sufficient.

14  I'm not going to steal Judge Caputo's thunder on the law, he'll

15  get upset.  But I submit to you, ladies and gentlemen, that no

16  money has to change hands here for this crime to be committed.

17  Just a simple attempt to defraud someone using the wires if you

18  have a scheme to defraud.  The intent to defraud is sufficient.

19  So this is an example of that, where Mr. Harley after the oil

20  scheme didn't work, you know, tries to build it up, say some

21  insurance company has now guaranteed it.  So, that is 10.1 and

22  it relates to Mr. Casselle.

23          Now, 11.1, which is the next count in the indictment,

24  as I read Randall, and that's the woman who lost the 500,000

25  previously and Harley and this other guy were fighting over

1  her.  He sent her this corporate profile on May 4, 2010 via the

2  internet.  And if you go to the next page.  This is his

3  corporate profile where he wants, you know, Ms. Randall to

4  believe, and she did believe.  She said if she had the money,

5  if she hadn't lost the 500,000 she would have invested more.

6  But he says right here how his company owns the 10,000 barrels

7  of oil located in Brown County with a value in excess of -- can

8  we have the next page -- in excess of one million dollars.  And

9  then his company also owns the investment grade debt instrument

10  valued in excess of one billion dollars.

11          And then -- boy -- We are pleased to confirm as of

12  April 2009 RJH & Company had unrestricted bond power with

13  valuable bank instruments totalling more than 700 billion

14  dollars.  I guess what's interesting here, and maybe you'll

15  consider it interesting as well, is how did you get from five

16  billion to 700 billion?  Did he lose all that money somewhere

17  along the way?  I mean, that's the kind of -- if you go to the

18  bankruptcy petition, he doesn't even list it.  So, like I said,

19  I think it's evidence that he couldn't keep his stories

20  straight, he just used whatever numbers he felt like at any

21  given time.

22          But you know, this is the type of thing where he's

23  tried to pump himself up and his company up as a very wealthy

24  person and a very -- a company that has a lot of assets.  So

25  it's someone rest assured that can pay you back.  Obviously if

1  you loan money to a destitute person, a homeless person, the

2  chances of likelihood of getting paid back are a lot less than

3  if you lend money to Warren Buffett or to General Electric, you

4  know, and that's what Harley was trying to do.

5          So 11.1 was Irene Randall.  Now you have to do the

6  financial institution.  So Count 12 is Merrill Lynch Pearce

7  Fenner & Smith, that was Andrew Heckenberger and Brian Pugh.

8  Brian Pugh.  You heard that Mr. Harley had a bank account there

9  at Merrill Lynch.  They closed it out when he started trying to

10  negotiate these checks, but they knew it was immediately

11  fraudulent and they told him so.

12          But that -- if you look at Exhibit 12.1, this would

13  be the document that relates to Count 12, where on April 20 of

14  '09 Mr. Harley is sending these documents to Andrew

15  Heckenberger at Merrill Lynch.  Now what does he say?  Please

16  be advised our firm is seeking to deposit these financial

17  securities in our company account with Merrill Lynch.  These

18  fraudulent documents.  If you have any questions regarding this

19  matter please do not hesitate to call.  What's on the next

20  page?  The phony treasury checks, and then a phony safe-keeping

21  receipt.  And then the next page, the phony confidential memo.

22  So all giving it -- trying to give it the air of legitimacy.

23          And these people didn't just blow him off

24  immediately.  They're in the business -- in the financial

25  world, even they were like we have to check it out, they would

1   send it up to their superiors, to people that deal with these

2   things, and come back with the conclusion that it's all

3   fraudulent.  Tell him close his account.  So he would basically

4   stop, if it was in good faith, as Mr. O'Brien said in his

5   opening statement, but no, he didn't stop, he continued on and

6   on and on.

7           So if we go to Count 13, the next victim is State

8   Street Alternate Investment Solutions, which is Exhibit 13.1.

9   So this is now from Mr. Harley on April 3, 2012.  So this is

10  way in the future.  You know, he's already spoken to Richard

11  Jones, general counsel at the Federal Reserve Bank in Atlanta.

12  Mr. Godiwala, who's told him this is a crime, if you keep on

13  trying to pass off these documents as legitimate.

14          Mr. Zawistowski who he spoke to in December of '09

15  from the Federal Reserve Board in Washington, all telling him.

16  So he's still sending out this junk now to another company in

17  2012 trying to get them to give him a line of credit and to

18  negotiate these documents.  If we just quickly scroll through

19  them, you can see it's the same fraudulent corporate profile,

20  Kiat, Federal Reserve Bank type documents.

21          One interesting thing that you'll notice, there was

22  at first Mr. Browning found a document, it was -- I believe it

23  was a to whom it may concern letter, to the attention of

24  Skyline Equities.  I don't know if I made it clear or not when

25  I was questioning Mr. Browning what the significance of that

1   was.   But it appeared that these instruments, these billion

2   dollar checks, or the 700 billion, whatever number he was

3   deciding on that day, were assigned to Skyline Equities, which

4   is a name that just came out of the blue, not to Mr. Kiat or

5   Mr. Riyadi.   You know, why does he have that in his house?   And

6   doesn't that indicate to him, well, maybe Kiat doesn't own it,

7   maybe this entity Skyline Equities owns it.   Who knows why.

8   But just more sitting around on his computer trying to

9   fabricate documents, besides the Ben Bernanke -- the website

10  that he was on, where he gets the signatures of famous people,

11  Dick Cheney, Ben Bernanke, and then plugs them into documents,

12  but all those fraudulent documents that we found.

13          But in any event, that was Count 13.   Count 14 is the

14  wire fraud involving LPL Financial, so, if we go to 14.1.   And

15  this is Neal Abrams.   I don't know what I'm looking at, but it

16  sure is impressive.   I'll work on it first thing in the

17  morning.   What did Harley say to him on April 28?   This is

18  right after Merrill Lynch closes his account.   As promised, see

19  the attached file.   Kindest regards.

20          Go to the next page.   More phony Federal Reserve

21  documents.   Subpoena now, Exhibit 15, Count 15 is a wire fraud

22  count relating to demands that he sent to the Federal Reserve

23  Bank of New York.   There were a series of four e-mails.   It was

24  so large and voluminous he had to break them up into a series

25  of four e-mails, where he sent demands to William Dudley, who

1  is the president of the Federal Reserve Bank of New York.  And

2  you heard the evidence, Mr. Godiwala unfortunately got assigned

3  to having to deal with this person.  How many times did Mr.

4  Godiwala tell you these were bogus?  I submit to you ladies and

5  gentlemen, Mr. Godiwala has patience beyond anyone.  Anyone

6  else would have just hung up the phone.  But he kept on going

7  back.  He even went so far to tell Mr. Harley it's a crime,

8  that you better stop doing it.  Unrelenting.  If that's not in

9  good faith, ladies and gentlemen, an honestly held belief, you

10  can't -- one of the other instructions the Judge is going to

11  tell you about is willful blindness.  You can't ignore -- you

12  can't deliberately close your eyes to what's obvious.  It's

13  called the ostrich instruction.  Ever see an ostrich?  They'll

14  stick their head in the sand.  That's called willful blindness.

15  People are telling him point blank these documents are

16  fraudulent.  It's a crime.  Stop doing it.  And he continued to

17  do it.

18          That relates to Exhibit 15.3.  If you bring up 15.3.

19  This is a series of 95 pages.  If you scroll down to the

20  bottom.  You'll see there are Bates numbers here from the

21  Federal Reserve Bank of New York.  And if you go to the last

22  one, it 's going to be page 96 actually.  98.  Is that the last

23  page?

24          TECHNICIAN:  98.

25          MR. BRANDLER:  98?  So these documents are all

1   submitted by Mr. Godiwala -- when Mr. Godiwala was on the stand

2   in archived e-mails and correspondence from Mr. Harley.  He

3   repeatedly tells him that these documents are fraudulent.  But

4   it has the e-mails where Mr. Harley is demanding a billion

5   dollars from the Federal Reserve, which Mr. Blau thought was a

6   great idea.

7          So, if we move on from the wire fraud counts, we get

8   into the bankruptcy fraud.  And Counts 16 and 17 are two

9   separate actions in addition, a 2010 addition.  So if we look

10  at the documents in the exhibit list that are in the 16 series,

11  they're all going to relate to this 2010 bankruptcy petition,

12  which is using the bankruptcy court to commit bankruptcy fraud

13  against Mr. Silverstein.  All these documents -- I'm not going

14  to repeat myself -- but where he claims Mr. Silverstein is a

15  creditor on his bankruptcy petition, and you heard from Mr.

16  Schiller, who is from the trustee's office that had he been

17  successful in discharging his debts, if the plan had been

18  confirmed, that this debt that Mr. Silverstein had would have

19  been wiped out.  And that's part of the fraud.  Not only did it

20  delay Mr. Silverstein from getting a judgment repeatedly, that

21  was the testimony from Mr. Fogerty, but if they had been

22  successful it would have wiped out this debt.

23         2011 the same thing happens again.  That one was

24  dismissed for bad faith by the bankruptcy court.  And

25  incidentally, he never paid the filing fees, that's why the

1  first one was dismissed.  He never paid the filing fees for any

2  of these bankruptcy petitions.  It shows he really has no

3  intention of declaring bankruptcy.  He's using it for his own

4  ulterior motive to defraud Mr. Silverstein and frustrate

5  collection of those judgments.

6        Count 17 is the documents related to -- Count 17

7  related to the 2011 petition.  Counts 18, 19, 20, 21 and 22 are

8  all false statements in a bankruptcy petition.  Where you saw

9  repeatedly he signed these things under perjury, made various

10  false statements in each of those bankruptcy petitions.  So, in

11  Count 20 he made the false statement, he failed to list -- now

12  all the sudden he fails to list Mr. Silverstein as a creditor.

13  And that was his personal bankruptcy petition.

14        Mr. Fogerty showed you the judgement.  It was not

15  only a corporate judgment against RJH, but it was against Mr.

16  Harley personally.  He didn't list it.  Which caused problems

17  because Mr. Fogerty wasn't given notice of that bankruptcy

18  proceeding, couldn't come into court to address it, and sustain

19  Mr. Silverstein's claim.  But in any event, it was a false

20  statement.

21        Not only did he fail to list Mr. Silverstein, but

22  also other judgments.  The Securities and Exchange Commission

23  had a case against Mr. Harley, and judgment for over 1 million

24  dollars, 1.4 million dollars that they had gotten against him

25  prior to him filing this bankruptcy petition.  He was on notice

1   of it.  They sent him mail trying to collect it and he failed

2   to list it as if it didn't even happen.  Just ignored it.  Same

3   thing as far as the United States.  You heard from Karen

4   Musloski, she's a paralegal in our office, $168,000 debt to the

5   United States prior.  He didn't list it at all on his

6   bankruptcy petition, despite being told in repeated

7   correspondence, notice of interrogatories, requests, financial

8   statements, totally ignored the bankruptcy petition.  So that's

9   Count 20.

10          Count 21, every single piece of document that he's

11  ever submitted to a victim said he's chairman or CEO of RJH,

12  Inc. that's the way he dresses himself up.  You know, I'm an

13  important officer of this corporation that owns billions of

14  dollars, trillions of dollars in assets.  On his own bankruptcy

15  petition when they ask are you the officer of any company he

16  doesn't list RJH.  I submit to you, ladies and gentlemen,

17  that's just a victimless false statement that was made under

18  penalty of perjury and satisfies the elements for Count 21.

19          Count 22 is interesting, because that is also on his

20  personal bankruptcy petition.  Remember the artwork?  Beautiful

21  Settlemyre that's worth 1.8 million dollars?  He didn't list

22  it.  You know, the Roman emperor, some Titian -- you know, they

23  asked him, Do you have any valuable artwork?  Didn't list any

24  of it.  Whatever it's worth -- Mr. Weiss says it's worth 200

25  bucks for both of them, he didn't list it.  Whether it was

1   worth 1.8 or $200, that was a willfully false statement.

2           So we get to Count 23, which is the bank fraud.  Kind

3   of an all-encompassing fraud that I've spoken about with these

4   victims here from State Street, LPL Financial, Merrill Lynch,

5   where he's trying to negotiate these checks, that if he had

6   been successful in negotiating these checks, what this is

7   saying is that the Federal Reserve Bank of New York, which was

8   the holder of this money, would have been defrauded.  The fact

9   that they weren't defrauded out of any money is

10  inconsequential, that they knew it was ridiculous is

11  inconsequential.  It's his intent to defraud.  His intent to

12  defraud, which is the key issue in these cases.

13          So he was intending to defraud the Federal Reserve

14  Bank of New York by making demands of it, Mr. Dudley and

15  others, and also by trying to negotiate the checks with these

16  other victims.  That's the assignment.  You're going to get the

17  verdict slip.  It's going to identify each one of those counts

18  separately.  You're going to be asked to give a verdict on each

19  one of those counts and you'll consider them independently and

20  separately.

21          Go to 15.3.  I think it's page 30.  Enlarge that.  I

22  just wanted to -- I didn't have the page earlier.  This is the

23  e-mail, one of the e-mails that Mr. Godiwala sent to Mr.

24  Harley.  I just want to read it.  As we discussed, the

25  documents and facts you provided The Federal Reserve Bank of

1  New York, including your account numbers and other identifying

2  numbers, treasury checks and reported Federal Reserve documents

3  are forgeries and do not correspond to any account at the New

4  York Fed.  As we also discussed, these documents and accounts

5  are trademarks of a scam.  For more information, please see our

6  website below.  It gives the link down here.  Of course, Harley

7  already had the links in his computer.

8          Additionally, as we discussed, it is both a Federal

9  and state crime to pass off fraudulent financial documents as

10 legitimate.  I have warned you that the documents you purport

11 to be from the Federal Reserve or the Treasury Department are

12 forgeries.  Thank you.

13         Mr. O'Brien told you in his opening there's good

14 faith here.  I submit to you, ladies and gentlemen, when they

15 tell you it's a crime and you keep on doing it, that's not an

16 honestly-held belief.

17         And after Mr. Godiwala and Mr. Jones, Mr. Zawistowski

18 told him, you know, we have the business from Irene Randall was

19 in May of 2010; Bert Falls was June of 2011; Peter Blau was

20 October of 2011; and Ed Sigel from LPL -- State Street was

21 April of 2012.  This all happens after that.

22         Interestingly, if you look at the bankruptcy

23 petitions, it just shows more of his intent to defraud here.

24 He doesn't -- but who owns RJH?  He comes up with 30 percent

25 and 70 percent.  Who owns the other 70 percent?  He doesn't

1  even put himself down.  He's telling all these people all over

2  the world that he's the owner and he controls RJH, but he

3  doesn't list himself as the owner of the stock.  Why not?

4           What did he tell Mr. Browning during his statement,

5  extensive statement when he was interviewed in his house?  He

6  hadn't had the art appraised.  Well, he told Mr. Silverstein it

7  was worth 1.8 million dollars.

8           We have six original notes.  There's nothing about

9  that.  I mean, he says I have the original note.  This guy has

10 six originals.  I mean, it's a good document without one

11 original and five copies.  This guy has six originals.  One is

12 -- Christie Bower, his lawyer, has one note in safekeeping in a

13 safety deposit box, but he has five other originals.  I mean,

14 these are just the hallmarks of classic fraud I submit to you,

15 ladies and gentlemen.  And on its face, a 200 million dollar

16 note from Enpetro -- he knew Enpetro LPC was a defunct

17 corporation.

18          We submitted into evidence records from the secretary

19 of state in Texas.  It was out of business in 2002.  The

20 charter was revoked.  They said they had no assets in 2002.

21 And Mr. Harley knew this and he kept on using that oil note.

22 Mr. Kesterson as witness kept on making an analysis of the

23 value of the note after 2002, when this corporation didn't even

24 exist.

25          So, Bert Massey, a very important witness, the lawyer

1  from Texas who was an expert, and the Judge will give you an

2  instruction on how you consider expert testimony.  He's been

3  involved in this field for 30, 40 years in terms of doing title

4  searches on property, definitively stated Mr. Harley owns

5  nothing in terms of the oil leases that were supposed to be

6  connected to these notes.  He actually said the leases

7  themselves, whoever owns it, are expired.  So, Harley's claims

8  to the contrary are just all ridiculous, just like his claim

9  that he owns five trillion dollars worth of Federal Reserve

10  notes.

11        The fact that he never called the note due is another

12  indication that he knew it was fraud.  I mean, you would think

13  if you have this 200 million dollar note from a legitimate

14  corporation after 380 days I think it was, just going back to

15  Enpetro and Mr. Dedmon and say I want my 200 million dollars.

16  Well, he never did that.  He said he preferred to use it as

17  collateral.  That's because he knew that that corporation was

18  not in existence, I submit to you, and that they didn't have

19  200 million dollars to give him.

20        So I'm going to sit down because I think I've said

21  enough, and I think you've heard enough in the last two weeks.

22  I do appreciate your patience here and I hope you give Mr.

23  O'Brien the same consideration.  Thank you very much.

24        THE COURT:  Thank you Mr. Brandler.  Mr. O'Brien.

25        (Pause.)

1    MR. O'BRIEN:  Ladies and gentlemen, I'll try to keep

2    my voice up because our technology isn't working.  I too would

3    like to thank you for the time you spent considering this very

4    important case.  We've worked long days and there's been a lot

5    of material presented before you, and I can tell you've all

6    been very attentive.  And I know you will continue to be very

7    attentive and take this case very seriously when you deliberate

8    and make a decision.

9         I'd like to say initially that I -- like Mr.

10   Brandler, I don't feel like sitting down, and I don't think I'm

11   insulting your intelligence.  I'm a lawyer.  I represent Mr.

12   Harley, and I believe in this case and I'm here to argue the

13   case before you.

14        First point, you understand everybody in the room.

15   We have the judge who runs the show, Mr. Brandler is here to

16   prosecute the case.  I'm here to argue for the defendant.  Now

17   your role.  Your first role I think is almost complete, is

18   listen to the evidence.  And I think you've been very

19   attentive.  It's complicated, but you've listened to it in a

20   very attentive manner.

21        You've also listened to the arguments of counsel, who

22   are now concluding right at this time.  Mr. Brandler has made

23   his argument.  I'm making mine.  He'll get to make a counter

24   argument.  The next thing you'll do is listen to the Judge.

25   The facts came from the witness stand; the law with the legal

1  principles guarding the case, that comes from the Judge.  He's

2  going to charge you on those.  He's going to give you a

3  statement of what the law is.  Now, after you hear them, you've

4  heard the evidence, you've listened to the arguments about the

5  evidence.  You've heard the charge of the Judge, the

6  explanation of the law.  The next step is to take the facts,

7  find the facts, apply the law and make a decision, so you're

8  almost there.  And I know you've done a very good job so far

9  and you'll continue to do so.

10        Now, with respect to the law, now the Judge is going

11  to charge you with respect to the law.  But there's a couple of

12  legal principles that I'd just like to outline now because

13  they're going to help you understand my argument, the legal

14  principles involved in this case.

15        First of all the presumption of innocence, that's

16  something that not just Mr. Harley has, everybody has that.

17  The Constitution of the United States grants everybody the

18  presumption of innocence.  Presumed innocent until guilty.  Mr.

19  Harley comes into that courtroom with that presumption.  He

20  sits before you with that presumption.  And until you decide

21  otherwise he is presumed innocent.

22        Now, second point is in order to overcome that very

23  important presumption the government has the burden of proof.

24  The government, not Mr. Harley, he doesn't have to prove

25  anything, he doesn't have to say anything.  They have to prove

1  that he's guilty.  So he's presumed innocent.  The burden to

2  overcome the presumption is with the government.  And how big a

3  burden is it?  Well, it's a very big burden.  They must prove

4  beyond a reasonable doubt that he's guilty.  They are three

5  very important legal principles that the Judge is going to

6  charge you on.  Mr. Harley is presumed innocent.  In order to

7  arrive at -- (inaudible) -- they must do so beyond a reasonable

8  doubt.

9         He's also going to tell you that Mr. Harley doesn't

10 have to testify.  He chose not to testify in this case, and

11 he's not required to.  He's not required to testify.  He's not

12 required to offer any evidence.  Because he's presumed

13 innocent.  Because the government must prove every element of

14 the case, and because they must do so beyond a reasonable

15 doubt.

16        The judge will also instruct you, I know you're going

17 to follow the instructions, that the fact that he didn't

18 testify you are not to make any inference on that or take it

19 against him.

20        Now, let's look at this particular -- there are

21 general legal principles that are applicable in a criminal

22 case.  Now, let's look at this particular case.  What are the

23 legal principles applicable here?  You know, of all these

24 complicated facts I think it comes down to this:  Did Mr.

25 Harley act with the intent to defraud?  Did he intend to

1    defraud anybody when he did this, the things that he did?

2         His attempts to I guess -- I never used it before, I

3    suppose I may have heard it before, but it kind of sounds like

4    a good term to apply in this case, his attempt to monetize,

5    turn somebody's assets into money.  Get some money.  He had

6    these assets; he had notes; he had a -- some checks that were

7    on deposit at the bank.  His attempts to encourage other people

8    to invest with him, to monetize is the term that's used.

9    That's what business people do when they have assets.  They try

10   to turn them into money.

11        So, the first issue is did he have any intent to

12   defraud?  Was that a scheme?  In this case -- the charges in

13   this case are that the indictment reads that Mr. Harley engaged

14   in this scheme to defraud.  And the scheme involved the note,

15   and the scheme involved the checks.  And the scheme involved

16   the banks and the filing of the bankruptcy petition.  And did

17   he engage in this scheme to defraud, and then did he act in

18   furtherance of that scheme with the intent to defraud?  And

19   they seem to be the legal issues in the case.

20        What -- did he have fraudulent intent in any of the

21   things that he did?  That's what the scheme issue is.  The

22   Judge is also going to explain to you that the government must

23   prove that he had fraudulent intent beyond a reasonable doubt.

24   He doesn't have to disprove it.  He doesn't have to prove to

25   you that he did that fraudulent intent.  They must prove it

1 beyond a reasonable doubt.

2         And also, another thing is if you conclude he acted

3 in good faith.  Did he believe -- believe that this stuff was

4 all right?  If you conclude that, you must acquit him also.  If

5 you conclude the government has not proven he acted fraudulent

6 -- or if you conclude the government has not proven he did not

7 act in good faith -- remember the government must prove.  They

8 must prove a lack of fraudulent intent beyond a reasonable

9 doubt.  They must prove the absence of good faith beyond a

10 reasonable doubt.  If they do not you must acquit.  They're the

11 legal principles that apply in this case.

12         Now, let's look briefly at the charges.  You have

13 charges here -- for purposes of this argument I think I'm going

14 to break the charges up into two groups.  The one group is the

15 false statements, there are false statements in the bankruptcy,

16 and I'll get to those later.  The other ones, the bank fraud,

17 the wire fraud, the bankruptcy fraud, they all basically

18 involve the same elements.  Did Mr. Harley act fraudulently?

19         Did he intend to defraud people or did he believe

20 what he was doing or did he act in good faith?  So I'm going to

21 talk about those first, those charges, they don't -- revolve

22 around a couple different facts.  No. 1, the note.  We have

23 evidence in this case of Enpetro, an oil promissory note, that

24 was for a lot of money, and the collateral for the note -- at

25 least arguably -- was the oil or the production from the oil

1  under some ground in Brown County, Texas.

2         Now, Mr. Harley had this note.  The individual of Mr.

3  Vince Browning, who did the search, he said that they located I

4  think five or six documents that appeared to be the originals,

5  he identified one that he considered to be original.  So Mr.

6  Harley had --

7         Now, why do I think there is a reasonable doubt here

8  about whether -- about his fraudulent intent with respect to

9  oil?  Why do I believe that this note was not part of any

10  fraudulent scheme to defraud?  Let's look at some facts.  No.

11  1, I want you to look at what happened in Atlanta.  He -- a

12  number of years ago this note was presented to some bank in

13  Atlanta.  Now, if the guy believed it was fraudulent would you

14  present it to a bank?  I don't -- well, let's look further.

15  When you present it to a bank you know the bank is going to do

16  due diligence, and they did.  We heard on the witness stand a

17  -- we heard questioning.  Who all notified -- made by the bank

18  officer -- Mr. Harley?  Their due diligence isn't there.  Their

19  due diligence -- they got an FBI guy to present you with a bank

20  officer, and called Mr. Harley on the phone and taped the

21  conversation.  And again, they got a lot of due diligence there

22  asking all sorts of questions about this.

23         Finally they got Mr. Harley's partner in the deal,

24  and they got him to kind of -- I call it turn states evidence

25  or whatever, and wear a wire and try to entrap Mr. Harley.  All

of this is this the type -- this is what happens in a
commercial transaction.  If you have a document, you present it
to the bank and they do their due diligence.

After all this was done, No. 1, the questions to the
bank officers, No. 2, the questions of the investigators.  Now
Mr. Harley thought they were bank officers.  I don't know.  He
might have figured out after a while.  No. 3, the questioning
of his own partner about this wire.  All of this happened, and
there were no charges filed.  In fact, Ms. Davis, the FBI
agent, very articulate FBI agent from down in Atlanta, she said
when all this was over the U.S. Attorney decided no charges
filed.  What does that tell me?  You know what it tells me?
That's good reason for Mr. Harley to believe there's no fraud
there.  No. 1, he's got an original note.  No. 2, this is
looked at very carefully by bank officials, FBI agents,
undercover agents, anybody you can think of, and what's the
conclusion?  No fraud, they're not going to file any charges.

So there's some pretty good evidence -- reason for
him in good faith to honestly believe it's not fraud, because
they already looked at it once before and said it wasn't.

Now, let's look -- after the Atlanta thing let's look
at the issue of the appraisal.  Mr. Harley, he has this note,
he goes and gets the appraisal.  Now, he went to a guy he had
never heard of, never met before, this Don Kesterson.  Mr.
Kesterson, he's an independent -- randomly for about an hour or

1  so in court tells Mr. Brandler, I don't think he got anybody.

2          Mr. Kesterson, No. 1, he had never met Mr. Harley.

3  He had never dealt with him before.  He was a small

4  businessman.  He didn't have any skin in the game.  And he was

5  offered a percentage of the deal and he turned it down because

6  he wanted to stay independent.

7          I think when you analyze the whole situation of Mr.

8  Kesterson you'll reach the conclusion that he was an honest man

9  and that's who Mr. Harley went to.  Said would you give us an

10 opinion?  Is there oil -- this note says there's certain oil

11 collateral, and the oil is oil under certain leases in Texas.

12 There are six parcels of leased land in Texas, and Mr.

13 Kesterson did the report.  He said, well, there hadn't been

14 production, he knew that.  And he said there's no provable oil

15 -- well, there is -- but there is oil in there.  There is.  And

16 he said there is 10 million dollars -- 10 million dollars of

17 oil.  It's in there and he said he got this information by

18 doing what he always does.

19          What he does as a geologist, what he's done before,

20 he gets records from the Texas Oil Commission, and does other

21 searches and makes a determination and --  I think you should

22 conclude that Mr. Kesterson was an honest man.  I think you

23 should conclude that he did his job in good faith, and I think

24 you should conclude he was accurate.  Because if he wasn't

25 don't you think the United States Government -- I don't know,

1   there were five or six FBI agents in here, they've been here

2   for a week, four people sitting at the counsel table.  A lot of

3   people flew from all over the country.  Don't you think they

4   could have gotten a geologist to say there was no oil in there?

5   No, they didn't.  They didn't get a geologist to say no oil in

6   there.

7           Because -- you should conclude there was.  Mr.

8   Kesterson did a study, determined it was in there.  Look it, he

9   says a lot of things in there that an honest man -- he says,

10  look it, I'm not making any promises here.  This is my opinion.

11  Any bank -- anybody that wants to loan money -- remember that?

12  Every one of those reports, anybody who wants to loan money,

13  you better get your own appraisal done.

14          He also said, I admit that there wasn't a lot of oil

15  taken out of there before.  And he really -- he gave the type

16  of report that an honest man gives.  I don't know how much it's

17  going to cost to take it out.  That's what an honest person

18  does.  He said, Here's my opinion, but I realize there's some

19  limitations.  There's some things that -- some questions I

20  don't know.  But there is oil under there and so forth.

21          Now, another attack on Mr. Kesterson that I think was

22  particularly unfair was the idea that he gave an opinion he

23  shouldn't have given.  Mr. Kesterson said ten times on the

24  stand, I'm here to give an opinion on oil reserves under this

25  land.  I'm not a lawyer, I'm not a title searcher.  I didn't

1   search the title, I didn't give legal opinion.

2           You can say -- Mr. Kesterson's report is Exhibit

3   32.6, Government's Exhibit 32.6.  You can review that in the --

4   in your deliberation room if you choose.  There were two

5   clauses, not even paragraphs, not even sentences, just two

6   clauses in which Mr. Brandler tried to twist into saying that

7   Mr. Kesterson was giving a report that this particular oil ties

8   into this particular -- No.  He didn't -- he said I never gave

9   that report.  I would have no idea.  I was asked to give a

10  report as to oil under a particular piece of property.  I did

11  that.  I was told that property hooked into the note, but I

12  never -- I never gave that opinion.

13          You look at that report.  Can you find anywhere he

14  gave that opinion?  There's two clauses, not even complete

15  paragraphs, not complete sentences, it's not in his

16  conclusions.  Just where he said I'm giving this report on the

17  oil and gas pertaining to --  Now, Mr. Kesterson is a

18  geologist, he's not an English professor.  Now the English

19  professor might have said, Well, you know, you're saying

20  something by that.  You should take out that pertaining.  And

21  there was another section I think on page 4 where it talked

22  about this is the oil backing the note.

23          Look at his entire testimony.  He was here half the

24  day.  He didn't give false testimony on that.  He didn't

25  attempt to give testimony beyond his expertise.  What Mr.

1  Kesterson said, there's oil under this property.  And I think

2  his testimony was credible, and I think it was credible for Mr.

3  Harley to believe it.

4          Now, look at another thing they did with Kesterson.

5  One of the things Kesterson said was -- or Harley -- tried to

6  get this asset insured.  Now that's not uncommon in the

7  business world.  You have a note, you have an asset, you get

8  insurance.  Nowadays they call it hedging.  We determined that

9  was an investment.  We hedged.  Kind of a protection.

10  Insurance or hedging they call it.

11          With somebody -- if Kesterson was involved in some

12  scheme or if Mr. Harley was involved in some scheme wouldn't

13  they have taken all the documents again and turned them over to

14  another person to look at, an insurance company.  Now, an

15  insurance company, they're going to insure a 200 million dollar

16  note, they're going on the hook for 200 million.  They're going

17  to look at it carefully, and everyone knows that.  That's

18  somebody who really -- someone who was involved in a fraudulent

19  scheme, and they were -- they had it right in their brain in

20  here that I'm trying to screw people, and would they say, well,

21  before I do that let's see whether this big powerful insurance

22  company would insure it.  Of course not.  You're just asking

23  for somebody to look at it.

24          Now, another point on that issue is the issue of Mr.

25  Massey.  Mr. Massey was -- he said he wasn't the smartest guy

in the world when he testified.  And he kind of messed up a
little bit about what the statute of limitations was in his
home jurisdiction.  But he was a very bright guy.  He was
admitted by the Court as an expert in commercial law.  He said
that he was brought in by an expert.  He looked at this
transaction just like he'd look at a transaction in his private
practice.  He looked at it and said is this -- I guess he was
there to say, Does this oil under the ground as it relates --
no.  He went and did his own title search.  I went and searched
my own records.  He's a lawyer.  He's a title searcher.  He's a
real estates title agent.  He's involved in all these important
committees involving real estate titles and oil and gas.  He's
the guy who looked at all this stuff.

He said, Well, I see some problems.  I'd ask for more
information, I would ask for more documentation before I would
sign off on this.  But he said that's not uncommon, that's the
job of a title searcher, that's the job of a real estate agent.

You look at these titles.  It's not the job of
geology.  You look at these things and then you come up with a
conclusion.  This conclusion -- in fact, he said he didn't see
any fraud in it at all, Mr. Harley.

Last thing he said, this is the type of thing --
there are some problems here, there's six different leases,
there's six different strains, there's division orders, all
these problems, all -- between the original owner and the

1  investors and the bank.  And what I would do is ask for more

2  information, I'd ask for more documents, I'd ask for something

3  -- that doesn't sound to me like a fraudulent scheme.

4        Mr. Massey said he saw no fraud, their own witness,

5  and he also said that this isn't the type of thing you

6  encounter in this type of business.  When people have oil

7  interest and they put them out to other people, individuals or

8  banks to invest in, due diligence is done, and this is what

9  people come up with, and the next step -- which they didn't do

10  the next step here because it wasn't a real deal.  If this were

11  a real deal the next step would have been explanation,

12  documentation and so forth.

13        So I think look at his testimony.  Based on all that

14  I think you can conclude in this case that the -- there is a

15  reasonable doubt that -- do you have a reasonable doubt as to

16  whether Mr. Harley knew that this note was a fraudulent scheme?

17  The U.S. Attorney in Atlanta, the bankers insurance companies,

18  expert lawyers, they all didn't see.  I think based on all that

19  you can reach your conclusion that there was no fraud with

20  respect to the note.  Or even better yet, you can reach the

21  conclusion that the government has not proved beyond a

22  reasonable doubt that Mr. Harley knew that this note was

23  fraudulent.  We're not here to decide whether that note is good

24  or bad or how good or how bad it is.  We're here to decide

25  whether or not Mr. Harley knew, he knew beyond a reasonable

1 doubt that it was fraudulent and that the government proved

2 that beyond a reasonable doubt.

3          Now, let's look at the second thing that's claimed to

4 be part of this fraudulent scheme.  The second thing that's

5 claimed to be part of this fraudulent scheme is the checks.

6 Now, would you put up those?

7          Early on in the trial, while Mr. Jones, and that

8 gentleman, he was the chief attorney in the Federal Reserve

9 Bank in New York.  And he identified an exhibit, and it was a

10 large exhibit, and it was admitted into evidence, and this is

11 part of the government's case, and the number of the exhibit is

12 15.3.

13          Now keep that in mind.  And 15.3 is an exhibit -- it

14 has hundreds of pages.  I kind of stumbled around a couple

15 times trying to find the pages, but fortunately we were able to

16 get them so we don't have to waste a lot of time here now,

17 pages -- I believe they're 52 to 65.  I think they're very,

18 very important pages.

19          And in the pages here are a couple of e-mails that

20 tell me when I look at them -- and what you determine is what's

21 important, not what I determine, what I'm going to argue.

22 These e-mails tell me that these checks, these two big checks

23 came from Riyadi or Kiat or somebody and ended up -- went to

24 Chris McCurry, who was at the Federal Reserve Bank in morning.

25          And then they also tell me these e-mails, these 13

pages of e-mails that are part of the government's case, one of their exhibits introduced into evidence by them, and that these documents show that these checks came from Indonesia, and they went to the bank, and also Mr. Harley was given some power over them.

Now, did Mr. -- did the government prove beyond a reasonable doubt that Mr. Harley knew that the checks were fraudulent?  Did they prove beyond a reasonable doubt that Mr. Harley knew that these documents he was given, they gave him some type of power over them were fraudulent.  I don't think so, I don't think so.

To me, this is the smoking gun, these documents. These documents that the government brought before you, not me, the government brought before you.  These documents show that these checks originated in Indonesia.  And that these checks went to Ms. McCurry at the bank.  And what was Mr. Harley's position?  Then Mr. Harley receives from the same source -- he receives the bond power that gives him some type of power. What's his position?  Checks were sent to the bank from Indonesia, and I was given control of them.  So he goes to the bank and starts asking for the money or asking for whatever.

Does that establish the act of fraudulent intent, when the government's own papers establish that it came from the people he said it came from?  The checks look legitimate, there's a maker on them.  It's not money, but there's a maker

1   on them, there's a payee on there, there's a bank on there,

2   there's a made by the federal government, paid to a bank, paid

3   to a -- Kiat or whatever his name is, sent to the bank.  What

4   else can you conclude from these documents?

5               Now, why do I think these documents are so important?

6   They gave them to us.  They came from them.  They introduced

7   them into evidence.  If they didn't think -- when they gave you

8   that exhibit, they gave you that exhibit and they put an

9   extremely intelligent gentleman from Atlanta, a lawyer, who

10  testified about it, and he went through that whole exhibit.

11  Spent at least an hour on that 90-page exhibit.

12              If some documents in there that were false, if this

13  was all a cock and bull story about him coming from Indonesia

14  and going to the bank, and Mr. Harley -- they would have

15  brought somebody else in here and said no, no, no, no, this

16  isn't true.  They would have brought somebody else in here,

17  this e-mail is a little bit messed up because of this, and this

18  isn't really what happened, and -- no.  They just put them

19  right before you.

20              And even Mr. Jones, when I asked him, he said, Well,

21  it looks that way.  He wasn't going to admit it.  He said it

22  looks that way.  So that's why I think there is reasonable

23  doubt that Mr. Harley had -- Mr. Harley thought that they were

24  valid.  Because government documents seem to indicate the right

25  source and the right location.  Source Indonesia, sent to the

1   Federal Reserve Bank, documents (inaudible).

2           Now, there's been some testimony that some
3   individuals may have said -- may have told him they weren't
4   valid.  Well, maybe.  Some guy came in here and said, I didn't
5   think they were valid.  Nobody explained why the government's
6   own documents said they came from Indonesia, they went to the
7   bank, and Harley was given power over them.  These aren't
8   documents that I pulled out of my shirt front and showed you.
9   These are documents that the government gave you.  Before I
10  even showed up to give my opening statement they were of
11  record.  Before I even gave my closing statement they were of
12  record.

13          Their own -- first witness, the first witness, a
14  lawyer from the Federal Reserve Bank, yeah, that's what they
15  look like.  If they looked like it to him, how could you say
16  they didn't look that way to Mr. Harley?  Looked that way to
17  that gentlemen and looked that way to Mr. Harley.  Again, I
18  don't know whether they're valid or not.  And I don't know if
19  you know, and I don't know when this ends today or tomorrow if
20  you're going to know.

21          But I think what you can conclude based on all of
22  this is that there is a reasonable doubt, that the government
23  has not proven beyond a reasonable doubt that Mr. Harley knew
24  they were false.  They have a couple people saying they were,
25  but their own documents seem to indicate -- oh, I think he was

1    acting in good faith when he thought they were real.

2         Now, the third -- they're the two main elements of

3    this scheme to defraud.  I don't think they proved the scheme

4    to defraud beyond a reasonable doubt.  And the charges of wire

5    fraud, the charge of bankruptcy fraud, the charge of -- what

6    was the other one?  Bank fraud.  Those three, those three

7    charges, they all have the elements, meaning they've got to

8    prove this scheme to defraud, and they didn't prove it.  And

9    the Judge is going to tell you if they don't prove all the

10   elements of the crime you should enter a verdict of not guilty.

11        Now, the third part of the scheme to defraud, we

12   didn't hear a lot about -- I think one guy was -- maybe Mr.

13   Silverstein was shown these paintings, if you look at Exhibit

14   42.1.  I didn't spend a lot of time on that.  You saw an

15   indication at one point, 42.1, No. 4 -- can you make that so --

16   no, the whole thing, just the whole thing.

17        I guess after Mr. Silverstein had already given 10,

18   20, $75,000 he was then kind of shown this painting.  And in

19   addition to the interest in the oil he was also given some type

20   of partnership in the paintings.  Well, look it, we wouldn't

21   all be here if these paintings are -- first of all, there's one

22   small reference to them.  This case is about the oil note and

23   this case is about the checks.  These paintings are just a

24   throw-in.

25        There was only one gentleman involved, and after he

93

1    advanced the money it was -- so I don't think you could

2    conclude beyond a reasonable doubt.  If you decide that Mr.

3    Harley -- if you conclude that the government has not proven

4    beyond a reasonable doubt that Mr. Harley knew the notes were

5    false, and if you conclude that the government has not proven

6    beyond a reasonable doubt that Mr. Harley knew the checks were

7    false, and all they said, Well, we have the paintings here, I

8    submit to you once -- the short reference to the paintings in

9    this case does not establish there's much of a scheme to

10   defraud.

11          And finally, after the filing of the bankruptcy

12   petition, that was somehow part of the scheme to defraud.  If

13   the scheme to defraud here, it would have shown -- to get

14   people to invest in the bankruptcy petition.  One of the things

15   you bring into the courtroom is your common sense and your

16   common knowledge, maybe all of you know, one of the things --

17   you have a right to file a bankruptcy petition.  And one of the

18   things you can file for is to get creditors off your back.

19          It  seems to me he did what he says -- you can do

20   that, and it gives you some time to work things out, and that's

21   what happened here.  He filed a couple of petitions and he had

22   one creditor on his back and he got some delayed period, 30

23   days, maybe 60 days in the case of the other one.  But I don't

24   see that as part of this scheme to defraud anybody.  It was an

25   attempt to get creditors off your back.

1          He owed Silverstein some money, there's no question.

2    Silverstein didn't get his money back.  And he was promised to

3    get it back.  He didn't get it back because the deals never

4    went through.  Mr. Harley didn't have it.  He was trying to get

5    the creditors off his back, trying to buy some time by filing

6    bankruptcy.

7          Okay.  Now, let me move to another point, the

8    victims.  Now here, you know, Mr. Brandler said -- he made

9    reference to Maryann Alexander, Kathleen Kelly, Peter Blau,

10   Bertrand Falls, four individuals who testified, seemed to be

11   very nice people.  He said that they were gullible, old and not

12   smart.  Well, I didn't think so.  That's not my concern.  I

13   wouldn't make those statements.  But the key thing about those

14   people is they're not victims.  The key thing about Maryann

15   Alexander, that -- is that no charges have been filed arising

16   out of those individuals.

17          You have over here -- you have an indictment that has

18   more than three columns.  And you have all this evidence.  And

19   if you don't believe -- and it is your belief that counts, not

20   mine.  Look at these.  None of those people are mentioned here.

21   There were no charges.  There was some testimony that Mr.

22   Harley got some money from some of these people, and that he

23   got it and that they knew it was risky.  They all got a big

24   return, they all promised a big return.  They knew -- they

25   wanted to make some money.  They invested in his notes, and

1  they knew there was risk involved and they knew they wouldn't

2  get paid back unless he was able to, as we said, monetize

3  everything, unless he was successful on his side of things, but

4  there were no charges filed against him.

5          I just submit to you that you're not -- they're in

6  here, but they're not victims because they didn't lose in this

7  case.  Not only didn't they lose anything -- strike that.  The

8  point is, the government chose not to even claim that Mr.

9  Harley defrauded them.  They claimed here that he defrauded

10 Merrill Lynch.  They claim he defrauded The Federal Reserve

11 Bank, claim he defrauded State Street -- claim he defrauded.

12 The reasons that -- I submit the reason, they knew they

13 couldn't prove a case, but that's not to be decided because

14 they didn't try to prove a case.  These individuals -- there's

15 no charge arising out of his dealings with them.  You may want

16 to ask that question, maybe some day we'll all find out why,

17 but again, it's not part of this case.

18          Now, who are the people that we have in this case?

19 Well, you have financial institutions lost some money and then

20 were -- the charges -- not lost, I don't think any financial

21 institutions lost any money, none of them invested.  You have

22 the counts in the indictment due on a list -- some financial

23 institutions, State Street, Merrill Lynch, LPL, Federal Reserve

24 Bank, I guess.  There are charges relating to his attempt to

25 deal with them, and then there are charges relating to Mr.

1   Silverstein and Mr. Casselle and Ms. Randall, who didn't even

2   advance any money.  He made a proposal and she turned him down.

3   And Mr. Schiller.

4          Let me talk about that.  You know, in this case it

5   would be one thing if you say -- you know, he gave them a bum

6   check and they gave him some money.  He gave them some

7   documents.  He said, Look, I've got this business deal going.

8   Are you interested?  The banks all did due diligence, looked at

9   it, no, I'm not interested.

10          In the case of Mr. Silverstein, Mr. Silverstein has

11   been here most of the trial, elderly gentleman.  Here is a

12   gentlemen with two degrees, very experienced as an employee

13   with a corporation, a business owner for two decades, did the

14   finances for the business, had a partner, had several people

15   working for him, had business advisors going into these things.

16   He admitted that he knew it was risky.  Admitted he made his

17   first loan and he knew it was risky -- and excuse me -- he knew

18   it was dependent on Mr. Harley monetizing the asset and getting

19   something out of it, being able to convince the bank to loan --

20   some other investors.  He knew his return was dependent on

21   that.

22          He was a sophisticated businessman.  He knew he was

23   making an investment.  He knew it was risky.  Mr. Casselle,

24   same thing, another guy, much like Mr. Silverstein, very

25   sophisticated businessman, and he understood the risks

1  involved.  You know, these gentlemen, not only did they tell

2  you they understood, they make an investment.  Like Mr.

3  Silverstein and Mr. Casselle, when that didn't pan out, they

4  didn't get the money back in the time agreed, they put more

5  money in and said, Okay, I'll give you more money and I'll help

6  you reach your goal, but I want a better return.  I want a

7  better return.  And one of the persons -- I don't know which

8  one, it's up to you to remember, I don't remember all of them,

9  the facts, all the amounts, one person was putting in ten

10 thousand and getting a million back.

11         Now, that's the kind of deal everyone knows that --

12 every person here knows -- has experience with money and

13 experience with investments and experience with loaning money,

14 when you put money into an investment vehicle and into a load

15 and you're promised an exorbitant return, you know one thing.

16 You know that there's risk involved.  And the risk here is they

17 all understood one thing.  Mr. Harley was attempting to get

18 banks and financial institutions to give him money on these

19 assets, to loan him money or purchase part of them or whatever,

20 and it didn't -- as Mr. Silverstein said, it didn't happen and

21 he knew he wasn't getting his money back.

22         I don't think that is evidence of fraud.  I think

23 that's evidence of people making a risky investment.  People

24 like Mr. Silverstein said, This wasn't all the money I had.  I

25 didn't throw all my assets -- certainly Merrill Lynch and these

1  banks didn't also.  It shows someone presenting an investment

2  opportunity to somebody and somebody looking at it and

3  realizing boy I can make a lot of money, but I understand

4  there's risks involved.

5         So, I think there's a reasonable doubt with respect

6  to this matter, that's No. 1.  There's the -- a reasonable

7  doubt that Mr. Harley believed, he believed that these were

8  legitimate investment vehicles.  No. 2, that he acted in good

9  faith.  And No. 3, he didn't intend to defraud anybody.

10 Everybody was given a chance to look at these things and these

11 people -- look in their own -- look in his mind.  No intent to

12 defraud.  Look in their minds.  They knew this was risky.

13 They voluntarily and willingly went into it.

14        The evidence in this case, as a reasonable doubt, Mr.

15 Harley knowingly involved here, attempted to defraud.  These

16 people who got involved, they got involved by their own free

17 will.  It wasn't a result of simply being defrauded.  It's a

18 big risk but there's a possibility of a big return.  So I would

19 submit to you the evidence is there's reasonable doubt on those

20 issues.

21        And that really covers -- I think it covers the 23

22 counts.  That covers the counts against the individuals, it

23 covers the counts against the financial people, it covers the

24 filing of bankruptcy petition.  The only thing it doesn't cover

25 is the false statements in bankruptcy.  And that would be

1   Counts 20, 21 -- or let's see, I'm sorry.  18, 19, 20, 21 --

2   18, 19, 20, 21, and 22.  My eyes are -- I think there are five

3   counts of false statements in the bankruptcy.

4           I don't want to spend a lot of time on this, because

5   here again, honest mistake, inadvertence, good faith -- the

6   government must prove beyond a reasonable doubt that Mr. Harley

7   made these false statements with the intent to defraud.  Now,

8   if you conclude as a result of -- whether the government cannot

9   prove beyond a reasonable doubt it was covered in the --  the

10  false statements, you agree they are, and they are Exhibits I

11  believe it's 16, Exhibit 16, but don't hold me to that, are the

12  bankruptcy petitions.  Take a look at those.  Before you decide

13  those counts of false statements, take a look at those and see

14  if you wouldn't make any mistakes yourselves.

15          You'll have about 1500 blanks to fill in, it's all

16  complicated stuff, it's all legal stuff.  In fact, to explain

17  it, the government had to bring a lawyer employed by the

18  Department of Justice with special expertise in bankruptcy to

19  explain these petitions.  I submit to you their difficulty,

20  given the fact that Mr. Harley was pro se, what they will call,

21  filled these out himself without the benefit of legal counsel,

22  and the fact that you could just see not only are there

23  mistakes made, just the type of mistakes that a lay person

24  would make trying to fill out these complicated legal

25  documents.  And they were all important.  So I submit to you

1   there is a reasonable doubt whether he knew he had fraudulent

2   intent when he filed those bankruptcy papers, when he made

3   those statements or whether he really -- this was just --

4          So, that's basically our position in this case.

5   You're going to get this verdict form on all the counts.  You

6   have to decide guilty or not guilty.  And remember, as I said

7   initially, if you conclude that the government has not met its

8   burden of proof in proving that Mr. Harley acted with

9   fraudulent intent, or if you otherwise conclude the government

10  has not disproved his good faith, then you must enter a verdict

11  of not guilty.

12         Same thing on false statements.  If you conclude the

13  government has not proved beyond a reasonable doubt that he

14  made these knowingly -- fraudulently made these false

15  statements then you must enter a verdict of not guilty.  And

16  that's what we ask you to do, we ask you to go in, especially

17  take a look at the exhibits I referred to, those e-mails that

18  came from their records, these very complicated legal documents

19  and bankruptcy petitions.  I think they're the key ones in your

20  case, look at those, discuss the evidence, and I'm confident

21  when you do that you will conclude that the government has not

22  met its burden in this case.  Has not met its burden, a very

23  high burden, to overcome the presumption of innocence, and it

24  has not proven beyond a reasonable doubt that Mr. Harley had

25  the fraudulent intent or knowingly filed false statements, and

1 that therefore you should find him not guilty.  Thank you.

2          THE COURT:  Thank you, Mr. O'Brien.  Mr. Brandler,

3 any rebuttal?

4          MR. BRANDLER:  Your Honor, I don't think there's

5 anything necessary to rebut, and I'm going to waive my

6 rebuttal.

7          THE COURT:  All right.  Members of the jury, you

8 know, normally, I won't break it up, but we've been at it over

9 two hours.  We're going to break for lunch, and then I'm going

10 to instruct you on the law after lunch.

11          Remember, you don't have the case yet.  You will not

12 have it until I tell you that you have it, and that's after my

13 instructions.  So you're not to begin to discuss the case among

14 yourselves.  Certainly you're not to discuss it with anyone

15 else, and should anyone try to talk to you about it bring it to

16 my attention immediately.

17          We'll come back at ten after two, at which time I'll

18 instruct you.  It will not take that long.  You will then

19 retire to deliberate.  Enjoy your lunch, see you back here at

20 ten after two.

21          (Whereupon, a luncheon recess was taken from 12:56

22 p.m. to 2:10 p.m.)

23                    (Jury not present.)

24          THE COURT:  What about this highlighted exhibit?

25          MR. O'BRIEN:  I think that's Mr. O'Brien's exhibit.

1  It should be highlighted.

2          THE COURT:  Do you have a clean copy?

3          MR. BRANDLER:  No.

4          THE COURT:  Do you have a problem with it?

5          MR. O'BRIEN:  Can I see it again?

6          THE COURT:  Yeah.

7          MR. O'BRIEN:  The copy I have is more highlighted

8  than that.  It's all yellow.

9          MR. BRANDLER:  That's fine, whatever.

10          THE COURT:  Yes, go ahead.

11          MR. BRANDLER:  So on the verdict form --

12          THE COURT:  Yes.

13          MR. BRANDLER:  -- there's a typographical error,

14  first of all, on Count 23, it says 1844.  It should be 1344.

15          THE COURT:  Wait a minute.  Count 20- --

16          MR. BRANDLER:  3, the last one.

17          THE COURT:  Should be what?

18          MR. BRANDLER:  It should be 1344 not 1844.

19          THE COURT:  Okay.

20          MR. BRANDLER:  And then on Counts 18 through 22,

21  which are the false statements counts, they all read exactly

22  the same, you know, that it's on the charge of making a false

23  statement in a bankruptcy filing.

24          THE COURT:  Yeah.

25          MR. BRANDLER:  But it doesn't identify what the false

1   statement is, and without the indictment I don't know how the

2   jury is going to remember that Count 22 --

3           THE COURT:  All right.  Let's straighten it out.

4   What is 18?

5           MR. BRANDLER:  18 is false statements relating to

6   assets totalling 765 million dollars, including ten million

7   barrels of oil.

8           THE COURT:  Assets totalling --

9           MR. BRANDLER:  765 million dollars, including 10

10  million barrels of oil worth 700 million.  And that's the same

11  language for Count 19.

12          THE COURT:  Wait a minute.  You want me to add

13  relating to amounts totalling 765 million dollars relating to

14  10 million barrels of oil.  And then was there more?

15          MR. BRANDLER:  Yes.

16          THE COURT:  Valued at?

17          MR. BRANDLER:  Valued at 700 million dollars.

18          THE COURT:  Do we have to put all that in?

19          MR. BRANDLER:  Well, that's what's in the indictment.

20  I don't want to -- I mean, that's exactly the language from the

21  indictment.

22          THE COURT:  Why can't we just say relating to assets

23  totalling 765 million dollars?

24          MR. BRANDLER:  I'm fine with that.

25          THE COURT:  Okay.

1    MR. BRANDLER:  And that's the same things in Count

2    19.

3    THE COURT:  That would be the same language?

4    MR. BRANDLER:  Same language in Count 19.

5    THE COURT:  Okay.

6    MR. BRANDLER:  Count 20, the false statement is the

7    omission of Silverstein, the SEC and the United States as

8    creditors.

9    THE COURT:  So, relating to --

10   MR. BRANDLER:  The omission of Mr. Silverstein, the

11   Securities and Exchange Commission and the United States as

12   creditors.

13   THE COURT:  Mr. Silverstein, the Securities and

14   Exchange Commission?

15   MR. BRANDLER:  Right.

16   THE COURT:  And what was the other one?

17   MR. BRANDLER:  The United States.

18   THE COURT:  Is it just the omission of associate or

19   debts involving.

20   MR. BRANDLER:  Debts involving.

21   THE COURT:  Related to the omission of the debts --

22   of debts involving Mr. Silverstein, Securities and Exchange

23   Commission and the United States.  Okay.

24   MR. BRANDLER:  Count 21 --

25   THE COURT:  Yes.

1          MR. BRANDLER:  -- is the omission of listing himself

2    as an officer of RJH and Company.

3          THE COURT:  Okay.

4          MR. BRANDLER:  And Count 22 is the failure to list

5    all personal property, including art objects.

6          THE COURT:  Well, is it only that or is it --

7          MR. BRANDLER:  It's including art objects.  That's

8    the way the indictment is phrased.

9          THE COURT:  Well, what would be wrong with failure to

10   list the art objects?

11         MR. BRANDLER:  I don't have a problem with it.

12         THE COURT:  Do you have a problem with that Mr.

13   O'Brien?

14         MR. O'BRIEN:  No, your Honor.

15         THE COURT:  Let's do it that way.  It's quieter that

16   way.  Okay?

17         MR. BRANDLER:  That's it.

18         THE COURT:  All right.  We'll make those changes.

19              (Whereupon, a recess was taken.)

20         THE COURT:  All right.  Okay.  All right.  Members of

21   the jury, I'm going to instruct you now on the law that you

22   will apply to the facts as you find them from the evidence in

23   the case.  While I'm doing this I'm also recording it on a

24   tape-recorder, which you will take with you into the jury room

25   in the event you want to refer back to any instruction that I

give.  And consequently, I'm also going to give you an outline
of the title of each of the instructions that I'm giving, so if
you do want to hear them again or hear one or two again, at
least you'll know generally in order where they appear.  That
way you can move to that point in the recording.

So, I'm going to start now.  The role of the jury.
You have seen and heard all of the evidence and the arguments
of the lawyers.  I now will instruct you on the law.  You have
two duties as a jury.  Your first duty is to decide the facts
from the evidence that you have heard and seen in court here
during this trial.  This is your job and yours alone.  I play
no part in finding the facts.

As I told you at the outset, you should not take
anything that I may have said or done during this trial as
indicating what I think of the evidence or what I think your
verdict should be.  Your second duty is to apply the law that I
give to you to the facts that you find from the evidence in the
case.  My role now is to explain to you the legal principles
that must guide you in your decisions.  You must apply my
instructions carefully.

Each of the instructions is important and you must
apply them all.  You must not substitute or follow your own
notion or opinion about what the law is or what it ought to be.
You must apply the law that I give to you, whether you agree
with it or not.  Whatever your verdict, it will have to be

1   unanimous.  All of you will have to agree on it or there will

2   be no verdict.

3           In the jury room you will discuss the case among

4   yourselves, but ultimately each of you will have to make up his

5   or her own mind.  This is a responsibility that each of you has

6   and you cannot avoid.

7           During your deliberations you must not communicate

8   with or provide any information to anyone by any means about

9   this case.  You may not use any electronic device, media, such

10  as a telephone, cell phone, smart phone, iPhone, Blackberry or

11  computer, the internet or any internet service, any text or

12  instant messaging service, any internet chat room, blog or

13  website, such as facebook, Myspace, Linked In, YouTube or

14  Twitter to communicate to anyone any information about the case

15  or to conduct any research about this case.

16          In other words, you cannot talk to anyone on the

17  phone, correspond with anyone or electronically communicate

18  with anyone about this case.  You can only discuss this case in

19  the jury room with your fellow jurors during your deliberation.

20  You may not use any electronic means to investigate or

21  communicate about the case, because as I have said time and

22  time again, it is important for you to decide this case based

23  solely on the evidence presented here in this courtroom.  You

24  are only permitted to discuss the case with your fellow jurors

25  during deliberations, because they have seen and heard the same

1  evidence as you have.  In our judicial system it is important

2  that you are not influenced by anything or anyone outside of

3  the courtroom.

4       Perform your duties fairly and impartially.  Do not

5  let sympathy, prejudice, fear or public opinion influence -- to

6  influence you.  You should also not be influenced by any

7  person's race, color, religion, national ancestry or gender.

8       I'm going to talk to you now about evidence.  I did

9  tell you about this at the beginning, again, I'm going to tell

10  you about evidence.  You must make your decision in this case

11  based solely on the evidence that you saw and heard in this

12  courtroom.  Don't let rumors, suspicions or anything else that

13  you may have seen or heard outside of the court influence your

14  decision in any way.

15       The evidence from which you are to find the facts

16  consist of the following.  The testimony of the witnesses;

17  documents and other things received as exhibits; and any fact

18  or testimony that was stipulated that is formally agreed to by

19  the parties.

20       The following things are not evidence:  The

21  indictment; statements and arguments by the lawyers for the

22  parties in this case; questions by the lawyers and questions --

23  well, I don't believe I asked any questions.  Questions by the

24  lawyers.  Objections by the lawyers, including objections in

25  which the lawyers stated facts.  Any testimony that I told you

1  to disregard and anything that you may have seen or heard

2  outside of the courtroom about the case.

3          You should use your common sense in weighing the

4  evidence.  Consider it in light of your every day experience

5  with people and events, and give it whatever weight you believe

6  it deserves.  If your experience and common sense tells you

7  that certain evidence reasonably leads to a conclusion, you may

8  reach that conclusion.

9          As I told you in my preliminary instructions, the

10 Rules of Evidence control what can be received in evidence.

11 During the trial the lawyers objected when they thought that

12 certain evidence that was being offered was not permitted by

13 the Rules of Evidence.  These objections simply meant that the

14 lawyers were asking me to decide whether the evidence should be

15 allowed under the rules.

16         You should not be influenced by the fact that an

17 objection was made.  You should also not be influenced by any

18 of my rulings on objections or any side-bar conferences that

19 you may have overheard.  When I overruled the objection the

20 question -- when I overruled the objection the question was

21 answered or the exhibit was received in evidence, and you

22 should treat that testimony or exhibit as any other.  When I

23 allowed evidence -- I don't believe this happened, but if it

24 did I'm going to give you the instruction.  When I allowed

25 evidence such as testimony or exhibits for a limited purposes

1  only I instructed you to consider that evidence only for that

2  limited purpose, and you must do that.

3        When I sustained an objection the question was not

4  answered or the exhibit was not received in evidence.  You must

5  disregard the question or the exhibit entirely.  Do not think

6  or guess about what the witness might have said in answer to

7  the question.  Do not think or guess about what the exhibit

8  might have shown.  Sometimes a witness may have already

9  answered before an objection was made or before I ruled on the

10 objection.  If this happened and I sustained the objection you

11 must disregard the answer that was given.  Also, if I ordered

12 -- I don't believe I did that.

13        Although the lawyers may have called your attention

14 to certain facts or factual conclusions that they may have

15 thought were important, what the lawyer said is not evidence

16 and is not binding on you.  It is your own recollection and

17 interpretation of the evidence that controls your decision in

18 this case.  Also, don't assume from anything that I may have

19 said or done during this trial that I have an opinion about any

20 of the issues in the case or about what your verdict ought to

21 be.  I'm going to instruct you on direct and circumstantial

22 evidence, you'll remember that I did that at the beginning of

23 the case.  I'm going to do that again.  There are two types of

24 evidence which may be used in this trial, direct evidence and

25 circumstantial evidence.  You may use both types of evidence in

1  reaching your verdict.

2         Direct evidence is simply evidence which if believed

3  directly proves a fact.  An example of direct evidence occurs

4  when a witness testifies about something the witness knows from

5  the witness's own sense.  Something the witness has seen,

6  touched, heard or smelled.  Circumstantial evidence is evidence

7  which if believed indirectly proves a fact.  It is evidence

8  that proves one or more facts from which you could reasonably

9  find or infer the existence of some other fact or facts.  A

10  reasonable inference is simply a deduction or conclusion that

11  reason, experience and common sense lead you to make from the

12  evidence.

13         A reasonable inference is not a suspicion or a guess,

14  it is a reasoned logical decision to find that a disputed fact

15  exist on the basis of another fact.  As I told you about -- I

16  gave you the rain coat example or the rain example.  If someone

17  came into court, took an oath and testified it was raining

18  outside and you believed the witness, that would be direct

19  evidence that it was raining outside.

20         An example of circumstantial evidence would be if

21  someone came in with a wet rain coat or a wet umbrella, that

22  would be circumstantial evidence from which you can conclude

23  that it was raining outside.

24         Sometimes different inferences may be drawn from the

25  same set of facts.  The government may ask you to draw one

1  inference and the defense may ask you to draw another.  You and

2  you alone must decide what reasonable inferences you will draw

3  based on the evidence and your reason, experience and common

4  sense.

5          You should consider all of the evidence that is

6  presented at this trial, both direct and circumstantial

7  evidence.  The law makes no distinction between the weight that

8  you should give either direct or circumstantial evidence.  It's

9  for you to decide how much weight to give to any evidence.

10          Credibility of witnesses.  I'm going to instruct you

11 now on credibility of witnesses.  As I stated in my preliminary

12 instructions at the beginning of this trial, in deciding what

13 facts you must decide and what -- in deciding what the facts

14 are, you must decide what testimony you believe and what

15 testimony you do not believe.  You are the sole judges of the

16 credibility of the witnesses.  Credibility is a witness's

17 worthiness of belief.  Was the witness truthful?  Was the

18 witness's testimony accurate?  You may believe everything a

19 witness says, only part of what a witness says or none of what

20 a witness says.

21          You may decide whether to believe a witness based on

22 the witness's behavior or manner while testifying, the

23 explanations the witness gave and all other evidence in the

24 case just as you would in any matter -- in any important matter

25 where you are trying to decide if a person is truthful,

1  straightforward and accurate in his or her recollection.

2          In deciding the question of credibility, remember to

3  use your common sense, good judgment and your experience.  In

4  deciding what to believe, you may consider a number of factors,

5  including the opportunity and ability of the witness to see or

6  hear or know the things about which the witness testified; the

7  quality of the witness's knowledge, understanding and memory;

8  the witness's appearance and behavior and manner while

9  testifying; whether the witness has an interest in the outcome

10  of the case or any motive, bias or prejudice; any relation the

11  witness may have with the party in the case; and any effect the

12  verdict may have on that witness.

13          Whether the witness said or wrote anything before

14  trial that was different from the witness's testimony here in

15  court.  Whether the witness's testimony was consistent or

16  inconsistent with other evidence that you believe.  And any

17  other factors that bear on whether the witness should be

18  believed.

19          Now, remember, I told you also that you should use

20  all of the tests for truthfulness when you decide credibility.

21  You should use all of the tests for truthfulness that you would

22  use in a matter of importance to you in your every day life.

23          Inconsistencies or discrepancies in a witness's

24  testimony or between the testimony of different witnesses may

25  or may not cause you to disbelieve a witness's testimony.  Two

1   or more persons witnessing an event may simply see or hear it

2   differently.  Mistaken recollection, like failure to recall, is

3   a common human experience.  And weighing the effect or

4   inconsistency -- and weighing the effect of an inconsistency

5   you should also consider whether it was about a matter of

6   importance or an insignificant detail.  You should also

7   consider whether the inconsistency was innocent or intentional.

8           You are not required to accept testimony even if the

9   testimony was not contradicted and the witness was not

10  impeached.  You may decide that the witness is not worthy of

11  belief because of the witness's bearing and demeanor, or

12  because of the inherent improbability of the witness's

13  testimony, or for other reasons that are sufficient to you.

14          After you make your judgment about believability of a

15  witness, you can then attach to that witness's testimony the

16  importance or weight that you think it deserves.  The weight of

17  the evidence to prove a fact does not necessarily depend on the

18  number of witnesses who testified or the quantity of evidence

19  that was presented.  What is more important than numbers or

20  quantity is how believable the witnesses were and how much

21  weight you think their testimony deserves.

22          Although the government -- not all evidence -- not.

23          All witnesses needed is the title of this

24  instruction.  Although the government is required to prove the

25  defendant guilty beyond a reasonable doubt, the government is

1  not required to present all possible evidence related to the

2  case or to produce all possible witnesses who might have some

3  knowledge about the facts of the case.  In addition, as I have

4  explained, the defendant is not required to present any

5  evidence or produce any witnesses.

6          In this case, Mr. Harley presented evidence.  Mr.

7  Harley is not required to present all possible evidence related

8  to the case or produce all possible witnesses who might have

9  some knowledge about the facts of the case.

10          Presumption of innocence, burden of proof and

11  reasonable doubt.  The Defendant Richard Harley pleaded not

12  guilty to the offenses charged.  Mr. Harley is presumed to be

13  innocent.  He started this trial with a clean slate and no

14  evidence against him.  Presumption of innocence stays with Mr.

15  Harley unless and until the government has presented evidence

16  that overcomes the presumption by convincing you that Mr.

17  Harley is guilty of the offenses charged beyond a reasonable

18  doubt.

19          Presumption of innocence requires that you find Mr.

20  Harley not guilty unless you are satisfied the government has

21  proved guilt beyond a reasonable doubt.  Presumption of

22  evidence means that Mr. Harley has no burden or obligation to

23  present any evidence at all to prove that he is not guilty.

24  The burden or obligation of proof is on the government to prove

25  that Mr. Harley is guilty and that burden stays with the

government throughout this trial.  In order for you to find Mr.

Harley guilty of the offenses charged, the government must

convince you that Mr. Harley is guilty beyond a reasonable

doubt.  This means that the government must prove each and

every element of the offenses charged beyond a reasonable

doubt.  A defendant may not be convicted based on suspicion or

conjecture, but only on evidence proving guilt beyond a

reasonable doubt.

Proof beyond a reasonable doubt does not mean proof

beyond all possible doubt, or to a mathematical certainty.

Possible doubts or doubts based on conjecture, speculation or

hunch are not reasonable doubt.  A reasonable doubt is a fair

doubt based on reason, logic, common sense or experience.  It

is a doubt that an ordinary reasonable person has after

carefully weighing all of the evidence.  And it is a doubt of

the sort that would cause him or her to hesitate to act in

matters of importance in his or her own life.  It may arise

from the evidence or from the lack of evidence or from the

nature of the evidence.

If having now heard all of the evidence you are

convinced that the government prove each and every element of

the offense charged beyond a reasonable doubt you should return

a verdict of guilty for that offense.  However, if you have a

reasonable doubt about one or more of the elements of the

offense charged, then you must return a verdict of not guilty

1  of that offense.

2          Nature of indictment.  As you know, Mr. Harley is

3  charged in an indictment with violating federal law,

4  specifically wire fraud, bankruptcy fraud, false statements in

5  bankruptcy filing and bank fraud.  As I explained at the

6  beginning of the trial, an indictment is just a formal way of

7  specifying the exact crimes that Mr. Harley is accused of

8  committing.  An indictment is simply a description of the

9  charges against him.

10         It is an accusation only.  An indictment is not

11 evidence of anything.  And you should not give it any weight --

12 you should not give any weight to the fact that Mr. Harley has

13 been indicted in making your decision in this case.

14         I'm going to instruct you now on the term on or

15 about.  You have heard that the indictment charges that the

16 offenses were committed on or about the certain date.  The

17 government does not have to prove with certainty the exact date

18 of the alleged offense.  It is sufficient that the government

19 prove beyond a reasonable doubt that the offense was committed

20 on a date reasonably near the date alleged.

21         Stipulations of fact.  The government and the

22 defendant have agreed that in Counts 1 through 15 all

23 communications traveled in interstate commerce.  Therefore,

24 they have agreed that is true.  You should therefore treat

25 these facts as having been proved.  That is, that all

1 communications in Counts 1 through 15 traveled in interstate

2 commerce.  You are not required to do so, however, since you

3 are the sole judges of the facts.

4        Audio recordings, consensual, I'm going to instruct

5 you on that.  During this trial you heard audio or sound

6 recordings of conversations with Mr. Harley made without his

7 knowledge.  These recordings were made with the consent and

8 agreement of one of the other parties to the conversations.

9 The use of this procedure to gather evidence is lawful and the

10 recordings may be used by either party.

11        I'm going to instruct you now on opinion evidence.

12 Expert witnesses.  The Rules of Evidence ordinarily do not

13 permit witnesses to state their own opinions about important

14 questions in a trial.  But there are exceptions to these rules.

15 In this case you heard testimony from David Weiss about art;

16 from Massey about oil and real estate; and Donald Kesterson

17 about geology, petroleum geology, who offered their opinions.

18        Because of their knowledge, skill, experience,

19 training or education in the field of art, oil and petroleum

20 geology, Mr. Weiss, Mr. Massey and Mr. Kesterson were permitted

21 to offer opinions in those fields and to give the reasons for

22 those opinions.

23        The opinions of these witnesses -- the opinions these

24 witnesses state should receive whatever weight you think is

25 appropriate given all the other evidence in the case.

1          In weighing this opinion testimony you may consider

2   the witness's qualifications, the reasons for the witness's

3   opinions and the reliability of the information supporting the

4   witnesses opinions, as well as any other factors discussed in

5   these instructions for weighing the testimony of the witnesses.

6   You may disregard these opinions entirely if you decide that

7   the opinions are not based on sufficient knowledge, skill,

8   experience, training or education.

9          You may also disregard the opinions if you conclude

10  that the reasons given in support of the opinions are not

11  sound.  Or if you conclude that the opinions are not supported

12  by the facts shown by the evidence, or if you think the

13  opinions are outweighed by other evidence.

14          I'm going to instruct you now on credibility of

15  witnesses, law enforcement officers.  You have heard the

16  testimony of law enforcement officers.  The fact that a witness

17  is employed as a law enforcement officer does not mean that

18  their testimony necessarily deserves more or less consideration

19  or greater or lessor weight than any other witness.  You must

20  decide after reviewing all of the evidence whether you believe

21  the testimony of the law enforcement witness and how much

22  weight if any it deserves.

23          Impeachment of witness's prior inconsistent statement

24  for credibility only.  You have heard the testimony of certain

25  witnesses.  You have also heard that before this trial they

1  made statements that may be different from their testimony here

2  at trial.  It is up to you to determine whether these

3  statements were made and whether they were different from the

4  witness's testimony in this trial.

5       These earlier statements were brought to your

6  attention only to help you decide whether to believe the

7  witness's testimony here at trial.  You could not use it as

8  proof of truth of what the witness said in the earlier

9  statements.  You can only use it as one way of evaluating the

10 witness's testimony here at trial.  You have also heard

11 evidence that certain witnesses made statements before this

12 trial that were given before the grand jury, and that may be

13 different from their testimony here at trial.

14      When the statement is made before the grand jury you

15 may not only -- you may not only use it to help you decide

16 whether the witness -- whether you believe the witness's

17 testimony in this trial, but you may also use it as evidence of

18 the truth of what the witness said in the earlier statement.

19 But when a statement is not given before a grand jury, you may

20 use it only to help you decide whether to believe the witness's

21 testimony here at trial, not as proof of the truth of what the

22 witness said in the earlier statement.

23      I'm going to instruct you now on the defendant's

24 choice not to testify.  Mr. Harley did not testify in this

25 case.  A defendant has an absolute constitutional right not to

testify.  The burden of proof remains on the prosecution

throughout the entire trial and never shifts to the defendant.

The defendant is never required to prove that he is innocent.

You must not attach any significance to the fact that Mr.

Harley did not testify.  You must not draw any adverse

inference against him because he did not take the witness stand

and testify.  Do not consider any reason at all the fact that

Mr. Harley did not testify.  Do not discuss that fact during

your deliberations or let it influence you in any way.

I'm going to instruct you now on proof of state of

mind, intentionally, knowingly, willfully.  Often the state of

mind with which a person acts at a given time cannot be proved

directly, because one cannot read another person's mind and

tell you what that person is thinking.  However, Mr. Harley's

state of mind can improve indirectly from surrounding

circumstances.  Thus, to determine Mr. Harley's state of mind,

that is to say what Mr. Harley intended or knew at a particular

time, you may consider evidence about what he said, about what

he did, about what he failed to do, about how he acted, and any

other facts or circumstances shown by the evidence that may

prove what was in Mr. Harley's mind at the time.

It is entirely up to you to decide what the

evidence -- what the evidence presented during this trial

proves or fails to prove about Mr. Harley's state of mind.  You

may also consider the natural and probable results or

1  consequences of any acts Mr. Harley knowingly did, and whether

2  it is reasonable to conclude whether -- reasonable to conclude

3  that Mr. Harley intended those results or consequences.

4         You may find but you're not required to find that Mr.

5  Harley knew and intended the natural and probable consequences

6  or results of facts he knowingly did.  This means that if you

7  find that an ordinary person in Mr. Harley's situation would

8  have naturally realized that certain consequences would result

9  from his actions, then you may find, but you are not required

10 to find, that Mr. Harley did know and did intend that those

11 consequences would result from his actions.  This is entirely

12 up to you to decide as the finders of fact in this case.

13         I'm going to instruct you now on knowingly.  The

14 offenses of wire fraud, bankruptcy fraud, false statements in

15 bankruptcy filing and bank fraud charged in the indictment

16 require the government prove that Mr. Harley acted knowingly

17 with respect to certain elements of the offense.  This means

18 that the government must prove beyond a reasonable doubt that

19 Mr. Harley was conscious and aware of the nature of his actions

20 and of the surrounding facts and circumstances as specified in

21 the definition of the offenses charged.

22         In deciding whether Mr. Harley acted knowingly, that

23 is with knowledge, you may consider evidence about what he

24 said, about what he did, about what he failed to do, about how

25 he acted, and any other facts and circumstances shown by the

1  evidence that may prove what was in Mr. Harley's mind at the

2  time.  The government is not required to prove that Mr. Harley

3  knew that his acts were against the law.

4        Intentionally.  I'm going to instruct you now on

5  intentionally.  The offenses of wire fraud, bankruptcy fraud,

6  false statements in bankruptcy filing and bank fraud charged in

7  the indictment require the government prove that Mr. Harley

8  acted intentionally, that is with intent, with respect to

9  certain elements of the offense.  This means -- offenses, I'm

10 sorry.  With respect to certain elements of the offenses.

11       This means that the government must prove beyond a

12 reasonable doubt either, one, it was Mr. Harley's conscious

13 desire or purpose to act in a certain way or cause a certain

14 result.  Or two, that Mr. Harley knew he was acting in a way

15 that would be practically certain to cause that result.

16       In deciding whether Mr. Harley acted intentionally

17 with intent you may consider evidence about what Mr. Harley

18 said, what he did, what he failed to do, how he acted, and any

19 other facts and circumstances shown by the evidence that may

20 prove what was in Mr. Harley's mind at that time.

21       Motive.  Motive explained.  Motive is not an element

22 of any of the offenses with which Mr. Harley is charged.  Proof

23 of bad motive is not required to convict.  Further, proof of

24 bad motive alone does not establish that Mr. Harley is guilty.

25 And proof of good motive alone does not establish that he is

1  not guilty.

2        Evidence of Mr. Harley's motive may, however, help

3  you find his intent.  Intent and motive are different concepts.

4  Motive is what prompts a person to act.  Intent refers to the

5  state of mind with which a particular act is done.  Personal

6  advancement and financial gain, for example, are motives for

7  much human conduct.  However, these motives may prompt one

8  person to intentionally do something perfectly acceptable while

9  prompting another to intentionally do an act that is a crime.

10        I'm going to instruct you now on willfully.  The

11  offense of making false statements in connection with

12  bankruptcy filings, Counts 18 through 22 charged in the

13  indictment, require the government to prove that Mr. Harley

14  acted willfully with respect to making false statements charged

15  in the indictment.  This means the government must prove beyond

16  a reasonable doubt Mr. Harley knew his conduct was unlawful and

17  intended to do something the law forbids.  That is, to find Mr.

18  Harley acted willfully, you must find that the evidence proved

19  beyond a reasonable doubt that Mr. Harley acted with a purpose

20  to disobey or disregard the law.

21        Willfully does not, however, require proof that Mr.

22  Harley had any evil motive or bad purpose other than the

23  purpose to disobey or disregard the law.

24        I'm going to instruct you now on willful blindness.

25  If you find Mr. Harley guilty of certain offenses you must find

1  that the government proved beyond a reasonable doubt that Mr.

2  Harley knew that neither he nor RJH and Co., did not own any

3  valuable oil in Texas, or that neither he nor RJH and Co.,

4  didn't own any valuable treasury checks.  In this case there is

5  a question about whether Mr. Harley knew these facts.  When in

6  this case knowledge of a particular fact or circumstance is an

7  essential part of the offense charged, the government may prove

8  that Mr. Harley knew of that fact or circumstance if the

9  evidence proves beyond a reasonable doubt that Mr. Harley

10  deliberately closed his eyes to what otherwise would have been

11  obvious to him.

12          No one can avoid responsibility for a crime by

13  deliberately ignoring what is obvious.  You may not find that

14  Mr. Harley knew these facts if you find that the defendant Mr.

15  Harley actually believed that these facts did not exist.

16          Also, you may not find that Mr. Harley knew those

17  facts if you find only that Mr. Harley consciously disregarded

18  a risk that the fact existed, or that Mr. Harley should have

19  known that the facts existed, or that a reasonable person would

20  have known of a high probability that the facts existed.  It is

21  not enough that Mr. Harley may have been reckless or stupid or

22  foolish, or may have acted out of inadvertence or accident.

23  You must find that Mr. Harley himself actually believed that

24  there was a high probability of the existence of these facts

25  and consciously took deliberate actions to avoid learning about

1    it, and did not actually believe that it did not exist.

2           I'm going to instruct you now on the good faith

3    defense.  The offenses of wire bankruptcy fraud and false

4    statements in bankruptcy filing charged in the indictment

5    require proof that Mr. Harley acted with the intent to defraud.

6    If you find Mr. Harley acted in good faith that would be a

7    complete defense to the -- this charge, because good faith on

8    the part of Mr. Harley would be inconsistent with his acting

9    with the intent to defraud.  A person acts in good faith when

10   that person has an honestly held belief, opinion or

11   understanding that his statements are true, even though the

12   belief, opinion or understanding turns out to be inaccurate or

13   incorrect.

14          Thus, in this case Mr. Harley made an honest mistake

15   or had an honest misunderstanding about the truth of his

16   statements, then he did not act with the intent to defraud.

17   Mr. Harley does not have the burden of proving good faith.

18   Good faith is a defense because it is not consistent with the

19   requirement of the offenses charged -- with the requirement of

20   the offenses charged that he acted with the intent to defraud.

21          As I told you, it is the government's burden of proof

22   -- burden to prove beyond a reasonable doubt each element of

23   the offense -- to prove each element of the offense, including

24   the mental state element.  In deciding whether the government

25   proved Mr. Harley acted with the intent to defraud, or instead

1  whether he acted in good faith, you should consider all of the

2  evidence presented that may bear on Mr. Harley's state of mind.

3        If you find from the evidence that Mr. Harley acted

4  in good faith as I have defined it, or if you find for any

5  other reason the government has not proved beyond a reasonable

6  doubt Mr. Harley acted with the intent to defraud you must find

7  Mr. Harley not guilty of the offense of wire, bank, bankruptcy

8  fraud and false statements in bankruptcy filing.

9        Now, I'm going to instruct you on the elements of the

10  offenses charged, and I'm beginning with wire, bank, bankruptcy

11  fraud, scheme to defraud or obtain money for property defined.

12  The first element that the government must prove beyond a

13  reasonable doubt with respect to the wire, bankruptcy and bank

14  fraud charges is that Mr. Harley knowingly devised a scheme to

15  defraud one or more victims of money or property by materially

16  false or fraudulent pretenses, representations or promises.  A

17  scheme is merely -- merely a plan for accomplishing an object.

18        Fraud is a general term that embraces all of the

19  various means by which one person can engage an advantage over

20  another by false representations, suppression of the truth or

21  deliberate disregard of the truth.  Thus, a scheme to defraud

22  is any plan, device or course of action to deprive another of

23  money or property by means of false or fraudulent pretenses,

24  representations or promises reasonably calculated to deceive

25  persons of average prudence.

1       In this case the indictment alleges that the schemes

2  to defraud were carried out by making false or fraudulent

3  statements, representations, claims and documents.  The

4  representations with the government -- the representations

5  which the government charges were made as part of the scheme to

6  defraud.  The government is not required to prove every

7  representation charged in the indictment is sufficient if the

8  government proves beyond a reasonable doubt that one or more of

9  the alleged material misrepresentations were made in

10 furtherance of the alleged scheme to defraud.

11       However, you cannot convict a defendant unless all of

12 you agree as to at least one of the material

13 misrepresentations.  A statement, representation, claim or

14 document is false if it is untrue and made, and if the person

15 making this statement, representation, claim or document or

16 causing it to be made knew that it was untrue at the time it

17 was made.  A representation or statement is fraudulent if it

18 was falsely made with the intent to deceive.  In addition,

19 deceitful statements of half truths or concealment of material

20 facts or the expression of an opinion not honestly entertained

21 may constitute false or fraudulent statements.

22       The arrangement of words or circumstances -- or the

23 circumstances in which they are used may convey the false and

24 deceptive appearance.  The deception need not be premised upon

25 spoken or written words alone.  If there is deception, the

1   manner in which it is accomplished is not material.  The

2   failure to disclose material may constitute a fraudulent

3   representation.  If the defendant was under a legal

4   professional or contractual duty to make such a disclosure, and

5   actually knew the disclosure ought to be made, and the

6   defendant failed to make such disclosure with the intent to

7   defraud.

8           The false or fraudulent representation must relate to

9   the material fact or matter.  A material fact is one which

10  would reasonably be expected to be of concern to a reasonable

11  and prudent person relying on the representation or statement

12  in making a decision.

13          This means that if you find in a particular statement

14  a fact was false, you must determine whether the statement was

15  one that a reasonable person or investor may consider

16  important -- may have considered important in making his or her

17  decision.  The same principal applies to fraudulent half truths

18  or omissions of material facts.

19          In order to establish a scheme to defraud the

20  government must also prove that the alleged scheme contemplated

21  depriving another of money or property.  However, the

22  government is not required to prove that Mr. Harley himself

23  originated the scheme to defraud.  Furthermore, it is not

24  necessary that the government prove Mr. Harley actually

25  realized that he gained from the scheme, or that the intended

1  victim actually suffered any loss.

2        In this case it so happens that the government does

3  contend that the proof establishes that there were persons --

4  there were persons defrauded and that Mr. Harley profited.

5  Although whether or not the scheme actually succeeded is really

6  not the question.  You may consider whether it succeeded in

7  determining whether a scheme existed.

8        If you find the government has proved beyond a

9  reasonable doubt that schemes to defraud charged in the

10  indictment did exist and that the defendant, Mr. Harley,

11  knowingly devised or participated in the scheme as charged in

12  the indictment, then you should then consider the other

13  elements of the offenses.

14        I'm going to instruct you now on wire, bankruptcy

15  fraud.  Counts 1 through 15, 16, 17 and 23 of the indictment

16  charging Mr. Harley with wire bankruptcy fraud and bank fraud

17  allege a number of separate schemes or plans to defraud and

18  schemes or plans to obtain money or profiting by means of false

19  or fraudulent pretenses, representations or promises.  The

20  government is not required to prove all of the schemes or plans

21  to defraud, or all of the schemes or plans to obtain money or

22  property by means of false or fraudulent pretenses,

23  representations or promises, or all of the false or fraudulent

24  pretenses, representations or promises that are alleged.

25        However, each of you must agree with each of the

 1  other jurors that the same scheme or plan to defraud or scheme

 2  or plan to obtain money or property by means of false or

 3  fraudulent pretenses, representations or promises alleged in

 4  Counts 1 through 15, 16 and 17 and 23 were in fact employed by

 5  Mr. Harley.  The jury need not unanimously agree on each scheme

 6  or plan, but in order to convict Mr. Harley you must

 7  unanimously agree upon at least one such scheme or plan as a

 8  scheme or plan that was knowingly used by Mr. Harley.

 9         Unless each of you agrees that the government has

10  proved the same scheme or plan to defraud or scheme or plan to

11  obtain money or property by means of false or fraudulent

12  pretenses, representations or promises beyond a reasonable

13  doubt, you must find Mr. Harley not guilty of the wire and bank

14  fraud charge charged in Counts 1 through 15, 16 and 17 and 23

15  of the indictment.

16         I'm going to instruct you now on wire, bank,

17  bankruptcy fraud, intent to defraud.  Another element the

18  government must prove beyond a reasonable doubt with respect to

19  wire fraud, bankruptcy fraud, bank fraud, and bank fraud

20  charged is that Mr. Harley acted with the specific intent to

21  defraud.  To act with the intent to defraud means to act

22  knowingly, and with the intention or purpose to deceive or to

23  cheat.

24         In considering whether Mr. Harley acted with an

25  intent to defraud you may consider among other things whether

1  Mr. Harley acted with a desire or purpose to bring about some

2  gain or benefit to himself or someone else, or with a desire or

3  purpose to cause some loss to someone.

4        I'm going to instruct you now on wire fraud, elements

5  of the offense.  Counts 1 through 15 of the indictment charged

6  Mr. Harley with wire fraud in violation of federal law.  In

7  order to find him guilty of this offense you must find that the

8  government proved each of the following three elements beyond a

9  reasonable doubt.  First, that Mr. Harley devised a scheme to

10 defraud or to obtain money or property by materially false or

11 fraudulent pretenses, representations or promises.

12       (Pause.)

13       THE COURT:  Because my tape-recording turned off I'm

14 going to start this one over.  I will instruct you now on wire

15 fraud, elements of the offense.  Counts 1 through 15 of the

16 indictment charges Mr. Harley with wire fraud, which is a

17 violation of federal law.  In order to find him guilty of this

18 offense you must find the government prove each of the

19 following elements beyond a reasonable doubt:  First element,

20 that Mr. Harley devised a scheme to defraud money or property

21 by materially false or fraudulent pretenses, representations or

22 promises.  Second element, that Mr. Harley acted with the

23 intent to defraud.

24       Third element.  In advancing, furthering or carrying

25 out the scheme Mr. Harley transmitted any writing, signal or

1  sound by means of wire, radio, television communication in

2  interstate commerce, or caused the transmission of any writing,

3  signal, sound of some kind or means of a radio, wire,

4  television communication in interstate commerce.

5           Next one, I'm going to instruct you on wire fraud,

6  transmission by means of wire, radio or television

7  communication in interstate commerce defined.  I've already

8  instructed you on the first two elements of this offense.  The

9  third element is that the government must prove beyond a

10  reasonable doubt that advancing, furthering or carrying out the

11  scheme Mr. Harley transmitted wire -- transmitted in writing,

12  signal or sound by means of wire, radio or television

13  communication in interstate commerce, or caused the

14  transmission of a writing, signal or sound of some kind by

15  means of wire, radio or television communication in interstate

16  commerce.

17           The phrase transmits by wire -- by means of wire,

18  radio or television communication in interstate commerce means

19  to send from one state to another by means of telephone,

20  telegraph lines or by means of radio or television.  The phrase

21  includes the telephone conversation by a person in one state

22  with a person in another state, or electronic signal sent from

23  one state to another, such as by fax or financial wire.  Use of

24  the internet to send a message such as an e-mail or to

25  communicate with a website may constitute a wire transmission

1  in interstate commerce.  The government is not required to

2  prove that Mr. Harley actually used a wire communication in

3  interstate commerce or even intended anything to be transmitted

4  in interstate commerce by means of wire, radio or television

5  communication to further or to advance or carrying out the

6  scheme, or plan to defraud -- or plan for obtaining money or

7  other property by means of false or fraudulent pretenses,

8  representations or promises.

9          However, the government must prove beyond a

10 reasonable doubt that transmission by wire, radio or television

11 communication facility in interstate commerce was in fact used

12 in some manner to further or to advance or to carry out the

13 scheme to defraud.  The government must also prove either that

14 Mr. Harley used radio wire or television communication in

15 interstate commerce, or that he knew that the use of the wire,

16 radio or television communication in interstate commerce would

17 follow in the ordinary course of business or events, or that

18 Mr. Harley should reasonably have anticipated that wire, radio,

19 or television communication in interstate commerce would be

20 used.

21         It is not necessary that the information transmitted

22 by means of wire, radio or television communication in

23 interstate commerce itself was false or fraudulent, or

24 contained any false or fraudulent pretense, representation or

25 promise, or contained any request for money or thing of value.

1          However, the government must prove beyond a

2     reasonable doubt that the use of the wire, radio or television

3     communication in interstate commerce furthered or advanced or

4     carried out in some way the scheme.

5          Wire fraud.  Each transmission by wire communication

6     is a separate offense.  Each transmission by wire communication

7     in interstate commerce to advance or to further or to carry out

8     a scheme or plan may be a separate violation of the wire fraud

9     statute or law.

10          Now I'm going to instruct you on bankruptcy fraud,

11     elements of the offense.  Count 16 and 17 charge Mr. Harley

12     with bankruptcy fraud in connection with a 2010 and 2011

13     bankruptcy filing he allegedly made.  In order to convict Mr.

14     Harley of these offenses the government must prove each of the

15     following elements beyond a reasonable doubt.

16          First element.  Mr. Harley devised or intended to

17     devise a scheme or plan to defraud.  Second element, Mr. Harley

18     acted with the intent to defraud.  Third element, Mr. Harley's

19     act was material, that is, it had a natural tendency to

20     influence or was capable of influencing the acts of an

21     identifiable person, entity or group.

22          And fourth element, Mr. Harley filed a petition or

23     filed a document in a proceeding, made a false or fraudulent

24     representation, claim or promise concerning or in relation to a

25     proceeding under Title 11, bankruptcy proceeding to carry out

1   or attempt to carry out an essential part of the scheme.  It

2   does not matter whether the document, representation, claim or

3   promise in the petition was itself false or deceptive, so long

4   as the bankruptcy proceeding was used as part of a scheme or

5   plan to defraud, nor does it matter whether the scheme or plan

6   was successful, or therefore, that any money or property was

7   obtained.

8           Next I'm going to instruct you on false statements in

9   bankruptcy filings.  Counts 18 through 22 of the indictment

10  charged Mr. Harley with making false statements in connection

11  with bankruptcy petitions he filed on behalf of himself and RJH

12  and Co., in 2010, 2011 and 2012.  In order to convict Mr.

13  Harley of these offenses the government must prove each of the

14  following elements beyond a reasonable doubt.

15          First -- first element.  That on or about each of the

16  above dates a bankruptcy case was pending in the United States

17  Bankruptcy Court for the Middle District of Pennsylvania in

18  which Mr. Harley was the debtor.  Second element, that Mr.

19  Harley made a false statement regarding a material matter in

20  relation to the bankruptcy proceeding.

21          Third element.  That Mr. Harley knew the statement

22  was false when it was made.  Fourth element, that Mr. Harley

23  did so with the intent to defraud.  The term debtor means a

24  person or corporation whom the bankruptcy case has been

25  commenced.  To act with intent to defraud means to act

1  knowingly and with the intent to deceive element for the

2  purpose of causing some financial loss, the loss of property or

3  property rights to another, or bringing about financial gain to

4  one's self or another, or to the detriment -- rather to the

5  detriment of a third party.

6         A matter is material if it has a natural tendency to

7  influence or is capable of influencing the outcome of the

8  bankruptcy proceeding.

9         Next I'm going to instruct you on bank fraud,

10 elements of the offense.  Count 23 of the indictment charges

11 Mr. Harley with bank fraud, a violation of federal statute.  In

12 order to find Mr. Harley guilty of this offense you must find

13 the government has proven each of the following elements beyond

14 a reasonable doubt.

15        First element.  Mr. Harley knowingly executed or

16 attempted to execute a scheme or artifice to defraud the

17 Federal Reserve Bank of New York or knowingly executed or

18 attempted to execute a scheme to obtain money, funds or other

19 property owned by or under the control of the Federal Reserve

20 Bank of New York by means of material, false or fraudulent

21 pretenses, representations, or promises.

22        Second.  That Mr. Harley did so with the intent to

23 defraud the Federal Reserve Bank of New York.  And third, that.

24        The Federal Reserve Bank of New York was then a

25 Federal Reserve Bank or a member of the Federal Reserve System.

1 I have previously instructed you on the meaning of scheme or

2 artifice to defraud and intent to defraud.  The definitions

3 apply here as well.

4          Next I'm going to instruct you on separate

5 consideration, single defendant charged with multiple offenses.

6 Mr. Harley is charged with several offenses, each offense

7 charged in a separate count in the indictment.  The number of

8 offenses charged is not evidence of guilt, and it should not

9 influence your decision in any way.  You must separately

10 consider the evidence that relates to each offense, and you

11 must return a separate verdict for each offense.

12          For each offense charged you must decide whether the

13 government has proved beyond a reasonable doubt that Mr. Harley

14 is guilty of that particular offense.  Your decision on one

15 offense, whether guilty or not guilty, should not influence

16 your decision on any of the other offenses charged.  Each

17 offense should be considered separately.

18          I'm going to instruct you now on the election of a

19 foreperson, the unanimous verdict, do not consider punishment,

20 duty to deliberate and communications with me.  This concludes

21 my instructions explaining to you the law and testimony and

22 other evidence in the offenses charged.  Let me explain some

23 things to do you about deliberations in the jury room and your

24 possible verdict.  First, the first thing you should do when

25 you go to the jury room is choose someone to be your

1  foreperson.  That person will be your spokesperson here in

2  court.  He or she will also preside over your discussions.

3          However, the views and vote of the foreperson are

4  entitled to no greater weight than any of those of any other

5  juror.  Second, I want to remind you that your verdict, whether

6  guilty or not guilty, must be unanimous.  To find Mr. Harley

7  guilty of an offense every one of you must agree that the

8  government has overcome the presumption of innocence, and with

9  evidence that proves each and every element of the offense --

10 of that offense beyond a reasonable doubt.

11         To find Mr. Harley not guilty each and every one of

12 you must agree that the government has failed to convince you

13 of that offense beyond a reasonable doubt.

14         Third.  If you decide the government has proved Mr.

15 Harley guilty then it will be my responsibility to decide on

16 the appropriate punishment.  You should never consider possible

17 punishment in reaching your verdict.

18         Fourth.  As I said before, your verdict must be based

19 only on the evidence received in this case and the law that I

20 have given to you.  You should not take anything that I may

21 have said or done during this trial as indicating what I think

22 of the evidence or what I think your verdict should be.  What

23 the verdict should be is the exclusive responsibility of you,

24 the jurors.

25         Fifth.  Now that all the evidence is in, the

1  arguments completed, and once I finish these discussions you

2  will be free to talk about the case in the jury room.  In fact,

3  it is your duty to talk about the case with each other, about

4  the evidence, and to make every reasonable effort that you can

5  to reach unanimous agreement.  Talk with each other, listen

6  carefully and respectfully of each other's views, and keep an

7  open mind to listen to what your fellow jurors have to say.

8          Don't hesitate to change your mind if you are

9  convinced that the other jurors are right and that your

10 position is wrong.  But do not change your mind just because

11 other jurors see things differently, or just to get the case

12 over with.  In the end, your vote must be exactly that, your

13 own vote.  It is important for you to reach unanimous

14 agreement, but only if you can do so honestly and in good

15 conscience.

16         Listen carefully to what the other jurors have to say

17 and then decide for yourself that the government has proven

18 that Mr. Harley is guilty beyond a reasonable doubt.  No one

19 will be allowed to hear your discussions in the jury room and

20 no record will be made of what you say.  You should feel free

21 and speak your minds.

22         Sixth.  Once you start deliberating do not talk,

23 communicate with or provide any information about this case by

24 any means to anybody, not to court officials or to me or to

25 anyone except each other.  During your deliberations you may

1  not use electronic devices or media such as telephone, cell

2  phone, smart phone, iPhone, Blackberry or computer, internet or

3  any internet service or any text or instant messaging service,

4  or any internet chat room blog or website such as facebook,

5  MySpace, Linked In, YouTube or Twitter to communicate to anyone

6  any information about the case or conduct any research about

7  the case.

8           Seventh.  If you have any questions or messages your

9  foreperson should write them down on a piece of paper, sign

10 them, and give them to the court official, who will then give

11 them to me.  I will first talk to the lawyers about what you

12 have asked and I will respond as promptly as possible.  In the

13 meantime, if possible, continue your deliberations on some

14 other subject.  Never -- never write down or never tell anyone

15 how the jury stands, including me, numerically or otherwise

16 until you have reached a unanimous verdict.  That should stay

17 -- that should be a secret and never to be disclosed.

18           If you have occasion to communicate with me while you

19 were deliberating, as I said, do not disclose the number of

20 jurors who have voted to either convict or acquit or otherwise.

21           Verdict form.  I'm going to instruct you now on that.

22 A verdict form has been prepared for your use in the jury room.

23 When you have reached your unanimous verdict the foreperson

24 will write down the verdicts on the form, date and sign them,

25 return with it to courtroom, whereupon you will give it to my

 1   courtroom deputy to give to me.  If you decide the government

 2   has proved Mr. Harley guilty of any or all offenses charged

 3   beyond a reasonable doubt say so by having your foreperson mark

 4   the appropriate place on the form.  If you decide that the

 5   government has not proved Mr. Harley guilty of some or all of

 6   the offenses charged beyond a reasonable doubt say so by having

 7   your foreperson mark the appropriate place on the form.

 8          Now, a jury verdict slip is simple, and each charge

 9   by indictment number, and it will have a brief description of

10   what that is, and it will have a space guilty, not guilty.

11   Make the appropriate check based on the unanimous vote of the

12   verdict on each and every one of those charges.  Your

13   foreperson will then date and sign the verdict slip.

14          Now, that said, you'll now retire to deliberate, but

15   first I'm going to ask counsel, do they have anything?

16          MR. BRANDLER:  May we approach?

17          THE COURT:  Of course.

18          (Whereupon, the following discussion occurred at

19   side-bar between the Court and counsel:)

20          THE COURT:  Go ahead.

21          MR. BRANDLER:  I may have missed it.  On your charge

22   on Counts 18 through 22 when you were giving the elements of

23   the offense --

24          THE COURT:  Yeah.

25          MR. BRANDLER:  -- one of the element s of the offense

1  is that the statements are made under the penalty of perjury.

2  I didn't hear that.

3          THE COURT:  Which one?

4          MR. BRANDLER:  This is Counts 18 through 22, which is

5  the bankruptcy, false statements.

6          THE COURT:  I don't think I said that.  I think

7  you're quite right.

8          MR. BRANDLER:  And I'm not sure -- I know there are

9  two kinds of similar sections in that statute.  I think we may

10 have given the elements for the parallel section and not this

11 statute, but I know that that section -- I don't think -- that

12 element was not given.  So I'm not sure if the other ones

13 corresponded as well.

14         THE COURT:  16-18?

15         MR. BRANDLER:  The one I'm holding here is from Devan

16 and Blackmar for this particular statute, and I know that --

17 152.3, that's what it is.  18 U.S.C. Section 152.  There are

18 two false statement sections, so I don't know.  I just want

19 to --

20         THE COURT:  I have all four, but the fifth one is

21 missing, so I should just tell them that.

22         MR. BRANDLER:  Right.

23         THE COURT:  Do you have any problem with me -- do you

24 want me to read the whole instruction?

25         MR. BRANDLER:  Just adding additional, it must be

1    under the penalty of perjury.

2            THE COURT:  Is that it?

3            MR. BRANDLER:  I think that was the only one.  I

4    haven't seen yours -- I couldn't read along.  The language

5    appeared to be different in yours.  It is, but it's

6    substantively the same.

7            THE COURT:  That's what I just wanted to -- yeah.

8            (Whereupon, the discussion held at side-bar between

9    the Court and counsel concluded.)

10           THE COURT:  All right.  Members of the jury, I had a

11   conference with counsel.  There is one addition to an

12   instruction that I gave to you.  I gave you an instruction -- I

13   called it -- entitled False Statements in Bankruptcy Filings,

14   Counts 18 through 22.  And I gave you four elements.  Now, I'll

15   give you those four elements.  There is a fifth element, which

16   I omitted.  So I'm going to give you all five.  Okay.  This is

17   -- it relates to the bankruptcy petitions on behalf of himself,

18   Mr. Harley, and RJH Co., in 2010, 2011 and 2012, false

19   statements in bankruptcy filings.

20           The elements are, first, that on or about each of the

21   above dates a bankruptcy case was pending in the United States

22   Bankruptcy Court for the Middle District of Pennsylvania in

23   which Mr. Harley was a debtor.  Second, that Mr. Harley made a

24   false statement regarding a material matter in relation to the

25   bankruptcy proceeding.

 1          Third, that he knew the statement was false when it

 2   was made.  Fourth, that Mr. Harley did so with the intent to

 3   defraud.  And fifth is that the statement was made under

 4   penalty of perjury.

 5          The remaining part of the instruction is -- I'll read

 6   it, it's very short.  The term debtor means a person or

 7   corporation from whom the bankruptcy case was commenced.  To

 8   act with intent to defraud means to act knowingly and with an

 9   intent to deceive someone for the purpose of causing someone

10   financial loss or loss of property or property rights to

11   another, or bringing about financial gain to one's self or

12   another, or rather to the detriment of a third party.  And a

13   matter is material if it has a natural tendency to influence or

14   is capable of influencing the outcome of the bankruptcy

15   proceeding.  Acceptable?

16          MR. BRANDLER:  Yes.

17          THE COURT:  Acceptable?

18          MR. O'BRIEN:  Acceptable.

19          THE COURT:  All right.  Members of the jury, you'll

20   now retire to deliberate.

21          Okay.  At this time the alternates will be dismissed.

22   And I want to thank you for being here.  I know it's probably a

23   let down that you're not going to deliberate, but the way the

24   system works is we need to have people in the event that some

25   of the regular jurors would have not been able to continue to

146

1   serve throughout the course of this entire trial.  So, those of

2   you who are leaving, I can't tell you how much I appreciate

3   personally your presence, the Court appreciates it.  I hope you

4   take something from it as part of good citizenship, because

5   that's exactly what you have done.  And I also notice that you

6   all paid attention, as did the entire jury during the course of

7   this trial.  So thank you very much, those of you who are

8   leaving.  You may now proceed.

9           (Whereupon, the jury retired to deliberate at 3:30

10  p.m.)

11                          (5:26 p.m., reconvene.)

12          THE COURT:  We have a question.  So I will tell you

13  what it is.  I have never seen this one before.  "We have a

14  question."  Signed Peter Dogger [ph], Juror No. 2.

15          MR. BRANDLER:  But they didn't say what the question

16  is?

17          THE COURT:  No.  That's what I'm going to do, here.

18  "Please write the question."  I'm sending a note back saying,

19  "Please write the question."  Thank you.

20          (Pause.)

21          THE COURT:  Okay.  I'm told they don't have a

22  question, they have a verdict.  So bring them back.

23          (Pause.)

24          THE COURT:  Who speaks for the jury foreperson?

25          FOREPERSON:  I do.

147

1          THE COURT:  Have you reached a verdict?

2          FOREPERSON:  We have.

3          THE COURT:  Is it unanimous?

4          FOREPERSON:  Yes, your Honor.

5          THE COURT:  Would you hand the verdict slip to my

6    courtroom deputy?  Thank you.

7          (Pause.)

8          THE COURT:  All right.  This verdict is in order.  I

9    note it.  It's been told to me that it's unanimous.  I will now

10   publish the verdict.  Rather than read each count, because they

11   are all the same, I am going to tell you that Counts 1 through

12   23, in each and every event the verdict is guilty.  It is

13   signed and dated and is in order.  Is there anything from

14   counsel.

15         MR. O'BRIEN:  Can we poll the jury, your Honor?

16         MR. BRANDLER:  May we be seated?

17         THE COURT:  Pardon?

18         MR. BRANDLER:  May we be seated?

19         THE COURT:  Sure.  I've been asked to poll the jury.

20   So, members of the jury, I'm going to ask each and every one of

21   you whether this verdict that I just read is your verdict.

22   Juror No. 1, is the verdict that I just read your verdict?

23         THE JUROR:  Yes, your Honor.

24         THE COURT:  Juror No. 2?

25         THE JUROR:  Yes, your Honor.

1        THE COURT:  Juror No 3?

2        THE JUROR:  Yes, your Honor.

3        THE COURT:  Juror No. 4?

4        THE JUROR:  Yes, your Honor.

5        THE COURT:  Juror No. 5?

6        THE JUROR:  Yes, sir, your Honor.

7        THE COURT:  Juror No. 6?

8        THE JUROR:  Yes.

9        THE COURT:  Juror No. 7?

10       THE JUROR:  Yes, your Honor.

11       THE COURT:  Whoops.  Who is seven?

12       THE DEPUTY CLERK:  At the end.

13       THE COURT:  Juror No. 8?

14       THE JUROR:  Yes, your Honor.

15       THE COURT:  Juror No. 9?

16       THE JUROR:  Yes, your Honor.

17       THE COURT:  Juror No. 10?

18       THE JUROR:  Yes, your Honor.

19       THE COURT:  Juror No. 11?

20       PROSPECTIVE JUROR:  Yes, your Honor.

21       THE COURT:  Juror No. 12?

22       THE JUROR:  Yes, your Honor.

23       THE COURT:  Anything further Mr. O'Brien?

24       MR. O'BRIEN:  No, your Honor.

25       MR. BRANDLER:  No, your Honor.

1          THE COURT:  Members of the jury, I want to thank you

2    for your service.  It's a daunting task that you perform, and

3    you paid attention, I watched you throughout the course of the

4    trial.  Someone wins and someone loses, and this is what makes

5    us tick.  This is what we do in our society, and you've become

6    an integral part of making our system work.

7          I want to thank you for your service personally and

8    on behalf of the court.  You are excused.  Thank you for your

9    service.

10          (Jury was dismissed at 5:35 p.m.)

11          (Whereupon, the Court conferred with Probation

12   Officer Kaleta.)

13          THE COURT:  All right.  Mr. O'Brien, Mr. Harley.  All

14   right.  Do you want to come forward?  There's one offense that

15   we're trying to determine what the penalty is.

16          Mr. Harley, you've been found guilty on all 23

17   counts.

18          PROBATION OFFICER KALETA:  It's the same statutory

19   penalty we cited.

20          THE COURT:  Okay.  I'm going to tell you that -- I'm

21   obliged to tell you that the maximum sentence in each -- with

22   respect to each count is as follows:  Counts 1 through --

23   Counts 1 through 15, the maximum sentence is 30 years in

24   prison, $250,000 fine, and up to five years of supervised

25   release.  With respect to Counts 16, 17, 18, 19, 20, and 21,

1 22, the maximum sentence is five years in prison, $250,000

2 fine, and not more than three years of supervised release.  And

3 Count 23 is 30 years in prison, $250,000 fine, and not more

4 than five years of supervised release.

5            Therefore, you would accumulate those totals.  The

6 total number maximum years would be 515.  The total fines would

7 be an accumulation of those.  Let's see, I can tell you.  I

8 wish I had a calculator.

9            (Whereupon, the Court and Probation Officer

10 conferred.)

11            THE COURT:  Okay.  So, the fine is exceeding five

12 million dollars cumulatively.  So you're talking 515 years,

13 fines accumulated to more than over 500 -- or over five million

14 dollars.  And a special assessment of a hundred dollars on each

15 of the 23 counts, which will be $230, and supervised release

16 would be -- could be cumulative as well on each of those

17 maximums, five years and maximum of three years.  So,

18 supervised release would certainly exceed 60 years anyway.

19            Anyhow, those are the maximum sentences.  Now, I

20 won't know, nor will you, what your guideline range would be

21 until a pre-sentence report is prepared.  There will be one

22 prepared.  You'll have an opportunity to review it with Mr.

23 O'Brien.  Mr. Brandler has an opportunity to review it.  At the

24 time of sentence, of course, you can present anything to me

25 that you think will assist me in arriving at a fair sentence.

1           Your counsel will speak in your behalf.  You can

2     speak in your own behalf.  You can present anything to me by

3     way of letter, witness, anything you think will be appropriate

4     for me to ascertain what a fair and appropriate sentence in

5     your case is.

6           The sentencing regiment involves the guidelines,

7     which are advisory.  It also involves a federal statute which

8     prescribes the things that I'm supposed to look at to determine

9     a fair and appropriate sentence.  Those things are the nature

10    and circumstances of the offense; your personal history and

11    characteristics; the need for the sentence that I impose to

12    take into account the nature and circumstances of the offense;

13    the seriousness of the offense; promote respect for the law and

14    provide just punishment.  It's also to act as a deterrent to

15    prevent or discourage others from doing the same or similar

16    things.  It's also to protect the public from any future crimes

17    by you.  And it's also to provide you with any needed

18    educational or vocational training, medical care or other

19    correctional treatment.

20          The statute also tells me that I'm supposed to try to

21    sentence people who have been found guilty of similar crimes

22    and who have similar records in a similar way.  And lastly, I

23    have to be satisfied that the sentence is reasonable.

24          Now, what your advisory guideline range is I won't

25    know until after there's a pre-sentence report prepared and any

1 objections to it resolved.  That generally is the sentencing

2 regiment.  Do you have any questions?

3          MR. HARLEY:  Not at the moment, your Honor.  One

4 thing I'd like to ask, with the Court's permission, because of

5 my wife's illness, can I come back for sentencing?

6          THE COURT:  We're going to get to that right now.

7          MR. HARLEY:  Okay.

8          THE COURT:  So that's the sentencing regiment.  Now

9 the next question is the disposition of Mr. Harley at the

10 present time.

11         MR. BRANDLER:  We have a motion under Section

12 3143(a), which is the statute that pertains to release or

13 detention pending sentence.  As the Court is well aware, under

14 Subsection A the Court shall order that a person who has been

15 found guilty of an offense and is awaiting imposition or

16 execution of sentence, other than a person for whom the

17 applicable guideline range -- guideline promulgates up 28 USC

18 Section 994 does not recommend a term of imprisonment be

19 entertained, unless the Court finds by clear and convincing

20 evidence that the person is not likely to flee or possess a

21 danger to the safety of other person or community if released

22 under Section 3142(b).

23         We believe that Mr. Harley is both a risk of flight

24 and a danger to the community.  And I don't say that lightly.

25 Obviously the Court has just stated what the maximum penalties

1  are that he faces here, and they're very substantial.  And that

2  in and of itself would make him a risk of flight.  Even though

3  he has appeared here for every court appearance, I understand,

4  but the circumstances have changed from his appearance now that

5  he's been found guilty, and he's facing this substantial

6  sentence.

7         I say he's a danger to the community because the

8  evidence that we have is that this activity of his is nonstop.

9  He is on the computer day in and day out trolling for potential

10 victims.  There's no way to control him, even while he's under

11 the supervision of the Court, to approach victims and peddle

12 his assets in return for money.  We think that's an economic

13 danger.  There is substantial case law, he doesn't just have to

14 be a physical danger to the community.  We think he's an

15 economical danger to the community.  For both of those reasons

16 we think he should be detained.

17         THE COURT:  Which is the latest information you have

18 that he's been doing that?

19         MR. BRANDLER:  Well, in 2000 -- we had the indictment

20 in 2012.  So, he was doing it clearly up until that point

21 because the information we received during the execution of the

22 search warrant, it was right up --

23         THE COURT:  Did he have anything in the past two

24 years?

25         MR. BRANDLER:  Well, he hasn't been under

1  investigation in the last two years.

2          THE COURT:  I didn't ask that.  I just asked you if

3  you have anything.

4          MR. BRANDLER:  No, we don't have anything specific.

5  I think in the last two years --

6          MR. HARLEY:  Your Honor, may I speak on that?

7          THE COURT:  Just a minute.

8          MR. O'BRIEN:  Your Honor, the first issue, likely to

9  flee, No. 1.  He's appeared in all proceedings in this case.

10 He's been -- he was charged in another case where he had a

11 trial and retrial.  He appeared for everything.  His wife is

12 very ill and he needs to care for her.  I think that indicates

13 a danger of fleeing.  Also on the question of -- I would

14 make -- echo the point the Court made.  The government has no

15 proof he's continuing to do this.  Also, if the Court has a

16 concern about that he can be released on the condition that he

17 not use the computer or not do anything like that.  So we'd ask

18 he be released pending sentence.

19         THE COURT:  Mr. Harley, do you want to say something?

20         MR. HARLEY:  I'm not computer literate to begin with.

21 In fact, I don't like computers that much.  I only use them to

22 look up different word meanings or something like that.  I'm

23 not computer literate.  To go on and browse the internet like

24 Mr. Brandler just suggested, I don't know how to do that.  I

25 barely can get on the computer, your Honor.  I'm still old

1   school, okay?  I mean that from my heart.  I don't know the

2   computer.  I don't really like computers.  I rather work the

3   phone.  That's how I conduct my business, not on the computer.

4   I would assure you I'll be back here, your Honor.  You have my

5   word on it.

6           THE COURT:  Anything else Mr. Brandler you want to

7   say?

8           MR. BRANDLER:  The only thing I want to add is it's

9   clear Mr. Harley doesn't feel he did anything wrong.  Mr.

10  O'Brien said in his opening statement, to this day Mr. Harley's

11  position is he does own these assets and he owns the oil and he

12  owns these Federal Reserve notes.  He's not going to stop.

13  Because the Federal Reserve people told him that they're bogus,

14  that didn't stop him.  This verdict is not going to stop him.

15  He's going to continue to try to get money using those assets

16  through the phone or computer whatever way he can.  And I think

17  that should be taken into consideration.

18          THE COURT:  All right.  I understand your point, but

19  I think that is also a matter for your good offices, not mine.

20  And given the fact that I haven't heard anything in the last

21  two years that is untoward, I'm discounting that to some

22  degree.  I understand your point.  But again, that's for your

23  good offices .

24          I'm convinced that this is a serious offense.  And

25  generally, the statute does mandate that I put you in

1    confinement.  However, there's also an indication that I have

2    to find by clear and convincing evidence that you're likely to

3    flee.  And just because you are looking at these stiff

4    penalties, I'm not convinced that that's adequate evidence that

5    you're likely to flee.  And I also am conscious of your wife's

6    illness.  And as a consequence of that I'm going to release you

7    pending sentence

8            MR. HARLEY:  Thank you.  Thank you very much.

9            THE COURT:  There will be a condition however, and

10   that will be that you can use your computer for anything other

11   than business.  I'm going to make that a condition of your

12   release because it seems appropriate to me.  Other than that,

13   you will be required to be here when appointed.  I don't have a

14   date for a sentencing yet, but as soon as I have one you will

15   have it.  And at that time we will have the pre-sentence

16   report, you'll have it in advance, have an opportunity to

17   review it.  Counsel will have an opportunity to review it, Mr.

18   Brandler will have an opportunity to review it.  If there are

19   any objections they'll be resolved at the time of sentencing.

20   Okay.  That said, we'll get something together.

21           PROBATION OFFICER KALETA:  From the probation office

22   perspective, how would we enforce the computer condition?  We

23   do have computer-monitoring software.

24           THE COURT:  Tell me how you want to.  How would you

25   enforce --

1          PROBATION OFFICER KALETA:  We do have computer

2   monitoring software that we could install on his computer to

3   monitor his activity to ensure that he's using it within the

4   scope that the Court requests.

5          THE COURT:  Is that very complicated?

6          PROBATION OFFICER KALETA:  No.

7          MR. BRANDLER:  I think we need to do the phone.  He

8   just said in open court he uses the phone.

9          THE COURT:  Well, I'm not going to put anything on

10  his telephone.  The computer is more concerning to me than

11  anything else.  I mean, obviously the computer has been used.

12  E-mail, e-mailing is part of the computer.  I don't care if you

13  e-mail.

14         MR. HARLEY:  I don't even know how to e-mail.  I do

15  it sporadically.

16         THE COURT:  All right, fine.  Well, whatever.  We're

17  going to put that software on your computer.  Anything else?

18         PROBATION OFFICER KALETA:  The date would be February

19  9, 2015.

20         THE COURT:  Oh.  You'll have the pre-sentence report

21  February 9 --

22         PROBATION OFFICER KALETA:  2015.

23         THE COURT:  2015.  Sentencing will probably take

24  place in April.  I can tell you that right now.  Okay?

25         MR. BRANDLER:  Very good.  Thank you, your Honor.

1          THE COURT:  Any questions?

2          MR. BRANDLER:  I guess same conditions he previously

3  was under with the additional condition the Court just set.

4          THE COURT:  Absolutely same conditions as before,

5  with the add-on about the computer.

6          MR. HARLEY:  I call my probation officer like I've

7  been doing?

8          THE COURT:  She'll talk to you right now.

9          MR. HARLEY:  Okay.  Thank you so much.

10         THE COURT:  Any questions?

11         MR. HARLEY:  Thank you so much.

12         THE COURT:  Any questions?

13         MR. HARLEY:  I'm good, your Honor.  Thank you so

14  much.

15         THE COURT:  Thank you.

16              (5:52 p.m., court adjourned.)

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3        I, DIANA L. GILBRIDE, Official Court Reporter for the

4   United States District Court for the Middle District of

5   Pennsylvania, appointed pursuant to the provisions of Title 28,

6   United States Code, Section 753, do hereby certify that the

7   foregoing is a true and correct transcript of the

8   within-mentioned proceedings had in the above-mentioned and

9   numbered cause on the date or dates hereinbefore set forth; and

10  I do further certify that the foregoing transcript has been

11  prepared by me or under my supervision.

12

13                         /s/ Diana L. Gilbride

14                         _____
                           Diana L. Gilbride, RMR, FCRR
15                         Official Court Reporter

16  REPORTED BY:

17      DIANA L. GILBRIDE, RPR
        Official Court Reporter
18      United States District Court
        Middle District of Pennsylvania
19      P.O. Box G
        Scranton, PA  18501-0090

20

21        (The foregoing certificate of this transcript does not
    apply to any reproduction of the same by any means unless under
22  the direct control and/or supervision of the certifying
    reporter.)

23

24

25