PJS:BB:nl

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIM. NO. 3:CR-12-00224 |
| | ) | |
| v. | ) | |
| | ) | (CAPUTO, J.) |
| RICHARD J. HARLEY, | ) | |
| | ) | |
| Defendant. | ) | (ELECTRONICALLY FILED) |

## <u>GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AND/OR NEW TRIAL</u>

Respectfully submitted,

PETER J. SMITH
United States Attorney

Bruce Brandler
Assistant U.S. Attorney
Chief, Criminal Division
Attorney I.D. No. PA62052
228 Walnut Street, Suite 220
P.O. Box 11754
Harrisburg, Pennsylvania  17108-1754
(717) 221-4482
(717) 221-4493 (Facsimile)

Date:  July 1, 2015          bruce.brandler@usdoj.gov (Email)

# TABLE OF CONTENTS

Page

I.   PROCEDURAL HISTORY ................................................................. 1

II.  LEGAL STANDARD ........................................................................ 2

     A.   Standard  of Review–Fed. R. Crim. P. 29 ............................ 2

     B.   Standard of Review–Fed. R. Crim. P. 33 ............................. 5

     C.   Elements of Wire Fraud, Bankruptcy Fraud,
          Making False Statements in Bankruptcy Filings,
          And Bank Fraud ................................................................... 6

III. ARGUMENT ..................................................................................... 7

     A.   Harley's Guilty State of Mind Was Established By
          Overwhelming Evidence ....................................................... 7

          1.   There Was Overwhelming Evidence That Harley
               Acted Knowingly And With The Intent to Defraud
               Regarding Counts 1 Through 15 of The Indictment ....... 7

          2.   There Was Overwhelming Evidence That Harley
               Acted Knowingly And With The Intent to Defraud
               Regarding Count 23 of The Indictment ......................... 23

          3.   There was Overwhelming Evidence That Harley
               Devised a Scheme to Defraud Mr. Silverstein by
               Filing Two Fraudulent Bankruptcy Petitions .............. 24

          4.   There Was Overwhelming Evidence That Harley
               Knowingly And Willfully Made Material False
               Declarations on His Three Bankruptcy Petitions ......... 28

<u>TABLE OF CONTENTS (Cont.)</u>                                          <u>Page</u>

B.   There Was No Miscarriage of Justice When a
     Document Was Briefly Shown to The Jury Reflecting
     a Prior Criminal Case Harley Was Involved in ................... 33

C.   The Alleged Inconsistency Regarding The Location of
     The "Original" Oil Promissory Note is Not Grounds
     For a New Trial ..................................................... 36

D.   There Are No Grounds For a New Trial Under Rule 33 ...... 37

IV.   CONCLUSION ................................................................. 38

CERTIFICATION OF LENGTH OF BRIEF ......................................... 39

CERTIFICATE OF SERVICE ................................................. 40

# TABLE OF AUTHORITIES

## FEDERAL CASES:                                    Page(s)

Coleman v. Johnson,
    132 S. Ct. 2060 (2012) ........................................................ 4

SEC v. Lazare Industries, Inc.,
    294 Fed. App'x 711 (3d Cir. 2008)................................... 30

United States v. Boria,
    592 F.3d 476 (3d Cir. 2010)............................................... 3

United States v. Brodie,
    403 F.3d 123 (3d Cir. 2005)............................................... 3

United States v. Caraballo-Rodriguez,
    726 F.3d 418 (3d Cir. 2013)....................................... 2-4,8

United States v. Gambone,
    314 F.3d 163 (3d Cir. 2003)............................................... 3

United States v. Gjeli,
    2015 WL 1573369 (E.D. Pa. 2015) ................................... 5

United States v. Greenstein,
    322 Fed. App'x 259 (3d Cir. 2009)................................. 36

United States v. Harley,
    39 Fed. App'x 789 (3d Cir. 2002)................................... 29

United States v. Iafelice,
    978 F.2d 92 (3d Cir. 1992)............................................... 4

<u>**FEDERAL CASES (Cont.)**</u>:                                    <u>Page(s)</u>

<u>United States v. Leon,</u>
    739 F.2d 885 (3d Cir. 1984)............................................................4

<u>United States v. Mercado,</u>
    610 F.3d 841 (3d Cir. 2010)............................................................4

<u>United States v. Pearlstein,</u>
    576 F.2d 531 (3d Cir. 1978)............................................................6

<u>United States v. Rinaldi,</u>
    301 F.2d 576 (2d Cir. 1962)..........................................................35

<u>United States v. Self,</u>
    681 F.3d 190 (3d Cir. 2012)..........................................................36

<u>United States v. Silveus,</u>
    542 F.3d 993 (3d Cir. 2002)............................................................5

<u>United States v. Soto,</u>
    539 F.3d 191 (3d Cir. 2008)............................................................3

<u>United States v. Starnes,</u>
    583 F.3d 196 (3d Cir. 2009)............................................................4

<u>United States v. Tomlinson,</u>
    2 Fed. App'x 104 (2d Cir. 2001)...............................................35-36

<u>United States v. Wright,</u>
    665 F.3d 560 (3d Cir. 2012)............................................................5

<u>**FEDERAL STATUTES**</u>:

18 U.S.C. § 152(3).........................................................................1

## FEDERAL STATUTES (Cont.): <span style="float:right">Page(s)</span>

18 U.S.C. § 157(1) .......................................................................... 1

18 U.S.C. § 1343 ............................................................................ 1

18 U.S.C. § 1344 ............................................................................ 1

## FEDERAL RULES:

Fed. R. Crim. P. 29 .......................................................... 2,4,7-8

Fed. R. Crim. P. 33 ........................................................... 5,37

# I.   <u>PROCEDURAL HISTORY</u>.

On August 30, 2012, the defendant, Richard J. Harley ("Harley"), was indicted by the federal grand jury and charged in a twenty-three count Indictment.  Counts 1 through 15 charged Harley with wire fraud, in violation of 18 U.S.C. § 1343.  Counts 16 and 17 charged Harley with bankruptcy fraud, in violation of 18 U.S.C. § 157(1).  Counts 18 through 22 charged Harley with making false statements in bankruptcy filings, in violation of 18 U.S.C. § 152(3).  Count twenty-three charged Harley with bank fraud, in violation of 18 U.S.C. § 1344.

The Indictment alleged that Harley executed three related schemes to defraud multiple victims of money and property between 1999 and 2012.  The first scheme, described as "the Oil Scheme," relates to Harley's solicitation of investments and loans based on his claim to own $1 billion worth of oil in Texas.  Indictment, ¶ 5-12.  The second scheme, described as "the Treasury Check Scheme," relates to Harley's claim to owning negotiable bank instruments worth more than $700 billion and his attempt to get financial institutions to lend him money using the bank instruments as collateral.  Indictment, ¶ 13-17.  The

third scheme, described as "the Bankruptcy Fraud Scheme," relates to

Harley's attempt to defraud his creditors and the bankruptcy court by

making false statements in his three bankruptcy filings between 2010

and 2012.  Indictment, ¶ 18-22.

Harley was arraigned on October 16, 2012, pled not guilty to the

charges, and was released on a $100,000 unsecured bond.

Trial commenced on December 8, 2014, and proceeded until

December 16, 2014 when the jury returned guilty verdicts on all counts.

DDE 164.  Harley was continued on bail pending sentencing.

On December 30, 2014, Harley filed a motion for a judgment of

acquittal and/or new trial.  DDE 168.  The brief in support of the motion

was filed on June 17, 2015.  DDE 200.  This brief is filed in opposition to

that motion.

## II.   LEGAL STANDARD.

### A.   STANDARD  OF REVIEW–FED. R. CRIM. P. 29.

In United States v. Caraballo-Rodriguez, 726 F.3d 418 (3d Cir.

2013) (en banc), the Third Circuit stated the applicable standard of

review when a motion for a judgment of acquittal is premised upon the

claim of insufficiency of the evidence:

> We have set forth the appropriate standard in a sufficiency of the evidence challenge many times.  We "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt[ ] beyond a reasonable doubt."  United States v. Brodie, 403 F.3d 123 at 133 (3d Cir. 2005) (internal quotation marks and citation omitted).  Under this particularly deferential standard, we "must be ever vigilant not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury."  Id.  Furthermore, "we review the evidence as a whole, not in isolation, and ask whether it is strong enough for a rational trier of fact to find guilt beyond a reasonable doubt."  United States v. Boria, 592 F.3d 476 at 480 (3d Cir. 2010).  We must sustain the jury's verdict "if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision."  United States v. Gambone, 314 F.3d 163, 170 (3d Cir. 2003) (internal quotation marks omitted).

Caraballo-Rodriguez, 726 F.3d at 430.

Thus, the standard for granting a motion for judgment of acquittal

based on insufficient evidence is quite stringent.  United States v. Soto,

539 F.3d 191, 194 (3d Cir. 2008).  The defendant bears a heavy burden of demonstrating that relief is appropriate, and the granting of relief under Rule 29 is "confined to cases where the prosecution's failure is clear." United States v. Leon, 739 F.2d 885, 891 (3d Cir. 1984); United States v. Mercado, 610 F.3d 841, 845 (3d Cir. 2010).  The jury's verdict must be assessed from the perspective of a reasonable juror, and the verdict must be upheld as long as it does not "fall below the threshold of bare rationality." Caraballo-Rodriguez, 726 F.3d at 431, quoting Coleman v. Johnson, 132 S. Ct. 2060, 2065 (2012).

In cases where the defendant's state of mind is in issue, as is the case here, this highly deferential standard of review is still applicable. Caraballo-Rodriquez, 726 F.3d at 431.  The Third Circuit has repeatedly emphasized that it is not unusual that the government will not have direct evidence of a defendant's state of mind.  Id.  Circumstantial evidence alone is sufficient to prove a defendant's state of mind.  Id. United States v. Iafelice, 978 F.2d 92, 98 (3d Cir. 1992); United States v. Starnes, 583 F.3d 196, 213 (3d Cir. 2009).  "Inferring mental state

from circumstantial evidence is among the chief tasks of fact finders."

United States v. Wright, 665 F.3d 560, 569 (3d Cir. 2012).

### B.    STANDARD OF REVIEW–FED. R. CRIM. P. 33.

Harley also bears a heavy burden under Rule 33:

> Rule 33 allows the court to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case."  United States v. Silveus, 542 F.3d 993, 1004 (3d Cir. 2002).  However, "[s]uch motions are not favored and should be granted sparingly and only in exceptional cases."  Id. at 1005 (internal quotation marks and citations omitted).  It is not enough that the court believes a verdict to be against the weight of the evidence; the court may order a new trial only if it believes that "there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted."  Id.  (internal quotation marks and citations omitted).

United States v. Gjeli, 2015 WL 1573369 *2 (E.D. Pa. 2015).

## C.  ELEMENTS OF WIRE FRAUD, BANKRUPTCY FRAUD, MAKING FALSE STATEMENTS IN BANKRUPTCY FILINGS, AND BANK FRAUD.

Despite Harley's claims to the contrary, the only charges that required a showing of willfulness were counts 18 through 22 which charged Harley with making false statements in bankruptcy filings. Devitt, Blackmar, and O'Malley, Federal Jury Practice and Instructions, § 24.07 (4th ed. 1990).  The mens rea for wire fraud, bankruptcy fraud, and bank fraud charges only require that Harley knowingly devised the fraudulent scheme and acted with the intent to defraud.  See Third Circuit Model Jury Instructions 6.18.1343 (wire fraud); Mod. Crim. Jury Instr. 9th Cir. 8.11 (2010) (bankruptcy fraud); Third Circuit Model Jury Instructions 6.18.1344 (bank fraud). Willfulness for fraud offenses is only required if the government contends that the defendant participated in an on-going fraud.  Then, the government must show that the defendant willfully participated in the scheme with knowledge of its fraudulent nature.  United States v. Pearlstein, 576 F.2d 531, 537 (3d Cir. 1978).  Here, the government

-6-

alleged that Harley devised the schemes, so willfulness was not required.[1]

## III.   ARGUMENT.

### A.   HARLEY'S GUILTY STATE OF MIND WAS ESTABLISHED BY OVERWHELMING EVIDENCE.

#### 1.   There Was Overwhelming Evidence That Harley Acted Knowingly And With The Intent to Defraud Regarding Counts 1 Through 15 of The Indictment.

Harley argues that this Court should grant a judgment of acquittal under Rule 29 for the wire fraud counts because there was insufficient proof as a matter of law that he "knew that the Texas oil investment or the Federal Reserve checks were fraudulent or that he intended to make any misrepresentations to the companies and individuals to whom he presented these investment opportunities." Harley Br., p. 11-12.  The government respectfully disagrees.

First, this Court has already ruled there was sufficient evidence to convict Harley of all the charges at the close of the evidence.  Tr. 12/15/14, p. 27-28.  Harley moved for a judgment of acquittal at that

---

[1]   Harley's own requested jury instructions did not mention willfulness as an element of any of the offenses.  DDE 141.

time and raised the same arguments he raises now.  This Court denied

the motion, and the persuasiveness of Harley's arguments have not

increased with the passage of time.    While it is true that Harley is

entitled to resubmit his motion for a judgment of acquittal after the jury

returns its verdict (see Rule 29(c)), the fact remains he has not raised

any new arguments that would justify this Court to reverse itself.

Second, as pointed out above, circumstantial evidence alone is

sufficient to establish a defendant's state of mind, and it is the rare case

where the government will have direct evidence of the defendant's state

of mind.  Caraballo-Rodriguez, 726 F.3d at 431.  In this case, however,

the government did introduce direct evidence of Harley's state of mind

with respect to the Treasury check scheme.  Various Federal Reserve

Bank officials testified that they personally communicated with Harley

on numerous occasions and informed him that the Treasury checks and

associated documents he claimed to be valid were bogus and part of a

well-known scheme to defraud the Federal Reserve Bank.  See, e.g.,

testimony of Richard Jones, Tr. 12/03/14, p. 54; Tr. 12/04/14, p. 16, 23-

24; testimony of Leonard Zawistowski, Tr. 12/04/14, p. 82-85; testimony

of Sahil Godiwala, Tr. 12/04/14, p. 106-114.  In one conversation, Harley was told it was a federal crime to attempt to negotiate these bogus checks.  Tr. 12/04/14, p. 109.  The earliest of these conversations occurred in December 2009.  Tr. 12/04/14, p. 78.  Yet, Harley continued to make false representations about the legitimacy of the checks and associated documents well after those conversations.  See, e.g., Count 11—May 4, 2010; Count 13—April 3, 2012; Count 15—April 18, 2011.  Thus, there was direct evidence of Harley's state of mind with respect to the Treasury check scheme.

Besides the direct evidence of Harley's state of mind, there was overwhelming circumstantial evidence of his guilty state of mind with respect to the Treasury check scheme.  At the outset, it must be noted that Harley's claims of owning "trillions" of dollars of Federal Reserve instruments was patently absurd.  Why some wealthy Indonesians would have received such an extraordinary amount of money from the Federal Reserve Bank and why they would have agreed to give Harley "unrestricted bond power" over the funds defies common sense.

Second, S.A. Browning testified that he found numerous incriminating documents in Harley's residence and on his computer as a result of a search conducted on August 29, 2012.   Government exhibit 23.8(B) was a printout of the document found on the Federal Reserve Bank of New York website titled "Scam Involving Yohannes Riyadi and/or Wilfredo Saurin November 2007."  The document goes on to advise the public of the fraudulent nature of Harley's documents. Specifically, the document describes Harley's scheme, i.e., where fraudsters attempt to use the fraudulent documentation as collateral for lines of credit or other types of asset-based financing.

Government exhibit 23.9 was Harley's own characterization of the conversation he had with Richard Jones where Jones tells him his documents are all bogus.  These documents show that Harley knew his documents were fraudulent.

Other incriminating documents found during the search indicated that Harley actually created the fraudulent Federal Reserve documents. For example, government exhibit 23.15 was a printout of an email from Harley to "josefteo@gmail.com" dated April 30, 2009 titled "verbiage."

-10-

The email goes on to request "Joseph" to write a letter on bank letterhead claiming the Treasury checks are valid.  Attached were copies of the bogus "to whom it may concern" letters on what purported to be Federal Reserve Bank letterhead dated May 4, 1009 claiming the Treasury checks are valid.  One version has a typed signature for Ben S. Bernanke, the other a signed version.  Government exhibits 23.16, 17, 18, and 19 were all images of signatures of various individuals, including Ben S. Bernanke, the former Chairman of the Federal Reserve System, Mr. Kiat, and Mr. Riyadi.  Government Exhibit 23.21 was a copy of Yohannes Riyadi's Indonesian passport, blank letterhead titled "Yohannes Riyadi," and various documents purportedly signed by Riyadi appointing Harley his power of attorney.

Government exhibit 23.10 was a printout of a press release from the United States Attorney's Office for the District of Nevada titled "Men Charged With Providing Phony Million Dollar Bills to Local Bank as Collateral For Loan."  A jury could reasonably conclude that Harley not only knew that his documents were fraudulent, but that what he was doing was illegal.  Based on the above, the government respectfully

-11-

submits there was overwhelming evidence of Harley's guilty state of mind with respect to the Treasury check scheme.

The government submits there was also overwhelming evidence of Harley's guilty state of mind with respect to the oil scheme.

First, Harley's claim that he owned over $1 billion of oil located in Texas was just as absurd as his claim of owning trillions of dollars in Federal Reserve instruments.  According to Harley, he subsisted on $535 per month in Social Security income.   Tr. 12/11/14, p. 31.  Yet, he claimed to be the holder of a valid $200 million corporate promissory note since 1997 collateralized by valuable oil reserves worth over $1 billion, and the note was callable 380 days from the date of issue.  When questioned by S.A. Browning why he didn't call the note due in 1998 and get his $200 million from Enpetro, Harley stated he preferred to hold the asset and just try to borrow against its value.  Tr. 12/11/14, p. 37.  Then he stated he didn't think Enpetro had the money to pay him, which would supposedly have allowed him to attach the oil that collateralized the note.  Id.  When asked what value Harley gave to Enpetro to get the note in the first place, Harley refused to answer.  Id.

at p. 37-38.  In light of the documentation found in Harley's possession during the execution of the search warrant which describes various schemes to use bogus assets to collateralize loans and lines of credits (see, e.g., Gov't Ex. 23.10 and 23.8(B)), coupled with the fact that Harley never called his note due despite having no sources of income besides Social Security income, the jury could have reasonably inferred that Harley knew his note and collateral were worthless.

Second, S.A. Browning found five "original" $200 million oil promissory notes in Harley's possession (Gov't Ex. 45.1), and the jury could have reasonably concluded that Harley simply created these documents rather than providing any consideration to Enpetro in exchange for the note.

Third, Harley's own witness, oil geologist Donald Kesterson, who was promised 2.5 percent of the proceeds of any loans Harley could obtain using his "certified report,"[2] told Harley that by the terms of his assignment of collateral, if there was a default on the note, Harley was

_____

[2]   Tr. 12/12/14, p. 73-74, 109, Gov't Ex. 32.10.

to be paid monthly from the production of the wells.[3]  Tr. 12/12/14, p.

59-60.  Kesterson also told Harley that if the oil hit the surface, he had

no rights to it.  Tr. 12/12/14, p. 105.  Yet, Mr. Kesterson acknowledged

that there had been no production on any of the wells since 1993, that

fact was conveyed to Harley in his report.  Harley lied to Kesterson

claiming the wells were in production as of 1999.  Id. at p. 85-86.  Id.

The jury could have reasonably inferred that Harley knew the collateral

was worthless, even assuming Enpetro owned the leases and assuming

they were not expired of sufficient drilling depth rights, because no oil

had been produced on any of the wells for fifteen years and the wells

were incapable of producing marketable oil.  The jury could have also

reasonably inferred that the fact Harley lied to Kesterson claiming that

the wells were in production in 1999 when they were not, indicated that

he knew the collateral was worthless.

---

[3]  Kesterson conceded he never did a title search of the six leases
he issued his report on and had never inspected the wells.  He
acknowledged that he didn't know whether Enpetro owned the leases,
whether the leases were expired, what the drilling depth rights of the
leases were, and most importantly, whether any of the six leases were
the collateral listed in the note and assignment of collateral.  Tr.
12/12/14, p. 38-48.

The jury could have also reasonably inferred that Harley acted with the intent to defraud his victims when he repeatedly claimed that he needed their money so he could extract the oil and sell it because Kesterson told him that he had no rights to the oil once it was removed from the ground.  Tr. 12/12/14, p. 105.

In addition to this circumstantial evidence, there was other circumstantial evidence showing that Harley intended to defraud his victims.  For example, he lied that he needed their money for various business-related purposes, but in reality, used it for everyday living expenses and luxury automobiles.  He lied about his education and wealth, claiming to have a Ph.D., discovering a cure for AIDS, and owning artwork valued at millions of dollars.  He promised exorbitant returns on his "secured corporate promissory demand notes," and then failed to return any of the principle or any of the promised interest, making wildly false claims to justify the failure to pay the victims.

Specifically, the evidence showed that Harley repeatedly lied to his victims about the nature of their investment and his background to get their money.  Mary Ann Alexander, who was born blind, was told by

Harley that his oil investment opportunity was just being offered to a few people he thought who needed it the most, when, in fact, Harley trolled the internet constantly for unsuspecting victims.  Tr. 12/05/14, p. 49; Gov't Ex. 23.11.  As a result, Ms. Alexander borrowed money from her home equity line of credit and took money from her daughter's college education fund because Harley promised a 500 percent return on her money in thirty days.  Tr. 12/05/14, p. 50-51.  Despite asking repeatedly for her money back over the course of twenty-six months, she finally gave up because she couldn't afford to hire a lawyer.  Tr. 12/05/14, p. 55-56.

Harley told Mr. Blau that he represented a group of wealthy Indonesians who owned Federal Reserve notes worth $40 billion and requested Blau to recruit investors to buy the notes.  Tr. 12/05/14, p. 72. Harley also told him that he owned oil and gas reserves worth a huge amount of money and wanted Mr. Blau to recruit people to loan Harley money based on his oil reserves.  Id. at p. 73.  Harley then solicited $5,000 from Mr. Blau promising to give him $1 million in four months in return.  Id. at p. 78.  The $5,000 was supposedly needed by Harley to

pay a certain expense in order to be able to have the Federal Reserve notes free and clear of any encumbrances. Id. at p. 79. After repeatedly asking for his money, Mr. Blau finally gave up in 2012 or 2013. Id. at p. 82.

Kathleen Kelly was a close friend of Harley's wife, who received a $40,000 Social Security disability payment for a brain aneurysm and psychological issues. Tr. 12/05/14, p. 102-103. Harley told her he could triple her money in six months because he was going to sell his vast reserves of oil. Id. at p. 104-105. He offered her that opportunity because they were such good friends. Id. at p. 104. Harley made various excuses why he couldn't pay her back and she eventually contacted a lawyer, but didn't have the money to pursue it. Id. at p. 111.

Marshall Silverstein, an 83-year old man with major medical problems, lost $259,500 as a result of Harley's lies. Tr. 12/05/14, p. 146, Gov't Ex. 42.1. Harley told Silverstein he owned vast oil reserves in Texas worth billions of dollars, $1 billion in government Treasury checks, and artwork worth over $1 million. Tr. 12/05/14, p. 150-151.

-17-

Harley told Silverstein he needed money to get his oil out of the ground and sell it, and promised Silverstein he could triple or quadruple his money in a short time.  Id. at p. 152-153, 170.  Harley also promised to make a $500,000 donation to Silverstein's synagogue and extend it a loan of up to $1.5 million.  Id. at p. 157.  Over a three-year period, 2006 through 2009, based on these lies, Silverstein invested $259,500 with Harley and was promised $2 million in return.  Gov't Ex. 42.1.  He eventually sued Harley, obtained a civil judgment, and his lawyer referred the matter to law enforcement.  Tr. 12/05/14, p. 124-126; 159.  After Harley filed three successive bankruptcy actions to stall Silverstein's lawsuit, he was able to collect $40,000 from the sale of a Lexus automobile Harley purchased with Silverstein's money.  Id. at p. 132, 136-146.  There was more than sufficient evidence for the jury to reasonably conclude that Harley acted with the intent to defraud Silverstein.

Bertrand Falls invested his money with Harley based, in part, on Harley's false claims that he was a minister, was a doctor, and had discovered a cure for AIDS.  Tr. 12/08/14, p. 30.  Harley claimed he had

amassed vast wealth through his ministry and business contacts, including oil and gas contracts, deposits with the Federal Reserve, and valuable artwork. <u>Id.</u> at p. 31.  He also claimed to own a Bentley or a Rolls Royce. <u>Id.</u> at p. 34.  Harley told Mr. Falls he would make him a wealthy man by "assigning the contract with the checks." <u>Id.</u> at p. 36. Mr. Falls was going to use the two $500 million checks to get a credit line and pay Harley once the credit line was opened. <u>Id.</u> at p. 37.  For the privilege of using Harley's checks, Mr. Falls paid Harley $5,000 as an "origination fee." <u>Id.</u> at p. 38.  When Mr. Falls could not gain a line of credit using Harley's bogus checks, Harley demanded $100 million from Falls. <u>Id.</u> at p. 42-43.  Harley threatened to sue him and Mr. Falls begged Harley for forgiveness. <u>Id.</u> at p. 59-60.  Harley continued to demand money from Mr. Falls and Mr. Falls became distraught. <u>Id.</u> at p. 65-66.

Maurice Schufford lost $10,000 based on Harley's false claim of owning an oil field. Tr. 12/08/15, p. 79.  Harley told Schufford he needed his money to "reopen" the oil fields and sell the oil. <u>Id.</u> at p. 79-80.  Harley promised to double Schufford's money in 45 to 60 days. <u>Id.</u>

at p. 82.  Based on these false claims, Schufford, who was 74-years old,

borrowed $10,000 from his mother and wired it to Harley.  Id. at p. 82-

83.  Harley gave him various excuses that it was "taking longer to sell

the oil," but he "never received a dime."  Id. at p. 84.

Malcolm Casselle lost $10,000 based on Harley's false claim of

owning a "voluminous oil asset that had been unrealized."  Tr. 12/08/14,

p. 98, 101.  Harley claimed to own the oil because it collateralized a note

that had defaulted.  Id. at p. 98-99.  Harley proposed a joint venture

where after Mr. Casselle provided funds to Harley, Harley would assign

the oil to Casselle and Casselle would obtain financing based upon it.

Id. at p. 99.  After giving Harley the $10,000, Mr. Casselle realized the

oil assets were bogus and dropped out of the deal.  Id. at p. 106-107.

Harley continued to solicit money from Mr. Casselle based on false

claims of owning valuable Federal Reserve notes and using them as

collateral for an "insurance wrap."  Id. at p. 107-108.  Mr. Casselle

determined that the Federal Reserve notes were bogus and didn't invest

any more money.  Id. at p. 108.  There was more than sufficient

evidence proving that Harley intended to defraud Mr. Casselle with his

false claims of owning a billion dollars' worth of oil and a billion dollars in Federal Reserve notes.

Peter Bunche lost $21,000 as a result of the lies Harley told him. Gov't Ex. 42.1.  Mr. Bunche was looking for someone to finance his film company and was introduced to Harley.  Tr. 12/08/14, p. 166-167. Harley told Mr. Bunche that he owned nearly a billion dollars of oil in Texas and proposed that Mr. Bunche use his assets to obtain the financing.  Id. at p. 173-174.  For the privilege of using Harley's assets, Mr. Bunche had to pay Harley.  Id. at p. 174.  Mr. Bunche borrowed the money from family and friends, wired it to Harley, and soon realized he was unable to obtain financing using the oil assets.  Id. at p. 176. Harley then demanded Mr. Bunche pay him hundreds of thousands of dollars for breaching their agreement.  Id. at p. 178.  Finally, Mr. Bunche realized he had been scammed and refused to pay Harley any more money.  Id. at p. 181-132.

Irene Randall was solicited by Harley to invest $500,000 based on false claims of owning $1 billion of oil in Texas and "billions" in federal bonds or securities.  Tr. 12/09/14, p. 104-105.  Harley found Ms. Randall

because she had previously lost $500,000 in a financial scam and listed her contact information on a website called ripoff.com where investors report fraudsters. Tr. 12/09/14, p. 102. According to Harley, he needed Randall's money to qualify her for an "international trading platform." Id. at p. 105, 110. He promised Randall that she would earn ten times the amount of her principle within months. Id. at p. 105. As part of the sales pitch, Harley emailed an RJH and Co. corporate profile (Gov't Ex. 11.1) which stated that RJH owned ten million barrels of oil in Texas with a value in excess of $1 billion and "investment grade debt instruments valued in excess of $1 billion." In addition, Harley claimed that as of April 2009, RJH had "unrestricted bond power over valuable bank instruments totaling more than $700 billion." Gov't Ex. 11.1. Randall, who had lost $500,000 in a prior scam, didn't have the money so she didn't invest. Id. at p. 114. The United States submits that there was more than sufficient evidence to prove that Harley acted with the intent to defraud Ms. Randall when he solicited her to invest based on his false claims that RJH owned $1 billion in oil and $1 billion in federal securities.

-22-

2.    <u>There Was Overwhelming Evidence That Harley Acted Knowingly And With The Intent to Defraud Regarding Count 23 of The Indictment</u>.

Count 23 of the indictment charged Harley with bank fraud in connection with his repeated attempts between April 2009 and April 2012 to defraud the Federal Reserve Bank of New York by negotiating, depositing, and using two fraudulent $500 million checks purportedly issued by the Federal Reserve Bank of New York for collateral on loans with other financial institutions.  Harley also repeatedly made demands on the Federal Reserve Bank of New York to pay him $1 billion based on the checks.

Harley claims there was insufficient evidence to prove he knew the checks were fraudulent.  As stated above, there was direct evidence of Harley's state of mind because he was repeatedly told by Federal Reserve Bank officials that the checks were fraudulent, and there was a large amount of evidence found during the search showing he created the fraudulent Federal Reserve Bank documents.

3.   <u>There was Overwhelming Evidence That Harley
Devised a Scheme to Defraud Mr. Silverstein by Filing
Two Fraudulent Bankruptcy Petitions</u>.

Counts 16 and 17 charged Harley with bankruptcy fraud based on

two corporate bankruptcy petitions he filed on behalf of RJH and Co.,

which was the debtor on a $2 million of secured corporate promissory

note issued to Mr. Silverstein.  Harley claims that there was insufficient

evidence to prove that the filings constituted a scheme to defraud Mr.

Silverstein.  The United States disagrees.

Harley's only argument is that RJH was in substantial debt and

therefore was entitled to file a bankruptcy petition.  Harley's Br., p. 15.

That argument misses the mark.  Whether or not RJH was entitled to

file a bankruptcy petition is immaterial as to whether the petition was

filed with the intent to defraud Mr. Silverstein.

Mr. Silverstein's lawyer, Kevin Fogerty, testified in great detail

how the two bankruptcy petitions greatly impeded his ability to litigate

his claims against Harley.  Mr. Fogerty testified that he filed the civil

complaint against Harley and RJH in November 2009 and didn't obtain

a judgment until August 2011.  Tr. 12/05/14, p. 132.  He stated the

primary reason for the delay was Harley's bankruptcy filings on behalf of RJH where he listed Mr. Silverstein as a creditor and triggered the delays in his lawsuit. Id. at p. 132-133.

Specifically, the November 22, 2010 bankruptcy petition was filed immediately prior to a pretrial conference scheduled for December 14, 2010 where Mr. Fogerty was seeking sanctions against Harley and entry of a judgment for Harley's refusal to appear for depositions. Id. at p. 135. The pretrial conference was cancelled when Mr. Fogerty and the Court were notified the day before the hearing that the petition was filed due to the automatic stay provision of the Bankruptcy Code. Id. at p. 136.

The records of the bankruptcy court showed that Harley never pursued the petition after it was filed. Tr. 12/09/14, p. 124. Rather, it was dismissed on December 28, 2010, for failure to pay the filing fee. Id. A jury could reasonably conclude that the only reason Harley filed the petition was to defraud Mr. Silverstein and frustrate his attempts to get a judgment, which constitutes "bad faith" under the Bankruptcy Code. Id. at p. 126.

Mr. Fogarty testified that Harley filed a second bankruptcy petition for RJH on March 24, 2011, the day before the hearing was scheduled, on the same issues that were to be litigated on December 14, 2010.  <u>Id.</u> at p. 138-139.  Due to the second bankruptcy petition, the rescheduled hearing was cancelled.  <u>Id.</u> at p. 139.

Mr. Fogarty and the U.S. Trustee both filed motions to dismiss the second bankruptcy petition for "bad faith."  <u>Id.</u> at p. 138; 12/09/14, p. 126.  A hearing was conducted in the bankruptcy court, and Harley testified under oath.  Tr. 12/09/14, p. 139-140.  Harley admitted that one of the reasons he filed the second bankruptcy petition was to prevent the hearing on March 25, 2011.  <u>Id.</u> at p. 140.  At the conclusion of the hearing, the bankruptcy court found that Harley acted in "bad faith" and dismissed the petition and entered a 180-day bar against Harley filing another bankruptcy petition on behalf of RJH.  <u>Id.</u> at p. 141; Tr. 12/09/14, p. 161, Gov't Ex. 17.9.  The government submits that a reasonable juror could conclude that Harley filed the second bankruptcy petition to defraud Mr. Silverstein and frustrate his attempts to get a judgment in the state court proceeding.

-26-

It is also relevant to note that Harley filed a third petition in the bankruptcy court on May 29, 2012, this one a personal bankruptcy petition.  Tr. 12/05/14, p. 142.  At the time this petition was filed, Mr. Silverstein had already obtained a judgment in the state court against RJH and Harley, personally.  <u>Id.</u> at p. 142.  Mr. Fogerty was attempting to collect on the judgment by seizing assets belonging to Harley and the corporation.  The third bankruptcy petition "stopped everything" except for collection efforts of assets titled to RJH.  <u>Id.</u> at p. 143.  At the time, Mr. Fogerty was trying to get the sheriff to go into Harley's home and levy against all assets owned by him personally.  <u>Id.</u> at p. 143.  The third bankruptcy petition prevented that.  On October 12, 2012, that petition was dismissed for failure to pay the filing fee.  <u>Id.</u> at p. 145.

On the totality of this evidence, the government submits there was more than sufficient evidence for a reasonable juror to conclude that Harley intended to defraud Mr. Silverstein by filing the 2010 and 2011 bankruptcy petitions as alleged in counts 16 and 17 of the indictment.

4.    <u>There Was Overwhelming Evidence That Harley
Knowingly and Willfully Made Material False
Declarations on His Three Bankruptcy Petitions</u>.

Harley claims that although "there were some mistakes made in
the information provided on the bankruptcy petitions . . . the record,
however, contains no evidence that the mistakes were knowingly or
fraudulently made."  Harley Br., p. 17.  Harley's conclusory argument is
not supported by the record.

With respect to count 18, the 2010 bankruptcy petition falsely
stated that RJH had assets totaling $765 million, including ten million
barrels of proven reserves valued at $700 million.  This was no simple
mistake.  For the reasons stated above, a reasonable juror could
conclude that Harley well knew that his oil promissory note and
assignment of collateral were worthless.  Thus, there was more than
sufficient evidence to show that Harley's false statement was made
knowingly and fraudulently.

The same argument applies to count 19 which pertains to the 2011
bankruptcy petition which alleged that RJH had assets totaling $765
million, including ten million barrels of proven reserves valued at $700

million.  Viewed in the light most favorable to the government, there was more than sufficient evidence to show that this statement was no mistake, but rather made knowingly and willfully.

With respect to count 20, the 2012 personal bankruptcy petition failed to list Mr. Silverstein, the SEC, and the United States as creditors.  Tr. 12/09/14, p. 171-172, Gov't Ex. 20.1.  The evidence showed that Harley was well aware of these judgments, particularly the Silverstein judgment which had just recently been entered against him personally on August 11, 2011 and was the ongoing subject of collection efforts by Mr. Fogerty at the time the petition was filed.  Harley, himself, listed Silverstein as a creditor of RJH in his 2010 and 2011 petitions so there can be no doubt that he realized Silverstein was owed over $1 million by virtue of the judgment in Lehigh County.

Similarly, Karen Muslowski testified that the United States had a judgment against Harley for $168,802 as of March 30, 2001.[4]  Tr.

_____

[4]  The judgment was based on a restitution order in a prior criminal case that Harley was convicted of involving defrauding AIDS patients.  See United States v. Harley, 3:CR-96-286-01, DDE 558, aff'd, United States v. Harley, 39 Fed. App'x 789 (3d Cir. 2002).

12/09/14, p. 5-6.  As of July 26, 2012, the balance owed was $167,855.74.

Id. at p. 6.  Ms. Muslowski testified that Harley was repeatedly notified

about this debt, including the filing of lien documents in March 2009

with the Monroe County Court of Common Pleas, and with two

collection letters in May 2011 and August 2011.  Id. at p. 9-13.  A

reasonable juror could conclude that Harley's omission of the debt was

knowing and willful and not a simple mistake.

Last, the SEC had a judgment against Harley for $1.4 million.[5]

Pursuant to a stipulation, a copy of the SEC's judgment (Gov't Ex.

20.5A) was read into the record.  Tr. 12/09/14, p. 13-15.  That judgment

was dated January 4, 2008.  Id.  Also read into evidence was a letter

from the SEC reminding Harley of that debt dated October 25, 2010.

Id. at p. 15-17, Gov't Ex. 20.5C.

_____

[5]   The SEC judgment was the result of a securities fraud lawsuit
connected to Harley's operation of an AIDS clinic in the Poconos
between 1989 and 1996 and his solicitation of investments from the
public alleging that his ozone/enema treatment was a clinically tested,
patented procedure that cures AIDS.  See SEC v. Lazare Industries,
Inc., et al., 3:CV-96-0705, DDE 121, aff'd, SEC v. Lazare Industries,
Inc., 294 Fed. App'x 711 (3d Cir. 2008).

Based on these facts, the jury could have reasonably concluded that Harley's omission of this debt was knowing and willful and not a simple mistake.

Count 21 alleged that Harley made other false statements in his 2012 personal bankruptcy petition.  Specifically, that he failed to state he was an officer of RJH.  Tr. 12/09/14, p. 174.  Harley repeatedly told his victims he was the CEO of RJH and signed all of his correspondence using that title, including his prior corporate bankruptcy petitions. Thus, the United States submits there was more than sufficient evidence for the jury to reasonably conclude that Harley knowingly and willfully omitted this information.

Count 22 alleged that Harley made additional false statements in his 2012 personal bankruptcy petition.  Specifically, that he failed to list all personal property owned by him and his wife, including art objects. The petition, in fact, failed to list any personal property in Schedule B except a checking account at FNCB with a value of $3.00, and Harley's

clothes, watch, wedding band, and chain.[6]  See Gov't Ex. 20.3, Tr.

12/09/14, p. 177.  Harley failed to list bank accounts he controlled at

Merrill Lynch, Penn Security, and Wachovia (Gov't Ex. 26.2A, B, and C)

where most of the victims' money ended up going, luxury vehicles he

purchased with the victims' money, as well as the $1.8 million in

valuable art he claimed to own.  Nor did he list any government or

corporate bonds he claimed were worth billions of dollars and over

which he claimed to have "unrestricted bond power."

The government submits that there was more than sufficient

evidence for the jury to conclude that Harley knowingly and willfully

omitted this information from his personal bankruptcy petition.

---

[6]    On Schedule C, Harley claimed some personal property was
exempt, including his townhome, which he valued at $70,000,
"personal," no value, and "car" at $1,800.  As Mr. Fogerty testified, the
2008 Lexus was valued at $40,000 and titled in the name of RJH.  Tr.
12/05/14, p. 129-132.  See Gov't Ex. 20.3.

**B.** **THERE WAS NO MISCARRIAGE OF JUSTICE WHEN A DOCUMENT WAS BRIEFLY SHOWN TO THE JURY REFLECTING A PRIOR CRIMINAL CASE HARLEY WAS INVOLVED IN.**

During the testimony of Karen Muslowski on December 9, 2014, Gov't Ex. 20.6(E) was briefly displayed to the jury.[7]  Tr. 12/09/14, p. 12. That document reflects a "criminal" docket number for the monetary judgment that Ms. Muslowski was testifying about.  At the time the document was displayed, no objection was made, nor was there any indication that anyone on the jury noticed the word "criminal."  Nor was any objection made prior to trial when all the government's exhibits were turned over to the defense for review.

The next day, Harley brought the matter up, but incorrectly stated it happened during the testimony of Greg Schiller.  Tr. 12/10/14, p. 4.  Although the Court stated it did not remember seeing the reference, the Court did indicate it would give a curative instruction if the defense wanted it to do so.  Id. at p. 5.  The matter was then put on

---

[7]    The redacted and unredacted version of this letter is attached as Exhibit 1(A) and 1(B).

hold so the government could find the document Harley was referring to.  Id. at p. 8.

Over the lunch break, the government identified the document as Gov't Ex. 20.6(E).  Tr. 12/10/14, p. 47.  The caption used the word "criminal."  There was no other information on the document indicating the nature of the charge or any other specifics.  The parties agreed to redact that portion of the document before it went back to the jury.  Id. The defendant requested time to think about the need for a curative instruction and that was granted.  Id. at p. 48.  No motion for a mistrial was made.  The trial then proceeded.

On December 15, 2014, Harley declined to request a curative instruction.  Tr. 12/15/14, p. 32. Harley's Br., p. 18.

The United States submits that no miscarriage of justice occurred in connection with the inadvertent display of this document, and a new trial is not warranted.  First, there is no evidence that anyone on the jury ever saw the word "criminal" during the few moments the document was displayed, or somehow interpreted it to mean that Harley was previously convicted of an offense.  Second, the matter was

so brief and insignificant that defense counsel did not request a curative instruction or move for a mistrial.  In light of the overwhelming evidence of Harley's guilt, this error was harmless.

Harley's citation to United States v. Rinaldi, 301 F.2d 576 (2d Cir. 1962), is inapposite.  In Rinaldi, a motion for a mistrial was made because the prosecutor deliberately asked the defendant's wife if her husband was ever convicted of a crime.  Rinaldi, 301 F.2d at 577.  The witness answered "yes."  Id.  An immediate motion for a mistrial was made and denied by the court.  Id. at 578.  Under these facts, the Second Circuit reversed.

Unlike Rinaldi, there was no testimony here about a prior criminal conviction.  Nor was the evidence intentionally elicited.  Nor was a motion for a mistrial made.

In United States v. Tomlinson, 2 Fed. App'x 104 (2d Cir. 2001), the Second Circuit distinguished Rinaldi and found that a new trial was not warranted under far worse facts than presented here.  In Tomlinson, a witness referred to the defendant's "extensive criminal history."  Id. at 105.  The court noted there was no contemporaneous

objection to the agent's testimony and no request for a curative

instruction.  Id.  Moreover, the court noted that the district court's sua

sponte invitation for a curative instruction was declined.  Under plain

error review, the court found that the testimony did not seriously affect

the fairness, integrity, or public reputation of judicial proceedings.  Id.

More to the point, the Third Circuit has held that inadvertent

disclosures, far worse than this one, are harmless.  See, e.g., United

States v. Self, 681 F.3d 190, 199 (3d Cir. 2012) (Testimony that

defendant was "already in jail" held harmless, noting that the comment

was "brief, isolated, and unsolicited."); United States v. Greenstein, 322

Fed. App'x 259, 264 (3d Cir. 2009) (Use of the term "police photo" by

prosecutor and "weapons violation" by witness held harmless).  The

same analysis and result should apply here.

### C.  THE ALLEGED INCONSISTENCY REGARDING THE LOCATION OF THE "ORIGINAL" OIL PROMISSORY NOTE IS NOT GROUNDS FOR A NEW TRIAL.

The defendant's argument is difficult, if not impossible, to follow.

He claims there is some inconsistency between the grand jury testimony

of Mr. Dedmon and Mr. Trantham and the trial testimony of S.A.

Browning regarding the location of the "original" oil promissory note.

Assuming <u>arguendo</u> that is true, it is irrelevant and not grounds for a

new trial.

Mr. Dedmon and Mr. Trantham did not testify at trial.  S.A.

Browning testified that he found what appeared to be five "original" oil

promissory notes in Harley's possession.  Tr. 12/11/14, p. 76-77; Gov't

Ex. 45.1.  Harley's counsel could have called Mr. Dedmon or Mr.

Trantham as witnesses if he believed they would have helped the

defense or impeached S.A. Browning, but he did not do so.  The

government fails to see how any alleged inconsistency about the

location of the original oil note[s] impacted the trial considering that the

alleged inconsistency was never brought to the attention of the jury.

### D.    <u>THERE ARE NO GROUNDS FOR A NEW TRIAL UNDER RULE 33.</u>

Although Harley's Brief only makes a passing reference to Rule

33, as pointed out above, in order to grant a new trial on this basis, the

Court must find that an innocent man has been convicted and a

miscarriage of justice has occurred.  Under the facts of this case, that

burden has not been met.  Harley was convicted based on overwhelming evidence of guilt.  The verdict should stand.

## IV.    <u>CONCLUSION</u>.

WHEREFORE, for the reasons stated above, the United States requests that the defendant's motion for a judgment of acquittal or new trial should be denied.  A date for sentencing should be scheduled.

Respectfully submitted,

PETER J. SMITH
United States Attorney


 s/ Bruce Brandler
Bruce Brandler
Assistant U.S. Attorney
Chief, Criminal Division
Attorney I.D. No. PA62052
228 Walnut Street, Suite 220
P.O. Box 11754
Harrisburg, Pennsylvania  17108-1754
(717) 221-4482
(717) 221-4493 (Facsimile)
bruce.brandler@usdoj.gov (Email)

Date:  July 1, 2015

# CERTIFICATION OF LENGTH OF BRIEF

It is hereby certified that government's response in opposition to

defendant's motion for judgment of acquittal and/or new trial contains 7,241

words, as calculated by the word processing software used to create it.


      s/ Bruce Brandler
BRUCE BRANDLER
Assistant U.S. Attorney

PJS:BB:nl

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIM. NO. 3:CR-12-00224 |
| | ) | |
| v. | ) | |
| | ) | (CAPUTO, J.) |
| RICHARD J. HARLEY, | ) | |
| | ) | |
| Defendant. | ) | (ELECTRONICALLY FILED) |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.

That on July 1, 2015, she served a copy of the attached:

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AND/OR NEW TRIAL

by electronic filing to the person hereinafter named:

Joseph A. O'Brien, Esquire
OLIVER, PRICE & RHODES
at jaob@oprlaw.com

s/ Naomi Losch
Naomi Losch
Legal Assistant