## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,    :

                    Plaintiff   :

v.                        :

RICHARD J. HARLEY,       :

                    Defendant

No. 3:12-cr-224

Honorable A. Richard Caputo

---

## MOTION OF DEFENDANT RICHARD J. HARLEY FOR DISMISSAL OF THE INDICTMENT, BASED ON PERJURED TESTIMONY BEFORE THE GRAND JURY, SET ASSIDE GUILTY VERDICT, AND INEFFECTIVE ASSISTANCE OF COUNSEL

---

**NOW COMES**, Richard J. Harley, for dismissal of the indictment for perjured testimony before the Grand Jury, set aside guilty verdict, and for ineffective assistance of counsel for the following reasons:

### PERJURED TESTIMONY AT GRAND JURY

1. Stan Dedmond and William Tranthan testified at the Grand Jury proceedings that resulted in Defendants indictment. They conspired to present false testimony to the Grand Jury in the matter as to the existence of the original Note and the original collateral of assignment. The following questions were asked by AUSA Bruce Brandler on Wednesday February 22, 2012 then on a 302 statement September 4th and 5th 2002.

### STATEMENTS BY DEDMOND

**STATEMENT NO. 1 IN RE: GRAND Jury no. 10-410 pages 18, 19**
Witness: Alvin Stanley Dedmond, Wed. Feb 22, 2012, 2:16 PM. Stated to the Grand Jury pg. 18
> **Q**... Did you ever send the original copy of the note to anyone, to Mr. Harley, to Christie Bower or any one else?
> **A**... No, Sir.

**Q**... Where is the original copy of the note now?
A.  If we can find it, it is in the records in William Tranthan's file system some where or may I say to you that my memory wants me to say that I think I gave that to the young man from the FBI back in 2003 or whatever that...when they had... when Harley was being prosecuted in Alabama or wherever that was.

**STATEMENT 2. PAGE 2 ON 9/4/00 FILE NO. 196D-BH-47935 FBI** in part......
Dedmond confirmed that Enpetro executed a $200 million Promissory Note to RJH and Company dated 9/24/97. He identified his signature on the assignment of collateral, which secured the $ 200 million note with the Brown County oil reserves.  Dedmond sent the note, the assignment of collateral, and engineer report, prepared by Phil Page of Abilene, Texas, to Harley in Pennsylvania via Federal Express. (see exhibit A)


### STATEMENT BY WILLIAM E. TRANTHAN


**STATEMENT 1 IN RE; GRAND JURY NO. 10-410 WED. FEB. 22, 2012 3;15 PM PAGE 9 LINE 13**

**Q**... You don't have copies of any of this correspondence?
A... We thought this thing was long dead, and we buried the paperwork in the Denton Land Fill six, seven years ago at least.

**PAGE 13 Lines 6 thru 13**

**Q**... Was the original note to your knowledge tended to Mr. Harley?
**A**... No
**Q**... Do you know where the original note is?
**A**... No
**Q**... Have you attempted to locate it?
**A**... Yes, well I believe the original not does not exist, I think it went to a landfill.


**STATEMENT NO. 2 PAGE 1 ON 9/5/2000 FILE # 196D-BH-47935 BY FBI RANDY M. HERTON**

Tranthan identified his signature on a 200 million promissory note payable to RJH and Company, Inc. dated 9/24/97, secured by the Brown County Oil Reserves.  RJH was owned by Richard Harley.  Tranthan does not recall the purpose of the note but believes it was used to raise capital.  He does not know that Enpetro never received any consideration from RJH for the note...

**PAGE 2** Tranthan told Harley that note was cancelled and, if he presented it to a financial institution, he would tell them that the note was worthless.

Tranthan has attempted to get the **original note** back from Harley but has been unsuccessful. ( See exhibit B)

### STATEMENT BY DONALD C. KESTERSON

**IN RE: GRAND Jury no. 10-410 pages 18, 19 Wednesday February 22, 2012 12:52 p.m.**

**Q...**On the first one with Christie Bower you said you never got in touch with her?

**A...**No, Sir, not at that time.

**Q...**Did you try to get in touch with her?

**A...**Not at that time sir.

**Q...**At any time?

**A...**Later I believe she called me or I called her just to verify that she had the

**Q...**The original note?

**A. .** Yes, sir

**Q...**Did she verify that?

**A...**Yes Sir

(See exhibit C and D Attorney Christie Bower Safe Keeping Receipts-March 1 1999 and June 13, 2006)

It is important to note that AUSA Brandler made false statements to the Grand Jury pertaining to ownership of a $45,000.00 automobile.  On page 7 line 8 ( See exhibit E)

**Q...**What was the money used for?

**A...**The money was used for what appears to be personal expenses and I'd be happy to go over some of them but the high points, $45,000.00 for an automobile.

**Q...**So they were personal expenses?

**A...**Personal expenses yes.

In AUSA Brandlers brief document 202 (foot note) July 1, 2015 page 38 of 46 he stated Mr. Fogerty testified, the 2008 Lexus was valued at $40,000 and titled in the name of RJH. ( See exhibit F)

Another false statement was made when AUSA Brandler on page 38 line 13-18 stated in part-documents provided by Grand Jury subpoena from Mr. Kesterson's extensive documents stated, I have seen nothing indicating ownership in oil in those documents by Mr. Harley.

> 1.  Donald Kesterson Certified Report Page 4 para. 4 states "based on the wording of the Collateral Assignment in my opinion Enpetro must maintain these Oil Reserves on behalf of RJH and Company, Inc.
> 2.  Re: Analysis of the Oil Reserves in Brown County Texas dated July 3, 1999 very first para. Third line pertaining to "your" Oil Promissory Note and Collateral of Assignment "from" Enpetro LPC, In. ( See exhibits G)

The Defendants Attorney was put on notice regarding the perjured testimony before the Grand Jury, false statements by AUSA Brandler and was provided statements of fact for more than a year and refused to bring the matter to the attention of the Court.  Following are the dates and time notices were faxed. (See exhibit H)

> 1st faxed on June 16, 2014 @ 7:24 pm
> 2nd faxed on June 8, 2015 @ 9;24 am
> 3rd faxed on July 13, 2015@ 10:35 am
> 4th faxed on Nov. 10, 2015 @ 7:02 pm

**BRIEF IN SUPPORT OF MOTION FOR DISMISSAL OF THE INDICTMENT, BASED ON PERJURED TESTIMONY BEFORE THE GRAND JURY, SET ASSIDE GUILTY VERDICT, AND INEFFECTIVE ASSISTANCE OF COUNSEL**

Perjury charges in federal court involves (a) testimony made under oath, (b) that was false, (c) material to the proceeding,[2] and (d) was made deliberately with

knowledge that the information was false. 18 U.S.C. § 1621; 9th Cir. Model Crim. Jury Inst. No. 8.135 (2010). The U.S. Supreme Court stated, "[a] witness testifying under oath or affirmation violates this statute if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94 (1993).

**Grand Jury Misconduct**

Federal courts may use their supervisory powers to dismiss indictments for prosecutorial misconduct in the grand jury. The Supreme Court has recently held that dismissal of an indictment is appropriate only "if it is established that the violation substantially influenced the grand jury's decision to indict," or there is "great doubt" that the decision to indict was free from this substantial influence.

**False Testimony**

Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured material, and when jeopardy is not attached. Whenever a prosecutor learns of any perjury committed before the grand jury, he is under a duty to immediately inform the court and opposing counsel – and, if the perjury may be material, also the grand jury – in order that appropriate action may be taken.

**Ineffective Assistance of Counsel**

The Sixth Amendment provides that it is compulsory process for obtaining witnesses in his/her favor and to have effective assistance of counsel.

> 1. There has been a significant break down in communication before and during trial.
> 2. Failure to investigate.
> 3. Failure to contact witnesses of the defendants choosing.

4. Failure to file meritorious motion on defendant's behalf.

More importantly the defendant faxed and emailed to the Attorney on 4 occasion concerning Subornation of Perjury and Perjury during the Grand Jury proceedings stating that Prosecutor knew or should have known that two of Prosecutions key witnesses knowingly made false statement that were material to the proceedings.

## CONCLUSION

The Defendant submits that the discovery produced in this case of perjured testimony by two key witnesses of the Prosecutor is a miscarriage of Justice and is prejudicial to the Defendant.

Wherefore, this Court for the reasons cited should grant a hearing, delay the reporting to the U.S. Marshals office, grant Defendant Richard J. Harley's Motion for Dismissal of the Indictment, based upon perjured testimony before the Grand Jury, set aside guilty verdict and ineffective assistance of counsel.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of MOTION FOR
DISMISSAL OF INDICTMENT, BASED ON PERJURED TESTIMONY BEFOE
THE GRAND JURY, SET ASSIDE GUILTY VERDICT, AND INEFFECTIVE
ASSISTANCE OF COUNSEL and BRIEF IN SUPPORT, by Defendant, Richard J.
Harley was faxed to Oliver Price & Rhodes, Attorney, Joseph A O'Brien 1212
South Abington Road, P.O. Box 240 Clarks Summit, Pa. 18411

Dated: November 18, 2015

Respectfully Submitted,

Richard J. Harley
P.O. Box 306
Shawnee on Del. Pa. 18356
570-476-6990

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:   GRAND JURY NO. 10-410

IN THE MATTER OF THE UNITED STATES ATTORNEY'S OFFICE


| | | |
|---|---|---|
| Witness | : | ALVIN STANLEY DEDMON |
| Location | : | Federal Building<br>228 Walnut Street, 7th Floor<br>Harrisburg, Pennsylvania |
| Date | : | Wednesday, February 22, 2012,<br>2:16 p.m. |
| Reporter | : | Tracy L. Lloyd<br>Registered Professional Reporter<br>Filius & McLucas Reporting Service |
| Counsel | : | BRUCE D. BRANDLER, ESQUIRE<br>Assistant U.S. Attorney |

1  because why?  Why do you say that?

2  A.    Well, that's a copy he had to fix up from

3  somewhere else.  I don't know where that came from.

4  Q.    How does this differ from the one you sent

5  him?

6  A.    The copy we sent out has "copy" right across

7  William Trantham's signature so the world knows it's a

8  copy.

9  Q.    This one has "copy" -- I'll just put it up on the

10  screen here -- up in the upper right-hand corner, not

11  across the signature; correct?

12  A.    That's correct.

13  Q.    All right.  I think we do have that other

14  document somewhere among this mass of papers, but for

15  the time being let's just use this one.  Other than the

16  placement of the stamped copy, there's also some

17  handwriting at the top left that says certified as a

18  true and correct copy from the original December 1st,

19  '97, Christie Bower.  I'm assuming that that was not on

20  there when you sent it?

21  A.    No, sir, and I'm telling you here today that is

22  not a true copy of the note.

23  Q.    Did you ever send the original copy of the note

24  to anyone, to Mr. Harley, to Christie Bower or anyone

25  else?

1  A.    No, sir.

2  Q.    Where is the original copy of the note now?

3  A.    If we can find it, it is in the records in

4  William Trantham's file system somewhere or may I say

5  to you that my memory wants me to say that I think I

6  gave that to the young man from the FBI back in 2003

7  or whatever that -- when they had -- when Harley

8  was being prosecuted in Alabama or wherever that

9  was.

10  Q.    You think you may have given it to the FBI in

11  Alabama?

12  A.    I believe.  I think I did.

13  Q.    But other than that without finding the other

14  note that has a different copy and handwriting, is the

15  language on the note the same?

16  A.    Yes, I believe it is.

17  Q.    And basically how would you describe what this

18  note -- what rights it gives Mr. Harley and Enpetro?

19  What does this note signify?

20  A.    The note shows our intention to provide a

21  collateral instrument.  If you'll notice on line three

22  or four, I guess it is, below promissory note, you'll

23  see that it gives him the right of assignment and then

24  it says two with a colon, and it's blank.  And then it

25  gives the amount of the note and the determination by

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    09/05/2000

     **ALVIN STANLEY DEDMON**, known as STAN, was interviewed at his place of employment, ENPETRO LPC, INC., 1039 North I-35, suite 301, Carrollton, Texas  75006, telephone 972-446-3775.  DEDMON provided the following descriptive data:

| | |
|---|---|
| RACE: | White |
| DOB: | 9/7/41 |
| HEIGHT: | 6'0" |
| WEIGHT: | 205 lbs |
| HAIR: | Red/White |
| EYES: | Brown |
| TX DL: | 05403137 |
| HOME ADDRESS: | 2023 Grenoble, Carrollton, Texas  75007 |
| HOME TELEPHONE: | 972-242-4384 |
| MOBILE TELEPHONE: | 214-616-8690 |

     DEDMON advised that ENPETRO has moved its location two times within the last two years.  His file related to RICHARD J. HARLEY is in a warehouse, and he would attempt to locate it and provide it to the interviewing agent.

     DEDMON advised that he has been involved in the oil and gas industry for 25 years.  He is the owner of ENPETRO, which was formed in 1989.  While WILLIAM E. TRANTHAM, known as BILL, is listed as an officer, TRANTHAM is actually an attorney and merely signs some corporate documents for ENPETRO.  DEDMON and TRANTHAM officed together for several years in a building owned by TRANTHAM at 2243 Valwood Parkway, Farmers Branch, Texas.  In 1999, TRANTHAM leased the space to an accounting firm and moved his law practice to Denton, Texas.

Investigation on   9/4/00    at  Carrollton, Texas

File #  196D-BH-47935                                     Date dictated   9/5/00

by   Randy M. Horton

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

196D-BH-47935

Continuation of FD-302 of __ALVIN STANLEY DEDMON_____ , On _9/4/00____ , Page __2__

     DEDMON stated that ENPETRO owns leases to approximately 10 million barrels of oil reserves in Brown County, Texas.  These leases were acquired from HAYS HILLTOP OPERATING in 12/93.  HAYS HILLTOP is owned by WELDON HAYS of Lancaster, Texas, whom DEDMON has known for many years.  ENPETRO's purchase from HAYS was in the form of cash and notes.

     DEDMON advised that ENPETRO only owns the oil and gas reserves, and the operation of the wells is conducted by HAYS HILLTOP.  BML, INC, owned by the BERRY brothers, is a trucking service which delivers oil to customers.  DEDMON stated that there has been little production in the 1990's, as the price for oil did not warrant the cost.  Enough oil has been produced to keep from plugging the wells as required by the Texas Railroad Commission.

     DEDMON advised that in the mid 1990's, he and others tried to put together a group of insurance companies.  Promissory notes were issued, secured by the oil reserves, which could be used as part of the capital of the proposed insurance companies.  Nothing came of these efforts.

     In 1997, DEDMON was diagnosed with cancer.  He received a telephone call from TOM GILLEN of Baton Rouge, Louisiana, telephone 225-923-0502.  GILLEN told him that he had learned about RICHARD HARLEY from EDWIN WHITE.  According to DEDMON, WHITE had been the chairman of the Republican Committee in Mississippi.  GILLEN told DEDMON that HARLEY was a holistic medical specialist and had a miracle cure for cancer.  HARLEY wanted to build cancer facilities all over the world.  GILLEN is a white male, 83 years old.

     DEDMON advised that he began corresponding with HARLEY on the telephone.  He has never met HARLEY.  HARLEY told DEDMON that he had an insurance company willing to loan him money, but he needed a promissory note from DEDMON to put on his financial statement.  DEDMON confirmed that ENPETRO executed a $200 million promissory note to RJH and COMPANY dated 9/24/97.  He identified his signature on the Assignment of Collateral, which secured the $200 million note with the Brown County oil reserves.  DEDMON sent the note, the assignment of collateral, and an engineer report, prepared by PHIL PAGE of Abilene, Texas, to HARLEY in Pennsylvania via Federal Express.

     DEDMON stated that ENPETRO did not receive any consideration for the note.  For giving the note, ENPETRO was to

# EXHIBIT B

# CERTIFICATE

This is to certify that the attached proceedings before the Federal Grand Jury 11-01 of the Middle District of Pennsylvania in the matter of:

Witness :          WILLIAM TRANTHAM

Docket Number :

Place :            Federal Building
                   229 Walnut Street, 7th Floor
                   Harrisburg, Pennsylvania

Date :             February 22, 2012

were held as herein appears, and that this is the original transcript thereof.

Tracy L. Lloyd, RPR                    6/20/12
Official Court Reporter                Date

1    produced out of that property.

2         And the purpose, of course, to get some of this

3    money that he was going to be paying was to get the oil

4    to produce in there so that the note would be backed by

5    collateral.  We'd sell the oil and pay the note.

6    Q.      Was the original note ever, to your knowledge,

7    tended to Mr. Harley?

8    A.      No.

9    Q.      Do you know where the original note is?

10   A.      No.

11   Q.      Have you attempted to locate it?

12   A.      Yes.  Well, I believe the original note does not

13   exist.  I think it went to a landfill.  I have just

14   called my secretary to see if there is any electronic

15   form of that around, and I have not heard back from

16   her.

17   Q.      And did you ever deal with the woman named

18   Christie Bower?

19   A.      No, sir.

20   Q.      Did you ever deal with a person named Donald

21   Kesterson?

22   A.      Who?

23   Q.      Kesterson, other than meeting him maybe today at

24   lunchtime in the waiting room?

25   A.      I didn't know the names.

(. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription      09/05/2000

WILLIAM E. TRANTHAM, also known as BILL, DOB 9/16/43, was interviewed at his office, WILLIAM E. TRANTHAM, Attorney, 1710 West University Drive (State Highway 360), Suite A, Denton, Texas 76201, telephone 940-380-1016, fax 940-387-2849.  TRANTHAM provided a home address of 1504 East Sherman Drive, Denton, Texas  76201, telephone 940-382-2912.  TRANTHAM advised as follows:

ENPETRO LPC, INC. is a company which promotes oil and gas deals and is owned by STAN DEDMON.  TRANTHAM is a practicing attorney and is only involved in ENPETRO to the extent that he can sign corporate documents.  Only DEDMON is responsible for its operations.  DEDMON has all of the ENPETRO records.

TRANTHAM advised that he and DEDMON shared office space for several years at 2243 Valwood Parkway, Farmers Branch, Texas. TRANTHAM is the owner of the building.  In 1999, he decided to rent the building out and move his law practice to Denton, Texas, where he lives.

TRANTHAM advised that ENPETRO has extensive holdings of oil and gas reserves, located in Brown County, Texas.  ENPETRO obtained title to these holdings in the early 1990's from WELDON HAYS, an oil man.

TRANTHAM identified his signature on a $200 million promissory note payable to RJH AND COMPANY, INC dated 9/24/97, secured by the Brown County oil reserves.  RJH was owned by RICHARD HARLEY.  TRANTHAM does not recall the purpose of the note but believes it was to be used to raise capital.  He does know that ENPETRO never received any consideration from RJH for the note. TRANTHAM guesses that DEDMON was introduced to HARLEY through TOM GILLEN, an 85 year old oil and gas investor from Baton Rouge, Louisiana.

TRANTHAM advised that he was present when HARLEY called DEDMON at 2243 Valwood Parkway, date unknown.  DEDMON became very angry and told HARLEY that the note was cancelled and wanted it returned.

Investigation on      9/1/00          at   Denton, Texas

File #   196D-BH-47935                              Date dictated   9/5/00

by     Randy M. Horton

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

(v. 10-6-95)

196D-BH-47935

Continuation of FD-302 of    **WILLIAM E. TRANTHAM** _____ , On 9/1/00 ____ , Page ___2___

     Later that afternoon, HARLEY called TRANTHAM, wanting him to write a letter as to the authenticity of the promissory note and the existence and ownership of the oil reserves.  TRANTHAM told HARLEY that the note was cancelled and, if he presented it to a financial institution, he would tell them that the note was worthless.

*NEVER SPOKE to MR TRANTHAM*

    ~~TRANTHAM has attempted to get the original note back from HARLEY but has been unsuccessful.  HARLEY has threatened to sue ENFIELD.~~  TRANTHAM has never met HARLEY.

    The names of DEBORAH CAVE, DIAL AMERICA MARKETING, WORLD WIDE INVESTORS, CHERYL VASSARO, CHERYL VASALLO, RUDOLPH ATKINSON, KEN NELSON, PAUL AHLRICH, EDWIN WHITE, and CLIFTON PATE are all unfamiliar to TRANTHAM.

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

### IN RE:   GRAND JURY NO. 10-410

## IN THE MATTER OF THE UNITED STATES ATTORNEY'S OFFICE

| | | |
|---|---|---|
| **Witness** | : | **DONALD C. KESTERSON** |
| **Location** | : | Federal Building<br>228 Walnut Street, 7th Floor<br>Harrisburg, Pennsylvania |
| **Date** | : | Wednesday, February 22, 2012,<br>12:52 p.m. |
| **Reporter** | : | Tracy L. Lloyd<br>Registered Professional Reporter<br>Filius & McLucas Reporting Service |
| **Counsel** | : | BRUCE D. BRANDLER, ESQUIRE<br>Assistant U.S. Attorney |

1   A.      Yes, sir.

2   Q.      What is that?

3   A.      The first page is a fax cover sheet, and on the

4   second page it's a request of information and some

5   clarifications of relationships with respect to the oil

6   promissory note.

7   Q.      It says the first sentence, the purpose of this

8   letter is to advise you that I have spoken to company

9   officials evaluating your absence this afternoon.  They

10  have requested the following items.  Who are you

11  referring to when you say "I have spoken to company

12  officials"?

13  A.      I do not recall.

14  Q.      Did you speak to anyone besides Mr. Harley

15  regarding any of these documents that he had sent you?

16  A.      Not --

17  Q.      At that time?

18  A.      -- not at that time.

19  Q.      And you asked him various questions like that you

20  just mentioned as follow-ups here.  One of the things

21  you asked was would it be permissible to speak to

22  Christie Bower regarding the safekeeping receipt, and

23  you also said in number six you have confirmed to me

24  verbally, but could you confirm to me in writing that

25  these leases are all currently in production and at

1   what rates.  On the first one with Christie Bower you

2   said you never got in touch with her?

3   A.    No, sir, not at that time.

4   Q.    Did you try to get in touch with her?

5   A.    Not at that time, sir.

6   Q.    At any time?

7   A.    Later I believe she called me or I called her

8   just to verify that she had the --

9   Q.    The original noto?

10   A.    Yes, sir.

11   Q.    And did she verify that?

12   A.    Yes, sir.

13   Q.    Do you remember what time period that would have

14   been?

15   A.    I'm sorry, sir, I do not.

16   Q.    As far as number six, did you ever get anything

17   in writing confirming that the leases are all currently

18   in production and at what rates?

19   A.    He did send a follow-up to that that alluded to a

20   time period that there was production.

21   Q.    What time period were these wells in production?

22   A.    They were older wells, but there had been

23   production sometime in the early nineties.  I think, if

24   I recall, I believe it was 19 -- up to 1996.

25   Q.    So in 1909 at the time you were asked to do this,

1   Q.    So he sent that proposal to you, but you're

2   saying you rejected it?

3   A.    I rejected it.

4   Q.    Because it was a conflict of interest?

5   A.    Yes, sir.

6         (Grand Jury Exhibit Numbers 13 and 14 were

7   marked for identification.)

8   BY MR. BRANDLER:

9   Q.    Let's start with 13.  What is Exhibit 13?

10  A.    It says verbiage for safekeeping receipt.

11  Q.    And who sent it to who?

12  A.    Mr. Harley faxed it to me.

13  Q.    Why was he sending you verbiage for a safekeeping

14  receipt?

15  A.    I have no idea.

16  Q.    What did he -- were you safekeeping any of his

17  documents?

18  A.    No, sir.

19  Q.    So you have no idea why he sent that to you?

20  A.    No, sir.

21  Q.    Did you ever prepare a safekeeping receipt?

22  A.    No, sir.

23  Q.    Did you have any of the original documents, the

24  original note, the original assignment of collateral?

25  A.    No, sir.

1   Q.    As far as you knew, this lawyer in Pennsylvania

2   had it?

3   A.    Yes, sir.

4   Q.    Going to Exhibit 14, what is that?

5   A.    It is a complete executive summary on RJH and

6   Company and a little more detailed explanation for his

7   ozone treatment therapy.

8   Q.    Do you know why he sent that to you?

9   A.    It says as per my request, but I don't recall

10  requesting it.

11  Q.    You already had an executive summary of RJH that

12  we read earlier?

13  A.    Yes, sir.

14  Q.    Was this -- you mentioned there was a second

15  thing besides the insurance wrap.  There was a capital

16  group --

17  A.    Capital Alliance Group.

18  Q.    Capital Alliance Group.  What was your dealings

19  with Capital Alliance Group with Mr. Harley?

20  A.    Capital Alliance was an equity -- potential

21  equity provider, and Mr. Harley asked if I knew

22  somebody who would possibly lend money against the

23  note, so I introduced him to the firm.

24  Q.    And what was the name of the point of contact at

25  the firm?

1   Q.    That never raised your suspicion that maybe these
2   documents were being used in an illegal manner?
3   A.    No, sir, it didn't.
4   Q.    When is the last time you spoke to Mr. Harley?
5   A.    Sometime just before Christmas of 2011.
6   Q.    Tell us the circumstances of that.
7   A.    He had -- I was busy working out in the oil
8   field.  He had called once and left a message.  I did
9   not return his call.  That was early in the month of
10  December.  He called back, as I say, sometime right
11  before Christmas.  I picked up the phone, and it was
12  him.
13  Q.    What did he say?
14  A.    It was just a friendly exchange asking about how
15  my family was and telling me about his family.  That
16  was it.  There was no business discussion on that.  It
17  was just because we hadn't talked.
18  Q.    Any other discussions with him?
19  A.    No, sir.
20  Q.    Did you try and get in touch with him or did he
21  try and get in touch with you after that point?
22  A.    There has been no attempt by either party that
23  I'm aware of.
24  Q.    Is he aware -- do you know if he's aware that
25  you're here in front of the Grand Jury?

# EXHIBIT D

# Christie E. Bower

### *Attorney and Counselor at Law*

*Jay Park Plaza     P.O. Box 12*
*Marshalls Creek, Pennsylvania 18335-0012*
*570-223-9995*
*Fax  570-223-9141*
*email cebower@csrlink.net*

*402A South Third Street*
*Lehighton, Pennsylvania 18235*
*800-918-9995*

March 1, 1999

Richard J. Harley
RJH and Company, Inc.


Re:     **SAFE-KEEPING RECEIPT**

Dear Richard:

This is to verify that the following documents which you gave to me to place in safekeeping are contained in a safe deposit box rented by me in the Marshalls Creek branch of Mellon Bank:

1.    Original Promissory Oil Production Note payable to RJH and Company, inc. dated September 24, 1997, certificate # M20092497 in the amount of two hundred million ($200,000,000.00) dollars;

2.    Original Assignment of Collateral, dated September 24, 1997, of approximately nine million five hundred twenty-four thousand (9,524,000) barrels of oil reserves; and

3.    Excerpts from geological reports.

Thank you for your consideration in this matter.

Very truly yours,

CHRISTIE E. BOWER

# Christie E. Bower

**Attorney and Counselor at Law**

*5224 Milford Road, Suite 104*
*East Stroudsburg, PA 18301*
*(570) 588-0550*
*Fax (570) 588-0441*
*email: ceblaw@unlink.net*

June 13, 2006

Richard J. Harley
RJH and Company, Inc.

Re:   **SAFE-KEEPING RECEIPT**

Dear Richard:

This is to verify that the following documents which you gave to me to place in safekeeping are contained in a safe deposit box rented by me in the Marshalls Creek branch of PennStar Bank, formerly LA Bank, N.A.:

1.    Original Promissory Oil Production Note payable to RJH and Company, Inc. dated September 24, 1997, certificate #M20092497 in the amount of two hundred million ($200,000,000.00) dollars;

2.    Original Assignment of Collateral, dated September 24, 1997, of approximately nine million five hundred twenty-four thousand (9,524,000) barrels of oil reserves; and

3.    Excerpts from geological reports.

Thank you for your consideration in this matter.

Very truly yours,

*Christie E. Bower*

CHRISTIE E. BOWER

**ENPETRO LPC, INC.**
**2243 Valwood Parkway**
**Farmers Branch, Texas 75234**
**(972)481-7734**

## ASSIGNMENT OF COLLATERAL

STATE OF TEXAS          }

                                     **KNOW ALL MEN BY THESE PRESENTS:**

COUNTY OF DALLAS        }

     That ENPETRO LPC, INC., a Texas corporation whose address is 2243 Valwood Parkway, Farmers Branch, Texas 75234, herein referred to as "Assignor", for a sufficient consideration paid by the Assignee herein, and subject to the further terms and conditions hereof, does hereby TRANSFER, ASSIGN AND CONVEY that certain corporate note as collateral for note numbered M20092497, issued to RJH and Company, Inc., herein referred to as "Assignee", approximately 9,524,000 barrels of oil, being approximately 9,524,000 barrels of the proven reserves of oil underlying the following Oil, Gas, and Mineral lease covering lands in Brown County, Texas to wit:

     Those leases located in Brown County, Texas, described as the Williams Group, containing approximately 10,000,000 barrels of oil reserves.

     The estimated reserves underlying each of the above leases have been arrived at by the use of standard reservoir engineering procedures and production histories of the producing reservoirs.

### I.

### TERM

     This conveyance and all rights hereunder shall be in force concurrently with the effective dates of the note, unless on or before such date the credit enhancement collateral assigned hereby is being called on by a creditor under the provisions of part II hereof or extended by letter of agreement. In such event this conveyance shall remain in full force and effect for so long as reserves are being called on by a creditor under said part II.

### II.

### USE OF ASSIGNED RESERVES

     In the event of default of any loan in which the assigned reserves have been pledged as collateral:

ASSIGNMENT OF COLLATERAL PAGE - 1

STATE OF PENNSYLVANIA
COUNTY OF MONROE
I, JUDITH A. MILLER, DO CERTIFY THIS COPY
To be A TRUE AND EXACT COPY OF THE
ORIGINAL.

*Judith A. Miller*
8/10/99

Notarial Seal
Judith A. Miller, Notary Public
Smithfield Twp., Monroe County
My Commission Expires Sept. 6, 2001
Member, Pennsylvania Association of Notaries

1.   The creditor shall be paid monthly from the production of wells located on the referenced lease a sum of money equal to ½ (one half) of the oil produced and sold during the preceding month which would otherwise be credited to the full leasehold working interest.

2.   Assignor covenants and agrees that it will at all times during the term of this Assignment, and prior to any call being made on such collateral, maintain available for future production from the above referred to lease, or from such other lease or leases as may be added to this assignment from time to time, sufficient remaining producible reserves so that ½ (one half) of the leasehold working interest share of such reserves shall equal or exceed 9,524,000 barrels of oil at a net value after operations of USD $21.00 (twenty-one United States Dollars) per barrel for each barrel assigned herein for collateral purposes.

3.   Assignor reserves the following rights with respect to the leases subject to this assignment: (a) the right at all times to sell interest in said leases to third parties so long as Assignor retains title to sufficient future producible oil reserves to comply with the terms and provisions of this assignment; (b) the right to drill, operate, produce and sell oil, gas and other hydrocarbons from the lease subject to this agreement so long as sufficient future recoverable reserves are maintained to comply with subparagraph 2 immediately above, provided however, Assignor shall always have the right to maintain sufficient production from each lease to maintain each lease in full force and effect pursuant to its terms, regardless of the future recoverable barrels of oil remaining under each lease in full force and effect pursuant its terms, regardless of the future recoverable barrels of oil remaining under each lease. Assignor covenants that should it be required to continue to produce a lease in order to maintain it in force and effect, and if such continued production would possibly default to less than the required number of barrels to satisfy the balance under default, that it will add additional lease interest to bring the collateral reserve into balance.

   Assignor warrants that the oil reserves assigned hereby are free and clear of all liens and encumbrances whatsoever, that the Grantor has good title to the leasehold estates created by the referenced leases and has the right to assign these oil reserves underlying said lease.

   Please note that facsimile copy of this document is to be considered as the original.

   Executed this <u>24</u> day of <u>September</u>, 1997.

STATE OF PENNSYLVANIA
COUNTY OF MONROE
I, JUDITH A MILLER, DO CERTIFY
THIS COPY TO BE A TRUE AND
EXACT COPY OF THE ORIGINAL.

*Judith A. Miller*
8/10/99

ENPETRO LPC, INC.

BY: _____
   Stan Dedmon,
   President

**ASSIGNMENT OF COLLATERAL PAGE - 2**

Notarial Seal
Judith A. Miller, Notary Public
Smithfield Twp., Monroe County
My Commission Expires Sept. 6, 2001
Member, Pennsylvania Association of Notaries

**STATE OF TEXAS**      {

**COUNTY OF DALLAS**     {

    This instrument was acknowledged before me on <u>September 24, 1997,</u> by Stan Dedmon, President of ENPETRO LPC, INC., a Texas corporation on behalf of said corporation.



           **SEAL**

Notary Public in and for
The State of Texas

STATE OF PENNSYLVANIA
COUNTY OF MONROE
I, JUDITH A MILLER DO CERTIFY
This Copy To be A TRUE AND EXACT
COPY OF the ORIGINAL.

Judith A. Miller 8/10/99

**ASSIGNMENT OF COLLATERAL PAGE - 3**

Notarial Seal
Judith A. Miller, Notary Public
Smithfield Twp., Monroe County
My Commission Expires Sept. 6, 2001
Member, Pennsylvania Association of Notaries

## LEASE LIST AND DATA

| LEASE | LEASE # | NO. WELLS | ACRES |
|---|---|---|---|
| BUSBEE | 14272 | 16 | 158 |
| J. A. BUTLER (3 Inj) | 10455 | 9 | 171 |

(Note: some of the wells on this lease started out as V. O. King then lease was sold to Jos. A. Butler)

| LEASE | LEASE # | NO. WELLS | ACRES |
|---|---|---|---|
| HARRIS "A" (2 Inj) | 11301 | 7 | 121 |
| HARRIS "B" (shows 1 inj) | 11197 | 4 | 203 |
| TISCHLER | 11842 | 7 | 101 |

This lease was combined in 1984, joining 3 sub-leases

| LEASE | LEASE # | NO. WELLS | ACRES |
|---|---|---|---|
| WATSON | 14273 | 3 | 61 |

STATE OF PENNSYLVANIA
COUNTY OF MONROE

I, Judith A Miller Do Certify
This Copy To Be A True And Exact
Copy Of The Original.

Judith A Miller

8/10/99

Notarial Seal
Judith A. Miller, Notary Public
Smithfield Twp., Monroe County
My Commission Expires Sept. 6, 2001

Member, Pennsylvania Association of Notaries

1

$200,000,000

$200,000,000

# ENPETRO LPC, INC.

## PROMISSORY

## OIL PRODUCTION NOTE

FOR VALUE RECEIVED, ENPETRO, LPC, INC. PROMISES TO PAY TO THE ORDER OF:
RJH AND COMPANY, INC.

WITH RIGHTS OF ASSIGNMENT TO:
THE SUM OF TWO HUNDRED MILLION DOLLARS ($200,000,000)
DUE AND PAYABLE UPON DEMAND AFTER 380 DAYS FROM DATE OF ISSUE,

THIS NOTE IS SECURED BY THE ASSIGNMENT OF THE OIL RESERVES PRODUCED
PURSUANT TO DIVISION ORDER FROM BML, INC. CRUDE OIL MARKETING CO. TO HAYS
HILLTOP OPERATING, DATED MAY 11, 1992. THE ASSIGNMENT AGREEMENT IS MADE A PART
HEREOF FOR PROPER IDENTIFICATION. THE PRINCIPAL AND THE ACCUMULATED INTEREST OF
THIS NOTE IS FULLY PAYABLE UPON THE DUE DATE. THE MAKER HEREOF WAIVES
PRESENTATION FOR PAYMENT, NOTICE OF NON-PAYMENT, PROTEST AND DILIGENCE IN
BRINGING SUIT AGAINST ANY PARTY. IN THE EVENT OF DEFAULT THE UNDERSIGNED
AGREES TO PAY ALL REASONABLE ATTORNEY FEES AND COSTS OF COLLECTION.

ENPETRO LPC, INC.

BY: _____

ITS: CORP. SEC./TREASURER

DATE ISSUED:   September 24, 1997

CERTIFICATE #: M20092497

*ANY PLEDGE OR ASSIGNMENT REQUIRES NOTICE TO THE MAKER OF THIS NOTE*

STATE OF PennSyLVAniA
CounTy iF mohRoe
I, JudiTh M miLLee, DO cERTiFy This copy   Judith A. Miller   8/10/99
To be A TRue And ExALT copY oF The oRiginal.

Notarial Seal
Judith A. Miller, Notary Public
Smithfield Twp., Monroe County
My Commission Expires Sept. 8, 2001
Member, Pennsylvania Association of Notaries

# EXHIBIT E

1  this, when you got Mr. Harley's bank accounts and his

2  Merrill Lynch account, did you look to see how he used

3  the investors' money?

4  A.      Yes, I did.

5  Q.      Was any money ever used to extract oil from

6  Texas?

7  A.      No.

8  Q.      What was the money used for?

9  A.      The money was used for what appears to be

10 personal expenses, and I'd be happy to go over some of

11 them, but the high points, $45,000 for an automobile.

12 Q.      So they were personal expenses? ( purchase in

13 A.      Personal expenses, yes.  the corporate Name

14 Q.      There were no checks written to -- ~~during~~ RSH

15 A.      I saw nothing.

16 Q.      -- oil companies?

17 A.      No wire transfers or checks indicating any

18 attempt to extract oil, anything to do with oil related

19 issues in Texas at all.  Personal did no run wells or Leases

20         MEMBER OF THE GRAND JURY:  Was there

21 anything in doing your background research that linked

22 Mr. Harley to the physical property in Texas?  Any

23 deeds, anything that would say that he had any

24 ownership or right to the land that was under this?

25 A.      I have not found anything indicating he has any

# EXHIBIT F

clothes, watch, wedding band, and chain.[6]   See Gov't Ex. 20.3, Tr.

12/09/14, p. 177.   Harley failed to list bank accounts he controlled at

Merrill Lynch, Penn Security, and Wachovia (Gov't Ex. 26.2A, B, and C)

where most of the victims' money ended up going, luxury vehicles he

purchased with the victims' money, as well as the $1.8 million in

valuable art he claimed to own.   Nor did he list any government or

corporate bonds he claimed were worth billions of dollars and over

which he claimed to have "unrestricted bond power."

The government submits that there was more than sufficient

evidence for the jury to conclude that Harley knowingly and willfully

omitted this information from his personal bankruptcy petition.

---

[6]   On Schedule C, Harley claimed some personal property was
exempt, including his townhome, which he valued at $70,000,
"personal," no value, and "car" at $1,800.   As Mr. Fogerty testified, the
2008 Lexus was valued at $40,000 and titled in the name of DHL.  Tr.
12/05/14, p. 129-132.   See Gov't Ex. 20.3.

-32-

# PENNSYLVANIA FINANCIAL RESPONSIBILITY IDENTIFICATION CARD

This card must be shown to any Law Enforcement Officer upon request

**American Fire and Casualty Company**

Company Number
**24066**

An authorized Pennsylvania insurer has issued an Owner's Policy of Liability Insurance which satisfies the requirements of the Pennsylvania Financial Responsibility Law.

OFFICE ISSUING CARD

TEL 908-537-2000

**DDD AGENCY LLC T/A DURYEA AGENCY**
**PO BOX 278**
**GLEN GARDNER, NJ  08826-0278**

**RJH AND CO INC**
**PO BOX 337**
**SHAWNEE ON DELAWARE, PA  18356-0337**

POLICY NUMBER
**BAA 53535797**
EFFECTIVE DATE
**08/23/2009**

EXPIRATION DATE
**08/23/2010**
NOT VALID MORE THAN 1 YEAR
FROM EFFECTIVE DATE

Applicable with respect to the following Motor Vehicles

**2008    LEXS GX 470**
Year            Make

**JTJBT20X880164193**
Vehicle Identification Number

SEE IMPORTANT MESSAGE ON REVERSE SIDE

# EXHIBIT G

STATE OF PENNSYLVANIA

County of Monroe Case 3:12-cr-00224-ARC Document 218 Filed 11/19/15 Page 40 of 51

I, Judith A Miller, Do Certify that

This copy is A True And Exact copy of The Original.

Judith A Miller
8/10/99

# DONALD C. KESTERSON

PETROLEUM GEOLOGIST

P.O. Box 2036
Parkersburg, WV 26102

Phone (304) 295-5511
Fax (304) 295-9292

Notarial Seal
Judith A. Miller, Notary Public
Smithfield Twp., Monroe County
My Commission Expires Sept. 6, 2001
Member, Pennsylvania Association of Notaries

July 3, 1999

Mr. Richard J. Harley
RJH and Company, Inc.
P. O. Box 337
Shawnee on Delaware, PA 18356

RE: Analysis of the Oil Reserves in Brown County, Texas

Dear Mr. Harley:

As per your request, a complete analysis of the recoverable volumes of crude oil reserves has been prepared on the Oil and Gas Leases in Brown County, Texas pertaining to your Oil Promissory Note and Collateral Assignment from Enpetro LPC, Inc. (Enpetro). The reserve analysis was prepared on six leases totaling 815 Acres, more or less, with a total of 46 wells.

No trips were made to the leases to determine their present condition, nor to the Brown County Court House to determine the present status. Title Abstracts should be sought to determine the status of these leases including the drilling depth rights.

There has been no production from any of these 46 wells since 1993, which means no value can be assigned to the Proved Developed Producing (PDP) Reserves. It has been represented, verbally, by the Texas Railroad Commission that as of June 1, 1999, these wells remain on the active list, without violation. However, this status could change in continued absence of production at some time in the future. Then the operator would not only have a plugging liability but would be in default of your agreement, unless altered in writing by both parties.

The information used to compile this reserve study was provided by the following sources and accepted as factual.

1) The Texas Railroad Commission, governing body for the oil and gas industry of the State of Texas has certified that they are providing you with true copies of all documents including: plats (surveys), permits, completion data, 4 Point Draw Down Tests, historical production figures, etc. filed with the Commission. This, obviously is good quality information and the production filed with the Railroad Commission must be cross-reference with the oil purchaser, so the production information is probably good and accurate.

2) An Engineering/Geology report prepared by Mr. Phil Page, including various structure and well spot maps showing the six leases covering 815 acres. The structure maps and wells spot maps from his report were used to determine certain conditions for the reserve report.

3) The Oil Promissory Note, which covers crude oil only, not natural gas. The 380-day time period has passed, therefore, it can be called or leveraged.

**DISCUSSION:**

In order to appraise the crude oil reserves on the Oil and Gas Leases in Brown County, Texas backing the Oil Promissory Note and Collateral Assignment from Enpetro LPC, Inc. (Enpetro). The information was compile as follows:

1) The Texas Railroad Commission, governing body for the oil and gas industry of the State of Texas has certified that they are providing you with true copies of all documents including: plats (surveys), permits, completion data, 4 point draw down tests, historical production figures, etc. Some of this information was summarized in the Well Data Section of this report.

2) An Engineering/Geology report prepared by Mr. Phil Page, covering the six leases, 815 acres. The electric logs, structure maps and wells spot maps from his report were used to determine certain conditions for this reserve report.

3) The Oil Promissory Note, which covers crude oil only and not natural gas. This Note was for 360 days and that time period has passed. Therefore, it can be called or leveraged if acceptable by a third party. It is in the amount of Two Hundred Million Dollars ($200,000,000.00) and states it is secured by a Division Order from BML, Inc. to Hays Hilltop Operating.

4) The Collateral Assignment does state that the Assignor, Enpetro, "...will maintain at all times an oil reserves in Brown County, Texas described as the Williams Group, which contains 10,000,000 barrels." Based on the wording of the Collateral Assignment, it my opinion Enpetro must maintain these Oil Reserves on behalf of RJH and Company, Inc. Further, Enpetro should maintain a current oil reserves report, prepared by a certified professional, with RJH and Company, Inc., on their oil reserves in Brown County in order to meet the terms of the **Collateral Assignment – Clause II. Use of Assigned Reserves 2. Available Reserves.** "...whereby one-half (1/2) of the working interest reserves will equal to or exceeding 9,524,000 barrels" to back its Oil Promissory Note. This clause goes on to state that these reserves, the 9,524,000 barrels, could be increased such that the net value after operations is equal to the value of the reserves at the time of the Collateral Assignment and based on $21.00 per barrel oil. Based on the current market price of $16.75 per barrel, their reserve base must be increased. Although, Mr. Pages report covers only these six leases or 815 acres, it is implied in Enpetro's Executive Summary that they have more leases in Brown County and could assign them in order to maintain this reserve base.

The information from the Texas Railroad Commission, Oil Promissory Note and the Collateral Assignment were accepted as factual, without further investigation.

No trips were made to the field to examine the current equipment status on each of the wells on these leases. No trip was made to the Brown County Court House to determine the present status of the leases, drilling depth rights or the working interest ownership.

There has been no production from any of these 46 wells since 1993, according to the figures provided by Railroad Commission, these leases have sold 20,629 MCF of natural gas and 63,405 barrels of oil in their cumulative history. There are some inconsistency in the reporting; The permit papers on

4

RJH and Company
Page Two

July 3, 1999

4) The Collateral Assignment does state that the Assignor, Enpetro, will
   maintain at all times oil reserves, whereby one-half (1/2) of the working
   interest reserves will equal to or exceeding 9,524,000 barrels to back up
   the Oil Promissory Note.

The determination of crude oil reserves for this report is unique for
several reasons. Normally, to analysis oil and gas leases, an evaluation is
prepared based on historical Gas and Oil Production figures, Cash flow, Lease
Operating Expenses (LOE), Net Revenue Interests of each of these leases.
However, this situation does not apply to the terms of the Oil Promissory
Note or the Collateral Assignment. Volumetric Reserves were estimated on 19
wells covering five formations underlying these leases, which are as follows:
Blake Sand, Cross Cut Formation, Caddo Limestone, Marble Falls Sand and the
Duffer Sand, using Petroleum Industry accepted formulas. However, the
estimation of these reserves do not constitute any guarantees of production.
In order to estimate volumetric reserves, certain geological conditions also
must be estimated, such as, formation extent and ability to drain same. There
are no depth limitation cited in either the Collateral Assignment or the Oil
Promissory Note, but with electric log data available for formations only
down to 3500 feet. It is likely that there are deeper formations, which
contained untapped reserves, however, no value can be assigned to them in the
absence of electric logs or other drilling data, etc.

According to the figures provided by Railroad Commission, these leases
have sold 20,629 MCF of natural gas and 63,405 barrels of oil in their
cumulative history. According to these records, the oldest wells were drilled
in 1966, therefore, production spans from 1966 to 1993.

Data from a total of 67 wells was used to prepare this report, 43 of
these wells had 4 Point Draw Down Tests filed with the Railroad Commission
showing commercial production at the time of the tests. Twenty-five of these
wells were completed in the Blake Sand, six were completed in the Cross Cut
Formation, three in the Caddo Limestone and one in the Marble Falls Sand.
There were several wells where it was impossible to determine what formation
was completed. There were a total of three Dry Holes and according to the
records three additional wells have been subsequently plugged. Based on the
data from the 4 Point Draw Down Tests, it appears as though this area of
Brown County has/had the potential to be productive. However, taking in
consideration of the cumulative production history, it appears as though
operations have not been carried out very diligently. There may be another
reason, shallow formations tend to decline to stripper production rapidly and
with the noted increases in the water production they may have no longer been
economical under primary production methods.

Considering there has been no production from any of these 46 wells
since 1993, no value can be assigned to the Proved Developed Producing (PDP)
Reserves.

STATE OF PENNSYLVANIA
COUNTY OF MONROE

I, JUDITH A MILLER, DO CERTIFY
THAT THIS COPY IS A TRUE AND EXACT
COPY OF THE ORIGINAL.

*Judith A. Miller*

8/10/99

Notarial Seal
Judith A. Miller, Notary Public
Smithfield Twp., Monroe County
My Commission Expires Sept. 6, 2001
Member, Pennsylvania Association of Notaries

THIS OF PENNSYLVANIA
County of MONROE
I, Judith A. Miller, DO CERTIFY THIS
COPY TO be A TRUE AND EXACT COPY
OF THE ORIGINAL.
Judith A. Miller
8/10/99

Notarial Seal
Judith A. Miller, Notary Public
Smithfield Twp., Monroe County
My Commission Expires Sept. 6, 2001
Member, Pennsylvania Association of Notaries

RTH and Company
Page Three

Based on the above, all of the estimated reserves on these leases and others will fall into two categories: 1) Proved Developed Non-Producing, which can be further broken down into two separate categories; a) Wells which are completed for production but are currently not in production, and, b) Wells which have zones behind pipe appearing to be productive; and 2) Proved Undeveloped Reserves or expected reserves to be recovered from new wells on undrilled acreage limited to those off-setting proved developed reserves. Also, included are undeveloped reserves, which may be recovered through application of improved recovery techniques that have been proven effective by actual production in the area and in the same reservoir.

Volumetric Reserve Estimations were prepared on a total of 19 wells, then using the Structure Maps for each formations they can be projected under the remaining portions of the leases. Again, the five formations analyzed were the Blake Sand, Cross Cut Formation, Caddo Limestone, Marble Falls Sand and the Duffer Sand. To determine the total cumulative recoverable reserves including primary, secondary and tertiary, if applicable, a 25% factor of in-place reserves was used. Because of the terms and conditions of the Oil Promissory Note and the Collateral Assignment, no time limit nor has any economic expense has been placed on the recovery of any of these estimated reserves.

Once the total Estimated Volumetric Reserves have been calculated, then their estimated value must be determined. The estimated reserves were estimated by multiplying them by $16.75, which was the spot price for West Texas Intermediate - Cushing grade for Friday, July 2, 1999. No deductions were made for lifting cost, additional development or for the operation of wells past their economic limit and the plugging of same.

| FORMATION | ESTIMATED BARRELS OF CRUDE OIL | ESTIMATED VALUE |
|-----------|-------------------------------|-----------------|
| TOTAL | 10,217,369 | $171,140,930.75 |

The above reserves and the associated price is applicable by today's standards, any change in the current market price could have a dramatic effect in this estimated value. Again, these reserves were estimated volumetrically, using Petroleum Industry accepted formulas, however, they do not constitute any guarantees of production. These reserves should be viewed as estimations, there are no assurances they can be recovered. If these reserves can be recovered through the variety of methods, no representation of time or expense has been made regarding their recovery. Any lending institution must determine the value of the reserves for their purposes.

Should you have any questions or need additional information please feel free to contact me at your convenience.

Sincerely,

Donald C. Kesterson
AAPG - CPG No. 5090

AMERICAN ASSOCIATION OF PETROLEUM GEOLOGISTS
CERTIFIED PETROLEUM GEOLOGIST
DONALD C. KESTERSON
5090

# EXHIBIT H

Print  |  Close Window

Subject: [FWD: Subornation of perjury/perjury]
From: r.harley@rjhco13.com
Date: Mon, Nov 10, 2014 7:23 pm
To: "Joe O'brien" <jaob@oprlaw.com>
Attach: STATEMENTS BY DEDMON.doc
subbornation.doc
fed rul 1623.doc

-------- Original Message --------
Subject: Subornation of perjury/perjury
From: <r.harley@rjhco13.com>
Date: Mon, June 16, 2014 7:24 pm
To: "Joe O'brien" <jaob@oprlaw.com>

Dear Joe,

As per our meeting on May 29, 2014 you requested that I email you information on the matter of
subornation of perjury and perjury.  Please see the following attachment.

- Statements by Dedmon and William E. Trantam
- Rule 1752 Subornation of Perjury
- 18 U.S. Code 1621-Perjury

Please note, the AUSA knew or should have known the statements from the  two witnesses
during the Grand Jury proceedings were false due to prior statements the two witnesses gave to
agent Randy M. Horton in 2000.

Should you need additional information please do not hesitate to call or email.

Richard Harley, CEO
RJH and Company, Incorporated
570-476-7600
r.harley@rjhco13.com
Skype rjhco2

THE ATTACHED COMMUNICATION IS CONFIDENTIAL AND PRIVILEGED INFORMATION
AND MAY BE USED FOR DISCUSSION AND EVALUATION PURPOSE BY THE RECIPIENT

Copyright © 2003-2015. All rights reserved.

**HP Officejet 4630 e-All-in-One Printer**

**Fax Log for**
mpr
5704761234
Jun 08 2015 9:32AM

**Last Transaction**

| Date | Time | Type | Station ID | Duration | Pages | Result |
|------|------|------|------------|----------|-------|--------|
| Jun 8 | 9:24AM | Fax Sent | 5705855100 | 7:53 | 21 | OK |

HP Officejet 4630 e-All-in-One Printer

Fax Log for
mpr
5704761234
Jul 13 2015 10:45AM

## Last Transaction

| Date | Time | Type | Station ID | Duration | Pages | Result |
|------|------|------|-----------|----------|-------|--------|
| Jul 13 | 10:35AM | Fax Sent | 5705855100 | 9:51 | 21 | OK |

# RJH AND CO. INC.
## PHONE: 570-476-7600

**TO:**   Joe O'Brien                    **Company:** Oliver Price and Rhodes

**DATE:**  June 8, 2015                  **FAX:**  1-570-585-5100

**FROM:**  Richard Harley, CEO           **TOTAL # OF PAGES:** 21

## SPECIAL INSTRUCTIONS

Dear Joe:

In reference to our phone conversation on Friday, June 5, 2015 please see the following attachments:

- False declaration in Grand Jury.
- Excerpts of Grand Jury Statements by Stan Dedmon.
- Excerpts of FBI 302 Statements by Stan Dedmom.
- Excerpts of Grand Jury Statements by William Trantham.
- Excerpts of FBI 302 statements by William Trantham.
- Safekeeping Receipt by Christie Bower, Attorney
- Excerpts of Certified Geological Report by Donald C. Kesterson dated July 2, 1999.

The above mentioned attachments **must** be made a part of your brief along with the exhibits.

Should you need additional information please do not hesitate to call or email.

Joe, Just a reminder I have emailed you these documents at least two times.


Regards,
*R. Harley, CEO*


**Confidentiality Notice:** The information in this faxed transmission is legally privilege and confidential.  It is intended only for the addressed named above.  If you are not the intended addressee, any disclosure, copying or distribution of the information, or the taking action in reliance on it, is strictly prohibited.  If you have received this fax in error, please advice immediately, by phone.  Thank you for your cooperation.

FAXED on JUNE 8, 2015
REFAXED on July 13, 2015

**HP Officejet 4630 e-All-in-One Printer**

**Fax Log for**
mpr
5704761234
Nov 10 2015 7:11PM

**Last Transaction**

| Date | Time | Type | Station ID | Duration | Pages | Result |
|------|------|------|-----------|----------|-------|--------|
| Nov 10 | 7:02PM | Fax Sent | 5705855100 | 8:32 | 20 | OK |

# RICHARD J. HARLEY
**P.O. BOX 306**
**SHAWNEE ON DELAWARE, PA. 18356**

PHONE: 570-476-6990  FAX: 570-476-1234

---

**TO:**   Joe O'Brien, Esq.               **Co.**        OPR Law

**DATE:**  11/10/2015                     **FAX:**      570-585-5100

**FROM:** Richard Harley                  **TOTAL # OF PAGES:** 19

---

## SPECIAL INSTRUCTIONS

Dear Joe,

In reference to our conversation on Tuesday, November 10, 2015, as per your request please see the following documents pertaining to perjured testimony, etc.

- Info on FBI 302 statements
- Excerpt of Grand Jury Testimony regarding the original note.
- 302 statement by FBI Browning
- Excerpt of Grand Jury testimony regarding a personal expense of a $45,000 automobile.
- Identification card on said automobile.
- Excerpt of Grand Jury testimony regarding ownership of oil.
- Excerpts of Certified Geological by Don Kesterson, (see para. No. 4)
- Excerpts of Certified Geological Report ( see para. No. 1)
- Excerpts of Grand Jury Testimony regarding what RJH and Company, Inc. does (see certificate of Incorporation statement no. 3)

Should you need additional information please do not hesitate to call.

Richard

**Confidentiality Notice:** The information in this faxed transmission is legally privilege and confidential. It is intended only for the addressed named above. If you are not the intended addressee, any disclosure, coping or distribution of the information, or the taking action in reliance on it, is strictly prohibited. If you have received this fax in error, please advice immediately, by phone. Thank you for your cooperation.

NOVEMBER 18, 2015

OFFICE OF the CLERK
FEDERAL Building
PO BOX 1148
SCRANTON, PA 18501

RE: CASE NO. 3:12-CR-224

DEAR CLERK OF Courts:

PLEASE STAMP AND File the ENCLOSED
MOTION OF DEFENDANT, Richard J. HARLEY
FOR DISMISSAL OF the INDICTMENT, BASED
ON PERJURED TESTIMONY BEFORE the
GRAND JURY, SET ASSIDE Guilty Verdict,
AND INEFFECTIVE ASSIStANCE OF COUNSEL.

SINCERELY,
RICHARD J HARLEY
PO BOX 306
SHAWNEE ON DEL. PA.
18356
570-476-6990