**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | NO. 12-CR-224 |
| RICHARD J. HARLEY, | (JUDGE CAPUTO) |
| Defendant. | |

**MEMORANDUM**

Presently before me are two (2) post-trial motions filed by Defendant Richard J. Harley ("Defendant" or "Harley"): (1) Harley's Motion for a Judgment of Acquittal or a New Trial (Doc. 168) and (2) Harley's Motion to Dismiss the Indictment, to Set Aside the Verdict, and for Ineffective Assistance of Counsel (Doc. 218).  Harley argues that he is entitled to an acquittal because the Government failed to satisfy its burden of establishing that Harley acted with the requisite intent.  In the alternative, he argues that a new trial is warranted based on (1) the presentation to the jury of evidence regarding his criminal history and (2) inconsistent evidence provided by the United States before the Grand Jury and at trial. Because I find that there was sufficient evidence to sustain Harley's conviction, his Motion for a Judgment of Acquittal will be denied.  Because I find that Harley has failed to establish that there was a miscarriage of justice, his Motion for a New Trial will also be denied. Harley's Motion to Dismiss the Indictment, to Set Aside the Verdict, and for Ineffective Assistance of Counsel will also be denied.

**I. Background**

On August 30, 2012, Harley was indicted by a Grand Jury on twenty-three (23) counts of wire fraud, bankruptcy fraud, and false statements in connection with bankruptcy and bank fraud.  (Doc. 1.)  The basis for these charges are three (3) alleged schemes to defraud in which Harley participated.

The first scheme involves the ownership of oil in Texas.  Harley defrauded individuals

and financial institutions by claiming that his company, RJH & Company ("RJH"), owned over one million dollars ($1,000,000.00) in oil located in Texas. Harley solicited loans and investments from individuals and financial institutions based on this claim of ownership.

The second scheme involves the ownership of bank instruments. Harley falsely claimed that RJH owned Federal Reserve Bank instruments totaling one billion dollars ($1,000,000,000.00) and solicited financial and lending institutions to negotiate, deposit, manage, and loan money against these funds.

The third scheme involves bankruptcy proceedings filed by Harley and RJH. Harley attempted to defraud creditors by filing false and fraudulent bankruptcy petitions in the United States Bankruptcy Court.

On October 16, 2012, Harley entered a plea of not guilty and was granted a pre-trial release on a one hundred thousand dollar ($100,000.00) unsecured bond. On December 3, 2014, a jury trial commenced and on December 15, 2014, Harley moved for a judgment of acquittal, which was denied. On December 16, 2014, the jury entered a guilty verdict on all twenty-three (23) counts against Harley.

On November 16, 2015, judgment was entered against Harley and he was committed to prison for a term of one-hundred and forty-four (144) months on each of Counts 1-15 and 23; and terms of sixty (60) months on each of Counts 16-22, all to run concurrently. Harley was ordered to make restitution totaling three hundred twenty-thousand eight hundred dollars ($323,800.00). No fine was imposed. Upon release from imprisonment, Harley shall be on Supervised Release for three (3) years on each of Counts 1-23, to run concurrently.

**II. Discussion**

Harley has moved (1) for a judgment of acquittal or a new trial and (2) to dismiss the Indictment, to set aside the verdict, and for ineffective assistance of counsel. Each motion will be discussed in turn.

**A.     Motion for a Judgment of Acquittal (Doc. 168)**

On December 30, 2014, Harley filed a motion for a judgment of acquittal or a new trial. (Doc. 168.) He filed a supporting brief on June 17, 2015. (Doc. 200.) On July 1, 2015, the United States filed a brief in opposition to Harley's motion. (Doc. 202.) Although Harley's reply brief was due by July 20, 2015, no reply was filed. His motion is now ripe for disposition.

Rule 29 of the Federal Rules of Criminal Procedure provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The Third Circuit Court of Appeals has stated that the relevant inquiry in deciding a motion for a judgment of acquittal is "whether, after reviewing the evidence in the light most favorable to the prosecution, ***any*** rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. McIntyre*, 612 F. App'x 77, 78 (3d Cir. 2015) (citation and internal quotation marks omitted); *see also Jackson v. Virginia*, 99 S.Ct. 2781, 2789 (1979) (stating the same legal standard). Deference must be afforded to the jury's findings and all reasonable inferences must be drawn in favor of the jury's verdict. *United States v. Riley*, 621 F.3d 312, 329 (3d Cir. 2010).

**1.     Wire Fraud Charges Contained in Counts 1-15**

First, Harley argues that I should grant his motion for an acquittal and enter a verdict of not guilty on the wire fraud charges contained in Counts 1-15 of the Indictment. To prove wire fraud, the Government must prove beyond a reasonable doubt (1) that Harley knowingly and willfully participated in a scheme or artifice to defraud with the specific intent to defraud; and (2) the use of the mail or interstate wire communications in furtherance of the scheme. *United States v. Sawyer*, 85 F.3d 713, 722 (1st Cir. 1996); *Phila. Reserve Supply Co. v. Nowalk & Assocs., Inc.*, 846 F. Supp. 1456, 1470-71 (E.D. Pa. 1994).

Harley argues that there was insufficient evidence to establish the first element, that he *knew* that the Texas oil investment or the Federal Reserve checks were fraudulent or that he *intended* to make any misrepresentation to the companies and individuals to whom he presented these investment opportunities.  In opposition, the Government argues that there was overwhelming evidence that Harley acted knowingly and with intent to defraud.  Because I find that sufficient evidence was presented on this element, Harley's motion for a judgment of acquittal with respect to the wire fraud charges contained in Counts 1-15 of the Indictment will be denied.

### a. Harley Knew That the Texas Oil Investment Was Fraudulent

First, the Government accurately points out that Harley's claim that he owned over one billion dollars ($1,000,000,000.00) of oil located in Texas is sufficiently incredulous that any reasonable juror could have disbelieved it.

Second, F.B.I. Special Agent Vincent Browning ("S.A. Browning") testified at trial that Harley told him that his income consisted of five hundred and thirty-five dollars ($535.00) per month in Social Security income.  (Doc. 180, Tr. 12/11/14, 31:11-15.)  According to S.A. Browning's trial testimony, Harley informed him that he possessed a valid, signed, two hundred million dollar ($200,000,000.00) original oil promissory production note from Enpetro, yet when asked why he did not call the note due given his limited income, Harley stated that he "preferred to hold the asset and just try to borrow against its value." (*Id.* at 36:9-37:8.)  Harley then stated that he did not think that Enpetro had the money to pay him. (*Id.* at 37:8-13.)  S.A. Browning also testified that when he pressed Harley on what consideration he gave Enpetro in exchange for the two hundred million dollar ($200,000,000.00) note, Harley "didn't want to talk further about his financial dealings" and that "it was kind of the end of that oil discussion." (*Id.* at 38:1-6.)  In light of this evidence that Harley never called his  two hundred million dollar ($200,000,000.00) note due despite

having no source of income besides five hundred and thirty-five dollars ($535.00) per month in Social Security income, the jury could have reasonably inferred that Harley knew that his note and collateral were worthless.

Third, oil geologist Donald Kesterson acknowledged that there had been no production on any of the wells since 1993, and that fact was conveyed to Harley in Kesterson's July 3, 1999 report. (*See* Doc. 193, Tr. 12/12/14, 106:5-8; 107:25-108:8; *see also* Doc. 218, Ex. G.) Kesterson also testified that Harley falsely told him that the wells were in production as of 1999. (*Id.* at 85:1-22.) Based on Kesterson's testimony that Harley lied to him about the wells being in production in 1999, the jury could have reasonably inferred that Harley knew that the collateral was worthless.

In addition, there was circumstantial evidence showing that Harley intended to defraud his victims. For example, S.A. Browning testified that Harley obtained money from his victims that they demanded he use for investments, but then instead of investing that money, he spent it on his mortgage payments, household expenses, and a Lexus automobile. (*See, e.g.*, Doc. 180, Tr. 12/11/14, 31:16-33:25.) Harley also lied about his education and wealth, claiming to have a Ph.D., to have discovered a cure for AIDS, and to own artwork valued at millions of dollars. (*See, e.g.*, Doc. 178, Tr. 12/5/14, 150:20-151:23; Doc. 181, Tr. 12/4/14, 105:24-106:2.) Taken together, a reasonable juror could have inferred that Harley knew the Texas oil investment was fraudulent and that he intended to make misrepresentations to individuals to whom he presented investment opportunities.

### b. Harley Knew That the Federal Reserve Checks Were Fraudulent

First, the Government accurately points out that Harley's claim that he owned trillions of dollars in Federal Reserve instruments is sufficiently incredulous that any reasonable juror could have disbelieved it.

Second, direct evidence of Harley's state of mind was introduced with testimony from

various Federal Reserve Bank officials that they frequently communicated with Harley and repeatedly informed him that the Treasury checks and associated documents that he claimed to be valid were bogus and part of a well-known scheme to defraud the Federal Reserve Bank. (*See, e.g.*, Doc. 185, Tr. 12/3/14, 54:1-58:4 (testimony of Richard Jones, General Counsel for the Federal Reserve Bank of Atlanta); Doc. 181, Tr. 12/4/14, 83:11-85:10 (testimony of Leonard Zawistowski, former investigator for the Board of Governors of the Federal Reserve System); Doc. 181, Tr. 12/4/14, 106:16-114:8 (testimony of Sahil Godiwala, Managing Director at the Bank of New York Mellon and former counsel at the Federal Reserve Bank of New York).) In one conversation, Harley was told that it was a federal crime to attempt to negotiate these checks. (Doc. 181, Tr. 12/4/14, 109:12-18 (testimony of Sahil Godiwala).) However, Harley continued to make false representations about the legitimacy of the checks well after those conversations. Based on his persistent representations of these checks even after being repeatedly informed by officials that they were bogus, a reasonable juror could have concluded that Harley knew the checks were fraudulent and possessed an intent to defraud.

Third, circumstantial evidence of Harley's state of mind was introduced through S.A. Browning's testimony that he found numerous incriminating documents in Harley's residence and on Harley's computer as a result of a search conducted on August 29, 2012. For example, the print-out of a document entitled "Scam Involving Yohannes Riyadi and/or Wilfredo Saurin November 2007," pulled off of the Federal Reserve Bank of New York website, was found in Harley's residence. (*See* Govt. Ex. 23.8(B).) This printout, which advised the public of the fraudulent nature of Harley's documents and described Harley's scheme, *i.e.*, fraudsters attempting to use the fraudulent documentation as collateral for lines of credit or other types of asset-based financing, was admitted into evidence and presented to the jury.

Additionally, S.A. Browning testified that during the course of his search of Harley's residence, he found a document entitled "Overview of a Conversation with Richard A. Jones, general counsel and myself," which was Harley's own characterization of a

conversation he had with Richard Jones, showing that Jones told Harley that his documents were all bogus. (*See* Doc. 180, Tr. 12/11/14, 89:8-90:6; *see also* Gov. Ex. 23.9.)

Other incriminating documents found during the August 29, 2012 search indicated that Harley actually created the fraudulent Federal Reserve documents. For example, S.A. Browning testified to a print-out of an April 30, 2009 e-mail from Harley to "josefteo@gmail.com" entitled "verbiage." (Doc. 180, Tr. 12/11/14, 96:12-98:11; *see also* Gov. Ex. 23.15.) This e-mail goes on to request "Joseph" to write a letter on bank letterhead claiming that the Treasury checks are valid. (Gov. Ex. 23.15.) Attached were copies of the bogus "to whom it may concern" letters on what purported to be Federal Reserve Bank letterhead dated May 4, 2009, claiming that the Treasury checks are valid. One version had a typed signature from Ben S. Bernanke, former Chairman of the Federal Reserve System; the other was signed. Other images of signatures of various individuals, including Ben S. Bernanke, were also introduced. (*See* Gov. Exs. 23.16, 17, 18, & 19.).

Based on all of the above evidence, a jury could reasonably conclude that Harley not only knew that his documents were fraudulent, but that what he was doing was illegal. Accordingly, Harley's motion for a judgment of an acquittal of the wire fraud charges in Counts 1-15 of the Indictment will be denied.

**2.    Bank Fraud Charges Contained in Count 23**

Second, Harley argues for an acquittal of the bank fraud charges contained in Count 23 of the Indictment. Count 23 charges Harley with bank fraud in connection with his repeated attempts between April 2009 and April 2012 to defraud the Federal Reserve Bank of New York by negotiating, depositing, and using two (2) fraudulent five hundred million dollar ($500,000,000.00) checks purportedly issued by the Federal Reserve Bank of New York for collateral on loans with other financial institutions. Harley argues that there was insufficient evidence to prove that he knew that the checks were fraudulent.

However, as stated above, there was direct evidence of Harley's state of mind presented at trial. Specifically, there was evidence that Harley was repeatedly told by Federal Reserve Bank officials that the checks were fraudulent, and there was significant

evidence found during the search of his residence showing that he created the fraudulent Federal Reserve Bank documents. Therefore, Harley's motion for a judgment of acquittal on the bank fraud charges contained in Count 23 will be denied.

### 3. Bankruptcy Fraud Charges Contained in Counts 16 and 17

Third, Harley argues for an acquittal of the bankruptcy fraud charges contained in Counts 16 and 17 of the Indictment. Counts 16 and 17 charge Harley with bankruptcy fraud based on two (2) corporate bankruptcy petitions that he filed on behalf of RJH, which was the debtor on a two million dollar ($2,000,000.00) secured corporate promissory note issued to Marshall Silverstein, a victim of Harley's schemes. Harley claims that there was insufficient evidence to prove that the filings constituted a scheme to defraud Silverstein. However, I find that sufficient evidence was presented.

First, Kevin Fogerty, Silverstein's attorney, testified at great length regarding the bankruptcy petitions filed on behalf of Harley and RJH and discussed the reasons he had for believing that these petitions were filed in bad faith. (*See* Doc. 178, Tr. 12/5/14, 132:19-145:25.) For example, the November 22, 2010 bankruptcy petition was filed immediately prior to a pre-trial conference where Fogerty was seeking sanctions against Harley and entry of a judgment for Harley's refusal to appear for depositions. The pre-trial conference was cancelled when Fogerty and the Court were notified the day before the hearing that the petition was filed due to the automatic stay provision of the Bankruptcy Code. The records of the bankruptcy court show that Harley never pursued the petition after it was filed. Rather, it was dismissed on December 28, 2010, for failure to pay the filing fee. A jury could reasonably conclude that the only reason Harley filed the petition was to defraud Silverstein and frustrate his attempts to get a judgment, which constitutes "bad faith" under the Bankruptcy Code.

Additionally, Fogerty also testified that Harley filed a second bankruptcy petition for RJH on March 24, 2011, the day before the hearing was scheduled, on the same issues that were to be litigated on December 14, 2010. (Doc. 178, Tr. 12/5/14, 138:18-139:13.) Due to the second bankruptcy petition, the rescheduled hearing was cancelled. (*Id.*) In

fact, in a separate hearing conducted in bankruptcy court, Harley testified under oath that one of the reasons he filed the second bankruptcy petition was to prevent the hearing on March 25, 2011. (*Id.* at 140:16-21.) A reasonable juror could conclude that Harley filed a second bankruptcy petition to defraud Silverstein and frustrate his attempts to get a judgment in the state court proceeding. Therefore, Harley's motion for a judgment of acquittal on the bankruptcy fraud charges contained in Counts 16 and 17 of the Indictment will be denied.

### 4. False Statement Charges Contained in Counts 18-22

Lastly, Harley argues that I should grant his motion for acquittal on the false statement charges contained in Counts 18-22 of the Indictment. Specifically, he claims that although "there were some mistakes made in the information provided on the bankruptcy petitions," the record contains no evidence that the mistakes were "knowingly or fraudulently made." (Doc. 200, at 17.) However, sufficient evidence was presented at trial that he knowingly and willfully made materially false declarations on his three (3) bankruptcy petitions.

With respect to Count 18, the 2010 bankruptcy petition falsely stated that RJH had assets totaling seven hundred sixty-five million dollars ($765,000,000.00), including ten (10) million barrels of proven reserves valued at seven hundred million dollars ($700,000,000.00). A reasonable juror could conclude that this was no simple mistake and that Harley knew that his oil promissory note and assignment of collateral were worthless. This is also true of Count 19, which pertains to the 2011 bankruptcy petition, which alleged that RJH had assets totaling seven hundred sixty-five million dollars ($765,000,000.00), including ten (10) million barrels of proven reserves valued at seven hundred million dollars ($700,000,000.00).

With respect to Count 20, Harley's 2012 personal bankruptcy petition failed to list Silverstein, the Securities and Exchange Commission, and the United States as creditors. (*See* Gov. Ex. 20.1; *see also* Doc. 192, 12/9/14 Tr. 170:1-172:4.) Evidence at trial showed that Harley was well aware of these judgments, particularly the Silverstein judgment, which

had recently been entered against him personally on August 11, 2011, and was the ongoing subject of collection efforts by Fogerty at the time the petition was filed. Harley himself listed Silverstein as a creditor of RJH in his 2010 and 2011 petitions, so there is little doubt that he realized Silverstein was owed over one million dollars ($1,000,000.00) by virtue of a judgment in Lehigh County.

In addition, Karen Musloski, a paralegal specialist with the United States Attorney's Office for the Middle District of Pennsylvania, testified that the United States had a judgment against Harley for one hundred sixty-eight thousand eight hundred and two dollars ($168,802.00) as of March 30, 2001. (Doc. 192, 12/9/14 Tr. 5:18-6:1.) She testified that Harley was repeatedly notified about this debt, including the filing of lien documents in March 2009 with the Monroe County Court of Common Pleas and with two (2) collection letters in May 2011 and August 2011. (Doc. 192, 12/9/14 Tr. 7:13-13:6.) Therefore, a reasonable juror could conclude that Harley's omission of the debt was knowing and willful and not a simple mistake.

Count 21 alleged that Harley made other false statements in his 2012 personal bankruptcy petition, such as failing to state that he was an officer of RJH. (*See* Doc. 192, 12/9/14 Tr. 174:3-174:7.) Harley repeatedly told his victims that he was the Chief Executive Officer of RJH and signed all of his correspondence using that title, including his prior corporate bankruptcy petitions. Therefore, there was sufficient evidence for the jury to reasonably conclude that Harley knowingly and willfully omitted this information.

Count 22 alleged that in his 2012 personal bankruptcy petition, Harley failed to list all personal property owned by him and his wife, including various artwork. (*See* Gov. Ex. 20.1.) For example, he failed to list bank accounts that he controlled at Merrill Lynch, Penn Security, and Wachovia, where most of the victims' money ended up going. (*Id.*) Therefore, there was sufficient evidence for the jury to conclude that Harley knowingly and willfully omitted this information from his personal bankruptcy petition. Accordingly, Harley's motion for a judgment of acquittal of the false statement charges contained in Counts 18-22 of the Indictment will be denied.

**B.     Motion for a New Trial (Doc. 168)**

Harley has also moved for a new trial pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure. Rule 33(a) permits the court to vacate any judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court "can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred–that is, that an innocent person has been convicted." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (citation and internal quotation marks omitted). Under Rule 33, the court does not view the evidence in the light most favorable to the government. Rather, the court must exercise its own judgment in assessing the government's case. *United States v. Silveus*, 542 F.3d 993, 1004 (3d Cir. 2008).

Harley offers two (2) grounds for a new trial, based on (1) the presentation to the jury of evidence regarding his criminal history and (2) inconsistent evidence provided by the United States before the Grand Jury and at trial concerning the location of the original promissory note. In opposition, the Government argues that a new trial is not warranted on either of these grounds and that Harley has failed to demonstrate any miscarriage of justice that would warrant a new trial.

**1.     Harley's Criminal History**

First, Harley argues that I should grant a new trial due to the presentation before the jury of evidence regarding his prior involvement with the criminal justice system. Specifically, during the testimony of Karen Musloski, Government Ex. 20.6E was displayed to the jury, which reflects a "criminal" docket number for the monetary judgment that Musloski was testifying about. No objection was made at the time the document was displayed or prior to trial when all of the Government's exhibits were turned over to the defense for review. The parties agreed to redact the word "criminal" in the caption of the document before it went to the jury with all of the other evidence. Although I had indicated that I would give a curative instruction if the defense requested, the defense declined.

There was no miscarriage of justice with the inadvertent display of this document.

11

First, there is no evidence that any juror noticed the word "criminal" during the few moments that the document was displayed. Second, the display was apparently not significant enough for defense counsel to request a curative instruction or move for a mistrial. Finally, the Third Circuit Court of Appeals has held that inadvertent disclosures far worse than this one were harmless. *See, e.g.*, *United States v. Self*, 681 F.3d 190, 199 (3d Cir. 2012) (holding that testimony that the defendant was "already in jail" was harmless, noting that the comment was "brief, isolated, and unsolicited"); *United States v. Greenstein*, 322 F. App'x 259, 264 (3d Cir. 2009) (holding that the use of the term "police photo" by the prosecutor and "weapons violation" by the witness was harmless). Therefore, the brief display of the word "criminal" in the caption of Government Ex. 20.6(E) was harmless and does not warrant a new trial.

### 2. Inconsistent Evidence Concerning the Location of the Original Oil Promissory Note

Second, Harley argues that I should grant a new trial due to inconsistent evidence provided by the United States before the Grand Jury and at trial concerning the location of the original oil promissory note. Specifically, Harley claims that there is inconsistency between the Grand Jury testimony of Stan Dedmon and William Trantham and the trial testimony of S.A. Browning regarding the location of the "original" oil promissory note. Even if this were true, this would not be grounds for a new trial. Neither Dedmon nor Trantham testified at trial. Rather, S.A. Browning testified that he found what appeared to be five (5) "original" oil promissory notes in Harley's possession. (*See* Doc. 180, 12/11/14 Tr. 72:16-73:15.) Defense counsel could have called Dedmon or Trantham as witnesses if he believed that they would impeach S.A. Browning. Yet, he chose not to. There is no basis for suggesting that this alleged inconsistency about the location of the original oil note impacted the trial. Therefore, Harley's motion for a new trial will be denied.

### C. Motion to Dismiss the Indictment, to Set Aside the Verdict, and for Ineffective Assistance of Counsel (Doc. 218)

On November 19, 2015, Harley filed a motion to dismiss his Indictment, set aside the verdict, and for ineffective assistance of counsel. (Doc. 218.) Harley argues for a

dismissal of the Indictment based on perjured testimony presented before the Grand Jury. Specifically, Harley asserts that (1) Stan Dedmon and William Trantham conspired to present false testimony to the Grand Jury as to the existence of the original note and the original collateral of assignment; (2) Donald Kesterson falsely testified that he never got in touch with Christie Bower, Esq., regarding the safe-keeping of the original note; and (3) Assistant U.S. Attorney ("AUSA") Brandler made false statements to the Grand Jury pertaining to ownership of a $45,000.00 automobile and falsely stated that he did not find any evidence establishing Harley's ownership of oil. Harley adds that his attorney was put on notice of these false statements for more than a year but failed to bring the matter to the attention of the Court. Although the time for the Government to file an opposition has expired, they have not filed one. Accordingly, this motion is ripe for disposition.

**1.     Motion to Dismiss the Indictment and Set Aside the Verdict**

Harley has moved for dismissal of his Indictment based on purportedly perjured testimony during the Grand Jury proceedings. The Supreme Court has held that dismissal of an Indictment is only appropriate "if it is established that the violation substantially influenced the grand jury's decision to indict or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (citation and internal quotation marks omitted). A district court "may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Id.* at 254. Moreover, if a petit jury convicts the defendant of charges contained in a wrongfully obtained Indictment, "'any error in the grand jury proceeding connected with the charging decision [is deemed] harmless beyond a reasonable doubt.'" *United States v. Aguilar*, 831 F. Supp. 2d 1180, 1206 (C.D. Cal. 2011) (quoting *United States v. Mechanik*, 475 U.S. 66, 70). In other words, "once there is a jury verdict, the task of arguing for dismissal of an indictment based solely on errors in a grand

jury proceeding becomes nearly insurmountable." *Aguilar*, 831 F. Supp. 2d at 1206.[1] Once there is a jury verdict, dismissal of the Indictment is appropriate only if "the structural protections of the grand jury . . . [were] so compromised as to render the proceedings fundamentally unfair." *Bank of Nova Scotia*, 487 U.S. at 257. As once noted by the Ninth Circuit Court of Appeals, "[t]he only structural errors the Supreme Court has recognized are racial and gender discrimination in the selection of grand jurors." *United States v. Bingham*, 653 F.3d 983, 998 (9th Cir. 2011) (citing *Bank of Nova Scotia*, 487 U.S. at 257). Because it is a drastic step, dismissing an Indictment is a disfavored remedy. *United States v. Blue*, 384 U.S. 251, 255 (1966). The Third Circuit Court of Appeals has once noted that upon review of Third Circuit cases in which it found prosecutorial misconduct before the Grand Jury, the Indictment was not dismissed in a single one of those cases. *Martino*, 825 F.2d at 759. Instead, the Third Circuit looks to "whether there was sufficient evidence to support the indictment" and in almost all cases, the Third Circuit has "determined that the misconduct was harmless error and not prejudicial." *Id.* Courts are instructed not to focus on the misconduct itself, but on whether there was any prejudice. *Id.*

First, Harley argues that Stanley Dedmon, owner of Enpetro, falsely testified at the Grand Jury proceedings that he never sent an original copy of Enpetro's two hundred million dollar ($200,000,000.00) promissory note to anyone. To demonstrate the falsity of this testimony, Harley submits an FBI document dated September 5, 2000, summarizing an interview conducted with Dedmon, in which Dedmon confirms that Enpetro executed the note to RJH and that he sent the note and the assignment of collateral to Harley. (*See* Doc. 218, Ex. A.)

Second, Harley argues that William Trantham, an attorney who signs corporate documents for Enpetro, falsely testified at the Grand Jury proceedings that to his

---

[1] Ironically, *Aguilar* is a case that Defendant urged I consider at oral argument.

14

knowledge, the original note was never tendered to Harley, and that he did not know where the original note was and that he believed it went to a landfill. To demonstrate the falsity of this testimony, Harley submits an FBI document dated September 5, 2000, summarizing an interview conducted with Trantham, in which Trantham "identified his signature on a $200 million promissory note payable to RJH," which was "owned by RICHARD HARLEY." (*See* Doc. 218, Ex. B.) The document reflects that Trantham did not recall the purpose of the note but believed it was to be used to raise capital. Harley adds that the FBI document's representation that Trantham unsuccessfully attempted to get the original note back from Harley is also false, because he never spoke to Trantham. However, at oral argument, Harley conceded that there was no evidence that he never actually spoke to Trantham, and therefore has no proof that this was a false statement.

Third, Harley argues that Donald C. Kesterson, the oil geologist, falsely testified to the Grand Jury that he never got in touch with Christie Bower, nor did he try to, and that he believed that they did get in touch at one point to verify that she had the original note. However, Harley provides no evidence that this testimony was false. He only attaches letters addressed to him from Christie Bower, Esq., verifying the safe-keeping of his oil production note, assignment of collateral, and geological reports. However, these letters do not demonstrate that Kesterson's testimony was false.

Fourth, Harley argues that there was an inconsistency between AUSA Brandler's statement to the Grand Jury regarding a forty-five thousand dollar ($45,000.00) Lexus automobile titled to Harley and the Government's brief in opposition to Harley's motion for judgment of acquittal, in which the Government states that the automobile was valued at forty thousand dollars ($40,000.00) and titled to RJH. Harley also argues that AUSA Brandler's statement at the Grand Jury proceedings that he had seen nothing indicating Harley's ownership in oil was false. Harley maintains that this must have been false

15

because (1) Kesterson's report to Harley states that "based on the wording of the Collateral Assignment in my opinion Enpetro must maintain these Oil Reserves on behalf of RJH" and also includes a line pertaining to "*your*" Oil Promissory Note and Collateral of Assignment "*from*" Enpetro." (*See* Doc. 218, Ex. G.)

First, it is unclear that several of these statements were actually false. For example, the excerpts that Harley highlights from Kesterson's report do not clearly demonstrate Harley's ownership in oil, and therefore do not clearly demonstrate that AUSA Brandler lied when he stated that he found nothing showing Harley's ownership in oil.[2]

More importantly, however, even assuming that they were false statements, there is no indication of how any of these statements "substantially influenced the grand jury's decision to indict," nor did these statements create "grave doubt" that the grand jury's decision to indict was free from the substantial influence of the purportedly perjured testimony. *Bank of Nova Scotia*, 487 U.S. at 256 (citation and internal quotation marks omitted). And as explained earlier, "the petit jury's guilty verdict[] render[s] harmless any possible error in the grand jury proceedings." *United States v. Morgan*, 384 F.3d 439, 443 (7th Cir. 2004) (citing *Mechanik*, 475 U.S. at 72-73). Accordingly, Harley's motion for dismissal of the Indictment will be denied.

At oral argument, Harley urged that I consider two (2) cases he had not previously raised in his briefs. However, the first case, *Coleman v. Thompson*, 501 U.S. 719 (1991), bears no relevance to his motion at hand, as it involves a procedural default as the result of ineffective assistance of counsel in the context of federal habeas review. Harley has not filed a petition for habeas review, nor has there been any procedural default. The second case, *United States v. Aguilar*, 831 F. Supp. 2d 1180 (C.D. Cal. 2011), bears some relevance, but is inapposite because the prosecutorial misconduct in that case was so

---

[2]   Because AUSA Brandler was not a witness sworn under oath during the Grand Jury proceedings, there is no issue of perjury. *United States v. Seavey*, 180 F.2d 837, 839 (3d Cir. 1950).

egregious that it cannot fairly be compared to the case at hand. In *Aguilar*, the court emphasized a long **pattern** of prosecutorial misconduct dating back before the Indictment that continued all throughout trial. *Id.* at 1182-1206. The Government's misconduct included procuring search and seizure warrants through materially false and misleading affidavits; making several materially false statements to the Grand Jury, including much of which was made in response to questions from jurors during the proceedings; improperly obtaining attorney-client privileged communications; violating court orders; questioning witnesses improperly; failing to produce multiple FBI statements until after the Government had already rested its case at trial, including one statement that was found to be potentially exculpatory; and engaging in questionable behavior during closing arguments. *Id.* at 1182-1206. The handful of purportedly false statements made during Harley's Grand Jury proceedings, none of which was material, pales in comparison to the pattern of gross misconduct in *Aguilar*.

     Harley also appears to argue that his Fifth Amendment right to due process has been violated because he was forced to stand trial on an Indictment that the Government knew to be based partially on perjured material. In order to set aside a verdict based on perjured testimony, Harley must show that (1) perjury was committed; (2) the Government knew or should have known of this perjury; (3) the testimony was uncorrected; and (4) there is any reasonable likelihood that the false testimony could have affected the verdict. *Lambert v. Blackwell*, 387 F.3d 210, 242-43 (3d Cir. 2004). Harley has fallen far short of establishing these elements. As noted above, he has not provided sufficient evidence demonstrating that the statements he highlights constitute perjury. Additionally, he has not provided sufficient evidence demonstrating that the Government knew or should have known of this perjury. Finally, he has not made any argument as to the reasonable likelihood that any of this testimony could have affected the verdict. Given the trivial nature of many of these purported inconsistencies, such as AUSA Brandler's initial statement that Harley's Lexus was valued at forty-five thousand dollars ($45,000.00) and the Government's later statement that the Lexus was valued at forty-thousand dollars ($40,000.00) and titled to

RJH, it is unlikely that these statements affected the jury verdict. Accordingly, Harley's motion to set aside the verdict will be denied.

### 2. Motion for Ineffective Assistance of Counsel

Harley also argues that his attorney was put on notice regarding the perjured testimony but refused to bring the matter to the attention of the Court. Specifically, Harley notes that his attorney was put on notice of this testimony by fax as early as June 16, 2014. For this reason, Harley asserts that his Sixth Amendment right to effective assistance of counsel has been violated.

To successfully present an ineffective assistance of counsel claim, a defendant must establish that (1) the performance of counsel fell below an objective standard of reasonableness and (2) the errors of counsel prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The first prong requires the defendant to show that counsel's performance was "deficient" and that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001). There is a strong presumption that counsel's performance was reasonable. *Id.* The second prong requires the defendant to demonstrate that there is a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.*

Here, Harley makes blanket assertions that there was ineffective assistance of counsel due to (1) "a significant break down in communication before and during trial," (2) a "[f]ailure to investigate," (3) a "[f]ailure to contact witnesses of the defendants [sic] choosing," and (4) a "[f]ailure to file [a] meritorious motion on defendant's behalf." (Doc. 218, at 5-6.) Harley also adds that counsel was on notice of the perjured testimony discussed above but failed to take any action on his behalf. These blanket assertions fail to assert an ineffective assistance of counsel claim. For example, Harley fails to explain what the significant breakdown in communications was with his counsel or when it occurred. He also fails to explain what his counsel failed to investigate, which witnesses his counsel

failed to contact, or what motions his counsel failed to file.  This fails to establish that he was prejudiced by his counsel's performance.  *See, e.g.*, *United States v. Mangiardi*, 173 F. Supp. 2d 292, 315 (M.D. Pa. 2001) (explaining that when a defendant claims that his trial counsel failed to call a specific witness, "he must make a specific showing as to what the evidence would have been, and prove that this witness's testimony would have produced a different result.  Otherwise, the prejudice prong under *Strickland* is not satisfied.").  Harley also fails to demonstrate how his counsel's failure to take action with regard to the purportedly perjured testimony he highlights above caused him prejudice, particularly given the overwhelming evidence that was presented at trial against him, such as testimony from S.A. Browning or Richard Jones, none of which Harley has objected to.  Accordingly, Harley's Motion for Ineffective Assistance of Counsel will be denied.

### III. Conclusion

For the above stated reasons, Harley's motions for a judgment of acquittal, a new trial, to dismiss the Indictment, to set aside the verdict, and for ineffective assistance of counsel will all be denied.

An appropriate order follows.

February 1, 2016                                                  /s/ A. Richard Caputo
Date                                                                        A. Richard Caputo
                                                                               United States District Judge