1

1       IN THE UNITED STATES DISTRICT COURT
      FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3  UNITED STATES OF AMERICA :
                          :
4                         :
                          :
5     vs                  :    12-CR-224
                          :
6                         :
                          :
7  RICHARD J. HARLEY      :
                          :
8                         :

9

10

      BEFORE:      THE HONORABLE A. RICHARD CAPUTO
11
      PLACE:       COURTROOM NO. 3
12                 WILKES-BARRE, PENNSYLVANIA

13    PROCEEDINGS:  MOTION HEARING

14    DATE:        JANUARY 25, 2016

15

16
  APPEARANCES:
17
  For the United States:
18
  BRUCE D. BRANDLER, ESQ.
19  U.S. ATTORNEY'S OFFICE
  ROOM 217, FEDERAL BUILDING
20  228 WALNUT STREET
  HARRISBURG, PA 17108
21
  For the Defendant:
22
  JOSEPH A. O'BRIEN, ESQ.
23  OLIVER PRICE & RHODES
  1212 SOUTH ABINGTON ROAD
24  CLARKS SUMMIT, PA 18411

25

2

1          THE COURT:  Good morning.  We're here on motion for

2   judgment of acquittal and new trial in the case of United

3   States versus Richard Harley.  Ready to go?

4          MR. O'BRIEN:  Yes, Your Honor.

5          THE COURT:  Mr. O'Brien?

6          MR. O'BRIEN:  May we proceed from here, Your Honor?

7          THE COURT:  Wherever you like.  Wherever you're

8   comfortable.

9          MR. O'BRIEN:  Your Honor, just by way of background,

10  Mr. Harley was indicted on August 30, 2012, entered a plea of

11  not guilty on October 16th.  The case went to trial before Your

12  Honor on December 3rd, 4th and 5th, 8th, 9th, 10th, 11th, 12th

13  and 15th of 2014.  Mr. Harley made a motion for judgment of

14  acquittal -- motion for judgment of acquittal at the conclusion

15  of the trial.  The jury entered a verdict of guilty on all 23

16  counts.

17          Since that time he's been sentenced, and he's

18  presently serving his sentence at Fort Dix Federal Correctional

19  Institute.  He's filed a motion for judgment of acquittal

20  December 30, 2014.  And the Court has scheduled oral argument

21  for today.  We like to thank the Court for bringing Mr. Harley

22  to this argument.  He has some points he would like to make.

23  And so we thank you -- the Court for having him here.

24          Your Honor, the indictment against Mr. Harley

25  contained 23 counts, wire fraud, bankruptcy, fraud, false

1  statements in connection with a bankruptcy and bank fraud.  The

2  basis for the charge is three schemes that were used --

3  allegedly used by Mr. Harley to defraud other individuals.  The

4  first scheme involved the ownership of oil in Texas.  The

5  second scheme involved certain bank instruments drawn on the

6  Federal Reserve Bank.  The third scheme involved bankruptcy

7  proceedings.

8         Your Honor, as to the -- the allegations involving

9  the alleged ownership of oil in Texas and the bank instruments

10  from the Federal Reserve Bank, we have asked the Court to enter

11  a judgment of acquittal on the grounds that the evidence was

12  insufficient to prove that Mr. Harley had intent to defraud.

13         These statutes -- these charges were based on 18

14  U.S.C. 1343, which requires a specific intent to defraud.  It

15  requires proof that the defendant knowingly and willingly

16  participated in the scheme to defraud and that he, of course,

17  used the mail or interstate wire communications in furtherance

18  of the scheme.  We do not dispute the second charge, that the

19  second element that interstate commerce was used.  We do

20  dispute whether there was sufficient evidence for a jury to

21  conclude that he had an intent to defraud.

22         The intent to defraud requires knowledge that the

23  defendant must know he that the -- what he's doing is

24  fraudulent and with that knowledge must intend to defraud other

25  individuals.  Your Honor, Mr. Harley did not testify at trial.

4

1  But the only evidence presented at trial as to his intent to

2  defraud came from testimony of two individuals -- the only

3  direct evidence -- Edward Siegel of the State Street Bank and

4  Richard Jones of the Federal Reserve Bank.  Those individuals

5  testified that in their opinion that Mr. Harley believed that

6  the Texas oil documents and the federal reserve checks were

7  legitimate and that, therefore, he -- did not have intent to

8  defraud.  Based on that, Your Honor, we submit that the wire

9  fraud charges contained in counts one through 15 of the

10 indictment that he should be acquitted on those charges because

11 the record does not contain any evidence other than the fact

12 that he believed that these -- the instruments that he was

13 using would be the -- No. 1, the federal reserve checks or No.

14 2, the instruments -- the oil production notes he believed they

15 were legitimate.  He was attempting to monetize them, and he

16 was not guilty of intentionally attempting to defraud anybody.

17          Second, Your Honor, we ask for a judgment of

18 acquittal on the bank fraud charge.  That's contained in count

19 23 of the indictment.  Here again, Your Honor, the -- the

20 statute requires statute -- 18 U.S.C. 1344 requires intent to

21 defraud a financial institution.  The -- again, they involve

22 did -- this count involves the federal reserve checks, two $500

23 million federal reserve checks.  We believe the evidence in

24 this case does not establish -- is not enough sufficient for a

25 jury to conclude that Mr. Harley knew these checks were

1  fraudulent, and, therefore, the judgment of acquittal should be

2  granted.

3         The final aspect, Your Honor, involves the bankruptcy

4  charges.  Mr. Harley was involved in the filing of bankruptcies

5  on behalf of his company and also on his own behalf.  And the

6  charges are based on 18 U.S.C. 157.  They involve if an

7  individual makes a fraudulent representation, claim or promise

8  in conjunction with the proceedings, there could be a criminal

9  liability.

10         On this point, Your Honor, we submit first that Mr.

11  Harley and his company had the right to file bankruptcy

12  proceedings under the constitution and that both he and his

13  company were in substantial debt at the time and, therefore,

14  the filing of the charges was legitimate.  There was a basis to

15  file a charge.  He had a right to do it.  The company was in

16  debt and, therefore, there was -- he should not have been found

17  guilty of bankruptcy with respect to filing of the bankruptcy

18  petitions.

19         The next aspect of the bankruptcy counts -- counts 18

20  to 22 involves the false statements.  And the elements of these

21  charges are the existence of bankruptcy proceedings, a

22  statement made thereof as to a material fact that was false and

23  knowingly false.  Here we submit, Your Honor, that the

24  statements made in the bankruptcy proceeding were not knowingly

25  false or at least that there was -- they were not -- that he --

1  strike that -- not knowingly false.  There was some mistakes

2  obviously in these very complex filings.

3          They were filed pro se by Mr. Harley.  We do not

4  believe there's sufficient evidence for the jury to conclude

5  they were knowingly false.  The final point to make, Your

6  Honor, is the -- involved the point Mr. Harley feels extremely

7  strongly about, and that is false statement before the grand

8  jury.  Mr. Harley did not -- again take the stand during the

9  trial, and the -- one of the issues that was in the case

10 involved the oil note that was the basis for some of the

11 charges.

12         And the question arose whether the original oil note

13 had been in Mr. Harley's possession, and we believe that

14 certain witnesses Dedmon and William Trantham testified falsely

15 about the original note at the grand jury and that we ask for a

16 new trial on that basis.  Finally, the question of the evidence

17 at trial involving Mr. Harley's previous involvement in the

18 criminal justice system, there was presented before the jury a

19 letter that had a reference to a criminal case.  And that was

20 presented on December 9th, 2014.

21         The document was appropriately redacted before it was

22 given to the jury.  And we feel that it entitles Mr. Harley to

23 a fair trial -- to a new trial because it referred to his

24 involvement in a prior criminal case without any basis under

25 the Federal Rules of Evidence.  Thank you.  Your Honor, Mr.

1  Harley would like to address his own motion.  He has a motion

2  for dismissal of the indictment based on perjured testimony

3  before the grand jury.  That matter was raised in our motion.

4  Mr. Harley has expanded on his motion.  He would like the

5  opportunity to speak on that.

6           THE COURT:  All right.

7           THE DEFENDANT:  Good afternoon, Your Honor.  May I

8  stand?

9           THE COURT:  No, you don't have to.

10          THE DEFENDANT:  Okay.  First and foremost, I sent

11 this motion in to Your Honor because I felt Your Honor should

12 see what went on at the grand jury.  After going through the

13 grand jury transcripts myself, I found that perjured testimony

14 and suborn perjury was absolute at the grand jury level.  And I

15 balanced that all with the transcripts and the 302 statements

16 from the F.B.I.

17          Going to Stan Dedmon, who was the president of the

18 oil company in Texas, he was asked at the grand jury, have you

19 sent the original copy of the note to anyone, to Mr. Harley,

20 Christie Bower or anyone else.  His answer was no.  And but on

21 the F.B.I. statement in 2000 -- no, let me go back further.  He

22 said, where is the original copy of the note now.  He said --

23 Mr. Dedmon said, if we can find it, it is in the records in

24 William Trantham's file systems somewhere or may I say to you

25 that maybe my memory wants to say that I think I gave that to

1  the young man from the F.B.I. back in 2003 or whatever that

2  when they had -- when Mr. Harley was being prosecuted in

3  Alabama or whatever that was.  Dedmon on this 302 statement

4  that he gave to the F.B.I. which was in 2000, not 2003, Dedmon

5  confirmed that Enpetro executed a $200 million promissory note

6  to R. H. J. and Company dated 9/24/97.  He identified his

7  signature on the assignment collateral, which secured the $200

8  million note with the Brown County oil reserves.  Dedmon said

9  the note, the assignment of collateral and engineering report

10  prepared by Philip Avery of Abilene, Texas to Harley in

11  Pennsylvania via Federal Express mail.  And that really

12  bothered me because they were all -- Mr. -- the A.U.S.A. was

13  alleging that I had not received the original documents, that I

14  did not own any oil.

15         But back in 2000, Mr. Dedmon -- he went on saying he

16  sent it to me via Federal Express mail.  They are going to Mr.

17  Trantham, his corporate secretary and treasurer, the same

18  questions basically was asked at the grand jury.  You don't

19  have -- he said to Mr. Trantham at the grand jury -- the

20  question was, you don't have any copies of this correspondence,

21  and his answer was, we thought this thing was going dead and we

22  buried the paperwork in the landfill six or seven years ago.

23         Then he goes on to say, question, was the original

24  note to your knowledge tendered to Mr. Harley, answer, no.  Did

25  you know where the original is, answer, no.  Have you attempted

1 to locate it.  Answer, yes, well, I believe the original note

2 does not exist.  I think it went to a landfill.  Well, Mr.

3 Dedmon said that he thought it was in Trantham's file, and now

4 Trantham said that he thinks it went to the landfill.  But in

5 2000 now to the same F.B.I. Mr. Horton -- Herton, I'm sorry -

6 H-e-r-t-o-n -- Trantham identified his signature on the $200

7 million promissory note payable to R. H. J. and Company dated

8 9/24/97 secured by the Brown County Town Oil Reserves, R. J. H.

9 was owned by Richard Harley.  Trantham does not recall the

10 purpose of the note but believes it was used to raise capital.

11 He does not know that Enpetro never received any consideration

12 from R. J. H. for the note.

13          Then he goes on to say, Trantham told Harley that the

14 note was cancelled and if he presented it to a financial

15 institution he would tell them that the note was worthless.

16 Trantham has attempted to get the original note -- the original

17 note back from Harley but has been unsuccessful.  Well, he made

18 -- I never talked to Trantham.  That's No. 1.  I never talked

19 to him on the phone at all.  I talked to Mr. Dedmon a couple

20 times.  But Trantham said he talked to me about having a

21 worthless note.  But he went on to say I had the original note

22 which they said I never had.  So that was a lie at the grand

23 jury.

24          THE COURT:  Wait a minute.  You got me confused.

25          THE DEFENDANT:  Pardon me?

1        THE COURT:  Go back on Trantham again.  He -- wait.

2   He told the grand jury that the note was in a landfill?

3        THE DEFENDANT:  Yes.

4        THE COURT:  And in the 302 he says that he told you

5   that it was worthless?

6        THE DEFENDANT:  Yes.  But he tried to get the

7   original note back but was unsuccessful.

8        THE COURT:  What difference does that make?

9        THE DEFENDANT:  The note original was sent to me.

10  That's --

11       THE COURT:  What difference does that make if he told

12  you it was worthless?

13       THE DEFENDANT:  He never told me that.  That's my

14  point.  My point is --

15       THE COURT:  There's no evidence of that except what

16  you say now, correct?

17       THE DEFENDANT:  That is true.

18       THE COURT:  All right.

19       THE DEFENDANT:  My point is this, Your Honor.  They

20  saying I never had the original documents.  That's what they

21  said in the grand jury -- the grand jury and the indictment

22  that I never had the original oil papers.  And that was a lie.

23  I always had them.  Christie Bower has had them for a number of

24  years holding them in safe keeping.  I have the safe keeping

25  receipts here from Christie Bower stating that she was holding

1   the originals in the Melon Bank in a safe deposit box, okay.

2   She went on to say that --

3          THE COURT:  Have you given the original note to the

4   United States attorney?

5          THE DEFENDANT:  United States attorney --

6          THE COURT:  So that you can determine whether they

7   wish to do anything about the testimony that you say is false?

8          THE DEFENDANT:  The original notes was taken by Mr.

9   -- the agent when he came to my house.  He found them.  And, in

10  fact, he gave me -- I wish I had it here -- he gave me a

11  statement stating that on this 302 that he said -- I'm trying

12  to remember correctly.  But he said something to the effect

13  that he found -- found -- I am trying to remember how he said

14  it now -- an original looking document or note -- note and

15  collateral of assignment he found, and he said he may be aware

16  of that fact.  Something like that he said.  But his agent was

17  downstairs in my downstairs bedroom in my closet where it was,

18  and it was in a brown eel skin brief case.  And it was -- when

19  he opened it up, you see it was a plastic folder in there that

20  kept it secure, kept it so it won't get damaged.  He came

21  running upstairs.  He remember what he said to Mr. Browning.

22  Mr. Browning, I think I found it.  Mr. Browning opened it up,

23  and he said -- and he told me -- to my face -- he said, yes,

24  this looks like the original.  That's what he said to me.  So

25  they have them now.

1        They've had them ever since they came to my house.

2  Why they didn't show Mr. Brandler the originals is beyond me.

3  I always had them.  Don Kesterson would never gave a certified

4  report if I didn't have the original documents.  He said that

5  in his testimony basically.  He said that Christie Bower

6  verified to him in writing and sent copies of the safe keeping

7  receipts she was holding the original documents for me.

8        THE COURT:  I don't understand what is false about

9  the testimony.  The testimony to the grand jury was the

10 Trantham told you that it was worthless.

11       THE DEFENDANT:  No, that was -- that wasn't in the

12 grand jury's statement, Your Honor.

13       THE COURT:  It was the 302.

14       THE DEFENDANT:  In the 302 back in 2000.  What he

15 said at the grand jury, he said -- the question was asked, did

16 you ever send Mr. Harley the original note or collateral

17 assignment.  The answer was no.  That was asked of Trantham,

18 and that was asked of Dedmon.  Did you ever send the original

19 note or the collateral assignment to anyone, Christie Bower or

20 anyone else.  The answer was no, a flat no.

21       When I've always had the originals.  Having the

22 originals -- by the way, Your Honor, the same -- during that

23 same period, I received a letter that was in the discovery that

24 Mr. Browning -- Mr. Brandler has sent my attorney from the

25 United States Attorney's Office in Alabama and from -- from --

1 Alice H. Morton, United States attorney, she wrote this letter

2 to Mr. -- Ms. Thornton, who is the -- Ms. Thornton was the

3 special agent in charge of the Federal Bureau of

4 Investigations. She said the United States Attorney's Office

5 declines prosecution of Richard J. Harley due to insufficient

6 evidence. That's because she heard that Stan Dedmon and

7 William Trantham sent me the original documents because if I

8 had the original documents, there is no crime. There can't be

9 a crime.

10        THE COURT: Why?

11        THE DEFENDANT: I own them. I own the oil just like

12 it was purported to be. My company -- my company owns that oil

13 and always -- and still owns the oil.

14        THE COURT: The question was whether you knew -- not

15 only -- there's two possibilities, right. One is that notes

16 were bogus because they were created. The other is that the

17 note might have been real but that you knew it was worthless.

18        THE DEFENDANT: No, sir. Those weren't worthless.

19        THE COURT: I am not arguing the point whether they

20 were or not. I'm saying what could the jury conclude.

21        THE DEFENDANT: The jury never heard they were

22 worthless except from Mr. Brandler. Mr. Brandler said that.

23 The two witnesses they said anything at the grand jury, they

24 weren't here to testify.

25        THE COURT: All right. I understand your point. I

 1  understand your point.

 2          THE DEFENDANT:  All I am saying, Your Honor, is that

 3  the grand jury was perjured by those two gentlemen that said

 4  they never sent me the original documents.  That's a lie.

 5          THE COURT:  I got it.  I understand your point.

 6  Anything else?

 7          THE DEFENDANT:  I went on to say in my -- oh, Don

 8  Kesterson said -- I think I mentioned to you said that he had

 9  it verified by Christie Bower and then -- let me see -- on I

10  mentioned false statements that Mr. Brandler mentioned to the

11  grand jury about an automobile -- one of the questions was --

12  let me read it to you if I may, Your Honor, what he said at the

13  grand jury testimony about the automobile.  It's right here.

14          One of the jurors asked Mr. Brandler what was the

15  money used for, and the answer, the money was used for what

16  appears to be personal expenses, and I believe -- and I -- I

17  will happy to go over some of them but the high points is a

18  $45,000 automobile.  So they were personal expenses.  His

19  answer was, personal expenses, yes.  But -- in Brandler's brief

20  document, 202 on the footnote, July 1, 2015, page 38 of 46, he

21  stated to Mr. Fergie, he testified the 2008 Lexus was valued at

22  $40,000 and titled in the name of R. J. H.  And I also sent him

23  a copy of the registration that states that it was in R. J. H.

24  and Company's name.  That was a false statement.

25          THE COURT:  What was false?

1          THE DEFENDANT:  He told the grand jury all the money

2  was used for personal expenses, car, the car was personal.  The

3  car was titled in the company's name.

4          THE COURT:  So you're making a distinction between R.

5  J. H. and you?

6          THE DEFENDANT:  No, all I am saying is that -- well,

7  yes, in that regard yes because the personal expenses would be

8  something that, you know, I personally --

9          THE COURT:  I understand that.  I understand.

10          THE DEFENDANT:  Okay.  He's saying here -- he's

11  saying here that the money was used for -- all the money was

12  used for personal expenses, even the car.  But he forgot Mr.

13  Fergie told him the car was titled in R. J. H. and Company's

14  name.

15          THE COURT:  What difference does that make?  Who

16  drove the car?

17          THE DEFENDANT:  I did.

18          THE COURT:  In pursuit of what?

19          THE DEFENDANT:  Driving the car?

20          THE COURT:  Yeah.

21          THE DEFENDANT:  I drove the car on a daily basis.

22          THE COURT:  In pursuit of what?

23          THE DEFENDANT:  I don't quite understand your

24  question, Your Honor.

25          THE COURT:  Business of R. J. H?

1          THE DEFENDANT:  Absolutely, absolutely.

2          THE COURT:  I see.  I got it.

3          THE DEFENDANT:  These statements are false, okay.

4  And Mr. Brandler said -- another false statement was made when

5  A. S. U. A. Brandler was -- page 38, line 13 to 18.  He stated

6  in part documents provided by grand jury subpoena for Mr.

7  Kesterson, extensive documents stated I have seen nothing

8  indicating ownership in oil in those documents by Mr. Harley.

9          Now, Don Kesterson certified report on page four,

10  paragraph four states based on the wording of the collateral

11  assignment in my opinion Enpetro must maintain these oil

12  reserves on behalf R. J. H. and Company, Inc., and then on his

13  analysis report of oil reserves in Brown County Texas dated

14  July 3rd, 1999, very first paragraph he states, third line,

15  pertaining to your oil promissory note and collateral

16  assignment from Enpetro states -- in other words, he said that

17  there was nothing in Donald's report that stated I -- my

18  company owned any oil, which it did.  I just proved that.

19          All I am saying is -- there is a lot more false

20  statements that were made to the grand jury, Your Honor.  I

21  could have just -- I took -- I took out the high points.

22  Especially me not having the original documents in my

23  possession was the big key because without that again -- if I

24  hadn't had the documents, it would be fraud.  But having the

25  ownership of those paperwork, it doesn't make this fraud at

1 all.  Ownership is not against the law.  I owned those

2 documents since 1997 and still own them.  So all I am saying

3 the grand jury, yes, was perjured absolutely.

4          THE COURT:  All right.  Anything else?

5          THE DEFENDANT:  I sent these documents to my attorney

6 here four times, and he did mention it slightly in the judgment

7 of acquittal that statements that were made were inconsistent,

8 but he didn't come out and say it was perjured testimony like

9 I.  That's what it is.  I checked the law out.  The law states

10 that anything that what they call material -- material to the

11 proceedings the indictment must be dismissed.  And these were

12 material.

13          Having the oil -- the oil documents in my possession

14 and ownership of it is definitely material to the proceedings.

15 That's my point.

16          THE COURT:  I understand your point.  All right.

17          THE DEFENDANT:  The only thing I can add to that is I

18 feel as though my due process has been violated because of

19 again, these perjured testimony to the grand jury.  I think

20 they would have come to a different conclusion.  If they had

21 said, yes, they sent the oil to me and the collateral

22 assignment to me, I think the grand jury proceedings would have

23 been different because that shows ownership.  There can't be

24 any fraud when someone owns something.  Even if they are trying

25 to establish or borrow money on it, that's not fraud.  At best

1  it's civil, not fraud.  And this is what I am saying, and it's

2  clear.  It's clear that this was what happened to me.

3          THE COURT:  Do you want to address your ineffective

4  assistance of counsel?

5          THE DEFENDANT:  Yes, I believe that if Mr. O'Brien

6  had come before the Court with this in the beginning, I don't

7  think there would have been -- I don't think there would have

8  been a trial, Your Honor.  I really believe that because again,

9  the grand jury was the key for the indictment.  The only way I

10 could have gone to trial is having an indictment against me,

11 correct?

12         THE COURT:  That's right.

13         THE DEFENDANT:  And if he had come through in the

14 beginning before this all -- before the trial got started I

15 don't think there would have been one because we could have

16 addressed and fine tuned it and went into it deeper.  There's a

17 lot more to that grand jury transcript that I just -- I just

18 wanted to highlight the best points especially with the oil.

19             That was the whole basis of the whole scheme of the

20 indictment.  They even called it that, the oil scheme.  And he

21 said in the indictment that I didn't own any oil, that

22 everything I was doing was false.  And, in fact, my company

23 does own the oil, Your Honor.  That is since 1997.  And, in

24 fact, even -- there was other things that happened during that

25 period that they even -- what happened with Mr. White -- Edwin

1  white one who helped me get the oil for the company that I had

2  back then, and we were working on some things at that time.

3  But I've always had the oil in my possession.  Until this day I

4  own the oil.  And I think the indictment should have said that

5  the oil was owned by R. J. H. and Company and not saying

6  everything we have is false because that hurt.  That hurt a

7  lot.  And again, that's material to the proceedings, owning the

8  oil.  That's all part of the oil scheme.  Had he said that we

9  wouldn't be here today like this.

10        THE COURT:  All right.  Anything else?

11        THE DEFENDANT:  I did say that Mr. O'Brien had filed

12  meritorious defenses in my behalf -- especially based on the

13  oil, this matter would have never gone to the grand jury the

14  way it did or we would never had had a trial.  That was one of

15  the main things, too.  The suborn perjury and perjured

16  testimony is there.  It's in black and white, Your Honor.  I

17  tried to explain the best way I could.  I'm not an attorney,

18  but the facts don't lie.  The facts are what they are.

19        THE COURT:  Okay.

20        THE DEFENDANT:  Other people seen the same thing.

21  They seen that.  They say it's definitely perjury.

22        THE COURT:  All right.  Thank you.  Mr. Brandler?

23        MR. BRANDLER:  Your Honor, the government filed a

24  lengthy response to the motion, and I am not going to belabor

25  the entire response.  I'm just going to raise a number of

1  points that have been addressed this morning.  That's document

2  202 in the -- in the docket records, and we will incorporate

3  that by reference.  I will reiterate the standard that the

4  Court uses to judge this judgment -- rule 29 motion for

5  judgment of acquittal and new trial.  It's a very heavy burden

6  on the defendant.

7          The record must be viewed in the light most favorable

8  to the prosecution to determine whether any rational trier of

9  fact could have found guilt beyond a reasonable doubt.  It's a

10  very differential standard.  The Third Circuit has admonished

11  district courts not to usurp the purpose the role of the jury

12  in that respect.  Rule 33 being the more stringent standard of

13  this miscarriage of justice standard.

14          Basically, what's -- the focus of the argument at

15  least on Mr. O'Brien's point was insufficient evidence based on

16  Mr. Harley's state of mind relating to all of the counts in the

17  indictment.  And we would submit there was more than sufficient

18  evidence in the record to establish Mr. Harley's state of mind.

19  First of all, we would point out at the close of the

20  government's case Mr. O'Brien made a motion for a judgment of

21  acquittal, which was denied by the Court based upon the record

22  as of that time.

23          There's nothing that has happened -- that happened on

24  the defense case that would warrant the Court to reconsider its

25  judgment at the conclusion of the government's case.  Second of

1 all, state of mind is generally proven through circumstantial

2 evidence.

3        The Third Circuit has repeated it on many occasions

4 that circumstantial evidence is sufficient and that it's

5 usually the case that it cannot be proved by direct evidence.

6 But in this particular case, we did have direct evidence of Mr.

7 Harley's state of mind.  At least related to the bank fraud

8 scheme he was told on repeated occasions by federal reserve

9 officials that what he was doing was illegal, that it was a

10 known scam to the Federal Reserve Bank, and despite those

11 admonitions he continued to pedal those bank notes to investors

12 to the Federal Reserve Bank and institutions and tried to

13 negotiate those notes.

14        So -- in that case, there was direct evidence of Mr.

15 Harley's state of mind.  Regarding the oil scheme, there was

16 more than sufficient evidence regarding his state of mind that

17 he knew that this was bogus.  First of all, the original note

18 that he complains so vocally about this morning and in his

19 motion papers -- the Court will recall there were five original

20 notes found in his home, not one original note.  A rational

21 jury could infer from that that Mr. Harley was fabricating and

22 creating those original notes.

23        If he wanted to establish through Mr. Dedmon or Mr.

24 Trantham that he, in fact, had one or more original notes in

25 this case, he could have called Mr. Dedmon and Mr. Trantham to

1  the stand.  He those not to do so.  The evidence that the jury

2  had he had in his possession five -- what appeared to be five

3  original notes based on a company called Enpetro, that did not

4  prove that he owned any oil.  The note itself only showed that

5  a company called Enpetro owed him $200 million.  It didn't say

6  anything about ownership of oil.

7          The Court will recall during the trial we had a

8  witness -- a lawyer from Texas who was familiar with title

9  ownership of oil wells who said conclusively he had done a

10  title search of this oil and neither R. J. H., Mr. Harley or

11  Mr. Dedmon and Mr. Trantham for that matter owned any of the

12  oil Mr. Harley was claiming to own.  So even, you know, his

13  claim this morning that the fact he had an original oil note

14  shows that he owned the oil is belied by the evidence.

15          But there's more circumstantial evidence that he knew

16  the oil note was bogus.  No. 1, he never gave Enpetro anything

17  in exchange for this $200 million note.  The records that he

18  read this morning from the grand jury and from the 302s, the

19  interview reports, indicate that there was no consideration

20  given, that it was just simply given to Mr. Harley as a means

21  so he could use that bogus note to get loans from various

22  financial institutions to set up these AIDS clinics he was

23  trying to set up in the early 90s.

24          It was not a legitimate note at that time as he well

25  knew.  It was a basically the start of a hypothecation fraud

1  that he started back in the early 90s regarding his AIDS

2  clinics.  There was also evidence that he lied to Mr. Kesterson

3  regarding the production on the wells.  Mr. Kesterson gave him

4  an opinion stating that the only thing that that note or

5  collateral gave him the rights to was the oil -- the production

6  of the oil once it reached the ground, and Mr. Harley told him

7  that there was production in those wells as of 1999 when he

8  gave him the paperwork when, in fact, there had been no

9  production on those wells since much earlier in the 1990s.

10          We found during the search warrant in addition to the

11  five what appeared to be original notes, many documents related

12  to hypothecation fraud.  That is where somebody uses what

13  appears to be a legitimate asset but it's really a bogus asset

14  to get financial institutions and others to give them or lend

15  them money.  A rational jury could have concluded that Mr.

16  Harley was using this note as part of the hypothecation fraud.

17  He also promised many of these investors that he was going to

18  use the proceeds of their money, their investments, for

19  business purpose, to extract the oil for instance.  That's what

20  he told Mr. Silverstein.  In fact, when he got their money he

21  never used any of their money for any business purpose.

22          He just used the money for personal expenses whether

23  it was to buy an automobile that he drove for day-to-day

24  purposes, to pay his mortgage, for household expenses.  He lied

25  about his education and background.  He lied throughout the

entire scope of his relationship with all of the investors

which a rational jury could conclude that he had intent to

defraud on both the oil scheme and the bank fraud scheme.  I

would just jump ahead to Mr. Harley's argument regarding

perjury in the grand jury.

Your Honor, I cite to the Court the case of the

United States versus Morgan, 384 F.3rd 439.  It's a case from

the 7th Circuit Court of Appeals from 2005.  I have a copy for

the Court and for defense counsel.  I just want to read one

section into the record because the same allegation was made in

that case where a defendant claimed that perjury in the grand

jury somehow entitled him to a new trial or a judgment of

acquittal, and this is what the Court said.

We turn now to Morgan's remaining arguments.  First

he accuses the government of using perjured testimony before

the grand jury to obtain his indictment.  His argument suffers

from a number of false notably that it was never raised in the

district court and lacks any support in the record.  Most

significantly the petit jury's guilty verdicts render harmless

any possible error in the grand jury proceedings.  So even

assuming there was perjury in the grand jury, the petit jury's

verdict would cure any problems that took place in the grand

jury.

We don't agree that there's been any perjury

established from Mr. Dedmon and Mr. Trantham.  Mr. Harley can

1  claim that there was perjury.  All we have in the record is

2  that they claim they never gave an original note to Mr. Harley.

3          And what we found in Mr. Harley's possession was what

4  appeared to be five original notes not knowing if any of them

5  were legitimate at all.  So there was maybe a potential

6  inconsistency but no evidence of perjury there.  But as I

7  stated, this was not an issue that was raised prior to trial.

8  He could have called Mr. Dedmon and Mr. Trantham during the

9  course of this case.  He had the grand jury transcripts in

10 discovery.  He choose not to call them.

11         So the -- even assuming there was perjury, it would

12 not be grounds for a new trial or judgment of acquittal.

13 Regarding the allegation that there was documents shown to the

14 petit jury that indicated Mr. Harley's involvement with the

15 criminal justice system on a prior occasion, that was briefed

16 in my papers.  I won't go over it.  But defense counsel did not

17 request a curative instruction during the trial.  As a matter

18 of fact, there was no objection raised to the item during the

19 course of the trial.

20         And it's unclear whether any jurors even saw it or

21 could have connected the dots to make -- infer that Mr. Harley

22 had been previously convicted.  I cited a number of cases from

23 the Third Circuit which indicates much worse information going

24 to a petit jury that has not been cause for a new trial.  So

25 based upon all of those items, we think the motion for judgment

1  of acquittal and new trial should be denied.  Thank you.

2  THE COURT:  Thank you.  Mr. O'Brien?

3  MR. O'BRIEN:  I have nothing further, Your Honor.

4  THE DEFENDANT:  Your Honor, I disagree with him --

5  Mr. Brandler profusely when he said that first and foremost he

6  said that I never had the original notes.  That's a lie.  They

7  said they sent the original notes to me, F.B.I. 302 statements.

8  If the F.B.I. 302 statement doesn't mean anything, I need to

9  know that.

10  Martha Stewart went to jail for testifying before the

11  F.B.I. falsely.  Now, these gentlemen said to the F.B.I. in

12  2000 that they sent me the original oil note and the original

13  collateral assignment.  I have it here from the Mr. Herton -- I

14  think his name was.  Mr. Brandler said that -- he went on to

15  say some things about my background, my education.  I never

16  said anything about my education.  He's talking about

17  education.  I got an honorary Ph.D. from the Inventor's Club of

18  America.  The F.B.I. saw all those plaques I have got.

19  They saw them.  They took pictures of them -- and

20  then going back to the degree, they have -- there were five --

21  no, four copies that look like the original because what I did

22  is took the original, Your Honor, and I made copies of them in

23  color, but it was a different type paper even.  Mr. Browning,

24  F.B.I. found the originals downstairs in my lower basement --

25  I'm sorry, lower bedroom on a shelf in a brief case.  If Mr.

1  Brandler was here -- in fact, Mr. O'Brien was sent a 302

2  statement by Mr. Browning through my wife just a couple days

3  ago.

4         He doesn't have it here unfortunately that states

5  that he found what looks like an original.  Mr. Browning said

6  that, just the one, not five in his 302 statement.  I wish I

7  had it here because that's important.  I -- my wife sent it to

8  Mr. O'Brien.  He forgot to bring with him.  I would like to

9  have him fax it to you to show that Mr. Browning found the

10 original in my basement -- in my lower bedroom like he said he

11 did.

12        So I don't know where Mr. Brandler is coming off that

13 the grand jury wasn't lied to.  My gosh, a blind person can

14 see.  The facts are there.  You asked the question.  Did you

15 send the original.  They both said no.  But then in 2000 they

16 said they sent the original to me.  Now, 1997 is when I got it.

17 1997 to 2000 only three years.  I would imagine now they would

18 remembered what happened three years from 1997.  But again he

19 keeps saying they never sent me the originals, and that's a

20 lie.  That's a lie.  That's a shame he would say something like

21 that after 302 statements -- he sent me the 302 statements.  He

22 should have known that.  Mr. Brandler sent me the 302

23 statements in his discovery from these two gentleman from 2000.

24 He saw it then.  He's still saying that I never had the

25 originals.

1        MR. BRANDLER:  The point is the jury -- the petit

2  jury never heard the testimony that was in the grand jury that

3  they sent -- they never sent him the original.

4        THE COURT:  I am aware of that.

5        THE DEFENDANT:  That may be.  But you knew it.  You

6  knew it.  And I think it goes on to say that you knew or should

7  have known that the originals was sent to me, and you should

8  have said that to the grand jury because you had these

9  documents there.  That's what I'm saying.  It was a lie.  It's

10  still a lie.  It's got to stop because I did nothing wrong.  I

11  did everything by the book.

12        And by the way, I never once said that I was trying

13  to extract oil because my collateral assignment doesn't give me

14  the right to extract oil.  We only owned the oil that's in the

15  ground.  That's all we own.  So I don't know where that came

16  from that we needed -- we needed money to extract oil.  You

17  won't find a piece of paper anywhere that says anything about

18  my company wanting to extract oil, Mr. Brandler.  Did you find

19  anything like that --

20        THE COURT:  We're off the beaten track now.

21        THE DEFENDANT:  I know, Your Honor.   I'm sorry.

22        THE COURT:  Let's not --

23        THE DEFENDANT:  I'm sorry.

24        THE COURT:  Anything else on these motions?  I

25  understand your point.  I do.

1     THE DEFENDANT:  I appreciate that.  I really do

2  because this is frustrating to me right now.  You can see pure

3  as day that the grand jury was lied to, and he wants to twist

4  it around again to make it seem as though that didn't happen.

5  My goodness, like I said before, a blind person can see it,

6  Your Honor.  They were lied to.  It's as simple as that.  The

7  matter will not stop here.  I will get to the bottom of it

8  because they were lied to.

9     THE COURT:  All right.  Okay.  Anything else?

10     MR. O'BRIEN:  Nothing further, Your Honor.

11     THE COURT:  Mr. Harley?

12     THE DEFENDANT:  Nothing else, Your Honor.

13     THE COURT:  Mr. Brandler?

14     MR. BRANDLER:  No, Your Honor.

15     THE COURT:  All right.  Thank you all.  And you will

16  hear from me soon.  We're adjourned.

17     THE DEFENDANT:  Your Honor, can I have Mr. O'Brien

18  send you a copy of Mr. Browning's 302 statement where he said

19  he saw what looks like the original, he found that just that

20  one with -- would you like that?

21     THE COURT:  No, I don't need that.  I hear your

22  point.  I mean, I don't know what is that going to do for you.

23     THE DEFENDANT:  Show that the original -- we had the

24  originals, and we have the originals, Your Honor -- with the

25  originals, Your Honor, there is no crime.  That's all I'm

30

1  saying.

2        THE COURT:  Well, didn't -- who said they were five

3  originals?

4        MR. BRANDLER:  Mr. Browning testified at trial that

5  he found what looked like five originals.

6        THE COURT:  That's what I thought.  So --

7        THE DEFENDANT:  Looks like it, yes, he did say that.

8        THE COURT:  That's the testimony at trial.  That's

9  all I have to deal with.  It's testimony at trial.

10        THE DEFENDANT:  How about the grand jury transcripts?

11        THE COURT:  What about it?

12        THE DEFENDANT:  Where they were asked the question

13  whether or not the originals was sent.  I sent --

14        THE COURT:  You're talking about Trantham and Dedmon?

15        THE DEFENDANT:  Yes.

16        THE COURT:  You made that point.  Mr. Brandler has a

17  case that indicates that even if the grand jury was -- was not

18  told the truth the jury verdict trumps that.

19        THE DEFENDANT:  I have a case here that says just the

20  opposite.

21        THE COURT:  Where is that case from?

22        THE DEFENDANT:  United circuit in California.

23        THE COURT:  Do you have a cite?

24        THE DEFENDANT:  Yes, it's -- the judge -- he really,

25  really laid into it.  Your Honor, maybe I can have -- maybe so

1  you can see the cite number, a very good case, strong case.

2  Basically the same thing that happened in that case that

3  happened to me.  They had a trial, but fortunately -- while the

4  jury was deliberating, that's when they came in with the --

5         THE COURT:  All I want is the cite.  Is there no

6  note?

7         THE DEFENDANT:  There's no cite.

8         MR. BRANDLER:  I think it's 2011 Lexis 138431.

9         THE COURT:  I don't need that.  I will -- we will

10  look it up.

11         THE DEFENDANT:  Very strong case, Your Honor.

12         THE COURT:  You say it's from the Ninth Circuit.

13         THE DEFENDANT:  Yes, yes, sir.

14         THE COURT:  Okay.

15         THE DEFENDANT:  There was one other too, if I may,

16  Your Honor.

17         THE COURT:  Go ahead.

18         THE DEFENDANT:  This is Coleman versus Thompson, 501

19  U.S. 722, 750, 115, L. Ed. Sec. 640, 1115, C. E. -- 2546, 1991.

20  That case I just gave you gives a lot of cases in it for you to

21  read, Your Honor, about what happened to them.  It's a strong

22  case here.

23         THE COURT:  All right.  Thank you.

24         MR. O'BRIEN:  Your Honor, may I make one point,

25  please?  Mr. Harley made a point about a 302 not being here.

1  Well, that is in the record, Your Honor.  It's Mr. -- Mr.

2  Harley filed a motion for dismissal November 19th, 2015.

3  Exhibit B. to that motion contains the testimony of Mr.

4  Browning before the grand jury.  It also contains -- I'm sorry,

5  Mr. Trantham before the grand jury and also contains the 302 of

6  9/5/2000 dealing with the original promissory note.  So those

7  documents are in Mr. Harley's motion.

8          THE DEFENDANT:  They are.  Yes, they are, Your Honor.

9          THE COURT:  All right.

10          THE DEFENDANT:  Please look at them, Your Honor.

11          THE COURT:  I think I have seen them, all right.

12  Anything else?

13          MR. BRANDLER:  No, Your Honor.

14          THE COURT:  All right.  We're adjourned.  Thank you.

15

16

17

18

19

20

21

22

23

24

25

33

1                    REPORTER'S CERTIFICATE

2

3       I, LAURA BOYANOWSKI, Official Court Reporter for the

4   United States District Court for the Middle District of

5   Pennsylvania, appointed pursuant to the provisions of Title 28,

6   United States Code, Section 753, do hereby certify that the

7   foregoing is a true and correct transcript of the

8   within-mentioned proceedings had in the above-mentioned and

9   numbered cause on the date or dates hereinbefore set forth; and

10  I do further certify that the foregoing transcript has been

11  prepared by me or under my supervision.

12

13

14                          _____
                            Laura Boyanowski, RMR, CRR
15                          Official Court Reporter

16  REPORTED BY:

17      LAURA BOYANOWSKI, RMR, CRR
        Official Court Reporter
18      United States District Court
        Middle District of Pennsylvania
19      Scranton, PA  18503

20

21          (The foregoing certificate of this transcript does not
    apply to any reproduction of the same by any means unless under
        the direct control and/or supervision of the certifying
22  reporter.)

23

24

25