1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,    )
                             )
            Plaintiff        )
                             )
        vs                   )    3:12-CR-224
                             )
RICHARD J. HARLEY,           )
                             )
            Defendant        )
_____)


TRANSCRIPT OF PROCEEDINGS - SENTENCING
BEFORE THE HONORABLE A. RICHARD CAPUTO
THURSDAY, NOVEMBER 12, 2015; 10:45 A.M.
WILKES-BARRE, PENNSYLVANIA


FOR THE GOVERNMENT:
    BRUCE BRANDLER, ESQ.
    Assistant United States Attorney
    Room 217, Federal Building
    228 Walnut Street
    Harrisburg, Pennsylvania  17108

FOR THE DEFENDANT:
    JOSEPH A. O'BRIEN, ESQ.
    Oliver, Price & Rhodes
    1212 S. Abington Road
    Clarks Summit, Pennsylvania  18411



Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.
_____

KRISTIN L. YEAGER, RMR, CRR
CERTIFIED REALTIME REPORTER
235 N. WASHINGTON AVENUE
SCRANTON, PENNSYLVANIA 18503

1     THE COURT: Ready to proceed?

2     MR. BRANDLER: Yes, Your Honor.

3     Your Honor, this is the case of United States of America v.

4  Richard J. Harley, criminal number 3:CR-12-224.

5     Today is the date that's been set for sentencing, based on

6  the jury's previous conviction of Mr. Harley on 23 counts of

7  wire fraud, mail fraud and bankruptcy fraud. The United States

8  is ready to proceed.

9     THE COURT: Mr. O'Brien.

10     MR. O'BRIEN: Yes, Your Honor. Your Honor, as the Court

11  knows, post-trial motions are still pending in this case, and

12  Mr. Harley continues to assert his innocence and requests that

13  the Court make a prompt ruling on his motions.

14     As to the issue before the Court at this time, the

15  sentencing, Your Honor, I think there's really only one

16  question, and that is, whether or not the sentence in the

17  Pre-sentence Report of life or the sentence recommended by the

18  U.S. Attorney of 25 years is reasonable, and our position is we

19  do not think it is.

20     The very high sentence in this case that is reflected in

21  the guidelines and reflected in the Pre-sentence Report and

22  also the sentence that's recommended by the U.S. Attorney comes

23  solely out of the fact that there could have been a lot of

24  money involved here. The actual loss is a little over $300,000,

25  that's an awful lot of money and people have suffered from it,

1   but we believe that Mr. Harley should be sentenced on the basis

2   of that loss.

3        The very high sentence recommended in the Pre-sentence

4   Report and recommended by the U.S. Attorney arises out of those

5   two checks that Mr. Harley had that nobody honored, nobody

6   believed were true from the very beginning, did not result in

7   any loss to any individual. Also stems from the claim in the

8   bankruptcy petition, $2 million owed to Mr. Silverstein, that's

9   what Mr. Silverstein was claiming against Mr. Harley, and Mr.

10  Harley, obviously, just listed it in his bankruptcy petition.

11       So we believe, Your Honor, that the Court in imposing its

12  sentence in this case should look at the actual loss figure of

13  I believe it's $318,000.

14       Since Mr. Harley continues to assert his innocence, he

15  wishes a ruling on his post-trial motions and plans to appeal.

16  I can't speak directly to the merits of the case, however, this

17  is a case while there are victims, it is financial only, there

18  was no physical harm to anybody, there was no threats of

19  physical harm to anybody, it's strictly a financial crime. It's

20  very serious, people have suffered losses, some people it has

21  affected them very much.

22       Again, the type of sentence that would be produced, based

23  on an actual loss of $318,000, I feel, would adequately meet

24  the provisions of the sentencing code and would be the

25  appropriate sentence in this case.

1      THE COURT: Did you look at what that might be?

2      MR. O'BRIEN: Well, I'm thinking, you know, 7 to 8 years,

3  Your Honor.

4      THE COURT: You're thinking that or you've found that to be

5  the case?

6      MR. O'BRIEN: No, I'm thinking that, Your Honor.

7      THE COURT: I see. Mr. Harley.

8      THE DEFENDANT: Yes, sir. I still maintain my innocence,

9  Your Honor, with every fiber of my bone. I never intended to

10  cheat anybody, I never intended to take money from anybody. In

11  fact, there are documents that weren't presented to the Court

12  during the trial which indicate that my company had received

13  far more exceeding than the amount of money that was owed, but

14  that never came into trial. And for whatever reason, I don't

15  know. But it was held back and never came in.

16      So no one could see that money that was owed to my company

17  far exceeded what the company had borrowed. By the way, it was

18  borrowed money, it was never an investment, everybody received

19  a promissory note for the company to pay them back, the

20  company. And I fall on the company because everything was

21  signed off by being a CEO of the company, it was a legitimate

22  company, registered since 1989, and has been in good standing

23  since that time.

24      If you check the records, you'll see the company is still

25  in good standing, so there was nothing arbitrary about that, at

1   all.

2      I maintained that the certifications on the oil, I have

3   three certified statements from Don Kesterson, a Notary Public

4   from the State of Pennsylvania notarized it as being a true and

5   exact copy of the original, and Christie Bower, who kept all of

6   this in safe keeping for my company, she also certified that

7   she was holding the original oil notes and collateral

8   assignment.

9      That never came in, Your Honor. There's a lot of things

10  that didn't come in.

11     THE COURT: I don't know what you mean by that. Never came

12  in. I've heard all about that.

13     THE DEFENDANT: Pardon me?

14     THE COURT: I heard all about that.

15     THE DEFENDANT: Christie Bowers and Don Kesterson?

16     THE COURT: Yes.

17     THE DEFENDANT: If they certified these as being true and

18  exact, there's no crime.

19     THE COURT: Well, that's your view.

20     THE DEFENDANT: But anyway, if anybody got hurt through this

21  matter, I apologize, Your Honor, I didn't mean for anybody to

22  get hurt. In fact, that's why I showed people what the company

23  owned, at that time, to show them that they would feel

24  comfortable with what we had and what we were doing.

25     But if you saw the receivables, the signed contracts, money

1  owed to the company, you would see that far exceeds -- but that

2  never came in, nobody talked about it, and it's unfair.

3      THE COURT: Mr. Harley, you talked to these people at the

4  Federal Reserve Banks.

5      THE DEFENDANT: That's another thing.

6      THE COURT: They told you that you were barking up the wrong

7  tree, and you just went on undaunted to the next guy. Did you

8  not believe them?

9      THE DEFENDANT: Your Honor, the wrong people were telling me

10 that it was not true. I sent Mr. Bernanke documents of what we

11 had, Mr. Bernanke's secretary sent an email back stating that

12 they received my documents.

13     Now, why didn't they press charges against me if they were

14 so false? No one ever pressed charges against me, and I we

15 vetted this whole thing. But that never came out.

16     THE COURT: What do you mean they never pressed charges

17 against you?

18     THE DEFENDANT: I'm talking about Mr. Bernanke.

19     THE COURT: That's why you're here. The United States of

20 America pressed charges against you.

21     THE DEFENDANT: But Mr. Bernanke didn't sign a claim.

22     THE COURT: What difference does it make?

23     THE DEFENDANT: If I was doing something illegal, Your

24 Honor, that the people that I was trying to do something

25 illegal against would file a claim against me.

1      THE COURT:  The United States of America

2      THE DEFENDANT: I understand that. But what I'm trying to

3  say, Your Honor, if all these things could have been brought

4  out in trial, you would have saw a different picture. I had my

5  friend Ian Fleming who is with the Government, has one of the

6  highest security levels with the Government, sent you a letter

7  stating that everything was valid and authentic.

8      Now, if it wasn't, he would have never did that for me. He

9  meant what he said. He works with a lot of high-ranking people,

10 and this man knows what he's talking about. He's a progenitor

11 of the financial system, this man, Mr. Ian Fleming.

12     Again, I wish I could have afforded to have him testify,

13 but right now, he's not able to, he wasn't able to. But he

14 wrote that letter to you, Your Honor, I hope that carried some

15 weight. Because he did it because he knew the situation I was

16 in, and he was trying to help me. But what I had, I believed in

17 that, I had bond power, it was signed and sealed and notarized

18 by people who live in a foreign country. I didn't sign that.

19     And  also Bank Medallion with the Bank of Indonesia on it,

20 they stamped it, my bond power. Now, why would all this happen,

21 if these things were so outrageously no good?

22     THE COURT: Nobody seemed very impressed by that stuff.

23     THE DEFENDANT: Nobody saw them. That's the problem.

24     THE COURT: I thought they saw them and it meant nothing to

25 them.

1  THE DEFENDANT: Why didn't they check those things out? They

2  could have checked it all out.

3  THE COURT: How do you know they didn't?

4  THE DEFENDANT: I don't see any records that they did.

5  THE COURT: How do you know that they didn't?

6  THE DEFENDANT: I wish they had. Your Honor, there's another

7  thing I don't understand. Mr. Fleming, in his letter to you --

8  THE COURT: Why didn't you check it out and bring it into

9  Court and show us?

10  THE DEFENDANT: I did. I brought it to my attorney, Your

11  Honor, I told him these things.

12  THE COURT: Okay.

13  MR. BRANDLER: Your Honor, before I speak, Mr. Silverstein

14  is here, he was one of the primary victims in this matter, and

15  he would like to address the Court.

16  THE COURT: Fine.

17  (At this time Marshall Silverstein was sworn.)

18  MR. SILVERSTEIN: As you know, my Honor, my name is Marshall

19  Silverstein. I live in a modest home in Allentown,

20  Pennsylvania. I turned 84 years old this past August. I live

21  with my wife Nina who has suffered from dementia for ten years.

22  I take care of her with the help of some health care aides.

23  I would never allow her to be put into a nursing home.

24  When I met Richard Harley, I was looking for a way to

25  invest my savings so I would have future security,

1 particularly, because I knew my wife at this point had the

2 onset of dementia and I would need money to take care of and

3 support her.

4     From the onset, Mr. Harley assured me he had substantial

5 resources to repay my money with a promised return showing me a

6 certificate for a large quantity of oil reserves and also

7 FAXing information on two supposedly valuable paintings. In

8 addition to repeatedly promising that I would not only get my

9 money back, but also an excellent return. He prepared the

10 documents spelling out what I was investing and what he would

11 pay back to me.

12     In short, I trusted him 100 percent, because when he was

13 asking for the money, he gave me no reason not to, plus, he

14 gave me papers that seemed to show that he had valuable assets

15 which could be set to generate more than enough money to repay

16 me, plus provide a good return.

17     In addition, the loans were for short term, meaning, my

18 money would not be out of my hands for long. However, when he

19 started to miss deadlines to pay me back, I asked him at a

20 meeting at a restaurant to please assure me this was not a

21 scam. He stood up indignant and asked, What are you accusing me

22 of? Making me feel as if I had been wrong to even bring up the

23 subject. Looking back, he was practicing his profession, a

24 scammer, which, it turns out, he is very good at.

25     Altogether, I gave Mr. Harley about $235,000. Although, I

1   recouped about $30,000 on a civil judgment I eventually

2   obtained, after I had to hire a lawyer to sue him by putting a

3   lien against and having the Sheriff retrieve, and then sell a

4   fancy Lexus he was driving.

5       And not only have I lost more than $200,000 on which I got

6   no return, I also had to hire a lawyer who filed a civil suit

7   against Mr. Harley.

8       In that case, Mr. Harley did everything he could do to

9   delay and obstruct the proceedings, making numerous, frivolous

10  and pointless filings, including three bankruptcies, and going

11  as far as calling me at home to intimidate me.

12      In other words, he added insult to injury by making me run

13  up legal bills to try to get my money back rather than just

14  admitting he owed me the money. I am a 100 percent disabled

15  American veteran, having fought in Korea during the Korean war,

16  and now incapable of earning money to replace what I gave to

17  Mr. Harley.

18      Eventually, after my lawyer obtained judgment against Mr.

19  Harley, his company and his wife, we decided to notify the

20  authorities of Mr. Harley's activities. That led us to the U.S.

21  Attorney's Office, which eventually lead to this criminal

22  prosecution.

23      My only hope is Your Honor could understand the harm Mr.

24  Harley has caused me and my wife and how our lives will never

25  be the same, as we will have to scrimp and save and borrow from

1   our children to care for each other now in our old age.

2       I also ask Your Honor to consider the importance of getting

3   Mr. Harley off the streets so he cannot ever do this again to

4   anyone else, especially, considering all the people who

5   testified at trial that he has taken advantage of. Please,

6   also, consider the need for him to be punished for this

7   repeated fraudulent behavior, which goes back more than ten

8   years when he was in jail previously for scamming people with a

9   bogus cure for AIDS.

10      Bernie Madoff, who committed many similar crimes as Mr.

11  Harley, only numerous more victims, was sentenced in June 2009

12  to 150 years in Federal Prison, along with his assets to be

13  liquidated for the restitution to his victims.

14      Your Honor, I would respectfully ask that any sentence

15  imposed against Mr. Harley not only include serious prison

16  time, but also a condition of restitution for me and the other

17  victims of his scheming.

18      Thank you, Your Honor, for allowing me to be heard. I

19  apologize if I sound emotional as I read this statement, but

20  words cannot express how devastating this has been for me and

21  my family.

22      THE COURT: Thank you.

23      MR. BRANDLER: Thank you, Mr. Silverstein.

24      Your Honor, I filed a Sentencing Memorandum, I'm not going

25  to repeat what's in it, I'm just going to comment on what we

1  heard from Mr. Harley today, which is a complete lack of

2  remorse, complete lack of acceptance of responsibility, and

3  there is no doubt in the Government's mind that if he remains

4  free at large, even pending reporting to prison, he will

5  continue to prey upon people, because he believes what he is

6  doing is correct, and no one is going to convince him

7  otherwise, and he will continue to attempt to defraud people

8  using these bogus documents.

9       We believe the 25-year sentence that we have recommended is

10 completely justified under the facts of this case. The harm, as

11 Mr. Silverstein has stated, was enormous to him, but it was

12 enormous to the other victims, as well.

13      The fact that Mr. Harley has a prior conviction for a very

14 serious offense of defrauding dying AIDS patients received a

15 fairly light sentence of five years imprisonment, and that did

16 not deter him from committing these crimes, and, actually, he

17 started committing these crimes while he was on supervised

18 release for that offense. It's a very serious aggravating

19 factor.

20      He also never paid any restitution to any of the victims

21 from his prior offense. The amount due the United States on

22 that matter, $168,000, is still outstanding, as is the money

23 that was due and owing to the Securities and Exchange

24 Commission of over $1 million.

25      So, although, the Court will likely impose a Restitution

1 Order in this case, I've explained to Mr. Silverstein and the

2 other victims that it's very unlikely they will ever receive

3 any money from Mr. Harley to compensate them for their losses.

4      Based upon all of those factors and those mentioned in my

5 sentencing memo, we request the Court to impose a sentence of

6 25 years imprisonment, restitution in the amount of the actual

7 losses suffered by the victims, a three-year term of supervised

8 release and $2300 special assessment.

9      THE COURT: What are those actual losses? Are they set forth

10 in the order?

11      MR. O'BRIEN: Page 6 and 7 of Mr. Brandler's memorandum.

12      MR. BRANDLER: 318,800.

13      THE COURT: So what's in the --

14      MR. BRANDLER: There's a discrepancy within the Pre-sentence

15 Report in the amount of $5,000, an individual by the name of

16 Henry Cohen, who the Government interviewed and indicated he

17 had also paid Mr. Harley $5,000, based upon fraudulent

18 representations.

19      He did not testify at trial, and we did not include him in

20 the actual loss figure. I know that the Probation Department

21 has included him in the restitution figure, because they

22 received from Mr. Cohen a statement seeking restitution in that

23 amount which I had never received, Mr. Zdaniewicz has just

24 given me a copy of that. We didn't include it in the loss

25 figure for guideline purposes, but it has been included in the

1  restitution figure.

2     It makes no difference on the guideline calculation.

3     THE COURT: Well, I guess what I'm trying to find out is Mr.

4  Silverstein had 259,500, and over here, in the order I have, it

5  says a 1,400,000.

6     MR. BRANDLER: That was the Probation Department's

7  calculation, not the Government's. I think that was based upon

8  the judgment Mr. Silverstein obtained in the Court of Common

9  Pleas.

10    THE COURT: So you stand by the 259?

11    MR. BRANDLER: Yes, I think the restitution should be the

12 actual out-of-pocket loss, not the judgment he received.

13    THE COURT: I'm inclined to agree with that.

14    MR. O'BRIEN: Your Honor, may I make a brief comment?

15    THE COURT: Of course.

16    MR. O'BRIEN: Couple things, Your Honor. Again, Your Honor,

17 our position is not only the restitution but the sentencing

18 should be based on the actual loss figure of $318,000. The way

19 that Mr. Brandler and the Probation Officer arrived at the

20 higher figure was through the use of Mr. Silverstein's alleged

21 million or 2 million-dollar claim, and I think his testimony

22 didn't mention that, at all, talked about his loss of being in

23 the 250,000 range.

24    It also was based on the checks and promissory notes that I

25 don't think ever even came close to producing any loss to any

1  individual. The $500,000 involved from Randall, she was asked

2  to invest, she never did, that didn't come close to producing

3  any loss to any individual.

4      So, Your Honor, we would ask the Court, in its discretion,

5  to impose a sentence based on the actual loss.

6      As the Court knows, this sentence is being driven by the

7  amount by which the guidelines are increased because of

8  the -- by virtue of the actual loss. Using the figure proposed

9  by Mr. Brandler, it increases by 30, we think it should be

10  increased by much less. Criminal history is 3, we feel the

11  sentence, as I said before, in the range of 6 to 7 years would

12  be more than fair in this case, considering all of the factors.

13      Finally, Your Honor, Mr. Brandler made a statement about if

14  Mr. Harley were to be given today a few days to clear up his

15  affairs, that he would continue to prey on individuals. I would

16  take issue with that for a couple reasons.

17      Number one, there's no evidence that he has continued to

18  prey on individuals since the trial.

19      Number two, when he was released after trial, we met with

20  the Probation Officer, and they did something with his computer

21  to give them the availability to get into it if he was going to

22  prey on someone. So the Probation Officer took steps to ensure

23  that didn't happen, there's no proof that it happened, there's

24  no complaints that it happened.

25      I think the allegation that he would continue to prey on

1  individuals is unsubstantiated by the record and should not be

2  such that he shouldn't be given what most Defendants are given,

3  some time to take care of his affairs, in this case,

4  also -- I'll stop there.

5      THE DEFENDANT: Your Honor, my wife, as you well know, has a

6  serious problem. And if I may take time to get her situated,

7  have someone come in -- right now, I've got to have somebody

8  take care of her, Your Honor.

9      THE COURT: I understand that, but I don't know what that

10 means.

11     THE DEFENDANT: I would like to go back and get that

12 straightened out for her.

13     THE COURT: Well, you've had a lot of time to do that.

14     THE DEFENDANT: Your Honor --

15     THE COURT: Mr. Harley, I'm not being unreasonable, I'm not

16 giving you a great amount of time. It just can't be done here.

17     THE DEFENDANT: At least two weeks, Your Honor, at least two

18 weeks to get my wife situated, so that she -- I could lose her,

19 Your Honor, that's the bottom line.

20     THE COURT: I understand all of that.

21     THE DEFENDANT: At least two weeks, Your Honor.

22     THE COURT: Mr. Brandler.

23     MR. BRANDLER: Your Honor, we oppose that. This trial took

24 place last December, he has had almost a year to make whatever

25 arrangements he needed to make for his wife. There's no

1  evidence that her situation is going to change between now and

2  the next two weeks. We would request an immediate imposition of

3  sentence.

4      THE DEFENDANT: All I'm saying is I just need somebody to

5  come in to have her taken care of, Your Honor, at least, come

6  in on a daily basis, Your Honor. There's certain things she

7  needs to have done.

8      THE COURT: I understand that, but what have you done up

9  until now?

10     THE DEFENDANT: Like I said, Your Honor, I've been doing it

11 all myself.

12     THE COURT: But you saw this day coming.

13     THE DEFENDANT: Yes, I did, I knew it was coming, Your

14 Honor. But it has been hard on me too.

15     THE COURT: I have no doubt.

16     THE DEFENDANT: All I'm asking for is just a couple weeks to

17 make sure she's okay. And I've been here to every trial, every

18 day.

19     THE COURT: I understand all of that. Mr. Brandler, where

20 are we getting 25 years, by the way? I'm confused about the

21 calculation. I'm seeing 240 months.

22     MR. BRANDLER: The guideline calculation is actually life.

23 Under the advisory guidelines, it's life. We reduced -- our

24 recommendation is below what the advisory guideline range is in

25 this matter. I don't know where the Court is seeing 240 months.

1  In the Pre-sentence Report --

2      THE COURT: I'm seeing it in the --

3      MR. BRANDLER: The Pre-sentence Report said the advisory

4  guideline range is life. It was based on a total offense level

5  of 43 and criminal history category of 3, and based on the

6  3553(a) factors, we recommended a 25-year sentence.

7      THE COURT: What is the incremental sentencing given in

8  terms of amounts, since we're adjusting these amounts, where do

9  I find that?

10     MR. BRANDLER: I'm not sure I understand.

11     THE COURT: Do you know what I mean?

12     MR. BRANDLER: No.

13     THE COURT: For example, if it's $318,000.

14     MR. BRANDLER: For the actual out-of-pocket loss.

15     THE COURT: Right. That carries with it a certain weight.

16     MR. BRANDLER: An increase in the guidelines, you mean, if

17 it was calculated --

18     THE COURT: Yes.

19     MR. BRANDLER: I haven't done that calculation because the

20 guidelines specifically say the Court should look at -- that

21 it's the greater of actual loss or intended loss. So the way we

22 looked at it, we looked at intended loss. I have not done a

23 guideline calculation looking at actual loss because that was

24 never our position.

25     So I don't know what the answer to that question is.

1        THE COURT: Mr. Zdaniewicz.

2        PROBATION OFFICER ZDANIEWICZ: Your Honor, I have the

3    information that you need, if you want to take a look at the

4    figures.

5        THE COURT: I do.

6        (At this time there was a brief pause in the proceedings.)

7        MR. BRANDLER: I would just also note, and I think Mr.

8    Zdaniewicz noted in his report, there's a new guideline version

9    effective November 1st of this year, and that affected the loss

10   table. I don't know if it affected this, at this level, whether

11   it had any impact.

12       MR. ZDANIEWICZ: It does not. It would be 323,000, that's

13   including the $5,000 that Mr. Cohen --

14       MR. BRANDLER: And I also mentioned in my sentencing memo

15   there would be a four-level increase because of substantially

16   -- having a substantial financial impact on five or more

17   victims, which would be in the new guidelines, which was not

18   assessed in the older version.

19       THE COURT: So what would that be?

20       MR. BRANDLER: If the Court was looking at that guideline

21   calculation, there would be an additional -- whatever that

22   number is that Mr. Zdaniewicz is pointing to, plus another four

23   levels for substantial harm to five or more victims, if the

24   Court was using the new guideline version.

25       But -- the law -- I think the Court -- Mr. Harley is

1   entitled to use whatever version is most beneficial to him at

2   this sentencing proceeding, whether it's the older one or the

3   newer one. I think the older version is more beneficial to him

4   because of that increase.

5        THE COURT: All right, thank you. Well, then, you're right,

6   the old version is better for him.

7        All right, given the actual loss computation in this

8   guideline calculation, the guideline calculation in this

9   case -- do we need to address your objections?

10       MR. O'BRIEN: Well, my objection, Your Honor, was based on

11  the amount, and I believe, when you make that decision, you'll

12  have addressed it.

13       THE COURT: Well, I'm going to reduce the amount, everybody

14  seems in accord on that.

15       MR. BRANDLER: Well, we think, as far as the guidelines are

16  concerned, it's very clear the Court should look to intended

17  loss, not actual loss. So the first step in this process is to

18  calculate the advisory guideline range. The guidelines -- and I

19  stated the section in my sentencing memo -- specifically states

20  the Court should look to the larger of actual or intended loss.

21       That's the guideline range. I believe the guideline range

22  is life.

23       Then, the Court, in the next step, looks at departures.

24  There's been no requests for departures. Then we look to the

25  3553(a) factors, and that's a confluence of different factors,

1  where the Court can look at actual loss versus intended loss.

2  But as far as the guidelines are concerned, I think the Court

3  must start with the advisory guideline range using intended

4  loss, not actual loss.

5      THE COURT: All right. I don't dispute that.

6      MR. O'BRIEN: Well, our position is, I think that that is a

7  correct statement of the law from the Third Circuit, and our

8  position is that the actual loss would reflect intended loss in

9  this case.

10     THE COURT: Well, given that, then, the guideline

11 calculation in this case is base offense level of 7, specific

12 offense characteristics 30 levels added about the intended loss

13 of more than 400,000,000, then, so that's 30, and then we have

14 two specific offense characteristics involved,

15 misrepresentation or other fraudulent acts during the course of

16 three bankruptcy proceedings plus 2, and then we have paragraph

17 32, offense involved a sophisticated means by obtaining various

18 signatures from the internet and cutting and pasting on

19 fraudulent documents, false representation that the documents

20 were legitimate to defraud investors, plus 2.

21     Adjustment for role in offense. Mr. Harley is Chief

22 Executive Officer of RJH Company, Incorporated. He

23 misrepresented that he possessed legitimate financial reserve

24 instruments, he abused the position of public and private trust

25 or used a special skill in a manner that significantly

1 facilitated the commission or the concealment of the offense,

2 therefore, increase by 2 levels, plus 2. Total offense level of

3 43.

4     Given that, under the guidelines, the guideline calculation

5 is 43, criminal history category of 3, that yields a guideline

6 calculation;

7     Counts 1 through 15, 20 on each count, 20 years on each

8 count, life.

9     Counts 16 through 22, five years on each count.

10     Count 23, 30 years, probation ineligible, supervised

11 release.

12     Counts 1 through 22, 1 to 3 years on each count.

13     Count 23, 2 to 5 years, restitution based on intended loss,

14 $1,553,711.49.

15     There's an allowable fine of 25,000 to $1 million, and a

16 special assessment of $100 on each count, which is $2300.

17     Now, I'll hear you on variance regarding amounts and

18 whatever else you want to offer.

19     MR. O'BRIEN: Your Honor, again, we feel that a sentence in

20 the 6 to 7 years range would be appropriate here. It is greater

21 than the sentence he received in his previous trial. The only

22 loss here is a financial loss. The actual loss is much less

23 than claimed by the U.S. Attorney, when using the figures of

24 intended loss.

25     Mr. Harley is 71 years of age, he has a wife who is in poor

1   health. A sentence of anything more than that could be, in

2   effect, a life sentence. We do not feel that putting him in

3   jail for the rest of his life is appropriate in this case.

4       I think you can send a message to the public in a theft

5   case with a sentence in the 6 to 7-year range. You could

6   certainly prevent him from committing further crimes with a

7   sentence in that range.

8       I think it's consistent with other sentences imposed in

9   financial crimes, so we feel that that would be appropriate in

10  this case.

11      MR. BRANDLER: We have stated our reasons in the Sentencing

12  Memo. The Court must, in considering the 3553(a) factors,

13  promote respect for the law, impose punishment that corresponds

14  with the gravity of the offense, deter not just Mr. Harley but

15  deter others. And look at his criminal background and his

16  history.

17      What we have said is this man has never had a legitimate

18  job in his entire life. He spent his entire life scamming

19  people, it goes back to the age of 25. And the harm that he has

20  caused people really goes beyond pecuniary harm.

21      Mr. Silverstein is trying to take care of a wife Nina who

22  has got dementia. Mr. Harley talks about his wife and how he

23  needs to take care of her, but he has no concern for Mr.

24  Silverstein's wife.

25      A lady who was blind, Mary Ann Alexander, who took money

1  from her daughter, she only lost $2500, but she was devastated

2  because she had -- so the harm here goes way beyond the

3  pecuniary amount.

4      Considering his prior history and the fraud he committed

5  against dying AIDS patients and that he did this crime while on

6  supervised release for that offense, we believe that a sentence

7  far in excess of 6 to 7 years is justified in this case, and we

8  stand by our request for a 25-year sentence.

9      THE DEFENDANT: Your Honor, I take exception to most of what

10  he said. First and foremost, I did have a job, I started with

11  Mack trucks back in the '60s. I worked there for a number of

12  years.

13      After Mack trucks, I bought two laundromats, two

14  laundromats I bought. I've worked those laundromats. After the

15  laundromats, I owned a shopping center in North Newark, it

16  could all be checked out, and I owned a 30,000 square foot

17  supermarket back in those days. I had viable businesses and a

18  good job at Mack Trucks. So I take exception to that part of it

19  anyway.

20      Yes, I've been an entrepreneur for most of my life, I

21  really have, and being a black man is not easy. I've walked

22  into banks where banks have said, I'm sorry, but we are not

23  going to make a black man a millionaire. I've suffered through

24  all of that, I know how things work.

25      And with this business I have now, yes, I believed in it, I

1  would have never done it if I hadn't believed in it. I stand

2  square on what I believe in, Your Honor, and I was not going to

3  take anybody's money and do harm to anybody, and I take

4  exception to what he said, I really do. It hurts, because, as a

5  black man, I know what it's like when you're trying to do

6  things, you have no idea what I've been through.

7      See, nobody knows my pain and my suffering. But I suffered

8  a lot in my lifetime because of the color of my skin. And it

9  wasn't -- I grew up in a family of all ministers, my dad, mom,

10  grandma, they're all ministers. I believe in the sanctity of

11  church and God. So would I hurt anybody intentionally? No, not

12  in a million years.

13      Yes, this particular situation I'm in now, it wasn't my

14  fault, people who signed contracts didn't live up to their

15  word, and that's what caused me the problem the debacle that I

16  finds myself in. That's what happened. If they had paid, and

17  they all got paid, we wouldn't be here, Your Honor, would we?

18  Your Honor, we wouldn't be here if I could pay these people

19  what I promised.

20      But if you look at those files, I wish you would, look at

21  those accounts receivable files, they have them, but they never

22  came out, because there's a lot of money there that people owe

23  me, and I haven't sued anybody. Maybe I should have, then, I

24  could kind of balance things out a little bit.

25      But anyway, I just wanted to say, Your Honor, that's not

1 | me, that is not me at all. I stand on the square.

2 |     THE COURT: All right. Anything else?

3 |     MR. BRANDLER: No, Your Honor.

4 |     THE COURT: All right. Well, I looked at this over and over.

5 | We know what the guideline range is, we know that -- or I know

6 | that I'm going to make the actual loss, the touch stone of the

7 | restitution. The question is what is the appropriate sentence

8 | here?

9 |     The factors in 3553(a) weigh heavily here, for sure. First

10 | of all, it's the nature and circumstances of the offense and

11 | the history and characteristics of Mr. Harley. The nature and

12 | circumstances of the offense are serious business. I know Mr.

13 | Harley feels he's innocent, that's his entitlement. The jury

14 | didn't think he was innocent. I'm sentencing him on the basis

15 | that he's not innocent.

16 |     So this is serious business to, for lack of a better word,

17 | con people out of money, which is what happened, and not only

18 | that, some of the most vulnerable people, which is very,

19 | very -- it's kind of the underbelly, it's kind of a sad

20 | commentary on a human condition.

21 |     So, number one, I think this is a very serious offense.

22 |     Number two, the history and characteristics of Mr. Harley.

23 | Mr. Harley has been in trouble before, he served time for a

24 | fraudulent AIDS cure, I have to take that into account. The

25 | sentence that I impose has to reflect the seriousness of the

1  offense, promote respect for the law and provide just

2  punishment. I will do that.

3      It has to afford an adequate deterrence to criminal

4  conduct, not only to Mr. Harley but to others. I will do that.

5  Protect the public from further crimes by Mr. Harley. I will

6  keep that in mind.

7      And to provide Mr. Harley with any needed educational or

8  vocational training, medical care or correctional treatment in

9  the most effective way. I don't know that we have an issue like

10 that, but if we do, I'm sure it will be addressed wherever Mr.

11 Harley is housed.

12     Of course, the need to avoid unwarranted sentencing

13 differences of people who have been found guilty of similar

14 conduct and to provide restitution for any victims of this

15 offense.

16     Given all of these things, I'm going to sentence Mr.

17 Harley, in large measure, based on some downward movement,

18 because of the amounts involved in actual loss. I'm going to

19 sentence Mr. Harley to 144 months followed by a term of three

20 years of supervised release.

21     Mr. Zdaniewicz, would that be right?

22     PROBATION OFFICER ZDANIEWICZ: Correct.

23     THE COURT: I'm not going to impose a fine because he has to

24 make restitution. Makes no sense for me to impose a fine, given

25 that he's going to have to make restitution.

1     I also order that he make restitution in the total amount

2  of $318,800. This comes out of Mr. Brandler's memo.

3     Marshall Silverstein, $259,500; Maurice Shufford $10,000;

4  Malcolm Caselle $10,000; Peter Bunche $21,000; Peter Blau

5  $1500; Bertrand Falls $5,000; Kathleen Kelly $5,000.

6     I find the sentence I have imposed is reasonable. I advise

7  you, Mr. Harley, of your right to appeal this conviction and

8  sentence to the United States District Court of Appeals for the

9  Third Circuit.

10     If you're not able to pay costs of an appeal, you may then

11  apply for leave to appeal In Forma Pauperis, and if approved,

12  counsel will be appointed for you and you will not be required

13  to pay any costs.

14     If you so request, the Clerk of Court will file and prepare

15  a Notice of Appeal on your behalf. With few exceptions, any

16  Notice of Appeal must be filed within 14 days after sentencing

17  is imposed upon you.

18     Now, is there anything else I need to do?

19     MR. BRANDLER: The date for reporting.

20     THE COURT: Okay.

21     THE DEFENDANT: Your Honor, may I say something?

22     THE COURT: Go ahead.

23     THE DEFENDANT: Around the first of December, would that be

24  amenable to the Court?

25     THE COURT: That's too long.

1      THE DEFENDANT: That's only two weeks away.

2      THE COURT: It's too long. I'll give you 10 days. I'm going

3   to give you 10 days starting tomorrow.

4      THE DEFENDANT: Starting tomorrow.

5      THE COURT: That's right. So count that out, Judy. What day

6   would that be?

7      THE CLERK: The 23rd would be that Monday, November 23 would

8   be a Monday.

9      THE COURT: Okay, so you will telephone three days prior to

10  that, you'll telephone the Marshal's Office to determine where

11  it is that you're going to report to begin your sentence. All

12  right.

13     MR. BRANDLER: I think the $2300 statutory assessment, I

14  don't know if you mentioned that.

15     THE COURT: I thought I mentioned that, but I'll mention it

16  again. There's a 2300-dollar -- it's called a --

17     MR. BRANDLER: Special assessment.

18     THE COURT: -- special assessment.

19     MR. ZDANIEWICZ: Your Honor, just two matters. There is the

20  victim Mary Ann Alexander $2500 that was in Mr. Brandler's

21  memorandum, and also the Henry Cohen additional $5,000.

22     THE COURT: Well, wait a minute now. I didn't see Mary Ann

23  Alexander.

24     MR. BRANDLER: It's on the next page.

25     THE COURT: Oh, Mary Ann Alexander 2500. And who else?

1    MR. ZDANIEWICZ: Henry Cohen for $5,000.

2    MR. BRANDLER: He submitted a restitution claim.

3    THE COURT: And Henry Cohen 5,000. Those are to be added to

4 the list of restitution payments and the total of 318,800

5 should be adjusted.

6    MR. BRANDLER: 323,800.

7    THE COURT: Only needs to be adjusted upward of 5.

8    THE DEFENDANT: Your Honor, at the trial, Mary Ann testified

9 I paid her back about half of what I owed her.

10    THE COURT: That will come out in the wash. Okay, anything

11 else?

12    MR. O'BRIEN: Your Honor, the question of the post-trial

13 motions.

14    THE COURT: I'll work on them.

15    MR. O'BRIEN: I know. I think the appeal time, as I

16 understand it, runs from the denial of those motions. Am I

17 incorrect on that?

18    MR. BRANDLER: I think it runs from the date of sentence.

19    THE COURT: You don't have to worry about that, we will move

20 it along.

21    MR. O'BRIEN: Go ahead, Mr. Harley.

22    THE DEFENDANT: I would like, Your Honor, to have a hearing

23 on those motions we presented, a hearing on that. It's very

24 important to me. Very important.

25    THE COURT: Fine. Ask for it.

1      THE DEFENDANT: Please, may I have a hearing?

2      THE COURT: Ask for it at the time you file your papers.

3  You want a hearing on the motion, right?

4      THE DEFENDANT: Yes.

5      THE COURT: Well, just ask for it at that time.

6      THE DEFENDANT: Thank you so much, Your Honor.

7      THE COURT: Anything else?

8      MR. BRANDLER: No, Your Honor.

9      THE DEFENDANT: Thank you so much, Your Honor.

10      (At this time the proceedings were adjourned.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3          I, KRISTIN L. YEAGER, Official Court Reporter for the

4   United States District Court for the Middle District of

5   Pennsylvania, appointed pursuant to the provisions of

6   Title 28, United States Code, Section 753, do hereby certify

7   that the foregoing is a true and correct transcript of the

8   within-mentioned proceedings had in the above-mentioned and

9   numbered cause on the date or dates hereinbefore set forth; and

10  I do further certify that the foregoing transcript has

11  been prepared by me or under my supervision.

12

13                         S/Kristin L. Yeager
                           KRISTIN L. YEAGER, RMR,CRR
14                         Official Court Reporter

15

    REPORTED BY:
16
        KRISTIN L. YEAGER, RMR,CRR
17      Official Court Reporter
        United States District Court
18      Middle District of Pennsylvania
        P.O. Box 5
19      Scranton, Pennsylvania  18501

20

21

22          (The foregoing certificate of this transcript
    does not apply to any reproduction of the same by any means
23  unless under the direct control and/or supervision of the
    certifying reporter.)

24

25