1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2

 3   UNITED STATES OF AMERICA :
                              :
 4                            :
                              :
 5       vs                   :    12-CR-224
                              :
 6                            :
                              :
 7   RICHARD J. HARLEY        :
                              :
 8                            :

 9

10

        BEFORE:      THE HONORABLE A. RICHARD CAPUTO
11
        PLACE:       COURTROOM NO. 3
12                   WILKES-BARRE, PENNSYLVANIA

13      PROCEEDINGS:  SUPPRESSION HEARING

14      DATE:        APRIL 8, 2014

15

16

17   APPEARANCES:

18   For the United States:

19   BRUCE D. BRANDLER, ESQ.
     U.S. ATTORNEY'S OFFICE
20   ROOM 217, FEDERAL BUILDING
     228 WALNUT STREET
21   HARRISBURG, PA 17108

22   For the Defendant:

23   WILLIAM RUZZO, ESQ.
     590 RUTTER AVE
24   KINGSTON, PA 18704

25
```

2

1    <u>INDEX TO WITNESSES</u>

2

3    FOR GOVERNMENT:    DIRECT   CROSS   REDIRECT   RECROSS

4    VINCENT BROWNING    3        13

5

6

7

8    FOR DEFENDANT:     DIRECT   CROSS   REDIRECT   RECROSS

9    RICHARD HARLEY     23        32       37

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE COURT:  All right.  We're here on a motion to

2   suppress in the case of United States versus Richard Harley.

3        MR. BRANDLER:  United States called Vincent Browning

4   to the stand, Your Honor.

5        THE COURT:  Pardon?

6        MR. BRANDLER:  We have a witness that we would like

7   to call for the purpose of the hearing.

8        THE COURT:  Yes.

9        MR. BRANDLER:  Vince Browning.

10       VINCENT BROWNING, called as a witness, being duly

11  sworn, testified as follows:

12  DIRECT EXAMINATION

13  BY MR. BRANDLER:

14  Q.   Thank you.  Mr. Browning, by whom are you employed?

15  A.   The F.B.I.

16  Q.   What is your title?

17  A.   I'm a special agent.

18  Q.   How long have you been a special agent with the F.B.I.?

19  A.   15 years.

20  Q.   And what is your current duty station?

21  A.   I'm assigned to the Scranton residence agency out of the

22  Philadelphia division.

23  Q.   In your role as a special agent with the F.B.I. had you

24  been assigned an investigation involving Richard Harley?

25  A.   Yes.

4

1  Q.    And during the course of your investigation, did you

2  obtain a search warrant for Mr. Harley's residence?

3  A.    Yes, I did.

4  Q.    I would like to show you a document which I've marked for

5  the purpose of this hearing as Government's Exhibit 1.   I

6  believe you have a copy of it up there.

7  A.    I do.

8  Q.    Can you identify this document, please?

9  A.    Yes, I can.

10  Q.    What is it?

11  A.    A copy of the search warrant issued August 27th, 2012, 11

12  a.m. by Magistrate Judge Malachy Mannion.

13  Q.    Is there a case number?

14  A.    There is.  It's 3:MC-12-306.

15  Q.    And the caption in the matter of the search of what is

16  indicated the location?

17  A.    Search of North Slope Three Skyview Circle Unit 45 A.

18  Shawnee on Delaware, Pennsylvania.

19  Q.    Is there attachments A. and B. with this?

20  A.    Yes.

21  Q.    Did you obtain -- what was your connection with obtaining

22  this warrant?

23  A.    I wrote the affidavit supporting it and went down and had

24  it sworn out in front of Magistrate Judge Mannion.

25  Q.    So you presented it to Magistrate Mannion?

1  A.    Correct, yes.

2  Q.    After obtaining the warrant did you have an occasion to

3  execute the warrant?

4  A.    Yes.

5  Q.    When did you execute the warrant?

6  A.    It was executed on August 29th, 2012.

7  Q.    So that would be two days later?

8  A.    Yes.

9  Q.    And approximately what time was the warrant executed?

10  What time did you first arrive at the scene of the residence?

11  A.    Approximately 8:10 in the morning.

12  Q.    Approximately how many law enforcement officers were with

13  you at that time?

14  A.    Including myself, 12 of us.

15         THE COURT:  How many?

16         THE WITNESS:  12, Your Honor.

17  BY MR. BRANDLER:

18  Q.    Were they various different law enforcement agencies?

19  A.    Yes, there were various including F.B.I. agents.

20  Q.    Tell us what happened after you arrived at the scene.

21  A.    The search warrant team spread out around the outside of

22  the residence.  Several agents went to the front door of the

23  residence and several went around to the rear of the residence.

24  Q.    Where were you located?

25  A.    I was on the outside of the residence foot of the stairs

1  and walking around the outside during the time we intended

2  entry.

3  Q.    Were you in charge in the execution of the search warrant

4  as the case agent?

5  A.    Yes.

6  Q.    Continue on.  What happened after you --

7  A.    So approximately 8:10, 8:11 in the morning, we attempted a

8  knock and announce.  We started knocking on the front door and

9  the back slide door to the basement area.

10 Q.    And this knocking, was that going on simultaneously at the

11 front and rear doors?

12 A.    Yes.

13 Q.    And when you say there was an announce, what do you mean

14 by that?

15 A.    That's where we knock and announce that we are F.B.I. with

16 a warrant, F.B.I. with a search warrant, just basically saying

17 that out loud and knocking on the door.

18 Q.    And in addition to knocking and announcing, were there any

19 marked vehicles at the location?

20 A.    Yes, we -- I requested the Pennsylvania State Police to

21 provide a marked unit to sit -- just to sit in the driveway.

22 Q.    What happened after you were knocking and announcing?

23 A.    There was no response.

24 Q.    How long did you knock and announce and wait for a

25 response?

1  A.    Five minutes in total.

2  Q.    So that would take us to about 8:16 a.m., 8:15 a.m.?

3  A.    Correct.

4  Q.    And what happened at that time?

5  A.    Well, approximately four minutes after we began to knock

6  and announce, I made several phone calls to the number I had

7  for the residence.

8  Q.    What was the phone number you called?

9  A.    It was a 570 number -- 476-7600.

10  Q.    And did you personally call that number?

11  A.    Yes, from my personal cell phone I made two calls.

12  Q.    What response, if any, did you get?

13  A.    The first phone call I made it sounded to me as if the

14  phone had been picked up and then hung up.  Nobody spoke.

15  Q.    What happened on the second call?

16  A.    It went to voicemail.

17  Q.    And were those calls made one immediately after the other?

18  A.    Yes, yes.

19  Q.    After making those two phone calls, what did you do next?

20  A.    At this point, approximately five minutes had gone by.  I

21  made the decision that we would force entry into the residence.

22  Q.    And what did you do to accomplish the forced entry?

23  A.    We had two agents at the front door who -- one had a

24  battering ram.  The other one had a pry bar.

25  Q.    And you used --

1  A.    There was an outside metal door -- like, door like --

2  popped that open, and they used the ram to punch open the front

3  door.

4  Q.    At any time prior to forcing entry, did you hear any

5  noises inside other than -- did you hear any noises inside?

6  A.    No, I didn't, no.

7  Q.    And other than the phone call you said which -- sounded

8  like someone hung up the phone, did you have any indication

9  that there was someone inside?

10 A.    No, I didn't see anyone peeking out the windows or -- I

11 didn't hear any sounds inside.

12 Q.    What happened after -- was entry gained?

13 A.    Entry was gained.

14 Q.    What happened at that point?

15 A.    The first agents into the residence did draw their

16 firearms for protection and then spread out to determine if --

17 what occupants were there, if any.

18 Q.    And what was observed at that time?  What did you observe

19 at that time?

20 A.    I was approximately the fourth person in behind the agent

21 -- the initial agents.  I observed Mr. Harley and his wife were

22 in the residence in different parts of the residence.

23 Q.    Which parts of the residence were they in?

24 A.    Mr. Harley was in the basement area, the basement living

25 area, and his wife was upstairs.  It's a three level, main

1  floor and -- like, up a second floor and a basement area.  The

2  wife was in the upstairs area of the home.

3  Q.    And tell us what happened.

4  A.    They were called to the main floor respectively, Mr.

5  Harley from the basement stairway to the main floor, and his

6  wife from the upstairs down to the main floor.

7  Q.    Then what happened?

8  A.    They were asked to sit quietly.  They sat over at a

9  kitchen table area.

10 Q.    What did the rest of the agents do while they were sitting

11 in the main area?

12 A.    They continued to spread out throughout the residence to

13 determine if there any other occupants that might be hiding,

14 just to basically clear the residence for safety reasons.

15 Q.    Did you have any discussion with Mr. Harley at that time

16 regarding the reason for your presence there?

17 A.    Yes, I identified that we were F.B.I., that we had a

18 search warrant and asked him to sit quietly while we took care

19 of the premises.

20 Q.    Did you have any discussion with Mr. Harley about whether

21 or not he had heard you knocking on the door?

22 A.    Mr. Harley stated he had -- he was in the bathroom at the

23 time and couldn't respond.

24 Q.    Did he -- was his wife present also?

25 A.    Yes.

1  Q.    Did she say why she didn't respond?

2  A.    Mr. Harley told us his wife thought it was an intruder.  I

3  didn't hear her say that, that we were intruders potentially.

4  She was scared and stayed upstairs.

5  Q.    Now, after the other agents cleared the house, there was

6  no one else there?

7  A.    No, no one else.

8  Q.    After they cleared the house, did you then engage in an

9  interview of Mr. Harley?

10  A.    I did, yes.

11  Q.    How long did that interview last?

12  A.    I would say approximately 45 minutes to an hour perhaps.

13  No more than that.

14  Q.    And who else was present during the course of that

15  interview?

16  A.    There was another agent present.

17  Q.    What's his name?

18  A.    William Smith.

19  Q.    And was anyone else present besides you, Smith and Harley?

20  A.    Mr. Harley's wife at times was sitting at the table

21  several seats away from us.

22  Q.    Would she come and go?

23  A.    Some parts, yes.  A few times she got up and left and then

24  came back.

25  Q.    What's her name?

1  A.    Jacqueline.

2  Q.    Did she go by the same last name as Mr. Harley?

3  A.    She's gone by either Jacqueline Harley or Jacqueline Kube.

4  Q.    During the course of the interview, tell us at any point

5  during the course of the interview did you discuss the search

6  warrant?

7  A.    I did.

8  Q.    Tell us what happened.

9  A.    I told Mr. Harley we have a search warrant for the

10  residence, and I showed him the original search warrant, which

11  I had with me.

12  Q.    And what I've marked as Government's Exhibit 1, did you

13  show him the original of that document?

14  A.    Yes.

15  Q.    With the blue ink?

16  A.    It had an ink signature and a seal, like, a paper stamp.

17  I distinctly remember showing him the original and pointing to

18  the judge's signature on it.  I showed him that.

19  Q.    After showing him that, did the interview continue on?

20  Did you discuss the case with him?

21  A.    Yes, yes.

22  Q.    You said that took about 45 minutes to an hour?

23  A.    Yes.

24  Q.    And during that time period, what were the other agents

25  doing while you were interviewing Mr. Harley?

12

1   A.    They were conducting the search warrant in the various

2   portions of the residence.

3   Q.    How long did the search take place?

4   A.    Approximately five hours.

5   Q.    When did the search end?

6   A.    1:30 in the afternoon.

7   Q.    Did you ever discuss with Mr. Harley whether he was under

8   arrest or free to leave?

9   A.    I told Mr. Harley he was free to leave, he was not under

10  arrest.

11  Q.    And he chose to stay?

12  A.    Yes, he did.

13  Q.    At the time that the search was ending, you said it was

14  around 1:30?

15  A.    Yes.

16  Q.    Did you leave any documents with him or in the residence?

17  A.    I did.

18  Q.    What did you leave?

19  A.    I left probably copies of the property receipts listing

20  what we had seized and a copy of the search warrant.

21  Q.    And as far as the receipt of the property seized, did you

22  have any discussion with him about obtaining a signature?

23  A.    I did.  Yes.  He did not want to sign.

24  Q.    So he refused to sign it?

25  A.    Yes, he did.

1   Q.   You said you left a copy of the search warrant at the

2   residence.  What do you mean by that?

3   A.   I left a photocopy.

4   Q.   Was it the same copy you had shown him sitting in the

5   living room area?

6   A.   It was an unsigned copy.

7   Q.   Was it different other than being an unsigned copy?  Other

8   than that fact, was it different in any respect?

9   A.   No.

10  Q.   Did it have the attachments A. and B.?

11  A.   Yes, it did.

12  Q.   When you interviewed Mr. Harley at the outset, did you

13  advise him of his Miranda -- what is commonly known as Miranda

14  rights?

15  A.   No.

16  Q.   The reason for that?

17  A.   It was not a custodial interview.  He was not under

18  arrest.  He was not in custody.

19          MR. BRANDLER:  Your Honor, I have no further

20  questions, and I move the admission of Government's Exhibit 1.

21          THE COURT:  Any objection?

22          MR. RUZZO:  No, Your Honor.

23          THE COURT:  It will be admitted.

24  CROSS EXAMINATION

25  BY MR. RUZZO:

1  Q.    Agent Browning, you say you were in the -- Mr. Harley's

2  residence for about five hours?

3  A.    That's correct.

4  Q.    And you spoke with him for about 45 minutes?

5  A.    45 minutes to an hour, yes.

6  Q.    I think I will be accurate to say that you reduced a

7  summary of your conversation with him to a report about two or

8  three pages; is that correct?

9  A.    No, I believe it was close to six or seven pages.

10 Q.    Counsel provided me with a copy.  That's the substance of

11 your conversation with Mr. Harley, correct?

12 A.    I have two reports, but correct, yes, there's a report

13 with the substance of the interview of the conversation with

14 Mr. Harley, yes.

15 Q.    And when you -- Mr. Harley was cooperative during the

16 interview?  He answered most of your questions, correct?

17 A.    Yes, yes.

18 Q.    Never gave you any resistance or anything, neither did

19 Jackie?

20 A.    No, they were not combative.  They were not uncooperative.

21 Q.    Did there come a time when he asked you to see a copy of

22 the warrant or see the warrant?

23 A.    I showed him the warrant right off the bat before we got

24 going with the interview.

25 Q.    So before he sat down and talked to you, you showed him

1  the warrant, which you have with you.  I think it's Exhibit 1

2  for the purposes of this hearing.

3  A.    I have it, yes.

4  Q.    And you say that is a -- a copy of the search warrant that

5  you showed him?

6  A.    Yes -- no, I showed him the original of that, the original

7  warrant that I had in my possession.

8  Q.    You have that copy of Exhibit 1?

9  A.    Yes.

10 Q.    And in response to Mr. Brandler's questions, you also said

11 you showed him -- or you left him with a copy that was not too

12 much different from Exhibit 1, correct?

13 A.    I said I left him an unsigned copy, but that the -- it was

14 -- other than that it was not substantially different than the

15 original warrant.

16 Q.    Agent, I'm showing you what's been marked for the purposes

17 of this hearing Defense 1.  Can you identify that?

18 A.    It's a copy of the warrant without the judge's signature

19 or date.

20 Q.    That's a copy of what you -- the document you left with

21 Mr. Harley?

22 A.    Yes, that's correct.

23 Q.    And I think your testimony was it's not substantially

24 different from Government 1; is that correct?

25 A.    My understanding is --

1  Q.    Was that your testimony, Agent?

2  A.    The question is -- the riders, the attachments are not

3  substantially different.

4  Q.    That's not the question I asked you.

5  A.    Okay, sir.

6  Q.    I asked you -- it was your testimony that it was not

7  substantially different.  Was that your testimony?

8  A.    This is an unsigned copy.  That's my testimony, yes.  This

9  is the copy of what I left at the residence.

10 Q.    Your testimony was it was not substantially --

11        THE COURT:  Let's not argue with the witness.  Let's

12 not argue with the witness over a word.

13 BY MR. RUZZO:

14 Q.    Let's do it this way, Agent.  Government 1 has a case

15 number on it, correct?

16 A.    Yes.

17 Q.    Does Defense 1 have a case number on it?

18 A.    No, no there's not a case number on it.

19 Q.    Half way down the warrant -- the Government 1 has a date

20 you were permitted to execute this warrant or before September

21 7th, 2012.  That's on Government 1, correct?

22 A.    Correct.

23 Q.    It is not on Defense 1; is that correct?

24 A.    That's correct.

25 Q.    And there's, of course, a signature -- I take it that is

1  representative of magistrate -- former Magistrate Judge Mal

2  Mannion, correct?

3  A.    Correct.

4  Q.    And there was no signature on Defense 1; is that correct?

5  A.    That's correct.

6  Q.    And there's a date and time issued 8/27/12 on Government 1

7  and a time, 11:00 a.m., correct?

8  A.    Yes.

9  Q.    Then it's blank?

10  A.    It is.

11  Q.    On Defense 1?

12  A.    Yes.

13  Q.    The actual copy, okay.

14  A.    Correct.

15  Q.    You left with Mr. Harley.

16  A.    Correct.

17  Q.    Now, you -- your testimony was that you had this -- you

18  had -- I am showing Government 1 -- with you, and you showed it

19  to Mr. Harley?

20  A.    Yes.

21  Q.    Is there any reason you can't carry with you a document

22  that -- search and seizure warrant that had little or no

23  indicia of authenticity when you had what is -- what I will

24  determine a validly issued search warrant -- and you chose to

25  issue this blank piece of paper for all practical purposes,

1  blank piece of paper to Mr. Harley?  Any reason why you did

2  that?

3  A.    I had some copies printed out when the warrant was sent

4  down to the magistrate by e-mail, cc'd to me, and I printed out

5  some copies of that and ended up in my folder that day.  That's

6  how I ended up with them.  It wasn't an intentional attempt to

7  be deceptive.

8  Q.    Did Mr. Harley make any comments when he saw this?

9  A.    I don't recall that he did.  If he did, I don't remember

10 if he did.

11 Q.    Did he give you any reason for not signing your inventory?

12 A.    Yes.

13 Q.    What was that reason?

14 A.    He -- he wanted every document that we were taking listed

15 individually on inventory sheets, and I advised him that was

16 not feasible.  We took many boxes of what looked to be relevant

17 documents.  That was not just -- a time constraint.  It was not

18 feasible to list every document out in detail.

19 Q.    And --

20 A.    So he -- he wasn't -- in my impression he wasn't satisfied

21 with that and didn't want to sign the inventories.

22 Q.    And aside from that, he was otherwise very cooperative; is

23 that correct?

24 A.    Yes, he was.

25 Q.    As was Mrs. Harley?

1  A.   Yes, both of them.

2  Q.   Are you the only agent that had any conversation with Mr.

3  Harley that -- on that particular day?

4  A.   There may have been.  I don't recall any specific

5  conversations other than my interview with him and just -- just

6  general -- he made some comments now that I recall.  He did say

7  there was some things he felt were not -- that we were taking

8  that weren't on the -- on the list, the attachment,

9  specifically delineated on the attachment.

10  Q.   He never made any comment about Defense 1 --

11  A.   I don't recall that he did, no.

12  Q.   Any of your -- any of your colleagues or your other agents

13  or law enforcement -- other law enforcement that accompanied

14  you make any informal comments to Mr. Harley about what he

15  intends to do about the warrant or anything else?

16  A.   There might have been -- I think there was a task force

17  agent that might have spoke with him briefly.  I remember that.

18  Q.   Do you remember what that conversation was?

19  A.   It had to do again with Mr. Harley wanting every document

20  listed on an inventory in detail and that task force officer

21  reiterating that it wasn't feasible to do that.

22  Q.   On Defense 1, the document you left with Mr. Harley,

23  there's no case number on it, correct?

24  A.   No, not on Defense 1, no.

25  Q.   Did you know what the case number was?

1  A.    I didn't have it committed to memory at the time, but it

2  was on the copy that I showed him, the original I showed him at

3  the outset of the interview.

4  Q.    You could have filled that in right here if you wanted to?

5  A.    I could have handwritten that in, yes.

6  Q.    Did you -- and by the way, you were back and forth several

7  times on your own phone during the course of the search?

8  A.    I don't recall that I made calls from inside the

9  residence.  I made several calls before we made entry.

10 Q.    I didn't hear the answer.

11 A.    I'm sorry.  I don't remember making any phone calls from

12 inside the residence from my phone.

13 Q.    And you -- you never made any phone calls within your --

14 where Mr. Harley could have overheard you?

15 A.    No, I don't -- I don't recall that at all making any phone

16 calls.

17 Q.    You made phone calls, just not within his earshot,

18 correct?

19 A.    I don't recall make anything phone calls within the

20 residence during the search.

21 Q.    Could have made some outside the residence?

22 A.    No, I don't believe that I did.  I don't remember making

23 any calls.

24        MR. RUZZO:  If I may have one minute, Your Honor.

25        THE COURT:  Sure.

1  BY MR. RUZZO:

2  Q.    Agent, there's a case number on the inventory you left,

3  and I believe the case number is 318 B. -- looks like a P. H.

4  -- 109143.

5  A.    Yes.

6  Q.    And that's not the case number on Government 1?

7  A.    No.   That's our F.B.I. case number.   That's what that

8  number is.

9  Q.    That's an F.B.I. case number?

10  A.    Correct.

11  Q.    That is not a number you file under?

12  A.    No, no.

13         MR. RUZZO:   If I may have one moment, Your Honor.

14         THE COURT:   Sure.

15         MR. RUZZO:   One more question.

16  BY MR. RUZZO:

17  Q.    Never believe a lawyer when he says one more.   Agent, you

18  prepared a 302 -- you prepared a couple of them related to

19  search and conversations you had with Mr. Harley.   In your 302

20  -- I will show him the 302.   Do you have a copy of this with

21  you?

22  A.    Yes.

23  Q.    I just showed you what we -- what you have marked for as

24  an exhibit 16 -- marked Defense 2.   Do you recognize that?

25  A.    Yes.

1  Q.    That's the 302 you provided us?

2          MR. BRANDLER:  Just for the record -- there were two

3  302s.  I don't think the Court has either one.  This is the one

4  that dealt with the search and not the statement.

5          THE WITNESS:  This is what we call the search 302.

6  This is the administrative -- how we conducted the search and

7  times, what transpired in the search, not the substance of the

8  interview with Mr. Harley.  That was a separate report.

9  BY MR. RUZZO:

10 Q.    And if you would go down to -- let's see -- page two,

11 third full paragraph.

12 A.    Page two.

13 Q.    I believe a statement from you says, Harley was provided a

14 copy of a search warrant with attachments describing the

15 residence and items to be searched for and seized.

16 A.    Yes.

17 Q.    And you did provide Harley a copy; is that correct?

18 A.    Yes.

19 Q.    And you never provided him with Government 1; is that

20 correct?

21 A.    Other than showing it to him, no.

22 Q.    This is signed -- it's a signed warrant?

23 A.    I showed it to him, but I did not leave that copy with

24 him.

25 Q.    You chose to leave a blank -- what I'm referring to as a

1  blank piece of paper -- a form that could be filled in rather

2  than giving him what I think is a valid search, correct?

3  A.   I left him Defense 1, yes.

4        MR. RUZZO:  Nothing further, Your Honor.

5        THE COURT:  Any redirect?

6        MR. BRANDLER:  No, Your Honor.

7        THE COURT:  You may step down.

8        MR. BRANDLER:  We have nothing further.

9        THE COURT:  Mr. Ruzzo?

10       MR. RUZZO:  One moment, Your Honor.  We call Mr.

11 Harley, Your Honor.

12       RICHARD HARLEY, called as a witness, being duly

13 sworn, testified as follows:

14 DIRECT EXAMINATION

15 BY MR. RUZZO:

16 Q.   Mr. Harley, state your name and your address -- your

17 address for the record, please.

18 A.   My name is Richard Harley, Richard J. Harley.  My address

19 is North Slope 3, Unit 45 A., Shawnee on the Delaware 18356.

20 Q.   Mr. Harley, I'm sure you recall the events of August 29th,

21 2012?

22 A.   Yes, I do.

23 Q.   We just discussed here at some length.  It was your house

24 to be searched by the F.B.I. and other law enforcement,

25 correct?

24

1   A.   Yes.

2   Q.   You were home that day I take it?

3   A.   I was.

4   Q.   Agents came into your home?

5   A.   Yes.

6   Q.   Is that fair?

7   A.   Yes.

8   Q.   Mr. Browning was there?

9   A.   Yes.

10  Q.   And did you hear the agents knocking that day?

11  A.   No, no, I did not.

12  Q.   They did come in your home.  How did they get into your

13  house?

14  A.   They broke in.

15  Q.   And when agents came in -- when I say agents I mean law

16  enforcement generally.  They came in.  Who was at home?

17  A.   Just my wife and myself.

18  Q.   They searched your house?

19  A.   Yes.

20  Q.   Did there come a time when you had any discussion with

21  anybody from law enforcement?

22  A.   If I may elaborate a little bit?  I was downstairs on the

23  lower level when I heard the ruckus.  I was in the bathroom

24  downstairs.  I heard the ruckus when I came out of the

25  bathroom.  I ran upstairs, and when I saw -- I saw the agents

1  coming in the door -- at that time they were already in.  I

2  said to them, what's going on.  They did announce themselves as

3  being F.B.I. agents.  I said, let me see your warrant and no

4  response.

5  Q.    Whom did you address that question?

6  A.    Well, the agent -- whatever agent I saw first, I said, let

7  me see your warrant.  Nobody responded.

8  Q.    Did you think that was unusual?

9  A.    I did.  I watch a lot of Law and Order.

10 Q.    Unfortunately.  And that was immediately upon your contact

11 with the agents?

12 A.    Yes.

13 Q.    What happened?

14 A.    I asked to see the warrant.

15 Q.    Did you ever ask again to see a warrant?

16 A.    I did several times.

17 Q.    And what response did you get, if any?

18 A.    I got no response at that time other than the fact -- now

19 agent Browning come in -- he identified himself -- and asked my

20 wife and I to sit and be quiet at that time.

21 Q.    Did you comply with that request?

22 A.    Yes, we did.

23 Q.    Did there come a time when you had a conversation with

24 agent Browning?

25 A.    Yes, yes.

1  Q.    Where did that take place?

2  A.    That took place at my dining room table.  May I add, not

3  at that moment though -- when he came in and asked us to sit

4  and be quiet, Mr. Browning went into my kitchen and laid out a

5  lot of papers on my kitchen counter.

6  Q.    Just let me interrupt one moment.  Can you describe the

7  area of the kitchen and the dining room in your home?

8  A.    Well, they are both adjacent, and they are -- there's a

9  partition between the two which you can see into the kitchen.

10  It's like a -- I would say a counter that's between the dining

11  room and kitchen area.

12  Q.    Just a counter that separates the two areas?

13  A.    That's correct.

14  Q.    You can see and hear what goes on from one room to the

15  other?

16  A.    That's correct.

17  Q.    What happened next?

18  A.    Mr. Browning went in the kitchen as I said before and

19  spread his papers out and got on the phone.  And Mr. Browning

20  was on the phone for at least 45 minutes before he came back in

21  to the dining room area where my wife and I were sitting.

22  Q.    Was that 45 minutes continuously or off and on?

23  A.    Continuously.

24  Q.    After that, then you had a conversation with him .  Would

25  that be correct?

1  A.    Yes, when he -- he hung up the phone, came into the dining

2  room area, and I again I asked him to see a warrant.  He

3  hesitated for a moment, and I asked him again, let me -- I have

4  to see your warrant.  Nobody showed me a warrant at this time.

5  And he finally showed me -- he had a piece of paper.  It was

6  kind of folded over a little bit.  So I couldn't see it right

7  away.  He handed me the paper like this.  I opened it up, and I

8  am looking at it.  And I am reading it, but I don't see

9  anything on it.

10 Q.    One moment, Mr. Harley.  What you're looking at now is a

11 copy of Defense 1?

12 A.    This is the actual warrant he left.

13 Q.    It's a little bigger than what I showed the agent Defense

14 1?

15 A.    Yes.  This is the actual warrant that he left me -- with

16 me.

17 Q.    That's the warrant he left you?

18 A.    Yes.

19 Q.    Okay.  And then there's Defense 1, a copy of Defense 1?

20 A.    That's correct.

21 Q.    That's all he showed you?

22 A.    That was it.

23 Q.    That is the only -- is that the only document purporting

24 to be a warrant that you saw or were shown that day?

25 A.    Absolutely.  Absolutely.

1  Q.    And when was the first time you saw what was Government 1

2  here, purported to be what the agent showed you?

3  A.    This was about seven months later, sometime in March I

4  think it was when I got the discovery material.  And we were

5  going through discovery material, and I saw a signed warrant in

6  that discovery material.  That was the first time I saw a

7  signed warrant, my wife and I both.

8  Q.    And after you were shown that, did you continue your

9  conversation with the agent?

10 A.    When he was in my home?

11 Q.    Yes.

12 A.    No -- I was still looking to see where his signature was.

13 I was going through all the attachments and everything.  And

14 then I finally said, well, this doesn't appear to be a warrant

15 to me, it's not signed.  He didn't say anything to me.

16 Q.    Did you voice that concern with agent Browning or any of

17 the other agents that were in your home at that time?

18 A.    Mr. Browning was sitting on my left, and then there was

19 another special agent on my right.  He was there.  He didn't

20 say too much.  Mr. Browning did all of the talking, but there

21 was another agent on my right at that time.

22 Q.    And would you agree that the conversation lasted --

23 between you and the agent lasted about 45 minutes?

24 A.    That wasn't until he begun to ask me questions about

25 different things that I was involved with.  I remember that.

29

1  Other than that, Mr. Browning -- in fact, he got back on the

2  phone short after I asked to see the warrant.  I still had not

3  seen a warrant at that time.  And then he hung up the phone

4  again.  Then he came back again.  I asked to see a warrant

5  again.  That's when he finally give me the warrant, this blank

6  warrant.

7  Q.   The search -- I think the agent said the search lasted

8  about five hours.  Would that be about right?

9  A.   That's about right, yes.

10  Q.   I believe the testimony was, too, your conversation, I

11  think you agree, it was about 45 minutes off and on; is that

12  right?

13  A.   I would say that, yes.

14  Q.   What was agent Browning doing for the rest of the five

15  hours?

16  A.   He was on the phone most of the time.  In fact, it's funny

17  you ask me that because I heard Mr. Browning say something

18  about telephonic and I didn't know exactly what that meant at

19  the time, but I do know.  I pretty much -- I heard him -- both

20  my wife and I heard him say -- use the word telephonic.

21  Q.   You heard the agent testify that you refused to sign the

22  inventory?

23  A.   That's correct.

24  Q.   Why did you refuse to sign the inventory?

25  A.   After studying this warrant, blank piece of paper, I just

1  said to myself -- in fact I said to him, I don't think you have

2  a reason to be in my home.  You gave me a blank warrant.  I am

3  not signing anything what a blank warrant.

4  Q.   Is that why you didn't sign it, or is that what you told

5  the agent?

6  A.   That's what I told the agent.  I also added, too, they did

7  take my things, but I -- without giving me an itemized list.  I

8  mentioned that, too.  But it was both.  The warrant wasn't

9  signed and that he did not give me an itemized list as to what

10  they took from my home.

11  Q.   Did you have any other conversation with the agent after

12  he asked to you sign and you refused to sign the inventory?

13  A.   Not really.  At that time, during that period, I got a

14  phone call from my friend in Mississippi, Mr. White.

15  Q.   He allowed you to take the phone call?

16  A.   Yes.

17  Q.   He --

18  A.   He was sitting at my left when I took the phone call, yes.

19  Q.   And was that a business call?  What was -- what call did

20  you get?

21  A.   Mr. White and I --

22  Q.   Excuse me.  Did you place the call, or was the call --

23  A.   The call came to me, and I picked it up.  I asked him if

24  it was okay.  He said, you can pick up the phone, and I picked

25  it up.  It was Mr. White.  I mentioned, Edward, how are you --

1  he calls me frequently.  And I said, I can't talk right now

2  because the F.B.I. is here searching my home.  I said, I'm

3  looking at the warrant and the warrant is blank.  And that's

4  when Edward say, what -- he responded to me that way.  Mr.

5  Browning heard that.

6  Q.   He overheard the conversation?

7  A.   Yes, he mentioned it in his 302 about my conversation with

8  Mr. White.  He didn't elaborate on it, but that was part of the

9  conversation.

10 Q.   Did you have any conversation with any other agent either

11 formally or informally -- any other agent other than agent

12 Browning?

13 A.   Yes, on the way out, there was one agent that was standing

14 by my railing there, and I kept asking about the search warrant

15 on their way out.  And the one agent said to me, he says, I

16 know exactly what you're thinking, I'm reading your mind.  He

17 said you -- we don't have a search warrant but we have one back

18 at the office.  That's what he said to me.  My wife heard it,

19 too.

20 Q.   And you testified that you were concerned and brought up

21 questions about the delivery of the warrant several times?

22 A.   Yes.

23 Q.   Why were you so concerned about that?

24 A.   Again, there was nothing -- there was nothing on it,

25 nothing -- none of the lines were filled in.  There was no

1  signature, no date, no time, nothing.

2  Q.    Just so we're clear, your testimony is that you never saw

3  any other document that purported to be a search warrant?

4  A.    No, sir.  Had I seen another document I would have asked

5  him to see a copy that was signed.  That's what I would have

6  done if I seen one.

7  Q.    So we're clear, I am going to show you what's been marked

8  Government's Exhibit 1.  On August 29th, did you ever see that

9  document -- first identify the document, please.

10  A.    This purports to be a search warrant with a case number.

11  It has a scheduled time not to exceed ten days and --

12  Q.    Marked Government 1?

13  A.    Marked Government 1 and a signature line.

14  Q.    Your testimony is that you did not see this document on

15  August 29th?

16  A.    Absolutely not.

17         MR. RUZZO:  If I may have one moment, Your Honor.

18  Nothing further, Your Honor.

19  CROSS EXAMINATION

20  BY MR. BRANDLER:

21  Q.    Mr. Harley, the agent testified he placed two telephone

22  calls to your residence prior to making forced entry.  Did you

23  answer one of those phone calls?

24  A.    I didn't, no.  I was in the bathroom at the time.

25  Q.    But you answered the phone in the bathroom the last I

1  heard?

2  A.   I didn't have my phone in the bathroom with me.

3  Q.   Where was your phone?

4  A.   My phones are in the dining room area.  I have a phone in

5  the loft area, and I have a phone -- two phones in my bedroom.

6  Q.   The agent said what phone number he called.  So that's the

7  phone that I'm referring to that would be phone number

8  570-476-7600?

9  A.   None of those phones are in my bedrooms.

10  Q.   Was that phone located in your residence that day?

11  A.   Absolutely.

12  Q.   Where in your residence was it?

13  A.   In the loft and the dining room area.

14  Q.   It can't be two places at once?

15  A.   They are extension phones.

16  Q.   So two separate phones with that number?

17  A.   Exactly.

18  Q.   One in the loft and one in the dining room area?

19  A.   Yes.

20  Q.   Do you know who answered that phone?

21  A.   I don't.

22  Q.   But whoever did answer the phone would have heard whatever

23  Mr. Browning said which he testified that he identified himself

24  as an F.B.I. officer and they were there to execute a search

25  warrant?

1  A.    No, you're telling me that Mr. Browning said that he

2  talked on the phone to somebody?

3  Q.    Yes.  He said he identified himself and someone hung up.

4  I thought that was his testimony.

5  A.    Certainly wasn't me because I was in the bathroom at that

6  time.

7  Q.    Did you talk to your wife about that after the search and

8  say, hey, honey, did you get a phone call and hang up on the

9  F.B.I. guy?

10 A.    My wife and I were asked to sit down and be quiet.

11 Q.    After the search was over, did you talk to her about that?

12 A.    About the phone?

13 Q.    Yeah.

14 A.    No, no.  I didn't hear the phone ring.

15 Q.    So let me ask you this.  You have no -- you don't dispute

16 the fact that Mr. Browning showed you Defense Exhibit 2, which

17 is a copy of the search warrant which has no handwriting on it,

18 the unsigned version, he showed that to you?

19 A.    A blank one, yes.

20 Q.    You can call it blank.  You can characterize it any way

21 you want.  Defense Exhibit 2.

22 A.    What about it?

23 Q.    That's what he showed you?

24 A.    The blank one, yes.

25 Q.    In addition to -- one -- Defense Exhibit 1, that's only a

1   one-page document.  In addition to that page there was an

2   attachment A. and B. he showed you as well; is that correct?

3   A.    That's correct.

4   Q.    That's not on Defense Exhibit 1, is it?

5   A.    Are you talking about what he showed me?

6   Q.    No.  I am talking about what your attorney today

7   introduced into evidence as Defense Exhibit 1 is a one-page

8   document without attachments A. and B.?

9   A.    That's correct, yes.

10  Q.    Attachments A. and B. are multiple pages?

11  A.    That's correct.

12  Q.    That's not attached to Defense Exhibit 1, correct?

13  A.    No.

14  Q.    But you -- but you were shown Defense Exhibit 1 plus

15  attachments A. and B. at the time of this search?

16  A.    That's correct.

17  Q.    You said that -- you questioned Mr. Browning how come it's

18  not signed.  You said this doesn't appear to be a warrant, it's

19  not signed -- you said that to him?

20  A.    I said to him -- what I am looking at is not signed,

21  there's nothing filled in, nothing filled in.

22  Q.    And his response to you, was it not, to show you a

23  signature where Mr. Mannion the magistrate signed it, he

24  pointed it to you?

25  A.    Sir, if he had shown me a signed warrant before he left

36

1  the house, I would have asked him to leave me the signed

2  warrant.

3  Q.    That's not my question what you would have had he done it.

4  When you questioned him about whether or not the warrant was

5  official and signed, isn't it a fact he pointed to you the

6  signature of the magistrate who issued the warrant?

7  A.    Not at all.

8  Q.    In any event, you were very upset by that, you thought

9  they have no authority to be there because it was an unsigned

10 warrant?

11 A.    Yes, absolutely.

12 Q.    You said you were so upset you refused to sign the

13 property receipt?

14 A.    That's correct.

15 Q.    But yet you were interviewed by Mr. Browning for 45

16 minutes to an hour.  You answered all his questions about your

17 dealings with oil, Enpetro, federal reserve notes and every

18 other substantive matter during that time period, correct?

19 A.    That's correct, I did.

20 Q.    So although you were so upset they have no authority to be

21 in the house, on the other hand you weren't so upset that you

22 weren't prepared to talk to him?

23 A.    I wanted him to know my side of it, the truth at that

24 time, yes.

25          MR. BRANDLER:  No further questions.

1          THE COURT:  Any redirect?

2          MR. RUZZO:  One question.

3    REDIRECT EXAMINATION

4    BY MR. RUZZO:

5    Q.   Mr. Harley, counsel asked you if you were so upset you sat

6    down and talked to the agents and you were cooperative; is that

7    correct?

8    A.   Yes.

9    Q.   You answered all of his questions?

10   A.   Yes, I did.

11   Q.   And during that time, did you again ask to see a signed

12   warrant?

13   A.   I did.  I did.  All the way until they were going out the

14   door, I said, I still haven't seen a signed warrant.  They know

15   that.

16   Q.   And even though you were upset, you never gave anybody --

17   never -- you never resifted the search, physically resisted?

18   A.   No.

19   Q.   Or tried to prevent them from searching your house in any

20   physical way?

21   A.   Not at all.

22   Q.   Despite the fact as you testified, your door was broken

23   into, and at the time you believed -- tell me if I'm correct --

24   you believed --

25          MR. BRANDLER:  Your Honor, I will object.  He's kind

1    of arguing at this point.  Is there a question?

2                THE COURT:  I'll allow it.  Go ahead.

3    BY MR. RUZZO:

4    Q.    Is the reason you were upset that you believed they had no

5    authority in your house?  Is that the reason you were upset?

6    A.    Absolutely.  And, in fact, that's why I called your office

7    that day, Mr. Ruzzo.  I called your office.

8    Q.    Let's not get into what you told me.

9                MR. RUZZO:  I have nothing further, Your Honor.

10               THE COURT:  All right.  You may step down.

11               THE WITNESS:  Thank you very much, Your Honor.

12               MR. BRANDLER:  We have nothing further.

13               THE COURT:  Mr. Ruzzo?

14               MR. RUZZO:  Brief argument.

15               THE COURT:  Sure.  Mr. Brandler?

16               MR. BRANDLER:  Your Honor, obviously there is a

17   factual dispute here.  I think it's an irrelevant factual

18   dispute for the purpose of this motion to suppress.  Even if we

19   are going to assume for the sake argument, which we don't

20   accept, that Mr. Browning did not have a copy of the signed

21   warrant at the time he issued it and did not leave a copy of

22   the signed warrant, that is not grounds for a suppression to

23   suppress the evidence.  I filed a brief on this.

24               I cited numerous cases on this point that universally

25   hold there's no requirement under the Constitution for a valid

1  search warrant to be left with the resident -- a signed

2  version.  Actually the Constitution doesn't even require a

3  magistrate to sign the warrant.  The Constitution requires the

4  issuance of a warrant by a neutral and detached magistrate.

5  There is which no dispute here we did have a signed warrant two

6  days prior to the entry of this premises.

7          So based on that, I really think as a legal issue the

8  motion fails whether or not the Court wants to credit Mr.

9  Browning's testimony or Mr. Harley's testimony.  Thank you.

10          THE COURT:  Thank you.

11          MR. RUZZO:  I disagree with my colleague about the

12  legal issues.  He cited numerous cases in his brief saying that

13  an unsigned warrant is a technical violation.  I agree with

14  him.  An unsigned warrant is a technical violation if there are

15  other indicia of authenticity in the warrant.  The cases that

16  he cites actually say that.  I think we both cited United

17  States versus Jackson, which is a middle district case.

18          And in Jackson they said, well, a violation of rule

19  41 is a technical violation, it's still a violation, but the

20  remedy is not suppression because there were five other things

21  in there -- five other issues which indicated that, well, the

22  lack of his signature is not dispositive on the issue.  It was

23  a state case up on habeas, Jackson was.  They had indicia of

24  reliability.  They had a signed -- I'm sorry -- a sealed

25  district justice stamp, handwritten warrant number indicating

1  the warrant was filed, contained handwritten date and other

2  things in Jackson, which is why I cited it for the proposition

3  that all of those things were missing on the warrant they

4  showed Mr. Harley.  If you credit the F.B.I.'s testimony as

5  credible, just because Mr. Browning is an F.B.I. agent that

6  doesn't mean he's more credible than the version Mr. Harley

7  gave you.

8         Every other case he cited -- they are both in our

9  briefs, Your Honor -- it asks you -- there was a -- a violation

10 of rule 41 is not a Constitutional violation, but again, that

11 was just -- there was just no signature.  He cited Marks,

12 United States versus Marks, Fifth Circuit case.  In that case,

13 again, they said, well, they didn't show the defendant --

14 eventual defendant a signed copy of the warrant.

15         But what happened was there they took a suitcase --

16 seized a suit case incident to arrest.  The suitcase was at the

17 D.E.A. office.  Even then they applied for a warrant and got

18 the warrant and the defendant wasn't present.  24 hours later

19 they take a valid signed, sealed, whole bit, to the residence

20 of the defendant and served it on him.

21         So all of those cases there's a signature missing on

22 the warrant.  And if you recall, I had a dispute with the

23 agent, and he says, Defense 1 was not substantially different

24 from Government 1.  Come on.  It is.  There's a difference.

25         Factually here's some of the questions that I have,

1  Your Honor.  Why would an experienced agent have a blank form?

2  It's not a search warrant.  Just because it says search warrant

3  on the top doesn't make it a search warrant.  In 1775 British

4  agents ran around with pieces of paper like that.  That's one

5  of the causes of the revolution.  What's to say if agent -- or

6  12 agents are outside my door, and I say, let me see your

7  warrant, let me see your authority to come in my castle, and

8  they are either unable or unwilling to show it to me, I can

9  think they have no authority to come in my house.

10          THE COURT:  Do you have a case that says that?

11          MR. RUZZO:  Excuse me?

12          THE COURT:  Do you have a case that says that?

13          MR. RUZZO:  Do I have a case that says I have --

14          THE COURT:  What you just said.

15          MR. RUZZO:  I don't think they have a case other the

16  other way.

17          THE COURT:  Well, all right.

18          MR. RUZZO:  I'm talking just as a -- policy and

19  reason that the reason that they have -- the reason that we

20  have a warrant clause absent exigent circumstances and you need

21  a warrant, I think that's a policy reason why they have a

22  warrant so somebody can say let me in your house.

23          THE COURT:  Did you dispute that this warrant was

24  issued?

25          MR. RUZZO:  I don't know if it was or it wasn't.  I'm

1 not convinced.  Eventually it was issued, yes.

2          THE COURT:  Pardon?

3          MR. RUZZO:  Eventually it was issued.  There's no

4 question about that.  I mean, they presented it here.

5          THE COURT:  You don't -- you don't know whether it

6 was issued on the date it indicates it was issued?

7          MR. RUZZO:  That's correct.  I think there's some

8 question about that, Your Honor.  I think there's a question of

9 whether -- I think there is a question of whether or not Mr.

10 Harley was actually shown or saw that particular warrant.  I

11 question an experienced agent not leaving that -- the good cop

12 --

13          THE COURT:  I understand your point there.  That may

14 -- but that may be just a question of practice.

15          MR. RUZZO:  Thank you, Your Honor.

16          THE COURT:  Thank you.

17          MR. BRANDLER:  May I just briefly respond?

18          THE COURT:  Sure.

19          MR. BRANDLER:  On the issue whether or not this

20 warrant was actually issued on -- two days prior to the

21 execution of the warrant, there is a case number.  It was filed

22 with the magistrate's office.  I think the Court can take

23 judicial notice that it was actually issued two days prior to

24 the execution of the warrant.  Really can't be a dispute that

25 this was issued two days prior to the execution of the warrant.

1          And as far as rule 41 is concerned, as conceded by

2   defense counsel, five technical violations of the rule 21 even

3   if there is one is -- the remedy is not suppression.  I don't

4   even question whether or not there was a violation of rule 41

5   because rule 41 doesn't say that you have to leave a copy of

6   the signed warrant with the resident.  Rule 41 subsection F. 1

7   C. says the officer executing the warrant must give a copy of

8   the warrant and a receipt for the property taken to the person

9   from whom or from whose premises the property was taken or

10  leave a copy of the warrant and receipt at the place where the

11  officer took the property.

12          It never talks about signed warrants because there is

13  no requirement in rule 41 that a warrant be signed.  It just

14  has to be issued.  So I think the case is directly on point

15  here.  The cases that counsel is relying on are cases where

16  there was no signed warrant prior to the execution of the -- of

17  the -- prior to the execution, and even in those cases there

18  wasn't a suppression.

19          MR. RUZZO:  Well, Your Honor, if the government --

20  I'm sorry, Defendants 1 was a copy they left with him, that's

21  no warrant.  That's no warrant.  That's a piece of paper.  And

22  it -- another thing that is just curious to me is that the

23  warrant wasn't filed until 14 days later, 12, 13 days,

24  September 12th.  The warrant was filed September 12th.

25          THE COURT:  I didn't hear that.

44

1          MR. BRANDLER:  I think what he's referring to is the

2    return on the warrant which is required under rule 41.

3          THE COURT:  That's not in evidence.  Are you offering

4    Defense 1?

5          MR. RUZZO:  Yes, Your Honor.

6          THE COURT:  Okay.  Do we have it?

7          MR. BRANDLER:  Defense 2 you mentioned as well.

8          THE COURT:  Defense 1.  Incidentally, is it a fact

9    that the attachments were on that?

10         MR. RUZZO:  Excuse me?

11         THE COURT:  Is it a fact the attachments were on

12   Defense 1?  I think Mr. Harley said so.

13         THE DEFENDANT:  Yes, yes.

14         THE COURT:  Are you offering Defense 2?

15         MR. RUZZO:  No, Your Honor.  We just used that for --

16         MR. BRANDLER:  Nothing else.

17         THE COURT:  Anything else, Mr. Ruzzo?

18         MR. RUZZO:  No, Your Honor.

19         THE COURT:  You'll hear from me shortly.  Thank you.

20

21

22

23

24

25

1                      REPORTER'S CERTIFICATE

2

3      I, LAURA BOYANOWSKI, Official Court Reporter for the

4  United States District Court for the Middle District of

5  Pennsylvania, appointed pursuant to the provisions of Title 28,

6  United States Code, Section 753, do hereby certify that the

7  foregoing is a true and correct transcript of the

8  within-mentioned proceedings had in the above-mentioned and

9  numbered cause on the date or dates hereinbefore set forth; and

10  I do further certify that the foregoing transcript has been

11  prepared by me or under my supervision.

12

13

14                    _____
                      Laura Boyanowski, RMR, CRR

15                     Official Court Reporter

16  REPORTED BY:

17      LAURA BOYANOWSKI, RMR, CRR
        Official Court Reporter

18      United States District Court
        Middle District of Pennsylvania

19      Scranton, PA  18503

20

21        (The foregoing certificate of this transcript does not
  apply to any reproduction of the same by any means unless under

22  the direct control and/or supervision of the certifying
  reporter.)

23

24

25